## 2001 CR 00793 STATE OF OHIO -VS- ROBERTS, DONNA MARIE JMS

Case Type:
CR - Criminal
Case Status:
CLOSED
File Date:
12/21/2001
DCM Track:

Action:
AGGRAVATED MURDER (prior calculation/design)
Status Date:
12/20/2001
Case Judge:
STUARD, JOHN M
Next Event:

| All Information | Party | Charge | Ticket/Citation # | Event | Docket | Financial | Checks | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 12/20/2001 | FILING FEE FOR EACH CAUSE OF ACTION AND EACH UNDERTAKING<br>Amount Owed: $27.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $27.00 | |
| 12/20/2001 | PRISONER FEES<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $11.00 | |
| 12/20/2001 | GENERAL REVENUE FUND<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $11.00 | |
| 12/20/2001 | VICTIMS OF CRIME<br>Amount Owed: $30.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $30.00 | |
| 12/20/2001 | SPECIAL PROJECTS JUDGES<br>Amount Owed: $50.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $50.00 | |
| 12/21/2001 | WARRANT ON COMPLAINT AND RETURN OF SERVICE FILED. | $0.00 | |
| 12/21/2001 | COMPLAINT AND AFFIDAVIT FILED UNDER SEAL BY ORDER OF THE COURT | $0.00 | |
| 12/21/2001 | DEFT APPEARED WITH COUNSEL. NO PLEA ENTERED. NO BOND SET. | $0.00 | |
| 12/26/2001 | MOTION TO INTERVENE WITH SERVICE FILED BY ATTY STEPHEN BOLTON. | $0.00 | |
| 12/28/2001 | PRELIMINARY HEARING 12/31/2001 11:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 12/28/2001 | DIRECT PRESENTMENT FOR<br>CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES<br>CT 2: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES<br>CT 3: AGG BURGLARY (F1) W/FIREARM SPEC<br>CT 4: AGG ROBBERY (F1) W/FIREARM SPEC | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 12/28/2001 | INDICTMENT AND SUMMONS FILED BY PROSECUTOR'S OFFICE AND COPIES OF SAME ISSUED TO SHERIFF.<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 123746 Date: 04/29/2008 | $2.00 | |
| 12/28/2001 | MOTION OF THE VINDICATOR PRINTING CO IN OPPOSITION TO DEFT DONNA M ROBERTS MOTION TO SEAL COURT RECORDS WITH SERVICE FILED BY ATTY DAVID MARBURGER. | $0.00 | |
| 12/28/2001 | NOTICE OF APPEARANCE AS CO-COUNSEL WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 12/28/2001 | DEFTS MOTION AND MEMORANDUM TO HOLD AFFIDAVIT AND EXHIBITS UNDER SEAL WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 12/31/2001 | NOT GUILTY PLEA TO ARRAIGNMENT ON INDICTMENT & SUMMONS NO BOND SET | $0.00 | |
| 12/31/2001 | SUMMONS ON INDICTMENT RETURNED BY SHERIFF ON DONNA MARIE ROBERTS SHERIFF ALTIERE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 123746 Date: 04/29/2008 | $2.00 | |
| 12/31/2001 | CAPIAS RETURNED AND ENDORSED BY SHERIFF ON DONNA MARIE ROBERTS SHERIFF ALTIERE | $0.00 | |
| 01/03/2002 | PRE TRIAL 01/30/2002  09:00 AM<br>JUDGE:HON. JOHN M. STUARD LOC:COURT 2<br>(N1-3-02) | $0.00 | |
| 01/04/2002 | CERTIFIED MAILER NUMBER 0891 801 SENT TO: THE SUPREME COURT OF OHIO<br>Amount Owed: $5.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $5.00 | |
| 01/07/2002 | VICTIM'S RIGHTS NOTIFICATION FILED. | $0.00 | |
| 01/07/2002 | DEFENDANT'S NOTICE OF REQUEST FOR DISCOVERY FILED BY DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 01/07/2002 | DEFENDANT'S MOTION FOR NOTICE OF INTENTION TO USE EVIDENCE FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 01/14/2002 | CERTIFIED MAIL NUMBER 891801 RETURNED ENDORSED FROM THE SUPREME COURT OF OHIO ON 1/9/02 BY ? | $0.00 | |
| 02/01/2002 | HEARING ON PENDING MOTIONS 05/23/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/01/2002 | JURY TRIAL 11/18/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/01/2002 | 963/427 WAIVER OF SPEEDY TRIAL FOR 300 DAYS UNTIL 11/18/02<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 02/11/2002 | DEFENDANT'S MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS FILED FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 02/11/2002 | DEFENDANT'S MOTION FPR DISCOVERY FILED  BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 02/20/2002 | MOTION TO DETERMINE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ. | $0.00 | |
| 02/26/2002 | DEFENDANT'S MOTION FOR COMPREHENSIVE VOIR DIRE EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 03/13/2002 | NOTICE TO SUPREME COURT (COPY) CC02008 | $0.00 | |
| 03/15/2002 | STATE'S REQUEST FOR RECIPROCAL DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/15/2002 | STATE'S RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/15/2002 | STATE'S RESPONSE TO DEFENDANT'S REQUEST BILL OF PARTICULARS FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/20/2002 | MOTION OF INTEREST PARTY FILED BY ATTORNEY ROSEMARY MILBY ATTORNEY FORD MOTOR CREDIT COMPANY FILED | $0.00 | |
| 04/16/2002 | STATES SECOND SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/18/2002 | STATES THIRD SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 05/20/2002 | HEARING ON PENDING 07/18/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 06/18/2002 | DEFENDANT'S MOTION FOR COMPEHENSIVE VOIR DIRE EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN B JUHASZ | $0.00 | |
| 06/18/2002 | DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE EVIDENTIARY HEARING REQUESTED FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN J JUHASZ | $0.00 | |
| 07/09/2002 | DEFENDANT'S MOTION TO SUPPRESS EVIDENCE REQUEST FOR EVIDENTIARY HEARING FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN B JUHASZ | $0.00 | |
| 07/15/2002 | DEFENDANT'S MOTION FOR ALTERNATING VOIR EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 07/15/2002 | DEFENDANT'S MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE<br>RECORD FILED BY THE DEFENANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 07/18/2002 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATIONS UNTIL PROSECUTION HAS SHOWN PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | STATE'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO DETERMINE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPREHENSIVE VOIR DIRE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | DEFENDANT'S MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL REQUEST FOR ORAL HEARING FILED BY THE DEFENDANT'S ATTORNEY'S JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 07/19/2002 | 976/309 ENTRY OF STIPULATION REGARDING DEFTS JULY 9, 2002 MOTION TO SUPPRESS. SEE J/E. 7/19/02  COPIES SENT TO: J INGRAM, J JUHASZ, S BOLTON, D MARBURGER, A MILLETTE & PROSECUTOR<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 07/19/2002 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.22 | |
| 07/23/2002 | HEARING ON PENDING MOTIONS 09/20/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 08/26/2002 | DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 09/11/2002 | 981/507 DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT THE DEATH PENALTY IS BEING SOUGHT IS DENIED. SEE J/E. 9/11/02 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $6.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.00 | |
| 09/11/2002 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 09/12/2002 | DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW REQUEST FOR HEARING WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 09/13/2002 | DEFTS MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/16/2002 | DEFTS MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULLING OBJECTIONS PLACED ON THE RECORD WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/16/2002 | DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/20/2002 | HEARING ON PENDING MOTIONS 10/10/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/04/2002 | MOTION TO SUPPRESS WITH SERVICE FILED BY ATTY GERALD INGRAM | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM CONTRA TO DEFTS MOTION TO DISMISS INDICTMENT: OR IN ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO HAVE REASONS FOR DEFENSE OBJECTIONS AND REASONS FOR OVERRULING DEFTS OBJECTIONS PLACED ON RECORD WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO PROHIBIT THE USE OF PEREMPTORY CHALLENGES TO EXCLUDE VERIREMEN WHO EXPRESS CONCERNS ABOUT IMPOSING CAPITAL PUNISHMENT WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION FOR ALTERNATING VOIR DIRE WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MOTION FOR DEFT TO SUBMIT TO HANDWRITING EXEMPLARS WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | STATES FOURTH SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | 983/808 MOTIONS HEARING SCHEDULED FOR 9/20/02 AT 9:00 AM IS RESCHEDULED TO 10/10/02 AT 1:00 PM. 10/10/02 COPIES SENT TO: C BECKER, K BAILEY, TR CO PROSECUTOR, J INGRAM AND J JUHASZ<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 10/15/2002 | HRG ON MOTION TO SUPPRESS 11/08/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 10/21/2002 | STATUS CONFERENCE 10/24/2002  11:30 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 10/25/2002 | 985/232 WAIVER OF SPEEDY TRIAL FOR 210 DAYS UNTIL 4/7/03<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/29/2002 | JURY TRIAL 04/07/2003  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 11/01/2002 | PRE TRIAL 12/19/2002  08:45 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 12/03/2002 | DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONST ART IV, 2 AND 3 AND ORC ANN 2929.05 AND 2953.02 AND REQUEST FOR HEARING WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 12/20/2002 | PRE TRIAL 01/02/2003  08:45 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 01/03/2003 | SUPPRESSION HEARING 02/26/2003  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | FINAL PRE TRIAL 03/26/2003  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | JURY TRIAL 04/08/2003  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | 995/415 WAIVER OF SPEEDY TRIAL FOR ADDITIONAL 45 DAYS; TRIAL DATE APRIL 8, 2003.<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 03/03/2003 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/17/2003 | NOTICE OF OPEN FILE DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/18/2003 | DEFENDANT'S MOTION FOR ORDER GRANTING EXPERT ACCESS TO DEFENDANT IN COUNTY JAIL FILED BY THE DEFENDANT'S ATTORNEY JOHN JUHASZ | $0.00 | |

10/20/21, 11:18 AM | Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 03/18/2003 | 996/977 JUDGMENT ENTRY GRANTING EXPERT ACESS. 3/18/03 CC SENT TO: C BECKER, K BAILEY, J G INGRAM, J JUHASZ, DR T EBERLE & T ALTIERE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 03/18/2003 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.22 | |
| 03/21/2003 | DEFENDANT'S POST SUPPRESSION HEARING MEMORANDUM FILED BY THE DEFENDANT'S ATTORNEY GERALD INGRAM AND JOHN JUHASZ | $0.00 | |
| 04/04/2003 | 998/433 DEFTS MOTION TO SUPPRESS IS DENIED. 4/4/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $6.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.00 | |
| 04/04/2003 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 04/07/2003 | PROPOSED ORIENTATION INSTRUCTIONS AS TO PROCEDURE IN A CAPITAL CASE FILED BY THE DEFENDANT'S ATTORNEY J GERALD INGRAM | $0.00 | |
| 04/07/2003 | HEARING ON MOTION TO SUPPRESS EVIDENCE FILED BY THE DEFENDANT'S ATTONREY J GERALD INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 04/07/2003 | NOTICE OF APPEAL TO THE 11TH APPELLATE COURT FILED BY ATTY J JUHASZ | $0.00 | |
| 04/07/2003 | DEFENDANTS MOTION TO CHANGE VENUE REQUEST FOR CLOSED ORAL HEARING FILED BY ATTY INGRAM AND JUHASZ | $0.00 | |
| 04/08/2003 | 998/713 MANDATE FROM COURT OF APPEALS. THE INSTANT APPEAL IS DISMISSED FOR LACK OF JURISDICTION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 04/08/2003 | SUBPOENA RETURNED AND ENDORSED ON ANDREW HARVEY BY SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/09/2003 | SUBPOENA RETURNED AND ENDORSED ON JOSE SANCHEZ MAHONING COUNTY SHERIFF'S DEPARTMENT<br>Amount Owed: $1.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.00 | |
| 04/10/2003 | PRELIMINARY INSTRUCTIONS (DEFENDANT'S SUBMISSION) FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 04/10/2003 | DEFENDANT'S MOTION FOR SPECIFIC DISCLOSURE OF DUE PROCESS MATERIAL FILED BY THE DEFENDANT'S ATTONREY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 04/14/2003 | STATE'S FIFTH SUPPLEMENTAL RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON MELVIN WILLIAMS MAHONING COUNTY SHERIFF<br>Amount Owed: $6.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.60 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON SHELIA FIELDS MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JEFFREY DIAMANTES MAHONING COUNTY SHERIFF<br>Amount Owed: $27.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $27.40 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JOSE FLORES RICHLAND COUNTY SHERIFF<br>Amount Owed: $2.50<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.50 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JIM MCCOY CUYAHOGA COUNTY SHERIFF<br>Amount Owed: $16.27<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $16.27 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON CHRIS GEAR MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON RALPH ROBERTS MAHONING COUNTY SHERIFF<br>Amount Owed: $14.50<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $14.50 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JAMES CULWELL FRANKLIN COUNTY SHERIFF<br>Amount Owed: $2.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JILL KENYON SHERIFF ALTIERE<br>Amount Owed: $4.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JENNIFER ROBINSON MAHONING COUNTY SHERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JEFFREY PASCARELLA MAHONING COUNTY SHERIFF<br>Amount Owed: $8.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.60 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON RITA MORRISON MAHNING COUNTY SJERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON RITA MOSSISON SHERIFF ALTIERE | $0.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JOHN GUZIK MAHONING COUNTY SHERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON MIGUEL DIAZ MAHONING SHERIFF ALTIERE<br>Amount Owed: $6.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.60 | |
| 04/25/2003 | TRIAL STIPULATION FILED BY THE DEDENDANT'S ATTORNEY ALONG WITH THE PROSECUTOR'S OFFICE | $0.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON FRANK REYNOLDS NOT SERVED MAHONING COUNTY SHERIFF<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JAMES DANIELS MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON BRIDGET PAUL SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON PAULA CARSON SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/25/2003 | SUBPOENA RETURNED UNABLE TO SERVE IN TIME FOR HEARING (KRIS ELLINGTON) | $0.00 | |
| 04/29/2003 | SUBPOENA RETURNED - UNABLE TO SERVE IN TIME FOR HEARING - NEW ADDRESS 2747 RANDOLPH NW, WARREN, OH 44485 (SANTIAGO MASON) | $0.00 | |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 639

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 05/12/2003 | 1001/295 1 - DEFTS MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT IS OVERRULED.<br>2 - DEFTS MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD IS GRANTED IN PART. THE COURT WILL PROVIDE ITS REASONS FOR OVERRULING ANY OBJECTIONS ON THE RECORD IF REQUESTED BY EITHER PARTY.<br>3 - DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL IS OVERRULED.<br>4 - DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW IS OVERRULED.<br>5 - DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION IS OVERRULED.<br>6 - DEFTS MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL IS OVERRULED.<br>7 - DEFTS MOTION FOR ALTERNATING VOIR DIRE EXAMINATION IS WITHDRAWN.<br>8 - DEFTS MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS FILED 2/11/02 IS GRANTED.<br>9 - DEFTS MOTION TO DETERMINE THE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE IS OVERRULED TO THE EXTENT THAT THE COURT WILL DETERMINE BASED UPON THE APPLICABLE LAW THE STANDARD FOR EXCUSING JURORS.<br>10 - DEFTS MOTION FOR COMPREHENSIVE VOIR DIRE EXAMINATION IS GRANTED AND THE COURT WILL PERMIT THE PARTIES 45 MINUTES PER SIDE TO INDIVIDUALLY VOIR DIRE THE PROSEPECTIVE JURORS.<br>11 - DEFTS MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE IS OVERRULED.<br>12 - STATES MOTION TO HAVE THE DEFT SUBMIT TO HANDWRITING EXEMPLARS IS MOOT DUE TO THE STIPULATED ENTRY FILED ON 4/25/02.<br>13 - DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONSTITUTION ART IV, 2 AND 3 AND ORC 2929.05 AND 2953.02 IS OVERRULED.<br>14 - DEFTS MOTION TO CHANGE VENUE IS OVERRULED.<br>5/12/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 05/12/2003 | DEFENDANT'S MOTION IN LIMINE HEARING REQUEST OR HEARING FILED BY THE DEFENDANT'S ATTORNEY JERRY INDRAM AND JOHN JUHASZ | $0.00 | |
| 05/12/2003 | DEFENDANT'S MOTION IN LIMINE CONCERING EXTRANEOUS STATEMENTS IN LETTERS AND TAPES FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM & JOHN JUHASZ | $0.00 | |
| 05/12/2003 | STENOGRAPHER FEE FILED BY KELLY J WILSON OFFICIAL COURT REPORTER<br>Amount Owed: $125.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $125.00 | |
| 05/13/2003 | WITNESS FEES FOR CHRIS MONYAK<br>Amount Owed: $24.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $24.00 | |
| 05/14/2003 | WITNESS FEES<br>JAMES DANIELS<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 05/14/2003 | WITNESS FEES<br>$283.90<br>Amount Owed: $283.90<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 132123  Date: 08/25/2008 | $283.90 | |
| 05/15/2003 | WITNESS FEES  SANTIAGO MASON<br>Amount Owed: $24.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $24.00 | |
| 05/15/2003 | STIPULATION FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 05/16/2003 | DEFENDANT'S MTION IN LIMNE REQUEST FOR HEARING FILED BY THE DEFENDANT'S ATTORNEY JERRY AND ATTORNEY JOHN JUHASZ | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/22/2003 | 1002/478 JURORS MARGARET KAY AND TERRY GRAY ARE ORDERED BY THIS COURT NOT TO REPORT TO THEIR PLACES OF EMPLOYMENT DURING THE DURATION OF THEIR JURY SERVICE IN THE ABOVE STYLED CASE. THIS ORDER SHALL REMAIN IN EFFECT UNTIL A FINAL VERDICT IS REACHED IN THIS CASE IN THE GUILT PHASE AS WELL AS THE PENALTY PHASE IF SUCH PHASE IS NECESSARY. 5/22/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/22/2003 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 05/22/2003 | 1004/867 ORDERED THAT JURORS MARGARET KAY & TERRY GRAY ARE NOT TO REPORT TO PLACES OF EMPLOYMENT DURING DURATION OF JURY SERVICE IN THIS CASE 06-30-03 COPIES TO J GERALD INGRAM, JOHN JUHASZ & PROS<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/27/2003 | DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL FILED BY THE DEFENDANT'S ATTOENRY J. INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/27/2003 | DEFENDANT'S PROPSED INSTRUCTION TO TRIAL JURY FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/27/2003 | CHARGE IF THE COURT FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/29/2003 | 1002/761 VERDICT FOR PLAINTIFF - COUNT ONE - COMPLICITY TO AGGRAVATED MURDER (PRIOR CALCULATION AND DESIGN)<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/762 VERDICT FOR PLAINTIFF COUNT ONE - VERDICT ON SPECIFICATION ONE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/763 VERDICT FOR PLAINTIFF  COUNT ONE - VERDICT ON SPECIFICATION TWO<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/764 VERDICT FOR PLAINTIFF COUNT TWO - COMPLICITY TO AGGRAVATED MURDER (FELONY MURDER)<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/765 VERDICT FOR PLAINTIFF COUNT TWO VERDICT ON SPECIFICATION ONE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/766 VERDICT FOR PLAINTIFF COUNT TWO - VERDICT ON SPECIFICATION TWO<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/767 VERDICT FOR PLAINTIFF COUNT THREE COMPLICITY TO AGGRAVATED BURGLARY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/768 VERDICT FOR PLAINTIFF COUNT THREE - VERDICT ON FIREARM SPECIFICATION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/769 VERDICT FOR PLAINTIFF COUNT 4 COMPLICITY TO AGGRAVATED ROBBERY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/29/2003 | 1002/770 VERDICT FOR PLAINTIFF COUNT FOUR - VERDICT ON FIREARM SPECIFICATION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: 128021  Date: 06/30/2008 | $2.00 | |
| 06/03/2003 | MOTION TO MERGE DEATH SPECIFICATIONS FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT READMISSION OF CERTAIN EXHIBITS FROM THE FIRST TRIAL PHASE FILED BY THE DEFENDANT'S ATTORNEY'S ATTORNEY JERRY INGRAM AND ATTORENY JOHN JUHASZ | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT REFERENCE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AT CERTAIN TIMES FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT REFERENCE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AT CERTIN TIMES FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT IMPROPER COMMENT BY PROSECUTOR ON DEFENDANT'S UNSWORN STATEMENT FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | PROPOSED INSTRUCTION TO JURY FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/05/2003 | 1003/391 JURY FINDING AND RECOMMENDATION OF DEATH SENTENCE. COUNT ONE SPECIFICATION ONE: AGGRAVATED BURGLARY<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 06/05/2003 | 1003/393 JURY FINDING AND RECOMMENDATION OF DEATH SENTENCE. COUNT ONE SPECIFICATION TWO: AGGRAVATED ROBBERY<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 06/13/2003 | SENTENCING HEARING 06/20/2003  01:30 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 06/16/2003 | 1003/911 THE COURT FINDS THAT THERE IS NO AUTHORITY TO ORDER A PRE-SENTENCE INVESTIGATION AND REPORTS, AS WAS ORDERED BY THE COURT ON 6/4/03. AS SUCH A REPORT MAY BE PREPARED ONLY AT THE REQUEST OF THE DEFT AND AS THE DEFT HAS NOT MADE SUCH A REQUEST,THE DIRECTIVE THAT SUCH A REPORT BE PREPARED IS RESCINDED<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 06/20/2003 | 1004/263 JURORS EXCUSED WITHOUT OBJECTION BY COUNSEL. SEE J/E<br>Amount Owed: $16.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $16.00 | |
| 06/20/2003 | 1004/271 JURORS EXCUSED FOR CAUSE DURING THE TRIAL. SEE J/E<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 06/20/2003 | 1004/275 OPINION OF THE COURT IMPOSING DEATH SENTENCE AND FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH SENTENCE. SEE J/E<br>Amount Owed: $34.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $34.00 | |
| 06/23/2003 | POST SENTENCING RIGHTS FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 06/24/2003 | COMPLETE RECORD<br>Amount Owed: $20.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $20.00 | |
| 06/24/2003 | STENOGRAPHER FEE<br>Amount Owed: $25.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021  Date: 06/30/2008 | $25.00 | |
| 06/24/2003 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON 6-24-03 | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 06/24/2003 | 1004/449 SENTENCING: 6/4/03 DEFT IS SENTENCED TO DEATH ON 1/11/04 ON COUNT ONE. DEFT SENTENCED TO THE OHIO REFORMATORY FOR WOMEN AT MARYSVILLE OHIO FOR 10 YEARS ON COUNT 3 PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 3; 10 YEARS ON COUNT 4 PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT THREE. FIREARM SPECIFICATIONS IN COUNT THREE AND COUNT FOUR SHALL MERGE AS ONE SENTENCE IN COUNT THREE AS A MATTER OF LAW. DEFT TO PAY COSTS. 6/24/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ Amount Owed: $8.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 06/24/2003 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 06/25/2003 | 1004/453 WRIT TO CONVEY PRISONER FOR EXECUTION OF PENALTY Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 06/25/2003 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF Amount Owed: $5.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 06/30/2003 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT DONNA ROBERTS SHERIFF ALTIERE Amount Owed: $82.30 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $82.30 | |
| 07/23/2003 | NOTICE OF COMMITTMENT AND CALCULATION OF SENTENCE FILED BY OHIO DEPT. OF REHABILITATION/CORRECTION | $0.00 | |
| 08/05/2003 | 1008/468 THE STATE OF OHIO PUBLIC DEFENDER'S OFFICE IS APPOINTED AS COUNSEL FOR THE DEFT IN HER APPEAL OF THIS MATTER. 8/6/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J YUHASZ Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 08/06/2003 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 08/18/2003 | ORDER TO FILE RECORD WITH SUPREME COURT BY 10/14/03 Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 12/05/2003 | PETITIONER DONNA ROBERT'S MOTION FOR APPOINTMENT OF COUNSEL FILED BY THE DEFENDANT ALSO MEMORANDUM IN SUPPORT OF PETITIONER DONNA ROBERT'S MOTION FOR APPOINTMENT OF COUNSEL FILED BY THE DEFENDANT DONNA MARIE ROBERTS. | $0.00 | |
| 01/20/2004 | APPELLANTS NOTICE OF APPEAL FOR DELAYED APPEAL IN THE SUPREME COURT OF OHIO FILED. | $0.00 | |
| 01/29/2004 | RECORD TRANSMITTED TO THE SUPREME COURT INCLUDING ORIGINAL PAPERS,TRANSCRIPTS (28 VOLUMES), AND EXHIBITS WITH INDEX BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY SHERIFFS DEPARTMENT.COPIES OF INDEX SENT TO COUNSEL OF RECORD. Amount Owed: $1.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.00 | |
| 02/02/2004 | COPY OF EXHIBIT OF RECORD OF DEATH PENALTY CASE FROM THE SUPREME COURT OF OHIO | $0.00 | |
| 02/13/2004 | HEARING 03/12/2004  01:00 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/27/2004 | MOTION FOR WARRANT FOR REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 02/27/2004 | ONE CERTIFIED COPY OF WARRANT FOR REMOVAL AND COPY OF MOTION FOR WARRANT OF REMOVAL AND WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL ISSUED TO THE SHERIFF ON 2-27-04 | $0.00 | |
| 02/27/2004 | 1024/551 ORDER ON WARRANT TO CONVEY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 03/15/2004 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT SHERIFF ALTIERE<br>Amount Owed: $240.50<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 132122 Date: 08/25/2008 | $240.50 | |
| 03/23/2004 | 1026/435 THE COURT FINDS THAT THERE IS A CONFLICT OF INTEREST WITH THE PUBLIC DEFENDERS OFFICE. ATTYS DAVID DOUGHTEN AND PATTY SMITH APPOINTED AS COUNSEL FOR DEFT IN HER APPEAL. THE ADDRESS FOR ATTYS IS 4403 ST CLAIR AVE, CLEVELAND OH 44103 (216)361-1112<br>3/23/04 COPIES SENT TO: K CULSHAW, R TROUTMAN, J WILHELM, D WATKINS, C BECKER, K BAILEY & L ANNOS. CC TO THE OHIO SUPREME COURT<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $4.00 | |
| 03/23/2004 | POSTAGE<br>Amount Owed: $2.96<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.96 | |
| 04/14/2004 | 1028/385 ORDER APPOINTING COUNSEL FOR POST CONVICTION PETITION AND SETTING FEES.<br>4/14/04 COPIES SENT TO: J INGRAM, J JUHASZ, D BODIKER, J WILHELM, S BOLTON, D MARGURGER, A MILLETTE, D WATKINS, C BECKER, K BAILEY & L ANNOS<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 04/14/2004 | POSTAGE<br>Amount Owed: $4.07<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $4.07 | |
| 07/22/2004 | MOTION FOR SUBSTITUTION OF COUNSEL FILED BY THE THE DEFENDANT'S ATTORNEY DAVID L DOUGHTEN AND ATTORNEY PATRICIA J SMITH | $0.00 | |
| 08/20/2004 | 1039/213 MOTION FOR SUBSTITUTION OF COUNSEL IS GRANTED<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 09/09/2004 | JOINT MOTION TO TOLL FILING DATE OF POST CONVICTION PETITION FILED BY ATTY LUWAYNE ANNOS | $0.00 | |
| 09/09/2004 | 1040/696 PURSUANT TO A JOINT MOTION FILED BY COUNSEL FOR DEFT DONNA ROBERTS AND COUNSEL FOR THE STATE OF OHIO, THIS COURT IN THE INTEREST OF JUSTICE WILL CONSTRUE DEFTS POSTCONVICTION PETITION TIMELY FILED IF IT IS TIME-STAMPED BY THE CLERK OF COURTS ON OR BEFORE 9/25/04.<br>9/9/04 COPIES SENT TO: PROSECUTOR, J INGRAM, J YUHASZ, D BODIKER, J WILHELM & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 09/09/2004 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.22 | |
| 09/24/2004 | PETITION TO VACATE OR SET ASIDE SENTENCE FILED BY ATTORNEY DAVID DOUGHTEN COUNSEL FOR PETITIONER ALSO EXHIBIT B FILED  NATHANIEL JACKSON'S VIDEO STATEMENT FILED.SERVED A COPY OF PETITION TO THE TRUMBULL COUNTY PROSECUTORS OFFICE ON THIS DATE. | $0.00 | |
| 10/01/2004 | MOTION TO EXTEND TIME  TO RESPONSE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |

10/20/21, 11:18 AM                                    Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 10/07/2004 | 1042/898 PURSUANT TO A JOINT MOTION FILED BY COUNSEL FOR DEFT DONNA ROBERTS AND COUNSEL FOR THE STATE OF OHIO, THIS COURT, IN THE INTEREST OF JUSTICE, WILL CONSTRUE DEFTS POSTCONVICTION PETITION TIMELY FILED IF IT IS TIME-STAMPED BY THE CLERK OF COURTS ON OR BEFORE 9/25/04.<br>10/7/04 COPIES SENT TO: PROSECUTOR, J INGRAM, J YUHASZ, D BODIKER, J WILHELM & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/07/2004 | 1042/899 PURSUANT TO A MOTION BY THE PLAINTIFF-RESPONDENT, THE STATE OF OHIO, AND R.C. 2953.21 (D), THIS COURT FIXES THE DUE DATE FOR THE STATE'S RESPONSE BY ANSWER OR MOTION AT 11/3/04. THE STATE, PER MOTION, HAS SHOWN GOOD CAUSE TO EXTEND THE DUE DATE FROM 10/4/04 TO 11/3/04.<br>10/7/04 COPIES SENT TO: PROSECUTOR & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/25/2004 | FIRST AMENDED PETITION TO VACATE OR SET ASIDE SENTENCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 11/02/2004 | MOTION FOR SUMMARY JUDGMENT WITH SERVICE FILED BY ATTY LUWAYNE ANNOS | $0.00 | |
| 11/03/2004 | COPY OF MERIT BRIEF OF PLTF/APPLEE OF STATE OF OHIO FILED BY PROSECUTOR | $0.00 | |
| 12/01/2004 | PETITIONER'S MOTION TO TRANSFER THE RECORD OF NATHANIEL JACKSON TO THE CAUSE OF ACTION FILED BY THE DEFENDANT'S ATTORNEY DAVID L DOUGHTEN | $0.00 | |
| 12/01/2004 | PETITIONER'S MOTION IN OPPOSITION TO STATE'S MOTION FOR SUMMARY JUDGMENT FILED BY THE DEFENDANT'S ATTORNEY DAVID DOUGHTEN | $0.00 | |
| 12/01/2004 | MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY FILED BY THE DEFENDANT'S ATTORNEY DAVID DOUGHTEN | $0.00 | |
| 01/24/2005 | FILE SIGNED OUT TO JUDGE STUARD ON 1-25-05 | $0.00 | |
| 02/11/2005 | 1052/303 FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING PETITIONERS ORIGINAL AND FIRST AMENDED PETITION FOR POST CONVICTION RELIEF<br>Amount Owed: $28.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $28.00 | |
| 02/11/2005 | 1052/709 DEFENDANT-PETITIONER DONNA ROBERTS' MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY FILED DECEMBER 1, 2004 IS OVERRULED AS MOOT. MOTION TO TRANSFER THE RECORD OF NATHANIEL JACKSON TO THIS CASUE OF ACTION IS ALSO DENIED AS MOOT.<br>2/14/05 COPIES SENT TO: J INGRAM, J JUHASZ, D BOKER, J WILHELM, D DOUGHTEN, S BOLTEN, D MARBURGER, A MILLETTE, A WATKINS, C BECKER, D BODIKER, K BAILEY, L ANNOS<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/14/2005 | POSTAGE<br>Amount Owed: $4.81<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.81 | |
| 02/23/2005 | 1053/026 ORDER FOR CLERK OF COURTS TO IMMEDIATELY SERVE A COPY OF THIS COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW FILED FEBRUARY 11, 2005 UPON ATTY DAVID DOUGHTEN COUNSEL FOR DEFENDANT-PETITIONER DONNA ROBERTS AND UPON TRUMBULL COUNTY PROSECUTOR'S OFFICE COUNSEL FOR PLAINTIFF RESPONDENT. 2/24/05 COPIES SENT: ATTY D DOUGHTEN, PROSECUTOR<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 03/01/2005 | MOTION FOR APPOINTMENT OF APPELLATE COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 03/17/2005 | MOTION FOR LEAVE TO FILE DELAYED APPEAL AND NOTICE OF APPEAL TO THE 11TH APPELLATE COURT FILED BY ATTY D  DOUGHTEN | $0.00 | |
| 03/30/2005 | 1056/564 APPROVAL OF PAYMENT OF COUNSEL FEES CC: AUDITOR<br>Amount Owed: $12.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $12.00 | |
| 09/13/2006 | NOTICE FILE REQUESTED BY JUDGE STUARD FROM CLERK'S OFFICE | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/10/2006 | ORDER FROM SUPREME COURT OF OHIO.  JUDGMENT OF THE COURT OF COMMON PLEAS IS AFFIRMED IN PART, VACATED IN PART AND THIS CAUSE IS REMANDED TO THE TRIAL COURT CONSISTENT WITH THE OPINION RENDERED HEREON.   SEE JE | $0.00 | |
| 10/10/2006 | ORDERED BY THE SUPREME COURT OF OHIO THAT THE MOTION FOR RECONSIDERATION IN THIS CASE IS DENIED | $0.00 | |
| 11/01/2006 | HEARING SET: <br> Event: STATUS HEARING <br> Date: 12/06/2006   Time: 9:00 am <br> Judge: STUARD, JOHN M    Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 11/01/2006 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  11/01/2006  10:10:21 | | |
| 12/04/2006 | MOTION FOR APPOINTMENT OF CO-COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/04/2006 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/04/2006 | MOTION FOR RELEASE OF RECORDS WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/06/2006 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 12/06/2006 at 9:00 am has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 01/17/2007   Time: 3:00 pm <br> Judge: STUARD, JOHN M    Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 12/06/2006 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  12/06/2006  12:31:39 | | |
| 12/08/2006 | MOTION FOR APPOINTMENT OF CO-COUNSEL IS GRANTED | $0.00 | |
| 01/17/2007 | ORDERED THAT ROBERT A DIXON BE APPOINTED AS CO COUNSEL  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/17/2007 | ORDER DIRECTIVING EVALUATION OF DEFENDANT'S COMPETENCE TO STAND TRIAL 1-23-97 COPIES TO  J. INGRAM, J. WILHELM, D DOUGHTON, R. DIXON, D. BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/17/2007 | ORDER FOR FORENSIC EXAM 1-23-07 COPIES TO J. INGRAM, J. WILHELM, D. DOUGTEN, R. DIXON, D BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/23/2007 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 01/17/2007 at 3:00 pm has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 02/14/2007   Time: 3:30 pm <br> Judge: STUARD, JOHN M    Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 01/23/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on: 01/23/2007  14:22:06 | | |
| 01/25/2007 | MOTION FOR APPROPRIATION OF FUNDS FOR LEAD COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 01/29/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 01/29/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 02/01/2007 | REGULAR MAIL SENT TO:ROBERTA A DIXON <br> RETURNED BY POST OFFICE  FOR: ATTEMPTED NOT KNOWN <br> Receipt: 123746  Date: 04/29/2008 | $0.20 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 02/05/2007 | ORDER FOR DAVID DOUGHTEN TO BE APPOINTED LEAD COUNSEL.  2-8-07  COPIES SENT TO D DOUGHTEN, J INGRAM, J WILHELM, R DIXON, D BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/08/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 02/26/2007 | HEARING SET:<br><br>The following event: STATUS HEARING scheduled for 02/14/2007 at 3:30 pm has been rescheduled as follows:<br><br>Event: STATUS HEARING<br>Date: 03/09/2007   Time: 2:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: SET STATUS CONFERENCE | | |
| 02/26/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on: 02/26/2007 11:04:16 | | |
| 03/09/2007 | HEARING SET:<br><br>The following event: STATUS HEARING scheduled for 03/09/2007 at 2:00 pm has been rescheduled as follows:<br><br>Event: STATUS HEARING<br>Date: 05/11/2007   Time: 2:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 03/09/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  03/09/2007 15:21:27 | | |
| 04/24/2007 | RECEIPT FROM THE SUPREME COURT OF OHIO.  ALL ORIGINAL PAPERS (3 BOXES) WERE RETURNED TO THE TRUMBULL COUNTY CLERK OF COURTS | $0.00 | |
| 05/01/2007 | MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING REHEARING WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 05/01/2007 | MOTION TO CONTINUE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 05/25/2007 | HEARING SET:<br><br>The following event: STATUS HEARING scheduled for 05/11/2007 at 2:00 pm has been rescheduled as follows:<br><br>Event: STATUS HEARING<br>Date: 06/29/2007   Time: 10:30 am<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: SET SENTENCING | | |
| 05/25/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on: 05/25/2007 14:49:56 | | |
| 06/28/2007 | STATES MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING  HEARING AND MEMORANDUM IN OPPOSITION WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 06/29/2007 | HEARING SET:<br>Event: RE-SENTENCING HEARING<br>Date: 08/15/2007   Time: 3:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 06/29/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on: 06/29/2007 11:14:40 | | |
| 07/13/2007 | WARRANT FOR REMOVAL.  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 07/13/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 07/13/2007 | WARRANT ISSUED TO SHERIFF ON 7-13-07 | $0.00 | |
| 08/02/2007 | MOTION TO CONTINUE SENTENCING HEARING WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 08/02/2007 | MOTION FOR VOLUNTARY RECUSAL OF TRIAL JUDGE, TO ASSIGN CASE TO VISITING JUDGE AND TO HOLD CASE IN ABEYANCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 08/07/2007 | XXX COSTS SENT TO CORRECTIONAL FACILITY FOR INMATE PAYMENT OF COSTS | $0.00 | |
| 08/15/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 08/17/2007 | HEARING SET:<br><br>The following event: RE-SENTENCING HEARING scheduled for 08/15/2007 at 3:00 pm has been rescheduled as follows:<br><br>Event: RE-SENTENCING HEARING<br>Date: 09/21/2007  Time: 2:30 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 08/17/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  08/17/2007  14:44:40 | | |
| 08/17/2007 | HEARING SET:<br>Event: HEARING<br>Date: 09/20/2007  Time: 2:30 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: TO BE RESET | | |
| 08/17/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  08/17/2007  14:49:21 | | |
| 08/27/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 08/27/2007 | WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL  ISSUED TO SHERIFF ON 8-28-07 | $0.00 | |
| 08/27/2007 | WARRANT FOR REMOVAL.<br>8-28-07 ISSUED TO SHERIFF  Receipt: 123746  Date: 04/29/2008 | $2.00 | Image |
| 09/05/2007 | ORDER FOR CONTINUANCE OF TRIAL IS GRANTED TO ALLOW THE COMPETENCY EXAM TO BE CONDUCTED. SENTENCING DATE WILL BE SET AT COMPLETION OF COMPETENCY PROCEEDINGS.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 09/11/2007 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/14/2007 | DEFENDANTS MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING HEARING IS DENIED.<br>9-14-07 COPIES TO: PROS, J. INGRAM, D. DOUGHTEN  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 09/14/2007 | POSTAGE  Receipt: 123746  Date: 04/29/2008 | $0.82 | |
| 09/18/2007 | MOTION TO PROFFER EVIDENCE FILED BY THE  DEFENDANT WITH PROOF OF SERVICE ALSO MEMORANDUM IN SUPPORT FILED BY THE DEFENDANT'S ATTORNEY WITH PROOF OF SERVICE DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/18/2007 | MOTION TO PROFFER EVIDENCE APPENDIX PRISON RECORDS ALONG WITH EXHIBITS FILED BY THE DEFENDANT'S ATTORNEY  FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/19/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 128021  Date: 06/30/2008  Receipt: 132122  Date: 08/25/2008 | $230.50 | |
| 09/20/2007 | MOTION TO PROFFER EVIDENCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/20/2007 | MOTION FOR APPOINTMENT OF INDEPENDENT EXPERT AND FOR CONTINUANCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 09/21/2007 | HEARING SET: <br><br> The following event: HEARING scheduled for 09/20/2007 at 2:30 pm has been rescheduled as follows: <br><br> Event: HEARING <br> Date: 10/22/2007   Time: 1:00 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: COMPLETED | | |
| 09/21/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  09/21/2007  13:24:22 | | |
| 09/21/2007 | HEARING SET: <br><br> The following event: RE-SENTENCING HEARING scheduled for 09/21/2007 at 2:30 pm has been rescheduled as follows: <br><br> Event: RE-SENTENCING HEARING <br> Date: 10/29/2007   Time: 1:00 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: SENTENCED | | |
| 09/21/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  09/21/2007  13:59:03 | | |
| 10/02/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 10/02/2007 | JOURNAL ENTRY/ WARRANT FOR REMOVAL.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 10/03/2007 | WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL  ISSUED TO SHERIFF ON 10-3-07 | $0.00 | |
| 10/18/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 10/22/2007 | MANDATE FROM COURT OF APPEALS. INSTANT APPEAL IS DISMISSED FOR LACK OF JURISDICTION.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 10/29/2007 | DEFT ROBERT'S SENTENCING MEMORANDUM WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 10/29/2007 | ORDERED THAT THE JURYS RECOMMENDATION IS ACCEPTED AND COURT DOES  FIND THAT THE SENTENCE OF DEATH IS THE APPROPRIATE PENALTY IN THIS CASE. <br> 10-29-07 COPIES TO: PROS, D. DOUGTHEN  Receipt: 128021  Date: 06/30/2008 | $48.00 | Image |
| 10/29/2007 | POSTAGE Receipt: 123746  Date: 04/29/2008 | $0.41 | |
| 11/06/2007 | EXECUTION FOR COSTS IN FELONY  ISSUED TO SHERIFF ON 11-6-07 | $0.00 | |
| 11/06/2007 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN  ISSUED TO SHERIFF ON 11-6-07 | $0.00 | |
| 11/06/2007 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 11/06/2007 | WRIT TO CONVEY PRISONER FOR EXECUTION OF PENALTY ON OCT. 28, 2008. <br> 11-6-07 ISSUED TO SHERIFF  Receipt: 123746  Date: 04/29/2008 | $2.00 | Image |
| 11/06/2007 | SENTENCING: ON OCT. 29, 2007 DEFENDANT RE-SENTENCED TO DEATH ON OCT. 28, 2008 ON COUNT 1; AND IMPRISONED FOR 10 YEARS ON COUNT 3; PLUS MANDATORY TERM OF 3 YEARS OF FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO COUNT 3; 10 YEARS ON COUNT 4, PLUS MANDATORY 3 YEARS ON FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO SENTENCE IMPOSED ON COUNT 3. FIREARM SPECIFICATION IN COUNT 3 & 4 SHALL MERGE AS ONE SENTENCE IN COUNT 3. <br> 11-6-07 COPIES TO: PROS, D. DOUGHTEN, BUREAU OF SENTENCE COMPUTATION  Receipt: 128021  Date: 06/30/2008 | $6.00 | Image |
| 11/06/2007 | POSTAGE Receipt: 123746  Date: 04/29/2008 | $0.82 | |
| 11/07/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 <br> Receipt: 132123  Date: 08/25/2008 | $240.50 | |
| 11/15/2007 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED  Receipt: 128021  Date: 06/30/2008 | $6.00 | Image |
| 12/03/2007 | MOTION TO APPOINT APPELLATE COUNSEL WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 12/14/2007 | ORDER TO CERTIFY RECORD IN DEATH PENALTY CASE BY 2-11-08 FILED BY THE SUPREME COURT OF OHIO | $0.00 | |
| 12/18/2007 | TRANSCRIPT OF PROCEEDINGS FILED BY MARY ANN MILLS COURT REPORTER | $0.00 | |
| 12/18/2007 | DEFTS EXHIBIT A, DEFTS EXHIBIT B AND STATES EXHIBIT 1 FILED BY MARY ANN MILLS COURT REPORTER | $0.00 | |
| 01/11/2008 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED  Receipt: 128021  Date: 06/30/2008 | $8.00 | Image |
| 01/11/2008 | ORDERED THAT ATTY JEFFREY J HELMICK TO REPRESENT DEFENDANT FOR PURPOSES OF APPEAL. 1-11-08 COPIES TO: PROS, J. HELMICK  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 01/11/2008 | POSTAGE  Receipt: 123746  Date: 04/29/2008 | $0.41 | |
| 02/07/2008 | INDEX PREPARED AND SENT TO ATTY'S. | $0.00 | |
| 02/12/2008 | RECEIPT FROM THE SUPREME COURT OF OHIO FOR FOUR BOXES WHICH INCLUDE THE CASE FILE, EXHIBITS AND TRANSCRIPTS OF THIS CASE | $0.00 | |
| 02/21/2008 | RECEIPT FROM SUPREME COURT OF OHIO FOR 6 BOXES OF EXHIBITS AND ONE POSTER | $0.00 | |
| 06/24/2008 | MOTION FOR APPOINTMENT OF COUNSEL FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 07/01/2008 | COUNTY FEES WITNESS FEES FOR CHRIS MONYAK, JAMES DANIEL AND SANTIAGO MASON  Receipt: 128057  Date: 07/01/2008 | $56.00 | |
| 07/09/2008 | MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED.  Receipt: 132122  Date: 08/25/2008 | $4.00 | Image |
| 07/09/2008 | ATTY DAVID L DOUGHTEN IS REAPPOINTED AS COUNSEL FOR DEFENDANT. 7-10-08 COPIES TO: PROS, D. DOUGHTHEN  Receipt: 132122  Date: 08/25/2008 | $2.00 | Image |
| 07/09/2008 | POSTAGE  Receipt: 132122  Date: 08/25/2008 | $0.42 | |
| 08/20/2008 | APPENDIX TO DONNA ROBERTS FILED ALONG WITH EXHIBIT A FILED BY DAVID L DOUGHTEN | $0.00 | |
| 08/20/2008 | PETITION TO VACATE OR SET ASIDE SENTENCE FILED BY DAVID L DOUGHTEN | $0.00 | Image |
| 08/20/2008 | APPENDIX TO DONNA ROBERTS  ALONG WITH EXCHIBIT K FILED BY DAVID L DOUGHTEN | $0.00 | Image |
| 08/22/2008 | MOTION TO EXTEND TIME TO RESPOND FILED WITH PROOF OF SERVICE LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 08/26/2008 | COUNTY FEES *WITNESS FEES  Receipt: 134296  Date: 09/25/2008  Receipt: 136816  Date: 11/03/2008 | $283.90 | |
| 09/02/2008 | ORDERED THAT DEFENDANTS PETITION TO A FIXED DATE OF SEPT 30, 2008 IS GRANTED. 9-2-08 COPIES TO: PROS, D. DOUGHTEN  Receipt: 134296  Date: 09/25/2008 | $2.00 | Image |
| 09/02/2008 | POSTAGE  Receipt: 134296  Date: 09/25/2008 | $0.42 | |
| 09/17/2008 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE (INDEPENDENT PSYCHOLOGIST) WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE (NEUROPSYCHOLOGIST) WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | MOTION TO STAY WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | DONNA ROBERT'S MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/22/2008 | STATES RESPONSE TO PETITIONERS MOTION TO STAY POSTCONVICTION PROCEEDINGS WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE (INDEPENDENT PSYCHOLOGIST) WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES RESPONSE TO PETITIONERS MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE (NEUROPSYCHOLOGIST) WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/25/2008 | ORDERED THAT DEFENDANTS MOTION IS GRANTED. 9-26-08 COPIES TO: PROS, J. INGRAM  Receipt: 136816  Date: 11/03/2008 | $2.00 | Image |
| 09/25/2008 | POSTAGE  Receipt: 136816  Date: 11/03/2008 | $0.42 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/02/2008 | LETTER FILED BY DEFT REGARDING COURT COSTS | $0.00 | |
| 10/29/2008 | COUNTY FEES WITNESS FEES Receipt: 136592 Date: 10/29/2008 Receipt: 136816 Date: 11/03/2008 | $339.90 | |
| 11/03/2008 | DEPOSIT FROM: OVERPAYMENT OF COURT COSTS Receipt: 136816 Date: 11/03/2008 | $281.41 | |
| 11/04/2008 | REFUND OF OVERPAYMETN OF LEBANON CORRECTIONAL  Voided on 11/19/2008. | $0.00 | |
| 11/19/2008 | REFUND OF DEPOSIT TO: OAKWOOD CORRECTIONAL INSTITUTION | $281.41 | |
| 03/11/2013 | MOTION TO APPOINT COUNSEL WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/08/2013 | APPOINTMENT OF COUNSEL:  ORDERED THAT ROBERT DIXON, OHIO REGISTRATION #0022466, 4403 ST. CLAIR AVENUE, CLEVELAND, OHIO 44103 BE APPOINTED AS SUBSTITUTE COUNSEL. 4/8/13--COPIES TO:  PROS, ATTY J. INGRAM, ATTY A. MILLETTE, ATTY J. WILHELM, ATTY J. HELMICK, ATTY S. BOLTON, ATTY D. DOUGHTEN, ATTY R. DIXON, ATTY J. JUHASZ  Receipt: 280467 Date: 08/18/2014 | $2.00 | Image |
| 04/08/2013 | POSTAGE  Receipt: 280467  Date: 08/18/2014 | $3.68 | |
| 04/24/2013 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM  RETURNED BY POST OFFICE FOR: RETURN TO SENDER, NOT DELIVERABLE AS ADDRESSED, UNABLE TO FORWARD | $0.00 | |
| 11/18/2013 | APPEAL FROM THE COURT OF COMMON PLEAS:  THE DEATH SENTENCE IS VACATED AND THIS CAUSE IS REMANDED TO THE TRIAL COURT FOR RESENTENCING ON THE BASIS OF THE EXISTING RECORD, CONSISTENT WITH THE OPINION RENDERED HEREIN.  IT IS FURTHER ORDERED THAT MANDATES BE SENT TO AND FILED WITH THE CLERK OF THE COURT OF APPEALS FOR TRUMBULL COUNTY AND THE COURT OF COMMON PLEAS FOR TRUMBULL COUNTY. Receipt: 280467  Date: 08/18/2014 | $9.00 | Image |
| 01/02/2014 | RETURN OF RECORD OF DEATH PENALTY CASE FROM THE SUPREME COURT OF OHIO. CONTENTS ARE 4 LARGE BOXES AND 4 REGULAR BOXES.   EXHIBITS SHARED WITH 01 CR 794 (STATE VS JACKSON) RETAINED BY THE SUPREME COURT FOR CONSIDERATION OF SUPREME COURT CASE NO.  2012-1644.  ATTACHED LIST OF PHYSICAL EXHIBITS ARE ALSO RETURNED. | $0.00 | Image |
| 03/25/2014 | HEARING SET: Event: RE-SENTENCING HEARING Date: 04/30/2014   Time: 2:00 pm Judge: RICE, RONALD J  Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/25/2014 | NOTICE SENT:<br><br>SPEEDY MAILER Sent on:  03/25/2014  15:47:33.48 | | |
| 03/27/2014 | NOTICE SENT:<br><br>SPEEDY MAILER Sent on:  03/27/2014  10:52:01.91 | | |
| 03/27/2014 | HEARING SET: Event: CONFERENCE CALL Date: 03/28/2014   Time: 10:00 am Judge: RICE, RONALD J  Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/28/2014 | HEARING SET: Event: HEARING ON PENDING MOTIONS Date: 04/30/2014   Time: 11:00 am Judge: RICE, RONALD J  Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/28/2014 | NOTICE SENT:<br><br>SPEEDY MAILER Sent on:  03/28/2014  11:45:42.97 | | |
| 04/02/2014 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | Image |
| 04/02/2014 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON: APRIL 2, 2014 | $0.00 | |

10/20/21, 11:18 AM                                Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/02/2014 | WARRANT FOR REMOVAL FOR A MOTIONS HEARING ON APRIL 30, 2014 @ 11:00 A.M. AND A RE-SENTENCING HEARING @ 2:00 P.M. 4/3/14--COPIES TO:  PROS, J. INGRAM, A. MILLETTE, J. WHILHELM, L. ANNOS, S. BOLTON, D. DOUGHTEN, R. DIXON, D. BODIKER, J. JUHASZ  Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 04/03/2014 | MOTION TO APPOINT COUNSEL (DEATH PENALTY CASE) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/03/2014 | POSTAGE  Receipt: 280467  Date: 08/18/2014 | $4.32 | |
| 04/10/2014 | JE:  ATTORNEY DAVID L. DAUGHTEN AND ATTORNEY ROBERT A. DIXON ARE HEREBY APPOINTED TO REPRESENT THE DEFENDANT, DONNA ROBERTS, IN THE ABOVE CAPTIONED CASE FOR THE SENTENCING HEARING SCHEDULED FOR APRIL 30, 2014.  Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 04/17/2014 | MOTION TO PRECLUDE A SENTENCE OF DEATH; OR IN THE ALTERNATIAVE, ORDER A FULL PENALTY PHASE HEARING WITH CERTIFICATE OF SERVICE FILED  BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/23/2014 | MOTION FOR CONTINUANCE OF SENTENCING HEARING WITH SERVICE FILED BY: DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/24/2014 | REGULAR MAIL ISSUED TO: DAVID H BODIKER RETURNED BY POST OFFICE FOR: ATTEMPTED NOT KNOWN  Receipt: 280467  Date: 08/18/2014 | $0.48 | |
| 04/24/2014 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM RETURNED BY POST OFFICE FOR: ATTEMPTED NOT KNOWN  Receipt: 280467  Date: 08/18/2014 | $0.48 | |
| 04/28/2014 | WARRANT TO CONVEY RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 282654  Date: 09/19/2014 | $471.00 | Image |
| 04/30/2014 | NOTICE OF POST RELEASE CONTROL FILED AND SIGNED BY DONNA M ROBERTS (DEFENDANT) AND DAVID L DOUDGHTEN (ATTORNEY FOR DEFENDANT) | $0.00 | Image |
| 04/30/2014 | OPINION OF THE COURT:  FINDS OF LAW REGARDING IMPOSITION OF DEATH PENALTY.  THE COURT HEREBY FINDS THE SENTENCE OF DEATH IS AN APPROPRIATE PENALTY FOR THE DEFENDANT DONNA MARIE ROBERTS IN THIS MATTER.  Receipt: 280467  Date: 08/18/2014 | $69.00 | Image |
| 04/30/2014 | INDIGENT APPLICATION FEE ($25.00) NOTICE FILED  Receipt: 280467  Date: 08/18/2014 | $25.00 | Image |
| 04/30/2014 | JE:  THIS WRIT OF EXECUTION TO CONVEY DONNA MARIE ROBERTS TO THE OHIO REFORMATORY FOR WOMEN OR OTHER FACILITY AS INSTRUCTED BY THE DIRECTOR FOR THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTION WHERE SHE SHALL BE HELD UNTIL THE EXECUTION OF THE DEATH SENTENCE AGAINST DONNA MARIE ROBERTS.  Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 04/30/2014 | JE:  THE COURT FINDS ROBERT'S MOTION TO PRECLUDE A SENTENCE OF DEATH; OR IN THE ALTERNATIVE, ORDER A FULL PENALTY PHASE HEARING IS DENIED.  Receipt: 280467  Date: 08/18/2014 | $9.00 | Image |
| 04/30/2014 | DEATH PENALTY SENTENCING:  DEFENDANT SENTENCE ON APRIL 30, 2014 TO THE OHIO REFORMATORY FOR WOMEN.  DEFENDANT SENTENCED TO DEATH ON COUNT ONE, SHALL SERVE AN IMPRISONMENT TERM OF 10 YEARS ON COUNT 3; PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED ON COUNT 3; SHALL SERVE AN IMPRISONMENT TERM OF 10 YEARS ON COUNT 4, PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED ON COUNT 3 PLUS COSTS. 4/30/14--COPIES TO:  PROS, J. INGRAM, A. MILLETTE, J. WILHELM, D. MARBURGER, S. BOLTON, D. DOUGHTEN, J. JUHASZ  Receipt: 280467  Date: 08/18/2014 | $15.00 | Image |
| 04/30/2014 | POSTAGE  Receipt: 280467  Date: 08/18/2014 | $3.36 | |
| 05/01/2014 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON: MAY 1, 2014 | $0.00 | |
| 05/01/2014 | EXECUTION FOR COSTS IN FELONY  ISSUED TO SHERIFF ON: MAY 1, 2014 | $0.00 | |
| 05/01/2014 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF  Receipt: 280467  Date: 08/18/2014 | $5.00 | Image |
| 05/05/2014 | STATES MOTION FOR NUNC PRO TUNC ENTRIES WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 05/05/2014 | MOTION TO APPOINT APPELLATE COUNSEL DEATH PENALTY CASE WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 05/05/2014 | WARRANT TO CONVEY RETURNED SHOWING SERVICE ON DEFENDANT | $471.00 | Image |

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 05/12/2014 | ORDER: ATTORNEY DAVID L. DOUGHTEN IS APPOINTED LEAD COUNSEL AND ROBERT L. DIXON IS APPOINTED AS CO-COUNSEL. Receipt: 280467 Date: 08/18/2014 | $3.00 | Image |
| 05/14/2014 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM RETURNED BY POST OFFICE FOR: NO SUCH NUMBER Receipt: 280467 Date: 08/18/2014 | $0.48 | |
| 06/02/2014 | MOTION TO CLARIFY COURTS SENTENCING OPINION FILED PURSUANT TO R.C. 2929.03(F) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 06/03/2014 | $636.32 COSTS SENT TO CORRECTIONAL FACILITY FOR INMATE PAYMENT OF COSTS | $0.00 | Image |
| 06/10/2014 | OPINION OF THE COURT: NUNC PRO TUNC FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH PENALTY. SEE JE Receipt: 280467 Date: 08/18/2014 Receipt: 282654 Date: 09/19/2014 | $72.00 | Image |
| 06/16/2014 | ORDER TO CERTIFY RECORD WITH NOTICE OF APPEAL OF APPELLANT DONNA ROBERTS DEATH PENALTY APPEAL | $0.00 | Image |
| 07/07/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED 7/8/2014: CC TO AUDITOR. Receipt: 280467 Date: 08/18/2014 | $12.00 | Image |
| 07/17/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES CC AUDITOR 7/18/14 Receipt: 280467 Date: 08/18/2014 | $6.00 | Image |
| 07/22/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES CC AUDITOR 7/24/14 Receipt: 280467 Date: 08/18/2014 | $18.00 | Image |
| 09/15/2014 | RECORD TRANSPORTED TO THE SUPREME COURT INCLUDING ORIGINAL PAPERS (1 BOX), TRANSCRIPTS (28 VOLUMES IN 3 BOXES), NUMBERED INDEX AND LIST OF EXHIBITS BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY CLERK OF COURTS ON SEPTEMBER 15, 2014. COPIES OF INDEX ALSO SENT TO COUNSEL OF RECORD (L ANNOS, D DOUGHTEN, R DIXON) Receipt: 282654 Date: 09/19/2014 | $1.00 | Image |
| 09/15/2014 | TRANSCRIPT OF PROCEEDINGS FILED BY: OFFICIAL COURT REPORTER: RICHELLE J. GUERRIERI | $0.00 | |
| 09/18/2014 | RECEIPT OF RECORD DEATH PENALTY CASE (4 BOXES) TRANSMITTED TO THE CLERK OF COURT OF THE SUPREME COURT OF OHIO BY THE TRUMBULL COUNTY CLERK OF COURTS ON 09/15/14 Receipt: 282654 Date: 09/19/2014 | $1.00 | Image |
| 09/23/2014 | EXHIBITS (ONE EXPANDABLE FOLDER) AND LIST OF EXHIBITS (SEE IMAGE) TRANSPORTED TO THE SUPREME OF COURT OF OHIO BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY COURT OF CLERKS ON SEPTEMBER 26, 2014 | $0.00 | Image |
| 12/15/2014 | MEMO ENTRY: 4 BOXS OF EVIDENCE, 1 BOX COPIES OF THE RECORD AND 3 BOXES OF TRANSCRIPTS TRANSPORTED TO THE EVIDENCE ROOM ON | $0.00 | |
| 02/17/2015 | MOTION TO AMEND POST-CONVICTION PETITION PURSUANT TO R.C.2929.03(F) FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 02/26/2015 | MOTION TO EXTEND TIME TO RESPOND WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Prosecuting Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 03/05/2015 | HEARING SET: Event: MOTION Date: 03/31/2015 Time: 1:30 pm Judge: RICE, RONALD J Location: COURTROOM 2 Result: COMPLETED | | |
| 03/05/2015 | NOTICE SENT: SPEEDY MAILER Sent on: 03/05/2015 14:40:00.79 | | |
| 03/05/2015 | NOTICE SENT: SPEEDY MAILER Sent on: 03/05/2015 14:42:09.60 | | |
| 07/20/2015 | AGREED JUDGMENT ENTRY SUBMITTED BY ATTORNEY DAVID L. DOUGHTEN AND ATTORNEY LUWAYNE ANNOS | $0.00 | Image |
| 08/19/2015 | AGREED JUDGMENT ENTRY. SEE JE. | $6.00 | Image |

10/20/21, 11:18 AM                          Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 08/19/2015 | Issue Date:  08/19/2015<br>Service:  FINAL APPEALABLE ORDER<br>Method:  REGULAR MAIL - ENVELOPE<br>Cost Per:  $<br><br>ROBERTS, DONNA MARIE<br>055 276<br>OAKWOOD CORRECTIONAL FACILITY<br>3200 N WEST STREET<br>LIMA, OH  45801<br>Tracking No: R000005205<br><br>STATE OF OHIO<br>c/o ATTY: ANNOS, LUWAYNE<br>TRUMBULL COUNTY ASSISTANT PROSECUTOR<br>160 HIGH STREET NW-4TH FLOOR<br>WARREN, OH  44481<br>Tracking No: R000005206 | | |
| 08/28/2015 | MOTION FOR SUMMARY JUDGMENT WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 09/04/2015 | HEARING SET:<br>Event: MOTION FOR SUMMARY JUDGMENT (MEMO)<br>Date: 10/30/2015   Time: 8:00 am<br>Judge: RICE, RONALD J  Location: COURTROOM 2<br><br>Result: TAKEN UNDER ADVISEMENT | | |
| 09/04/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  09/04/2015  08:37:29.79 | | |
| 11/16/2015 | LETTER FILED BY: DONNA MARIE ROBERTS (DEFENDANT); PRO SE (REQUEST FOR COPIES OF TRANSCRIPTS) | $0.00 | Image |
| 07/28/2017 | ENTRY:  RECONSIDERATION IS DENIED FILED BY SUPREME COURT | $6.00 | Image |
| 04/12/2018 | NOTICE FROM THE SUPREME COURT OF OHIO. THE FOLLOWING RECORD IN THE ABOVE-NAMED CASE WAS RECEIVED BY THE UNDERSIGNED.<br>LIST OF CONTENTS:  4 BOXES | $0.00 | Image |
| 04/02/2019 | HEARING SET:<br>Event: MEMO ONLY<br>Date: 06/07/2019   Time: 8:00 am<br>Judge: RICE, RONALD J  Location: COURTROOM 2<br><br>Result: UNDER ADVISEMENT | | |
| 04/02/2019 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  04/02/2019  15:53:47.34 | | |
| 04/02/2019 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  04/02/2019  15:54:50.16 | | |
| 06/05/2019 | NOTICE OF MEMORANDUM IN SUPPORT WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 06/07/2019 | RENEWED MOTION FOR SUMMARY JUDGMENT WITH PROOF OF SERVICE FILED BY CHRISTOPHER D. BECKER (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 06/13/2019 | OBJECTION TO SUMMARY JUDGMENT WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 11/20/2019 | Issue Date:  11/20/2019<br>Service:  FINAL APPEALABLE ORDER<br>Method:  REGULAR MAIL - ENVELOPE<br>Cost Per:  $<br><br>ROBERTS, DONNA MARIE<br>c/o ATTY: DIXON, ROBERT A<br>4403 ST CLAIR AVENUE<br>CLEVELAND, OH  44103<br>Tracking No: R000101953<br><br>STATE OF OHIO<br>c/o ATTY: MUSICK, ASHLEIGH<br>ASSISTANT PROSECUTING ATTORNEY<br>160 HIGH ST, N.W. 4TH FLOOR<br>WARREN, OH  44481<br>Tracking No: R000101954 | | |
| 11/20/2019 | POSTAGE | $0.50 | |
| 11/20/2019 | JE: THE PETITION FOR POST-CONVICTION RELIEF FILED BY DEFENDANT IS DENIED WITHOUT HEARING. SEE JE. FAP. | $18.00 | Image |
| 12/02/2019 | MOTION TO APPOINT APPELLATE COUNSEL (DEATH PENALTY CASE) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT); ROBERT A DIXON (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 12/10/2019 | JE: ATTORNEY ROBERT A. DIXON AND ATTORNEY DAVID L. DOUGHTEN ARE APPOINTED AS APPELLATE COUNSEL. | $3.00 | Image |
| 12/18/2019 | NOTICE OF APPEAL TO 11TH DISTRICT COURT OF APPEALS WITH DOCKETING STATEMENT, AFFIDAVIT OF INDIGENCY AND COPY OF JE FILED BY: DAVID L DOUGHTEN (Attorney) on behalf of DONNA ROBERTS (DEFENDANT); ROBERT A DIXON (Attorney) on behalf of DONNA ROBERTS (DEFENDANT) | $0.00 | Image |
| 12/18/2019 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED; CC: TRUMBULL COUNTY AUDITOR'S OFFICE | $12.00 | Image |
| 08/25/2020 | MANDATE FROM COURT OF APPEALS; JUDGMENT OF THE TRUMBULL COUNTY COURT OF COMMON PLEAS IS AFFIRMED. COSTS TO APPELLANT. | $3.00 | |
| 10/06/2020 | IT IS SO ORDERED THAT THE MOTION FOR STAY OF EXECUTION IS GRANTED AND IT IS FURTHER ORDERED THAT THIS STAY SHALL REMAIN IN EFFECT UNTIL EXHAUSTION OF ALL STATE POSTCONVICTION PROCEEDINGS, INCLUDING ANY APPEALS, FILED BY THE SUPREME COURT OF OHIO | $0.00 | Image |

Roberts.suppress

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO                           )        CASE NO. 01 CR 793
                                        )
    Plaintiff                        )        Judge John M. Stuard
                                        )
vs.                                     )        *MOTION TO SUPPRESS*
                                        )
DONNA ROBERTS                           )
                                        )
    Defendant                        )

Now comes the Defendant, DONNA ROBERTS, and pursuant to CRIM. R. 12,

OHIO RULES OF CRIM. PROC., hereby moves that this Honorable Court exclude from

evidence all items obtained by Officers of the Howland Township Police Department,

Trumbull County Sheriff's Department, Warren Police Department or any other state

agents during a warrantless search of her home at 254 Fonderlac SE, and motor vehicle

on December 12, 2001. The warrantless search of the Defendant's residence and motor

vehicle by state agents violated the Fourth Amendment Prohibition against

unreasonable searches and seizures, and §14, Art. I, of the OHIO CONSTITUTION. The

warrantless search of a home is presumptively unreasonable. *Payton v. New York*

(1980), 445 U.S. 573. The government bears the burden of overcoming this presumption

by establishing either consent or another recognized exception to the warrant

requirement. *State v. Kessler* (1970), 53 Ohio St.2d 204. The state cannot meet its

burden and overcome the presumptive unreasonableness of the warrantless searches in question and the fruits of said searches must be suppressed as evidence. The Defendant incorporates the Memorandum of Law attached hereto and made part hereof.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

AND

JOHN B. JUHASZ (#0023777)
7330 MARKET STREET
YOUNGSTOWN, OHIO 44512
(330) 758-2308
COUNSEL FOR DEFENDANT

CERTIFICATE OF SERVICE

A copy of the foregoing was hand delivered this 4th day of October, 2002 to Christopher D. Becker and Kenneth N. Bailey, Trumbull County Prosecutor's Office, 160 High Street NW, Warren, Ohio 44481.

J. GERALD INGRAM (#0007887)

AND

JOHN B. JUHASZ (#0023777)

COUNSEL FOR DONNA ROBERTS

## STATEMENT OF THE FACTS

On Tuesday, December 12, 2001, Donna Roberts placed a 911 call from her residence at 254 Fonderlac SE requesting emergency police assistance.  Howland Township Police Officers Ray and Poolcino were dispatched to 254 Fonderlac Drive. Upon arrival, the officers were met by Donna Roberts, who came running out of the front door of the residence.  The Defendant was hysterical and informed the officers that she had discovered her husband on the kitchen floor.

Upon entering the residence, Officers Ray and Poolcino observed Robert Fingerhut lying on the kitchen floor apparently dead with a handgun near his body. Patrolmen Ray and Poolcino requested assistance in processing the crime scene. Investigating officers from the Howland Police Department, Trumbull County Sheriff's Department, and Warren Police Department eventually arrived at 254 Fonderlac Drive SE to assist in the investigation.

Before the arrival of assisting officers, Patrol Officers Ray and Poolcino had determined that there was no sign of apparent forced entry to the residence.  The patrol officers had inspected the entire exterior of the residence and found nothing unusual. The patrol officers had further conducted a protective sweep of the residence and secured same until investigating detectives could arrive.

Detective Sergeant Monroe and Sergeant Dillon of the Howland Police Department arrived at the scene to assume control of the investigation.  Detective Sergeant Monroe, Sergeant Dillon, and Patrolman Ray questioned the Defendant at her

1

residence. Officers suggested that the Defendant find a family member with whom she could stay. Officers arranged for the Austintown Police Department to contact the Defendant's brother, Ralph Roberts, and request that he proceed to the Defendant's residence. Before leaving the residence with her brother, the Defendant was informed that the police would "continue processing the crime scene and search for more evidence." Detective Sergeant Monroe had previously informed the Defendant that "the entire house" needed to be handled as a crime scene and searched by investigating officers. The Defendant left her residence at approximately 2:00 a.m. The police continued to search the residence until approximately 6:30 a.m. During the search of the Defendant's residence, the police searched the interior and trunk area of the Defendant's automobile which was located in the garage.

Later that morning, Detective Sergeant Monroe and Captain Compton of the Howland Police Department proceeded to the residence of Ralph Roberts, 8931 Kirwin, Austintown, Ohio to speak with the Defendant. At that time, Detective Sergeant Monroe told the Defendant that additional processing needed to be conducted at her residence to complete the crime scene investigation. Detective Sergeant Monroe informed the Defendant that he would like her to get her written permission to further search 254 Fonderlac and her automobile. In fact, the residence and automobile had already been searched, and evidence had already been seized by the police.

2

LAW

The Fourth Amendment prohibits all unreasonable searches and seizures, and it is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well defined exceptions." *Katz v. United States (1967),* 389 U.S. 347, 357. The Supreme Court has established a presumption of unreasonableness to all warrantless home entries. *Payton v. New York* (1980), 445 U.S. 573. To overcome this presumption, the burden is upon the state to demonstrate that the search falls within a legally recognized exception to the warrant requirement. *State v. Kessler* (1978), 53 Ohio St.2d 204, 207.

There is no "crime scene" or "murder scene" exception to the warrant requirement. In *Mincey v. Arizona* (1978), 437 U.S. 385, the Supreme Court definitively stated that the "murder scene" exception to the warrant requirement recognized by the Arizona Supreme Court was inconsistent with the Fourth and Fourteenth Amendments. In *Mincey,* an undercover police officer was shot and killed during a ddrug bust. Following the shooting of the police officer, other injured persons were located within the apartment, emergency assistance was requested and a protective sweep of the apartment was completed. Within ten minutes homicide detective arrived, and a four day warrantless search ensued during which the entire apartment was searched, photographed and diagramed. The Arizona Supreme Court held the search permissible under a state recognized homicide scene exception to the warrant requirement. In

3

reversing and ordering the evidence suppressed, the United States Supreme Court noted that all the persons in the apartment had been located before the search began, and that there was no indication that evidence would be lost, destroyed or removed during the time required to obtain a search warrant.  In the case at bar, all individuals within 254 Fonderlac Drive had been accounted for before the warrantless search, and there was no danger that evidence would be lost or destroyed.

In *Flippo v. West Virgina* (1999) 528 U.S. 11, the Supreme Court reiterated that there is no "murder scene exception" to the Fourth Amendment warrant requirement, and explained its previous ruling in *Mincey* as follows:

> This position squarely conflicts with *Mincey v. Arizona, supra*, where we rejected the contention that thee is a 'murder scene exception' to the Warrant Clause of the Fourth Amendment.  We noted that police may make warrantless entries onto premises if they reasonably believe a person is in need of immediate aid and may make prompt warrantless searches of a homicide scene for possible other victims or a killer on the presmises, 437 U.S. at 392, but we rejected any general 'murder scene exception' as 'inconsistent with the Fourth and Fourteenth Amendments – . . .the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there.' 437 U.S. at 395; see also *Thompson v. Louisiana* 469 U.S. 17, 21, 83 L.Ed. 2d 246, 105 S.Ct. 409 (1984) (per curiam).  *Mincey* controls here.

The defense reasonably anticipates that the state will seek to justify the warrantless intrusions in question by claiming consent.  A consent search need not satisfy either the warrant or probable cause requirement of the Fourth Amendment.  When the state seeks to justify a warrantless intrusion upon consent, the state has the burden of proving that the consent was freely and voluntarily given.  *Bumper v. North Carolina* (1968), 391 U.S. 543, 548.  In *Schneckloth v. Bustamonte* (1973), 412 U.S. 218,

4

the Supreme Court held:

> We hold only that when the subject of a search is not in custody and the state attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was, in fact, voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

412 U.S., at 248.

In the case at bar, the Defendant was not in custody and not aware of her right to refuse.

Further, the Defendant's mental and emotional condition rendered her unable to knowingly give consent and left her susceptible to subtle coercive police actions.

In *State v. Taylor* (1991), 77 Ohio App.3d 223, the court held that to justify a warrantless search on the basis of consent:

> The state must demonstrate that the consent was freely and voluntarily given and not the result of coercion, express or implied. . . . voluntariness is a question of fact to be determined from the totality of the circumstances . . . The state's burden to prove consent cannot be discharged by showing no more than acquiescence to a claim of lawful authority.

*Id* at 225.

Consent given after the use of coercion, duress or trickery is not free and voluntary.

*State v. Ingram* (1992), 82 Ohio App.3d 341.

The state cannot meet its burden of justifying the warrantless searches in question by consent. Accordingly, this Honorable Court is left with no choice but to suppress the fruits of the warrantless intrusions described herein.

5

Respectfully submitted,

J. GERALD INGRAM (#0007887)

AND

JOHN B. JUHASZ (#0023777)
7330 MARKET STREET
YOUNGSTOWN, OHIO 44512
(330) 758-2308
COUNSEL FOR DEFENDANT

6

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.     01-CR-793 |
| Plaintiff, | ) | |
| | ) | HONORABLE JUDGE |
| -vs- | ) | JOHN M. STUARD |
| | ) | |
| DONNA MARIE ROBERTS, | ) | **MEMORANDUM IN OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | ) | **DEATH PENALTY SPECIFICATIONS** |
| | | **DUE TO INADEQUATE APPELLATE** |
| | | **REVIEW** |

The State of Ohio requests that the above-entitled motion by defendant be overruled

The Defendant argues that the death specifications in this case should be dismissed because the appellate review process in Ohio is inadequate. Defendant has filed a lengthy memorandum in support of her argument.

The Ohio Supreme Court has previously reviewed this issue and found them to be without merit. State v. Carter (2000), 89 Ohio St. 3d 593, 606, 734 N.E.2d 345, 357; State v. Lorraine (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212, 216; State v. Hicks (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030, 1037; and State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, syllabus.

The United States Supreme Court has held that appellate review is an integral part of a state's capital punishment scheme. Gregg v. Georgia (1976), 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859, 888. Since Gregg, however, the court has not found a sentencing scheme unconstitutional due to the nature of the appellate review process engaged in by any state. Nothing in the Defendant's argument warrants finding Ohio's death penalty scheme unconstitutional based upon the appellate review process.

Wherefore, the State of Ohio would respectfully request that the Court overrule the

Defendant's motion.

Respectfully Submitted,

_____
KENNETH N. BAILEY, (#0023288)
Assistant Prosecuting Attorney

and

_____
CHRISTOPHER D. BECKER (0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing State's Response to Defendant's Motion was served upon the attorneys of record by hand delivering a copy of the same this 10th day of October 2002.

_____
CHRISTOPHER D. BECKER (0047252)
Assistant Prosecutor
Trumbull County, Ohio

2

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    01-CR-793 |
| Plaintiff, | ) | |
| | ) | HONORABLE JUDGE: |
| -vs- | ) | JOHN M. STUARD |
| | ) | |
| DONNA MARIE ROBERTS, | ) | **MEMORANDUM IN OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | ) | **DEATH PENALTY SPECIFICATIONS** |
| | | **BECAUSE METHOD OF EXECUTION** |
| | | **IS UNCONSTITUTIONAL** |

The State of Ohio requests that the above-entitled motion by defendant be overruled.

The defendant seeks to have the death specifications dismissed upon constitutional grounds arguing that the method of execution is unconstitutional and has attached a lengthy, form memorandum. The Ohio Supreme Court has reviewed this issue and has specifically found that Ohio's method of execution, specifically, execution by lethal injection is constitutional. State v. Carter (2000), 89 Ohio St.3d 593, 608, 734 N.E.2d 345. The Supreme Court of the United States has also refused to grant certiorari regarding this issue on numerous occasions.

Respectfully Submitted,

KENNETH N. BAILEY, (#0023288)
Assistant Prosecuting Attorney

and

46

CHRISTOPHER D. BECKER (0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing State's Response to Defendant's Motion was served upon the attorneys of record by hand delivering a copy of the same this 10th day of October 2002.

CHRISTOPHER D. BECKER (0047252)
Assistant Prosecutor
Trumbull County, Ohio

2

IN THE COMMON PLEAS COURT OF TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | MEMORANDUM CONTRA TO |
| | | DEFENDANT'S MOTION TO DISMISS |
| PLAINTIFF | * | INDICTMENT; OR IN ALTERNATIVE |
| | | TO DISMISS DEATH |
| VS. | * | SPECIFICATIONS BECAUSE DEATH |
| | | PENALTY IN OHIO IS |
| DONNA MARIE ROBERTS, | * | UNCONSTITUTIONAL |
| | | |
| DEFENDANT | * | HONORABLE JUDGE: |
| | | JOHN M. STUARD |
| | * | |
| | | CASE NO. 01-CR-793 |

Now comes the State of Ohio by Assistant Prosecuting Attorneys, Kenneth N. Bailey and

Christopher D. Becker, in response to the Defendant's Motion to dismiss indictment; or in the

alternative to dismiss death specifications because the death penalty in Ohio is unconstitutional.

For cause the State submits the following Memorandum.

MEMORANDUM IN SUPPORT

The Ohio Supreme Court has repeatedly overruled these arguments. With respect to the

issue that Ohio's death penalty statute is unconstitutional the Ohio Supreme Court has repeatedly

stated that Ohio's death penalty statute is constitutional.  See, e.g., State v. Jenkins, 15 Ohio

St.3d 164, 473 N.E.2d 264; State v. Maurer (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d

768; State v. Buell (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; State v. Zuern

(1987), 32 Ohio St.3d 56, 512 N.E.2d 585; State v. Davis (1992), 63 Ohio St.3d 44, 584 N.E.2d

1192; and State v. Bey (1999), 85 Ohio St. 3d 487, 709 N.E.2d 484.

With respect to whether or not Ohio's death penalty statute violates international law and

treaties to which the United States is a party the Ohio Supreme Court has consistently rejected

this argument State v. Phillips (1995),74 Ohio St.3d 72, 103-104, 656 N.E.2d 643, 671; State v.

Bey (1999), 85 Ohio St. 3d 487, 709 N.E.2d 484; and State v. Ashworth (1999), 85 Ohio St. 3d

56, 706 N.E2d 1231.

WHEREFORE, the State of Ohio respectfully submits that both of these issues are moot

given their repeated rejection by the Ohio Supreme Court.

Respectfully Submitted,
STATE OF OHIO, by

_____
KENNETH N. BAILEY (0023228)
Assistant Prosecuting Attorney
Trumbull County, Ohio

and

_____
CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio  44481
(330) 675-2426

**CERTIFICATION**

This is to certify that a copy of the foregoing motion was hand delivered to counsel for the Defendant, this October 10, 2002.

_____
CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. :01-CR-793 |
| | ) | |
| Plaintiff, | ) | JUDGE: :JOHN M. STUARD |
| | ) | |
| -vs- | ) | MEMORANDUM IN OPPOSITION TO |
| | ) | DEFENDANT'S MOTION TO HAVE |
| DONNA MARIE ROBERTS, | ) | REASONS FOR DEFENSE OBJECTIONS |
| | ) | AND REASONS FOR OVERRULING |
| Defendant. | ) | DEFENDANT'S OBJECTIONS PLACED |
| | ) | ON RECORD |
| | ) | |

Now comes the State of Ohio by Assistant Prosecutor's Kenneth N. Bailey and Christopher D. Becker in response to Defendant's Motion to have reasons for objections and reasons for overruling objections placed on the record.

Defendant asks that this Court allow defense counsel to place the reasons for their objections on the record and that this Court order itself to place its reasons for overruling defense objections on the record.

Defendant is represented by experienced trial counsel who are perfectly capable of placing the reasons for their objections on the record where they deem appropriate. Thus, there is no need for a court order regarding this.

Furthermore, defense counsel are perfectly capable to asking during the course of trial that the Court place its reasoning for overruling a particular objection on the record. Again, there is no need for a separate court order regarding this.

Thus, the State requests that this motion be overruled, with the proviso that the defense counsel may still request during the course of trial that it be allowed to place its reasons for

48

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 671

objecting on the record, and that the Court place its reasons for overruling defense objections on the record.

For the above-stated reasons, defendant's motion should be overruled.

Respectfully Submitted,
STATE OF OHIO, by

KENNETH N. BAILEY (0023228)
Assistant Prosecuting Attorney
Trumbull County, Ohio
and

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing motion was hand-delivered to counsel for the Defendant, this October 10, 2002.

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.   :01-CR-7943 |
| | ) | |
| Plaintiff, | ) | JUDGE:   :JOHN M. STUARD |
| | ) | |
| -vs- | ) | |
| | ) | MEMORANDUM IN OPPOSITION TO |
| DONNA MARIE ROBERTS, | ) | DEFENDANT'S MOTION TO |
| | ) | PROHIBIT THE USE OF |
| Defendant. | ) | PEREMPTORY CHALLENGES TO |
| | ) | EXCLUDE VENIREMEN WHO |
| | ) | EXPRESS CONCERNS ABOUT |
| | ) | IMPOSING CAPITAL PUNISHMENT |
| | ) | |

Now comes the State of Ohio by Assistant Prosecuting Attorneys Kenneth N. Bailey and Christopher D. Becker and file this Memorandum in opposition to Defendant's Motion to prohibit the State of Ohio from using peremptory challenges to exclude veniremen who express concern about imposing capital punishment.

Defendant has requested this Court for an order prohibiting the prosecution from excluding, through the use of peremptory challenges, all prospective jurors who express concerns over the imposition of the death penalty. The defendant contends that such exclusion would violate his right to a fair and impartial jury, as guaranteed by the Constitutions of the State of Ohio and the United States. The State of Ohio opposes defendant's motion because defendant's arguments are baseless and wholly without merit.

It is fundamental principle of law that both sides in a criminal case have wide discretion in the use of peremptory challenges. Counsel is ordinarily entitled to exercise peremptory challenges "for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried." *Batson v. Kentucky* (1986), 476 U.S. 79, 89, citing *United*

49

*States v. Robinson* (D. Conn. 1976), 421 F. Supp. 467, 473. Exclusion of a juror because of his or her opposition to capital punishment is directly related to the outcome of the case to be tried, and is therefore valid according to the United States Supreme Court.

Defendant also argues that a jury automatically becomes biased toward conviction when persons who are opposed to the death penalty are excluded from the venire. Following defendant's line of reasoning would only lead to the argument that defense counsel, through its use of peremptory challenges, selects a jury biased towards acquittal. Realizing this inherent fallacy, the United States Supreme Court has expressly rejected defendant's argument:

> "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt, or substantially increases the risk of conviction *Witherspoon v Illinois* (1968), 391 U.S. 510, 518.

The court reaffirmed that position in *Lockhart v. McCree* (1986), 476 U.S. 162, 184.Since defendant's argument finds no support, either in logic or in law, his motion should be denied by this Court.

Respectfully Submitted,
STATE OF OHIO, by

KENNETH N. BAILEY (#0023228)
Assistant Prosecuting Attorney
Trumbull County, Ohio
and

2

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecutor
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio  44481
(330)-675-2426

## CERTIFICATION

This is to certify that a copy of the foregoing motion was hand delivered to counsel for the Defendant,  this October 10, 2002.

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office

3

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    01-CR-793 |
| Plaintiff, | ) | |
| | ) | HONORABLE JUDGE: |
| -vs- | ) | JOHN M. STUARD |
| | ) | |
| DONNA MARIE ROBERTS, | ) | **MEMORANDUM IN OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION FOR** |
| Defendant. | ) | **ALTERNATING VOIR DIRE** |

The defendant has requested that the Court allow the defense to examine veniremen in an alternating manner. As counsel notes, this request is only proper if the Court grants the Defendant's request for individual voir dire. As the State is opposed to such a process, and believes that the Court should deny the same.

Notwithstanding the foregoing, the state would note that jury matters have traditionally been left to the discretion of the trial court. Criminal Rule 24. Because of this, Ohio courts generally require that the defendant prove that a trial court's decision will materially affect the defendant's substantial rights in an adverse way, or that the trial court's decision prejudices the defendant. *State v. Williams* (1974), 39 Ohio St. 2d 20, 24-25.

In a criminal trial, the State bears a very high burden of proof. Thus, the Ohio legislature has mandated that the State shall proceed before the defense in stating its case, in producing evidence, and in concluding arguments to the jury. Section 2945.10, Ohio Revised Code. Allowing the prosecution to examine veniremen before the defense merely continues this judicial practice and does not prejudice the defendant in any way.

For the foregoing reasons, the prosecution respectfully asks the Court to overrule the

50

defendant's motion.

Respectfully Submitted,

_Kenneth N. Bailey_
_____
KENNETH N. BAILEY (#0023228)
Assistant Prosecuting Attorney

and

_____
CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
(330)-675-2426

ATTORNEYS FOR STATE OF OHIO

2

## CERTIFICATION

This is to certify that a copy of the foregoing State's Response to Defendant's Motion was hand delivered to counsel for the Defendant this 10th day of October 2002.

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney

3

IN THE COURT OF COMMON PLEAS OF TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | MOTION FOR DEFENDANT TO SUBMIT TO HANDWRITING EXEMPLARS |
| PLAINTIFF | * | CASE NO. 01-CR-793 |
| VS. | * | HONORABLE JUDGE: |
| DONNA MARIE ROBERTS, | * | JOHN M. STUARD |
| DEFENDANT | * | |

Now comes the State of Ohio by Assistant Prosecuting Attorney, Christopher D. Becker and moves this Honorable Court for an order directing the defendant, to submit to handwriting exemplars conducted and supervised by the Ohio Bureau of Criminal Identification and Investigation.

For cause, the State of Ohio states that the handwriting exemplars are necessary for the preparation and presentation of the State's case, and further the Ohio Bureau of Criminal Identification and Investigation needs said samples for scientific comparison purposes of evidence in the case at bar. In support the State of Ohio submits the following Memorandum in Support.

## MEMORANDUM IN SUPPORT

This case involves numerous letters allegedly written by the Defendant and her co-defendant with many of the letters containing inculpatory statements relative to the intent of the defendant and her co-defendant.

The Fifth Amendment privilege against self-incrimination only extends to testimonial or communicative acts of the defendant. The privilege does not extend to the non-communicative acts of the defendant such as fingerprintings, photographing, weighing and measuring of the defendant, nor to handwriting exemplars.

The United States Supreme Court has held that the Fifth Amendment privilege against self-incrimination as made applicable to the states by the Fourteenth Amendment, protects an accused only from being compelled to testify against himself, or otherwise, provide the State with evidence of a testimonial or communicative nature, and that, "a mere handwriting exemplar in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its (Fifth Amendment privilege) protection." Gilbert v. California, (1967), 388 U.S. 263, 266.

Ohio courts have followed this view and have stated that a defendant may be lawfully asked to submit to handwriting exemplars. In re: Grand Jury Directive to Creager (1993), 89 Ohio App. 3d 672, 627 N.E. 2d 563; State v. Kiser, (1968), 13 Ohio St. 2d 126, 235 N.E.2d 126; and State v. Heston, (1972), 29 Ohio St. 2d 152, 280 N.E.2d 376. Further a criminal defendant has no right to have his or her attorney present or to refuse to give a handwriting exemplar State v. Flinn (1982), 7 Ohio App. 3d 294, 455 N.E.2d 691. Obtaining a handwriting exemplar from a criminal defendant does not violate the right against self-incrimination. State v. Ostrowski (1972), 30 Ohio St. 2d 34.

Additionally, since the handwriting exemplar is "non-testimonial" in nature, the propriety of using appellant's refusal to submit one as evidence against him at trial violates neither his right against self-incrimination nor his right to due process. See, e.g., State v. Gray (1993), 85 Ohio App. 3d 165, 619 N.E.2d 460.

Finally, a similar motion was sought and granted by this court in the co-defendant's case.

WHEREFORE, the State of Ohio respectfully requests this Honorable Court to issue an order directing the defendant to submit to handwriting exemplars conducted by the either the Trumbull County Sheriff's Department of the Ohio Bureau of Criminal Identification and

Investigation at time and place agreed upon by the parties.

CHRISTOPHER D. BECKER #0047252
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
160 High Street
Warren, Ohio 44481
Phone: (330) 675-2907
Fax: (330) 675-2431

PROOF OF SERVICE

A copy of the foregoing Motion was served upon the attorney of record, by hand delivering a copy of the same to counsel for the Defendant this 10th day of October 2002.

CHRISTOPHER D. BECKER #0047252
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | CASE NO.:   01-CR-793 |
| Plaintiff, | * | HONORABLE JUDGE: JOHN M. STUARD |
| -vs- | * | |
| DONNA MARIE ROBERTS, | * | S T A T E ' S   F O U R T H SUPPLEMENTAL RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY |
| Defendant, | * | |

Now comes the State of Ohio by Assistant Prosecuting Attorney's Kenneth N. Bailey and

Christopher D. Becker and submit the following fourth supplemental answer to the Defendant's

Request for Discovery pursuant to Criminal Rule 16 of the Ohio Rules of Criminal Procedure.

Pursuant to Crim.R. 16 (B)( 1)(c), the State is providing to counsel for the Defendant:

Black and white copies of color photographs, which counsel for the Defendant may make

arrangements to view at the Trumbull County Prosecutor's Office,  numbered pages 261-266,

Five (5) video tapes labeled: 1.) Greyhound Terminal Youngstown Oh 12-11-01, 2.) Walgreens

12-11-01, 3.) Walgreens 12-12-01, 4.) Walgreens 12-13-01,  5.) Walgreens 12-14-01, one (1)

CD labeled "Nate Jackson 399-469, 19 Calls to Donna Roberts between Oct.5, 2001 - Dec. 8,

2001.", one (1) page entitled "DOTS Net, Offender Tracking Information on the Web,"

numbered 268,   Four (4) pages of cancelled checks, numbered 269-272, one (1) page of

telephone records, numbered 273, one (1) page entitled "Unit 8B Pod Activity Schedule,"

numbered 274,  .

Pursuant to Crim. R. 16 (B)(1)(d), the State responds as follows: The state has provided

copies of the following reports to Counsel for the Defendant: Copies of the report of Det. Sgt.

52

Peter J. Pizzulo, dated Wednesday, May 01, 2002 has provided to counsel for the Defendant as Exhibit number 248 -249, Report of D. Steven Greene dated May 29, 2002, numbered 250, Property Control form, Dated April 17, 2002, numbered 251-252, Supplemental 1 Corrected Copy of Brenda K. Gerardi, Dated 3/28/02, numbered 254-255, Supplemental 2 of Brenda K. Gerardi, Dated 6/17/02, numbered 256-258, Report of Donna L. Rose, Dated 12/14/01, numbered 259, Report of Michael E. Roberts, Dated 03/22/02, numbered 267, Report of Detective Anthony Leshnack, consisting of five (5) pages, numbered 275-279, Report of Michael E. Roberts, dated 3-22-02, numbered 280.

Pursuant to Crim. R. 16 (B)(1)(e), the State intends to call the following witnesses, whose criminal record, if any, is as follows: The State is providing to counsel for the Defendant a supplemental witness list, numbered 253, 260, 268, and 281.

Respectfully submitted,
STATE OF OHIO, by:

_____
KENNETH N. BAILEY
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
4th Floor Administration Building
160 High Street, N.W.
Warren, Ohio 44481-1092
Phone: (330) 675-2907
Fax: (330) 675-2431
Attorney Reg. # 0023228

and

_____
CHRISTOPHER D. BECKER
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
Attorney Reg. # 0047252

PROOF OF SERVICE

A copy of the foregoing document was served upon the Attorneys of record by hand-delivering a copy of the same to them, this 10th day of October 2002.

CHRISTOPHER D. BECKER (0047252)
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO

D:\Alex1\CRIMINAL\FELONY\Trumbull\Stuard\JE.roberts.wpd ✦ Wed 2 October 2002 - 01:18pm (1318 hrs)

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| *STATE OF OHIO,* | } | Case No. 01 CR 793 |
| Plaintiff | } | Judge John M. Stuard |
| | } | |
| -vs- | } | |
| | } | JUDGMENT ENTRY |
| | } | |
| *DONNA M. ROBERTS,* | } | |
| | } | |
| Defendant | } | |

Upon oral request of the Defendant, and with the concurrence of the State of Ohio, the motions hearing scheduled for September 20, 2002 at 9:00 a.m. is hereby ordered rescheduled to October 10, 2002 at 1:00 p.m.

HON. _____
JOHN M. STUARD, Judge

Date: 10/8/02

**Clerk**:  Please forward copies of this Judgment Entry to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, Trumbull County Prosecutor's Office, 160 High Street NW, Warren, Ohio 44481; and to J. Gerald Ingram, Esq., and John B. Juhasz, Esq., Counsel for Defendant, 7330 Market Street, Youngstown, OH 44512.

10/10/02 - copies sent

JUDGE JOHN M. STUARD ·TRUMBULL COUNTY COURTHOUSE· 120 HIGH STREET, NW · WARREN, OHIO 44481

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

State of Ohio )  Case Number _01_-CR-_793_
    Plaintiff )
 )  JUDGE JOHN M. STUARD
v. )
 )  Waiver of Speedy Trial
_Donna Marie Roberts_ )
    Defendant )

This matter came before this Court on this _24_ day of _October_, 2002, before the Honorable John M. Stuard, Judge of the Court of Common Pleas. The Defendant appeared with counsel, Attorney _Rual J. Gerngiso June 2 Juhne_, and the State was represented by Assistant Prosecuting Attorney _Bailey_.

The Court advised the Defendant that he/she has a right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution and Section 10, Article I of the Ohio Constitution. Further, the Defendant was advised pursuant to Ohio Supreme Court Rules of Superintendence, Rule 8(B), he/she has the right to be brought to trial within (6) months of arraignment on indictment or information.

The Defendant, voluntarily, and in open Court, agreed to waive his/her rights to a speedy trial; agreed to extend the time in which he/she has to be brought to trial by an additional _210_ days and hereby expressly agreed to the trial date selected below.

The Court, having fully advised the Defendant of his /her speedy trial rights, and being fully satisfied that the Defendant understood, and voluntarily waived the same, and for good cause shown, hereby accepts Defendant's Speedy Trial Waiver, and extends the time in which the Defendant must be brought to trial for an additional _210_ days beyond the statutorily imposed time period, and sets a trial date for _April 7_, 2002, said date being expressly approved by both the Defendant and the State.

_____
Defendant

_____
Counsel for Defendant

_____
Judge John M. Stuard

0985  232

54

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 686

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,              )
                           )
       Plaintiff        )    Case No.  01 CR 793
                           )
*vs.*                      )    Judge John M. Stuard
                           )
                           )
DONNA ROBERTS,             )
                           )
      Defendant       )    **Death Penalty Case**

---

DEFENDANT'S MOTION TO DISMISS DEATH SPECIFICATIONS
AND TO DECLARE INVALID
OHIO CONST. art. IV, §§2 AND 3 AND
OHIO REV. CODE ANN. §§2929.05 and 2953.02
REQUEST FOR HEARING

---

                                      J. GERALD INGRAM (#0007887)
                                       JOHN B. JUHASZ (#0023777)
                                       7330 Market Street
                                       Youngstown, Ohio  44512-5610
                                       Telephone: 330.758.2308
                                       Facsimile: 330.758.8290
                                       COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
Christopher D. Becker, Esq., Assistant
Kenneth N. Bailey, Esq., Assistant
160 High Street NW
Warren, Ohio  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

D:\Alex1\CAPITAL\Client\Roberts.Donna\Cover.Page.wpd•Sat 30Nov2002•1618.04 (04:18:04pm)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 687

D:\Alex1\CAPITAL\Client\Roberts.Donna\Death\Issue One.MTD.table.wpd°Sat 30 November 2002 - 05:39pm (1739 hrs)

# IN THE COURT OF COMMON PLEAS TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | |
| | } | |
| *vs.* | } | Judge John M. Stuard |
| | } | |
| | } | |
| DONNA M. ROBERTS, | } | |
| Defendant | } | |

---

### DEFENDANT'S MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONST. art. IV, §§2 AND 3 AND OHIO REV. CODE ANN. §§2929.05 and 2953.02 REQUEST FOR HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Court for an order dismissing the death specifications appended to the indictment and to declare invalid OHIO CONST. art. IV, §§2 and 3 and OHIO REV. CODE ANN. §§2929.05 and 2953.02.

For cause, the Defendant says that these jurisdictional statutes and constitutional amendments violate specific guarantees of the federal and state bill of rights and must therefore yield to those provisions of the bill of rights. Further in support of this Motion, the Defendant offers the attached Memorandum, which is incorporated herein as though fully rewritten herein. The Defendant also prays for a hearing on this motion.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2578 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJURIS@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 688

Respectfully submitted,

J. GERALD INGRAM 0007887

JOHN B. JUHASZ 0023777
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330·758·2308
Facsimile: 330·758·8290
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid,
❑ hand delivered to counsel or counsel's office
❑ sent by telecopier

this _____ day of December, 2002 to Christopher D. Becker, Esq., and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio 44481.

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JILJURISDOC@AOL.COM

ii

# TABLE OF AUTHORITIES CITED

*Cases*:

*Adamsky v. Buckeye Local School District* (1995), 73 Ohio St.3d 360, 1995 Ohio 298, 653 N.E.2d 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163 . . . . . . .  37

*Barclay v. Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (Stevens, J., concurring) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Beck v. Alabama* (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Bell v. State* (Ala. 1984), 461 So.2d  . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* (1971), 91 S.Ct. 1999, 29 L.Ed.2d 619 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

*California v. Ramos* (1983), 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Clark v. Jeter* (1987), 486 U.S. 456, 108 S.Ct. 1910 100 L.Ed.2d 465, 56 USLW 4527 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Classic Pictures, Inc. v. Department of Education* (1952), 158 Ohio St. 229, 108 N.E.2d 319, 48 Ohio Op. 453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  524

*Clemons v. State* (Miss. 1985), 473 So.2d 943 . . . . . . . . . . . . . . . . . . .  29

*Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 .  11-13

*Dickerson v. Attorney General* (1986), 396 Mass. 740, 488 N.E.2d 757 .  27

*Dunn v. Blumstein* (1972), 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail c/o Jbjjurisdoc@aol.com

iii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 690

*Eastman v. State* (1936), 131 Ohio St. 1, 1 N.E.2d 14, 5 Ohio Op. 248 . 33

*Eddings v. Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Evitts v. Lucey* (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821, 53 USLW 4101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Federal Communications Commission v. Beach Communications, Inc.* (1993), 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211, 61 USLW 4526 . . . . . . 15

*Ford v. Wainwright* (1986), 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335, 54 USLW 4799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 514 N.E.2d 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gardner v. Florida* (1977), 430 U.S. 340, 97 S.Ct. 1197, 51 L.Ed.2d 393 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 . . 6, 24, 33

*Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Griffin v. Illinois* (1956), 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 . . 9, 18

*Harmelin v. Michigan* (1991), 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836, 59 USLW 4839 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347, 55 USLW 4567 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail c/o jbjjurisdoc@aol.com

iv

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 691

*Hyde v. Reynoldsville Casket Co.* (1994), 68 Ohio St.3d 240, 1994 Ohio 67, 626 N.E.2d 75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Griffiths* (1973), 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 . . . 17, 19

*International Shoe Co. v. Washington* (1945), 326 U.S. 310 . . . . . . . . . 27

*Kinney v. Kaiser Aluminum & Chemical Corp.* (1975) 41 Ohio St.2d 120, 322 N.E.2d 880, 70 Ohio Op.2d. 206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Klepper v. Ohio Bd. of Regents* (1991), 59 Ohio St.3d 131, 570 N.E.2d 1124 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lindsey v. Normet* (1972), 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 . . . 10

*Lindsley v. Natural Carbonic Gas Co.* (1911), 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 . . . . 5, 24

*Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265, 50 USLW 4247 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Loving v. United States* (1996), 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 . . . 36

*Marbury v. Madison* (1803), 5 U.S. 137, 2 L.Ed. 60 . . . . . . . . . . . . . . 33

*McGautha v. California* (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McKane v. Durston* (1894), 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed.2d 867 . 9, 18

*Mississippi University for Women v. Hogan* (1982), 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090, 50 USLW 5068 . . . . . . . . . . . . . . . . . . . . . . . . 17

*Moore v. State* (1975), 233 Ga. 861, 213 S.E.2d 829 . . . . . . . . . . . . . . . 33

*Murray's Lessee v. Hoboken Land and Improvement Co.* (1856), 59 U.S. 272, 15 L.Ed. 372 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Payne v. Commonwealth* (1987), 233 Va. 460, 357 S.E.2d 500 . . . . 26, 33

*People v. Baker* (1993), 253 Ill. App.3d 15, 625 N.E.2d 719 . . . . . . . . . 29

*Profitt v. Florida* (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 . . 6, 24

*Roberts* v. *Louisiana* (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Romano v. Oklahoma* (1994), 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Romer v. Evans* (1986), 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855, 64 USLW 4353 . . . . . . . . . . . . . . . . . . . . . . . 23

*Schweiker v. Wilson* (1981), 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186, 49 USLW 4207 . . . . . . . . . . . . . . . . . . . . . . . 21

*Skinner v. Oklahoma* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 1994 Ohio 38, 633 N.E.2d 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State ex rel. Doersam v. Indus. Comm.* (1989), 45 Ohio St.3d 115, 543 N.E.2d 1169 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 399 N.E.2d 66, 15 Ohio Op.3d 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*State ex rel. Nyitray v. Indus. Comm.* (1983), 2 Ohio St.3d 173, 443 N.E.2d 962, 2 OBR 715 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJURISDOC@AOL.COM

vi

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 693

*State ex. rel. Turner v. Fender* (1922), 106 Ohio St. 191, 140 N.E. 182, 1 Ohio L.Abs. 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*State v Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*State v. Abi-Sarkis* (1988), 41 Ohio App.3d 333, 535 N.E.2d 745 . . . . . 28

*State v. Assad* (1992), 83 Ohio App.3d 114, 614 N.E.2d 772 . . . . . . . . 28

*State v. Bonnell* (1991), 61 Ohio St.3d 179, 573 N.E.2d 1082 . . . . . . . 34

*State v. Burroughs* (Dec. 16, 1999), Mahoning App. No. 93-CA-13, 1999 Ohio App. LEXIS 6200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895 . . . . . . . . 28, 31

*State v. Eley* (1978), 56 Ohio St.2d 169, 383 N.E.2d 132, 10 Ohio Op.3d 340 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*State v. Franklin* (2002), 97 Ohio St.3d 1, 2002 Ohio 5304, 776 N.E.2d 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State v. Gilkerson* (1965), 1 Ohio St.2d 103, 205 N.E.2d 13, 30 Ohio Op.2d 385 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*State v. Gross* (2002), 97 Ohio St.3d 121, 2002 Ohio 5524, 776 N.E.2d 1061 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227 . . . . . . . 34

*State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264 . . . . . . . . . 7

*State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768 . . . . . . . . . 7

*State v. Peagler* (1996), 76 Ohio St.3d 496, 668 N.E.2d 489 . . . . . . . . . 22

*State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568 . . . . . . . . 34

*State v. Powell* (1990), 49 Ohio St.3d 255, 552 N.E.2d 191 . . . . . . . . . 28

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

vii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 694

*State v. Ramirez* (1994), 178 Ariz. 116, 871 P.2d 237 . . . . . . . . . . . . . 26

*State v. Rojas* (1992), 62 Ohio St.3d 1501, 583 N.E.2d 972 . . . . . . . . . . 7

*State v. Rojas* (1992), 64 Ohio St.3d 131, 1992 Ohio 110, 592 N.E.2d 1376
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State v. Santine* (June 26, 1998), Ashtabula App. No. 97-A-0025, 1998 Ohio
App. LEXIS 2936 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Scudder* (1994), 71 Ohio St.3d 263, 1994 Ohio 298, 643 N.E.2d 524
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Shoemaker* (1996), 74 Ohio St.3d 664, 660 N.E.2d 1197 . . . . . . 28

*State v. Smith* (1997), 80 Ohio St. 3d 89, 1997 Ohio 355, 684 N.E.2d 668
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 30, 32, 33

*State v. Steffen* (1994), 70 Ohio St. 3d 399, 1994 Ohio 111, 639 N.E.2d 67
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*State v. Storch* (1993), 66 Ohio St.3d 280, 1993 Ohio 38, 612 N.E.2d 305, 61
USLW 2795 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*State v. Thompkins* (1996), 75 Ohio St.3d 558, 1996 Ohio 264, 664 N.E.2d
926 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*State v. Turvey* (1992), 84 Ohio App.3d 724, 618 N.E.2d 214 . . . . . . . 28

*State v. Tyler* (1990), 50 Ohio St.3d 24, 533 N.E.2d 576 . . . . . . . . . . . 28

*State v. Vrabel* (2001), 92 Ohio St.3d 1446, 751 N.E.2d 483 . . . . . . . . . 7

*State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 1996 Ohio 219, 662 N.E.2d
311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

*Taylor v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tuck v. Chapple* (1926), 114 Ohio St. 155, 151 N.E. 48 . . . . . . . . . . . 33

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: c/o JBJJURISDOC@AOL.COM

viii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 695

*United States Railroad Retirement Board v. Fritz* (1980), 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368, 49 USLW 4035 . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Carolene Products Co.* (1938), 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Virginia* (1996), 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735, 64 USLW 4638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*West Virginia v. Barnette* (1943), 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. Vermont* (1985), 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11, 53 USLW 4659 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Woodson v. North Carolina* (1976), 428 U.S. 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 24

*Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

*Constitutional Provisions*:

OHIO CONST., art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 34, 38

OHIO CONST., art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 34, 37, 39

OHIO CONST., art. I, §9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

OHIO CONST., art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

OHIO CONST., art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . 7, 17, 19, 21, 34, 38

OHIO CONST., art. IV, §§2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 32

OHIO CONST., art. IV, §3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4, 27, 32

U.S. CONST., amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. CONST., amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 17, 24, 34

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJUCRINDOC@AOL.COM

ix

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . 5, 6, 17, 21, 24, 34, 39

*Statutes*:

OHIO REV. CODE ANN. §2953.02  . . . . . . . . . . . . . . . . . . . . . . 2, 29, 30, 33

OHIO REV. CODE ANN. §§2929.05  . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33

*Other Authorities*:

Bowen, Katherine Drinker, *Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787* (Boston: Little, Brown & Co., Copyright ©1966, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Kozinski, Alex, and Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 CASE W. RES. L. REV. 1 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Medina v. California* (1992), 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353, 60 USLW 4684 (BLACKMUN, J., joined by STEVENS, J., dissenting) . . . 23

Pollack, *Natural Rights: Conflict and Consequences*, 27 OHIO ST.L.J. 559 (Fall 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: c/o JBJURISDOC@AOL.COM

x

## Memorandum in Support of Motion

### I

On January 5, 1994, Ohio Governor George Voinovich addressed the Ohio General Assembly in the annual State of the State Address. After addressing the problem of crime in Ohio, the Governor said:

> Finally, the tragic loss of Officer Robert Vallandingham at Lucasville reminds us that it is time to do more about the status of capital punishment in Ohio.
>
> I agree with his mom and dad, who took the time to express their feelings to me personally- the appeals never ended.
>
> Accordingly, I am today announcing my intention to seek your approval of a constitutional amendment to be placed on the November ballot, which would eliminate the review of death penalty cases by the court of appeals.
>
> We know that this will cut the appeals process by approximately two years.
>
> We also support the concepts outlined in House Bill 437, which would restructure *Habeas corpus* and post-conviction petitions to further reduce delays in processing capital punishment cases.
>
> It's time to recognize that justice in capital punishment cases has, for decades, been a prisoner, itself- held captive by a system that's not working—a system that prolongs the suffering of victims and their families—wastes untold amounts of taxpayer dollars—and renders the death penalty anything but a deterrent to heinous crimes!

The Governor's stated purpose for wanting the law changed was to avoid prolonged suffering by victims and their families and to save taxpayer dollars. With what appears to be uncharacteristic alacrity, the Ohio General Assembly responded and adopted 1994 HJR 15. The effect of HJR 15 was to place on the November, 1994 general election ballot a proposal to eliminate the court of appeals *only* from cases where death was actually imposed as a sentence. Collectively the constitutional amendments were known as "Issue One" and for convenience shall be referred to as such

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail c/o jbjjurisdoc@aol.com

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 698

herein.[1]  On November 8, 1994, the Ohio electorate voted to adopt Issue One and thereby amend OHIO CONST., art. IV, §§2 and 3.  The General Assembly then amended OHIO REV. CODE ANN. §§2929.05 and 2953.02, effective September 18, 1995, in an effort to make those statutes comport with the Issue One constitutional amendments.  The impact of Issue One is to deny an appeal of right in the court of appeals only in cases that occur on or after January 1, 1995 and only where death is actually imposed as a sentence.[2]  The Issue One amendments to the jurisdictional provisions of the Ohio

---

[1] Issue One amended OHIO CONST., art. IV, §§2(B)(2)© and 3(B)(2).  *See*, 1994 HJR 15.

[2] *See*, the Banks-Baldwin Editor's Comment to the 1994 amendments to the Ohio Constitution, found after OHIO CONST., art. IV §2.  The comment reads in part:

The amendment to this section and Sec. 3, Article IV, adopted November 8, 1994, eliminates the intermediate appeal in death penalty cases, providing instead for an appeal directly to the Ohio Supreme Court from the trial court.  The Schedule provides that the amendment applies only to cases in which the death penalty is imposed for crimes committed on or after January 1, 1995, and requires the General Assembly to amend the statute law to implement the direct appeal provision.

Prior to the amendment, the judgment or final order of the trial court in a felony case (including a capital case) could be appealed "as of right" to the court of appeals having territorial jurisdiction.  Section 3, Article IV, Ohio Constitution; RC 2502.03; App R 3(A).  In a capital case, if the death penalty was affirmed by the court of appeals, the defendant had a further appeal "as of right" to the Supreme Court under this section.  Other felony cases, however, could be appealed from the court of appeals to the Supreme Court only by leave of the Supreme Court first obtained.  The 1994 amendment leaves intact the two-step appellate process as to felony cases generally, but strips the court of appeals from jurisdiction to review death penalty cases, providing instead for a direct appeal "as a matter of right" from the trial court to the Supreme Court.

Although the amendment eliminates a major step in the basic appellate process, its effect on reducing delay between the imposition and execution of a death sentence may be comparatively minor.  An appeal in a capital case in Ohio typically takes a little over eighteen months from the time a death sentence is imposed until the court of appeals renders a decision, and another eighteen months for the Supreme Court to rule in the case.  The Supreme Court's decision does not conclude the case, however, it merely ends the first round of a larger process not touched by the amendment- a process involving further appeals, collateral proceedings and other actions brought on both federal and state levels by a death row inmate, and strung out for ten years or more. . . .

Copyright © Banks-Baldwin Law Publishing Co. 1996.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBJURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 699

Constitution make abundantly clear the intent to single out a class of cases.

OHIO CONST., art. IV, §2 as amended provides in pertinent part:

§2 The supreme court.
(A) The supreme court shall, until otherwise provided by law, consist of seven judges, who shall be known as the chief justice and justices. In case of the absence or disability of the chief justice, the judge having the period of longest total service upon the court shall be the acting chief justice. If any member of the court shall be unable, by reason of illness, disability or disqualification, to hear, consider and decide a cause or causes, the chief justice or the acting chief justice may direct any judge of any court of appeals to sit with the judges of the supreme court in the place and stead of the absent judge. A majority of the supreme court shall be necessary to constitute a quorum or to render a judgment.
(B)(1) The supreme court shall have original jurisdiction in the following:

. . .

(2) The supreme court shall have appellate jurisdiction as follows:
(a) In appeals from the courts of appeals as a matter of right in the following:

. . .

© In *direct appeals from the courts of common pleas* or other courts of record inferior to the court of appeals as a matter of right in *cases in which the death penalty has been imposed;*

. . .

(Emphasis added.) OHIO CONST., art. IV, §3 as amended provides in pertinent part:

§3 Court of appeals.
(A) The state shall be divided by law into compact appellate districts in each of which there shall be a court of appeals consisting of three judges. Laws may be passed increasing the number of judges in any district wherein the volume of business may require such additional judge or judges. In districts having additional judges, three judges shall participate in the hearing and disposition of each case. The court shall hold sessions in each county of the district as the necessity arises. The county commissioners of each county shall provide a proper and convenient place for the court of appeals to hold court.
(B)(1) The courts of appeals shall have original jurisdiction in the following:

. . .

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJJURISDOC@AOL.COM

3

    (2) Courts of appeals shall have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district, *except that courts of appeals shall not have jurisdiction to review on direct appeal a judgment that imposes a sentence of death.* Courts of appeals shall have such appellate jurisdiction as may be provided by law to review and affirm, modify, or reverse final orders or actions of administrative officers or agencies.

    (3) A majority of the judges hearing the cause shall be necessary to render a judgment. Judgments of the courts of appeals are final except as provided in section 2(B)(2) of this article. No judgment resulting from a trial by jury shall be reversed *on the weight of the evidence* except by the concurrence of all three judges hearing the cause.

(Emphasis added.) The blatant political nature of Issue One is manifested in its logical and procedural difficulties.[3] As will be demonstrated, Ohio's statutes, amended after Issue One, violate the state and federal constitutions; and the Ohio Constitution's jurisdictional provisions as

---

[3] If a defendant is convicted at the same time and at the same trial of, *e.g.*, aggravated robbery—which might form the basis for a death penalty specification under OHIO REV. CODE ANN. §2929.04(A)(7)—does he then have two separate appeals simultaneously prosecuted, one in the court of appeals for the aggravated robbery conviction and one in the Supreme Court for the death penalty conviction? No, held the Supreme Court in *State v. Smith* (1997), 80 Ohio St. 3d 89, 1997 Ohio 355, 684 N.E.2d 668, *cert. denied, Smith v. Ohio* (1998), 523 U.S. 1125, 118 S.Ct. 1811, 140 L.Ed.2d 949, 66 USLW 3748:

    Defendant also appeals the dismissal by the court of appeals of his noncapital charges, arguing that only the capital charges can go directly to the Supreme Court of Ohio. However, the plain language of the amendments speaks of "*cases* in which the death penalty has been imposed" and "*judgment* that imposes the sentence of death." (Emphasis added.) Section 2(B)(2)(c), Article IV and Section 3(B)(2), Article IV, Ohio Constitution. Thus the Supreme Court has jurisdiction over the whole case, instead of counts, charges, or sentences.

    . . . Indeed, to so separate the convictions and appeals would lead to further delay, confusion in record transmittal, waste of judicial resources, possible inconsistency in decisions, and a further wait for the appeal to the Supreme Court from the appellate court on noncapital cases (albeit now only a two to three percent chance of being accepted instead of the current certainty of review). Such absurd consequences were surely never intended by the voters in passing such amendments and would thwart the very purpose of expeditious review of capital cases.

*Id.*, 80 Ohio St.3d at 104. (Emphasis in original.) This Supreme Court has been widely criticized for legislating rather than judging, and the *Smith* case is a prime example. The phrase "judgment that imposes the sentence of death" is not from the jurisdictional provisions for the Supreme Court but from the jurisdictional provision relating to the courts of appeal.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

4

amended by Issue One violate guarantees of the federal constitution as well as the specific guarantees of the Ohio "Bill of Rights."

## II

*Due Process and Cruel and Unusual Punishment.* Ohio's present capital laws, at least before Issue One, reflected the effort of the General Assembly to comply with the federal constitutional requirements for imposing the death penalty. Before 1972, mandatory death sentences largely had been abandoned across the United States. Instead, many states had adopted discretionary sentencing laws for death penalty cases.[4] In *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the United States Supreme Court held that unbridled discretionary sentencing violated U.S. CONST., amend. VIII and XIV.[5] After *Furman*, many states, including Ohio, enacted laws to try to impose the death penalty and at the same time to comply with the constitutional requirements imposed by *Furman*. Ohio, however, was unsuccessful in its first attempt. Its post-*Furman* scheme was declared invalid in *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. After *Lockett*, the Ohio General Assembly again enacted a

---

[4] Just a year before *Furman*, the United States Supreme Court had decided *McGautha v. California* and a Ohio companion case, *Crampton v. Ohio*, both at (1971), 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 973. *McGautha* had held that untrammeled discretion of the trial jury to impose a death sentence did not offend U.S. CONST. amend. VIII and XIV.

[5] The issue of whether U.S. CONST. amend. VIII applied to state court proceedings had long been settled with the Supreme Court holding that such provisions do indeed apply to state court proceedings. *See, Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: CJO.JBJUERSDOC@AOL.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 702

capital law that it hoped would survive a constitutional challenge. The result was the present capital laws, except as now modified by Issue One.[6]

The death sentence may not be imposed consistent with U.S. CONST., amend. VIII unless the process is one that is reliable and results in a sentence of death not arrived at through arbitrary or capricious action. *See, Furman v. Georgia, ante; Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. The Cruel and Unusual Punishment provisions of U.S. CONST., amend. VIII to one side, the Due Process requirements of the federal Constitution are mandated in state death penalty cases. Indeed, it is through the Due Process Clause of U.S. CONST., amend. XIV that the provisions of U.S. CONST., amend. VIII apply to state criminal prosecutions. *See, Robinson v. California, ante.* Before Issue One, the Ohio law involved a multi-step review and appeal process.[7] Each facet of the Ohio law as it

---

[6] There have also been amendments, not material here but discussed in other motions filed by the Defendant, to impose a life sentence without parole eligibility as a sentencing option, and to impanel a new sentencing jury if the death sentence is reversed on appeal.

Ohio's law before Issue One required a jury to weigh aggravating circumstances against mitigating factors, and to impose the death penalty only when the jury is persuaded beyond the existence of any reasonable doubt that the aggravating circumstances outweigh the evidence presented in mitigation. It also had other facets designed to genuinely narrow the class of offenders eligible for the death penalty and to insure reliability in the process of imposing the death sentence. *See, e.g., Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891; *Woodson v. North Carolina* (1976), 428 U.S. 305, 96 S.Ct. 2978, 49 L.Ed.2d 944. Included were provisions so that a defendant under the age of eighteen could not be sentenced to death, regardless of the offense, provisions for expert assistance so that an indigent could receive a proper defense and present mitigation evidence, and provisions for mandatory appeals to both the court of appeals and the Supreme Court of Ohio.

Ohio's pre-Issue One law recognized the appeal to the court of appeals as a mandatory part of the process of insuring reliability in the imposition of the death penalty. The courts of appeal and the Supreme Court have reversed roughly the same number of capital cases, *see,* Defendant's Motion to Dismiss Death Specifications Due to Inadequate Appellate Review. Issue One takes away that facet, not with the stated purpose of insuring reliability in the process of imposing death, but in an unabashed effort to speed up executions. Death is "different" in Ohio: it is singled out for the bum's rush to "justice."

[7] Similar formats were upheld by the United States Supreme Court in *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; and *Profitt v. Florida* (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913. At the same time, the Court struck down North Carolina's and

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJURISDOC@AOL.COM

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 703

existed before Issue One was ostensibly designed to avoid the arbitrary and capricious infliction of the death penalty. The present law has thus far been upheld. *See, e.g., State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, *cert. denied, Jenkins v. Ohio* (1985), 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643; and *State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, *cert. denied, Maurer v. Ohio* (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728, 53 USLW 3869.[8]

Before Issue One, a defendant sentenced to death received an appeal as of right first in the court of appeals and then in the Ohio Supreme Court.[9] The automatic review of a death sentence by two courts rather than one provides an additional level of reliability. The post-*Lockett* statutory scheme allowed the court of appeals the opportunity to ferret out errors and focus

---

[7] (...continued)
Louisiana's mandatory punishment provisions. *See, Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; and *Roberts* v. *Louisiana* (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.

[8] Notwithstanding that the state courts have upheld the death penalty in Ohio, the defendant does not concede that Ohio's present death penalty is constitutional under either the State or Federal Constitutions. The defendant has filed separately a motion to dismiss the death penalty specifications because the death penalty in Ohio is unconstitutional.

[9] *See, State v. Rojas* (1992), 62 Ohio St.3d 1501, 583 N.E.2d 972. In that case, Defendant Martin Rojas filed a motion to discontinue his direct appeal and to be executed. That motion was denied. Implicit in the Ohio Supreme Court's ruling is that a death row inmate must exhaust his direct appeal in both the court of appeals and the Supreme Court. *See,* later decision at *State v. Rojas* (1992), 64 Ohio St.3d 131, 1992 Ohio 110, 592 N.E.2d 1376, *cert. denied, Rojas v. Ohio* (1993), 506 U.S. 1064, 113 S.Ct. 1007, 122 L.Ed.2d 156, 61 USLW 3479. Another local capital case, still pending before the Supreme Court, is that of Steve Vrabel. *See, State v. Vrabel* (2001), 92 Ohio St.3d 1446, 751 N.E.2d 483, where the Court after ordering the parties to submit memoranda on the Appellant's *pro se* motions to prevent being penalized for not complying with the Supreme Court Rules of Practice; to waive all appeals; to waive the Supreme Court's review of appellant's death sentence; to forgo expert evaluation to determine competence to waive appeals; to discharge attorneys; to ignore any other party's request for delays or expert evaluation; and to set execution date in ninety days, ordered all of the motions " stricken." A powerful case can be made that the arcane nature of the Ohio Supreme Court's practice rules denies meaningful access to that Court in violation of OHIO CONST., art. I, §16. Though that argument will not be developed here, the Vrabel case makes the point succinctly.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · Youngstown, Ohio 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL c/o JBJURISDOC@AOL.COM

7

attention on material parts of a usually voluminous record, thus conserving the judicial resources of the Supreme Court of Ohio.[10]  There is no reason to assume that the number of people sentenced to death will decline.  Before Issue One, the courts of appeal had reversed approximately the same number of death cases as had the Ohio Supreme Court.  The Supreme Court is now going to be threatened with the same type of backlog that exists in the California Supreme Court.  That court each year handles only about ten per cent of the pending death cases before it.  The effect may be not to increase the speed of executions, but to slow them down.[11]  In any event, regardless of the political ramifications, seven appellate judges rather than ten now review capital cases on direct appeal, thereby reducing the reliability of the process imposing death.[12]

---

[10] Much like in the federal judicial system, the ability to use additional manpower is much greater on the appellate court level than is the ability to employ such manpower at the Supreme Court level.  The United States Supreme Court consists of nine (9) justices, and if one or more is unable to serve on a particular case, the case is decided with the number of remaining justices, provided that the minimum number is satisfied.  The Ohio Supreme Court consists of seven (7) justices.  Often a justice will designate another judge from another court to sit in his or her stead by assignment.  However, the number of justices available to review any given death penalty case never exceeds seven (7).  On the other hand, many courts of appeal have more than enough judges for one three judge panel, thus enabling the workload created by capital cases to be spread out much more easily at the appellate level than can be done at the Supreme Court level.

[11] Alternatively, more money could be spent by the Supreme Court for additional staffing and perhaps even the assignment of other judges to sit on death cases.  However, that would involve the expenditure of additional tax dollars, something Issue One was designed not to do.

[12] No better example of this truism can be found than in the case of *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347, 55 USLW 4567.  In that case, Hitchcock's direct appeals and state remedies had all been denied.  His federal *habeas corpus* petition had been denied.  The United States Supreme Court, in reviewing the appeal of his *habeas* denial, granted relief.  The procedural history of reported opinions on Hitchcock's case before Justice Scalia and the other justices unanimously held that Hitchcock's right to relief "could not be clearer" was: *Hitchcock v. State* (Fla. 1982), 413 So.2d 741, 1982 Fla. LEXIS 2365, *cert. denied, Hitchcock v. Florida* (1982), 459 U.S. 960, 74 L.Ed.2d 213, 103 S.Ct. 274; *post-conviction proceeding, Hitchcock v. State* (Fla. 1983), 432 So.2d 42, 1983 Fla. LEXIS 2351; *habeas corpus proceeding, Hitchcock v. Wainright* (11ᵗʰ Cir. Fla. 1984), 745 F.2d 1332, *affirmed en banc by Hitchcock v. Wainright* (11ᵗʰ Cir. Fla. 1985), 770 F.2d 1514, 1985 U.S. App. LEXIS 26360, *rehearing denied en banc by, Hitchcock v. Wainright* (11ᵗʰ Cir. Fla. 1985), 777 F.2d 628, 3 Fed. R. Serv.3d (Callaghan) 1181, *writ of certiorari granted, in*

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL CJO.JBJURISDOC@AOL.COM

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 705

*Equal Protection.*  Issue One deprives the Defendant and all persons similarly situated of equal protection of the laws, guaranteed by U.S. CONST., amend. XIV.  The United States Constitution has not been interpreted to require a state to afford any opportunity for direct appeal in criminal cases. *See, McKane v. Durston* (1894), 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed.2d 867.  However, once a state chooses, as Ohio has done, to provide for a direct appeal as a matter of right, it must do so in a way that comports with the minimum standards of the Equal Protection Clause.[13]  *See, e.g., Griffin v. Illinois* (1956), 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; *see, also*, OHIO CONST., art. I, §2.

In *Skinner v. Oklahoma* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655, the Supreme Court had before it an Oklahoma statute that provided for compulsory sterilization of habitual criminals.  Habitual criminals were defined as those who had been convicted of three or more felonies involving moral turpitude.  The Court held the law invalid, saying that "[w]hen the law lays an unequal hand on those who have committed intrinsically the

---

[12] (...continued)
*part: Hitchcock v. Wainwright* (1986), 476 U.S. 1168, 90 L.Ed.2d 976, 106 S.Ct. 2888, 54 USLW 3809, *reversed and remanded by Hitchcock v. Dugger* (1987), 481 U.S. 393, 95 L.Ed.2d 347, 107 S.Ct. 1821, 55 USLW 4567.  Countless judges had passed upon Hitchcock's arguments and denied them.  In the last appeal before execution, he was granted relief by a unanimous Supreme Court (which had earlier declined to hear his case).

[13] In reality, much of the talk that there was historically no constitutional right to appeal, while interesting, has little merit in Ohio, which constitutionally provides not only for appellate courts but for their specific jurisdiction.  Though it is arguable that Ohio could constitutionally provide for an appellate system without constitutionally guaranteeing the right of appeal, that argument is too esoteric for all but the most idle of the country's law professors.
At any rate, the fact that Ohio does provide for an appeal leaves for another day any discussion of why there would be federal appellate courts if there were no constitutional right to an appeal, and where the Due Process Clause fits into a system which presumptively guarantees that every trial will be fair so that a litigant may have had the process which was "due" without an appeal to correct error.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 706

same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *Id.*, 316 U.S. at 541.  If one substitutes the death penalty for sterilization, it is clear that the Issue One denies equal protection. Under Issue One, a person who commits an aggravated murder during the course of an aggravated robbery may or may not be spared the death sentence.  As the aggravating circumstance is the same, to-wit: OHIO REV. CODE ANN. §2929.04(A)(7), it is only the difference in mitigation that spares or fails to spare a defendant from the death sentence.  Defendant A, convicted of aggravated murder under OHIO REV. CODE ANN. §§2903.01(B) and 2929.04(A)(7) may be sentenced to death, while Defendant B, convicted of exactly the same statutes, may be spared the death penalty because of the mitigating evidence.  In terms of the criminal act, however, their conduct is "intrinsically the same quality of offense."  Yet, under Issue One, Defendant A, having been sentenced to death, receives no appeal in the court of appeals for his capital convictions, while Defendant B does enjoy such an appeal. There can be no clearer violation of the Equal Protection Clause.

The United States Supreme Court has regularly held that equal protection principles forbid creation of arbitrary classes that result in discrimination for civil claimants.  *See, e.g., Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265, 50 USLW 4247; *Lindsey v. Normet* (1972), 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36; *see, also, Adamsky v. Buckeye Local School District* (1995), 73 Ohio St.3d 360, 1995 Ohio 298, 653 N.E.2d 212; *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 1994 Ohio 38, 633 N.E.2d 504; *Gaines v. Preterm-Cleveland, Inc.* (1987), 33

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJURISDOC8AOL.COM

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 707

Ohio St.3d 54, 514 N.E.2d 709.   There is no constitutionally justifiable reason why those guarantees should not apply with equal force to criminal defendants.   The invidious nature of the classification created by Issue One is self-evident because Issue One is geared specifically to one type of criminal case; a case in which the defendant is sentenced to death.   Issue One does not affect the jurisdiction of the appellate courts in misdemeanor criminal cases, in felony criminal cases, or in capital cases where (a) the defendant was indicted with a capital specification but not sentenced to death; or (b) the offense was committed before midnight, December 31, 1994.[14]   Issue One creates a special classification: capital murder defendants actually sentenced to death.   In fact, were the Supreme Court of Ohio concerned with a true proportionality review in death cases, it would see that having only death cases directly reviewed (while other capital cases where a sentence less than death is imposed are reviewed in the appellate courts) results in a pool of inadequate information to perform the type of proportionality review that the Eighth Amendment commands.   *See, e.g., Coker v. Georgia* (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982.  There, in deciding that a death sentence for adult rape in all circumstances violated the Eighth Amendment, the Court reiterated what it needed for a true proportionality review:

---

[14]  If a criminal defendant is indicted capitally and convicted of a lesser-included offense of aggravated murder, he enjoys a direct appeal to the court of appeals.  If the capital murder defendant is convicted of aggravated murder but is found not guilty of the capital specifications, that defendant enjoys a right of appeal to the court of appeals.  *See, e.g., State v. Santine* (June 26, 1998), Ashtabula App. No. 97-A-0025, 1998 Ohio App. LEXIS 2936, *appeal dismissed*, (1998), 83 Ohio St. 3d 1473, 701 N.E.2d 380.  If a capital murder defendant is convicted of aggravated murder and one or more capital specifications, but the jury recommends one of the life imprisonment terms, that defendant enjoys a direct appeal to the court of appeals.  *See, e.g., State v. Burroughs* (Dec. 16, 1999), Mahoning App. No. 93-CA-13, 1999 Ohio App. LEXIS 6200.

In sustaining the imposition of the death penalty in *Gregg*, however, the Court firmly embraced the holdings and dicta from prior cases, *Furman* v. *Georgia, supra; Robinson* v. *California,* 370 U.S. 660 (1962); *Trop v. Dulles,* 356 U.S. 86 (1958); and *Weems* v. *United States,* 217 U.S. 349 (1910), to the effect that the Eighth Amendment bars not only those punishments that are "barbaric" but also those that are "excessive" in relation to the crime committed. Under *Gregg,* a punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground. Furthermore, these Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent. To this end, attention must be given to the public attitudes concerning a particular sentence—history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions are to be consulted. In *Gregg,* after giving due regard to such sources, the Court's judgment was that the death penalty for deliberate murder was neither the purposeless imposition of severe punishment nor a punishment grossly disproportionate to the crime. But the Court reserved the question of the constitutionality of the death penalty when imposed for other crimes. 428 U.S., at 187 n. 35.

### III

That question, with respect to rape of an adult woman, is now before us. We have concluded that a sentence of death is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment. [Footnote omitted.]

It was also observed in *Gregg* that "[t]he jury... is a significant and reliable objective index of contemporary values because it is so directly involved," 428 U.S., at 181, and that it is thus important to look to the sentencing decisions that juries have made in the course of assessing whether capital punishment is an appropriate penalty for the crime being tried. Of course, the jury's judgment is meaningful only where the jury has an appropriate measure of choice as to whether the death penalty is to be imposed. As far as execution for rape is concerned, this is now true only in Georgia and in Florida; and in the latter State, capital punishment is authorized only for the rape of children.

According to the factual submissions in this Court, out of all rape convictions in Georgia since 1973—and that total number has not been tendered—63 cases had been reviewed by the Georgia Supreme Court as of the time of oral argument; and of these, 6

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJURISDOC@AOL.COM

12

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 709

> involved a death sentence, 1 of which was set aside, leaving 5
> convicted rapists now under sentence of death in the State of Georgia.
> Georgia juries have thus sentenced rapists to death six times since
> 1973. This obviously is not a negligible number; and the State argues
> that as a practical matter juries simply reserve the extreme sanction
> for extreme cases of rape and that recent experience surely does not
> prove that jurors consider the death penalty to be a disproportionate
> punishment for every conceivable instance of rape, no matter how
> aggravated. Nevertheless, it is true that in the vast majority of cases,
> at least 9 out of 10, juries have not imposed the death sentence.

*Id.*, 433 U.S., at 591-592, 596-597.

The Equal Protection Clause guarantees that similar individuals will be dealt with in a similar manner by the government. The Clause deprives the government the unfettered ability to classify persons or to "draw lines" in the creation and application of laws. The promise of Equal Protection assures that classifications will not be based upon impermissible criteria or will not be used arbitrarily to burden a group of individuals. When a law employs a classification of persons who are accorded differing benefits or assessed differing burdens, it must be tested under the equal protection guarantee.[15] If the created classification does not meet *or does not have a sufficient relationship* to a required governmental purpose, then the law cannot withstand an Equal Protection Clause challenge. "Equal protection of the laws requires the existence of *reasonable grounds* for making a distinction between those within and those outside a designated class." *See, State ex rel. Nyitray v. Indus. Comm.* (1983), 2 Ohio St.3d 173, 175, 443

---

[15] The Defendant by no means ignores the assurance of OHIO CONST., art. I, §2, which has different wording than the federal equal protection guarantee, though the courts have largely ignored the Ohio Constitution. "The standard for determining violations of equal protection is essentially the same under state and federal law." *See, Fabrey v. McDonald Police Dept.* (1994), 70 Ohio St. 3d 351, 353, 1994 Ohio 368, 639 N.E.2d 31.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBJJURIS@SOL.COM

13

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 710

N.E.2d 962, 2 OBR 715; *State ex rel. Doersam v. Indus. Comm.* (1989), 45 Ohio St.3d 115, 120, 543 N.E.2d 1169.

In determining whether a statute's classification is sufficiently related to a required governmental purpose so as to comply with guarantees of equal protection, courts traditionally have subjected the challenged statute to different levels of scrutiny depending on the group or nature of the right affected by the legislation. If the classification drawn by the statute affects neither a "suspect class," nor a "fundamental right," then the statute will be subjected only to a minimal level of scrutiny by the courts, often called the "rational basis" or "rational relations" test. *See, e.g., Lindsley v. Natural Carbonic Gas Co.* (1911), 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369. If the classification employed by the legislature is rationally related to a legitimate governmental interest or objective, the statute does not violate the constitutional guarantees of equal protection. *See, State v. Thompkins* (1996), 75 Ohio St.3d 558, 561, 1996 Ohio 264, 664 N.E.2d 926; *Klepper v. Ohio Bd. of Regents* (1991), 59 Ohio St.3d 131, 133, 570 N.E.2d 1124. Under this "rational basis" test, "great deference is paid to the state." *See, State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 11, 399 N.E.2d 66, 15 Ohio Op.3d 3.[16]

---

[16] The United States Supreme Court has summarized the narrow scope of the "rational relation" test as follows:

Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. *See Sullivan v. Stroop*, 496 U.S. 478, 485 (1990); *Bowen v. Gilliard*, 483 U.S. 587, 600-603 (1987); *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174-179 (1980); *Dandridge v. Williams*, 397 U.S. 471, 484-485 (1970).

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJURISDOC@AOL.COM

14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 711

Conversely, when, as here, the classification drawn by the government affects a "fundamental right," the enactment must be subjected to "strict scrutiny" by the Court.  Under the "strict scrutiny" test, a court must not defer to the decision of the other branches of government, but must independently determine the degree of relationship which the classification bears to a constitutionally compelling end—if one there be.  Under this analysis a court may not accept every permissible government purpose as sufficient to support the classification.  Instead, the Court must require the government to show that it is pursuing a "compelling" or "overriding" end.  Even then, the Court may not uphold the classification unless the Court has independently reached the conclusion that the classification is necessary, or narrowly tailored, to promote that compelling interest.  Although absolute necessity might not be required, a court must require the government to show a close relationship between the classification and promotion of a compelling or overriding interest.  If the Court concludes that the classification need not be employed to achieve such an end, the law will be held to violate the Equal Protection Clause.

The "strict scrutiny" test emanated from the famous "footnote four" in *United States v. Carolene Products Co.* (1938), 304 U.S. 144, 152-153, 58

---

[16] (...continued)
Where there are "plausible reasons" for Congress' action, "our inquiry is at an end." *United States Railroad Retirement Bd. v. Fritz, supra,* at 179. This standard of review is a paradigm of judicial restraint. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley,* 440 U.S. 93, 97,(1979)(footnote omitted).
*See, Federal Communications Commission v. Beach Communications, Inc.* (1993), 508 U.S. 307, 313-314, 113 S.Ct. 2096, 124 L.Ed.2d 211, 61 USLW 4526.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL C/O JBJURINDOC@AOL.COM

15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 712

S.Ct. 778, 82 L.Ed. 1234.[17] Under the strict scrutiny standard of review, the burden is on the government to demonstrate a substantial and compelling reason for the classification chosen.[18] *See, Dunn v. Blumstein* (1972), 405 U.S. 330, 342-343, 92 S.Ct. 995, 31 L.Ed.2d 274.  The government must show that the challenged law is "*necessary* to promote a *compelling* governmental interest." *Id.*, 405 U.S. at 342 (emphasis in the original). The burden of justification on the government is a heavy one.  *Id.*, 405 U.S. at 343. The government must prove that the classification "furthers a very substantial state interest."  *Id.* In addition, "in pursuing that important interest, the State cannot choose means that *unnecessarily burden or restrict constitutionally protected activity.*  Statutes affecting constitutional rights must be drawn with 'precision;' .   .   . and must be 'tailored' to serve their legitimate objectives .   .   .   . And *if there are other, reasonable ways to*

---

[17] The famous and controversial footnote four provided something of a setback to those who automatically assumed every legislative enactment to be constitutional.  Justice Stone's opinion noted that: "the existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." 304 U.S. at 152.  At this point he added the famous footnote, which read in pertinent part::

> There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth. [Citations omitted.]
>
> It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation.   .   .   .   Nor need we enquire   .   .   . whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry. [Citations omitted.]

*Id.*

[18] It is not only appropriate but necessary to hold a hearing on this matter, as the Ohio Supreme Court in *State v. Smith, ante,* engaged in virtually none of this required analysis.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 713

*achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.* If it acts at all, it must choose 'less drastic means.'" *Id.* (citations omitted) (emphasis added); *see, also, In re Griffiths* (1973), 413 U.S. 717, 721-722, 93 S.Ct. 2851, 37 L.Ed.2d 910.[19]

Here, strict scrutiny analysis is obviously appropriate. It would be obtuse to claim that fundamental rights are not involved here. At stake are the ability to defend life and liberty, OHIO CONST., art. I, §1, due process of law, U.S. CONST., amend. XIV, a remedy by due course of law, OHIO CONST., art. I, §16, the effective assistance of counsel, U.S. CONST., amend. VI and XIV, the administration of justice without denial, OHIO CONST., art. I, §16, and the ability to remain free from cruel and unusual punishment. U.S. CONST., amend. VIII and XIV, and OHIO CONST., art. I, §9. There is no doubt that liberties specified as sacrosanct against encroachment by the government are "fundamental." No citation of authority is required for the proposition that due process of law is a "fundamental right".[20] If one requires

---

[19] As if life were not challenging enough, the Supreme Court has also composed a third level of scrutiny, described as "intermediate scrutiny," in equal protection cases involving classifications based on gender and classifications based on a person's status as "legitimate" or "illegitimate" at birth. *See, e.g., Mississippi University for Women v. Hogan* (1982), 458 U.S. 718, 723-726, 102 S.Ct. 3331, 73 L.Ed.2d 1090, 50 USLW 5068; *Clark v. Jeter* (1987), 486 U.S. 456, 461-462, 108 S.Ct. 1910 100 L.Ed.2d 465, 56 USLW 4527; *United States v. Virginia* (1996), 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735, 64 USLW 4638. Under the "intermediate scrutiny" test, the government burden is to demonstrate an "exceedingly persuasive justification" for the classification. *Mississippi University for Women v. Hogan, ante,* 458 U.S. at 724.

[20] All the talk of fundamental rights would have had at least some of the Framers stewing in their own juices. Noah Webster, for example, noted that the panoply of personal liberties cannot be defined. Webster suggested that it was impossible to set forth in a "Bill of Rights" the list of all unalienable freedoms. He sarcastically suggested a constitutional clause "that everybody shall, in good weather, hunt on his own land, and catch fish in rivers that are public property . . . And that Congress shall never restrain any inhabitant of America from eating and drinking, at seasonable times, or prevent his lying on his left side, in a long winter's night, or even on his back, when he is fatigued by lying on his right." *See,* Katherine Drinker Bowen, *Miracle at Philadelphia: The Story*

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: CJO.JBJJURISDOC@AOL.COM

17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 714

a citation, *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, is as good as any. Nor can it be any clearer than that of OHIO CONST., art. I, §1 demonstrates the fundamental nature of the ability to defend life and liberty.  Fundamental rights, whether regarded as rights or immunities, mean nothing if the judiciary does not protect them,[21] and that protection cannot be effectively accomplished absent the ability to appeal.[22] The late Justice Robert H. Jackson, writing for the Court in *West Virginia v. Barnette* (1943), 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674, noted that some liberties are above a majority vote:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

Here, the government cannot demonstrate a substantial and compelling reason for the classification chosen.  *See Dunn v. Blumstein, ante,* 405 U.S. at 342-343.  The government cannot meet its "heavy" burden to demonstrate that Issue One is "*necessary* to promote a *compelling* governmental interest." *Id.*, 405 U.S. at 342, 343 (emphasis in the original).

---

[20] (...continued)
*of the Constitutional Convention May to September 1787* (Boston: Little, Brown & Co., Copyright ©1966, 1986), 246.  How arrogant Webster would have thought it for judges to decide that some liberties are "fundamental" while others are not.

[21] Indeed, it seems clear that the jurisdictional provisions of OHIO CONST., art. IV and the courts created thereby exist in large measure to provide citizens of this State the "ability to defend life and liberty", OHIO CONST., art. I, §1, and to have a "remedy by due course of law", OHIO CONST., art. I, §16.

[22] While the right to appeal has been held not to be guaranteed by the Federal Constitution, *McKane v. Durston, ante,* where an appeal is provided for, that appeal must comply with the minimum requirements of due process and equal protection. *See, e.g., Griffin v. Illinois, ante.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: CFO.JBJURISDOC@AOL.COM

18

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 715

The government cannot establish that the classification "furthers a very substantial state interest" *id.*, or that "in pursuing that important interest, the State cannot choose means that *unnecessarily burden or restrict constitutionally protected activity.* Statutes affecting constitutional rights must be drawn with 'precision;' . . . and must be 'tailored' to serve their legitimate objectives . . . . And *if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.* If it acts at all, it must choose 'less drastic means.'" *Id.* (citations omitted) (emphasis added); *see, also, In re Griffiths* (1973), 413 U.S. 717, 721-722, 93 S.Ct. 2851, 37 L.Ed.2d 910. Here, the law in Ohio before Issue One demonstrates that there were in place less drastic means of accomplishing the government's end, which presumably is promoting public safety and welfare by executing capital murderers. The track record of the Ohio Supreme Court since Issue One, where there is a death penalty case bottleneck, shows not only that there is no compelling government end, but that the stated illegitimate governmental end of speedier executions through fewer appellate delays is not being accomplished.[23] *See, e.g, State v. Gross* (2002), 97 Ohio St.3d 121,

---

[23] Though there is a bottleneck at the Supreme Court, it is not due to what many have regarded as the major source of delay in the system: those darned criminal defense lawyers. No matter what the size of the record, appellate counsel for a capital defendant is given no more than 110 days to review the record and write a brief. Beyond the scope of this argument is whether such unrelenting application of the Court's arcane practice rules is a denial of meaningful access to the courts and the effective assistance of appellate counsel. *See, e.g.,* OHIO CONST., art. I, §16; *Evitts v. Lucey* (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821, 53 USLW 4101.

2002 Ohio 5524, 776 N.E.2d 1061;[24] *State v. Franklin* (2002), 97 Ohio St.3d 1, 2002 Ohio 5304, 776 N.E.2d 26.[25]

In *Williams v. Vermont* (1985), 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11, 53 USLW 4659, the Supreme Court struck down a Vermont statute as being in violation of the Equal Protection Clause. The Court held that the fact that all of those persons in a created classification are treated equally has "no bearing on the legitimacy of that classification in the first place". *Id.*, at 27. A State, held the Supreme Court:

> cannot deflect an equal protection challenge by observing that in light of the statutory classification all those within the burdened class are similarly situated. The classification must reflect pre-existing differences; it cannot create new ones that are supported only by their own bootstraps. "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes." *Rinaldi v. Yeager*, 384 U.S. 305, 308, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966).

Here, Ohio has done exactly what the United States Constitution says that it cannot. Ohio has *created* a "burdened class", not singled out a pre-existing class for different treatment. The created "burdened class" consists of those sentenced to death. The statutes in effect before the Issue One amendments prove clearly that there were no pre-existing differences. The only differences are the ones created by the Issue One amendment and supported by its bootstraps. Assuming for discussion purpose that the jury and trial court properly weigh in each case the aggravating circumstances

---

[24] In *Gross*, the crime was committed on July 30, 1994. The case was decided by the court of appeals on May 24, 1999. The matter was not argued to the Supreme Court until February 26, 2002 and decided eight months later, October 30, 2002.

[25] In *Franklin*, the crime took place on April 18, 1997, but the case was not argued to the Supreme Court (on direct appeal) until five years later, May 21, 2002.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: CFO.JBJURISDOC@AOL.COM

20

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 717

and the mitigating circumstances,[26] the burdened class here is those who have little or no mitigation—or at least not enough mitigation to avoid the death penalty. A defendant, therefore, who is found guilty of exactly the same offenses and specifications but who *does* have sufficient mitigation to persuade a jury or a judge not to impose death, is treated like every other convicted felon in Ohio for purposes of appeal. The Equal Protection Clause of U.S. CONST., amend. XIV prohibits the government from successfully claiming that the Issue One procedure is valid simply because all inmates who are sentenced to death receive the same appellate rights, *i.e.,* a direct appeal to the Supreme Court of Ohio. *Williams v. Vermont, ante,* 472 U.S. at 27. The Ohio procedure under Issue One is designed to give those sentenced to die the "bum's rush" through the legal system, hardly by any reasonable standard a notion which complies with "due course of law", *see,* OHIO CONST., art. I, §16, and hardly a meaningful ability to defend one's life and liberty, *see,* OHIO CONST., art. I, §1. Issue One makes no more sense than enacting a jurisdictional provision for common pleas courts denying them the ability to hear constitutional challenges.

*Rational Basis Analysis.* The least demanding analysis in an equal protection challenge is to determine whether a classification bears a rational relationship to a legitimate government interest.[27] *See, e.g., Schweiker v.*

---

[26] *See,* the Defendant's separate motion to dismiss based upon the unconstitutionality of the Ohio statutory framework. It is asserted therein that a jury cannot make that decision properly, for the Ohio framework fails to adequately guide the jurors' deliberations.

[27] Although the phrase "government interest" is used herein, it is used because that is how the cases often describe the issue. The Defendant specifically asserts that governments do not have interests: they have limited powers delegated by the Constitution or by a statutory enactment pursuant to the Constitution.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 718

*Wilson* (1981), 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186, 49 USLW 4207; *United States Railroad Retirement Board v. Fritz* (1980), 449 U.S. 166, 174-175, 101 S.Ct. 453, 66 L.Ed.2d 368, 49 USLW 4035; *Kinney v. Kaiser Aluminum & Chemical Corp.* (1975) 41 Ohio St.2d 120, 123, 322 N.E.2d 880, 70 Ohio Op.2d 206.  Thus, there are in essence two prongs to any rational basis analysis.  A classification must: (1) bear a rational relationship to (2) a legitimate state interest.  The Equal Protection Clause of U.S. CONST., amend. XIV requires, if there are to be different classifications of criminal appeals, "some rationality in the nature of the class singled out" for different treatment. *Rinaldi v. Yeager, ante,* 384 U.S. at 308-09.  There is none here. The desire to speed up executions is not a manifestation of "some rationality in the nature of the class singled out" for different treatment.[28]

---

[28] The Ohio Supreme Court's predisposition to political rather than judicial resolutions is tacitly evident in the Court's opinion in *State v. Smith, ante,* which quoted with approval Chief Justice Moyer's opinion in *State v. Steffen* (1994), 70 Ohio St. 3d 399, 1994 Ohio 111, 639 N.E.2d 67.  In *Smith,* Justice Stratton says that the Supreme Court "recognized the public's frustration" when the court ruled that lower courts could not stay an execution date set by the Supreme Court of Ohio.  Justice Moyer's pronouncement at that time bears repeating: In *Steffen,* the Chief Justice wrote:

> The constitutions and courts of our country have established procedural safeguards reflecting our society's concern for the rights of citizens accused of committing crimes.  When those safeguards are used to thwart judgments rendered pursuant to the procedures, it is predictable that citizens will lose confidence in the ability of the criminal justice system to enforce the judgments. . . .
> Whatever one's views regarding capital punishment, the reality is that some thirteen years ago the General Assembly adopted a death penalty as the public policy of this state. The courts have declared the law to be constitutional; this court has affirmed eighty-seven death penalties, and the law has not yet been fully implemented.  That fact creates doubt about the ability of the justice system to carry out the death penalty and, perhaps even more importantly, a perception that the entire criminal justice system is not working.  Inaccurate as those perceptions are, they do persist.

*Id.* Though no doubt designed to appear as reasoned statements, both of these opinions are lacking in judicial craftsmanship.  Has the Ohio Supreme Court now taken judicial notice of its perceived opinion of the public's frustration?  Or has the Court taken judicial notice that cases which take so long to make their way through the system are not raising valid issues, but the asserted only for delay's sake? *See, generally, State v. Peagler* (1996), 76 Ohio St.3d 496, 668 N.E.2d 489, which held that while an appellate court may decide an issue on grounds different from those determined by the trial court, the evidentiary basis upon which the court of appeals decides a legal issue must have

(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 719

Concerning the creation of special legislative classifications, the United States Supreme Court has held that "[b]y requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *See, Romer v. Evans* (1986), 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855, 64 USLW 4353. Anyone who says that Ohio has done other than drawing a special classification "for the purpose of disadvantaging the group burdened by the law" is simply, as the Supreme Court said in another context, "blinking reality." *See, Taylor v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690.

The only "interest" that the government has ever advanced in support of Issue One is reducing delays in carrying out executions. The Issue One procedure has not in fact sped up executions. Collateral proceedings take far longer in capital cases than do direct appeals. *See*, Alex Kozinski and Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 CASE W. RES. L. REV. 1, 5-11 (1995).[29] Indeed, the backlog in the Ohio Supreme Court created by Issue One is becoming more and more evident each day. The government has produced in support of Issue One no convincing evidence that there were unreasonable delays in direct appeals to the Court of Appeals under the appellate system in place in place before the enactment of Issue One. The

---

[28] (...continued)
been adduced before the trial court and must have been made a part of the trial court record. Without even realizing what it has done, the Court has made clear that Ohio capital cases are entitled to, as Justice Harry Blackmun once put it, *some* process, not *due* process. *See, Medina v. California* (1992), 505 U.S. 437, 463, 112 S.Ct. 2572, 120 L.Ed.2d 353, 60 USLW 4684 (BLACKMUN, J., joined by STEVENS, J., dissenting).

[29] One of the authors of that article, Judge Alex Kozinski, a member of the United States Court of Appeals for the Ninth Circuit since 1985, is a supporter of the death penalty.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJUHISDOC@AOL.COM

23

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 720

effect of the Issue One Amendments is to deposit with the Ohio Supreme Court the sole responsibility for deciding direct appeals in cases where the defendant is sentenced to death. These death penalty cases are more complex and time-consuming than other criminal proceedings.

The United States Supreme Court has consistently recognized that capital punishment is unique and that because "the penalty of death is qualitatively different from [any] sentence of imprisonment", *see, Woodson v. North Carolina, ante*, 428 U.S. at 305, there is a need for "a greater degree of reliability when the death sentence is imposed." *See, Lockett v. Ohio, ante*, 438 U.S. at 604. The Court continues to honor that principle[30] as a matter of jurisprudence under U.S. CONST., amend. VIII and XIV. It is beyond question that the death penalty cannot be constitutionally administered unless safeguards are in place to ensure that the "death penalty is not meted out arbitrarily or capriciously." Among the requirements are that statutes be in place to "genuinely narrow the class of persons eligible for the death penalty" and that there be available a process of "meaningful appellate review."[31]

Two examples point out the constitutional invalidity of the arbitrary classifications created by Issue One. In the first example, assume that co-

---

[30] *See, e.g., Romano v. Oklahoma* (1994), 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1; *California v. Ramos* (1983), 463 U.S. 992, 998-99, 103 S.Ct. 3446, 77 L.Ed.2d 1171; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 117-18, 102 S.Ct. 869, 71 L.Ed.2d 1; *Godfrey v. Georgia* (1980), 446 U.S. 420, 427-28, 100 S.Ct. 1759, 64 L.Ed.2d 398; *Beck v. Alabama* (1980), 447 U.S. 625, 637-38, 100 S.Ct. 2382, 65 L.Ed.2d 392; *Gardner v. Florida* (1977), 430 U.S. 340, 357-58, 97 S.Ct. 1197, 51 L.Ed.2d 393; and, *Gregg v. Georgia, ante*.

[31] *California v. Ramos, ante*, at 999; *Loving v. United States* (1996), 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36; *Zant v. Stephens, ante*, 462 U.S. at 875; *Proffitt v. Florida, ante*, 428 U.S. at 251; *Gregg v. Georgia, ante*, 428 U.S. at 195; *Clemons v. Mississippi* (1990), 494 U.S. 738, 749, 110 S.Ct. 1441, 108 L.Ed.2d 725; and, *Barclay v. Florida* (1983), 463 U.S. 939, 973-74, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (STEVENS, J., concurring).

defendants "A" and "B" are capitally indicted for causing the death of "C". The death occurred on or after January 1, 1995. The indictments charge "A" and "B" with exactly the same offenses and exactly the same capital specifications. "A" is convicted of the offense and a death specification. The trial jury recommends a sentence of death and the judge imposes the sentence of death. On the other hand, "B" is convicted of aggravated murder and the death specification, but the trial jury instead recommends a life sentence with no possibility of parole until "B" has served thirty (30) years fully. Again, the judge imposes the sentence recommended by the trial jury. "A" is not entitled under Issue One to direct appeal in the Court of Appeals, but "B" is entitled to an appeal to the Court of Appeals under the Issue One Amendments.[32]

A second example involves a situation where Defendant "A" is indicted for aggravated felony murder under OHIO REV. CODE ANN. §2903.01(B) and a death penalty specification under OHIO REV. CODE ANN. §2929.04(A)(7). Defendant "B" is indicted for exactly the same offense and exactly the same death penalty specification. The government alleges that "A", on or about December 31, 1994 at 11:00 p.m. robbed a convenient store and shot and killed the clerk. The government alleges that "B", on or about January 1, 1995 at 1:00 a.m. robbed a convenience store and shot and killed the clerk. Both men are tried by juries, and both men are found guilty of felony aggravated murder and the death specification. Both trial juries recommend

---

[32] Ohio has enacted legislation to authorize a separate sentence: life imprisonment without the possibility of parole. *See*, OHIO REV. CODE ANN. §2929.03(C)(2) and (D)(3)(a). If a co-defendant receives that sentence, the argument is exactly the same as above.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 722

imposition of the death penalty, and both trial judges in fact impose the death penalty. Under these circumstances, "A" would be entitled to a direct appeal in the Court of Appeals and an automatic appeal to the Supreme Court of Ohio. "B", on the other hand, would not be entitled to a direct appeal to the Court of Appeals but would only be entitled to an automatic appeal to the Supreme Court of Ohio simply because the offense for which "A" was convicted of occurred two hours before the offense for which "B" was convicted. This completely alters the appellate rights of "B". There is no rational basis for the distinction whatsoever. The distinction is wholly arbitrary, serves no rational public purpose, and does not survive even the most lenient of the levels of scrutiny of a federal equal protection challenge.[33]

*Due Process.* The phrase "due process of law" has long been held to be "a restraint on the legislative, as well as on the executive and judicial powers of government and cannot be so construed as to leave [the legislature, in that case] Congress free to make any process 'due process of law' by its mere will." *Murray's Lessee v. Hoboken Land and Improvement Co.* (1856), 59 U.S. 272,

---

[33] The government may argue that other similar schemes have been upheld. In *Payne v. Commonwealth* (1987), 233 Va. 460, 357 S.E.2d 500, *cert. denied, Payne v. Virginia* (1987), 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 267, the Supreme Court of Virginia rejected a challenge to a provision requiring capital appeals to be filed in the that court rather than in the court of appeals. However, in rejecting the challenge, the court explained that capital appellants actually received more favorable treatment than other convicted persons. Thus, the challenge to the Virginia system was rejected by that court for exactly the opposite reason of what has occurred in Ohio. In Virginia, the challenge was rejected because capital defendants received more favorable treatment that other criminal defendants. Here, some capital defendants- only those sentenced to death- receive fewer appellate rights than any other criminal defendant, including one convicted of a misdemeanor.

The other decision is *State v. Ramirez* (1994), 178 Ariz. 116, 871 P.2d 237, *cert. den, Martinez Ramirez v. Arizona* (1994), 513 U.S. 968, 115 S.Ct. 435, 130 L.Ed.2d 347, 63 USLW 3347. However, unlike the situation here, the reasoning of the Arizona Supreme Court is suspect. In a cursory fashion, it dismissed the appellant's equal protection argument in *Ramirez*, relying on *Proffitt v. Florida, ante.* In *Proffitt,* the United States Supreme Court did uphold a Florida statute that provided for direct appeal of all death penalty cases to the State Supreme Court. However, the only challenge in *Proffitt* was the adequacy of the State Supreme Court's review process. *Id.*, 258-259.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 723

15 L.Ed. 372.  Due process "mean[s] a course of legal proceedings according to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights," including the "well-established principles of  public law respecting the jurisdiction of an independent State over persons and property," that a state court's assertion of personal jurisdiction satisfies the Due Process Clause if it does not violate "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 316.

### III

Concededly, some courts have held that capital defendants may be held to a single direct appeal when that appeal involves a "uniquely thorough" review that is unavailable in any other criminal appeal. *See, e.g., Dickerson v. Attorney General* (1986), 396 Mass. 740, 488 N.E.2d 757.[34] Unfortunately for the government, such an argument is inapposite here because the appellate review of the Supreme Court is less than plenary.  The Ohio Constitution contains no provision for the Supreme Court of Ohio to perform a weight of the evidence analysis.  In Ohio, only a Court of Appeals is specifically and constitutionally authorized to consider the weight of the evidence.  *See*, OHIO CONST., art. IV, §3(B)(3).  There is no corresponding provision in the Ohio Constitution granting such review to the Supreme

---

[34] These holdings are "incredible" because restrictions upon the rights of the citizenry run contra to the history and intent of virtually any constitution, be it the United States Constitution or the constitution of any state or commonwealth.  It is the defendant's position that such incredulous rulings are made for political and not judicial purposes; that is, that the decisions rest upon no sound constitutional theory, but instead upon the desire to please the electorate and thereby gain re-election.  Aside from the intellectual disingenuousness of such decisions, it is such decisions that make the death penalty, at least in Ohio, unconstitutional.  *See*, the defendant's argument concerning judicial fiat in the defendant's motion to dismiss based upon unconstitutionality of Ohio's statutory death penalty scheme.  *See, also*, the DEFENDANT'S MOTION TO DISMISS DEATH SPECIFICATIONS.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJURISDOC@AOL.COM     27

Court of Ohio.  Indeed, in *State v. Cooey* (1989), 46 Ohio St.3d 20, 25, 544 N.E.2d 895, *cert. denied*, *Cooey v. Ohio* (1991), 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482, 59 USLW 3673, the Ohio Supreme Court discussed the issue and flatly held that when it comes to the weight of the evidence, "we have no such power . . . ." *Id.*, 46 Ohio St.3d at 26.  *See, also, State v. Shoemaker* (1996), 74 Ohio St.3d 664, 660 N.E.2d 1197.  The Ohio Supreme Court is authorized to consider only the *sufficiency* of the evidence, but not its *weight*.[35]  A sufficiency review gives more deference to the findings below than does the weight of the evidence review.  *See, e.g., State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 365, 1996 Ohio 219, 662 N.E.2d 311, *cert. denied* (1996), 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169, 65 USLW 3264; *State v. Tyler* (1990), 50 Ohio St.3d 24, 33, 533 N.E.2d 576, *cert. denied* (1990), 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 334, 59 USLW 3326; *State v. Powell* (1990), 49 Ohio St.3d 255, 260, 552 N.E.2d 191, *cert. denied* (1990), 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183, 59 USLW 3250; and, *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 383 N.E.2d 132, 10 Ohio Op.3d 340.  The appellate courts on the basis of a weight of the evidence analysis have set convictions aside.  *See, e.g., State v. Turvey* (1992), 84 Ohio App.3d 724, 746-47, 618 N.E.2d 214, *appeal overruled* (1993), 66 Ohio St.3d 1469, 611 N.E.2d 327; *State v. Assad* (1992), 83 Ohio App.3d 114, 614 N.E.2d 772, *appeal overruled* (1993), 66 Ohio St.3d 1402, 605 N.E.2d 1260; *State v. Abi-Sarkis*

---

[35] An intriguing argument can be made that the Supreme Court of Ohio has authority under the federal constitution when passing on an appellant's constitutional rights.  Thus, while the Supreme Court of Ohio may not have authority to act as a "thirteenth juror" under the authority of the state constitution, it may have such authority under the *federal* constitution.  The argument is academic because the Court has held that is has no jurisdiction to act as a "thirteenth juror". *See, State v. Taylor* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576, *cert. denied,* (1990), 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 334, 59 USLW 3326.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610<br>TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: C/O JBJJURISDOC@AOL.COM

28

(1988), 41 Ohio App.3d 333, 535 N.E.2d 745.   Capital murder convictions have also been set-aside on that basis.   *See, State v. Gilkerson* (1965), 1 Ohio St.2d 103, 205 N.E.2d 13, 30 Ohio Op.2d 385.   As to other jurisdictions, *See, e.g., Bell v. State* (Ala. 1984), 461 So.2d 855; *People v. Baker* (1993), 253 Ill. App.3d 15, 625 N.E.2d 719, *appeal denied* (1993), 153 Ill.2d 562, 624 N.E.2d 809; and, *Clemons v. State* (Miss. 1985), 473 So.2d 943.

The Ohio General Assembly was astute enough to recognize the lack of authority of the Ohio Supreme Court to engage in a weight of the evidence analysis.   The General Assembly therefore sought to confer such authority on the Supreme Court when it enacted the enabling legislation under Issue One.   *See*, OHIO REV. CODE ANN. §2953.02.   The statute provides:

> In a capital case in which a sentence of death is imposed for an offense committed before January 1, 1995, and in any other criminal case, including a conviction for the violation of an ordinance of a municipal corporation, the judgment or final order of a court of record inferior to the court of appeals may be reviewed in the court of appeals. A final order of an administrative officer or agency may be reviewed in the court of common pleas. A judgment or final order of the court of appeals involving a question arising under the Constitution of the United States or of this state may be appealed to the supreme court as a matter of right.   This right of appeal from judgments and final orders of the court of appeals shall extend to cases in which a sentence of death is imposed for an offense committed before January 1, 1995, and in which the death penalty has been affirmed, felony cases in which the supreme court has directed the court of appeals to certify its record, and in all other criminal cases of public or general interest wherein the supreme court has granted a motion to certify the record of the court of appeals. In a capital case in which a sentence of death is imposed for an offense committed on or after January 1, 1995, the judgment or final order may be appealed from the trial court directly to the supreme court as a matter of right. *The supreme court in criminal cases shall not be required to determine as to the weight of the evidence, except that, in cases in which a sentence of death is imposed for an offense committed on or after January 1, 1995, and in which the question of the weight of the evidence to support the judgment has been raised on appeal, the supreme court shall determine as to the weight of the*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 726

> *evidence to support the judgment and shall determine as to the weight of the evidence to support the sentence of death as provided in section 2929.05 of the Revised Code.*

(Emphasis added.)  The statutory enactment is simply further evidence of Issue One's attempt to drive a square peg into a round hole.  Any reasoned theory of constitutional interpretation would hold that the Supreme Court has no such power, at least under the state Constitution.  This type of legal analysis would result in any law student flunking out of law school, with advice to try dentistry as a career.  Though the Supreme Court itself has held that is has no such power, the General Assembly magically conferred such power upon the Supreme Court of Ohio without constitutional authority for doing so.  As if the constitutional desecration by the General Assembly were not enough, the Supreme Court completed the constitutional hat trick in *Smith, ante*:

> Defendant also argues that due process is denied the capital defendant because the Supreme Court of Ohio cannot consider weight-of-the-evidence arguments during the guilt phase (although defendants often argue that the Supreme Court *does* have jurisdiction to do so). Despite some admittedly conflicting case law on this issue, there is *no provision* in the Ohio Constitution or statutes that prevents this court from reviewing weight-of-the-evidence in capital cases. See Article IV of the Ohio Constitution.[36]  Further, this court,

---

[36] In footnote four, the Court said:
> This court has held that it is not required to review weight-of-the-evidence claims. See *State v. Tyler* (1990), 50 Ohio St. 3d 24, 33, 553 N.E.2d 576, 589; *State v. Eley* (1978), 56 Ohio St. 2d 169, 172, 10 Ohio Op. 3d 340, 341-342, 383 N.E.2d 132, 134; *State v. Robinson* (1955), 162 Ohio St. 486, 487, 55 Ohio Op. 388, 124 N.E.2d 148, 149.  We have even gone so far as to say that we are not forbidden to review weight-of-the-evidence claims. See *State v. Frohner* (1948), 150 Ohio St. 53, 75-76, 37 Ohio Op. 406, 415, 80 N.E.2d 868, 880.  However, we have also held that we may not review weight-of-the-evidence claims.  See *State v. Shoemaker* (1996), 74 Ohio St.3d 664, 664-665, 660 N.E.2d 1197, 1198-1199; *State v. Eley* (1996), 77 Ohio St. 3d 174, 180, 672 N.E.2d 640, 648; *State v. Waddy* (1992), 63 Ohio St. 3d 424, 432, 588 N.E.2d 819, 827; *State v. Jenks* (1991), 61 Ohio St. 3d 259, 263, 574 N.E.2d 492, 496; *State v. Powell* (1990), 49 Ohio St. 3d 255, 260, 552 N.E.2d 191, 197; *State v. Cooey* (1989), 46 Ohio St. 3d 20, 26, 544 N.E.2d 895, 905-906.  Those

(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 727

in its prior review of capital cases, has often responded to claims concerning evidence. For example, in *State v. Greer* (1988), 39 Ohio St. 3d 236, 237-240, 530 N.E.2d 382, 388-389, this court devoted two pages of the opinion to reviewing an argument on weight of the evidence. *See, also*, *State v. Montgomery* (1991), 61 Ohio St. 3d 410, 416, 575 N.E.2d 167, 173; *State v. Wickline* (1990), 50 Ohio St. 3d 114, 123-124, 552 N.E.2d 913, 922-923. In fact, R.C. 2953.02 and 2929.05, even before the adoption of Issue I, required this court to "review and independently weigh" the evidence as to any death penalty sentence. This court has regularly done so without objection from defendants as to its lack of constitutional power to do so. See *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 199, 203, 15 Ohio B. Rep.

---

[36] (...continued)
issues are now mooted by the passage of the Issue I amendments to the Ohio Constitution.
The Court, with due respect, was disingenuous. In *Tyler*, it said it not that it is "not required to review weight-of-the-evidence claims" but that "[n]ot even in a capital case may we sit as a "thirteenth juror," *Tibbs v. Florida* (1982), 457 U.S. 31, 42, as to a judgment of conviction. *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 905-906. Having found the evidence of appellant's guilt easily sufficient to support the convictions, we overrule this proposition of law." 50 Ohio St.3d at 33. In *Shoemaker*, the Court went further than it wanted to admit in *Smith*. In *Shoemaker*, the Court was asked to reverse an involuntary manslaughter conviction on the weight of the evidence. The Court declined to do so.
    However, the court of appeals unanimously ruled that the conviction was not against the manifest weight of the evidence. We cannot disturb that ruling. Only courts of appeals may overturn trial court judgments on the grounds urged here, *i.e.*, that the verdict was against the manifest weight of the evidence. See *State v. Cooey* (1989), 46 Ohio St. 3d 20, 25-26, 544 N.E.2d 895, 905-906. n1 Our review "is limited to a determination of whether there was evidence presented 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Eley* (1978), 56 Ohio St. 2d 169, 172, 10 Ohio Op. 3d 340, 341, 383 N.E.2d 132, 134.
*Id.*, at 664-665. In a footnote, the Court noted that a "recent amendment to R.C. 2953.02 grants us such power in appeals of capital cases where the offense was committed on or after January 1, 1995. That provision obviously does not apply here." The Court's opinion in *Cooey* made clear the Constitutional basis for its lack of authority to conduct a weight-of-the-evidence review:
    In his thirty-first proposition of law, Cooey argues that a verdict of guilt, though supported by legally sufficient evidence, may nevertheless be overturned as against the weight of the evidence. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E. 2d 148.
    In Robinson, we observed that courts of appeals have power to "consider and pass upon the weight of the evidence." Id. at 487, 55 O.O. at 388, 124 N.E. 2d at 149. See Section 3(B)(3), Article IV, Ohio Constitution. But we have no such power; our review "is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" State v. Eley (1978), 56 Ohio St. 2d 169, 172, 10 O.O. 3d 340, 341, 383 N.E. 2d 132, 134. See, also, State v. Glenn (1986), 28 Ohio St. 3d 451, 456, 28 OBR 501, 505, 504 N.E. 2d 701, 707. Having found the evidence legally sufficient on all counts, we overrule this proposition of law.
46 Ohio St.3d at 25-26. The Ohio Supreme Court does not and has never had the power to conduct a weight-of-the-evidence review.

311, 341, 345, 473 N.E.2d 264, 296, 299; *State v. Claytor* (1991), 61 Ohio St. 3d 234, 244, 574 N.E.2d 472, 481.

However, the Supreme Court of Ohio has always had the constitutional grant of "appellate jurisdiction" in capital cases. (Preamendment Section 2[B][2], Article IV.) The phrase "appellate jurisdiction" means the power to hear and resolve all issues necessary to determine an appeal, including weight-of-the-evidence claims. On direct appeals, this court now assumes *all* roles performed by the lower appellate courts, including a full weight-of-the-evidence review. The legislature has not expanded this court's jurisdiction by the amendment of R.C. 2953.02, but has merely spelled out the new role of the Supreme Court as the only court of appellate review in death penalty cases.

Nor is there any requirement in the Constitution, including the amendments, that this court must be unanimous (as a court of appeals must be) on decisions to overturn on a weight-of-the-evidence finding (nor, certainly, would defendant seek such a strict standard). Supreme Court review thus provides greater protection for a capital defendant, since we can reverse on weight of the evidence with a mere majority.

80 Ohio St.3d at 102-103.

The Constitution of Ohio specifically defines the original and appellate jurisdiction of the Supreme Court. *See,* OHIO CONST., art. IV, §2. Nothing in that constitutional provision gives the General Assembly power to alter the terms of the jurisdiction of the court. On the other hand, OHIO CONST., art. IV, §3 says that the Court of Appeals shall have such jurisdiction as may be provided by law. Indeed, the Supreme Court of Ohio has on many occasions held that the Ohio General Assembly may not adjust the constitutional allocation of powers to the various branches of government. The Court has even held that an attempt by the General Assembly to expand the Supreme Court's jurisdiction would be void. *See, Classic Pictures, Inc. v. Department of Education* (1952), 158 Ohio St. 229, 108 N.E.2d 319, 48

Ohio Op. 453.[37]  Accordingly, OHIO REV. CODE ANN. §2953.02 must be declared unconstitutional and void as an overreaching attempt by the General Assembly to exercise power not conferred upon it by the Ohio Constitution.

Because the Ohio Supreme Court under the state constitution has no power to engage in a weight of the evidence analysis, that court is prevented from engaging in a full-scale review that a court of appeals is specifically authorized to perform as a matter of course.  Indeed, each court of appeals has actually performed such a review in death penalty cases coming before them prior to the enactment of Issue One.

Courts of appeal are to review the assignments of error, but must also review whether the death sentence imposed in a particular case is "appropriate" and "proportional".  *See*, former OHIO REV. CODE ANN. §2929.05(A).  Such reviews, if properly conducted, are mandatory in determining whether the death sentence imposed in the particular case is similar to that imposed throughout the state generally.  *See, generally, Gregg v. Georgia, ante,* at 205; and *Moore v. State* (1975), 233 Ga. 861, 213 S.E.2d 829, 832.[38]  Issue One treats a person sentenced to death differently than

---

[37]  In *Marbury v. Madison* (1803), 5 U.S. 137, 174-75, 2 L.Ed. 60, the United States Supreme Court invalidated a congressional attempt to expand the jurisdiction of the United States Supreme Court.  Further, the Ohio Supreme Court has on other occasions held that the General Assembly has no power to alter the jurisdiction of the Ohio Supreme Court. *See, e.g., Eastman v. State* (1936), 131 Ohio St. 1, 1 N.E.2d 14, 5 Ohio Op. 248, *appeal dismissed* (1936), 299 U.S. 505, 575 S.Ct. 21, 81 L.Ed. 374; *Tuck v. Chapple* (1926), 114 Ohio St. 155, 156-57, 151 N.E. 48; *State ex. rel. Turner v. Fender* (1922), 106 Ohio St. 191, 193, 140 N.E. 182, 1 Ohio L.Abs. 40.

[38]  In *Smith, ante,* the Supreme Court removed an artificial barrier it had erected in the first place: deciding proportionality by appellate district.  In Smith, the Court said that it " can more readily judge both the appropriateness and proportionality of death sentences on a statewide basis, instead of the geographical limits of an appellate district. *See, also, Payne,* 233 Va. at 474, 357 S.E.2d at 508.  An appellate court does not have the breadth and scope of experience that this court

(continued...)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJJURISDOC@AOL.COM

33

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 730

any other convicted felon in Ohio. A court of appeals is required to review and dispose of all assignments of error presented to it, unless because of a reversal on one assignment of error, discussion of others is not necessary. The same does not hold true, however, when the Supreme Court deals with propositions of law. The Ohio Supreme Court has consistently held that it is not required to address and discuss, in opinion form, every proposition of law raised in a death penalty appeal. *See, e.g., State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 1994 Ohio 298, 643 N.E.2d 524. *See, also, State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568; *State v. Bonnell* (1991), 61 Ohio St.3d 179, 181, 573 N.E.2d 1082; and, *State v. Hawkins* (1993), 66 Ohio St.3d 339, 342, 612 N.E.2d 1227. Thus, as a result of Issue One, defendants sentenced to death and only defendants sentenced to death received disparate treatment from any other convicted felon in Ohio. This disparate treatment deprives a person sentenced to death of effective review of his case and therefore violates immunities specified in U.S. CONST., amend. VIII and XIV, and OHIO CONST., art. I, §§1, 2, and 16.

The United States Supreme Court has consistently held that the death penalty is qualitatively (and obviously quantitatively) "different" from any other penalty available in the criminal justice system. *See, e.g., Harmelin v. Michigan* (1991), 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836, 59 USLW 4839; *Ford v. Wainwright* (1986), 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335, 54 USLW 4799; and, *Gregg v. Georgia, ante.* Further, the

---

[38] (...continued)
has to review the death sentences of all eighty-eight counties and to measure the appropriateness and proportionality of all cases in the state."

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL CJO.JBJJURISDOC@AOL.COM

34

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 731

Supreme Court of Ohio has held that it is not required to address in opinion form every argument asserted by a capital defendant on appeal. In *State v. Wogenstahl, ante*, the Court held:

> We have repeatedly held that this court is not required to address and discuss, in opinion form each and every proposition of law raised by the parties in a death penalty appeal. *See, e.g., State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528, [1994 Ohio 298.] We adhere to that position today. Several issues raised by this appellant have been addressed and rejected under similar circumstances in a number of prior cases. Moreover, a number of appellant's arguments have been waived. Upon a careful review of the record and the governing law, we fail to detect any errors that would undermine our confidence in the outcome of the appellant's trial. We are convinced that appellant received a fair trial, a fair a reliable sentencing determination, and competent representation both at trial and on appeal. We address, in opinion form, only those matters that merit some discussion.

This review alone distinguishes Supreme Court review from that of a court of appeals.

## IV

The relief sought by the Defendant is multifaceted. Primarily, the Defendant seeks an order dismissing the capital specifications appended to the indictment as being in violation of the state and federal constitutional provisions discussed herein. Secondarily, the Defendant seeks an order declaring OHIO REV. CODE ANN. §§2929.05 and 2953.02, as amended, to be in violation of U.S. CONST., amend. VI, VIII, and XIV and OHIO CONST., art. I, §§2, 9, 10, and 16. Additionally, the Defendant prays for an order declaring OHIO CONST., art. IV, §§2 and 3 to be in violation of U.S. CONST., amend. VI, VIII, XIV and the liberties specified in the Ohio Constitution, *ante*.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C7O.JB.JURISDOCS@AOL.COM

35

Lest this Court have reservations about affording this relief, the Defendant notes that a portion of the Ohio Constitution has previously been held to violate provisions of the United States Constitution. Of course, provisions of the federal Bill of Rights are not applicable to state proceedings unless and until the United States Supreme Court declares that the specific right is a fundamental part of due process of law and hence applicable by the doctrine of incorporation under the due process clause of U.S. CONST., amend. XIV. In *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, the United States Supreme Court in fact held that the privilege against self-incrimination under U.S. CONST., amend. V is applicable to state criminal prosecutions. The following year, in *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the Court held that the privilege against self-incrimination prohibits comment by the prosecutor on the defendant's silence. In effect at the time that *Griffin* was decided was OHIO CONST., art. I, §10, a portion of which specifically provided that if the defendant in a criminal trial did not take the stand, his failure to do so could be the subject of comment. Although OHIO CONST., art. I, §10 has not been amended to remove the offending language, and comply with *Griffin*, no one would seriously argue that the prosecution may comment, under authority of that provision, on the defendant's silence.[39] States may, by constitution or statute, provide for greater rights to a criminal defendant than those afforded by the United States Constitution, but no state may

---

[39] The situation is the converse of the usual scenario. Normally, state constitutional liberties are greater than federal constitutional liberties, *e.g., State v. Storch* (1993), 66 Ohio St.3d 280, 1993 Ohio 38, 612 N.E.2d 305, 61 USLW 2795. Here, the situation is reversed, but federal liberties provide a barrier through which the state government may not pass in its effort to prosecute and convict.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJUHASDOC@AOL.COM

36

circumscribe the rights guaranteed by the United States Constitution. *See, e.g., Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163; *Hyde v. Reynoldsville Casket Co.* (1994), 68 Ohio St.3d 240, 1994 Ohio 67, 626 N.E.2d 75, *reversed by, Reynoldsville Casket v. Hyde* (1995), 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820, 63 USLW 4408; and, *State v. Storch, ante.*

<center>V</center>

Issue One also deprives the defendant, a citizen of this State, equal protection and benefits of laws. OHIO CONST., art. I, §2. The Court, when considering the constitutional arguments made herein—particularly the arguments asserted under the Ohio Constitution—should be mindful that courts are to give the words in a constitutional provisions there ordinary meaning, unless it is not possible to do so. Only then should a court look to the intent of the Framers. Here, the words of the Ohio Constitution are simple, straightforward, and capable of easy understanding. OHIO CONST., art. I, §2 provides:

> All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly.[40]

Indeed, there are at least two reasons why such guarantees should apply with even greater force to criminal defendants. First, generally in civil cases, a claimant seeks redress usually against a private party and seeks to use the machinery of the government judiciary to redress the wrong. However, in

---

[40] OHIO CONST., art. I, §2 provides that when the government fails to provide equal protection and benefit of the laws, it remains the right of the people to alter, amend, or abolish the government.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL C/O JBJJURISDOC@AOL.COM

37

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 734

criminal cases, the government initiates the action and brings to bear against the private citizen the full power of governmental machinery. Second, unlike the United States Constitution, the Ohio Constitution specifies certain inalienable rights. The Ohio Constitution is a specification of liberties and immunities upon which the government may not encroach. *See, e.g., Pollack, Natural Rights: Conflict and Consequences*, 27 OHIO ST.L.J. 559 (Fall 1966). OHIO CONST., art. I, §1 provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoining and defining life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Thus, the Ohio Constitution guarantees the opportunity of defending life and liberty, but the Issue One Amendment attempts to abrogate that ability.[41] The Issue One Amendments impermissibly permit the government to encroach on the ability to effectively defend life and liberty. Therefore, in addition to violating other constitutional provisions, the Issue One Amendments cannot stand because they violate the guarantees of OHIO CONST., art. I, §1. Mere procedural and jurisdictional provisions cannot abrogate or defeat natural rights, protected by the Ohio Constitution, against encroachment. Indeed, the Defendant says that OHIO CONST., art. I, §§ 1 and 16 create the ability to appeal a death sentence, even absent—or, in this case, in spite of—a jurisdictional grant. It has been long established that a

---

[41] The Issue One Amendments are not statements of fundamental rights, but rather limited provisions concerning the jurisdiction of the appellate courts of this State. Those limited provisions, when read in light of the broad guarantees of OHIO CONST., art. I, §§1, 2, and 16, must yield. On occasion the courts have held that rights guaranteed by one provision of the Ohio Constitution must yield to other provisions of the constitution. Here, it is not a right that must yield, but a jurisdictional provision.

constitutional provision may itself give rise to a cause of action, enabling legislation, or lack thereof, notwithstanding. The most obvious example is the holding of the United States Supreme Court that U.S. CONST., amend. IV provides a cause of action even in the absence of a jurisdictional statute. *See, Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* (1971), 91 S.Ct. 1999, 29 L.Ed.2d 619. Here, the provisions of the Ohio Constitution cited above give rise to an appeal, the jurisdictional provisions of the Ohio Constitution notwithstanding. This is the only possible construction of the Ohio Constitution, for government exists for the common protection and benefit of the citizens and may exists under the Ohio Constitution only as long as fundamental rights—here, the ability to defend life and liberty—remain intact.

Further, the Ohio Supreme Court has held that denial of rights to a defendant, when other defendants enjoy those rights, is a violation of equal protection. U.S. CONST., amend. XIV; OHIO CONST., art. I, §2; *see, State v Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342. In that case, the Court reversed convictions of prison inmates of the southern Ohio Correctional facility who were tried for escape charges right inside the prison. The jurors and court personnel were carted into the prison every day. The Court said in part:

> By allowing a change in forum to the Bankruptcy Court near the prison, the court circumvented any security difficulties that may have arisen and yet maintained the dignity and solemnity of the proceedings. We find it unassailable that the trials which were held within the confines of the penitentiary for an offense committed within the same institution violate the constitutional guarantee of the right to a public trial.

III.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · Youngstown, Ohio 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: C/O JBJUHRISDOC@AOL.COM

39

By violating due process and the right to a fair and public trial, the legal conclusion is that there is a violation of the defendants' rights to equal protection. In addition to the above, there is a separate and independent violation of equal protection rights by treating these defendants different from other persons similarly situated without a showing of a compelling state interest.

The defendants, in the instant case, were treated differently by the court's attempt to administer justice within the confines of the penitentiary. Rather than showing a compelling state interest, the justification was framed for administrative convenience, which is clearly insufficient. *Procunier v. Martinez* (1974), 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224.

*Id.* at 122. OHIO CONST., art. IV, §§ 2(B)(2)(c) and 3(B)(2) and OHIO REV. CODE ANN. §§2929.05 and 2953.02 violate the Equal Protection Clause of U.S. CONST., amend. XIV.

## VI

Accordingly, the Defendant prays for an order dismissing the indictment herein. In the alternative, the Defendant prays for an order of the Court dismissing the death specification appended to the indictment. Failing that, the Defendant prays for an order declaring the Issue One Amendments invalid.

J. GERALD INGRAM

JOHN B. JUHASZ

# APPENDIX

STATE OF OHIO, Plaintiff-Appellee, - vs - JOHN J. SANTINE, Defendant-Appellant.
CASE NO. 97-A-0025
COURT OF APPEALS OF OHIO, ELEVENTH APPELLATE DISTRICT,
ASHTABULA COUNTY
1998 Ohio App. LEXIS 2936
June 26, 1998, Decided

**PRIOR HISTORY:**
[*1]
CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas. Case No. 96 CR 171.

**DISPOSITION:**
JUDGMENT: Affirmed.

**COUNSEL:**
DENNIS WATKINS, TRUMBULL COUNTY PROSECUTOR, LUWAYNE ANNOS, ASSISTANT PROSECUTOR, Warren, OH, (For Plaintiff-Appellee).

ATTY. JOHN B. JUHASZ, Youngstown, OH, (For Defendant-Appellant).

**JUDGES:**
HON. DONALD R. FORD, P.J., HON. JUDITH A. CHRISTLEY, J., HON. WILLIAM M. O'NEILL, J. FORD, P.J., O'NEILL, J., concur.

**OPINIONBY:**
JUDITH A. CHRISTLEY

**OPINION:**

OPINION

CHRISTLEY, J.

Appellant, John J. Santine, appeals his conviction and sentence entered by the Ashtabula County Court of Common Pleas. Appellee, the state of Ohio, has filed an answer brief. For the reasons that follow, we affirm the judgment of the trial court.

Appellant was indicted by the May 1995 term of the Trumbull County Grand Jury on a five-count indictment. Count one

alleged that appellant committed aggravated murder with prior calculation and design in violation of R.C. 2903.01(A) with specifications of aggravating circumstances under R.C. 2929.04(A)(2), (A)(5), and (A)(7). Count two alleged that appellant committed aggravated murder while committing or attempting to commit or while fleeing immediately [*2] thereafter the commission of aggravated burglary, in violation of R.C. 2903.01(B) with specifications of aggravating circumstances under R.C. 2929.04(A)(2), (A)(5), and (A)(7). Both counts one and two identified Ann Serafino as the victim.

Count three alleged that appellant committed attempted aggravated murder in violation of R.C. 2923.02 and 2903.01(A), with a firearm specification. Count three identified Charles Serafino as the victim. Count four alleged that appellant engaged in a conspiracy to commit aggravated murder in violation of R.C. 2923.01(A)(1) and/or (2). Count four named both Ann and Charles Serafino as the victims. Finally, count five alleged that appellant committed aggravated burglary of the residence of Ann Serafino in violation of R.C. 2911.11(A)(1) and/or (2) and/or (3), also with a firearm specification.

Appellant pled not guilty to the charges, and the case proceeded to a jury trial. Due to the large amount of publicity surrounding the case, the case was transferred to Ashtabula County for trial. Opening statements commenced on February 19, 1997.

The charges stemmed from the murder of Ann Serafino ("Mrs. Serafino") and the attempted murder of her son, Charles [*3] Serafino ("Serafino"), during the early morning hours of July 7, 1995 at the Serafino residence in Trumbull County.

The state accused appellant of masterminding a conspiracy to kill both Mrs. Serafino and her son as a result of a business relationship between appellant and the Serafinos which had gone sour. Appellant was accused of hiring and directing three young men, namely Richard McNaulty ("McNaulty"), Jason Getsy ("Getsy"), and Benjamin Hudach ("Hudach"), to dress up in camouflage gear, break into the Serafino residence and open fire on Serafino and his mother with the intent to kill them both. Both Charles and Ann Serafino were shot, but only Charles survived.

It was undisputed that appellant never entered the Serafino residence nor fired any weapons at the victims on the night in question. However, the state presented the testimony of one of the alleged co-conspirators, Hudach, to prove that appellant was intricately involved in the plot, such that he was ordering, directing, planning, and otherwise orchestrating the alleged offenses.

The state also presented the testimony of two acquaintances of the three alleged co-conspirators, namely Joshua Koch ("Koch") and Michael Dripps [*4] ("Dripps"). Although both Koch and Dripps had some level of involvement in the events leading to Mrs. Serafino's death and the other alleged offenses, neither was indicted by the state, and neither was offered prosecutorial immunity for his testimony.

At trial, appellant's defense was that the three indicted young men, McNaulty, Getsy and Hudach, as well as their cohorts, Koch and Dripps, independently conspired and planned to murder the Serafinos with no involvement on appellant's part. Although the defense did not dispute that these young men committed the acts in the manner alleged by the state, they denied that appellant was in any way connected with the events.

The jury found appellant guilty on count two, aggravated murder in violation of R.C. 2903.01(B), but without the death penalty specifications; count three, attempted aggravated murder in violation of R.C. 2923.02 and 2903.01(A) with a firearm specification; count four, conspiracy to commit aggravated murder in

violation of R.C. 2923.01(A)(1) and/or (2); and count five, aggravated burglary, also with a firearm specification in violation of R.C. 2911.11(A)(1) and/or (2) and/or (3). Appellant was acquitted on count one, [*5] including the death penalty specifications and all similar specifications on count two.

The state moved to *nolle* count four, and the court merged the two gun specifications in counts three and five. Appellant was thereafter sentenced to a life term on count two, with parole eligibility after twenty years; ten to twenty-five years actual incarceration on count three, with three years to be served prior to and consecutive to count three on the gun specification; and ten to twenty-five years actual incarceration on count five. All sentences were to be served consecutively.

Appellant perfected a timely appeal, asserting five assignments of error:

"[1.] The trial court erred to Appellant's prejudice by refusing to give requested cautionary instructions relating to the testimony of unindicted accomplices.

"[2.] The Trial Court Erred to Appellant's Prejudice in Failing to Declare a Mistrial.

"[3.] The Trial Court Erred in Failing to Quash the Indictment.

"[4.] The Trial Court Erred in Refusing to Allow Appellant to Impeach a Witness with Convictions Involving Dishonesty.

"[5.] The Trial Court Erred by Coercing a Jury Verdict When the Jury Was Deadlocked."

In the [*6] first assignment of error, appellant contends that the trial court committed reversible error by refusing to give the cautionary instruction requested by the defense, and found in R.C. 2923.01(H)(2), after certain witnesses testified on behalf of the state, *i.e.,* the indicted co-conspirator Hudach and the two unindicted cohorts Koch and Dripps. He argues that R.C. 2923.01(H)(2) and both the federal and state constitutions required that such a cautionary instruction be given in the instant case.

[HN1] R.C. 2923.01(H)(2) reads:

"If a person with whom the defendant allegedly has conspired testifies against the defendant in a case in which

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

Appendix - 2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 739

the defendant is charged with conspiracy and if the testimony is supported by other evidence, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice that is supported by other evidence does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

"It is for you, as jurors, in light of [*7] all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"

Thus, R.C. 2923.01(H)(2) creates a mandatory jury instruction for those conspiracy cases in which an alleged co-conspirator or accomplice testifies against the defendant and his or her testimony is supported by other evidence. See *State v. Fink* (Dec. 21, 1992), Fayette App. No. CA92-01-001, unreported, at 7, 1992 Ohio App. LEXIS 6453.

There are, in fact, two assertions made by appellant in connection with this assignment of error. First, appellant argues that the trial court erred by not giving the instruction immediately after Hudach, Koch, and Dripps testified at trial. Second, appellant argues that although the trial court gave the required instruction with regard to Hudach's testimony *at the close of the trial,* the trial court failed to give the instruction in regards to the testimony of Koch and Dripps *at any point in the trial.*

As to the first assertion, we note that appellant has failed to cite one case or other authority which would *require* the trial court to give the instruction contained in R.C. [*8] 2923.01(H)(2) immediately after the alleged co-conspirator or accomplice testified. Indeed, [HN2] Crim.R. 30(B) merely gives the court *discretionary* power to give the jury cautionary instructions of law relating to the credibility and weight of the evidence during the course of trial; it does not *require* the court to do the same. This being the case, we find no merit to appellant's contention in this regard.

As to appellant's assertion that the trial court erred by not giving the instruction in relation to the testimony of Koch and Dripps, we find no merit to the assertion for any of the following three reasons.

[HN3] After closing arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the trier of fact. *State v. Comen* (1990), 50 Ohio St. 3d 206, 553 N.E.2d 640, paragraph two of the syllabus; Crim.R. 30(A). The trial court must consider the evidence presented at trial and determine whether a requested instruction is warranted based on that evidence. See *State v. Williford* (1990), 49 Ohio St. 3d 247, 551 N.E.2d 1279, paragraph three of the syllabus; [*9] *State v. Guster* (1981), 66 Ohio St. 2d 266, 421 N.E.2d 157, syllabus.

An appellate court will review a trial court's decision in this regard for an "abuse of discretion." See *Guster* at syllabus. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Montgomery* (1991), 61 Ohio St. 3d 410, 413, 575 N.E.2d 167.

In the instant case, the record reveals that the trial court considered arguments from both sides on the issue of whether Koch and Dripps could have been indicted as coconspirators or accomplices in the alleged offenses. After hearing these arguments, and considering the testimony elicited at trial, the trial court determined that the instruction was not warranted for either witness.

We find no abuse of discretion on the facts of this case. First, it is uncontroverted that Koch and Dripps were not indicted in connection with the alleged offenses, as were Hudach, McNulty, and Getsy. This factor alone has led this court and others to conclude that a similar cautionary instruction found in R.C. 2923.03(D) was not required when an unindicted accomplice testified [*10] against a defendant at trial. n1 See *State v. Hinkle*, 1996 Ohio App. LEXIS 3562 (Aug. 23, 1996), Portage App. No. 95-P-0069,

unreported, at 6, 1996 WL 494873; *State v. Redd* (Mar. 29, 1996), Lucas App. No. L-94-330, unreported, 1996 Ohio App. LEXIS 1194; *State v. Royce* (Dec. 27, 1993), Madison App. Nos. CA92-09-023, CA92-09-024, CA92-09-025, CA92-09-026, unreported, at 11, 1993 Ohio App. LEXIS 6226.

n1 R.C. 2923.03(D), effective September 17, 1986, reads:

"If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

"'It is for you, as jurors, in light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"

[*11]

Second, there was no testimony which established that Koch and Dripps were offered any kind of prosecutorial immunity in exchange for their testimony. Koch testified that no one promised him that he would not be charged in connection with the alleged offenses. Koch also testified that he was never so charged. Dripps testified that shortly after the shootings, he was told by the police and the prosecutor that he would not be charged so long as he was not involved in the actual shooting and so long as he told the truth. Dripps likewise testified that he had never been charged. However, there was no testimony establishing a specific deal of prosecutorial

immunity in exchange for either witnesses' testimony. n2

n2 Although appellant implied in his brief that the state deliberately chose not to indict the two witnesses in order to circumvent application of the cautionary instruction, the record is devoid of support for this theory.

This factor is important because it confirms that the witnesses were not giving [*12] their testimony in exchange for leniency for themselves. Accordingly, the witnesses' testimony would not be viewed with the same suspicion that must accompany the testimony of an indicted co-conspirator or accomplice seeking leniency in his or her own case. Cf. *State v. Holdsworth* (Feb. 21, 1992), Portage App. No. 90-P-2231, unreported, 1992 Ohio App. LEXIS 724, in which we held that an accomplice is a person who *could* be indicted and punished for complicity, noting that the alleged accomplice in that case testified in exchange for some form of prosecutorial immunity.

On this point we emphasize that the underlying purpose of the statute is to ensure that juries are informed that the testimony of a co-conspirator or accomplice in a conspiracy trial is inherently suspect. Indeed, a co-conspirator or accomplice would be likely to have a motive to conceal the truth or otherwise falsely inculpate the defendant. See *Fink* at 9. This is why the instruction warns the jury to weigh the coconspirator or accomplice's testimony with "grave caution." However, in the case at bar, neither witness was indicted, and neither witness was offered prosecutorial immunity in exchange for his [*13] testimony.

Third, even if the prevailing legal standard were whether the accomplices *could* have been convicted of conspiracy, the assignment still fails.

Although the record before this court indicates that both young men played a peripheral role in the events related to the alleged offenses, reasonable minds could not conclude that either acted with the

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: jbjjuris1doc@aol.com

Appendix - 4

requisite mental state of a co-conspirator or accomplice. As a result, we cannot say that there was an arbitrary, unreasonable, or unconscionable attitude exhibited by the trial court when it concluded that the requested instruction was not warranted upon the evidence before it.

[HN4] To be convicted of conspiracy in Ohio, a defendant must have acted with the "purpose to commit or to promote or facilitate the commission of" one of the named statutory offenses, which include aggravated murder and aggravated burglary. n3 A person acts "purposely" when it is his or her specific intention to cause a certain result or to engage in certain conduct. R.C. 2901.22(A). As appellant noted in his brief, an accomplice is one who *fully* and *voluntarily* engages with another in the commission of a crime. *State v. Durham*(1976), 49 Ohio App. 2d 231, [*14] 360 N.E.2d 743.

n3 [HN5] R.C. 2923.01(A) states, in pertinent part:

"No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, *** aggravated burglary, *** shall do either of the following:

"(1) With another person or persons, plan or aid in planning the commission of any such offense;

"(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any such offense."

At trial, both Koch and Dripps admitted that they acted as an alibi for appellant during different portions of the critical time period surrounding the attack on the Serafinos. However, Koch testified without contradiction that he did not actually know why he was needed as an alibi and had no knowledge that his friends and appellant were plotting to murder anyone. In essence, he testified that he knew only that something nefarious was underfoot, and that he was to housesit at McNulty's apartment and write down [*15] television programs to establish an alibi.

Although Dripps admitted to knowing that murder was underfoot, Dripps testified that he felt he had no choice but to go with appellant to establish an alibi at a place called "Truck World." Dripps, a minor at the time of the alleged offenses, testified that he was afraid of appellant because he believed that appellant was connected to the mafia; that he was informed that he was to act as an alibi only after he and appellant were actually in a car driving to Truck World; and that he (Dripps) was so nervous and upset when they actually arrived at Truck World that appellant gave him several pills (Valium and Vicodin) to calm him down.

Both witnesses admitted to handling certain weapons during the time period at issue. Koch testified that appellant joined him at McNulty's apartment while he was watching television. Appellant allegedly received a telephone call, and Koch overheard appellant asking the caller whether "both" were killed. It was only at that point, Koch realized that one or more murders had occurred. Immediately thereafter, appellant asked/ordered Koch to collect any other guns and knives lying around the apartment and to conceal [*16] them. Koch did so. None of these weapons were involved in the murder at issue.

Dripps admitted to transporting two of the weapons actually used in the shootings earlier in the day from McNulty's apartment to the lawn care business. However, at the time he transported them, he was unaware of the brewing conspiracy and its purpose. He only learned after he had arrived at the shop and had delivered the two guns that murder was underfoot. Thereafter, he stood aside and did not participate in "washing down" the guns.

It is clear from the above that neither witness acted purposely or otherwise "fully and voluntarily" engaged in the commission of the alleged offenses. Koch did not know why he was establishing an alibi; and when he finally realized that murder occurred, he only acted to conceal the weapons *after* the alleged offenses were

Appendix - 5

accomplished. At worst, Koch participated as an accessory after the fact, rather than as a co-conspirator or accomplice.

Dripps transported the weapons used in the shootings at a time when he did not realize why they were needed. Although he finally knew of the actual conspiracy at the time he went with appellant to Truck World, his uncontradicted testimony [*17] indicates that he did not fully and voluntarily participate in that endeavor.

In light of this testimony, we cannot say that the trial court abused its discretion in deciding that the evidence did not warrant the giving of the cautionary instruction found in R.C. 2923.01(H)(2) in connection with the two unindicted witnesses, Koch and Dripps. We further note that the only indicted co-conspirator to testify, Hudach, presented no testimony which would contradict the two witnesses' accounts of the events at issue. Indeed, Hudach's testimony often reinforced their stories.

We additionally note that appellant has failed to cite any authority which would support his assertion that the federal and state constitutions required the grave suspicion instruction to be given in conjunction with the testimony, under the specific facts of this case. This being the case, we find no merit to this argument. Appellant's first assignment of error is without merit.

In the second assignment of error, appellant argues that the trial court committed prejudicial error by failing to grant either of appellant's two motions for a mistrial. Appellant argued that prosecutorial misconduct so eroded the fair nature [*18] of his criminal trial that a mistrial was warranted. In particular, appellant claimed that the state failed to provide timely and complete discovery to the defense.

[HN6] Crim.R. 33(A) provides the grounds for granting a new trial. It reads, in pertinent part: "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: *** misconduct of the *** prosecuting attorney ***." Crim.R. 33(A)(2). When a motion for a mistrial is premised upon allegations of prosecutorial misconduct, a determination must be made as to whether the defendant's substantial rights have been materially affected by the alleged misconduct. *State v. Johnston* (1988), 39 Ohio St. 3d 48, 59, 529 N.E.2d 898. In other words, the court must determine whether the defendant received a fair trial. *Id.* An appellate court will review the trial court's determination in this regard under a due process analysis, rather than an abuse of discretion analysis. *Id.*

Initially, we note that both of appellant's motions for a mistrial were made and denied before the jury was even seated and before opening statements were given, although after the voir dire process [*19] had commenced. n4

n4 The relevant time frames are as follows. Appellant was indicted on July 17, 1995. Trial was originally scheduled to take place in Trumbull County. Both sides agreed to a trial date of May 20, 1996. The trial date was extended. The case was ultimately transferred, however, to Ashtabula County on September 20, 1996 due to the large amount of publicity surrounding the case. Voir dire in Ashtabula County commenced on January 14, 1997. The jury was empaneled on February 13, 1997. Opening statements began on February 19, 1997.

Although the voluminous record of the discovery requested and received in this case is too extensive to catalogue herein, we will briefly address appellant's central contentions in the two motions for a mistrial. Appellant's first motion for a mistrial was filed on January 27, 1997, approximately two weeks after voir dire in Ashtabula County had commenced.

In the motion, appellant made various allegations of untimely discovery by the state, most notably accusing the state [*20] of failing to disclose material which was favorable to the defense, or to deny the same. Appellant also accused the government of failing to provide written

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 743

summaries of the oral statements of the co-defendants. In the alternative, appellant asked the court to inquire into the nature of the discovery violations and to order a three-week continuance as a sanction against the state.

The trial court held a hearing on appellant's motion the same day that it was filed, asking the state to explain its position as to each of the seven assertions raised in appellant's motion. The state did so. The hearing revealed that the defense had, in fact, previously received a seventeen-page report from the detective assigned to the case, Detective Begeot, and that the detective previously swore under oath that said report contained a summary of all known statements of the co-defendants.

The defense, however, insisted that it needed to see the entire one hundred forty-eight page report of the detective's case from which the seventeen-page report was derived in order to ensure that all exculpatory evidence had been revealed. The state claimed that the report was work product, not subject to discovery. [*21] The court agreed to review the full report *in camera* for material discoverable by the defense. The court later indicated that it did the same.

The court thereafter addressed the various issues raised by the defense's motion in a judgment entry filed on January 29, 1997. The trial court denied the motion for a mistrial and denied in part and allowed in part appellant's motion for discovery sanctions. The trial court reminded the state that it was under a continuing duty to provide any exculpatory material in its possession or any other due process material to which appellant would be entitled under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 and its progeny.

On the same day, the trial court issued a judgment entry granting appellant's prior request for the grand jury testimony of one of the state's witnesses mentioned previously, Dripps, upon the court's finding that appellant had made a showing of a particularized need on due process grounds. n5 However, the trial court denied appellant's request for other portions of the grand jury testimony,

indicating instead that it would review the same, disclose any discoverable material to the defense, and [*22] thereafter seal the remaining non-discoverable testimony for appellate review.

n5 Appellant had argued that there were conflicts and inconsistencies between the various versions of the stories of the state's witnesses of which the defense was aware. Appellant also asserted that the state was aware of the inconsistencies as it used the grand jury testimony to impeach at least one of its witnesses, Dripps, during the trial of co-defendant Getsy. Appellant argued that the need to preserve the secrecy of grand jury testimony was no longer an issue.

Then, at an oral hearing on January 29, 1997, the defense orally renewed its motion for a mistrial on the basis that late discovery was still "dribbling in." The court again considered various discovery issues previously raised by the parties and thereafter denied appellant's renewed motion for a mistrial. However, the court felt it prudent to grant a continuance until February 10, 1997 to compensate for any tardy discovery provided by the state.

Appellant's second [*23] motion for a mistrial was filed on February 10, 1997, primarily on the basis that the state filed a late discovery document which summarized a conversation allegedly favorable to the defense. n6 In the summary, the state indicated that Detective Begeot met with a former employee of the lawn care business owned by Serafino and appellant. This former employee was Sean McIlveen ("McIlveen"). Detective Begeot met with McIlveen in November 1995 when McIlveen was apparently incarcerated at the Trumbull County Jail. The gist of the summary was that McIlveen told the detective that he (McIlveen) heard McNulty and Hudach plan Serafino's murder several days before the attack on the Serafino residence occurred, because they were angry with

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 744

Serafino for writing bad checks as payment for their services in the lawn care business. Appellant was apparently not mentioned in the conversation, thus raising the implication that appellant was not involved in a conspiracy to kill the Serafinos.

n6  Although the state's supplemental discovery indicated that it was mailed to the defense on January 4, 1997, the defense indicated that it only received the discovery on February 6, 1997. The state failed to file the supplemental discovery in the record so there is no time stamp to clarify the matter.

[*24]  The court held a hearing on the motion on February 10, 1997. At the hearing, the court indicated that it believed the government should have provided the McIlveen disclosure sooner. When asked to explain itself, the state responded, unsatisfactorily, that it only recently became aware that Detective Begeot's one hundred forty-eight page report contained the very short reference to the incident. n7

n7 Although the court indicated that it had read Detective Begeot's full report, it was unclear whether the trial court itself noticed the passage regarding McIlveen. It would appear that the trial court inadvertently missed the passage.

The court then asked the defense to explain why a mistrial should be declared, seeing that opening statements had not yet commenced. The defense responded that it was prejudiced because individual voir dire had already been completed at that point, and that it was now precluded from questioning jurors in relation to this incident. The court stated that the defense would have the [*25] opportunity to raise the same when it reached the general voir dire, which had not yet occurred. After hearing the defense's response, the court ruled that the defense was not prejudiced

by the untimely discovery or otherwise denied a fair trial because it could still explore the issue with the jurors on general voir dire. The court further stated:

"The material that has been provided in regard to this witness, McIlveen, this Court views as essential material that the Defendant must have to prepare a proper defense. This Court sees no reason to grant a mistrial at this point because we are talking about time to prepare for defense. If I were of a mind to grant a mistrial, this case would be set down immediately and begin again. So there would be no advantage to the defense that I could see to have a mistrial granted rather than a continuance."

The court thereafter granted a two-day continuance to allow the defense to pursue the McIlveen lead. n8 It appears from the record that this continuance provided adequate time for the defense to pursue that lead. Thereafter, the defense represented to the court that it would be reasonable for the jury selection to be finalized within [*26] the next few days. The jury was empaneled on February 13, 1997.

n8 We note that McIlveen was not called as a witness at trial.

Here we determine that appellant's substantial rights were not materially affected by the alleged misconduct of the state, and, therefore, that appellant was not deprived of a fair trial. Although appellant asserts otherwise in his brief, the record before this court reveals that the trial court closely monitored the unfolding discovery process in this difficult trial. Lengthy discussions were had over what material requested by the defense was, in fact, discoverable. The trial court was scrupulous in attempting to ensure that appellant received a fair trial with access to discovery material to which he was entitled. When a question arose about whether the prosecution fully complied with the specific requests of the defense, the trial court examined the situation and ruled accordingly.

Moreover, the trial court frequently reviewed material *in camera* in order to ensure that the [*27] prosecution was responding to appellant's specific requests for favorable evidence. We further note that a review of the sealed documents reveals no material which should have otherwise been disclosed. In response to appellant's two motions for a mistrial, the trial court acknowledged that discovery was faulty and granted continuances to the defense.

On this point, we note that we continue to be dismayed at the shortsighted and unnecessary gamesmanship evident at the trial level. Nevertheless, although the prosecution's conduct was questionable, appellant failed to demonstrate that any potential for prejudice was not adequately dealt with by the vigilance of the trial court. He further failed to show that he was otherwise denied a fair trial as a result of the prosecution's actions. A guide to the resolution of this situation has been provided by Crim.R. 16(E)(3) and the Supreme Court of Ohio. [HN7] "A trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis* (1987), 32 Ohio St. 3d 1, [*28] 511 N.E.2d 1138, paragraph two of the syllabus. See, also, *State v. Wickline* (1990), 50 Ohio St. 3d 114, 116-117, 552 N.E.2d 913. This was the path correctly chosen by the trial court. Appellant's second assignment of error is without merit.

In the third assignment of error, appellant argues that the trial court committed reversible error by refusing to grant appellant's motion to quash the indictment against him. Appellant's motion was filed in the Trumbull County Court of Common Pleas on September 12, 1996. The motion alleged that the government failed to adhere to the procedures set forth in R.C. Chapter 2313 concerning the selection of the annual jury list and the drawing and summoning of the grand jury venire. n9 The motion requested an evidentiary hearing to establish a factual basis for the allegations contained in the motion.

n9 Specifically, appellant alleged: (1) the annual jury list was not compiled, maintained, and filed in accordance with R.C. 2313.08, in particular the annual jury lists were not maintained once a succeeding annual jury list was drawn or generated, thus making it impossible for appellant to review the list to determine whether any unconstitutional underrepresentation of any given group took place; (2) the procedures established for excusing jurors as set forth in R.C. 2313.12 and 2313.13 were not followed, especially with regard to grand jurors; (3) the grand jury venire in the instant case lacked the signatures of certain officers required by statute to certify that the Jury Code has been complied with; and (4) the sheriff had failed to properly execute the return of service in regards to the grand jurors pursuant to R.C. 2313.25.

[*29]

The next day, on September 13, 1996, the trial court conducted an evidentiary hearing on the matter. Appellant called the Trumbull County Deputy Jury Commissioner and the Chief Deputy of the Civil Division of the Trumbull County Clerk of Courts to explain the procedures followed in the selection of the annual jury list and the grand jury venire. No other persons were called to testify. Appellant introduced several exhibits into evidence.

From the record before this court, it appears that appellant was only successful in demonstrating that the venire for grand jurors for the May 1995 Term of the Trumbull County Grand Jury lacked three of the required signatures, namely that of the clerk of courts, sheriff, and judge pursuant to statute. See R.C. 2313.23; 2313.21(A)(4); 2939.02; 2939.03. Appellee conceded the same in its brief.

The next reference to the motion to quash which this court can find in the record before us is found at a hearing on January 10, 1997. At this hearing,

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 746

appellant's counsel indicted that an evidentiary hearing had already occurred on the motion, (presumably the September 13, 1996 hearing), and that additional argumentation had been made. Appellant indicated [*30] that there was nothing left to do but for the court to rule on the motion. We note that we have been unable to locate any other portion of the record which documents the additional argumentation on the motion. The court thereafter orally denied the motion to quash on January 10, 1997.

For unexplained reasons, however, the court again entertained the motion to quash at a hearing on January 16, 1997, asking appellant if he had any other evidence to present. Appellant declined the opportunity to present further evidence and indicated for a second time that the defense was ready for the court to rule.

The trial court thereafter formally denied appellant's motion to quash the indictment. In short, the trial court compared the alleged irregularities in the instant case with those found in the case of *State v. Puente* (1982), 69 Ohio St. 2d 136, 431 N.E.2d 987, concluding that the alleged irregularities were technical in nature and that the government substantially complied with the requirements of R.C. Chapter 2313. The trial court prepared a judgment entry to this effect, later filed on January 21, 1997. The judgment entry read, in pertinent part:

"On the basis of *State of Ohio* [*31] *vs. Puente* [1982,] 69 Ohio St. 2d 136, 431 N.E.2d 987, the jury selection procedures are found to be in substantial compliance with the statute.

"This Court has further reviewed the record as [to] the other points raised and finds no reason to hold [that] the statute has not been complied with. Also, there is no proffer of evidence to show any basis of systematic or intentional exclusion of any potential jurors or prejudice to Defendant's rights.

"This Court finds no specific exclusion of any potential juror.

"For the foregoing reasons, Defendant's motion is overruled and denied."

In his brief, appellant argues, in essence, that the alleged irregularities were *per se* prejudicial, and thus that the trial court erred by refusing to quash the indictment. Appellee, on the other hand, asserts that the test is whether anything in the record "leads to the conclusion that *** [appellant] was either prejudiced by the jury commissioner's failure to follow the requirements of R.C. 2313.01 *et seq.,* or that the jurors who indicted and convicted *** [appellant] were not qualified jurors." *Puente* at 138.

This court quite recently had occasion to address a similar [*32] situation in the case of *State v. Gunther* (Dec. 31, 1997), Trumbull App. No. 96-T-5605, unreported, 1997 Ohio App. LEXIS 6033. In *Gunther,* although we adhered to the test espoused in *Puente,* we ultimately reversed a conviction when similar irregularities in the grand jury venire were alleged. However, a critical distinction exists between *Gunther* and the instant case, namely that the appellant in *Gunther* was denied the opportunity to prove what, if any prejudice, occurred in his case as a result of the alleged irregularity.

In the case *sub judice,* appellant was given ample opportunity to present evidence demonstrating that he was prejudiced by the alleged irregularities or that the grand jurors which indicted him were not qualified. The record reveals at least two occasions on which appellant declined to present additional evidence to further his case.

Indeed, the record of the hearing on January 16, 1997 reveals that the trial court expressly rejected his argument that the annual lists of jurors were not compiled, maintained, and filed in accordance with R.C. 2313.08. As a result, the trial court found no merit to appellant's assertion that it was impossible [*33] for appellant to review the lists to determine whether any unconstitutional underrepresentation of a given group took place.

On this point we note that [HN8] appellant had the burden of establishing a prima facie case of discrimination by showing that a "recognizable, distinct group was substantially underrepresented in the jury pool by comparing its proportion in the population to the proportion called to serve

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

Appendix - 10

as grand jurors over a significant period." *State v. Williams* (1997), 79 Ohio St. 3d 1, 17, 679 N.E.2d 646. Appellant made no attempt to do this.

In light of the foregoing, we concur with the trial court's conclusion that appellant has failed to meet his burden in demonstrating prejudice or in demonstrating that the grand jurors who indicted him were unqualified. Accordingly, the motion to quash (actually a motion to dismiss in substance, see, *Gunther* at 10, fn. 1) was properly denied pursuant to *Puente*. Appellant's third assignment of error is without merit.

In appellant's fourth assignment of error, appellant argues that the trial court erred by granting the state's motion *in limine* to prevent the defense from impeaching the state's pathologist, Dr. William A. [*34] Cox ("Dr. Cox"), with prior misdemeanor convictions which appellant asserts involve dishonesty. Dr. Cox testified about the results of the autopsy conducted on the body of Mrs. Serafino. The state conceded that he had several prior misdemeanor convictions, but argued that the prior convictions did not involve dishonesty or theft, and thus were not proper impeachment material under Evid.R. 609(A)(3). n10

n10 In the motion *in limine,* the state indicated that Dr. Cox openly used the facilities at the Summit County Coroner's Office to perform autopsies for other counties, charging a private fee for the autopsies. Dr. Cox also separately billed for the use of the facility at $ 150 per case. According to the state, Dr. Cox pled no contest and was subsequently convicted of the following offenses: (1) two counts of unlawful interest in a public contract, first degree misdemeanors in violation of R.C. 2921.42(A)(4); (2) two counts of soliciting or accepting improper compensation, first degree misdemeanors in violation of R.C. 2921.43(A)(1); (3) one count of use of authority to secure a thing of value, a first degree misdemeanor in violation of R.C. 102.03(D); (4) one count of

improper solicitation and receipt of a thing of value, a first degree misdemeanor in violation of R.C. 102.03(E); (5) three counts of failure to disclose sources and amounts of income required by law, first degree misdemeanors in violation of R.C. 102.02(D).

[*35]

However, it appears that appellant failed to preserve this issue for appellate review. [HN9] An order granting or denying a motion *in limine* is a tentative, preliminary, or presumptive ruling about an evidentiary issue that is anticipated. *State v. Leslie* (1984), 14 Ohio App. 3d 343, 344, 471 N.E.2d 503. An appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial. *Id.*

In the case at bar, the state filed its motion *in limine* on February 10, 1997. Appellant filed a written memorandum in opposition to the motion on the same day, indicating that he had received a copy of the motion on February 7, 1997. Appellant further orally objected to the motion on February 13, 1997. However, during this hearing, appellant's counsel also indicated to the court that the defense was not entirely sure that the impeachment material would be necessary.

Specifically, defense counsel stated that the defense would never introduce the evidence just to embarrass the witness. Defense counsel thereafter intimated that the court might consider reserving its ruling on the issue.

The [*36] state, however, opposed any reserved ruling, indicating that it intended to address the issue on voir dire. The trial court then agreed to render an immediate ruling on the issue and asked the defense to inform the court if it decided not to proceed on the motion. The trial court rendered its written judgment entry granting the state's motion on February 13, 1997. The motion was granted, in essence, on the basis that Dr. Cox's convictions were not those of dishonesty under Evid.R. 609(A)(3).

Then, when Dr. Cox was called to

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 748

the stand, appellant's defense counsel failed to renew an objection to the granting of the state's motion. Given this fact and the defense's prior indications that it might not renew its objection, we determine that appellant failed to preserve this issue for appeal.

However, even if we were to reach the merits of the issue, appellant has failed to demonstrate that any reversible error occurred. Although we agree that the trial court's ruling was erroneous, this error was clearly harmless beyond a reasonable doubt. See Crim.R. 52(A); *State v. Williams* (1988), 38 Ohio St. 3d 346, 349, 528 N.E.2d 910 holding [HN10] "'To be deemed nonprejudicial, error of constitutional [*37] dimension must be harmless beyond a reasonable doubt,'" quoting *State v. Williams* (1983), 6 Ohio St. 3d 281, 452 N.E.2d 1323, paragraph three of the syllabus. See, also, *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431, holding that violations of the Confrontation Clause do not fit within the limited category of constitutional errors that are deemed prejudicial in every case.

In the case at bar, the defense stipulated to Dr. Cox's qualifications. The defense repeatedly indicated that it did not challenge the fact that Mrs. Serafino was murdered, nor the manner in which the murder was alleged to have occurred. The defense did not cross-examine Dr. Cox. Being that the nature and manner of the cause of death was completely uncontroverted by appellant at trial, any error which may have occurred was harmless beyond a reasonable doubt.

Additionally, it is questionable whether the information had any relevance whatsoever given the defense strategy used at trial. On this point, we note that [HN11] a defendant has no Sixth Amendment right to confront a witness with irrelevant information. *Leslie* at 346, citing *Logan v. Marshall* (N.D. Ohio 1981), 540 [*38] F. Supp. 3. The fourth assignment of error is without merit.

In his fifth and final assignment of error, appellant contends that the trial court committed reversible error by giving the deadlocked jury the "*Howard* instruction" as it is commonly called, from the case of *State v. Howard* (1989), 42 Ohio St. 3d 18, 537 N.E.2d 188, paragraph two of the syllabus. n11 This assignment of error is also without merit.

n11 The *Howard* charge reads: "'The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.'" *Howard* at paragraph two of the syllabus.

[*39]

The jury began deliberations in this case on Tuesday, March 4, 1997; however, it had to begin anew the next morning after one of its jurors requested and received permission to be excused. The jury was sequestered that night and throughout the deliberations. It began again on the next day with the alternate juror. On Thursday, March 6, 1997 at 6:10 p.m., the jury foreperson informed the court in writing that it could not reach a verdict. Over defense counsel's objection, the trial court read the *Howard* charge, almost verbatim, to the jury. It concluded the charge by instructing the jury to decide the preliminary matter of whether agreement would be possible if the deliberations were to continue, after considering the *Howard* charge. The jury returned an answer that it would be possible to reach an agreement if it deliberated further. The jury concluded deliberations for the night and returned the next day. On that day, Friday, March 7, 1997, at 3:20 p.m., the jury reached its verdict.

Appellant now asks this court to find that the trial court erred by giving the *Howard* charge, arguing that it was coercive in light of the fact that the weekend was approaching, and the [*40] jury most likely did not wish to be remain sequestered over the weekend.

This argument is without merit. First, we are obligated as an intermediate court to follow the precedent set forth by the Supreme Court of Ohio. Obviously, the Supreme Court found the *Howard* charge to be constitutionally permissible in cases such as these where the jury indicates, after some deliberation, that it is deadlocked. Second, appellant's assertion that the upcoming weekend played a role in the verdict is pure conjecture on his part, with no support in the record. Appellant's fifth assignment of error is without merit.

In light of the foregoing analysis, appellant's five assignments of error are without merit. The judgment of the trial court is affirmed.

JUDGE JUDITH A. CHRISTLEY

FORD, P.J.,

O'NEILL, J., concur.

**STATE OF OHIO, PLAINTIFF-APPELLEE VS. STEPHEN BURROUGHS,
DEFENDANT-APPELLANT
CASE NO. 93-CA-13
COURT OF APPEALS OF OHIO, SEVENTH APPELLATE DISTRICT,
MAHONING COUNTY
1999 Ohio App. LEXIS 6200
December 16, 1999, Decided
December 16, 1999, Filed**

**PRIOR HISTORY:**
[*1]            CHARACTER OF PROCEEDINGS:
Criminal Appeal from Mahoning County
Court of Common Pleas, Case No. 92 CR
87.

**DISPOSITION:**
         JUDGMENT: Affirmed.

**COUNSEL:**
For Plaintiff-Appellee: Atty. Paul J. Gains,
Prosecuting Attorney, Atty. Janice T.
O'Halloran, Assistant Prosecuting Attorney,
Youngstown, Ohio.

For Defendant-Appellant: Atty. James
Gentile, Youngstown, Ohio.

**JUDGES:**
Hon. Cheryl L. Waite, Hon. Gene Donofrio,
Hon. Joseph J. Vukovich. Donofrio, J.,
concurs. Vukovich, J., concurs.

**OPINIONBY:**
Cheryl L. Waite

**OPINION:**

WAITE, J.
      This timely appeal arises from a
Mahoning County Court of Common Pleas
jury verdict finding Appellant, Stephen
Burroughs, guilty of aggravated murder
with a firearms specification and guilty of
aggravated robbery, also with a firearms
specifications. For the following reasons, we
affirm the trial court jury verdict.
      In the early morning hours of
November 2, 1991, Appellant lost
approximately two thousand dollars ($
2000.00), either by gambling or when
fleeing from police, and planned to rob
someone to recoup his loss. Around 8:00

a.m. on that morning, Appellant and two
friends, Freddie Taylor and Robert Tracy
Green, were at the Quick Pick Market on
Market Street in Youngstown, Ohio. [*2]
The record reflects that while Green waited
outside, Appellant produced a 9mm
handgun before he and Taylor entered the
store. Inside the store, Appellant fired at
least two shots into the head of Husam
Halaweh, the owner of the store. Halaweh
died at the scene. Appellant and Taylor
stole money, beer and lottery tickets still in
the dispensers.
      Appellant was charged with one
count of aggravated murder with a firearm
specification and a death specification and
one count of aggravated robbery with a
firearm specification. Appellant pleaded not
guilty and waived his right to a speedy
trial.
      A jury trial commenced on December
14, 1992. Pursuant to their plea
agreements, Green and Taylor testified
against Appellant. The state also presented
the testimony of Deneen Duvall, Appellant's
girlfriend and the mother of his child.
During her direct examination, the
prosecutor requested permission to "cross
examine" Duvall. Over Appellant's
objection, the trial court permitted the state
to ask leading questions of its own witness.
      On December 14, 1992, a jury found
Appellant guilty of aggravated murder with
a firearm specification. The jury also found
Appellant guilty of aggravated robbery with
[*3] a firearm specification. On January
20, 1993, pursuant to the jury's
recommendation, the trial court sentenced
Appellant to life imprisonment with parole
eligibility after thirty (30) years on the
aggravated murder conviction and three (3)
years actual incarceration on the firearm
specification to be served prior to and
consecutive with the sentence for
aggravated murder. The court also

sentenced Appellant to an indefinite term of ten (10) to twenty-five (25) years imprisonment for aggravated robbery with a minimum ten (10) years of actual incarceration. The court further ordered that all sentences be served consecutively with each other.

On January 21, 1993, Appellant filed his notice of appeal. His first assignment of error alleges:

"THE COURT ERRED IN PERMITTING THE STATE TO CROSS EXAMINE A WITNESS CALLED TO THE STAND BY THE STATE."

Appellant argues that the trial court erred in permitting the prosecution to "cross examine" its own witness, Deneen Duvall. Appellant contends that he was prejudiced as Duvall's testimony was necessary to buttress the incriminating testimony of his accomplices, Robert Tracy Green and Freddie Taylor. Specifically, Appellant argues that through [*4] "cross examination" of Deneen, the state was able to establish that the lottery tickets were located in the room shared by Deneen and Appellant and that this allowed the jury to infer that since the lottery tickets were in Appellant's possession, that Appellant must have taken them during the robbery.

Appellant argues that the only manner in which the state can cross examine its own witness is pursuant to Evid.R. 607 which permits a party to impeach its own witness, "*** by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Evid.R. 607. Appellant contends that although Duvall made a prior statement to police, the prosecution made no attempt to demonstrate surprise or damage stemming from Duvall's testimony at trial. Appellant further contends that although Evid.R. 611(C) permits counsel to ask leading questions of a hostile witness, an adverse party or a witness identified with an adverse party, the prosecution opted "for all out cross examination" under Evid.R. 607.

[HN1] "A decision as to whether a party may pose leading questions on direct examination is left to the sound discretion of the trial court." State v. Talley, 1998 Ohio App. LEXIS 5524 (Nov. 5, 1998), [*5] Mahoning App. No. 97 CA 72, unreported, 8, citing Ramage v. Central Ohio Emergency Serv., Inc., (1992), 64 Ohio St. 3d 97, 111, 592 N.E.2d 828. [HN2] "Absent an abuse of discretion, such a decision will not be overturned on appeal." Id. [HN3] "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980) 62 Ohio St. 2d 151, 157, 404 N.E.2d 144. Our review of the record reveals no abuse of discretion.

[HN4] According to Evid.R. 611(A), "the court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." [HN5] Furthermore, Evid.R. 611(C) provides that "leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony *** [HN6] When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation [*6] may be by leading questions."

The record before us does reflect circumstances which reveal that the court was correct in allowing the state to ask leading questions of its own witness. In reviewing the record of Ms. Duvall's testimony, prior to the prosecution's request to "cross examine" her, there were at least eight instances where Duvall's answers to the prosecutor's questions were inaudible, requiring either the prosecutor or the court to ask her to repeat her statements. (Tr., 285, 286, 288, 289, 290.) In fact, the prosecutor asked Duvall three times to speak up because of her imperceptible responses. (Tr. 285, 286, 289.) Based on this alone, the court was within its discretion to take steps to control the mode of questioning to avoid needless consumption of time. Evid.R. 611(A). Furthermore, [HN7] the exception which disallows leading one's own witness, "except as may

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 752

be necessary to develop his testimony," provides the trial court with great discretionary latitude. *State v. Lewis* (1982), 4 Ohio App. 3d 275, 278, 448 N.E.2d 487. Here, the trial court was permitted to allow a change in the mode of questioning to efficiently develop Duvall's reluctant testimony.

Importantly, [*7] the record reflects clearly that Duvall was a witness identified with Appellant. She testified that Appellant was her boyfriend (Tr. 286) and that he was also the father of her child. (Tr. 287.) This identification with Appellant alone would permit the prosecution to ask leading questions of her on direct examination pursuant to Evid.R. 611(C).

The record also reveals that Appellant was a hostile witness. Duvall unequivocally indicated that she did not want to be on the stand testifying. (Tr. 287.) Furthermore, Duvall testified that she recalled making a statement to police on December 6, 1991 but that she could not recall everything contained therein. (Tr. 292-293.) When presented with a copy of the statement, Duvall confirmed that she made and signed the statement. (Tr. 293.) However, after reading the statement, Duvall indicated that it did not refresh her recollection. (Tr. 293.) Duvall testified that she remembered seeing a bag (which apparently contained money and lottery tickets taken in the robbery) in her apartment after Appellant, Taylor and Green arrived there but stated that she did not see who brought the bag into the apartment. (Tr. 294.) Duvall then testified that [*8] bag was sitting on the floor but that the three men did nothing with it. (Tr. 294.) In response to Duvall's inability to recall the information in the statement, a copy of which she reviewed, the following exchange took place between the prosecutor and Duvall:

"Q. Did you talk to me around noon today or 1:00 o'clock?

"A. Yes.

"Q. And at that time did you remember everything that happened?

"A. Yes.

"[Prosecutor]: Ask permission to cross examine this witness.

"[Defense counsel]: Objection.

"The Court: Overruled. You may proceed."

(Tr. 295.)

Given that Duvall was a reluctant witness, that she claimed she could not recall the particulars of her statement to police (even when reviewing a copy of the statement) and that she admits that her recollection had not been faulty earlier in the day, it was proper to treat her as a hostile witness. Appellant is mistaken in arguing that the state invoked Evid.R. 607 in order to impeach Duvall's testimony. There is no indication on the record that the prosecution sought to impeach Duvall or that the prosecution ever raised Evid.R. 607. Rather, our review of the record on the whole indicates that the [*9] prosecution was unable to develop any material testimony from Duvall, whether due to a sincere inability to recall her prior account or due to the fact that she was uncooperative, and sought "cross examination" as a means to develop her testimony.

As there were several bases on which the trial court could have permitted the prosecution to ask leading questions of its own witness, we can not say that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. We therefore overrule Appellant's first assignment of error.

Appellant's second assignment of error alleges:

"THE VERDICT OF GUILTY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

Appellant argues that the state failed to introduce competent and credible evidence that Appellant was guilty of the crimes charged beyond a reasonable doubt. Appellant contends that as the state presented no scientific or forensic evidence linking Appellant to the crime, the state relied solely on the conflicting testimony of

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 753

accomplices. Appellant further states that Ohio law prohibits conviction based solely on uncorroborated accomplice testimony. *State v. Lundy* (1987) 41 Ohio App. 3d 163, 535 N.E.2d 664; [*10] R.C. § 2923.03(D).

We may reverse a conviction as being against the weight of the evidence only after the State has presented both sufficient evidence to support a conviction and has persuaded the fact finder to convict. *State v. Thompkins* (1997), 78 Ohio St. 3d 380, 388, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 41-43, 72 L. Ed. 2d 652, 102 S. Ct. 2211. [HN8] To reverse Appellant's conviction based upon the weight of the evidence, we must find that, "***the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 387, quoting *State v. Martin* (1983), 20 Ohio App. 3d 172, 175, 485 N.E.2d 717. [HN9] For such a reversal, all three judges of the reviewing panel must unanimously concur. *Thompkins*, 389. [HN10] A witness with strong motivation to fabricate his testimony is not incompetent to testify. Rather, it is well within the province of the jury, in determining a defendant's guilt beyond a reasonable doubt, to determine the weight to be given to such testimony. *State v. Sneed* (1992), 63 Ohio St. 3d 3, 9, 584 N.E.2d 1160. [*11]

Prior to its amendment in September, 1986, R.C. § 2923.03(D) prohibited a conviction based, "* * *solely upon the testimony of an accomplice, unsupported by other evidence." *State v. Lundy*, supra, 163, quoting former R.C. § 2923.03(D). [HN11] Since its amendment, however, R.C. § 2923.03(D) provides that the trial court must advise the jury as to the evidentiary value of accomplice testimony. [HN12] R.C. § 2923.03(D) provides:

"(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with *** an offense, the court, when it charges the jury, shall state substantially the following:

"'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

"'It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony [*12] and to determine its quality and worth or its lack of quality and worth.'"

In the present case, the trial court charged the jury in compliance with R.C. § 2923.03(D).

Appellant was charged with felony murder, in violation of R.C. § 2903.01(D) with a death penalty specification in violation of R.C. § § 2929.04(A)(7) and 2941.41. Along with these charges, he was also charged with a firearm specification in violation of R.C. § § 2941.141 and 2929.71(A). [HN13] R.C. § 2903.01(B) provides that, "No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit *** aggravated robbery or robbery * * *" Appellant was also charged with aggravated robbery with a firearm specification in violation of R.C. § § 2911.01(A)(1)(B), 2941.141 and 2929.71(A). Ohio's aggravated robbery statute, [HN14] R.C. § 2911.01, provides:

"(A) No person, in attempting or committing a theft offense *** or in fleeing immediately after such [*13] attempt or offense, shall do either of the following:

"(1) Have a deadly weapon or dangerous ordnance *** on or about his person or under his control;

"* * *"

At trial, Green testified that while still outside of the Quick Pick Market, Appellant stated that he was going to rob somebody. (Tr. 67-68.) He then testified that Appellant pulled out a 9mm pistol, cocked the hammer and handed the pistol to Taylor. (Tr. 68.) Green also stated that he saw Appellant and Taylor enter the store when as he was leaving the parking lot. (Tr. 70-71.) Green testified that when he returned to the store a few minutes later, he witnessed Appellant and Taylor exit the store. (Tr. 71.) Green stated that

Appellant's pockets appeared to be stuffed and that he noticed some food stamps in one of the pockets. (Tr. 71.)

Green also testified that he left the store's parking lot with Appellant and Taylor and that in the car, Taylor had a beer and was pulling lottery tickets from the dispensers. (Tr. 75.) Green stated that they drove to a parking lot in Mill Creek Park where Appellant discarded the ticket dispensers over the side of a hill. (Tr. 76.) He said that they drove to Duvall's apartment building [*14] and that Appellant carried in a trash bag filled with lottery tickets. (Tr. 76-77.) Green testified that while in the apartment, Taylor told the others there that he entered the store and asked Mr. Halaweh for change and then shot him and that Appellant proceeded to grab the gun from Taylor, jump over the counter and shoot Halaweh two more times. (Tr. 78.)

Taylor testified that prior to entering the store, Appellant stated that he wanted to rob the store owner. (Tr. 227.) In Taylor's version of events, Appellant showed him a 9mm handgun before they entered the store and once inside, Appellant asked for change for twenty-dollar bill and then for a pack of cigarettes. (Tr. 228.) Taylor testified that Appellant fired a shot at Halaweh when he opened the register to make change for the cigarettes. (Tr. 230.) Taylor further stated that when Halaweh fell, Appellant jumped over the counter and fired two shots into Halaweh's head. (Tr. 230-231.) Taylor said that he went to the back of the store and took a six pack of beer while Appellant took a box of lottery tickets. Then the two left the store. (Tr. 231.)

Based on the testimony of Green and Taylor, we cannot find that the duly cautioned [*15] jury clearly lost its way. *Thompkins, supra.* Their testimony elicited that Appellant was directly involved in the robbery in which Husam Halaweh was murdered and that Appellant had control of a firearm. Furthermore, this testimony could lead a properly charged jury to conclude that Appellant committed the crimes beyond a reasonable doubt.

We find Appellant's second assignment of error also to be without merit and affirm the judgment of the trial court.

Donofrio, J., concurs.

Vukovich, J., concurs
    APPROVED:
    CHERYL L. WAITE, JUDGE

E:\Jbjcap1cd\Subjects\Issue.One\Appendix.wpd

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

State of Ohio )  Case Number _01_-CR-_793_
    Plaintiff )
  )  JUDGE JOHN M. STUARD
v. )
  )  Waiver of Speedy Trial
_Donna Roberts_ )
    Defendant )

This matter came before this Court on this _26th_ day of _February_ 2002, before the Honorable John M. Stuard, Judge of the Court of Common Pleas. The Defendant appeared with counsel, Attorney _J. Gerald Ingram_, and the State was represented by Assistant Prosecuting Attorney _Chris Becker and_ ~~Attorney~~ _Ken Bailey_.

The Court advised the Defendant that he/she has a right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution and Section 10, Article I of the Ohio Constitution. Further, the Defendant was advised pursuant to Ohio Supreme Court Rules of Superintendence, Rule 8(B), he/she has the right to be brought to trial within (6) months of arraignment on indictment or information.

The Defendant, voluntarily, and in open Court, agreed to waive his/her rights to a speedy trial; agreed to extend the time in which he/she has to be brought to trial by an additional _____ days and hereby expressly agreed to the trial date selected below.

The Court, having fully advised the Defendant of his /her speedy trial rights, and being fully satisfied that the Defendant understood, and voluntarily waived the same, and for good cause shown, hereby accepts Defendant's Speedy Trial Waiver, and extends the time in which the Defendant must be brought to trial for an additional _45_ days beyond the statutorily imposed time period, and sets a trial date for _April 8_, 200**3** said date being expressly approved by both the Defendant and the State.

_____
Defendant

_____
Counsel for Defendant

_____
Judge John M. Stuard

0835  415

56

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 756

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                )
                             )      CASE NO.     01-CR-793
        Plaintiff,            )
                             )      HONORABLE JUDGE:
        -vs-                  )      JOHN M. STUARD
                             )
DONNA ROBERTS,                )      **MEMORANDUM IN OPPOSITION TO**
                             )      **DEFENDANT'S  MOTION  TO**
        Defendant.            )      **SUPPRESS**

---

Now comes the State of Ohio, by and through Trumbull County Assistant Prosecutors Kenneth N. Bailey and Christopher D. Becker who file this Memorandum in Opposition to Defendant's Motion to Suppress.

The Defendant filed a Motion to Suppress on October 4, 2002. A hearing on that motion was held on February 26, 2003. The Defendant asks this Court to exclude from evidence all items obtained by law enforcement officers from her home on December 12, 2001. The Defendant argues that the warrantless search of her home and automobile were in violation of her Fourth Amendment Rights and because there is not a "murder scene exception" to the Fourth Amendment. The Defendant further argues that she was not aware of her right to refuse and that due to her mental and emotional condition she was unable to give consent and that she was susceptible to subtle coercive police actions.

The State concurs that there is not a "murder scene exception" to the Fourth Amendment. The Defendant in this case consented to the search by the police. In fact the Defendant requested the search by summoning the police to her residence "to find the person" who committed the crimes against her husband. In this case it is clear that it was the **Defendant** and not the police who

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 757

engaged in trickery and deceit. The Defendant portrayed herself as a victim who had nothing to do with the crime scene that she herself helped create and which she summoned the police to under the guise of being a victim. Based on the following well established case law defining implied consent, the Defendant cannot now complain that the police violated her Fourth Amendment Rights.

## MEMORANDUM

### Facts

On December 12, 2001, just after midnight the Defendant returned to her home at 254 Fonderlac, SE, Howland Township and called 911. Responding Officers were not made aware by 911 and dispatchers what the call was in reference to because the caller was hysterical. Officers Ray and Policino from the Howland Township Police Department were met by the Defendant who came running towards them from the residence. The Defendant, who was excited and slightly hysterical, indicated that her husband was in the doorway from the garage to the kitchen and was bleeding and that she didn't know what had happened. Officers checked the residence and were able to determine that there appeared to be no forced entry. Paramedics arrived and determined that the victim, Robert Fingerhut, was dead.

Eventually, Howland Detective Sgt. Paul Monroe and Detective Sgt. Frank Dillon arrived at the scene. The Defendant told all of the officers that were at her residence that "someone had murdered her Robert" and that the police should "do whatever it takes to find whoever did this". At no point on December 12, 2001, did the police suspect Donna Roberts as a suspect in the death of Robert Fingerhut.

Donna Roberts was described by law enforcement officials who saw her on December 12,

2

2001, as cooperative. Additionally, Donna Roberts portrayed herself throughout the early morning hours of December 12, 2001, as a scared victim whose home had been invaded and in which a homicide had occurred.

Eventually, it was mutually decided by Donna Roberts and the Howland Police Department that it would be best if Donna went to the home of a friend or relative for the evening while the police processed the home which she had requested officers to come into and search in order to find the perpetrator. Ralph and Rita Roberts, the Defendant's brother and sister-in-law, were summoned to come to the Defendant's home.

Ralph Roberts described the interaction between his sister Donna and the police as positive. Ralph eventually took Donna back to his home in Austintown. At no point during the time he was present at the Fonderlac residence did Ralph indicate that his sister wanted the police to leave or discontinue their work in finding the person or persons responsible for the death of Robert Fingerhut.

Howland Police were made aware by Donna that Robert Fingerhut's vehicle was missing from the home as well as at least one firearm. According to Donna Roberts the missing firearm was either in the car of Robert Fingerhut or in a bedroom drawer. After checking the bedroom drawer with the police it was determined that in fact the firearm was missing. Police began to search the entire house to determine if anything else was missing and in order to find any evidence that could assist them in solving the murder of Robert Fingerhut.

Howland Police told Donna that they would like to search her entire home for evidence of where the perpetrator may have gone, what he may have taken and any other evidence relating to the crimes, Donna Roberts repeatedly told officers that they were to do whatever they had to do

3

to and "search the whole place" to find the person responsible.

Additionally, Donna cooperated with police at the scene by detailing her activities throughout the day of December 11, 2001. According to Det. Sgt. Monroe her story indicating that she was out shopping was corroborated by shopping bags that indicated the stores she had been to earlier that evening and which were consistent with the statement she provided to police. Det. Monroe found a container containing crab legs in Donna's vehicle which was consistent with statements from Donna that she had eaten alone at Red Lobster that evening. As important to the police as catching the suspect or suspects it is equally important to remove suspicion that others may have committed the crime. Det. Monroe's corroboration of Donna Robert's story is integral to the investigation and would logically be a part of "whatever he had to do to catch the person" who had committed the crime.

The testimony at the hearing on February 26, 2003, was unanimous in a number of respects. First, Donna Roberts requested the police to her residence on December 12, 2001. Second, Donna Roberts repeatedly told the investigating officers to "do whatever they had to do", "search the whole place" and "just find the guy". Third, Donna Roberts not only cooperated but gave a statement indicating her activity prior to returning to her residence. Her statement was corroborated by physical evidence found in her vehicle and in the residence. Fourth, not one officer felt that Donna Roberts was a suspect on December 12, 2001. She was never hand-cuffed or restrained in any manner. Rather all of the officers believed that based upon their observations of Donna that evening she was a victim. In fact it was not until over a week later that Donna Roberts became a suspect and was criminally charged. Fifth, Donna Roberts never once revoked her consent and in fact she repeatedly requested that the police find the person responsible for this crime. Donna left

4

the police in her residence with her brother with explicit instructions that they were to find the person responsible. Prior to leaving Donna told the officers to contact her at any time if they needed to speak to her. Even her own brother described her interaction with the police as positive on December 12, 2001. Finally, later in the morning of December 12, 2001, Donna Roberts signed a written consent to search form. Said form was signed freely and voluntarily and without any coercion by the Police.

<u>Law</u>

When a search occurs without a warrant, the state has the burden to show that the search comes within one of the judicially recognized exceptions to the warrant requirement. <u>State v. Akron Airport Post No. 8975</u> (1985), 19 Ohio St.3d 49, 51, 482 N.E.2d 606. One exception exists when searches are conducted with consent. <u>Schneckkloth v. Bustamonte</u> (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854; <u>State v. Posey</u> (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61.

Courts and commentators have long recognized that "consent [to search] may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search." Jeffrey Hanninggan Kuras, et al., <u>Warrantless Searches and Seizures," 90 Georgetown Law Journal 1130, 1172 (2002)</u>. "Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" <u>United States v. Buettner-Janusch</u>, (2d Cir. 1981), 646 F.ed 759, 764. See also <u>United States v. Wesela</u> (7th Cir. 2000).

In fact a long list of authorities exist for the premise that a consent to search may be implied by either the circumstances, the person's actions or agreements or by the person's failure to object

5

to the search. [1]

_____

[1]

  United States v. Gordon 173 F.3d 761, 766 (10th Cir.1999) ("Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."); United States v. Gilbert, 774 F.2d 962, 964 (9th Cir.1985) ("Appellant's request that the officers obtain her clothing necessarily implied consent to enter the bedroom in which she said the clothing was located."); United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir.1981) ("Moreover, it is well settled that consent may be inferred from an individual's words, gestures, or conduct."); United States v. Turbyfill, 525 F.2d 57, 59 (8th Cir.1975) ("An invitation or consent to enter a house may be implied as well as expressed."); Phillips v. State 625 P.2d 816, 817 (Alaska 1980) ("In this case, we conclude that Mike Yakasoff voluntarily consented to the entry. Someone in the cabin, presumably he or his brother, summoned the police to the scene. Mike Yakasoff met Little when he arrived a short time later and directed him to the cabin, and there is no evidence suggesting that Yakasoff's actions were not voluntary."); People v. Superior Court, 41 Cal.App.3d 636, 116 Cal.Rptr. 24, 25 (1974) ("From our appraisal of the facts we think it clear that Henry's statement about the location of the gun amounted to an implied consent to look for it. Words may imply consent as well as express it."); State v. Bryant, 19 Conn.App. 626, 563 A.2d 326, 328 (1989) ([Defendant's] request that Gerovitz follow him to the trunk and watch him prop it open implied his consent to the officer's view of the trunk's contents."); Steigler v. State, 277 A.2d 662, 667 (Del.1971) ("We think that appellant's actions amounted to an implied consent to the search and seizure."), vacated in part on other grounds by Steigler v. Delaware, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972); Zeigler v. State, 402 So.2d 365, 372 (Fla.1981)("[T]he police were at the store as a result of the invitation of the defendant. That invitation removed any application of Mincey."); State v. Hanson, 97 Hawai'i 71, 34 P.3d 1, 5 (2001) ("Consent may also be implied 'from an individual's words, gestures, or conduct.' "); State v. Knapp, 120 Idaho 343, 815 P.2d 1083, 1089 (App.1991)("[W]e agree with the district court's ruling that Knapp impliedly authorized the officer to enter his motel room."); People v. Rodgers, 96 Ill.App.3d 416, 51 Ill.Dec. 695, 421 N.E.2d 203, 205 (1981)("The principles of consent searches are well established. They are applicable where the consent is implied from actions as well as where expressly

6

granted."); <u>State v. Jorgensen</u>,526 N.E.2d 1004, 1006 (Ind.Ct.App.1988) ("The circumstances surrounding the search may demonstrate that the party involved implicitly gave consent, by word or deed."); <u>State v. Fredette</u>, 411 A.2d 65, 69 (Me.1979) ("There can be no doubt that the entry of the police into the Fredette home, and the conduct of Mrs. Fredette after the police had arrived, suggested her consent to their entry for the dual purpose of getting medical assistance for her husband and for determining who his assailant might have been."); <u>Lewis v. State</u>, 285 Md. 705, 404 A.2d 1073, 1080-1081 (1979) ("The defendant had indicated a purpose of cooperating with the police and then affirmatively made arrangements for the police to obtain a house key during his absence. In our judgment, these circumstances are sufficient to demonstrate that the search was freely and voluntarily consented to and therefore not violative of the Fourth Amendment."); <u>Thompson v. State</u> 384 N.W.2d 461, 463 (Minn.1986) ("Thompson had consented, at least tacitly, to the search. Not only did Thompson voice no objection to the search, he gave every indication of a desire to cooperate with the police in finding his wife's assailant, to assist in apprehending the perpetrator of the crime."); <u>State v. Wright</u>, 735 S.W.2d 137, 140 (Mo.Ct.App.1987) (Defendant "gave his implied consent to the search for the weapon."); <u>State v. Koedatich</u>,112 N.J. 225, 548 A.2d 939, 957 (1988) ("A consent sufficient to avoid the necessity of a warrant may be express or implied from the circumstances."); <u>State v. Daivs</u>,133 Or.App. 467, 891 P.2d 1373, 1379 (1995) ("[A]fter evaluating defendant's acquiescence to the officers' actions in the light of the circumstances, we conclude that defendant's actions constituted consent to the search and seizure conducted [.]"); <u>Commonwealth v. Daniels</u>,280 Pa.Super. 278, 421 A.2d 721, 723 (1980) ("Appellant voluntarily opened the door when he saw uniformed police officers. He did not respond to the policemen's question and in doing so, we hold, consented to their entry at least so they could complete their questioning."); <u>State v. Wilshire</u>, 509 A.2d 444, 449 (R.I.1986) ("[W]e are of the opinion that the uncontradicted evidence could lead to only one conclusion on this issue, that defendant had issued both an express and a clearly implied invitation to examine the entire house to the police to determine whether a burglary had been an attendant circumstance of her husband's death."); <u>State v. Tapio</u>, 459 N.W.2d 406, 414 (S.D.1990) ("Vera's words and conduct clearly invited police officers to

7

While there are no cases directly on point from Ohio numerous jurisdictions have found that when a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and the individual either states or suggests that the crime was committed by a third person, he or she implicitly consents to the search of the premises. These Courts have found that when a Defendant invites police to the premises under the guise that a third person has committed crimes the doctrine announced in <u>Mincey v. Arizona</u> (1978) 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 prohibiting a "murder scene" exception to the warrant requirement is inapplicable because unlike <u>Mincey</u> the Defendant in such a scenarios has invited the police to the scene ostensibly to investigate a crime committed by a third party.

In <u>Alford v. State</u> (1987), 291 Ark. 243, 724 S.W.2d 151, Mildred Weiser was Dennis Alford's girlfriend, and they had lived together, along with Dennis's son Richard, the Defendant, in an  apartment for about one year. Because of some apparent difficulties which had arisen between Weiser and the Alfords, Weiser made plans to move elsewhere. On the night of April 1, 1985, she was alone with both Alfords in their apartment and whatever hostilities existed between the parties culminated in the shooting and resulting death of Weiser. Afterwards, Dennis asked a neighbor to call for an ambulance and the police. When the police arrived, Dennis was outside

---

enter her home and investigate."); <u>State v. Sabbot</u>,16 Wash.App. 929, 561 P.2d 212, 216 (1977) ("[A] police officer needs no warrant if he is in the house with the express or implied invitation of the accused, or with his acquiescence, tacit or express."); <u>Kelly v. State</u>,75 Wis.2d 303, 249 N.W.2d 800, 805 (1977) ("Under such circumstances there was an implied consent not only to aid the victim but to determine what had caused the death injury and who was responsible.").

8

yelling for help and ushered Officers Dunlavy and Towner into the apartment. Officer Towner found Weiser's body on the floor, lying partly in the hallway and partly in Richard's bedroom. She had a gunshot wound to the head, and a .25 caliber automatic pistol was located in her hand. The officers testified that Dennis was emotionally upset, but his son, the Defendant Richard, was calm. Both Alfords related to the officers that Weiser had committed suicide.

While Officer Dunlavy and Officer Towner were securing the premises, Officer Dunlavy and another officer, who had arrived on the scene, kept the Alfords in the living room area. Minutes later, two criminal investigators, Williams and Spradlin, arrived and conducted a search of the apartment. At some point in their investigation, the officers became suspicious that Weiser's death was not a suicide. Investigator Spradlin took photographs of the entire apartment and collected evidence, including the murder weapon--a .357 magnum--which was located on a shelf under some books in a closed closet in Richard's bedroom. Other weapons were located in the apartment by the officers, some with the help of Dennis.

The Arkansas Supreme Court noted that none of the weapons seized were in plain view, including the murder weapon--which was located on the shelf of a closed closet. Nor could the search be validated as one incident to a lawful arrest since neither the appellant nor his father had been arrested until Richard was arrested after confessing to the crime hours after the search had been conducted. Additionally, the Court noted that a search warrant was never issued to search the premises.

In finding that there had been implied consent for the search from the actions of the Defendant's father, Dennis Alford, the Arkansas Supreme Court found that he requested the police officers' presence and manifested his clear willingness and permission for them to enter his

9

apartment. Both Alfords indicated that Weiser committed suicide, thereby initially removing the possibility of that either of the Alfords were involved in a deliberate shooting. Dennis was cooperative throughout the investigation that evening, and, in fact, assisted the officers in locating weapons throughout the apartment after the murder weapon was located.

Richard Alford also argued that Dennis was emotionally upset and, for that reason, was not able to prevent the search that took place or object to the photographs the officers obtained in their initial "intrusion" into the apartment. The Arkansas Supreme Court found that the trial judge was justified in inferring voluntary consent on Dennis's part since his cooperation throughout the officers' investigation and search was consistent with his denial of any involvement in a homicide. While two of the officers testified that they had a "possible impression" or "suspicion" that the .25 caliber automatic had not caused Weiser's wound, they had nothing to indicate that either of the Alfords shot Weiser. And it was not until the police took Richard Alford to the police station that Richard Alford suggested Weiser's death was the result of an accidental shooting on his part.

In upholding the search, the Arkansas Supreme Court noted that in <u>Schneckloth v.</u> <u>Bustamonte</u>, supra, the United States Supreme Court found there are two competing concerns which must be accommodated in determining the meaning of a voluntary consent--the legitimate need for such searches and the equally important requirement of assuring the absence of coercion. 412 U.S. at 227, 93 S.Ct. at 2047. The Arkansas Supreme Court noted that the U.S. Supreme Court expounded that, in situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence.

In <u>Alford's</u> case, the officers were permissibly in the Alfords' apartment investigating a

10

reported suicide, and no probable cause existed initially to obtain a warrant or to make an arrest. Yet, as a result of Dennis Alford's invitation into the apartment and his total cooperation in the search, the officers' search did ultimately yield substantial evidence that served as a basis for appellant's prosecution. On the facts presented the Arkansas Supreme Court upheld the search as constitutionally permissible.

In State v. Fleischman (1988), 157 Ariz. 11, 754 P.2d 340, an Arizona Court of Appeals overruled the trial judge's granting of a motion to suppress. In that case Alfonso Schembri and his wife Isabel were the owners of a restaurant. Schembri allegedly found his wife lying on the floor of the restaurant in a pool of blood Schembri immediately went to the Dairy Queen next door and had an employee of the Dairy Queen call 911. Schembri told the employee, "my wife was killed, they killed my wife." Schembri himself eventually spoke to the 911 operator.

After the police arrived and secured the premises, Schembri was still visibly distraught during this period. Eventually Schembri was taken to a police station for questioning by officers. Meanwhile homicide detectives searched the business for two hours. During the search homicide detectives opened a safe, inventoried and photographed a cash register, made measurements and diagrams and lifted latent fingerprints.

In reversing the trial court's motion to suppress the Arizona Appellate Court found that, "when a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator." Id. at 15, 344.

The Superior Court of Pennsylvania in a case of first impression held that a Defendant

11

implicitly consented to police entry in his house by summoning emergency personnel for help and communicating to police the idea that the murderer was at large. In <u>Commonwealth v. Witman</u> (2000), 2000 PA Super 92, 750 A.2d 327, the Superior Court of Pennsylvania reversed a trial court's suppression of evidence.

In that case the Defendant told police he had been at home sleeping when his brother came home from school. The Defendant repeatedly told police and EMS personnel that he had heard a commotion downstairs and a thud and when he went downstairs he found his brother and blood in the laundry room.

The Defendant's mother was summoned to the scene and spoke to police. The police advised the mother they were treating the home as a crime scene and the Defendant's mother told them "they better do their job and find out who did this." The father was subsequently brought to the scene and when told by officers that they needed to process the crime scene the father stated, "whatever it takes, do." Officers never obtained a search warrant in collecting numerous items from the home including hair, blood samples, trash from a kitchen trash compactor, samples from an outside gate, two knives from a dishwasher, latent prints, an exacto knife from the Defendant's bedroom, an outside latch from a screen door on the rear porch and other items.

The Appellate Court, finding no cases on point from its own jurisdiction looked to other jurisdictions and concluded that, "in summoning emergency personnel for help and by communicating to police the idea that a murderer was at large, appellee implicitly consented to the police entry into the house." <u>Id.</u> at 335 ¶ 7.

The Court in <u>Witman</u> relied in part on the Texas Criminal Appeal Court's decision in <u>Brown v. Texas</u> (1993), 856 S.W.2d 177. In <u>Brown</u> the Defendant called the police and advised

12

that he had just found his wife dead in the garage.  The Defendant asked the police dispatcher to send a squad car and an ambulance, to the crime scene which also was his home. The Defendant also volunteered the opinion that someone had robbed his wife because her purse was missing. The Defendant appeared very upset, and an officer soon escorted him to a patrol unit to calm down and stay warm until the investigators could speak with him. The Defendant proceeded to discuss his activities earlier that day.

When a detective of the Physical Evidence Section arrived at the murder scene, other officers had already cordoned off the area. The detective initially went into the garage and observed the deceased's body. He then learned from other police officers at the location that the deceased had apparently been robbed, and that her purse was missing. The detective unsuccessfully searched outside the residence for the purse or anything that might have been discarded from it. He then photographed the garage, and examined the complete exterior of the house for signs of forced entry.

Although the garage was detached from the house, the detective noticed the back door of the house leading to the garage was open and he went into the house. He entered the house and photographed the inside, which exhibited no evidence of being ransacked. He looked throughout the home and noted blood splatters on the right inside of the entrance door to the southeast bedroom. Blood splatters were also noted on the wall behind and above the TV in the same room. In the southwest bedroom, he observed a purse sitting on top of a bedroom dresser. He thought the purse belonged to the deceased. The detective opened the purse and found a security officer identification card bearing appellant's name, $164 cash, and a cash register receipt from What-A-Burger. The detective took the receipt, which later would be used to disprove defendant's story,

13

and the identification to another detective. The purse looked like a woman's handbag but actually belonged to the defendant.

A few hours later at the police station, a homicide detective interviewed defendant more extensively. During this interview, an inconsistency appeared between defendant's assertion that he had remained home all evening and the receipt's indication that defendant had been to a What-A- Burger restaurant. This discovery and other discrepancies caused the homicide detective to suspect defendant had murdered his wife.

Analyzing the facts the Court found that the Defendant's behavior throughout the investigation indicated full approval of the police's actions. He indicated no desire not to cooperate. He was clearly the owner of the house to be searched, and he was not a suspect in the case at the time of the search. He requested the police investigate a crime he claimed had been committed by a third person. He asserted that a robbery/murder had occurred and alerted the police that the victim's purse was missing, thus prompting the police officers' search for evidence relating to that crime. He expressed no reservations about the police conducting a search on his property. Throughout this series of events he exhibited a cooperative attitude, speaking freely with and being consoled by the officers. The Defendant never objected as the officers arrived at the scene and went into his home, nor did he ever indicate any objection to the officers conducting a search or hesitancy about the officers continuing their investigation on his property. Finally, the Defendant presented no evidence of coercive or manipulative behavior on the part of any law enforcement official.

In finding that the Defendant had given implied consent to the search the <u>Brown</u> Court stated, "that when a crime is reported to the police by an individual who owns or controls the

14

premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator. As long as the individual is not a suspect in the case or does nothing to revoke his consent, the police may search the premises for these purposes, and evidence obtained thereby is admissible. This implied consent is valid only for the initial investigation conducted at the scene and does not carry over to future visits to the scene." Id. at 182.

Most recently in State v. Flippo (2002), 575 S.E.2d 170, the West Virginia Supreme Court affirmed the trial court's decision finding that a search of a cabin the Defendant had rented was permissible due to the Defendant's implied consent in calling the police to the cabin under the guise that his wife had been murdered and he had been assaulted by an intruder.

The case is the extension of Flippo v. West Virginia (1999), 528 U.S. 11, a United States Supreme Court decision cited by Donna Roberts in her Motion to Suppress for the proposition that there is no "murder scene exception" to the Fourth Amendment.

On remand from the United States Supreme Court the West Virginia trial court found that the Defendant had given implied consent for the search of the cabin.

In affirming the trial court's decision, the West Virginia Supreme Court gave a lengthy discussion on the law of implied consent.

In affirming the trial court the West Virginia Supreme Court found, "consent to search may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search." State v. Flippo (2002), 575 S.E.2d 170, 180.

15

The West Virginia Supreme Court noted that in <u>Thompson v. State</u> (1986), 384 N.W.2d 461, 463 the Minnesota Court found that when the owner or occupant of the premises permits the police to make a search without a warrant at a time when the occupant is not even suspected of complicity in the crime, the police are lulled into a sense of security, and that the occupant could not later object if the search led to the discovery of evidence which ultimately resulted in his being charged with crime.

Following that logic and the law of implied consent the <u>Flippo</u> Court held that, "when a person summons the police to a dwelling he/she owns, possesses, or controls, and that person states that a crime was committed against him/her or others by a third person at the premises, he/she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator, absent a contrary limitation imposed by the person summoning the police. As long as the person summoning the police is not a suspect in the case or does not affirmatively revoke his/her implied consent, the police may search the premises without a warrant for the purposes of investigating the reported offense and identifying the perpetrator, and evidence obtained thereby is admissible. If the person affirmatively revokes his/her implied consent or becomes a suspect during the investigation, the police must stop the search and obtain a warrant for the purpose of continuing the search. The implied consent exception is valid only for the initial investigation conducted at the scene, and does not extend to future visits to the scene." <u>State v. Flippo</u> (2002), 575 S.E.2d 170, 183 (footnotes omitted).

The number of jurisdictions finding that a Defendant may give implied consent are obviously too numerous to list here. With just the foregoing it is obvious that Donna Roberts implicitly consented to the search of her home and vehicle on December 12, 2001. She summoned

16

them to her home under the guise that an unknown third person had murdered Robert Fingerhut. Her actions were consistent with a grieving widow. She provided a story to the police which was verified that evening by items found in her vehicle and in her home. She agreed to leave the residence while the police searched the residence to find the identity of the person responsible. She gave her consent, albeit not in the talismanic phrase of search my home and car, but in more broad and general terms of "do whatever you have to do" and just find the person responsible. At no point did Donna Roberts ever request the police leave. Her actions in leaving the police there while they were searching necessarily implied to the police to continue to search in her absence. Finally, Donna continued her consent by signing a written consent to search form later that morning.

Indeed, " '[o]ne can hardly expect the police to get a search warrant for a house or building when the owner is obviously cooperative and gives every appearance of being the victim, rather than the perpetrator, of a crime.' " State v. Koedatich 112 N.J. 225, 548 A.2d 939, 958 (1988) (quoting Steigler v. State, 277 A.2d 662, 667 (Del.1971)), vacated in part on other grounds by Steigler v. Delaware, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972).

With respect to the Defendant's claims that she should have been advised of her right to refuse to give consent the question of whether a consent to search was voluntary or was the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. Knowledge of the right to refuse consent is one of the circumstances to be considered. Schneckloth v. Bustamonte, (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854.

Finally, the extent of the search is limited to the scope of the consent given, and the scope of the consent is generally defined by its expressed object. Florida v. Jimeno, 500 U.S. at 251, 111 S.Ct. 1801. The standard for measuring the scope of consent is that of objective reasonableness,

17

i.e., what a reasonable person would have understood by the exchange between the officer and the individual. Florida v. Jimeno, 500 U.S. at 251, 111 S.Ct. 1801.

A reasonable person in Donna Roberts's position would have understood that the object of the search would be for all evidence of identifying a killer of Robert Fingerhut and excluding her as a suspect. Donna Robert's words to the officers to "do whatever it takes" to catch the person responsible for Robert Fingerhut's death, coupled with her leaving the residence and the car at the scene with the officers while they were searching conveyed to the officers unlimited access to search the property and all things found on the property including the It is not unreasonable to expect that evidence of Robert Fingerhut's murder may have been found in things such as letters, notebooks, diaries, etc. given the fact that the alleged perpetrator apparently didn't force his way into the residence at 254 Fonderlac Drive. Given that information it appeared to the police from the outset that the perpetrator was a known acquaintance of Robert Fingerhut, someone who knew his daily routine, a relative, someone who had access to the home, etc.

Therefore, it is clear from her words and actions that Donna Roberts wanted the police to find the killer of Robert Fingerhut. Her words and actions implicitly consented to the search that took place in the morning hours of December 12, 2001.

Her signing of a written consent to search form later in the morning only reiterated her position that the police were to do whatever it took to find the killer of Robert Fingerhut.

Additionally, should this Honorable Court find that Donna Roberts did not give implied consent to the police to search her home on December 12, 2001, this Court can easily determine that the evidence would have been found based upon the doctrine of inevitable discovery.

The inevitable discovery rule allows the admission of illegally obtained evidence where

18

"it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation." State v. Perkins (1985), 18 Ohio St.3d 193, syllabus; see, also, Nix v. Williams (1984), 476 U.S. 431. The state bears the burden of showing "within a reasonable probability that police officers would have discovered the derivative evidence apart from the unlawful conduct." Perkins, 18 Ohio St.3d at 196.

Later in the investigation the Howland Police Department discovered a number of telephone calls that were placed from Donna Roberts and Nate Jackson. It is submitted that the discovery of these telephone calls would naturally and reasonably led to the discovery of the letters.

Based upon the following the State submits that the Defendant Donna Roberts implicitly consented to the search of her home and vehicle on December 12, 2001. She summoned the police to her home under the guise that an unknown third person had murdered Robert Fingerhut. Her actions were consistent with a grieving widow. She provided a story to the police which was verified that evening by items found in her vehicle and in her home. She agreed to leave the residence while the police searched the residence to find the identity of the person responsible. She gave her consent, albeit not in the talismanic phrase of search my home and car, but in more broad and general terms of "do whatever you have to do" and just find the person responsible. At no point did Donna Roberts ever request the police leave. Her actions in leaving the police there while they were searching necessarily implied to the police to continue to search in her absence. Her own brother testified that the entire interaction between Donna and the police was "positive". Finally, Donna reiterated her consent to the search by signing a written consent to search form later that morning.

19

The facts of this case and the law relating to implied consent clearly prohibit the Defendant from arguing that the police violated her Fourth Amendment Rights when the police did exactly what she wanted them to do-catch the persons responsible for Robert Fingerhut's death.

Additionally, the letters would have inevitably been discovered after the police listened to the telephone calls between Donna Roberts and Nate Jackson. Throughout the phone calls references are made to letters sent between the two and the police certainly would have obtained a search warrant and recovered the same after listening to the telephone calls.

WHEREFORE, the State of Ohio respectfully requests this Court to overrule the Defendant's Motion to Suppress in its entirety.

Respectfully Submitted,

KENNETH N. BAILEY (0023228)
Assistant Prosecuting Attorney

CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High Street, NW
4th Floor Administration Bldg.
Warren, Ohio 44481
(330)-675-2426

ATTORNEYS FOR STATE OF OHIO

20

## CERTIFICATION

This is to certify that a copy of the foregoing Memorandum in Opposition to Defendant's Motion to Suppress was sent to counsel of record by depositing a copy of the same in the U.S. Mails, postage prepaid, this 3rd day of March 2003.

_____
CHRISTOPHER D. BECKER (#0047252)
Assistant Prosecuting Attorney

21

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | CASE NO.: 01-CR-793 |
| Plaintiff, | * | HONORABLE JUDGE: JOHN M. STUARD |
| -vs- | * | |
| DONNA MARIE ROBERTS, | * | NOTICE OF OPEN FILE DISCOVERY |
| Defendant, | * | |

Now comes the State of Ohio by Assistant Prosecuting Attorney's Kenneth N. Bailey and Christopher D. Becker and submit that the entire prosecution file is now available for discovery by Defendant's counsel. Counsel for the Defendant has been provided a typed copy of the statement of Vaughnda Chambers. Counsel for the Defendant may inspect the audio taped statements of Vaughnda Chambers by making an appointment with the Trumbull County Prosecutor's Office to do the same. Counsel for the Defendant has been provided a copy of Vaughnda Chambers criminal record.

Respectfully submitted,
STATE OF OHIO, by:

KENNETH N. BAILEY
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
4th Floor Administration Building
160 High Street, N.W.
Warren, Ohio 44481-1092
Phone: (330) 675-2907
Fax: (330) 675-2431
Attorney Reg. # 0023228

and

_____

CHRISTOPHER D. BECKER
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
Attorney Reg. # 0047252

PROOF OF SERVICE

A copy of the foregoing document was served upon the Attorneys of record by depositing the same in the U.S. Mails, postage prepaid, this 17th day of March 2003.

_____

CHRISTOPHER D. BECKER (0047252)
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO



A:\Roberts.Donna.2\Eberle.access.wpd ✦ Monday 17 March 2003•12:26PM (1226 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )     Case No. 01 CR 793
     Plaintiff                   )
                    )     Judge John M. Stuard
                    )
*vs.*                             )
                    )
                    )
DONNA M. ROBERTS,                 )
     Defendant                   )
                    )

### DEFENDANT'S MOTION FOR ORDER GRANTING EXPERT ACCESS TO DEFENDANT IN COUNTY JAIL

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves for an order requiring the Sheriff of Trumbull County or his deputies, employees, and agents to grant access to the Defendant in the County Jail by Dr. Thomas M. Eberle, 3154 Wildwood Road Extension, Allison Park, Pennsylvania 15101. Dr. Eberle is an expert engaged by the defense and he cannot perform necessary testing upon the Defendant without access to her in the Trumbull County Jail.

This relief is required to protect the Defendant's constitutional liberties which include the ability to effectively defend life and liberty, *see*, OHIO CONST. art. I, §1; to present a defense, *see*, U.S. CONST. amend. VI and XIV, *Washington v. Texas* (1967), 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019, and *Rock v. Arkansas* (1987), 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37; to be

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.7808 · FACSIMILE: 330.758.8900 · EMAIL: JBJUHASZ@ACE.COM

     i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 780

free from cruel and unusual punishment, *see*, U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §9, and *Robinson* v. *California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758; and to avoid conviction and/or execution if incompetent, *see*, U.S. CONST. amend. XIV, OHIO CONST. art. I, §16, *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; *Godinez v. Moran* (1993), 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321, 61 USLW 4749; and, *Ford* v. *Wainwright* (1986), 477 U.S. 399, 414, 106 S.Ct. 2595, 91 L.Ed.2d 335. Further, the Defendant has Fourteenth Amendment and other constitutional liberties which require that she be granted meaningful access to experts which are reasonably necessary for a defense. *See, generally*, U.S. CONST. amend. XIV; OHIO CONST. art. I, §2; *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53; and, *State* v. *Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, 15 O.B.R. 311, *cert. denied, Jenkins v. Ohio* (1985), 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643.

The Defendant seeks an order that Dr. Eberle be granted access to the Defendant between the hours of 8:00 a.m. and 8:00 p.m., subject to calling the Sheriff's Department in advance to arrange a visit with the Defendant.

WHEREFORE, the Defendant seeks an order of this Court that Dr. Thomas M. Eberle be granted access to the Defendant at the Trumbull County Jail between the hours of 8:00 a.m. and 8:00 p.m., subject to calling the Sheriff's Department in advance to arrange a visit with the Defendant.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · EMAIL: JBJUHASZ@AOL.COM

ii

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❏ sent by regular United States Mail, postage prepaid
❏ sent by telecopier pursuant to OHIO CRIM.R. 57(B) and OHIO CIV.R.
5(B)
❏ hand delivered to counsel or counsel's office

this ____ day of March, 2003 to Messrs. Christopher D. Becker, Esq. and
Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street NW, Warren,
OH 44481.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL: JBJJURISDOC@AOL.COM

iii

A:\Roberts.Donna.2\JE.Eberle.access.wpd ✦ Monday 17 March 2003•12:32PM (1232 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,　　　　　　　}　　Case No. 01 CR 793
　　　　　　　　　　　　　　　}
　　　　Plaintiff　　　　　　}
　　　　　　　　　　　　　　　}　　Judge John M. Stuard
vs.　　　　　　　　　　　　　}
　　　　　　　　　　　　　　　}　　JUDGMENT ENTRY
　　　　　　　　　　　　　　　}　　GRANTING EXPERT ACCESS
DONNA M. ROBERTS,　　　　　　}
　　　　　　　　　　　　　　　}
　　　　Defendant　　　　　　 }

　　　　Upon Motion of the Defendant, Donna M. Roberts, through counsel, and

for good cause shown therein, the Court orders that the Sheriff of Trumbull

County or his deputies, employees, and agents grant access to the Defendant

in the County Jail by Dr. Thomas M. Eberle, 3154 Wildwood Road

Extension, Allison Park, Pennsylvania 15101.  Dr. Eberle shall be granted

access to the Defendant between the hours of 8:00 a.m. and 8:00 p.m., subject

to calling the Sheriff's Department in advance to arrange a visit with the

Defendant.

Date: _3/18/03_　　　　　　　HON. _____
　　　　　　　　　　　　　　　　　　JOHN M. STUARD, Judge

**Clerk:** Forward *certified copies* of this entry to Messrs. Christopher D. Becker, Esq.
and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street NW, Warren,
Ohio 44481; Messrs. J. Gerald Ingram and John B. Juhasz, 7330 Market Street,
Youngstown, Ohio 44512-5610, Counsel for Defendant; Dr. Thomas M. Eberle, 3154
Wildwood Road Extension, Allison Park, Pennsylvania 15101; and Sheriff Thomas
Altiere.

3/18/03 - issued CC to above



# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | Judge John M. Stuard |
| -vs- | } | |
| DONNA M. ROBERTS, | } | |
| Defendant | } | |

### DEFENDANT'S POST SUPPRESSION HEARING MEMORANDUM

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and submits her post-hearing Memorandum concerning her Motion to Suppress Evidence, previously submitted and heard.

WHEREFORE, the Defendant prays for an order of this Court sustaining the Motion to Suppress Evidence.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

i

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was hand delivered this 21st day of March, 2003 to CHRISTOPHER D. BECKER, Esq., and KENNETH N. BAILEY, Esq., Assistant County Prosecutors, 160 High Street NW, Warren, OH 44483.

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

A:\Roberts.Donna.2\Roberts.posthearing.memo.wpd

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

ii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 785

POST HEARING MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

## I. FACTS

On Tuesday, December 12, 2001, Donna Roberts, the Defendant herein, placed a 911 call from her residence at 254 Fonderlac SE, requesting emergency police assistance.  Howland Township Police Officers Ray and Poolcino were dispatched to 254 Fonderlac Drive.  Because of Donna Roberts' hysterical condition, the 911 operator was unable to determine the exact nature of the call.  (See, transcript of proceedings of the evidentiary hearing on Motion to Suppress Evidence, hereinafter "T.p.", 25.)  Upon arrival, officers observed Donna Roberts coming from the front of the residence yelling, screaming, and acting hysterically.  (T.p. 26, 33.)  Donna Roberts was "rambling", and it took "awhile" for Officers Ray and Poolcino to determine what she was upset about.  (*Id.*)   Donna's responses to questions posed by Officers Ray and Poolcino were not always appropriate and it was difficult for the two officers to make sense of what Donna was saying.  Eventually, Officers Ray and Poolcino were able to determine that the Defendant's husband lay bleeding on the floor of the kitchen of the home.

Upon entering the residence, Officers Ray and Poolcino observed Robert Fingerhut lying on the kitchen floor apparently dead with a handgun near his body.  Patrolmen Ray and Poolcino requested assistance in processing the crime scene.  Investigating officers from the Howland Police Department, Trumbull County Sheriff's Department and Warren police Department eventually arrived at 254 Fonderlac Drive SE to assist in the investigation.

Before the arrival of assisting officers, Patrolman Ray and Poolcino had secured the scene.  (T.p. 36.)  Officers Ray and Poolcino completed a

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8250 · E-MAIL: JBJJURINDO@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 786

protective sweep of the interior and exterior of the Roberts residence before the arrival of assisting officers. (T.p. 38.) It was determined that there was no sign of forced entry to the residence, and the residence was secured by Officers Ray and Poolcino until investigating detectives could arrive.

Sergeant Dillon of the Howland Police Department was the first assisting officer to arrive at the scene. Detective-Sergeant Monroe arrived at the scene approximately five minutes after Sergeant Dillon. Upon arrival, Sergeant Dillon was told by Officers Ray and Poolcino that Donna Roberts was hysterical. (T.p. 64.) Officer Dillon was further informed that an interior and exterior protective sweep of the residence had been completed. (*Id.*) When Detective-Sergeant Monroe arrived, he also was briefed by Officer Ray.

Donna Roberts was displaying symptoms of hysteria. (T.p. 35.) Her emotional state ran the full gambit from calm to hysteria. (*Id.*) Accordingly, once it was determined that Robert Fingerhut was deceased, Officer Poolcino requested that emergency medical personnel attend to Donna Roberts. Sergeant Dillon observed the Defendant as being upset and hysterical. (T.p. 53.) Sergeant Dillon could hear Donna Roberts crying out and sobbing. (T.p. 58.) The Defendant would shout out, become agitated, and need to be calmed. (T.p. 56.) Before Sergeant Dillon could interview or obtain any information from Donna Roberts, he had to calm her down. During the Defendant's conversation with Sergeant Dillon, she was "on again, off again." (T.p. 66.)

Detective-Sergeant Monroe testified that while at the Roberts' residence, he would hear the Defendant "bellowing," "screaming" and "crying." (T.p. 86.) The Defendant was screaming and appeared to be

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHISDOC@AOL.COM

2

emotional. (T.p. 77.)  Detective-Sergeant Monroe was aware that the Defendant had been treated by emergency medical personnel. (T.p. 107.) Detective-Sergeant Monroe also had to calm Donna Roberts down before he could talk with her. (T.p. 110.)  Detective-Sergeant Monroe's first effort to calm Donna Roberts down took several minutes. (T.p.110.)  As a result of the Defendant's emotional condition, it was determined by Detectives Dillon and Monroe that a family member should be called to comfort her.   The Defendant eventually agreed to leave with her brother and sister-in-law, Ralph and Rita Roberts, and stay at their home in Austintown, Ohio.

When the Defendant was leaving her home, it was necessary for police officers to support her and help her out of the house. (T.p. 95.)  Prior to leaving the residence, Donna Roberts was informed by Detective-Sergeant Monroe that the house was a "crime scene," and that the residence would need to be processed. (T.p. 30, 59.)  Before ever discussing the house as a crime scene and the processing thereof, Detective-Sergeant Monroe had already walked through the house looking for evidence or anything that might be missing. (T.p. 89.) Officer Ray and Sergeant Monroe, both of whom overheard conversations between the Defendant and Detective-Sergeant Monroe regarding the house as a crime scene, testified that the Defendant responded basically do whatever you have to do to find the person who did this. (T.p. 30, 42, 60.)

It is uncontroverted that the Defendant was never informed that her consent was necessary for the police to process or explore her residence; (T.p. 43, 71, 129);  that Defendant was never informed that she had a right to refuse consent (*id.*); and, that the Defendant never discussed a search of her motor vehicle with the police and was never told by police of the processing

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: jbjurisdoc@aol.com

3

of her motor vehicle (T.p. 132). The Defendant never implicitly or explicitly indicated that the police had permission to search her car. (T.p. 133.) Her motor vehicle was, in fact, searched and items were seized without consent.

After Donna Roberts left her residence to accompany Ralph and Rita Roberts to Austintown, Ohio, the police continued their search of her residence. Later that day at about 10:00 a.m., Captain Carl Compton and Detective-Sergeant Monroe traveled to Austintown, Ohio to obtain a written consent from Donna Roberts. The sole purpose of Captain Compton and Detective-Sergeant Monroe in traveling to Austintown, Ohio was to procure a written consent. (T.p. 48.) Captain Compton and Detective-Sergeant Monroe did not intend to question or otherwise obtain information from Donna Roberts. (*Id.*) Detective-Sergeant Monroe had not received any communication from Donna Roberts prior to execution of the written consent indicating that the consent allegedly obtained at her residence had been canceled or revoked. (T.p. 126.) All evidence described in Defendant's Exhibit "A" was obtained before execution of the written consent to search.

## II

## A

The Defendant has explicated elsewhere that most basic precept of our government is also the most often overlooked: our democratic republic is a creature not of plenary powers with specific restrictions spelled out in the Constitution. Rather, the government is a creature of derived powers, given only the limited authority specified in the Constitution. American government is different from any other government in the world—even the English government upon which we so often rely for legal guidance. In his

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

4

essay, "The Bill of Rights and the Doctrine of Incorporation," Notre Dame Law Professor Emeritus Charles Rice makes this point succinctly:

> The Constitution of the United States is the *first instance in all history* of the creation of a government *possessing only limited powers*. The Magna Charta, the Petition of Right, the English Bill of Rights, and all the other previous efforts to restrain government had merely imposed restrictions on the otherwise unlimited power of government. The framers of the Constitution, however, created a new government which would possess *only the powers delegated to it*.

Reproduced in Eugene Hickok, ed., *The Bill of Rights: Original Meaning and Current Understanding* (Charlottesville, Va.: University Press of Virginia, Copyright © 1991), 11. (Emphasis added.)

This point is repeated because here the government asks this Court to create a new rule of constitutional law for Ohio: the doctrine of implied consent to search. To do so, this Court would have to find that OHIO CONST., art. I, §14 actually *authorizes* such an exception. The natural law principles[1] upon which American constitutionalism is founded are spelled out clearly in the Ohio Constitution. For example, OHIO CONST. art. I, §1 provides:

> All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.[2]

OHIO CONST. art. I, §2 provides:

---

[1] One of the earliest advocates of natural law was the English philosopher John Locke (1632-1704), who said in his 1690 work *Concerning Civil Government* that the "natural liberty of man is to be free from any superior power on earth, and not to be under the will or legislative authority of man. . . . The liberty of man in society is to be under no other legislative power but that established by consent in the commonwealth; nor under dominion of any will or restraint of any law, but what that legislative shall enact *according to the trust put in it . . . .*" (Emphasis added.) *But cf.* David Wootton, ed., *Political Writings of John Locke* (New York, Mentor/New American Library, Copyright © 1993). *See, also,* the discussion of the thought of Thomas Hobbes in Raoul Berger, *Natural Law and Judicial Review: Reflections of an Earthbound Lawyer,* 61 U. CIN. L. REV. 5 (1992).

[2] *But cf. State v. Williams* (2000), 88 Ohio St.3d 513, 523, 728 N.E.2d 342, *cert. denied sub nom. Suffecool v. Ohio* (2000), 531 U.S. 902, 121 S.Ct. 241, 148 L.Ed.2d 173, 69 USLW 3232, *post.*

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX — PAGE 790

> All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly.

In fact, Ohio's Constitution is even more explicit than the federal Constitution about the fact that government is a creature of delegated powers. *See*, OHIO CONST. art. I, §20, which provides: "This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, *not herein delegated*, *remain with the people*." (Emphasis added.)

<div align="center">B</div>

In *Federalist No. 78*, Alexander Hamilton made clear that the courts are the "intermediate body between the people and the legislature," a role which is of paramount importance in this situation. *See*, Alexander Hamilton, James Madison, John Jay, *The Federalist Papers*, ed. Clinton Rossiter (New York: New American Library, copyright ©1961), No. 78, p. 467. The facts or charges of the case aside, the role of the Court is to guard the liberty not just of the accused, but of all citizens of this State by ensuring that when the government acts it does not exceed its constitutionally delegated authority. The Defendant in essence asks this Court not to introduce blight to the entire forest simply to deal with this particular tree. The late Justice Tom Clark made this point succinctly for the Supreme Court in the case which made the exclusionary applicable to state criminal prosecutions under U.S. CONST., amend. XIV. *See, Mapp v. Ohio* (1961), 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081: "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." The principle was nowhere

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

6

more eloquently stated than it had years earlier by some of the greatest justices of the United States Supreme Court to sit in the Twentieth Century. In *United States v. Rabinowitz* (1950), 339 U.S. 56, 68-69, 70 S.Ct. 430, 94 L.Ed. 653, Justices Felix Frankfurter, Robert H. Jackson, and Hugo L. Black wrote in dissent:[3]

> The old saw that hard cases make bad law has its basis in experience. But petty cases are even more calculated to make bad law. The impact of a sordid little case is apt to obscure the implications of the generalization to which the case gives rise. Only thus can I account for a disregard of the history embedded in the Fourth Amendment and the great place which belongs to that Amendment in the body of our liberties as recognized and applied by unanimous decisions over a long stretch of the Court's history.
>
> It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment. A disregard of the historic materials underlying the Amendment does not answer them.
>
> 1. It is true also of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out on a case depends on where one goes in. It makes all the difference in the world whether one approaches the Fourth Amendment as the Court approached it in *Boyd v. United States,* 116 U.S. 616, [6 S.Ct. 524, 29 L.Ed. 746,] in *Weeks v. United States*, 232 U.S. 383, [34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177,] in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426,] in *Gouled v. United States,* 255 U.S. 298, [41 S.Ct. 261, 65 L.Ed. 647,] or one approaches is as a provision dealing with a formality. It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece of paper.

---

[3] The case was reversed in part by *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Justice William O. Douglas did not participate in the case, though it seems likely based upon Douglas' writings that he, too, would have joined the opinion.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

7

When deciding whether to engraft yet another exception to U.S. CONST., amend. IV and OHIO CONST., art. I, §14, this Court must be mindfully circumspect of the original purposes of those provisions.

<div align="center">III</div>

<div align="center">A</div>

There is no question that the search of the defendant's residence and her auto were without a warrant. The government has offered no satisfactory explanation for why, after the scene was secured, a judicial warrant was not obtained. A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement. *See*, *Katz* v. *United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. The government acknowledges its burden to demonstrate that the search comes within a judicially recognized exception to the warrant requirement. *State's Memorandum*, at 5, citing *State v. Akron Airport Post No. 8975* (1985), 19 Ohio St.3d 49, 482 N.E.2d 606. On the evening of December 12, 2001, the police did not ask the Defendant to execute a consent to search form. The State's Memorandum makes much ado of the Defendant's "cooperation" with police on the night in question. Yet, the police made no effort to execute a written consent to search. The evidence elicited at the evidentiary hearing clearly established that the Defendant was neither told that her consent was necessary nor that she had a right to refuse consent.

The government tacitly agrees that it cannot establish a consent to search directly, for its Memorandum leaps from the assumption of the burden of proof to a lengthy discussion of authorities from other jurisdictions

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

8

concerning implied consent to search.[4] *See, State's Memorandum*, p. 5. The State suggests that there are "no cases directly on point from Ohio", *id.*, 8. What the State does not tell this Court is that it is asking for a new rule of law to justify a search that is patently invalid. The government's legal "conclusion" blatantly ignores the fact that this is a question of constitutional construction. After its recitation of authorities from other jurisdictions, the government attempts to apply those holdings to the facts as it views them.

> The number of jurisdictions finding that a Defendant may give implied consent are obviously too numerous to list here. With just the foregoing it is obvious that Donna Roberts implicitly consented to the search of her home and vehicle on December 12, 2001.

*State's Memorandum*, 16. The Defendant submits that it is not "obvious" and even if it were obvious, implied consent to search does not exist in Ohio as an exception to the warrant requirement. The government has supplied this Court with neither constitutional authority nor compelling logical reason to enact a new judicially-crafted exception to the warrant requirement.

The best evidence that the Defendant Donna Roberts did not consent to a search of her residence is the effort taken by Captain Compton and Detective-Sergeant Monroe to obtain a written consent at 10:00 a.m. on December 12, 2001. The Defendant's residence and motor vehicle had already been searched. All evidence itemized in Defendant's Exhibit A had already been seized. If Detective-Sergeant Monroe felt that he had "consent" he and captain Compton would not have gone to the extraordinary effort at such a crucial time in their investigation of procuring a written consent.

---

[4] The lengthy footnote 1 in the State's Memorandum is a recitation of the authorities surveyed by the West Virginia Supreme Court in the *Flippo* case when it was remanded.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

9

B

There is, as both parties acknowledge, no "crime scene" exception to the Fourth Amendment. *State's Memorandum*, p.1. *See, Flippo v. West Virginia* (1999), 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16, 68 USLW 3260. There, the Supreme Court summarily reversed, in a *per curiam* opinion, a state court decision which denied a motion to suppress evidence on the ground that the police were entitled to make a thorough search of any crime scene and seize the objects found there.[5] On remand, the West Virginia Supreme Court recognized for the first time in that state the doctrine of implied consent to search. Though the Court did not make clear that it was construing the West Virginia Constitution, that must necessarily be the case. To rule as the government wants in this case, then, would require this Court to create a new exception to the warrant requirement of OHIO CONST., art. I, §14. That section provides: "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."[6]

---

[5] The government makes much of the West Virginia state court decision after the United States Supreme Court remand. *See, West Virginia v. Flippo* (2002), 575 S.E.2d 170, 2002 W. Va. LEXIS 208. It overlooks that holding, syl. 2, that if "the person . . . becomes a suspect during the investigation, the police must stop the search and obtain a warrant for the purpose of continuing the search." The Court also found that any "implied consent exception is valid only for the initial investigation conducted at the scene, and does not carry over to future visits to the scene." The string of cases cited by the government from other jurisdictions is a reproduction of the West Virginia Supreme Court's review of those authorities when deciding the case of "first impression" of whether "implied consent to search is part of our jurisprudence". Slip op. at 19.

[6] The language is virtually identical to U.S. CONST., amend. IV, which provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Accordingly, for this Court to create such a new exception to OHIO CONST., art. I, §14 without creating such an exception to U.S. CONST., amend. IV would require "artful dodging". *See,*

10

The *Flippo* rule is well-established.  *See, e.g., Thompson v. Louisiana* (1984), 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246, 53 USLW 3396.  In *Thompson*, the Supreme Court in a *per curiam* opinion expressed the unanimous view of the Court that the warrantless search and seizure conducted at the defendant's home violated the Fourth and Fourteenth Amendments.  In *Thompson*, the police were invited into the home by the defendant's daughter, who had called police and reported a homicide.  The Court found that the search and seizure was not justifiable simply because a homicide recently occurred there, nor because the search took only 2 hours and was conducted on the same day as the murder.  *Accord, Mincey* v. *Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290.  In that case, the Court held that the Arizona Supreme Court's "murder scene" exception to the requirement of a warrant was inconsistent with the Fourth and Fourteenth Amendments, and that a warrantless search of the apartment in that case was not constitutionally permissible simply because a homicide had occurred there.  Interestingly, because the State here wants this Court to engraft an exception on U.S. CONST., amend. IV and OHIO CONST., art. I, §14 which does not exist, the State has offered no reasons "to meet its 'burden .   . to show the existence of such an exceptional situation' as to justify creating a new exception to the warrant requirement."  *See, Mincey v. Arizona, ante*, 437 U.S. at 390-391, citing *Vale* v. *Louisiana* (1970), 399 U.S. 30, 90 S.Ct. 1969 26 L.Ed.2d 409.  In *Mincey*, none of the government's proffered reasons persuaded the Supreme Court "of the validity of the

---

*State v. Rudge* (1993), 89 Ohio App.3d 429, 624 N.E.2d 1069, *appeal dismissed*, (1993), 67 Ohio St. 3d 1502, 622 N.E.2d 651.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 796

generic exception" for crime scene searches, and here the State has offered no reason for a new rule of constitutional law.

As there is clearly no "murder scene" or "crime scene" exception to the Fourth Amendment nor to OHIO CONST., art. I, §14,[7] the government attempts to justify the intrusion by with the doctrine of implied consent. As shown *ante*, there is no such doctrine in Ohio. Because there is no implied consent exception in Ohio, the determination to be made by this Court is whether there was a valid consent to search, not whether there was implied consent to search.

## IV

## A

*Test for Consent.* In *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854, the Supreme Court held that "the Constitution requires the sacrifice of neither security nor liberty." *Id.*, 412 U.S. at 225. The question is whether the person's "will has been overborne" or her "capacity for self-determination [is] critically impaired." *Id.* The State of Ohio maintains that the evidence seized and described in Defendant's Exhibit A was seized pursuant to a the consent exception to the warrant requirement. Accordingly, the State bears the burden of proving valid consent, *see, State v. Kessler* (1978) 53 Ohio St.2d 204, 207, a burden that has not been met in this case.

What the government overlooks in its arguments is that, applying the well-established test, the overwhelming weight of the evidence is that the accused's "capacity for self-determination [was] critically impaired" by her

---

[7] *See, e.g., State v. Nields* (2001), 93 Ohio St.3d 6, 2001 Ohio 1291, 752 N.E.2d 859; and, *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 2001 Ohio 132, 749 N.E.2d 226.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

12

hysterical, emotional condition as described in the "facts" set forth *ante*. The well-established test is an assessment of "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.*, at 225. Some of the factors to be considered are youth or inexperience, intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, and the repeated and prolonged nature of the questioning. Clearly not all are applicable here. The role of the Court here is to determine all the factual circumstances surrounding the alleged implied consent, assess the psychological impact on the accused, and evaluate the legal significance of how the accused reacted. *Schneckloth, ante* at 225, citing *Culombe* v. *Connecticut,* (1961), 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037. At the time Detective-Sergeant Monroe maintains he received consent, he was aware that the Defendant was under the care of a psychiatrist for post-menopausal depression (T.p. 134.) Detective-Sergeant Monroe was also aware that approximately twenty three different prescription medications (as described in Defendant's Exhibit B) were found at the residence and written in the name of Donna Roberts (T.p. 134). Detective-Sergeant Monroe made no effort to determine whether any of the prescriptions were for psychotropic medication or a mind-altering substance. (T.p. 135.) Detective-Sergeant Monroe made no effort to determine whether the Defendant had consumed any medication before he spoke with the Defendant. Additionally, marijuana was seized from the Defendant's residence and Monroe made no effort to determine whether the Defendant had smoke any marijuana prior to his conversation with her.

The Court in *Schneckloth* looked at these traditional factors in determining the voluntariness of a statement to resolve the question "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied". *Schneckloth, ante,* 412 U.S. at 227. The Court said that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.* The evidence elicited sat the evidentiary hearing conclusively established that the Defendant was not informed that her consent was required for the police to process her home or that she had a right to refuse consent. Detective Sergeant Monroe's assertion that the residence was a crime scene and had to be processed clearly implied that consent was not needed and could not be refused.

Justice Potter Stewart's opinion for the Court in *Schneckloth* noted that even slight intrusions on the Fourth Amendment[8] are both impermissible and dangerous to liberty:

> But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. In the words of the classic admonition in *Boyd* v. *United States,* 116 U.S. 616, 635:
>
> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to

---

[8] There is no question that the Fourth Amendment's protections and prohibitions are applicable to this state court criminal prosecution. *See, Wolf v. Colorado* (1949), 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

14

> gradual depreciation of the right, as if it consisted more in sound than in substance.  It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

*Id.,* 412 U.S. at 228-229.  The Court said that "[i]n examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, *as well as the possibly vulnerable subjective state of the person who consents.*" *Id.*, at 229. (Emphasis added.) *Accord, United States v. Hurston* (E.D. Mich. 1998), 12 F.Supp.2d 630, 1998 U.S. Dist. LEXIS 17661.  There, relying upon *Schneckloth, ante,* the Court found that a purported consent to search the home was not voluntary.  The Court noted that Hurston had just been arrested and handcuffed:

> after being confronted at the front door at 5 a.m. by 11 police with firearms drawn.  In the hectic aftermath of his arrest, his fiancé and her two young children were being rounded up by the police, who had fanned out throughout the house.  Simultaneously with this scenario the police, after discovering a firearm in the kitchen, asked his permission to search the house.

The Court distinguished *Schneckloth,* finding that there was evidence of coercion from the nature of the recent police entry and the environment in which the consent issue took place.  The Court said that "all of the circumstances impel the conclusion that Mr. Hurston's consent to search was not given voluntarily." *Id.,* 12 F. Supp.2d at 637.

In the case at bar, the Defendant's hysterical, emotional condition left her in a vulnerable, submissive state.  Detective-Sergeant Monroe's factual assertion that the residence was a crime scene and had to be processed constitutes a subtle, yet coercive effort to sidestep the issue of consent and the Defendant's right to refuse consent.  Virtually every police officer who

J. GERALD INGHAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8200 · E-MAIL: JBJUURISDOC@AOL.COM

15

testified at the evidentiary hearing described the Defendant as cooperative. Yet, not one police officer ever bother to request permission to search.

Once the police determined that there were no perpetrators in the home, they should have either (1) obtained a valid consent, if it were possible to do so (here, it was not possible); or (2) obtain a judicial warrant while preserving the scene.

For the foregoing reasons, the Defendant's Motion to Suppress Evidence must be sustained.

J. GERALD INGRAM

JOHN B. JUHASZ

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

16

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. <u>01-CR-793</u>

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| Plaintiff | ) | |
| vs. | ) | <u>JUDGMENT ENTRY</u> |
| DONNA ROBERTS, | ) | |
| Defendant | ) | |

This matter was heard upon Defendant's Motion to Suppress Evidence obtained during the search of the premises at 254 Fonderlac S.E., Howland Township on December 12 and December 13, 2001.

From the evidence presented, Defendant, Donna Roberts, called 911 around midnight on December 12-13. Ms. Roberts was extremely excited and at times unintelligible but apparently was advising the operator that she had found her husband, Robert Fingerhut, shot at their home.

The Howland Police were dispatched and upon arriving found the body of Robert Fingerhut in the home's kitchen, the apparent victim of a shooting.

Ms. Roberts told the investigating officer, Detective Monroe, she had been shopping and discovered her

VOL. 998 PAGE 433

2

ex-husband's body when she returned home.  It is apparent the police had no immediate suspicion that Ms. Roberts had murdered her husband as the story she gave about being out shopping seemed to be verified by sales receipts she had for purchases made in the time period when the homicide occurred.

Ms. Roberts' brother was summoned from Youngstown to be with her and before the brother arrived and after he arrived, Defendant told the officers on at least three occasions "to do whatever you have to do" to catch the person responsible. Detective Monroe told her the police had to search the premises in order to accomplish her request.  She again replied the police were to do anything necessary.

As a result of the initial search conducted, numerous pieces of evidence were found.  Most significantly was a box of letters from co-defendant, Nathaniel Jackson, to defendant, Donna Roberts, found under Ms. Roberts bed and a box of letters from Ms. Roberts to Mr. Jackson found in the trunk of her automobile.

The main issue raised by Defendant is whether there was a valid consent to search the scene of the murder.  There was no written consent requested or given until after the initial search had been completed.

It is clear from the evidence that Defendant was

VOL 998 PAGE 434

3

emotionally upset during the initial interview with the police, but for her to have been otherwise would have been out of the ordinary.  She responded intelligently and rationally to questions put to her, although at times she showed strong emotional release due to the circumstances.  The police testified they had no suspicion Ms. Roberts was involved in the homicide.  She showed all the emotion one would expect if her original story was taken as true.  She rationally, although emotionally, repeated the request for the police to find the killer, and there was every reason for the police to take her actions as a request for them to search for evidence. It was reasonable to imply Ms. Roberts consent to do so.  This is reinforced by Ms. Roberts agreeing in writing later on the 13th of December for the police to re-search the house.

From the totality of circumstances presented, it was not an unreasonable search that was conducted by the Howland Police Department.

Defendant's Motion to Suppress is denied.

4/4/03 -
copies
sent to:
Pros
G. Ingram
G. Gulusy

_____
4/2/2003
DATE

_____
JUDGE JOHN M. STUARD

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.

_____
JUDGE

VOL 998 PAGE 435

D:\Alex1\CAPITAL\Client\Roberts, Donna\orientation.roberts.wpd
07Apr03 1:33 pm

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,  }  Case No. 01 CR 793
}
    Plaintiff  }
}  Judge John M. Stuard
vs.  }
}
}
DONNA M. ROBERTS,  }
}
    Defendant  }

---

### PROPOSED ORIENTATION
### INSTRUCTIONS AS TO PROCEDURE
### IN A CAPITAL CASE
### (DEFENDANT'S SUBMISSION)

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, and requests this Court give the following orientation instructions before commencement of voir dire. For cause, the Defendant submits that the proposed instructions are a proper statement of the law and will assist the jury in understanding the procedures in a capital case.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

G3

*John Juhasz (by JCS)*

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512
Telephone: 330.758.2308
Facsimile: 330.758.8290
ATTORNEYS FOR DEFENDANT

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing was:

☐ sent by regular United States Mail, postage prepaid,
☒ hand delivered to counsel or counsel's office
☐ sent by telecopier

this _____ day of April, 2003 to Dennis Watkins, Esq., Christopher D. Becker, Esq., and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio  44481.

JOHN B. JUHASZ

PROPOSED INSTRUCTIONS FOR ORIENTATION OF THE JURY

Ladies and Gentlemen, the process we are about to begin is known as voir dire. The attorneys for the State and the Defendant will ask you questions regarding your qualifications to serve on this jury. You should understand that although it is your duty as a citizen to serve on juries, it is also your duty as a citizen not to serve on a jury if there is any reason whatsoever why you cannot do so in fairness to the State, the Defendant, or to yourself. What is important is that you be as honest as you can be in your responses to questions put to you by the Court and the attorneys. You are not here to be judged and you will not be judged. It should not be an embarrassment to you in any way if you are excused in this case. Many of you will be. Many persons are excused in every case. It does not mean that you cannot serve on a future jury. If you are excused, it will mean that you have been honest and forthright in your feelings and that is what we ask of you.

This is a case in which the Defendant, DONNA M. ROBERTS, is charged with Aggravated Murder with Specifications. As in all such cases, one possible penalty is the death penalty. Because of that possibility, it is necessary that counsel ask you certain questions about your views regarding the death penalty. The death penalty is an issue about which people have varying opinions. Some favor it, some oppose

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 807

it. There are strong arguments for either position.  You will be asked your opinion, and I urge you to be as candid and honest as you can be in your answers.

The questions the lawyers will be asking you are asked in every case of Aggravated Murder with Specifications.  The law requires that such questions be asked of you.  The inquiry has no relation whatsoever as to whether or not DONNA M. ROBERTS is guilty or not guilty of the offenses charged.  As she sits before you she is presumed innocent.  The State must prove —if it is able to do so—her guilt beyond a reasonable doubt.

Because we will only have the opportunity of questioning you regarding your feelings about the death penalty at this stage of the trial, before the State produces any evidence about whether the Defendant is even guilty, I must caution you that you should not conclude that just because attorneys ask you about a possible penalty that they believe that DONNA M. ROBERTS is guilty.  It is simply a part of the jury selection process that occurs in every such case.  Does everyone understand?  Do you have any questions?

As you know, this is a capital case, that is a case where the death penalty and life imprisonment are potentially sentencing options.  There are common misconceptions as to the procedure in such a case, and this preliminary instruction is designed to help eliminate any misconceptions you may hold.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 808

The trial of a capital case may be — but is not necessarily — a two stage process. The issue in the first phase of this trial is the same as in any other criminal case; that is, whether DONNA M. ROBERTS is guilty or not guilty. In the event the State satisfies you by proof beyond a reasonable doubt of the Defendant's guilt on either charge of aggravated murder and her guilt on a specification that the aggravated murder was committed during the course of an aggravated robbery or aggravated burglary, this case would then go to a second phase.

If the case does proceed to a second phase, at that second phase, the jury would be called upon to determine the appropriate punishment. At that time, you would be called upon to determine which of four sentencing alternatives should be imposed. The sentencing alternatives are:

1.  Death by lethal injection;

2.  Life imprisonment with parole eligibility only after serving twenty-five (25) full years; and

3.  Life imprisonment with parole eligibility only after serving thirty (30) full years.

4.  Life imprisonment without any opportunity for parole.

There is a common misperception that upon a finding of guilty on a charge of Aggravated Murder with a Death Specification that the jury must sentence a defendant to death. This simply is not so. The death penalty is only one of four

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

3

possible penalties, and the jury must fairly consider, following my instructions, life imprisonment as well as the death penalty.  If this case does proceed to a second phase, you should enter the second phase with an open mind, not favoring the imposition of one penalty over the other.

If you do have to decide upon a sentence, your decision will not be made in a vacuum.  At that time, I would instruct you to weigh or balance what the law calls aggravating circumstances (the facts which the State claims justifies imposition of the death penalty) against certain mitigating factors  (positive things brought out about the Defendant).  At that time, I would more fully describe what is meant by "aggravating circumstances" and "mitigating factors".

You would further be instructed that the burden would be upon the prosecuting attorney to prove to you beyond any reasonable doubt that the aggravating circumstances outweigh the mitigating factors and that death is the appropriate sentence.  Only if the prosecutor were to meet that burden of proof and firmly convince you that the aggravating circumstances outweigh the mitigating factors, would the law require a verdict of death by lethal injection.  On the other hand, if the prosecutor did not convince you that the aggravating circumstances outweighed the mitigating factors beyond any reasonable doubt, the law would require imposition of one of the life sentence options.  Each of the sentencing

J. Gerald Ingram · John B. Juhasz · Attorneys at Law · 7330 Market Street
Youngstown, Ohio 44512-5610 · Telephone: 330.758.2308 · Facsimile: 330.758.8290

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 810

options is entitled to equal consideration in the event this case proceeds to a second phase and a juror should not automatically favor imposition of one over the others.

Let me caution you once again that neither this preliminary instruction on the procedure in a capital case nor the questions of the court or counsel regarding your views on capital punishment has any bearing upon the guilt or innocence of the accused. DONNA M. ROBERTS is presumed innocent, and you must test the evidence presented by the State in this case just as you would in any other case.

Is there anyone who could not fairly consider either the death penalty or life imprisonment as sentencing options? If so, would you please raise you hand?[1]

---

[1] In the event any juror responds affirmatively, the defense requests that the juror be asked to take his or her juror number, and that the juror then be questioned out of the hearing of the other jurors.

J. GERALD INGRAM · JOHN B. JUHASZ · ATTORNEYS AT LAW · 7330 MARKET STREET
YOUNGSTOWN, OHIO 44512-5610 · TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

5

# NOTICE OF APPEAL
## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,

      Plaintiff-Appellee

-vs-

DONNA M. ROBERTS,

      Defendant-Appellant

Trial Court No. 01 CR 793

Court of Appeals No. 03-TR-56

NOTICE IS HEREBY GIVEN that DONNA M. ROBERTS, Defendant-Appellant hereby appeals to the Eleventh District Court of Appeals from the trial court Judgment Entry of April 3, 2003 overruling the Defendant-Appellant's Motion to Suppress Evidence.

COURT OF APPEALS

APR 7 2003

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: (330) 758-2308
COUNSEL FOR DEFENDANT-APPELLANT

_____ Check here if court-appointed and attach copy of appointment and Affidavit of Indigence.

Christopher D. Becker/Kenneth N. Bailey
160 High Street NW
Warren, Ohio 44481
(330) 675-2426

# ELEVENTH DISTRICT COURT OF APPEALS
## DOCKETING STATEMENT

STATE OF OHIO,

    Plaintiff-Appellee

-vs-

DONNA M. ROBERTS,

    Defendant-Appellant

} Dennis Watkins; Christopher D. Becker
} 160 High St., NW
} Warren, Ohio 44481
} Telephone: (330) 675-2426
}
} **Appeal No.** 03-TR-56
} Trial Court No. 01 CR 793
} J. Gerald Ingram & John B. Juhasz
} 7330 Market Street
} Youngstown, Ohio 44512-5610
} Telephone: (330) 758-2308

**TYPE OF CASE:** (Please indicate)
- ☐ A. No transcript of proceedings required.
- ☒ B. Length of transcript is such that preparation time will not be a source of delay.
- ☐ C. Agreed or narrative statement to be submitted pursuant to APP.R. 9(C) or (D).
- ☐ D. Record was made in administrative hearing and filed with trial court.
- ☐ E. All parties to case approve assignment to accelerated calendar.
- ☐ F. Criminal cases involving:
  - ☐ 1. OHIO CRIM.R. 11 challenges.
  - ☐ 2. Post-conviction appeals alleging ineffective assistance of counsel.
  - ☐ 3. Challenges to sentencing, to revocation of probation, or to failure to grant probation.
  - ☐ 4. OHIO CRIM.R. 29 or weight of evidence challenges, especially with lesser crimes.
  - ☐ 5. Routine DUI cases and other minor traffic offenses.
  - ☐ 6. Expungement cases.
- ☐ G. Civil cases involving:
  - ☐ 1. Routine administrative appeals.
  - ☐ 2. Actions on account.
  - ☐ 3. Slip and fall.
  - ☐ 4. OHIO CIV.R. 60(B) motions.
  - ☐ 5. Simple contract cases.
  - ☐ 6. Minor negligence actions.
  - ☐ 7. Property division in divorce cases or post-decree support motions.
- ☒ H. Other Criminal case involving constitutional issues.
- ☐ I. None of the above.

**PROBABLE ISSUE FOR REVIEW:** Trial court errors in overruling motion to suppress evidence.
**NOTE:** Information regarding record (and Court Reporter's Certification, if applicable) must be completed on Notice of Appeal.
**NOTICE:** Appellant's failure to file brief in a timely fashion (20 days after filing of the record, 15 days on Accelerated Calendar cases, or an extension thereof), may result in the dismissal of appellant's appeal, *sua sponte*, pursuant to OHIO APP.R. 11.1(C), OHIO APP.R. 18 and LOC.R. VII. Appeal will not be reinstated except for a finding of just cause.

**CERTIFICATE OF SERVICE:** I hereby certify that I have mailed or otherwise delivered a copy of this Docketing Statement to all counsel of record or the parties, if unrepresented.

Date: _____

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
COUNSEL FOR DEFENDANT-APPELLANT

[Effective January 1, 1992] • JBJ\APPEALS-FORMS\DOCKETST.11

TRANSCRIPT INFORMATION [OHIO APP.R. 9(B)] (TO BE COMPLETED BY ATTORNEY)

___  I have ordered a complete transcript from the court reporter as evidenced by the completion of the Court Reporter Acknowledgment.

___  I have ordered a partial transcript from the court reporter as evidenced by the completion of the Court Reporter Acknowledgment.

___  A statement pursuant to OHIO APP.R. 9(C) or (D) is to be prepared in lieu of a transcript.

___  Video tapes to be filed. [*See* OHIO APP.R. 9(A) and (B).]

___  No transcript or statement pursuant to either OHIO APP.R. 9(C) or (D) is necessary.

✗  The transcript has already been prepared and is filed herewith.

_____          _____
Date                                                 Attorney's Signature

COURT REPORTER ACKNOWLEDGMENT-MUST BE COMPLETED BY COURT REPORTER BEFORE FILING NOTICE OF APPEAL

Date Order Received:  _____

Estimated Completion Date          **TRANSCRIPT HAS ALREADY BEEN PREPARED AND IS FILED HEREWITH**

_____          _____
(Give specific date)                        Court Reporter

Estimated Number of Pages

_____                    Date:_____
(Give specific number)

D:\Alex1\APPEALS\AppealsCt\Eleventh\Forms\Notice appeal Donna Roberts suppression Ingram.wpd

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-793

STATE OF OHIO,              )

    Plaintiff             )

vs.                        )        JUDGMENT ENTRY

DONNA ROBERTS,             )

    Defendant             )

     This matter was heard upon Defendant's Motion to Suppress Evidence obtained during the search of the premises at 254 Fonderlac S.E., Howland Township on December 12 and December 13, 2001.

     From the evidence presented, Defendant, Donna Roberts, called 911 around midnight on December 12-13. Ms. Roberts was extremely excited and at times unintelligible but apparently was advising the operator that she had found her husband, Robert Fingerhut, shot at their home.

     The Howland Police were dispatched and upon arriving found the body of Robert Fingerhut in the home's kitchen, the apparent victim of a shooting.

     Ms. Roberts told the investigating officer, Detective Monroe, she had been shopping and discovered her

ex-husband's body when she returned home.  It is apparent the police had no immediate suspicion that Ms. Roberts had murdered her husband as the story she gave about being out shopping seemed to be verified by sales receipts she had for purchases made in the time period when the homicide occurred.

Ms. Roberts' brother was summoned from Youngstown to be with her and before the brother arrived and after he arrived, Defendant told the officers on at least three occasions "to do whatever you have to do" to catch the person responsible. Detective Monroe told her the police had to search the premises in order to accomplish her request.  She again replied the police were to do anything necessary.

As a result of the initial search conducted, numerous pieces of evidence were found.  Most significantly was a box of letters from co-defendant, Nathaniel Jackson, to defendant, Donna Roberts, found under Ms. Roberts bed and a box of letters from Ms. Roberts to Mr. Jackson found in the trunk of her automobile.

The main issue raised by Defendant is whether there was a valid consent to search the scene of the murder.  There was no written consent requested or given until after the initial search had been completed.

It is clear from the evidence that Defendant was

emotionally upset during the initial interview with the
police, but for her to have been otherwise would have been out
of the ordinary.  She responded intelligently and rationally
to questions put to her, although at times she showed strong
emotional release due to the circumstances.  The police
testified they had no suspicion Ms. Roberts was involved in
the homicide.  She showed all the emotion one would expect if
her original story was taken as true.  She rationally,
although emotionally, repeated the request for the police to
find the killer, and there was every reason for the police to
take her actions as a request for them to search for evidence.
It was reasonable to imply Ms. Roberts consent to do so.  This
is reinforced by Ms. Roberts agreeing in writing later on the
13th of December for the police to re-search the house.

From the totality of circumstances presented, it was not
an unreasonable search that was conducted by the Howland
Police Department.

Defendant's Motion to Suppress is denied.


_4/2/2003_
DATE

JUDGE JOHN M. STUARD

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL

JUDGE

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA M. ROBERTS,

    Defendant

Case No.  01 CR 793

Judge John M. Stuard

**Death Penalty Case**

---

### DEFENDANT'S MOTION TO CHANGE VENUE
### REQUEST FOR CLOSED ORAL HEARING

---

J. GERALD INGRAM (#0007887)
JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

DENNIS WATKINS, Esq., County Prosecutor (#0009949)
CHRISTOPHER D. BECKER, Esq., Assistant
KENNETH N. BAILEY, Esq., Assistant
160 High Street NW
Warren, OH  44483
Telephone: 330.675.2426
Facsimile: 330.675.2431
COUNSEL FOR PLAINTIFF

FILED

JAN 3 0 2004

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

E:\Jbj.Cap.10\Roberts.Donna.M\Cover page.wpd*Mon 07Apr2003•0837.15 (08:37:15am)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 818

E:\Jbj.Cap.10\Roberts.Donna.M\Roberts.change venue.wpd•Printed: Mon 7 Apr 2003 (8:50am)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )

       Plaintiff         )         Case No. 01 CR 793

                  )         Judge John M. Stuard
vs.                               )         Courtroom 3

                  )
DONNA M. ROBERTS,                 )

       Defendant         )

---

## DEFENDANT'S MOTION TO CHANGE VENUE
## REQUEST FOR CLOSED ORAL HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for a pretrial order changing venue to a county which is not saturated with pretrial publicity. For reasons shown herein, the hearing should be closed.

For cause, the Defendant says that the relief requested must be granted if the Defendant is to be afforded due process of law, a remedy by due course of law, the presumption of innocence and trial by an impartial jury. Further for cause and as shown in the attached Memorandum, made a part hereof by this reference, the actions of the local news media in general have so saturated the potential pool of trial jurors with publicity concerning the case that a panel unaffected by such publicity cannot be drawn.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 819

WHEREFORE, the Defendant prays for an order of this Court order changing the venue of the trial of this cause.

Respectfully submitted,

J. GERALD INGRAM 0007887

JOHN B. JUHASZ 0023777
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing Motion to Change Venue was:

❑ sent by regular United States Mail, postage prepaid
❑ sent by telecopier pursuant to OHIO CRIM.R. 49(B) and OHIO CIV.R. 5(B)
☑ hand delivered to counsel or counsel's office

this ___ day of April, 2003 to Christopher D. Becker, Esq., and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, Warren, Ohio 44481.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

ii

# TABLE OF AUTHORITIES CITED

*Cases:*

*Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163 . . . . . . .  19

*Benton v. Maryland* (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Boyd v. United States* (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 .  22

*Bridges v. California* (1941), 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 .  18

*Chambers v. Florida* (1940), 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 .  18

*Commonwealth v. Pierce* (1973), 451 Pa. 190, 303 A.2d 209 . . . . . . .  10-12

*Craig v. Harney* (1947), 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 . . .  17

*Davenport v. Garcia* (Tex. 1992), 834 S.W.2d 4 . . . . . . . . . . . . . . . . .  14

*Forsythe v. State* (1967), 12 Ohio Misc. 99, 230 N.E.2d 681, 41 Ohio Op.2d 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Gannett v. DePasquale* (1979), 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  823

*Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Irvin v. Dowd* (1960), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 . . . .  18

*Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 . . .  13

*Marshall v. United States,* (1959) 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Olmstead v. United States* (1928), 277 U.S. 438, 48 S.Ct. 545, 72 L.Ed. 944 (BRANDEIS, J., dissenting) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Patterson v. Colorado* (1907), 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed.879 .  11

*People v. Luedecke* (1965), 258 N.Y.S.2d 115, 22 A.D.2d 636 . . . . . . .  8, 9

*People v. Martin* (1963), 243 N.Y.S.2d 343, 19 A.D.2d 804 . . . . . . . . . .  9

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

*People v. Sepos* (1964), 254 N.Y.S.2d 759, 22 A.D.2d 1007 . . . . . . . . . 2, 8

*Press Enter. Co. v. Superior Court* (1984), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629, 52 USLW 4113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 23

*Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, 35 Ohio Op.2d 431, 6 Ohio Misc. 231 . . . . . . . . . . . . . . . . . . . . 6, 17, 20, 21

*South Euclid v. Florian* (1963), 95 Ohio Law Abs. 236, 192 N.E.2d 548, 26 Ohio Op.2d 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*State v. Fairbanks*, (1972) 32 Ohio St.2d 34, 289 N.E.2d 352, 61 Ohio Op.2d 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12, 15, 21

*State v. Williams* (1961), 67 N.J. Super. 599, 171 A.2d 137 . . . . . . . . . 19

*United States v. Carolene Products Co.* (1938), 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Murray* (6th Cir. 1986), 784 F.2d 188, 20 Fed. R. Evid. Serv. 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Constitutional Provisions*:

OHIO CONST., art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

OHIO CONST. art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

OHIO CONST., art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

U. S. CONST. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U. S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. CONST., amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

U.S. CONST., amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 822

*Statutes and Rules*:

OHIO CODE PROF. RESP. DR 7-107 . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

OHIO CRIM.R. 18(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

OHIO REV. CODE ANN. §2901.12(K) . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Other Authorities*:

Comment, *Interpretation and Authority in State Constitutionalism* (1993),
106 HARV.L.REV. 1147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

William J. Brennan, Jr., *State Constitutions and the Protection of Individual
Rights* (1977), 90 HARV.L.REV. 489 . . . . . . . . . . . . . . . . . . . . . . . . . .   18

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

v

## MEMORANDUM IN SUPPORT OF MOTION

### I

FACTUAL BACKGROUND.  The Defendant, DONNA M. ROBERTS, has been indicted by the Trumbull County Grand Jury by direct presentment for *inter alia*, aggravated murder with death penalty specifications.  Also indicted was a co-defendant, Nathaniel Jackson.  Mr. Jackson's trial was held in this Court late last year and he was convicted and sentenced to death.

There was considerable publicity surrounding the case when the Defendant and Jackson were arrested.  That publicity has continued from time to time as proceedings have been scheduled either for the Defendant or Jackson.

In addition to the broadcast media coverage, which has been pervasive and which is impossible to accurately capture and reproduce here, there have been no less than sixty seven newspaper articles on the case.  From December 13, 2001 through April 4, 2003, forty seven articles were printed in the Warren *Tribune* relating to either the Defendant Donna Roberts or her co-defendant, Nathaniel Jackson.  These articles are attached hereto as Exhibits A-1 through A-47.  From November 12, 2001 through January 8, 2003, at least twenty articles appeared in the Youngstown *Vindicator*, attached as Exhibits B-1 through B-2. It is fair to say that virtually none of them paint this Defendant in a favorable light or preserve the constitutional presumption of innocence.

The affidavit of Detective Sergeant Paul Monroe filed herein in support of the State's request for an arrest warrant, made reference to letters and tape recordings between this Defendant and her co-defendant.  The defense

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUCHISDOC@AOL.COM

1

moved to have the Monroe affidavit sealed on the grounds that disclosure thereof would taint the jury pool. Subsequently, the affidavit was released as a public record while the exhibits remained sealed until the *Jackson* trial.

Immediately upon release of the affidavit, the news media began to disseminate to the public the inference that the "sexually explicit letters" and audiotapes laid out a plot to murder Robert Fingerhut. *See*, Exhibits A-8, A-12, and B-6, Appendix, *post*. On January 1, 2002, the Youngstown *Vindicator* carried a front page article which read: "Love, a new Cadillac and a $325,000 life insurance policy are what drove Donna Roberts and her lover to kill her husband, prosecutors say." *See*, Exhibit B-6. On January 6, 2002, a Warren *Tribune Chronicle* article read: "Besides more than 280 love letters, authorities used telephone technology and jail phone-taping techniques to trap a couple accused of a murder conspiracy last month." *See*, Exhibit A-8. The defense respectfully submits that the consequence of releasing the Monroe affidavit was, as predicted, and resulted in poisoning the fountain of justice even before it began to flow. *See*, *People v. Sepos*, *post*.

Upon the arrest of co-defendant Nathaniel Jackson, Mr. Jackson gave a videotaped statement. In the video statement, Mr. Jackson admitted to shooting Robert Fingerhut. The co-defendant's admission received extensive news coverage. Mr. Jackson's assertion that "I didn't mean to, man" was printed in both local newspapers. *See*, Exhibits A-10, B-7, and B-9. Mr. Jackson's trial began in late October of 2002 and a guilty verdict was returned on or about November 9, 2002. The guilty verdict was covered live by virtually every TV station in the broadcast area. Headlines setting forth the guilty verdict appeared in both local papers. *See*, Exhibits A-36 and B-

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: JBJURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 825

12.   Virtually every article written about the *Jackson* trial made some reference to this Defendant's upcoming trial date. County Prosecutor Dennis Watkins stated to the media that the *Jackson* case was the most documented and most proven case he had ever tried. *See*, Exhibits A-40 and A-42.   A November 9, 2002 front page article the Youngstown *Vindicator* quoted Prosecutor Watkins as asserting that the case involved "the most evidence of any case he has ever tried." *See*, Exhibit B-12.   In the same article, Anthony Consoldane, one of Mr. Jackson's attorneys, is quoted as follows: "I understand how they reached it [their verdict].   There was a lot of evidence that showed that there was some type of plot that was being hatched to try and take his [Robert Fingerhut's] life." *Id*.   In another article in the Warren *Tribune* on November 9, 2002, Consoldane was again quoted: "I could see them convicting Nate of the murder but not the robbery or the burglary."   The jury pool in this case has been exposed to post-verdict statements of counsel for co-defendant Jackson virtually conceding that the guilty verdict was correct; and, by implication, that this Defendant likewise is guilty.

Nathaniel Jackson, as we all know, was eventually sentenced to death. The inescapable conclusion for the members of this venire to draw from the coverage of the *Jackson* case is that he was rightly convicted and sentenced to death for horrible crimes and that this Defendant is just as guilty.   A fair trial in this circus-like atmosphere is impossible.   A December 10, 2002 article which appeared in the Youngstown *Vindicator* regarding the Jackson verdict contained a sub-headline which read "Blaming Roberts" and quoted a friend of Jackson's as follows: "Nate didn't know this guy . . .   Donna

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail: JBJuchis@aol.com

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 826

Roberts knew the guy.  She became Nate's friend.  She set this up."  *See*, Exhibit B-19.  Similarly, a November 15, 2002 article in the Warren *Tribune* described statements by Dr. Sandra McPherson and read: "She pointed out that even today, Jackson has never blamed the murder completely on Roberts."  *See*, Exhibit A-38.  The pervasive pretrial publicity in this case endangers the Defendant's constitutional right to a fair trial as to guilt or innocence, but equally impacts the Defendant's constitutional right to a fair, individualized consideration of whether death is the appropriate penalty.  *See, e.g., Barclay* v. *Florida* (1983), 463 U.S. 939, 964, 103 S.Ct. 3418, 77 L.Ed.2d 1134, 51 USLW 5206.

<div align="center">II</div>

ARGUMENT.  None of the lawyers in this case can talk about it, and they all know it—though they have from time to time failed to resist the apparently irresistible temptation to do so.  The disclosure of evidence by a lawyer clearly violates DR 7-107, which provides in pertinent part:

> (A) A *lawyer participating in* or associated with the investigation of a criminal matter shall not make *or participate in making an extra-judicial statement* that a *reasonable person* would *expect to be disseminated* by means of public communication *and that does more than state without elaboration*:
> (1) Information contained in a public record.
> (2) That the investigation is in progress.
> (3) The general scope of the investigation including a description of the offense and, if permitted by law, the identity of the victim.
> (4) .   .
>  .  .  .  .
> (B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extra-judicial

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE (330) 758-7808 · FACSIMILE (330) 758-8290 · E-MAIL: JBJUHISDOC@AOL.COM

4

statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

(1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

(2) The possibility of a plea of guilty to the offense charged or to a lesser offense.

(3) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.

(4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

(5) The identity, testimony, or credibility of a prospective witness.

(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

(C) DR 7-107 (B) does not preclude a lawyer during such period from announcing:

(1) The name, age, residence, occupation, and family status of the accused.

(2) If the accused has not been apprehended, any information necessary to aid in his apprehension or to warn the public of any dangers he may present.

(3) A request for assistance in obtaining evidence.

(4) The identity of the victim of the crime.

(5) The fact, time, and place of arrest, resistance, pursuit, and use of weapons.

(6) The identity of investigating and arresting officers or agencies and the length of the investigation.

(7) At the time of seizure, a description of the physical evidence seized, other than a confession, admission, or statement.

(8) The nature, substance, or text of the charge.

(9) Quotations from or references to public records of the court in the case.

(10) The scheduling or result of any step in the judicial proceedings.

(11) That the accused denies the charges made against him.

(D) During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case.

.   .   .

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS DOC@AOL.COM

5

Little short of its own sense of responsibility to avoid injuring the ability of a citizen to get a fair trial can stop the news media from publishing items that it wants to publish.[1]  Writing for the Court in *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, 35 Ohio Op.2d 431, 6 Ohio Misc. 231, Justice Tom Clerk said that a "responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field." 384 U.S. at 350.  Regardless of the media's responsibility or lack thereof, the requirement that the Defendant be afforded a fair trial pervades.  Though the disciplinary code concededly is not applicable to non-lawyers, the rule does recognize the unfairness that disclosures of the type made in this case have upon the fairness of the trial.

In *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, the petitioner was arrested just hours after someone robbed a bank, kidnaped three bank employees, and killed one of those employees.  The morning after Rideau's arrest, a motion picture film and sound track were made of a purported interview in the jail between petitioner and the local sheriff.  The "interview"[2] lasted approximately twenty (20) minutes, during which Rideau admitted involvement in the bank robbery, kidnaping, and murder.  Later that day and on two succeeding days, the "interview" was broadcast over the local television stations.  Rideau's trial counsel filed a

---

[1] The First Amendment just happens to be numbered that way; it does not mean that it takes priority over all other matters spelled out in the Bill of Rights.  In point of fact, it may deflate some of the more portentous members of the Fourth Estate who claim priority of the First Amendment to learn that the First Amendment was originally the Third Amendment.  When two of the prosed twelve amendments were not adopted, the Third Amendment became the First.

[2] Throughout the opinion, Justice Stewart, who wrote the majority opinion, used quotation marks around the word "interview," thus emphasizing that the majority of the Court felt that the taped statement was anything but an interview.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

6

motion for change of venue, but the motion was denied.   Rideau was convicted and sentenced to death on the murder charge.  The United States Supreme Court reversed the conviction.  The Court noted that although the record failed to show whose idea it was to make the sound film and to broadcast it over the television stations, it was clear from the "conceded circumstances" that the plan was carried out with the "active cooperation and participation of the local law enforcement officers." *Id.*, 373 U.S. at 725. Reversing the case on due process grounds, the court held in part:

> For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder.  Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id.*, 373 U.S. at 726.  (Emphasis in original.)  In *Rideau,* there was little question about the guilt of the defendant.  The United States Supreme Court nonetheless did in that case what the Defendant asks this Court to do here: find a due process violation regardless of the guilt of the Defendant, for it is adherence to the principles of due process of law that must supersede even the guilt or innocence of the particular defendant.[3]  *See, e.g., State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342.

---

[3] John Adams, one of the Founding Fathers of the Nation and its second President, said that:
It is more important that innocence be protected than it is that guilt be punished, for guilt and crimes are so frequent in this world that they cannot all be punished.  .  .  .  But if innocence itself is brought to the bar and condemned, perhaps to die, then the citizen will say, "whether I do good or I do evil is immaterial, for innocence itself is no protection," and if such an idea as that were to take hold in the mind of the citizen that would be the end of security whatsoever.
The Ohio and United States Constitutions promise that any trial held in the courts of those respective jurisdictions will be fair so that innocence is protected and guilt is fairly determined.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

7

Here, in the circus atmosphere of a press feeding frenzy, fueled by suggestions of an interracial May-December romance and a plot by the lovers to put to death the victim, the media already has held DONNA M. ROBERTS' trial. Any "trial" by a jury, which now has been saturated in news coverage about the case—including matters which may not be admitted into evidence—would be a "hollow formality." Yet, just as surely as Rideau's trial was held in the media and not in the courtroom, so it is and so it has been with this "trial". Any resulting verdict and sentence would not be in accordance with due process of law—indeed, it would be in defiance of due process of law.

In *People v. Sepos* (1964), 254 N.Y.S.2d 759, 22 A.D.2d 1007, the New York Supreme Court, Appellate Division, had before it the issue of the propriety of a prisoner having been made to pose for sound motion picture cameras with a stolen money bag allegedly taken in the holdup. The defendant filed a motion to vacate his judgment and the county court denied the motion without a hearing. The appellate court held that a hearing was required. It did so with a short and to the point memorandum opinion, wherein the court said in part that "[w]hile we make no comment on the right of freedom of the press or the permissible limits of the newsmen's endeavors, we think, if the allegations of the petition are true, that the active participation by law enforcement officers in the events alleged to have occurred was reprehensible, shocking and difficult to understand in a civilized, lawful community." *Id.*, at 760.

In *People v. Luedecke* (1965), 258 N.Y.S.2d 115, 22 A.D.2d 636, the defendant was shown reenacting the alleged crime before a television

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

8

camera of one of the largest television stations in the area.   It was undisputed that approximately forty thousand, two hundred (40,200) homes normally view the newscasts of that station.  In deciding that a change of venue was proper, and in relying on *People v. Sepos*, the court held in part:

> The active participation by the District Attorney (as well as the police officers) far exceeded the responsibilities of that office, the duties of which require not only the prosecution of crime but also the obligation to safeguard and insure the constitutional rights of defendants to a fair and impartial trial.  The effect of what was done in the case at bar was "effectively to poison the fountain of justice before it begins to flow." [*Rex v. Parke* (1903), 2 K.B. 432, 438].

*Id.,* 258 N.Y.S.2d at 117.   Here, the pool of prospective jurors has been poisoned.  The media has effectively poisoned the fountain of justice even before it begins to flow.  The government has "exceeded the responsibilities of that office, the duties of which require not only the prosecution of crime but also the obligation to safeguard and insure the constitutional rights of defendants to a fair and impartial trial" when the prosecutor says that he has never had more evidence in a case and implies that the Defendant is guilty because of the mountain of evidence.

In *People v. Martin* (1963), 243 N.Y.S.2d 343, 19 A.D.2d 804, juvenile defendants were indicted for first degree murder and moved for a change of venue.  The New York Supreme Court, Appellate Division, held that they were entitled to a change of venue.  The sixteen (16) year old defendants, pursuant to instructions of a police officer, were subjected to filmed questioning by press and television reporters and then the film was broadcast.  In ordering a change of venue, the court held in part:

> While the exact figures of the number of people who saw the telecast is in doubt, there can be no doubt that it was a very large number and that the potential for influence on possible talesmen is

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 832

significant. The effect of the telecast cannot but be prejudicial. The deputy police commissioner defends his action on the ground that the police should keep the public informed through the various news media; and further that the police should not prevent defendants from giving any statement to the representatives of these media that they might care to give. As applied to this case, the explanation is ingenuous. Here two very young men, after first being conditioned by being photographed without their consent, are allowed to be subjected to insistent questioning of reporters bent on getting sensational details. Defendants far more experienced than these two would get the impression that their inquisitors were approved by those that had them custody and that to rebuff them would not be advisable. To call this giving them an opportunity to state their version is an exercise in naivete. The practice defeats the very purpose of police work. People are not arrested to provide new stories or telecasts. They are arrested to be brought to justice. Any police conduct that prevents a fair trial could allow the guilty to escape conviction. Good public relations have their importance but being on good terms with the press at the expense of a scrupulous performance of the department's functions is hardly commendable.

*Id.,* 243 N.Y.S.2d at 343-344. The Defendant here was ostensibly arrested to be "brought to justice"—which, before the media coverage, might have included a not guilty verdict.

In *Commonwealth v. Pierce* (1973), 451 Pa. 190, 303 A.2d 209, the Supreme Court of Pennsylvania reversed a murder conviction and ordered a new trial. The court held that the defendant was denied due process by denial of a change of venue where the community had been informed by authorities, including police, that the defendant was the confessed triggerman with a past record for violent crimes; pictures were shown of a staged re-enactment of the crime; and, there was other widespread publicity. The court noted that the nature of the accounts released by the police were so inherently prejudicial that the defendant was not required to show a nexus between the publicity and actual jury prejudice, and that the defendant had no burden of proving identifiable prejudice. The court noted

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone (330) 758-2308 · Facsimile (330) 758-8290 · e-mail: jbjuhisdoc@aol.com

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 833

that publication of news accounts cannot interfere with the orderly administration of criminal justice. The court relied upon a quote from Justice Holmes in *Patterson v. Colorado* (1907), 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed.879: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." The Pennsylvania Supreme Court held in part:

> We rule the basic theory of our system of criminal justice has been violated in the instant case. For the lower court to refuse a motion for a change of venue after the community had been informed by the authorities that Pierce was the confessed "triggerman" with a past record for violent crimes, as well as pictures of a staged re-enactment of the crime—which is a confession in itself—coupled with the other widespread publicity was a denial of due process of law.
>
> It has been recognized by the United States Supreme Court that under normal circumstances a claim of a due process violation requires a showing of identifiable prejudice to the accused. Nevertheless there are certain procedures employed the states which involve such a probability of prejudice that they are deemed inherently lacking in due process. . . . We hold that the nature of the accounts released by the police were so "inherently prejudicial" that Pierce need not have shown a nexus between the publicity and actual jury prejudice, and hence, he did not have the burden of showing identifiable prejudice.

*Id.,* 303 A.2d at 212. The *Pierce* Court went on to discuss and to quote from *Rideau v. Louisiana*:

> We believe that much of what was said in *Rideau* is applicable herein. In the instant case, as in *Rideau*, we believe that the deliberate release of the information that Pierce was the confessed "triggerman" in the double shooting, as well as the staged re-enactment of the crime "in a very real sense *was* [Pierce's] trial at which he pleaded guilty to murder." All the information released by the authorities clearly pointed to Pierce's guilt, and any prospective juror exposed to this publicity must surely have formed a definite opinion as to Pierce's guilt or innocence. Moreover, some of the information, such as the accused's past criminal record, was not admissible at trial, but it was available to the prospective jurors through the news accounts. In the constitutional sense a fair trial necessarily demands the evidence

John R. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail jrjuhasz@aol.com

11

developed against the accused shall come from the witness stand in a public tribunal with the full judicial protection of such rights as: counsel, cross-examination, confrontation, and the right against self-incrimination. These safeguards could not have been afforded to the appellant, they were precluded from being fully effective by the pretrial news coverage.

It is not only the fact that the publicity was "inherently prejudicial" that troubles us about this case: it is also the source of the publicity. The information in this case was not reported as a result of independent research by the representatives of the news media — it came directly from the police. . . .

Statements such as those of the police and the prosecutor in this case create an even more substantial risk of a denial of a fair trial, because of the position in the community these individuals hold, and also suggest an official disregard of safeguards inherent in a fair trial. Officers of the Commonwealth and the police have a special duty and responsibility to *all* of the citizens of the Commonwealth. They must never lose sight of the fact that an accused has a right to fair trial by an impartial jury, and that only a jury can "strip a man of his liberty," *and a man is presumed innocent until proven guilty in a court of law,* and that all men are guaranteed basic rights under the Constitution.

*Id.,* 303 A.2d at 213-214. (Emphasis in original.) Here, the publicity is inherently prejudicial to the Defendant. The Defendant's trial in Trumbull County now cannot be fair. As in *Pierce*, this Defendant need not show any nexus between the publicity and actual jury prejudice. The news accounts themselves were *inherently prejudicial.*

As seen above, courts from the United States Supreme Court on down have not allowed convictions to stand when due process rights of the defendant have been violated by "trials" in the media. This Court must step in and secure the constitutional immunities and liberties of the Defendant. *See, e.g.,* U.S. CONST., amend. XIV; OHIO CONST., art. I, §16; *State v. Lane.* The time for this Court to insure due process is now—not after some attempt to pick a jury in this County. Due process and a fair trial by an impartial jury cannot be sacrificed for *any* other motive or reason. As noted

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

12

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 835

by Justice Brandeis: "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States* (1928), 277 U.S. 438, 479, 48 S.Ct. 545, 72 L.Ed. 944 (BRANDEIS, J., dissenting).  Here, we see much zeal but little understanding for the constitutional trial liberties that set this nation apart from all others.

No less important than due process are the presumption of innocence and privilege against self incrimination which naturally inure to every citizen and which is specified as an immunity free from encroachment in U.S. CONST. amend. V[4] and OHIO CONST., art. I, §§1,[5] 10,[6] and 16.[7] The State

---

[4] U.S. CONST. amend. V provides in pertinent part that "No person shall be . . . compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." *See, also, Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. The Due Process Clause of U.S. CONST. amend. XIV makes U.S. CONST. amend. V applicable to state criminal prosecutions. *See, e.g., Griffin, supra; Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653; *Benton v. Maryland* (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707.  All quotes of Ohio materials and state and federal constitutional provisions are: Copyright © Banks-Baldwin Law Publishing Co. 1998; LEXIS-NEXIS, 2003.

[5] OHIO CONST. art. I, §1 provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." The Defendant is being deprived of the ability to defend life and liberty because the news media wants to sell advertisements.

[6] OHIO CONST. art. I, §10 provides in relevant part that "In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; . . . . No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel.  No person shall be twice put in jeopardy for the same offense."

[7] OHIO CONST. art. I, §16 provides I pertinent part: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

13

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 836

constitutional rights are not to be ignored, for as the Ohio Supreme Court has stated:

> The United States Supreme Court has repeatedly reminded state courts that they are free to construe their state constitutions as providing different or even broader individual liberties than those provided under the federal Constitution. See, *e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.* (1982), 455 U.S. 283, 293, 102 S.Ct. 1070, 71 L.Ed.2d 152 (" * * * [A] state court is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee."); and *California v. Greenwood* (1988), 486 U.S. 35, 43, * * * ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."). . . Further, in *Michigan v. Long* (1983), 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 [52 USLW 5231], the Supreme Court reinforced its comments in this area by declaring that the state courts' interpretations of state constitutions are to be accepted as final, as long as the state court plainly states that its decision is based on independent and adequate state grounds.

See, *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 41-42, 616 N.E.2d 163.[8]

The Court went on to hold:

> In joining the growing trend in other states, we believe that the Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups.

The Supreme Court of Ohio has commented upon the presumption of innocence and just what must be done by courts to see to it that the

---

[8] One court has correctly held that: "[w]hen a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights." *See, Davenport v. Garcia* (Tex. 1992), 834 S.W.2d 4, 12. *See, also,* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights* (1977), 90 HARV.L.REV. 489, and Comment, *Interpretation and Authority in State Constitutionalism* (1993), 106 HARV.L.REV. 1147.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

14

presumption remains intact and untainted. *State v. Lane* involved three inmates of the maximum security Southern Ohio Correctional Facility at Lucasville who were charged with escape from that facility. The trial court held the escape trial inside the prison, ushering the jury inside the maximum security prison every day. The Supreme Court reversed the convictions, finding that the physical setting of the trial, replete with guards, fences, *etc.* undermined the presumption of innocence. The Supreme Court of Ohio held:

> The United States Supreme Court, in *In re Murchison* (1955), 349 U.S. 133, discussed, at page 136, . . . , the constitutional requirements concerning the right to a fair trial:
> "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. . . .
> The presumption of innocence of the accused in a criminal prosecution is a basic component of a fair trial in the criminal justice system. *Coffin v. United States* (1895), 156 U.S. 432, 453, . . . It is the duty of our courts to guard against factors which may undermine the fairness of the fact-finding process and thereby dilute the right to the presumption of innocence. To implement the presumption courts must be alert to factors that may undermine the fairness of the fact-finding process. *Estelle v. Williams* (1976), 425 U.S. 501, 503 . . . .
> It is well established that the mere probability of deleterious effects on fundamental rights calls for close judicial scrutiny. See *Estes v. Texas* (1965), 381 U.S. 532 . . . .

The Court went on to discuss the right to a fair trial, at 60 Ohio St.2d 115, *et seq*:

> The Sixth Amendment to the United States Constitution and Section 10 of Article I of the Ohio Constitution guarantee every accused in a criminal proceeding the right to be tried by an impartial jury. This court does not believe that a trial within a maximum security penitentiary with 12-foot high double walls, armed guards, high guard towers and visible barred windows allows a jury to maintain the delicate posture of impartiality which is a mainstay of our judicial system.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

15

The United States Supreme Court, in *Frank v. Mangum* (1915), 237 U.S. 309, noted, at page 349, . . ., that ". . . [a]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere." . . .

In *Turner v. Louisiana* (1965), 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424, the prejudicial impact on the minds of the jurors was also at issue. In that case, the jurors in a criminal trial had to rely on the sheriff's deputies for security, who were also witnesses for the prosecution. Much akin to the Court of Appeals' decision in the instant cause, the court, in *Turner*, noted, 379 U.S. at pages 473-474, 85 S.Ct. at page 550, that:

". . . [I]t would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. . . .

A change of venue pursuant to OHIO REV. CODE ANN. §2901.12(K)[9] and OHIO CRIM.R. 18(B)[10] is proper. Extensive and prejudicial media coverage

---

[9] OHIO REV. CODE ANN. §2901.12 provides in pertinent part:
(K) Notwithstanding any other requirement for the place of trial, venue may be changed upon motion of the prosecution, the defense, or the court, to any court having jurisdiction of the subject matter outside the county in which trial otherwise would be held, when it appears that a fair and impartial trial cannot be held in the jurisdiction in which trial otherwise would be held, or when it appears that trial should be held in another jurisdiction for the convenience of the parties and in the interests of justice.

[10] OHIO CRIM.R. 18(B) provides in pertinent part:
(B) **Change of venue; procedure upon change of venue.** Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending.

(4) *Appearance of defendant, witnesses.* Where a change of venue is ordered and the defendant is in custody, a warrant shall be issued by the clerk of the court in which the action originated, directed to the person having custody of the defendant commanding him to bring the defendant to the jail of the county to which the action is transferred, there to be kept until discharged. If the defendant on the date of the order changing venue is not in custody, the court in the order changing venue shall continue the conditions of release and direct the defendant to appear in the court to which the venue is changed. The court shall recognize the witnesses to appear before the court in which the accused is to be tried.

(5) *Expenses.* The reasonable expenses of the prosecuting attorney incurred in consequence of a change of venue, compensation of counsel appointed pursuant to Rule 44, the fees of the clerk of the court to which the venue is changed, the sheriff or bailiff, and of the jury shall be allowed and paid out of the treasury of the political subdivision in which the action originated.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUERISDOC@AOL.COM

16

has tainted the jury pool, thereby making it impossible for the Defendant to receive the fair and impartial trial, guaranteed by the state and federal constitutions. *See*, U.S. CONST., amend. V, VI and XIV and OHIO CONST., art. I, §§2, 5, 10, and 16. Widespread community exposure to prejudicial pretrial publicity in this case has created a substantial likelihood that the Defendant will not be able to obtain his constitutionally guaranteed right to a fair trial. It is unlikely and improbable that any jurors can be found who are not aware of the Defendant's arrest and the allegations that he hired the other co-defendants to commit murder.

The American criminal justice system is firmly grounded on the principle imbedded in our Constitution that every person accused of a crime is entitled to be tried by a fair and impartial jury of his peers and to be convicted, if at all, on the basis of evidence properly adduced at trial. In *Sheppard v. Maxwell, ante*, the Supreme Court of the United States held that: "[a] showing of identifiable prejudice to the defendant is not necessary where there is a likelihood that prejudicial news prior to the trial will prevent a fair trial." The Court noted that it had been "unwilling to place any direct limitations on the freedom traditionally exercised by the news media for "[w]hat transpires in the court room is public property."' *Id.*, at 350, citing *Craig v. Harney* (1947), 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546. The Court also said that "where there was 'no threat or menace to the integrity of the trial,' *Craig v. Harney, supra*, 331 U.S. at 377, we have consistently required that the press have a free hand, even though we sometimes deplored its sensationalism." *Id.*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISTIC@AOL.COM

17

That the press should have a free hand however, does not mean that there are not constitutional implications for the accused.  Clark's opinion for the Court pointed out that "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."  *Id.*, *citing Bridges v. California* (1941), 314 U.S. 252, 271, 62 S.Ct. 190, 86 L.Ed. 192.  The Court also made clear that it has "insisted that no one be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'" *Id., citing Chambers v. Florida* (1940), 309 U.S. 227, 236-237, 60 S.Ct. 472, 84 L.Ed. 716.

The Court's opinion in *Sheppard, ante*, was little more than the logical application of the principles expressed in an earlier opinion, also written by Justice Clark.  In *Irvin v. Dowd* (1960), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, the Court held that "[i]n the ultimate analysis, only the jury can strip a man of his liberty or his life.  In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b.  His verdict must be based upon the evidence developed at the trial.  .   .   . This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." 366 U.S. at 722. *See also, State v. Fairbanks*, (1972) 32 Ohio St.2d 34, 289 N.E.2d 352, 61 Ohio Op.2d 241, wherein the Supreme Court of Ohio noted that where there is extensive press coverage prior to trial, it is not necessary to show identifiable prejudice in a motion for change of venue.  The newspaper articles attached hereto constitute extensive and prejudicial pretrial publicity

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

18

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 841

establishing a likelihood that prejudicial publicity will prevent the Defendant from receiving a fair trial.

In *South Euclid v. Florian* (1963), 95 Ohio Law Abs. 236, 192 N.E.2d 548, 26 Ohio Op.2d 242, the municipal court of South Euclid was faced with a defense motion for change of venue after the defendant had been previously convicted, and the conviction was publicized within the jurisdiction of the court. The *Florian* court gave great weight to the fact that the publicity in question related to a jury verdict of guilty rather than the defendant's original arrest or the police investigation. The *Florian* court stated, 26 Ohio Op.2d at 244: "It is the opinion of the court in the instant case that the publicity given to the jury verdict of guilty is of far greater importance than the publicity given the original arrest of the defendant." Although the Defendant has not been previously convicted, the net effect of every newspaper article published about this case is that the Defendant is guilty of a robbery and raping spree. The *Florian* court continued:

> However, when it is known by a juror that another jury has already found the defendant guilty of this particular crime, such a juror could hardly be considered to be without prejudice. If he is not *consciously prejudiced*, the probabilities are very great that he would be *subconsciously prejudiced*.

*Id.*, 26 Ohio Op.2d at 245. Here, the pretrial publicity has either consciously or subconsciously prejudiced the pool of prospective jurors against the Defendant. The *Florian* court relied upon the case of *State v. Williams* (1961), 67 N.J. Super. 599, 171 A.2d 137. In *Williams*, the court was faced with a defense motion for change of venue after the defendant had entered a plea of "*nonvult*" (the equivalent of a plea of guilty). The *Williams* court held:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

19

> It is to the credit of our system of justice that a prospective juror candidly admitted at the prior trial that he knew of the plea of *nonvult* to second degree murder. If such knowledge were not revealed in a subsequent trial, the defendant would be grossly prejudiced. In the interest of justice, it is the duty of this court not to expose this defendant to the risk contingent upon a trial in this county.

As noted by the *Williams* court and the *Florian* court, publicity relating to a guilty plea or jury verdict poses a unique threat to the defendant's constitutional right to a fair and impartial jury. Any juror knowing of the co-defendant's prior conviction is likely to be consciously or subconsciously prejudiced. As the Court in *Forsythe v. State* (1967), 12 Ohio Misc. 99, 230 N.E.2d 681, 41 Ohio Op.2d 104, noted, an assumption by a trial judge that a juror could disregard pretrial publicity because the juror was so instructed, was a triumph of faith over experience. An assumption in this case that a juror could disregard pretrial publicity of the Defendant's alleged participation in a murder scheme resulting in Robert Fingerhut's death would indeed be a triumph of faith over experience. *See, Marshall v. United States*, (1959) 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250.

In the case at bar, there is a reasonable likelihood that pretrial publicity will prevent a fair trial. As noted by the Supreme Court in *Sheppard v. Maxwell*:

> But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the *cure* lies in those remedial *measures that will prevent the prejudice at its inception.*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

20

384 U.S. at 363 (Emphasis added.)  Application of arcane rules of harmless error have no application here, where the matter is before the trial court.  As noted by the court in *Florian, supra*:

> The issue before this court is not what an appellate court would do if the judge in the exercise of his discretion overruled this motion, but rather, the issue is whether, this motion should be granted considering the publicity given the jury verdict, considering the general interest in the community (because of the unusual nature of the charge) and considering what transpired in the earlier trial of this case.

The Supreme Court correctly noted in *Sheppard v. Maxwell, ante*, that "we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception.  The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." 384 U.S. at 363.

Many courts in capital cases and other publicized cases have adhered to the theory that a change of venue should be granted only grudgingly and only after an attempt has been made to empanel a jury in the county of indictment.  Appellate courts affirm on the theory that there was no abuse of discretion.  With all due respect to those trial and appellate courts, they appear to have lost sight of the precept that the trial must be conducted with a watchful eye to factors which might undermine the presumption of innocence and which might eradicate due process of law.  *See, State v. Lane, supra*.  Those courts, guided by motives of economy or whatever else guides them, appear to have lost sight of the basic notion that in a criminal trial: "constitutional provisions for the security of person and property should be liberally construed .   .   .  .  It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments

John R. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail Jrjuhasz@aol.com

21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 844

thereon." *Boyd v. United States* (1886), 116 U.S. 616, 636, 6 S.Ct. 524, 29 L.Ed. 746. The Court's analysis of the constitutional issues involved here should bear in mind the famous footnote four in the case of *United States v. Carolene Products Co.* (1938), 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234.[11] Under the facts of this case, the defense respectfully submits that if the Court fails to dismiss the indictment, it has no option but to immediately and prior to voir dire, order a change of venue. As shown by the authorities quoted above, the notion that a court must attempt to seat a jury in this county by going through voir dire prior to ordering a change of venue is not

---

[11] The famous footnote provides in pertinent part:

    There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth. See *Stromberg v. California*, 283 U.S. 359, 369, 370, 51 S.Ct. 532, 535, 536, 75 L.Ed. 1117, 73 A.L.R. 1484; *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, decided March 28, 1938.

    It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation. On restrictions upon the right to vote, see *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458; on restraints upon the dissemination of information, see *Near v. Minnesota*, 283 U.S. 697, 713--714, 718--720, 722, 51 S.Ct. 625, 630, 632, 633, 75 L.Ed. 1357; *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; *Lovell v. Griffin, supra*; on interferences with political organizations, see *Stromberg v. California, supra*, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117, 73 A.L.R. 1484; *Fiske v. Kansas*, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108; *Whitney v. California*, 274 U.S. 357, 373--378, 47 S.Ct. 641, 647, 649, 71 L.Ed. 1095; *Herndon v. Lowry*, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; and see Holmes, J., in *Gitlow v. New York*, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138; as to prohibition of peaceable assembly, see *De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278. Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religious, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468, or national, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446; *Bartels v. Iowa*, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047; *Farrington v. Tokushige*, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646, or racial minorities. *Nixon v. Herndon, supra*; *Nixon v. Condon, supra*; whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry. Compare *McCulloch v. Maryland*, 4 Wheat. 316, 428, 4 L.Ed. 579; *South Carolina State Highway Department v. Barnwell Bros.*, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734, decided February 14, 1938, note 2, and cases cited.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURIS.DOC@AOL.COM

22

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 845

accurate.  The provision for trial in the county of the offense is one for the protection of the accused, U.S. CONST., amend. VI and XIV; OHIO CONST., ART. I, §§5 and 10.  It undoubtedly yields to the fundamental principle of due process.  Given what has transpired, there is no other way to insure due process other than to order an immediate change of venue.

### III

REQUEST FOR CLOSED HEARING.  Finally, given the media blitz that has already occurred, the hearing on this Motion should be closed.  Adverse publicity can affect the ability of a defendant to receive a fair trial, and the trial judge has "an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity."  *See*, *Gannett v. DePasquale* (1979), 443 U.S. 368, 378, 99 S.Ct. 2898, 61 L.Ed.2d 608.  The right of access, *see,* U. S. CONST. amend. I, is not absolute, and the presumption of openness may be overcome by "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *See*, *Press Enter. Co. v. Superior Court* (1984), 464 U.S. 501, 509, 104 S.Ct. 819, 78 L.Ed.2d 629, 52 USLW 4113.  Here, the Defendant asks that this evidentiary hearing only be closed.  The press has demonstrated its willingness to sacrifice the rights of the accused for its own First Amendment rights by publishing the "evidence" in the case, thus conducting DONNA M. ROBERTS'S's trial in the media.  *Rideau v. Louisiana, supra.*  Further risks to the fair administration of justice must be avoided.  There can be no "higher values" to "preserve" than "a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth."  *United*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBHURISDOC@AOL.COM

23

*States v. Carolene Products Co.*, 304 U.S. at 152, fn 4.[12]   Here, the Defendant's fair trial rights are within that definition.  Any attempt to seat a jury and then provide a curative instruction would be "very close to an instruction to unring a bell."  *See, United States v. Murray* (6th Cir. 1986), 784 F.2d 188, 189, 20 Fed. R. Evid. Serv. 186.


J. GERALD INGRAM


JOHN B. JUHASZ

---

[12] Media coverage of trial has reached the point where a criminal defendant on trial in a high publicity case is a member of a class "discrete and insular minorities" whose Fourteenth Amendment rights to due process and an impartial jury deserve special constitutional attention. *Id.*, 304 U.S. at 152, fn 4.

**The Tribune Chronicle**
**Warren, OH**
Date: Thu 13-Dec-2001
Publication: TC
Category: MUR
Author: JOHEME
Location: 1A

Man found dead: Police look for suspect
By JOHN GRANT EMEIGH
Tribune Chronicle
HOWLAND -- A Fonderlac Drive home, which displays a "Bates Motel" sign in its front window, was the scene of a bloody crime.
The Howland Police Department reported that **Robert** S. **Fingerhut**, 56, 254 Fonderlac Drive, was found dead of several gunshot wounds just after midnight Wednesday in the kitchen of the home in this quiet, upscale neighborhood located just off of Howland-Wilson Road.
Police Chief Steve Lamantia said the shooting was being treated as a homicide, but investigators had no motive. Lamantia, however, said police are looking to question a man who was not a stranger to the Fingerhuts.
By Wednesday evening, **Fingerhut's** silver 2001 Chrysler, which investigators believe was removed from his home around the time of his death, was recovered in Youngstown with blood in it, Lamantia said. The car was found on Pershing Street around 7 p.m., he said.
The chief also is awaiting the Trumbull County Coroner's report, which will give an exact time of death.
The victim's neighbor, Gloria Venger, said she was surprised when she learned about the act of violence that occurred next door as she slept.
"I was shocked. I could not believe it when they told me. Nothing like this has ever happened here before," said Venger, who has lived in the neighborhood for 21 years.
Just after midnight Wednesday, **Fingerhut's** wife, Donna M. Roberts, 57, called the Trumbull County 911 Center and said there was "a problem" with her husband, police reported.
**Fingerhut** was already dead by the time investigators arrived at the scene, Lamantia said.
No weapon was found at the scene, and there were no signs of forced entry or anything missing from inside the home, Lamantia said. The chief said the victim's wife told police she was returning home from somewhere around midnight when she discovered her husband's bloody body on the kitchen floor.

- 1 -



Lamantia would not say where **Fingerhut's** wife was coming from when she returned home that evening, adding that the case was still under investigation.

**Fingerhut** was the owner of the Greyhound bus stations in Warren and Youngstown.

Venger said she and her husband, Irving, didn't hear anything unusual coming from her neighbor's house.

"I just slept right through it," she said.

Venger said she never knew of any domestic problems or any other disputes going on between the couple. Despite living next to them for the past five years, she admitted she didn't know them that well.

"They more or less kept to themselves," Venger said.

Mark Mijavec, who lives a few houses down from the **Fingerhut** residence, also said he didn't know the couple very well.

"I never interacted with him or his wife. They were usually at work. The only time I'd see him was when he was out cutting his grass," Mijavec said.

Mijavec admitted that he thought the Bates Motel sign was a bit strange.

"I just figured he had an odd sense of humor," he said about the sign, which was the setting for a grisly murder in the Alfred Hitchcock horror movie "Psycho."

Mijavec's mother, Lucille Matsouris, who baby-sits her son's child at his house during the day, said it was unusual to hear about this kind of crime in this quiet neighborhood. Despite the violent nature of the crime, she said she's not worried about her safety.

"It (the shooting) doesn't frighten me because if it wasn't a burglary, it sounds like something personal," Matsouris said.

Reporter Kelli Young contributed to this story.

(BOX)

911 REPORT ON SLAYING IN HOWLAND

Excerpt from the transmission between the Trumbull County 911 Center dispatcher and Donna Roberts just after midnight Wednesday:

DISPATCHER: Are you by yourself?

ROBERTS: No, my husband ...

DISPATCHER: Your husband ...

ROBERTS: He's in the kitchen, on the floor, He's dead!

DISPATCHER: Your husband passed away?

ROBERTS: No! His blood ... please help me!

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 14-Dec-2001
Publication: TC
Category: MUR
Author: JOHEME
Location: 1A

Stolen handgun interests police
By JOHN GRANT EMEIGH Tribune Chronicle
HOWLAND -- The woman whose husband was found shot to death at his home Wednesday reported to the Warren Police Department last month that someone had stolen a gun from her. Howland Police Chief Steve Lamantia said investigators are looking into a report filed by Donna M. Roberts about a stolen handgun. Roberts is the wife of local businessman **Robert S. Fingerhut**, 56, who was found dead of multiple gunshot wounds in his home just after midnight Wednesday. Roberts told police she found her husband dead on the kitchen floor of their 254 Fonderlac Drive house after returning home late that evening. Police have made no arrests, and the shooting was still under investigation as of Thursday evening, Lamantia said. The Trumbull County Coroner's Officer ruled the shooting a homicide Thursday, but would not elaborate. According to the Warren Police Department, Roberts reported Nov. 26 that her .38-caliber Smith and Wesson handgun was stolen from her Nov. 20. The report states an unknown person took the weapon from her purse while she was shopping at a convenience store. Lamantia said police are looking into the missing weapon as part of the homicide investigation but couldn't say how significant the theft will be. "It's hard to tell at this point," he said. The chief said investigators are still awaiting test results on the victim's car, which was found Wednesday evening in Youngstown. **Fingerhut's** silver 2001 Chrysler was reported missing from the crime scene but was found abandoned on Pershing Street about 7 p.m. that day. Police initially reported some blood in the car, but Lamantia wouldn't comment on the condition of the car Thursday until it has been examined.

- 1 -



DEFENDANT'S EXHIBIT
A-2

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 19-Dec-2001
Publication: TC
Category: NSL
Location: 18A

    18AAgencies join murder probe
    HOWLAND -- Police Chief Steve Lamantia said along with Howland detectives, Warren police detectives, Trumbull County Sheriff's office detectives, Ohio Bureau of Criminal Identification and Investigation officials and Ohio State Highway Patrol investigators are part of the task force investigating the death of **Robert** S. **Fingerhut. Fingerhut**, 56, 254 Fonderlac Drive, was found dead of multiple gunshot wounds in his home just after midnight Dec. 12.

- 1 -



**The Tribune Chronicle**
**Warren, OH**
Date: Fri 21-Dec-2001
Publication: TC
Category: NSL
Author: KELYOU
Location: 1A

1ATwo arrested in Howland murder
By KELLI YOUNG
Tribune Chronicle
HOWLAND -- The woman who found Robert S. **Fingerhut's** body on the couple's living room floor and a Youngstown man were arrested in connection with his murder early this morning.

Donna M. Roberts, 57, 254 Fonderlac Drive and Nathaniel Edwin Jackson, 29, of Youngs-town are being held in the Trumbull County Jail. Both are charged with aggravated murder, according to Howland Police chief Steve Lamantia. A jail official said Roberts also is charged with aggravated burglary.

Around 7:30 p.m., police cordoned off Fonderlac Drive, and neighbors said they could see several officers searching the home. Lamantia said that is where police arrested Roberts. Jackson was arrested after midnight Friday but no details were available.

Bassam Rafeedie, 249 Fonderlac Drive, said he was coming home from Youngstown with his wife when he was stopped by the police barrier.

"They were blocking off the road and wouldn't let us into the house," Rafeedie said. He said he could see at least six police cars surrounding the house where Roberts and **Fingerhut** lived.

Roberts made a desperate telephone call to the Trumbull County 911 Center Dec. 12 after finding **Fingerhut** dead of several gunshot wounds on the kitchen floor.

"He's in the kitchen, on the floor, he's dead!" Roberts told the emergency dispatcher the night of the homicide.

No weapon was found at the scene, and there were no signs of forced entry or anything missing from inside the home, Lamantia said.

The chief said Roberts told police she was returning home from shopping around midnight when she discovered the bloody body.

A graveside funeral service for **Fingerhut** was held Dec. 14 at Beth Israel Temple Center.

Although Roberts referred to **Fingerhut** as her husband to the dispatcher, documents from the Trumbull County Recorder's Office dated April 2001 refer

- 1 -



to Roberts as an "unmarried woman." Police officials also have said
**Fingerhut's** family members have indicated the two were not legally married.
Roberts reported her gun was stolen in Warren last month.

- 2 -

5

**The Tribune Chronicle
Warren, OH**
Date: Sat 22-Dec-2001
Publication: TC
Category: CTL
Author: KELYOU
Illustration: P
Location: 3A

3AJudge seals an affidavit in death case
By KELLI YOUNG
Tribune Chronicle
WARREN -- Two people are being held without bond in the Trumbull County Jail in the shooting death of a Howland man, but a common pleas judge sealed a police affidavit detailing information of the crime.

Judge John M. Stuard agreed to seal the affidavit, which includes statements made by police under oath used to secure arrest and search warrants.

Defense attorney J. Gerald Ingram argued releasing the document's details would taint potential jurors.

Nathaniel E. Jackson, 29, 309 S. Pearl St., Youngstown, and Donna M. Roberts, 57, 254 Fonderlac Drive, Howland, face charges of aggravated murder and aggravated burglary in connection with the shooting death of **Robert S. Fingerhut**, 57, whose body was found Dec. 12 on his kitchen floor with multiple gunshot wounds.

The case potentially could become a capital murder case, according to Trumbull Prosecutor Dennis Watkins, who said **Fingerhut's** death was premeditated. A capital murder case means defendants could be eligible for the death penalty if convicted.

Watkins disagreed with the sealing but neither he nor police would release details of the murder.

The Tribune Chronicle has filed a public records request, arguing the document is a public record and should be open to the public.

Jackson, represented by public defender Anthony Consoldane, pleaded innocent to the charges, but Roberts, represented by Ingram, did not enter a plea during the initial appearance. Consoldane decided to seek the sealing of the affidavit after Ingram made the motion.

Roberts lived with **Fingerhut** at the Fonderlac address and worked at the Greyhound bus stations in Warren and Youngstown that **Fingerhut** owned.

Police and prosecutors refused to characterize Roberts' and Jackson's relationship, which apparently is outlined in detail in the sealed affidavit.

- 1 -



DEFENDANT'S
EXHIBIT
A-5

The 30-to 40-page document has letters attached to it, according to Ingram, who said he needed time to look over the lengthy filing, which he described as prejudicial.

Although Roberts has referred to **Fingerhut** as her husband, documents from the Trumbull County Recorder's Office dated April 2001 refer to Roberts as an "unmarried woman." Police officials also have said **Fingerhut's** family members have indicated the two were not legally married. But authorities said they have heard conflicting reports on whether **Fingerhut** and Roberts were married.

Jackson was released from prison Dec. 9 after serving six months for two counts of receiving stolen property. Though police are not releasing a motive, they did say that Jackson was not a stranger to the Howland couple.

Hours after the court appearance, investigators combed through leaves, muddy puddles and litter on the side of Ohio 82 near Howland-Wilson Road searching for the murder weapon.

Jackson appeared in court with his left index finger wrapped with a bulky white bandage. It was his writing hand.

Chief Deputy Ernest G. Cook III called the wound "suspicious" but declined to describe it or how Jackson received the wound.

Consoldane accused police officials of taking pictures of the wound without receiving consent or having a search warrant. But Cook said it is routine for someone to be medically checked when they are arrested. Jackson was arrested at a house on Wirt Street in Youngstown shortly after midnight Friday. Roberts was arrested around 7:30 p.m. at the Fonderlac address.

Jackson, also known as Nathaniel Johnson and Nathaniel Korneagay, has a history in Lorain Correction Institution.

Lidia Hishynsky, administrative assistant at the prison, said Jackson has been incarcerated four times. Hishynsky said Jackson was admitted in January 1992 for aggravated burglary and in February 1996 for having a weapon under disability.

In February 2001, Jackson was admitted for having a stolen 1987 Buick Electra and a stolen license plate in his possesion, according to court documents. He was transferred to Belmont Correctional Institution in March and given a judicial release in May.

After failing to show for work at Dinesol Plastics in Niles, Jackson was taken back to prison in October to serve the remainder of his sentence, being released Dec. 9 -- three days before **Fingerhut** was murdered.

Roberts has been charged with driving under the influence and failure to control her vehicle, according to reports.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Sat 29-Dec-2001
Publication: TC
Category: NSL
Author: RONSEL
Location: 1A

1ASuspects face death: Arraignment scheduled for Monday
By RON SELAK JR.
Tribune Chronicle
WARREN -- A man and a woman who authorities say killed **Robert** S. **Fingerhut** in his Howland home Dec. 12, now face capital murder charges.

The charges contained in Friday's grand jury indictment against Donna M. Roberts, 57, 254 Fonderlac Drive, and Nathaniel E. Jackson, 49, of Youngstown, allege there was prior calculation and design in the murder. That, along with charges that the murder was committed during the commission of another aggravated felony, means the pair would face the death penalty.

Roberts and Jackson each face two counts of aggravated murder with two aggravated burglary and robbery specifications each, and two separate counts of aggravated burglary and robbery.

A Trumbull County grand jury handed up the secret indictment Friday. The two are set to be arraigned Monday before Judge John M. Stuard.

The two remain in the county jail without bond.

**Fingerhut** was found dead of multiple gunshot wounds on the kitchen floor of his Fonderlac Drive home. Roberts called the Trumbull County 911 Center stating she found **Fingerhut** on the floor.

Jackson, who was arrested in a Youngstown house early Dec. 21, pleaded innocent to aggravated burglary and murder charges, but Roberts, who was arrested Dec. 20 at the Howland address, did not enter a plea during their initial appearance Dec. 21.

Roberts lived with **Fingerhut** at the Fonderlac address and worked at the Greyhound bus stations in Warren and Youngstown that **Fingerhut** owned.

Police and prosecutors refuse to characterize Roberts' and Jackson's relationship. Statements on their relationship conflict. Roberts has referred to **Fingerhut** as her husband, however, documents from the Trumbull County Recorder's Office dated April 2001 refer to Roberts as an "unmarried woman." **Fingerhut's** family members have have told police the two were not legally married.

Though police are not releasing a motive, they did say that Jackson was

- 1 -



not a stranger to the Howland couple.

An administrative assistant at the Lorain Correction Institute said Jackson has been incarcerated four times. She said Jackson was admitted in January 1992 for aggravated burglary conviction and in February 1996 for having a weapon under disability.

In February 2001, Jackson was imprisoned for having a stolen a car and a stolen license plate in his possession, according to court documents. After failing to show for work at Dinesol Plastics in Niles, Jackson was taken back to prison in October to serve the remainder of his sentence. Records show he was released Dec. 9 -- three days before **Fingerhut** was killed.

In Trumbull County, Jackson has been arrested for receiving stolen property, unauthorized use of motor vehicles and driving under suspension, according to police reports.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 23-Jan-2002
Publication: TC
Category: BUS
Location: 12B

Greyhound names new manager

WARREN -- Greyhound Bus Lines announces a new manager for its Warren terminal.

Larry Southwick of Warren has replaced the late **Robert Fingerhut**, who was slain at his Howland home last month.

Southwick took over operations Jan. 1, after being offered the position by Greyhound area sales manager Gynnie Smyth, according to a news release. Southwick began working for Greyhound in 1998, serving as an agent at the Warren terminal. He said rumors that the terminal was closing after **Fingerhut's** death are false.

"We are still there, we are still open," Southwick said of the East Market Street terminal.

Southwick said some of his ideas for the terminal include a customer area with cable television and new furniture. The Warren terminal also will be operating under new hours: 8 a.m. through 5:30 p.m. Monday through Saturday, according to a news release.

- 1 -





**SUNDAY, JANUARY 6, 2002**

# Prison calls go unchecked

## Personnel shortage blamed

By CHRISTOPHER BOBBY
and KELLI YOUNG
*Tribune Chronicle*

WARREN — Besides more than 280 love letters, authorities used telephone technology and jail phone-taping techniques to trap a couple accused of a murder conspiracy last month.

But because of insufficient personnel, training and financial support, police and prison officials say it is literally impossible to monitor inmate mail and telephone conversations and prevent a murder, or any crime.

The accused — Donna Roberts of Howland and Nathaniel Jackson of Youngstown — are facing capital murder charges in the Dec. 12 shooting of Roberts' common-law husband, 57-year-old Robert S. Fingerhut.

Roberts and Jackson met two years ago at the Greyhound bus station in Youngstown, where Roberts worked for Fingerhut. A romance began between Roberts and Jackson. Jackson was out of prison at the time, but later was sentenced on a receiving stolen

used to establish probable cause for the two arrests, the letters sent between Roberts and Jackson and tapes of at least 18 telephone conversations between the inmate and Roberts, who received his collect calls from prison, lay out the murder plot.

While serving time in the Lorain Correctional Institution, Jackson was one of about 44,000 inmates in the state prison system, most of whom make collect calls to relatives, lovers, attorneys or clergymen.

Andrea Dean, spokeswoman with Ohio Department of Corrections and Rehabilitation, points out that tapes of phone calls are often used as evidence in criminal cases.

The most common use is to set up a sting operation when someone tries to smuggle drugs into a prison after an inmate already has been targeted in an investigation.

"But to monitor every telephone call would be physically and fiscally impossible, especially at a time when we're laying off staff," Dean said. "We



DEFENDANT'S EXHIBIT
A-8

# Calls

**From Page 1A**

have the capability to listen afterwards. And we have the capability of withholding the phone privileges."

Lidia Hishynsky, an administrative assistant at Lorain Correctional, points out that monitoring usually happens when the prison's investigator receives some kind of tip or flag. Hishynsky, however, declined to give specifics as to how often or how phone conversations are monitored.

"But in the monitoring process, we have to know what to look for," she said.

The same is true for inmate mail, Hishynsky said.

Incoming mail is opened by an automatic machine and searched for contraband or anything outside prison standards. Usually, the only time outgoing

mail is opened is if it looks suspicious, such as being bulky.

"Unless there is some specific reason as to why we should monitor it, the correspondence is not read," Hishynsky said.

She said in order for them to read the mail, the monitors would have to get authorization by the central office.

"We would have to explain why we wanted to read the mail. There has to be a legitimate reason."

Lorain inmates do not have e-mail access.

And in Trumbull County Jail, where the normal population has been about 300 inmates per day, Chief Deputy Ernest Cook III says recorded calls can only be retrieved after a call is made and only through a computer that displays the number to which the collect call was made.

He said it's ridiculous to think of monitoring every call out of the jail.

# Lab

**From Page 1A**

At one workstation, a desktop metal framework supports two suspended wrist slings, allowing a user to glide his or her hands over the keyboard with minimal effort, easing use for operators with multiple sclerosis or other conditions that affect muscle control.

Kent Trumbull officials sought the input of various

ing the handicapped-accessible restroom built within.

And the adaptive technology has already proven useful.

Tony Zampino, a Kent State University graduate and computer analyst at Kent Trumbull, has been using the screen-reading software, which assists sight-impaired operators by reading aloud the contents of anything — from documents to Web pages — to ensure that Kent Trumbull's own Web site is accessible to the disabled.

"During the investigation of

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 860

**The Tribune Chronicle**
**Warren, OH**
Date: Thu 31-Jan-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1A

Letters studied in murder case
By CHRISTOPHER BOBBY
Tribune Chronicle
WARREN -- An attorney for accused murderer Donna Roberts said Wednesday he expects to review more than 280 love letters and hours and hours of prison telephone conversations between Roberts and prison inmate Nathaniel Jackson, a co-conspirator in the murder case.

Roberts and Jackson are accused of planning the murder of Roberts' live-in boyfriend, **Robert Fingerhut** of Howland.

Attorneys John Juhasz and J. Gerald Ingram are defending Roberts. Juhasz appeared in court Wednesday, and Roberts formally signed a time waiver paving the way for a Nov. 18 trial before Common Pleas Judge John M. Stuard.

Stuard also is presiding over Jackson's trial, which is set for Oct. 8.

Juhasz, meanwhile, said he and Ingram must pour over the tapes and letters Prosecutor Dennis Watkins has supplied as evidence of the conspiracy of murder. But they want access to other letters and tapes Juhasz said may prove something else.

Juhasz suggested he may be able to prove his client intended not to participate in any plot to murder.

Roberts of Howland and Jackson of Youngstown are facing capital murder charges in the Dec. 12 murder the 57-year-old **Fingerhut**, a bus station owner whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood in Howland.

He was shot several times, including once in the back of the head and was found with his own unfired handgun near his side.

Prosecutors and police say Roberts and Jackson, an apparent career criminal who was released from prison Dec. 9, plotted the murder in an effort to collect on a $325,000 **Fingerhut** life insurance policy.

The two met two years ago at a Greyhound bus station where Roberts worked for **Fingerhut**, and where the romance started between her and Jackson.

Jackson was out of prison at the time, but later was sentenced on a

- 1 -



receiving stolen property conviction.

According to an affidavit used to establish probable cause for the pair's arrest, the sexually-explicit letters between Roberts and Jackson and tapes of at least 18 telephone conversations between them lay out the murder plot. The calls were made collect from prison and inmate's calls are recorded.

Both defendants have pleaded innocent to charges and remain in Trumbull County Jail in lieu of no bond.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Thu 18-Apr-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1A

Suspect: 'I didn't mean to, man': Howland slaying described
  By CHRISTOPHER BOBBY
  Tribune Chronicle
  WARREN -- In a videotaped statement his lawyers hope to keep out of court, a Youngstown man accused of murder said he and the victim struggled over a gun that the victim pulled out before he was shot to death last December.

When asked directly if he shot **Robert Fingerhut**, defendant Nathaniel Jackson said, "I didn't mean to, man."

Jackson's taped statement was played Wednesday during a hearing before Common Pleas Judge John M. Stuard, who will decide later whether the statement can be used in Jackson's trial.

Jackson, 30, of Youngstown and Donna Roberts, 57, the victim's wife, are charged in the Dec. 12 murder of **Fingerhut**, 57, a bus station owner whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood. Jackson and Roberts could be sentenced to death if convicted.

Both defendants have pleaded innocent and are being held in Trumbull County Jail without bond.

In a sometimes confusing street slang, Jackson described himself as a "hustler" but denied he was capable of murdering a man with whom he used to watch sports on television.

Jackson's public defenders are trying to prevent the prosecution from using the the videotaped statement as evidence, claiming their client wasn't given, or didn't understand, his constitutional rights. Prosecutor Dennis Watkins pointed out to Jackson that he signed a rights wavier and acknowledged signing it on the tape, but the defendant still denied he was ever read his rights.

After defense attorneys James Lewis and Anthony Consoldane called their client as a witness, Watkins tried to show that Jackson had been read his rights several times previously. Jackson acknowledged that he has been arrested more than 20 times.

On the videotape, Jackson was being questioned by Sgt. Paul Monroe, a

- 1 -



DEFENDANT'S EXHIBIT
A-10

Howland detective, and Sgt. Jeff Hoolihan, a Warren detective, who told Jackson that Roberts already had given a statement.

Puffing on a cigarette and wearing a hooded black jacket while sipping on coffee, Jackson said **Fingerhut** picked him up at a Belmont Avenue barbecue in Youngstown and bought $100 worth of marijuana from him. Both of them wound up at the **Fingerhut** home when an argument started.

Jackson said **Fingerhut** first had offered him a job at the bus station and was going to explain the job further.

"I mean, he just may, I mean, it's just like, he just flipped, man, you know what I'm saying, I mean he just, Doctor Jeckyl, Mr. Hyde, you know," Jackson said. "He squeezed on me man."

At that point, Jackson said he did not mean to shoot **Fingerhut**.

Jackson said after the shooting, he took the gun and **Fingerhut's** car and threw the weapon out of the vehicle on the way back to Youngstown before meeting Roberts.

Roberts then got a room at a local Days Inn Motel where Jackson treated himself for a bullet wound that struck his left index finger.

Meanwhile, Roberts is scheduled for a suppression hearing May 17, that is expected to focus on any statement she may have made and a series of love letters she and Jackson exchanged. Jackson's trial is scheduled for Oct. 8, and Roberts is due to stand trial, also before Stuard, in November.

**Fingerhut** was shot several times, including once in the back of the head and was found with his own unfired handgun near his side. Prosecutors and police say Roberts and Jackson, who had been released from prison three days before, developed a relationship and plotted the murder in an effort to collect on **Fingerhut** 's $325,000 life insurance policy.

According to an affidavit used to establish probable cause for arrests, the sexually-explicit letters between Roberts and Jackson and tapes of at least 18 telephone conversations between them lay out the murder plot. The calls were made collect from prison and inmate's calls are recorded.

The two met two years ago at a Greyhound bus station where Roberts worked for **Fingerhut**, and where the romance started between her and Jackson.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 19-Jul-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 5A

Defense to omit speech: Attorneys agree in murder trial
By CHRISTOPHER BOBBY
Tribune Chronicle
WARREN -- Prosecutors and defense attorneys representing the Howland woman charged in the Dec. 12 death of her live-in boyfriend have agreed not to use part of a statement the woman gave to detectives shortly after her boyfriend was shot to death at their Avalon Estates home in Howland.

Attorneys John Yuhasz and Gerald Ingram, representing Donna Roberts, 57, were prepared to challenge the use of the statement in a formal suppression hearing before Common Pleas Judge John M. Stuard.

Instead, assistant prosecutor Chris Becker said the statement -- which is not considered a confession -- will not be used in any upcoming trial since the woman's Miranda rights were violated when she was speaking to two detectives investigating the crime.

Attorneys did not specify what the statement was.

Roberts reportedly told the investigators she probably should not speak any further on advice given to her by Ingram. Further questioning did occur on videotape, however.

Becker said, however, that if Roberts takes the stand to defend herself in her November trial, the complete tape still could be used to discredit any of her testimony.

The defense team is expected to try to suppress other evidence, including taped telephone calls and love letters between Roberts and co-defendant Nathaniel Jackson, who had been in prison prior to the December murder but was released shortly before the crime.

When asked directly if he shot **Robert Fingerhut**, Jackson, 30, of Youngstown said in a videotaped statement, "I didn't mean to, man." He said he and **Fingerhut** struggled over a gun just inside the house.

Jackson and Roberts are charged in the death of **Fingerhut**, 57, a bus station owner whose body was found on the kitchen floor of his home. Jackson and Roberts could be sentenced to death if convicted.

Both defendants have pleaded innocent and are being held in Trumbull County Jail without bond.

- 1 -



Jackson's trial is scheduled for Oct. 8.

**Fingerhut** was shot several times, including once in the back of the head, and was found with his own unfired handgun near his side.

Prosecutors and police say Roberts and Jackson, who had been released from prison three days before, developed a relationship and plotted the murder in an effort to collect on **Fingerhut's** $325,000 life insurance policy.

According to an affidavit used to establish probable cause for arrests, the sexually-explicit letters between Roberts and Jackson and tapes of at least 18 telephone conversations between them laid out the murder plot. The calls were made collect from prison, and inmates' calls are recorded.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Mon 07-Oct-2002
Publication: TC
Category: NSL
Author: CHRBOB
Location: 1A

Howland murder trial set to begin
By CHRISTOPHER BOBBY
WARREN -- As many as 400 prospective jurors have been called in as selection is expected to get under way this week in the capital murder case of a Youngstown man accused of killing a businessman inside his Howland home last December.

The defendant, 30-year-old Nathaniel Jackson, could face the death penalty if convicted. Court officials say it could take up to two weeks to seat a jury in the courtroom of Judge John M. Stuard.

Prosecutor Dennis Watkins and his assistant Charles Morrow along with attorneys with the Public Defender's Office, James Lewis and Anthony Consoldane will be part of the selection process.

Jackson and co-defendant Donna Roberts, 58, are both accused in the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12 in what prosecutors described as a plot to recover as much as $550,000 in life insurance money.

Roberts, **Fingerhut's** companion, whose trial is scheduled for November in the same courtroom, struck up a relationship with Jackson while he was about to be paroled from prison.

It's believed the two met previously at a Warren Greyhound bus station that **Fingerhut** operated and where Roberts worked.

Evidence in the trial is expected focus on a series of sexually explicit love letters exchanged between Jackson and Roberts and more than a dozen phone calls made to a state prison and later recovered by Howland police investigators and the Trumbull County Sheriff's Department.

Prison officials routinely tape phone calls, warning inmates that they are being recordedž

Jackson spoke with detectives after his arrest and in one videotaped statement, admitted he and **Fingerhut** struggled over a gun inside the **Fingerhut** house: "I didn't mean to, man." the defendant told investigators.

**Fingerhut** was shot several times, including once in the back of the head, and was found with his own handgun -- which hadn't been fired -- near his side on the kitchen floor of his home. Jurors will most likely view the home

- 1 -



before opening arguments and testimony gets under way.

Jackson, an ex-convict who has acknowledged being arrested at least 20 times, had been released from prison three days before the murder.

Both co-defendants have pleaded innocent and are being held in Trumbull County Jail without bond.

In a sometimes confusing street slang, Jackson described himself as a "hustler" but denied he was capable of murdering a man with whom he used to watch sports on television, according to his video statements.

The statements were played earlier at a suppression hearing where the defense team was unsuccessful in getting the statements thrown out as evidence.

Jackson said that after the shooting, he took the gun and **Fingerhut's** car and threw the weapon out of the vehicle on the way back to Youngstown before meeting Roberts.

Roberts then got a room at a local Days Inn Motel where Jackson treated himself for a bullet wound to his left index finger.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 09-Oct-2002
Publication: TC
Category: PHO
Author: MICSEM
Illustration: P
Location: 1B

Working on his short game
Jury selection process can last weeks
Attorneys handling capital cases must consider carefully
By CHRISTOPHER BOBBY
WARREN -- A total of 169 prospective jurors Tuesday were told to ignore reports in local newspapers and television stations dealing with the capital murder trial of Nathaniel Jackson.

Common Pleas Judge John M. Stuard, who is hearing the case of the Youngstown man accused of killing a Howland businessman last December, admonished potential jurors to avoid media coverage of the case.

The number of potential jurors being questioned, the case was moved to the larger courtroom of Judge Andrew Logan.

The judge wants to ensure an impartial panel hears the case, in which jury selection is expected to take two weeks and another week of testimony.

All but 60 of the 169 possible jurors were released temporarily and told to call to find out when they would be instructed to return for individual questioning, known as voir dire.

Most of the remaining group of 60 were questioned by the judge, prosecutors and defense attorneys about reasons that might keep them from serving on the panel of 12, plus an anticipated three or four alternates.

Others among the 400 originally in the jury pool didn't show up since they were excused earlier or their addresses have changed and they never received their subpoenas. A few had died since their names were plucked from the list of eligible jurors.

Attorney Terry Swauger was called for jury duty but was expected to be released after explaining that he works part-time for the Public Defender's Office -- the same agency defending Jackson. Another man was released after explaining the trial hours conflict with his college classes at Kent State University.

A woman was released since she was the only one available to care for her 103-year-old father. And the ex-wife of a former mayor was excused after forming an opinion on the case after talking with a co-worker who is married

- 1 -



to one of the investigators.

Jackson, 30, of Youngstown could face the death penalty if convicted.

If he is convicted, jurors would be called back for the second part of the trial, which deals with mitigating circumstances and the penalty.

Prosecutor Dennis Watkins and his assistant, Charles Morrow, along with James Lewis and Anthony Consoldane, attorneys with the Public Defender's Office, are all part of the jury selection process.

Jackson and co-defendant Donna Roberts, 58, are both accused in the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12 in what prosecutors described as a plot to recover as much as $550,000 in life insurance money.

Roberts, **Fingerhut's** companion, whose trial is scheduled for November in the same courtroom, struck up a relationship with Jackson, who at the time was a prison inmate about to be released on parole.

Evidence in the trial is expected to focus on a series of sexually explicit love letters exchanged between Jackson and Roberts and more than a dozen calls made to a state prison and later recovered by investigators with Howland police and the Trumbull County Sheriff's Department.

Watkins has said he and Morrow will use a computerized presentation for some of their evidence, which is to include hundreds of items.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 11-Oct-2002
Publication: TC
Category: NSL
Author: CHRBOB
Location: 2B

Woman wants letters tossed
By CHRISTOPHER BOBBY
WARREN -- A woman charged in what prosecutors call the love-triangle murder of a Howland businessman is trying to get explicit letters thrown out as evidence before her trial.

Attorneys for Donna Roberts say they want to convince a judge to toss sexually explicit love letters between their client and Nathaniel Jackson, accused of being the triggerman. Roberts' trial is set for Nov. 18.

Meanwhile, jury selection for Jackson's trial resumes this morning.

The letters could be the most damaging evidence in both capital murder trials. The cases focus on the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12, 2001, in what prosecutors described as a plot to recover as much as $550,000 in life insurance money.

Prosecutors intend to use the letters and statements Jackson gave to police as evidence in his case, which is being heard by Judge John M. Stuard.

While arguing routine motions before Stuard in Roberts' case, defense attorneys J. Gerald Ingram and John Juhasz and assistant prosecutors Chris Becker and Ken Bailey agreed to hold a suppression hearing Nov. 8 to explore the issue of whether investigators seized the letters properly.

Ingram has said that search warrants were needed and weren't produced at the crime scene to seize letters Roberts wrote to Jackson and letters Jackson, 30, wrote to Roberts, 58. The letters Roberts wrote were found in the trunk of a car. The letters Jackson wrote were found in the home.

Prosecutors are expected to argue that Roberts gave permission to search.

Both sides agreed to allow a handwriting expert analyze the letters.

Other evidence includes more than a dozen telephone calls between the two. The calls were made to a state prison where Jackson was housed. They were later recovered by investigators from the Howland police and Trumbull County Sheriff's departments.

- 1 -



**The Tribune Chronicle**
**Warren, OH**
Date: Sat 12-Oct-2002
Publication: TC
Category: NSL
Location: 12A

Jury selection continues in Jackson trial
Tribune Chronicle
WARREN -- Jury selection resumed Friday in the capital murder trial of 30-year-old Nathaniel Jackson of Youngstown, and prosecutors and defense attorneys qualified 11 potential jurors toward a pool of 35 or 36.

A dozen prospective jurors were questioned between 15 and 30 minutes about their views on the death penalty and whether they would be able to recommend the maximum punishment. Prosecutor Dennis Watkins and defense attorney James Lewis also quizzed the possible jurors on whether they had formed any opinions in the case and if they could put any opinions aside and follow the judge's instructions.

Another 10 potential panel members will arrive Tuesday in the courtroom of Judge John M. Stuard, who is hearing the case. Monday is a holiday, and court is closed.

Jackson and co-defendant Donna Roberts, 58, are accused of plotting a love-triangle murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12. Prosecutors called it a plot by Jackson and Roberts, **Fingerhut's** girlfriend, to gain as much as $550,000 in life insurance money.

- 1 -



**The Tribune Chronicle**
**Warren, OH**
Date: Mon 14-Oct-2002
Publication: TC
Category: NSL
Author: TC
Illustration: M
Location: 1B


Murder trial jury selection continues

Tribune Chronicle

WARREN -- Jury selection will resume this week in the capital murder trial of 30-year-old Nathanial Jackson of Youngs-town.

Last week, prosecutors and defense attorneys qualified 10 potential jurors toward a pool of 35 or 36.

The courtroom of Judge John M. Stuard will be in recess today because of the Columbus Day holiday and will resume on Tuesday. Another 12 potential panel members will be picked this week.

Last week, each of the prospective jurors was questioned between 15 and 30 minutes about their views on the death penalty and whether they would be able to recommend the maximum punishment.

Prosecutor Dennis Watkins and defense attorney James Lewis also asked possible jurors if they had formed any opinions about the case and if they could put those opinions aside and follow the judge's instructions.

Jackson and co-defendant Donna Roberts, 58, are both accused in the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12 in what prosecutors described as a plot by Jackson and his common-law wife, Roberts, to recover as much as $550,000 in life insurance money.


- 1 -


DEFENDANT'S
EXHIBIT
A - 16

**The Tribune Chronicle**
**Warren, OH**
Date: Thu 17-Oct-2002
Publication: TC
Category: NSL
Author: CHRBOB
Location: 2B

Jury panel grows for Jackson trial
By CHRISTOPHER BOBBY
WARREN -- Testimony in the murder trial of Nathaniel Jackson tentatively is set to begin Wednesday. Meanwhile, attorneys on both sides are continuing with jury selection.

Common Pleas Judge John M. Stuard along with Prosecutor Dennis Watkins, assistant Charles Morrow and a defense team of attorneys Anthony Consoldane and James Lewis qualified 27 potential jurors Wednesday toward a needed pool of 36 in the capital murder trial.

By the end of the day, it was decided that jury selection will continue this afternoon with interviews of five or six more potential jurors. Attorneys expect to complete the pool by Friday.

On Monday, attorneys plan to use their final challenges and seat a panel of 12 with four alternates. Monday afternoon, the jury is to be bused to the murder scene.

Jackson, 30, of Youngstown and Donna Roberts, 58, **Robert Fingerhut's** live-in companion who will have a separate trial, are charged in the murder of **Fingerhut**, 57, who was gunned down Dec. 12 in what prosecutors described as a love-triangle plot to get as much as $550,000 in life insurance money.

- 1 -



*18*

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 18-Oct-2002
Publication: TC
Category: BRF
Location: 3B

Murder trial still needs five jurors
WARREN -- Jury selection in the murder trial of Nathaniel Jackson has produced a pool of 30 prospective jurors, and attorneys say another five are needed before a panel is seated Monday.

At least 10 potential jurors will be interviewed in court today to reach that pool of 35.

Testimony in the capital murder trial tentatively is set to begin Wednesday after a jury of 12 and four alternates are seated Monday and view the murder scene later in the day.

Jackson, 30, of Youngstown, and co-defendant Donna Roberts, 58, of Howland, are accused in the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12 in what prosecutors described as a plot by Jackson and the **Fingerhut's** live-in companion, Roberts, to gain as much as $550,000 in life insurance.

Brookfield offers citizen's academy
BROOKFIELD -- The township Police Department will hold its second Citizen's Police Academy in January and its first Junior Police Academy before the end of the year. Police Chief Daniel Faustino said dates will be announced later.

The academies give residents and youngsters an in-depth look at police work. Courses include 911 system operations, hostage situations and negotiations, DUI enforcement, accident investigation, crime scene investigation, evidence collection, community policing, narcotics investigation, weapon familiarization, traffic patrolling, first-aid training and filing a police report.

For more information on the citizen's academy, call the Brookfield Police Department at 330-448-6960.

Man and woman charged in beating
WARREN -- A man and a woman are accused or luring another man to a residence and beating and robbing him early Thursday morning, according to a report from the Police Department.

Cheryl L. Rider, 42, 455 Waverly Ave. N.E., and Dennis Little Sr., 40, 169 W. Chalmer St., Youngstown, each were arrested on charges of robbery, the police report states.

- 1 -



A Leavittsburg man told police he drove a woman he did not know to a residence in the 200 block of Washington Street N.E. As they were entering the home, the victim said a man came up to him and punched him several time and took his wallet and car keys, police reported.

Rider and Little were being held in Trumbull County Jail Tuesday evening on $25,000 bond each.

Trustees continue
clerk interviews

CHAMPION -- Township trustees scheduled an executive session for 4:30 p.m. Monday at the township hall to continue reviewing applications and interviewing the 31 candidates for township clerk.

Trustees this week extended to Wednesday the time current Clerk Thomas Tracey will serve as they continue the selection process.

Tracey submitted his resignation last month because of a conflict with his full-time job.

Fight with woman leads to charges

NILES -- A Fenton Street man is facing two charges of domestic violence after a woman told police he beat her and her sister.

Jay E. Zell, 19, 425 Fenton St., did not enter a plea Thursday in Niles Municipal Court on the two felony charges. He is free on a $5,000 bond. A preliminary hearing is set for 9 a.m. Oct. 23.

According to a police report, an 18-year-old woman told officers she and Zell began arguing over playing the radio about 11:35 p.m. Wednesday. She accused Zell of hitting her in the facing, biting her nose and choking her while she was holding a 7-week-old baby.

A second report said the girl's sister, 17, was punched and had her hair pulled while trying to break up the fight.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Sun 20-Oct-2002
Publication: TC
Category: NSL
Author: CHRBOB
Location: 1A

Victim's heirs go to court over estate
By CHRISTOPHER BOBBY
WARREN -- While Nathaniel Jackson begins fighting for his life this week in a capital murder case and his pen-pal lover Donna Roberts is poised to wage the same battle next month, another skirmish is quietly taking place in probate court.

The probate battle involves a scramble over $550,000 in life insurance payoffs originally left to Roberts from two policies taken out by **Robert Fingerhut**, the man she lived with and the person she and Jackson are accused of killing. Police say the murder was planned so Roberts, 58, and Jackson, 30, could get the insurance money.

Roberts' trial is set to begin Nov. 18 before Judge John M. Stuard, while Jackson's case will begin with opening statements and testimony on Wednesday. The seated jury and alternates are scheduled to view the murder scene Monday.

Roberts was named the sole primary beneficiary of **Fingerhut's** sizable estate, with no other contingent beneficiaries named.

Included in **Fingerhut's** estate was a sizable collection of sports jerseys and memorabilia along with a $250,000 Zurich American Life policy and a $300,000 State Farm insurance policy.

If convicted of the murder charge, Roberts is ineligible to receive any of the proceeds. An attorney involved in the probate case said it is still unclear whether "conviction" means that all appeals must be exhausted.

In the meantime, Michael A. Raymond of Dover, N.H., who is Roberts' son from a previous marriage, and two **Fingerhut** sons from a previous marriage, Michael of Palm Coast, Fla., and Allen of Salisbury, Md., have agreed to a split the money if Roberts is convicted or she signs away any claim to the money.

The **Fingerhut** sons stand to receive 60 percent of the insurance money, or 30 percent each. Raymond would get 40 percent of the money under the agreement that was recently sealed by Probate Judge Thomas Swift after a request by an attorney in the case.

The Tribune Chronicle received a copy of the June 20 agreement before it

- 1 -



was sealed.

Authorities have said Roberts, at some point, struck up a relationship with Jackson, who at the time was a prison inmate about to be released on parole. **Fingerhut**, 57, was found shot to death Dec. 12, 2001, in his fashionable Howland Estates home only three days after Jackson was released from prison.

Evidence in Jackson's trial is expected to focus on a series of sexually explicit love letters exchanged between Jackson and Roberts and more than a dozen calls made to a state prison and later recovered by Howland police and the Trumbull County Sheriff's Department.

Prosecutor Dennis Watkins and his assistant, Charles Morrow, along with James Lewis and Anthony Consoldane, attorneys with the Public Defender's Office, have individually questioned prospective jurors for Jackson's trial.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Tue 22-Oct-2002
Publication: TC
Category: MUR
Author: TRIB
Location: 7B

Jury chosen in murder case
Tribune Chronicle
WARREN -- A jury of 11 women and one man was seated Monday in the capital murder trial of Nathaniel Jackson.
The panel was selected from a pool of 33 who were chosen after individual questioning that started Oct. 8.
Testimony in the trial is tentatively set to begin Wednesday after the jury and four alternates, that includes two men and two women viewed a murder scene in Avalon Estates in Howland.
Jackson, 30, of Youngstown, and co-defendant Donna Roberts, 58, of Howland, are both accused in the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12, 2001, in what prosecutors described as a plot by Jackson and the victim's common-law wife, Roberts, to recover as much as $550,000 in life insurance money.

- 1 -



DEFENDANT'S EXHIBIT A-20

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 23-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 3B

Murder trial to start today
Jackson accused in capital case
By CHRISTOPHER BOBBY
WARREN -- The defense team for accused murderer Nathaniel Jackson, on the eve of opening arguments in the trial, claimed the Youngstown defendant isn't going to be tried before a jury of his peers.

With opening statements set for this morning before Common Pleas Judge John M. Stuard, the defense attorneys on Tuesday moved to have the trial moved out of town as well as to have death penalty specifications dismissed. Stuard denied both motions.

The 30-year-old Jackson and co-defendant Donna Roberts, 58, of Howland, are both accused in the murder of **Robert Fingerhut**, 57, who was gunned down Dec. 12, 2001, in what prosecutors described as a plot by Jackson and the victim's common-law wife, Roberts, to recover as much as $550,000 in life insurance money.

And the case is expected to feature a love affair struck up by Roberts, the live-in companion of the victim, and Jackson a prison inmate. Prosecutors say they will use explicit love letters and telephone conversations taped from a prison phone system to convince jurors.

Jury selection started Oct. 8 and as the panel of 12 and four alternates were seated Friday, defense attorneys Anthony Consoldane and James Lewis renewed an argument that both have made before.

The defense team was claiming that a jury pool made up of those from a registered voter list worked against their African-American client, who wound up with one man and 11 women on the jury and two female and two male alternates -- all of them white.

Prosecutor Dennis Watkins and his assistant Charles Morrow countered with another familiar argument, pointing out that the voter list is more accurate than the state's Bureau of Motor Vehicle listing that other counties use in jury selection. They say addresses are more current and make it easier for the courts to summon prospective jurors into court.

"Your honor, some counties are even returning to the practice of using the voter lists rather than the BMV," Watkins said.

- 1 -



And Stuard agreed that in the final selection of the panel and alternates, no jurors excused from the duty fell along racial lines.

The defense team argued that race wasn't an issue because only one black potential juror was ever individually questioned to form the pool of 33. And that juror was a preacher who admitted that for religious reasons he could not consider the death penalty.

Still, Watkins pointed out that the voter list is as representative and as random as one could hope for. He pointed out that for some reason, three residents from the tiny community of Farmdale wound up being interviewed.

- 2 -



**The Tribune Chronicle**
**Warren, OH**
Date: Thu 24-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1A

Howland officer testifies in trial
By CHRISTOPHER BOBBY
WARREN -- Testimony of Howland detective Paul Monroe was to continue today and possibly the remainder of the week, as prosecutors began piling on what will amount to several hundred pieces of evidence in the murder trial of 30-year-old Nathaniel Jackson.

Prosecutor Dennis Watkins spent nearly an hour in his opening remarks linking Jackson, an ex-convict from Youngstown, to Donna Roberts and her live-in companion and one-time husband, **Robert Fingerhut**.

Jackson, who admitted in a video-taped statement, "I didn't mean to do it," and Roberts, 58, of Howland, are both accused in the murder of **Fingerhut**.

**Fingerhut**, 57, was gunned down Dec. 11, 2001, in what prosecutors described as a plot by Jackson and Roberts to recover as much as $550,000 in life insurance money.

**Fingerhut** operated Greyhound Bus terminals in Youngstown and Warren.

"The plan by Roberts and this defendant originated months before the murder. When he got out (of prison), the plan was to kill," said Watkins, describing a love affair between the two defendants.

"The evidence will show she picked him up from prison," Watkins said. "They got a room at the Wagon Wheel Motel in Boardman. It was Room 101 with a Jacuzzi, a big bed and mirrors. They both checked in. And that's where the plan of death and destruction was made."

Watkins, who's prosecuting the case with Assistant Prosecutor Charles Morrow, said they will use a computer presentation to show jurors portions of love letters written between Roberts and Jackson.

"In one of them, Nate admits he wants a new Cadillac after the murder and after she got insurance money," Watkins said.

Common Pleas Judge John M. Stuard is hearing the case and is scheduled to hear Roberts' trial next month.

Jackson's defense team of attorneys Anthony Consoldane and James Lewis gave a different version of what happened to **Fingerhut**, an avid sports fan and collector of sports memorabilia.

- 1 -



Consoldane, in a brief opening, said **Fingerhut** and Roberts have not been married for awhile. The Avalon Estate's home where **Fingerhut's** body was found was in Roberts name, according to Consoldane.

"The prosecution has no murder weapon. **Fingerhut** had plenty of reason to kill Nate since some letters indicate Nate was moving into the Fonderlac Drive S.E. home. He could have moved in anytime he wanted. **Fingerhut** invited him over," said Consoldane, laying out a scenario of self-defense.

He told jurors that Jackson went to the home and a confrontation developed between him and **Fingerhut**, who was found dead with his own loaded and unfired .38-caliber revolver by his side.

"Our evidence will show and you'll find there was no aggravated murder, no burglary and no robbery," Consoldane said.

Watkins plans to use a series of state criminologists and scientists to link Jackson to shooting **Fingerhut** three times and Jackson being shot once in the finger.

Watkins said a blood smear on the visor of **Fingerhut's** Chrysler that was stolen after the murder will show a mixture of both Jackson's and the victim's blood. Another sample from the car will identify a bleeding Jackson as the only one of among 26 quadrillion people who could have made his getaway in the car.

The car was found on the North Side of Youngstown after Jackson had checked into the Days Inn Motel in Boardman, Watkins said.

Monroe, meanwhile, was testifying about the Cincinnati Reds jacket that **Fingerhut** was wearing when he was shot and how he found an unmarked bullet in the clothing. That bullet traveled from the victim's shoulder to the opposite side of his body. Another shot grazed **Fingerhut** and was found lodged in the wall area leading to the basement.

The fatal blow expected to be described later by forensic pathologist Dr. Humphrey Germaniuk was to the top of the head. A videotape of the scene was played for the 11 women and one man on the jury.

PULLOUT:

Also testifying Wednesday (Day 1)

Paula Carson, a 911 dispatcher, told of fielding a frantic call from Roberts the night of the murder. A tape of the call was played for jurors

James Daniels, a supervisor at Youngstown's Greyhound station, described **Fingerhut**, his boss, as a fun-loving guy who had nicknames for all the workers. "Anytime he had a chance he'd watch all the games on TV," Daniels said.

Jose Sanchez, a Mahoning County deputy who worked off-duty security at the station, showed the jury still photos taken from security cameras that established **Fingerhut** arriving there about 3 p.m. and taking off his coat. Another photo showed **Fingerhut** leaving just before 9 p.m. -- about 30

- 2 -

minutes before the shooting occurred.

Frank Reynolds, another **Fingerhut** employee, testified that the day before the murder he overheard Roberts ask **Fingerhut** for $3,000 and he turned down her request. ''She was shaky and nervous. She gave him the dirtiest look,'' he said.

- 3 -



**The Tribune Chronicle**
**Warren, OH**
Date: Fri 25-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1B

Prosecution laying groundwork in trial        Love letters introduced as evidence

By CHRISTOPHER BOBBY

WARREN -- Two insurance policies totaling $550,000 and a series of love letters were introduced as evidence Thursday in the love-triangle murder trial of a Youngstown man.

Nathaniel Jackson, 30, of Youngstown, is on trial in Trumbull County Common Pleas court in the Dec. 11, 2001, murder of **Robert Fingerhut**, 57, of Howland. The trial of co-defendant Donna Roberts, 58, **Fingerhut's** live-in companion, was rescheduled for April 7, 2003. Later in the trial, lead investigator Detective Paul Monroe will reveal the contents of the letters to jurors.

A handwriting expert is expected to authenticate the sexually explicit letters written by Jackson and found in the **Fingerhut** home and those written by Roberts and recovered from her car, which she used to pick up Jackson when he was released from Lorain Correctional Institute three days before the murder.

Prosecutors say the two insurance policies, both naming Roberts as the beneficiary, are a strong motive for what they label a murder conspiracy.

Prosecutor Dennis Watkins said in opening remarks Wednesday that Jackson was banking on getting a new Cadillac after his lover, Roberts, cashed in the insurance policies.

Monroe spent considerable time in a half-day of testimony Thursday introducing photos of the **Fingerhut** home in Avalon Estates along with pictures of **Fingerhut's** car, which was stolen and found in Youngstown containing blood smears that were tested. More tests were performed on condoms, bloody bandages, a plastic tip from a cigar and other items found in a garbage bag in a trash bin outside a Days Inn in Boardman where Jackson stayed. Monroe also showed receipts listing Roberts as renting a room from Dec. 11-17 for $235.

No one was in the room to Dec. 16 when Monroe and detective Sgt. Frank Dillon showed up and collected evidence.

- 1 -



DEFENDANT'S EXHIBIT
A-23
PENGAD-Bayonne, N.J.

Investigators also introduced records of cell phone calls made from three phones Roberts had. Details of the calls linking her and Jackson are yet to come up in the trial that started with jury selection Oct. 8.

Both defendants could face the death penalty if convicted.

Today's trial highlights are expected to include Jackson's taped confession, in which he describes the 57-year-old **Fingerhut** as a sports fan with whom he watched games in his home. Jackson says on the tape, "I didn't mean to do it," when he describes a confrontation with the victim, a businessman who operated Greyhound Bus terminals in Youngstown and Warren.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Sat 26-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 3B

Jury listens to confession tape    Jackson capital trial continues
By CHRISTOPHER BOBBY

WARREN — In mumbling street slang, Nathaniel Jackson told detectives that he didn't mean to shoot **Robert Fingerhut** last December. He called it self-defense.

The 30-year-old ex-convict from Youngstown facing capital murder charges said he wasn't capable of planning a premeditated type of killing.

The videotaped confession of Jackson was played for the jury Friday morning in the darkened courtroom of Trumbull County Common Pleas Judge John M. Stuard, with Sgt. Paul Monroe, a Howland detective, still on the witness stand.

Jackson and Donna Roberts, 57, the victim's live-in companion, are charged in the Dec. 12 murder of **Fingerhut**, 57, a bus station owner whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood. Jackson and Roberts, whose trial is scheduled for April 7, could both be sentenced to death if convicted.

Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** to try to collect $550,000 in life insurance money.

On the tape, Jackson was being questioned by Monroe and Sgt. Jeff Hoolihan, a Warren detective who told Jackson that Roberts already had given a statement.

Puffing on a cigarette and wearing the same hooded black jacket he's been wearing to court every day this week, Jackson said **Fingerhut** picked him up at a Belmont Avenue barbecue in Youngstown and bought $100 worth of marijuana from him. Both of them wound up at the Fonderlac Drive S.E. home of **Fingerhut** and Roberts when an argument started.

Jackson said **Fingerhut** first had offered him a job at the bus station and was going to explain the job further.

"I mean, he just may, I mean, it's just like, he just flipped, man, you know what I'm saying, I mean he just, Doctor Jeckyl, Mr. Hyde, you know," Jackson said. "He squeezed on me, man."

Trying to reinforce the self-defense claim and fend off allegations of

- 1 -



DEFENDANT'S EXHIBIT A-24

burglary and robbery, defense attorney Anthony Consoldane cross-examined Monroe, who admitted that detectives found no forced entry to the Howland home and **Fingerhut** was found with more than $300 in two of his pockets.

Monday, prosecutors are expected to call Dr. Humphrey Germaniuk to explain findings of the autopsy performed on **Fingerhut**.

Germaniuk, the county's forensic pathologist, reportedly found three wounds on the victim. One shot amounted to a graze. Another penetrated the rear shoulder and exited near the waist on the opposite of the body.

The fatal shot was to the top of **Fingerhut's** head, while prosecutors say he crouched down holding his hand above his head in a defensive posture.

The bullet grazed his hand and toppled end over end for a short distance before entering the skull and brain.

**Fingerhut** was found with his unfired handgun next to his body.

On the tape, Jackson said that after the shooting, he took the gun he had and **Fingerhut's** car and threw the weapon out of the vehicle on the way back to Youngstown before calling Roberts and going to the Days Inn Motel in Boardman.

Roberts then got a room at the Days Inn Motel, where Jackson treated himself for a wound since he shot himself in the left index finger.

Monroe also introduced cell phone records that showed a trace of the calls made between Roberts and Jackson.

BOX

Also testifying Friday for the prosecution were:

Sgt. Frank Dillon, a Howland detective, who told about collecting receipts for the Wagon Wheel Motel and the Day's Inn Motel, both in Boardman. Jackson, identified through a photo lineup, and Roberts spent time at the Wagon Wheel before **Fingerhut** was murdered. Afterward, Jackson checked into the Day's Inn, where Dillon and Monroe went through a trash bin and found blood evidence from the defendant's finger wound.

Sheriff's Sgt. Anthony Leshnack testified about collecting evidence at the crime scene in Howland and drawing a diagram showing the layout of the home.

Sheriff's Detective Rick Tackett told of accompanying local investigators and those with a Mahoning Violent Crime Task Force to Wirt Street in Youngstown, where Jackson was arrested Dec. 21. Tackett found Jackson's tennis shoes, which may have blood and footprint evidence.

Sheriff's Detective Mike Yannucci also went to Wirt Street and inside the house where Jackson was staying, and located leather gloves that prosecutors say were used in the murder. One finger was missing from the left glove and Yannucci said there was blood visible.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Tue 29-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1A

Doctor: Murder victim died almost immediately
By CHRISTOPHER BOBBY
WARREN -- **Robert Fingerhut** had little chance of surviving the last of three gunshots fired at him by an attacker in his home last December.

"One of the wounds would have dropped him like a sack of potatoes. The wound was directly into the brain. Maybe a couple of heartbeats or a couple of breaths," said Dr. Humphrey Germaniuk, Trumbull County's forensic pathologist, who testified most of Monday morning.

The testimony continued the second week in the capital murder trial of Nathaniel Jackson of Youngstown. Jackson, 30, and Donna Roberts, 57, the victim's live-in companion, are charged in the Dec. 12 murder of **Fingerhut**, whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood.

Jackson and Roberts, whose trial is scheduled for April 7, could be sentenced to death if convicted. Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** to try and collect $550,000 in life insurance money.

Germaniuk also said microscopic slides that were eventually returned to him after an autopsy showed traces of gunpowder soot in the head wound and in a wound found on **Fingerhut's** left hand in the "webbing" between the thumb and index finger.

**Fingerhut**, 57, a businessman who operated Greyhound bus terminals in Youngstown and Warren, had no drugs or alcohol in his system at the time he was killed, Germaniuk said. Jackson gave a statement to police that he sold **Fingerhut** $100 worth of marijuana.

Germaniuk testified that he found three wounds on the victim. One shot amounted to a graze on the upper right back. Another penetrated the rear shoulder and exited near the waist on the opposite side of **Fingerhut's** body.

The fatal shot was to the top of **Fingerhut's** head, when prosecutors say he crouched down and held his hand above his head in a defensive posture.

The bullet grazed **Fingerhut's** hand and toppled end over end for a short distance before entering the skull and brain, according to testimony.

- 1 -



**Fingerhut** was found with his unfired handgun next to his body.

Photos of the body showed a laceration to the victim's forehead and an abrasion to the bridge of the nose, wounds Germaniuk called consistent with being beaten by a pistol.

Today, Prosecutor Dennis Watkins said he expects to call a line of forensic scientists with the Ohio Bureau of Criminal Identification and Investigation. The agents and technicians will tell of fingerprints they collected, testing the bullets found at the murder scene, blood and DNA tests performed and handwriting analysis performed on love letters exchanged between Roberts and Jackson when he was a prison inmate up until three days before the murder.

*******BOX*******

Also testifying Monday for the prosecution were:

Trumbull County Coroner Dr. Theodore Soboslay, who testified about reviewing the findings of the forensic pathologist and the autopsy before issuing a verdict of homicide.

Jeff Diamantes, a night front-desk clerk at the Days Inn Motel in Boardman, where Jackson spent time after **Fingerhut's** death. Prosecutors said Jackson stayed there before moving to a home on Wirt Street in Youngstown, where he was eventually arrested. Diamantes showed a Mastercard receipt signed by Donna Roberts, who paid $210 to rent Room 129 for about a week.

Jose Flores, a former manager of the Wagon Wheel Motel in Boardman, where prosecutors say Jackson and Roberts spent the night after she picked him up from prison. Flores later picked Jackson's photo out of a lineup.

John Stamper of Austintown, who told of driving two women to the Days Inn Motel late on Dec. 11 or early Dec. 12. He said two women, himself and Jackson partied. Prosecutors have said Jackson had sex with the woman before trying to rendezvous with Roberts.

Edward Lula, a crime scene technician for BCI who took photos at both motels and collected evidence in the form of fingerprints, hair and blood samples from the Days Inn.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 30-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1A

Expert: Jackson wrote letters
Love notes include plans to shoot victim in head
By CHRISTOPHER BOBBY
WARREN -- An expert handwriting analyst told jurors Tuesday that
Nathaniel Jackson's handwriting was a perfect match to the writing in love
letters sent from Jackson's prison cell to Donna Roberts' post office box.

And portions of the letters appear to damage the defense of the
30-year-old Youngstown man, who faces capital murder charges in the Dec.
11, 2001, shooting death of Roberts' live-in companion **Robert Fingerhut**.

Tuesday's testimony in the courtroom of Trumbull County Common Pleas
Judge John M. Stuard also included a series of Ohio Bureau of Criminal
Identification and Investigation experts, who spoke of things ranging from
ballistics to fingerprints and blood and DNA to the handwriting analysis. But
the letters were the focal point. One letter contained a drawing of a
tombstone.

A second letter from the inmate to Roberts states: "After the funeral we'll
be together." He also referred to "the **Robert** problem."

Three days after Jackson's release from prison, **Fingerhut** was killed when
he was shot three times just inside his Fonderlac Drive S.E. home in
Howland's Avalon Estates neighborhood.

Prosecutors claim Jackson and Roberts, 57, were having an affair and
killed **Fingerhut**, 58, to try and collect $550,000 in life insurance money.

Another passage by Jackson fits perfectly into the scenario that Prosecutor
Dennis Watkins laid out in opening arguments: "We're going to be together
even if I have to come to the house and shoot **Robert** in the f---ing head. This
is how you will believe I love you 100 percent."

**Fingerhut** was shot three times, including once in the head.

Meanwhile, D. Steven Greene, the handwriting expert with BCI, told how
he compared Jackson's writing on a prison employment history with the
sexually explicit love letters sent to Roberts.

With two letters compared, Greene found a left hand slant to certain letters
like "F." He noticed Jackson always uses an upper case "N" and a Greek
style "E." Likewise, Jackson always seems to cross his "T" on top of a

- 1 -



following "h."

Prosecutors are expected today to play tapes of Roberts and Jackson talking to each other over the telephone. The taped conversations were grabbed as evidence at Lorain Correctional Institution, where Jackson was serving time for receiving stolen property. Inmate's conversation are tape recorded.

Portions of the conversations are expected to be played for the jury of 11 women and one man when the prosecution is expected to rest Thursday.

BOX ***************

Others testifying for the prosecution Tuesday in Nathaniel Jackson's murder trial included:

BCI Agent Michael Roberts, a forensic scientist specializing in firearms, who test-fired the loaded and unfired gun found next to **Fingerhut's** body. Roberts ruled that gun out as the murder weapon, afterward finding no comparison in markings or striations with those on the three bullets that struck **Fingerhut**. Those bullets were fired from the same gun, which has never been found.

Cynthia Mayle, a BCI fingerprint expert, who compared and found a match between Jackson's fingerprints and those lifted from a key card envelope at the Days Inn motel in Boardman, where prosecutors say Jackson checked into after the shooting death.

Dale Laux, a serologist with BCI, who testified about obtaining a vile of blood from the victim and then swabs or samples of blood found at the murder scene, inside **Fingerhut's** stolen car and from bloody items inside a trash bin outside the Days Inn.

Brenda Gerardi, a DNA expert with BCI, who said that from all the samples sent to her from Laux mixtures of blood types and DNA that matched both **Fingerhut** and Jackson on the interior trunk latch and the driver's side visor. According to prosecutors, Jackson shot himself in the hand during a struggle inside the Fonderlac home and prosecutors say he touched the visor and the trunk latch, his blood mixing with **Fingerhut's** skin cells.

- 2 -

*97*

**The Tribune Chronicle**
**Warren, OH**
Date: Thu 31-Oct-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1A


Phone tapes ready for murder case
By CHRISTOPHER BOBBY
WARREN -- Several witnesses for the state made quick appearances Wednesday in the capital murder case of Nathaniel Jackson with the prosecution planning a PowerPoint finale for today's proceedings.

Prosecutor Dennis Watkins and his chief criminal assistant, Charles Morrow, are expected to use computerized technology this afternoon to reveal the content of jailhouse telephone calls between Jackson, 30, and his pen-pal lover Donna Roberts, 58, of Howland.

Jackson and Roberts are charged in the Dec. 12 murder of **Robert Fingerhut**, 57, a bus station owner whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood. If convicted, Jackson and Roberts, whose trial is scheduled for April 7, could be sentenced to death. Roberts was **Fingerhut's** live-in companion.

It remains to be seen if the taped calls from Lorain Correctional Institution to Roberts paint a picture of conspiracy. Portions of love letters that Jackson sent to Roberts, which were released in court earlier this week, do reveal a murder plot, according to prosecutors.

Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** to try and collect $550,000 in life insurance money.

Judge John M. Stuard instructed the jury of 11 women, one man and four alternates, to pack an overnight bag when they come to court Monday, when closing arguments are expected. Friday is being reserved for the defense planned by attorneys Anthony Consoldane and James Lewis, who represent Jackson of Youngstown.

Meanwhile on Wednesday, Katherine Thomas, who sold **Fingerhut** most of his State Farm insurance coverage, testified that Roberts was the sole beneficiary for one $300,000 life insurance policy. State Farm also insured **Fingerhut's** cars, rental property and the two Greyhound bus terminals that he operated.

Morrow, under direct examination, brought out that **Fingerhut** took out the coverage and was all vehicles were covered.

Under cross examination, however, Lewis and Consoldane showed that

- 1 -



Thomas was instructed by **Fingerhut** to get policy premium payments from Roberts, who was listed as the owner of all the cars, businesses as well as the house where the murder took place.

BOX ***********

Others testifying Wednesday for the prosecution in Nathaniel Jackson's murder trial included:

Jimmy McCoy, a Greyhound bus driver for the last 25 years, told about being introduced by Roberts to a man named Nate as they were closing the Warren terminal the day of the murder.

Chris Ellington, who owns Final Cut located near the terminal, explained that Roberts brought Jackson in for a haircut after the terminal was closed.

Jill Kenyon, a waitress at Red Lobster in Niles, showed a dinner receipt itemizing the crab-stuffed flounder that Roberts ordered and the king crab legs that Jackson ordered along with drinks, finally leaving the restaurant at 6:43 p.m. on Dec. 11 on the eve of the murder.

Jennifer Robinson, a Days Inn Motel housekeeper, told of cleaning up room 129, where Jackson stayed after **Fingerhut's** murder. She said Howland detectives Sgt. Paul Monroe and Sgt. Frank Dillon showed up soon after to retrieve evidence that was in the room but later pitched in an outside Dumpster.

Kathy Kihm, of Community Corrections Association, introduced seven documents containing Jackson's handwriting and used later as a standard to compare the defendant's handwriting on the prison love letters. CCA is a prison halfway house.

Bridget Paul, a Howland neighbor of **Fingerhut** and Roberts, testified about noticing Roberts driving her car from her home west toward Warren on East Market Street between 9 and 10 p.m. the night of the murder. Paul said she didn't know Roberts personally, but noticed the familiar way she flicked her cigarette ashes from the car window.

Howland Patrolman Jim Campbell testified for chain-of-evidence purposes how he transported a vile of **Fingerhut's** blood and a bullet taken from his brain from the morgue at Forum Health Trumbull Memorial Hospital to Monroe, the chief investigator in the case.

- 2 -

*8*

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 01-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1B

Calls played for jury
Defense scheduled to begin today in murder trial
By CHRISTOPHER BOBBY
WARREN -- Taped telephone conversations played before a jury Thursday revealed that murder co-defendants Nathaniel Jackson and Donna Roberts were involved in a love affair even before Jackson went to prison for a previous offense.

As their case concluded, prosecutors continued to try to show a conspiracy between Jackson and Roberts to kill Roberts' live-in companion, **Robert Fingerhut**.

Portions of 18 calls were played while transcripts were projected on a large screen for jurors hearing Jackson's capital murder case in the Trumbull County Common Pleas courtroom of Judge John M. Stuard.

Prosecutor Dennis Watkins and his chief criminal assistant, Charles Morrow, claim that Jackson, 30, and Roberts, 58, plotted to kill **Fingerhut**, 57, to try and collect $550,000 in life insurance money. Roberts died Dec. 12, 2001, after being shot in the Avalon Estates home he shared with Roberts.

Meanwhile, the defense team of Anthony Consoldane and James Lewis stressed to jurors that they weren't hearing all the conversations, and prosecutors were selecting what was brought out as evidence. Lewis grilled Sgt. Paul Monroe of Howland, the lead investigator in the case, who introduced the tapes.

The defense, which will present its case today, is expected to continue to point out that Roberts is listed as the owner of the Fonderlac Avenue S.E. home where the murder took place. The two leased Chrysler vehicles that also were in her name.

The defense will try and show how Jackson was invited into the home by Roberts since there was no forced entry. And since more than $300 was found on **Fingerhut's** body and since it was Roberts' and not **Fingerhut's** car that was taken, no robbery or burglary took place.

If Jackson could win acquittal on two felonies that accompany the aggravated murder charge, then the case would no longer be considered a

- 1 -



death penalty case.

Among the audio clips played for the jury from Oct. 25, 2001, Jackson tells Roberts that he just received a Dec. 9 (2001) release date from Lorain Correctional Institution.

Jackson: "I'll be home to you. Dec. 9th all the worries will be over, baby.

Roberts: "Oh Nate. You don't have to stay in there all winter?"

Jackson: "No. And you know what."

Roberts: "Oh my God."

Jackson: "You know what, baby."

Roberts: "What, honey."

Jackson: "The next day out, I'm going to ... I already got it in my mind, my mind made up. I'm going to go ahead and do that the next day, OK. All right?"

Roberts: "Oh, I just wrote to you that I didn't think that you really meant it."

Jackson: "What? My mind is made up. My mind made ... I wrote it in my letters, you know what I'm saying, but you know, I don't like to talk too much like that but when I come home, you know what I mean, it's going to be in full detail. OK. I'm going to let you know how I'm going to do it and everything. I'm going to do it for sure the next day."

Later, Jackson and Roberts talk about her picking him up from prison and getting a motel room to celebrate.

In portions of the tapes, a digital voice interrupts to tell the couple they are being recorded, or they only have 60 seconds left to speak.

In a Nov. 22 call:

Jackson: "Just forget about it man, you know what I'm saying, 'cause man, I mean, when a person, man, know what he's doing, man, you know what I'm saying, that's like jinxing, man. You know what I'm saying, I know what I was doing, man. You know what I'm saying."

Roberts: "But what was the story with the trunk and handcuffs, that's too involved."

Jackson: "Just, just, just leave it alone, all right."

Roberts: "It's too involved. You're gonna leave hair, you're gonna leave prints, you're gonna."

Jackson: "Leave it alone, man. Leave it alone, all right. Come on, man. This ain't Perry Mason, man."

Then on Nov. 24, Jackson tells Roberts that DNA evidence is no concern to him.

Later, Roberts tells Jackson that one of her two guns was stolen and she questions whether to report it stolen.

Prosecutors say Jackson waited an additional day to carry out his end of the plan. And his original idea of handcuffing **Fingerhut**, placing him in the trunk of his car, killing him and dumping him somewhere in Youngstown never materialized.

- 2 -

BOX**************
Others testifying Thursday in the trail of Nathaniel Jackson were:

Linda Thomas, the warden at Lorain Correctional Institution, who verified turning over four documents containing Jackson's handwriting to authorities investigating **Fingerhut's** murder.

Chris Monyak, an investigator at the prison, who explained in detail how the MCI telephone system in the prison records all calls. Inmates must give a personal identification number that includes their prison number and a date of birth. The number that the collect call goes to also is recorded.

Ohio State Highway Patrol Trooper Gerry Funelli told how Monyak placed the 18 or 19 calls made by Jackson on a CD and turned over the recording to him. He in turn turned it over to Monroe.

- 3 -

Roberts' name.

Attorneys stressed that Jackson was invited into the home and permitted to drive Roberts' car. If the defense gains acquittals on those two charges, it would take the murder case out of the capital category.

Defense attorneys on Friday used testimony from:

I Brad Cain of Preston Auto Mall, to explain the lease process he used to turn over to Roberts the two late-model Chrysler 200 M autos. He said a bank was the first owner on the lease and Roberts was the second owner on both cars.

I Tammie Kaye, a deputy registrar with Ohio's Bureau of Motor Vehicles, also to confirm the cars and registration were in Roberts' name.

I **Robert** Stanton, chief deputy appraiser for the county Auditor's Office, who said the home at 254 Fonderlac, with a market value of $174,500, remains in Roberts' name. He also said two rental properties in Warren were previously owned by only Roberts before they were recently turned over to new owners.

Prosecutors spent practically no time cross-examining.

the defense witnesses, and instead both sides began the process of agreeing or disagreeing on what physical evidence will be turned over to jurors after they hear closing arguments and listen to instructions, scheduled for Tuesday.

- 2 -



**The Tribune Chronicle**
**Warren, OH**
Date: Sat 02-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 2A


Three testify in Jackson defense
By CHRISTOPHER BOBBY
WARREN -- Defense attorneys for Nathaniel Jackson called just three witnesses Friday in an attempt to eliminate charges that could invoke the death penalty.

The defense team of Anthony Consoldane and James Lewis declined to actually rest their case, saying instead they still may call Sgt. Paul Monroe, a Howland police detective and lead investigator in the case, for more questioning.

Friday's testimony concluded the second week of witnesses in the capital murder trial of Jackson, 30, of Youngstown.

Jackson is charged with aggravated murder, aggravated burglary and aggravated robbery in the Dec. 12, 2001, shooting death of **Robert Fingerhut**, 57, of Howland. Capital murder means that if convicted, Jackson faces the death penalty.

Monroe testified for the prosecution at length about how police believe Jackson and co-defendant Donna Roberts -- with whom Jackson was having an affair -- plotted **Fingerhut's** death to get $550,000 in insurance money. Roberts, 58, was **Fingerhut's** ex-wife but continued to share a home with him in Avalon Estates.

Prosecutors revealed love letters and taped telephone conversations between Roberts and Jackson detailing their affair and plot to kill **Fingerhut**. Roberts also faces murder charges and will be tried separately.

Consoldane and Lewis declined to say what they would ask Monroe, but one thing was clear from their line of questioning Friday: They are trying to show that Jackson did not break into the house prior to the shooting and did not steal **Fingerhut's** car following the shooting.

Those two first-degree felony charges, aggravated robbery and aggravated burglary, are the aggravated circumstances needed for Jackson to face capital murder charges, specifically that the murder occurred during the commission of two other first-degree felonies.

The defense tried to show that both automobiles, including the one **Fingerhut** normally drove, were in Roberts' name and the house also was in

- 1 -



**The Tribune Chronicle**
**Warren, OH**
Date: Sun 03-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1A

Jury readies for final statements
By CHRISTOPHER BOBBY

WARREN -- Restaurant servers, retirees and business managers make up the jury who will be deciding the fate of murder defendant Nathaniel Jackson starting Tuesday.

Jury members will take packed bags to closing arguments on Tuesday. If deliberations run late, the staff of Trumbull County Common Pleas Judge John M. Stuard already made arrangements with nearby Comfort Inn, formerly the Park Hotel, to sequester jurors until they reach verdict in the death penalty case.

Jackson, 30, and his pen-pal lover, Donna Roberts, 58, both were charged in the murder of Roberts' ex-husband, **Robert Fingerhut**, 57, with whom she still shared a Howland home. **Fingerhut** was gunned down Dec. 12 in what prosecutors described as a plot to gain more than $550,000 in insurance money. Roberts will be tried separately.

Prosecutors said that while Jackson was a prison inmate about to be released on parole, he plotted with Roberts to kill **Fingerhut**.

Taped prison telephone calls and sexually explicit love letters exchanged between Jackson and Roberts played a key role in the trial, which started Oct. 8 with a lengthy jury selection.

As far as Jackson is concerned, the key role now is the decisions of the jury that he watched Prosecutors Dennis Watkins and Charles Morrow and defense attorneys Anthony Consoldane and James Lewis individually question and select.

The panel includes 11 women -- most of whom routinely talk among themselves during breaks in the trial -- and one man -- who appears to keep to himself.

If sequestration occurs, the panel will spend one or more nights away from home -- homes that are situated in Leavittsburg, Hubbard, Farmdale, Southington, Cortland, Niles, Masury, two in Brookfield, two in Girard and the remainder in Warren.

At Comfort Inn, the commonly used sleepover in past local capital cases, the lone man on the jury would get his own room. That means one of the

- 1 -



female jurors also would get her own room, while the rest of the female jurors, along with two female alternates and two male alternates, would share rooms.

The judge ordered that rooms cannot have telephones or TV sets.

Stuard's bailiff, Laurie Brown, has already put in a requisition for meals at the Saratoga Restaurant, around the corner from the hotel.

If Jackson is convicted, the jury will deliberate again in the mitigation phase on whether the penalty should be death, life without parole; or a life sentence with parole eligibility after 30 or 25 years.

Jurors include a tall, 65-year-old retiree with an Air Force background who serves as the first alternate and who tends to hold the courtroom door open for the women.

His fellow alternates include two other veterans, including a man and a woman. Another female alternate is an administrative pastor of a local church.

That sole man on the main body of the jury is a 60-year-old retired tool and die maker from General Motors. He sits next to a 24-year-old server at the Olive Garden and a 39-year-old part-time waitress who is married to a truck driver and who has a 12-year-old son.

A 23-year-old Bank One employee, a 38-year-old transfer press operator at Target Stamped Products Corp., a 46-year-old property manager and a case manager with Trumbull County's Job and Family Services round out the first row in the jury box.

In the back row, the retiree sits with another waitress and hostess at Bob Evans Restaurant; a 36-year-old legal assistant; a 41-year-old purchasing manager with four kids who is married to a carpenter; a service manager at Value City Furniture; and a retired bookkeeper from Denman Tire Co.

During the course of the trial, one juror lost a piece of jewelry. It was found by a Courthouse custodian. Another juror put a request in with the judge for timeout to vote on Tuesday if deliberations go late.

Recap box********************

Highlights of last week's testimony in the Nathaniel Jackson murder trial included:

A detailed description by forensic pathologist Dr. Humphrey Germaniuk of how murder victim **Robert Fingerhut** was killed by his attacker. "One of the wounds would have dropped him like a sack of potatoes," the doctor said, describing a bullet wound from a .38-caliber handgun that penetrated the top of the victim's head directly into the brain. Two other bullets -- one that landed in a wall at **Fingerhut's** Fonderlac Drive S.E. home -- were considered nonlethal.

Love letters sent by Jackson to **Fingerhut's** ex-wife, Donna Roberts, were authenticated by a forensic expert with Ohio Bureau of Criminal

- 2 -

Identification and Investigation. "We're going be together even if I have to come to the house and shooting **Robert** in the f–ing head. This is how you will believe I love you 100 percent," Jackson wrote in one letter.

Excerpts of taped prison telephone conversations between Jackson and Roberts were played for jurors while they followed along with projected copies of the transcripts in court. The sexually explicit excerpts revealed a plot to kill the Howland businessman.

- 3 -

ᴐ ᴘ

**The Tribune Chronicle**
**Warren, OH**
Date: Sun 03-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 4A

testimony highlights
Highlights of last week's testimony in the Nathaniel Jackson murder trial included:
n A detailed description by forensic pathologist Dr. Humphrey Germaniuk of how murder victim **Robert Fingerhut** was killed by his attacker. "One of the wounds would have dropped him like a sack of potatoes," the doctor said, describing a bullet wound from a .38-caliber handgun that penetrated the top of the victim's head directly into the brain. Two other bullets -- one that landed in a wall at **Fingerhut's** Fonderlac Drive S.E. home -- were considered nonlethal.
n Love letters sent by Jackson to **Fingerhut's** ex-wife, Donna Roberts, were authenticated by a forensic expert with Ohio Bureau of Criminal Identification and Investigation. "We're going be together even if I have to come to the house and shooting **Robert** in the f—ing head. This is how you will believe I love you 100 percent," Jackson wrote in one letter.
n Excerpts of taped prison telephone conversations between Jackson and Roberts were played for jurors while they followed along with projected copies of the transcripts in court. The sexually explicit excerpts revealed a plot to kill the Howland businessman.

- 1 -



DEFENDANT'S
EXHIBIT
A-31

92

**The Tribune Chronicle**
**Warren, OH**
Date: Tue 05-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1B

Judge denies bid to throw out charges
Murder trial continues in Warren
By CHRISTOPHER BOBBY
WARREN -- Trumbull County Common Pleas Judge John M. Stuard on Monday denied a request by defense attorneys for Nathaniel Jackson to direct a verdict and throw out all charges against the murder defendant.

The judge also said he would not throw out two accompanying felony charges of aggravated robbery and aggravated burglary after the defense team and prosecutors argued over the issue that centered on ownership of the victim's car and home, which prosecutors had said were respectively stolen and entered during the murder.

Stuard told the attorneys that jurors would have to judge any inferences in their deliberations.

"And you are welcome to take up the issue at the appellate level," Stuard said.

The defense maintains murder victim **Robert Fingerhut** picked up Jackson at a Youngstown restaurant and took him to the Howland home where they argued and **Fingerhut** was shot to death. They also contend **Fingerhut** neither owned the car nor house. The prosecution contends that co-defendant Donna Roberts, **Fingerhut's** ex-wife who still lived with him, drove Jackson to the home and let him inside to wait and ambush **Fingerhut**.

Both sides have now rested their cases, but Prosecutor Dennis Watkins said there is about 30 minutes of rebuttal testimony from additional witnesses that would support the state's position that although **Fingerhut** didn't officially own the car or the home -- Roberts did -- he maintained the car and lived in the home.

If the robbery and burglary charges were to be dismissed, Jackson's trial would cease to be a death-penalty case.

Rebuttal witnesses and further haggling over jury instructions were scheduled to take up today's proceedings. Closing arguments have been pushed back to Wednesday, when the jury will be ordered back with overnight bags in case they are sequestered.

One rebuttal witness is expected to testify today that **Fingerhut** got the oil

- 1 -



changed in the car he drove shortly before he was murdered.

Three days after Jackson's release from prison, **Fingerhut** was killed Dec. 12 after being shot three times just inside the Fonderlac Drive S.E. home in Howland's Avalon Estates.

Prosecutors claim Jackson, 30, and Roberts, 57, killed **Fingerhut**, 58, to try to collect $550,000 in life insurance money and continue their love affair.

Roberts is scheduled to stand trial in April.

Defense attorneys James Lewis and Anthony Consoldane argued Monday that Jackson's video statement indicates he was invited in the home. Therefore, the charges other than murder should be dismissed. They said prosecutors failed to prove that Jackson wasn't given permission to enter the home or to drive away in **Fingerhut's** car to make his getaway.

Stuard pointed out, however, that any statements made by Jackson could be considered self-serving and it was unlikely that Roberts would testify in Jackson's case.

- 2 -



**The Tribune Chronicle**
**Warren, OH**
Date: Wed 06-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1B

Arguments scheduled in murder trial
By CHRISTOPHER BOBBY
WARREN -- Prosecutors called three final rebuttal witnesses Tuesday, and jurors are scheduled to hear final arguments and get their instructions today before deliberations begin in the Nathaniel Jackson capital murder case.

Prosecutor Dennis Watkins has reserved more than two hours to deliver his closing, and defense attorneys will need at least an hour to wrap up their case for a jury that first began being selected Oct. 8.

Tuesday though, the 11 women and one man along with four alternates were told by Common Pleas Judge John M. Stuard to pack an overnight bag in case they are sequestered at the Comfort Inn downtown. Some jurors already have inquired about parking arrangements, meals and how long they might consider evidence into the night before calling it a day.

Three rebuttal witnesses testified for about an hour Tuesday. Then Watkins, his chief criminal assistant, Charles Morrow, and the defense team of attorneys Anthony Consoldane and James Lewis started hammering out a long series of instructions that Stuard will read to jurors.

Jackson, 30, and Donna Roberts, 58, the murder victim's live-in ex-wife, are charged in the Dec. 12 murder of **Robert Fingerhut**, 57, whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood. Jackson and Roberts, whose trial is scheduled for April 7, could be sentenced to death if convicted.

Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** to try and collect $550,000 in life insurance money.

Lewis and Consoldane have made a major issue out of the home and car ownership, arguing that robbery and burglary charges should not even be considered. If those charges were stripped away, the case would become a noncapital murder case.

Trying to counter the defense tactic that Jackson was invited into the home where the murder was committed and that he may have had permission to take a car that is formally owned by a co-defendant, prosecutors offered a different version.

Carmen Oliva, a salesman at Preston Auto Mall, said although two

- 1 -



DEFENDANT'S
EXHIBIT
**A-33**

late-model Chry-slers were leased in Roberts' name, it was **Fingerhut** who did all the negotiating on the lease deal. Oliva said that employees at the dealership commonly referred to **Fingerhut** as "Mr. Roberts."

Barry Ricker, also employed at Preston, produced numerous maintenance records including car washes that showed **Fingerhut** normally brought the cars in for repairs, oil changes or washes.

And in an attempt to show that Roberts, along with Jackson, had a motive to kill, prosecutors also called County Recorder Diana Marchese, who explained that more than $100,000 in mortgage payments are still owed on the Fonderlac property, according to her records. Marchese also said two other rental properties in Warren also are not paid off.

Watkins and Morrow have argued that possession and usage, not ownership, accurately portray **Fingerhut** as the victim of robbery and burglary as well as the murder.

As Watkins pointed out in one argument: "Children don't hold ownership to a house, but the law still affords them protection in their homes."

- 2 -

*3T*

The Tribune Chronicle
Warren, OH
Date: Thu 07-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1B


Murder trial jury sequestered
Deliberations to resume today
By CHRISTOPHER BOBBY
WARREN -- Jurors considering the capital murder charges against
Nathaniel Jackson were sequestered Wednesday night after a long day of
listening to closing arguments and detailed instructions.

''This wannabe wanted to be a tough guy, and he killed **Robert Fingerhut
Fingerhut**,'' Charles Morrow, Trumbull County assistant prosecutor, told
jurors following closing arguments by prosecutors and defense attorneys.

Prosecutors claim Jackson, 30, and Donna Roberts, 57, who lived with
**Fingerhut**, 58, were having an affair and killed **Fingerhut** to try and collect
$550,000 in life insurance money.

Roberts is scheduled to be tried April 7 on the same aggravated murder,
aggravated robbery and aggravated burglary charges as Jackson.

Jurors were set to return this morning to the jury room at the rear of
Common Pleas Judge John M. Stuard's courtroom after breakfast at the
Saratoga Restaurant.

The 11 women and one man have more than 300 exhibits and testimony
from 33 witnesses to consider. Also, the jury most likely will weed through
most of the more than 180 love letters and 19 different 10-minute long taped
telephone calls between Jackson and Roberts -- considered key evidence in
the December murder of **Fingerhut**.

Three days after Jackson's release from prison, **Fingerhut**, who operated
Greyhound bus terminals in Warren and Youngstown, died after he was shot
three times just inside his Fonderlac Drive S.E. home in Howland's Avalon
Estates neighborhood.

Prosecutor Dennis Watkins spent considerable time in his closing detailing
how **Fingerhut** and Roberts were not legally married but still held themselves
out as a married couple by living together.

''The balance is in your hands. There is a victim -- **Robert Fingerhut** --
who can't sit in this courtroom today,'' Watkins told jurors.

Watkins and Morrow challenged the jury to read the letters and listen to the

- 1 -



DEFENDANT'S
EXHIBIT
A-34

tapes of the calls exchanged between Jackson and Roberts and then retrieved from the phone system in Lorain Correctional Institution, where Jackson was serving time for receiving stolen property.

Both prosecutors read excerpts from the sexually explicit letters they say spelled out a plot to buy gloves and handcuffs for Jackson so he could kidnap **Fingerhut**, kill him and dump his body somewhere in Youngstown.

"This woman (Roberts) had a pretty good life. She had everything -- legal title to the home and the cars. But she depended on **Robert**," Watkins said. "I don't care who had title!"

Watkins called self-serving the videotaped statement from Jackson, who said he shot **Fingerhut** in self-defense after the victim offered to get him a job and then drove him to the house where a confrontation developed over the love triangle. Jackson said he wrestled a gun away from **Fingerhut**.

Jurors received instructions from Stuard that included that self-defense theory. They will consider that as well as lesser included offenses of murder and manslaughter.

"If **Fingerhut** read those letters, like the defense would have you believe, do you think he would have driven him from Youngstown and tried to get him a job?" Watkins said.

Defense attorneys also had a final turn at the jury.

Attorney Anthony Consoldane told a "cat and mouse" story he has used in court before and how he defined the burden of proof known as reasonable doubt.

And attorney James Lewis took more time to introduce himself to the jury and explain how he, too, served as a prosecutor for 15 years.

"You (jurors) are the most powerful component in the judicial system. You've been given a huge puzzle to put together. Our cross-examinations of their witnesses are nothing sinister. We're trying to get at the whole story," Lewis said.

"I don't care how many letters they write or conversations they had. Most people don't act on that."

"Nate is going along with the flow here. He's getting a haircut from Donna, sex and food at the Red Lobster. He's not going to kill. He's a chicken," Lewis said.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 08-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 2A

Deliberations go on with Jackson case

By CHRISTOPHER BOBBY

WARREN -- A jury continued poring over love letters and jailhouse telephone tapes past midnight this morning in an attempt to decide the fate of murder defendant Nathaniel Jackson.

The second day of deliberations in Jackson's death-penalty case began after breakfast and went well into the night with pauses for meals and cigarette breaks. Jackson, of Youngstown, is charged in Trumbull County Common Pleas Court with the aggravated murder of Howland businessman **Robert Fingerhut**, 57. Fingerhut's ex-wife and live-in companion, Donna Roberts, is a co-defendant whose trial is set for April.

The 11-woman, one-man jury also must decide the accompanying felony charges of aggravated robbery or aggravated burglary.

If they find Jackson guilty of any of the charges, the trial will continue next week into a mitigation, or penalty, phase, during which the jury will recommend a sentence.

Three days after Jackson's Dec. 9 release from prison, **Fingerhut** died after being shot three times just inside his Fonderlac Drive S.E. home in Howland's Avalon Estates neighborhood.

Prosecutors claim Jackson, 30, and Roberts, 58, killed **Fingerhut** to try to collect $550,000 in life insurance money and continue their love affair.

More than 180 letters and the phone calls exchanged between Jackson and Roberts link the two in what the prosecutors called a murder plot. County Prosecutor Dennis Watkins said late Thursday that he wasn't surprised it was taking the jury so long.

"This is the most I have ever had in my career," he said of the evidence. "It is a record amount."

On Wednesday after lengthy closing arguments and jury instructions by Judge John M. Stuard, the jury deliberated from 7:30 p.m. onward.

The 12 jurors, plus four alternates, were sequestered at Comfort Inn downtown.

Thursday, the panel had breakfast at a local restaurant and continued deliberating through a late lunch as they consumed six large pizzas from

- 1 -



Sunrise Inn, including two old world-style, a pepperoni, one veggie, another one with "the works" minus anchovies and another pizza that was half pepperoni and half mushrooms. While waiting for the verdict, the judge periodically read a book about Harry Truman between handling matters in other cases.

- 2 -

*36*

**The Tribune Chronicle**
**Warren, OH**
Date: Sat 09-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1A

Jackson guilty of murder
Death penalty hearing set for next week
By CHRISTOPHER BOBBY
WARREN — A jury deliberated more than 28 hours over three days before finding Nathaniel Jackson guilty of aggravated murder and death-penalty specifications in the death of Howland businessman **Robert Fingerhut**.

Jackson, 30, of Youngstown, showed no emotion Friday while seated at the defense table with his attorney, Anthony Consoldane, as Judge John M. Stuard read the lengthy verdict sheets. The verdict was returned shortly after 6 p.m.

The jury ignored instructions that they could have decided the murder was in self- defense or could have convicted Jackson of the lesser charges of murder or manslaughter.

Stuard instructed the 11 women and one man on the jury, as well as four alternates, to stay home from work until a mitigation, or penalty phase, begins at noon Thursday. The judge told jurors it was important to stay away from and not discuss the case with co-workers and neighbors before next week's deliberations on whether to recommend the death penalty.

Jackson and co-defendant Donna Roberts, 58, were charged in the Dec. 12 murder of **Fingerhut**, 57, a bus station owner whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood. Roberts, whose trial is scheduled for April 7, also could face the death penalty if convicted.

Prosecutors claim Jackson and Roberts, **Fingerhut's** ex-wife and live-in companion, were having an affair and killed **Fingerhut** to collect $550,000 in life insurance money.

"We're just very satisfied with the verdict," said Prosecutor Dennis Watkins, adding that he would reserve any specific comment on the case until after the sentence was decided.

Consoldane, who was assisted in the monthlong trial by attorney James Lewis, said, "This was the worst case of bootstrapping I've ever seen," he said in reference to the added charges of aggravated robbery and

- 1 -



aggravated burglary.

"I could see them convicting Nate of the murder but not the robbery or the burglary. There was no intent to rob or burglarize," Consoldane said.

The defense claims that Jackson broke into the house and made his getaway in **Fingerhut's** car, which was stolen after the murder. The aggravated robbery and aggravated burglary charges committed during the murder made Jackson eligible for the death penalty.

The defense team tried to convince jurors that since Roberts was listed as the owner of the home and both cars driven by the couple, **Fingerhut** had not been robbed and Jackson had permission to enter the house.

The defense pointed out that no forced entry was found at the home and **Fingerhut** was found with more than $300 in his pockets.

Watkins and his chief criminal assistant Charles Morrow used computerized equipment to display jailhouse telephone calls between Jackson and Roberts.

Prosecutors used the taped calls from Lorain Correctional Institution to Roberts and portions of love letters Jackson sent to Roberts to paint a picture of conspiracy.

Officials believe the jury spent considerable time reading over the collection of more than 180 letters and 19 tapes of phone calls.

Jurors were sequestered in a downtown motel for two nights over the deliberations.

- 2 -

7

**The Tribune Chronicle**
**Warren, OH**
Date: Mon 11-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1A


Jackson jury will decide on life or death
By CHRISTOPHER BOBBY
WARREN -- After more than 28 hours of deliberations and two nights of sequestration, the same jury that returned a guilty verdict that included aggravated murder will return this week to consider a penalty for Nathaniel Jackson of Youngstown.

The penalty, or mitigation, phase of Jackson's trial is expected to take up to two days depending on the number of witnesses produced by Jackson's attorneys, Anthony Consoldane and James Lewis.

In past cases, defense attorneys have relied on Dr. Sandra McPherson of Cleveland to interview and test a convicted murderer before outlining their childhood and often their criminal history. McPherson has testified in more than 100 mitigation hearings since the state restored the death penalty in 1981.

Besides McPherson, Consoldane said he expects to find some of Jackson's relatives to testify -- even though none were seen in the courtroom during the trial.

As jurors were told during the selection process that started Oct. 8, they will be called upon to weigh the aggravated circumstances in the murder of **Robert Fingerhut** of Howland against the mitigating factors.

Mitigating factors presented by the defense include McPherson's testimony along with pleas for mercy from defendant's family members.

Jackson could receive any of three possible sentences: the death penalty; life in prison with no chance of parole; or a life sentence with parole eligibility after 25 to 30 years.

Jackson, 30, and Donna Roberts, 57, the victim's ex-wife and live-in companion, are charged in the Dec. 11 murder of **Fingerhut**, whose body was found on the kitchen floor of his home in the fashionable Avalon Estates neighborhood. Roberts' trial is scheduled for April 7.

Prosecutors claimed Jackson and Roberts were having an affair and killed **Fingerhut** in an attempt to collect $550,000 in life insurance money.

Key evidence in the case, besides 33 witnesses and almost 400 pieces of evidence, included more than 180 love letters exchanged between Jackson

- 1 -



and Roberts and 19 different 10-minute tapes that captured telephone conversations between Roberts and Jackson, while he was serving time in Lorain Correctional Institution.

Trumbull County currently has eight convicted murderers on death row, the most recent one being Stanley Adams.

In August 2001, the 35-year-old Adams was found guilty on seven of eight counts connected to the 1999 murders of Esther Cook, 43, and her 12-year-old daughter, Ashley, who was also raped.

- 2 -

58

**The Tribune Chronicle**
**Warren, OH**
Date: Fri 15-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1B

Jurors consider penalty
Jackson's family pleads for his life
By CHRISTOPHER BOBBY
WARREN -- Nathaniel Jackson smiled in court for the first time Thursday as he watched his 7-year-old daughter, Shaylese, testify on his behalf during the penalty phase of his capital murder trial.

Later, Jackson, of Youngstown, stood at the side of the defense table in the courtroom of Trumbull County Common Pleas Judge John M. Stuard and apologized for his actions.

"I know being sorry won't bring him back, but I want to watch my daughter grow up," Jackson told jurors in a plea for mercy.

Thus far, the 30-year-old Jackson has showed little emotion since the trial began Oct. 8. Last Friday, an 11-woman, one-man jury returned verdicts of guilty on all charges after deliberating 28 hours.

He was convicted of aggravated murder, aggravated robbery and aggravated burglary in the Dec. 11, 2001, murder of **Robert Fingerhut**, 57, whose body was found with three bullet wounds on the kitchen floor of his home in the Avalon Estates neighborhood of Howland.

Also charged in **Fingerhut's** death is Donna Roberts, **Fingerhut's** live-in companion and ex-wife. Using hundreds of sexually suggestive love letters and taped telephone conversations, prosecutors convinced jurors that Jackson, who made the calls from prison, and Roberts were having an affair, and Jackson killed **Fingerhut** to try to collect $550,000 in life insurance money.

Roberts, who along with **Fingerhut** operated Greyhound bus terminals in Warren and Youngstown, is scheduled to stand trial April 7.

On Thursday, the jury began the penalty, or mitigation, phase to recommend a sentence. Jackson can receive any of four options: the death penalty, life in prison with no chance of parole or a life sentence with parole eligibility after either 25 or 30 years.

"You would rather visit your son in prison than to visit his grave?" defense attorney Anthony Consoldane asked Jackson's mother, Pauline Korneagay.

- 1 -



His mother and other family members asked the judge and jury to spare Jackson's life. She said her son did well in school but quit in the 11th grade.

Other family members testifying included his half-sister Taushia Korneagay, who said she has four children of her own.

"Nate did a lot for us," Korneagay said. She described her older sibling as a talented artist.

Shaylese -- seated on her mother's lap -- said her father has given her toys and she too wants to continue to see him in the future.

Expert testimony came from clinical forensic psychologist Dr. Sandra McPherson, who detailed what she found while examining and interviewing Jackson beginning in March.

She described the soft, sexy "Southern Belle-like voice" of Roberts that convinced an imprisoned Jackson to carry out the plot to kill **Fingerhut**, an avid sports memorabilia collector.

McPherson said even the tone of Jackson's voice was completely different on the telephone compared to the voice on the videotaped admission that he had shot **Fingerhut**.

"He can't make good decisions on his own. This was a destructive relationship he had with Donna Roberts," the doctor said.

McPherson is an expert who has testified in more than 100 capital murder cases. She acknowledges that she does not believe in the death penalty.

She said Jackson has an IQ of anywhere between 70 and 84, but an anti-social personality disorder and attention deficit hyperactivity placed him at a disadvantage when he took to living on the streets at age 17.

McPherson said there is evidence that Jackson had been shot at least four times, but he tends to be loyal to people he trusts. She pointed out that even today, Jackson has never blamed the murder completely on Roberts.

On cross examination, Prosecutor Dennis Watkins had McPherson admit that Jackson has served four prison terms, has no real mental defect and once threatened to kill a high school teacher.

The jury returns again this morning to listen to brief closing arguments and instructions from Stuard before beginning deliberations.

- 2 -

The Tribune Chronicle
Warren, OH
Date: Sat 16-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 3A

Jury returns death verdict for Jackson
By CHRISTOPHER BOBBY
WARREN -- After smiling Thursday at the sight of his young daughter in the courtroom, Nathaniel Jackson looked dumbfounded Friday after a jury recommend he be put to death.

Jurors filed into the courtroom of Trumbull County Common Pleas Judge John M. Stuard shortly before 4 p.m., after a little more than three hours of deliberation.

None of them looked directly at the standing Jackson. At least three of the 11 women on the jury had tears in their eyes as they watched Stuard read the verdict.

The judge said he would meet with prosecutors and defense attorneys Monday before deciding on a formal sentencing date, which is expected to be in about a week.

Stuard could reduce the sentence.

If he does not, Jackson would become the ninth convicted murderer from Trumbull County to be sent to Ohio's death row.

"I'm just very upset," said defense attorney Anthony Consoldane. "I talked to Nate before the verdict, and I think I prepared him. He didn't say anything to me."

Jackson, 30, of Youngstown, and his pen pal lover Donna Roberts, 58, the murder victim's live-in companion and ex-wife, were charged in the Dec. 12, 2001, murder of **Robert Fingerhut**, 57, a bus station owner whose body was found on the kitchen floor of his home in the Avalon Estates neighborhood of Howland. Roberts' capital murder trial is scheduled for April 7.

Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** to try to collect $550,000 in life insurance money.

Prosecutor Dennis Watkins and his chief criminal assistant, Charles Morrow, used more than 700 exhibits, including more than 200 love letters and 19 10-minute-long taped telephone calls exchanged between Jackson and Roberts to convince jurors, who last week deliberated about 28 hours before finding Jackson guilty.

- 1 -



Following the jury's sentencing recommendation Friday, Watkins called the crime "the worst form of burglary," referring to Jackson being allowed into the home where he waited to ambush **Fingerhut**. **Fingerhut** was shot three times, including a fatal wound in the top of the head directly, into the brain.

Following the mitigation, or penalty, phase, which included testimony from a clinical forensic psychologist, Jackson's daughter and other family members, Consoldane pleaded for a life sentence, saying his client could function in a "more structured environment."

Watkins hammered away at the fact that the last time the ex-convict Jackson was in prison he planned **Fingerhut's** murder.

The jury could have recommended any of four sentences: death, life in prison with no chance of parole or a life sentence with parole eligibility after either 25 or 30 years.

The last person to receive the death penalty in Trumbull County was 35-year-old Stanley Adams, who was found guilty in August 2001 of murdering Esther Cook, 43, and raping and murdering her 12-year-old daughter, Ashley.

Their bodies were found Oct. 12, 1999, in their bloody Dickey Avenue N.W. home in Warren.

- 2 -

*pw*

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 20-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Illustration: P
Location: 1B

Lawyer to plead for killer's life
By CHRISTOPHER BOBBY
WARREN — An attorney for convicted murderer Nathaniel Jackson says he is still poised and ready to argue that his client should not be sentenced to death.

Attorney Anthony Consoldane said he will make oral motions Tuesday afternoon to Judge John M. Stuard to try to spare Jackson's life.

Jackson, 30, faces sentencing at 9 a.m. Dec. 9, and Consoldane said he hopes his arguments will convince Stuard to discard the jury's recommendation of the death penalty and reduce the punishment to at least life in prison with no parole.

Jackson could receive any of four sentences: death, life in prison with no chance of parole or a life sentence with parole eligibility after 25 or 30 years.

A jury deliberated more than 28 hours before finding Jackson guilty of killing Howland businessman **Robert Fingerhut**, 57, who was found shot to death in his Avalon Estates home Dec. 12.

Prosecutors claim Jackson and his pen-pal lover Donna Roberts, 58, were having an affair and killed **Fingerhut** to try to collect $550,000 in life insurance money. Roberts, **Fingerhut's** live-in companion, also faces capital murder charges and is scheduled to stand trial in April.

A week after the jury convicted Jackson, it deliberated another day before recommending the death penalty last Friday.

The jury was asked to weigh the aggravated circumstances of the crime against mitigating factors presented by the defense.

Consoldane said his arguments next week will most likely be along racial lines since Jackson is black and his last death penalty client was also black -- Sean Carter. Carter was convicted of robbing, raping and killing his grandmother, Veader Prince of Southington, in September 1997.

"There are three other defendants in death penalty cases since then that didn't get the death penalty," said Consoldane.

Prosecutor Dennis Watkins, meanwhile, questions Consoldane's arguments at this point in the case. He said proportionality arguments are

- 1 -



DEFENDANT'S
EXHIBIT
A-40

routinely made at the appellate level or in the case of capital crimes at the Ohio Supreme Court, where capital murder cases are automatically appealed.

"Nathaniel Jackson's case is the most documented and proven case of premeditated murder I've ever seen in my career," said Watkins, citing other local capital cases in which white defendants have been sentenced to die and black defendants have been spared the death penalty.

Watkins said mitigating factors in Jackson's case were extremely weak considering the murder was planned over a period of months and while the defendant was serving his fourth prison term. He said Jackson's age also worked against him.

Key evidence in the case, besides 33 witnesses and almost 400 pieces of evidence, included more than 280 love letters exchanged between Jackson and Roberts and 19 different 10-minute long tapes that captured telephone conversations between Roberts and Jackson, who was serving time in Lorain Correctional Institution.

- 2 -

*A*

**The Tribune Chronicle**
**Warren, OH**
Date: Sun 24-Nov-2002
Publication: TC
Category: NSL
Author: CHRBOB
Illustration: P
Location: 1B

Men fight for their lives Men fight for their lives
By CHRISTOPHER BOBBY
WARREN -- With Nathaniel Jackson poised to become Trumbull County's
ninth member of Ohio's death row, the county's first modern-day death row
inmate, Danny Lee Hill, is waging a battle to avoid execution.
Both matters are due to come to a head early next month.
Jackson is scheduled for sentencing Dec. 9 in the courtroom of county
Common Pleas Judge John M. Stuard.
Meanwhile, attorneys for Hill have until Dec. 4 to file their written
arguments in advance of a hearing on the constitutionality of executing a
mentally retarded person.
Hill was 18 years old when he was sentenced to die in the electric chair
after he and another teen, Timothy Combs, were convicted of killing
12-year-old Raymond Fife. The boy was tortured, murdered and mutilated on
Warren's southwest side in 1985. Since then, Ohio has done away with using
its electric chair.
A jury in Jackson's case deliberated more than 28 hours earlier this month
before declaring his guilt in the killing of Howland businessman **Robert
Fingerhut**, 57, who was found shot to death in his Avalon Estates home Dec.
12, 2001.
Prosecutors claimed Jackson and his pen-pal lover Donna Roberts, 58,
were having an affair and killed **Fingerhut** to try and collect $550,000 in life
insurance money.
A week later, the same jury spent half a day hearing mitigation evidence
before recommending the death penalty, which currently in Ohio means lethal
injection.
Defense attorneys for Jackson will argue further Tuesday why he shouldn't
be put to death.
Jackson's defense team of attorneys, Anthony Consoldane and James
Lewis, also were appointed recently by Judge Andrew Logan to represent Hill
in any upcoming hearing -- a proceeding which attorneys are referring to as
an "Atkins hearing," named for the landmark case decided June 20 by the

- 1 -



U.S. Supreme Court.

In that case, the high court set an IQ of 70 as the cutoff point for mentally retarded but also said each case should be viewed individually. Hill's IQ tests varied. Sometimes he tested above 70, sometimes below. Prosecutors maintain that his test at the time of the murder was above 70.

Ironically, Lewis represented both Jackson and Hill at trial.

And in Hill's case, besides the defendant's young age, Lewis argued strongly against the death penalty because of his client's low IQ.

Now, 17 years later, the same arguments and issues are facing Lewis, who said he and Consoldane will be assisted by attorney Gregory W. Meyers, a senior assistant Ohio public defendant.

"At the moment, we still don't have ground rules in place for such a hearing," said Lewis, explaining that the U.S. Supreme Court decision also directed individual states to devise their own procedures for re-examining the cruel and unusual punishment issue facing borderline mentally retarded death row inmates.

"There's no civilized country in the world that executes mentally retarded people," said Consoldane, who like Lewis is a local public defender.

Meanwhile, assistant county prosecutor LuWayne Annos said that most counties that have convicted murderers with "borderline IQs" are awaiting a decision from an Ohio Supreme Court case that was argued Sept. 25 in Columbus.

The case involves a death row inmate named Gregory Lott, who was convicted in Cuyahoga County. Annos said, it's hoped that sound procedures will be put in place by the state Supreme Court in that decision.

- 2 -

42

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 27-Nov-2002
Publication: TC
Category: MUR
Author: CHRBOB
Location: 1B


Lawyers debate death sentence
Judge to decide convicted killer's fate
By CHRISTOPHER BOBBY
WARREN -- Common Pleas Judge John M. Stuard said he will address arguments he heard Tuesday in a written decision to be released Dec. 9 -- the scheduled date for the sentencing of convicted murderer Nathaniel Jackson.

Prosecutor Dennis Watkins and attorneys for Jackson argued over local trends in jury verdicts in recent capital cases, with Watkins arguing that the jury has spoken by recommending the death penalty for the 30-year-old.

"This law of proportionality involves a statewide application, and I don't know if it should be addressed now," Watkins said.

Meanwhile, defense attorneys Anthony Consoldane and James Lewis tried to convince Stuard to reconsider the jury's decision and reduce the sentence to life in prison without any chance of parole.

Judges are allowed to reduce death sentences in Ohio, but Stuard said from the bench that he knows of no other judge who ever reduced a death sentence in Trumbull County.

Consoldane argued that in murder cases involving death row inmates Bernie Lee, Scott Burrows and Ronald Shaffer, each of the defendants broke into homes before killing their victims. And in the case of Burrows and Shaffer, more than one person was killed.

Watkins reiterated that mitigating factors with Burrows and Shaffer included their young ages and the fact that they didn't plan the murders while serving prison time -- as prosecutors claimed Jackson did.

Watkins also cited the case of Ken Biros and pointed out that even though that defendant had no criminal background and the murder may not be considered premeditated, aggravated circumstances allowed a jury to recommend the death penalty.

A jury deliberated more than 28 hours before finding Jackson guilty of killing Howland businessman **Robert Fingerhut**, 57, who was found shot to death in his Avalon Estates home in December 2001.

Prosecutors claimed Jackson and his pen-pal lover Donna Roberts, 58,

- 1 -



were having an affair and killed **Fingerhut** to try to collect $550,000 in life insurance settlement.

Roberts, **Fingerhut's** live-in companion, also faces capital murder charges. She is scheduled to stand trial in April.

After Jackson's conviction and following a mitigation hearing, the jury deliberated another day before recommending the death penalty.

The jury was asked to weigh the aggravated circumstances of the crime against mitigating factors presented by the defense.

Watkins reiterated his claim that "Nathaniel Jackson's case is the most documented and proven case of premeditated murder I've ever seen in my career."

"Mr. Watkins calls every capital case he argues the worst he's ever seen," Lewis said. "Regardless of what he says, a life sentence would be appropriate in this case."

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Sun 01-Dec-2002
Publication: TC
Category: NSL
Author: CHRBOB
Illustration: P
Location: 1B

Detectives took year on murder
Overtime hours secured evidence
By CHRISTOPHER BOBBY

WARREN -- Sgt. Paul Monroe figured he was due for a little "R&R" Nov. 8 after spending the previous 11 months looking for people in the crime-ridden neighborhoods of Youngstown; searching for evidence in a Boardman trash bin; driving the evidence to a state lab in Richfield; running to Mansfield to look for a witness and hauling boxes of reports and more evidence to the third floor of the Courthouse.

Monroe and his partner, Sgt. Frank Dillon, were just doing their jobs as Howland detectives, helping to solve the **Robert Fingerhut** murder case and then helping prosecutors prepare for Nathaniel Jackson's murder trial.

Howland police Chief Steve Lamantia said Monroe and Dillon chalked up more than 100 hours of overtime since the Dec. 11 murder of the 57-year-old **Fingerhut**. The 221.5 paid overtime hours cost the department $4,897 and nearly equaled the 231.5 overtime hours for all detectives working other cases during the same period.

"It's something that's unavoidable though. These cases have to be worked. And really I feel we're blessed around here to have people like Paul and Frank," Lamantia said. "They worked day and night away from their families, especially last Christmas holiday."

The investigators admit the work was well worth it since Jackson was eventually convicted and now faces the death penalty -- the first ever for a Howland murder case.

With the 11-woman, one-man jury deliberating more than 27 hours and working into the late hours of a weekend, Monroe decided his services wouldn't be needed until at least the next day.

"It was sort of relaxing. I was in this deer stand in Liberty. I saw seven deer that night before the cell phone rang. It was Chuck (Morrow, assistant county prosecutor). Wouldn't you know, they had a verdict. I wanted to be there and still had a little time before they brought the defendant from his cell to the courtroom. I asked Chuck if I could show up in my boots, camouflage pants,

- 1 -



shirt and this stupid old hat," Monroe said.

Monroe, however, opted for a quick change routine, barely getting his tie around his neck as the jury filed into the courtroom and Judge John M. Stuard read their guilty verdict.

Between Oct. 8 and Nov. 8, the two detectives put the last-minute touches on the case for Prosecutor Dennis Watkins and Morrow.

Monroe, under the supervision of the prosecutors and prosecutor's investigator Jim Teeple, got to sit at the prosecution table during the crucial testimony and introduction of the all-important chain of evidence, which included up to 800 exhibits.

Lamantia said that while Monroe and Dillon worked on the Jackson case, helping with other township cases were Assistant Chief Carl Compton, Capt. Jim Martin and Sgt. John Rumancik.

"Our patrol officers also covered for them, following up on their own investigations," Lamantia said.

Lamantia and the two detectives also praised the work of crime scene specialists Sgt. Tony Leshnack and Sgt. Pete Pizzulo along with Capt. Gary Bacon and others from the Sheriff's Department who helped in the apprehension of Jackson. Warren Detective Jeff Hoolihan helped to question the defendant.

And the local investigators were backed up by state crime experts, who performed tests in terms of ballistics, blood and DNA evidence along with handwriting analysis.

Dillon said it was a massive undertaking for a community like Howland, which has averaged one murder every 1.8 years over the last 20 years.

It was Dillon who talked Monroe into climbing into a trash bin outside the Boardman motel where Jackson holed up after the murder and after he shot himself in the finger.

"Frank told me something like if he got hurt inside (the bin) I would never be able to carry him out. He naturally would be able to carry me out, so I crawled in with the gloves looking for the bandages and whatever I could find," Monroe said.

He said he and Dillon spent hours on Youngstown's southside looking for witnesses, including a prostitute who never testified but who spent time with Jackson after the murder.

"We couldn't have put this whole thing together without Paul and Frank," said Watkins.

The prosecutor recalled Dillon spending hours editing a seven-hour videotape at the Youngstown Greyhound bus terminal, which **Fingerhut** operated.

Dillon pieced together portions of the tape that showed the victim and failed to show the defendant -- one exhibit that countered what Jackson said

- 2 -

in his taped statement.

The trial featured testimony about the murder itself on Fonderlac Avenue S.E. and the conspiracy prosecutors say existed between the inmate, Jackson, and **Fingerhut's** live-in companion, Donna Roberts, who is scheduled to be tried for the same capital murder charges next year.

The love triangle between Roberts and Jackson was exposed through taped telephone calls between Roberts and the inmate in Lorain Correctional Institution and more than 280 love letters exchanged and depicting the plot that unraveled less than three days after Jackson was released from prison.

"Paul sorted through all those letters, putting them in chronological order helping to develop our case to show the conspiracy," Watkins said.

Roberts, according to prosecutors, was planning to collect $550,000 in insurance money and buy her lover a Cadillac with some of the proceeds.

The triangle parallels another in Howland from a sensational 1988 murder trial. Monroe recalls the case of Marie Poling as one of the first he worked. In January 1988, the woman shot her husband Richard to death as he slept on the couch in their Niles Road S.E. home.

Poling and her lover, Rafael Garcia Jr., whom she met in a nursing home, beheaded the victim and dumped his body off a highway outside of Pittsburgh. The head was discarded about 12 miles away and also was eventually found. Garcia and another co-worker at the nursing home pleaded guilty to non-murder charges and Poling, the 29-year-old mother of three, was sentenced to life in prison in July 1988 following a two-week trial.

- 3 -

**The Tribune Chronicle**
**Warren, OH**
Date: Tue 10-Dec-2002
Publication: TC
Category: CTL
Author: CHRBOB
Illustration: P
Location: 1A

Judge sentences killer to death
By CHRISTOPHER BOBBY
WARREN -- Common Pleas Judge John M. Stuard sentenced Nathaniel Jackson to death Monday, noting that the 30-year-old Youngstown man has never shown any genuine remorse for killing a Howland businessman.

The judge sentenced Jackson to die a year from today. In addition, he tacked on two consecutive sentences of 13 years for aggravated robbery and for aggravated burglary, both with gun specifications.

Jackson showed no emotion when the sentence -- recommended earlier by the jury that convicted him -- was handed down in court.

The case will be automatically appealed to the Ohio Supreme Court.

The jury deliberated more than 28 hours before finding Jackson guilty of killing **Robert Fingerhut**, 57, a Howland businessman who was found shot to death in his Avalon Estates home last Dec. 11.

Prosecutors claimed Jackson and his pen-pal lover Donna Roberts, 58, were having an affair and killed **Fingerhut** to try to collect $550,000 in life insurance money.

Roberts, **Fingerhut's** live-in companion, also faces capital murder charges and is scheduled to stand trial in April.

"Quite simply, in the very setting in which the defense suggests that he could be a productive member (in prison), the defendant defined and refined a plot, involving gloves, a mask and handcuffs, to murder (**Fingerhut**) so that in effect he could assume **Fingerhut's** lifestyle, including running the Greyhound bus business, managing rental properties and living in his home with his ex-wife," Stuard said in his written opinion.

The opinion clearly states that aggravated circumstances outweighed any mitigating factors presented to jurors by the defense.

As he did in an unsworn statement made to jurors last month, Jackson asked the judge to spare his life. He said he was sorry for what happened.

"**Robert Fingerhut** had the absolute right to not have his life taken this way," Stuard said.

Defense attorney Anthony Consoldane reiterated earlier objections critical

- 1 -



DEFENDANT'S EXHIBIT A-44

of Prosecutor Dennis Watkins. Consoldane said Watkins, in his closing statement, made mention of Jackson manipulating the prison system to get out early.

Watkins said he was referring to the four previous times Jackson had been in prison, but Consoldane said jurors could have confused the remark and thought it meant Jackson could get parole even if sentenced to life in prison.

Watkins challenged Consoldane to put his arguments in the form of a written memorandum, but the defense attorney declined.

Jackson was serving time for receiving stolen property when he exchanged more than 280 love letters and telephone conversations with Roberts. The letters and telephone tapes amounted to key evidence for Watkins, who was assisted in the trial by assistant prosecutor Charles Morrow.

Stuard, meanwhile, made no formal reference to a letter given to him by Mike **Fingerhut**, the son of the victim who is a firefighter in Florida. He urged the judge to apply the death sentence.

"Nothing is going to bring my father back to us, this is why justice must prevail. Nate Jackson took a very special person from this world and should not be allowed to live another day," **Fingerhut** wrote. "My father should have been able to live to be an old man. To enjoy life's special moments to come, like having grandchildren."

Also observing the sentence was Jeffrey Wells, 37, of Braceville, who identified himself as a friend of Jackson.

The men confided in each other while in Trumbull County Jail, where they played basketball and talked while in the same jail pod.

"I fault the lady (Roberts) in this. Nate didn't know that guy from Adam. Nate was just a lost person. His family gave up on him. It shouldn't have been a capital case," said Wells, who acknowledged serving six months in the local jail before serving two more months in prison on assault and drug possession charges.

Wells said he will continue to write to Jackson.

- 2 -

**The Tribune Chronicle**
**Warren, OH**
Date: Wed 08-Jan-2003
Publication: TC
Category: NSL
Author: CHRBOB
Location: 1A

New homeowner learns of murder
By CHRISTOPHER BOBBY
Tribune Chronicle
WARREN -- Margaret Pilon thought buying a home in an upscale Howland neighborhood was a good deal.

Before Tuesday's sheriff's sale, the Farmington mother of two used the Internet to research the 2,000-square-foot Spanish style home in Avalon Estates.

"There were more expensive homes in the same area. Good school district. It's near a golf course. I did it as an investment," said Pilon, who became more awe-struck after hearing the home at 254 Fonderlac Drive S.E. was the scene of a 2001 murder.

"You've got to be kidding! The neighbors aren't talking about ghosts or anything are they?" asked Pilon, who plunked down 10 percent of her high bid of $120,000.

Pilon cringed a little after hearing that **Robert Fingerhut** was shot to death in the house Dec. 11, 2001, by Nathaniel Jackson, who has since been tried and sentenced to death row.

"I might be the only one around here who didn't follow the murder case. I follow the Cleveland news," said Pilon, a transplant from the Cleveland suburb of Richmond Heights where she grew up.

A conservative appraisal by sheriff's officials said the house was worth at least $135,000; Pilon estimated the appraised worth to be closer to $150,000. One other man bid her up to $119,500 before bowing out. The bidding started at $90,000.

Metropolitan National Bank of Ohio is assured of getting its $77,315 that is owed on one mortgage along with some minimal court fees and back taxes. Another bank claiming interest might get other money owed on the property, leaving little left to be placed in an escrow account ordered by the court in the name of Donna Roberts -- **Fingerhut's** former wife and live-in companion who is charged as a co-defendant in the murder.

Roberts, 58, faces the same capital murder charges that the 30-year-old Jackson faced. She is scheduled for trial in April.

- 1 -



The home -- along with cars and Greyhound bus terminals in Warren and Youngstown that **Fingerhut** operated -- were in Roberts' name.

Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** in an attempt to collect $550,000 in life insurance.

Evidence in Jackson's trial focused on taped telephone conversations between the lovers while Jackson was in prison. The two also exchanged love letters that were found inside the house and and one of the cars.

**Fingerhut** was shot three times and found in a pool of blood inside the entrance to the home, which has an attached garage.

- 2 -

76

**The Tribune Chronicle**
**Warren, OH**
Date: Thu 27-Feb-2003
Publication: TC
Category: NSL
Author: CHRBOB
Illustration: P
Location: 1B

Defense
seeks to
suppress
letters
By CHRISTOPHER BOBBY
Tribune Chronicle
WARREN -- A defense attorney for Donna Roberts wants the judge in her murder trial to throw out hundreds of love letters exchanged between his client and a co-defendant since the evidence was not seized with a search warrant.

The letters -- and how they were confiscated -- were the subject of a suppression hearing Wednesday before Common Pleas Judge John M. Stuard. He will get written arguments from both sides before deciding if the prosecution can use the letters as evidence in Roberts' trial.

Prosecutors say the sexually explicit letters show a clear murder plot. They say Roberts, 58, and Nathaniel Jackson, a 30-year-old prison inmate, exchanged the letters up until his release from prison more than a year ago and only days before the murder of Howland businessman **Robert Fingerhut Fingerhut**, 57, Roberts' live-in companion.

Prosecutors claim Jackson and Roberts were having an affair and killed **Fingerhut** Dec. 12, 2001, to try to collect $550,000 in life insurance money.

Jackson was convicted as the triggerman in **Fingerhut's** murder, and Stuard sentenced him to death in December.

Roberts also could be sentenced to death if convicted in her trial, which begins April 8.

Roberts' attorney J. Gerald Ingram spent considerable time questioning Howland detective Sgt. Paul Monroe about his initial contact with Roberts, who frantically called 911 after finding her husband shot.

Monroe, the third officer on the scene, said he and other officers found themselves trying to calm Roberts to ask her questions.

"At the time, she was the victim. She was the grieving wife as far as we were concerned," Monroe said.

- 1 -



DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 933

Monroe and his partner, Sgt. Frank Dillon, both testified that Roberts told them to do whatever was needed to track down her husband's killer.

Roberts then left her Fonderlac Avenue S.E. home to stay with a brother and sister-in-law in Austintown while investigators processed her home as a crime scene, police said.

It wasn't until later in the morning that Monroe went to Austintown to have Roberts sign a formal written consent to the search of her house.

Evidence, including the letters, was taken along with other items. The items were contained on an eight-page inventory report.

Assistant prosecutors Chris Becker and Ken Bailey say Roberts' 911 call and her remarks giving verbal permission police to process her house are considered implied consent to search.

"Did she ever say search my car? Did she ever say search my home? Were you aware of the 23 different medications Mrs. Roberts was prescribed? And had she taken any of the medications?" Ingram asked.

Ingram said without the written consent, letters written by Jackson should not have been taken from the master bedroom and letters written by Roberts should never have been taken from her car -- the vehicle prosecutors say she used to pick up Jackson after his release from prison, where he was serving a sentence for receiving stolen property.

Prosecutors in Jackson's trial said Roberts drove Jackson to the house and he ambushed **Fingerhut** just inside the garage door leading to the kitchen. He was shot three times and apparently struggled with Jackson who was shot in the finger.

Tribune Chronicle / R. Michael Semple

ABOVE: Defendant Donna Roberts attends a suppression hearing Wednesday in Trumbull County Common Pleas Court. Roberts faces murder charges in connection with the 2001 death of her live-in companion **Robert Fingerhut**.

BELOW: Roberts looks over legal documents as her defense attorney, J. Gerald Ingram, takes notes Wednesday in court.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 934

DEFENDANT'S
EXHIBIT
A-47

- Police blotters/ **2B**
- Community/ **4B**
- Business/ **5B**
- Stocks/ **6B, 7B**   *4-4-03*

# Local / State

Tribune Chronicle

# Court allowing love letters

By CHRISTOPHER BOBBY
Tribune Chronicle

WARREN — Common Pleas Judge John M. Stuard ruled Thursday that hundreds of love letters will be admitted as evidence in the capital murder case of Donna Roberts.

Roberts' defense team of attorneys J. Gerald Ingram and John Juhasz unsuccessfully sought to keep the letters out of the trial, which is scheduled to start with jury selection Tuesday.

Roberts is accused of working with her lover, Nathaniel Jackson, to plot the murder of her live-in boyfriend, Robert Fingerhut.

Fingerhut was shot to death in his Fonderlac Drive



ROBERTS

home in Howland in December 2001.

At a recent suppression hearing, Ingram argued to have the love letters between Roberts and Jackson, her co-defendant, thrown out as evidence since no search warrant was used by Howland police.

Trumbull County Assistant Prosecutors Chris Becker and Ken Bailey said the sexually-explicit letters show a clear murder plot between Roberts, 58,

and Jackson, a 30-year-old prison inmate. Jackson was released from prison only days before Fingerhut's murder.

Prosecutors claimed Jackson and Roberts were having an affair and killed Fingerhut to try to collect $550,000 in life insurance.

Becker and Bailey argued that an exception to any search warrant existed since the letters were found at what was determined to be a crime scene

and they were collected like any other crime scene evidence.

Selecting a jury could take from one to two weeks and prosecutors and defense attorneys have tentatively approved a formal questionnaire that up to 300 perspective jurors would answer to streamline the selection process.

Jackson was convicted as the triggerman in Fingerhut's murder and was sentenced to death in December, also by Stuard.

## Ju to de on

By CHRIS
Tribune Ch

WAR
Pleas Ju
said he,
if death
Lee Hill
accordir
ment en
day.

The r
argumer
defender
make the

Logar
does not
judicatic
tion clai

The
shed mc
dures to
ing hear

Signs of support



DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 935

**Benefit concert**

Taylor Veisz, killed by a drunken driver in May, will be honored with a benefit concert by members of the Youngstown Playhouse Youth Board. Local, B1

WEDNESDAY
December 12, 2001
35 cents



**Our Good Cook**

Our Good Cook for December is a nurse from Boardman who specializes in tasty dishes created with ease. Food, D1

# The Vindicator

## WAR ON TERRORISM



LEAVING HER MARK: Teresa Lamens writes a message on a temporary memorial cross at the World Trade site in Shanksville, Pa., lot 93 in Shanksville, Pa. Lamens visited the site Tuesday. Tuesday marked the three-month anniversary of the terrorist attack on the World Trade Center in New York City.

## Airstrikes resume



## Afghan fighters: Are they in the fold or in the way?

# Man is found shot dead in home

*The house is in an upscale neighborhood.*

By PEGGY SINKOVICH
VINDICATOR STAFF

HOWLAND — Police are searching for a vehicle stolen from a home where a 56-year-old man was found shot to death early today.

A spokesman from Trumbull County 911 said the man, identified by Howland Police Chief Steve Lamantia as Robert Fingerhut, was found by his wife, Donna Roberts, around 12:25 a.m. in the kitchen of their home at 254 Fonderlac Drive.

Police said Fingerhut's body was near the door that led to the garage. There were no signs of a forced entry, police said. A car owned by the couple is missing, police said, but nothing else appeared to be disturbed.

Lamantia declined to give a description of the missing car.

**911 call:** "According to our records, Donna Roberts called to say that she got home and found her husband," said Tim Gladis, director of the 911 center. "My dispatchers say that the woman was hysterical, and it was very difficult to get information from her."

The 911 officials said they were not sure what had happened to Fingerhut so they dispatched police and ambulances. When police arrived at the scene they found he had been shot.

"He was shot several times," Lamantia said. He said he will not know how many times until an autopsy is complete. A spokeswoman with the Trumbull County Coroner's office said an autopsy is expected to be performed later today.

Police said they believe Fingerhut was shot with a handgun.

Howland Township police and the Trumbull County Sheriff's Department are investigating.

The scene: "At this time we have no suspects," Lamantia said. "There is

See Howland on Page A2

See Terrorism on Page A2

# Gibson's father faces charges



DEFENDANT'S EXHIBIT
B-1
PINKAS-Bayonne, N.J.

*Source: Ohio Board of Regents* | *The Vindicator*

universities that must admit all Ohio applicants who have a high school diploma: YSU, Akron, Cleveland, Central, Shawnee, Toledo and Wright. Six other universities limit admission based on academic preparation:

Bowling Green, Cincinnati, Kent State, Miami, Ohio State and Ohio University.

☐ The full report is available at www.regents.state.oh.us/perkrpt.

---

## r faces charges

know their identities.

**Testing:** Niles Capt. Ken Criswell filed the misdemeanor charges after blood tests revealed that Gibson doesn't have a communicable disease that would increase the charges to felonies. Gibson voluntarily submitted to the testing.

The Ohio Bureau of Criminal Investigation and Identification in Richfield is doing DNA tests on the semen to determine if it is from Gibson. Police expect results in four to six weeks.

Gibson will return to municipal court Feb. 6.

*sinkovich@vindy.com*

---

## upport for term limits

ing term limits for state representatives and senators than Democrats, 60 percent. But more Democrats, 62 percent, oppose an amendment to increase the number of consecutive years served by state legislators, compared to Republicans, 59 percent.

Males were more opposed to eliminating term limits than females, 66 percent to 59 percent, as well as more opposed to a plan to increase the number of consecutive years legislators can serve, 62 percent to 56 percent, the poll results show.

Also, more educated and wealthier people participating in the poll oppose ending term limits and increas-

---

## HOWLAND | Man ✗
## is found shot dead
## in home

*Continued from A9*

a very nice area here, and we have not had trouble here before."

Fonderlac is behind the Butler Institute of American Art's Howland branch in an upscale neighborhood.

There was no one at Fingerhut's home this morning. There were, however, several lights on inside the ranch-style home.

Neighbors say Fingerhut and Roberts lived in the house for about 2½ years and did not have any children.

Fingerhut managed the Greyhound bus stations in Warren and Youngstown, police said.

Neighbors also reported hearing gunshots in the area around 8:30 a.m. Tuesday. Lamantia said this morning, however, that he believes the gunshots may have been someone shooting birds near the Avalon golf course. "We are investigating that at this time," the chief said.

According to *Vindicator* articles, Fingerhut and Roberts had operated a restaurant called "Just the Ticket" inside the WRTA terminal on Federal Plaza. That restaurant is now closed.

*sinkovich@vindy.com*

12/12/01




COM
Pri
COMPUTERS $199 MO
Compu
New & Used Com
New & Used S
SPECTRUM
2731 Robl
NILES, OHIO


ONE-DAY G
3690 W. LIBERTY (R
Hubbard


Computer Cu
Vinyl Signs
○ Banners
○ Buttons
○ Magnets
○ Vehicle Lettering
○ ADA Signs
○ Dimensional Let
○ Sandwich Board

# [illegible]
## car of man
## found slain

*The wife of the victim reported to police that her gun was stolen Nov. 26.*

By PEGGY SINKOVICH
VINDICATOR STAFF WRITER

HOWLAND — Authorities were combing a car for clues today in the killing of a 56-year-old Howland man.

Township Police Chief Steve Lamantia said the silver Chrysler missing from the home of Robert Fingerhut was found around 6:30 p.m. Wednesday on [illegible] Street in Youngstown.

There was blood inside.

"We are processing the car now in hopes of finding some clues," Lamantia said. "We still do not have a motive. We are trying to piece this together."

Fingerhut was found shot to death inside his home at 254 [illegible] Drive around 12:25 [illegible] Wednesday.

Donna Roberts, Fingerhut's wife, told call-takers at the emergency 911 center that she discovered her husband's body when she came home.

Roberts was hysterical when she

See Killing on Page A2



The Vin[dicator]

[illegible] Maria Rosario Romano says she feels let down b[y] [illegible] after two men charged with her kidnapping and shooting w[ere]

## [illegible] SCHOOLS
## [illegible] object to state's [illegible]

[illegible] to [illegible] based on a standardized test all students take

By [illegible] GIVIN
[illegible] BUREAU

[illegible]GE, Pa. — Hermitage [illegible] directors aren't impressed [illegible] [illegible] plan to place a state [illegible] on the diplomas of high school [illegible] exhibit a certain aca-

demic proficiency.

"It's a bad idea," di[rector] Lumpp said at Wedne[sday] board meeting, urging [illegible] take a stand against it.

The proficiency rati[ng] one test taken by all ju[niors]





- Unlim[ited]
- Transf[er]
- Make [illegible]

Unli[mited]

* Requir[ed]

VINDI   12/13/01

DEFENDANT'S
EXHIBIT
B-2



ng U.S. bomb-

*e*

*es*

n sent to
lker.

nistan — U.S.
amatically to-
bal fighters
und assault
ida forces af-
rorist leaders
Laden's be-
for neighbor-

bin Laden re-

nanders of the
nce said they
for Al-Qaida
surrender at

12/13/01

difficult negotiating climate.
"I didn't want to see it get that far.
I really wanted to work something

## KILLING | Police  search automobile of Howland man found slain

Continued From A1

called 911 and
was not able to
give many details,
911 officials said.

On the tape of
the call, Roberts
said her husband
was on the
kitchen floor and
she did not find
any weapons.

Police said Fin-
gerhut's body was
found near a door leading to the
garage.

There were no signs of a forced en-
try, police said. Fingerhut was shot
several times.

The Trumbull County coroner's of-
fice said an autopsy was performed
Wednesday. Results are pending.

Police believe Fingerhut was shot
with a handgun.

Township police obtained a copy
of a report filed Nov. 26 by Roberts
with Warren police. According to
that report, Roberts said her hand-
gun was stolen while she was at a
convenience store in Warren.

Lamantia declined to say why his
department was interested in that
report.

Ponderac Drive runs behind the
Howland branch of the Butler Insti-
tute of American Art in an upscale
neighborhood.

Neighbors say Fingerhut and
Roberts lived there about 2½ years
and did not have any children.

Fingerhut managed the Grey-
hound bus stations in Warren and
Youngstown, police said.

Employees of the bus stations de-
scribed him as a nice man.

According to Vindicator files, Fin-
gerhut and Roberts formerly operat-
ed Just the Ticket, a restaurant inside
the Western Reserve Transit Author-

Lamantia

## VICTIM | ( kidnapping

Continued From A1

"I offered to gi
fered to give him
she said. "I just b
hurt my kids."

Shot in hip: ins
her in the left hi
through her abdo
right hip, shatteri
bone.

When she aske
he shot her, the m
the second shot m

What followed
deal during which
children were tak
on Glenwood Ave
nappers telepho
and demanded $1

The family was
a gas station in
free. Police found
the 7-year-old c
nearby pay phone
not paid, Romano

The true myster
still does not und
was targeted. Unti
never had a reaso
was in danger, she

Last week, a ju
County Common F
ted Jose Placeres a
lez, who were acc
in the crimes. Th
mano dumbfound

"I can't believe
those people go,
youngest child, a g
next to her on the

Two suspects
Gonzalez nor Plac
to be the one w
napped and shot
children. That mar
tified or arrested.
saw his face but di

HERMITA



FRIDAY
December 21, 2001
www.vindy.com
35 cents

Arge

Argenti
do De la
driven a
econom
civil un

# The Vindicator

Operation Eagle
Several Lakeview High School
students are lending a hand to
Operation Christmas Eagle, a
gift-raising drive a fellow stu-
dent helped to start. Local. B1.

## ATTACKS/RECOVERY EFFORTS

# Payout amounts draw ire

*The official in charge of the plan said the award formula is to
to narrow the gap between those who made a lot of money
and those who didn't make much.*

NEW YORK — The federal gov-
ernment ruled Thursday that it will
pay an average of $1.6 million to
families of Sept. 11 victims — a fig-
ure that one angry widow said was
"a sick joke."

Special Master Kenneth Fein-
berg, who is in charge of the fed-
eral plan for the victims, released a
formula for calculating the gov-
ernment's compensation for the
3,225 people who died in the terror

attacks on the World Trade Center
and the Pentagon.



ALTERED SKYLINE: Some of the first to
be glad that a known draws
saw the 102th day since the attacks.
A trip to see where the Statue of Liberty

## HOWLAND

# Wife
# charged
# with
# murder

*The victim was found shot to
death Dec. 12 in his kitchen.*

HOWLAND — Police charge Don-
na Roberts with conspiracy to aggra-
vated murder and a Youngstown
man with aggravated murder in the
death of her husband, Robert Fin-
gerhut.



## TOYS FOR TOTS TAKES FLIGHT

# When sleigh
# and reindeer
# just won't do

Santa arrives at Youngstown-
Warren Regional Airport to pick up
gifts donated by people in

DEFENDANT'S
EXHIBIT
B-3

## LOUD | Facing the music again

Continued From A1

his fourth conviction. The judge fined him $600, sentenced him to 60 days in jail, suspended 45 days and ordered Adams to spend weekends in jail for the remaining 15 days.

Municipal Judge Robert P. Milich placed Adams on two years' nonreporting probation in June for his fifth loud-music conviction. The judge fined Adams $400, gave him 60 days in jail and suspended them all.

Probation violation: Adams' fifth conviction was a violation of his probation to Judge Douglas. When a probation violation occurs, a judge can impose the entire suspended jail time.

His sixth loud-music case has been pending in Judge Douglas' court since July.

The judge said Thursday that there was a constitutional challenge to the charge and he has taken the case under advisement and not reached a decision.

A sixth conviction would mean that Adams has violated his probation to Judge Douglas for the second time and violated his probation to Judge Milich.

Ordinance language: The city ordinance, meanwhile, was revamped in February to require that police hear the loud music at least 50 feet from the vehicle.

The ordinance says that a judge may order forfeiture of the sound equipment on the first or second offense but must order forfeiture on third and subsequent offenses. There's no record to indicate that Adams was ordered to forfeit his sound equipment.

For second and subsequent loud-music offenses, a judge may impose up to 60 days in jail.

Fines for a first offense are $50 to $250. A second offense nets a mandatory fine of $500. For third and subsequent offenses, the mandatory fine is $600.

Latest arrest: Adams' seventh arrest on a loud music charge took place Wednesday on the city's South Side.

Patrolmen Matt Willis and Brad Blackburn heard loud music coming from Adams' Chevrolet Caprice as he drove north in the 3200 block of Market Street. Adams pulled into a gas station and the officers approached, telling him to turn down the music.

A check by the officers through the index operator downtown revealed that Adams has no driving privileges. His license is under suspension for failure to have insurance.

Adams appeared for arraignment Thursday in municipal court on charges of driving under suspension and loud music.

Judge Douglas released Adams on his own recognizance and set a pretrial for Feb. 27 in Judge Milich's court.

Municipal court records show the disposition of Adams' earliest loud-music cases:
- Nov. 17, 1999 — $100 fine by Magistrate Lynn Sfara Bruno.
- Dec. 21, 1999 — $300 fine by Magistrate Andrew G. Bresko.
- March 20, 2000 — $200 fine by Sfara Bruno.

nmeede@vindy.com

## SHOT | Wife charged in murder



Continued From A1

give specifics about the arrests.

Roberts called 911 on Dec. 13 to report that she found her husband's body when she returned home.

Police said that it did not appear that anyone broke into the home but that a car belonging to Fingerhut, 57, had been stolen. The car was found Dec. 13 on Pershing Street.

What's suspected: Police believe Fingerhut was shot with a handgun.

Township police obtained a copy of a report filed Nov. 26 by Roberts with Warren police. According to that report, Roberts said her handbag was stolen while she was at a convenience store in Warren.

Fonderlac Drive runs behind the Howland branch of the Butler Institute of American Art in an upscale neighborhood. Neighbors say Fingerhut and Roberts lived there about 2 1/2 years and did not have any children.

Fingerhut managed the Greyhound bus stations in Warren and Youngstown, police said.

According to Vindicator files, Fingerhut and Roberts formerly operated just the Ticket, a restaurant inside the Western Reserve Transit Authority bus terminal at Federal Street and Fifth Avenue in downtown Youngstown.

nink@vindy.com

Here's the

### COURTS

MAHONING CO

Divorces asked
Ronald J. Ragen, 6
Susan L. Ragen,
Court, Austintow
David Pavelko, 422
Sharon A. Pavelk
Boardman.
Dissolutions asked:
Ahmad Kassim, 116
Manal Kassim, 55
tintown.
New complaints
Mahoning County
al. taxes, assess
foreclosure and
Mahoning County
et al. taxes, asso
est. foreclosure
Mahoning County
McIntyre et al, t
and interest, for
Tonja Delaine vs.
Elizabeth Brahler
ev.

### BIRTHS

St. Elizabeth
Keltaska Kenned
wood Ave., Your
Michelle Guerrier
Dama Ave., Aus
North Lima, bo
Randall and Dear
North Lima, bo
Michael and Ste
Main St., Colum
Robert and Kelle
Ave., Austinton
Forrest Health Re
Dr. Ed and Karen
Columbiana, bo
Tamika Berger a
son Ave., Youn
James and Kelly
Youngstown, b
Juan and Deidre

### LOTTERY

THURS

Night drawi
Pick 3, 3-0-0
Pick 4, 6-5-4
Buckeye 5, 3
Day drawing

Summary of p
BOARDMAN
Dec. 7
Arrest: A 23-ye
rested in the
on charges of
Arrest A 46-ye
rested in the
Road on char
Arrest: A 51-yea
rested on U.S.





**Bear factory**
Thanks to Terri Dance's Life
Skills class, Mahoning County
deputy sheriffs have collected
96 handmade bears — so far.
Local, B7

**SATURDAY**
*December 22, 2001*
www.vindy.com
35 cents

# The Vindicat

## WAR ON TERRORISM

### HOTLAND SLAYING

# Bond is delayed for jailed suspects

*Both suspects remained quiet during the hearings.*

By TODD FRANKO and
JOHN GOODALL Vindicator Staff

WARREN — The
county prosecutor
says two teenagers accused of
killing a 57-year-
old Hartland
Township man
could face the
death penalty.



Prosecutor Dennis Watkins said
Donna Roberts, of Bri Dorice Drive, Howland, and
Nathaniel Jackson,
29, of West Street,
Youngstown, face
aggravated murder
and an aggravated-
burglary
charge. Court officials said the
case could be presented to the
grand jury when Roberts there is sufficient evidence to let the jury
decide the charges.

There are accused to be aaron
Jackson, to set a hearing.

Jackson could face the death
penalty in about six. Judge John
learned of a mistrial county judge
Paula Court but is not listed.



DANGEROUS GROUND: Navy Petty Officer Scott Bryant of Enumclaw, Wash., walks past a minefield that almost
Afghanistan, he was photographing some of the mines just behind the barbed wire Friday.

# U.S. destroys co

*Tribal leaders streamed into Kabul for the inauguration of an interim government.*

WASHINGTON — U.S. helicopter gunships
and fighter jets attacked a large convoy of
Taliban leaders and the command compound
they were leaving in eastern Afghanistan, Defense Secretary Donald H. Rumsfeld said Saturday.

The Pentagon strongly denied a report
from the region that the convoy was actually made up of tribal elders.

Rumsfeld said the convoy and
the Taliban compound southwest of the Tora
Bora mountain complex of caves and tunnels
killed "a lot of people." The strikes also destroyed many of the vehicles in the convoy, he said.

DEFENDANT'S
EXHIBIT
B-4



[illegible] SCHEDULE

Youngstown City pupils return Jan. [illegible] City pupils return Jan. 3; Salem pupils return Jan. 3; [illegible] pupils return Jan. 2; New Castle pupils return Jan. 2; Youngstown Diocese pupils return Jan. 3.

UNIVERSITIES

Youngstown State University and Kent State University Trumbull Campus offices closed. [illegible] students return Jan. [illegible].

WESTERN RESERVE TRANSIT AUTHORITY

Last runs from downtown at 6:10 and 6:40 p.m. Monday.

PUBLIC LIBRARIES

Youngstown and Mahoning County Public Library, also closed Monday; Warren-Trumbull County Public Library, also closed [illegible] Monday.

STOCK MARKET

Closed

BANKS

National City of Ohio, Farmers National Bank, First Place of Warren, Second National of Warren, Cortland Bank, National City of Pennsylvania, all closed [illegible] Monday.

TRASH COLLECTION

Browning-Ferris Industries, Youngstown City, [illegible] Waste Management, Warren City Environmental Services, all one day late after Christmas and no [illegible] Saturday pickup for Friday.

## BIRTHS

Forum Health Northside

[illegible]

St. Joseph

[illegible]

## LOTTERY RESULTS

FRIDAY'S DRAWINGS

Ohio

Night drawings:
Pick 3, 9-0-9
Pick 4, 5-0-5-6
Buckeye 5, 9-24-25-30-30
Day Drawings:
Pick 3, 6-9-4
Pick 4, 3-3-6-6

Tonight's Super Lotto Plus jackpot is worth $7 million.

Pennsylvania

Daily Number, 9-0-[illegible]
Big 4, 6-4-6-4
Cash 5, 4-14-16-[illegible]

Tonight's Super 6 Lotto jackpot is worth at least $7 million.

The Vindicator
[illegible] Vindicator Square
Youngstown, OH 44503
[illegible]
VOLUME 112 NO. [illegible]
[illegible]

... [illegible] one of Nemenz's stores May 16, 1994, and urged his constituents to cross the UFCW picket line at the store.

Traficant also had a congressional staffer, Charles O'Nesti, meet with union officials to put a stop to the picketing. The efforts proved futile but Traficant repeatedly reminded Nemenz that crossing the picket line had cost him political capital with organized labor, the government said.

It didn't stop there, however.

Nemenz, the government said, bought a four-wheel-drive truck worth $23,234 for Traficant, made the down payment of $1,500 and made monthly payments of $439 for 38 months and paid the insurance. Traficant, Nemenz said in court papers, wanted the truck to tow his horses to and from shows.

Nemenz also provided Traficant with a Corvette to use, the government said.

The congressman, whom federal prosecutors described as a schemer well-adept at shakedowns, always lamented being short of cash because of an IRS obligation. He won acquittal at a bribery trial in 1983 but lost the civil tax case in 1987 and has been paying ever since.

**Allegation:** The government said Nemenz is just another contractor who got sucked in to do work for Traficant only to learn that he wanted to repay them with congressional favors, not cash.

The government said Traficant used identical schemes with businessman J.J. Cafaro and contractors James A. Sabatine, Anthony and Robert Bucci, Henry DiBlasio, Greg Tyson and A. David Sugar. Cafaro, Sabatine and Sugar have pleaded guilty to their part in the Traficant case and are expected to testify for the government at trial in February.

Traficant also asked Nemenz's help in submitting a fraudulent insurance claim for windstorm damage in an ... would use the money to pay down what he owed Nemenz for the pole barn.

Nemenz, despite fears of suing a popular congressman who had influence with labor, hired a lawyer in 1997 to try to get his money back. After a series of negotiations, Nemenz agreed to a settlement worked out by Claire Maluso, a Traficant staffer.

Traficant was to give Nemenz $10,000 plus a note for $15,000 and Nemenz would give Traficant title to the truck and forgive the rest.

The government's motion was filed just before a status conference U.S. District Judge Lesley Brooks Wells scheduled to make sure Traficant's trial remains on track.

Traficant, who is not a lawyer, was originally indicted on 10 counts May 4 and has opted to represent himself. His charges include racketeering, bribery and income tax evasion.

**Detore:** His co-defendant, Richard E. Detore, a 41-year-old Clifton, Va., engineer, was added to the case in a superseding indictment filed Oct. 26. Detore is charged with conspiracy to violate the federal bribery statute.

Detore didn't retain counsel until Tuesday — John M. Dowd and James C. Osborne Jr., both Washington, D.C., lawyers.

Just hours before Friday's hearing, Dowd filed a motion asking that Judge Wells postpone the trial at least 60 days. Dowd cited the need to adequately prepare his client's defense.

Traficant and Dowd made oral motions during the hearing to have the cases heard separately.

Craig S. Morford, an assistant U.S. attorney, said the trial should go forward as planned with both defendants. He said Detore created his own predicament by waiting nearly two months to get a lawyer.

"We've been dealing with him for one and a half years and he's had three sets of lawyers," Morford told Judge Wells.

Traficant [illegible]. He then wished all reporters happy holidays.

**USAG:** Detore's alleged involvement in the case can be traced back to his time as chief operating officer of USAerospace Group, once based in Manassas, Va.

Cafaro, of the mall development family, was affiliated with USAG and has pleaded guilty to bribing Traficant in return for the 60-year-old congressman's using his influence to promote USAG laser-guidance technology.

Cafaro admitted the bribe was nearly $40,000 — including cash and the purchase of the congressman's houseboat.

The government said that from April 1998 through December 1999, USAG paid $3,219 for meals at the Taverna in Washington, D.C. for Traficant and Detore. Traficant, Cafaro, a USAG chief engineer, and Detore agreed to conceal Cafaro's purchase of the congressman's houseboat by making it appear as though the engineer bought the boat, the government said.

**Immunity:** A magistrate judge asked by Judge Wells to consider Traficant's objections to certain government evidence based on his immunity granted in the speech or debate clause issued a report and recommendation Friday.

The clause protects Traficant from legal reprisal for comments made on the House floor or documents inserted in the Congressional Record.

Magistrate Judge William H. Baughman Jr. said documents that reflect consultation by Traficant with his staff for purposes of deciding the content of language for legislation are privileged.

Press releases and communication with private citizens are not privileged, the magistrate concluded. Traficant has until Jan. 8 to file objections.

meade@vindy.com

## SUSPECTS | Bond is delayed ✗ 12/22/01

Continued From A1

... [illegible] on his finger. Consoldane said police did not have permission to do so.

Consoldane declined to say what type of injury his client has or how he was injured.

Police also declined to say why they photographed the injury.

Police said Jackson and Roberts were friends. Jackson recently had been released from prison. Officials would not say how the two knew each other.

Howland Police Chief Steve Lamantia and Sheriff Thomas Altiere declined to give specifics about the arrests.

**Affidavit:** Atty. J. Gerald Ingram, who represents Roberts, objected to the release of an affidavit filed by the prosecutor's office, saying information in it may make it difficult to seat an impartial jury in the county.

Watkins objected, saying the affidavit is public record.

The judge said he will have a hearing on the matter Dec. 31.

**What happened:** Roberts called 911 at 12:20 a.m. Dec. 12 to report that she found her husband's body when she returned home.

Police said that it did not appear that anyone broke into the home but that a car belonging to Fingerhut had been stolen. The car was found at 6:30 p.m. Dec. 12 on Pershing Street in Youngstown.

Police think Fingerhut was shot with a handgun. The weapon has not been recovered, officials said. Police spent several hours Friday searching for the weapon. They were looking in an area off state Route 82 in Howland.

Township police obtained a copy of a report filed Nov. 26 by Roberts with Warren police. The report says Roberts said her handgun was stolen while she was at a convenience store in Warren.

Lamantia said he was pleased that arrests were able to be made so quickly.

"Our two detectives, Paul Monroe and Frank Dillon, and Gary Bacon and the other detectives from the sheriff's department, Jeff Hoolihan of Warren City and the Ohio State Highway Patrol did a terrific job," Lamantia said. "We also had members of the Violent Crimes Task Force assisting us. This was a great effort by everyone involved."

Fonderlac Drive runs behind the Howland branch of the Butler Institute of American Art in an upscale neighborhood. Neighbors say Fingerhut and Roberts lived there about 2 1/2 years and did not have any children.

Fingerhut managed the Greyhound bus stations in Warren and Youngstown, police said. Roberts also worked at the bus stations, officials said.

sinkovich@vindy.com

## VALUES | Poverty rates drop but lag behind nation and states

Continued From A1

percent and a rate of 10.7 percent across both Ohio and Pennsylvania.

In Trumbull County, the 11 percent poverty rate remained below the national average but edged slightly higher than the state.

In 1998, the poverty threshold for a family of four was $16,600.

While dated, the Census Bureau says the new numbers give the most comprehensive look at poverty [illegible] on the county level.

**Analysis:** The fact that the numbers have gone down indicates that [illegible] benefited from economic [illegible] the same [illegible]

*"We've constantly been below the curve as far as median income."*

Jim Micsky
*United Way of Mercer County*

[illegible] Micsky cautioned, though, that the plant employs workers from various counties.

Jim Micsky, United Way of Mercer County executive director, said it is unclear why the poverty rates are higher in the Shenango Valley, where [illegible] percent of the labor force has retained a manufacturing job. He ...

percent of children under 18 below the poverty level in Columbiana County, 17.9 in Trumbull, 21.4 in Lawrence and 19.9 in Mercer.

These numbers compare with an 18.9 percent child poverty rate in the nation and 16.4 in Ohio and 16.5 in Pennsylvania.

Across the board, the child poverty rate has decreased by anywhere from 2.5 percent to 6.7 percent with the least decrease in Mercer County and the greatest decrease in Mahoning County.

But the declines may not be reason to celebrate, cautioned Elsie Dursi, director of the Mahoning Valley Association of Churches.

[illegible]



VINDI
12/29/01

DEFENDANT'S
EXHIBIT
B-5

# Jury issues indictment of premeditated murder

## The two will be arraigned Monday in the death of Robert Fingerhut.

### By AMANDA C. DAVIS
VINDICATOR STAFF

WARREN — A Howland woman and Youngstown man could face the death penalty if convicted of killing the woman's husband.

A special Trumbull County grand jury met Friday, issuing an indictment of premeditated murder against Donna M. Roberts, 57, of Fonderlac Drive, Howland, and Nathaniel E. Jackson, 29, of Wirt Street, Youngstown.

Both are charged with capital murder, one count each of aggravated burglary with firearm specification and one count each of aggravated robbery with firearm specifications.

They will be arraigned at 11 a.m. Monday in the courtroom of Judge John Stuard of Trumbull County Common Pleas Court.

The two are being charged with the Dec. 11 capital murder of Roberts' husband, Robert S. Fingerhut, also 57.

Remaining in jail: Roberts and Jackson, who remain in Trumbull County jail, appeared last week before Judge Stuard. Since it was an initial appearance, neither had to enter a plea, a court official said.

Police say Jackson and Roberts were friends, but have not said how they knew each other. Jackson was recently released from prison.

Officials have declined to give specifics about the arrests.

Atty. J. Gerald Ingram, who represents Roberts, objected to the release of an affidavit filed by the prosecutor's office last week, saying information in it may make it difficult to seat an impartial jury in the county.

County Prosecutor Dennis Watkins objected, saying the affidavit is public record.

The judge said he will have a hearing on the matter Monday.

Reported death: Roberts called 911 at 12:25 a.m. Dec. 12 to report she found her husband's body when she returned home.

Police said it didn't appear anyone broke into the home but that a car belonging to Fingerhut had been stolen. The car was found Dec. 12 on Marching Street in Youngstown.

Police said Fingerhut was shot with a gun, though a weapon has not been recovered.

Fonderlac Drive runs behind the Howland branch of the Butler Institute of American Art in an upscale neighborhood. Neighbors say Fingerhut and Roberts lived there about 2½ years and did not have any children.

Fingerhut managed the Greyhound bus stations in Warren and Youngstown, and Roberts worked at both, officials have said.

# The Vindicator







## FINGERHUT KILLING

## Officials: Letters reveal scheme

*Police found nearly 290 letters the two suspects wrote to each other.*

DEFENDANT'S
EXHIBIT
B-6

*TUESDAY, JANUARY 1, 2002*

## KILLING | Officials: Letters reveal scheme

Continued From A1

According to documents, Jackson was released from Lorain Correctional Institution Dec. 9 after serving one year after being convicted in Mahoning County Common Pleas Court of two counts of receiving stolen property.

**Charges:** Roberts and Jackson have been indicted on charges of capital murder, one count each of aggravated burglary with firearm specifications and one count each of aggravated robbery with firearm specifications.

Both could face the death penalty.

They pleaded innocent Monday before Judge John Stuard in Trumbull County Common Pleas Court. They are being held without bond in the county jail. Judge Stuard said he will discuss bond during a Jan. 29 hearing.

The affidavit, filed with the court Dec. 21, was released to the public Monday after the arraignment. The judge, however, declined to release copies of letters written by Jackson and Roberts that were attached to the affidavit.

The affidavit notes that Roberts picked Jackson up at prison and took him to the Wagon Wheel Motel on Market Street in Boardman.

Police think Fingerhut was shot Dec. 11.

Trumbull County 911 records show that Roberts called the center about 12:05 a.m. Dec. 12 to say she found her husband dead.

Fingerhut was shot at least three times, including once in the back of the head, according to the affidavit.

Dr. Humphrey Germaniuk, the county's forensic pathologist, also said instead that the victim was prob-

ably engaged in a struggle with the assailant because of other injuries, including lacerations, abrasions and contusions.

**Employees:** Roberts told police she was not having trouble with her husband, but employees who worked with her and Fingerhut at the Greyhound bus station in Youngstown said the two had been fighting.

The affidavit quotes one witness as saying that on Dec. 10, Roberts asked Fingerhut for $3,000 and he said no and she gave him "the dirtiest look, like she was out to get him."

Roberts wrote to Jackson Nov. 26 that "I (live) exist in hell on earth. Like last night — I got so sick of just looking at him. And hearing the same s---- over and over. And seeing his skin. And watching him walk or breathe. I can't hold my disgust and contempt for him ...Which makes him feel worse about me in return. Which makes him talk to me and treat me like dirt."

The affidavit also notes that police obtained tapes of 18 telephone conversations between Roberts and Jackson while Jackson was incarcerated.

On one tape, Roberts says, "I can't take it anymore here. I even gave you permission to do that to Robert to be with you forever."

*sinkovichО vindy.com*



Fight Your Way To $20,000
Original Toughman Contest
Packard Music Hall · Warren
January 18 - 19, 2002
Tickets: Subways in Warren &
Packard Music Hall
1-800-90-TOUGH

UP TO OR UPGRADE YOUR



Organización Cívica y Cultural Hispano Americana will have minority health fair from 10 a.m. to 3 p.m. Sunday at St. Rose Lima Church hall, 50 Struthers-Coitsville Road, Youngstown. For more information, call OCCHA's office at (330) 781-1808.

## WARREN



# Lawyer: statement to be thrown out

*The defendant said the victim shot him first.*

By FEDDY STRUTHERS
VINDICATOR STAFF WRITER

WARREN — Attorneys for the city that the husband of his later don the action of fighting with the victim or first intention.

Nathaniel Jackson told detectives he and Fingerhut, Police and First Martino of Howland in a videotaped statement that he and Roberts slice

Police said they found hundreds of handwritten letters Roberts and Jackson wrote to each other. The letters, found in Roberts home and car, show Roberts and Jackson were lovers more than two years.

These letters also established that they were plotting to murder Robert Fingerhut, according to the affidavit. Jackson denies planning anything with Roberts, He refers to her as a nice lady who helps people.

cn's constitutional rights were violated because he asked for an attorney and was not able to talk to one before the interview.

Judge Stuard is expected to rule on the moment in a few days.

Jackson, 28, of South Pearl Street, Youngstown, and Donna Roberts, 57, Fingerhut's common-law wife, are facing aggravated-murder charges.

According to an 11-page affidavit, Roberts and Jackson planned for several months to kill Fingerhut, 57.

**What's in letters**

See Jackson on Page E2

## YOUNGSTOWN

# Judge: Parents, talk with your kids

*Children shouldn't be pushed to grow up too soon, the judge said.*

By WILLIAM K. ALCORN
VINDICATOR STAFF WRITER

YOUNGSTOWN — With regard to troth our parents to be parents, in part Juvenile Court Judge Theodore Simon Jr. told area parents Wednesday during the annual Youngstown public forum, Judge Theo. at Covelli

Listen for "risk, your live in Mahoning, the values of family and a reality anticipated by Mahoning County Children's, that a sure that can all stand that parent's the question relates the parents not heard.

Some of the issues were we well limitation on children, such as "Children should be seen and the following to be clear at the door.

"Let new parents be parents because we can't, "Children should be heard," he said the

"With your kids in the air, spend your time, the family around, a large reason to your child's. Invest in the time, the future, take the time, your time on parents to give you," he said.

Others such as:

"When children now to be productive, they need a little time competition, the social, sit set to limits to the special-time, you don't too much of their times

"Children may not need to do that much. The



DEFENDANT'S EXHIBIT B-7

## ⬤ TOWN STATE UNIVERSITY

# This year, English Fest has Southern accents

*A contingent of South Carolinians is making its way here.*

By RON COLE
VINDICATOR EDUCATION WRITER

YOUNGSTOWN — By the time you read this, 13 South Carolina teen-agers and two teachers — jammed shoulder to shoulder in a passenger van — should be closing in on Youngstown.

The eighth-graders from League Academy of Communication Arts in Greenville, S.C., are expected to arrive in Youngstown late this evening to attend the Youngstown State University English Festival on Friday.

They will be the first pupils from outside the greater Mahoning and Shenango valleys region to participate in the three-day event, now in its 24th year.

"They are unbelievably excited," teacher Bekki Camden said Wednesday from her classroom in South Carolina. "A lot of them have never even been out of the South, so it's quite an experience for them."

Attracts more than 3,000

The festival, which began Wednesday and runs through Friday, attracts more than 3,000

YOU
learn
as the
side
Mah
Th
year
forme
Mun
Doug
man
time
fuel
Su
wait
inst
char
too
rece

Th
Che
need
Shre
23, a
wer
la
spee
ter
chai

Lyi
able

Su
bee
eith
roar
spec
sidg
poll
spa
Th
into
colt
mak

The
from
Th
its ai
The
Wes
By
By fi
the
wear
light
hat S

*The Vindicator*  THURSDAY, APRIL 18, 2002

## ntial panel tackles
## erning merger study

apartments.

has an all-paid department, raises, has a paid chief and several volunteer firefighters, has some full-time, some and some volunteer fire-while Sharpsville and d have all-volunteer forces, ily, a Sharpsville council-firefighter, is chairman of ubcommittee and told the ommittee Tuesday that his tee far been unable to come plan that pleases everyone. est suggestion under revisit vide the new municipality ments fire districts, Lully said, ng that departments would react and continue to serve cific geographic areas.

rate some tax inequalities, because everyone in the would be paying the same taxation yet some people getting full-time paid fire on while others would still volunteers, he said.

d some volunteer firefighters are objecting to that proposal, saying it's unfair for them to volunteer their services in a new city while others are getting paid for the same duties.

**What about the cost?**

Lully added that there is a question about how much fire protection will cost in the future.

The ranks of volunteers are gradually declining, and under a single, new community, those spots would probably have to be filled with paid firefighters, greatly increasing fire protection costs, he said.

Lully said his subcommittee is trying to put some figures together to find out what those costs might be and plans in seeking legal advice on the issue of separate fire districts within a single municipality.

The committee is expected to come up with a final report some time this summer. If a consolidation is recommended, a plan will be presented to the fire municipal commission.

Change could go before the voters in 2003 and, if approved, a new government could begin operations in 2

CRASH | Jury to consider indictment



The Vindicator/Lewis Palmer

DINN ... takes a picture of his papers in Youngstown Municipal Court. Two aggravated vehicular homicide charges against her were bound over Wednesday to a felony grand jury.

ing against a fence crying at the crash scene. He told the officers that the Corsica had been racing alongside his car, with the woman inside making faces.

meade@vindy.com

---

### plea hearing

... sentencing, his lawyer, Jerogerlich, said there's no typical treatment facilities for in jail, but he'll get help after ... eased.

"Bernard said he felt "a little orrable" because of the nation of Gibran's nations. "It's in her bothers me," the judge ...

### What happened

... police Detective Don Mills believe the woman was in the when she thought something her sweater from the ceiling ... of a police complaint.

minary tests showed the substance citron, and he sent it for results at the Ohio Bureau of criminal identification and investigation ...

... said that no other ... or as the third similar case plans is able to identify Gibson in a photo array and was visually at the scene.

### CSI: Bernard tells

...

### GUILTY | Lawyer

... statement's turned

... and Fagerhut picked him downtown around 5 p.m. that bought $100 worth of crack, ... and then they went ... hours.

... he first gave me to the Fagerhut started crying ...

... acknowledged calling order in the house from a cellular phone that was ( thin $600.

... he didn't call Roberts what and said he met her some in Youngstown. He said she ... corner for six at a local hotel a gave him bandages in his ...

... County 911 records show ... Ied 911 around 12:35 ... to say she found her dead.

... him shot at least three in the back of ... in the bad bit of ...

### CASH | Council approves payment for case

... agreed to pay $62,000, in insurance company will pay $30,000 and ... funeral home will pay $2,000.

City council agreed that on Wednesday at its meeting. The ... ment. The city will pay off the remainder of the judgment over five-year period, $2,560 in 2002, ... Feb. 1, 2007.

Council members also voted to ... lation authorizing purchase of ... service director ... and enter a contract with ... roof of the safety complex ... Street building ...

... ed by wet insulation. The project involves digging down to the roof's base and replacing the insulation.

The new roof will be of a rubber-like material that bends to different types of weather. The roof material that now tops the building is more susceptible to cracking. The new material has a 15-year guarantee.

The project is estimated at $50,000.

Infante also said he expects legislation to be presented at the next meeting for a 75-percent, 10-year, tax abatement on a $12.5 million investment of new machinery for Sharon ... habilities Division.



# Local

REGIONAL
STATE

Happy homeowner

*After 25 years of making severe rental home every time she went Lee of Warren now pulls into he...*

mary
Valley

## New corps to serve on home fro...

### IN RUSH IN CONCERT

## Good...ap for the Val



## Cattle a...use...get clean-up duty at fair

## Gra...
## indi...

DEFENDANT'S
EXHIBIT
B-8

The Vindicator — FRIDAY, JULY 19, 2002

# ...1 of owning home
## ...mes woman's reality



### CORPS | To serve on home front

### OFFICIALS | Jury decision against indicting

### CATTLE | Abusers get cleanup duty at fair

### WARREN | Man pleads guilty to charge

### TRIAL | Wiretaps won't be used



## ...d rap for the Valley'

FRIDAY, JULY 1

### CANFIELD

# Tha
## festi

*The Italian Fest for almost every*

### AKRON-CA

# Grov

*The airport's din lower-fare flight encourage more*

The Vindicator                                    TUESDAY, OCTOBER 8, 2002

# reprimanded for not complying with procedure

*(body text illegible due to faded scan)*

## DIARY | A ribbon to the past in Struthers



# Trial begins in Howland killing

*(body text illegible due to faded scan)*

## STUDY | Mold in buildings is getting attention

DEFENDANT'S EXHIBIT
B-9





this morning, noting that he does not harbor any ill feelings.

The prosecutor's office said last week the grand jury reached its decision after meeting in a special session to investigate the shooting involving Kaintz and Christopher Rex of Southington.

The Ohio Bureau of Criminal Identification and Investigation also investigated and sent its findings to the grand jury.

*See Deputy on Page B2*

FINGERHUT SLAYING    10/24/02

# Murder trial gets under way

*The defendant and the victim's ex-wife were lovers, a defense lawyer said.*

By PEGGY SINKOVICH
VINDICATOR TRUMBULL STAFF

WARREN — The shooting death of a Howland businessman last year was not aggravated murder, a defense attorney says.

Atty. Anthony Consoldane, who along with Atty. James Lewis of the Ohio Public Defender's Office is representing Nathaniel Jackson of Youngstown, told jurors Wednesday that Jackson was acting in self-defense when Robert Fingerhut died.

Consoldane added that Jackson had nothing to gain by killing Fingerhut.

Jackson, 30, of South Pearl Street, and Donna Roberts, 57, of Howland, are both accused of killing Fingerhut, 57, on Dec. 11, 2001, in Fingerhut's Howland Township home.

Consoldane said Fingerhut brought Jackson to his home and started a fight. Consoldane said it was Fingerhut who pulled a gun on Jackson.

"There was a love affair between Nate and the victim's ex-wife," Consoldane said, during opening statements. If Fingerhut dies, his ex-wife could get his life insurance policy.

*See Murder on Page B2*



DEFENDANT'S EXHIBIT
B-10

## MURDER | Trial gets under way

10/24/02

...ers during his opening statements that Jackson and Roberts kept in touch while Jackson was an inmate at the Lorain Correctional Institution.

Jackson was released from prison after serving one year on a conviction out of Mahoning County Common Pleas Court on two counts of receiving stolen property.

Watkins said they found hundreds of handwritten letters Roberts and Jackson had sent to each other.

The letters, found in Roberts' home ... can show that Roberts and Jackson were lovers for more than two years and were planning Fingerhut's murder, Watkins added.

Watkins noted that Jackson did not go to the Greyhound bus terminal in Youngstown on Dec. 10 but instead had dinner with Roberts at the Red Lobster in Niles. Watkins said Jackson went to Fingerhut's home after the dinner and shot him three times — twice in the back and once in the head.

"We believe that the victim was killed at 9:00 a.m., and one hour later Donna Roberts is using her credit card to pay for a room for the defendant," Watkins said.

Shortly after midnight on Dec. 11, Roberts called 911 to report that she found her husband dead. She told a dispatcher that she was out shopping, Watkins added.



TUESDAY, NOVEMBER 5, 2002

TRUMBULL COUNTY

# 3 more witness... ...ify in murder trial

*The judge denied the defense attorney's request to dismiss all charges.*

By JODY TURNER
Tribune Chronicle

WARREN — Prosecutors are planning to call additional witnesses today in the capital murder trial of Nathaniel Jackson.

Prosecutor Dennis Watkins said Monday that he plans to call three additional witnesses.

The witnesses are scheduled to be re-called in this morning Watkins, who is leading the capital murder case, said he believes all three counsel for close testimony in about 30 minutes. Jackson is facing aggravated murder...

...Nov. 18.

Jackson's trial began last month.

Atty. Anthony Consoldane, along with Atty. James Lewis of the Ohio Public Defender's Office, is representing Jackson. The two attorneys based police found during Monday's learned to dismiss all the charges filed against Jackson. The attorneys said they did not believe Watkins and Charles Morrow, an assistant Trumbull County prosecutor, proved the case during the trial.

Judge David Fuhry, denied the defense's ruling he made the prosecuting provided sufficient evidence.

The defense maintains that Jackson was killed in self-defense after Fingerhut died.

Consoldane said Fingerhut brought Jackson to his home and started a

...fight. Consoldane said it was Fingerhut who pulled a gun on Jackson.

**Letters are evidence**

During the two-week trial, Watkins, however produced numerous letters written by Jackson to Roberts, which he said showed the two were planning Fingerhut's murder. Watkins told Jackson was working at the home when Fingerhut arrived.

Watkins said the letters showed that Jackson and Roberts kept in touch while Jackson was an inmate at the Lorain Correctional Institution.

Jackson was released from prison Dec. 9 after serving one part on a conviction out of Mahoning County Common Pleas Court on the counts of receiving stolen property.

WARREN

# Draft per... ... form...
# targets h...

*This marks the fourth phase of a performance audit started in 2000.*

By DENISE LACK
Tribune Chronicle

WARREN — The city could keep as a central living plan on internal control for operation and financial functions, according to the draft of a performance audit...

The city administration, council members and outside parties agreed upon in the report Monday. Officials behind a third-draft McKinley rights plan to employ professional project review audit of the city operations. The business resource of financial technology information, according to the final report on it...

McKinley Elementary

# makes grade on clean air

*A public meeting to discuss test results will be Wednesday.*

By JEFFREY BARTLETT
Tribune Chronicle

WARREN — The air quality at McKinley Elementary School is good, according to the data agency that tested it.

Superintendent Charles McShane reported the school board with the results of the air quality test conducted recently by the state Bureau of Workers' Compensation.

The results were in a letter from Mr. Roberts, a certified industrial hygienist, who said he tested that the air numbers are well located, clean and current as well carbon dioxide levels and dangerous amounts of fresh air are not presently low which was detected at extremely low levels, well within federal guidelines.

Additionally, the research indicated that the acoustical treatment on the ...room walls was not sloughing off.

...amounts of fresh air are applied.

Earlier this school year, parents of some McKinley pupils and school officials that children were becoming ill said that they suspected the acoustical material used for soundproofing in the cafeteria was the cause of the illnesses.

School officials had the acoustical material checked, but it was not found to be a problem.

The district then contacted the BWC to conduct the indoor air quality.

Additionally, the district had commissioned water quality tests, which showed a negative report for bacteria levels, McShane said.

McShane said the BWC test results will be discussed at a public meeting at 6 p.m. Wednesday in the school offices.

**Special education**

In other matters at the board's meeting Monday, the board agreed to contract with the Columbiana County Educational Service Center for special education services for the year.

Treasurer Cindy Altomare said the program costs the district about $100,000 a year for about 20 students. She pointed out last contracting with the center is less expensive than providing the services in house.

# Sewer system plans, costs
# to be ready for village soon

By...
Tribune Chronicle

MASSILLON — Plans for a sewer system for the village should be ready soon, according to Mayor Dan Wilson.

Wilson said the council Monday that the consulting engineers on the project, Ms. Consultants of Youngstown, will they have considered plans and alternatives and expect to have one ...system available by the end of this month.

Wilson said the council could consider...

...tion Agency has ordered the village to abate a pollution problem caused by failing septic systems.

In other business...noted, Atty. village clerk Deb Blazer, and Council...village...Wilson said, the finance committee, will have a representative hearing with a representative from the state auditors office Wednesday. Wilson noted the fiscal committee to discuss preparing...

DEFENDANT'S
EXHIBIT
B-11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 954









SATURDAY

November 9, 2002
www.vindy.com
35 cents

**Liberty sculptors**
Senior art students at Liberty High school create a superstar sculpture to adorn the school's foyer. Local 34.

# Vindicator

## llenges with U.N. backing

**A case for war**

NOV
9

DEFENDANT'S EXHIBIT B-12

## VERDICT | Jackson found guilty in Newland slaying



The Vindicator/Bruce Palmer

CONCERNED: It is not clear... people with Panda DeLoreto Anthony Concellone as deputy sheriffs prepare to return him to Trumbull County... his conviction in the murder of Robert Fingerhut. Jackson was convicted Friday.

**Continued from Page 1**

...

> "Obviously, we are very pleased with the verdict. We are going to proceed with the next phase."
>
> **Dennis Watkins**
> Trumbull County prosecutor

### COURTS

#### MAHONING COUNTY

**Marriage licenses**
...

**Docket entries**
...

Case: 4:21-cv-00368-DAP  Doc #: 12-2  Filed:  01/14/22  324 of 677.  PageID #: 7759

## ...urderer's bad childhood

## ...Woman celebrates years of memories

DEFENDANT'S EXHIBIT B-13



DEFENDANT'S EXHIBIT 13-14

...ling 12 Israelis and wound... ...Hebron, a divided city long ...by religious tensions and ...of furious violence.

...sraelis were emerging from ...prayers in the Tomb of the ...s, a shrine in downtown He... ...d were walking along "wor... ...s' lane" when Palestinians ...ssault rifles and hurled ...es from the hilltop 'Abu ...neighborhood, army sources

...rby army post and soldiers ...t to the scene were also ...in the ambush, the sources

...e was gunfire from left and ...from every possible angle. ...were shooting at us from ...one man, who gave his name ...Arik, told Army Radio. "The ...f Jews were slaughtered. ...attles raged for more than 90 ...s, making it difficult for ...to reach the wounded. Flares ...the night sky and military he... ...rs helped evacuate the ...ed, including the regional ...e commander — a colonel — ...embers of his entourage. ...ps hunted for the gunmen, ...reports said a gunbattle ...d as soldiers surrounded a ...nian home.

...militant Islamic Jihad group ...d responsibility, saying it was

*See Middle East on Page A3*

## WEST BANK

### Ambush
...tinian militants opened fire ...vish worshippers as they ...ed toward a disputed holy ...e Friday.





Militants killed at least 12 and wounded at least 15

*Associated Press: ESPN*



11/16/02

*The Vindicator/Jean Neice*

## Ursuline rolls
## Girard, How...

Above, Ursuline High School quar... teammate Terrell Washington sco... playoff game against the Girard I... Suley shouts instructions to his p... state semifinals in Division IV wi... con Stadium in Austintown. At le... during the Tigers' 43-14 loss to O... al final in Bedford. Coverage begi...



### WARREN

# Jury recommends death in murder case

*The judge can decide to reduce Jackson's death sentence to prison time.*

**By PEGGY SINKOVICH**
*VINDICATOR TRUMBULL STAFF*

WARREN — A jury is recommending to a judge that a 30-year-old Youngstown man, convicted of killing a Howland businessman, be sentenced to death.

The jury reached that decision in Nathaniel Jackson's case after deliberating about 3½ hours Friday.

The jurors began deliberations after they heard closing arguments in the penalty phase of the trial.

Jackson showed no emotion as the verdict was read.

Jackson was convicted last Friday in Trumbull County Common Pleas Court of aggravated murder, burglary and robbery, with firearms specifications.

Jackson, 30, of South Pearl Street.

*See Case on Page A2*

## INSIDE

### Index
| | |
|---|---|
| Advice | B7 |
| Births | A2 |
| Bridge | C8 |
| Business | B6 |
| Classified | C9-12 |
| Comics | C7 |
| Courts | A2 |
| Crossword | B12 |
| Editorial | A6 |
| Entertain't | B10-12 |
| Helena | C4 |
| Local | B1-5 |
| Mini-Page | C6 |
| Newsmakers | B6 |
| Obituaries | B4 |
| Religion | B8,9 |
| School | A9 |
| Society | B7 |
| Sports | C1 |
| TV grid | B12 |
| Years Ago | A9 |

### Weather

Occasional rain today possibly mixing with snow at times. High near 40. Occasional rain or snow tonight possibly mixing with freezing rain. Low in the lower 30s. A10

**LOTTERY, A2**

Insurance For Your Needs

**Nationwide**
Insurance & Financial Services

*Nationwide Is On Your Side®*

surance underwritten by Nationwide Life Insurance Company, onwide Mutual Insurance Company and Affiliated Companies. Home Office: Columbus, OH 43215-2220. MISC8 11/00

## Local Service. It's Our Policy.

We're for A


Lisa Kohler
AUSTINTOWN
792-4222


Bill Greska
CANFIELD
533-0400


Ken F...
BELO...
726-...

DEFENDANT'S EXHIBIT B-15

state.

Blessing said he expects to gain some Democratic support for the measure if it makes it to the Senate floor.

State Sen. Gregory L. DiDonato, a Dennison Democrat and the Senate's minority leader, said he's looking to see what's in the revised proposal, but that he and others in his caucus might support it. "The devil's in the details," DiDonato said.

"There are members on our side that are friendly to this, including myself, but until I see what the benefits are ... we're kind of stymied."

### Hagan's stance

State Sen. Robert F. Hagan of

Edgar. His group is also working with the Ohio Council of Churches, which represents about 3.5 million Christians statewide, he said.

Edgar said he fears that an expansion of the state's role in gambling might lead to other problems such as loan-sharking, prostitution and political corruption.

If the bill passes the Legislature and survives Taft's threatened veto, Edgar promised a campaign to place the measure on the statewide ballot.

Twice in the 1990s, voters rejected proposals to legalize casino gambling in the state. If this proposal passes the Senate, it still must go to the House.

## CASE | Jury recommends death in murder

### Continued From A1

Youngstown, and Donna Roberts, 57, of Howland, were charged with killing Robert Fingerhut in his Fonderlac Drive Southeast residence Dec. 11, 2001.

Fingerhut owned the Greyhound bus terminals in Warren and Youngstown.

Roberts and Fingerhut were divorced but were living together. She is scheduled to go on trial in April.

Judge John Stuard of Trumbull County Common Pleas Court said he has to review the case before he decides Jackson's sentence. The judge can decide to reduce Jackson's sentence to life in prison without parole, or a 25- or 30-year sentence.

### Reactions

"It will be about a week because the judge has to go over everything," said Atty. Anthony Consoldane, who represented Jackson. "Since this is a capital case, it obviously will be appealed. I'm very disappointed."

Prosecutor Dennis Watkins and Charles Morrow, an assistant county prosecutor, said they are "very satisfied" with the verdict.

"The jury worked very hard on this case," Watkins said. "It's a tragic event."

Consoldane had urged jurors during closing arguments to spare Jackson's life. He reminded the jurors that Jackson had a low IQ and had adapted well to prison life in the past.

Watkins, however, disagreed, saying that when Jackson was in prison last year, he plotted with Roberts to kill Fingerhut. "This was a cold-blooded, psychopathic killing," Watkins said. "You can't get any worse than being in prison and planning to execute a man."

During the trial, Watkins produced numerous letters written by Jackson to Roberts, which he said showed the two were planning Fingerhut's murder, and Jackson was waiting at the home for Fingerhut to arrive.

Watkins said the letters showed Jackson and Roberts kept in touch while Jackson was an inmate in Lorain Correctional Institution.

Jackson was released from prison Dec. 9 after serving one year on a conviction out of Mahoning County on two counts of receiving stolen property.

Jurors told court officials that they did not want to be interviewed by the press.

sinkovich@vindy.com

### BIRTHS

**Forum Health Northside**

Terra L. Hewlett, 2407 Logan Ave., Youngstown, boy, Nov. 15.

Stacey Greathouse and Edward A. Klepper III, 133 Summit Drive, Girard, boy, Nov. 15.

### GETTING IT RIGHT

The 1,000-foot road that Warren City Council rejected for Community Development Block Grant money was to run off state Route 46. An article in The Vindicator stated it was



VINDI
B2

11/21/02

DEFENDANT'S
EXHIBIT
B-16

16

# ealth panel seeks more facts from state

# Hearing set on killer's penalty

Page B2

**University officials want answers**

*If the Pennsylvania State System of High Education's chancellor and its board of governors get their way, Slippery Rock University President G. Warren Smith won't be employed after his current contract expires in 2004. B3*

WARREN   11/27/02

# Judge to mull death penalty for Jackson

*Last year, a white man was sentenced to death in Trumbull County, the prosecutor said.*

**By PEGGY SINKOVICH**
VINDICATOR TRUMBULL STAFF

WARREN — A judge will soon decide if defense attorneys' argument that the death penalty is applied disproportionately to blacks has any bearing on a Trumbull County case.

Attys. Anthony Consoldane and James Lewis of the Ohio Public Defender's Commission told Judge John Stuard during Tuesday's hearing that their client, Nathaniel Jackson, should not receive the death penalty.

Judge Stuard said he will take the matter under advisement and release a decision in a few weeks.

"The death penalty is not given proportionately in this county," Con-

soldane said during the 30-minute hearing.

"We've had recent cases where a defendant convicted of multiple killings received life in prison and a defendant accused of raping and killing a girl also received life in prison."

Consoldane noted that those defendants were white. Jackson is black.

Prosecutor Dennis Watkins, however, argued that the defendants in those cases, Scott Burrows, convicted of killing Charles and Dorothy London of Hubbard, and George Foster, convicted of killing Bridget Wetzl, had more mitigating circumstances than Jackson.

**Another example**

Watkins added that Stanley Adams was convicted and sentenced to

*See Jackson on Page B2*

**COLUMBIANA COUNTY**

# Highway [ ]ct

DEFENDANT'S
EXHIBIT
B-17

---

**Detonated e**

SALEM — The Yo Department bomb an explosive devic was discovered ne Egypt roads in Per

A township poli ered the device, w middle of Egypt R a.m. Tuesday.

The 9-inch-high shaped object had looked as though s tried to light it.

It appears the o in the road as a p spokesman said.

**Kids' readin**

EAST PALESTINE invited to particip reading program at the East Palesti brary, 309 N. Mar

Participants in Christmas" who r have the books re earn a prize.

For details, call 426-3778.

**TV stolen fr**

SALEM — A tele from a residence of Broadway Ave

The theft occur or early Tuesday.

It was reported Tuesday.

No details wer the thief entered

**VFW official**

WASHINGTON Sisk, national con Veterans of Forei VFW Post 5532, from 4 to 5:30 p. part of his statew weekend.

Sisk, who is ex key issues relate sues and nationa accompanied by mander George and Chris Taylor president of the

The Ohio Division of Wildlife got at least 20 complaints about the bird. Wildlife officers looked for the turkey but couldn't find it.

A school principal had warned children that the turkey was becoming bolder and had sharp talons. Another resident began carrying a stick after her dog reportedly was attacked.

John H. Scofield, chairman of the physics and astronomy department at Oberlin College, had seen the turkey regularly over the past year but not in the past 1½ weeks.

"I'm guessing somebody got him,

and acorns in fall and winter, he said.

Wild turkeys, which had disappeared from Ohio 50 years ago, now can be found in all 88 counties. They are most prevalent in eastern counties with ample woodland.

The wildlife division estimates the population at 250,000.

Hunters took 2,145 turkeys during Ohio's fall gun season Oct. 12-27 in 35 counties. The 34-day archery season ends Sunday.

As for Scofield's Thanksgiving dinner plans, "The best turkey you've ever had," he said: cooked by his aunt and bought locally in Spring Arbor, Mich.

---

# JACKSON | *Judge to mull death penalty*

**Continued From B1**  11/27/02

death last year. Adams is white.

Adams was convicted of killing Esther Cook and her 12-year-old daughter, Ashley.

A jury recommended two weeks ago that Jackson, 30, of Youngstown, convicted of killing a Howland businessman, be sentenced to death.

Whether Jackson is given the death penalty is up to Judge Stuard. Sentencing is scheduled for next month. The judge can decide to reduce Jackson's sentence to life in prison without parole, or to 25 to 30 years.

Judge Stuard, however, said during Tuesday's hearing that he hasn't found a case in Trumbull County

where the judge did not follow the jury's recommendation in a death penalty case.

Jackson was convicted two weeks ago in Trumbull County Common Pleas Court of aggravated murder, burglary and robbery, with firearms specifications.

Jackson and Donna Roberts, 57, of Howland, were charged with killing Robert Fingerhut in his Fonderlac Drive S.E. residence Dec. 11, 2001. She is scheduled to go on trial in April.

Fingerhut owned the Greyhound bus terminals in Warren and Youngstown. Roberts and Fingerhut were divorced but lived together.

*sinkovich@vindy.com*

---



# ITALIAN CHARM BRACELETS

**BUY ONE THANKSGIVING GIFT ITEM...**

**GET ONE 50% OFF!**

"In a varied and productive career, John Snow has shown consistent qualities of foresight and integrity and public spirit," Bush said. "He's led one of our nation's largest railroads with skill and success."

**Recent departures**

Bush nominated Snow just three days after the president fired O'Neill and White House economic adviser Larry Lindsey as part of a shake-up designed to control political damage from the ailing economy. Harvey Pitt,

"It isn't the names but the plan that is of concern to us," Senate Democratic leader Tom Daschle said Sunday. "It wasn't necessarily the people that he had in place in the last two years, it's the plan. Trickle-down economics doesn't work."

The Senate would have to confirm Snow's nomination, and White House officials expect he will be grilled about any government aid to

*See Snow on Page A2*

## WARREN

12/9/02 VINDI

# Man gets death penalty for Fingerhut murder

*The woman who helped plan the murder is scheduled to go on trial in April.*

### By PEGGY SINKOVICH
VINDICATOR/TRUMBULL STAFF



**Jackson**

WARREN — Judge John Stuard of Trumbull County Common Pleas Court sentenced Nathaniel Jackson, 30, of Youngstown today to death for the murder of businessman Robert Fingerhut. Jackson asked the judge to spare his life, adding, "I didn't mean for it to happen."

After sentencing, Jackson's defense counsel made a motion for a new trial, citing prosecutorial misconduct and other legal matters. The judge took the motion under advisement.

Jackson was convicted last month of killing Fingerhut, a Howland businessman. A jury recommended that Jackson be sentenced to death.

Jackson, 30, of South Pearl Street, and Donna Roberts, 57, of Howland were charged with killing Robert Fingerhut in his Fonderlac Drive Southeast residence Dec. 11, 2001.

Fingerhut owned the Greyhound bus terminals in Warren and Youngstown.

Roberts and Fingerhut were divorced but were living together. She is scheduled to go on trial in April.

The judge could have reduced Jackson's sentence to life in prison without parole, or 25 or 30 years.

During closing arguments in the

*See Sentenced on Page A2*



**BREAKFAST:** U. conducting de

# Sadd

*The Iraqi lea difficult for b*

CHRISTIAN

BAGHDAD — American pre Baghdad, cau dam Hussein new charm o dermine U.S.

The distanc war is evident would have se

# INSIDE

## Index

Advice . . . . . . . . B8
Births . . . . . . . . A2
Bridge . . . . . . . . B11
Business . . . . . B5, 6
Classified . . . . D1-4

## Weather

# POLITICS

# Democrats in Congress i__ _f mounting c

*Th_ __ __ _ing from*

DEFENDANT'S EXHIBIT B-18

*The* Vindicator

MONDAY, *DECEMBER 9, 2002*



Associated Press

...ION: Police officers cordon off a McDonald's restaurant, ...at killed three people in Makassar, 1,000 miles east of Jakar-...ealership in central Indonesia was also bombed. Police said ...blasts had planned to blow up a church over Christmas.

## ...rnment, rebels
## ...eace accord

The Indonesian ...bels from Aceh ...ned a landmark ...-year separatist ...natra island. But ...he issue of dis-...e to further ne-

...ned in Geneva, ...Aceh wide-rang-...ot does not allow ..."The war has ...es in the past

...hus agreed that, ...y between them ...d a thing of the ...age accord.

...point'

...hony Zinni said, ...ented here real-...nt to work. This ...nt. But it is just ...he end."

...has roots going ...years, is consid-...'s oldest armed

...commitment of ...l see no reason ...ain this goal we ...ono Sastro Han-...nesian govern-

ment negotiator, after signing the ac-cord. "There is no obstacle we can't overcome."

Zaini Abdullah, who signed for the leadership of the Free Aceh Move-ment, said: "The achievement today is the direct result of the struggle and sacrifices of our people."

**'The Forgotten War'**

The insurgency has been dubbed "The Forgotten War" because it nev-er attracted international public at-tention in the same way that other conflicts, such as East Timor, did.

But Aceh is seen as the most dan-gerous of Indonesia's many internal conflicts because of the rebels' insis-tence on independence and the gov-ernment's resolve not to allow the province to break away — a move that many believe would lead to the disintegration of the ethnically and religiously diverse nation of 210 mil-lion people.

If the solution envisaged by the peace agreement — which also pro-vides for autonomy and control over revenues from the province's timber and natural gas resources — proves successful, it could also be imple-mented in other secessionist trouble spots in Indonesia.

D

## ...nist: Israel has cost
## ...6 trillion since '73

*SENTENCED |*
*Convicted killer*
*from Youngstown*
*gets death penalty*

**Continued From A1**

sentencing phase, Anthony Consol-dane of the public defender's office had urged jurors to spare Jackson's life. He reminded the jurors that Jackson had a low IQ and had adapt-ed well to prison life in the past.

Trumbull County Prosecutor Den-nis Watkins, however, argued, say-ing that when Jackson was in prison last year, he plotted with Roberts to kill Fingerhut.

During the trial, Watkins produced numerous letters written by Jackson to Roberts, which he said showed the two were planning Finger-hut's killing, and Jackson was waiting at the home for Fingerhut to arrive.

Watkins said the letters showed Jackson and Roberts kept in touch while Jackson was an inmate in Lo-rain Correctional Institution.

Jackson was released from prison Dec. 9 after serving one year on a conviction out of Mahoning County on two counts of receiving stolen property.

*sinkovich@vindy.com*

## Justices opt
## not to hear
## legal-aid cases

WASHINGTON (AP) — The Supreme Court refused today to con-sider giving poor death-row inmates more free legal help.

The court had been asked to force the government to pick up the tab for inmates' legal bills during clemency proceedings and some last-minute appeals. Defense attor-neys argued that a 1998 federal law requires death-row inmates' lawyers to continue representing them through "every" stage of appeals.

"Congress made clear that people sentenced to death should not be abandoned by their lawyer as an ex-ecution date nears," law professor Charles Weisselberg of the Universi-ty of California, Berkeley, told the court on behalf of lawyers in a fees dispute. "Clemency is a critical part of our criminal justice system and is particularly vital when the state seeks to take a human life."

The Bush administration argued that it made no sense for the federal government to pay to assist inmates in state clemency hearings. The gov-ernment does pay for some federal death-row appeals.

The cases the Supreme Court re-

*DEMOCRATS | Hope*
*to mount comeback*

**Continued From A1**

said Rep. Ted Strickland of Lucasville, whose reconfigured 6th Congres-sional District encompasses most of eastern Ohio. "I believe that if we have any hope at all of gaining a ma-jority or winning the presidency, we've got to present a clear alterna-tive to the American people. We did-n't in this last election, and we lost."

Unlike the Republicans — who have set aside disagreements on is-sues such as abortion, trade and civ-il liberties and cobbled together a co-hesive majority — the Democratic Party is fractured. In Congress, the fault lines are defined by three coali-tions: the centrist New Democrats, the conservative Blue Dogs and the liber-al Progressive Caucus.

**Narrow defeats**

Democrats are quick to point out that several party members lost their House, Senate and gubernatorial contests by narrow margins. They say the party's losses were because of unique political circumstances, not core Democratic problems or a national political realignment, as some Republicans gleefully suggest.

"The country is pretty evenly di-vided," said Rep. Sherrod Brown of Lorain, a member of the Progressive Caucus. "The elections were disap-pointing, obviously, but the country has certainly not given the Republi-cans a mandate — not even close."

**Getting out its message**

Most Democrats also agree that in upcoming elections, the party will have to do a better job communicat-ing its ideas to voters.

"The goal for this week is to really sharpen our message and make sure that people know there's a difference between the two parties," said Rep.-elect Tim Ryan of Niles. "I think whatever we decide to do, we need to do, and not be breaking off in dif-ferent factions."

That won't be easy, however.

Ryan recommends a focus on the problems with recent free-trade agreements and President Bush's tax cuts. But a significant number of con-gressional Democrats voted for the tax cut, and the trade agreements were pushed through Congress by then-President Clinton and his De-mocratic allies.

To avoid alienating more conserv-ative voters in southern and rural parts of the country, Ryan said, De-mocrats must avoid hot-button is-sues such as abortion and gay rights.

Referring to those issues as non-sense, he said Republicans would use them to "really try to divide us, and that's why we need to stay united on economic issues."

That viewpoint is likely to be anathema to the party's liberal wing and many traditional Democratic ...

MOND

**Serbia**
**after i...**

BELGR...
headed f...
after it fa...
elect a pr...
getter sai...
the outc...

Yugosl...
tunica ...
the Sund...
because o...
cause of ...
nouncing...
the ballo...

"We w...
sults of tl...
said hour...
"Crime is...
happened...

Sunda...
cause son...
torate ca...
percent r...
by the ele...
the State...
the indep...
conclusio...
other suc...

Althou...
Sunday, t...
dealt a se...
indicatin...
whelmin...
joyed wh...
Yugoslav...
Milosevi...

**Autho**
**not be**

DHAK...
families t...
and offer...
day after...
Zia vowe...
bombers...

No sus...
and no o...
for Satur...
killed 18...

Autho...
"organize...
bombs in...
town 70 ...
Dhaka. B...
that Osan...

"I... w...
state her...
network ...
Home M...
ence.

Zia or...
at mosqu...
shopping...
Banglad...

*The* Vindicator

TUESDAY, DECEMBER 10, 2002

## STATE | REGION

### FINGERHUT MURDER

# Victim's son: Execute killer

*Nate Jackson is appealing his death sentence.*

**By PEGGY SINKOVICH**
VINDICATOR TRUMBULL STAFF

WARREN — The son of a Howland Township murder victim says the only way his family can make peace with his father's death is to make sure the defendants "are not able to enjoy life."

Mike Fingerhut sent a letter to Judge John Stuard of Trumbull County Common Pleas Court urging the death sentence for Nathaniel Jackson.

Jackson, 30, of South Pearl Street, and Donna Roberts, 57, of Howland, were charged with killing Robert Fingerhut in his Fonderlac Drive S.E. residence Dec. 11, 2001.

Fingerhut owned the Greyhound bus terminals in Warren and Youngstown.

Jackson was convicted of aggravated murder, aggravated robbery and aggravated burglary last month. Judge Stuard sentenced him to death Monday. Jackson is appealing.

Roberts' trial is scheduled for April. Roberts and Fingerhut were divorced but were living together.

**'Justice must prevail'**

"Nothing is going to bring my father back to us, this is why justice must prevail," the letter states. "Nate Jackson took a very special person from this world, and should not be allowed to live another day."

The judge could have reduced Jackson's sentence to life in prison without parole, or 25 or 30 years.

The judge, however, said during sentencing that Jackson broke into Fingerhut's home to "carry out a coldblooded execution."

Defense attorneys have asked the judge to grant a new trial. The judge said he would take the matter under advisement.

**Blaming Roberts**

After the sentencing hearing, Jeffrey Wells, 37, of Braceville, a friend of Jackson's, said he faults Roberts for the murder.

Wells, who said he met Jackson while serving time on an assault charge in the Trumbull County jail, said he doesn't believe the murder would have taken place if it wasn't for Roberts.

"Nate didn't know this guy," Wells said. "Donna Roberts knew the guy. She became Nate's friend. She set this up."

During the trial, Prosecutor Dennis Watkins told the jury that while Jackson was in prison in 2001, he and Roberts wrote to each and plotted Fingerhut's murder.

Jackson was released from prison Dec. 9, 2001, after serving one year on a conviction out of Mahoning County on two counts of receiving stolen property.

*sinkovich@vindy.com*

### YOUNGSTOWN

# Guilty plea entered in cough-syrup case

*The seven-month sentence will be served after she finishes doing time in Trumbull County Jail.*

**By BOB JACKSON**
VINDICATOR COURTHOUSE REPORTER

YOUNGSTOWN — A city woman who brought stolen prescription cough syrup here from the West Coast was sentenced to prison Monday.

Khaliah Janae Green, 26, of Idlewood Avenue, pleaded guilty in Mahoning County Common Pleas Court to possession of Tussionex, a fourth-degree felony.

In exchange for the plea, assistant prosecutor Dennis Sarisky recommended a seven-month prison sentence, which was approved by Judge James C. Evans. The sentence will begin immediately after Green finishes a stint in the Trumbull County Jail, where she is serving time for an unrelated charge of drug abuse. She is scheduled to be released in February.

A charge of carrying a concealed weapon, also unrelated to the drug charge, was dismissed as part of Green's plea agreement with the prosecutor's office.

**What happened**

Green and Tameika Fields, 28, of Crandall Avenue, were indicted by a county grand jury in September 2001 on felony charges of Tussionex possession. Authorities caught them at the WRTA bus station downtown with two bags full of the medicine.

Tussionex is a highly potent cough syrup that contains the same active ingredient as Vicodin and other depressants, and its effect is similar to heroin.

Authorities say the liquid sells on the streets for between $125 and $150 an ounce.

Sarisky said it is often used by young people, who mix it with orange juice or drink it with a six-pack of beer.

Green and Fields got the cough syrup in Los Angeles, where it had been stolen from a pharmacy, Sarisky said. Green was living in California at the time, said her attorney, James C. Dunn.

The women flew back to this area and were riding a WRTA bus back into Youngstown when the driver overheard them talking about drug transactions. The driver alerted local authorities, who apprehended the women when they got off the bus downtown. They were carrying between 165 and 200 ounces of the liquid in two bags.

Fields was scheduled to plead guilty Nov. 26 but did not show up. Judge Evans issued a warrant for her arrest, but she has not yet been located.

*bjackson@vindy.com*

### YOUNGSTOWN

# Man from Flordia pleads guilty in car chase with state police

### POLAND

# 3 traffic stops end in drug charges

*The men have all pleaded innocent.*

**By JOHN W. GOODWIN JR.**
VINDICATOR STAFF WRITER

POLAND — Routine traffic stops by village police officers have resulted in several drug arrests.

Ernest Harding, 47, of Third Street, Lowellville, was pulled over by police just after 11 a.m. Sunday on U.S. Route 224 after a routine license check showed he had arrest warrants from Georgia. Police reports say officers, once at the police station, found Valium hidden in a cigarette pack Harding was carrying.

Harding pleaded innocent in Struthers court to misdemeanor drug abuse. He is jailed in lieu of $1,000 bond and due back in court Jan. 3.

**Cracked windshield**

Saturday afternoon, a car that Alan Harper, 23, of New Castle, was a passenger in was pulled over on Route 224 for having a cracked windshield and no license plate light. Harper was arrested on a warrant out of Struthers.

At the police station, reports say, officers found a small bag of marijuana hidden in Harper's shoe. Deputies at the county jail found more than $3,700 on him. Because of the drug arrest, village police are looking to confiscate the money.

Harper pleaded innocent to the minor misdemeanor drug charge. He is due back in court Sept. 19 for that citation and a 2001 driving under suspension charge. He is in Mahoning County Jail in lieu of $5,000 bond.

**Marijuana burning**

Phillip Knepp, 22, of Beaver Falls, Pa., pleaded innocent Dec. 6 to misdemeanor drug paraphernalia and minor misdemeanor drug charges. He is out of jail on his own recognizance and due back in court Sept. 3.

Police reports say Knepp was stopped for speeding at 10:04 p.m. Dec. 3 on state Route 616. Officers found a small amount of marijuana


DEFENDANT'S EXHIBIT B-19

**WEDNESDAY, JANUARY 8, 2003**

## Local
### digest

### Port authority chair is leaving the board

VIENNA — Chairman Reid Dulberger has announced he does not wish to be reappointed to the Western Reserve Port Authority board. His term expired at the end of the year.

The decision leaves three open positions on the eight-member board, which runs Youngstown-Warren Regional Airport here and promotes economic development in Mahoning and Trumbull counties.

Each county appoints four people; the board elects its chairman. Dulberger will remain as chairman until a replacement is picked.

A vice president of Youngstown/Warren Regional Chamber and a Trumbull County appointee, Dulberger has served as authority chairman since Dino Theofilos stepped down at the end of 2001.

Two Mahoning County appointees to the board who resigned in the past 18 months have yet to be replaced by Mahoning County commissioners.

The authority also is seeking a replacement for Tom Nolan as director of aviation, who left to take a another job last week.

### Fingerhut house is sold

WARREN — The Howland Township house of a murder victim was sold at a Trumbull County sheriff's sale Tuesday.

Margaret Pilon of Farmington bought the Fonderlac Drive S.E. house where Robert Fingerhut was shot to death Dec. 11. It sold for $120,000.

Nate Jackson, 30, of South Pearl Street, Youngstown, was convicted of aggravated murder and sentenced to death.

Fingerhut's ex-wife, Donna Roberts, 57, of Howland, is scheduled to go to trial in April on a murder charge.

### Pleads guilty

WARREN — A 29-year-old assistant Trumbull County jail warden has pleaded guilty in Trumbull County Common Pleas Court to a misdemeanor charge of contributing to the delinquency of a minor.

Jason M. Fusillo of Girard will be sentenced after a background check is completed by the county adult probation department.

Prosecutors said the victim was a 14-year-old girl who knows Fusil___ ___ his case ___tus.

DEFENDANT'S EXHIBIT B-20

---

### st day

___or, Ryan was accompanied by ei___er Strickland or Democratic Rep. ___ephanie Tubbs Jones of Cleveland.

"I'm showing him around. I com___itted to it." Tubbs Jones said later. ___'s the colleague and the mother in ___e."

**Jobless insurance**

The pomp largely dispensed with, ___yan and his new colleagues now get ___own to the more substantive busi___ess of legislating.

The House's first legislative task ___ill be to extend the federal unem___loyment insurance program that

See House on Page B2

---

### ___ILES

# ___Road
# ___project
# ___slated
# ___to begin

*___ost of the project will be ___nded by state Issue II money.*

**By SHERRI L. SHAULIS**
VINDICATOR TRUMBULL STAFF

NILES — After completing the ma___rity of the work on one major road ___roject, city officials plan to start an___ther.

City Engineer Mark Hess said the ___cond phase of the North Road pro___ct could start in late February or ___arly March.

"I'm scheduled to meet with the ___ntractor this week," Hess said.

Niles officials are taking the lead ___ the project, though portions of ___e road pass through Warren and

---

## BOARDMAN

# Long-locked frien___
# can cut it as dono___

*Several women donated at least 10 inches of hair to the program.*

**By JOHN W. GOODWIN Jr.**
VINDICATOR STAFF WRITER

BOARDMAN — At 6 a.m. today, Amanda McPheron stood in the lobby of Panache Hair Salon and Day Spa on West Boulevard brushing the brown, elbow-length hair she has cherished for two decades.

The 20-year-old Masury woman has always enjoyed the feel and look of her long flowing hair. Today she was hoping to share that feeling with someone else through the Cuts for a Cause Program, organized by a group of East Palestine middle and high school students.

About half of her hair will be donated to the Locks of Love Program — an organization that makes wigs for terminally ill children.

Jean Metzger, an East Palestine middle school teacher, said the event is part of a yearlong community service project by students.

**Another donor**

Kristen Morris, 17, of East Palestine donated about 10 inches of her hair to the program. Because she is a minor, Morris needed parental consent before the stylists went to work, but that was no problem.

"My mom was really h__ said. "She was proud th__ to do something like this __ is for such a good cause."

McPheron had been l__ hair grow for several yea__ cided to donate it after h__ announcement at schoo__ about two years to grow t__ es of hair she donated __.

Several of the women w__ nervous at cutting their l__ ished locks. By the end of __ though, each looked was s__ stroking a new hair style.

**Important progra__**

Beth Barry-Renstrom, a __ stylist, said programs suc__ of Love are important. __ real hair takes 10 to 1__ ponytails, and the cos__ $3,000, she said. A real w__ er, last longer and feels b__ wearer than a synthetic w__

Barry-Renstrom and se__ beauticians at Panache do__ time to cut and style the d__ A client approached he__ idea, and she couldn't ref__

"My dad died of cance__ years ago and I am happy__ thing I can do to help so__ cancer," she said.

*jgoodwin@vindy.com*

---

## MERCER COUNTY

# Humane Society fin__
# new spot for busine__

*The society dropped plans for erecting a building in Farrell after a church protested the action.*

**By HAROLD GWIN**
VINDICATOR SHARON BUREAU

WHEATLAND, Pa. — The Mercer County Humane Society appears to have found a spot on Broadway Avenue to open an office, kennel and retail store.

Rick Harakal, president, said a search committee has decided that a newly rebuilt building adjacent to the Farrell sewage treatment plant

the humane society an__ would drop plans for th__ cation in light of the pro__

Harakal said the sea__ newed for another locati__ he will present the Broad__ building in Wheatland a__ site to his board of direct__

The board will have t__ negotiations with the __ owner, he said, noting t__ nary discussions show th__ ety and the owner are "c__ apart" on a sale price.

**The new stru__**

The building was exte__ aged in a fire several y__ was recently rebuilt and __ said.

---

STATE OF OHIO              )          IN THE COURT OF APPEALS
                          )SS.
COUNTY OF TRUMBULL        )          ELEVENTH DISTRICT


STATE OF OHIO,

            Plaintiff-Appellee,          **JUDGMENT ENTRY**

      - vs -                              **CASE NO. 2003-T-0056**

DONNA  ROBERTS,                          M A N D A T E

            Defendant-Appellant.         COMMON PLEAS

                                         CASE NO. 01 CR 793

      For the reasons stated in the Memorandum Opinion of this Court, Appellee's

motion to dismiss the instant appeal is granted.  It is the order of this Court that

the instant appeal is hereby dismissed for lack of jurisdiction.



                          _Donald R. Ford_
                          PRESIDING JUDGE DONALD R. FORD

JUDITH A. CHRISTLEY, J.,

ROBERT A. NADER, J., Ret., Eleventh Appellate
District, sitting by assignment, concur.

FILED
COURT OF APPEALS

APR  8 2003

TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

## PRE___ FOR SUBPOENA - In ___ Case
### Revised Code, Section 2303.11

THE STATE OF OHIO )  COMMON PLEAS COURT
                  )
        Plaintiff )  TRUMBULL COUNTY, OHIO
                  )
    vs.           )  Case No. / 01-CR-793
                  )
DONNA  ROBERTS.   )
                  )
        Defendant )  **PRECIPE**

To the Clerk of the Court:
    Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|------|---------|
| Andrew Harvey | c/o Wal-Mart 2015 Elm Road NE Warren, OH 44483 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __22__ day of __APRIL__ 2003, at __9:00 a.m.__. Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3ʳᵈ Floor, Warren, Ohio 44481

Christopher D. Becker
Assistant Prosecuting Attorney

**\*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.**

### SUBPOENA IN CRIMINAL CASE
#### Revised Code, Section 2335.07, 2317.11-14.

The State of Ohio, Trumbull County.                          Common Pleas Court
To the Sheriff of said County:

    You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
        (Deputy Clerk)

   RETURN OF SERVICE

Received this on the _____ day of _____, 2003
at _____ o'clock ____. M. and served the person
named therein against whose name are indicated
the manner of service.

        SHERIFF FEES

Service & Return each name ____ cents  $ _____

Mileage _____ miles at _____ cents  $ _____

        TOTAL                      $ _____

_____

SHERIFF

By: _____
        Deputy

**PRE⸤ ⸥PE FOR SUBPOENA - In ⸤ ⸥ate Case**

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| | ) | |
| vs. | ) | |
| | ) | Case No.   01-CR-793   |
| DONNA   ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Jose Sanchez | c/o Mahoning County Sheriff's Dept.<br>110 Fifth Avenue<br>Youngstown, OH 44511 |

** JURY TRIAL **

to appear as a witness in the above case on the __21__ day of __APRIL__ 2003, at __9 :00 a.m.__ Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3ʳᵈ Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

---

**SUBPOENA IN CRIMINAL CASE**

Revised Code, Section 2335.07, 2317.11-.14.

**The State of Ohio, Trumbull County.**                                    **Common Pleas Court**
**To the Sheriff of said County:**

    You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _P.J. Dudley_ _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____ PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

  Plaintiff

vs.

DONNA ROBERTS,

  Defendant

PRECIPE AND SUBPOENA
  Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

    RETURN OF SERVICE

Received this on the 04 day of __April__, 2003

at 2:23 o'clock P. M. and served the person
named therein against whose name are indicated
the manner of service.

    SHERIFF FEES

Service & Return each name ____ cents  $ 1 00

Mileage _____ miles at ____ cents  $ 0

    TOTAL                         $ 1.00

RANDALL A. WELLINGTON                    MAHONING COUNTY
SHERIFF

By: LT. MARC L. MAJTO M-7
    Deputy



# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )
                                  )
    Plaintiff                     )    Case No. 01-CR-793
                                  )
                                  )    Judge John M. Stuard
-vs-                              )
                                  )    PRELIMINARY INSTRUCTIONS
DONNA M. ROBERTS,                 )    (Defendant's Submission)
                                  )
    Defendant                     )

    COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and hereby submits the following preliminary instructions to be given to members of the veiire to read and review before individual voir dire.  For cause, the Defendant says that the proposed instructions are an accurate statement of the law and procedures in an Ohio capital case, would be helpful to the potential jurors, and would save time in the voir dire process by reducing the amount of effort needed to school the jurors about Ohio capital law to determine their fitness to sit on a capital case.

    Because this case has the possibility of a death penalty it would be helpful to instruct you upon the law of Ohio regarding death penalty cases.  Once again, the mere fact that we are discussing the death penalty in this case has absolutely nothing to do with the guilt or innocence of Donna Roberts.  It is simply something that must be done at this point in the trial of any capital case.  Also, whether you believe in the death penalty or do not believe in the death penalty is not the question.  The question is whether you can follow the instructions of law in that particular area and if you have formed an opinion as to the law in death penalty cases, whether or not you can set that opinion aside and follow the instructions of

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS1@AOL.COM

69

law.

If called upon to be a juror in this case, this trial could involve two (2) phases of trial. Phase One is what we call the Trial Phase. There, you would sit and listen to the evidence, along with the other jurors, and determine if the State has proven its case against this defendant by a burden of proof of beyond a reasonable doubt. Incidentally, the State of Ohio will have the burden of proof throughout this entire case. The Defendant is presumed innocent, and she never has to prove anything. In the first phase, you will be called upon to decide if the Defendant is guilty or not guilty of aggravated murder, aggravated robbery and aggravated burglary. Attached to the aggravated murder charges in this case are what we call specifications, which is a legal term for a separate factual determination. If you find the Defendant guilty of aggravated murder, you will be told that you should continue to deliberate and decide whether the State has proved beyond a reasonable doubt the specifications that the aggravated murder was committed during the course of an aggravated robbery, during the course of an aggravated burglary, or either. If you find the Defendant not guilty of aggravated murder, you would not go on to make this separate factual determination, since you would have found that the State did not prove the Defendant guilty of aggravated murder. If you find the Defendant not guilty of aggravated murder, or if you find that the Defendant was guilty of aggravated murder but that the State did not prove the specifications, then, in either of those circumstances, your participation in the trial would conclude. In other words, the death penalty is not a possibility in any case in this State where the State fails to prove by proof beyond a reasonable doubt both aggravated murder and at least one specification.

If, on the other hand, the jurors find that the State has proven beyond a reasonable doubt the Defendant's guilt on an aggravated murder charge and one or more of the death specifications, you would then be called upon to go to Phase

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8210 · E-MAIL: JBJJURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 974

Two of the trial.  If the case does proceed to a second phase, at that second phase, the jury would be called upon to determine the appropriate punishment.  At that time, you would be called upon to determine which of four sentencing alternatives should be imposed.  The sentencing alternatives are:

1.  Death by lethal injection;

2.  Life imprisonment with no eligibility for parole;

3.  Life imprisonment with no eligibility for parole until the offender has served thirty (30) full years of imprisonment; and

4.  Life imprisonment with no eligibility for parole until the offender has served twenty five (25) full years of imprisonment.

There is a common misperception that upon a finding of guilty on a charge of aggravated murder with a death specification, the jury must sentence a defendant to death.  This simply is not so.  The death penalty is only one of four possibilities, and the jury must fairly consider, following the Court's instructions, life imprisonment as well as the death penalty.  If the case does proceed to a second phase, you should enter that second phase with an open mind, not favoring the imposition of one penalty over another.

*Aggravating circumstances* are reasons that weigh in favor of imposing the death penalty.  *Mitigating factors* are reasons that weigh against imposing the death penalty.  If you get to Phase Two, you would receive an instruction that you are to consider and weigh against the aggravating circumstance(s) all of the mitigating factors presented at the second phase; in other words, to weigh the reasons for the death penalty against the reasons against the death penalty.  The aggravating circumstance(s)—reason(s) to consider imposing the death penalty—is the specification(s) you found in the first phase (in this case, that the aggravated murder was committed during the course of an aggravated robbery, an aggravated burglary, or both.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail Jbjurisdoc@aol.com

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 975

At the second phase, if the State proves to you by proof beyond a reasonable doubt that the aggravating circumstance(s) outweigh the mitigating factors, and if you find that death is the appropriate penalty, then you must return a verdict to impose the death penalty. If, on the other hand, you find that the State has failed to prove to you by proof beyond a reasonable doubt that the aggravating circumstance(s) outweigh the mitigating factors, then your duty is to return a verdict to impose one of the following life sentencing options: (1) life imprisonment with no possibility of parole; (2) life imprisonment with parole eligibility after the offender serves thirty (30) full years; or, (3) life imprisonment with parole eligibility after the offender serves twenty-five (25) full years. On these last two options, there is no "good time" or "time off for good behavior": thirty years means thirty full years and twenty five years means twenty five full years.

This is a brief synopsis of the law having to do with death penalty cases in Ohio. As you can see, the death penalty is not automatic in all murder cases. To consider imposing death , the jury must find at the first phase that the State proved beyond a reasonable doubt both aggravated murder and at least one of the specification; and, at the second phase that the State proved beyond a reasonable doubt that the aggravating circumstance(s) outweighs the mitigation evidence and that death is the appropriate sentence in this case.

With that in mind, the attorneys will ask you questions about the death penalty. They may ask you questions about how you feel about the death penalty or its application, how you felt about the death penalty prior to coming here, and they may ask you whether you would listen to their arguments about aggravating circumstances and mitigating factors. Please keep in mind that you are not disqualified as a juror simply because you had a preconceived idea of how the death penalty should be applied. The question is whether you can erase any preconceived ideas and follow my instructions of law on this subject. You will also initially be

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZDOC@AOL.COM

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 976

asked a series of questions by the Court:

• Do you understand and appreciate that as a juror, no matter what you think about the death penalty and when it should be applied, you must be able to follow the instructions of law and only apply the Court's instructions rather than your preconceived understanding of what you think the law is?

• Can you appreciate the importance that you will only apply the instructions of law that the Court gives you in this regard?

• Are your feelings about the death penalty such that if you found the Defendant guilty of aggravated murder and at least one specification, you would refuse to even consider imposition of the death in every case?

• Are your feelings about the death penalty such that if you found the Defendant guilty of aggravated murder and at least one specification, you would vote to impose death in every case?

• Are your feelings about the death penalty such that if you found the Defendant guilty of aggravated murder and at least one specification, you would consider the death penalty and all of the life imprisonment options equally, and then make your decision based only upon what is presented to you at the second phase?

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was: ❑ sent by regular United States Mail, postage prepaid; ❑ sent by telecopier pursuant to OHIO CRIM.R. 57(B) and OHIO CIV.R. 5(B); ☑ hand delivered to counsel or counsel's office this _10_ day of April, 2003 to CHRISTOPHER D. BECKER, Esq., and KENNETH N. BAILEY, Esq., 160 High Street NW, Warren, Ohio 44483.

JOHN B. JUHASZ

E:\JBJCap2\Roberts\Trial\Preliminary instructions.Defense Submission.wpd ✦ Thu 10Apr03-11:23:17A

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250 · E-MAIL JBJJURISDOC@AOL.COM

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 978



E:\JBJCrim27\CAPITAL\Client\Roberts.Donna\Mtn.Specific.req.wpd ✦ Sunday 06 April 2003•03:05pm (1505 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA M. ROBERTS,

    Defendant

}
}
}
}
}
}
}
}
}

Case No. 01 CR 793

Judge Stuard

---

### DEFENDANT'S MOTION FOR SPECIFIC DISCLOSURE OF
### DUE PROCESS MATERIAL

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves for an order either requiring the government to disclose to the Defendant the following items; or, specifying of record that such items do not exist. The Defendant specifically requests disclosure of any and all evidence and/or information known to the government or any of its agents concerning:

•any and all records or information showing prior misconduct or bad acts committed by any potential prosecution witness, including disciplinary, internal affairs, and excessive force records of any police or corrections officers who are potential prosecution witnesses or who had any involvement in any aspect of the investigation of this case;

•any and all consideration or promises of consideration given to or made on behalf of any and all government witnesses; including State's

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

i
70

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 979

witness Vaunda Chambers, *see, Giglio v. United States* (1972), 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, discussed *post*; *United States v. Boyd* (7th Cir. 1995), 55 F.3d 239, 245-46;

 • any and all information that Vaunda Chambers has previously acted as a government informant or witness, and any consideration for such actions and/or testimony;

 • any and all prosecutions, investigations, or possible prosecutions pending or which could be brought against any potential government witnesses, including Vaunda Chambers, and any probation, parole, or deferred prosecution status of any potential witnesses; *see, e.g., Davis v. Alaska* (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.

 • any statements of potential witnesses, including Vaunda Chambers, which conflict, either internally or with other statements given by the same witness; and, any statement, or summary of any statement, of any person, whether or not the government intends to call such witness at trial, which conflicts with the statement of any other person or witness, including any inconsistencies obtained during the interview process for trial preparation, *see, Giglio v. United States* (1972), 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.

 The Defendant makes this specific demand for information pursuant to the authorities cited in the attached Memorandum field in support of his Motion For Disclosure of Due Process Material, earlier filed herein.   In addition thereto, the Defendant notes that the United States Supreme Court in *United States* v. *Agurs* (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

ii

held that if a "substantial basis for claiming material exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Id.*, 427 U.S. at 106. The Court several years later said that the "more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist." *See, United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481, 53 USLW 5084. When deciding the question of prejudice to the Defendant by the government's failure to make disclosures in response to specific requests, "it may be proper to weigh in favor of the accused the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value." *See, Wilson v. Whitley* (5th Cir. 1994), 28 F.3d 433, 438.

WHEREFORE, the Defendant respectfully prays for an order requiring the government to disclose the information and evidence herein described; or, for the government to affirmatively state on the record that such evidence does not exist.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASDOC@AOL.COM

iii

JOHN B. JUHASZ   (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:
☐ sent by regular United States Mail, postage prepaid on
☐ hand delivered to counsel or counsel's office
☐ sent by telecopier
to Christopher D. Becker, Esq., and Kenneth N. Bailey, Esq., Counsel for
Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this ___ day of April,
2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJJURISDOC@AOL.COM

iv

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | **CASE NO.:   01-CR-793** |
| Plaintiff, | * | **HONORABLE JUDGE:** |
| | | **JOHN M. STUARD** |
| -vs- | * | |
| DONNA MARIE ROBERTS, | * | **STATE'S FIFTH SUPPLEMENTAL** |
| | | **RESPONSE TO** |
| Defendant, | * | **DEFENDANT'S REQUEST FOR** |
| | | **DISCOVERY** |

Now comes the State of Ohio by Assistant Prosecuting Attorneys Kenneth N. Bailey and

Christopher D. Becker and submit the following fifth supplemental answer to the Defendant's

Request for Discovery pursuant to Criminal Rule 16 of the Ohio Rules of Criminal Procedure.

Attached hereto are copies of the indictment, Rule 11 Agreement, Sentence and Order

granting shock probation for Vaughnda R. Chambers in Case No. 01-CR-786, whose name was

previously provided in discovery. This discovery explains the consideration Vaughnda Chambers

received for providing information to the State of Ohio in reference to conversations Vaughnda

Chambers had with the Defendant.

Respectfully submitted,
STATE OF OHIO, by:

KENNETH N. BAILEY
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
4th Floor Administration Building
160 High Street, N.W.
Warren, Ohio 44481-1092
Phone: (330) 675-2907
Fax: (330) 675-2431
Attorney Reg. # 0023228

71

and

CHRISTOPHER D. BECKER
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO
Attorney Reg. # 0047252

PROOF OF SERVICE

A copy of the foregoing document was served upon the Attorneys of record by hand-delivering a copy of the same to them, this 14 th day of April 2003.

CHRISTOPHER D. BECKER (0047252)
ASSISTANT PROSECUTING ATTORNEY
TRUMBULL COUNTY, OHIO

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 01-CR-786 |
| | ) | |
| Plaintiff | ) | JUDGE JOHN M. STUARD |
| | ) | |
| -vs- | ) | SENTENCED TO THE OHIO |
| | ) | REFORMATORY FOR WOMEN |
| VAUGHNDA R. CHAMBERS, | ) | |
| | ) | ENTRY ON SENTENCE |
| Defendant | ) | |

The Defendant having been indicted by the September, 2001 First Term of the Grand

Jury of Trumbull County, Ohio for Count 1: Possession of Crack Cocaine (F1) With

Specification of Major Drug Offender (F1) (ORC 2925.11(A)&(C)(4)(f) & 2941.1410) and

Count 2: Possession of Cocaine (F3) (ORC 2925.11(A)&(C)(4)(c), and having been brought

into Court on the 27th day of February, 2002, and being fully advised in the premises and

represented by counsel, Attorney , entered a plea of guilty to amended indictment, Count 1:

Possession of Crack Cocaine (F3) (ORC 2925.11(A)&(C)(4)(C) and Count 2: Possession of

Cocaine (F4) (ORC 2925.11(A)&(C)(4)(b), said plea being accepted by the Court and

probation report having been waived.

On February 27, 2002, defendant's sentencing hearing was held pursuant to O.R.C.

Section 2929.19. Defense Attorney John Fowler and Assistant Prosecuting Attorney Thomas

C. Wrenn were present as was Defendant who was afforded all rights pursuant to Criminal

Rule 32. The Court has considered the record, oral statements, any victim impact statements,

as well as the principles and purposes of sentencing under O.R.C. Section 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12.

The Court finds that the Defendant has been convicted of Count 1: Possession of Crack Cocaine (F3) (ORC 2925.11(A)&(C)(4)(C) and Count 2: Possession of Cocaine (F4) (ORC 2925.11(A)&(C)(4)(b), and offense charged in Count 1 being subject to a mandatory term of incarceration pursuant to ORC 2929.13(F).

After weighing the seriousness of the crime and recidivism factors, the Court finds that prison is consistent with purposes & principles of sentencing and that the defendant is not amenable to an available community control sanctions.

It is therefore ORDERED, ADJUDGED, and DECREED that the Defendant serve a stated prison term of one (1) year on Count 1, which is a mandatory term of incarceration pursuant to ORC 2929.13(F), and one (1) year on Count 2, sentences to be served consecutively for a total of two (2) years, and that she pay a mandatory fine of $5,000.00. Defendant shall pay the cost of prosecution taxed in the amount of $_____ for which execution is awarded. Driver's license suspension of a period of six (6) months.

The Court has further notified the Defendant that post release control is mandatory in this case up to a maximum of 3 years, as well as the consequences for violating conditions of post release control imposed by the Parole Board under Revised Code Section 2967.28. The Defendant is Ordered to serve as part of this sentence any term of post release control imposed by the Parole Board, and any prison term for violation of that post release control.

It is further ORDERED that the Superintendent of the OHIO REFORMATORY FOR WOMEN shall take note that the Defendant herein has granted credit for time served pursuant to these charges from June 21, 2001 to date.

_____
DATE

_____
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD

_____
JUDGE

You are hereby notified that you have been convicted of an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse and pursuant to Section 2923.13 of the Ohio Revised Code, you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance.

COPY

SECRET

**INDICTMENT**
Crim R. 6, 7

POSSESSION OF CRACK COCAINE (F1) WITH SPECIFICATION OF MAJOR DRUG OFFENDER

THE STATE OF OHIO                )
                                                       )     **COURT OF COMMON PLEAS**
TRUMBULL . . . . . . . . . . . . . . . COUNTY, ss.)

**Of the Term September, in the year two thousand one,**

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County*

*aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or*

*about the* **20th** *day of* **June, 2001,** at Trumbull County, Ohio, **VAUGHNDA R. CHAMBERS (aka McCRAY),**

did  knowingly obtain, possess, or use, Crack Cocaine, a Schedule II controlled substance, and the amount

involved exceeds one-hundred grams of Crack Cocaine, to-wit: 148.7 grams,

SPECIFICATION:

THE  GRAND  JURORS  further  find  and  specify  pursuant  to  Ohio  Revised  Code  2941.1410  that

**VAUGHNDA R. CHAMBERS (aka McCRAY)** is a major drug offender as specified in section 2929.01 of the

Ohio Revised Code,

You are hereby notified that you are under indictment for an offense involving the illegal possession, use, sale, administration, distribution or trafficking in any drug of abuse and pursuant to Section 2923.13 of the Ohio Revised Code you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance while under indictment.

in violation of the Ohio Revised Code, Title 29, Section 2925.03(A)&(C)(4)(f) and 2941.1410, *and against the*

*peace and dignity of the State of Ohio.*

Case No.        SECRET
Defendant       CHAMBERS, Vaughnda R.(aka McCRAY)                                Page 1 of 3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 988

**COUNT 2:** **POSSESSION OF COCAINE (F3)**

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County*

*aforesaid,* on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about

the **20th day of June, 2001,** at Trumbull County, Ohio, **VAUGHNDA R. CHAMBERS (aka McCRAY),** did

knowingly obtain, possess, or use Cocaine, a Schedule II controlled substance, and the amount involved exceeds

25 grams but does not exceed 100 grams that is not Crack Cocaine, to-wit: 27.9 grams,

in violation of Section 2925.11(A)&(C)(4)(c) of the Ohio Revised Code, *and against the peace and dignity of the*

*State of Ohio.*

You are hereby notified that you are under indictment
for an offense involving the illegal possession, use, sale,
administration, distribution or trafficking in any drug of
abuse and pursuant to Section 2923.13 of the Ohio
Revised Code you are prohibited from acquiring, having,
carrying, or using any firearm or dangerous ordnance
while under indictment.

_____
Dennis Watkins
Prosecuting Attorney

_____
Charles L. Morrow
Assistant Prosecuting Attorney

Case No.     SECRET
Defendant    CHAMBERS, Vaughnda R.(aka McCRAY)

Page 2 of 3

SECRET
September First Term, 2001
**COMMON PLEAS COURT**
TRUMBULL COUNTY, OHIO

**THE STATE OF OHIO**
*vs.*
VAUGHNDA R. CHAMBERS (aka McCRAY)
(lka) 526 Woodbine, Apt C
Warren, OH  44483
SSN: 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; DOB: 04/17/73

*Indictment for:* CT 1: POSS OF CRACK COCAINE
(F1) W/SPEC OF MAJOR DRUG OFFENDER
(2925.11(A)&(C)(4)(f) and 2941.1410;
CT 2: POSS OF COCAINE (F3)
(2925.11(A)&(C)(4)(c)

_____
*Dennis Watkins*
_____
Prosecuting Attorney
**A TRUE BILL**

_____
*Janie Winans*
Foreman of the Grand Jury
_____
This Bill of Indictment found upon testimony sworn and sent before
the Grand Jury at the request of the Prosecuting Attorney

_____
*Janie Winans*
Foreman of the Grand Jury
_____

*Filed*_____, 20_____

_____
                                    Clerk
*By*_____
                                    Deputy

_____

On this _____ day of _____ 20___

the within named _____

_____

Defendant was arraigned, and pleads

_____guilty to this indictment

_____
                                    Clerk
*By*_____
                                    Deputy


**The State of Ohio**
**Trumbull County.**

    *I, the undersigned, Clerk of the Court of Common Pleas in and for said County, do hereby certify that the foregoing is a full, true, and correct copy of the original indictment, with endorsements thereon, now on file in my office.*

*WITNESS my hand and seal of said Court at, Warren,*

*Ohio, this*_____ *day of*_____, 20_____

_____
                                    Clerk
*By* _____
                                    Deputy


Case No.        SECRET
Defendant       CHAMBERS, Vaughnda R.(aka McCRAY)

Page 3 of 3

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )        CASE NO. 01-CR-786
                                  )
        Plaintiff                 )        JUDGE JOHN M. STUARD
                                  )
-vs-                              )
                                  )        JOURNAL ENTRY*
VAUGHNDA R. CHAMBERS,             )
                                  )
        Defendant                 )

This cause came on for hearing this 10th day of October, 2002, on the Defendant's

Motion For Judicial Release, filed by her attorney, John Fowler.

The Court finds that the motion is well-taken and Judicial Release is hereby granted.

It is hereby ORDERED, ADJUDGED, and DECREED that the Warden of the Ohio

Reformatory for Women release the Defendant, Vaughnda R. Chambers, and that said

Defendant shall report to the Adult Probation Department, Trumbull County, Ohio, within

five (5) days from the date of said release.

It is the ORDER of the Court that the Defendant be placed on ISP probation with

electronic monitoring. Defendant shall follow all terms of probation that is set by the

Trumbull County Adult Probation Department. Defendant placed on 3 years
probation.

_____10/10/02_____
DATE

HONORABLE JOHN M. STUARD
Judge, Court of Common Pleas
Trumbull County, Ohio

_____10/17___ 20_02_
This is a true and correct copy to the original

MARGARET R. O'BRIEN, Clerk

By_____Deputy

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )        CASE NO. 01-CR-786
                                  )
        Plaintiff                 )        JUDGE JOHN M. STUARD
                                  )
-vs-                              )
                                  )        FINDING ON GUILTY PLEA
VAUGHNDA R. CHAMBERS,             )        TO AMENDED INDICTMENT
                                  )
        Defendant                 )

After being fully informed by my counsel and by the Court of the charge against me, I am

making a plea voluntarily with the understanding of the nature of the charge and the

consequences, including the penalty of the plea, which can be from:

<u>COUNT 1</u>:  Mandatory prison term of 1, 2, 3, 4, or 5 years and up to $10,000.00 fine;

mandatory minimum fine of $5,000.00.  Driver's license suspension for not less than 6

months nor more than 5 years.

<u>COUNT 2</u>:  6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, or 18 months and up to $5,000.00 fine.

Driver's license suspension for not less than 6 months nor more than 5 years.

Said prison term is (not) presumed necessary and is (not) mandatory.

Additionally, the Defendant expressly acknowledges and understands, that under the terms

of this plea agreement and/or relevant law regarding Judicial Release, the following is applicable

(check one):

_X_    (1)  the State will not oppose a timely filed motion for judicial release;
            *subject to condition herein.*

____   (2)  the State will not take a position on judicial release;

____   (3)  the State will oppose judicial release; or

1

_____ (4)  the Defendant is not eligible for judicial release.

Further, the Defendant expressly acknowledges and understands that the victim or victim's representative is neither a party to, nor bound by, the terms of this plea agreement, and the victim or the victim's representative retains the right to make a statement regarding Judicial Release or other similar modifications of sentence.

Court costs, restitution and other financial sanctions including day fine, standard fine, reimbursement for the cost of community sanctions may be imposed.

If you are now on felony probation or parole, this plea may result in revocation proceedings and any new sentence could be imposed consecutively.

In addition a period of control or supervision by the Adult Parole Authority after release from prison is mandatory/optional in this case.  The control period may be a maximum of ___ years.  A violation of any post-release control rule or condition can result in a more restrictive sanction while released, an increased duration of supervision or control, up to the maximum set out above and/or re-imprisonment even though you have served an entire stated prison sentence imposed upon you by this court for all offenses set out above.  Re-imprisonment can be imposed in segments of up to 9 months but cannot exceed a maximum of ½ of the total term imposed for all of the offenses set out above.  If you commit another felony while subject to this period of control or supervision you may be subject to an additional prison term consisting of the maximum period of unserved time remaining on post-release control as set out above or 12 months whichever is greater.  This prison term must be served consecutively to any term imposed for the new felony you are convicted of committing.  If this court is not required by law to impose a prison sanction, it may impose a community control sanction or non-prison sanction upon you.

2

If you violate the rules or conditions of such a community control sanction, the court may extend the time for which you are subject to this sanction up to a maximum of 5 years, impose a more restrictive sanction, or imprison you for up to the maximum term allowed for the offense/offenses as set out above.

I understand that the Court upon acceptance of a plea of guilty may proceed with judgment and sentencing. I understand I have the right to a jury trial. I understand that at trial I have the right to confront and cross-examine the witnesses against me, and the right to have compulsory process for obtaining witnesses in my favor and to require the State to prove my guilt beyond a reasonable doubt at a trial at which I cannot be compelled to testify against myself. Upon conviction, I would have the further right of Appeal. However, I waive all those rights, including right to a trial by jury. I withdraw my former plea of "not guilty" and enter a plea of "guilty" to the amended indictment charging me with the crime of:

COUNT 1: POSSESSION OF CRACK COCAINE (F3) (ORC 2925.11(A)&(C)(4)(c)

COUNT 2: POSSESSION OF COCAINE (F4) (ORC 2925.11(A)&(C)(4)(b)

Furthermore, I am entering the plea of guilty after being fully informed by my counsel and by the Court of the elements of the charge. Those elements are:

COUNT 1: The Defendant did in Trumbull County, Ohio, knowingly, obtain, possess, or use, crack cocaine, a schedule II controlled substance, and the amount involved exceeds 5 grams but does not exceed 10 grams of crack cocaine.

COUNT 2: The Defendant did in Trumbull County, Ohio, knowingly, obtain, possess, or use cocaine, a schedule II controlled substance, and the amount involved exceeds 10 grams but does not exceed 25 grams of cocaine.

3

Furthermore, I have been informed by the Court and understand that I am (not) eligible for probation or community control sanction or (if applicable) that my plea of guilty may result in an additional sentence for a parole or post release control violation, and/or probation or community control sanction violation and such sentence shall be consecutive.  Further my attorney has advised me of the possible appellate rights that may be applicable conditioned on the sentence imposed.  Furthermore, my counsel and I have fully discussed the facts and circumstances surrounding this case including the names of all witnesses.  My attorney has investigated these facts and circumstances to the best of my knowledge and has discussed with me the making of or the necessity of pre-trial motions.  I am, therefore, satisfied that I am now entering this plea with full understanding of my legal rights under the facts and circumstances as explained me by my attorney and the Court.  I have further advised my counsel and this Court that I am (not) a citizen of the United States of America.

If you are not a citizen of the United States you are hereby advised that conviction of the offense to which you are pleading guilty (or no contest, when applicable) may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.

The underlying agreement upon which the plea is based is as follows:

**Defendant to waive PSI.  State will recommend at sentencing, one year mandatory prison term on Count 1, and one (1) year sentence on Count 2, to be served consecutively to Count 1, for a total of total of two (2) years incarceration, of which, one (1) year is mandatory incarceration. The Defendant will be given credit for all time served.  Furthermore, the State will not oppose a timely filed Motion of Judicial Release filed upon the Defendant's**

4

complete cooperation with the State, which includes taking a polygraph test at the request of the State  to verify her information, and includes testifying truthfully at any trial, not related to the instant matter.

_____        _____
ATTORNEY FOR DEFENDANT            DEFENDANT

The Court is satisfied that there is a factual basis for the plea; that the Defendant was advised of all his/her constitutional rights and that he/she understood and waived them before entering the plea.  The above plea of guilty is accepted.

_____        _____
DATE                              HONORABLE JOHN M. STUARD
                                  JUDGE, COURT OF COMMON PLEAS
                                  TRUMBULL COUNTY, OHIO

5

## PRECI    C FOR SUBPOENA - In St    Case

Revised Code, Section 2303.11

THE STATE OF OHIO                )          COMMON PLEAS COURT
                                 )
              Plaintiff          )          TRUMBULL COUNTY, OHIO
       vs.                       )
                                 )          Case No.  01-CR-793
DONNA   ROBERTS,                 )
                                 )
              Defendant          )          **PRECIPE**

To the Clerk of the Court:

    Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|------|---------|
| Melvin Williams | 1519 Victor<br>Youngstown, OH 44505 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __28__ day of __APRIL__ 2003, at 1:00 p.m. Required on behalf of the State of Ohio.

> Report to the Courtroom of: Judge J. Stuard
> Trumbull County Courthouse, 161 High St.,
> 3ʳᵈ Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm**
**your date/time of testimony, a day or**
**two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11-.14,

The State of Ohio, Trumbull County.                                    **Common Pleas Court**
To the Sheriff of said County:

    You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave. And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _PJ Dudley_ Deputy

72

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____ PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

   RETURN OF SERVICE

Received this on the _4_ day of _April_, 2003

at _2:24_ o'clock _A_. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents $ _1.00_

Mileage _____ miles at ____ cents $ _5.60_    2x @ 2.80 ea

    TOTAL         $ _6.60_

_Randall A. Wellington_
SHERIFF

By: _CAPTAIN James Lewandowski_
    Deputy

## PRECI  E FOR SUBPOENA - In Sta   Case
Revised Code, Section 2303.11

THE STATE OF OHIO ) COMMON PLEAS COURT
)
Plaintiff ) TRUMBULL COUNTY, OHIO
vs. )
) Case No. __01-CR-793__
DONNA   ROBERTS, )
)
Defendant ) **PRECIPE**

To the Clerk of the Court:
Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|------|---------|
| Sheila Fields | 791 Wirt Street<br>Youngstown, OH 44510 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __23__ day of __APRIL__ 2003, at __10:00 a.m.__ Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3ʳᵈ Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

---

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11~14,

The State of Ohio, Trumbull County.                         **Common Pleas Court**
To the Sheriff of said County:

   You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave. And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _PJ Dudley_                                              Deputy

23

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

     RETURN OF SERVICE

Received this on the _4ᵗʰ_ day of _April_, 2003

at _/423_ o'clock _P._ M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ____ cents  $ _1.⁰⁵_

Mileage _____ miles at ____ cents  $ _2.⁸⁰_

    TOTAL            $ _3.⁸⁰_

_Randall Wellington_
SHERIFF

By: _Deputy J. Tanner M-132_
    Deputy

## PRECI⬚E FOR SUBPOENA - In Sta⬚ Case
Revised Code, Section 2303.11

| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
|---|---|---|
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Jeffrey Diamantes | 4009 Glenwood Ave., Apt. 2<br>Boardman, OH  44512 |
| **And/or** | c/o Days Inn<br>8392 Market Street<br>Boardman, OH 44512 |

** JURY TRIAL **

to appear as a witness in the above case on the  22  day of  **APRIL**  2003, at  9:00 a.m . Required  on  behalf of  the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

---

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11–14,

The State of Ohio, Trumbull County.                                                     **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this  2  day of  APRIL  ,  2003
Margaret O'Brien, Clerk

By  PJ Dudley  Deputy

74

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1001

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

   RETURN OF SERVICE

Received this on the _4_ day of _April_, 2003

at _2:23_ o'clock _P._ M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents  $ 1.00

Mileage _____ miles at _____ cents  $ 26.40

    TOTAL       $ 27.40

*Randall A Wellington*
SHERIFF

By: *Bruno Wojsrczuk*
    Deputy

## PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No. __01-CR-793__ |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Jose T. Flores | c/o Wagon Wheel Motel<br>7015 Market Street<br>Boardman, OH 44512<br>Or   117 ½ S. Adams St.<br>Mansfield, OH  44902 |

** JURY TRIAL **

to appear as a witness in the above case on the __23__ day of __APRIL__ 2003, at __9:00 a.m.__ Required on behalf of the State of Ohio.

> Report to the Courtroom of: Judge J. Stuard
> Trumbull County Courthouse, 161 High St.,
> 3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11~14,

The State of Ohio, Trumbull County.                          **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this __2__ day of __APRIL__, __2003__

Margaret O'Brien, Clerk

By _____ Deputy

75

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1003

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____   PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the ___ day of _____, 2003

at _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

   SHERIFF FEES

Service & Return each name ____ cents  $ _____

Mileage _____ miles at ____ cents  $ _____

   TOTAL          $ _____

_____

SHERIFF

By: _____
   Deputy

Trumbull Co.

**RICHLAND COUNTY SHERIFF'S OFFICE**
Civil Bureau
Richland County Sheriff

Received this writ

NAME    Apr 14  11:47 AM '99    Case # 01-CR-793

Address    Jose I Flores

Service was made as follows    117 1/2 S Adams St

☒ Personal service upon: Jose I Flores

☐ Residence by leaving paper with: _____

☐ Failure to serve upon: _____

As instructed, due to,: _____

Service &/or Attempts to serve were made:

| DATE | TIME | OFFICER | FEES |
|------|------|---------|------|
| 4/20/0 | 1443 | 737 | |
| ADDRESS Same) Served | | | |
| | | | |
| ADDRESS | | | |
| | | | |
| ADDRESS | | | |
| | | | |
| ADDRESS | | | |

Richland County Sheriff

_____
By          Deputy Sheriff

Fees:
Service: $ 1.00
Mileage: $ 1.05
Docket $ .40
Total: $ 2.50

# PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.   01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Jim McCoy | 1961 Ridgehill<br>Cleveland, OH 44121 |

** JURY TRIAL **

to appear as a witness in the above case on the __28__ day of __APRIL__ 2003, at __1:00 p.m.__ Required on behalf of the State of Ohio.

```
Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481
```

*Please call 330-675-2426 to confirm
 your date/time of testimony, a day or
 two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

---

## SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11~14,

The State of Ohio, Trumbull County.                                   **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____   PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
       (Deputy Clerk)

   RETURN OF SERVICE

Received this on the _8 th_ day of _April_, 2003

at _3 oo_ o'clock _P_. M. and served the person
named therein against whose name are indicated
the manner of service.   _c/o WIFE_

   SHERIFF FEES    _4/10/03_

                     _8.37_

Service & Return each name ____ cents $ _325_    = 6.50

Mileage _____ miles at _____ cents $ _470_    = 9.40

   TOTAL           $ _16.27_

_2 attempts_    _1) 4/8 No Response_
               _2) 4/10 c/o WIFE_

                 SHERIFF
            GERALD T. McFAUL

_____
SHERIFF

By: _____
     Deputy    JEREMIAH JOHNSON

CKET #     03-78-0544

# OFFICE OF THE SHERIFF
## CUYAHOGA COUNTY
1215 West 3rd Street, Cleveland, Ohio 44113

Thursday, April 17, 2003

**TO:** TRUMBULL COUNTY CLERK OF COURTS  160
HIGH ST.

| SUBJECT | CAUSE | 01-CR-793 |

STATE OF OHIO                                              Pltf.

vs.

DONNA ROBERTS                                           Deft.

We have completed services on the within writ and our return accompanies it.

**JIM MC COY**          Please mail your check AT ONCE for          **$16.27**

## PRECIᴘ⌐ FOR SUBPOENA - In Staᵗ Case
### Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:
    Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Chris Gear | 116 Victoria<br>Youngstown, OH 44510 |

** JURY TRIAL **

to appear as a witness in the above case on the  21  day of  **APRIL**  2003, at  1:00 p.m. . Required  on behalf of  the  State of Ohio.

```
Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3ʳᵈ Floor, Warren, Ohio 44481
```

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

## SUBPOENA IN CRIMINAL CASE
### Revised Code, Section 2335.07, 2317.11~.14,

The State of Ohio, Trumbull County.                                   **Common Pleas Court**
To the Sheriff of said County:

    You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this  2  day of  APRIL ,  2003
Margaret O'Brien, Clerk

By  *PJ Dudley*                        Deputy

77

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1009

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____ PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
       (Deputy Clerk)

    RETURN OF SERVICE

Received this on the 4TH day of APRIL , 2003

at 2:24 o'clock P. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents  $ 1.00

Mileage _____ miles at ____ cents  $ 2.80

    TOTAL          $ 3.80

RANDALL A. WELLINGTON     MAHONING COUNTY
SHERIFF

By: LT. MARC L. MILITO M-7
    Deputy

## PRECI⁓ FOR SUBPOENA - In Sta⁓ Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Ralph Roberts | 931 Kirwin Drive<br>Youngstown, OH 44515 |

** JURY TRIAL **

to appear as a witness in the above case on the __23__ day of __APRIL__ 2003, at __10:00 a.m.__ Required on behalf of the State of Ohio.

> Report to the Courtroom of: Judge J. Stuard
> Trumbull County Courthouse, 161 High St.,
> 3ʳᵈ Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
 your date/time of testimony, a day or
 two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

---

### SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11~.14,

**The State of Ohio, Trumbull County.**
**To the Sheriff of said County:**

**Common Pleas Court**

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _M.J. Dudley_ _____ Deputy

78

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the 4 day of April, 2003

at 2:23 o'clock P. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents  $ 1.00

Mileage _____ miles at ____ cents  $ 13.50

   TOTAL  $ 14.50

Randall A Wellington
SHERIFF

By: Bruno Wajvrczuk
   Deputy

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
|---|---|---|
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| James Culwell | c/o  State Farm Insurance Company<br>1440 Granville Road<br>Newark, OH 43055 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __29__ day of __APRIL__ 2003, at __10:00 a.m.__. Required on behalf of the State of Ohio.

> Report to the Courtroom of: Judge J. Stuard
> Trumbull County Courthouse, 161 High St.,
> 3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11~14.

The State of Ohio, Trumbull County.                                      **Common Pleas Court**
To the Sheriff of said County:

   You are hereby commanded to subpoena each of above named persons to be and appear before the **Common Pleas Court** at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this __2__ day of __APRIL__ , __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

     RETURN OF SERVICE

Received this on the $\underline{14}$ day of $\underline{\quad APR \quad}$, 2003

at $\underline{10:32}$o'clock $\underline{A}$. M. and served the person
named therein against whose name are indicated
the manner of service.    LEFT WITH BONNIE

        SHERIFF FEES

Service & Return each name ___ cents $ \$\underline{1.00}$

Mileage _____ miles at ____ cents $ \$\underline{1.30}$

     TOTAL       $ \$\underline{2.30}$

   GERRY D. BILLY, SHERIFF
SHERIFF

By: Chuck Walcott 47
    Deputy

# PRECIPE FOR SUBPOENA - In State Case
### Revised Code, Section 2303.11

THE STATE OF OHIO )          COMMON PLEAS COURT

   Plaintiff )          TRUMBULL COUNTY, OHIO

vs. )

DONNA  ROBERTS, )          Case No.  01-CR-793

   Defendant )          **PRECIPE**

To the Clerk of the Court:

   Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|------|---------|
| Jill Kenyon | c/o Red Lobster<br>5701 Youngstown Rd.<br>Niles, OH 44446 |
| **And/or** | 214 Linden Avenue SE<br>Warren, OH  44483 |

** JURY TRIAL **

to appear as a witness in the above case on the  **23**  day of  **APRIL**  2003, at  **9:00 a.m.**.  Required  on behalf  of  the  State of  Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

---

## SUBPOENA IN CRIMINAL CASE
### Revised Code, Section 2335.07, 2317.11-.14,

The State of Ohio, Trumbull County.                    **Common Pleas Court**
To the Sheriff of said County:

   You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this  2  day of  APRIL        ,  2003
Margaret O'Brien, Clerk

By _PJ Dudley_____ Deputy



CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the *2* day of *April*, 2003
at *4:14* o'clock *P.* M. and served the person
named therein against whose name are indicated
the manner of service.

    SHERIFF FEES

Service & Return each name ___ cents $ *1.00*

Mileage _____ miles at ____ cents $ *.33*

   TOTAL         $ *1.33*

_____
SHERIFF

By: _____
    Deputy

*Served personally
on 4/9/03*

## PRECI¯¯ FOR SUBPOENA - In Sta¯ Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No. __01-CR-793__ |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Jennifer Robinson | c/o Days Inn |
| | 8392 Market Street |
| | Boardman, OH 44512 |
| And/or | 935 Parkview |
| | Youngstown, OH 44511 |

** JURY TRIAL **

to appear as a witness in the above case on the __22__ day of __APRIL__ 2003, at __9:00 a.m.__ Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11-.14,

The State of Ohio, Trumbull County.                                    **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

81

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____    PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the 4 day of April, 2003

at 2:23 o'clock p. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents  $ 1.00

Mileage _____ miles at ____ cents  $ 4.40

   TOTAL        $ 5.40

Randall A Wellington
SHERIFF

By: Bruno Wajszczok
   Deputy

## PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.   01-CR-793 |
| DONNA  ROBERTS. | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Jeffrey Pascarella | 9525 Woodsworth Road North Lima, OH 44452 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __22__ day of __APRIL__, 2003, at __11:00 a.m.__ Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11–.14,

**The State of Ohio, Trumbull County.**                    **Common Pleas Court**
**To the Sheriff of said County:**

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this __2__ day of __APRIL__, __2003__

Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
       (Deputy Clerk)

   RETURN OF SERVICE

Received this on the _4_ day of _April_, 2003

at _2:23_ o'clock _P_. M. and served the person
named therein against whose name are indicated
the manner of service.

       SHERIFF FEES

Service & Return each name ___ cents  $ 1.00

Mileage _____ miles at ____ cents  $ 7.60

    TOTAL         $ 8.60

_Randall A Wellington_
SHERIFF

By: _Bruno Wojsrczuk_
    Deputy

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Rita Morrison | c/o Days Inn |
| | 8392 Market Street |
| | Boardman, OH 44512 |

** JURY TRIAL **

to appear as a witness in the above case on the **22** day of **APRIL** 2003, at **9**:00 a.m.. Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

## SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11-14.

The State of Ohio, Trumbull County.                              Common Pleas Court
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this **2** day of **APRIL** , **2003**
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____   PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

  Defendant

PRECIPE AND SUBPOENA
  Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

RETURN OF SERVICE

Received this on the ___ day of _____, 2003

at _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

SHERIFF FEES

Service & Return each name ___ cents  $ _____

Mileage _____ miles at ____ cents  $ _____

    TOTAL         $ _____

_____

SHERIFF

By: _____
    Deputy

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.   01-CR-793 |
| DONNA   ROBERTS, | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:
Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
| --- | --- |
| Rita Morrison | c/o Days Inn |
| | 8392 Market Street |
| | Boardman, OH 44512 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the **22** day of **APRIL**  2003, at **9 :00 a.m.**  Required  on behalf of  the  State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

---

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11~.14,

**The State of Ohio, Trumbull County.**                        **Common Pleas Court**
**To the Sheriff of said County:**

You are hereby commanded to subpoena each of above named persons to be and appear before the **Common Pleas Court** at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this **2**      day  of   **APRIL**      ,    **2003**
Margaret O'Brien, Clerk

By _____   Deputy

84

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

  Plaintiff

vs.

DONNA ROBERTS,

  Defendant

PRECIPE AND SUBPOENA
  Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

    RETURN OF SERVICE

Received this on the _4_ day of _April_, 2003
                   Failed To Serve
at _2:23_ o'clock _P_. M. and ~~served~~ the person
named therein against whose name are indicated
the manner of service.

      SHERIFF FEES

Service & Return each name ____ cents $ 1.00

Mileage _____ miles at ____ cents $ 4.40

    TOTAL         $ 5.40

Randell A Wellington
SHERIFF

By: Bruno Wojszczuk
   Deputy

Subject No Longer Employed At Days Inn.    4-8-03

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | PRECIPE |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| John Guzik | c/o Walgreen Drug Store 7295 Market Street Boardman, OH 44512 |

** JURY TRIAL **

to appear as a witness in the above case on the __22__ day of __APRIL__ 2003, at __9 :00 a.m.__. Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11-.14.

The State of Ohio, Trumbull County.                                    Common Pleas Court
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

   RETURN OF SERVICE

Received this on the 4 day of April, 2003

at 2:24 o'clock P. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents $ 1.00

Mileage _____ miles at ____ cents $ 4.40

   TOTAL       $ 5.40

Randall A Wellington
SHERIFF

By: Bruno Wajszczuk
   Deputy

## PRECI___ FOR SUBPOENA - In Sta__ Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| | ) | |
| vs. | ) | Case No.  01-CR-793 |
| | ) | |
| DONNA  ROBERTS. | ) | |
| | ) | **PRECIPE** |
| Defendant | ) | |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Miguel Diaz | c/o Greyhound Bus Station<br>529 Martin Luther King Blvd.<br>Youngstown, OH 44502 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the  22  day of **APRIL**  2003, at  9 :00 a.m . Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3ʳᵈ Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

---

## SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11-14,

The State of Ohio, Trumbull County.                                                   **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this  2  day of  APRIL ,  2003
Margaret O'Brien, Clerk

By _J J Dudley_ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
       (Deputy Clerk)

     RETURN OF SERVICE

Received this on the _4_ day of _April_, 2003

at _2:24_ o'clock _P._ M. and served the person
named therein against whose name are indicated
the manner of service.

        SHERIFF FEES

Service & Return each name ___ cents $ _1.00_

Mileage _____ miles at ____ cents $ _5.60_

     TOTAL        $ _6.60_

_Randall A. Wellington_
SHERIFF

By: _Captain James Lewandowski_
     Deputy

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, | ) |
| | ) CASE NO.:  01-CR-793 |
| Plaintiff, | ) |
| | ) |
| -vs- | ) HONORABLE JUDGE: |
| | ) JOHN M. STUARD |
| DONNA ROBERTS, | ) |
| | ) **TRIAL STIPULATION** |
| Defendant. | ) |

Now come the parties, who stipulate to the following:

The parties stipulate that exhibits 271-D-1 through 271-D139 inclusive are authentic and were written by the Defendant, Donna Roberts. The Parties further stipulate exhibits 273-N-1 through 273-N-143 are authentic and were written by Nathaniel Jackson.

FOR DEFENDANT:                     FOR STATE OF OHIO:

_____            _____
J. GERALD INGRAM (0007887)         KENNETH N. BAILEY (0023228)
                                   ASSISTANT PROSECUTING ATTORNEY

_____            _____
JOHN B. JUHASZ (0023777)           CHRISTOPHER D. BECKER (0047252)
7330 Market Street                 ASSISTANT PROSECUTING ATTORNEY
Youngstown, Ohio 44512-5610        TRUMBULL COUNTY, OHIO
Telephone: (330) 758-2308          Trumbull County Prosecutor's Office
Facsimile: (330) 758-8290          160 High Street, NW
                                   4th Floor Administration Bldg.
                                   Warren, Ohio 44481
                                   Telephone: (330) 675-2426
                                   Fax: (330) 675-2431

27

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA   ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRÆCIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Frank Reynolds | 5230 West Rockwell Road |
| | Youngstown, OH 44515 |
| **or** | c/o Greyhound Bus Station |
| | 529 Martin Luther King Blvd. |
| | Youngstown, OH 44502 |

** JURY TRIAL **

to appear as a witness in the above case on the __21__ day of __APRIL__ 2003, at _9:00 a.m._. Required on behalf of  the  State of  Ohio.

```
Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481
```

*Please call 330-675-2426 to confirm
 your date/time of testimony, a day or
 two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11-.14.

The State of Ohio, Trumbull County.                                      **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

38

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____ PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

    Plaintiff

vs.

DONNA ROBERTS,

    Defendant

PRECIPE AND SUBPOENA
    Returned and Filed

_____, 2003

by _____
        (Deputy Clerk)

        RETURN OF SERVICE

Received this on the 4 day of April, 2003

at 2:23 o'clock P. M. and served the person
named therein against whose name are indicated
the manner of service.

        SHERIFF FEES

Service & Return each name ____ cents  $ 1 00

Mileage _____ miles at ____ cents  $ 10 00

        TOTAL                          $ 11 00

*Randall A. Wellington*
SHERIFF

By: *Captain James*
        Deputy
            *Lewandowski*

SUBJECT DOESN'T RESIDE
@ ROCKWELL OR
PARKWOOD, NOR CAN
HE BE FOUND @ BUS
STATION. ALSO HAS A
TPO ON SSN 184565941

# PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No. __01-CR-793__ |
| DONNA   ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| James Daniels | 905 Lanterman Avenue<br>Youngstown, OH 44511 |

** JURY TRIAL **

to appear as a witness in the above case on the __21__ day of __APRIL__ 2003, at _1:00 p.m._. Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

---

## SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11~14,

The State of Ohio, Trumbull County.
To the Sheriff of said County:

**Common Pleas Court**

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave. And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by  _____
         (Deputy Clerk)

RETURN OF SERVICE

Received this on the _4_ day of _April_ , 2003

at _2:23_ o'clock _P_ . M. and served the person
named therein against whose name are indicated
the manner of service.

SHERIFF FEES

Service & Return each name ____ cents  $ *1 00*

Mileage _____ miles at _____ cents  $ *2 80*

   TOTAL                                     $ *3 80*

*Randall A. Wellington*
SHERIFF

By: *Captain James Lewandowski*
       Deputy

## PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.  01-CR-793 |
| DONNA  ROBERTS. | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

    Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Bridget Paul | 201 Avalon Drive<br>Warren, OH  44484 |

** JURY TRIAL **

to appear as a witness in the above case on the __28__ day of __APRIL__ 2003, at __10:00 a.m.__ Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

---

### SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11-.14,

The State of Ohio, Trumbull County.                                                     Common Pleas Court
To the Sheriff of said County:

    You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

qo

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
       (Deputy Clerk)

   RETURN OF SERVICE

Received this on the ___ day of _____, 2003

at _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents  $ _1.00_

Mileage _____ miles at ____ cents  $ _2.30_

    TOTAL           $ _3.30_

SHERIFF

By: _____
    Deputy

Served personally
on 4/3/03.

# PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | Case No. __01-CR-793__ |
| DONNA ROBERTS, | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Paula Carson | c/o  911 Center |
| | 911 Howland Wilson Rd. NE |
| | Warren, OH 44484 |

** JURY TRIAL **

to appear as a witness in the above case on the __21__ day of __APRIL__ 2003, at __9:00 a.m.__ Required on behalf of the State of Ohio.

```
Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481
```

**\*Please call 330-675-2426 to confirm your date/time of testimony, a couple days prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

---

## SUBPOENA IN CRIMINAL CASE

Revised Code, Section 2335.07, 2317.11-14,

**The State of Ohio, Trumbull County.**                                    **Common Pleas Court**
**To the Sheriff of said County:**

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave. And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _J. Dudley_ _____ Deputy

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
       (Deputy Clerk)

    RETURN OF SERVICE

Received this on the *2* day of *April*, 2003

at *4:13* o'clock *P*. M. and served the person
named therein against whose name are indicated
the manner of service.

    SHERIFF FEES

Service & Return each name ____ cents  $ *1.00*

Mileage _____ miles at ____ cents  $ *230*

    TOTAL  $ *330*

SHERIFF _____

By: _____
    Deputy

*Roger Laird accepted
on 4/3/03.*

## PRECIPE FOR SUBPOENA - In State Case

Revised Code, Section 2303.11

| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
|---|---|---|
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| DONNA  ROBERTS, | ) | Case No. 01-CR-793 |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Kris Ellington | 900 Royal Arms Drive |
| | Girard, OH 44420 |
| And/Or | c/o Final Cut |
| | 402 E. Market Street |
| | Warren, OH  44484 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __23__ day of __APRIL__ 2003, at __11:00 a.m.__. Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA  IN  CRIMINAL  CASE

Revised Code, Section 2335.07, 2317.11-14,

The State of Ohio, Trumbull County.                                **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__ , __2003__
Margaret O'Brien, Clerk

By __J. Dudley__ Deputy

92

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____ PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
  Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the ___ day of _____, 2003

at _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

    SHERIFF FEES

Service & Return each name ___ cents $ _1 00_

Mileage _____ miles at ____ cents $ _____

    TOTAL               $ _1 00_

_____
SHERIFF

By: _____TCSO_____
    Deputy

*Unable to serve
in time for hearing*

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No.   01-CR-793 |
| DONNA  ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:
Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Kris Ellington | 900 Royal Arms Drive |
| | Girard, OH 44420 |
| And/Or | c/o Final Cut |
| | 402 E. Market Street |
| | Warren, OH   44484 |

** JURY TRIAL **

to appear as a witness in the above case on the __23__ day of __APRIL__ 2003, at __11:00 a.m.__ Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3ʳᵈ Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm
your date/time of testimony, a day or
two prior to your scheduled date.

Christopher D. Becker
Assistant Prosecuting Attorney

## SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11~14,

The State of Ohio, Trumbull County.                                    **Common Pleas Court**
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court,
this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____   PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
  Returned and Filed

_____, 2003

by _____
      (Deputy Clerk)

   RETURN OF SERVICE

Received this on the  ___ day of _____, 2003

at  _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each name ___ cents  $ _____

Mileage _____ miles at _____ cents  $ _____

    TOTAL           $ _____

_____
SHERIFF

By: _____
     Deputy

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No. 01-CR-793 |
| DONNA ROBERTS, | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Santiago Mason | 356 Reo Court |
| | Warren, OH 44483 |

** JURY TRIAL **

to appear as a witness in the above case on the __29__ day of __APRIL__ 2003, at __1:00 p.m.__. Required on behalf of the State of Ohio.

> Report to the Courtroom of: Judge J. Stuard
> Trumbull County Courthouse, 161 High St.,
> 3ᴿᴰ Floor, Warren, Ohio 44481

*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.*

Christopher D. Becker
Assistant Prosecuting Attorney

---

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11-.14,

The State of Ohio, Trumbull County.                                                    Common Pleas Court
To the Sheriff of said County:

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave. And therein to fail not, under penalty of the law; and to have then and there this writ.
Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this __2__ day of __APRIL__, __2003__

Margaret O'Brien, Clerk

By _____ Deputy

93

CASE NO. 01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____ PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
  Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the ___ day of _____, 2003

at _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

    SHERIFF FEES

Service & Return each name ____ cents $ 1.00

Mileage _____ miles at ____ cents $ 4.60

    TOTAL         $ 5.60

SHERIFF _____

By: _____
    Deputy

*Unable to serve in
time for hearing.
New (A) 2747 Randolph NW
Warren, OH 44485*

## PRECIPE FOR SUBPOENA - In State Case
Revised Code, Section 2303.11

| | | |
|---|---|---|
| THE STATE OF OHIO | ) | COMMON PLEAS COURT |
| | ) | |
| Plaintiff | ) | TRUMBULL COUNTY, OHIO |
| vs. | ) | |
| | ) | Case No. __01-CR-793__ |
| DONNA  ROBERTS. | ) | |
| | ) | |
| Defendant | ) | **PRECIPE** |

To the Clerk of the Court:

Issue Subpoena for the following persons, to wit:

| NAME | ADDRESS |
|---|---|
| Santiago Mason | 358 Reo Court |
| | Warren, OH 44483 |

**\*\* JURY TRIAL \*\***

to appear as a witness in the above case on the __29__ day of __APRIL__ 2003, at __1:00 p.m.__. Required on behalf of the State of Ohio.

Report to the Courtroom of: Judge J. Stuard
Trumbull County Courthouse, 161 High St.,
3rd Floor, Warren, Ohio 44481

**\*Please call 330-675-2426 to confirm your date/time of testimony, a day or two prior to your scheduled date.**

Christopher D. Becker
Assistant Prosecuting Attorney

### SUBPOENA IN CRIMINAL CASE
Revised Code, Section 2335.07, 2317.11-14,

**The State of Ohio, Trumbull County**                                **Common Pleas Court**
**To the Sheriff of said County:**

You are hereby commanded to subpoena each of above named persons to be and appear before the Common Pleas Court at the Court House in said County, on the day and hour set forth in the above Precipe, to testify as a witness in a certain case pending in said Court, wherein the State of Ohio prosecutes the Defendant named above; and not depart the Court without leave.  And therein to fail not, under penalty of the law; and to have then and there this writ. Said Court requires your said attendance on behalf of the State of Ohio.

WITNESS my hand and the seal of said Court, this __2__ day of __APRIL__, __2003__
Margaret O'Brien, Clerk

By _____ Deputy

CASE NO.  01-CR-793

TRUMBULL COUNTY COMMON PLEAS COURT

DOC. _____  PAGE _____

COMMON PLEAS COURT

STATE OF OHIO,

   Plaintiff

vs.

DONNA ROBERTS,

   Defendant

PRECIPE AND SUBPOENA
   Returned and Filed

_____, 2003

by _____
     (Deputy Clerk)

   RETURN OF SERVICE

Received this on the ___ day of _____, 2003

at _____o'clock ___. M. and served the person
named therein against whose name are indicated
the manner of service.

     SHERIFF FEES

Service & Return each nam ___ cents $ _____

Mileage _____ miles at ___ cents $ _____

    TOTAL         $ _____

_____
SHERIFF

By: _____
    Deputy

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          *       CASE NO.:   01-CR-793

    Plaintiff,                      *       HONORABLE JUDGE:
                                                JOHN M. STUARD
-vs-                                    *

DONNA MARIE ROBERTS,                    *       ENTRY

    Defendant,                      *

                                        *

---

Throughout the pendency of this case various motions filed by the Defendant have come on

for hearing before the Court. At all such hearings the Defendant was present and represented by

retained counsel J. Gerald Ingram and John B. Juhasz and the State was present and represented by

Trumbull County Assistant Prosecuting Attorneys Kenneth N. Bailey and Christopher D. Becker.

On September 13, 2002, the Defendant filed a Motion to Prohibit the Government from

Using Peremptory Challenges to Exclude Veniremen Who Express Concern About Imposing Capital

Punishment. The State filed a Memorandum in Opposition to said Motion on October 10, 2002. The

Court having read the briefs and heard the oral arguments regarding said motion hereby overrules

the same.

On September 16, 2002, the Defendant filed a Motion to Have Reasons for Objections and

Reasons for Overruling Objections Placed on the Record. On October 10, 2002, the State filed a

Memorandum in Opposition to said Motion. The Court having read the briefs and heard the oral

arguments regarding said motion hereby grants the motion in part. The Court believes that this case

involves experienced attorneys for both the Defendant and the State and it is the obligation of the

-1-

VOL **1001** PAGE **295**

94

parties to make all objections for the record. The Court will provide its reasons for overruling any objections on the record if requested by either party.

On September 16, 2002, the Defendant filed a Motion to Dismiss Death Penalty Specifications Because Method of Execution is Unconstitutional. On October 10, 2002, the State filed a Memorandum in Opposition to said Motion. The Court having read the briefs and having heard oral arguments on the motion hereby overrules the same.

On September 12, 2002, the Defendant filed a Motion to Dismiss Death Specifications Due to Inadequate Appellate Review. On October 10, 2002, the State filed a Memorandum in Opposition to said Motion. The Court having read the briefs and heard the oral arguments regarding said motion hereby overrules the same.

On August 26, 2002, the Defendant filed a Motion to Suppress References to the Jury that a Verdict of Death is Only a Recommendation. The State did not file a Memorandum in Opposition to said Motion but orally argued against the same at the hearing. The Court having read the brief and heard the oral arguments regarding said motion hereby overrules the same.

On July 18, 2002, The Defendant filed a Motion to Dismiss Indictment; or in the Alternative, to Dismiss Death Specifications Because Death Penalty in Ohio is Unconstitutional. On October 10, 2002, the State filed a Memorandum in Opposition to said Motion. The Court having read the briefs and heard the oral arguments regarding said motion hereby overrules the same.

On July 15, 2002, the Defendant filed a Motion for Alternating Voir Dire Examination. The Defendant through her counsel has withdrawn that Motion.

The Defendant's Motion for an Order Enlarging the Time for Filing Pretrial Motions filed

-2-

on February 11, 2002, is granted.

On February 20, 2002, the Defendant filed a Motion to Determine the Proper Standard to Excuse Jurors for Cause. On July 18, 2002, the State filed a Memorandum in Opposition to said motion. The Court having read the briefs and heard the arguments of Counsel hereby overrules the motion to the extent that the Court will determine based upon the applicable law the standard for excusing jurors.

On February 26, 2002, and June 18, 2002, the Defendant filed a Motion for Comprehensive Voir Dire Examination. On July 18, 2002, the State filed a Memorandum in Opposition to said motion. The Court having read the briefs and heard the arguments of Counsel hereby grants the Motion and will permit the parties forty five minutes per side to individually voir dire the prospective jurors.

On June 18, 2002, the Defendant filed a Motion to Prohibit Death Qualification of Jurors Unless and Until the Government has Established Probable Cause that the Case Will Proceed to a Second Phase. On July 18, 2002, the State filed a Memorandum in Opposition to said Motion. The Court having read the briefs and heard the oral arguments regarding said motion hereby overrules the same.

The State's Motion to have the Defendant Submit to Handwriting Exemplars Filed on October 10, 2002, is moot due to the Stipulated Entry filed on April 25, 2002.

On December 3, 2002, the Defendant filed a Motion to Dismiss Death Specifications and to Declare Invalid Ohio Constitution Art. IV, 2 and 3 and ORC. §2929.05 and 2953.02 is overruled.

On April 7, 2003, the Defendant filed a Motion to Change Venue. After spending five weeks

-3-

VOL **1001** PAGE **297**

of individual Voir Dire the Court has seated a jury in this case and therefore overrules the

Defendant's Motion to Change Venue.

SO ORDERED.

JOHN M. STUARD, JUDGE

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD

JUDGE

5/12/03 - Copies sent to:

Pros.

J Ingram

J. Juhasz

-4-

VOL 1061 PAGE 298



E:\DRoberts\Trial\Conspiracy\LIMINE.wpd • last rev'd: Monday 12 May 2003 • 05:25 am

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

vs.

DONNA M. ROBERTS,

    Defendant

Case No. 01 CR 793

Judge John M. Stuard

### DEFENDANT'S MOTION IN LIMINE
### HEARING REQUEST OR HEARING

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order, *in limine*, prohibiting the government from introducing any statements of Nathaniel Jackson, whether oral, recorded or in writing, through any witness whatsoever, unless and until the government has first established by independent proof the existence of a criminal conspiracy which involves this Defendant and Jackson, and that the statements otherwise meet the foundational requirements ingrained in the law.

For cause, the Defendant says that while the government may under proper circumstances admit statements made by co-conspirators, the evidence here, if admitted before the government establishes the existence of a criminal conspiracy involving the Defendant and Jackson, would violate the constitutional liberties secured by U.S. CONST. amend. VI and XIV and OHIO

JOHN B. JUHASZ • ATTORNEY AT LAW • 7330 MARKET STREET • YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 • FACSIMILE 330.758.8290 • E-MAIL JBJURIS@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1050

CONST. art. I, §§1, 10, and 16, as regulated and enforced by OHIO EVID. R. 104 and 801(D)(2)(e).  Further in support of this motion, the Defendant offers the attached memorandum, made a part hereof by this reference.

The Defendant requests a hearing pursuant to OHIO EVID. R. 104 on this matter, so that it clearly will be determined whether the government can first establish the existence of a criminal conspiracy involving this Defendant, DONNA M. ROBERTS, and Nathaniel Jackson by independent proof.  To admit such evidence without satisfying those foundational requirements would deprive the Defendant of her ability to have a fair trial, to due process of law, confrontation, the ability to effectively defend life and liberty, the ability to meet witnesses face to face meaningfully, a remedy in the courts of this State by due course of law, and the ability to have justice administered without denial.  These liberties and immunities are specified in the constitutional provisions aforesaid, which are reproduced in the Appendix, *post*.

WHEREFORE, the Defendant prays for an order of this Court, *in limine*, prohibiting the government from introducing statements allegedly made during the course of and in furtherance of a criminal conspiracy unless and until the government has first established the existence of such conspiracy by independent proof; and that this Defendant, DONNA M. ROBERTS, was a part thereof.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8200 · E-MAIL JBJURISDOC@AOL.COM

2

JOHN B. JUHASZ  (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758-2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❏ sent by regular United States Mail, postage prepaid
☒ hand delivered to counsel or counsel's office
❏ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street NW, Warren, Ohio 44481 (Facsimile: 330.675.2431) this ___ day of May, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURINDOC@AOL.COM

3

## MEMORANDUM IN SUPPORT OF MOTION

### I

The Defendant, DONNA M. ROBERTS, has been indicted for, *inter alia*, aggravated murder. The government seeks the death penalty. The government has alleged that the Defendant aided and abetted Nathaniel Jackson in causing the death of Robert Fingerhut.

While it may be possible to admit the statements of a co-conspirator even in a case where no conspiracy is alleged, *see, e.g., State v. Daniels* (1992), 92 Ohio App.3d 473, 636 N.E.2d 336, *leave to appeal overruled*, (1994), 68 Ohio St.3d 1479, 629 N.E.2d 455; and, (1994), 68 Ohio St.3d 1449, 626 N.E.2d 690, admission of such evidence is not to be done lightly. OHIO EVID.R.801(D)(2)(e)[1] authorizes receipt into evidence of certain out of court statements, provided that they are made during the course of and in furtherance of a criminal conspiracy upon independent proof of the conspiracy. To protect citizens from being convicted solely by such suspect out of court statements,[2] the law has erected certain barriers. Those barriers, the evidence will show, cannot be successfully hurdled by the government in this case.

---

[1] OHIO EVID.R. 801(D)(2)(e) provides:
    (D) A statement is not hearsay if: . . . (2) The statement is offered against a party and is . . . (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy *upon independent proof of the conspiracy.* (Emphasis added.)

[2] Though the inclination is to call such statements hearsay, the rule excludes the statements from the realm of hearsay by defining the statements as not hearsay.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1053

## II

Five conditions must be established before the a statement of a co-conspirator can be admitted into evidence. They are: (1) the existence of a conspiracy; (2) the defendant's participation in the conspiracy; (3) the declarant's participation in the conspiracy; (4) the statement was made during the course of the conspiracy; and (5) the statement was in furtherance of the conspiracy. *See, State v. Milo* (1982), 6 Ohio App.3d 19, 22, 451 N.E.2d 1253, 6 OBR 44, *leave to appeal overruled*, January 26, 1983 (Case No. 82-1682). *See, also, Giannelli, Ohio Evidence Manual* (1982), §801.15.

## A

*Existence of a conspiracy*. The first thing, then, that the government must establish is the existence of a conspiracy in the first place. "A conspiracy exists where two or more persons plan or agree to commit a crime, coupled with an overt act substantial enough to show an intention to carry the conspiracy through to completion." *See, State v. Milo, ante*, 6 Ohio App.3d at 22. A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. *See, United States v. Socony-Vacuum Oil Co.* (1940), 310 U.S. 150, 253-254, 60 S.Ct. 811, 84 L.Ed. 1129. However, the partners in the criminal plan must agree to *pursue* the same criminal objective. While they may divide up the work, each is responsible for the acts of each other. *See, Pinkerton v. United States* (1946), 328 U.S. 640, 646, 66 S.Ct. 1180, 90 L.Ed. 1489 ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1054

perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

B

*The defendant's participation in the conspiracy.*  Courts are not to not lightly infer a defendant's knowledge of and participation in a conspiracy, and the decision to join conspiracy cannot be shown by mere association with a conspirator or mere presence at a crime scene.  *See, United States v. Dean* (5th Cir. 1995), 59 F.3d 1479, 1485-86.  Here, the Defendant cannot be found to have participated in a conspiracy merely because she happened to communicate with Mr. Jackson.  Instead, the government must establish that she did some overt act in furtherance of the criminal conspiracy.  What appears in this case are a series of letters and tapes which, while the government may legitimately claim they manifest an objective agreement, establish no act on the part of the Defendant.  Indeed, the government's only evidence in this regard is from Jackson's trial, not admissible here: Jackson's custodial admission that he went to the Roberts/Fingerhut residence with Mr. Fingerhut, and that he ended up killing Mr. Fingerhut in self defense.  That the jury in Jackson's case did not believe him does nothing to satisfy the government's foundational burden here.  This situation is not unlike the situation in United States v. *Bradfield* (6th Cir. 2000), 2000 U.S. App. LEXIS 17556, unpublished.  There, the district court entered a post-verdict judgment of acquittal against one police officer.  The district judge found that just because Bradfield happened to be working on the day in question as an assigned partner with another officer caught committing wrongful acts was not enough to establish his participation in a conspiracy.  *See, also, United*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHISDO@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1055

*States v. Ross* (5th Cir. 1995), 58 F.3d 154, 159-60; *United States v. Heater* (4th Cir. 1995), 63 F.3d 311, 324, *cert. denied, Heater v. United States* (1996), 516 U.S. 1083, 116 S.Ct. 796, 133 L.Ed.2d 744, 64 USLW 3485 (mere knowledge, acquiescence, or approval of crime not enough to establish conspiracy); *United States v. Knox*, 68 F.3d 990, 995 (7th Cir. 1995) (mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions are not sufficient proof of participation in conspiracy).

Here, the government will be unable to establish the Defendant's participation in any conspiracy to cause Mr. Fingerhut's death.

<div align="center">C</div>

*The declarant's participation in the conspiracy.*  While the government may have proof of Jackson's involvement in the homicide of Mr. Fingerhut, that is not the same as having, as the law requires, independent proof of Jackson's involvement in the conspiracy with this Defendant.

<div align="center">D</div>

*The statement was made during the course of the conspiracy.*  To establish admissibility, the government will have to prove that the statement was made during the existence of the conspiracy.  This necessarily entails a showing of the existence of a conspiracy and the Defendant's participation in it.  A declaration of a conspirator, made subsequent to the actual commission of the crime, may be admissible against any co-conspirator if it was made while the conspirators were still concerned with the concealment of their criminal conduct or their identity:  *See, e.g., State v. Shelton* (1977), 51 Ohio St.2d 68, 364 N.E.2d 1152, 5 Ohio Op.3d 42.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail JBJURISDOC@AOL.COM

4

E

*The statement was made in furtherance of the conspiracy.* Statements made to further the goals of the conspiracy are admissible. However, statements made after apprehension or statements which are not designed to promote the goals of the conspiracy are not admissible. *See, generally, State v. Siller*, Cuyahoga App. No. 80219, 2003 Ohio 1948, 2003 Ohio App. LEXIS 1856.

III

In *State v. Martin* (1983), 9 Ohio App.3d 150, 458 N.E.2d 898, 9 OBR 215, the Court of Appeals for this appellate district held:

In Anderson's Ohio Evidence (1980), Part Two, Professors Blackmore and Weissenberger, in discussing Evid. R. 801(D)(2)(e), state, at page 120, as follows:
"Rule 801(D)(2)(e) also provides for vicarious admissions in the context of a statement by a co-conspirator of a party. The statement of a member of a conspiracy is attributed to the co-conspirator party against whom the statement is offered at trial. To utilize this exception, the proponent must establish there was a conspiracy, that both the declarant and the party against whom the statement is offered were members of the conspiracy, that the statement was made during the course of the conspiracy, and that the statement in fact, furthered or advanced the conspiracy."
Admissibility of an otherwise hearsay statement under Evid. R. 801(D)(2)(e) requires independent proof of conspiracy and a statement by a co-conspirator during the existence of the conspiracy. The key inquiries are: when does the conspiracy come into existence, the degree of proof necessary to show the conspiracy, and what is necessary to independently prove the conspiracy.

. . .

The burden of establishing the conspiracy *prima facie*[3] must be met by the introduction of independent proof of the conspiracy rather than using the hearsay statements of the alleged co-conspirators. *State v. Carver* (1972), 30 Ohio St.2d 280 [59 O.O.2d

---

[3] Whether the prima facie standard employed by Ohio courts satisfies the Due Process Clause is doubtful in light of the requirement set forth in *Bourjaily v. United States, post*, that a conspiracy must be proved by a preponderance of the evidence. (Footnote not in original.)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7080 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS00@AOL.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1057

343] and *Campbell* v. *United States* (C.A. 6, 1969), 415 F.2d 356.[4] The underlying rationale of the requirement of independent evidence is the fear that a defendant might be convicted solely on the basis of evidence which he has no opportunity to impeach or refute. Before statements of co-conspirators can be used against an alleged co-conspirator, there must be evidence *aliunde* to prove the co-conspiracy, *i.e.,* besides the declaration of conspirators, there must be evidence that a conspiracy existed. *Tatu* v. *State* (1932), 43 Ohio App. 68. This long-standing, independent evidence requirement has been included in Evid. R. 801(D)(2)(e).  <u>The obvious rationale for such a rule is to avoid allowing hearsay to lift itself by its own bootstraps to the level of competent evidence.</u>  Failure to meet the independent evidence requirements results in the lack of establishing the conspiracy *prima facie,* and therefore statements allegedly made during such conspiracy would be inadmissible.

In our opinion, the arrangement to purchase the ounce of cocaine, the arrival of defendant with Dyckes and Jeffries, and the existence of one ounce of cocaine hidden in the vehicle constitute the independent proof of the conspiracy.

In order for statements to be admissible under the co-conspirator rule, it is sufficient if the conspiracy is established by evidence making a *prima facie case* which fairly raises a *presumption* or an *inference* of conspiracy. *Hutchinson* v. *State* (1906), 8 Ohio C.C. (N.S.) 313, 18 Ohio C.D. 595.  A *"prima facie case"* is one in which the evidence introduced is sufficient to support but not to compel a certain conclusion and which does no more than furnish evidence to be considered and weighed but not necessarily accepted by the trier of facts. *Cleveland* v. *Keah* (1952), 157 Ohio St. 331 [47 O.O. 195].

[Emphasis (<u>underlining</u>) added; italics in original.] The burden of establishing the existence of the legal conspiracy *prima facie* can only be met by the introduction of *independent proof* of the conspiracy rather than using hearsay declarations of the co-conspirators. *See, State v. Carver* (1972), 30 Ohio St.2d 280, 285 N.E.2d 26, 59 Ohio Op.2d 343, *cert. denied, Carver v. Ohio* (1972), 409 U.S. 1044, 93 S.Ct. 542, 34 L.Ed.2d 495. There, the Ohio Supreme Court ruled that where the existence of a conspiracy to rob is

---

[4] *Campbell* is likely of little precedential value after *Bourjaily, post.* The bootstrapping argument rejected by the Court in *Bourjaily* is a valid argument in Ohio, however, where the rule is different from the federal rule. (Footnote not in original.)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1058

established by other evidence, the extrajudicial statement of a co-conspirator, made in furtherance of the objectives of that conspiracy, is admissible as an exception to the hearsay rule. *Accord, State v. Carter*, 72 Ohio St.3d 545, 1995 Ohio 104; 651 N.E.2d 965, syllabus.[5]  Aside from the case law, the requirement for evidence *aliunde* has been incorporated into OHIO EVID.R. 801(D)(2)(e).

There is no question but that evidence concerning the existence of a conspiracy, and evidence of the defendant's and the declarant's participation in the conspiracy must be received *before* an out of court declaration of co-conspirator may be proffered. *See, e.g., State v. Thomas, ante,* 61 Ohio St.2d at 232; *State v. Osborne* (1976), 49 Ohio St.2d 135, 143, 359 N.E.2d 78, 3 Ohio Op.3d 79, *vacated on other grounds, Osborne v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1155; *State v. Milo, ante,* 6 Ohio App.3d at 22.

## IV

Ohio's rule contains an implicit prohibition against bootstrapping the existence of a conspiracy by employing the statements of co-conspirators as proof of the existence of the conspiracy. In this regard, the Ohio rule differs from the federal rule. *Cf. United States v. Bourjaily, post.*

There is some question about the standard of proof required. Ohio cases hold that before evidence or acts or declarations of co-conspirators are admissible against a defendant, the existence of a conspiracy must be first

---

[5] There, the Court said in the syllabus, at 3-4: "3. The statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." "4. A confession to police by one co-conspirator implicating a second co-conspirator is not made 'during the course and in furtherance of the conspiracy' within the scope of Evid.R. 801(D)(2)(e), as such a statement is made at a point in time when the confessor is no longer attempting to conceal the crime and has abandoned the conspiracy."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS DOC@AOL.COM

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1059

established *prima facie. See, Goins v. State* (1889), 46 Ohio St. 457, 21 N.E. 476;[6] *State v. Thomas* (1979), 61 Ohio St.2d 223, 232, 400 N.E.2d 401, 15 Ohio Op.3d 234 ("Where a *prima facie* showing of conspiracy has been made, . . . an extrajudicial statement of a co-conspirator is admissible as an exception to the hearsay rule, and does not violate the right of confrontation."); and, *State v. Martin* (1983), 9 Ohio App.3d 150, 458 N.E.2d 898, 9 OBR 215. In *Bourjaily v. United States* (1987), 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144, 55 USLW 4962, the Supreme Court discussed the proper standard of proof:

> Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule. There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "during the course and in furtherance of the conspiracy." Federal Rule of Evidence 104(a) provides: "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Petitioner and the Government agree that the existence of a conspiracy and petitioner's involvement in it are preliminary questions of fact that, under Rule 104, must be resolved by the court. The Federal Rules, however, nowhere define the standard of proof the court must observe in resolving these questions.
>
> We are therefore guided by our prior decisions regarding admissibility determinations that hinge on preliminary factual questions. We have traditionally required that these matters be established by a preponderance of proof. . . . [T]he evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case, see *In re Winship*, 397 U.S. 358 (1970), or a civil case. See generally *Colorado v. Connelly*, 479 U.S. 157, 167-169 (1986). . . . Therefore, we hold that when the preliminary facts

---

[6] There the Court held in part: that "On the trial of one of several defendants jointly indicted for an offense, the declarations of a co-defendant, made in the absence of the defendant on trial, in furtherance of the common purpose, are admissible when a *prima facie* case of conspiracy has been made. (b) To authorize the admission of such evidence, an express averment in the indictment of the fact of a conspiracy is not necessary. (c) Nor need the conspiracy be one to commit the identical offense charged in the indictment, or even a similar one; it being enough that the offense charged in the indictment was one which might have been contemplated as a result of the conspiracy." *Id.* Syl. 4.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS00@AOL.COM

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1060

relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence. [Footnote omitted.]

*Id.*, 483 U.S. at 175-176.

Reconciliation of the concepts of a *prima facie* case and the standard of proving it by a preponderance is provided by cases such as *Equal Employment Opportunity Commission* v. *Avery Dennison Corporation* (6th Cir. 1997), 104 F.3d 858, 861, 1997 FED App. 0019P:

> The prima facie case is not the final inquiry, but rather the first prong of analysis which defeats a motion for dismissal prior to trial. The Supreme Court so noted this in *Aikens* when it stated: "By establishing a prima facie case, the plaintiff in a Title VII action creates a rebuttable 'presumption that the employer unlawfully discriminated against' him." *Aikens*, 460 U.S. at 714 (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)). In fact, a *prima facie* case is defined as "sufficient evidence in the type of case to get plaintiff past a motion for directed verdict in a jury case or motion to dismiss in a nonjury case; it is the evidence necessary to require defendant to proceed with his case." *Black's Law Dictionary* 1190 (6th ed. 1990). The finding that plaintiff has proven a *prima facie* case forces the defendant to proceed with its case. It necessarily follows, then, that the defendant is not entitled to judgment as a matter of law or summary judgment if a plaintiff has proven its *prima facie* case. Following a trial on the merits, the district court, therefore, cannot return to a consideration of whether plaintiff has proven its *prima facie* case. This is a preliminary matter which cannot be revisited at a later time.
>
> The reason for this is quite simple and logical. To find that a *prima facie* case is lacking after the parties have presented all of the evidence confuses the traditional role of *prima facie* proof. There must be a lower burden of proof to sustain a *prima facie* case than to win a judgment on the ultimate issue of discrimination, and the manner in which the district court handled this case does not allow for that distinction. We must be careful not to lose sight of the methods of evidence, particularly in a case such as this where the *prima facie* causal connection question is similar to the ultimate question of whether the defendant acted with retaliatory intent or motive. Otherwise, we would perpetually compound an already difficult distinction, in a Title VII retaliation case, between a plaintiff's *prima facie* case and his ultimate burden.

9

*Accord, Kovacevich* v. *Kent State University* (6th Cir. 2000), 224 F.3d 806, 2000 FED App. 0281P.

## V

The Ohio rule is different from the federal rule, and thus the Supreme Court's decision in *Bourjaily v. United States* (1987), 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144, 55 USLW 4962, is of limited assistance. There, the Court first quoted the Rule and set forth the issues it chose to decide in *Bourjaily*:

> Federal Rule of Evidence 801(d)(2)(E) provides: "A statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." We granted certiorari to answer three questions regarding the admission of statements under Rule 801(d)(2)(E): (1) whether the court must determine by independent evidence that the conspiracy existed and that the defendant and the declarant were members of this conspiracy; (2) the quantum of proof on which such determinations must be based; and (3) whether a court must in each case examine the circumstances of such a statement to determine its reliability.

*Bourjaily* involved a situation where Clarence Greathouse, an informant working for the FBI, arranged to sell a kilogram of cocaine to Angelo Lonardo. Lonardo agreed that he would find individuals to distribute the drug. As the sale approached, Lonardo stated in a tape-recorded telephone conversation that he had a "gentleman friend" who had some questions to ask about the cocaine. In a subsequent telephone call, Greathouse spoke to the "friend" about the quality of the drug and the price. Greathouse then spoke again with Lonardo, and the two arranged the details of the purchase. They agreed that the sale would take place in a designated hotel parking lot, and Lonardo would transfer the drug from Greathouse's car to the "friend," who would be waiting in the parking lot in his own car. Greathouse

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250 · E-MAIL JBJJURISDOC@AOL.COM

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1062

proceeded with the transaction as planned, and FBI agents arrested Lonardo and petitioner immediately after Lonardo placed a kilogram of cocaine into Bourjaily's car in the hotel parking lot.  Government agents found over $20,000 in cash in Bourjaily's car.  Bourjaily was charged with conspiring to distribute cocaine and possession of cocaine with intent to distribute.  At trial, the government introduced, over Bourjaily's objection, Angelo Lonardo's telephone statements regarding the participation of the "friend" in the transaction.  The District Court found that, considering the events in the parking lot and Lonardo's statements over the telephone, the Government had established by a preponderance of the evidence that a conspiracy involving Lonardo and petitioner existed, and that Lonardo's statements over the telephone had been made in the course of and in furtherance of the conspiracy.  Accordingly, the trial court held that Lonardo's out-of-court statements satisfied Rule 801 and were not hearsay.  Bourjaily was convicted and sentenced to 15 years.  The United States Court of Appeals for the Sixth Circuit affirmed. *See, United States v. Bourjaily* (6th Cir. 1986), 781 F.2d 539 (1986).  Despite the difference in the Ohio and federal rules, *Bourjaily* is instructive to the extent that it makes clear that, before a co-conspirator's statement is admitted over an objection that it does not qualify under Rule 801, a trial court must be satisfied that the statement actually falls within the Rule's definition.  Even under the federal rule, there must be corroborating evidence of the conspiracy.  *See, Bourjaily, ante*, STEVENS, J., concurring.[7]

---

[7] Justice Stevens wrote:
An otherwise inadmissible hearsay statement cannot provide the sole evidentiary support for its own admissibility—it cannot lift itself into admissibility entirely by

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1063

The Court in *Bourjaily* cited to Federal Rule of Evidence 104(a) which provides in pertinent part that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Thus, said the Supreme Court, the existence of a conspiracy and a defendant's involvement in it are preliminary questions of fact that, under Rule 104, must be resolved by the court. The Court held that the standard of proof the trial court must observe in resolving these questions is a preponderance of the evidence. 483 U.S. at 176.[8]

<p align="center">VI</p>

The Rule 104 hearing which is required before any statements of Jackson may be considered for admission into evidence will establish that the 5 elements set forth above cannot be established by the government. Because the government will be unable to establish those elements, and because the government cannot establish the existence of a conspiracy by independent proof *aliunde*, the relief sought herein must be granted.

J. GERALD INGRAM                    JOHN B. JUHASZ

---

[7] (...continued)
tugging on its own bootstraps. It may, however, use its own bootstraps, *together with other support*, to overcome the objection. In the words of the *Glasser* opinion, there must be proof *"aliunde,"* that is, evidence from another source, that together with the contents of the statement satisfies the preliminary conditions for admission of the statement. *Id.*, at 74. [Footnote omitted.] This interpretation of *Glasser* [*v. United States* (1942), 315 U.S. 60] as requiring some but not complete proof *"aliunde "* is fully consistent with the plain language of Rule 104(a).
*Id.*, 483 U.S. at 184-185.

[8] Though it should go without saying, Jackson's statements are likewise inadmissible under the holding of *Lilly v. Virginia* (1999), 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d, 117, 67 USLW 3683, 67 USLW 4435; *accord, State v. Thompson* (Mar. 22, 2000), Jefferson App. No. 98-JE-55, Ohio App. LEXIS 1212.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1064

# APPENDIX

## U.S. CONST., amend. VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## U.S. CONST., amend. XIV, §1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## OHIO CONST., art. I, §1

All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.

## OHIO CONST., art. I, §2

All political power is inherent in the people.  Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the General Assembly.

## OHIO CONST., art. I, §10

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law.  In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

Appendix - 1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1065

committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

OHIO CONST., art. I, §16

All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | Judge John M. Stuard |
| v. | } | |
| DONNA M. ROBERTS, | } | |
| Defendant | } | |

---

### DEFENDANT'S MOTION *IN LIMINE*
### CONCERNING EXTRANEOUS STATEMENTS IN LETTERS AND TAPES

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Court for an order prohibiting any evidence about or testimony from any witness which refers to alleged sexual activity between the Defendant and Nathaniel Jackson other than references which are inextricably intertwined with statements relevant to actions specifically alleged in the instant indictment.  The discovery in this case involves scores of letters written between the Defendant and Nathaniel Jackson, as well as recorded telephone conversations.  No OHIO CRIM.R. 12(E)(2) notice has been filed indicating that the government intends to use such evidence, but the defense files this motion out of an abundance of caution and so that government witnesses may be forewarned not to mention any such other alleged activity.  Additionally, the government sought to introduce all of the letters and telephone conversations in the trial of Nathaniel Jackson.  Except

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7080 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1067

for letters written by the Defendant to Jackson which the government claims discusses the plot or agreement between the Defendant and Jackson to kill the decedent, Robert Fingerhut, the evidence is not admissible under the guise of OHIO EVID.R. 401, 402, 403, 404(B), or under OHIO REV. CODE ANN. §2945.59, or under the State and Federal constitutions.

WHEREFORE, the Defendant prays for an order of this Court *in limine* prohibiting evidence of any alleged "other acts" as aforesaid.

Respectfully submitted,

J. GERALD INGRAM (0007887)

JOHN B. JUHASZ (0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was

❑ sent by regular United States Mail, postage prepaid
❑ hand delivered to counsel or counsel's office
❑ sent by telecopier

this ____ day of May, 2003 to Messrs. Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481.

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

ii

## MEMORANDUM IN SUPPORT OF MOTION

### I

The Defendant has been indicted for, *inter alia*, aggravated murder with capital specifications. The government's basic claim is that the Defendant and Nathaniel Jackson communicated by telephone and by letter while Jackson was incarcerated, and that the two planned the murder of the decedent. Concededly, two days after Jackson's release, Jackson shot and killed the decedent, Robert Fingerhut. The question to be resolved in this trial, of course, is whether this Defendant helped Jackson in such a way as to give rise to criminal liability. For reasons which follow, evidence about sexual licentiousness of the Defendant is not admissible and should not be placed before the jury for consideration. If the jury does hear the "evidence," a fair trial will not be had. *See, generally*, U.S. CONST., amend. XIV, OHIO CONST., art. I, §§1, 2, 10 and 16; *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (conviction must be based only upon proof beyond a reasonable doubt); *Chambers* v. *Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (procedural and evidence rules may not be mechanistically applied to defeat the ends of justice). It is incumbent upon this Court to be watchful for factors which may impermissibly destroy the presumption of innocence, *State v. Lane* (1979), 60 Ohio St.2d 112, 397 N.E.2d 1338, 14 Ohio Op.3d 342; *accord, Estelle v. Williams* (1976), 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126, and thus the current relief is required.

To admit such evidence, the government must establish that the evidence either is relevant in its own right or has a "substantial" tendency to

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1069

prove one of the matters listed in either the evidence rule or the statute[1] and that the evidence is *material* to this case, *i.e.*, that the evidence has something to do with the issues in the case. That is not the situation here. If the government introduces the evidence, it will be introduced as propensity evidence and solely for the purpose of poisoning the jury[2] and showing that the Defendant committed this crime because he has a predisposition to commit burglaries.

## II

Relevant evidence is evidence which has a tendency to make a fact which is of consequence to the determination of the lawsuit more or less likely to be true, depending upon whether the proponent or the opponent of the issue is offering the evidence. *See*, OHIO EVID.R. 401. As used in modern parlance, "relevance" encompasses the now largely-discarded term "materiality". *See*, *State v. Howard* (1978), 57 Ohio App.2d 1, 385 N.E.2d 308, 11 Ohio Op.3d 3. In pre-Rule parlance, *relevance* had to do with a tendency of evidence to make a certain fact more or less likely to be true, while *materiality* dealt with whether or not that fact, if proven, was of consequence to the determination of the lawsuit. The testimony objected to here is not

---

[1] *See,* OHIO EVID.R. 404(B) and OHIO REV. CODE ANN. §2945.59. *See also*, *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, *cert denied, Broom v. Ohio* (1989), 490 U.S 1075, 109 S.Ct. 2089, 104 L.Ed.2d 653, 57 USLW 3753; *State v. Flonnory* (1972), 31 Ohio St.2d 124, 285 N.E.2d 726, 60 Ohio Op.2d 95.

[2] In this regard, it is a fundamental duty of the trial court, in acting as the guardian of the Defendant's liberties under U.S. CONST., amend. XIV and OHIO CONST., art. I, §§2, 10, and 16 to be alert for and to remove from the trial any invidious factors which would undermine the fairness of the trial. *See, State v. Lane, ante. Accord, Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, 35 Ohio Op.2d 431, 6 Ohio Misc. 231; *Estes v. Texas* (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; and *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8280 · E-MAIL JBJURISDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1070

relevant to prove any material fact and must therefore be excluded. OHIO EVID. R. 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[3]

OHIO EVID. R. 402 provides:

> All relevant evidence is admissible, expect as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.

These two rules form the cornerstone of the evidence law of Ohio. Rule 401 provides both a threshold test and an analytic framework. The Rule provides a threshold in that, to be *prima facie* admissible, evidence must be relevant. The Rule also provides the starting point for the analysis of any particular piece of evidence. Put another way, it matters little indeed if the evidence is hearsay or an exception to the hearsay rule; if the evidence is privileged or not; or if the evidence is competent or not: those tests are all *secondary* tests and need never be applied if the evidence cannot satisfy the threshold test of relevance. Conversely, the fact that a piece of evidence which fits squarely, *e.g.*, into a well-established exception to the hearsay rule does not make that evidence admissible if it is not relevant. The first necessary step in analyzing the evidence is to determine whether or not the evidence is relevant. In this case, evidence of sexual acts and/or desires is irrelevant

---

[3] The staff note to Ohio Evid. R. 401 states that "relevancy is not an inherent characteristic of any item of evidence. When it exists, it is a relationship between an item of evidence and a matter properly provable in the case."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASDOC@AOL.COM

3

because it has no tendency to make the existence of any fact that is of consequence to the determination of this action more probable. There is no logical nexus between the evidence and the elements of the offenses charged in the indictment.

Because each case stands on its own facts, the analysis is necessarily a logical, rather than a legal one. There is no logical connection between the extraneous discussion of sex and the acts alleged in the indictment. That evidence does not have any tendency whatsoever to make the existence of any material fact more probable.[4] For these reasons, the testimony sought to be elicited is not relevant and must be excluded.

<center>III</center>

Assuming, *arguendo*, that the Court finds the statements relevant, they must nonetheless be excluded. The most troubling aspect of these statements is the prejudicial effect that they would have, if admitted, on the Defendant and her right to a fair trial. The statements still must be excluded under Evid.R. 403 as any probative value obtained from the evidence is far outweighed by its prejudicial impact. Evid.R. 403 reads as follows:

> **(A)     Exclusion mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or misleading the jury.

Evid.R. 403 requires the Court to perform a balancing test by weighing the probative value of a piece of evidence against the danger of unfair

---

[4] Admittedly, Rule 401 talks in terms of "more probable or less probable". However, as the Government is seeking to establish the existence of facts and prove elements of the crimes charged in the indictment, this memorandum deals only with the concept of the Government attempting to show that something is "more probable" than it would be without the introduction of the evidence in question.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZDOCS@AOL.COM

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1072

prejudice stemming from admission of that evidence. In *State v. Catlin* (1990), 56 Ohio App.3d 75, 564 N.E.2d 750, *leave to appeal overruled*, 56 Ohio St. 3d 713, 565 N.E.2d 836, the Defendant was convicted of felonious assault. At trial, he sought to introduce testimony of the victim's former wife. The victim's former wife would have testified that she had been married to the victim for a period of about ten years; that the victim had a propensity for violence when intoxicated; and that, as a result, he had beaten her severely a number of times. She also would have testified that the defendant was aware of the victim's violent propensities. 56 Ohio App.3d at 78. The trial court excluded the testimony. Although conceding its relevance, the trial court concluded that its prejudicial effect and its tendency to confuse the jury outweighed its probative value. The Montgomery County Court of Appeals agreed, and stated that:

> We conclude that the trial court did not abuse its discretion in this respect. The proper testimony would have interjected into this trial the marital dispute between Billy Catlin and Anna Catlin; more importantly, it would have portrayed the alleged victim of the offense for which Oscar Catlin was on trial as a wife beater and, consequently, a figure to be despised by the jury. The evidence would have had the tendency to inflame the passion and prejudice of the jury against the victim of the alleged offense.

*Id.*

The principles set forth in *Catlin, ante,* are applicable to the present case. The testimony which the State hopes to offer would portray the Defendant as a person with extravagant sexual desires so pervasive that she would participate in a plan to kill her live-in lover to whom she was once married. The evidence would inflame the passion and prejudices of the jury against the Defendant and make more probable convictions for aggravated

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ@CS.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1073

murder based not upon the evidence presented in support of those charges, but based upon evidence of the Defendant's offensive behavior.   These statements are not relevant to the issues presented in this case.   The prejudicial impact and effect of the statements far outweighs any probative value that might be contained in the statements.

Since the government will be unable to establish relevance, and because the general policy of the law disfavors "other act" evidence, the burden is upon the government to lay a proper foundation for the evidence, to demonstrate that the evidence is relevant to prove one of the factors cited in the rule or the statute, and to prove that those factors are *material* to the decision of this case.   If the government is able to prove the case, it can certainly do so without resort to evidence concerning alleged sexual fantasies of the Defendant.   The evidence can only be offered to poison the minds of the jurors against the Defendant and for that reason cannot be admitted.   *See,* *State v. Williams* (1969), 21 Ohio App.2d 184, 255 N.E.2d 639, 50 Ohio Op.2d 280.

OHIO EVID.R.  403(A) requires that this evidence be excluded.   The rule provides:

> **(A) Exclusion mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

Concededly, sometimes other acts evidence can be admitted.   *See,* OHIO EVID.R.  404, titled "Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes".   It provides in relevant part:

> **(A) Character evidence generally.**  Evidence of a person's character or a trait of his character is not admissible for the purpose

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUURISDOC@AOL.COM

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1074

of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

(1) *Character of accused*. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

. . . .

**(B) Other crimes, wrongs or acts**. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

OHIO REV. CODE ANN. §2945.59 provides:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

The statute clearly provides that (1) the matter sought to be proved by the "other act" evidence must be material to the case; and (2) the "other act" evidence must be relevant in that it must actually prove or tend to prove one of the statutory factors.

IV

Use of other acts evidence is inherently dangerous. Therefore, courts are to approach the situation with caution, and any proffered exception to the general rule must be strictly construed against the government.[5] In *State* v. *Broom, ante*, the Supreme Court of Ohio held, 40 Ohio St.3d at 281-282:

---

[5] This should come as no surprise, because the state and federal constitutions mandate that anything the government wants to do must be strictly construed against the government. *See*, U.S. CONST. amend. IX and X; OHIO CONST. art. I, §§1 and 2.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1075

Because R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict. *State* v. *Burson* (1974), 38 Ohio St.2d 157, 158-159, *State* v. *DeMarco* (1987), 31 Ohio St.3d 191, 194. Neither the rule nor the statute contains the words "like" or "similar." The rule and statute contemplate acts which may or may not be similar to the crime at issue. If the other act does in fact "tend to show" by substantial proof any of those things enumerated, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, then evidence of the other act may be admissible. *State* v. *Flonnory* (1972), 31 Ohio St.2d 124.[6]

The dangers of an improper conviction when other acts evidence is used has been emphasized by the courts. For example, in *State* v. *Williams*, *ante*, the defendant was convicted of the second degree murder of his wife. The State argued at trial that evidence of other acts was relevant to prove motive. These acts included: that the defendant had been deceitful in swearing that he had never been previously married; that he falsified a marriage license application; that he had falsely posed as an FBI agent; that he had lied to a newspaper reporter about a purported war injury; and that he had lied to his wife about a furniture down payment. The Clermont County Court of Appeals reversed the conviction, finding no logical connection between the evidence admitted and any of the factors set forth in the statute. The court held at 187-188:

We are impressed with the observation of the court in *State* v. *Pigott*, 1 Ohio App.2d 22, at page 25, 197 N.E.2d 911, at page 913 referring to evidence of similar acts:

"* * * This court is fully aware that this type of evidence can be highly prejudicial unless its introduction and reception is meticulously handled by the trial court. Furthermore, unless the rights of the defendant are properly safeguarded, the door is opened to a conviction of an accused by evidence which was not designed for

_____

[6] Parallel citations omitted in quote.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8200 · E-MAIL JBJUHASDOC@AOL.COM

8

that purpose and a denial to the accused of the fair trial he is entitled to. . . . ."

\* \* \*.

It must be remembered that the law of this state expressly declares that the defendant in a criminal case is presumed to be innocent until he is proved guilty. Suspicion, no matter how well founded in the mind, cannot be permitted to supplant proof. Scoundrel, philanderer and prevaricator though the state believes him to be, the defendant is entitled to the shield of the presumption of innocence. As a man then on trial for his life, he was entitled to have strict compliance with the rules of law prescribed and which should have been understood.

In this case, the other acts evidence would be admitted only to prove that the Defendant is a person of substantial sexual appetite. In *State* v. *Burson* (1974), 38 Ohio St.2d 157, 311 N.E.2d 526, 67 Ohio Op.2d 174, the Supreme Court of Ohio held:

This court has, thus far, permitted [OHIO REV. CODE ANN. §2945.59] to operate as an exception to the general rule that the introduction of evidence tending to show that the accused has committed any crime unconnected with the offense for which he is on trial is not permitted. *State* v. *Hector* (1969), 19 Ohio St.2d 167, 249 N.E.2d 912. Therefore, R.C. 2945.59 must be strictly construed against the state. See *State* v. *Strong* (1963), 119 Ohio App. 31, 196 N.E.2d 801.

Nowhere do the words "like" or "similar" appear in the statute. Prosecutors and trial courts should be particularly aware that evidence of other acts of a defendant if admissible *only* when it "tends to show" one of the matters enumerated in the statute *and only when it is relevant* to proof of the guilt of the defendant of the offense in question. Such evidence is admissible, not because it shows that the defendant is crime prone, or even that he has committed an offense similar to the one in question, but in spite of such facts. *Hector supra*.

Where evidence of other acts of the defendant is sought to be introduced for the purpose of showing his identity, by his common scheme, plan, or system of committing an offense, the standard for determining admissibility is strict. In *Hector, supra*, Ohio St.2d at page 177, 249 N.E.2d at page 918, it is stated:

"The legal determination, by comparison of the plan, system, or method employed in a prior crime with the plan, system or method employed in the crime in question, of whether the former is relevant to the issue of identity of the perpetrator of the latter, must be made without consideration of the fact that eyewitnesses have identified the same person as the perpetrator of both crimes.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250 · E-MAIL JBJURIS0009@AOL.COM

9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1077

"There must be some similarity of methodology employed which itself would constitute probative evidence of the probability that the same person (whoever he might be) committed both crimes.  In such event, eye-witness proof of the identity of the perpetrator of the prior offense is relevant proof on the issue of the identity of the perpetrator of the offense in question.

When the purpose of evidence of other acts is to show the absence of mistake or accident on the part of the defendant in committing the offense charged, it must be shown that a connection, in the mind of the defendant, must have existed between the offense in question and the other acts of a similar nature.  See *State* v. *Moore* (1948), 149 Ohio St. 226, 78 N.E.2d 365.  The other acts of the defendant must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question.  The evidence is then admissible to the extent it may be relevant in showing the defendant acted in the absence of mistake or accident.

In the present case, the conduct of appellant . . . was of such a nature that it was not indicative of appellant's scheme or plan, his identity, or his absence of mistake or accident.  It only served to show that appellant was an intemperate and violent individual. . . . . Such evidence was outside the purview of R.C. 2945.59 and its admission constituted prejudicial error.

38 Ohio St.2d at 158-160.  Here, regardless of what factors the Defendant may place in issue, this other acts evidence does nothing to prove them for the State.

In *State* v. *Howard, ante,* the court discussed the tests for admissibility of such evidence.

Scheme, plan, or system evidence is admissible when the identity of the perpetrator of the crime is in issue.  *State* v. *Curry* (1975), 43 Ohio St.2d 66, at 73, 330 N.E.2d 720, at 726, states:
"One recognized method of establishing that the accused committed the offense set forth in the indictment is to show that he has committed similar crimes within a period of time reasonably near to the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8250 · E-MAIL JBHCRISPO@AOL.COM

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1078

*Id.*, 57 Ohio App.2d at 6.[7]  In *State* v. *Lowe*, 69 Ohio St.3d 527, 1994 Ohio 345, 634 N.E.2d 616, Lowe was indicted on two counts of aggravated murder for the murders of Mullet and Griffin.  After an initial appeal and remand the trial court found that certain evidence was not admissible and the government took an interlocutory appeal.

Central to the government's case was what it claimed were interrelated pieces of evidence, including a handwritten document known as the "power list."  The government characterized the power list as a written plan of deviant sexual activity.  To prove its theory, the government sought to introduce certain "other acts" evidence, specifically the testimony of three young girls, one of whom was age eleven, and two of whom were age eight at the time of the murders.  The government argued that Lowe's sexual activities with those girls proved that the power list was a plan of action and not just fantasy.  The government also argued that Lowe's plan to have sex with Mullet, one of the victims, went awry, resulting in the murders.  Some of Lowe's activities with the girls were overtly sexual in nature.  There was no evidence that he ever touched the girls in a way that constituted sexual

---

[7] The Court also spelled out the test for admission:
> As this court held in *State v. Snowden, supra*, 49 Ohio App.2d at 9, 359 N.E.2d at 90, the test in determining the admissibility of evidence of other acts is twofold:
> "* * * [F]irst, an examination to determine the Relevancy [*sic*] of the other act to the crime in question; next, if that threshold issue is determined favorably for the state, an inquiry into the succeeding question of whether evidence of the other act is Material to any issue placed in question by the conduct of the instant trial."

*Id.*, 57 Ohio App.2d at 6.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: jbjjuris@aol.com

11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1079

contact.[8]  The murder scene contained no direct evidence that the killings were sexually motivated.

The trial court held that the other acts were inadmissible, ruling that the other acts and the power list were not linked to the murders.  The Supreme Court of Ohio affirmed[9] and reiterated the limited use of "other act" evidence.  The Court held:

> Evidence of other acts is admissible if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  *State* v. *Broom* (1988), 40 Ohio St.3d 277, 282-283, * * *; Evid.R. 404(B); R.C. 2945.59.  R.C. 2945.59 and Evid.R. 404(B) codify the common law with respect to evidence of other acts of wrongdoing, and are construed against admissibility.  See *State* v. *Burson* (1974), 38 Ohio St.2d 157, * * *; *State* v. *Hector* (1969), 19 Ohio St.2d 167, 174-175, * * *.
>
> That there is substantial proof that Lowe engaged in questionable activities with the young girls is not disputed.  The issue is whether those activities tend to prove any of the enumerated purposes of Evid.R. 404(B).
>
> The state argues that Lowe's activities with the girls should be admitted into evidence in order to show identity.  Identity is the least precise of the enumerated purposes of Evid.R. 404(B).  Evid.R. 404(B) states that other acts are not admissible "to prove the character of a person in order to show that he acted in conformity therewith," and we therefore must be careful when considering evidence as proof of identity to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and evidence which shows that a defendant is the person who committed a particular crime.
>
> Other acts can be evidence of identity in two types of situations. First are those situations where other acts "form part of the immediate background of the alleged act which forms the foundation

---

[8] Lowe showed two of the girls X-rated videotapes, and explained to the girls what was happening in the films.  At times while watching the videos, Lowe's hands would be down his pants.  On other occasions, Lowe would walk through his house in bikini underwear and would have his hands down his pants.  Lowe also showed the girls *Playboy* magazines, and had the girls make audiotapes, uttering sexual language.

[9] The government took a midtrial appeal pursuant to OHIO CRIM.R. 12(J).  The court of appeals affirmed the trial court.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHRISDOG@AOL.COM

12

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1080

of the crime charged in the indictment," and which are "inextricably related to the alleged criminal act." *State* v. *Curry* (1975), 43 Ohio St.2d 66, 73, * * * .

Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. . . . . [T]he acts should show a *modus operandi* identifiable with the defendant. *State* v. *Hutton* (1990), 53 Ohio St.3d 36, 40, 559 N.E.2d 432, 438.

A certain *modus operandi* is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. . . .

. . . .

Lowe's activities with the girls establish no *modus operandi* applicable to the Mullet and Griffin murders. . . .

. . . .

Lowe's other acts and the murders are not sufficiently related, nor do they share any significant common features. . . .

The evidence at issue neither inextricably ties Lowe to the underlying crime nor establishes a modus operandi consistent with the murders. . . .

*Id.*, 69 Ohio St.3d at 530-532.  Evidence of sex acts and desires does not inextricably tie the Defendant to the crimes alleged in the indictment, and the evidence must be excluded.  Use of such evidence is an open invitation to an unconstitutional trial.

The "other acts" statute, being in derogation of the common law principle, and being a criminal statute, must be strictly construed against the State.  See, *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N. E.2d 180, *cert. denied, Jamison v. Ohio* (1990), 498 U. S. 881, 111 S.Ct. 228, 112 L.Ed.2d 183, 59 USLW 3250; *State v. Strong* (1963), 119 Ohio App. 31, 196 N.E.2d 801. The trial court must conduct a test before admitting the evidence of other acts:

The court must determine that (1) the other act is relevant to the crime in question . . . , and (2) evidence of other acts is relevant to an issue placed in question by the conduct of the present trial . .

John R. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail Jrjurisdoc@aol.com

13

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1081

> .  .  The court, in addition to determining relevancy, must pay
> attention to other factors, examples of which are: (1) the time of the
> other act * * *; (2) the accused's *modus operandi* .  .  . ; (3) the
> nature of the other acts committed, and (4) location of other acts .  .
> .  .

*State v. McCornell* (1993), 91 Ohio App.3d 141, 146, 631 N. E.2d 1110.

[Citations in quotation omitted.]

### V

The use of evidence of sexual acts, completed or contemplated, is also in essence use of character evidence to attempt to convict the Defendant. The rule of Anglo-American common law was set forth in *State v. Ross* (1952), 92 Ohio App. 29, 36-37, 108 N. E.2d 77, 62 Ohio Law Abs. 562, *appeal dismissed* (1952), 158 Ohio St. 248, 108 N. E.2d 282, 49 Ohio Op.25: "Fundamental has been the rule that character is never an issue in a criminal prosecution, unless the defendant chooses to make it one.  The law has set its face against the endeavor to fasten guilt upon an accused person by proof of character or experience predisposing to an act of crime.  The State may not prove generally against a defendant crimes not alleged in the indictment, as aiding the proof that he is guilty of the crime alleged in the indictment." *See, also, State v. Mann* (1985), 19 Ohio St.3d 34, 36, 482 N.E.2d 592, 19 OBR 28; *State v. Curry* (1975), 43 Ohio St.2d 66, 68-69, 330 N.E.2d 720, 72 Ohio Op.2d 37; *State v. Burson* (1974), 38 Ohio St.2d 157, 311 N. E.2d 526, 67 Ohio Op.2d 174; *State v. Hector* (1969), 19 Ohio St.2d 167, 249 N. E.2d 912, 48 Ohio Op.2d 199.

Here, the evidence is so clearly prejudicial and so clearly inadmissable that a pretrial hearing—and not objections made before the jury—is required to resolve questions of admissibility.  Those questions should be resolved in

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1082

favor of the Defendant, and the Court should exclude all evidence of sexual activities, completed or contemplated, unless the same are shown to be inextricably[10] intertwined with the charged offenses.

J. GERALD INGRAM

JOHN B. JUHASZ

E:\DRoberts\Trial\Letter.tapes.limine.wpd•Monday 12 May 2003•06:50am (0650 hrs)

---

[10] *Oxford's Dictionary* defines "inextricably" as "impossible to disentangle or separate" or "impossible to escape from."  That is certainly not the case here.

JOHN B. JUHASZ • ATTORNEY AT LAW • 7330 MARKET STREET • YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 • FACSIMILE 330.758.8290 • E-MAIL JBJJURISDOC@AOL.COM

15

## COURT REPORTER'S REPORT

## RE: BILLING OF COURT COSTS

### CASE NO.: 2001-CR-793

STATE OF OHIO,                      )  JUDGE W. WYATT McKAY
                                    )
    PLAINTIFF                   )
                                    )
-VS-                                )
                                    )
DONNA M. ROBERTS,                   )
                                    )
    DEFENDANT                   )

I, Kelly J. Wilson, do hereby certify that I was the Court Reporter in the above-captioned case, and a record of proceedings was taken on the following day(s):

MAY 5, 6, 7, 8 AND 9, 2003

The Clerk shall collect court costs for **5 days** at the rate of $25.00 per day for a total of $125.00.

DATE: _5-12-03_ _____          _____

KELLY J. WILSON
OFFICIAL COURT REPORTER

97



# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )    Case No. 01 CR 793
                                 )
    Plaintiff                    )    Judge John M. Stuard
                                 )
v.                               )
                                 )
                                 )
DONNA M. ROBERTS,                )
                                 )
    Defendant                    )



## STIPULATION

COME NOW THE PARTIES, through their respective counsel, and stipulate that if recalled to the witness stand by either party, Katherine Thomas would testify that her business records, kept in the regular course of business, would establish that Donna M. Roberts and Robert Fingerhut reported to State Farm Insurance that the primary driver of the 2001 Silver Mist Chrysler 300M was Donna M. Roberts and the principal driver of the 2000 Inferno Red Chrysler 300M was Robert Fingerhut.

Respectfully submitted,

CHRISTOPHER D. BECKER, Esq.

KENNETH N. BAILEY, Esq.
Counsel for Plaintiff
60 High Street, NW
Warren, Ohio 44481

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@GMAIL.COM

i        98

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1085

J. GERALD INGRAM (0007887)

JOHN B. JUHASZ  (0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

E:\DRoberts\Trial\Stipulation.State.Farm.wpd•Thursday 15 May 2003 • 07:27 am

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

ii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1086

E:\DRoberts\Trial\Daubert.Limine\Germaniuk.et.al.wpd ●Friday, May 16, 2003 ● 9:34 am

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

-vs-

DONNA M. ROBERTS,

    Defendant

Case No. 01 CR 793

Judge John M. Stuard

03-1441

FILED

JAN 5 U 2004

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

---

## DEFENDANT'S MOTION IN *LIMINE*
## REQUEST FOR HEARING

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Court for an order in *limine* prohibiting the testimony of Dr. Humphrey Germaniuk, Michael Roberts, Dale Laux, and Brenda Gerardi; or, scheduling *Daubert* hearing before the "expert" witnesses testify to determine the admissibility of their testimony or portions thereof. For cause, the Defendant says that the requested relief is required by U.S. CONST., amend. XIV, OHIO CONST., art. I, §§1 and 16, and OHIO EVID. R. 104. The Government's discovery and the transcribed testimony of the trial of co-defendant Nathaniel Jackson suggests that the government will offer expert and scientific testimony in a number of areas. As shown in the attached Memorandum, made a part hereof by this reference, such testimony, if admitted at all, is only properly admitted after this Court has performed its gatekeeping function, to be done at a Rule 104 hearing. Further for cause, the Defendant offers the attached Memorandum, made a part hereof by this reference.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

i

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1087

WHEREFORE, the Defendant prays for an order in *limine* prohibiting the testimony of Dr. Humphrey Germaniuk, Michael Roberts, Dale Laux, and Brenda Gerardi; or, scheduling a *Daubert* hearing before the "expert" witnesses testify to determine the admissibility of their testimony or portions thereof.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❏ sent by regular United States Mail, postage prepaid
☑ hand delivered to counsel or counsel's office
❏ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this ___ day of May, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

ii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1088

# AUTHORITIES CITED

**Cases**:

*Barefoot v. Estelle* (1983), 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090, 51 USLW 5189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Commonwealth v. Lanigan* (1992), 413 Mass. 154, 596 N.E.2d 311 . . . . . . . . . 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 48056, 125 L.Ed.2d 4 . . . . . . . . . . . . . . . . . . . 1, 6, 7

*Evitts v. Lucey* (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821,  53 USLW 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fishback v. People* (Colo. 1993), 851 P.2d 884 . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Frye v. United States* (D.C. Cir. 1923), 293 F. 1013 . . . . . . . . . . . . . . . . . . . . . . 1

*In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 . . . . . . . . . 2

*Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 528 N.E.2d 603 . . . . . . . . . . . 6

*Kumho Tire Co. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, 67 USLW 4179 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

*Lee v. Barber* (Jul. 12, 2001), Butler App. No. CA2000-02-014, 2001 Ohio App. LEXIS 2980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 . . . . . . . . 6

*Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 1998 Ohio 178, 687 N.E.2d 735 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

*Ohio Adult Parole Authority v. Woodard* (1998), 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387, 66 USLW 4226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Pointer v. Texas* (1965), 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 . . . . . . . . 3

*State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, 535 N.E.2d 315 . . 10

*State v. Bible* (1993), 175 Ariz. 549, 858 P.2d 1152 . . . . . . . . . . . . . . . . . . . . . 24

*State v. Brown* (Mar. 31, 2000), Trumbull App. Nos. 95-T-5349 and 98-T-0061, 2000 Ohio App. LEXIS 1430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Chapin* (1981), 67 Ohio St.2d 437, 424 N.E.2d 317, 21 Ohio Op.3d 273 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

*State v. Hartman*, 93 Ohio St.3d 274, 2001 Ohio 1580, 754 N.E.2d 1150 . . . . . 11

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

iii

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1089

*State v. Jackson*, 92 Ohio St.3d 436, 2001 Ohio 1266, 751 N.E.2d 946 . . . . . . 11

*State v. Jones* (1984), 9 Ohio St.3d 123, 459 N.E.2d 526, 9 OBR 347 . . . . . . 8, 22

*State v. Knight* (1984), 20 Ohio App.3d 289, 485 N.E.2d 1064, 20 OBR 381 . . . 7

*State v. Robles* (1989), 65 Ohio App.3d 104, 583 N.E.2d 318 . . . . . . . . . 7, 10, 21

*State v. Vandebogart* (1992), 136 N.H. 365, 616 A.2d 483 . . . . . . . . . . . . . . . 25

*Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 . . . . . . 3

*United States v. Downing* (3rd Cir. 1985), 753 F.2d 1225 . . . . . . . . . . . . . . . 27

*Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 482 N.E.2d 955, 19 OBR 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Woodson* v. *North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

## Constitutional Provisions:

OHIO CONST. art. I, §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OHIO CONST., art. I, §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OHIO CONST., art. I, §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OHIO CONST., art. I, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OHIO CONST., art. I, §20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OHIO CONST., art. I, §5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OHIO CONST., art. I, §9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. CONST. amend. IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. CONST. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. CONST. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8210 · E-MAIL JBJURISDOC@AOL.COM

iv

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1090

**Rules:**

OHIO EVID. R. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

OHIO EVID.R. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

OHIO EVID.R. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Law Reviews:**

Fleming, Thomas M., *Admissibility of DNA Identification Evidence*, 84 ALR4th 31
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325

Giannelli, Paul C., Daubert: *Interpreting the Federal Rules of Evidence*, 15 CARDOZO
L. REV. 1999 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27

Hoeffel, Janet C., Note, *The Dark Side of DNA Profiling: Unreliable Scientific
Evidence Meets the Criminal Defendant*, 42 STAN. L. REV. 465 (1990) . . . . . . . 25

McDonald, Ryan, *Juries and Crime Labs: Correcting the Weak Links in the DNA
Chain*, 24 AM. J. L. AND MED. 345 . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

Whitney, Sherry J., State v. Bible: *The Admissibility of Forensic DNA Profiling and
Statistical Probability Evidence in Arizona Criminal Proceedings*, 26 ARIZ. ST. L.J.
593 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Whitney, Sherry J., State v. Bible: *The Admissibility of Forensic DNA Profiling and
Statistical Probability Evidence in Arizona Criminal Proceedings*, 26 ARIZ. ST. L.J.
593 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# MEMORANDUM

## I

In *Daubert v. Merrill Dow Pharmaceuticals* (1993), 509 U.S. 579, 592-593, 113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, the United States Supreme Court, in an opinion authored by the late Justice Harry A. Blackmun, said:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a),[1] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. [Footnote omitted.]  This entails *a preliminary assessment* of whether the *reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.*  We are confident that federal judges possess the capacity to undertake this review.  . . .

(Emphasis added.)  *Daubert*'s emphasis is not, as was the case with the *Frye* test, *see, Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, on general acceptance, but upon "reliability."[2]  Case Western Reserve Law School Professor Paul Giannelli,

---

[1] The Court's footnote quoted the federal version of Rule 104, which is virtually identical to the Ohio rule, quoted *post*.  FED. EVID. R. 104(a) provides:
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions].  In making its determination it is not bound by the rules of evidence except those with respect to privileges.
The Court's footnote noted that "[t]hese matters should be established by a preponderance of proof. See *Bourjaily v. United States*, 483 U.S. 171, 175-176 (1987)."

[2] "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability."  509 U.S. at 590.  The Court inserted footnote 9, which emphasized the difference between *reliability* and *validity:*
We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?).  *See* Black, [A Unified Theory of Scientific Evidence,] 56 FORD.L.REV. [595], at 599 [(1988).]  Although "the difference between accuracy, validity, and reliability may be such that each is distinct from the other by no more than a hen's kick," Starrs, Frye v. United States *Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702,* 26 JURIMETRICS J. 249, 256 (1986), our reference here is to evidentiary reliability—that is, trustworthiness. *Cf., e.g.,* Advisory Committee's Notes on Fed.Rule Evid. 602, 28 U.S.C.App., p. 755 ("[T]he rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact' is a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information'" (citation omitted)); Advisory
(continued...)

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1092

one of the country's leading evidence scholars, has set forth a synopsis of *Daubert*'s requirements:

> In performing this "gatekeeping role," [footnote omitted] the trial court may consider a number of factors. First, the court should determine whether the scientific theory or technique has been tested. [Footnote omitted.] Citing scientific authorities, the Court recognized that a hallmark of science is empirical testing. [Footnote omitted.] Second, whether a theory or technique has been subjected to peer review and publication is "a relevant, though not dispositive, consideration in assessing . . . scientific validity." [Footnote omitted.] The peer review and publication process increases the likelihood that flaws will be revealed. Third, a technique's "known or potential rate of error" is also a relevant factor. [Footnote omitted.] Fourth, the "existence and maintenance of standards controlling the technique's operation" is indicative of trustworthiness. [Footnote omitted.] Finally, "general acceptance" remains an important consideration. Although the Court rejected "general acceptance" as the sole criterion for admissibility, it recognized its relevance in assessing the reliability of scientific evidence. [Footnote omitted.]

*See*, Paul C. Giannelli, Daubert: *Interpreting the Federal Rules of Evidence*, 15 CARDOZO L. REV. 1999 (1994).

Expert testimony is admissible only if certain predicates are first established. These predicates include whether the witness is qualified as an expert, whether the witness' testimony and/or opinions derive from the application of *reliable* scientific protocols, whether the items subjected to scientific tests were collected and preserved in such a way as to permit sound scientific testing and conclusions, *etc.* It is not to be forgotten that the Due Process Clause demands *reliability* in the process of determining whether an individual is guilty beyond any reasonable doubt.[3] *See, generally, In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068,

---

[2] (...continued)
Committee's Notes on Art. VIII of Rules of Evidence, 28 U.S.C.App., p. 770 (hearsay exceptions will be recognized only "under circumstances supposed to furnish guarantees of trustworthiness"). In a case involving scientific evidence, evidentiary reliability will be based upon scientific validity.
509 U.S. at 590.

[3] U.S. CONST., amend. XIV provides in pertinent part that "No State shall . . . deprive any
(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8280 · E-MAIL JBJUHASZDOC@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1093

25 L.Ed.2d 368; *Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; *Pointer* v. *Texas* (1965), 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923. That precept applies with even more force in a capital case because death is "different". *See, Woodson* v. *North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.

The *Daubert* reliability rule applies to both scientific and other types of expert testimony. *See, Kumho Tire Co. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, 67 USLW 4179: "In *Daubert,* this Court held that Federal Rule of Evidence 702 imposes a *special obligation* upon a trial judge to ensure that any and all scientific testimony . . . is not only relevant, but *reliable.*" 526 U.S. at 147, citing and quoting *Daubert,* 509 U.S. at 589. (Emphasis added.) The Court went on to say that:

> The objective of [the *Daubert*] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field . . . . [W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.

*Kumho Tire,* 526 U.S. at 152.[4] Thus, results of medical and crime laboratory tests, autopsy methodology, and similar types of expert or scientific evidence must be first

---

[3] (...continued)
person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." OHIO CONST., art. I, §1 provides that: "All men are, by nature, free and independent, and have certain *inalienable rights,* among which are those of enjoying and *defending life and liberty,* acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." (Emphasis added.) OHIO CONST., art. I, §16 provides that: All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have *remedy by due course of law, and shall have justice administered without denial* or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law." (Emphasis added.)

[4] Justice Antonin Scalia, joined by Justices Sandra Day O'Connor and Clarence Thomas, in concurring with the decision, said: "I join the opinion of the Court, which makes clear that the discretion it endorses—trial-court discretion in choosing the manner of testing expert reliability—is not discretion to abandon the gatekeeping function. I think it worth adding that it is not discretion to perform the function inadequately. Rather, it is discretion to choose among reasonable means of excluding expertise that is *fausse* and science that is junky." *Id.* at 158-159.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8280 · E-MAIL JBJUHASZOO@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1094

shown to be reliable outside the presence of the jury in a "gatekeeping" hearing.[5] The reliability rule has been adopted by the Supreme Court of Ohio as regards the Ohio Evidence Rules. *See, Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 1998 Ohio 178, 687 N.E.2d 735, at syl. 1. The Court's syllabus there provides: "1. A trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial."

## II

Ohio Evid. R. 104 sets forth a procedure for this Court to exercise the essential gatekeeping function:

> *(A)  Questions of admissibility generally.*  Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (B).  In making its determination it is not bound by the rules of evidence except those with respect to privileges.
> *(B) Relevancy conditioned on fact.*  When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
> *(C) Hearing of jury.*  Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury.  Hearings on other preliminary matters shall also be conducted out of the hearing of the jury when the interests of justice require.
> *(D)  Testimony by accused.*  The accused does not, by testifying upon a preliminary matter, subject himself to cross-examination as to other issues in the case.
> *(E)  Weight and credibility.*  This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.

Though the Court has discretion, that discretion, as Justice Scalia said in his *Kumho* concurrence, *ante*, is "in choosing the manner of testing expert reliability—is not discretion to abandon the gatekeeping function." The discretion

---

[5] As with other motions *in limine* filed in this case, this motion is not a "surprise attack" of any kind, and is intended to do nothing more than to assure that which the law requires in every case. The legal requirements for the admissibility of scientific evidence, detailed herein, should come as a surprise to no one, as they are well-ingrained in the law. The true purpose of this motion is to insure that these legal requirements are observed in this most serious of cases.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.7700 · Facsimile 330.758.8290 · E-mail: jbjurisdoc@aol.com

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1095

is not, as he said, "to perform the function inadequately." Moreover, conducting a pretrial hearing on the admissibility of any expert testimony tendered by the government will facilitate the fair administration of justice, economize trial time, and minimize any inconvenience for the jury—this last point something all of us who participate in the system on a regular basis perhaps overlook from time to time. Absent a pretrial adjudication of these issues, the trial will be repeatedly interrupted with long delays while counsel conducts a voir dire of proffered government expert witnesses. Jurors' predictable and understandable deference to experts, imbued with the aura of credibility of being an "expert," must not be tainted by allowing questions to be asked when the basis for the testimony as not been established in a Rule 104 hearing.

The need for advance adjudication of admissibility issues is all the more critical in a capital case than any other. This Defendant is entitled to an OHIO R. EVID. 104 hearing to preserve inviolate her state and federal constitutional liberties, including the effective assistance of counsel, due process of law, equal protection of the law, confrontation of the government's evidence against her, and freedom from cruel and unusual punishment. *See*, U.S. CONST. amend. VI, VIII, IX and XIV; OHIO CONST. art. I, §§ 1, 2, 5, 9, 10, 16 and 20. Ohio has established OHIO R. EVID. 104 for precisely such purposes as these. It is clear that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *See*, *Evitts v. Lucey* (1985), 469 U.S. 387, 401, 105 S.Ct. 830, 83 L.Ed.2d 821, 53 USLW 4101. The need to insure compliance with the Due Process Clause is all the greater when a person's "life" interest (protected by the "life, liberty and property" language in the Due Process Clause) is at stake in the proceeding. *See*, *Ohio Adult Parole Authority v. Woodard* (1998), 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387, 66 USLW 4226 (wherein five Justices recognized a distinct "life" interest protected by the Due Process Clause in capital cases above and beyond liberty and property interests). Death is "different".

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHRSOO@AOL.COM

5

For that reason alone, *more* process is "due," not less. *See, Lockett* v. *Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973; *Woodson v. North Carolina*, *ante*. The State of Ohio's procedure for determining the admissibility of evidence must comport with the constitutional requirements that obtain in a capital case.

Therefore, Defendant respectfully requests this Court to hold a hearing at which the State's proposed expert witnesses along with any other evidence that falls within the parameters of OHIO R. EVID. 104 shall be examined by counsel for the parties and its admissibility adjudicated by this Court.

<div align="center">III</div>

OHIO EVID.R. 702  provides:

> A witness may testify as an expert if all of the following apply:
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
> (2) The design of the procedure, test, or experiment reliably implements the theory;
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

(Emphasis added.)  The Rule "as a prerequisite to admissibility, require[s] an expert to ground his or her conclusions in *reliable* methods and principles." *See, Miller v. Bike Athletic Company*, *ante*, 80 Ohio St.3d at 618 (COOK, J., dissenting); (emphasis added); *see, also,* OHIO EVID.R. 702(C); *Daubert*, *ante*, 509 U.S. at 589-590; *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 528 N.E.2d 603 [holding that while Rule 702 permits a witness to testify as an expert if his opinion or testimony will aid the trier of fact in search of the truth, a threshold determination

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8280 · E-MAIL: JBJUHASZ@AOL.COM

6

must first be made under Rule 104(A) concerning the qualification of the witness to testify as an expert]; *State v. Knight* (1984), 20 Ohio App.3d 289, 485 N.E.2d 1064, 20 OBR 381, [holding that the "preliminary fact" of whether the declarant believed that his death was imminent for purposes of admitting a statement under the "dying declaration" exception to the hearsay rule, OHIO EVID.R. 804(B)(2), must be determined by the trial court under OHIO EVID.R. 104]; and *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 482 N.E.2d 955, 19 OBR 71 [holding that preliminary questions concerning the qualifications of a person to be a witness are to be determined by the court under Rule 104(A)].

*Daubert* held that, faced with a proffer of expert scientific testimony under Federal Rule 702, the trial judge *must* make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue. This task, often referred to by practitioners as the *Daubert* "gatekeeping" obligation, applies not only to "scientific" testimony, but to all expert testimony. *See, Kumho Tire Co., ante.* The Rule does not distinguish between "scientific" knowledge and "technical" or "other specialized" knowledge, but makes clear that any such knowledge might become the subject of expert testimony, and hence the subject of the trial court's mandatory gatekeeping function. The goal is to keep "junk science" from the jury; and, at least in criminal cases, to "safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." *In re Winship*, quoted *post.* Whether the DNA and other scientific evidence in this case is "junk science" or not, this trial court must conduct the Rule 104 hearing prior to the testimony being presented to the jury. To do otherwise is to fail to perform the gatekeeping function that the Court is required to perform.

In *State v. Robles* (1989), 65 Ohio App.3d 104, 583 N.E.2d 318, *leave to appeal overruled*, (1990), 49 Ohio St.3d 707, 551 N.E.2d 1301, the court reversed an aggravated murder conviction. There, Robles claimed prejudicial error in allowing the opinion testimony of the government's expert where the expert did not have

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7788 · FACSIMILE 330.758.8592 · E-MAIL JBJUURISDOC@AOL.COM

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1098

personal knowledge of the data underlying his opinion, *and* that data was not admitted into evidence as required by OHIO EVID.R. 703. The witness, William Wilson, a BCI employee, testified about the percentage of the population having the same type of blood as the victim and as the blood found on certain pieces of evidence. That testimony was based upon statistics from an FBI report which was never admitted into evidence. Opinion testimony by an expert witness must be based upon facts within that witness's own personal knowledge or upon facts shown by the evidence admitted in the case. *See, State v. Chapin* (1981), 67 Ohio St.2d 437, 424 N.E.2d 317, 21 Ohio Op.3d 273; *State v. Jones* (1984), 9 Ohio St.3d 123, 459 N.E.2d 526, 9 OBR 347.

Wilson testified that he tested blood samples from the victim and the two defendants to determine the blood type and enzyme phenol type to distinguish between them. Wilson then ran the same tests on the blood samples taken from pieces of evidence gathered in the case. Wilson testified that he could indisputably eliminate both Robles and the co-defendant as sources of the blood found near the body and on the car. Wilson then testified as to the statistics of blood and enzyme types for the general population compiled by the FBI based upon population surveys conducted, from which it determined a breakdown according to the percentage of each type existing in the population. Wilson said that although the FBI studies are updated every three months, he used statistics from the 1982 study to formulate his conclusions as to population frequency. The court said in part:

> As set forth above, Evid.R. 703 and case law require that an expert witness base his opinion upon either personal knowledge or facts in evidence. Here, however, Wilson was permitted over appellant's objection to state conclusions which he claimed were based in part upon population statistics contained in reports compiled by the FBI. These reports, however, were never produced at trial. Instead, Wilson referred to State's Exhibit 29, a single sheet of paper which contained several typewritten tables. Wilson testified that this information was taken from an FBI report dated July 1, 1982; however, the exhibit itself was not even offered into evidence until the close of the state's case, at which point appellant objected to its introduction.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHSDOC@AOL.COM

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1099

It is clear from the record that Wilson's conclusions were based in part upon facts that were not within his personal knowledge or in evidence as required by Evid.R. 703 and Ohio case law. Specifically, at the time Wilson testified as to his conclusions, the statistics relied upon were not in evidence. Although Exhibit 29 was admitted at the conclusion of the state's case, the sequence of events is not the only problem. While the trial court in overruling appellant's objection to the admission of Exhibit 29 failed to indicate the hearsay exception under which it was permitting its admission, the only possible exception under which State's Exhibit 29 could have been admitted is Evid.R. 803(8), which provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"*:*:*

"(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness."

Under this exception, however, authentication or identification of the document as a public record or report is still required. Evid.R. 901. While such evidence can be self-authenticating, it is necessary that the report or record itself be offered into evidence and that it contain, on its face, authenticating and identifying information. See Evid.R. 902. Here, the specific FBI report containing the statistics used by Wilson in formulating his conclusion was never produced by Wilson or offered into evidence. Rather, what was offered was State's Exhibit 29, which Wilson claimed set forth statistics taken from an FBI report. Exhibit 29, however, does not fall into any category of self-authenticating documents and, therefore, necessarily requires proper authentication and identification as a prerequisite to its admission into evidence as a public record exception to the hearsay rule. After reviewing Wilson's testimony concerning the source and content of State's Exhibit 29, it is clear that appellee failed to lay a sufficient foundation for its admission into evidence and that there was not sufficient evidence in the record to support a finding that the contents thereof were what they were professed to be. Therefore, we hold that Exhibit 29 constituted inadmissible hearsay and that the trial court erred in admitting it into evidence and allowing Wilson to testify based upon the statistics contained therein.

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: jhajurinдок@aol.com

9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1100

*Id.*, 65 Ohio App.3d at 109-110.[6]

## IV

The reasons for requesting a hearing (and incontrovertibly lengthening an already lengthy trial process) are neither fanciful nor invented. The trial testimony at co-defendant Jackson's trial, whatever else it established in the minds of the jurors, was not an evidence clinic. Dr. Germaniuk testified at Jackson's trial, without foundation or objection, not to a reasonable degree of scientific certainty. Instead he used words and phrases such as "I believe"; "I'm not a blood spatter expert"; [7] and, "the finer points of ballistics between disposition and the two-inch, four-inch, six-inch-inch barrel, probably get someone from ballistics to talk about that."

Specifically, Dr. Germaniuk should be precluded from giving the jury an opinion about the distance between the firearm which caused Mr. Fingerhut's death from the body at the time the murder weapon was discharged. By his own sworn testimony, he has "limited knowledge" of firearms and has no knowledge about the weapon used here. At Mr. Jackson's trial he testified as follows:

Q. And how close of a distance would that be if you have an opinion?[8]

---

[6] The court went on to decide whether the error was harmless, but this Court does not have that failsafe luxury: its goal must be to prevent error where possible, not to divine whether an appellate court will hold the error to be harmless. The *Robles* court held that "the trial court's erroneous admission of State's Exhibit 29 and Wilson's testimony that was based on that exhibit was prejudicial to appellant." *Id.*, 65 Ohio App.3d at 111.

[7] The defense does not contest that Dr. Germaniuk is qualified to testify to the cause of death of the decedent. Dr. Germaniuk assisted "in approximately one thousand autopsies" while still a college student. After graduating from Wagner College, and attending the University of Turin and the University of Rome, he went Columbus, Ohio, and the Ohio State University Hospitals. He has served as chief medical examiner for Washington, D.C., and held other positions. He has performed about 3,800 legal autopsies, probably hundreds of homicides among those.

[8] As noted previously, the trial was not a trial practice clinic. The opinions of the doctor were not elicited by laying a proper foundation and no objection to that failure was made. *See, e.g.,* *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, 535 N.E.2d 315:

In this jurisdiction, an expert opinion is competent only if it is held to a reasonable degree of scientific certainty. See *State v. Holt* (1969), 17 Ohio St.2d 81, 46 [Ohio Op.]2d 408, 246 N.E.2d 365, syllabus. In this context, "reasonable certainty"

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1101

A.  When you have soot, unless you have the suspect firearm in custody, and that suspect firearm is test fired with similar ammunition, it becomes a range, and usually, the farthest distance out, would still get some of that gunshot or gun powder deposit, is about 24 inches.

So, when I see soot or black particulate material consistent with soot, we're talking about 24 inches or under for the distance from the muzzle of the firearm to the target.

Q.  Would a revolver with a two or four inch barrel be different than one with a six or eight inch barrel?

A.  Yes.

Q.  And explain.

A.  Well, I don't know how many people here are hunters or deal with firearms.  My limited experience with firearms, let's take a look at a barrel that is maybe about six inches or four inches, probably.[9]  What happens when you have a firearm that is discharged,

---

[8] (...continued)
means "probability." *Id*.  In a recent case, this court equated "extremely likely" to the word "probable." *State v. Buell* (1986), 22 Ohio St.3d 124, 134, 22 OBR 203, 212, 489 N.E.2d 795, 805. While our opinion in *Holt* stated that something that is "likely" is less certain than something that is "probable," *id*. at 85, 46 O.O. 2d at 411, 246 N.E. 2d at 368, we question the wisdom of that finding.

According to the Oxford English Dictionary, "probable" means "[h]aving an appearance of truth; that may in view of present evidence be reasonably expected to happen, or to prove true; likely." VIII Oxford English Dictionary (1933) 1401, definition 3.  "Likely" is defined as follows: "Having an appearance of truth or fact; that looks as if it would *** prove to be what is alleged or suggested; probable." VI Oxford English Dictionary (1933) 288, definition 2.

According to Black's Law Dictionary, "likelihood" means "[p]robability" and "imports something less than reasonably certain." Black's Law Dictionary (5 Ed. 1979) 834, citing *Clark v. Welch* (C.A. 1, 1944), 140 F. 2d 271, 273. "Likely" means "[p]robable" or "[i]n all probability." *Id*., citing *Horning v. Gerlach* (1934), 139 Cal. App. 470, 34 P. 2d 504, 505. See, also, Webster's Third New International Dictionary (1971) 1310 and 1806.
*Accord, State v. Hartman*, 93 Ohio St.3d 274, 2001 Ohio 1580, 754 N.E.2d 1150; *State v. Jackson*, 92 Ohio St.3d 436, 2001 Ohio 1266, 751 N.E.2d 946; and, *Lee v. Barber* (Jul. 12, 2001), Butler App. No. CA2000-02-014, 2001 Ohio App. LEXIS 2980.

[9] In *Lee v. Barber, ante*, the Court noted:
Counsel for Barber tried to elicit from Hill what the causes of the damage "could be," but the trial court would not permit Hill to answer. Then counsel, in general terms, attempted to elicit what "probably" caused the damage without ascertaining whether Hill had determined the cause to a degree of certainty greater than fifty percent. Again, the trial court prohibited Hill from answering and instructed counsel that the opinion would not be permitted unless it was expressed

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1102

firing pin strikes, either the primer or the rim, an explosion takes place, and what happens in the barrel of the gun, all of that gun powder is burning, and as a result of that, it will burn down the length of the barrel. Now, if I have a barrel that is almost two feet, most of that gun powder is going to end up burning so you are going to have very unburnt gun powder coming out of the end. Because throughout the entire distance of the barrel, it is burnt. If I take the same projectile and put it in a very short barrel, what is going to happen, I don't have enough barrel to allow for all of that gun powder to burn, so I'm going to have more unburnt gun powder coming out. Now, the finer points of ballistics between disposition and the two-inch, four-inch, six-inch-inch barrel, probably get someone from ballistics to talk about that, but if you take a similar firearm with a two-inch barrel, let's say for argument sake, a .38 caliber barrel with a two-inch, four-inch barrel, six-inch barrel, fire at same distance from the target. You are going to see three different patterns of soot. In answer to your question, usually in a shorter barrel you would expect to see more of the residue or gun powder come out, simply because you ain't got enough barrel for all of that gun powder to burn out.

Q. But you give as a general rule, 24 inches.

A. As a general rule about 24 inches.

The doctor also should not, without more, be permitted to render an opinion about the position of the body when Mr. Fingerhut was shot. Clearly at Mr. Jackson's trial, he did little more than speculate, and indeed on cross examination freely admitted that other physical scenarios were just as "possible" as the one the prosecutor had him describe on direct examination. On direct examination he testified:

Q. Looking at his body and the splatters that were present, can you give an opinion as to how a gunshot wound, how he would have to be located with the wound to the web of his hand, his left hand, and the top of his head?

A. Basically, it was straight on, so there's a number of location that this individual could have been in. Again, with the projectile coming straight down like this, the head is a ball. It can move in a wide variety of positions. Let's say if you are going to shoot me, to

---

[9] (...continued)
to a reasonable degree of scientific certainty.
*Id.*, at *6-*7.  (Footnote not in original.)

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8280 · E-Mail Jhojurisdoc@aol.com

12

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1103

have this type of projectory, my head would have to be down, and where would my hand be to give me the soot? It would have to be in this type of position. So that is one hypothetical location, to give you that type of a wound. Another type of hypothetical location, is that someone is down in the corner. Let's say this is the doorway right here leading to the garage, and on this side is where the counter is. If someone is in this position, in a crouching stance, you would get the same type trajectory.

Q. And if one were down next to a counter, say right here, down here, and a wound went into the head, would you get splatters from that type of wound?

A. You would expect to see splatters from the area of the wrist—I'm sorry, the area in between the webbing of the thumb and the index finger, and also from the gunshot wound to the head, you would expect that to bleed as well.

Q. Now, did you notice, and I think you described a bullet hole, that was a graze wound?

A. Yes.

Q. Which was C?

A. Yes.

Q. And that wound was not of significance as far as cause of death?

A. Again, all gunshot wounds have the ability to be lethal or fatal. Out of all of these gunshot wounds, it was certainly less lethal than the others, but I can't exclude the fact that he may have died from infection on the basis of that gunshot wound. It was certainly less lethal than the others.

Q. You found a bullet that was in the basement area?

A. I found a hole in the wall as one went down to the steps leading to the basement. Now whether a projectile was recovered from that perforation, you have to ask other individuals.

Q. Did you notice the type of hole that was there.

A. It was an irregularly shaped hole.

Q. Sort of like a keyhole type?

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

13

A.  It wasn't round.  It was more cylindrical or oblong.

Q.  That would be consistent with what you told the Jury with the hand up there.  If the bullet hit the shoulder, back shoulder, and then went and hit the wall or the area where the steps were, that you would have this tumbling of the bullet?

A.  Once you have a projectile that strikes an intermediary target.  That of course is deviated, the projectile can begin to wobble, began to tumble, it can travel sideways.  And so, if you take a look, if your question is, is that hole on the basement steps consistent with the projectile traveling sideways, the answer is yes.

Q.  And also, if one were shooting the victim, and his finger got in the way, that would also, could cause tumbling?

A.  Yes, any time you have an intermediary target which interferes with the trajectory or path of the bullet, you can cause that projectile to deviate.

Later, the prosecutor continued with his own whimsica version of the events at the Fingerhut/Roberts home, though it was clear that at best his fantasy version, while "consistent" with the physical findings, was just one of the possibilities.

Q.  Now, did you find any injury to the right forehead of Robert Fingerhut?

A.  Yes.

Q.  And did you find a laceration or lacerations?

A.  Yes.

Q.  And would you describe those to the Jury, please?
A.  On the right forehead, the upper outer right forehead had a three-quarters of an inch, by less than 1/16th of an inch, linear laceration, or tear, that was two and a half inches below the top of the head, and the center of it was more than three-quarters of an inch to the right of the anterior mid line.  The mid line is that imaginary line that divides the body into a right and left half.  So on the right side of the forehead, basically, he had a three-quarters of an inch by less than 1/16th of an inch tear or laceration.

Q.  And the difference between a laceration and abrasion?

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

14

A.  When dealing with blunt force injury, a laceration is a more severe injury.  It is a tear of the skin, and the way you know that, is that you can see what is known as connective tissue bridging.  Not all of our tissue is made the same way. The blood develops, the fibrous tissue is a lot tougher than the regular stuff that makes up skin.  So, if one receives a blow with a blunt object, the skin will have a tendency to tear, and if you look inside the tear, what you will see are some of the blood vessels, some of the fibrous tissue and some of the other strong tissue still in the area of injury.  And that is called connective tissue bridging and that is one of the ways to distinguish what type of blunt force you are dealing with.  An abrasion on the other hand is simply a scrape, and bicycle riding as a kid, we probably have fallen at one time, skinned our knee and so an abrasion is simply scraping the top layers of the skin off.  And that would be the basic difference between the abrasion and the laceration.

Q.  Now the laceration which you described or associate with blunt force trauma, would that be consistent with being hit with a pistol?

A.  Yes.  It would be consistent with being hit by some blunt object.

On cross examination, Dr. Germaniuk's answers demonstrated that his direct testimony as to the position of Mr. Fingerhut when he was shot were little more than speculation, "consistent" with his physical findings.

Q.  Just a couple of quick questions.  First of all, the overall condition of Mr. Fingerhut's body.  If you take away the gunshot wounds and just look at the abrasions and contusions, and other marks, was that kind of indicative that he was in a fight?

A.  It is consistent with being in a struggle.

Q.  And I'm going to show you what has been marked as State's Exhibit 21.  And there's a contusion and cut above his eye.

A.  There's a bruise or a contusion on the left side of his forehead and a laceration or tear above his right eye.

Q.  Doctor, . . . I'm going to hand you what has been marked as Exhibit 251.  And have you seen that before, Doctor?

A.  I don't know.

Q.  Does that look like the gun that you found at the scene?

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.7700 · Facsimile 330.758.8280 · E-mail Jhjuchs@aol.com

15

A. Yes.

Q. And if somebody had been holding the gun, and somebody grabbed their hand, could that have caused that mark above his eye?

A. Yes.

Q. So, in other words, if you would grab me with your left hand here like that and pushed back up, that could cause that mark?

A. Right.

Q. Now, if—would it have been possible, that if this was the—this was the counter where Mr. Fingerhut was, if he was down like this with the gun, holding the gun, and Nathaniel was standing maybe approximately, well, over this way, over here—

A. By the garage door.

Q. Right, and he shot him, could have fired two shots from pretty much the same angle, one could have grazed his back and the other one could have hit his head as he was down like this. He may have put up his hand like this, would that have been possible?

A. Yes.

Q. So, actually both of those shots, the one grazing the back, and the one that hit the head, could have came pretty much at the same angle and fairly close together, too?

A. That is correct.

On redirect and recross examination, what became clear is that the direct and cross examination of Dr. Germaniuk was not expert testimony offered with a reasonable degree of scientific certainty, but the closing arguments of counsel prematurely made under the guise of questioning an expert.

Q. Attorney Consoldane asked whether or not that could have been made in one manner?

A. Yes.

Q. Isn't it also possible that an assailant struck him with a similar firearm right over the forehead?

A. That is also possible.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8290 · E-mail: JBJUCHSDOC@AOL.COM

16

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1107

Q. You don't know that, do you?

A. That is correct.

Q. And the sequence of the shots, as to where the wound had entered, that grazed the right back, and the one that went in the shoulder and out the front, you don't know exactly where those shots occurred, do you?

A. No, I don't.

Q. And the hypothetical that was given by Attorney Consoldane was simply a hypothetical. You have no evidence that it happened that way, do you?

A. No, I don't.

MR. WATKINS: Thank you.

RECROSS EXAMINATION BY MR. CONSOLDANE:

Q. But it could have happened that way?

A. Yes.

In this case, the Due Process Clause, the Rules of Evidence and the preferences of the Defendant all coincide. She would prefer that closing arguments be made at the proper time, and that expert testimony, if it is truly expert testimony, be offered with the proper foundation having been laid. *See, e.g., State v. Brown* (Mar. 31, 2000), Trumbull App. Nos. 95-T-5349 and 98-T-0061, 2000 Ohio App. LEXIS 1430.[10]

---

[10] There, at *16-*18, the Court held:
The State next asked Dr. Cox if he had any personal experience with a slide cut from a .380 caliber handgun. He responded that he owns a Walter PPKS, a .380 caliber gun, which he practices firing on occasion. He testified that the last time he fired his gun, he got a laceration between the web of his thumb and his second finger from the gun's slide because he had his hand too high on the grip.
Appellant contends that Dr. Cox testified beyond the scope of his expertise because he was not qualified as a firearms expert. . . .
Evid.R. 702 governs the admission of expert testimony and provides, in part:
A witness may testify as an expert if all of the following apply:
(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8280 · E-MAIL: JBJUHASZ@AOL.COM

17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1108

V

With regard to Michael Roberts, at Mr. Jackson's trial his testimony failed
to comport with the requirements of *Daubert* or the basic evidentiary foundation:

> Q.   Next, I'm going to hand you what has been marked as
> State's Exhibit 257, 259, and 266.  I'll ask you to take a look at those,
> please?
>
> A.  Okay.
>
> Q.  Are you able to identify those?
>
> A.  Yes, I can.
>
> Q.  Are those three bullets that were submitted to you by the
> Howland Township Police Department in connection with this case?
> A.  Yes, Sir, they are.
>
> Q.   And were you asked to perform analysis on those three
> bullets?
>
> A.  Yes, I was.
>
> Q.   Or projectiles, I guess, and can you tell us what analysis
> you performed and what your results were?
>
> A.  First of all, we examined the bullets to determine the size or
> the caliber and I was able to determine based on the diameter, the
> rifling measurements or the general rifling characteristics along with
> the way, that is a .38 special or 357 magnum caliber bullet.  Like I
> said, both calibers use the same bullet.  The only difference being

---

[10] (...continued)
    (B) The witness is qualified as an expert by specialized knowledge, skill,
experience, training, or education regarding the subject matter of the testimony;
    (C) The witness' testimony is based on reliable scientific, technical, or other
specialized information. * * *
    Dr. Cox should have been precluded from testifying on the origins of the cut
on appellant's hand.  Evid.R. 702(B) requires that an expert be qualified by
"specialized knowledge, skill, experience, training, or education regarding the subject
matter of the testimony."  Had the State laid a proper foundation, Dr. Cox, as a
pathologist, could have given his opinion regarding the wound on appellant's hand;
however, the State did not demonstrate that Dr. Cox had arrived at his opinion after
examining appellant's hand or the weapon used in the shooting.  We cannot conclude
that Dr. Cox's limited experience with his own .380 caliber gun qualified him to
testify about whether the cut on appellant's hand came from firing the .380 caliber
gun that shot Monica Brandon.
The Court in that case found the error harmless because of the other evidence in the case.

John B. Juhász · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.7700 · Facsimile 330.758.8269 · E-mail: JBJURISDOC@AOL.COM

18

there's more power in a .357 meaning that the cartridge case is a little longer in a .357 than a .38 special.   Then from there, we microscopically compared the bullets to each other, to see if they have the same—first of all, the same general rifling characteristics or the same numbers of lands and grooves and direction of twist.  And from there we compared the unique pattern or microscopic detail.  We call it barrel striations.  You can establish that they do or do not have the same pattern.  That is how we can tell if they were all fired from the same weapon.  In this case, I was able to establish that they were all fired from the same weapon, they have the same unique pattern.

Q.  And were you able to compare those against the other two bullets that you test fired?

A.  Yes, I was.

Q.  And what were your results against that comparison?

A.  Well, in regards to all three, were compared to the test fired bullets, meaning that the internal characteristics when compared to the test fired bullets, I was able to establish that there was not the same pattern.  They had similar class characteristics or the same numbers of lands and grooves; however, the patterns, the microscopic patterns were different.

Mr. Roberts was also asked questions relating to the Cincinnati Reds baseball jacket worn by the decedent and a glove purportedly worn by Nathaniel Jackson. This testimony had the *aura* of scientific testimony, but not the *substance*. Certainly missing was any foundational requirement of establishing the reliability of the testimony:

Q.   And did you do some analysis on the Cincinnati Reds baseball jacket?

A.   Yes.

Q.  And in particular, did you do any gunshot residue analysis?

A.  Yes, Sir, I did.

Q.   And were you able to locate any gunshot residue on the Cincinnati Reds jacket?

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · e-mail jhjuhasz@aol.com

19

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1110

A.   There was very few particles that were recovered from the jacket.   There's approximately four nitrate specs found around the holes of the jacket.

Q.   Do you recall which hole that was that you found those nitrites?

A.   The hole in the armpit.

Q.   That is what you identified in your report as which hole?

A.   I believe C.

Q.   It was the hole in the armpit that you found the nitrites?
A.   Actually, I'm sorry, I checked my report.   It was hole A, which is near the armpit area.

Q.   I'm going to hand you what has been previously marked as State's Exhibit 317.   Could you take a look at that, please?   Are you able to identify those?

A.   Yes, I can.

Q.   Those gloves were received from the Howland Township Police Department in connection with the Robert Fingerhut case?

A.   Yes, Sir.

Q.   And did you perform an examination of those items?

A.   Yes, I did.

Q.   And before, did you perform a visual inspection?

A.   Yes, I did.

Q.   Could you briefly detail what your visual inspection revealed?

A.   We're looking for the contact characteristics to see if there's any melting or gun powder particles left on the area of the defect on the finger.

Q.   And those are black leather gloves?

A.   Yes, Sir, they are black leather gloves.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8200 · E-MAIL: JBJUHRS-DOC@AOL.COM

20

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1111

Q.   And which glove do you have the defect on?

A.   I have the left glove and it is the index finger.

Q.   And you were able to observe some damage to the left index finger?

A.   Yes, Sir.

Q.   Did you notice anything else that caused you to take some other action?

A.   Just the defect area and then we examined it for the gunshot residue, the lead and nitrites. I was able to detect a vaporous lead, meaning that the finger is consistent with being near a firearm at the time of discharge. Vaporous lead is another characteristic that is indicative of very close range of a firearm as it is being discharged.

Q.   And did you detect a vaporous lead on the left index finger?

A.   Yes, I did.

Q.   Did you also observe anything that would cause you to submit that glove to any one of your other departments?

A.   Yes.  There was a material on there, substance, that appeared to be blood, or consistent with blood.  So, I contacted the serology, DNA section for them to recover some of the unknown substance or suspected blood and they did so.

## VI

### A

With regard to Brenda Gerardi, there are any number of hurdles to be overcome before her testimony may be admitted.  First, in a chambers hearing in the *Jackson* case, she testified that her statistical inferences are based on "a formula that is produced by the FBI and we're trained on how to use this formula. We took a statistics course on this to determine frequency. So, I personally don't do the math. We're trained specifically on the statistics that we do."  Indeed, much like the *Robles* case, the State's expert Ms. Gerardi uses an "FBI data base that comes through our computer, that is an FBI computer and that cannot be tampered with. We actually log in our report and it generates the numbers for us. The FBI does it."

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8280 · E-MAIL JBJUHRSO@AOL.COM

21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1112

She says that she did not generate this number herself, but that it "is a computer generated formula." Opinion testimony by an expert witness must be based upon facts within that witness's own personal knowledge or upon facts shown by the evidence admitted in the case. *See, State v. Chapin, ante; State v. Jones, ante.*

She also testified in the Jackson trial that BCI uses a DNA method called "STR, short tandem repeat procedure, that is the type of DNA that we do and it is processed through a procedure called PCR, which is polymerase chain reaction, so that is the most common, the most advanced DNA that we have been trained with. I'm sure there's more upcoming."

The literature makes clear that DNA, which apparently has charmed judges nationwide into believing it is a virtually infallible fingerprint, is not regarded by everyone as highly reliable. The Defendant submits that issues in professional controversy concerning DNA analysis include the general acceptance of methods used to determine the false positive error rates of the laboratories for each test, and a danger of overstating the value of DNA evidence by (a) failing to present one statistical estimate which combines the probability of a coincidental match and the false positive error rate of the laboratory; or (b) failing to provide the comparatively high false positive error rate of the test when the coincidental match probability is much lower.

The PCR testing method, which BCI claims is the most reliable may indeed be that: the most reliable on a spectrum of as yet undiscovered science. If the experts are going to say the world is round and not flat, they will have to do more than say it: they will have to prove it. The literature bears out the claim made here that the DNA testing in general and the PCR method in particular are not reliable. *See, e.g.*, Ryan McDonald, *Juries and Crime Labs: Correcting the Weak Links in the DNA Chain*, 24 AM. J. L. AND MED. 345:

> *b. PCR Testing*
> Through PCR testing, forensic scientists are able to test smaller and older samples of DNA. PCR testing is able to test such small or disintegrated samples by amplifying sections of DNA where

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

22

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1113

polymorphisms are likely to occur. This amplification procedure works like "a genetic photocopy machine." PCR targets the polymorphic section of DNA and utilizes the replication system inherent in the DNA itself to produce millions of copies of that section.

There are several steps to PCR testing. First, the complementary strands from a DNA sample are separated by heating them within a reaction vessel. "Primers," which are short segments of single-stranded DNA corresponding to specific DNA segments, are then added to the solution of denatured DNA. The vessel temperature is then lowered to allow the primers to bind to their corresponding segments. They will form the initiation sites for the synthesis of new DNA strands. Heatstable DNA polymerase (*Taq*) is then added to the reaction vessel where it catalyzes the synthesis of new DNA strands. This process can be repeated many times, exponentially duplicating the template DNA.

Although PCR takes significantly less time to complete than RFLP (a couple of days rather than weeks) and can analyze smaller samples, it is much more susceptible to contamination. Contamination by police on the scene, bystanders, lab technicians or even the victim can result in false matches. Contamination risks, however, can be limited by following procedures designed to protect DNA samples.

Another concern of PCR testing is called "allelic drop-out." Each form of a gene is called an allele. Allelic drop-out occurs when there is an error in the amplification process and an allele fails to amplify. However, allelic drop-out should not occur in PCR testing if lab technicians competently use the proper equipment.

*Id.*, at 351-352. (Footnotes omitted.) McDonald also notes that DNA results are subject to interpretation. McDonald wrote:

2. Interpreting DNA Test Results

Regardless of the testing method used, once a DNA test is complete, the results need interpretation. The main problem with interpretation lies in calculating the probability of a false match. To make this calculation, scientists must determine the frequency with which a genetic pattern is likely to occur in the general population. This, in effect, gives the likelihood that another person's DNA could match the crime sample in addition to the defendant's. To best determine such a probability, the crime lab would need the DNA patterns of every individual in the world and to compare them with the defendant's DNA. This would produce conclusive results. Due to the impossibility of this suggestion, however, random population samples remain the next best and most frequently used alternative.

Geneticists produce such random population sample computations under a method called the Product Rule. The Product Rule multiplies the frequency in which the suspect's DNA variations

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail JBJURINDOC@AOL.COM

23

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1114

show up in that person's ethnic group.  The problem surrounding the Product Rule is the broad definition of ethnic groups such as Caucasian, Black or Hispanic.  Broad categories such as these are difficult to analyze because particular genetic variations may exist in unstudied subpopulations.

Population geneticists were quick to criticize this method for failing to account for population substructures in small unstudied subpopulations (such as Finns living in a small town) where individual's polymorphic sites in DNA might have the same structure.  In such a case, the Product Rule could underestimate the probability of a coincidental match.  Therefore, in 1992, The National Research Council's (NRC) Committee on DNA Technology in Forensic Science offered a conservative method called the "ceiling principle" to solve the dilemma of population substructure

The ceiling principle called for the creation of databases for population substructures.  Until the databases are completed, scientists utilizing this principle choose to use the highest frequency for each ethnic group or ten percent, whichever is larger, to calculate the probability of a suspect's DNA variation showing up in his or her population.  The ceiling principle represents a conservative means to thwart attacks on DNA evidence in the courtroom and to satisfy all involved.  However, critics have attacked this method as being too conservative, not conservative enough and as representing an unscientific compromise.  Both Eric Lander, a human geneticist at the Whitehead Institute for Biomedical Research in Cambridge, Massachusetts, and a member of the 1992 National Academy of Sciences committee commented on the ceiling principle: "The [difference in] numbers is typically in the order of one in 100 million versus a million . . . . The [statistical] issues don't matter to a jury, but they do have academics worked up."

*See, also*, Sherry J. Whitney, State v. Bible: *The Admissibility of Forensic DNA Profiling and Statistical Probability Evidence in Arizona Criminal Proceedings,* 26 ARIZ. ST. L.J. 593 (1994)[11]:

The interpretation of a match declaration is important.  When a match is declared, three explanations for the match exist: either the samples are (1) from the same individual; (2) from identical twins; or (3) from different individuals, but, by pure chance, the band patterns of the control and unknown samples match.

Prosecutors generally are interested in the third explanation for a match because the identity of the donor of an unknown sample is

---

[11] The FBI may declare a match if the length of two fragments falls within plus or minus 2.5% of one another.  *See*, Whitney, *op. cit.*, n. 62; *State v. Bible* (1993), 175 Ariz. 549, 858 P.2d 1152, 1184; *Fishback v. People* (Colo. 1993), 851 P.2d 884, 888.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · EMAIL: JBJUHISDOC@AOL.COM

24

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1115

usually not an ascertainable fact absent an outright admission by the donor.  Therefore, the interpretive evidence that a prosecutor may seek to present at trial is the "random match probability," the probability that matching band patterns originate from different individuals, but, by pure chance, the band patterns match.

In the past, disagreements about the probability of a coincidental DNA match impelled some courts to exclude DNA evidence.  *See, e.g., Commonwealth v. Lanigan* (1992), 413 Mass. 154, 596 N.E.2d 311, 314 (holding the method of calculating the odds of a random DNA match unacceptable); *State v. Vandebogart* (1992), 136 N.H. 365, 616 A.2d 483, 494 (holding that evidence of a match is inadmissible because the FBI methods used to determine "population frequencies" were not generally accepted by the scientific community).  In fact, until very recently, the admission of DNA test results constituted "the raging controversy" in the scientific community.  *See*, Janet C. Hoeffel, Note, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 STAN. L. REV. 465, 466 (1990):

> Although it usually takes many years for the engines of justice to churn out a personal injury suit or a criminal appeal, in less than two years the combined efforts of commercial laboratories and prosecutors have steamrolled the so-called "DNA fingerprinting" technique through the courts. The technique has been easy to sell. The current national obsession with crime-fighting and the apparent decrease in concern for individualized justice create a receptive environment for a cutting-edge technology, dazzling in its promise of identifying criminals with "virtual" or "99 percent certainty." Courts have lost all sense of balance and restraint in the face of this novel scientific evidence, embracing it with little scrutiny of its actual reliability and little concern for its impact on rights of individuals.

*See, also*, Thomas M. Fleming, *Admissibility of DNA Identification Evidence*, 84 ALR4th 313, and the authorities cited therein, which make clear that DNA is far from accepted as irrefutably reliable.  Issues such as these must be addressed at a pretrial hearing.

Additionally, there is a mixture of DNA samples here according to Gerardi's testimony in the Jackson trial.  The literature makes clear that deciphering these mixtures is far from simple and indeed it seems not to have been done here.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8280 · E-MAIL JBJURISDOC@AOL.COM

25

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1116

To calculate the random match probability, the "product rule" is often used. The frequencies of the individual alleles are multiplied together to calculate a frequency in the population of the complete band pattern. For example, if two alleles match, and one allele is found in 10% of the population while the other allele is found in 50% of the population, the random match probability equals (.10) X (.50) 0.05, or 5%. Multiplication of the frequencies of enough alleles might result in an estimated frequency of their common occurrence in a given person that greatly exceeds the number of samples in a database.

The first step of the product rule is to determine "allele frequencies," which describe how often each matching band occurs in a relevant reference population. A relevant reference population is composed preferably of people of the same race as the person for whom a match is being determined. Allele frequencies may be calculated by performing an allele frequency study, which is a large-scale, controlled population study conducted to determine allele frequencies within different reference populations for each band that might be observed.

The second step of the product rule is to calculate the frequency of the genotype at each locus by multiplying the frequencies of the two alleles comprising the genotype. Multiplication of the allele frequencies assumes that each matching allele provides statistically independent evidence. When there is no correlation between the two alleles inherited from the same locus, the locus is said to be in Hardy-Weinberg equilibrium. Hardy-Weinberg equilibrium indicates that allele frequencies remain constant from one generation to the next. An excess of apparently homozygous genotypes observed in a population indicates a lack of Hardy-Weinberg equilibrium. However, when one observes only a single allele for a given genotype in a sample, one cannot be certain that the individual is a homozygote. It is possible that a second allele for that genotype has been missed for technical reasons, as for example, if a second allele ran off the gel during electrophoresis[*601]

The third step of the product rule is to calculate the frequency of the complete multilocus genotype by multiplying the genotype frequencies at all the loci. This step assumes that there is no correlation between genotypes at different loci. The absence of such correlation is called linkage equilibrium. When alleles from different loci are very close on the same chromosome, the phenomenon of linkage disequilibrium can result. When one examines alleles from different chromosomes, the inheritance at one locus is independent of that at the other.

Whitney, *op. cit.*, 599-601.

## B

As to the serologist, Dale Laux, he was never asked at the Jackson trial if his conclusions and opinions were based on a reasonable degree of scientific certainty. *See, Lee v. Barber, ante.*

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.7308 · Facsimile 330.758.8290 · E-Mail JBJURINDOC@AOL.COM

26

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1117

## VII

Citing *United States v. Downing* (3rd Cir. 1985), 753 F.2d 1225, 1237, Professor Paul Giannelli said that "[i]f *Daubert* comes to stand for a stringent gatekeeping function in criminal cases, it will be an improvement over *Frye*. If, instead, *Daubert* comes to stand for nothing more than *Barefoot*, junk science will be the winner." (Footnote omitted.) *See*, Paul C. Giannelli, Daubert: *Interpreting the Federal Rules of Evidence*, 15 CARDOZO L. REV. 1999, 2026 (1994). In *Downing*, Judge Becker remarked that general acceptance of a technique in the scientific community "is neither a necessary nor a sufficient condition for admissibility." The *"Barefoot"* reference above is to *Barefoot v. Estelle* (1983), 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090, 51 USLW 5189. There, the government offered psychiatric testimony concerning Barefoot's future dangerousness in the penalty phase of a capital murder case. Dr. James Grigson, who had never examined Thomas Barefoot, testified that there was a "'one hundred percent and absolute' chance that Barefoot would commit future acts of criminal violence." 463 U.S. at 919 (BLACKMUN, J., dissenting) (quoting from record). Barefoot challenged the admission of this evidence on constitutional grounds due to its unreliability. In an amicus brief, the American Psychiatric Association stated that the "large body of research in this area indicates that, even under the best of conditions, psychiatric predictions of long-term future dangerousness are wrong in at least two out of every three cases" and that the "unreliability of these predictions is by now an established fact within the profession." The Supreme Court rejected Barefoot's argument, holding that "neither petitioner nor the APA suggests that psychiatrists are always wrong with respect to future dangerousness, only most of the time."

Writing for the Court in the seminal case of *In re Winship*, *ante*, 397 U.S. at 362, the late Justice William J. Brennan, Jr., emphasized the importance of insuring that any criminal conviction is reliably achieved based upon trustworthy evidence:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7630 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.7757 · E-MAIL: JBJUHASZDOC@AOL.COM

27

[T]he Court said in *Brinegar v. United States, supra*, 338 U.S., at 174, that "[g]uilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." *Davis v. United States, supra*, 160 U.S., at 488, stated that the requirement is implicit in "constitutions . . . [which] recognize the fundamental principles that are deemed essential for the protection of life and liberty."

There can be no more laudable goal for this Court to insure that, in a case where the Defendant may be executed as a punishment, than to "safeguard" the Defendant "from [a] dubious and unjust conviction[ ]." For the reasons stated, this Court must grant the requested relief.


J. GERALD INGRAM


JOHN B. JUHASZ

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.2308 · Facsimile: 330.758.8299 · E-mail: jbjuhdoc@aol.com

28

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | **CASE NO.:  01-CR-793** |
| Plaintiff, | * | **HONORABLE JUDGE:** |
| | | **JOHN M. STUARD** |
| -vs- | * | |
| DONNA MARIE ROBERTS, | * | **ORDER** |
| Defendant, | * | |
| | * | |

Jurors Margaret Kay and Terry Gray are hereby ordered by this Court not to report to their places of employment during the duration of their jury service in the above styled case. This order shall remain in effect until a final verdict is reached in this case in the guilt phase as well as the penalty phase if such phase is necessary.

SO ORDERED.

_JOHN M. STUARD, JUDGE_

**THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD**

JUDGE

5/22/03 - copies
sent to:
Pros.
J. Ingram
J. Juhasz

-1-

VOL 1002 PAGE 478

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | CASE NO.:   01-CR-793 |
| Plaintiff, | * | HONORABLE JUDGE: JOHN M. STUARD |
| -vs- | * | |
| DONNA MARIE ROBERTS, | * | ORDER |
| Defendant, | * | |
| | * | |

Jurors Margaret Kay and Terry Gray are hereby ordered by this Court not to report to their places of employment during the duration of their jury service in the above styled case. This order shall remain in effect until a final verdict is reached in this case in the guilt phase as well as the penalty phase if such phase is necessary.

SO ORDERED.

JOHN M. STUARD, JUDGE

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD

JUDGE

6-30-03 copies to
9 Harold Ingram,
John Juhasy 3
Pros

VOL 1001 PAGE 867

-1-

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )        Case No. 01 CR 793
                                  )
    Plaintiff              )        Judge John M. Stuard
                                  )
v.                                )
                                  )
                                  )
DONNA M. ROBERTS,                 )
                                  )
    Defendant              )

---

## DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Court for a judgment of acquittal as to all counts and specifications in the indictment.

For cause, OHIO CRIM. R. 29(A) states that "the court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged .   . if the evidence is insufficient to sustain a conviction of such offense". The well-known standard is that "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether *each material element* of a crime has been proven beyond a reasonable doubt." *See, State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus (emphasis added); *see, also, State v. Dixon*, Logan App. No. 8-02-44, 2003 Ohio 2547, 2003 Ohio App. LEXIS 2331; and, *State v. Boddie*, Allen App. No. 1-2000-72, 2001 Ohio 2261, 2001 Ohio App. LEXIS 3969. How to determine whether the evidence is sufficient was

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.788.2338 · FACSIMILE 330.788.8290 · E-MAIL JBJUHASZ@AOL.COM

i          102

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1122

set forth by the Ohio Supreme Court in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, syl. 2): a court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." As will be shown, the evidence submitted by the government in this case does not meet that threshold burden as applied to this Defendant.

Respectfully submitted,

J. GERALD INGRAM (0007887)

JOHN B. JUHASZ (0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
E-mail: Jbjjurisdoc@aol.com
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was ☐ sent by regular United States Mail, postage prepaid; ☐ hand delivered to counsel or counsel's office; ☐ sent by telecopier this ⟋⟍ day of May, 2003 to Messrs. Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481.

JOHN B. JUHASZ
COUNSEL FOR DEFENDANT

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC@AOL.COM

ii

## MEMORANDUM IN SUPPORT OF MOTION

### I

The Defendant has been indicted for, *inter alia*, aggravated murder with capital specifications. The government's basic claim is that the Defendant and Nathaniel Jackson communicated by telephone and by letter while Jackson was incarcerated, and that the two planned the murder of the decedent. It appears from the evidence that two days after Jackson's release from the Lorain Correctional Institution, he shot and killed the decedent, Robert Fingerhut. The circumstances of that shooting are unclear. The question to be resolved in this trial, of course, is whether this Defendant helped Jackson in such a way as to give rise to criminal liability.

U.S. CONST., amend. XIV and OHIO CONST., art. I, §§1, 2, 10, and 16 demand that a conviction must be based only upon proof beyond a reasonable doubt. *See, In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

### II

### A

*Death Specifications One and Two Appended to Counts One and Two*. Back on June 18, 2002, the Defendant filed a motion to prohibit death qualification of jurors unless and until the government established the existence of probable cause that this case would proceed to a penalty phase. After oral argument, this Court overruled that motion. Thereafter, some five weeks were invested in impaneling a jury. Both sides took the time and the care necessary to carefully examine prospective jurors because, if selected, those jurors might be called upon to decide the ultimate penalty, the one penalty that is different form all others, *see, Woodson* v. *North Carolina* (1976), 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944, and the only penalty

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1124

in which Ohio jurors have a say. In that June 18, 2002 motion, the Defendant suggested to the Court that the process of "death qualification" produces juries which are more conviction prone than juries which have not been death-qualified. The Defendant also suggested to the Court that "this indictment, with its capital specifications, is the product of the prosecutor's invitation to capitally indict. The grand jury, of course, returned the indictment, but it is 'blinking reality' to say that grand jurors are schooled in the nuances of Ohio's capital statutes when most lawyers are in fact not so schooled." The Defendant went on to suggest to the Court that if the grand jury had truly been presented with evidence to support capital specifications, "then the government should have little difficulty indeed persuading this Court that there is probable cause to believe that the case will proceed to a second phase." *See*, Memorandum in Support of the Defendant's *Motion to Prohibit Death Qualification of Jurors Unless and Until the Government Has Established Probable Cause that the Case Will Proceed to a Second Phase*, page 6. (Footnotes omitted.)

We are of course now at the point where the jurors have been death-qualified and the government has presented its evidence; and still there has been no evidence adduced that would permit reasonable minds can reach different conclusions as to whether each material element of the specifications has been proven beyond a reasonable doubt." *See, State v. Bridgeman, ante*. As will be shown below, this statement is principally true because the death specifications have been improperly pled in the first instance; and, in the second instance, because there is no evidence that this case is truly a capital case. Specifically, the specification for which the Defendant was indicted is constructed in the alternative. Either the State must show that the

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail Jhjurisdoc9aol.com

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1125

Defendant was the principal offender in the commission of the aggravated murder (committed during the course of certain enumerated felonies) or it must shown that the Defendant actually participated in the aggravated murder and that the aggravated murder was committed with prior calculation and design.

<div align="center">B</div>

Count One of this indictment charges the Defendant with aggravated murder pursuant to OHIO REV. CODE ANN. §2903.01(A). Specifically, the indictment charges that "on or about the 11th day of December, 2001, at Trumbull County, Ohio, DONNA MARIE ROBERTS, did purposely, and with prior calculation and design, cause the death of Robert S. Fingerhut, age 56." It is important to note that the government claims that this Defendant is guilty of complicity of all of the indicted offenses. This offense is commonly referred to as aggravated murder by prior calculation and design. Nothing in the government's representations to the Defendant or this Court, and nothing in its evidence suggests or establishes that the Defendant is the "principal offender ." As shown below, "principal offender" means the actual killer, and the government has never claimed that Donna Roberts is the actual killer.

Count Two of the indictment charges that the Defendant "did purposely cause the death of Robert as Fingerhut, age 56, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated burglary and/or aggravated robbery". This offense is commonly referred to as felony-murder aggravated murder.

Specification One appended to each of those two counts of aggravated murder are death penalty specifications pursuant to OHIO REV. CODE ANN. §2929.04(A)(7), alleging that the aggravated murder was committed while the

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJJURISDOC9AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1126

Defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the offense of aggravated burglary, and "Donna Marie Roberts was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." Specification Two attached to each of the first two counts of the indictment are virtually identical to Specification One attached to each count, except that specification to attached to each count alleges that the aggravated murder was committed during aggravated robbery as opposed to aggravated burglary as alleged in Specification One attached to each count.

The Defendant respectfully submits that denial of her earlier motion, described above, has now come home to roost. First, the specification under OHIO REV. CODE ANN. §2929.04(A)(7) is divided into essentially two parts, and the second part has two alternatives. The first part is that the aggravated murder was committed during one of the specified felonies (aggravated burglary and aggravated robbery, respectively, in this case). The second part of the specification makes plain that it is constructed in the alternative; that is, the government must allege either that the Defendant was the "principal offender"; or, if the government says that the Defendant was not the principal offender, and then the government must allege that the Defendant committed the aggravated murder with prior calculation and design. As will be shown, this "principal offender" specification is just that: it may not be used to sentence the Defendant, who at worst is no more than a complicitor, to death or make her eligible for one of the enhanced life imprisonment penalties that goes along with a capital specification. The cases make clear that to receive the death penalty under OHIO REV. CODE ANN. §2929.04(A)(7), the

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHRSDOC@AOL.COM

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1127

*offender* must have committed the aggravated murder with prior calculation and design.

<div align="center">C</div>

That the specification is improperly pled has long been well-established.[1] The State's indictment ignores the plain wording of the statute and the decisional law of this State which interprets the statute.  In *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, the Supreme Court of Ohio held that:

> the criteria set forth in R.C. 2929.04(A)(7) are *constructed in the alternative*.  If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (*i.e.,* the actual killer), *or where the defendant was not the principal offender, if he committed the murder with prior calculation and design.* The language of the statute provides that these are alternatives *which*

---

[1] Aside from all the other deficiencies noted herein, the specification does not genuinely narrow the class of offenders eligible for the death penalty *in this case*.  Because the State concedes that the Defendant was a complicitor, the State is left with only the "prior calculation and design" aspect of the specification—the "principal offender" aspect being clearly inapplicable.  Thus, the State has attempted to narrow the class by saying that the Defendant is guilty of complicity but should be sentenced to death because her complicity was with prior calculation and design. *See, e.g., State v. Simko*, 71 Ohio St.3d 483, 1994 Ohio 350, 644 N.E.2d 345 (PFEIFER, J., dissenting):

> I concur with Justice Wright that the aggravating circumstance in this case does not outweigh the mitigating factors. I write further because I would hold that the sentence of death is disproportionate, given the particular facts of this case.
> The death penalty is special. That special nature is reflected in the types of crimes punishable by death and by this court's role in the death-penalty analysis.
> By statute, not every murder is a death-penalty crime. The state of Ohio takes very seriously the awesome responsibility involved in taking a person's life. The death penalty is reserved for those committing what the state views as the most heinous of murders, such as those committed while the murderer was committing another violent crime, e.g., kidnapping or rape.
> This court's role is also special in death-penalty cases. Unlike other criminal defendants, including nondeath-penalty murderers, defendants eligible for the death penalty receive an automatic right of appeal to this court. Part of that appeal is our mandated consideration of "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). Proportionality review is a key part of this court's death-penalty review and, as the state's highest court, we are in a unique position to determine what is proportionate in a statewide sense.
> The focus in most death-penalty cases has been on issues other than proportionality. Typically, the court locates previous cases with similar statutory aggravating circumstances where the death penalty has been imposed, and thus finds proportionality to the case at issue. However, murders with the same statutorily defined aggravating circumstance are not necessarily crimes of the same character.

*Id.,* 71 Ohio St.3d at 500-501.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUCHSDOC@AOL.COM

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1128

*are not to be charged and proven in the same cause.* Thus, if the defendant is found to be the principal offender, then the aggravating circumstance is established, and the question of whether the offense was committed with prior calculation and design is irrelevant with respect to the death sentence.

(Emphasis added.)  Several years later, the Court reaffirmed that principle.

*See, State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316, syl.:

> The fact that, pursuant to R.C. 2923.03(F), a defendant who aids and abets another in committing an offense "shall be prosecuted and punished as if he were a principal offender" and so may be convicted of aggravated murder under R.C. 2903.01(B) does not make the defendant "the principal offender" for purposes of imposing the death penalty under R.C. 2929.04(A)(7).  (*State v. Penix* [1987], 32 Ohio St.3d 369, 513 N.E.2d 744, followed.)

In *Taylor*, the victim, Preston McKissick, had come to the house where Rayvon Taylor lived with his grandmother.  McKissick was a little intoxicated and was demeaning Taylor about not working.  McKissick "got a little huffy" and Leon Turnage "went to subdue him and apparently Mr. McKissick passed out."  Taylor went through McKissick's wallet and pockets and took money.  When McKissick awoke he became argumentative and he realized he was being assaulted.  Turnage then allegedly hit him in the head with the rolling pin.  Turnage and Taylor wrapped McKissick in a blanket and put him in the back seat of the van.  *See, State v. Taylor* (Oct. 10, 1991), Cuyahoga App. No. No. 59009, 1991 Ohio App. LEXIS 4890.

On appeal to the Ohio Supreme Court, Taylor argued that:

> the evidence was insufficient to establish the R.C. 2929.04(A)(7) death penalty specification attached to each count of aggravated murder. Taylor alleges there is no evidence that he was the principal offender, nor evidence *that he committed the offense with prior calculation and design.*  Our inquiry must focus on whether the evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question in this evaluation is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560, 573.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHS3@AOL.COM

6

Before considering the sufficiency of the evidence concerning the death penalty specification, we will discuss the underlying aggravated murder convictions. Taylor was convicted of two counts of aggravated murder: one count under R.C. 2903.01(A), for which the state must show Taylor acted with prior calculation and design, and one count under R.C. 2903.01(B), for which the state in this case must show the murder was caused while Taylor committed or attempted to commit aggravated robbery.

At trial, in its brief before this court and at oral argument, the state made clear that the linchpin of its theory of prior calculation and design was . . . testimony . . . concerning Taylor's alleged threats to McKissick. . . . For example, the state argued before the trial court that Adams's t

Because we find that the proffered double hearsay testimony . . . concerning McKissick's statements . . . did not qualify as an excited utterance under Evid.R. 803(2) and therefore . . . was improperly admitted. After removal of this linchpin testimony, there is insufficient evidence to sustain a finding of prior calculation and design. Therefore, we reverse Taylor's conviction for aggravated murder under R.C. 2903.01(A), since there was not "substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

With regard to Taylor's conviction of aggravated murder under R.C. 2903.01(B), there is sufficient evidence to find that Taylor aided and abetted Turnage in the murder, which was committed during an aggravated robbery. R.C. 2923.03 provides that if a person, acting with the culpability required for the commission of an offense, aids or abets another in committing the offense, then that person is guilty of complicity in the commission of the offense and shall be prosecuted and punished "as if" he were a principal offender. R.C. 2923.03(A)(2) and (F). An aider and abettor's purpose to kill may be inferred, but not conclusively, where he engaged in a common design with others to commit the offense by force or violence. R.C. 2903.01(D).

There is ample evidence contained in Taylor's oral and written statements to support a finding that he was an aider and abettor. He was present when Turnage struck McKissick and helped carry his body to the van and dispose of it. There was circumstantial evidence McKissick was still alive when he was placed in the van. Therefore, Taylor was properly prosecuted and punished "as if" he were a principal in his conviction under R.C. 2903.01(B).

To impose the death penalty, the state must also prove one of the specifications contained in R.C. 2929.04(A).
. . .

As we stated in *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746:

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail Jhjurisdoc@aol.com

7

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1130

"Prior calculation and design is an aggravating circumstance only in the case of an offender who did not personally kill the victim. Thus, the criteria set forth in R.C. 2929.04(A)(7) are constructed in the alternative. If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (*i.e.*, the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design. * * *"

As already discussed, without the improperly admitted testimony of Adams the evidence is insufficient to find prior calculation and design. Therefore, to impose the death penalty Taylor must be found to have been the principal. However, the state never seriously argued that Taylor was the principal. The jury verdict forms concerning the R.C. 2929.04(A)(7) specification required the jury to decide only whether the murder was committed with prior calculation and design. The form did not make any reference to the jury's determining whether Taylor was the principal offender. Indeed, there is no evidence that he was the principal. Turnage admitted that he struck the blows and there is no evidence to the contrary.

In its analysis of this proposition of law the court of appeals refers to Taylor's role as an aider and abettor and cites the provision in R.C. 2923.03 that permits prosecution "as if" the defendant were "a principal offender." It is unclear what conclusion the court of appeals seeks to reach by citing this statute. If the court of appeals refers to R.C. 2923.03 to show that Taylor was properly convicted of aggravated murder under R.C. 2903.01(B) as an aider and abettor, we agree. If, however, the court of appeals concludes that a defendant can be convicted of a death penalty specification under R.C. 2929.04(A)(7) as "the" principal offender through an extension of R.C. 2923.03(F)'s provision that an aider and abettor can be prosecuted and punished as if he were "a" principal offender, we disagree.

The fact that, pursuant to R.C. 2923.03(F), a defendant who aids and abets another in committing an offense "shall be prosecuted and punished as if he were a principal offender" and so may be convicted of aggravated murder under R.C. 2903.01(B) does not make the defendant "the principal offender" for purposes of imposing the death penalty under R.C. 2929.04(A)(7). To be eligible for the death penalty under R.C. 2929.04(A)(7) as "the principal offender," the defendant must have been the actual killer. *State v. Penix, supra*, 32 Ohio St.3d at 371, 513 N.E.2d at 746. As we stated in *Penix*, being "the principal offender" for purposes of R.C. 2929.04(A)(7) equates to being the actual killer. *Id.* So while Taylor can be convicted of aggravated murder in violation of R.C. 2903.01(B) without being the actual killer, but by aiding and abetting the actual killer, that finding cannot be bootstrapped into a finding that he is the principal offender for purposes of receiving the death penalty under R.C. 2929.04(A)(7).

John H. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone: 330.758.7700 · Facsimile: 330.758.8290 · E-mail: jhjuhasz00@aol.com

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1131

For the foregoing reasons we find Taylor's third proposition of law well taken.

*Id.*, 66 Ohio St.3d at 305-308.  The Supreme Court vacated Taylor's death sentence.

In *State v. Mapes* (1985), 19 Ohio St.3d 108, 484 N.E.2d 140, 19 OBR 318, *cert. denied, Mapes v. Ohio* (1986), 476 U.S. 1178, 106 S.Ct. 2905, 90 L.Ed.2d 991, 54 USLW 3810, Mapes was indicted for two counts of aggravated murder under OHIO REV. CODE ANN. §2903.01(B).  One count alleged that the murder occurred during the course of an aggravated robbery, and the other count charged that the murder occurred during the course of an aggravated burglary.  Each of the two counts had four identical specifications: as here, the specifications were under OHIO REV. CODE ANN. §2929.04(A)(7).  One capital specification alleged that the offense occurred in the course of an aggravated robbery; and one specification alleged that the offense occurred in the course of an aggravated burglary.  Unlike this case, where the Defendant has no criminal record, the *Mapes* case also involved specifications under OHIO REV. CODE ANN. §2929.04(A)(5), alleging that Mapes has a prior murder conviction.  Mapes was also charged with firearm specifications, aggravated robbery and aggravated burglary.  The jury found Mapes guilty of both counts of felony-murder aggravated murder under OHIO REV. CODE ANN. §2903.01(B), but not guilty of the capital specifications charged under OHIO REV. CODE ANN. §2929.04(A)(7).[2]  Mapes argued to the Supreme Court that the verdicts were inconsistent "because they seem to say appellant purposefully caused the death of John Allen during the course of an aggravated robbery and an aggravated burglary while at the same time

---

[2] The issue of whether Mapes was guilty of the prior murder specification under OHIO REV. CODE ANN. §2929.04(A)(5) was tried separately to the court.  The court found Mapes guilty of the prior murder specification.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1132

saying he was not guilty of such offenses." 19 Ohio St.3d at 112. The Supreme Court rejected Mapes' argument, and the Court's holding is pertinent to this discussion.

> Initially, we note that the finding of guilt on the third specification involving a prior conviction is sufficient to warrant the death penalty regardless of the findings on specifications one and two. Additionally, we note that a close reading of the language in the principal charge and the two specifications reveals that there is not necessarily an inconsistency in the guilty verdict of aggravated murder under R.C. 2903.01(B) and the jury's finding of not guilty on the two specifications. *An individual can be convicted of aggravated felony murder as an accomplice absent a finding that either the individual was the "principal offender" or that he committed the murder with "prior calculation and design" as those terms were used in the first two specifications. Thus, a person would be guilty of murder but would not be guilty of the aggravating specification set out in R.C. 2929.04(A)(7).* Therefore, appellant's argument that there is an inherent inconsistency in the results reached by the jury must be rejected. We would also point out that this issue is also resolved by our decision in *State* v.. *Perryman* (1976), 49 Ohio St. 2d 14 [3 O.O.3d 8], vacated on other grounds (1978), 438 U.S. 911.

*Id.*, 19 Ohio St.3d 112-113. (Emphasis added.)

In *State v. Ballew*, 76 Ohio St.3d 244, 1996 Ohio 81, 667 N.E.2d 369; 1996 Ohio LEXIS 578, *cert denied*, (1997), 519 U.S. 1065, 117 S.Ct. 704, 136 L.Ed.2d 625, 65 USLW 3466 (1997), Tyrone Ballew and four others forced their way into a house and removed the victim, Donald Hill. The five beat Hill and drove him to a vacant lot, where he was shot three times. The week before the murder, Ballew and others had visited Hill's girlfriend. Ballew told her that Hill owed him money and he was looking for him. Ballew searched her house for Hill, and told the girlfriend to tell Hill when she saw him, "I'm going to find him stinking."

On the night of the murder, Ballew, armed with his 9 mm handgun, went with his friends to get Hill. Others had a shotgun and a 9 mm Baretta. Ballew and the others rushed in and went to the kitchen where Hill was. In

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJOHIOSDC@AOL.COM

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1133

the kitchen, Ballew and another man began to beat Hill, who kept saying that he could get the money. The group picked Hill up off the floor, "walked" him out of the house, and dragged him to the car. Ballew and the others took Hill to a vacant lot, where most of the group walked Hill down a slope. All of the group left except for Coffey and Ballew, who were alone with Hill at the bottom of the slope. While at the top, the others heard several shots. After the shots, everybody ran to the car. Coffey and Ballew arrived at the car last, and Hill was not with them. The coroner concluded that Hill had been shot three times. The coroner recovered two bullets from Hill's body and concluded that the same caliber bullets could have caused all three bullet wounds. At trial, Ballew called Coffey as a defense witness and Coffey, who had pled guilty to the aggravated murder of Hill and received a life sentence, claimed that he, not Ballew, organized and directed the burglary and Hill's kidnapping because Hill owed him money. The jury convicted Ballew of aggravated murder with prior calculation and design, and during a kidnapping. On appeal Ballew argued that a finding of aiding and abetting cannot be bootstrapped into a finding that he is the principal offender under OHIO REV. CODE ANN. §2929.04(A)(7). However, Ballew did not object to the trial court's instructions and the Supreme Court found no outcome-determinative plain error. The Supreme Court found "purely speculative any claim that the jury confused complicity in the murder with whether Ballew was the actual killer. As we held earlier, the jury could reasonably find in this case that Ballew purposely engaged in a scheme designed to end with Hill's murder. Thus, it is irrelevant whether Ballew was the principal offender, since R.C. 2929.04(A)(7) only requires a finding that 'either' Ballew was the principal

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC9.AOL.COM

11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1134

offender 'or' *he committed the murder with prior calculation and design."* *Id.,* 76 Ohio St.3d at 251. (Emphasis added.)

In *State v. Guyton* (1984), 18 Ohio App.3d 101, 481 N.E.2d 650, 18 OBR 464, while the victim was out shopping Guyton broke into her apartment to commit a theft offense.  When the victim returned Guyton was still there.  Guyton severely beat and then strangled the victim to death.  Guyton pled guilty to aggravated murder, the specification under OHIO REV. CODE ANN. §2929.04(A)(7), and aggravated burglary. He received consecutive sentences of life imprisonment with eligibility for parole after serving thirty years for aggravated murder, and imprisonment for seven to twenty-five years for aggravated burglary.  On appeal, he argued that the trial court erred in failing to declare the specification under OHIO REV. CODE ANN. §2929.04(A)(7) unconstitutional as applied to him since he was charged with aggravated murder under the felony murder theory.  Guyton contended that the underlying burglary should not be used as an aggravating circumstance to impose a harsher sentence.  The Court rejected his argument, but the court's disposition is instructive here:

> In *Zant v. Stephens* (1983), 77 L.Ed. 2d 235, the United States Supreme Court discussed the function served by stipulations and aggravating circumstances, stating at 249-250:
> ". . a system 'could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' 428 U.S. at 195, n. 46 .  .  .  . To avoid this constitutional flaw, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."
> Under Ohio law an accomplice to a crime is subject to that punishment which the principal could receive. R.C. 2923.03(F); and *State* v. *Scott* (1980), 61 Ohio St.2d 155, 165 [15 Ohio Op.3d 182]. Accordingly, an accomplice can be charged and convicted of aggravated murder under the felony murder theory, pursuant to R.C.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS@AOL.COM

12

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1135

2903.01(B).   However, the specification under R.C. 2929.04(A)(7) is limited to a more narrow class of offenders. That specification applies only if:

"   .   .   . the offender was the *principal offender* in the commission of the aggravated murder or, if not the principal offender, *committed the aggravated murder with prior calculation and design*." (Emphasis added.)

Therefore, the class of offenders who are subject to the specification, and thus the enhanced penalty, has been limited to "only the worst criminals or the criminals who commit the worst crimes." *Furman* v.. *Georgia* (1972), 408 U.S. 238, 294.

A similar finding was made in *State v. Twyford*, Jefferson App. No. 93-J-13, 1998 Ohio App. LEXIS 4594, *affirmed, State v. Twyford*, 94 Ohio St.3d 340, 2002 Ohio 894, 763 N.E.2d 122, *cert. denied, Twyford v. Ohio* (2002), __ U.S. __, 123 S.Ct. 302, 154 L.Ed.2d 203, 71 USLW 3243.   There, the Seventh District Court of Appeals held:

Therefore, pursuant to the *Penix* analysis, the specification in R.C. 2929.04(A)(7) actually sets forth two distinct aggravating circumstances: (1) the aggravated murder was committed while the defendant was committing one of the five listed offenses, and the defendant was the principal offender in the commission of the aggravated murder; or (2) the aggravated murder was committed while the defendant was committing one of the listed offenses, and the defendant committed the aggravated murder with prior calculation and design. Whenever an aggravated murder count contains a specification under R.C. 2929.07(A)(7), the second of the two possible aggravating circumstances can be considered only when the first is not applicable under the facts. Moreover, only one of the possible aggravating circumstances can be considered under one aggravated murder count.

*Id.*, at *38-*39.[3]

---

[3] The facts in Twyford were essentially Twyford and one Eikelberry told the victim that they were planning to go hunting that night.  That the three men got into appellant's vehicle and drove over one hundred miles to a pond in Jefferson County; Ohio .  Once there, the victim was given the duty of "spot lighting" the deer with a flashlight and driving them to a location where appellant and Eikelberry could shoot them.  As the victim started to walk away the first time, Twyford wanted to shoot him, but could not.  Shortly thereafter, the victim returned and Twyford and Eikelberry then instructed the victim to walk in another direction.  As the victim was leaving, Twyford shot him in the back with a 30.06 caliber rifle; and, after the victim had fallen onto the ground, Eikelberry fired one shot from a .22 caliber pistol into his head.  Then Twyford fired another shot from the rifle into the victim's head.

13

All of these cases have something in common that this case does not: not mere complicity by the Defendant but actual participation in the events immediately surrounding the killing of the victim. In *Taylor*, the Court vacated the death sentence because Taylor was not the principal offender. Since he was not the actual killer and since his participation in the events leading to the victim's death were not with prior calculation and design, the Court held the death sentence improper. In *Mapes*, Mapes was at the scene of the killing and still the jury did not convict him of the "principal offender" specifications under OHIO REV. CODE ANN. §2929.04(A)(7). In *Guyton*, Guyton was the actual killer. In *Twyford*, both Twyford and his accomplice could be said top have equally caused the death of the victim. Here, the Defendant is, by the government's admission, not the actual killer. Thus, that part of the specification should be immediately removed from this case. Though the government says the aggravated murder was committed with prior calculation and design, there must be a showing that the offender *committed the offense* with prior calculation and design. A showing of complicity is sufficient for a conviction on the principal offense, but it is not enough for a conviction under OHIO REV. CODE ANN. §2929.04(A)(7), and a judgment of acquittal as to those specifications must be entered.

## D

The process of weighing aggravating circumstances against mitigating factors is designed to guide the sentencer's discretion by focusing on the circumstances of the offense and the individual offender, thereby reducing the arbitrary and capricious imposition of death sentences.[4]

---

[4] *Id.*, at 371. *See, also, State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, 15 OBR 311, *cert. denied, Jenkins v. Ohio* (1985), 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643,

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHISSQ@AOL.COM

14

In *State v. Johnson* (1986), 24 Ohio St.3d 87, 494 N.E.2d 1061, 24 OBR 282, the Supreme Court of Ohio held that when a jury is presented with specifications not permitted by statute, it: "impermissibly tips the scales in favor of death, and essentially undermines the required reliability in the jury's determination." *Id.*, at 94.[5] Here, as demonstrated by the clear language of *Penix, ante*, both alternatives of the specification are not permitted by statute in the same case. The specification as charged in the indictment is overbroad. Its submission to the jury would impermissibly tip the scales in favor of death, thereby failing to sufficiently narrow the class of individuals eligible for the death penalty.[6] Submission of the alternative theories under OHIO REV. CODE ANN. §2929.04(A)(7) would fail to properly guide the sentencer's discretion and

---

[5] The Court's opinion more fully explaining the concept is found at 24 Ohio St.3d 93-94:

> Indeed, the Eighth and Fourteenth Amendments to the United States Constitution would appear to preclude the inclusion of non-statutory aggravating specifications. Pursuant to *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, and its progeny, the United States Supreme Court has directed that jury discretion in capital sentencing be sufficiently guided so as to avoid the arbitrary and selective imposition of the death penalty. In *State v. Jenkins, supra*, 15 Ohio St.3d at 196, 473 N.E.2d 264, a California decision was discussed and quoted:
>
> "The use in the penalty phase of both these special circumstance allegations thus artificially inflates the particular circumstances of the crime and strays from the high court's mandate that the state "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." (*Godfrey v. Georgia* [1980], 446 U.S. 420 at p. 428 * * * ). * * * . That requirement is not met in a system where the jury considers the same act or an indivisible course of conduct to be more than one special circumstance." *Jenkins, supra*, quoting *People v. Harris* (1984), 36 Cal.3d 36, 201 Cal.Rptr. 782, 798, 679 P.2d 433, 449. The inclusion of a non-statutory aggravating factor creates a situation where a jury can deviate from the guidance provided by statute. The result may be an "arbitrary and capricious infliction of the death penalty" contrary to the dictates of *Godfrey, supra*.
>
> The inescapable conclusion is that it was error to submit the non-statutory aggravating factor to the jury for its consideration in the penalty phase of the trial. * * * . Presenting the jury with specifications not permitted by statute impermissibly tips the scales in favor of death, and essentially undermines the required reliability in the jury's determination.
>
> * * * . Appellant's sentence of death is therefore vacated.

This quote and the quotes from any other Ohio authorities cited herein are Copyright © West Publishing Co. 1995. No claim to original U.S. Govt. works.

[6] *See, e.g., Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1138

would thereby render any death sentence unconstitutional. *State v. Penix, ante;*[7] *State v. Johnson, ante.*

---

[7] The relevant portion of the opinion in *Penix* is more fully set forth below:

We now turn to the penalty phase of the proceedings. * * *.

At the conclusion of the penalty phase, over objection by appellee's counsel, the trial judge instructed the jury that there were two aggravating circumstances to weigh against the factors in mitigation, namely:

"1) That the Defendant, Bill Penix, aka Bill Davis, committed the offense of aggravated murder with prior calculation and design, and;

"2) That the Defendant, Bill Penix, aka Bill Davis, as the principal offender committed the offense of aggravated murder of Stephen Barker while the Defendant was committing or attempting to commit aggravated robbery."

The court of appeals held that the charge with respect to the first aggravating circumstance was inaccurate and misleading, resulting in prejudicial error. We agree. The aggravating circumstance of which appellee was convicted was R.C. 2929.04(A), which provides as follows:

"Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

" * * * *

"(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

Since the jury found that appellee was the principal offender, the second aggravating circumstance referred to in the instructions was present. The first, however, was an incomplete statement of a portion of R.C. 2929.04(A)(7) not applicable to appellee. Prior calculation and design is an aggravating circumstance only in the case of an offender who did not personally kill the victim. Thus, the criteria set forth in R.C. 2929.04(A)(7) are constructed in the alternative. If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (i.e., the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design. The language of the statute provides that these are alternatives which are not to be charged and proven in the same cause. Thus, if the defendant is found to be the principal offender, then the aggravating circumstance is established, and the question of whether the offense was committed with prior calculation and design is irrelevant with respect to the death sentence.

Appellee is entitled to jury participation in his sentencing pursuant to R.C. 2929.03(O)(2). However, we cannot say that the erroneous submission of the "first" aggravating circumstance compounded by the instruction permitting consideration of the quantity of aggravating circumstances did not taint the jury's deliberative process. As stated, we must agree with the court of appeals that the improper jury instructions constituted prejudicial error which could not simply be corrected in the appellate review process pursuant to R.C. 2929.05. Consequently, we affirm the vacation of appellee's sentence by the court of appeals and remand the cause to the trial court for resentencing.

Id., 370-372.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

16

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1139

There is also the risk that if the duplicative specifications are submitted to the jury in present form, the jury would not be unanimous on a particular specification. In other words, some jurors may find that the Defendant was a principal offender and others may find that the murder was committed with prior calculation and design.[8]

Allowing the indictment to stand in its present form is the logical equivalent of allowing the State to take a "shotgun" approach to the death penalty, something prohibited by the State and Federal Constitutions.[9]

The fact that, pursuant to R.C. 2923.03(F), a defendant who aids and abets another in committing an offense "shall be prosecuted and punished as if he were a principal offender" and so may be convicted of aggravated murder under R.C. 2903.01(B) does not make the defendant "the principal offender" for purposes of imposing the death penalty under R.C. 2929.04(A)(7). *State v. Taylor, ante*, citing *State v. Penix, ante*.

### III

*Complicity to Aggravated Murder.* As to the complicity to commit aggravated murder counts, judgment of acquittal must also be entered in favor of the Defendant. The State may demonstrate that the Defendant is guilty of aiding and abetting by direct or circumstantial evidence, or both. And, although criminal intent may be inferred from presence, companionship, and conduct before and after an offense is committed, a jury may not infer that the Defendant is guilty of complicity of an offense merely from a finding that she was an accessory after the fact. An aider and abettor to aggravated

---

[8] *See, State v. Burke*, 73 Ohio St.3d 399, 405, 1995 Ohio 290, 653 N.E.2d 242, *cert. denied, Burke v. Ohio* (1996), 517 U.S. 1112, 116 S.Ct. 1336, 134 L.Ed.2d 486, 64 USLW 3640; *State v. Johnson, ante*, at 104-105.

[9] *State v. Johnson, ante; Zant v. Stephens, ante*.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290 · E-mail: jbjurisdoc@aol.com

17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1140

murder must assist the principal *before* the offense with the "purpose" of causing death, and must intend to aid, abet, solicit, procure, or cause the principal to commit the offense.

Here, while the State may claim that it has evidence of prior calculation and design, there is no evidence that the Defendant participated before or during the homicide, only after.  Thus, an examination of the evidence admitted at trial would lead to the inescapable conclusion that the State's evidence, if believed, would not convince the average mind of the defendant's guilt beyond a reasonable doubt.  Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could not find the essential elements of the crime proven beyond a reasonable doubt.

## IV

*Complicity to Aggravated Burglary*.  As to the charge of complicity to commit aggravated burglary, there is no evidence, direct or circumstantial, that the Defendant, knowingly aided or abetted Nathaniel E. Jackson in trespassing in the Fonderlac home.  There is circumstantial evidence that Jackson was there, but not as to whether he entered by force, stealth, or deception.  There is no evidence that he entered with the purpose to commit in the structure any criminal offense.  There is circumstantial evidence that Nathaniel E. Jackson did inflict, or attempt or threaten to inflict, physical harm on Robert S. Fingerhut, and that Nathaniel E. Jackson had a deadly weapon on or about the his person or under his control.

There is no evidence from which a rational trier of fact can conclude that Jackson entered or remained in the Fonderlac residence without authority, consent or privilege to do so.  Absence of a privilege to be in or upon the premises of another is an essential element of trespass, which is an

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

18

essential part of aggravated burglary. Although a jury, where a Defendant has lawfully entered a residential premises, may infer that the privilege to be in or upon the premises had been revoked where the Defendant thereafter commits a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege, there is no evidence of this. The very purpose of Rule 29 is to insure convictions based upon reliable evidence, not speculation. This is *not* the Jackson case. Evidence of Jackson's entry and how the shooting occurred were not introduced in this case. Neither may the Court bootstrap what it knows was admitted there to deny a Rule 29 motion here.

<div align="center">V</div>

*Complicity to Aggravated Robbery*. Finally, a Rule 29 motion for acquittal must be granted as to the aggravated robbery count as well. To find the Defendant guilty of complicity to commit aggravated robbery, a jury must find beyond a reasonable doubt that the Defendant knowingly aided or abetted Nathaniel E. Jackson in attempting or committing a *theft offense* or in fleeing immediately after the attempt or offense, when Nathaniel E. Jackson had a deadly weapon on or about his person. For purposes of aggravated robbery, "theft" or "theft offense" means knowingly obtaining or exerting control over either the property or services *with a purpose to deprive the owner of* property or services, either without the consent of the owner or person authorized to give consent; or beyond the scope of the express or implied consent of the owner or person authorized to give consent; or by deception, threat, or intimidation.

"Deprive" means to withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or to dispose

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

19

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1142

of property so as to make it unlikely that the owner will recover it.  The State has produced no such evidence here.  Indeed, the evidence was that Mr. Fingerhut's car was fund less than a day after it was taken.

J. GERALD INGRAM

JOHN B. JUHASZ

E:\DRoberts\Trial\Rule29.wpd\Motion.acquittal.wpd•Tuesday 27 May 2003•06:23am (0623 hrs)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS300@AOL.COM

20

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1143

jbj\E:\DRoberts\Trial\Jury.Instructions\Defense.Charge.wpd * May 26, 2003 (10:34pm)

# In the Court of Common Pleas
# Trumbull County, Ohio

STATE OF OHIO,                    )      Case No.  01 CR 793
                                  )
    Plaintiff              )      Judge John M. Stuard
                                  )      Courtroom 2
*v.*                              )
                                  )
                                  )
DONNA M. ROBERTS,                 )
                                  )
    Defendant              )

---

## DEFENDANT'S PROPOSED
## INSTRUCTION TO TRIAL JURY

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and submits the following proposed instruction to the trial jury pursuant to OHIO CRIM.R. 30.  The Defendant says that the proposed instruction is a correct statement of the law in each instance.  *See, e.g., State* v. *Barron* (1960), 170 Ohio St. 267, 164 N.E.2d 409, 10 Ohio Op.2d 299, *cert. denied, Barron v. Ohio* (1960), 363 U.S. 814, 80 S.Ct. 1247, 4 L.Ed.2d 1153; *State* v. *Nelson* (1973), 36 Ohio St.2d 79, 303 N.E.2d 865, 65 Ohio Op.2d 222.  Further, the Defendant says that the instructions are required if the Defendant is to be secure in the constitutional liberties specified in U.S. CONST. amend. V, VI, VII, and XIV and also OHIO CONST. art. I, §§1, 2, 9, 10, and 16.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

1    103

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1144

Respectfully submitted,

J. GERALD INGRAM (0007887)

JOHN B. JUHASZ (0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Proposed Instructions to Trial Jury* was:

☐ sent by regular United States Mail, postage prepaid
☐ sent by telecopier pursuant to OHIO CRIM.R. 57(B) and OHIO CIV.R. 5(B)
☑ hand delivered to counsel or counsel's offices

this ____ day of May, 2003 to Christopher D. Becker, Esq., and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street NW, Warren, Ohio 44481.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

2

## Proposed Instruction of Defendant

Members of the Jury: You have heard the evidence and the arguments of counsel. The Court and the jury have separate functions: you decide the disputed facts and the Court provides the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You are not permitted to change the law, nor to apply your own conception of what you think the law should be.

*Indictment.* A criminal case begins with the filing of an indictment. The indictment informs the Defendant that she has been charged with an offense. The fact that it was filed may not be considered for any other purpose. The plea of not guilty is a denial of the charge and puts in issue all the essential elements of each offense.

*Defendant presumed innocent.* The Defendant is presumed innocent unless and until her guilt is established beyond a reasonable doubt. The Defendant must be acquitted unless you find that the State has produced evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged in the indictment.

*Reasonable doubt.* Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290

1

*Evidence.* Evidence is all the testimony received from the witnesses and the exhibits admitted during the trial, and any facts agreed to by counsel, which are called stipulations. Evidence may be direct or circumstantial, or both. Direct evidence is the testimony given by a witness who has seen or heard the facts to which he testifies. It includes exhibits admitted into evidence during the trial. Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experience of mankind.

To infer, or to make an inference, is to reach a reasonable conclusion of fact which you may, but are not required to, make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you. Direct evidence and circumstantial evidence are of equal weight.

The evidence does not include the indictment, opening statements or closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you. They are not evidence.

Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them.

*Objections.* You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been. You must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

2

*Credibility of witnesses.*  You are the sole judges of the facts, the credibility of the witnesses and the weight of the evidence.  To weigh the evidence, you must consider the credibility of the witnesses.  You will apply the tests of truthfulness which you apply in your daily lives. These tests include the appearance of each witness upon the stand; his manner of testifying; the reasonableness of the testimony; the opportunity he had to see, hear and know the things concerning which he testified; his accuracy of memory; frankness or lack of it; intelligence; interest and bias, if any; together with all the facts and circumstances surrounding the testimony.  Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.[1]

You are not required to believe the testimony of any witness simply because he or she was under oath.  You may believe or disbelieve all or any part of the testimony of any witness.  It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

*Experts.* Generally a witness may not express an opinion. However, one who follows a profession or special line of work may express his opinion because of his education, knowledge and experience.  Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict. However, as with other witnesses, upon you alone rests the duty of deciding what weight should be given to the testimony of the experts. In determining its weight, you may take into consideration their skill, experience, knowledge, veracity, familiarity with the facts of this case, and the

---

[1] *Ohio Jury Instructions*, §405.20; OHIO REV. CODE ANN. §2945.11.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

3

usual rules for testing credibility and determining the weight to be given to testimony.

*Exhibits.* A number of exhibits and the testimony related to them have been introduced. You may consider whether the exhibits are the same objects and in the same condition as originally taken by the law enforcement officers. You will determine what weight, if any, the exhibits should receive in the light of all the evidence.

*Videotape and audiotape recordings* and testimony relating to them have been introduced into evidence. You shall consider whether the videotape and/or audiotape is a true record of what transpired at the time it was taken. If you find that it is, you will then determine what weight, if any, the videotape and/or audiotape should receive in light of all the evidence.

*Venue.* The State must prove beyond a reasonable doubt that the offenses charged took place in Trumbull County, Ohio, which is known as *venue.* The right of this Court to try the Defendant depends upon proof that the offenses were committed in Trumbull County, Ohio. If, therefore, you find that the State has failed to prove beyond any reasonable doubt that the offense were committed in Trumbull County, Ohio, you must return a verdict of not guilty as to that count or counts.

*Count One Complicity to Commit Aggravated Murder With Prior Calculation and Design.* The Defendant is charged in Count One with complicity to commit aggravated murder. Aggravated murder for purposes of this Count is purposely causing the death of another with prior calculation and design. Before you can find the Defendant DONNA M. ROBERTS guilty, you must find beyond a reasonable doubt that on or about the 11th day of

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1149

December, 2001, in Trumbull County, Ohio, the Defendant purposely aided or abetted Nathaniel E. Jackson in committing the offense of aggravated murder.

*Purposely.*  Purpose to cause the death of another is an essential element of the crime of aggravated murder.  A person acts purposely when it is her specific intention to cause a certain result.  It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of Robert S. Fingerhut. Purpose is a decision of the mind to do an act with a conscious objective of engaging in specific conduct.  To do an act purposely is to do it intentionally and not accidentally.  Purpose and intent mean the same thing.  The purpose with which a person does an act is known only to herself, unless she expresses it to others or indicates it by her conduct.  The purpose with which a person does an act is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence.  If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon.[2]  However, any such inference, if made by you, is not conclusive.[3]

Proof of motive is not required.  The presence or absence of motive is one of the circumstances bearing upon purpose.

---

[2] 4 OJI §409.01; OHIO REV. CODE ANN. §2901.22(A).

[3] *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

5

*Cause* is an essential element of the offense of aggravated murder and must therefore be proved beyond a reasonable doubt. Cause is an act or failure to act which in a natural and continuous sequence directly produces physical harm, and without which it would not have occurred. The Defendant's responsibility is not limited to the immediate or most obvious result of her act or failure to act. The Defendant is also responsible for the natural and foreseeable results that follow, in the ordinary course of events, from the act or failure to act.

*Prior Calculation and Design.* "Prior calculation and design" means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means with which to cause the death of another. To constitute prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

*Specific Intent.* The Defendant may not be convicted of aggravated murder unless you find by proof beyond a reasonable doubt that she specifically intended to cause the death of Robert S. Fingerhut.

The offenses of aggravated burglary and aggravated robbery will be defined for you shortly.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

6

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1151

*Complicity*. The Defendant is charged with complicity to commit all of the indicted offenses. "Complicity" means acting with the kind of culpability required for the commission of an offense, soliciting or procuring another to commit the offense; or aiding or abetting another in committing the offense. To "aid" means to help, assist, or strengthen. "Abet" means to encourage, counsel, incite, or assist. Mere association with the person or persons who committed an offense are not enough to convict the Defendant of complicity. To be an aider and abettor, one must encourage or assist another in accomplishing a common goal or purpose. To be and aider and abettor, one must both be aware of and must consent to that common goal or purpose.

Before you can convict the Defendant as an aider or abettor, it must be proven beyond the existence of any reasonable doubt that she hired, incited, commanded or counseled Nathaniel Jackson to commit the offenses charged in this indictment. In the absence of some previous connection with the offense, a person does not aid and abet if she merely sees a crime being committed. Even approval or acquiescence, without either the expression of agreement or doing some act which in some way contributes to the commission of the crimes is not aiding and abetting. The Defendant must take some role before the offense to cause the commission of the offense.

The State may demonstrate that the Defendant is guilty of aiding and abetting by direct or circumstantial evidence, or both. Although criminal intent may be inferred from presence, companionship, and conduct before and after an offense is committed, you may not infer that the Defendant is guilty of complicity of an offense merely from the fact that you find that she was an

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

7

accessory after the fact.[4]  An aider and abettor to aggravated murder must assist the principal before the offense with the "purpose" of causing death, and must intend to aid, abet, solicit, procure, or cause the principal to commit the offense.  In other words, an intent to kill is insufficient; there must also be an intent to assist the principal offender to kill.[5]

Thus, before you can convict the Defendant, DONNA M. ROBERTS, of the offense of complicity to commit an offense, you must find beyond a reasonable doubt that she in some way aided or abetted NATHANIEL E. JACKSON by taking some role in causing the commission of the offenses of aggravated murder, aggravated burglary, and aggravated robbery.[6]

---

[4] See, State v. Woods (1988), 48 Ohio App. 3d 1, 7-8, 548 N.E.2d 954 (holding that a man who witnessed a murder, helped the murderer fabricate an alibi and dispose of murder weapon after the crime was not criminally liable as an accessory after the fact).

[5] See, State v. Moody (Mar. 13, 2001), Franklin App. No. 98AP-1371, 2001 Ohio App. LEXIS 1111, at *16-*17:

> "Thus, an aider and abettor to murder must assist the principal with the 'purpose' of causing death, because purpose is the *mens rea* for murder." *State v. Mendoza* (2000), 137 Ohio App.3d 336, 343, 738 N.E.2d 822. "In other words, an intent to kill is insufficient; there must also be an intent to assist the principal offender to kill." *Id.*, quoting 3 Katz & Giannelli, Criminal Law (1996) 233, Section 92.3.
>
> Mere association with the principal is insufficient to constitute the offense of aiding and abetting. *State v. Sims* (1983), 10 Ohio App. 3d 56, 58, 460 N.E.2d 672, citing *State v. Clifton* (1972), 32 Ohio App. 2d 284, 290 N.E.2d 921. To aid is to assist. To abet is to incite or encourage. *Sims, supra*, at 58. The accused must take some role in causing the commission of the offense. "Mere approval or acquiescence, [*17] without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act." 10 Ohio App. 3d at 59, quoting *Smith v. State* (1931), 41 Ohio App. 64, 67-68, 179 N.E. 696; see, also, *State v. Stepp* (1997), 117 Ohio App.3d 561, 568, 690 N.E.2d 1342. "Without previous connection with the transaction, one is not an aider or abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids; in order to aid or abet, whether by words, acts, encouragement, support or presence, there must be something more than a failure to object unless one is under a legal duty to object." *Sims*, at 59, quoting *Smith*, at 68. Criminal intent can be inferred from an accused's presence, companionship, and conduct both before and after an offense. *State v. Pruett* (1971), 28 Ohio App. 2d 29, at 34, 273 N.E.2d 884.

[6] *State v. Sims* (1983), 10 Ohio App.3d 56, 58-59, 460 N.E.2d 672, 10 O.B.R. 65, leave to appeal
(continued...)

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7308 · FACSIMILE 330.758.8290

8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1153

*Conviction of Principal Is No Defense.*  It is not a defense to a charge of

_____

[6](...continued)

overruled, December 21, 1983 (Case No. 83-1062), and the authorities cited therein. *See, also State v. Smith* (September 2, 1999), 1999 WL 689963, Ct. App. Mahoning Cty, unreported, appeal not allowed, *State v. Smith* (1999), 87 Ohio St.3d 1451, 719 N.E.2d 967 (Ohio Nov 24, 1999). The seminal case with the most comprehensive definition of aiding and abetting is *Sims*, which said:

> However, the terms "aid" and "abet" are familiar and simple legal terms. To aid is to assist. To abet is to incite or encourage. Mere association with the principal is not enough. *State v. Clifton* (1972), 32 Ohio App.2d 284, 290 N.E.2d 921 [61 O.O.2d 348]. *Black's Law Dictionary* (Rev. 4 Ed. 1968) defines an "aider and abettor" in the following terms:
>
> > "One who assists another in the accomplishment of a common design or purpose; he must be aware of, and consent to, such design or purpose. *Peats v. State,* 213 Ind. 560, 12 N.E.2d 270, 277.
> >
> > "One who advises, counsels, procures, or encourages another to commit a crime, himself being guilty of some overt act or advocacy or encouragement of his principal, actually or constructively present when crime is committed, and participating in commission thereof by some act, deed, word, or gesture, *Turner v. Commonwealth,* 268 Ky. 311, 104 S.W.2d 1085, and sharing the criminal intent of the principal. *State v. Reedy,* 97 W.Va. 549, 127 S.E. 24, 28. But one who incites or instigates the commission of a felony when he is neither actually nor constructively present is an 'aider, abettor, or procurer' within the meaning of a statute. *Neal v. State,* 104 Neb. 56, 175 N.W. 669, 670."
>
> The United States Court of Appeals for the Sixth Circuit has succinctly defined an "aider and abettor" in the following statement from *Morei v. United States* (1942), 127 F.2d 827, 830-831:
>
> > " * * * A person is not an accessory before the fact, unless there is some sort of active proceeding on his part; he must incite, or procure, or encourage the criminal act, or assist or enable it to be done, or engage or counsel, or command the principal to do it. * * *"
>
> Ohio courts of appeals have previously held that, to constitute aiding and abetting, the accused must have taken a role in causing the commission of the offense. In *State v. Starr* (1970), 24 Ohio App.2d 56, 58, 263 N.E.2d 572 [53 O.O.2d 167], the Hamilton County Court of Appeals held:
>
> > " * * * Before one can be convicted as an aider or abettor it must be proven beyond a reasonable doubt that he advised, hired, incited, commanded, or counselled the principal to do the act. * * *"
>
> A frequently quoted definition of "aiding and abetting" is contained in *Smith v. State* (1931), 41 Ohio App. 64, 67-68, 179 N.E. 696:
>
> > "In the absence of a conspiracy or some preceding connection with the transaction, one does not aid and abet if he merely sees a crime being committed. *Goins v. State,* 46 Ohio St., 457, 21 N.E., 476.
> >
> > "Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act. *State v. Peasley,* 80 Wash., 99, 141 P., 316.
> >
> > "Without previous connection with the transaction, one is not an aider or abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids; in order to aid or abet, whether by words, acts, encouragement, support or presence, there must be something more than a failure to object unless one is under a legal duty to object. If A. knows that B. is illegally transporting liquor by truck, he does not aid and abet him therein by merely riding with him as a passenger upon the truck, although A.'s presence and failure to object may in a sense encourage B. As A. does nothing to further or affect the transportation, he is not an aider or abettor. * * *"

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290

9

complicity that Nathaniel E. Jackson either has or has not been convicted as a principal offender.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of complicity to commit aggravated murder, then your verdict must be guilty.  If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of complicity to commit aggravated murder, then your verdict must be not guilty.

*Death Specification One to Count One.*  If you find the Defendant guilty of complicity to commit aggravated murder in Count One, it is your duty to deliberate further and decide an additional factual question (which we call a specification); that is, whether the State has proved beyond a reasonable doubt that the Defendant is guilty of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design.

If you find the Defendant not guilty of aggravated murder, you will not consider or decide this separate question.

"Prior calculation and design" has been previously defined for you.

*While.*  "While committing or attempting to commit" or "while fleeing immediately after committing or attempting to commit" means that the death must occur as part of acts leading up to, or occurring during, or immediately subsequent to aggravated burglary or aggravated robbery and that the death was directly associated with the aggravated burglary or aggravated robbery.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290

10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1155

If you find that the State proved beyond a reasonable doubt all the essential elements of the specification, then your verdict must be guilty. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then your verdict must be not guilty.

Your finding or verdict on this additional question will be expressed by a separate verdict of guilty or not guilty on this separate question. As with all matters in a criminal case, guilt on this additional question must be proved beyond a reasonable doubt.

The form you will receive on this additional question reads as follows:

VERDICT ON SPECIFICATION—OHIO REV. CODE ANN. §2929.04

"We, the jury, find that the Defendant is* ____ of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design."

*Insert in ink: Not Guilty or Guilty Beyond a Reasonable Doubt.

*Death Specification Two to Count One.* If you find the Defendant guilty of complicity to commit aggravated murder as charged in Count One, it is your duty to deliberate further and decide an additional factual question (which, again, we call a specification); that is, whether the State has proved beyond a reasonable doubt that the Defendant is guilty of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit

JOHN B. JUHANZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

11

aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design.

If you find the Defendant not guilty of aggravated murder, you will not consider or decide this separate question.

The terms "prior calculation and design", "while committing or attempting to commit" and "while fleeing immediately after committing or attempting to commit" have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of the specification, then your verdict must be guilty. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then your verdict must be not guilty.

Your finding or verdict on this additional question will be expressed by a separate verdict of guilty or not guilty on this separate question. As with all matters in a criminal case, guilt on this additional question must be proved beyond a reasonable doubt.

The form you will receive on this additional question reads as follows:

VERDICT ON SPECIFICATION—OHIO REV. CODE ANN. §2929.04

"We, the jury, find that the Defendant is* ____ of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design."

*Insert in ink: Not Guilty or Guilty Beyond a Reasonable Doubt.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

12

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1157

*Count Two. Complicity to Commit Aggravated Felony Murder.* The Defendant is charged in Count Two with complicity to commit aggravated murder. Aggravated murder for purposes of this Count is purposely causing the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated burglary or aggravated robbery.

Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001 and in Trumbull County, Ohio, the Defendant purposely aided and abetted Nathaniel E. Jackson in causing the death of Robert Fingerhut while the said Nathaniel E. Jackson was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary or aggravated robbery.

"Purposely" has been previously defined for you. The offenses of aggravated burglary and aggravated robbery will be defined for you shortly.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of complicity to commit aggravated murder as charged in Count Two, then your verdict must be guilty. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of complicity to commit aggravated murder, then your verdict must be not guilty.

*Death Specification One to Count Two.* If you find the Defendant guilty of complicity to commit aggravated murder as charged in Count Two, it is your duty to deliberate further and decide an additional factual question (a specification); that is, whether the State has proved beyond a reasonable

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

13

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1158

doubt that the Defendant is guilty of committing the offense while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design.

If you find the Defendant not guilty of aggravated murder, you will not consider or decide this separate question.

"Prior calculation and design" and the phrases "while committing or attempting to commit" and "while fleeing immediately after committing or attempting to commit" have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of the specification, then your verdict must be guilty.  If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then your verdict must be not guilty.

Your finding or verdict on this additional question will be expressed by a separate verdict of guilty or not guilty on this separate question.  As with all matters in a criminal case, guilt on this additional question must be proved beyond a reasonable doubt.

The form you will receive on this additional question reads as follows:

VERDICT ON SPECIFICATION—OHIO REV. CODE ANN. §2929.04

"We, the jury, find that the Defendant is* ____ of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1159

aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design."

*Insert in ink: Not Guilty or Guilty Beyond a Reasonable Doubt.

*Death Specification Two to Count Two.* If you find the Defendant guilty of complicity to commit aggravated murder as charged in Count Two, it is your duty to deliberate further and decide an additional factual question (a specification); that is, whether the State has proved beyond a reasonable doubt that the Defendant is guilty of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design.

If you find the Defendant not guilty of aggravated murder, you will not consider or decide this separate question.

The terms "prior calculation and design", "while committing or attempting to commit" and "while fleeing immediately after committing or attempting to commit" have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of the specification, then your verdict must be guilty. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then your verdict must be not guilty.

Your finding or verdict on this additional question will be expressed by a separate verdict of guilty or not guilty on this separate question. As with

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290

15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1160

all matters in a criminal case, guilt on this additional question must be proved beyond a reasonable doubt.

The form you will receive on this additional question reads as follows:

VERDICT ON SPECIFICATION—OHIO REV. CODE ANN. §2929.04

"We, the jury, find that the Defendant is* ____ of committing the offense of aggravated murder while she was committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design."

*Insert in ink: Not Guilty or Guilty Beyond a Reasonable Doubt.

*Count Three. Aggravated Burglary.* The Defendant is charged in Count Three with complicity to commit aggravated burglary. Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the Defendant, knowingly aided or abetted Nathaniel E. Jackson in trespassing in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the Defendant is present, with the purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, and that Nathaniel E. Jackson did inflict, or attempt or threaten to inflict, physical harm on Robert S. Fingerhut, and that Nathaniel E. Jackson had a deadly weapon on or about the his person or under his control.

*Force.* "Force" means any violence, compulsion or constraint exerted or used by any means upon or against a person or thing, to gain entrance.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

16

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1161

*Stealth.* "Stealth" means any secret, sly or clandestine act, to gain entrance.

*Deception.* "Deception" means knowingly deceiving or causing another to be deceived by any false or misleading representation or by any other conduct, act, or omission which creates, confirms or perpetuates a false impression in another, to gain entrance.

*Trespass.* "Trespass" means any entrance or remaining in, knowingly done, in a residence of another if it is without authority, consent or privilege to do so. Absence of a privilege to be in or upon the premises of another is an essential element of trespass. Where a Defendant lawfully entered a residential premises, the privilege to be in or upon this premises can be inferred to have been revoked where the Defendant thereafter commits a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege. Where one enters upon the property of another as an invitee or licensee, that person loses his status as an invitee or licensee and becomes a trespasser when it becomes evident that the purpose of such entry is to commit a criminal offense against the owner

*Knowingly.* A person acts knowingly, regardless of her purpose, when she is aware that her conduct will probably cause a certain result or she is aware that her conduct will probably be of a certain nature. A person has knowledge of circumstances when she is aware that such circumstances probably exist. Knowingly means that a person is aware of the existence of the facts and that her acts will probably cause a certain result or be of a certain nature. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2908 · Facsimile 330.758.8290

17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1162

determine from these facts and circumstances whether there existed at the time in the mind of the Defendant an awareness of the probability that she was aiding or abetting Nathaniel E. Jackson in trespassing in an occupied structure, or a separately secured or separately occupied portion thereof, by force, stealth, or deception, and that Nathaniel E. Jackson had a deadly weapon on or about his person or under his control, and that Nathaniel E. Jackson and that Nathaniel E. Jackson did inflict, or attempt or threaten to inflict, physical harm on Robert S. Fingerhut

"Purpose" has been previously defined for you.

*Attempt.* "Attempt" means that with sufficient culpability for the commission of an offense, engaging in conduct that, if successful, would constitute or result in the offense.

*Physical Harm to Persons.* "Physical harm to persons" means any injury, illness or other physiological impairment regardless of its gravity or duration.

*Occupied Structure.* "Occupied structure" means any house, building, or other structure which is maintained as a permanent or temporary dwelling, regardless of who owns it.

*Criminal Offense.* For purposes of this case aggravated murder, which has been defined for you, and aggravated robbery, which is defined below, are criminal offenses.

*Deadly Weapon.* "Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon.

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2308 · Facsimile 330.758.8290

18

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1163

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of complicity to commit aggravated burglary, your verdict must be guilty.  If you find that the state failed to prove beyond a reasonable doubt any one of the essential elements of the offense of complicity to commit aggravated burglary, then your verdict must be not guilty.

*Firearm Specification.*  Only if your verdict on Count Three is guilty will you then separately decide whether the Defendant had a firearm on or about her person or under her control while committing the offense of aggravated burglary and displayed the firearm, brandished the firearm, indicated that she possessed the firearm, or used it to facilitate the offense.

"Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm and any firearm which is inoperable, but which can be readily rendered operable.

When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you may rely on circumstantial evidence, including but not limited to the statements and actions of the individual exercising control over the firearm.

"Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon.

"On or about the Defendant's person or under the Defendant's control" means that the firearm was on the Defendant's person or so near the

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.2908 · Facsimile 330.758.8290

19

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1164

Defendant as to be conveniently accessible and within the Defendant's immediate physical reach.

If you find that the State proved beyond a reasonable doubt all the essential elements of the specification, then your verdict must be a finding that the Defendant "did" have a firearm on or about her person or under her control while committing aggravated burglary. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then your verdict must be that the Defendant "did not" have a firearm on or about her person or under her control while committing aggravated burglary. As with all matters in a criminal case, guilt on this additional question must be proved beyond a reasonable doubt.

Your finding or verdict on this additional question will be expressed by a separate verdict. After you reach a decision on the firearm specification, you shall complete the verdict from for the specification, which reads:

"We, the jury, further find that the Defendant (*) ____ have a firearm on or about her person or under her control while committing aggravated burglary."

(*) Insert in ink: "did" or "did not."

*Count Four. Aggravated Robbery.* The Defendant is charged in Count Four with complicity to commit aggravated robbery. Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001 and in Trumbull County, Ohio, the Defendant knowingly aided or abetted Nathaniel E. Jackson in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, when said Nathaniel E. Jackson had a deadly weapon on or about his person or

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

20

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1165

under his control and either displayed the weapon, brandished it, indicated that he possessed it, or used it.

"Attempt" has been previously defined for you.  The act of having the deadly weapon on or about his person or under his control must occur as part of the sequence of acts leading up to, occurring during or immediately subsequent to the theft.

"Deadly weapon" has been previously defined for you.

"Theft" or "theft offense" means knowingly obtaining or exerting control over either the property or services with a purpose to deprive the owner of property or services, either without the consent of the owner or person authorized to give consent; or beyond the scope of the express or implied consent of the owner or person authorized to give consent; or by deception, threat, or intimidation.

"Deprive" means to withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or to dispose of property so as to make it unlikely that the owner will recover it.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of complicity to commit aggravated robbery, your verdict must be guilty.  If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of complicity to commit aggravated robbery, then your verdict must be not guilty.

*Firearm Specification.*  Only if your verdict on Count Four is guilty will you then separately decide whether the Defendant had a firearm on or about her person or under her control while committing the offense of aggravated

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1166

robbery and displayed the firearm, brandished the firearm, indicated that she possessed the firearm, or used it to facilitate the offense.

"Firearm", "deadly weapon" and the phrase "on or about the Defendant's person or under the Defendant's control" have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of the specification, then your verdict must be a finding that the Defendant "did" have a firearm on or about her person or under her control while committing aggravated robbery. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then your verdict must be that the Defendant "did not" have a firearm on or about her person or under her control while committing aggravated robbery. As with all matters in a criminal case, guilt on this additional question must be proved beyond a reasonable doubt.

Your finding or verdict on this additional question will be expressed by a separate verdict. After you reach a decision on the firearm specification, you shall complete the verdict from for the specification, which reads:

"We, the jury, further find that the Defendant (*) _____ have a firearm on or about her person or under her control while committing aggravated robbery."

(*) Insert in ink: "did" or "did not."

*Duty to Deliberate Separately on Counts and Specifications.* The charges and specifications set forth in each count in the indictment constitute a separate and distinct matter. You must consider the count and the specification and the evidence applicable to each separately.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290

22

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1167

You will have with you in the jury room the following forms of verdicts. (Read and explain.)

When you have reached a verdict you will complete the forms which correspond to your decision and sign the verdicts in ink.

You may not discuss or consider the subject of punishment. Your duty is confined to the determination of the guilt or innocence of the Defendant and to the determination of the specifications submitted to you.

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdict accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy or prejudice, so that the state of Ohio and the Defendant will feel that their case was fairly and impartially tried. If, during the course of the trial, the Court said or did anything that you consider an indication of the Court's view on the facts, you are instructed to disregard it.

It may be difficult to remember all the instructions that I have given you. To assist you, you will have a copy of these instructions with you in the jury room.

If during deliberations you have a question, the foreperson must put your question in writing, indicating specifically what is requested. Such communication must be delivered to the bailiff.

Your initial conduct upon entering the jury room is a matter of importance. It is not wise immediately to express a determination to insist

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

23

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1168

upon a certain verdict because if your sense of pride is aroused you may hesitate to change your position even if you later decide you are wrong. Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors. Do not hesitate to change an opinion if convinced that it is wrong. However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other jurors.

From this time on, you will be in the charge of the bailiff. You will follow her instructions in every regard. If you want to communicate with the Court, you should do so in writing. You must be careful in the choice of language used in the question, so that you do not disclose the status of your deliberations and so that any question is clear and unambiguous. These requests must be submitted in writing and signed by the foreman or forelady.

During all of the breaks in your deliberations, you will follow the instructions of the bailiff, but do not discuss the case with her or even among yourselves during the breaks. If, for example, you are at lunch or dinner, do not use those occasions for deliberations.

The Court will place in your possession the exhibits and the verdict forms. You will also have with you in the jury room a VCR, a TV, and a cassette player. The foreman or forelady will retain possession of these records, including the verdicts, and return them to the courtroom. The foreman or forelady will see that your discussions are orderly and that each juror has the opportunity to discuss the case and to cast his or her vote;

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

24

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1169

otherwise, the authority of the foreman or forelady is the same as any other juror.  Until your verdict is announced in open Court, you are not to disclose to anyone else the status of your deliberations or the nature of your verdict.

After you retire, select a foreman or forelady and whenever all twelve—I repeat, all twelve—jurors agree upon verdicts, you will sign the verdicts in ink and advise the bailiff.  You will then be returned to the courtroom.

Are all the jurors prepared to deliberate?

It is required that I confer briefly with counsel at this time.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290

25

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1170

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 01-CR-793 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JUDGE JOHN M. STUARD** |
| -vs- | ) | |
| | ) | |
| DONNA MARIE ROBERTS, | ) | **JURY CHARGE** |
| | ) | |
| Defendant. | ) | |

## CHARGE OF THE COURT

Members of the Jury:  You have heard the evidence and the arguments of counsel.  The Court and the jury have separate functions:  you decide the disputed facts and the court provides the instructions of law.  It is your sworn duty to accept these instructions and to apply the law as it is given to you.  You are not permitted to change the law, nor to apply your own conception of what you think the law should be.  Similarly, the Court may not interfere in any way with your function as jurors.

A criminal case begins with the filing of an indictment.  The indictment informs the Defendant that she has been charged with an offense.  The fact that it was filed may not be considered for any other purpose.  The plea of not guilty is a denial of the charges and specifications and puts in issue all of the essential elements of each charge and specification.

The Defendant is presumed innocent unless her guilt is established beyond a reasonable doubt. The Defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of that offense and specification charged in the indictment.

1

Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say that you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

You must determine the issues in this case from the evidence. Evidence is all the testimony received from the witnesses, the exhibits admitted during the trial, and any facts agreed to by counsel.

Evidence may be direct or circumstantial, or both. Direct evidence is the testimony given by a witness who has seen or heard the facts to which he or she testifies. It includes exhibits admitted during the trial.

Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experience of mankind.

To infer, or to make an inference, is to reach a reasonable conclusion or deduction of fact which you may, but are not required to make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you. Direct and circumstantial evidence are of equal weight or probative value.

The evidence does not include the indictment or the opening statements or closing arguments of counsel. The opening statements and closing arguments of counsel are designed

2

to assist you.  They are not evidence.

Exhibits.  A number of exhibits and the testimony related to them have been introduced. You may consider whether the exhibits are the same objects and in the same condition as originally taken by the law enforcement officers.  You will determine what weight, if any, the exhibits should receive in the light of all the evidence.

Videotape and audiotape recordings and testimony relating to them have been introduced into evidence.  You shall consider whether the videotape and/or audiotape is a true record of what transpired at the time it was taken.  If you find that it is, you will then determine what weight, if any, the videotape and/or audiotape should receive in light of all the evidence.

Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them.  You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been.  You must not draw any inference or speculate upon the truth of any suggestion included in a question that was not answered.

You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence.  To weigh the evidence, you must consider the credibility of the witnesses.  You will apply the tests of truthfulness which you apply in your daily lives.  These tests include: the appearance of each witness upon the stand; his or her manner of testifying; the reasonableness of his or her testimony; the opportunity he or she had to see, hear, and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence; interest and bias, if any; together with all the facts and circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem

3

proper.

You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

Generally, a witness may not express an opinion. However, one who follows a profession or special line of work may express his or her opinion because of his or her education, knowledge and experience. Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict.

As with other witnesses, upon you alone rests the duty to decide what weight is to be given to the testimony of the experts. In determining its weight, you may take into consideration his or her skill, experience, knowledge, veracity, familiarity with the facts of the case, and the usual rules for testing credibility and determining the weight to be given to testimony.

It is not necessary that the Defendant take the witness stand in her own defense. She has a constitutional right not to testify. The fact that the Defendant did not testify must not be considered for any purpose.

The right of the Court to try the Defendant depends on proof that the offense was committed in Trumbull County, Ohio. This is called venue. Venue is an essential element of the offenses charged in the indictment, and as with other elements, must be proven by the State beyond a reasonable doubt.

Now, getting to the indictment itself, the Defendant is charged with a total of four (4) counts and six (6) specifications, as follows: **COUNT ONE: COMPLICITY TO**

4

**AGGRAVATED MURDER** with two specifications; **COUNT TWO: COMPLICITY TO AGGRAVATED MURDER** with two specifications; **COUNT THREE: COMPLICITY TO AGGRAVATED BURGLARY** with one specification; and **COUNT FOUR: COMPLICITY TO AGGRAVATED ROBBERY** with one specification.

Although the counts are numbered in chronological order, I feel that it would make more sense to instruct you on the **COMPLICITY TO AGGRAVATED BURGLARY** and **COMPLICITY TO AGGRAVATED ROBBERY** counts before I instruct you on the **COMPLICITY TO AGGRAVATED MURDER** counts as some of the same terms that I am going to define for you relative to those charges will also be used in the **COMPLICITY TO AGGRAVATED MURDER** instructions.

In Count Three of the Indictment, the Defendant has been charged with **COMPLICITY TO AGGRAVATED BURGLARY**. Before you can find the defendant guilty, you must find beyond a reasonable doubt, that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the defendant purposely solicited, procured, aided and/or abetted NATHANIEL JACKSON to commit the offense of AGGRAVATED BURGLARY. AGGRAVATED BURGLARY is the trespass by force, stealth or deception in an occupied structure or a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the defendant was present in that structure or separately secured or separately occupied portion of the occupied structure and with purpose to commit any criminal offense and that at the time, the accomplice did inflict or attempted or threatened to inflict serious physical harm on another and/or the accomplice had a deadly weapon on or about his person or under his control, to-wit: a firearm.

5

I will now define some terms for you.

**COMPLICITY**.  The Defendant is charged with complicity to commit all of the indicted offenses.  "Complicity" means acting with the kind of culpability required for the commission of an offense, soliciting or procuring another to commit the offense; or aiding or abetting another in committing the offense. Mere association with the person or persons who committed an offense are not enough to convict the Defendant of complicity.  To be a Complicitor, one must solicit, procure, aid and/or abet another in accomplishing a common goal or purpose.  To be a complicitor, one must both be aware of and must consent to that common goal or purpose.

Before you can convict the Defendant as a complicitor it must be proven beyond the existence of any reasonable doubt that she sought, asked, influenced, invited, tempted, led on, brought pressure to bear, got, obtained, induced, brought about, motivated, supported, assisted, encouraged, cooperated with, advised, or incited Nathaniel Jackson to commit the offenses charged in this indictment. Even approval or acquiescence, without either the expression of agreement or doing some act which in some way contributes to the commission of the crimes is not aiding and abetting.  The Defendant must take some role before the offense to cause the commission of the offense.

The State may demonstrate that the Defendant is guilty of complicity by direct or circumstantial evidence, or both.  Although criminal intent may be inferred from presence, companionship, and conduct before and after an offense is committed, you may not infer that the Defendant is guilty of complicity of an offense merely from the fact that you find that she was an accessory after the fact.  A complicitor to aggravated murder must assist the principal before the offense with the "purpose" of causing death, and must intend to aid, abet, solicit, procure, or

6

cause the principal to commit the offense.  In other words, an intent to kill is insufficient; there must also be an intent to assist the principal offender to kill.

Thus, before you can convict the Defendant, DONNA M. ROBERTS, of the offense of complicity to commit an offense, you must find beyond a reasonable doubt that she in some way solicited, procured, aided or abetted NATHANIEL E. JACKSON by taking some role in causing the commission of the offenses of aggravated murder, aggravated burglary, and aggravated robbery.

**CONVICTION OF PRINCIPAL IS NO DEFENSE.**  It is not a defense to a charge of complicity that Nathaniel E. Jackson either has or has not been convicted as a principal offender.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of complicity to commit aggravated murder, then your verdict must be guilty.  If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of complicity to commit aggravated murder, then your verdict must be not guilty.

**SOLICITED.** "Solicit" means to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear.

**PROCURED.** "Procure" means to get, obtain, induce, bring about, motivate.

**AIDED OR ABETTED.** "Aided or abetted" means supported, assisted, encouraged, cooperated with, advised, or incited.

**FORCE.** "Force" means any violence, compulsion or constraint used by any means upon or against a person or thing to gain entrance.

**STEALTH.** "Stealth" means a secret, sly, or clandestine act to gain entrance.

**DECEPTION.** "Deception" means knowingly deceiving or causing another to be

7

deceived by any false or misleading representation or by any other conduct, act, or omission which creates, confirms or perpetuates a false impression in another, to gain entrance.

**TRESPASS.** "Trespass" means knowingly entering the land or premises of another without privilege to do so. Any entrance or remaining in knowingly made in a structure of another that is unlawful if it is without the authority, consent or privilege to do so.

Where a Defendant lawfully entered a residential premises, the privilege to be in or upon this premises can be inferred to have been revoked where the Defendant thereafter commits a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege.

Where one enters upon the property of another as an invitee or licensee, that person loses his status as an invitee or licensee and becomes a trespasser when it becomes evident that the purpose of such entry is to commit a criminal offense against another.

**OCCUPIED STRUCTURE.** "Occupied structure" means any house, building, or other structure which is maintained as a permanent or temporary dwelling, regardless of who owns it.

**PURPOSE.** A person acts "purposely" when it is his specific intention to cause a certain result. It must be established in this case that at all times in question, there was present in the mind of the Defendant a specific intention to cause a certain result.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to herself, unless she expresses it to others or indicates it by her conduct.

The purpose with which a person does an act is determined from the manner in which it

8

is done, the means and weapons used and all the other facts and circumstances in evidence.

Proof of motive is not required. The presence or absence of motive is one of the circumstances bearing upon purpose.

**CRIMINAL OFFENSE.** For purposes of this case **COMPLICITY TO AGGRAVATED MURDER** and **COMPLICITY TO AGGRAVATED ROBBERY,** which are defined below, are criminal offenses.

**PHYSICAL HARM TO PERSONS.** "Physical harm to persons" means any injury, illness or other physiological impairment regardless of its gravity or duration.

**DEADLY WEAPON.** "Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **COMPLICITY TO AGGRAVATED BURGLARY,** your verdict must be guilty of **COMPLICITY TO AGGRAVATED BURGLARY.**

If you find that the State failed to prove any one of the essential elements of the offense of **COMPLICITY TO AGGRAVATED BURGLARY,** your verdict must be not guilty.

Now, if you find the Defendant guilty of Count Three of **COMPLICITY TO AGGRAVATED BURGLARY** it is your duty to deliberate further and decide one specification attached to Count Three. You will proceed to consider whether the specification has been proven beyond a reasonable doubt if, and only if, you determine that the Defendant is guilty of **COMPLICITY TO AGGRAVATED BURGLARY.** If your verdict is not guilty, then you would not consider the specification. If your verdict is guilty, the Defendant may be found guilty

9

or not guilty of the specification.

The specification is that co-defendant, Nathaniel E. Jackson did at the time of the commission of the offense have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, or used it to facilitate the offense.

**FIREARM.** "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. Firearm includes an unloaded firearm and any firearm which is inoperable, but which can be readily rendered operable.

**CAPABLE OF EXPELLING OR PROPELLING.** When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you may rely on circumstantial evidence, including but not limited to the statements and actions of the individual exercising control over the firearm.

**ON OR ABOUT HIS/HER PERSON OR UNDER HIS/HER CONTROL.** On or about the defendant's or accomplice's person or under the defendant's or accomplice's control means that the firearm was on the defendant's or accomplice's person or so near the defendant or accomplice as to be conveniently accessible and within the defendant's or accomplice's immediate physical reach.

Thus, if, as to this specification, you find that the State proved beyond a reasonable doubt all the essential elements of the specification, your verdict must be guilty of that specification.

If, as to this specification, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then you must find the defendant not guilty of that specification.

In Count Four of the Indictment, the Defendant is charged with **COMPLICITY TO**

10

AGGRAVATED ROBBERY.

Before you can find the Defendant guilty of **COMPLICITY TO AGGRAVATED ROBBERY**, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the Defendant, purposely solicited, procured, aided or abetted NATHANIEL JACKSON to commit the offense of AGGRAVATED ROBBERY. AGGRAVATED ROBBERY is attempting or committing a theft offense, and having a deadly weapon on or about his person or under his control and either brandished it or used it, or that the Defendant inflicted serious physical harm on others.

I will now define some terms for you.

**SOLICITED.** "Solicited" has previously been defined for you.

**PROCURED.** "Procured" has previously been defined for you.

**AIDED.** "Aided" has previously been defined for you.

**ABETTED.** "Abetted" has previously been defined for you.

**PURPOSELY.** "Purposely" has previously been defined for you.

**ATTEMPT.** An "attempt" is when one purposely does anything which is an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose.

**WHILE COMMITTING OR ATTEMPTING TO COMMIT.** "While committing or attempting to commit" means that the theft must occur as part of acts leading up to, or occurring during, or immediately subsequent to the offense set out in this charge and that the theft was directly associated with the offense set out in this charge.

11

**THEFT OFFENSE**.  A "theft offense" occurs when a person, with purpose to deprive the owner or property, knowingly obtains or exerts control over the property without the consent of the owner.

**DEPRIVE.** "Deprive" means to withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or to dispose of property so as to make it unlikely that the owner will recover it.

**KNOWINGLY.**  A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or that he is aware that his conduct will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist.

Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.  You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant the intent to obtain or exert control over the property.

**OWNER.**  "Owner" means any person, other than the actor, who is the owner of, or who has possession or control of, or any license or interest in property or services, even if such ownership, possession, control, license, or interest is unlawful.

**DEADLY WEAPON**.  "Deadly weapon" has been previously defined for you.

**SERIOUS PHYSICAL HARM TO PERSONS**.  "Serious physical harm to persons" means any of the following: (1) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;  (2) Any physical harm that carries a substantial risk of death; (3) Any physical harm that involves some permanent incapacity, whether

12

partial or total, or that involves some temporary, substantial incapacity; (4) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (5) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain; or (6) Death.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **COMPLICITY TO AGGRAVATED ROBBERY**, your verdict must be guilty of **COMPLICITY TO AGGRAVATED ROBBERY**.

If you find that the State failed to prove any one of the essential elements of the offense of **COMPLICITY TO AGGRAVATED ROBBERY**, your verdict must be not guilty.

Now, if you find the Defendant guilty of Count Four of **COMPLICITY TO AGGRAVATED ROBBERY,** it is your duty to deliberate further and decide one specification attached to Count Four. You will proceed to consider whether the specification has been proven beyond a reasonable doubt if, and only if, you determine that the Defendant is guilty of **COMPLICITY TO AGGRAVATED ROBBERY**. If your verdict is not guilty, then you would not consider the specification. If your verdict is guilty, the Defendant may be found guilty or not guilty of the specification.

The specification is that co-defendant, Nathaniel E. Jackson did at the time of the commission of the offense have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, or used it to facilitate the offense.

All relevant terms have been previously defined for you.

Thus, if, as to this specification, you find that the State proved beyond a reasonable doubt all the essential elements of the specification, your verdict must be guilty of that specification.

13

If, as to this specification, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then you must find the defendant not guilty of that specification.

In Count One of the Indictment, the Defendant is charged with **COMPLICITY TO AGGRAVATED MURDER**. With respect to this Count, **COMPLICITY TO AGGRAVATED MURDER** is purposely soliciting, procuring, aiding and/or abetting another to cause the death of another with prior calculation and design.

Before you can find the Defendant guilty of **COMPLICITY TO AGGRAVATED MURDER** in this Count, you must find beyond a reasonable doubt that on or about the 11th day of December 2001, and in Trumbull County, Ohio, the Defendant purposely solicited, procured, aided and/or abetted, another to cause the death of Robert S. Fingerhut with prior calculation and design.

I will now define some terms for you.

**SOLICITED.** "Solicited" has previously been defined for you.

**PROCURED.** "Procured" has previously been defined for you.

**AIDED.** "Aided" has previously been defined for you.

**ABETTED.** "Abetted" has previously been defined for you.

**PURPOSE.** "Purpose" has been previously defined for you.

In addition, if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause death may be inferred from the use of the weapon.

**SPECIFIC INTENT.** No person shall be convicted of Aggravated Murder unless she

14

is specifically found to have intended to cause the death of another.

**PRIOR CALCULATION AND DESIGN**. "Prior calculation and design" means that the purpose to cause death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means with which to cause the death of another.

To be prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

**CAUSE**. The State charges that the act of the Defendant caused the death of Robert S. Fingerhut. Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the death, and without which it would not have occurred.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **COMPLICITY TO AGGRAVATED MURDER** as charged in this count of the indictment, your verdict must be guilty as to that count.

If you find that the State failed to prove beyond a reasonable doubt any of the essential elements of the offense of **COMPLICITY TO AGGRAVATED MURDER** as charged in Count One of the Indictment, your verdict must be not guilty of that offense.

If you find the Defendant not guilty of **COMPLICITY TO AGGRAVATED MURDER**

15

as charged in this count, you will not consider any specifications relative to this count.

Now, if you find the Defendant guilty of **COMPLICITY TO AGGRAVATED MURDER** as charged in this count, it is your duty to deliberate further and to decide additional factual questions which we call specifications relative to this count. This count sets forth two (2) specifications. You will proceed to consider whether each specification to this count has been proven beyond a reasonable doubt if, and only if, you determine that the defendant is guilty of this count. If your verdict is not guilty as to this count, then you would not consider any of the specifications attached to this count. If your verdict is guilty as to this count, the Defendant may be found guilty or not guilty of any one or all of the specifications to that count.

Specification 1 to Count 1 charges that the defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 1 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

16

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

Specification 2 to Count 1 charges that the Defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

In Count Two of the Indictment, the Defendant is charged with **COMPLICITY TO AGGRAVATED MURDER**.  With respect to this Count, **AGGRAVATED MURDER** is

17

purposely soliciting, procuring, aiding and/or abetting an accomplice in causing the death of another while the accomplice was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and/or Aggravated Burglary.

Before you can find the Defendant guilty of **COMPLICITY TO AGGRAVATED MURDER** in this Count, you must find beyond a reasonable doubt that on or about the 11th day of December 2001, and in Trumbull County, Ohio, the Defendant purposely solicited, procured, aided and/or abetted another in causing the death of Robert S. Fingerhut while the accomplice was committing, attempting to commit, or fleeing immediately after committing or attempting to commit  Aggravated Robbery and/or Aggravated Burglary.

All of the relevant terms have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **COMPLICITY TO AGGRAVATED MURDER** as charged in this count of the indictment, your verdict must be guilty as to that count.

If you find Defendant not guilty of **COMPLICITY TO AGGRAVATED MURDER** as charged in this count or you are unable to reach a verdict as to this count, you will not consider any specifications relative to this count.

Specification 1 to Count 2 charges that the defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

18

Before you can find the Defendant guilty of Specification 1 to Count 2, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant solicited, procured, aided and/or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Specification 2 to Count 2 charges that the Defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 2, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** as a complicitor and that the **AGGRAVATED MURDER** was committed while the accomplice was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the defendant solicited, procured, aided or abetted the accomplice to the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

19

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

The specifications set forth in the indictment each constitute a separate and distinct matter. You must consider each count and each specification and the evidence applicable to each count and each specification separately and you must state your finding as to each count and each specification uninfluenced by your verdict as to any other count or specification, except that, should you find the Defendant not guilty of a particular count, you will not consider the specification or specifications to that count. The Defendant may be found guilty or not guilty of any of the offenses or any of the specifications.

ALTERNATES. Alternate jurors were selected to serve on this jury panel. It will be necessary for all of the alternate jurors to remain until this jury has returned its verdict in open court. You will be conducted to the office of the jury commissioner and will remain under the direction of the bailiff until this jury has reached its verdict. You are not to discuss this case with anyone or each other or tell anyone how you would have voted until after this jury has returned its verdict.

You may not discuss or consider the subject of punishment. Your duty is confined to the determination of whether the defendant is guilty or not guilty of the counts and the specifications.

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdicts accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy, or prejudice, so that both the State

20

of Ohio and DONNA MARIE ROBERTS will feel that their case was fairly and impartially tried. If, during the course of the trial, the Court said or did anything that you consider an indication of the Court's view on the facts, you are instructed to disregard it.

It may be difficult to remember all the instructions that I have given you. To assist you, you will have a copy of these instructions with you in the jury room.

If during your deliberations you have a question it should be discussed in the privacy of your jury room. It should not reflect the status of your deliberations. It should be reduced to writing so that there will be no misunderstanding as to what you request. It should then be delivered to the bailiff who will submit it to the court.

Your initial conduct upon entering the jury room is a matter of importance. It is not wise to immediately express a determination or to insist upon a certain verdict because if your sense of pride is aroused, you may hesitate to change your position even if you later decide you were wrong. Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors. Do not hesitate to change an opinion if convinced it is wrong. However, you should not surrender an honest conviction in order to be congenial or to reach a verdict solely because of the opinion of other jurors.

You will have with you in the jury room ten (10) verdict forms. I will now read the forms to you.

<u>READ VERDICT FORMS</u>

From this time on, you will be in the charge of the bailiff. You will follow her instructions

21

in every regard. If you desire to communicate with the Court, you should do so in writing and only after careful consideration of the language used so that the same does not unnecessarily disclose the status of your deliberations and making sure that any inquiry is clear and unambiguous. These requests should be submitted in writing and signed by the foreman or forelady.

During all of the breaks in your deliberations, you will follow the instructions of the bailiff, but do not discuss the case with her or even yourselves during the breaks. If, for example, you are at lunch or dinner, do not use those occasions for deliberations.

The court will place in your possession the exhibits and the verdict forms. You will also have with you in the jury room a VCR, a TV, and a cassette player. The foreman or forelady will retain possession of these records, including the verdicts, and return them to the courtroom. The foreman or forelady will see that your discussions are orderly and that each juror has the opportunity to discuss the case and to cast his or her vote; otherwise, the authority of the foreman or forelady is the same as any other juror. Until your verdict is announced in open court, you are not to disclose to anyone else the status of your deliberations or the nature of your verdict.

After you retire, select a foreman or forelady and whenever all twelve - I repeat, all twelve - jurors agree upon verdicts, you will sign the verdicts in ink and advise the bailiff. You will then be returned to the courtroom.

Are all the jurors prepared to deliberate?

Does counsel desire anything further at this time?

22

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,

     Plaintiff

*vs.*

DONNA M. ROBERTS,

     Defendant

Case No.  01 CR 793

Judge John M. Stuard
Courtroom 2

---

### JURY VERDICT
### COUNT ONE-COMPLICITY TO AGGRAVATED MURDER
### (PRIOR CALCULATION AND DESIGN)

---

We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

_Guilty Beyond a Reasonable Doubt_ * on Count One, Complicity to Commit Aggravated Murder, in the manner and form she stands charged in the indictment.
* Insert in ink either "Not Guilty" or "Guilty Beyond a Reasonable Doubt"

1. _Thelma Rankin_

2. _Margaret C Zellman_

3. _Victor V Zebulsky_

4. _Todd Alan Davidson_

5. _Ujhman Sng_

6. _Amy Bailott_

7. _Carol K Selak_

8. _Sandra Shatz_

9. _Janet Kitzler_

10. _Marsha Paradise_

11. _Gary Phillips_

12. _Margaret L Kay_

Date: _5-28-03_

VOL 1002 PAGE 761

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1193

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,

      Plaintiff

*vs.*

DONNA M. ROBERTS,

      Defendant

Case No.  01 CR 793

Judge John M. Stuard
Courtroom 2

---

## JURY VERDICT
### COUNT ONE—VERDICT ON SPECIFICATION ONE
#### OHIO REV. CODE ANN. §2929.04

---

      We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

*Guilty Beyond a Reasonable Doubt* of complicity in committing the offense of aggravated murder while she was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design in the manner and form she stands charged in the indictment.

      *Insert in ink either: "Not Guilty" or "Guilty Beyond a Reasonable Doubt."*

1. *Margaret E Dillow*
2. *Victor V Jabulsky*
3. *Todd Alan Douglas*
4. *Wyman Gray*
5. *Amy Bartlett*
6. *Carol K Files*
7. *Sandra A Lintz*
8. *Jane Cloth*
9. *Martha V Nivadic*
10. *Thelma Runyon*
11. *Gary Philcox*
12. *Margaret Z Kay*

Date:  *5-20-03*

vol 1003 page 762

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA M. ROBERTS,

    Defendant

Case No.  01 CR 793

Judge John M. Stuard
Courtroom 2

---

## JURY VERDICT
### COUNT ONE—VERDICT ON SPECIFICATION TWO
#### OHIO REV. CODE ANN. §2929.04

---

We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

_Guilty Beyond a Reasonable Doubt_ of complicity in committing the offense of aggravated murder while she was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design in the manner and form she stands charged in the indictment.

    *Insert in ink either: "Not Guilty" or "Guilty Beyond a Reasonable Doubt."

1. _Joseph Clother_

2. _____

3. _Thelma Rankin_

4. _Margaret Fellows_

5. _Victor Sabulsky_

6. _Todd Alan Sawdey_

7. _Tishman May_

8. _Amy Bartlett_

9. _Carol K. Selee_

10. _Sandi H. Lintz_

11. _Gary Phillips_

12. _Margaret L. Kay_

Date: _5-28-03_  VOL 1002 PAGE 763

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA M. ROBERTS,

    Defendant

Case No.  01 CR 793

Judge John M. Stuard
Courtroom 2

---

### JURY VERDICT
### COUNT TWO-COMPLICITY TO AGGRAVATED MURDER
### (FELONY MURDER)

---

We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

*Guilty Beyond a Reasonable Doubt* * on Count Two, Complicity to Commit Aggravated Murder, in the manner and form she stands charged in the indictment.

\* Insert in ink either "Not Guilty" or "Guilty Beyond a Reasonable Doubt"

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

11. _____

12. _____

Date: _____5-28-03_____

VOL 1002 PAGE 764

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
                                        )    Case No.  01 CR 793
    Plaintiff                   )
                                        )    Judge John M. Stuard
*vs.*                                   )    Courtroom 2
                                        )
                                        )
DONNA M. ROBERTS,                       )
                                        )
    Defendant                   )

---

## JURY VERDICT
## COUNT TWO—VERDICT ON SPECIFICATION ONE
### OHIO REV. CODE ANN. §2929.04

---

    We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

*Guilty Beyond a Reasonable Doubt* _____ of complicity in committing the offense of aggravated murder while she was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design in the manner and form she stands charged in the indictment.

    *Insert in ink either: "Not Guilty" or "Guilty Beyond a Reasonable Doubt."*

1. *[signature]*                          7. *[signature]*

2. *[signature]*                          8. *[signature]*

3. *[signature]*                          9. *[signature]*

4. *[signature]*                         10. *[signature]*

5. *[signature]*                         11. *[signature]*

6. *[signature]*                         12. *[signature]*

Date: _____5-28-03_____

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

*vs.*

DONNA M. ROBERTS,

    Defendant

Case No. 01 CR 793

Judge John M. Stuard
Courtroom 2

---

## JURY VERDICT
### COUNT TWO—VERDICT ON SPECIFICATION TWO
#### OHIO REV. CODE ANN. §2929.04

---

We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

_Guilty Beyond a Reasonable Doubt_ of complicity in committing the offense of aggravated murder while she was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design in the manner and form she stands charged in the indictment.

    *Insert in ink either: "Not Guilty" or "Guilty Beyond a Reasonable Doubt."*

1. _Carae K. Selow_

2. _Pamela N. Lixtz_

3. _Joseph Choto_

4. _Marsha Vanochi_

5. _Thelma Rankin_

6. _Margaret Dillman_

7. _Victor V. Jabulsky_

8. _Todd Alan Davidson_

9. _Wyllman Bray_

10. _Amy J. Bartlett_

11. _Gary Phillipi_

12. _Margaret L Kay_

Date: _5-28-03_

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )
                                  )   Case No.  01 CR 793
    Plaintiff             )
                                  )   Judge John M. Stuard
*vs.*                             )   Courtroom 2
                                  )
                                  )
DONNA M. ROBERTS,                 )
                                  )
    Defendant             )

## JURY VERDICT
## COUNT THREE-COMPLICITY TO AGGRAVATED BURGLARY

    We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

_Guilty Beyond a Reasonable Doubt_ * on Count Three, Complicity to Commit Aggravated Burglary, in the manner and form she stands charged in the indictment.

* Insert in ink either "Not Guilty" or "Guilty Beyond a Reasonable Doubt"

1. _Amy Bartlett_
2. _Carol K Selak_
3. _Panda A Luntz_
4. _Joseph Chatter_
5. _Abilita Danudie_
6. _Thelma Rankin_

7. _Margaret Stillson_
8. _Richard Jakubsky_
9. _Todd Alan Davidson_
10. _Ashman Gray_
11. _Gary Phillips_
12. _Margaret 2Kay_

Date: _5-28-03_

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1199

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
      Plaintiff          )   Case No.  01 CR 793
                         )
                         )   Judge John M. Stuard
vs.                                     )   Courtroom 2
                         )
                         )
DONNA M. ROBERTS,                       )
      Defendant          )

---

## JURY VERDICT
### COUNT THREE—VERDICT ON FIREARM SPECIFICATION

We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find by proof beyond a reasonable doubt that the Defendant, Donna M. Roberts _____did_____* have a firearm on or about her person or under her control while committing aggravated burglary in the manner and form she stands charged in the indictment.

(*) Insert in ink: "did" or "did not."

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

7. _____
8. _____
9. _____
10. _____
11. _____
12. _____

Date:_____5-28-03_____

112

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1200

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )
     Plaintiff            )    Case No.  01 CR 793
                          )
*vs.*                             )    Judge John M. Stuard
                          )    Courtroom 2
                          )
DONNA M. ROBERTS,                 )
     Defendant            )

---

## JURY VERDICT
### COUNT FOUR-COMPLICITY TO AGGRAVATED ROBBERY

      We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find the Defendant, Donna M. Roberts, is

_Guilty Beyond a Reasonable Doubt_ * on Count Four, Complicity to Commit Aggravated Robbery, in the manner and form she stands charged in the indictment.

* Insert in ink either "Not Guilty" or "Guilty Beyond a Reasonable Doubt"

1. _Todd Alan Davidson_
2. _Lighman May_
3. _Amy Birlett_
4. _Karen K Selee_
5. _Sandra Kratz_
6. _Joseph Clutter_
7. _Marsha Naradic_
8. _Thelma Rankin_
9. _Margaret E Fellows_
10. _Victor V Jabulsky_
11. _Davy Phillips_
12. _Margaret L Kay_

Date: _5-28-03_

VOL 1002 PAGE 769

113

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1201

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                                    )

      Plaintiff                              )          Case No.  01 CR 793

                                            )          Judge John M. Stuard

*vs.*                                            )          Courtroom 2

                                            )

DONNA M. ROBERTS,                                 )

      Defendant                             )

## JURY VERDICT
### COUNT FOUR—VERDICT ON FIREARM SPECIFICATION

      We, the jury, having been duly empaneled to well and truly try the above cause and true deliverance make, do find by proof beyond a reasonable doubt that the Defendant, Donna M. Roberts ___DID___* have a firearm on or about her person or under her control while committing aggravated robbery in the manner and form she stands charged in the indictment.

(*) Insert in ink: "did" or "did not."

1. Victor W. Jabutsky
2. Todd Alan Jacobs
3. Ajiman Gray
4. Jimmy Burllett
5. Carie K. Seler
6. Pandea A Jartz

7. Joseph Atiter
8. Marsha V Saudie
9. Thelma Ranlan
10. Margaret E Tillow
11. Gary Phillips
12. Margaret 2 Kay

Date: 5-28-03

VOL 1002 PAGE 770

114

D:\DRoberts\Death.pen\Mitigation\Merge.specs.wpd•Monday 2 June 2003 • 04:14 pm

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | } | Case No. 01 CR 793 |
| Plaintiff | } | Judge John M. Stuard |
| vs | } | |
| DONNA M. ROBERTS, | } | |
| Defendant | } | |

## MOTION TO MERGE DEATH SPECIFICATIONS

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and moves this Court for an order merging the specifications under OHIO REV. CODE ANN. §2929.04(A)(7) of which the Defendant was found guilty by the trial jury.

For cause, the Defendant says that the relief is demanded by U.S. CONST., amend. VIII and XIV and by OHIO CONST., art. I, §§1, 2, 9, and 16. Where duplicative aggravating circumstances are found by a jury, they should be merged by to the penalty phase if "two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative." Further, "the duplicative aggravating circumstances will be merged for purposes of sentencing." *State* v. *Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, 15 O.B.R. 311, *cert. denied, Jenkins v. Ohio* (1985), 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643, syl. 5. *Accord, State v. Wickline* (1990), 50 Ohio St.3d 114, 552 N.E.2d 913, *cert.*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.788.2908 · FACSIMILE 330.788.8290 · E-MAIL: JBJUHASZ@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1203

*denied*, *Wickline v. Ohio* (1990), 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235, 59 USLW 3277.

To instruct the jury on duplicative aggravating circumstances would lead to arbitrary and capricious sentencing, would lead to the influence of passion and prejudice in the sentence, and would diminish the reliability necessary in determining the appropriate sentence. Failure to grant the relief sought herein violates the state and federal constitutional rights to due process of law, to equal protection of the law, to a fair and impartial jury determination as to sentence, to the effective assistance of counsel, and to be free from cruel and usual punishment.[1]

WHEREFORE, the Defendant prays for an order granting the relief requested.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

---

[1] *See*, U.S. CONST., amend. VIII and XIV; OHIO CONST., art. I, §§1, 2, 9, 10, and 16.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHIS@AOL.COM

2

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❏ sent by regular United States Mail, postage prepaid
❏ hand delivered to counsel or counsel's office
☑ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this _____ day of June, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHES@AOL.COM

3

D:\DRoberts\Death.pen\Mitigation\Readmit exhibits first phase.wpd●Monday 2 June 2003 • 04:13 pm

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    }        Case No. 01 CR 793

    Plaintiff                     }        Judge John M. Stuard
                                  }        Courtroom 2
VS                                }
                                  }
DONNA M. ROBERTS,                 }
                                  }
    Defendant                     }

---

### MOTION TO PROHIBIT READMISSION
### OF CERTAIN EXHIBITS FROM THE
### FIRST TRIAL PHASE

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves for an order prohibiting readmission of certain photos and exhibits from the first phase of the trial. This relief is required by U.S. CONST., amend. VIII and XIV and by OHIO CONST., art. I, §§1, 2, 9 and 16. As applied here, those provisions prohibit a death sentence that is determined by improperly weighing the aggravating circumstances and the factors in mitigation, or by improperly tipping the scales in favor of death. *See, e.g., DePew v. Anderson* (S.D. Ohio 2000), 104 F. Supp.2d 879 (vacating death sentence due to penalty phase errors), *affirmed as to vacation of death sentence, DePew v. Anderson* (6th Cir. 2002), 311 F.3d 742, 2002 U.S. App. LEXIS 23804, 2002 FED App. 402P.

For cause, the Defendant says that she does not intend to raise the nature and circumstances of the offenses in mitigation; and, therefore, the State's exhibits and photos from the first phase respecting the offense are almost entirely

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1206

irrelevant at the penalty phase.[1]  Not every exhibit offered in the first phase proves the "specification."[2]

The Supreme Court of Ohio held in *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, *cert. denied, DePew v. Ohio* (1989), 489 U.S. 1042, 109 S.Ct. 1099, 103 L.Ed.2d 241, 57 USLW 3548, that only those exhibits and photos "relevant to the [particular] aggravating circumstances [the offender was found guilty of committing]" are to be introduced by the State at the penalty phase.  The law does not allow readmission of *all* photos or exhibits respecting simply the aggravated murder itself, as it is not an aggravating circumstance for the respective "specifications."   Rather, the evidence introduced must be relevant to the statutorily specified and proven aggravating circumstance accompanying the count of aggravated murder for which the jury is considering sentence.

In *State v. DePew, ante*, two of the specifications proven at the first phase were purposeful killings of two or more persons in a course of conduct and killing during commission of arson.  The Court held that a *minimal number* of exhibits from the first phase were admissible as relevant in the second phase.  *See, also, State v. Bedford* (1988), 39 Ohio St.3d 122, 135-136 529 N.E.2d 913, *cert. denied, Bedford v. Ohio* (1989), 489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825, 57 USLW

---

[1] Logic compels the conclusion that the State need introduce no exhibits in the second phase, for the jury has already made a special factual finding that constitutes the aggravating circumstance.  However, that is not the law in this State.  The Defendant reluctantly concedes that the law -- if not logic -- permits the government to introduce at the second phase exhibits which tend to show that Robert S. Fingerhut was killed during the course of an aggravated burglary or aggravated robbery and that the Defendant directly participated in the aggravated murder with prior calculation and design..

[2] The Defendant has not abandoned her objection that, with due respect, the "specifications" submitted to the jury at the conclusion of the first phase were not specifications at all, but last minute modifications to a hastily and imperfectly drawn capital indictment.  The resulting modified language submitted to the jury concerning the specifications was, to borrow a phrase from the Court, more emotion than logic.  *See,* OHIO REV. CODE ANN. §2929.04(A)(7).

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHS@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1207

3588 (where the dissent of three justices[3] questioned admission of photos of the disemboweled victim when the course of conduct specification was at issue.)

Most of the letters, tapes, photos, and exhibits introduced in the first phase of this trial are not relevant to the aggravating circumstance, but at best relate only to the aggravated murder itself.  They are therefore irrelevant to this proceeding. Readmission of all exhibits from the first phase poses the danger that the exhibits will tip the balance impermissibly in favor of the State at the second phase, thus violating due process of law and equal protection of the laws,[4] and presenting the very real danger that the death sentence will be imposed in an arbitrary, unreasonable, or capricious manner.[5]  In *State v. Bedford, ante,* the dissent of Justices Wright, Sweeney and Herbert Brown pointed out the dangers of readmission of all first phase exhibits during the second phase:

> In his argument at the penalty phase, the prosecutor showed the jury photographs that were previously admitted during the guilt phase and improperly commented upon them. Before the prosecutor readmitted the photographs at this stage, he told the jury that:
> "Whatever Mr. Bedford [the defendant] experienced, whatever he was feeling is not grounds to take two people's lives; and I'm going to show you the photographs in the case. You've already seen them, but I'll remind you of them because this is what the whole case is about; this is the reason we are here, okay?  This is [sic] the aggravating circumstances, this is the course of conduct which brought us all here together * * * * * * * .
> In *State v. Thompson, supra,* this court * * * stated that introduction of the slides during the guilt phase was harmless error, but held that the subsequent reference to them during the penalty phase was prejudicial.  * * * .  *Thompson, supra,* 33 Ohio St.3d at 15, 514 N.E.2d at 420.
> In the instant case, not only did the prosecutor refer to the gruesome photographs that were presented during the guilt phase, but he actually resubmitted the photos to the jury during the penalty phase. These photographs, including color close-ups, show Smith lying with his

---

[3] Those Justices were WRIGHT, J., SWEENEY, J. and H. BROWN, J.

[4] *See,* U.S. CONST., amend. V and XIV; OHIO CONST., art. I, §§1, 2, 10 and 16; *Thomas v. Mills* (1927), 117 Ohio St. 114, 157 N.E. 488, 5 Ohio Law Abs. 401, 25 Ohio Law Rep. 378, 54 ALR 1220.

[5] *See,* U.S. CONST., amend. VIII and XIV; *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346; OHIO CONST., ART. I, §9.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5616
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1208

head in a pool of blood on the porch. In addition, several photographs show Toepfert's body lying inside the apartment with a portion of her bowels protruding. It does not take much imagination to appreciate the revulsion the jury must have felt when these photographs were again presented to it. Therefore, if the tactics used by the prosecutor in *Thompson* were prejudicial, then surely the tactics used by the prosecutor in this case warrant vacation of the death sentence and a remand for resentencing pursuant to R.C. 2929.06.

Finally and most importantly, in *State v. Davis* (1988), 38 Ohio St.3d 361, 367-376, * * *, Justice Locher correctly pointed out that only those aggravating circumstances specifically enumerated in R.C. 2929.04(A) may be considered in imposing the death penalty. * * *.

The presentation of the photographs during the penalty phase and the prosecutor's related statement that "this is [*sic*] the aggravating circumstances, this is the course of conduct which brought us all here together" are precisely the types of nonstatutory circumstances that *Davis* proscribes. * * *.

The prosecutorial misconduct in introducing these nonstatutory aggravating circumstances to the jury during its weighing process was prejudicial to the defendant in that it allowed the jury to arbitrarily and capriciously impose the death penalty.

39 Ohio St.3d at 135-136.

Furthermore, even assuming that the exhibits were all relevant, the relevance does not substantially outweigh the prejudicial value of this evidence. *See,* OHIO EVID.R. 403(A). Admission of all these photos and exhibits is improper as they are repetitive and cumulative in nature. *State v. Thompson* (1987), 33 Ohio St.3d 1, 9, 514 N.E.2d 407; *see, also,* OHIO EVID.R. 403(B). Because the photos and exhibits are not admissible at the penalty phase, the prosecutor is properly barred from commenting upon them. For this Court to hold otherwise invites the jury to consider non-statutory aggravating circumstances will allow the jury to arbitrarily and capriciously impose the death penalty. *See,* U.S. CONST., amend. VIII and XIV; OHIO CONST., art. I, §§1, 2, 9, and 16; *and, e.g., Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, 51 USLW 4891; *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *Proffitt v. Florida* (1976), 428 U.S. 242, 96 S.Ct. 2960; 49 L.Ed.2d 913; *State v. Davis*

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8200 · E-MAIL: JBJURISDOC@AOL.COM

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1209

(1988), 38 Ohio St.3d 361, 528 N.E.2d 925, *cert denied, Davis v. Ohio* (1989), 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980, 57 USLW 3471 and, *State v. Bedford, ante.*

WHEREFORE, the Defendant prays for an order prohibiting readmission of certain photos and exhibits from the first phase of the trial and granting the relief herein described.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio  44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing was: ☐ sent by regular United States Mail, postage prepaid; ☐ hand delivered to counsel or counsel's office; ☑ sent by telecopier to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this ___ day of June, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · EMAIL JBJURISDOC@AOL.COM

5

D:\DRoberts\Death.pen\Mitigation\Circumstances.offense.wpd•revised: Monday 2 June 2003 • 04:12 pm

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                     )     Case No. 01 CR 793

     Plaintiff                         )     Judge John M. Stuard

vs                                )

DONNA M. ROBERTS,                  )

     Defendant                         )

---

### MOTION TO PROHIBIT REFERENCE TO
### THE NATURE AND CIRCUMSTANCES
### OF THE OFFENSES AT CERTAIN TIMES

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and requests that this Court refrain from including a reference to the "nature and circumstances of the offense" when:  (1) identifying the evidence presented by the Defendant; (2) introducing the concept of the evidence to be weighed by the jury against the aggravating circumstances; or (3) listing the mitigating factors, in its penalty phase jury instructions. The Defendant makes this request as she has not raised and does not intend to raise the nature and circumstances of the offenses in mitigation.

To instruct the jury that it may consider the same would mislead the jury, would lead to arbitrary and capricious sentencing, would lead to the influence of passion and prejudice in the sentence, and would diminish the reliability necessary in determining the appropriate sentence.  Failure to grant the relief sought herein violate the state and federal constitutional rights to due process of law, to equal

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7808 · FACSIMILE 330.758.8290 · E-MAIL JBJUHISOO@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1211

protection of the law, to a fair and impartial jury determination as to sentence, to the effective assistance of counsel, and to be free from cruel and usual punishment.[1] It would also violate rights under state statutes and case law foreclosing the instruction, comment, or reliance upon, mitigating factors not raised by the Defendant, and would give rise to the consideration of non-statutory aggravating circumstances and arbitrary sentencing.

OHIO REV. CODE ANN. §2929.04 (B)(1) states that the "the trial jury *shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt,* the *nature and circumstances of the offense,* the history, character, and background of the offender, *and all of the following factors*: * * *."* (Emphasis added.)

It is evident that the nature and circumstances of the crime are not to be considered or made the subject of instruction in this case because not raised by the defense. A trial court is not to instruct on a mitigating factor unless that mitigating factor has been lawfully inserted into the sentencing consideration. *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, n.3, *cert. denied, Hicks v. Ohio* (1990), 494 U.S. 1038, 110 S.Ct. 1502, 108 L.Ed.2d 636, 58 USLW 3596. "Lawfully inserted means inserted at the Defendant's instance," *i.e.,* whether he placed this information before the jury by raising same as a mitigating factor. *Id.* The *Hicks* court mandated that the judge not instruct on mitigating factors not raised by the Defendant. *Id.*

WHEREFORE, the Defendant prays for an order granting the relief requested.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

---

[1] *See,* U.S. CONST., amend. VIII and XIV; OHIO CONST., art. I, §§1, 2, 9, 10, and 16.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL: JBJUHASZ00@AOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1212

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

☐ sent by regular United States Mail, postage prepaid
☐ hand delivered to counsel or counsel's office
☒ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this _____ day of June, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHSN@GO.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1213

D:\DRoberts\Death.pen\Mitigation\Circumstances.offense.wpd • revised: Monday 2 June 2003 • 02:46 pm

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    }        Case No. 01 CR 793
                                 }
          Plaintiff              }        Judge John M. Stuard
                                 }
vs                               }
                                 }
                                 }
DONNA M. ROBERTS,                }
                                 }
          Defendant              }

### MOTION TO PROHIBIT REFERENCE TO
### THE NATURE AND CIRCUMSTANCES
### OF THE OFFENSES AT CERTAIN TIMES

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through the undersigned counsel, and requests that this Court refrain from including a reference to the "nature and circumstances of the offense" when:  (1) identifying the evidence presented by the Defendant; (2) introducing the concept of the evidence to be weighed by the jury against the aggravating circumstances; or (3) listing the mitigating factors, in its penalty phase jury instructions.  The Defendant makes this request as she has not raised and does not intend to raise the nature and circumstances of the offenses in mitigation.

To instruct the jury that it may consider the same would mislead the jury, would lead to arbitrary and capricious sentencing, would lead to the influence of

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.788.2408 · FACSIMILE 330.788.8220 · E-MAIL JBJURIS800@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1214

passion and prejudice in the sentence, and would diminish the reliability necessary in determining the appropriate sentence.  Failure to grant the relief sought herein violate the state and federal constitutional rights to due process of law, to equal protection of the law, to a fair and impartial jury determination as to sentence, to the effective assistance of counsel, and to be free from cruel and usual punishment.[1]  It would also violate rights under state statutes and case law foreclosing the instruction, comment, or reliance upon, mitigating factors not raised by the Defendant, and would give rise to the consideration of non-statutory aggravating circumstances and arbitrary sentencing.

OHIO REV. CODE ANN. §2929.04 (B)(1) states:

> the trial jury *shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt,* the *nature and circumstances of the offense,* the history, character, and background of the offender, *and all of the following factors:* * * * ".

(Emphasis added.)

It is evident that the nature and circumstances of the crime are not to be considered or made the subject of instruction in this case.  A trial court is not to instruct on a mitigating factor unless that mitigating factor has been lawfully inserted into the sentencing consideration. *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, n.3, *cert. denied, Hicks v. Ohio* (1990), 494 U.S. 1038, 110 S.Ct. 1502, 108 L.Ed.2d 636, 58 USLW 3596.  "Lawfully inserted means inserted at the Defendant's instance," *i.e.,* whether he placed this information before the jury by raising same as a mitigating factor. *Id.*  The *Hicks* court

---

[1] *See*, U.S. CONST., amend. VIII and XIV; OHIO CONST., art. I, §§1, 2, 9, 10, and 16.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610  TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURINDOC@AOL.COM

2

mandated that the judge not instruct on mitigating factors not raised by the Defendant. *Id.*

WHEREFORE, the Defendant prays for an order granting the relief requested.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was:

❑ sent by regular United States Mail, postage prepaid
❑ hand delivered to counsel or counsel's office
❑ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this 2nd day of June, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURISDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1216

D:\DRoberts\Death.pen\Mitigation\UNSWORN.wpd•June 2, 2003 (4:16pm)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

vs

DONNA M. ROBERTS,

    Defendant

Case No. 01 CR 793

Judge John M. Stuard

---

## MOTION TO PROHIBIT IMPROPER COMMENT BY PROSECUTOR ON DEFENDANT'S UNSWORN STATEMENT

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, through counsel, and moves this Honorable Court for an order to prohibit the prosecuting attorney from making any improper reference to the fact that the Defendant chose to make at the mitigation hearing an unsworn statement as opposed to testifying under oath and thereby subjecting himself to cross-examination, should that in fact be the choice exercised by the Defendant.

For cause, the Defendant says that limited and passing comment is all that is permitted by the Constitution, as set forth by the Supreme Court of Ohio in *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, *cert. denied, DePew v. Ohio* (1989), 489 U.S. 1042, 109 S.Ct. 1099, 103 L.Ed.2d 241, 57 USLW 3548.  The offensive comments in *DePew* were:

> [T]he gentleman for the defendant, he told you five different times about the oath you took, about the oath we all take, and the oath I take, and the oath you take—everybody takes the oath except the defendant; he isn't man enough to get up here and take the oath.  Everybody in this case took

JOHN B. JUHASZ • ATTORNEY AT LAW • 7330 MARKET STREET • YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 • FAX SIMILE 330.758.8290 • E-MAIL JBJUHSOS@AOL.COM

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1217

the oath. Everybody in this case raised his right hand to this man, and he says I solemnly swear to tell the truth, the whole truth and nothing but the truth so help me God. Everybody except DePew. * * * .

*Id.*, at 285, fn. 4. The Court held at syllabus 2:

Where the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the Defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the Defendant's statement was not made under oath, in contrast to the testimony of all other witnesses. (*State v. Mapes* [1985], 19 Ohio St.3d 108 [other citations omitted], modified in part.)

The Supreme Court also said that: "To permit the prosecutor to extensively comment on the fact that the Defendant's statement is unsworn affects Fifth Amendment rights and negates the defendant's statutory prerogative." *Id.*, at 285. Any expansion beyond a brief reference would offend rights guaranteed under state statute and case law interpreting the statute and the federal constitution.

Though the Ohio Supreme Court made the pronouncements recited herein in *DePew*, it did not, as is customary with that Court, vacate the conviction or sentence. The Defendant has chided the Supreme Court for its myopic appellate review of capital cases. The Defendant does not stand alone. In *DePew v. Anderson* (6th Cir. 2002), 311 F.3d 742, 2002 U.S. App. LEXIS 23804; 2002 FED App. 0402P, the United States Court of Appeals for the Sixth Circuit joined the refrain. The Court first quoted the Supreme Court's opinion on the prosecutor's comment on the defendant's failure to take the stand and testify under oath at the sentencing hearing. On the Fifth Amendment violation:

Although appellant herein does not focus on the prosecutor's remarks regarding appellant's failure to make a sworn statement, we deem it appropriate at this juncture to examine the general propriety of such remarks. R.C. 2929.03(D)(1) provides in pertinent part that "if the offender chooses to make a statement, he is subject to cross-examination only if he consents to make the statement under oath or affirmation." This section grants the defendant in a capital proceeding the right to make an unsworn statement at the penalty stage. To permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights and negates the defendant's statutory

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJUHSN@OGAOL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1218

> prerogative.  However, to totally restrict the prosecutor from making *any* comment would likewise be unfair, especially where the defendant, in his unsworn statement, has offered something less than "the truth, the whole truth and nothing but the truth." Therefore, notwithstanding our previous pronouncements in *State v. Mapes* (1985), 19 Ohio St.3d 108, 116, 19 OBR 318, 324-325, 484 N.E.2d 140, 147, we now hold that where the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses. While the remarks made herein surely exceed the proper scope of comment set forth today, we find that such remarks are harmless error in light of the overwhelming weight of the aggravating circumstances in this case relative to the factors offered in mitigation, as discussed *infra*.

38 Ohio St.3d at 284-85.  The Sixth Circuit noted the sometimes astonishing language which appears in Ohio capital case opinions:

> The Ohio Supreme Court held, however, that it would not reverse and upset the *public expectation* of capital punishment for a brutal murder:
>> "While all these comments, taken together or even standing alone, constitute unreasonable and unfair conduct by the prosecutor, we must balance against that conduct the admission of appellant that he brutally stabbed to death a young mother, her daughter and her younger sister and then mutilated their bodies by fire. In cases such as this, we cannot ignore the compelling interest of the public, which has every right to expect its criminal justice system to work effectively."

311 F.3d at 745-746, quoting  38 Ohio St.3d at 288.  In dissent, former Justice J. Craig Wright noted in *DePew*:

> Although the majority opinion concedes that the prosecution indulged in misconduct during the penalty stage of the trial, it asserts—in what has become a frequent refrain in far too many criminal cases before us—that the errors were "harmless."  Once again, the majority denounces the prosecutorial misconduct obvious in this case, but allows it to continue unheeded, permitting the state to further chip away at the right to fundamental due process and a fair trial pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

38 Ohio St.3d at 293 (WRIGHT, J., dissenting.)   The Sixth Circuit's statement makes clear the constitutional significance of insuring a penalty phase free from error:

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL: JBJURISDOC@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1219

> Because we agree with the district court below and Ohio's Justice Wright that constitutional errors may not be swept under the rug because of public expectations or the pretext of harmless error, we conclude that the prosecutor's conduct violated the defendant's Eighth Amendment right to an individualized jury determination and his Fifth Amendment right not to testify and to remain silent. We therefore REMAND for a new sentencing hearing.

311 F.3d at 746. It may well be that the federal courts are beginning to do what Ohio courts have not done: police Ohio capital cases for constitutional error rather than sweeping them "under the rug because of public expectations or the pretext of harmless error." Trial courts always lament appellate reversals, and the greater the passage of time from trial to reversal, the louder the lament. The relief requested here will not repair the damage done, with due respect, by the submission of mutated "specifications" at the first phase. The best that can be done now is to avoid further constitutional error.

WHEREFORE, for the foregoing reasons, Defendant prays for the relief and orders hereinabove set forth.

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZDOC@AOL.COM

4

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing was:

❏ sent by regular United States Mail, postage prepaid
❏ hand delivered to counsel or counsel's office
☑ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this _____ day of June, 2003.

JOHN B. JUHASZ

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJUHRSDOC@AOL.COM

5

jbj\A:\Roberts.Donna.3\Phase two instructions.wpd▪Tuesday 3 June 2003 ▪ 07:30 am

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO , | ) | Case No. 01 CR 793 |
| Plaintiff | ) | Judge John M. Stuard |
| vs | ) | |
| DONNA M. ROBERTS | ) | |
| Defendant | ) | |

---

### PROPOSED INSTRUCTION TO JURY

---

COMES NOW THE DEFENDANT, DONNA M. ROBERTS, by and through the undersigned counsel, and hereby requests the following instructions:

**PROPOSED INSTRUCTION:**

Members of the jury: you have heard the evidence and the arguments of counsel and you will now decide whether the sentence of death shall be imposed upon the defendant; and, if not, whether the defendant be sentenced to life imprisonment with parole eligibility after serving twenty five (25) full years of imprisonment, to life imprisonment with parole eligibility after serving thirty (30) full years of imprisonment, or to life imprisonment with no opportunity for parole. The aggravating circumstance which will be considered by you is that the Defendant, DONNA M. ROBERTS, *******[1] It is the presence of this aggravating circumstance which warrants your consideration of these higher penalties.

You are here today to consider which of these three higher sentences to

---

[1] Although the Defendant continues to object, the Court's language from the jury instructions on phase one can be inserted.

1

impose because you found an aggravating circumstance was present in this case. It is this aggravating circumstance, and this alone, which is to be weighed against the mitigating factors which have been presented in this case.

It would be improper for you to weigh, in this balance against the mitigating factors, the aggravated murder itself. This is because the sentencing laws of Ohio have already incorporated consideration of the commission of the aggravated murder itself in setting the sentences now available to you. In other words, the sentences you are to consider have already been increased beyond that which would have been imposed for the aggravated murder itself, due to the presence of the aggravating circumstance you found in this case. Therefore, it is this aggravating circumstance alone against which you will weigh the mitigating factors in this case. You will consider all the evidence, arguments, the statement of the defendant, and all other information and reports which are relevant to the aggravating circumstance or to any mitigating factors including, but not limited to, the history, character, and background of the defendant and all of the following: the defendant's lack of a significant history of prior criminal convictions; the degree of the defendant's participation in the offense and the degree of the defendant's participation in the acts that led to the death of the victim; the defendant's mental, physical, and psychological history of the defendant, and any other factors whcih you find form the evidence are relevant to the issue of whether the defendant should be sentenced to death.

The State has the burden to prove beyond the existence of any reasonable doubt that the aggravating circumstance of which the defendant was found guilty outweighs the factors in mitigation of imposing the death sentence. To "outweigh" means to weigh more than, to be more important than.

The existence of aggravating circumstance does not require the imposition of death sentence; and the sentence of death should be imposed

John B. Juhasz · Attorney at Law · 7330 Market Street · Youngstown, Ohio 44512-5610
Telephone 330.758.7700 · Facsimile 330.758.8290 · E-mail JBJUHASZ@GMAIL.COM

2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1223

only of you find that the State has proved by proof beyond the existence of a reasonable doubt that the aggravating circumstance outweighs any and all mitigating factors when the mitigating factors are weighed together or considered in the aggregate. The existence of mitigating factors does not preclude or prevent the death sentence, if you find beyond the existence of any reasonable doubt that the aggravating circumstance outweighs the mitigating factors.

Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that death is the appropriate sentence; that is, that the aggravating circumstance outweighs the aggregation of the mitigating factors beyond the existence of any reasonable doubt. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

If after a full and impartial consideration of all the evidence, you are firmly convinced that the aggravating circumstance outweighs the combined mitigating factors and that death is the appropriate sentence, the State has proved its case beyond a reasonable doubt. If you are not firmly convinced that the aggravating circumstance outweighs the combined mitigating factors and that death is the appropriate sentence, you must return a verdict of one of the life sentences. You are required to give a reasoned moral response to the mitigating evidence presented. If you conclude that the State has failed to prove beyond a reasonable doubt that the aggravating factor is sufficient to, and does, outweigh the mitigating circumstances; or, if after considering the evidence, the State has not convinced you, beyond a reasonable doubt, that death is the appropriate punishment, then you shall return a sentence

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.758.8290 · E-MAIL JBJUHASZ@AOL.COM

3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1224

of one of the life terms.[2]

You shall return a verdict of the sentence of death if you unanimously—that is, if all twelve (12) of you—find by proof beyond a reasonable doubt, that the aggravating circumstance outweighs the combined mitigating factors.

If you do not so find, you shall unanimously (all twelve) return a verdict of a life sentence with parole eligibility after serving twenty five (25) full years of imprisonment; life sentence with parole eligibility after serving thirty (30) full years of imprisonment; or life imprisonment without the opportunity for parole. A verdict form with these three options will be furnished to you.

Considerations of mercy have always been present within the jury system, and when the evidence so moves a jury it is fully capable of exercising such mercy toward a Defendant.[3] It is generally true, as the Court instructed you in the first phase of this trial, that as jurors you must not be influences by any consideration of sympathy or prejudice. This means that it is your duty to follow the law, to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdict accordingly. In fulfilling your duty in this sentencing phase, as in the previous phase, you efforts must be to arrive at a just verdict. As we are now engaged in a capital sentencing proceeding, the rule against being influenced by any consideration of sympathy must be somewhat altered. The Defendant, DONNA M. ROBERTS, has presented evidence in mitigation of punishment and this evidence may prompt in you a sympathetic reaction. If the evidence presented in mitigation prompts that sort of sympathy, you are hereby instructed that you are to consider, and that you may give effect to, that sort of sympathy arising from the Defendant's mitigating evidence, when you conduct your deliberations as to punishment.

---

[2] *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, *cert. denied, Greer v. Ohio* (1989), 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201, 57 USLW 3688.

[3] *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585, *cert. denied, Zuern v. Ohio* (1988) 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 872, 56 USLW 3500.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.7700 · FACSIMILE 330.726.9207 · E-MAIL JBJUHASZ@AOL.COM

4

Considerations of mercy have always been present within our system; and, if the evidence so moves you, you may exercise such mercy towards DONNA M. ROBERTS. You must consider all the evidence and make your finding with intelligence and impartiality, without bias, without improper sympathy, or without improper prejudice so that the State of Ohio and the Defendant will both feel that their case was fairly tried.[4]

Mitigating factors are factors that, while they do not justify or excuse the crime, nevertheless in fairness and mercy, may be considered by you, as they call for a penalty less than death, or lessen the appropriateness of a sentence of death.[5]

Respectfully submitted,

J. GERALD INGRAM (#0007887)

JOHN B. JUHASZ (#0023777)
7330 Market Street
Youngstown, Ohio 44512-5610
Telephone: 330.758.2308
Facsimile: 330.758.8290
COUNSEL FOR DEFENDANT

---

[4] *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585, *cert. denied, Zuern v. Ohio* (1988) 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 872, 56 USLW 3500; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, *cert. denied, Greer v. Ohio* (1989), 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201, 57 USLW 3688.

[5] *State v. Holloway* (1988), 38 Ohio St.3d 239, 242 and syl. 1, 527 N.E.2d 831, *cert. denied, Holloway v. Ohio* (1989), 492 U.S. 925, 109 S.Ct. 3261, 106 L.Ed.2d 606, 57 USLW 3860 wherein the Ohio Supreme Court announced disapproval of instructions which defined mitigating circumstances as those which "reduce the degree of culpability". The Court stated: "Mitigating factors under R.C. 2929.04 (B) are not related to a Defendant's culpability, but rather are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." *Id.* The requested instruction is a correct statement of the law. The Ohio Supreme Court has described mitigating factors as ones which: "lessen[s] the moral culpability of the offender or diminish[es] the appropriateness of death as the penalty." *State v. DePew* (1988), 38 Ohio St.3d 275, 292, 528 N.E.2d 542, *cert. denied, DePew v. Ohio* (1989), 489 U.S. 1042, 109 S.Ct. 1099, 103 L.Ed.2d 241, 57 USLW 3548, quoting *State v. Steffen* (1987), 31 Ohio St.3d 111, 509 N.E.2d 383. As the reference to culpability is no longer permissible, the requested instruction is appropriate.

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE: 330.758.2308 · FACSIMILE: 330.758.8290 · E-MAIL: JBJUHASZ@GMAIL.COM

5

*CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing was:

☐ sent by regular United States Mail, postage prepaid
☑ hand delivered to counsel or counsel's office
☐ sent by telecopier

to Christopher D. Becker, Esq. and Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren, Ohio 44481 this ___ day of June, 2003.

JOHN B. JUHASZ

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.  01-CR-793 |
| | ) | |
| Plaintiff, | ) | **COUNT ONE SPECIFICATION ONE:** |
| | ) | **AGGRAVATED BURGLARY** |
| -vs- | ) | |
| | ) | **JURY FINDING AND** |
| | ) | **RECOMMENDATION** |
| | ) | **OF DEATH SENTENCE** |
| DONNA MARIE ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |

<u>VERDICT</u>

We,  the  Jury,  being  duly  impaneled  and sworn or affirmed, do hereby find that the

aggravating circumstances that the Defendant, Donna Marie Roberts, was found guilty of

committing with reference to the death of Robert S. Fingerhut, outweigh, by proof beyond a

reasonable  doubt,  the  mitigating  factors  presented  in  this  case.   We,  therefore,  find  and

recommend that the sentence of death be imposed upon the Defendant, Donna Marie Roberts.

DATED:       June ____4____, 2003.

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

11. _____

12. _____

VOL 1003 PAGE 391

12-1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1228

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )
                                  )    CASE NO. 01-CR-793
            Plaintiff,            )    **COUNT ONE, SPECIFICATION ONE**
                                  )    **AGGRAVATED BURGLARY**
-vs-                              )    **JURY FINDING AND**
                                  )    **RECOMMENDATION**
DONNA MARIE ROBERTS,              )    **OF LIFE SENTENCE**
                                  )
            Defendant.            )

<u>VERDICT</u>

We, the Jury, being duly impaneled and sworn or affirmed, do hereby find that the State has not proved that the aggravating circumstances that the Defendant, Donna Marie Roberts, was found guilty of committing with reference to the death of Robert S. Fingerhut, outweigh, by proof beyond a reasonable doubt, the mitigating factors presented in this case, or that the jury is unable to reach a unanimous verdict recommending the sentence of death. We, therefore, find and recommend that the following sentence be imposed upon the Defendant, Donna Marie Roberts:

(Place an "**X**" in the appropriate space in accordance with your finding.)

_____    Life imprisonment without parole eligibility.

_____    Life imprisonment with parole eligibility after 30 full years of imprisonment.

_____    Life imprisonment with parole eligibility after 25 full years of imprisonment.

DATED:        June _____, 2003.

1._____        7._____

2._____        8._____

3._____        9._____

4._____        10._____

5._____        11._____

6._____        12._____

VOL 1003 PAGE 392

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 01-CR-793 |
| | ) | |
| Plaintiff, | ) | **COUNT ONE SPECIFICATION TWO:** |
| | ) | **AGGRAVATED ROBBERY** |
| -vs- | ) | |
| | ) | **JURY FINDING AND** |
| | ) | **RECOMMENDATION** |
| | ) | **OF DEATH SENTENCE** |
| DONNA MARIE ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |

<u>VERDICT</u>

We, the Jury, being duly impaneled and sworn or affirmed, do hereby find that the

aggravating circumstances that the Defendant, Donna Marie Roberts, was found guilty of

committing with reference to the death of Robert S. Fingerhut, outweigh, by proof beyond a

reasonable doubt, the mitigating factors presented in this case. We, therefore, find and

recommend that the sentence of death be imposed upon the Defendant, Donna Marie Roberts.


DATED:      June ___4___, 2003.


1. _____     7. _____

2. _____     8. _____

3. _____     9. _____

4. _____     10. _____

5. _____     11. _____

6. _____     12. _____


VOL **1003** PAGE **393**

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1230

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
                                        )       CASE NO. 01-CR-793
            Plaintiff,                  )       **CT. ONE SPECIFICATION TWO**
                                        )       **AGGRAVATED ROBBERY**
-vs-                                    )       **JURY FINDING AND**
                                        )       **RECOMMENDATION**
DONNA MARIE ROBERTS,                    )       **OF LIFE SENTENCE**
                                        )
            Defendant.                  )

## VERDICT

We, the Jury, being duly impaneled and sworn or affirmed, do hereby find that the State has not proved that the aggravating circumstances that the Defendant, Donna Marie Roberts, was found guilty of committing with reference to the death of Robert S. Fingerhut, outweigh, by proof beyond a reasonable doubt, the mitigating factors presented in this case, or that the jury is unable to reach a unanimous verdict recommending the sentence of death. We, therefore, find and recommend that the following sentence be imposed upon the Defendant, Donna Marie Roberts:

(Place an "**X**" in the appropriate space in accordance with your finding.)

_____     Life imprisonment without parole eligibility.

_____     Life imprisonment with parole eligibility after 30 full years of imprisonment.

_____     Life imprisonment with parole eligibility after 25 full years of imprisonment.

DATED:      June _____, 2003.

1._____          7._____

2._____          8._____

3._____          9._____

4._____          10._____

5._____          11._____

6._____          12._____

VOL 1003 PAGE 394

JBJ

C:\AA.Ofc.My.files\wp8docs\Criminal\Death\CAPITAL.JBJ\Roberts.PSI.JE.wpd ✦ Mon 9 June 2003 - 09:11AM (0911 hrs)

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
                                        )        Case No. 01 CR 793
    Plaintiff                       )
                                        )
                                        )
*vs.*                                   )        Courtroom 2
                                        )        Judge John M. Stuard
                                        )
DONNA M. ROBERTS,                       )        **JUDGMENT ENTRY**
                                        )
    Defendant                       )

    The Court finds that there is no authority to order a pre-sentence investigation and reports, as was ordered by the Court on June 4, 2003.  As such a report may be prepared only at the request of the Defendant, *see*, OHIO REV. CODE ANN. §2929.03(D)(1); and, as the Defendant has not made such a request, the directive that such a report be prepared is hereby rescinded.

HON. _____
          JOHN M. STUARD, Judge

Approved:

CHRISTOPHER D. BECKER

J. GERALD INGRAM

KENNETH N. BAILEY
160 High Street, NW
Warren, Ohio 44483
COUNSEL FOR PLAINTIFF

JOHN B. JUHASZ
7330 Market Street
Youngstown, Ohio  44512-5610
COUNSEL FOR DEFENDANT

VOL 1000 PAGE 911

JOHN B. JUHASZ · ATTORNEY AT LAW · 7330 MARKET STREET · YOUNGSTOWN, OHIO 44512-5610
TELEPHONE 330.758.2308 · FACSIMILE 330.758.8290 · E-MAIL JBJURIS00@AOL.COM

123

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE #01CR793 |
| PLAINTIFF | ) | |
| | ) | |
| VS. | ) | JOURNAL ENTRY |
| | ) | |
| DONNA M. ROBERTS | ) | |
| | ) | |
| DEFENDANT | ) | |

The following jurors have been excused without objection by counsel

| JUROR # | NAME: |
|---------|-------|
| 2 | GROSBECK, EDWARD |
| 3 | WALLACE, STANLEY L |
| 6 | HANAWALT, K M |
| 7 | SHIELDS, W B |
| 11 | JUKES, MARY L |
| 12 | LOWMAN, DEBORAH |
| 17 | STEWART, OPER |
| 24 | MORRIS, MICHAEL W |
| 25 | FURDEN-DOSS, MICHELLE W |
| 26 | COLLER JR, RALPH R |
| 27 | PRIOR, MARY |
| 29 | RIDDICK, DEBRA L |
| 32 | PAINTER, DORA J |
| 34 | PERLOV, LEONID |
| 35 | TRUMPHOUR, LORETTA |
| 39 | OLSON, DIANNA L |
| 42 | SHONTZ, RALPH M |
| 44 | GERNENTZ, CAROL L |
| 45 | RICE SR, WILLIAM J |

VOL 1004 PAGE 263

124

| JUROR # | NAME: (CONTINUED: Excused w/out objection) |
|---------|---------------------------------------------|
| 46 | CRETELLA, JANET L |
| 48 | RODRIGUEZ, TRACIE L |
| 50 | SHRIVER, RICHARD A |
| 51 | ULMER, OCRATIES |
| 53 | MATYSIAK, GILBERT B |
| 57 | KONOPKA, HEIDI L |
| 60 | GARRISON, MARY C |
| 61 | FRAELICH, MICHELLE L |
| 62 | BUGOSH, THOMAS |
| 65 | WEAVER, MELISSA L |
| 66 | ABURAHMA, FADWA |
| 67 | ANTHONY, STEPHEN M |
| 71 | MCVICKER, RICHARD |
| 73 | KELLAR, ROBERT W |
| 75 | KIFER, FRANK H |
| 77 | KOTB, HAYA |
| 78 | KOPER, EDWARD P |
| 79 | IFFT, ROBIN |
| 80 | SARKO, GARY E |
| 82 | FISHER, BETTY L |
| 83 | WALDECK, PAULINE M |
| 89 | TEMELKOFF, SONJA A |
| 91 | BARONE, DEBORAH A |
| 92 | LAROCCA, GEMMA |
| 93 | TOTH, ALBERT |
| 96 | WARD III, WILLIAM C |
| 99 | OROURKE, CAROL A |
| 101 | BERNARD, ANTHONY M |
| 104 | HALL, MARY |
| 107 | PALUMBO, MARY P |
| 108 | TWIST-HAMILTON, INGRID |
| 112 | DANKO, MARY H |
| 113 | WERNER, ALICE M |
| 114 | JONES, WILLIAM F |
| 115 | HECKMAN, ALENE |
| 118 | CAPITO, MARTHA B |
| 121 | HINKLE, ALBERTA M |
| 126 | WOODS, MARILYN S |
| 127 | DAVIS, LAURA |
| 128 | DRIPPS, THERESA |

VOL 1004 PAGE 264

| JUROR # | NAME: (CONTINUED: Excused w/out objection) |
|---------|---------------------------------------------|
| 129 | RUPERT, CHRISTINA A |
| 130 | LINSLEY, SARA H |
| 131 | LEWIS, CHERYL M |
| 133 | WEIMER, KATHLEEN A |
| 134 | WELLS, SCOTT A |
| 136 | TORR, ROBERT M |
| 138 | HALE, HAROLD R |
| 139 | FONDOULIS, DOLORES J |
| 140 | SEITZ, DERINDA L |
| 142 | HALL, RICKY |
| 143 | CHIEFFO, CHRIS |
| 146 | COONEY JR, THOMAS H |
| 151 | LABATE, DOMINIC J |
| 154 | MEEKS, CHERYL |
| 156 | YANCI, JAMES A |
| 157 | HELLEN, EMANUEL G |
| 158 | RADAKER, DORENE L |
| 161 | REESE, DAVID W |
| 162 | SHERIDAN, EMILY A |
| 164 | BEEMER, TAMMY |
| 169 | HOLINBAUGH, JEAN R |
| 170 | CHIMA, CONCETTA R |
| 176 | ARBOGAST, ELMA M |
| 177 | PALOMBI, MARY R |
| 179 | HEMMINGWAY, MAE G |
| 182 | MILLER, FREEMAN A |
| 186 | DEPASQUALE, ROSE M |
| 187 | BEHNER, LINDA D |
| 188 | MOSS, MELVIN M |
| 190 | BRADLEY, WILLIAM J |
| 191 | BRUNSTETTER, KERRIE L |
| 192 | LAWRENTZ, JOYCE L |
| 193 | THOMAS, BARBARA J |
| 202 | DAVIS, VERNICE L |
| 204 | HUSTEAD, NORMAN J |
| 206 | WOOD, CLARABELLE |
| 207 | GRONDESKI, MARY ANN |
| 211 | RASHID, MOHAMMAD |
| 213 | FISHER, TERRY L |
| 214 | AGGARWAL, ASHOK K |

| JUROR # | NAME:   (CONTINUED: Excused w/out objection) |
|---------|----------------------------------------------|
| 215 | LOUGH, CHRISTOPHER L |
| 216 | BOEHM, KRISTIN A |
| 220 | SAVOR, JOHN R |
| 221 | BIERY, PATRICK C |
| 224 | MITCHELL, ROSEMARIE |
| 225 | SPRANKLE, MARGIE A |
| 226 | WERNER, DEBRA D |
| 231 | HOSKINS, GERALDINE |
| 234 | SIMUN, IRENE D |
| 237 | HARRINGTON, BARBARA A |
| 242 | SETHMAN, PATRICIA L |
| 243 | PIETZAK, RICHARD |
| 244 | MORGAN JR, EDWIN C |
| 245 | HODGSON, MILDRED J |
| 249 | BRAKE, DENNIS |
| 251 | JOHNSON, EARL R |
| 252 | GINKINGER, CORALIE R |
| 257 | MATEYKO, CARLYNN |
| 260 | GEALY, PAUL E |
| 266 | CUPP, RENEE A |
| 267 | SANDOR, JOSEPH M |
| 268 | STARNES JR, PAUL G |
| 270 | REUFFO, CANDACE R |
| 273 | WIREMAN, PAULINE |
| 274 | CARPENTER, OLGA |
| 276 | SWICK, DENISE A |
| 278 | HALE JR, TOMMY L |
| 284 | ALLSTEADT, RANDY J |
| 286 | CODE, CHRISTINE R |
| 289 | ENGLISH, DAVID K |
| 294 | ISER, PAULA K |
| 297 | RADU JR, ELI |
| 299 | POWELL, ADRIENNE E |
| 302 | BURNETT, STEPHEN R |
| 306 | CLAY, ABBEY M |
| 307 | ROSENBERGER, DENNIS C |
| 308 | PRENTICE, CANDACE L |
| 311 | ARENS, KATE E |
| 313 | CARBO, JOAN |
| 315 | COLAPIETRO, JOSEPH |

| JUROR # | NAME:   (CONTINUED: Excused w/out objection) |
|---------|---------------------------------------------|
| 321 | ELLIS, WANDA J |
| 324 | ORTEGA-CLOSE, ALBA |
| 325 | POLING, MILDRED B |
| 326 | ENGLISH, CHARLES W |
| 327 | TISONE, RAYMOND J |
| 328 | COTTLE, BESSIE M |
| 330 | STEFANCIN, BRIAN J |
| 332 | DEJEAN, JERRY L |
| 335 | TOLNAR JR, EMIL J |
| 338 | HARRIS, M L |
| 339 | ALMASHY, THOMAS M |
| 340 | RINCK, ROBERT |
| 342 | NICHOLAS, GERTRUDE |
| 343 | POPADAK, MIKE |
| 346 | HUFSTETLER, TODD A |
| 349 | PROVANCE, ROBERT F |
| 351 | BEAL, CECELIA C |
| 352 | ROOD, CHARLES G |
| 353 | FATOBENE, PATRICIA J |
| 355 | UNDERWOOD, HAZEL E |
| 356 | GEILHARD, JEANNE L |
| 358 | AUBEL, SHIRLEY E |
| 359 | WILLIAMS, TERRY L |
| 360 | CRAIN JR, ALLAN J |
| 361 | LIBERATORE, EUGENE C |
| 362 | MANOFSKY, VERONICA A |
| 365 | PURNELL, MARK H |
| 370 | GASTON, ROBERT E |
| 371 | HOWARD, KAREN L |
| 372 | KELLAR, KATHERINE E |
| 379 | KOUPIARIS, MANUEL |
| 380 | MARSH, DARLA |
| 384 | ROWBOTHAM, TIM |
| 387 | BLANDINE, PHILIP |
| 389 | BARNOVSKY, ROBERT |
| 391 | LIM, BEE M |
| 394 | MULLANE, ADELAIDE T |
| 396 | GREATHOUSE, NANCY L |
| 400 | BARYAK, JUSTINA |

VOL 1004 PAGE 267

| JUROR # | NAME:   (CONTINUED: moved out of Trumbull County) |
|---------|-----------|
| 196 | BAGAGLIA, LYNN M |
| 280 | WALTERS, JULIA E |
| 385 | TAUB II, GEORGE |
| 386 | GEE-MASON, ANGELA |

The following prospective jurors are deceased

| JUROR # | NAME: |
|---------|-------|
| 319 | FOWLER, VICTORIA |
| 399 | OCH, MARY S |

The following jurors did not appear/respond for orientation

| JUROR # | NAME: |
|---------|-------|
| 5 | BONNER, YVETTE |
| 14 | MITCHELL, VALENTHEIA |
| 15 | LODWICK, KRISTEN L |
| 21 | MCCRIMMON, MATTHEW |
| 28 | ZICCARDI JR, DINO M |
| 70 | VIGUS, MATT |
| 132 | BYERLY, DONALD J |
| 149 | CALHOUN, NORMA E |
| 175 | DRISCOLL, GARY L |
| 256 | SILVIS, LEE |
| 261 | LANGLEY, JOHN E |
| 262 | VANCE, JOHN D |
| 296 | REES, JUDY |
| 304 | THOMAS, DANNY P |
| 318 | BEQUEATH JR, LARRY |
| 347 | LONG, RICHARD T |
| 364 | GATES, JOHN |
| 367 | DANIEL, CARLA R |
| 377 | MALANDRO, EUGENE K |
| 392 | CATO, VONETTA |

VOL 1004 PAGE 269

Both the State and the Defense agree to waive any objections concerning the names contained in this entry.

_____
HONORABLE JOHN M. STUARD
Judge, Court of Common Pleas

_____
COUNSEL FOR PLAINTIFF

_____
COUNSEL FOR DEFENDANT

VOL 1004 PAGE 270

A:\Roberts.charts\Juror.trial excusals.numeric.sort.wpdFriday, June 20, 2003

# IN THE COURT OF COMMON PLEAS
# TRUMBULL COUNTY, OHIO

STATE OF OHIO,

    Plaintiff

-vs-

DONNA M. ROBERTS,

    Defendant

Case No. 01 CR 793

Judge John M. Stuard

JUDGMENT ENTRY

The following jurors were excused for cause during the trial of this case:

| Juror No. | Name |
| --- | --- |
| 1 | Albert Depto |
| 5 | Yvette Bonner |
| 13 | Patricia Molendyke |
| 14 | Valentheia Mitchell |
| 15 | Kristen Lodwick |
| 16 | Donna Metz |
| 18 | Frederick Calhoun |
| 19 | Sheri R. Senek |
| 21 | Matthew McCrimmon |
| 23 | Aaron Florek |
| 28 | Dino M. Ziccardi, Jr. |
| 30 | Shawn I. Woods |
| 33 | Twila J Bartek |
| 38 | Douglas L. Jones |
| 40 | Steven W. Bokan |
| 41 | Lisa Jaskowiak |
| 43 | Thomas Savanyu |
| 47 | Walter M. Dawson, Sr. |
| 52 | Irene M. Zahornek |
| 55 | Diane L. Parke |
| 58 | Gary P. O'Malley |
| 59 | Thomas Carmichael |
| 68 | Michael P. Burzenski |
| 69 | Tabatha Lovejoy |
| 70 | Matt Vigus |
| 72 | Lawrence L. King |

JUDGE JOHN M. STUARD - TRUMBULL COUNTY, OHIO COURT OF COMMON PLEAS

1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1240

| 74 | Frank King |
|----|------------|
| 81 | Cynthia M. Sase |
| 84 | Daniel Skaggs |
| 85 | Shirley A. Biel |
| 86 | Ronald Conrad |
| 87 | Michael Hildack |
| 88 | Robert J. Young |
| 90 | Rebecca Miller |
| 97 | Nancy Marsh-McGarry |
| 98 | Kevin Patterson |
| 106 | William Kennedy |
| 109 | Kasey S. Kelley |
| 110 | Stephen L. Luzar |
| 111 | Moselle DiCenso |
| 116 | Walter G. Smusz |
| 119 | Gayle Barbarini |
| 120 | James B. Fetherholf |
| 125 | Kirk R. Evans |
| 132 | Donald J. Byerly |
| 135 | Rodger L. Killingsworth |
| 137 | Robin Schlaegel |
| 141 | John Drummond |
| 147 | Michael P. Evans |
| 148 | Jessie A. Pilney |
| 149 | Norma E. Calhoun |
| 153 | Barbara Albright |
| 155 | Joseph Foor |
| 159 | Everette F. Shaulis |
| 160 | Timothy L. Best |
| 165 | Russell D. Humphrey |
| 168 | Michael J. Arcuri |
| 172 | Lucille K. Kufchak |
| 174 | Brenda S. Morris-Bolger |
| 175 | Gary L. Driscoll |
| 178 | William M. Hall |
| 180 | Robert L. Hamilton |
| 181 | Regina M. Day |
| 185 | Dennis M. Cook |
| 189 | Sheria N. Grayer |
| 194 | Ellin L. Grantz |
| 197 | Patrick M. Russell |
| 201 | Katherine M. Blackann |
| 203 | Edward C. Schmidt |
| 208 | Melissa Buhala |
| 209 | Helene Messersmith |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1241

| | |
|---|---|
| 210 | Kara Gillespie |
| 212 | James T. Weller, Jr. |
| 217 | Martha Muldowney |
| 219 | Janine E. Veits |
| 222 | William M. Shultz |
| 227 | Thomas Hitt |
| 229 | Ronald Wynn |
| 230 | William H. Danklefsen |
| 233 | Regina C. Palette |
| 235 | Dawn M. Hanna |
| 236 | Jack Rusnak |
| 238 | Jessie M. Chase |
| 240 | Lance Mark Taylor |
| 241 | Charles Fink |
| 250 | Patricia M. Sawyer |
| 253 | Edward S. Colucci |
| 254 | Kathryn Sarisky |
| 255 | Diane K. Petsko |
| 256 | Lee Silvis |
| 258 | Kenneth Roberts |
| 259 | Barry R. Schecht |
| 261 | John E. Langley |
| 262 | John D. Vance |
| 263 | David C. Gordos |
| 264 | Michael S. Merriman |
| 265 | RubyE. Ramsey |
| 272 | Brad Masters |
| 275 | Ruth A. Bunker |
| 279 | Michelene Maruca |
| 281 | Joseph Natali |
| 281 | Jean T. Sprinkle |
| 282 | Sandra J. Clark |
| 283 | Lora Getts |
| 285 | Nicholas J. Ewanish |
| 287 | Harold E. Deraud |
| 288 | Larry Jordan |
| 292 | Sheryl E. Braun |
| 296 | Judy Rees |
| 298 | Jeffrey V. Proctor |
| 301 | Susan L. Booth |
| 303 | Marilyn J. Rook |
| 304 | Danny P. Thomas |
| 309 | Paul J. Drotar |
| 312 | Rebecca A. Pierce |
| 317 | Bradley John Petak |

VOL 1004 PAGE 273

3

| 318 | Larry Bequeath, Jr. |
| 322 | Ellyn L. Biles |
| 329 | Robert Morgan |
| 333 | Todd Anerino |
| 334 | John Brdek |
| 336 | Kristina Holmes |
| 337 | Susan P. Somich |
| 366 | Vicki Martin |
| 368 | Tracie Pirigyi |
| 374 | Carol Dietz |
| 383 | Donald J. Meszaros |
| 390 | Kathryn Carr |
| 393 | Sandra Gillespie |
| 395 | John A. Marsco, Jr. |
| 398 | James L. Ziegler, Jr. |

HON. _____

JOHN M. STUARD, Judge

Date: 6/20/03

Clerk: Please forward copies hereof to Christopher D. Becker, Esq. and
Kenneth N. Bailey, Esq., Counsel for Plaintiff, 160 High Street, NW, Warren,
Ohio 44481; and J. Gerald Ingram and John B. Juhasz, Counsel for
Defendant, 7330 Market Street, Youngstown, Ohio  44512-5610.

6/23/03  copies sent

VOL 1004 PAGE 274

JUDGE JOHN M. STUARD - TRUMBULL COUNTY, OHIO COURT OF COMMON PLEAS

4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1243

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | CASE NO.:  01-CR-793 |
| Plaintiff, | * | JUDGE:  JOHN M. STUARD |
| -vs- | * | **OPINION OF THE COURT IMPOSING** |
| | | **DEATH SENTENCE AND. FINDINGS** |
| DONNA MARIE ROBERTS, | * | **OF FACT AND CONCLUSIONS OF** |
| | | **LAW REGARDING IMPOSITION OF** |
| Defendant. | * | **DEATH SENTENCE. {O.R.C.** |
| | | **2929.03(F)}** |

## HISTORY

On May 28, 2003, a Trumbull County Petit Jury returned a unanimous verdict finding

the Defendant, Donna Marie Roberts, guilty of two (2) counts of complicity to commit

aggravated murder arising from the death of Robert S. Fingerhut. Each count contained two (2)

specifications of aggravating circumstances listed in division (A) of section 2929.04 of the

Revised Code. Since counts one and two of the indictment merge for sentencing purposes, the

State elected to dismiss count two and the specifications thereto prior to the commencement of

the mitigation phase. Therefore, for purposes of this opinion, the Defendant was convicted of

the first count of the indictment, or purposely and with prior calculation and design, causing the

death of Robert S. Fingerhut.

On June 4, 2003, the mitigation or second phase of the trial began. The jury, in that

phase, unanimously found that the State had proved beyond a reasonable doubt that the

aggravating circumstances, to-wit: specification one to count one, that the Defendant was a

complicitor in committing or attempting to commit, or in fleeing immediately after committing

-1-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1244

or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design and specification two to count one, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design outweighed the mitigating factors and returned two (2) verdicts recommending the death sentence.

Pursuant to Revised Code Section 2929.04(F) the Court is now obligated to file a separate written opinion independently weighing the aggravating circumstance of each specification against the mitigating factors. The weighing process reflected in this opinion is based upon evidence heard by the jury but is done independently and without regard to the findings of the jury.

## FACTS

Factually, the evidence at trial revealed that the Defendant planned the murder of her ex-husband and housemate, Robert S. Fingerhut, for five hundred and fifty thousand dollars ($550,000.00) in insurance proceeds. The Defendant plotted the murder for at least three (3) months prior to December 11, 2001. The Defendant corresponded with her convict lover and co-defendant, Nathaniel Jackson, while he was in prison at the Lorain Correctional Institution; she also accepted nineteen (19) collect telephone calls from Jackson while he was incarcerated wherein they planned details of the murder. The telephone calls were recorded and the letters and phone calls were seized by police during the course of the murder investigation.

The murder plot included a plan whereby the Defendant would pick up Jackson from prison on December 9, 2001, and take him to the Wagon Wheel Motel in Boardman, Ohio, and

-2-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1245

rent a room with a mirrored ceiling and a Jacuzzi tub where they would have sexual relations. The Defendant would obtain handcuffs, a firearm, ski mask, leather gloves to conceal fingerprints and would ensure Jackson access to the victim's residence so that Jackson could abduct the victim and take him out of the house and kill him. The conspirators discussed forcing the victim to watch the Defendant perform oral sex on Jackson before executing the victim. The Defendant planned to set up an alibi at the time of the murder by driving around and going to various retail outlets and shopping where she would be filmed by the store's video security cameras. The Defendant made several telephone calls to Fingerhut's place of employment, the Greyhound Bus Station in Youngstown, Ohio, to ensure that Fingerhut timely left work at approximately 9:00 p.m. on December 11, 2001. The Defendant also provided Jackson with a cellular telephone to keep in contact with her while she was driving a red Chrysler 300M which contained its own cellular telephone. The Defendant had previously checked on the insurance policies to ensure that they were in effect and that the premiums were paid until the end of 2001. The Defendant also discussed in the letters and phone calls obtaining a motel room for Jackson after the killing so Jackson could hide out after the murder.

However, the plan began to go bad when Jackson, who was in Fingerhut's residence, sustained a gunshot wound to his left index finger during a struggle with the victim. Jackson shot Fingerhut three (3) times, including one (1) fatal shot to the head. Jackson left the victim's body in the residence, and took Fingerhut's car keys and Fingerhut's silver Chrysler 300M from the garage of the residence. Jackson drove Fingerhut's car to Youngstown, Ohio, where he abandoned it approximately three (3) blocks from where he was ultimately arrested on

-3-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1246

December 20, 2001. A series of telephone calls occurred between the Defendant's telephone in her red Chrysler and her cellular telephone which was in the possession of Jackson during the time frame of approximately 9:30 p.m. and 12:00 midnight on December 11, 2001. Between 9:30 p.m. and 10:30 p.m. the Defendant drove Jackson to the Days Inn in Boardman, Ohio, and rented him a room for one week. Jackson's wound was treated and bandaged in the room.

The Defendant returned to the residence in Howland Township, Trumbull County, Ohio, and "discovered" her ex-husband's body just inside the man door leading from garage. The Defendant called 911 and feigned hysteria. The Defendant in her letters to Jackson had discussed how she would fake grief upon discovering that her ex-husband had been killed. Howland Township Police Officers responded to the 911 call and were met by the Defendant. The police did not find any signs of forced entry and the only things missing from the residence were the victim's car keys and the victim's automobile. Two wallets containing a large sum of cash and credit cards as well as other valuables were undisturbed inside the residence. The Defendant told the officers that her husband's car was missing and granted them permission to search the residence and her vehicle for evidence that might lead to the killer. During this search police found approximately one hundred and forty (140) letters from Jackson to the Defendant in her dresser, and approximately one hundred and forty (140) letter from the Defendant to Jackson in the trunk of the Defendant's red car, in a paper bag bearing Jackson's name and prison number.

As the investigation progressed, law enforcement officers were able to obtain the nineteen (19) recorded telephone conversations between the Defendant and Jackson while

-4-

VOL 1004 PAGE 278

Jackson was incarcerated in the Lorain Correctional Institution. These tapes constituted approximately three (3) hours of conversation. These telephone calls, along with the letters which spanned a time frame of approximately three (3) months, revealed a continuing and evolving plan to kill Fingerhut within days after Jackson's release from prison.

Jackson was soon arrested at a house on Wirt Street in Youngstown, Ohio, a few blocks from where Fingerhut's vehicle was recovered ,and a pair of black leather gloves with fleece lining were recovered from that house at the time of his arrest. In a letter written to Jackson, the Defendant acknowledged that she had found thin, fleece-lined leather gloves. The recovered gloves had gunshot residue and a hole in the left index finger, along with a reddish substance which appeared to be blood in that area. This damaged area matched the injury that Jackson had sustained to his finger.

The evidence also revealed that the Defendant, near the approximate time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two (2) hours from the last time Fingerhut was seen alive, the Defendant rented a motel room at the Days Inn in Boardman, Ohio, for Jackson. In this room bloody bandages and other medical supplies were found by hotel cleaning personnel and were subsequently collected by police.

Fingerhut's silver Chrysler, which had been stolen by Jackson from the residence, was recovered in Youngstown, Ohio. Blood stains in and on the vehicle were collected by law enforcement officers. DNA analysis of the blood stains collected on the trunk latch and the interior sun visor revealed that the blood matched the DNA profiles of Nate Jackson and the

-5-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1248

victim. Blood stains collected from the Days Inn also matched the DNA profile of Nate Jackson.

The State also introduced evidence from the letters that the Defendant and Jackson discussed purchasing a "new Lincoln" or a "2002 Cadillac DeVille" for Jackson. The Defendant and Jackson repeatedly discussed waking up together on Christmas Morning and the Defendant repeatedly stated how much she hated Fingerhut. Additionally, Fingerhut had two (2) life insurance policies with a combined benefit of five hundred and fifty thousand dollars ($550,000.00).

On December 12, 2001, shortly after calling 911, Howland police officers noticed the Defendant's behavior which included feigned crying and listening in on conversations of investigators. On December 12, 2001, shortly after calling 911, the Defendant told investigators that she had been out shopping at Wal-Mart, Super K-Mart and Giant Eagle. Police could only confirm that the Defendant was at Wal-Mart at approximately 9:30 p.m. The Defendant never stated to police that she had taken Jackson to the Days Inn in Boardman, Ohio.

Later in the afternoon of December 12, 2001, the Defendant provided police with a list of suspects who may have wanted to kill Fingerhut, including an alleged homosexual lover of the vicitm, a half Hispanic half black man that the Defendant had dated, a man named Santiago Mason and a number of people from the Greyhound bus station. When investigators asked the Defendant about Nathaniel Jackson the Defendant stated, "oh, I almost forgot about him" and proceeded to tell the officers that she had last seen Jackson on Monday, December 10, 2001, and had last spoken to him in the morning of Tuesday, December 11, 2001.

The investigation revealed that the Defendant and Jackson were together throughout the

-6-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1249

afternoon and evening of December 11, 2001. The State presented evidence and testimony that the Defendant took Jackson to get a haircut, ate dinner with him at Red Lobster and was with him at the Warren Greyhound bus terminal in Warren, Ohio, which was the Defendant's place of employment. One witness, Frank Reynolds, testified that after Jackson's release from prison and prior to the murder, he was present at the Youngstown bus terminal when the Defendant asked Fingerhut for three thousand dollars ($3,000.00); when Fingerhut refused to give her the money she gave him a dirty look. The Defendant had stated in her letters that she was tired of "the grinch doling out the money" and was referring to Fingerhut providing her with a set amount of cash to spend every week.

The Defendant planned to obtain a firearm for Jackson to use in order to kill Fingerhut. While the Defendant was supposedly in a torrid love relationship with Jackson, she invited ex-con Santiago Mason to her residence where she performed oral sex on him. When he refused her further sexual advances to engage in vaginal intercourse, Mason was accused by the Defendant of stealing a .38 caliber firearm. Forensic evidence revealed that the weapon used to kill Fingerhut was consistent with a .38 caliber firearm. The investigation revealed that Roberts was missing two .38 caliber firearms at the time of Fingerhut's murder.

### AGGRAVATING CIRCUMSTANCES

In this case the jury found the existence beyond a reasonable doubt of two aggravating circumstances pursuant to section 2929.04(A)(7) of the Revised Code, to-wit: specification one to count one, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that

-7-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1250

the Defendant committed the aggravated murder with prior calculation and design and specification two to count one, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design.

With respect to the aggravating circumstance related to the aggravated burglary, the evidence presented at trial proved that the Defendant allowed Jackson to trespass in Fingerhut's residence located at 254 Fonderlac Drive, Howland Township, Trumbull County, Ohio, with the specific purpose of killing Fingerhut with prior calculation and design. Jackson was wearing leather gloves and armed with a firearm, which he used to shoot the victim three times, causing his death. The gloves, a ski mask, firearm and access to the house were all provided by the Defendant with prior calculation and design as evidenced by the telephone calls and letters introduced by the State. The Defendant ensured the victim's arrival by checking at his place of employment and determining when he left work and by calling him on the telephone while he was on his way home. The Defendant had also checked on the status of the life insurance policies and determined that the premiums were paid up to the end of 2001 and advised Jackson of the same.

Pursuant to her plan to kill Fingerhut, the Defendant took Jackson to a motel room in Boardman, Ohio, and rented the room for one week which was consistent with the plans discussed in the letters and phone calls prior to the murder.

Upon discovering Fingerhut's body the Defendant feigned grief exactly as discussed in

-8-

VOL 1004 PAGE 282

her letters with Jackson.

During the course of the investigation the Defendant continually threw out red herrings for the Howland Police by mentioning a number of possible suspects including alleged homosexual lovers of the victim, her ex-boyfriends, crazy people from the Greyhound bus terminal in Youngstown and Santiago Mason. The Defendant only mentioned Jackson (the convict she had corresponded with by letter for three (3) months, spoken to on the telephone nineteen (19) times, picked up from prison, engaged in sexual relations with just two days prior, taken to get his haircut and ate dinner with just hours previously, and the person whom she had driven to Boardman, Ohio, on the night of the murder and who had an injured index finger) after the investigators confronted her with his name.

From the aforementioned evidence, this Court concludes that the Defendant committed the aggravated murder as a complicitor while committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design.

With respect to the aggravating circumstance related to the aggravated robbery, after Jackson had murdered the victim, he took the victim's set of keys and his silver Chrysler 300M. Although the planned crime involved Jackson stealing Fingerhut's car in order to kidnap Fingerhut it is clear that Jackson was to take the victim's car to flee the residence. The fact that Fingerhut struggled with Jackson in the residence and was killed in the residence in no way negates the Defendant's plan that Jackson should steal the victim's car to facilitate Jackson's own flight from the residence.

-9-

VOL 1004 PAGE 283

Ample DNA evidence was presented indicating that Jackson was in the silver Chrysler 300M following the murder of Fingerhut. Additionally, phone records were introduced showing that Jackson and the Defendant called each other after the murder to check on the status of the plan. Finally, the vehicle was recovered a few blocks from the location where Jackson was arrested.

The Defendant, in accordance with the plan to kill Fingerhut, paid for a hotel room for Jackson following the murder.

The fact that the silver Chrysler 300M was found abandoned with the victim's keys in the ignition coupled with the fact that the victim's wallet, money, credit cards and other valuables were not stolen clearly show that the plan to steal the victim's car as a means of escape following the kidnapping and murder of the victim were carried out in accordance with the prior calculation and design as set out by the Defendant and Jackson.

From the aforementioned evidence this Court concludes that the Defendant committed the aggravated murder as a complicitor while committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design.

## MITIGATING FACTORS

To be weighed against the aggravating circumstances the Court must weigh any mitigating factors.

On Tuesday, June 3, 2003, the Defendant appeared in chambers and on the record with her retained attorneys, J. Gerald Ingram and John B. Juhasz and her retained psychologist

-10-

VOL 1004 PAGE 284

Thomas Eberle. The State was present and represented by Assistant Prosecutors Kenneth N. Bailey and Christopher D. Becker.

The Defense indicated to the Court that the Defendant had been evaluated by Dr. Eberle for her competency to waive mitigating evidence and that in the doctor's opinion she was competent to do the same. The Court personally addressed the Defendant and inquired of her as to the importance of presenting mitigating evidence, the use of such evidence to offset the aggravating circumstances, and the effect of failing to present such evidence. The Court was assured that the Defendant understood these concepts by both defense counsel and Dr. Eberle and personally inquired whether the Defendant desired to waive the right to present mitigating evidence. The Court having found no evidence to contradict Dr. Eberle's findings and the Defendant's statements and desire to waive the presentation of mitigating evidence then found that the Defendant was competent to waive the presentation of mitigation evidence and had done so knowingly, voluntarily and intelligently. The Defendant indicated to the Court that she only desired to make an unsworn statement to the jury, which she was advised she was permitted to do and would be permitted to make on June 4, 2003, which was the date previously scheduled for the mitigation or second phase.

On Wednesday, June 4, 2003, the Defendant made an unsworn statement during which she stated to the jury that there were no mitigating factors and during which she requested the jury to impose a death sentence. This statement was articulate, coherent, and well organized. The statement lasted approximately one hour during which the Defendant showed no difficulty or fear in addressing a large group of individuals including the jury and a large number of

-11-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1254

courtroom observers.  The Defendant spoke freely and although she had with her prepared notes she often extemporized.

Despite the preceding the Court is still bound to make an independent weighing of any and all mitigating factors that it feels may exist in this case against the aggravating circumstances.

The Defendant in this case was not the principal offender.  Pursuant to section 2929.04(B)(6) the Court considers this factor and gives it very little weight.  The Defendant committed the aggravated murder during the course of the commission of both an aggravated burglary and aggravated robbery.  The record is replete with instances wherein the Defendant actively planned this aggravated murder with prior calculation and design in order to collect five hundred and fifty thousand dollars ($550,000.00) in life insurance proceeds.  The Defendant's plan included buying her co-defendant a new Cadillac or Lincoln in exchange for killing her ex-husband, promises of trips, a nice home in a wealthy neighborhood and overall a one hundred and eighty degree change in lifestyle for Nathaniel Jackson, her co-defendant.

The record is overwhelming that but for the Defendant's planning and actions the victim would be alive today.  The Defendant discussed and planned for months with the principal offender how they would kill the victim.  The Defendant checked on the status of the insurance policies in order to ensure that she would be able to collect the proceeds from the same and advised the principal offender of the status of the policies.  The Defendant then transported the principal offender in the aggravated murder from prison to a pre-determined location in order to engage in love making before the murder.  The Defendant fed the principal offender prior to

-12-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1255

the crime. The Defendant provided the principal offender with gloves, a ski mask, the murder weapon and a hide out after the aggravated murder all as planned and discussed prior to the aggravated murder. The Defendant gave the principal offender entry into the residence of the victim for the sole and exclusive purpose of killing the victim. This plan was clearly discussed in both the letters and the recorded telephone conversations, including the last telephone call of December 8, 2001, the day before the principal offender was released from prison. The Defendant failed to advise police of her relationship with the principal offender until she was confronted with the existence of the relationship by the police. Prior to being confronted by the existence of this relationship the Defendant gave the police a number of red herrings implicating a number of potential suspects but never mentioned her relationship with the principal offender and her discussions with him regarding the aggravated murder of Robert Fingerhut.

The Court gives very slight weight to the fact that the Defendant indicates in her letters that the victim may have been physically abusive to her. This factor is pursuant to section 2929.04(B)(1)&(2); however, the existence of this factor is given very slight weight due to the fact that it is unsubstantiated and even if it were true it would not warrant the Defendant's actions in this case.

The Court gives very little weight to the Defendant's unsworn statement. During the course of her unsworn statement the Defendant apologized to her defense team and thanked them for their hard work. The few positive things gleaned from this statement were overshadowed by the Defendant's personal attacks and statements that were clearly contrary to the evidence. The Defendant denied guilt and personally attacked the jurors by claiming they

-13-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1256

were not a jury of her peers. The Defendant accused the lead investigator as being motivated solely by career advancement and accusing him of obstruction of justice and perjury. The Defendant referred to the other investigators as "lackeys" and claimed that one member of the prosecution team was "anti-semetic and racist". The Defendant also chastised the jurors for being uninformed about current events. The Defendant also stated to the jury that she and the victim had a loving relationship and planned to live happily ever after. These statements are in direct contravention of her statements in the letters and the phone calls expressing her desire and wishes that the victim meet an untimely death and her desire to marry and live with Nathaniel Jackson. The Defendant also appeared to brag to the jury that she and the deceased had earned over two hundred thousand dollars ($200,000.00) per year and that the five hundred and fifty thousand dollars ($550,000.00) in life insurance proceeds was of little value to her because that sum would only sustain her for a few years.

It is difficult for this Court or any fact finder to give any weight to such a statement.

Pursuant to section 2929.04(A)(7) the Court will give very slight weight to the Defendant's behavior during the course of this trial. The Defendant was courteous, pleasant and properly addressed the Court at all times. The Defendant appeared intelligent and interested in the proceedings and appeared to assist in her defense at all times. The Defendant presented no security problems to the Court and those who transported her to Court each day.

<u>**CONCLUSIONS OF LAW**</u>

The Court has carefully and independently weighed the cumulation of all of the mitigating factors against each aggravating circumstance separately as to each of the two

-14-

VOL 1004 PAGE 288

specifications. In other words the Court has weighed the evidence twice  First, the Court weighed all of the mitigating factors against the aggravating circumstance surrounding the aggravated burglary and then the Court engaged in a second weighing whereby the Court again weighed all of the mitigating factors against the aggravating circumstance surrounding the aggravated robbery.

With respect to the first weighing of the aggravating circumstances related to the aggravated burglary against all of the mitigating factors, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The Legislature of the State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction to a defendant who commits an aggravated murder during the commission of certain felonies. In the case at bar, the underlying felonies were aggravated burglary and aggravated robbery.

In this particular case, the Court accords substantial weight to the aggravated burglary specification in the first weighing process. In order to prove an aggravated burglary, the State is required to prove that a defendant trespassed in an occupied structure for the purpose of committing a criminal offense. In this particular case the Defendant purposely had her co-defendant trespass in the occupied structure of Robert S. Fingerhut with the specific purpose of committing an aggravated murder which had been meticulously planned over a number of months with prior calculation and design.

Under the facts of this case, this Court can not foresee any other form of aggravated

-15-

VOL 1004 PAGE 289

burglary where the weight of this particular aggravating circumstance could ever be greater. The evidence reveals that the aggravated burglary was committed for the sole purpose of killing Robert S. Fingerhut pursuant to a planned and methodical execution scheme designed by the Defendant and her co-defendant and whereby the Defendant would collect five hundred and fifty thousand dollars ($550,000.00) in insurance proceeds. This is the most heinous form of aggravated burglary, and is entitled to unsurpassed weight. In this Court's view, this aggravating circumstance, standing alone, outweighs all of the mitigating evidence in this case.

Therefore, with respect to specification one to count one the Court concurs with the jury's recommendation and finds that the death sentence is the appropriate penalty.

With respect to the aggravating circumstance of the aggravated robbery, the Court concedes that this offense is not quite as heinous as the circumstances surrounding those concerned with the aggravated burglary. However, the aggravated robbery was clearly committed to facilitate the escape from the aggravated murder and is extremely close to being the worst form of aggravated robbery. This statement is galvanized by the fact that the aggravated robbery was planned by the Defendant to be part of a kidnapping, whereby the victim was to be removed and taken to a different location where the Defendant would then engage in oral sex with her co-defendant while the victim was forced to watch prior to his execution. This plot is clearly spelled out in the letters between the Defendant and co-defendant. The plan clearly went awry when the victim engaged the co-defendant in a struggle at the residence. Again, this scheme was hatched for the purpose of the Defendant collecting five hundred and fifty thousand dollars ($550,000.00) in insurance proceeds.

-16-

VOL 1004 PAGE 290

Therefore, the aggravating circumstance specification relating to the aggravated robbery, when weighed against all of the mitigating factors in this case, clearly and undeniably outweighs by proof beyond a reasonable doubt all of the mitigating evidence in this case.

Therefore, with respect to specification two to count one the Court concurs with the jury's recommendation and finds that the death sentence is the appropriate penalty.

The Court recognizes that the death sentences recommended by the Jury must be merged and the Court does hereby merge the death sentences for purposes of sentencing.

For the reasons set forth herein, and after independently and separately weighing the aggravating circumstances against all of the mitigating factors, it is the judgment of this Court that the jury's recommendation is accepted and the Court does find that the sentence of death is the appropriate penalty in this case.

Dated: _4/20/03_

JOHN M. STUARD, JUDGE
Trumbull County Common Pleas Court
Warren, Ohio

I hereby certify that a copy of the foregoing opinion was ~~hand delivered~~ Faxed to attorneys J. Gerald Ingram and John B. Juhasz and Assistant Prosecutor's Kenneth N. Bailey and Christopher D. Becker, this _20_ day of June, 2003.

JOHN M. STUARD, JUDGE

I also hereby certify that a copy of the foregoing opinion was duly mailed by ordinary U.S. Mail to the Clerk of the Supreme Court of Ohio, Rhodes State Office Tower, 30 E. Broad Street, 2nd Floor, Columbus, Ohio 43215-3431, this _20_ day of June, 2003.

JOHN M. STUARD, JUDGE

-17-

VOL 1004 PAGE 291

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO                                    CASE NO. ___01-CR-793___

VS.

    DONNA MARIE ROBERTS                        **POST SENTENCING RIGHTS**
_____

**DEFENDANT**

I.      I, _____, the Victim or Victims's Representative,

was present in Court for the sentencing of _____DONNA MARIE ROBERTS_____

I realize that I have the following rights:

    1.      The right to notification by the Ohio Adult Parole Authority if the defendant
becomes eligible for parole, shock parole or early release.  And, further, that
It is my responsibility to notify the Ohio Adult Parole Authority that I want such
notification.  In order to receive notification, I understand that I must write the
Ohio Adult Parole Authority, 1050 Freeway Drive, Columbus, Ohio 43229,
Phone: (614)431-3221, and request notification.  Further, I understand that it is
my responsibility to notify the Ohio Adult Parole Authority of any changes in my
address or phone number.

    2.      I also have the right to be notified by the Trumbull County Common Pleas Court
In advance should the Court consider granting shock probation to the defendant.
It is my responsibility to notify the Victim/Witness Division, located at the
Trumbull County Courthouse, 2nd floor, 160 High Street, Warren, OH 44481,
Phone: (330)675-2551 of any changes in my address or phone number.

_____
                              Victim or Victim's Representative

II.      The Victim or Victim's Representative in this case has been previously notified of his or her
rights under the Ohio Revised Code concerning Ohio Victims of Crime.  The Victim
or Victim's Representative was notified of the sentencing date and elected not to appear
in Court.

_____
                              Assistant Prosecuting Attorney

# W A R R A N T   T O   C O N V E Y

OHIO REFORMATORY FOR WOMEN
REVISED CODE, SEC. 2949.12 TO .17

### COURT OF COMMON PLEAS, TRUMBULL COUNTY, WARREN, OHIO

STATE OF OHIO                                    CASE NO. <u>2001 CR 00793</u>

    VS.

**DONNA MARIE ROBERTS**

**TO THE SHERIFF OF SAID COUNTY:**

WHEREAS, our said Court, begun and held at Warren, Ohio in said county, on JUNE 20 2003, the said Defendant

**DONNA MARIE ROBERTS**

was indicted for:

**AGGRAVATED MURDER**

and was sentenced by the Court to the OHIO REFORMATORY FOR WOMEN.

YOU ARE THEREFORE HEREBY COMMANDED, to take charge of and convey the said

**DONNA MARIE ROBERTS**

to the OHIO REFORMATORY FOR WOMEN at MARYSVILLE OHIO.

and make due return of your proceeding herein to this office forthwith.

IN TESTIMONY WHEREOF, I have hereunto
set my hand and affixed the seal of said
Court at Trumbull County, Warren, Ohio this
June 23, 2003
MARGARET R. O'BRIEN, Clerk of Courts

By <u>Rochelle Ryan</u>

                Deputy Clerk

CASE NO. **2001 CR 00793**

================================

TRUMBULL COUNTY COMMON PLEAS COURT

Trumbull County, Warren, Ohio

================================

STATE OF OHIO

vs.

DONNA MARIE ROBERTS

================================

WARRANT TO CONVEY

_____

================================

RETURNED AND FILED

_____, 20_____

MARGARET R. O'BRIEN, Clerk of Courts

By_____
          DEPUTY CLERK

**RETURN**

Received this writ on the _24th_ day of

_June_____, 20_03_

at _0254_ o'clock _A_.M., and on the

_26th_ day of _June_____, 20_03_

I executed the same by conveying the

person named to the place designated.

as shown by the receipt endorsed hereon

_____
SHERIFF   _Sgt. Arthur J. Lesko, Jr._
DEPUTY

|   | FEES |   |
|---|------|---|
| * MILEAGE | $ _72.30_ | * |
| * SERVICE | $ _1.00_ | * |
| * OTHER | $_____ | * |
| * | $_____ | * |
| * TOTAL | $ _82.30_ | * |

_Marysville_____, OHIO

_6/26_____, 20_03_

Received this day, from _____

_Trumbull Co._____ Sheriff of

_____ County, Ohio the

prisoner named in the within warrant.

_Dt Cooper J.W._____
Superintendent

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1263

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 01-CR-793 |
| | ) | |
| Plaintiff | ) | **DEATH PENALTY** |
| | ) | |
| -vs- | ) | SENTENCE TO OHIO |
| | ) | REFORMATORY FOR WOMEN |
| DONNA MARIE ROBERTS, | ) | |
| | ) | ENTRY ON SENTENCE |
| Defendant | ) | |

The Defendant herein having been indicted by the September Eighth, 2001, Term of the Grand Jury of Trumbull County, Ohio, for Count One: Aggravated Murder (O.R.C. §§2903.01(A) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Two: Aggravated Murder (O.R.C. §§2903.01(B)) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Three: Aggravated Burglary (F1) With Firearm Specification (O.R.C. §2911.11.(A)(1)(2) and 2941.145); and Count Four: Aggravated Robbery (F1) With Firearm Specification (O.R.C. §2911.01(A)(1)(3) and 2941.145), and on the 8th day of April, 2003, having been brought into Court for trial before a petit jury and being represented by counsel, Attorney J. Gerald Ingram and Attorney John B. Ingram, and the jury having been empaneled,

VOL 1004 PAGE 440

and after due deliberation on May 28, 2003, was found guilty of Count One: Complicity to Commit Aggravated Murder (O.R.C. §§2923.03(A)(2), 2903.01(A) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and  Specification No. 2: Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Two: Complicity to Commit Aggravated Murder (O.R.C. §§ 2923.03(A)(2),  2903.01(B) and 2941.14(C)) of Robert S. Fingerhut,  with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and  Specification No. 2:  Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Three: Complicity to Commit Aggravated  Burglary (F1) With Firearm Specification (O.R.C. §2923.03(A)(2), 2911.11.(A)(1)(2) and 2941.145); and  Count Four: Complicity to Commit Aggravated Robbery (F1) With Firearm Specification (O.R.C. §2923.03(A)(2), 2911.01(A)(1)(3) and 2941.145). Thereafter, Count Two was removed from the Jury pursuant to a Motion to Dismiss by the State.

On June 4, 2003, the Defendant having been brought into Court to give evidence in mitigation on Count One of the indictment, and after arguments of counsel and instructions of law, and after due deliberation, it was the finding and recommendation of the Jury on June 4, 2003, that the sentence of death be imposed on the Defendant.

On June 20, 2002, Defendant's sentencing hearing was held pursuant to O.R.C. Section 2929.19.  Defense Attorney J. Gerald Ingram and Attorney John B. Juhasz, and Assistant Prosecutor Christopher D. Becker and Assistant Prosecutor Kenneth N. Bailey, were present, as was Defendant who was afforded all rights pursuant to Criminal Rule 32.  The Court has considered the record and oral statements, as well as the principles and purposes of sentencing

under O.R.C. Section 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, June 20, 2003, having determined in a separate opinion of specific findings that the aggravating circumstances as to the count of Aggravated Murder outweigh the mitigating factors by proof beyond a reasonable doubt, then made inquiry as to whether the Defendant had anything to say why judgment should not be pronounced against him, and the Defendant in answer showed no good cause or sufficient reason why sentence should not be pronounced.

The Court has considered the factors under O.R.C. §2929.14, and makes the following findings: (1) the shortest prison term will demean the seriousness of the Defendant's conduct; (2) the longest prison term is appropriate because the defendant committed the worst form of the offense; (3) multiple prison terms are necessary to protect the public from future crime and to punish the offender; (4) consecutive prison sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the offender poses to the public; and (5) the harm caused by the multiple offenses was so great that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the defendant's conduct;

It is therefore ORDERED, ADJUDGED, and DECREED that the Defendant, DONNA MARIE ROBERTS, be taken from the courtroom to the Trumbull County Jail and from thence to the Ohio Reformatory for Women at Marysville, Ohio, and thereafter be sentenced to death on January 11, 2004 on Count One;  and imprisoned therein for the stated prison term of ten (10) years on Count Three; plus a mandatory term of three (3) years on the Firearm Specification to

VOL 1004 PAGE 451

be served prior to and consecutive to the sentence imposed in Count Three; ten (10) years on

Count Four, plus a mandatory term of three (3) years on the Firearm Specification to be served

prior to and consecutive to the sentence imposed in Count Four, sentence in Count Four to be

served consecutively to the sentence imposed on Count Three.  Firearm Specifications in Count

Three and Count Four shall merge as one sentence in Count Three as a matter of law.  Defendant

is Ordered to pay the cost of prosecution taxed in the amount $_____ for which

execution is awarded.


_____6/24/03_____

DATED

HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO


THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD

JUDGE

6/24/03. copies
sent to:
Pros.
J. Ingram
G. Jackey

You are hereby notified that you have
been convicted of a felony of violence
and pursuant to Section 2923.13 of the
Ohio Revised Code, you are prohibited
from acquiring, having, carrying or
using any firearm or dangerous
ordinance.

VOL 1003 PAGE 452

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                                    )     CASE NO. 01-CR-793
                                                 )
    Plaintiff                                )
                                                 )     **DEATH PENALTY**
                                                 )
-vs-                                             )     WRIT TO CONVEY PRISONER
                                                 )     FOR EXECUTION OF PENALTY
DONNA MARIE ROBERTS,                             )
                                                 )
    Defendant                                )


A Writ is hereby directed to Thomas Altiere, Sheriff of Trumbull County, Ohio for

conveyance of DONNA MARIE ROBERTS to the Ohio Reformatory for Women at Marysville,

Ohio, and deliverance to its warden.  Said Writ is issued pursuant to Section 2949.21 of the Ohio

Revised Code for the execution of the death penalty against Donna Marie Roberts on January 11,

2004.


_____6/24/03_____
DATED

_____~~Q.~~ M. Stuard_____
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO


VOL 1004 PAGE 453

EXECUTION FOR COSTS IN FELONY

Revised Code, Sec.2949.15

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Case No. 2001 CR 00793

The State of Ohio, Trumbull, County.                 Common Pleas Court

To the Sheriff of said County:

**You are Hereby Commanded,** That of the goods and chattels, and for want thereof, then of the lands and tenements of

**DONNA MARIE ROBERTS**

in your County,whereof SHE was convicted, as appears of record, with interest thereon from the first day of the term aforesaid; also you cause to be made the costs of execution and increase costs that accrue.

Hereof fail not, but of this writ and your proceedings endorsed hereon, make due return, within ten days from the date hereof.

WITNESS my hand and the seal of said Court.

at Warren, Ohio, this

June 23, 2003

**MARGARET R. O'BRIEN**
Clerk of Courts

By Rochelle Ryan
        Deputy

CASE NO. **2001 CR 00793**

=================================

TRUMBULL COUNTY COMMON PLEAS COURT

Trumbull County, Warren, Ohio

=================================

STATE OF OHIO

vs.

DONNA MARIE ROBERTS

=================================

EXECUTION FOR COSTS

_____

=================================

**RETURN**

Received this writ on the ___ day of

_____ , 20___

at ____ o'clock ___.M., and on the

_____ day of _____ , 20___

_____

SHERIFF

_____

DEPUTY

```
*            FEES            *
*                            *
*  MILEAGE    $_____   *
*                            *
*  SERVICE    $_____   *
*                            *
*  OTHER      $_____   *
*                            *
*  _____    $_____   *
*                            *
*      TOTAL  $_____   *
*                            *
```



# Ohio Department of Rehabilitation and Correction

OHIO REFORMATORY FOR WOMEN
1479 Collins Avenue
Marysville, Ohio 43040
937-642-1065

Bob Taft, Governor
www.drc.state.oh.us
Reginald A. Wilkinson, Director

JUNE 26, 2003

TRUMBULL COUNTY CLERK OF COURT
TRUMBULL COUNTY COURTHOUSE
161 HIGH STREET
WARREN  OH  44481

### NOTICE OF COMMITMENT AND CALCULATION OF SENTENCE

Inmate Name:   DONNA ROBERTS          Admission Date:  06/26/2003
Inmate Number: W055276                Judge:           STUARD

The crime and sentencing information reflected below is based on the
information provided at the time of admission to our reception facility.  The
submission of additional information such as jail time credit, additional
sentences or reversals will alter the calculated release date.  Updated
offender information is available on the ODRC web site at www.drc.state.oh.us.

| SB2 OFFENSE | LK CT | C L | JTC | AC GN | DEF TERM | MIN FULL | MAX SEN | A/I MAND | L D | CNTY | CASE NO | C N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| * AGG MURDER | 1 | C | 6 | | | | 777.77 | | D | TRUM | 2001CR00793 | C |
| * AGG BURGLARY | 1 | C | | 6 | 3 | 10.00 | | | | TRUM | 2001CR00793 | S |
| * AGG ROBBERY | 1 | C | | | | 10.00 | | | | TRUM | 2001CR00793 | C |

Aggregate Gun Specifications:        3 years
Aggregate Mandatory Sentence:
Aggregate Jail Time Credit:          6 days

Total Sentence:                      DEATH

Calculated Release/Parole Board Date: 06/13/2026
Sexual Predator Designation:         NO

If you need additional information or have any questions, please contact
the Bureau of Sentence Computation at (614) 877-4367 or P.O. Box 450, Orient
Ohio 43146.



DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1271

COURT OF COMMON PLEAS OF TRUMBULL COUNTY, OHIO
# DOCKET AND JOURNAL ENTRY

| The State of Ohio | CASE NO. 01-CR-793 |
| --- | --- |
| PLAINTIFF | JOURNAL VOL. _____ PAGE _____ |
| Donna Marie Roberts | |
| DEFENDANT | DATE OF REQUEST _____ 19 ___ |

The State of Ohio Public Defender's office is appointed as counsel for
the defendant, Donna Marie Roberts, in her appeal of this matter.

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH-
WITH BY ORDINARY MAIL

JUDGE _John M. Stuard_

APPROVED:

8/6/03 · Copies sent to:

_____
ATTORNEY—FOR PLAINTIFF

_____
ATTORNEY—FOR DEFENDANT

_John M. Stuard_

JOHN M. STUARD                    JUDGE
8/6/03
DATE OF SIGNATURE

Form No. 13-3            VOL **1008** PAGE **468**            TCP-74

132

# The Supreme Court of Ohio



FILED

AUG 14 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

To the Clerk of Court of Common Pleas for

Trumbull _____ County,

Warren _____, Ohio

ORDER TO CERTIFY RECORD
IN DEATH PENALTY CASE

S.C. Case No. _____03-1441_____

C.P. Case No. _____01CR793_____

State of Ohio _____

v.

Donna Marie Roberts _____

You are hereby ORDERED, pursuant to Rule XIX, Section 4, of the Rules of Practice of the Supreme Court of Ohio, to prepare and forward the record in the above-captioned case to the Clerk's Office of the Supreme Court, no later than October 14, 2003, unless the Supreme Court grants an extension of time under Rule XIX, Section 4(C)(1).

Pursuant to Rule XIX, Section 3(A), the record shall consist of the following:

- The original papers filed in the trial court and exhibits to those papers;

- The transcript of proceedings, including all exhibits, and computer diskettes of the transcript, if available; and

- A certified copy of the docket and journal entries prepared by the clerk of the trial court.

You are further ORDERED, pursuant to Rule XIX, Section 4(B)(1), to number the documents and exhibits comprising the record; to prepare an index of the documents and exhibits, correspondingly numbered and identified with reasonable definiteness; to briefly describe all exhibits listed in the index; and to send a copy of the index to all counsel of record in the case and transmit the index with the record to the Clerk of the Supreme Court.

THOMAS J. MOYER
Chief Justice

133

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, Ohio

STATE OF OHIO,                              :

    Plaintiff-Respondent

-v-                                        :        Case No. 01-CR-793

DONNA ROBERTS ,                            :

    Defendant-Petitioner                   :

---

### PETITIONER DONNA ROBERT 'S MOTION FOR APPOINTMENT OF COUNSEL

---

    Now comes Petitioner Donna Roberts, Pro Se, and moves this Court to appoint post-conviction counsel for her.  The reasons for this Motion are more fully set forth in the attached Memorandum of Law.

Respectfully submitted,

DONNA ROBERTS, PRO SE



IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, Ohio

STATE OF Ohio,                        :

     Plaintiff-Respondent

-v-                                   :        Case No. 01-CR-793

DONNA ROBERTS,                        :

     Defendant-Petitioner

---

MEMORANDUM IN SUPPORT OF
PETITIONER DONNA ROBERT'S  MOTION FOR APPOINTMENT OF COUNSEL

---

## I.    INTRODUCTION

On, Ms. Roberts was sentenced to death. At that time, this Court appointed counsel to represent her in the direct appeal of her convictions and death sentence to the Ohio Supreme Court.[1] However, Petitioner Roberts also has a statutory right to pursue post-conviction relief pursuant to O.R.C. § 2953.21. Moreover, O.R.C. § 2953.21(I) grants individuals sentenced to death a right to appointed counsel to pursue post-conviction relief. Petitioner Roberts  therefore gives notice to this Court of intention to pursue post-conviction relief and moves this Court to appoint counsel to assist her in preparing and filing a post-conviction petition.

**III.    Petitioner Roberts is entitled to appointed counsel.**

**A.    O.R.C. § 2953.21(1) Mandates Appointed Counsel.**

In 1996, the Ohio Legislature amended Ohio's post-conviction statutes, Ohio Revised Code Section 2953.21, et. seq.  This law was originally enacted in 1965 as an emergency

---

[1] This Court appointed the Office of the Ohio Public Defender to represent Petitioner for purposes of her direct appeal. However, the Office of the Ohio Public Defender cannot be appointed to provide post-conviction

1

measure to provide a "new procedure" to protect constitutional rights and provide an "orderly method of hearing such matters." See Section 2 of Amended S.B. 383, 106th General Assembly; see also Kott v. Maxwell, 3 Ohio App. 2d 337 (1965). The right to post-conviction relief is set forth in Section (A)(1) of Ohio Revised Code § 2953.21, provides:

> Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

Moreover, the Ohio Legislature recognized that indigent capital post-conviction petitioners are entitled to the appointment of counsel when pursuing their statutory right to post-conviction relief:

> If a person who has received the death penalty intends to file a petition under this section, the court shall appoint counsel to represent the person upon a finding that the person is indigent and that the person either accepts the appointment of counsel or is unable to make a competent decision whether to accept or reject the appointment of counsel. The court may decline to appoint counsel for the person only upon a finding, after a hearing if necessary, that the person rejects the appointment of counsel and understands the legal consequences of that decision or upon a finding that the person is not indigent.

O.R.C. § 2953.21(I)(1). Petitioner is therefore entitled to appointed counsel to represent her in her post-conviction proceedings.

### B. The Eighth and Fourteenth Amendments Mandate Appointment of Counsel.

---

representation for Petitioner because that office is currently providing post-conviction representation to Petitioner's death-sentenced co-defendant, Nathaniel Jackson.

2

The courts have recognized that though a state is not required to create an appellate review system for criminal cases, once it erects such a right, it must do so consistent with the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 393 (1984); Griffin v. Illinois, 351 U.S. 12, 18 (1956).

Further the courts have recognized the need for more exacting procedures in capital cases because the penalty demands fact-finding at a "heightened standard of reliability."  Ford v. Wainwright, 477 U.S. 399, 411 (1986); Parker v. Delo, 33 F.3d 933, 939, n.6 (8th Cir. 1994)

Capital petitioners face a serious dilemma under Ohio's post-conviction scheme.  The text of the statute provides that a petitioner must include with the post-conviction petition affidavits from experts and witnesses and other evidentiary documents in support of the claims contained in the petition.  State v. Kapper, 5 Ohio St. 3d 36, 38 (1983); State v. Cole, 2 Ohio St. 3d 112 (1982); State v. Pankey, 68 Ohio St. 2d 58 (1981); State v. Jackson, 64 Ohio St. 2d 107 (1980).  If these affidavits and documents are not attached, a petitioner faces summary dismissal.  Indigent petitioners like Petitioner Roberts face the burden of collecting evidence dehors the record of her case in support of constitutional claims without any means to pay for the services to conduct the necessary investigation.  The State, cannot, consistent with the Fourteenth Amendment, require that Petitioner Roberts attach affidavits and evidentiary documents to support her post-conviction petition, then deny Petitioner the access to counsel necessary to produce that evidence.

The courts have long recognized that a defendant may not be denied his access to the court due to his indigency status.  Griffin v. Illinois, 351 U.S. 12 (1956); Burns v. Ohio, 360 U.S. 252 (1959). This right of access of impoverished defendants to the courts extends to post-

3

conviction proceedings.  <u>Smith v. Bennett</u>, 365 U.S. 708 (1961); <u>Long v. Iowa</u>, 385 U.S. 192 (1966).

The courts have also recognized that when a defendant has a right, it includes the meaningful exercise of that right.  For instance the right to counsel includes the right to effective assistance of counsel.  <u>Powell v. Alabama</u>, 287 U.S. 45 (1932). The right of confrontation includes the opportunity to cross examine witnesses.  <u>Pointer v. Texas</u>, 380 U.S. 400 (1965). Thus Petitioner Roberts must be given a meaningful opportunity to pursue her statutory right to post-conviction relief which would include access to or the ability to access the necessary supporting documentation which Ohio caselaw requires to be attached to the post-conviction petition.

In <u>McFarland v. Scott</u>, 512 U.S. 849 (1994) the United States Supreme Court emphasized the need for the meaningful access to legal tools by the indigent prisoner sentenced to death.  In <u>McFarland</u> the Court held that the prisoner had the right to the appointment of experts and counsel prior to the filing of the habeas petition. While the Court was interpreting a federal statute, the Court cited to the policy considerations supporting its conclusion including the fact that 1) petitioner must meet heightened pleading requirements or face summary dismissal, 2) the complexity of the habeas jurisprudence, 3) the need in the litigation for identifying the factual basis for claims, and 4) the injurious effect of having to litigate any subsequently discovered claim in a successor petition.

The same prospects face Petitioner Roberts:  she faces heightened pleading requirements (<u>State v. Jackson</u>, 64 Ohio St. 2d 107 (1986)); she faces summary dismissal if not adequately supported by the evidence (O.R.C. § 2953.21) and the prospects of successfully litigating claims

4

in a successor post-conviction petition are much more difficult, if not impossible. (O.R.C. § 2953.23).

## IV. THIS COURT MUST APPOINT POST-CONVICTION COUNSEL CERTIFIED AS CAPITAL COUNSEL PURSUANT TO SUP. R. 20.

The American Bar Association ("ABA") has adopted standards for counsel in capital post-conviction cases. American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Case Guideline 11.9.3(B) and (C) state:

> B. Postconviction counsel should interview the client, and previous counsel if possible, about the case. Counsel should consider conducting a full investigation of the case, relating to both the guilt/innocence and sentencing phases. Postconviction counsel should obtain and review a complete record of all court proceedings relevant to the case. With the consent of the client, postconviction counsel should obtain and review all prior counsel's file(s).

> C. Postconviction counsel should seek to present to the appropriate court or courts all arguably meritorious issues, including challenges to overly restrictive rules governing postconviction proceedings. (Emphasis added.)

The Commentary to the Guidelines amplify the heavy burdens of investigation that are placed upon post-conviction counsel:

> Capital postconviction work requires enormous amounts of time, energy and knowledge to do an adequate job. The changing nature of postconviction work, along with the varied rules in the different jurisdictions, mandate the rather general nature of these Guidelines. Counsel representing a capital client must become familiar with the procedures of the given jurisdiction and act accordingly. Postconviction counsel should review the entire case. The record of all preliminary hearings, pretrial motions, post trial motions and any other court proceedings should be reviewed along with the guilt and penalty phases of the trial, as well as the appellate record. Issues that have developed in the wake of changing law may be evident to postconviction counsel even though they were not apparent to prior counsel. Possible deficiencies in the performance of prior counsel can be evaluated

5

only after review of the record, the files of prior counsel and discussion with the client.

Consequently, it is necessary for this Court to appoint Sup. R. 20 certified counsel in order to ensure that Petitioner Roberts is provided competent post-conviction counsel. The failure to appoint certified counsel who can re-investigate her case will result in Petitioner Roberts being denied any meaningful post-conviction review.

For over a decade, other state courts and at least one federal circuit court of appeals have recognized claims of the incompetence of post-conviction counsel. Iovieno v. Commissioner of Correction, 699 A.2d 1003 (Conn. 1997) (ineffective assistance of counsel found in state habeas, similar to state post-conviction proceeding); People v. Johnson, 609 N.E.2d 304 (Ill. 1993); Waters v. State, 574 N.E.2d 911 (Ind. 1991) (post-conviction counsel found to have abandoned client by not presenting any evidence in support of post-conviction claims); People v. Butler, 541 N.E.2d 171 (Ill. App. Ct. 1989) (appointment of a post-conviction attorney is but an empty formality unless proper representation is afforded); Patton v. State, 537 N.E.2d 513 (Ind. Ct. App. 1989) (post-conviction counsel's performance denied petitioner a fair hearing on the merits of his petition in accordance with due process of law principles.); Lawrence v. Armontrout, 900 F.2d 127 (8th Cir. 1990) (post-conviction counsel found ineffective by failing to exercise the skill and diligence expected of a reasonably competent attorney under similar circumstances).

For example, in People v. Johnson, Id., post-conviction counsel filed a petition containing claims that were "not accompanied by any affidavits or supporting documents." Johnson, 609 N.E.2d at 310. The Illinois Supreme Court found post-conviction counsel ineffective for failing to investigate and present evidence to support the death-sentenced inmate's allegations of ineffective assistance of counsel at trial. These allegations included the trial counsel's failure to investigate and present witnesses, including experts, to contradict the state's evidence and failed

6

to investigate, prepare and present mitigating evidence.  The Illinois Supreme Court remanded the case to the trial court so that post-conviction counsel could supplement the petition with affidavits and evidentiary documents.  Id. at 314.  In order to avoid similar problems, Petitioner Roberts must have appointed post-conviction counsel who have the training and experience to competently represent her in her post-conviction proceedings.

## VI.  CONCLUSION

As soon as possible, this Court should appoint undersigned counsel who are certified pursuant to Sup. R. 20 to represent Petitioner Donna Roberts in her O.R.C. § 2953.21 post-conviction proceedings.

Respectfully submitted,

_Donna M. Roberts_

Donna Roberts, Pro Se

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing PETITIONER DONNA ROBERT 'S MOTION FOR APPOINTMENT OF COUNSEL was mailed on this 20th day of November, 2003, to the office of  Dennis Watkins, Trumbull County Prosecuting Attorney, 160 High St. N.W., Administration Building, 4th Fl., Warren, Ohio  44481.

_Donna M. Roberts_

DONNA ROBERTS, Pro Se

7

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

    Appellee,                          :       Case No. **03-1441**

-vs-                                     :

DONNA MARIE ROBERTS,                     :       **Capital Case**

    Appellant.                          :

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

APPELLANT'S NOTICE OF APPEAL FOR DELAYED APPEAL

DENNIS WATKINS - 0009949
Trumbull County Prosecuting Attorney

LUWAYNE ANNOS - 0055651
Assistant Prosecuting Attorney

Trumbull County Prosecutor's Office
4th Floor Administration Building
160 High Street NW
Warren, Ohio 44481
(330) 675-2426
Facsimile:  (330) 393-7076

COUNSEL FOR APPELLEE



FILED

AUG 1 3 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

DAVID BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Appellate Supervisor
Death Penalty Division
Counsel of Record
KELLY CULSHAW - 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394
Facsimile:  (614) 644-0708
COUNSEL FOR APPELLANT

135

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1282

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

      Appellee,                      :      Case No. ____

-vs-                                    :

DONNA MARIE ROBERTS,                    :      **Capital Case**

      Appellant.                     :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S NOTICE OF APPEAL/DELAYED APPEAL

---

     Appellant Donna Marie Roberts hereby gives notice to this court of her appeal as of right/delayed appeal following a sentence of death. O.R.C. § 2929.05(A). The trial court's sentencing entry, issued on June 24, 2003, is attached. Also attached is the trial court's entry of August 5, 2003 appointing the Ohio Public Defender as counsel for Appellant. The praecipes were served on the court reporters on August 12, 2003.

                                Respectfully submitted,

                                DAVID BODIKER
                                Ohio Public Defender

                                JOSEPH E. WILHELM – 0055407
                                Appellate Supervisor
                                Death Penalty Division
                                Counsel of Record

*Kelly R. Culshaw*

KELLY CULSHAW – 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394
Facsimile: (614) 644-0708

COUNSEL FOR APPELLANT

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing APPELLANT'S NOTICE OF

APPEAL/DELAYED APPEAL was forwarded by first-class, postage prepaid U.S. Mail to

Dennis Watkins, Prosecuting Attorney and LuWayne Annos, Assistant Prosecuting Attorney, 4th

Floor Administration Building, 160 High Street NW, Warren, Ohio 44481, on this 13ᵗʰ day of

August, 2003.

JOSEPH E. WILHELM
COUNSEL FOR APPELLANT

# The Supreme Court of Ohio

Court of Common Pleas for

Trumbull _____ County,

Warren _____, Ohio

CERTIFICATE

S.C. Case No. 03-1441 _____

C.P. Case No. 01 CR 793 _____

State of Ohio _____

v.

Donna M Roberts _____

     In accordance with S. Ct. Prac. R. XIX, Section 4, I hereby certify that the attached is the record in this case, consisting of the original papers and exhibits to those papers; the transcript of proceedings and exhibits, along with a computer diskette of the transcript, if available; and certified copies of the journal entries and the docket of the case.

     I further certify that an index, prepared in accordance with S. Ct. Prac. R. XIX, Sec. 4(B)(1) is also attached.

     I further certify that I have sent a copy of the index to all counsel of record in this case.

     IN TESTIMONY WHEREOF, I have hereunto subscribed my name as Clerk of the Court of Common Pleas for TRUMBULL County, Ohio, and affixed the seal of the Court, on this 28 day of JAN , 2004 .

Clerk of the Court of Common Pleas in and for TRUMBULL County, Ohio

By _____ Deputy

*137*

1

03-1441

FILED

JAN 3 0 2004

MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
TRIAL COURT CASE NO. 01-CR-793

SUPREME COURT OF OHIO CASE NO. 03-1441

STATE OF OHIO,              )    JUDGE JOHN M. STUARD

        Plaintiff           )    EXHIBITS FROM

vs.                         )    MOTION TO SUPPRESS HEARING

DONNA M. ROBERTS,           )    JURY TRIAL PROCEEDINGS

        Defendant           )    MITIGATION HEARING

------------------------------------------------------------

TO THE CLERK OF THE COURT OF APPEALS:  This transcript

(28 volumes) contains State's Exhibits, Defendant's Exhibits,

Joint Exhibit and Court Exhibits; list of exhibits attached.

These exhibits were used in the Motion to Suppress Hearing,

Jury Trial and Mitigation Hearing in the above-captioned

matter, which is currently on appeal to the Supreme Court of

Ohio.  Please time-stamp and docket them accordingly.  Said

exhibits are to be filed along with the transcript of the

record with the Supreme Court of Ohio.

*Mary Ann Mills*
Mary Ann Mills
Official Court Reporter

RECEIVED THIS 20 DAY OF JANUARY, 2004.

CLERK OF COURTS

136A

2

IN THE COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

TRIAL COURT CASE NO. 01-CR-793

SUPREME COURT OF OHIO CASE NO. 03-1441

STATE OF OHIO vs. DONNA M. ROBERTS

LIST OF TRIAL EXHIBITS

AND MITIGATION HEARING EXHIBITS

EXHIBITS FROM MOTION TO SUPPRESS HEARING


STATE'S EXHIBITS:

    1.  Consent to search form by D. Roberts  Admitted


DEFENDANT'S EXHIBITS:

    A.  Property receipt           Admitted

    B.  List of medications       Admitted

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | No objection |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | No objection |
| 3 | Crime Scene Diagram | No objection |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | No Objection |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | Obj sustained |
| ~~22~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~23~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 24 | Photo | Obj sustained |
| 25 | Photo | Obj sustained |
| 26 | Photo | Obj sustained |
| 27 | Photo | Adm. over obj |
| 28 | Photo | withdrawn |
| ~~29~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~30~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 31 | Photo | Obj sustained |
| ~~32~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 33 | Photo | |
| ~~34~~ | ~~Photo~~ | ~~Obj Sustained~~ |
| ~~35~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~36~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 37 | Photo | Obj sustained |
| 38 | Photo | Obj sustained |
| 39 | Photo | Obj sustained |
| 40 | Photo | No Objection |
| ~~41~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~42~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 43 | Photo | Obj sustained |
| 44 | Photo | Obj sustained |
| ~~45~~ | ~~Photo~~ | ~~Withdrawn~~ |
| ~~46~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| ~~50~~ | ~~Photo~~ | ~~Withdrawn~~ |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 36 | Photo | No Objection |
| 57 | Photo | Adm over obj |
| 58 | Photo | Obj sustained |
| 59 | Photo | Obj sustained |
| 60 | Photo | Obj sustained |

| 61 | Photo Shirt | No Objection |
|----|-------------|--------------|
| 62 | Photo Shirt | Obj sustained |
| 63 | Photo - Victim | Obj sustained |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | ~~N. Side Exterior of House~~ | ~~No Objection~~ |
| 71 | ~~Front Exterior of House~~ | ~~No Objection~~ |
| 72 | ~~Rear Exterior of House~~ | ~~No Objection~~ |
| 73 | ~~S. Side Exterior of House~~ | ~~No Objection~~ |
| 74 | ~~Main Bathroom~~ | ~~No Objection~~ |
| 75 | ~~View of man door screen from house~~ | ~~No Objection~~ |
| 76 | View of man door screen from garage | No Objection |
| 77 | ~~Spare Bedroom~~ | ~~No Objection~~ |
| 78 | ~~Clothing - Spare Bedroom~~ | ~~No Objection~~ |
| 79 | ~~Blood spatter - perimissio~~ | ~~Withdrawn~~ |
| 80 | ~~Blood Spatters on walk by door~~ | ~~No Objection~~ |
| 81 | ~~Blood Spatters and smear~~ | ~~Withdrawn~~ |
| 82 | ~~Blood Spatters~~ | ~~Withdrawn~~ |
| 83 | ~~Inside Garage looking into residence~~ | ~~No Objection~~ |
| 84 | ~~Blood drops - garage~~ | ~~No Objection~~ |
| 85 | ~~Garage~~ | ~~Withdrawn~~ |
| 86 | ~~Blood Spatters - garage~~ | ~~No Objection~~ |
| 87 | ~~Overview garage~~ | ~~No Objection~~ |
| 88 | ~~Perminsio & Wall - blood splatters~~ | ~~Withdrawn~~ |
| 89 | ~~Different View as in 88~~ | ~~Withdrawn~~ |
| 90 | ~~Blood Drops in garage~~ | ~~No Objection~~ |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | ~~Eye glasses and broken lay bolt - garage~~ | ~~No Objection~~ |
| 96 | ~~Eye glasses - garage~~ | ~~No Objection~~ |
| 97 | ~~Stairwell railing~~ | ~~No Objection~~ |
| 98 | ~~Receipt dated 9-26-94~~ | ~~No Objection~~ |
| 99 | Victim | No objection |
| 100 | Victim -back close up | No objection |
| 101 | Small key found under victim | No Objection |
| 102 | ~~Overview bedroom~~ | ~~No Objection~~ |
| 103 | ~~bedroom master~~ | ~~No Objection~~ |
| 104 | bedroom closet | No Objection |
| 105 | ~~Photo~~ | ~~No Objection~~ |
| 105A | ~~Photo~~ | ~~No Objection~~ |
| 106 | ~~Photo~~ | ~~No Objection~~ |
| 106A | ~~Photo~~ | ~~No Objection~~ |
| 107 | ~~Photo~~ | ~~No Objection~~ |
| 107A | ~~photo~~ | ~~Withdrawn~~ |
| 108 | ~~Victim~~ | ~~No Objection~~ |
| 108A | ~~Victim Face down~~ | ~~Withdrawn~~ |
| 109 | Dry Wall Hole | No objection |
| 109A | ~~Victim face down~~ | ~~Withdrawn~~ |
| 110 | Victim in Kitchen | No Objection |
| 111 | ~~Victim lower torso~~ | ~~Withdrawn~~ |
| 112 | ~~Victim - Footprints w/ small dots~~ | ~~Withdrawn~~ |
| 113 | ~~Ashtray~~ | ~~No Objection~~ |
| 114 | ~~Ashtray~~ | ~~No Objection~~ |
| 115 | ~~Living Room~~ | ~~No Objection~~ |
| 116 | ~~Living Room~~ | ~~No Objection~~ |

| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 138 | Stainless Steel Revolver | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 157 | Rear view of Car | No Objection |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 162 | Front View of Car | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior - Left Console | No Objection |

| 180 | Driver Side Console | No Objection |
|---|---|---|
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | ~~...garage door opener~~ | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | Keys | With drawn |
| 189 | Cell Phone | With drawn |
| 190 | Keys - Bloo Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | No objection |
| 193 | Wagon Wheel Photo | No objection |
| 194 | Wagon Wheel Photo | No objection |
| 195 | Wagon Wheel Photo | No objection |
| 196 | Wagon Wheel Photo | No objection |
| 197 | Photograph Items Recovered Days Inn | No objection |
| 198 | Photo of Chrysler | No objection |
| 199 | Days Innn Photographs | No objection |
| 200 | Days Innn Photographs | No objection |
| 201 | Days Innn Photographs | No objection |
| 202 | Days Innn Photographs | Objection Sustained |
| 203 | Days Inn Photographs | No objection |
| 204 | Days Inn Photographs | Objection Sustained |
| 205 | Days Innn Photographs | No objection |
| 206 | Days Innn Photographs | No objection |
| 207 | Days Innn Photographs | No objection |
| 208 | Days Innn Photographs | No objection |
| 209 | Days Innn Photographs | No objection |
| 210 | Days Innn Photographs | No objection |
| 211 | Days Innn Photographs | No objection |
| 212 | Days Innn Photographs | No objection |
| 213 | Days Innn Photographs | No objection |
| 214 | Days Innn Photographs | No objection |
| 215 | Days Innn Photographs | No objection |
| 216 | Days Innn Photographs | No objection |
| 217 | Days Innn Photographs | No objection |
| 218 | Days Innn Photographs | No objection |
| 219 | Days Innn Photographs | No objection |
| 220 | Days Innn Photographs | No objection |
| 221 | Days Innn Photographs | No objection |
| 222 | Days Innn Photographs | No objection |
| 223 | Days Innn Photographs | No objection |
| 224 | Days Innn Photographs | No objection |
| 225 | Days Innn Photographs | No objection |
| 226 | Days Innn Photographs | No objection |
| 227 | Photographs of Wirt Street | No objection |
| 228 | Photographs of Wirt Street | No objection |
| 229 | Photographs of Wirt Street | No objection |
| 230 | Photographs of Wirt Street | No objection |
| 231 | Photographs of Wirt Street | No objection |
| 232 | Photographs of Wirt Street | No objection |
| 233 | Wirt Street Photographs | No objection |
| 234 | Wirt Street Photographs | No objection |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view - Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Left arm and hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | |
|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted |
| 271D2 | | 11/29/01 | Admitted |
| 271D3 | | 11/29/01 | Admitted |
| 271D4 | | 11/28/01 | Admitted |
| 271D5 | | 11/28/01 | Admitted |
| 271D6 | | 11/27/01 | Admitted |
| 271D7 | | 11/27/01 | Admitted |
| 271D8 | | 11/26/01 | Admitted |
| 271D9 | | 11/25/01 | Admitted |
| 271D10 | | 11/24/01 | Admitted |
| 271D11 | | 11/23/01 | Admitted |
| 271D12 | | 11/23/01 | Admitted |
| 271D13 | | 11/22/01 | Admitted |
| 271D14 | | 11/22/01 | Admitted |
| 271D15 | | 11/22/01 | Admitted |
| 271D16 | | 11/22/01 | Admitted |
| 271D17 | | 11/21/01 | Admitted |
| 271D18 | | 11/21/01 | Admitted |
| 271D19 | | 11/20/01 | Admitted |
| 271D20 | | 11/20/01 | Admitted |
| 271D21 | | 11/20/01 | Admitted |
| 271D22 | | 11/20/01 | Admitted |
| 271D23 | | 11/19/01 | Admitted |
| 271D24 | | 11/19/01 | Admitted |
| 271D25 | | 11/19/01 | Admitted |
| 271D26 | Empty | | Admitted |
| 271D27 | | 11/16/01 | Admitted |
| 271D28 | | 11/16/01 | Admitted |
| 271D29 | | 11/15/01 | Admitted |
| 271D30 | Empty | | Admitted |
| 271D31 | | 11/12/01 | Admitted |
| 271D32 | | 11/10/01 | Admitted |
| 271D33 | | 11/10/01 | Admitted |
| 271D34 | | 11/10/01 | Admitted |
| 271D35 | | 11/10/01 | Admitted |
| 271D36 | | 11/09/01 | Admitted |
| 271D37 | | 11/09/01 | Admitted |
| 271D38 | | 11/09/01 | Admitted |
| 271D39 | | 11/09/01 | Admitted |
| 271D40 | | 11/08/01 | Admitted |
| 271D41 | | 11/08/01 | Admitted |
| 271D42 | | 11/08/01 | Admitted |
| 271D43 | | 11/07/01 | Admitted |
| 271D44 | | 11/07/01 | Admitted |
| 271D45 | | 11/07/01 | Admitted |
| 271D46 | | 11/07/01 | Admitted |
| 271D47 | Empty | | Admitted |
| 271D48 | | 11/06/01 | Admitted |
| 271D49 | | 11/06/01 | Admitted |
| 271D50 | Empty | | Admitted |
| 271D51 | | 11/05/01 | Admitted |
| 271D52 | | 11/05/01 | Admitted |
| 271D53 | | 11/03/01 | Admitted |
| 271D54 | | 11/03/01 | Admitted |
| 271D55 | | 11/02/01 | Admitted |
| 271D56 | | 11/02/01 | Admitted |
| 271D57 | | 11/02/01 | Admitted |
| 271D58 | | 11/01/01 | Admitted |
| 271D59 | | 11/01/01 | Admitted |

| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/05/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |

| | | | |
|---|---|---|---|
| 271D124 | | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

| | | |
|---|---|---|
| 273N | Letters from Nate to Donna | Admitted |
| 273N1 | 12/01/01 | Admitted |
| 273N2 | 11/30/01 | Admitted |
| 273N3 | 11/29/01 | Admitted |
| 273N4 | 11/28/01 | Admitted |
| 273N5 | 11/27/01 | Admitted |
| 273N6 | 11/26/01 | Admitted |
| 273N7 | 11/25/01 | Admitted |
| 273N8 | 11/23/01 | Admitted |
| 273N9 | 11/22/01 | Admitted |
| 273N10 | 11/20/01 | Admitted |
| 273N11 | 11/19/01 | Admitted |
| 273N12 | 11/17/01 | Admitted |
| 273N13 | 11/16/01 | Admitted |
| 273N14 | 11/14/01 | Admitted |
| 273N15 | 11/14/01 | Admitted |
| 273N16 | 11/13/01 | Admitted |
| 273N17 | 11/12/01 | Admitted |
| 273N18 | 11/12/01 | Admitted |
| 273N19 | 11/10/01 | Admitted |
| 273N20 | 11/09/01 | Admitted |
| 273N21 | 11/07/01 | Admitted |
| 273N22 | 11/06/01 | Admitted |
| 273N23 | 11/08/01 | Admitted |
| 273N24 | 11/05/01 | Admitted |
| 273N25 | 11/03/01 | Admitted |
| 273N26 | 11/01/01 | Admitted |
| 273N27 | 11/01/01 | Admitted |
| 273N28 | 10/31/01 | Admitted |
| 273N29 | 10/30/01 | Admitted |
| 273N30 | | Admitted |
| 273N31 | 10/28/01 | Admitted |
| 273N32 | 10/27/01 | Admitted |
| 273N33 | | Admitted |
| 273N34 | 10/25/01 | Admitted |
| 273N35 | 10/25/01 | Admitted |
| 273N36 | 10/25/01 | Admitted |
| 273N37 | 10/24/01 | Admitted |
| 273N38 | 10/23/01 | Admitted |
| 273N39 | 10/22/01 | Admitted |
| 273N40 | 10/21/01 | Admitted |
| 273N41 | 10/21/01 | Admitted |
| 273N42 | 10/20/01 | Admitted |
| 273N43 | 10/19/01 | Admitted |
| 273N44 | 10/18/01 | Admitted |
| 273N45 | 10/17/01 | Admitted |
| 273N46 | 10/16/01 | Admitted |
| 273N47 | 10/16/01 | Admitted |
| 273N48 | 10/15/01 | Admitted |
| 273N49 | 10/14/01 | Admitted |
| 273N50 | 10/12/01 | Admitted |
| 273N51 | 10/10/01 | Admitted |
| 273N52 | 10/10/01 | Admitted |
| 273N53 | 10/08/01 | Admitted |
| 273N54 | 10/05/01 | Admitted |
| 273N55 | 10/07/01 | Admitted |
| 273N56 | 10/04/01 | Admitted |
| 273N57 | 10/04/01 | Admitted |
| 273N58 | 10/02/01 | Admitted |
| 273N59 | 10/01/01 | Admitted |
| 273N60 | 10/01/01 | Admitted |
| 273N61 | 09/30/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/23/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Enevlope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnati Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See Attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | No objection |
| 275B | Hand Writing Analysis | No objection |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 278A1 | GSA Records | No Objection |
| 278A2 | GSA Records | No Objection |
| 278A3 | GSA Records | No Objection |
| 278A4 | GSA Records | No Objection |
| 278A5 | GSA Records | No Objection |
| 278A6 | GSA Records | No Objection |
| 278A7 | GSA Records | No Objection |
| 275C | Hand Writing Standard | No Objection |
| 279B1 | Prison Records | No Objection |
| 279B2 | Prison Records | No Objection |
| 279B3 | Prison Records | No Objection |
| 279C4 | Prison Records | No Objection |
| 277A | 101-35755 - Two (2) pages | No Objection |
| 278B | 101-35755-A | No Objection |
| 279B | 101-35755-B | Obj sustained |
| 280 | 101-35755-C | Admitted over Obj |
| 281 | 101-35755-B | Admitted over Obj |
| 282A | 101-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | No Interpreted |
| 282C | 101-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 101-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |

| 323 | $300,000 - State Farm Insurance Policy 17 pages | No objection |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1page | No objection |
| 327B | Taurus IL46854 - 2 pages | No objection |
| 327C | Taurus JH14188 - 1 page | No objection |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | Adm. over obj |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic Line Up - Frank Reynolds | Not Introduced |
| 350 | Consent to Search - Wilt Street - Sheila Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Envelope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1300

| | | |
|---|---|---|
| 395 | Envelope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | No objection |
| 397 | Audio Tape of Excerpts | withdrawn |
| 397A | Transcript of Audio Tape Excerpts | withdrawn |
| 398 | Preston Automobile Service Records Red Chrysler | No objection |
| 398 A-P | Preston Automobile Service Records Red Chrysler | No objection |
| 399 | Preston Automobile Service Records Silver Chrysler | No objection |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | No objection |
| 400 | Trumbull County Recorder 161 Olive Street | Admitted over Obj |
| 400 A-C | Trumbull County Recorder 161 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-B | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder Fonderlac | Admitted over Obj |
| 403A-403Q | Defendant's school records | No Objection |

Defendant's Exhibits

| | | |
|---|---|---|
| Def't A | Draft's Criminal History | No Objection |
| Def't B | Contains 8 Subbox's of Blood Swabs | No Objection |
| Def't F | Credit Application | No Objection |
| Def't G | BMV Registration Card | No Objection |
| Def't H | Sales Agreement | No Objection |
| Def't I | Lease Agreement | No Objection |
| Def't J | Car Registration | No Objection |
| Def't K | Credit Application | No Objection |
| Def't L | BMV Registration Card | No Objection |
| Def't M | Real Estate Records | No Objection |
| Def't N | Real Estate Records | No Objection |
| Def't O | Real Estate Records | No Objection |
| Def't P | Psychological Report | No Objection |
| Joint | Fingernail Jewelry | No Objection |

| | | |
|---|---|---|
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief in Opposition to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

STATE'S EXHIBITS:

| | | |
|---|---|---|
| 378. | Audio tape | No objection |
| 378A. | Transcript | No objection |
| 309A. | Days Inn envelope | No objection |
| 403. | Photos (D. Roberts) | No objection |
| 404. | Wallet | No objection |
| 405. | Wallet | No objection |
| 406. | Greyhound video | No objection |
| 407. | Key | No objection |
| 408. | Key tag | No objection |

DEFENDANT'S EXHIBITS

    1.  Photo                    No objection

    2.  Photo                    No objection

    3.  Photo                    No objection

    4.  Photo                    No objection

    5.  Consent to Search form    No objection

    6.  Consent to Search form    No objection

    A.  Yellow shirt


JOINT EXHIBIT NO. 1    Photos


COURT'S EXHIBITS:

    1.  Jury verdict form

    1A. Court's answer to jury question

    2.  Jury questions

    2A. Court's answer to jury question

    3.  Jury question

    3A. Court's answer to jury question

    4.  Jury question

    4A. Court's answer to jury question

    5.  Jury question


SENTENCING EXHIBIT "A" (sealed by the Court)

# THE SUPREME COURT OF OHIO

| | |
|---|---|
| State of Ohio<br>v.<br>Donna Marie Roberts | CASE NO.<br>03-1441<br>**RECEIPT OF RECORD**<br>**OPF**<br>**DEATH PENALTY CASE** |

THE RECORD IN THE ABOVE-NAMED CASE WAS RECEIVED IN THE CLERK'S OFFICE OF THE SUPREME COURT OF OHIO FROM THE UNDERSIGNED. LIST CONTENTS:

*2 boxes of Transcripts*

*1 book of ...*

*(3 boxes total)*

_____          29 JAN 04
SIGNATURE                          DATE

01CR793

ABBY MINNIX-RECORDS COORDINATOR
(614)752-8946

*138*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1304

W A R R A N T   T O   C O N V E Y

TO THE TRUMBULL COUNTY JAIL
REVISED CODE, SEC. 2949.12 TO .17

**COURT OF COMMON PLEAS, TRUMBULL COUNTY, WARREN, OHIO**

STATE OF OHIO                                    CASE NO. **2001 CR 00793**

   VS.

DONNA MARIE ROBERTS   *055276*

**TO THE SHERIFF OF SAID COUNTY:**

   WHEREAS, our said Court, begun and held at Warren, Ohio in said county,
the said Defendant,

**DONNA MARIE ROBERTS**

TO BE BROUGHT/TAKEN BACK TO THE OHIO REFORMATORY FOR WOMEN IN MARYSVILLE OHIO

   YOU ARE THEREFORE HEREBY COMMANDED, to take charge of and convey the said

**DONNA MARIE ROBERTS**

to the TRUMBULL COUNTY JAIL at WARREN, OHIO and make due return of your
proceeding herein to this office forthwith.

                    IN TESTIMONY WHEREOF, I have hereunto

                    set my hand and affixed the seal of said

                    Court at Trumbull County, Warren, Ohio this

                    February 27, 2004

                    MARGARET R. O'BRIEN, Clerk of Courts

                    By , Deputy Clerk

*140 + 142*

CASE NO. **2001 CR 00793**

==================================

TRUMBULL COUNTY COMMON PLEAS COURT

Trumbull County, Warren, Ohio
==================================

STATE OF OHIO

vs.

DONNA MARIE ROBERTS

==================================

WARRANT TO CONVEY

_____

==================================

RETURNED AND FILED

_____, 20_____

MARGARET R. O'BRIEN, Clerk of Courts

By_____
        DEPUTY CLERK

RETURN

Received this writ on the _10_ day of
_March_ , 20_04_
at _0700_ o'clock _A_ .M., and on the
_10_ day of _March_ , 20_04_
I executed the same by conveying the
person named to the place designated.
as shown by the receipt endorsed hereon

_____
SHERIFF
_____
DEPUTY

```
*              FEES
*                              *
* MILEAGE  $ 230 50            *
*                              *
* SERVICE  $ 10 00             *
*                              *
* OTHER    $                   *
*                              *
* _____  $                   *
*                              *
*   TOTAL  $ 240 50            *
*                              *
```

_____ , OHIO
_____ 3/10/04 , 20____
Received this day, from _____
_____ Sheriff of
_____ County, Ohio the
prisoner named in the within warrant.

_____
Superintendent

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                                    )          CASE NO. 01-CR-793
                                                  )
          Plaintiff                               )
                                                  )          JUDGE JOHN M. STUARD
-vs-                                              )
                                                  )          MOTION FOR
DONNA ROBERTS,                                    )          WARRANT OF REMOVAL
INMATE #W055276                                   )
                                                  )
          Defendant                               )

          Now comes the Plaintiff, State of Ohio, by and through its undersigned counsel, and

pursuant to Ohio Revised Code 2941.40, moves this Honorable Court for a Warrant of Removal

for DONNA ROBERTS,  who is presently confined at the Ohio Reformatory For Women,

Marysville, Ohio. Said Defendant, is to be removed from said institution and taken to the Trumbull

County Jail in Warren, Ohio, and incarcerated there on or before Friday, March12, 2004.

DONNA ROBERTS has a  hearing on a Motion to Determine Conflict of Interest set  before this

court on  Friday, March12, 2004, at 1:00 p.m.

          The State requests that its requested Warrant be delivered to the Trumbull County Sheriff

Thomas Altiere and conveyed to the Warden at the facility who shall commit one DONNA

ROBERTS, to the Trumbull County Jail.

          For removing the Defendant, the State motions this Court to allow to the Sheriff the fees

allowed for conveying defendant to the Trumbull County Jail.


2-25-04
DATED

LuWAYNE ANNOS
Assistant Prosecuting Attorney
Trumbull C. Prosecutor's Office

*139*

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 01-CR-793 |
| | ) | |
| Plaintiff | ) | JUDGE   JOHN M. STUARD |
| | ) | |
| -vs- | ) | |
| | ) | JOURNAL ENTRY |
| DONNA ROBERTS, | ) | WARRANT FOR REMOVAL |
| INMATE #W055276 | ) | |
| | ) | |
| Defendant | ) | |

The State's Motion for Warrant for Removal has come before and been heard by this Court.
It is therefore, ORDERED, ADJUDGED, and DECREED that Trumbull County Sheriff Thomas
Altiere shall take, **DONNA ROBERTS, INMATE NO. W055276**, from Ohio Reformatory for
Women, Marysville, Ohio, and that Sheriff Altiere shall convey said Defendant to the Trumbull
County Jail, on or before Friday, March 12, 2004, where she shall remain until her hearing on
Motion to Determine Conflict of Interest set on March 12, 2003 at 1:00 p.m.

It is further ORDERED, ADJUDGED, and DECREED that the County Sheriff shall receive
the fees allowed for conveying the defendant to the Trumbull County Jail.

_2/26/04_
_____
DATED

_John M. Stuard_
_____
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

VOL **1024** PAGE **551**

141

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,
    Plaintiff

-vs-

DONNA M. ROBERTS
    Defendant

)
)
)
)
)
)
)
)
)
)

JUDGE: JOHN M. STUARD
Case No. 01-CR-793

**JUDGMENT ENTRY**

This matter came to be heard pursuant to a remand from The Supreme Court of Ohio to determine whether there is a conflict of interest concerning Defendant Donna M. Roberts' legal representation in her direct appeal.

It has come to this Court's attention that the Columbus Office of the Ohio Public Defender's Office is representing both Defendant in her direct appeal to the Ohio Supreme Court and co-defendant Nathaniel Jackson in his postconviction petition now pending in this Court. In his postconviction petition, Jackson raises the nature of his relationship with Defendant, and her role in the Robert Fingerhut homicide as contributing factors which should render his conviction and sentence void or voidable. It should further be noted that the local branch of the Ohio Public Defender's Office represented co-defendant Jackson during his trial in this Court.

This Court held hearing on this matter March 12, 2004. Defendant was present in Court represented by Atty. Joseph Wilhelm, Atty. Kelly Culshaw and Atty. Rachel Troutman. The State of Ohio was represented by Atty. Christopher Becker, Atty. LuWayne Annos, and Atty.

VOL **1026** PAGE **435**

143

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1309

Kenneth Bailey. The Court conducted a brief in camera hearing with counsel, reviewed a

Conflicts of Interest Memorandum submitted by the Ohio Public Defender's Office and took

under advisement the issue of the Ohio Public Defender's future representation of Defendant.

Based upon these above facts and circumstances,  this Court finds a potential conflict of

interest in the Ohio Public Defender's Office continued representation of  both co-defendant

Jackson and  Defendant.  Therefore, this Court appoints Atty. David. L. Doughten and Atty. Patty

Smith  of Cleveland, Ohio, to represent Defendant in her direct appeal to the Ohio Supreme

Court.

<div align="center">IT IS SO ORDERED</div>

3/22/04

Date

THE HONORABLE JOHN M.  STUARD
JUDGE OF THE COMMON PLEAS
COURT OF TRUMBULL COUNTY

The Clerk of Courts is ordered to serve copies
of this entry upon all counsel named in paragraph three of this
entry and to file this entry forthwith in the Ohio Supreme Court.

John M. Stuard

3/23/04 - copies sent to:

K. Culshaw
R. Troutman
J. Wilhelm
D. Watkins
C. Becker
K. Bailey
L. Annos
cc to Ohio Supreme Court

VOL 1026 PAGE 436