# T e Supreme Court of Ohio
## Case Docket

**State of Ohio v. Donna Marie Roberts**

| | | |
|---|---|---|
| **Case Information** | **Number** | 2003-1441 |
| | **Type** | Death Penalty Case (offense committed on or after 1/1/95) |
| | **Date Filed** | 08/13/2003 |
| | **Status** | Disposed |
| | **Prior Jurisdiction** | Trumbull County, Court of Common Pleas |
| | **Prior Decision Date** | 06/24/2003 |
| | **Prior Case Numbers** | 01CR793 |

**Parties**   Donna Marie Roberts; Appellant
   *Represented by:*
      Doughten, David Lawrence (2847), Counsel of Record
      Smith, Patricia Jean (59621)

   State of Ohio; Appellee
   *Represented by:*
      Annos, LuWayne (55651), Counsel of Record
      Watkins, Dennis (9949)

**Docket**

| Date Filed | Description | Filed By |
|---|---|---|
| 08/13/2003 | Notice of appeal of Donna Marie Roberts | Appellant |
| 08/13/2003 | And copy of entry of appointment of counsel | Appellant |
| 08/13/2003 | Motion for delayed appeal | Appellant |
| | **09/24/03 Granted; parties shall brief this case in accordance with S. Ct. Prac. R. XIX** | |
| 08/14/2003 | Copy of notice of appeal sent to clerk of court of common pleas | |
| 08/14/2003 | Order to clerk of court/custodian to certify record | |
| 10/06/2003 | Motion for extension of time to transmit record | Appellant |
| | **10/09/03 Granted; record due 12/31/03** | |
| 12/23/2003 | Second motion for extension of time to transmit record | Appellant |
| | **01/02/04 Granted; record due 1/31/04** | |
| 01/12/2004 | Motion to hold appeal in abeyance for remand to trial court to resolve putative conflict of interest | Appellant |
| | **02/06/04 Granted; remanded to the trial court for determination of conflict; trial court to file order with this court; appellant's brief due 90 days from date trial court entry filed with this Court (see entry)** | |
| 01/20/2004 | Response to motion to hold appeal in abeyance for remand to trial court to resolve putative conflict of interest | Appellee |
| 01/30/2004 | Record (portions filed under seal) | |
| 01/30/2004 | Clerk's notice of filing of record | |

Public Docket

| Date Filed | Description | Filed By |
| --- | --- | --- |
| 03/29/2004 | Certified copy of entry issued by Trumbull County Court of Common Pleas finding potential conflict of interest and appointing David Doughten and Patty Smith as counsel for appellant | |
| 06/22/2004 | Stipulation to extension of time to file merit brief to 7/19/04 | Appellant |
| 07/19/2004 | Appellant's merit brief | Appellant |
| 10/13/2004 | Stipulation to extension of time to file merit brief to 11/08/04 | Appellee |
| 11/01/2004 | Appellee's merit brief | Appellee |
| 11/15/2005 | Notice of oral argument to be held Tuesday, January 24, 2006 | |
| 01/17/2006 | List of additional authorities | Appellant |
| 01/24/2006 | Oral Argument Held | |
| 08/02/2006 | **DECISION: Affirmed in part, vacated in part, and cause remanded. See opinion at 2006-Ohio-3665 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2006/2006-ohio-3665.pdf)** | DISPOSITIVE |
| 08/11/2006 | Motion for reconsideration  **10/04/06 Denied** | Appellant |
| 08/17/2006 | Memo opposing motion for reconsideration | Appellee |
| 10/04/2006 | Certified copy of judgment entry/mandate sent to clerk | |
| 10/04/2006 | Copy of rehearing entry sent to clerk | |
| 10/19/2006 | Application for attorney fees by David L. Doughten  **11/28/06 Granted in the amount of $8,169.76, plus travel expenses to be paid in accordance with county standards** | |
| 11/13/2006 | Application for attorney fees by Patricia J. Smith  **11/28/06 Granted in the amount of $7,724.00** | |
| 04/23/2007 | Return of record to clerk of court/custodian | |

End of Docket

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                    :

    Appellee,                    :     Case No. **03-1441**

-vs-                              :

DONNA MARIE ROBERTS,             :     **Capital Case**

    Appellant.                   :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S NOTICE OF APPEAL FOR DELAYED APPEAL

---

| | |
|---|---|
| DENNIS WATKINS - 0009949<br>Trumbull County Prosecuting Attorney | DAVID BODIKER<br>Ohio Public Defender |
| LUWAYNE ANNOS - 0055651<br>Assistant Prosecuting Attorney | JOSEPH E. WILHELM – 0055407<br>Appellate Supervisor<br>Death Penalty Division<br>Counsel of Record |
| Trumbull County Prosecutor's Office<br>4th Floor Administration Building<br>160 High Street NW<br>Warren, Ohio 44481<br>(330) 675-2426<br>Facsimile: (330) 393-7076 | KELLY CULSHAW - 0066394<br>Assistant State Public Defender<br><br>Office of the Ohio Public Defender<br>8 East Long Street, 11th Floor<br>Columbus, Ohio 43215<br>(614) 466-5394<br>Facsimile: (614) 644-0708 |
| COUNSEL FOR APPELLEE | COUNSEL FOR APPELLANT |

FILED

AUG 1 3 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

A-1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1333

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

      Appellee,                         :       Case No. _____

-vs-                                    :

DONNA MARIE ROBERTS,                    :       **Capital Case**

      Appellant.                        :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S NOTICE OF APPEAL/DELAYED APPEAL

---

Appellant Donna Marie Roberts hereby gives notice to this court of her appeal as of

right/delayed appeal following a sentence of death.  O.R.C. § 2929.05(A).  The trial court's

sentencing entry, issued on June 24, 2003, is attached.  Also attached is the trial court's entry of

August 5, 2003 appointing the Ohio Public Defender as counsel for Appellant.  The praecipes

were served on the court reporters on August 12, 2003.

                            Respectfully submitted,

                            DAVID BODIKER
                            Ohio Public Defender

                            JOSEPH E. WILHELM – 0055407
                            Appellate Supervisor
                            Death Penalty Division
                            Counsel of Record

A-2

_Kelly R. Culshaw_

KELLY CULSHAW – 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394
Facsimile: (614) 644-0708

COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing APPELLANT'S NOTICE OF APPEAL/DELAYED APPEAL was forwarded by first-class, postage prepaid U.S. Mail to Dennis Watkins, Prosecuting Attorney and LuWayne Annos, Assistant Prosecuting Attorney, 4th Floor Administration Building, 160 High Street NW, Warren, Ohio 44481, on this _13TH_ day of August, 2003.

JOSEPH E. WILHELM
COUNSEL FOR APPELLANT

A-3

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                   )     CASE NO. 01-CR-793

     Plaintiff             )

                         )     **DEATH PENALTY**

-vs-                    )     SENTENCE TO OHIO
                         )     REFORMATORY FOR WOMEN

DONNA MARIE ROBERTS,    )
                         )     ENTRY ON SENTENCE

     Defendant          )

The Defendant herein having been indicted by the September Eighth, 2001, Term of the Grand Jury of Trumbull County, Ohio, for Count One: Aggravated Murder (O.R.C. §§2903.01(A) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Two: Aggravated Murder (O.R.C. §§2903.01(B)) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Three: Aggravated Burglary (F1) With Firearm Specification (O.R.C. §2911.11.(A)(1)(2) and 2941.145); and Count Four: Aggravated Robbery (F1) With Firearm Specification (O.R.C. §2911.01(A)(1)(3) and 2941.145), and on the 8th day of April, 2003, having been brought into Court for trial before a petit jury and being represented by counsel, Attorney J. Gerald Ingram and Attorney John B. Ingram, and the jury having been empaneled,

A-4

and after due deliberation on May 28, 2003, was found guilty of Count One: Complicity to

Commit Aggravated Murder (O.R.C. §§2923.03(A)(2), 2903.01(A) and 2941.14(C)) of Robert

S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit:

Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2:

Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Two: Complicity to Commit Aggravated

Murder (O.R.C. §§ 2923.03(A)(2), 2903.01(B) and 2941.14(C)) of Robert S. Fingerhut, with

two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1:

Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery

(O.R.C. 2929.04(A)(7)); Count Three: Complicity to Commit Aggravated Burglary (F1) With

Firearm Specification (O.R.C. §2923.03(A)(2), 2911.11.(A)(1)(2) and 2941.145); and Count

Four: Complicity to Commit Aggravated Robbery (F1) With Firearm Specification (O.R.C.

§2923.03(A)(2), 2911.01(A)(1)(3) and 2941.145). Thereafter, Count Two was removed from the

Jury pursuant to a Motion to Dismiss by the State.

On June 4, 2003, the Defendant having been brought into Court to give evidence in

mitigation on Count One of the indictment, and after arguments of counsel and instructions of

law, and after due deliberation, it was the finding and recommendation of the Jury on June 4,

2003, that the sentence of death be imposed on the Defendant.

On June 20, 2002, Defendant's sentencing hearing was held pursuant to O.R.C. Section

2929.19. Defense Attorney J. Gerald Ingram and Attorney John B. Juhasz, and Assistant

Prosecutor Christopher D. Becker and Assistant Prosecutor Kenneth N. Bailey, were present, as

was Defendant who was afforded all rights pursuant to Criminal Rule 32. The Court has

considered the record and oral statements, as well as the principles and purposes of sentencing

A-5

under O.R.C. Section 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, June 20, 2003, having determined in a separate opinion of specific findings that the aggravating circumstances as to the count of Aggravated Murder outweigh the mitigating factors by proof beyond a reasonable doubt, then made inquiry as to whether the Defendant had anything to say why judgment should not be pronounced against him, and the Defendant in answer showed no good cause or sufficient reason why sentence should not be pronounced.

The Court has considered the factors under O.R.C. §2929.14, and makes the following findings: (1) the shortest prison term will demean the seriousness of the Defendant's conduct; (2) the longest prison term is appropriate because the defendant committed the worst form of the offense; (3) multiple prison terms are necessary to protect the public from future crime and to punish the offender; (4) consecutive prison sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the offender poses to the public; and (5) the harm caused by the multiple offenses was so great that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the defendant's conduct;

It is therefore ORDERED, ADJUDGED, and DECREED that the Defendant, DONNA MARIE ROBERTS, be taken from the courtroom to the Trumbull County Jail and from thence to the Ohio Reformatory for Women at Marysville, Ohio, and thereafter be sentenced to death on January 11, 2004 on Count One;  and imprisoned therein for the stated prison term of ten (10) years on Count Three; plus a mandatory term of three (3) years on the Firearm Specification to

A-6

be served prior to and consecutive to the sentence imposed in Count Three; ten (10) years on

Count Four, plus a mandatory term of three (3) years on the Firearm Specification to be served

prior to and consecutive to the sentence imposed in Count Four, sentence in Count Four to be

served consecutively to the sentence imposed on Count Three.   Firearm Specifications in Count

Three and Count Four shall merge as one sentence in Count Three as a matter of law.  Defendant

is Ordered to pay the cost of prosecution taxed in the amount $_____ for which

execution is awarded.

_____6/24/03_____
DATED

HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD

JUDGE

You are hereby notified that you have
been convicted of a felony of violence
and pursuant to Section 2923.13 of the
Ohio Revised Code, you are prohibited
from acquiring, having, carrying or
using any firearm or dangerous
ordinance.

A-7



IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    •    CASE NO.:   01-CR-793

          Plaintiff,             •    JUDGE:    JOHN M. STUARD

  -vs-                           •    OPINION OF THE COURT IMPOSING
                                      DEATH SENTENCE AND. FINDINGS
DONNA MARIE ROBERTS,             •    OF FACT AND CONCLUSIONS OF
                                      LAW REGARDING IMPOSITION OF
          Defendant.             •    DEATH SENTENCE. [O.R.C.
                                      2929.03(F)]

**HISTORY**

On May 28, 2003, a Trumbull County Petit Jury returned a unanimous verdict finding

the Defendant, Donna Marie Roberts, guilty of two (2) counts of complicity to commit

aggravated murder arising from the death of Robert S. Fingerhut. Each count contained two (2)

specifications of aggravating circumstances listed in division (A) of section 2929.04 of the

Revised Code. Since counts one and two of the indictment merge for sentencing purposes, the

State elected to dismiss count two and the specifications thereto prior to the commencement of

the mitigation phase. Therefore, for purposes of this opinion, the Defendant was convicted of

the first count of the indictment, or purposely and with prior calculation and design, causing the

death of Robert S. Fingerhut.

On June 4, 2003, the mitigation or second phase of the trial began. The jury, in that

phase, unanimously found that the State had proved beyond a reasonable doubt that the

aggravating circumstances, to-wit: specification one to count one, that the Defendant was a

complicitor in committing or attempting to commit, or in fleeing immediately after committing

-1-

VOL 1004 PAGE 275

A-8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1340



08-11-1903 12:36

or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design and specification two to count one, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design outweighed the mitigating factors and returned two (2) verdicts recommending the death sentence.

Pursuant to Revised Code Section 2929.04(F) the Court is now obligated to file a separate written opinion independently weighing the aggravating circumstance of each specification against the mitigating factors. The weighing process reflected in this opinion is based upon evidence heard by the jury but is done independently and without regard to the findings of the jury.

### FACTS

Factually, the evidence at trial revealed that the Defendant planned the murder of her ex-husband and housemate, Robert S. Fingerhut, for five hundred and fifty thousand dollars ($550,000.00) in insurance proceeds. The Defendant plotted the murder for at least three (3) months prior to December 11, 2001. The Defendant corresponded with her convict lover and co-defendant, Nathaniel Jackson, while he was in prison at the Lorain Correctional Institution; she also accepted nineteen (19) collect telephone calls from Jackson while he was incarcerated wherein they planned details of the murder. The telephone calls were recorded and the letters and phone calls were seized by police during the course of the murder investigation.

The murder plot included a plan whereby the Defendant would pick up Jackson from prison on December 9, 2001, and take him to the Wagon Wheel Motel in Boardman, Ohio, and

-2-

VOL **1004** PAGE **276**

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1341



08-11-1903 12:40

Jackson was incarcerated in the Lorain Correctional Institution. These tapes constituted approximately three (3) hours of conversation. These telephone calls, along with the letters which spanned a time frame of approximately three (3) months, revealed a continuing and evolving plan to kill Fingerhut within days after Jackson's release from prison.

Jackson was soon arrested at a house on Wirt Street in Youngstown, Ohio, a few blocks from where Fingerhut's vehicle was recovered, and a pair of black leather gloves with fleece lining were recovered from that house at the time of his arrest. In a letter written to Jackson, the Defendant acknowledged that she had found thin, fleece-lined leather gloves. The recovered gloves had gunshot residue and a hole in the left index finger, along with a reddish substance which appeared to be blood in that area. This damaged area matched the injury that Jackson had sustained to his finger.

The evidence also revealed that the Defendant, near the approximate time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two (2) hours from the last time Fingerhut was seen alive, the Defendant rented a motel room at the Days Inn in Boardman, Ohio, for Jackson. In this room bloody bandages and other medical supplies were found by hotel cleaning personnel and were subsequently collected by police.

Fingerhut's silver Chrysler, which had been stolen by Jackson from the residence, was recovered in Youngstown, Ohio. Blood stains in and on the vehicle were collected by law enforcement officers. DNA analysis of the blood stains collected on the trunk latch and the interior sun visor revealed that the blood matched the DNA profiles of Nate Jackson and the

-5-

VOL 1004 PAGE 279

A-10

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1342



victim. Blood stains collected from the Days Inn also matched the DNA profile of Nate Jackson.

The State also introduced evidence from the letters that the Defendant and Jackson discussed purchasing a "new Lincoln" or a "2002 Cadillac DeVille" for Jackson. The Defendant and Jackson repeatedly discussed waking up together on Christmas Morning and the Defendant repeatedly stated how much she hated Fingerhut. Additionally, Fingerhut had two (2) life insurance policies with a combined benefit of five hundred and fifty thousand dollars ($550,000.00).

On December 12, 2001, shortly after calling 911, Howland police officers noticed the Defendant's behavior which included feigned crying and listening in on conversations of investigators. On December 12, 2001, shortly after calling 911, the Defendant told investigators that she had been out shopping at Wal-Mart, Super K-Mart and Giant Eagle. Police could only confirm that the Defendant was at Wal-Mart at approximately 9:30 p.m. The Defendant never stated to police that she had taken Jackson to the Days Inn in Boardman, Ohio.

Later in the afternoon of December 12, 2001, the Defendant provided police with a list of suspects who may have wanted to kill Fingerhut, including an alleged homosexual lover of the victim, a half Hispanic half black man that the Defendant had dated, a man named Santiago Mason and a number of people from the Greyhound bus station. When investigators asked the Defendant about Nathaniel Jackson the Defendant stated, "oh, I almost forgot about him" and proceeded to tell the officers that she had last seen Jackson on Monday, December 10, 2001, and had last spoken to him in the morning of Tuesday, December 11, 2001.

The investigation revealed that the Defendant and Jackson were together throughout the

-6-

VOL 1001 PAGE 280

A-11

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1343

rent a room with a mirrored ceiling and a Jacuzzi tub where they would have sexual relations. The Defendant would obtain handcuffs, a firearm, ski mask, leather gloves to conceal fingerprints and would ensure Jackson access to the victim's residence so that Jackson could abduct the victim and take him out of the house and kill him. The conspirators discussed forcing the victim to watch the Defendant perform oral sex on Jackson before executing the victim. The Defendant planned to set up an alibi at the time of the murder by driving around and going to various retail outlets and shopping where she would be filmed by the store's video security cameras. The Defendant made several telephone calls to Fingerhut's place of employment, the Greyhound Bus Station in Youngstown, Ohio, to ensure that Fingerhut timely left work at approximately 9:00 p.m. on December 11, 2001. The Defendant also provided Jackson with a cellular telephone to keep in contact with her while she was driving a red Chrysler 300M which contained its own cellular telephone. The Defendant had previously checked on the insurance policies to ensure that they were in effect and that the premiums were paid until the end of 2001. The Defendant also discussed in the letters and phone calls obtaining a motel room for Jackson

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1344



CONTINUE FROM PREVIOUS PAGE    002

Defendant called 911 and feigned hysteria. The Defendant in her letters to Jackson had

discussed how she would fake grief upon discovering that her ex-husband had been killed.

Howland Township Police Officers responded to the 911 call and were met by the Defendant.

The police did not find any signs of forced entry and the only things missing from the residence

were the victim's car keys and the victim's automobile. Two wallets containing a large sum of

cash and credit cards as well as other valuables were undisturbed inside the residence. The

Defendant told the officers that her husband's car was missing and granted them permission to

search the residence and her vehicle for evidence that might lead to the killer. During this search

police found approximately one hundred and forty (140) letters from Jackson to the Defendant

in her dresser, and approximately one hundred and forty (140) letter from the Defendant to

Jackson in the trunk of the Defendant's red car, in a paper bag bearing Jackson's name and

prison number.

As the investigation progressed, law enforcement officers were able to obtain the

nineteen (19) recorded telephone conversations between the Defendant and Jackson while

-4-

VOL 1001 PAGE 278



Jackson was incarcerated in the Lorain Correctional Institution. These tapes constituted

approximately three (3) hours of conversation. These telephone calls, along with the letters

which spanned a time frame of approximately three (3) months, revealed a continuing and

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1345

CONTINUE FROM PREVIOUS PAGE    001

The Defendant also discussed in the letters and phone calls obtaining a motel room for Jackson after the killing so Jackson could hide out after the murder.

However, the plan began to go bad when Jackson, who was in Fingerhut's residence, sustained a gunshot wound to his left index finger during a struggle with the victim. Jackson shot Fingerhut three (3) times, including one (1) fatal shot to the head. Jackson left the victim's body in the residence, and took Fingerhut's car keys and Fingerhut's silver Chrysler 300M from the garage of the residence. Jackson drove Fingerhut's car to Youngstown, Ohio, where he abandoned it approximately three (3) blocks from where he was ultimately arrested on

-3-

VOL 1004 PAGE 277



December 20, 2001  A series of telephone calls occurred between the Defendant's telephone in her red Chrysler and her cellular telephone which was in the possession of Jackson during the time frame of approximately 9:30 p.m. and 12:00 midnight on December 11, 2001. Between 9:30 p.m. and 10:30 p.m. the Defendant drove Jackson to the Days Inn in Boardman, Ohio, and rented him a room for one week. Jackson's wound was treated and bandaged in the room.

The Defendant returned to the residence in Howland Township, Trumbull County, Ohio, and "discovered" her ex-husband's body just inside the man door leading from garage. The Defendant called 911 and feigned hysteria. The Defendant in her letters to Jackson had

A-14

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1346



CONTINUE FROM PREVIOUS PAGE 003

approximately three (3) hours of conversation. These telephone calls, along with the letters which spanned a time frame of approximately three (3) months, revealed a continuing and evolving plan to kill Fingerhut within days after Jackson's release from prison.

Jackson was soon arrested at a house on Wirt Street in Youngstown, Ohio, a few blocks from where Fingerhut's vehicle was recovered, and a pair of black leather gloves with fleece lining were recovered from that house at the time of his arrest. In a letter written to Jackson, the Defendant acknowledged that she had found thin, fleece-lined leather gloves. The recovered gloves had gunshot residue and a hole in the left index finger, along with a reddish substance which appeared to be blood in that area. This damaged area matched the injury that Jackson had sustained to his finger.

The evidence also revealed that the Defendant, near the approximate time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two (2) hours from the last time Fingerhut was seen alive, the Defendant rented a motel room at the Days Inn in Boardman, Ohio, for Jackson. In this room bloody bandages and other medical supplies were found by hotel cleaning personnel and were subsequently collected by police.

Fingerhut's silver Chrysler, which had been stolen by Jackson from the residence, was recovered in Youngstown, Ohio. Blood stains in and on the vehicle were collected by law enforcement officers. DNA analysis of the blood stains collected on the trunk latch and the interior sun visor revealed that the blood matched the DNA profiles of Nate Jackson and the

-5-

VOL 1004 PAGE 279

A-15

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1347



circumstances pursuant to section 2929.04(A)(7) of the Revised Code, to-wit: specification one to count one, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that

-7-

VOL 1001 PAGE 281



the Defendant committed the aggravated murder with prior calculation and design and specification two to count one, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design.

With respect to the aggravating circumstance related to the aggravated burglary, the evidence presented at trial proved that the Defendant allowed Jackson to trespass in Fingerhut's residence located at 254 Fonderlac Drive, Howland Township, Trumbull County, Ohio, with the specific purpose of killing Fingerhut with prior calculation and design. Jackson was wearing leather gloves and armed with a firearm, which he used to shoot the victim three times, causing his death. The gloves, a ski mask, firearm and access to the house were all provided by the Defendant with prior calculation and design.

A-16

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1348



his death. The gloves, a ski mask, firearm and access to the house were all provided by the Defendant with prior calculation and design as evidenced by the telephone calls and letters introduced by the State. The Defendant ensured the victim's arrival by checking at his place of employment and determining when he left work and by calling him on the telephone while he was on his way home. The Defendant had also checked on the status of the life insurance policies and determined that the premiums were paid up to the end of 2001 and advised Jackson of the same.

Pursuant to her plan to kill Fingerhut, the Defendant took Jackson to a motel room in Boardman, Ohio, and rented the room for one week which was consistent with the plans discussed in the letters and phone calls prior to the murder.

Upon discovering Fingerhut's body the Defendant feigned grief exactly as discussed in

-8-

VOL 1004 PAGE 282



her letters with Jackson.

During the course of the investigation the Defendant continually threw out red herrings for the Howland Police by mentioning a number of possible suspects including alleged homosexual lovers of the victim, her ex-boyfriends, crazy people from the Greyhound bus terminal in Youngstown and Santiago Mason. The Defendant only mentioned Jackson (the convict she had corresponded with by letter for three (3) months, spoken to on the telephone nineteen (19) times, picked up from prison, engaged in sexual relations with just two days prior,

A-17

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1349



CONTINUE FROM PREVIOUS PAGE

nineteen (19) times, picked up from prison, engaged in sexual relations with just two days prior, taken to get his haircut and ate dinner with just hours previously, and the person whom she had driven to Boardman, Ohio, on the night of the murder and who had an injured index finger) after the investigators confronted her with his name.

From the aforementioned evidence, this Court concludes that the Defendant committed the aggravated murder as a complicitor while committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated burglary and that the Defendant committed the aggravated murder with prior calculation and design.

With respect to the aggravating circumstance related to the aggravated robbery, after Jackson had murdered the victim, he took the victim's set of keys and his silver Chrysler 300M. Although the planned crime involved Jackson stealing Fingerhut's car in order to kidnap Fingerhut it is clear that Jackson was to take the victim's car to flee the residence. The fact that Fingerhut struggled with Jackson in the residence and was killed in the residence in no way negates the Defendant's plan that Jackson should steal the victim's car to facilitate Jackson's own flight from the residence.

-9-

VOL 1001 PAGE 283

A-18

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1350

08-11-1903 12:42



afternoon and evening of December 11, 2001. The State presented evidence and testimony that the Defendant took Jackson to get a haircut, ate dinner with him at Red Lobster and was with him at the Warren Greyhound bus terminal in Warren, Ohio, which was the Defendant's place of employment. One witness, Frank Reynolds, testified that after Jackson's release from prison and prior to the murder, he was present at the Youngstown bus terminal when the Defendant asked Fingerhut for three thousand dollars ($3,000.00); when Fingerhut refused to give her the money she gave him a dirty look. The Defendant had stated in her letters that she was tired of "the grinch doling out the money" and was referring to Fingerhut providing her with a set amount of cash to spend every week.

The Defendant planned to obtain a firearm for Jackson to use in order to kill Fingerhut. While the Defendant was supposedly in a torrid love relationship with Jackson, she invited ex-con Santiago Mason to her residence where she performed oral sex on him. When he refused her further sexual advances to engage in vaginal intercourse, Mason was accused by the Defendant of stealing a .38 caliber firearm. Forensic evidence revealed that the weapon used to kill Fingerhut was consistent with a .38 caliber firearm. The investigation revealed that Roberts was missing two .38 caliber firearms at the time of Fingerhut's murder.

## AGGRAVATING CIRCUMSTANCES

In this case the jury found the existence beyond a reasonable doubt of two aggravating circumstances pursuant to section 2929.04(A)(7) of the Revised Code, to-wit: specification one

A-19



Ample DNA evidence was presented indicating that Jackson was in the silver Chrysler 300M following the murder of Fingerhut. Additionally, phone records were introduced showing that Jackson and the Defendant called each other after the murder to check on the status of the plan. Finally, the vehicle was recovered a few blocks from the location where Jackson was arrested.

The Defendant, in accordance with the plan to kill Fingerhut, paid for a hotel room for Jackson following the murder.

The fact that the silver Chrysler 300M was found abandoned with the victim's keys in the ignition coupled with the fact that the victim's wallet, money, credit cards and other valuables were not stolen clearly show that the plan to steal the victim's car as a means of escape following the kidnapping and murder of the victim were carried out in accordance with the prior calculation and design as set out by the Defendant and Jackson.

From the aforementioned evidence this Court concludes that the Defendant committed the aggravated murder as a complicitor while committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery and that the Defendant committed the aggravated murder with prior calculation and design.

## MITIGATING FACTORS

To be weighed against the aggravating circumstances the Court must weigh any mitigating factors.

On Tuesday, June 3, 2003, the Defendant appeared in chambers and on the record with her retained attorneys, J. Gerald Ingram and John B. Juhasz and her retained psychologist

-10-

VOL 1001 PAGE 284

A-20

CONTINUE FROM PREVIOUS PAGE    001

Thomas Eberle. The State was present and represented by Assistant Prosecutors Kenneth N. Bailey and Christopher D. Becker.

The Defense indicated to the Court that the Defendant had been evaluated by Dr. Eberle for her competency to waive mitigating evidence and that in the doctor's opinion she was competent to do the same. The Court personally addressed the Defendant and inquired of her as to the importance of presenting mitigating evidence, the use of such evidence against the aggravating circumstances, and the effect of failing to present such evidence. The Court was assured that the Defendant understood these concepts by both defense counsel and Dr. Eberle and personally inquired whether the Defendant desired to waive the right to present mitigating evidence. The Court having found no evidence to contradict Dr. Eberle's findings and the Defendant's statements and desire to waive the presentation of mitigating evidence then found that the Defendant was competent to waive the presentation of mitigation evidence and had done so knowingly, voluntarily and intelligently. The Defendant indicated to the Court that she only desired to make an unsworn statement to the jury, which she was advised she was permitted to do and would be permitted to make on June 4, 2003, which was the date previously scheduled for the mitigation or second phase.

On Wednesday, June 4, 2003, the Defendant made an unsworn statement during which she stated to the jury that there were no mitigating factors and during which she requested the jury to impose a death sentence. This statement was articulate, coherent, and well organized. The statement lasted approximately one hour during which the Defendant showed no difficulty or fear in addressing a large group of individuals including the jury and a large number of

-11-

VOL 1004 PAGE 285

B-2-1

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1353



courtroom observers. The Defendant spoke freely and although she had with her prepared notes she often extemporized.

Despite the preceding the Court is still bound to make an independent weighing of any and all mitigating factors that it feels may exist in this case against the aggravating circumstances.

The Defendant in this case was not the principal offender. Pursuant to section 2929.04(B)(6) the Court considers this factor and gives it very little weight. The Defendant committed the aggravated murder during the course of the commission of both an aggravated burglary and aggravated robbery. The record is replete with instances wherein the Defendant actively planned this aggravated murder with prior calculation and design in order to collect five hundred and fifty thousand dollars ($550,000.00) in life insurance proceeds. The Defendant's plan included buying her co-defendant a new Cadillac or Lincoln in exchange for killing her ex-husband, promises of trips, a nice home in a wealthy neighborhood and overall a one hundred and eighty degree change in lifestyle for Nathaniel Jackson, her co-defendant.

The record is overwhelming that but for the Defendant's planning and actions the victim would be alive today. The Defendant discussed and planned for months with the principal offender how they would kill the victim. The Defendant checked on the status of the insurance policies in order to ensure that she would be able to collect the proceeds from the same and advised the principal offender of the status of the policies. The Defendant then transported the principal offender in the aggravated murder from prison to a pre-determined location in order to engage in love making before the murder. The Defendant fed the principal offender prior to

-12-

A-22

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1354

08-11-1903 12:51



the crime. The Defendant provided the principal offender with gloves, a ski mask, the murder weapon and a hide-out after the aggravated murder all as planned and discussed prior to the aggravated murder. The Defendant gave the principal offender entry into the residence of the victim for the sole and exclusive purpose of killing the victim. This plan was clearly discussed in both the letters and the recorded telephone conversations, including the last telephone call of December 8, 2001, the day before the principal offender was released from prison. The Defendant failed to advise police of her relationship with the principal offender until she was confronted with the existence of the relationship by the police. Prior to being confronted by the existence of this relationship the Defendant gave the police a number of red herrings implicating a number of potential suspects but never mentioned her relationship with the principal offender and her discussions with him regarding the aggravated murder of Robert Fingerhut.

The Court gives very slight weight to the fact that the Defendant indicates in her letters that the victim may have been physically abusive to her. This factor is pursuant to section 2929.04(B)(1)&(2); however, the existence of this factor is given very slight weight due to the fact that it is unsubstantiated and even if it were true it would not warrant the Defendant's actions in this case.

The Court gives very little weight to the Defendant's unsworn statement. During the course of her unsworn statement the Defendant apologized to her defense team and thanked them for their hard work. The few positive things gleaned from this statement were overshadowed by the Defendant's personal attacks and statements that were clearly contrary to the evidence. The Defendant denied guilt and personally attacked the jurors by claiming they

-13-

VOL 100 PAGE 287



were not a jury of her peers. The Defendant accused the lead investigator as being motivated solely by career advancement and accusing him of obstruction of justice and perjury. The Defendant referred to the other investigators as "lackeys" and claimed that one member of the prosecution team was "anti-semetic and racist". The Defendant also chastised the jurors for being uninformed about current events. The Defendant also stated to the jury that she and the victim had a loving relationship and planned to live happily ever after. These statements are in direct contravention of her statements in the letters and the phone calls expressing her desire and wishes that the victim meet an untimely death and her desire to marry and live with Nathaniel Jackson. The Defendant also appeared to brag to the jury that she and the deceased had earned over two hundred thousand dollars ($200,000.00) per year and that the five hundred and fifty thousand dollars ($550,000.00) in life insurance proceeds was of little value to her because that sum would only sustain her for a few years.

It is difficult for this Court or any fact finder to give any weight to such a statement.

Pursuant to section 2929.04(A)(7) the Court will give very slight weight to the Defendant's behavior during the course of this trial. The Defendant was courteous, pleasant and properly addressed the Court at all times. The Defendant appeared intelligent and interested in the proceedings and appeared to assist in her defense at all times. The Defendant presented no security problems to the Court and those who transported her to Court each day.

**CONCLUSIONS OF LAW**

The Court has carefully and independently weighed the cumulation of all of the mitigating factors against each aggravating circumstance separately as to each of the two

-14-

VOL 1001 PAGE 288

A-24

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1356

08-11-1983 12:54



specifications. In other words the Court has weighed the evidence twice. First, the Court weighed all of the mitigating factors against the aggravating circumstance surrounding the aggravated burglary and then the Court engaged in a second weighing whereby the Court again weighed all of the mitigating factors against the aggravating circumstance surrounding the aggravated robbery.

With respect to the first weighing of the aggravating circumstances related to the aggravated burglary against all of the mitigating factors, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The Legislature of the State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction to a defendant who commits an aggravated murder during the commission of certain felonies. In the case at bar, the underlying felonies were aggravated burglary and aggravated robbery.

In this particular case, the Court accords substantial weight to the aggravated burglary specification in the first weighing process. In order to prove an aggravated burglary, the State is required to prove that a defendant trespassed in an occupied structure for the purpose of committing a criminal offense. In this particular case the Defendant purposely had her co-defendant trespass in the occupied structure of Robert S. Fingerhut with the specific purpose of committing an aggravated murder which had been meticulously planned over a number of months with prior calculation and design.

Under the facts of this case, this Court can not foresee any other form of aggravated

-15-

VOL 1004 PAGE 289

A-25

08-11-1903 12:55

burglary where the weight of this particular aggravating circumstance could ever be greater. The evidence reveals that the aggravated burglary was committed for the sole purpose of killing Robert S. Fingerhut pursuant to a planned and methodical execution scheme designed by the Defendant and her co-defendant and whereby the Defendant would collect five hundred and fifty thousand dollars ($550,000.00) in insurance proceeds. This is the most heinous form of aggravated burglary, and is entitled to unsurpassed weight. In this Court's view, this aggravating circumstance, standing alone, outweighs all of the mitigating evidence in this case.

Therefore, with respect to specification one to count one the Court concurs with the jury's recommendation and finds that the death sentence is the appropriate penalty.

With respect to the aggravating circumstance of the aggravated robbery, the Court concedes that this offense is not quite as heinous as the circumstances surrounding those concerned with the aggravated burglary. However, the aggravated robbery was clearly committed to facilitate the escape from the aggravated murder and is extremely close to being the worst form of aggravated robbery. This statement is galvanized by the fact that the aggravated robbery was planned by the Defendant to be part of a kidnapping, whereby the victim was to be removed and taken to a different location where the Defendant would then engage in oral sex with her co-defendant while the victim was forced to watch prior to his execution. This plot is clearly spelled out in the letters between the Defendant and co-defendant. The plan clearly went awry when the victim engaged the co-defendant in a struggle at the residence. Again, this scheme was hatched for the purpose of the Defendant collecting five hundred and fifty thousand dollars ($550,000.00) in insurance proceeds.

-16-

VOL 1004 PAGE 290

A-26

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1358

08-11-1903 12:56

Therefore, the aggravating circumstance specification relating to the aggravated robbery, when weighed against all of the mitigating factors in this case, clearly and undeniably outweighs by proof beyond a reasonable doubt all of the mitigating evidence in this case.

Therefore, with respect to specification two to count one the Court concurs with the jury's recommendation and finds that the death sentence is the appropriate penalty.

The Court recognizes that the death sentences recommended by the Jury must be merged and the Court does hereby merge the death sentences for purposes of sentencing.

For the reasons set forth herein, and after independently and separately weighing the aggravating circumstances against all of the mitigating factors, it is the judgment of this Court that the jury's recommendation is accepted and the Court does find that the sentence of death is the appropriate penalty in this case.

Dated: 6/20/03

JOHN M. STUARD, JUDGE
Trumbull County Common Pleas Court
Warren, Ohio
Faxed

I hereby certify that a copy of the foregoing opinion was hand delivered to attorneys J. Gerald Ingram and John B. Juhasz and Assistant Prosecutor's Kenneth N. Bailey and Christopher D. Becker, this ___ day of June, 2003.

JOHN M. STUARD, JUDGE

I also hereby certify that a copy of the foregoing opinion was duly mailed by ordinary U.S. Mail to the Clerk of the Supreme Court of Ohio, Rhodes State Office Tower, 30 E. Broad Street, 2nd Floor, Columbus, Ohio 43215-3431, this ___ day of June, 2003.

JOHN M. STUARD, JUDGE

-17-

VOL 1004 PAGE 291

Constitution of the State of Ohio

### O Const I § 10   Trial for crimes; witness

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to

meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

A28

Constitution of the State of Ohio

**O Const I § 9   Bailable offenses; bail, fine and punishment**

All persons shall be bailable by sufficient sureties, except for capital offences where the proof is evident, or the presumption great. Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted.

A-29

The Constitution of the United States

## AMENDMENT 8

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

A-30

The Constitution of the United States

### AMENDMENT 5

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

A-31

The Constitution of the United States

## AMENDMENT 6

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.

A-32

# AMENDMENT 14

### Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

### Section 2

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

### Section 3

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each house, remove such disability.

### Section 4

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations, and claims shall be held illegal and void.

### Section 5

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

A-33

§ 2913.02. Theft

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat;

(5) By intimidation.

(B) (1) Whoever violates this section is guilty of theft.

(2) Except as otherwise provided in this division or division (B)(3), (4), (5), or (6) of this section, a violation of this section is petty theft, a misdemeanor of the first degree. If the value of the property or services stolen is five hundred dollars or more and is less than five thousand dollars or if the property stolen is any of the property listed in section 2913.71 of the Revised Code, a violation of this section is theft, a felony of the fifth degree. If the value of the property or services stolen is five thousand dollars or more and is less than one hundred thousand dollars, a violation of this section is grand theft, a felony of the fourth degree. If the value of the property or services stolen is one hundred thousand dollars or more and is less than five hundred thousand dollars, a violation of this section is aggravated theft, a felony of the third degree. If the value of the property or services is five hundred thousand dollars or more and is less than one million dollars, a violation of this section is aggravated theft, a felony of the second degree. If the value of the property or services stolen is one million dollars or more, a violation of this section is aggravated theft of one million dollars or more, a felony of the first degree.

(3) Except as otherwise provided in division (B)(4), (5), or (6) of this section, if the victim of the offense is an elderly person or disabled adult, a violation of this section is theft from an elderly person or disabled adult, and division (B)(3) of this section applies. Except as otherwise provided in this division, theft from an elderly person or disabled adult is a felony of the fifth degree. If the value of the property or services stolen is five hundred dollars or more and is less than five thousand dollars, theft from an elderly person or disabled adult is a felony of the fourth degree. If the value of the property or services stolen is five thousand dollars or more and is less than twenty-five thousand dollars, theft from an elderly person or disabled adult is a felony of the third degree. If the value of the property or services stolen is twenty-five thousand dollars or more and is less than one hundred thousand dollars, theft from an elderly person or disabled adult is a felony of the second degree. If the value of the property or services stolen is one hundred thousand dollars or more, theft from an elderly person or disabled adult is a felony of the first degree.

(4) If the property stolen is a firearm or dangerous ordnance, a violation of this

A-34

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1366

section is grand theft, a felony of the third degree, and there is a presumption in favor of the court imposing a prison term for the offense. The offender shall serve the prison term consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender.

(5) If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree.

(6) If the property stolen is any dangerous drug, a violation of this section is theft of drugs, a felony of the fourth degree, or, if the offender previously has been convicted of a felony drug abuse offense, a felony of the third degree.

(7) In addition to the penalties described in division (B)(2) of this section, if the offender committed the violation by causing a motor vehicle to leave the premises of an establishment at which gasoline is offered for retail sale without the offender making full payment for gasoline that was dispensed into the fuel tank of the motor vehicle or into another container, the court may do one of the following:

(a) Unless division (B)(7)(b) of this section applies, suspend for not more than six months the offender's driver's license, probationary driver's license, commercial driver's license, temporary instruction permit, or nonresident operating privilege;

(b) If the offender's driver's license, probationary driver's license, commercial driver's license, temporary instruction permit, or nonresident operating privilege has previously been suspended pursuant to division (B)(7)(a) of this section, impose a class seven suspension of the offender's license, permit, or privilege from the range specified in division (A)(7) of section 4510.02 of the Revised Code, provided that the suspension shall be for at least six months.

(C) The sentencing court that suspends an offender's license, permit, or nonresident operating privilege under division (B)(7) of this section may grant the offender limited driving privileges during the period of the suspension in accordance with Chapter 4510. of the Revised Code.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 138 v S 191 (Eff 6-20-80); 139 v S 199 (Eff 1-1-83); 140 v H 632 (Eff 3-28-85); 141 v H 49 (Eff 6-26-86); 143 v H 347 (Eff 7-18-90); 143 v S 258 (Eff 11-20-90); 146 v H 4 (Eff 11-9-95); 146 v S 2 (Eff 7-1-96); 147 v S 66 (Eff 7-22-98); 148 v H 2. Eff 11-10-99; 150 v H 7, § 1, eff. 9-16-03; 150 v H 179, § 1, eff. 3-9-04; 150 v H 12, § 1, eff. 4-8-04.

**NOTES:**

A-35

§ 2911.02. Robbery

(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control;

(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;

(3) Use or threaten the immediate use of force against another.

(B) Whoever violates this section is guilty of robbery. A violation of division (A)(1) or (2) of this section is a felony of the second degree. A violation of division (A)(3) of this section is a felony of the third degree.

(C) As used in this section:

(1) "Deadly weapon" has the same meaning as in section 2923.11 of the Revised Code.

(2) "Theft offense" has the same meaning as in section 2913.01 of the Revised Code.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 7-1-83); 146 v S 2 (Eff 7-1-96); 146 v S 269. Eff 7-1-96.

A-36

§ 2901.11. Criminal law jurisdiction

(A) A person is subject to criminal prosecution and punishment in this state if any of the following occur:

(1) The person commits an offense under the laws of this state, any element of which takes place in this state.

(2) While in this state, the person conspires or attempts to commit, or is guilty of complicity in the commission of, an offense in another jurisdiction, which offense is an offense under both the laws of this state and the other jurisdiction.

(3) While out of this state, the person conspires or attempts to commit, or is guilty of complicity in the commission of, an offense in this state.

(4) While out of this state, the person omits to perform a legal duty imposed by the laws of this state, which omission affects a legitimate interest of the state in protecting, governing, or regulating any person, property, thing, transaction, or activity in this state.

(5) While out of this state, the person unlawfully takes or retains property and subsequently brings any of the unlawfully taken or retained property into this state.

(6) While out of this state, the person unlawfully takes or entices another and subsequently brings the other person into this state.

(7) The person, by means of a computer, computer system, computer network, telecommunication, telecommunications device, telecommunications service, or information service, causes or knowingly permits any writing, data, image, or other telecommunication to be disseminated or transmitted into this state in violation of the law of this state.

(B) In homicide, the element referred to in division (A)(1) of this section is either the act that causes death, or the physical contact that causes death, or the death itself. If any part of the body of a homicide victim is found in this state, the death is presumed to have occurred within this state.

(C) (1) This state includes the land and water within its boundaries and the air space above that land and water, with respect to which this state has either exclusive or concurrent legislative jurisdiction. Where the boundary between this state and another state or foreign country is disputed, the disputed territory is conclusively presumed to be within this state for purposes of this section.

(2) The courts of common pleas of Adams, Athens, Belmont, Brown, Clermont, Columbiana, Gallia, Hamilton, Jefferson, Lawrence, Meigs, Monroe, Scioto, and Washington counties have jurisdiction beyond the north or northwest shore of the Ohio river extending to the opposite shore line, between the extended boundary lines of any adjacent counties or adjacent state. Each of those courts of common pleas has concurrent jurisdiction on the Ohio river with any adjacent court of common pleas that borders on that river and with any court of Kentucky or of West Virginia that borders on the Ohio river and that has jurisdiction on the Ohio river under the law of Kentucky or the law of West Virginia, whichever is applicable, or under federal law.

A-37

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1369

(D) When an offense is committed under the laws of this state, and it appears beyond a reasonable doubt that the offense or any element of the offense took place either in this state or in another jurisdiction or jurisdictions, but it cannot reasonably be determined in which it took place, the offense or element is conclusively presumed to have taken place in this state for purposes of this section.

(E) As used in this section, "computer," "computer system," "computer network," "information service," "telecommunication," "telecommunications device," "telecommunications service," "data," and "writing" have the same meanings as in section 2913.01 of the Revised Code.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 144 v S 371 (Eff 1-17-93); 147 v H 565. Eff 3-30-99.

A-38

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1370

LEXSTAT ORC 2911.01

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH MARCH 29, 2004 ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 31, 2003 ***

TITLE 29. CRIMES -- PROCEDURE
CHAPTER 2911. ROBBERY, BURGLARY, TRESPASS AND SAFECRACKING
ROBBERY

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*ORC Ann. 2911.01 (2004)*

§ 2911.01. Aggravated robbery

(A) No person, in attempting or committing a theft offense, as defined in *section 2913.01 of the Revised Code*, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

(3) Inflict, or attempt to inflict, serious physical harm on another.

(B) No person, without privilege to do so, shall knowingly remove or attempt to remove a deadly weapon from the person of a law enforcement officer, or shall knowingly deprive or attempt to deprive a law enforcement officer of a deadly weapon, when both of the following apply:

(1) The law enforcement officer, at the time of the removal, attempted removal, deprivation, or attempted deprivation, is acting within the course and scope of the officer's duties;

(2) The offender knows or has reasonable cause to know that the law enforcement officer is a law enforcement officer.

(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

(D) As used in this section:

(1) "Deadly weapon" and "dangerous ordnance" have the same meanings as in *section 2923.11 of the Revised Code.*

(2) "Law enforcement officer" has the same meaning as in *section 2901.01 of the Revised Code* and also includes employees of the department of rehabilitation and correction who are authorized to carry weapons within the course and scope of their duties.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 1-5-83); 140 v S 210 (Eff 7-1-83); 146 v S 2 (Eff 7-1-96); 147 v H 151. Eff 9-16-97.

**NOTES:**

*A - 39*

2 of 32 DOCUMENTS

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH MARCH 29, 2004 ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 31, 2003 ***

TITLE 29. CRIMES -- PROCEDURE
CHAPTER 2901. GENERAL PROVISIONS
IN GENERAL

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*ORC Ann. 2901.05 (2004)*

§ 2901.05. Burden and degree of proof

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.

(B) As part of its charge to the jury in a criminal case, the court shall read the definitions of "reasonable doubt" and "proof beyond a reasonable doubt," contained in division (D) of this section.

(C) As used in this section, an "affirmative defense" is either of the following:

(1) A defense expressly designated as affirmative;

(2) A defense involving an excuse or justification peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence.

(D) "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 137 v H 1168. Eff 11-1-78.

**NOTES:**
*Not analogous to former RC § 2901.05 (RS § 6810; S&C 402; 33 v 33; GC § 12403; 124 v 14; Bureau of Code Revision, eff 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.*
*1974 Committee Comment to H 511*
This section retains the substance of an existing law which presumes the innocence of an accused, requires the prosecution to prove guilt beyond a reasonable doubt, defines reasonable doubt, and requires the definition to be read to the jury. The definition of reasonable doubt combines elements of the former Ohio and existing federal definitions, restyled for greater ease in understanding.

A - 40

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1372

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH MARCH 29, 2004 ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 31, 2003 ***

TITLE 29.  CRIMES -- PROCEDURE
CHAPTER 2929.  PENALTIES AND SENTENCING
PENALTIES FOR MURDER

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*ORC Ann. 2929.05  (2004)*

§ 2929.05. Appellate review of death sentence

   (A) Whenever sentence of death is imposed pursuant to *sections 2929.03* and *2929.04 of the Revised Code*, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall review upon appeal the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They also shall review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case.

   A court of appeals that reviews a case in which the sentence of death is imposed for an offense committed before January 1, 1995, shall file a separate opinion as to its findings in the case with the clerk of the supreme court. The opinion shall be filed within fifteen days after the court issues its opinion and shall contain whatever information is required by the clerk of the supreme court.

   (B) The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall give priority over all other cases to the review of judgments in which the sentence of death is imposed and, except as otherwise provided in this section, shall conduct the review in accordance with the Rules of Appellate Procedure.

   (C) At any time after a sentence of death is imposed pursuant to *section 2929.022 [2929.02.2]* or *2929.03 of the Revised Code,* the court of common pleas that sentenced the offender shall vacate the sentence if the offender did not present evidence at trial that the offender was not eighteen years of age or older at the time of the commission of the aggravated murder for which the offender was sentenced and if the offender shows by a preponderance of the evidence that the offender was less than eighteen years of age at the time of the commission of the aggravated murder for which the offender was sentenced. The court is not required to hold a hearing on a motion filed pursuant to this division unless the court finds, based on the motion and any supporting information submitted by the defendant, any information submitted by the prosecuting attorney, and the record in the case, including any previous hearings and orders, probable

*A-41*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1373

cause to believe that the defendant was not eighteen years of age or older at the time of the commission of the aggravated murder for which the defendant was sentenced to death.

**HISTORY:** 139 v S 1 (Eff 10-19-81); 146 v S 4 (Eff 9-21-95); 147 v S 107. Eff 7-29-98.

**NOTES:**
CROSS-REFERENCES TO RELATED STATUTES
  Annual capital case status report, *RC § 109.97.*
  Resentencing after vacation of death sentence or life imprisonment without parole, *RC § 2929.06.*
  Review of judgments, *RC § 2953.02.*

A-42

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH MARCH 29, 2004 ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 31, 2003 ***

TITLE 29.  CRIMES -- PROCEDURE
CHAPTER 2929.  PENALTIES AND SENTENCING
PENALTIES FOR MURDER

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*ORC Ann. 2929.04  (2004)*

§ 2929.04. Criteria for imposing death or imprisonment for a capital offense

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to *section 2941.14 of the Revised Code* and proved beyond a reasonable doubt:

(1) The offense was the assassination of the president of the United States or a person in line of succession to the presidency, the governor or lieutenant governor of this state, the president-elect or vice president-elect of the United States, the governor-elect or lieutenant governor-elect of this state, or a candidate for any of the offices described in this division. For purposes of this division, a person is a candidate if the person has been nominated for election according to law, if the person has filed a petition or petitions according to law to have the person's name placed on the ballot in a primary or general election, or if the person campaigns as a write-in candidate in a primary or general election.

(2) The offense was committed for hire.

(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

(4) The offense was committed while the offender was under detention or while the offender was at large after having broken detention. As used in division (A)(4) of this section, "detention" has the same meaning as in *section 2921.01 of the Revised Code*, except that detention does not include hospitalization, institutionalization, or confinement in a mental health facility or mental retardation and developmentally disabled facility unless at the time of the commission of the offense either of the following circumstances apply:

(a) The offender was in the facility as a result of being charged with a violation of a section of the Revised Code.

(b) The offender was under detention as a result of being convicted of or pleading guilty to a violation of a section of the Revised Code.

(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

(6) The victim of the offense was a law enforcement officer, as defined in *section 2911.01 of the Revised Code*, whom the offender had reasonable cause to know or knew to be so defined, and either the victim, at the time of the commission of the offense, was engaged in the victim's duties, or it was the offender's specific purpose to kill a law enforcement officer as so defined.

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated

*A-43*

burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding.

(9) The offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design.

(10) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit terrorism.

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to *section 2929.023 [2929.02.3] of the Revised Code* or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

(1) Whether the victim of the offense induced or facilitated it;

(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(C) The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death.

The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender but shall be weighed pursuant to divisions (D)(2) and (3) of *section 2929.03 of the Revised Code* by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v S 1 (Eff 10-19-81); 147 v S 32 (Eff 8-6-97); 147 v H 151 (Eff 9-16-97); 147 v S 193 (Eff 12-29-98); 149 v S 184. Eff 5-15-2002.

**NOTES:**
The provisions of §  3 of SB 193 (147 v --) read as follows:

*A-44*

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH MARCH 29, 2004 ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 31, 2003 ***

TITLE 29.  CRIMES -- PROCEDURE
CHAPTER 2929.  PENALTIES AND SENTENCING
PENALTIES FOR MURDER

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*ORC Ann. 2929.021  (2004)*

§ 2929.021. Notice to supreme court of indictment charging aggravated murder; plea

(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of *section 2929.04 of the Revised Code*, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification;

(2) The docket number or numbers of the case or cases arising out of the charge, if available;

(3) The court in which the case or cases will be heard;

(4) The date on which the indictment was filed.

(B) If the indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of *section 2929.04 of the Revised Code* and if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:

(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;

(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;

(3) The sentence imposed on the offender in each case.

**HISTORY:** 139 v S 1. Eff 10-19-81.

A-45

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH MARCH 29, 2004 ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 31, 2003 ***

TITLE 29.  CRIMES -- PROCEDURE
CHAPTER 2903.  HOMICIDE AND ASSAULT
HOMICIDE

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*ORC Ann. 2903.01  (2004)*

§ 2903.01.  Aggravated murder

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

(D) No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another.

(E) No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:

(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.

(2) It is the offender's specific purpose to kill a law enforcement officer.

(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in *section 2929.02 of the Revised Code.*

(G) As used in this section:

(1) "Detention" has the same meaning as in *section 2921.01 of the Revised Code.*

(2) "Law enforcement officer" has the same meaning as in *section 2911.01 of the Revised Code.*

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v S 1 (Eff 10-19-81); 146 v S 239 (Eff 9-6-96); 147 v S 32 (Eff 8-6-97); 147 v H 5 (Eff 6-30-98); 147 v S 193 (Eff 12-29-98); 149 v S 184. Eff 5-15-2002.

A-46

## RULES OF CRIMINAL PROCEDURE

### RULE 32.  SENTENCE

**(A) Sentence**

(1) *Imposition of Sentence.*  Sentence shall be imposed without unnecessary delay.  Pending sentence the court may commit the defendant or continue or alter the bail.  Before imposing sentence the court shall afford counsel an opportunity to speak on behalf of the defendant, and shall also address the defendant personally and ask him if he wishes to make a statement in his own behalf or present any information in mitigation of punishment.

(2) *Notification of Right to Appeal.*  After imposing sentence in a serious offense which has gone to trial on a plea of not guilty, the court shall advise the defendant that: (a) he has a right to appeal; (b) if he is unable to pay the cost of an appeal he has the right to appeal without payment; (c) if he is unable to obtain counsel for an appeal, counsel will be appointed without cost; (d) if he is unable to pay the costs of documents necessary to an appeal, such documents will be provided without cost; and (e) he has a right to have a notice of appeal timely filed on his behalf.  Upon defendant's request the court shall forthwith appoint counsel for appeal.

**(B) Judgment.**  A judgment of conviction shall set forth the plea, the verdict or findings and sentence.  If the defendant is found not guilty or for any other reason is entitled to be discharged, judgment shall be entered accordingly.  The judgment shall be signed by the judge and entered by the clerk.

A-48

Service: Get by LEXSEE®
Citation: 1998 Ohio App. LEXIS 5595

*1998 Ohio App. LEXIS 5595, ***

STATE OF OHIO, Plaintiff-Appellee -VS- KISMA CAMPBELL, Defendant-Appellant

NO. 73643

COURT OF APPEALS OF OHIO, EIGHTH APPELLATE DISTRICT, CUYAHOGA COUNTY

1998 Ohio App. LEXIS 5595

November 25, 1998, Date of Announcement of Decision

**PRIOR HISTORY:  [*1]**

Character of Proceeding: Criminal appeal from Court of Common Pleas. Case No. CR-351984.

**DISPOSITION:** Judgment: Reversed and Vacated.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant appealed a judgment from the Cuyahoga County Court of Common Pleas (Ohio), which convicted her of simple assault on the ground that it was a lesser included offense of robbery. She had been charged with one count of robbery. The trial court suspended a sentence of six months and placed the defendant on one year probation, ordering restitution for the amount of the coat she allegedly stole from her victim.

**OVERVIEW:** Defendant was charged with robbery after an altercation in which she allegedly slapped her victim and then stole her coat from the back seat of her car. The court did not address defendant's assignments of error because it found, sua sponte, that defendant was convicted of a crime for which she was not indicted. The court determined that the conviction constituted plain error that materially affected defendant's substantial rights. The court noted that in order for an offense to be a lesser-included offense of another, the greater offense could not ever be committed without committing the lesser offense. The court found, however, that robbery, under Ohio Rev. Code § 2911.02(A) (3), could be committed without committing an assault. Specifically, a robbery could be committed with the mere threat of force. The court concluded that a simple assault under Ohio Rev. Code § 2903.13(A) was therefore not a lesser-included offense of robbery. The court also decided that the prosecution failed to prove that defendant stole the victim's coat in the course of slapping the victim.

**OUTCOME:** The court reversed defendant's conviction, vacated the judgment, and discharged defendant.

**CORE TERMS:** lesser, coat, fight, robbery, guilty of assault, simple assault, indicted, assault, maced, elements of robbery, theft offense, greater offense, lesser offense, announcement, convicted of a crime, offense of robbery, threat of force, crime charged, sua sponte, restitution, ordering, vacated, assignments of error, physical harm, statutorily, approached, boyfriend, slapping, daughter, fleeing

**LexisNexis (TM) HEADNOTES - Core Concepts - ♦ Hide Concepts**

A-48

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1380

📄 Criminal Law & Procedure > Criminal Offenses > Crimes Against the Person > Robbery
HN1⬇ Ohio Rev. Code § 2911.02(A)(3) provides that no person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall use or threaten the immediate use of force against another.

📄 Criminal Law & Procedure > Criminal Offenses > Crimes Against the Person > Assault & Battery
HN2⬇ Ohio Rev. Code § 2903.13(A) provides that no person shall knowingly cause or attempt to cause physical harm to another or to another's unborn.

📄 Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses
HN3⬇ A defendant may be found guilty of a lesser included offense of the crime charged. Ohio Rev. Code § 2945.74; Ohio R. Crim. P. 31(C). The test for determining whether an offense is a lesser included offense of another is three-pronged: (1) the offense must carry a lesser penalty than the other; (2) the greater offense, cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense.

📄 Criminal Law & Procedure > Criminal Offenses > Crimes Against the Person > Robbery
HN4⬇ Under Ohio Rev. Code § 2911.02, the elements of robbery must occur simultaneously in order for the offense to occur. Therefore, the state must prove that an accused's intent to deprive the owner of the property, as well as the actual taking (elements of the theft offense), coincided in point of time with the force or threat of force used in committing the theft offense, or in fleeing thereafter.

**COUNSEL:** For Plaintiff-Appellee: STEPHANIE TUBBS JONES, Cuyahoga County Prosecutor, WILLIAM R. CAINE, Assistant Prosecuting Attorney, Cleveland, Ohio.

For Defendant-Appellant: PATRICIA J. SMITH, ESQ., Cleveland, Ohio.

**JUDGES:** JAMES M. PORTER, PRESIDING JUDGE. KARPINSKI, J., and MICHAEL J. CORRIGAN, J., CONCUR.

**OPINIONBY:** JAMES M. PORTER

**OPINION:** JOURNAL ENTRY AND OPINION

JAMES M. PORTER, P.J.:

Defendant-appellant Kisma Campbell appeals from her conviction for simple assault ( R.C. 2903.13) following a bench trial. Defendant claims the trial court erred in ordering restitution of an item involved in the original robbery charge when she was only found guilty of assault. Defendant also contends her conviction was against the manifest weight of the evidence. However, we find, *sua sponte,* that the defendant was convicted of a crime for which she was not indicted, and her conviction should be vacated as discussed below.

This case arose from a confrontation on April 12, 1997 between defendant and her friends with the victim, Tiffany McBride, in the parking lot outside **[*2]** a Finast supermarket where Ms. McBride worked.

Ms. McBride testified that she left her work as a check out clerk at approximately 9:45 p.m. to pick up her daughter at her boyfriend's. Her daughter and defendant's son were fathered

A-50

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1381

by the boyfriend. She claimed to have a coat with her that she had just purchased at Burlington Coat Factory for $ 159.00.

According to Ms. McBride, as she walked to her car, a vehicle approached containing defendant and three other girls. She and defendant had been feuding. She claimed defendant had been harassing her at work so she knew that defendant wanted to fight her. She threw her coat in her car and defendant's friend approached her, stating: "We going to whoop your ass."

Ms. McBride claimed that defendant struck the first blow, slapping her face and then her companion maced her with pepper spray in the face. McBride did not fight back but went into the store for about 15 minutes to wash out her eyes. The store security guard called the police.

Defendant and her friends were gone when Ms. McBride came out but the coat was missing from her car. She did not see anyone take the coat. She called defendant at her grandmother's house and asked her [*3] to return the coat. She claimed that the defendant told her "Yeh bitch, I got it, you ain't getting it back." Ms. McBride claimed that defendant has always been the aggressor. She admitted that she has been prosecuted by defendant for a fight they had in a video store.

Audrey Black, a co-worker of McBride's, testified: that she saw McBride walk out of the door that evening; that a car drove up; two girls got out of the car; and they all had words and then maced McBride. She could not see who maced McBride.

Defendant's friends testified that they were in the car that night; that McBride came over to their parked car and started to bang on the window; that McBride kicked the car door and banged on the window trying to get the defendant to fight; that defendant stated that she did not want to fight; and that McBride reached into her pocket and she thought she was going to pull something out so she was maced.

Defendant testified that she has had problems with McBride since she was six months pregnant. McBride has harassed her about the mutual father of their children. McBride would call and ask her if she was still seeing him. On one occasion, McBride came to defendant's house and started [*4] a physical fight with her. She did not recall McBride having a coat.

The case was tried to the court on one count of robbery. The trial court found that the defendant was guilty of simple assault on the grounds it was a "lesser included offense" of robbery. The trial court suspended a sentence of six months and placed the defendant on one year "probation" or community controlled sanctions, ordering restitution in the amount of $ 145.00 for the stolen coat. A timely notice of appeal was filed. Defendant's two assignments of error state as follows:

> I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ORDERED THE APPELLANT TO PAY RESTITUTION FOR A COAT OF THE VICTIM'S AFTER IT FOUND THE APPELLANT GUILTY OF SIMPLE ASSAULT AND NOT A THEFT OFFENSE.

> II. THE TRIAL COURT ERRED WHEN IT FOUND THE APPELLANT GUILTY OF ASSAULT WHICH WAS AGAINST THE WEIGHT OF THE EVIDENCE.

We do not find it necessary to address these assignments of error because plain error intervened below which materially affected defendant's substantial rights. Crim.R. 52(B). As

A-57

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1382

discussed below, the trial court erred in finding the defendant guilty of assault, which is not a lesser included offense of the crime **[*5]** charged, robbery. We take notice, *sua sponte*, that defendant was indicted for robbery under [HN1] R.C. 2911.02(A) (3), which states:

> No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall *** use or threaten the immediate use of force against another.

However, defendant was only convicted of assault under [HN2] R.C. 2903.13(A), which provides:

> No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn.

In its journal entry, the trial court stated that it "finds the defendant, Kisma Campbell, guilty of simple assault R.C. 2903.13 M-1 a lesser and included offense under the charge of the indictment." It is, of course, true that [HN3] a defendant may be found guilty of a lesser included offense of the crime charged. R.C. 2945.74; Crim.R. 31(C).

The test for determining whether an offense is a lesser included offense of another is three-pronged:

> (1) the offense must carry a lesser penalty than the other;

> (2) the greater offense, cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed;

> (3)  **[*6]**  some element of the greater offense is not required to prove the commission of the lesser offense.

*State v. Deem* (1988), 40 Ohio St. 3d 205, 209, 533 N.E.2d 294.

Based on the elements of robbery and assault listed above, assault under R.C. 2903.13(A) is not a lesser included offense of robbery under R.C. 2911.02 (A) (3). Under the second prong of the Deem test, in order for an offense to be a lesser included offense of another, the greater offense cannot ever be committed without committing the lesser offense. However, robbery, under which defendant was indicted, R.C. 2911.02(A) (3), can be committed without committing an assault. Specifically, a robbery can be committed with the mere threat of force. However, a mere threat cannot constitute an assault. In order to be guilty of assault, the offender must at least cause or attempt to cause physical harm to another. Therefore, simple assault under R.C. 2903.13(A) is not a lesser included offense of robbery under R.C. 2911.02(A) (3). Defendant was convicted of a crime for which she was not indicted.

Furthermore, the State failed to prove that defendant stole the victim's coat in the course of slapping the victim. The elements **[*7]** of robbery did not occur simultaneously as required by R.C. 2911.02. As held by this court in ***State v. Ballard* (1984), 14 Ohio App. 3d 59, 469 N.E.2d 1334,** syllabus:

A-52

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1383

**HN4** Under R.C 2911.02, the elements of robbery must occur simultaneously in order for the offense to occur. Therefore, the state must prove that the accused's intent to deprive the owner of the property, as well as the actual taking (elements of the theft offense), coincided in point of time with the force or threat of force used in committing the theft offense, or in fleeing thereafter.

Given the foregoing discussion, defendant's conviction is reversed, the judgment is vacated, and defendant is discharged.

It is ordered that appellant recover of appellee her costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KARPINSKI, J., and

MICHAEL, J. CORRIGAN, J., CONCUR.

JAMES M. PORTER

PRESIDING JUDGE

N.B. **[*8]**  This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 27. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22 (E). See, also, S.Ct.Prac.R. 112, Section 2(A) (1).

Service: Get by LEXSEE®
Citation: **1998 Ohio App. LEXIS 5595**
View: Full
Date/Time: Friday, August 8, 2003 - 2:16 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

A-53

DAF (ANT)



IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                              :

    Appellee,                          :    Case No. ____    03 - 1441

-vs-                                       :

DONNA MARIE ROBERTS,                       :    **Capital Case**

    Appellant.                         :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S MOTION FOR LEAVE TO FILE DELAYED APPEAL

---

DENNIS WATKINS - 0009949
Trumbull County Prosecuting Attorney

LUWAYNE ANNOS - 0055651
Assistant Prosecuting Attorney

Trumbull County Prosecutor's Office
4th Floor Administration Building
160 High Street NW
Warren, Ohio 44481
(330) 675-2426
Facsimile:  (330) 393-7076

COUNSEL FOR APPELLEE

DAVID BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Appellate Supervisor
Death Penalty Division
Counsel of Record
KELLY CULSHAW - 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio  43215
(614) 466-5394
Facsimile:  (614) 644-0708

COUNSEL FOR APPELLANT

ON COMPUTER-SMW

FILED

AUG 1 3 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

      Appellee,                      :      Case No. ____

-vs-                                    :

DONNA MARIE ROBERTS,                    :      **Capital Case**

      Appellant.                     :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S MOTION FOR LEAVE TO FILE DELAYED APPEAL

---

     Appellant, Donna Marie Roberts, through counsel, requests leave of this Court to file a delayed appeal in a capital case pursuant to Practice Rule XIX. § 1(A)(3). The trial court issued its opinion on June 20, 2003, and its final entry was issued on June 24, 2003. This request is supported by the affidavit of counsel. The reasons for this request are set out in the attached Memorandum.

                             Respectfully submitted,

                             DAVID BODIKER
                             Ohio Public Defender

                             JOSEPH E. WILHELM – 0055407
                             Appellate Supervisor
                             Death Penalty Division
                             Counsel of Record

1

*Kelly R. Culshaw*
KELLY CULSHAW – 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio  43215
(614) 466-5394
Facsimile:  (614) 644-0708

## MEMORANDUM

The trial court's final appealable order was issued on June 24, 2003.  At that time, the Ohio Public Defender had not been appointed as counsel for this appeal.  Indeed, the trial court did not appoint the Public Defender as counsel for Appellant until August 5, 2003.  (Exhibit B). The appointment entry was received by the Public Defender on August 7, 2003.  (See Exhibit C). Thus, the Public Defender did not have notice of this appointment until one day before the notice of appeal was due to be filed with the clerk of this Court. Through inadvertence, moreover, the appointment entry was not routed to appointed counsel within the Public defender's office until August 11.

This delay by the trial court in appointing the Public Defender provides this Court with good cause to grant Appellant leave to file her delayed appeal.  The trial court expressed interest in appointing the Public Defender before or shortly after Appellant was sentenced to death. (Exhibit A).  The Public Defender informed the trial court, through Assistant Prosecutor Christopher Becker, that it represented Appellant's co-defendant (Nathaniel Jackson) on post-conviction.  (Exhibit A.)  However, the Public Defender concluded that this putative conflict could be waived, because no actual conflict existed.  (Exhibit A).

Thus, the Public Defender stood ready to accept the appointment in early June or July of 2003.  But the Public Defender did not hear anything more about the appointment in Appellant's

2

case until it received the trial court's entry of August 5 appointing counsel.  (Exhibit A). Appellant's appointed counsel, attorneys Wilhelm and Culshaw, had no opportunity to file the notice of appeal within the 45 day deadline of Rule XIX § (1)(A)(1). Appellant's appointed counsel did not have personal notice of their appointment until August 11; after the deadline for the notice of appeal had passed.

This Court should grant Appellant leave to file her delayed appeal.  Appellant is under a sentence of death and this Court has a statutory duty to review the sufficiency of the evidence supporting the aggravating circumstances, to independently weigh the selection factors, and to review the sentence of death to see if it is disproportionate in comparison to other cases. O.R.C. § 2929.05(A).  This independent review cannot be waived by the Appellant.  See State v. Ashworth, 85 Ohio St. 3d 56, 62 (1999).  Accordingly, this Court should grant this motion to ensure that it fulfills its statutory duty to review Appellant's death sentence.

Likewise, this Court's review should not be forfeited under these circumstance,  because: (1) the trial court's failure to timely appoint counsel contributed to this delay in filing Appellant's notice, (2) the delay in filing this motion is de minimus because only three business days separate the last day for filing the notice of appeal and this motion, (3) appointed counsel had no personal notice of their appointment until after the deadline for filing the notice of appeal had passed, and, (4) the gravity of this death sentence imposed, and the infrequency of the use of the death penalty for women offenders, cautions in favor of this Court's review of Appellant's convictions and sentence.  See Woodson v. North Carolina, 428 U.S. 280, 305-06 (1976); *Gendering the Death Penalty:  Countering Sex Bias in a Masculine Sanctuary*, Streib 63 Ohio St. L.J. 431 (2002) (death penalty symposium issue).

3

Respectfully submitted,

DAVID BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Appellate Supervisor
Death Penalty Division
Counsel of Record

KELLY CULSHAW – 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio  43215
(614) 466-5394
Facsimile:  (614) 644-0708

COUNSEL FOR APPELLANT

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing APPELLANT'S MOTION FOR
LEAVE TO FILE DELAYED APPEAL was forwarded by first-class, postage prepaid U.S. Mail
to Dennis Watkins, Prosecuting Attorney and LuWayne Annos, Assistant Prosecuting Attorney,
4th Floor Administration Building, 160 High Street NW, Warren, Ohio 44481, on this _13th_ day
of August, 2003.

JOSEPH E. WILHELM
COUNSEL FOR APPELLANT

#184631

5

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1389

Exhibit A

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | Case No. _____ |
| -vs- | : | |
| DONNA MARIE ROBERTS, | : | **Capital Case** |
| Appellant. | : | |

_____

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793
_____
_____

AFFIDAVIT OF JOSEPH E. WILHELM IN SUPPORT
OF MOTION FOR LEAVE TO FILE DELAYED APPEAL
_____

IN THE COUNTY OF FRANKLIN,
STATE OF OHIO

                     ss:

I, Joseph E. Wilhelm do hereby affirm that the following statements are true to the best of my knowledge:

I am a licensed attorney in Ohio, registration number 0055407. I am employed by the Ohio Public Defender as the Appellate Supervisor for the Death Penalty Division.

During the latter part of June, 2003, or in early July, 2003, I learned from my supervisor, Gregory Meyers, that the trial court in State v. Roberts had expressed an interest in appointing the Public Defender to represent Ms. Roberts in her appeal of right from a sentence of death.

1

The Public Defender also represents Ms. Roberts's co-defendant, Nathaniel Jackson, on post-conviction.  However, it was determined by Mr. Meyers, Richard Vickers, the post-conviction supervisor, and myself that no actual conflict would prevent the Public Defender from representing Ms. Roberts on appeal, while simultaneously representing Mr. Jackson on post-conviction.  Accordingly, Mr. Meyers directed me to offer the services of the Public Defender to the trial court for Ms. Roberts's appeal of right to this Court.

I spoke to the prosecuting attorney on the <u>Roberts</u> case, Christopher Becker.  I informed Mr. Becker that the Public Defender would have a putative conflict based on the dual representation of both Ms. Roberts and Mr. Jackson.  I also advised Mr. Becker that the Public Defender did not believe that any actual conflict existed based on this dual representation; and that any dual representation by the Public Defender would not adversely effect the Public Defender's representation of either Ms. Roberts or Mr. Jackson.

I told Mr. Becker that the Public Defender could accept the appointment in Ms. Roberts's appeal, so long as Ms. Roberts was apprised of the putative conflict and she agreed to the Public Defender's dual representation of her and Mr. Jackson.  Mr. Becker said that he would pass this information to the trial court.

Several weeks went by after I spoke to Mr. Becker.  During that time I was not contacted about the appointment of the Public Defender to Ms. Roberts's appeal.  I assumed that the trial court did not want to appoint the Public Defender to avoid dealing with the putative conflict between Ms Roberts and Mr. Jackson.  My assumption proved to be incorrect, however.

On August 8, 2003, I received an e-mail message from Mr. Meyers. He said that he wanted to meet with me on Monday, August 11 to discuss the assignment of Ms. Roberts's appeal.

2

On Monday, August 11, I met with Mr. Meyers.  He had received from the trial court an entry dated August 5, 2003 appointing the Public Defender for Ms. Roberts's appeal of right.  Also enclosed with this appointment entry was a final sentencing entry.  This sentencing entry was not file stamped, but it was signed by the trial judge and dated as of June 24, 2003.  Based on this entry, Mr. Meyers and I calculated that the time for filing the notice of appeal, 45 days, had expired as of Friday, August 8, 2003; if this sentencing entry was the final appealable order.

After checking with the office of the Clerk of Trumbull County, it was determined that the sentencing entry was filed on June 24, 2003.  The sentencing entry was in fact the final appealable order for the filing of the notice of appeal in Ms. Roberts's case (the O.R.C. § 2929.03(F) opinion was filed before this sentencing entry was filed).

At this point I realized that I had just been assigned to a case of which the time for the filing of the Notice of Appeal had expired on the preceding business day (Friday, August 8).

I would have timely filed the notice of appeal in Ms. Roberts's case if I had known on or before August 8, 2003 that the trial court had appointed the Public Defender for the appeal of right.

After getting notice of this appointment on August 11, I took prompt steps to initiate a request for leave to file a delayed appeal on Ms. Roberts's behalf.

Further affiant saith naught.

_____

JOSEPH E. WILHELM

Sworn to and subscribed in my presence this _13th_ day of August, 2003.

_____

NOTARY PUBLIC

#184547

KELLY LEANN CULSHAW, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

3

COURT OF COMMON PLEAS OF TRUMBULL COUNTY, OHIO
## DOCKET AND JOURNAL ENTRY

The State of Ohio

PLAINTIFF

vs.

Donna Marie Roberts

DEFENDANT

CASE NO. 01-CR-793

JOURNAL VOL. PAGE

DATE OF REQUEST 19

The State of Ohio Public Defender's office is appointed as counsel for the defendant, Donna Marie Roberts, in her appeal of this matter.

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTHWITH BY ORDINARY MAIL

JUDGE _John M. Stuard_

APPROVED:

_John M. Stuard_

_____
ATTORNEY—FOR PLAINTIFF

_____
ATTORNEY—FOR DEFENDANT

JOHN M. STUARD                    JUDGE

4/15/03

DATE OF SIGNATURE

Form No. 13-3

TCP 74

EXHIBIT B

Exhibit C

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
|     Appellee, | : | Case No. _____ |
| -vs- | : | |
| DONNA MARIE ROBERTS, | : | **Capital Case** |
|     Appellant. | : | |

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

AFFIDAVIT OF BRENDA L. JONES

---

IN THE COUNTY OF FRANKLIN
STATE OF OHIO           ss:

    I, Brenda L. Jones, do hereby affirm that the following statements are true to the best of my knowledge:

    I am the Administrative Assistant in the Death Penalty Division of the Ohio Public Defender's Office and have served as such since 12-15-91.

    Since March 1996, I have been the assistant to the Death Penalty Division's Chief Counsel, Gregory W. Meyers.

    Part of my duties for Mr. Meyers consist of receiving his mail on a daily basis by dating and initialing the top left portion of envelopes.

1

On 8-7-03 I dated and initialed (8-7-03 bj) an envelope addressed to "Attn:  Atty. Gregory Myers" from John M. Stuard, Judge Court of Common Pleas, Trumbull County, Warren, Ohio 44481.

      Further affiant saith naught.

*Brenda L. Jones*

BRENDA L. JONES

Sworn to and subscribed in my presence this _12th_ day of August, 2003.

*Gloria Govine*

NOTARY PUBLIC

#184583

RIA GOVINE
...on Expires **7-24-2005**

2

# The Supreme Court of Ohio

FILED

AUG 14 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

To the Clerk of Court of Common Pleas for

Trumbull _____ County,

Warren _____, Ohio

ORDER TO CERTIFY RECORD
IN DEATH PENALTY CASE

S.C. Case No. _____ 03-1441 _____

C.P. Case No. _____ 01CR793 _____

State of Ohio _____

v.

Donna Marie Roberts _____

You are hereby ORDERED, pursuant to Rule XIX, Section 4, of the Rules of Practice of the Supreme Court of Ohio, to prepare and forward the record in the above-captioned case to the Clerk's Office of the Supreme Court, no later than October 14, 2003, unless the Supreme Court grants an extension of time under Rule XIX, Section 4(C)(1).

Pursuant to Rule XIX, Section 3(A), the record shall consist of the following:

- The original papers filed in the trial court and exhibits to those papers;

- The transcript of proceedings, including all exhibits, and computer diskettes of the transcript, if available; and

- A certified copy of the docket and journal entries prepared by the clerk of the trial court.

You are further ORDERED, pursuant to Rule XIX, Section 4(B)(1), to number the documents and exhibits comprising the record; to prepare an index of the documents and exhibits, correspondingly numbered and identified with reasonable definiteness; to briefly describe all exhibits listed in the index; and to send a copy of the index to all counsel of record in the case and transmit the index with the record to the Clerk of the Supreme Court.

THOMAS J. MOYER
Chief Justice

# The Supreme Court of Ohio

**FILED**

SEP 2 4 2003

98 - 242

MARCIA J. MENGEL, **CLERK**
SUPREME COURT OF OHIO

State of Ohio,                    :          Case No.   03-1441
    Appellee,                     :
                            :
      v.                            :

Donna Marie Roberts,              :          E N T R Y
    Appellant.                    :

    This cause is pending before the Court as a death penalty appeal from the Court of Common Pleas of Trumbull County.  Upon consideration of appellant's motion for delayed appeal,

    IT IS ORDERED by the Court that the motion for delayed appeal be, and hereby is, granted.

    IT IS FURTHER ORDERED by the Court that the parties shall brief this case in accordance with S. Ct. Prac. R. XIX.

    (Trumbull County Court of Common Pleas;  No. 01CR793)

THOMAS J. MOYER
Chief Justice

0023r092403



ORIGINAL
ON COMPUTER - HC

# IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | Case No. 03-1441 |
| -vs- | : | |
| DONNA MARIE ROBERTS, | : | **Capital Case** |
| Appellant. | : | |

---

ON APPEAL FROM THE COURT OF COMMON PLEAS OF TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S MOTION FOR EXTENSION OF TIME TO FILE THE RECORD

---

DENNIS WATKINS – 0009949
Prosecuting Attorney

WAYNE ANNOS – 0055651
Assistant Prosecuting Attorney

Trumbull County Prosecutor's Office
4th Floor Administration Building
160 High Street, N.W.
Warren, Ohio 44481
Phone (330) 675-2426
Facsimile (330) 393-7076

DAVID H. BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Appellate Supervisor
Death Penalty Division
Counsel of Record

KELLY CULSHAW – 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
Phone (614) 466-5394
Facsimile (614) 644-0708

COUNSEL FOR APPELLEE

COUNSEL FOR APPELLANT

FILED

OCT 0 6 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

# IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                              :

     Appellee,                          :    Case No. 03-1441

-vs-                                       :

DONNA MARIE ROBERTS,                       :    Capital Case

     Appellant.                         :

---

## ON APPEAL FROM THE COURT OF COMMON PLEAS OF TRUMBULL COUNTY
## CASE NO. 01-CR-793

---

### APPELLANT'S MOTION FOR EXTENSION OF TIME TO FILE THE RECORD

---

Appellant Donna Marie Roberts, through counsel, now requests an extension of time until January 31, 2004 to file the record in her case. The record is currently due on October 13, 2003.

This motion is supported by the affidavit of court reporter Mary Ann Mills. (Exhibit A.) Ms. Mills states that, due to the anticipated length of this record (estimated to be 7,000 pages), and because of the other duties of the five assigned court reporters, the court reporters will not be able to complete the transcript in this case by October 13. Ms. Mills now estimates that the transcript may be finished by January 31, 2004.[1]

Accordingly, Appellant Donna Marie Roberts, through counsel, requests an extension of time until January 31, 2004 to file the record in this capital appeal as of right. See Sup. Ct. Prac. R. XIX, § 4(c).

---

[1] Ms. Mills's erroneously stated in her affidavit that January 31, 2003 is the projected date for the completion of the transcript. Ms. Mills called counsel for appellant to point out this error, and she suggested that counsel could make a

2

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Appellate Supervisor
Death Penalty Division
Counsel of Record

KELLY CULSHAW – 0066394
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394
(614) 644-0708

COUNSEL FOR APPELLANT


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing APPELLANT'S MOTION FOR EXTENSION OF TIME TO FILE THE RECORD was forwarded by first-class, postage prepaid U.S. Mail to Dennis Watkins, Prosecuting Attorney, Luwayne Annos, Assistant Prosecuting Attorney, 4th Floor Administration Building, 160 High Street, N.W., Warren, Ohio 44481, on this 6th day of October, 2003.

JOSEPH E. WILHELM - 0055407
COUNSEL FOR APPELLANT

#187343

---

pen and ink correction to her affidavit. Rather than doing that, counsel for Appellant simply informs the Court of this error in Ms. Mills's affidavit by this motion.

3

EXHIBIT A

STATE OF OHIO          )          IN THE SUPREME COURT

COUNTY OF TRUMBULL     )              STATE OF OHIO


STATE OF OHIO,                    )

vs.                              )     Trial Court Case No. 01-CR-793

DONNA M. ROBERTS,                )

      Defendant                 )


### AFFIDAVIT OF MARY ANN MILLS


    I, MARY ANN MILLS, being first duly cautioned and
sworn, state that I am the Official Court Reporter assigned to
the Honorable John M. Stuard, Trumbull County Common Pleas
Court Judge, the trial judge in the above-captioned case; that
I was the Court Reporter assigned to take the record of this
case, along with Court Reporters, Maribeth Hoolihan, Richelle
Guerrieri, Lori Rittwage and Kelly Wilson; that by reason of
said trial, the Court Reporters estimate there are
approximately 7,000 pages to be transcribed for purposes of
appeal.  All of the Court Reporters are currently working on
this transcript, as well as performing their regular duties as
a Court Reporter for their assigned judge.

    WHEREFORE, this Court Reporter, along with the
above-mentioned Court Reporters estimate the transcript of
proceedings in the above-captioned case cannot be completed
until January 31, 2003.

                                  *Mary Ann Mills*
                                  Mary Ann Mills

Sworn to before me and subscribed in my presence this *2nd*
day of October 2003.

                                  *Laurie A. Brown*
                                  Laurie A. Brown, Notary Public
                                  My Commission expires 1/13/08

# The Supreme Court of Ohio

**FILED**

OCT 0 9 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio,               :        Case No.   03-1441
        Appellee,            :

        v.                   :

Donna Marie Roberts,         :              E N T R Y
        Appellant.           :


This cause is pending before the Court as a death penalty appeal from the Court of Common Pleas for Trumbull County.  Upon consideration of appellant's motion for extension of time to transmit the record,

IT IS ORDERED by the Court that the motion for extension of time to transmit the record be, and hereby is, granted to the extent that the time for transmitting the record is extended to December 31, 2003.

(Trumbull County Court of Common Pleas;  No. 01CR793)

THOMAS J. MOYER
Chief Justice

1208r100703

# IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | Case No. 03-1441 |
| -vs- | : | |
| DONNA MARIE ROBERTS, | : | **Capital Case** |
| Appellant. | : | |

DEC 2 3 2003

---

ON APPEAL FROM THE COURT OF COMMON PLEAS OF TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S SECOND MOTION FOR EXTENSION OF TIME TO FILE THE RECORD

---

DENNIS WATKINS – 0009949
Prosecuting Attorney

WAYNE ANNOS – 0055651
Assistant Prosecuting Attorney

DAVID H. BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Chief Counsel, Death Penalty Division
Counsel of Record

KELLY L. CULSHAW – 0066394
Supervisor, Death Penalty Division

Trumbull County Prosecutor's Office
4th Floor Administration Building
160 High Street, N.W.
Warren, Ohio 44481
Phone (330) 675-2426
Facsimile (330) 393-7076

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
Phone (614) 466-5394
Facsimile (614) 644-0708

COUNSEL FOR APPELLEE

COUNSEL FOR APPELLANT

**IN THE SUPREME COURT OF OHIO**

STATE OF OHIO,               :

      Appellee,         :    Case No. 03-1441

-vs-                      :

DONNA MARIE ROBERTS,     :    Capital Case

      Appellant.       :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS OF TRUMBULL COUNTY
CASE NO. 01-CR-793

---

APPELLANT'S SECOND MOTION FOR EXTENSION OF TIME TO FILE THE RECORD

---

Appellant Donna Marie Roberts, through counsel, now requests an extension of time until January 31, 2004 to file the record in her case. The record is currently due on December 31, 2003.

This motion is supported by the affidavit of court reporter Mary Ann Mills. (Exhibit A.) Ms. Mills states that, due to the anticipated length of this record (estimated to be 7,000 pages), and because of the other duties of the five assigned court reporters, the court reporters will not be able to complete the transcript in this case by December 31, 20003. Ms. Mills now estimates that the transcript may be finished by January 31, 2004.

Accordingly, Appellant Donna Marie Roberts, through counsel, requests an extension of time until January 31, 2004 to file the record in this capital appeal as of right. See Sup. Ct. Prac. R. XIX, § 4(c).

2

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

JOSEPH E. WILHELM – 0055407
Chief Counsel, Death Penalty Division
Counsel of Record

KELLY L. CULSHAW – 0066394
Supervisor, Death Penalty Division

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394
(614) 644-0708

COUNSEL FOR APPELLANT

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing APPELLANT'S SECOND MOTION FOR EXTENSION OF TIME TO FILE THE RECORD was forwarded by first-class, postage prepaid U.S. Mail to Dennis Watkins, Prosecuting Attorney, Luwayne Annos, Assistant Prosecuting Attorney, 4th Floor Administration Building, 160 High Street, N.W., Warren, Ohio 44481, on this 23rd day of December, 2003.

JOSEPH E. WILHELM - 0055407
COUNSEL FOR APPELLANT

#191263

3

```
STATE OF OHIO          )      IN THE SUPREME COURT

COUNTY OF TRUMBULL  )          STATE OF OHIO


STATE OF OHIO,               )

vs.                          )      Trial Court Case No. 01-CR-793

DONNA M. ROBERTS,            )      Supreme Court Case No. 03-1441

     Defendant               )
```

<u>AFFIDAVIT OF MARY ANN MILLS</u>

    I, MARY ANN MILLS, being first duly cautioned and sworn, state that I am the Official Court Reporter assigned to the Honorable John M. Stuard, Trumbull County Common Pleas Court Judge, the trial judge in the above-captioned case; that I was the Court Reporter assigned to take the record of this case, along with Court Reporters, Maribeth Hoolihan, Richelle Guerrieri, Lori Rittwage and Kelly Wilson; that by reason of said trial, the Court Reporters estimate there are approximately 7,000 pages to be transcribed for purposes of appeal.  All of the Court Reporters are currently working on this transcript, as well as performing their regular duties as a Court Reporter for their assigned judge.

    WHEREFORE, this Court Reporter, along with the above-mentioned Court Reporters estimate the transcript of proceedings in the above-captioned case cannot be completed until January 31, 2004.

                                *Mary Ann Mills*
                                Mary Ann Mills

Sworn to before me and subscribed in my presence this ___19th___ day of December, 2003.

                          *Laurie A Brown*
                          Laurie A. Brown, Notary Public
                          My Commission expires 1/13/08

**EXHIBIT**

A

# The Supreme Court of Ohio

**FILED**

JAN 0 2 2004

MARCIA J. MENGEL, **CLERK**
SUPREME COURT OF OHIO

State of Ohio,
    Appellee,
       v.
Donna Marie Roberts,
    Appellant.

Case No. 03-1441

E N T R Y

    This cause is pending before the Court as a death penalty appeal from the Court of Common Pleas for Trumbull County.  Upon consideration of appellant's motion for extension of time to transmit the record,

    IT IS ORDERED by the Court that the motion for extension of time to transmit the record be, and hereby is, granted, and the time for transmitting the record is extended to January 31, 2004.

    (Trumbull County Court of Common Pleas; No. 01CR793)

THOMAS J. MOYER
Chief Justice

**In The Supreme Court Of Ohio**

State Of Ohio,                                  :

     Appellee,                             :      Case No. 03-1441

-vs-                                            :

Donna Marie Roberts,                            :      **Capital Case**

     Appellant.                            :

---

On Appeal From The Court Of Common Pleas Of Trumbull County
Case No. 01-CR-793

---

Appellant's Motion To Hold Appeal In Abeyance For
Remand To Trial Court To Resolve Putative Conflict Of Interest

---

Dennis Watkins – 0009949
Prosecuting Attorney

Wayne Annos – 0055651
Assistant Prosecuting Attorney

David H. Bodiker
Ohio Public Defender

Joseph E. Wilhelm – 0055407
Chief Counsel
Counsel Of Record

Kelly L. Culshaw – 0066394
Supervisor, Death Penalty Division

Rachel Troutman – 0076741
Assistant State Public Defender

Trumbull County Prosecutor's Office
4th Floor Administration Building
160 High Street, N.W.
Warren, Ohio 44481
Phone (330) 675-2426
Facsimile (330) 393-7076

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
Phone (614) 466-5394
Facsimile (614) 644-0708

Counsel For Appellee

Counsel For Appellant

FILED

JAN 1 2 2004

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1408

**In The Supreme Court Of Ohio**

| | | |
|---|---|---|
| State of Ohio, | : | |
|     Appellee, | : | Case No. 03-1441 |
| -vs- | : | |
| Donna Marie Roberts, | : | Capital Case |
|     Appellant. | : | |

On Appeal From The Court Of Common Pleas Of Trumbull County
Case No. 01-CR-793

Appellant's Motion To Hold Appeal In Abeyance For
Remand To Trial Court To Resolve Putative Conflict Of Interest

The Ohio Public Defender represents Appellant Donna Roberts in this appeal, and it represents her co-defendant Nathaniel Jackson on post-conviction. A putative conflict exists due to the Public Defender's joint representation of Roberts and Jackson. This putative conflict should be resolved before Roberts's appeal goes any further (the record is due on January 31, 2004.)

Roberts moves this Court for an order to remand her case to the trial court for a determination of whether an actual conflict of interest exists by the Public Defender's joint representation of Roberts and Jackson. On remand, the trial court should also determine if Roberts wishes to waive any conflict of interest.

A Memorandum in support of this motion is included.

Respectfully Submitted,

David H. Bodiker

1

Ohio Public Defender

Joseph E. Wilhelm – 0055407
Chief Counsel, Death Penalty Division
Counsel of Record

Kelly L. Culshaw – 0066394
Supervisor, Death Penalty Division

Rachel Troutman – 0076741
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394
(614) 644-0708

Counsel for Appellant

## Memorandum

**The trial court did not resolve this conflict issue.**

Donna Roberts began her appeal to this Court by filing a Motion For Leave To File Delayed Appeal. That motion was supported by the affidavit of Attorney Wilhelm. (Exhibit A.) Wilhelm stated in his affidavit that the trial court contacted the Public Defender to see if it could accept an appointment to handle Roberts's appeal. Wilhelm told the trial prosecutor, Christopher Becker, that a putative conflict of interest would occur by the Public Defender's joint representation of Roberts and Jackson.

Although Wilhelm did not anticipate an actual conflict of interest, he told Becker "that the Public Defender could accept the appointment in Ms. Roberts's appeal, so long as [she] was apprised of the putative conflict and she agreed to the Public Defender's dual representation of her and Mr. Jackson."(Exhibit A.) Becker agreed to pass this information to the trial court. (The

2

Public Defender went through Becker, rather than filing a motion, because the Public Defender was not a party at that time and had no standing to file a motion.)  Despite this expressed concern, the trial court appointed the Public Defender for Roberts's appeal without resolving this conflict of interest issue.

**This conflict issue should now be resolved in the trial court.**

A putative conflict of interest exists by the Public Defender's joint representation of Roberts and Jackson.  Roberts is entitled to conflict-free representation.[1]  As in <u>State v. Gillard,</u> the trial court was "constitutionally required to conduct an inquiry into the possible conflict of interest to determine whether appellant... would receive... conflict-free counsel...."[2]

Recent developments also prompt this request.  Attorney Richard Vickers recently expressed his concern to Wilhelm that this conflict issue should be revisited, because Jackson's post-conviction strategy involves an attack against Roberts (Vickers supervises Jackson's post-conviction counsel.  An affidavit from Vickers is attached as Exhibit B.)  Moreover, Wilhelm now heads the Public Defender's death penalty attorneys.  This puts Jackson's post-conviction counsel in the awkward position of attacking Wilhelm's client.[3]

**Conclusion.**

This case is tinged with the appearance of impropriety resulting from the Public Defender's joint representation of Roberts and Jackson.  To ensure the integrity of this appeal, this Court should hold Donna Roberts's case in abeyance and remand it to the trial court for a resolution of this conflict issue.  The trial court should determine if there is an actual conflict of interest.  If an actual conflict exists, then the trial court should determine whether Roberts wishes to waive it.  A

---

[1] <u>State v. Lentz</u>, 70 Ohio St. 3d 527, 531, 639 N.E.2d 784, 786 (1994).
[2] <u>See</u> <u>State v. Gillard</u>, 64 Ohio St. 3d 304, 312, 593 N.E.2d 878, 883 (1992).
[3] <u>But see</u> <u>State v. Lentz</u>, 70 Ohio St. 3d at 530 N.E.2d at 786.

3

waiver by Roberts could stave off future collateral attacks against the Public Defender's joint representation.

Respectfully Submitted,

David H. Bodiker
Ohio Public Defender

Joseph E. Wilhelm – 0055407
Chief Counsel, Death Penalty Division
Counsel Of Record

Kelly L. Culshaw – 0066394
Supervisor, Death Penalty Division

Rachel Troutman – 0076741
Assistant State Public Defender

Office Of The Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio  43215
(614) 466-5394
(614) 644-0708

Counsel for Appellant

4

<u>Certificate Of Service</u>

I hereby certify that a true copy of the foregoing Appellant's Motion To Hold Appeal In Abeyance For Remand To Trial Court To Resolve Putative Conflict Of Interest was forwarded by first-class, postage prepaid U.S. Mail to Dennis Watkins, Prosecuting Attorney, Luwayne Annos, Assistant Prosecuting Attorney, 4th Floor Administration Building, 160 High Street, N.W., Warren, Ohio 44481, on this 12th day of January, 2004.

Joseph E. Wilhelm - 0055407
Counsel for Appellant

#191911

5

Exhibit A

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

      Appellee,                        :      Case No. ____

-vs-                                    :

DONNA MARIE ROBERTS,                    :      **Capital Case**

      Appellant.                       :

---

ON APPEAL FROM THE COURT OF COMMON PLEAS, TRUMBULL COUNTY
CASE NO. 01-CR-793

---

AFFIDAVIT OF JOSEPH E. WILHELM IN SUPPORT
OF MOTION FOR LEAVE TO FILE DELAYED APPEAL

---

IN THE COUNTY OF FRANKLIN,
STATE OF OHIO
              ss:

      I, Joseph E. Wilhelm do hereby affirm that the following statements are true to the best of my knowledge:

      I am a licensed attorney in Ohio, registration number 0055407. I am employed by the Ohio Public Defender as the Appellate Supervisor for the Death Penalty Division.

      During the latter part of June, 2003, or in early July, 2003, I learned from my supervisor, Gregory Meyers, that the trial court in State v. Roberts had expressed an interest in appointing the Public Defender to represent Ms. Roberts in her appeal of right from a sentence of death.

1

The Public Defender also represents Ms. Roberts's co-defendant, Nathaniel Jackson, on post-conviction. However, it was determined by Mr. Meyers, Richard Vickers, the post-conviction supervisor, and myself that no actual conflict would prevent the Public Defender from representing Ms. Roberts on appeal, while simultaneously representing Mr. Jackson on post-conviction. Accordingly, Mr. Meyers directed me to offer the services of the Public Defender to the trial court for Ms. Roberts's appeal of right to this Court.

I spoke to the prosecuting attorney on the <u>Roberts</u> case, Christopher Becker. I informed Mr. Becker that the Public Defender would have a putative conflict based on the dual representation of both Ms. Roberts and Mr. Jackson. I also advised Mr. Becker that the Public Defender did not believe that any actual conflict existed based on this dual representation; and that any dual representation by the Public Defender would not adversely effect the Public Defender's representation of either Ms. Roberts or Mr. Jackson.

I told Mr. Becker that the Public Defender could accept the appointment in Ms. Roberts's appeal, so long as Ms. Roberts was apprised of the putative conflict and she agreed to the Public Defender's dual representation of her and Mr. Jackson. Mr. Becker said that he would pass this information to the trial court.

Several weeks went by after I spoke to Mr. Becker. During that time I was not contacted about the appointment of the Public Defender to Ms. Roberts's appeal. I assumed that the trial court did not want to appoint the Public Defender to avoid dealing with the putative conflict between Ms Roberts and Mr. Jackson. My assumption proved to be incorrect, however.

On August 8, 2003, I received an e-mail message from Mr. Meyers. He said that he wanted to meet with me on Monday, August 11 to discuss the assignment of Ms. Roberts's appeal.

2

On Monday, August 11, I met with Mr. Meyers.  He had received from the trial court an entry dated August 5, 2003 appointing the Public Defender for Ms. Roberts's appeal of right. Also enclosed with this appointment entry was a final sentencing entry.  This sentencing entry was not file stamped, but it was signed by the trial judge and dated as of June 24, 2003.  Based on this entry, Mr. Meyers and I calculated that the time for filing the notice of appeal, 45 days, had expired as of Friday, August 8, 2003; if this sentencing entry was the final appealable order.

After checking with the office of the Clerk of Trumbull County, it was determined that the sentencing entry was filed on June 24, 2003.  The sentencing entry was in fact the final appealable order for the filing of the notice of appeal in Ms. Roberts's case (the O.R.C. § 2929.03(F) opinion was filed before this sentencing entry was filed).

At this point I realized that I had just been assigned to a case of which the time for the filing of the Notice of Appeal had expired on the preceding business day (Friday, August 8).

I would have timely filed the notice of appeal in Ms. Roberts's case if I had known on or before August 8, 2003 that the trial court had appointed the Public Defender for the appeal of right.

After getting notice of this appointment on August 11, I took prompt steps to initiate a request for leave to file a delayed appeal on Ms. Roberts's behalf.

Further affiant saith naught.

JOSEPH E. WILHELM

Sworn to and subscribed in my presence this 13th day of August, 2003.

NOTARY PUBLIC

#184547

KELLY LEANN CULSHAW, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

3



**EXHIBIT**

B

_____

**In The Supreme Court Of Ohio**

| | | |
|---|---|---|
| State Of Ohio, | : | |
| Appellee, | : | Case No. 03-1441 |
| -vs- | : | |
| Donna Marie Roberts, | : | **Capital Case** |
| Appellant. | : | |

### AFFIDAVIT OF RICHARD J. VICKERS

IN THE STATE OF OHIO  )
                       )  SS:
COUNTY OF FRANKLIN  )

     I, Richard J. Vickers, being first duly sworn according to law, state the following:

1. I am attorney, licensed to practice law in Ohio.

2. Beginning in September, 1986, I have been continually employed as an attorney in the Death Penalty Division of the Office of the Ohio Public Defender.

3. From 1996 until 2003 I was the Post-Conviction Supervisor in the Ohio Public Defender's Death Penalty Division.

4. I continue to be a supervising attorney in the Ohio Public Defender's Death Penalty Division. My current supervisor is Chief Death Penalty Counsel Joseph Wilhelm.

5. I am currently supervising the post-conviction case of State v. Nathaniel Jackson, Trumbull C.P Case No. 01-CR-794. Because Jackson was sentenced to death, the Office of the Ohio Public Defender contacted  Jackson and offered to provide post-conviction representation to him. Mr. Jackson accepted the offer of representation. Mr. Jackson's post-conviction petition was filed on January 5, 2004.

6. I am also aware that the Death Penalty Division of the Office of the Ohio Public Defender represents Donna Roberts in her direct appeal to this Court.

7. Donna Roberts and Nathaniel Jackson were both charged with capital murder in the murder of Roberts's former husband, Mr. Robert Fingerhut. In order to zealously represent Jackson, his post-conviction petition sets forth claims that attack Roberts's character and implicate her as the prime mover in the murder of Mr. Fingerhut. The purpose of these claims is to shift responsibility from Jackson to Roberts in an effort to protect his constitutional rights and to spare him from execution. As such, the efforts of post-conviction counsel are fully opposed to Roberts's legal interests.

8. Given the nature of the post-conviction claims implicating Roberts, I became concerned that the Death Penalty Division faced an ostensible conflict of interest by continuing to represent both Roberts and Jackson.

9. I communicated my concerns to Chief Death Penalty Counsel Joseph Wilhelm. Mr. Wilhelm agreed that the appearance of a conflict was present. He also noted that his supervision of me seemed to exacerbate the potential conflict. Mr. Wilhelm stated that he would address the issue of the conflict with this Court. I concur with Mr. Wilhelm's decision.

Further Affiant sayeth naught.

RICHARD J. VICKERS

JURAT

Sworn to and subscribed before me this 9th day of January, 2004.

NOTARY PUBLIC

KATHRYN L. SANDFORD, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

ORIGINAL
ON COMPUTER - HCG

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          )
                                        )
        Plaintiff-Appellee              )          CASE No. 03-1441
-vs-                                    )
                                        )          Appeal from the Trumbull
                                        )          County Court of Common Pleas
DONNA MARIE ROBERTS                     )          Case No. 2001 CR 793
                                        )
        Defendant-Appellant             )

---

### APPELLEE'S RESPONSE TO APPELLANT'S MOTION TO HOLD APPEAL IN ABEYANCE FOR REMAND TO TRIAL COURT TO RESOLVE PUTATIVE CONFLICT OF INTEREST

---

DENNIS WATKINS
Atty. Reg. No. 0009949
LuWAYNE ANNOS (Counsel of Record)
Atty Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio 44481
Telephone No.(330)675-2426
Telefax No. (330) 675-2431


COUNSEL FOR PLAINTIFF-APPELLEE
STATE OF OHIO

DAVID H. BODIKER
JOSEPH E. WILHELM
Atty. Reg. No. 0055407
 KELLY L. CULSHAW
Atty. Reg. No. 0066394
RACHEL TROUTMAN
Atty. Reg. No. 0076741
Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio  43215
Telephone No. (614) 466-5394


COUNSEL FOR DEFENDANT-
APPELLANT DONNA MARIE ROBERTS



FILED
JAN 2 0 2004
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO



ORIGINAL

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          )
                                        )
      Plaintiff-Appellee              )       CASE No. 03-1441
-vs-                                    )
                                        )       Appeal from the Trumbull
                                        )       County Court of Common Pleas
                                        )       Case No. 01-CR-793
DONNA MARIE ROBERTS                     )
                                        )
      Defendant-Appellant             )

---

### APPELLEE'S RESPONSE TO APPELLANT'S MOTION TO HOLD APPEAL IN ABEYANCE FOR REMAND TO TRIAL COURT TO RESOLVE PUTATIVE CONFLICT OF INTEREST

---

Now comes the Plaintiff-Appellee, the State of Ohio, in response to Defendant-Appellant Donna Marie Roberts' Motion to Hold Appeal in Abeyance for Remand to the Trial Court to Resolve Putative Conflict of Interest filed with this Court Jan. 12, 2004.

The State does not object to holding this appeal in abeyance for a *limit* period of time for the purposes of determining whether or not an actual conflict of interest exists in the Office of the Ohio Public Defender's representation of both Appellant, in her direct appeal to this Court, and her co-defendant, Nathaniel Jackson, in his post-conviction claim and presumably subsequent state court appeals of said petition.[1]

The State takes no position as to whether this matter should be remanded to the trial court for such a determination, or if this Court should retain jurisdiction and resolve the issue of a putative conflict of interest. The State does maintain that this matter should be resolved in an open hearing with Appellant present to perfect the record on this issue.

---

[1] Jackson's direct appeal is pending in this Court under case number 03-137. He is represented by appointed counsel in the direct appeal.

Respectfully submitted by:

DENNIS WATKINS (#0009949)
Prosecuting Attorney

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio        44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing response was sent by ordinary U.S. Mail to Attys. David H. Bodiker, Joseph E. Wilhelm (#0055407), Kelly L. Culshaw (#0066394), Rachel Troutman (#0076741), Counsel for Defendant-Appellant Donna Marie Roberts, Office of the Ohio Public Defender, 8 East Long Street, 11th Floor, Columbus, Ohio 43215 on this 16th Day of January, 2004.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

# The Supreme Court of Ohio

30 EAST BROAD STREET, COLUMBUS, OHIO 43215-3431

THOMAS J. MOYER, CHIEF JUSTICE
ALICE ROBIE RESNICK
FRANCIS E. SWEENEY
PAUL E. PFEIFER
EVELYN LUNDBERG STRATTON
MAUREEN O'CONNOR
TERRENCE O'DONNELL

MARCIA J. MENGEL
CLERK OF COURT

(614) 466-3931
(614) 466-5201

January 30, 2004

Joseph Edmond Wilhelm
Ohio Public Defender Comm.
8 East Long Street
Columbus OH 43266-0587

COMPUTER

Re: 03-1441

State of Ohio
            v.
Donna Marie Roberts

Dear Joseph Edmond Wilhelm:

    This is to notify you that the record in the above-styled
case was filed with the Clerk's Office on January 30, 2004.

    If, after reviewing the Supreme Court Rules of Practice, you
have any questions about filing deadlines in the case, please
feel free to call me at 614/644-9323.

                    Sincerely,

                    Rita A. Nash
                    Senior Deputy Clerk

/ran

S.C. Case No. 3 - 1441
Date 3/30/2004

## Item(s) to be Docketed

☑ OPF   Record. *Under Seal Portions*

**ON COMPUTER - RM**

☐ APF   Supplemental record.

☐ DEP   $100 deposit for costs by _____, receipt #_____. (REL)

☐ OBP   Original board papers. (BDC)

☐ ARC   Attorney registration card. (REP/REA)

☐ CAR   Certificate of admission. (REP/REA)

☐ PCP   Payment of publication costs in the amount of $_____ by _____; receipt #_____. (REP)

☐ PPC   Payment of board costs in the amount of $_____ by _____; receipt #_____. (REP)

☐ DPS   $500 deposit for costs by _____, receipt #_____. (REP)

☐ CAG   Board costs collected by Attorney General in the amount of $_____, less AG fee of $_____; check total $_____; receipt #_____. (NON)

☐ AAF   Application for attorney fees by _____. (    )

☐ OPC   Cost of copying record or portions of record; $_____ billed to _____. (    )

☐ OPT   Copy of record sent to _____; _____ pages copied at 15¢/page.

☐ CRM   Copies of record made in office by _____; total paid $_____; receipt #_____. (    )

☐ XXX   _____ _____. (    )

☐ NRJ   Notice of recusal of Justice _____, received by _____.

# The Supreme Court of Ohio

FILED

FEB 06 2004

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio,
     Appellee,

     v.

Donna Marie Roberts,
     Appellant.

Case No. 03-1441

E N T R Y

This cause is pending before the Court as a death penalty from the Court of Common Pleas of Trumbull County. Upon consideration of appellant's motion to hold appeal in abeyance for remand to trial court to resolve putative conflict of interest,

IT IS ORDERED by the Court that the motion be, and hereby is, granted.

IT IS FURTHER ORDERED by the Court that this case is remanded to the trial court for a hearing and determination of the putative conflict of interest of appellant's counsel. Following determination of that issue, the trial court shall refer this matter back to this Court by sending an order finding either that no such conflict exists or finding that a conflict of interest exists and appointing new counsel.

IT IS FURTHER ORDERED by the Court that briefing in this case be stayed during the remand. Briefing shall commence when the trial court's order on remand is filed with this Court, and appellant's brief shall be due 90 days from that date. The parties shall otherwise comply with S. Ct. Prac. R. VI and S. Ct. Prac. R. XIX.

(Trumbull County Court of Common Pleas; No. 01CR793)

THOMAS J. MOYER
Chief Justice

# 03-1441

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
        Plaintiff                       )
                                        )     JUDGE: JOHN M. STUARD
                                        )     Case No. 01-CR-793
-vs-                                    )
                                        )
                                        )
DONNA M. ROBERTS                        )     **JUDGMENT ENTRY**
        Defendant                       )

This matter came to be heard pursuant to a remand from The Supreme Court of Ohio to determine whether there is a conflict of interest concerning Defendant Donna M. Roberts' legal representation in her direct appeal.

It has come to this Court's attention that the Columbus Office of the Ohio Public Defender's Office is representing both Defendant in her direct appeal to the Ohio Supreme Court and co-defendant Nathaniel Jackson in his postconviction petition now pending in this Court. In his postconviction petition, Jackson raises the nature of his relationship with Defendant, and her role in the Robert Fingerhut homicide as contributing factors which should render his conviction and sentence void or voidable.  It should further be noted that the local branch of the Ohio Public Defender's Office represented co-defendant Jackson during his trial in this Court.

This Court held hearing on this matter March 12, 2004.  Defendant was present in Court represented by Atty. Joseph Wilhelm, Atty. Kelly Culshaw and Atty. Rachel Troutman.  The State of Ohio was represented by Atty. Christopher Becker, Atty. LuWayne Annos, and Atty.

Kenneth Bailey. The Court conducted a brief in camera hearing with counsel, reviewed a

Conflicts of Interest Memorandum submitted by the Ohio Public Defender's Office and took

under advisement the issue of the Ohio Public Defender's future representation of Defendant.

Based upon these above facts and circumstances,  this Court finds a potential conflict of

interest in the Ohio Public Defender's Office continued representation of  both co-defendant

Jackson and  Defendant.  Therefore, this Court appoints Atty. David. L. Doughten and Atty. Patty

Smith  of Cleveland, Ohio, to represent Defendant in her direct appeal to the Ohio Supreme

Court.

IT IS SO ORDERED

3/22/04
Date

THE HONORABLE JOHN M.  STUARD
JUDGE OF THE COMMON PLEAS
COURT OF TRUMBULL COUNTY

**The Clerk of Courts is ordered to serve copies
of this entry upon all counsel named in paragraph three of this
entry and to file this entry forthwith in the Ohio Supreme Court.**

John M. Stuard

*ORIGINAL*

*ON COMPUTER -* X

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| Plaintiff-Appellee | ) | CASE No. 03-1441 |
| | ) | |
| -vs- | ) | |
| | ) | Appeal from the Trumbull |
| | ) | County Court of Common Pleas |
| DONNA ROBERTS | ) | Case No. 01-CR-793 |
| | ) | |
| Defendant-Appellant | ) | |

## STIPULATED EXTENSION OF TIME

DENNIS WATKINS
Atty.  Reg. No. 0009949
LuWAYNE ANNOS (Counsel of Record)
Atty Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Fax No. (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE


OCT 1  2004
MARCIA J. ... CLERK
SUPREME ... OHIO

DAVID L. DOUGHTEN
Atty Reg. No.0002847
PATRICIA J. SMITH
Atty. Reg. No. 0059621
4403 St. Clair Ave.
Cleveland, Ohio      44103
Telephone No. (216) 361-1112

COUNSEL FOR DEFENDANT-
APPELLANT

ORIGINAL

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                                          )
                                                       )
      Plaintiff-Appellee                        )      CASE No.  03-1441
                                                       )
-vs-                                                   )
                                                       )      Appeal from the Trumbull
                                                       )      County Court of Common Pleas
DONNA ROBERTS                                          )      Case No. 01-CR-793
                                                       )
      Defendant-Appellant                       )

---

## STIPULATED EXTENSION OF TIME

---

      Defendant-Appellant, Donna Roberts, and the Plaintiff-Appellee, the State of

Ohio ("State"), hereby stipulate to an extension of time of twenty days, pursuant to S.Ct.

Prac. R. XIV, Sec. 3, (B)(2)(a), for the filing of the State's merit brief in the above-

captioned matter.  Parties hereby agree that the State's brief originally due on October

18, 2004, is now due Nov. 8, 2004.

      Respectfully submitted,

LuWAYNE ANNOS
Atty. Reg. No.0055651
COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Fax No. (330) 675-2431

David J. Doughten _per L.A._         Patricia J. Smith _per L.A._
DAVID L. DOUGHTEN                        PATRICIA J. SMITH
Atty. Reg. No. 0002847                   Atty.  Reg. No. 0059621
4403 St. Clair Avenue                    4403 St. Clair Avenue
Cleveland, Ohio   44103                  Cleveland, Ohio    44103
Telephone No. (216) 361-1112             Telephone No. (216) 361-1112


COUNSEL FOR DEFENDANT-APPELLANT DONNA ROBERTS


PROOF OF SERVICE

I do hereby certify that a copy of the foregoing stipulation was sent by ordinary U.S. Mail on this 12th Day of October, 2004, to Atty. David L. Doughten (Atty. Reg. 0002847), and Atty. Patricia J. Smith (Atty. Reg. 0059621) 4403 St. Clair Ave., Cleveland, Ohio, 44103.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Counsel for Plaintiff-Appellee, The State
Of Ohio

ORIGINAL
ON COMPUTER - JJ

## IN THE SUPREME COURT OF OHIO

State of Ohio                                     :
                                                  :
    Plaintiff - Appellee,                     :          CASE NO. 03-1441
                                                  :
    v.                                        :
                                                  :
Donna Roberts                                     :
                                                  :
    Defendant - Appellant.                    :
                                                  :          CAPITAL CASE
                                                  :

---

### MERIT BRIEF OF APPELLANT, DONNA ROBERTS

---

FILED

JUL 19 2004

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

COUNSEL FOR APPELLEE:

DENNIS WATKIND, ESQ. 0009949
Trumbull County Prosecutor
4th Floor Administration Building
160 High Street NW
Warren OH 44481
(330) 675-2426

LUWAYNE ANNOS - 0055651
Assistant Trumbull County Prosecutor

COUNSEL FOR APPELLANT:

DAVID L. DOUGHTEN, ESQ.
Regis. No. 0002847
4403 St. Clair Avenue
Cleveland, OH 44103-1125
(216) 361-1112

PATRICIA J. SMITH, ESQ.
Regis. No. 0059621
4403 St. Clair Avenue
Cleveland, OH 44103-1125
(216) 361-1112

# TABLE OF CONTENTS

PAGES

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Proposition of Law One:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Authorities Relied Upon to Support Proposition of Law One

State v. Ashworth (1999) 85 Ohio St. 3d 56, 1999 Ohio 204 . . . . . . . . . . . . . . . . . . . . . . 9, 11

**Proposition of Law Two:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   **The scope of a consent search of the home of a defendant must be limited
   strictly to the terms of the consent provided by the defendant.**

Authorities Relied Upon to Support Proposition of Law Two

U.S. v. Dichiarinte, 445 F.2d 126 (7th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Florida v. Jimeno, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) . . . . . . . . . . . . . 15

U.S. v. Carey, 172 F.3d 1268, 1270 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Proposition of Law Three:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   **A trial court's refusal to dismiss biased jurors from the panel deprives a capital
   defendant her protections under the Fifth, Sixth, Eighth and Fourteenth**

i

**Amendments to the United States Constitution.**

Authorities Relied Upon to Support Proposition of Law Three

U.S. v. Salamone, 800 F.2d 1216, (3rd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. v. Daly, 716 F.2d 1499 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. v. Nell. 526 F. 2d 1223 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Adams v. Texas (1980), 448 U.S. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

Wainwright v. Witt (1985), 469 U.S. 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23, 24

Witherspoon v. Illinois (1968), 391 U.S.510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Proposition of Law Four:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

> **Evidence that does not establish the theft element of an Aggravated Robbery, R.C. §2911.01 and the corresponding capital specification, R.C. §2929.04(A)(7) is insufficient to sustain guilty verdicts on these charges.**

Authorities Relied Upon to Support Proposition of Law Four

In re Winship, 397 U.S. 358, 364 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Davis v. United States, 160 U.S. 469, 487-88 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Jackson v. Virginia (1979), 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

State v. Jenks (1991), 61 Ohio St. 3d 259 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Tibbetts, 92 Ohio St.3d at 146, 162, 2001 Ohio132 . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Treesh, (2001) 90 Ohio St.3d 460, 484, 2001 Ohio 4 . . . . . . . . . . . . . . . . . . . . . . . . 26

R.C. §2911.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R.C. §2929.04(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Ballard, (1984) 14 Ohio App.3d 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Campbell, (Nov. 25, 1998) Cuyahoga App. No. 73643 . . . . . . . . . . . . . . . . . . . . . . 27

R.C. 2911.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R.C. 2913.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R.C. 2913.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Proposition of Law Five:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

> **A capital defendant's right to allocution before being sentenced is
> mandatory. Where the sentencing court neglects this right, the subsequent
> sentence is void or voidable.**

<u>Authorities Relied Upon to Support Proposition of Law Five</u>

R.C. 2929.03(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

State v. Campbell (2000) 90 Ohio St.3d 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Crim. R. 32(A)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

State v.Reynolds (1998), 80 Ohio St.3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

State v. Myers (2002), 97 Ohio St.3d 335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Proposition of Law Six:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

> **The trial court sentencing opinion under R.C. §2929.03(F) requires
> independent analysis of the trial court in the weighing the factors to
> determine the appropriateness of a death sentence. It in not proper for the
> court to allow the prosecutor of the case to draft the opinion as the sentence
> loses its independent nature mandated by the legislature.**

<u>Authorities Relied Upon to Support Proposition of Law Six</u>

iii

R.C. 2929.03(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Anderson v City of Bessemer City, 470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

United States v El Paso Natural Gas Co., 376 U.S. 651 (1964) . . . . . . . . . . . . . . . . 32, 33, 34

United States v Marine Bancorporation, 418 U.S. 602 (1974). . . . . . . . . . . . . . . . . . . . . 32

United States v. Crescent Amusement Co., 323 U.S. 173 (1944) . . . . . . . . . . . . . . . . . . . . 32

United States v. Forness, 125 F.2d 928 (2nd Cir. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . 33

Miller v. Mercy Hosp., Inc., 720 F.2d 356 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960 (5th Cir. 1975) . . . . . . . . . . . 34

Johnson v. Mississippi, 486 U.S. 578 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Wyler Summit Partnership v. Turner Broadcasting System, Inc., 235 F.3d 1184 (9th Cir. 2000) 34

McClennan v. American Eurocopter Corp., Inc., 245 F.3d 403 (5th Cir. 2001) . . . . . . . . . . . . 35

**Proposition of Law Seven** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

> **Where the pre-trial publicity is so pervasive that a jury cannot be expected to ignore the media attention to the case, a trial court must grant a defense request for a change of venue to protect the integrity of the fact-finding process.**

<u>Authorities Relied Upon to Support Proposition of Law Seven</u>

Fourteenth Amendment United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Art. I, Section10 Ohio Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Rideau v. Louisiana (1963), 373 U.S. 723, 83 S. Ct. 1417 . . . . . . . . . . . . . . . . . . . . . . . . 36

Irvin v. Dowd (1961), 366 U.S. 717, 81 S. Ct. 1639 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

State v. Mills (1992), 62 Ohio St. 3d 357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

State v. Bayless (1976), 48 Ohio St. 2d 73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Proposition of Law Eight** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

> **The failure to properly advise and ensure that a capital defendant understands the ramification of a the waiver of evidence in the penalty phase constitutes ineffective assistance of counsel.**

Authorities Relied Upon For Proposition of Law Eight

Sixth Amendment of United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Powell v. Alabama 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

R.C. §2953.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

State v. Smith (1985) 17 Ohio St.3d 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Strickland v. Washington (1984), 466 U.S. 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

**Proposition of Law Nine** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43 ·

> **The inclusion of a R.C. §2929.04(A)(7) specification to a conviction of R.C. §2903.01(A) may not sustain a conviction of death when the element of prior calculation and design is found by the jury in both statutes. The repeat finding of the same element fails to provide the narrowing procedure that is required for a sentencing scheme to be found constitutional.**

Authorities Relied Upon to Support Proposition of Law Nine

R.C. 2903.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

R.C. 2929.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

State v. Penix, 32 Ohio St. 3d 369 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

State v. Landrum, 53 Ohio St.3d 107 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

State v. Burke, 73 Ohio St. 3d 399 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Eighth Amendment United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Proffitt v. Florida, 428 U.S. 242 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Jurek v. Texas, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Pulley v. Harris, 465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Arave v. Creech, 113 S. Ct. 1534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Lowenfield v. Phelps, 484 U.S. 231(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Barclay v. Florida, 463 U.S. 939 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Walton v. Arizona, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

State v. Henderson (1988) 39 Ohio St.3d 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fourteenth Amendment United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Article I, Section 9 Ohio State Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Proposition of Law Ten:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    **Instructing the jury that its penalty phase determination was a recommendation is improper because it unfairly diminishes the jury's sense of responsibility.**

Authorities Relied Upon to Support Proposition of Law Ten

Caldwell v. Mississippi (1985), 472 U.S. 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

State v. Rogers (1986), 28 Ohio St. 3d 427, cert. denied (1987), 484 U.S. 958 . . . . . . . . . . . . 48

vi

**Proposition of Law Eleven:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

> **Ohio's definition of reasonable doubt is violative of the constitutional as it allows the Appellant to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Authorities Relied Upon to Support Proposition of Law Eleven

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

R.C. §2901.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

In re Winship, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

R.C. § 2929.03 (D)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Cage v. Louisiana, 111 S.Ct. 328 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Victor v. Nebraska, 114 S.Ct. 1239 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

Cross v. Ledford, 161 Ohio St. 469 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Holland v. United States, 348 U.S. 121 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Scurry v. United States, 347 F.2d 468 (D.C. Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. Pinkney, 551 F.2d 1241 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Noon, 913 F.2d 20 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Colon, 835 F.2d 27 (2nd Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Conley, 523 F.2d 650 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Monk v. Zelez, 901 F.2d 885 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

vii

Thomas v. Arn, 704 F.2d 865 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Proposition of Law Twelve:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

> **The death penalty may not be sustained where the cumulative errors that occurring in in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.**

<u>Authorities Relied Upon to Support Proposition of Law Twelve</u>

State v. DeMarco (1987), 31 Ohio St.3d 191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Proposition of Law Thirteen:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

> **The death penalty cannot be upheld where the reviewing court fails to follow the statutory provisions regarding the proportionality review of the defendant's sentence.**

<u>Authorities Relied Upon to Support Proposition of Law Thirteen</u>

Ohio v. Murphy, 91 Ohio St.3d 516 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

R.C. §2929.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55

Pulley v. Harris, 465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

R.C. §2929.04(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Zant v. Stephens, 462 U. S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 58

<u>Furman v. Georgia</u>, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

R.C. §2929.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

R.C. §2929.03(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

<u>Evitts v. Lucey</u>, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

<u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

<u>State v. Steffen</u>, 31 Ohio St. 3d 111 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

<u>Ohio v. Jenkins</u>, 5 Ohio St.3d 164 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

R.C. §2929.03(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

R.C. §§ 2929.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

<u>Lockett v. Ohio</u>, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

<u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**Proposition of Law Fourteen:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**The death penalty is unconstitutional as presently administered in Ohio.**

<u>Authorities Relied Upon to Support Proposition of Law Fourteen</u>

<u>Robinson v. California</u>, 370 U.S. 660 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

<u>Coker v. Georgia</u>, 433 U.S. 584 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

<u>Furman v. Georgia</u>, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

ix

Rhodes v. Chapman, 452 U.S. 337 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Trop v. Dulles, 356 U.S. 86 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 65

Commonwealth v. O'Neal II, 339 N.E.2d 676 (Mass. 1975) . . . . . . . . . . . . . . . . . . . . . . . 60

Utah v. Pierre, 572 P.2d 1338 (Utah 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Shelton v. Tucker, 364 U.S. 479 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998) . . . . . . . . . . . . . . . . . . . . . 61

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 66, 67

Ohio Legisl. Serv. Comm'n., Capital Punishment (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Bailey, The Deterrent Effect of the Death Penalty for Murder in Ohio. A Time-Series Analysis,
28 Cleve. St. L. Rev. 51, 68, 70 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Gregg v. Georgia, 428 U.S. 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

State v. Fox, 69 Ohio St. 3d 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Free v. Peters, 12 F.3d 700 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

McMann v. Richardson, 397 U.S. 759 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

State v. Hester, (1976) 45 Ohio St. 2d 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Cronic, 466 U.S. 648 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Zant v. Stephens, 462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67, 69, 72

Barclay v. Florida, 463 U.S. 939 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 76

x

Ohio R. Crim. P. 11(C)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

United States v. Jackson, 390 U.S. 570 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Ohio Rev. Code §2929.03(D)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Ohio Rev. Code §2929.04(B)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

McCleskey v. Kemp, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Stringer v. Black, 503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 71

Boyde v. California, 494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Penry v. Lynaugh, 492 U.S. 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Eddings v. Oklahoma, 455 U.S. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Graham v. Collins, 506 U.S. 461(1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

The Constitutionality of Imposing the Death Penalty for Felony Murder, 15 Hous. L. Rev. 356,
375 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

State v. Williams, 74 Ohio St. 3d 569 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

State v. Rojas, 64 Ohio St. 3d 131 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Skinner v. Oklahoma, 316 U.S. 535 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

R.C. §2929.03(D)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

R.C §2929.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

Lewis v. Jeffers, 497 U.S. 764 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Maynard v. Cartwright, 486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Walton v. Arizona, 497 U.S. 639(1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Tuilaepa v. California, 512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

State v. Wogenstahl, 75 Ohio St. 3d 344 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

xi

R.C. §2929.03(D)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

R.C. §2929.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

R.C. §2929.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Pulley v. Harris, 465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

R.C. §2929.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

State v. Steffen, 31 Ohio St. 3d 111 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 72

State v. Zuern, 32 Ohio St. 3d 56 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

State v. Stumpf, 32 Ohio St. 3d 95 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

State v. Poindexter, 36 Ohio St. 3d 1 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 73

State v. Spisak, 36 Ohio St. 3d 80 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

McCleskey v. Kemp, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Spaziano v. Florida, 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Fleming v. Georgia, 240 S.E.2d 37 (Ga. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 76

Hayes v. Georgia, 282 S.E.2d 208 (Ga. 1981) . . . . . . . . . . . . . . . . . . . . . . . . 76

Chenault v. Stynchcombe, 581 F.2d 444 (5th Cir. 1978) . . . . . . . . . . . . . . . . . 76

Spivey v. Zant, 661 F.2d 464 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 76

Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1981) . . . . . . . . . . . . . . . . . . . 76

Westbrooke v. Zant, 704 F.2d 1487 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . 76

Tucker v. Zant, 724 F.2d 882 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 76

Gray v. Lucas, 677 F.2d 1086 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 76

Prejean v. Blackburn, 570 F. Supp. 985 (D. La. 1983). . . . . . . . . . . . . . . . . . . 76

xii

Conner v. Georgia, 303 S.E.2d 266 (Ga. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

California v. Brown, 726 P.2d 516 (Cal. 1985), rev'd on other grounds, 479 U.S. 38 (1987) . . 77

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

In re Winship, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 81

Cross v. Ledford, 161 Ohio St. 469 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Holland v. United States, 348 U.S. 121 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Scurry v. United States, 347 F.2d 468 (D.C. Cir. 1965)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

State v. Crenshaw, 51 Ohio App. 2d 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

State v. Nabozny, 54 Ohio St. 2d 195 (1978), vacated on other grounds, Nabozny v. Ohio, 439 U.S. 811 (1978)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

State v. Seneff, 70 Ohio App. 2d 171 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

California v. Terry, 390 P.2d 381 (Cal. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

The Paquete Habana, 75 U.S. 677 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Zschernig v. Miller, 389 U.S. 429 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Clark v. Allen, 331 U.S. 503 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

United States v. Pink, 315 U.S. 203 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Kansas v. Colorado, 206 U.S. 46 (1907). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

The Nereide, 13 U.S. (9 Cranch) 388 (1815) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Asakura v. City of Seattle, 265 U.S. 332 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Filartiga v. Pena-Irala, 630 F.2d 876 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Forti v. Suarez-Mason, 672 F.Supp. 1531 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 83

Clinton v. City of New York, 524 U.S. 417 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

xiii

Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370 (7th Cir. 1985) . . . . . . . . . . . . . 89

Marbury v. Madison, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

United States v. Smith, 18 U.S. (5 Wheat.) 153 (1820) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

William A. Schabas, The Death Penalty as Cruel Treatment and Torture (1996) . . . . . . . . . . . 90

Fifth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . PASSIM

Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . PASSIM

Eighth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . PASSIM

Fourteenth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . PASSIM

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**APPENDIX**

    Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

    Entry on Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4

    Sentencing Opinion of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8

    Ohio Constitution I Section 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-28

    Ohio Constitution I Section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-29

    Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-31

    Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-32

    Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-30

    Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-33

    R.C.§2913.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-34

    R.C.§2911.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36

xiv

R.C.§2901.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-37

R.C.§2911.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-39

R.C.§2901.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-40

R.C.§2929.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-41

R.C.§2929.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-43

R.C.§2929.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-45

R.C. §2903.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-46

Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-47

Crim. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-48

<u>State v. Campbell</u> No. 73643 (Cuyahoga Cty. App. 11/25/98) . . . . . . . . . . . . . . . . A-49

**TABLE OF AUTHORITIES**

<u>CASES</u>

<u>Adams v. Texas</u> (1980), 448 U.S. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23, 24

<u>Anderson v City of Bessemer City</u>, 470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

<u>Arave v. Creech</u>, 113 S. Ct. 1534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44,45

<u>Asakura v. City of Seattle</u>, 265 U.S. 332, 341 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

<u>State v. Ashworth</u> (1999) 85 Ohio St. 3d 56, 1999 Ohio 204 . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

<u>State v. Ballard</u>, (1984) 14 Ohio App.3d 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Barclay v. Florida</u>, 463 U.S. 939 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 76

<u>State v. Bayless</u> (1976), 48 Ohio St. 2d 73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

<u>Beck v. Alabama</u>, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

<u>Boyde v. California</u>, 494 U.S. 370, 380-81 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

<u>California v. Brown</u>, 479 U.S. 538, 543 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

<u>California v. Brown</u>, 726 P.2d 516 (Cal. 1985), <u>rev'd on other grounds</u>, 479 U.S. 538 (1987) . 77

<u>State v. Burke</u>, 73 Ohio St. 3d 399 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

<u>Cage v. Louisiana</u>, 111 S.Ct. 328 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

<u>Caldwell v. Mississippi</u> (1985), 472 U.S. 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

<u>State v. Campbell</u>, (Nov. 25, 1998) Cuyahoga App. No. 73643

<u>State v. Campbell</u> (2000) 90 Ohio St.3d 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>U.S. v. Carey</u>, 172 F.3d 1268 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Chenault v. Stynchcombe</u>, 581 F.2d 444 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 76

xvi

Clark v. Allen, 331 U.S. 503 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Coker v. Georgia, 433 U.S. 584 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Colon, 835 F.2d 27 (2nd Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Conley, 523 F.2d 650 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conner v. Georgia, 303 S.E.2d 266, 274 (Ga. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

State v. Crenshaw, 51 Ohio App. 2d 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

United States v. Crescent Amusement Co., 323 U.S. 173 (1944) . . . . . . . . . . . . . . . . . . . . 32

United States v. Cronic, 466 U.S. 648 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Cross v. Ledford, 161 Ohio St. 469(1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . 33

U.S. v. Daly, 716 F.2d 1499 (9th Cir. 1983)

Davis v. United States, 160 U.S. 469 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

State v. DeMarco (1987), 31 Ohio St.3d 191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

U.S. v. Dichiarinte, 445 F.2d 126 (7th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

United States v El Paso Natural Gas Co., 376 U.S. 651 (1964) . . . . . . . . . . . . . . . . . . 32, 33, 34

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Filartiga v. Pena-Irala, 630 F.2d 876 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Fleming v. Georgia, 240 S.E.2d 37 (Ga. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

United States v. Forness, 125 F.2d 928 (2nd Cir. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Forti v. Suarez-Mason, 672 F.Supp. 1531 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . 83

State v. Fox, 69 Ohio St. 3d 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

xvii

<u>Free v. Peters</u>, 12 F.3d 700 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

<u>Frolova v. Union of Soviet Socialist Republics</u>, 761 F.2d 370 (7th Cir. 1985) . . . . . . . . . . . . . 89

<u>Furman v. Georgia</u>, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

<u>Gardner v. Florida</u>, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 62

<u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

<u>Goodwin v. Balkcom</u>, 684 F.2d 794 (11th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

<u>Graham v. Collins</u>, 506 U.S. 461(1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

<u>Gray v. Lucas</u>, 677 F.2d 1086 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

<u>Gregg v. Georgia</u>, 428 U.S. 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

<u>Hayes v. Georgia</u>, 282 S.E.2d 208 (Ga. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

<u>State v. Henderson</u> (1988) 39 Ohio St.3d 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

<u>State v. Hester</u>, (1976) 45 Ohio St. 2d 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

<u>Holland v. United States</u>, 348 U.S. 121 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

<u>Irvin v. Dowd</u> (1961), 366 U.S. 717, 81 S. Ct. 1639 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

<u>Jackson v. Virginia</u> (1979), 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>United States v. Jackson</u>, 390 U.S. 570 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

<u>Ohio v. Jenkins</u>, 5 Ohio St.3d 164 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

<u>State v. Jenks</u> (1991), 61 Ohio St. 3d 259 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Florida v. Jimeno</u>, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) . . . . . . . . . . . . . 15

<u>McClennan v. American Eurocopter Corp., Inc.</u>, 245 F.3d 403 (5th Cir. 2001) . . . . . . . . . . . . 35

<u>Johnson v. Mississippi</u>, 486 U.S. 578 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1448

Jurek v. Texas, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Kansas v. Colorado, 206 U.S. 46, 48 (1907). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960 (5th Cir. 1975) . . . . . . . . . . . . 34

State v. Landrum, 53 Ohio St.3d 107 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Lewis v. Jeffers, 497 U.S. 764 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 66, 67

Lowenfield v. Phelps, 484 U.S. 231(1988)

McCleskey v. Kemp, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

McMann v. Richardson, 397 U.S. 759 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Marbury v. Madison, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

United States v Marine Bancorporation, 418 U.S. 602, 615 (1974) . . . . . . . . . . . . . . . . . . . 32

Maynard v. Cartwright, 486 U.S. 356, 362 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Miller v. Mercy Hosp., Inc., 720 F.2d 356 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

State v. Mills (1992), 62 Ohio St. 3d 357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Monk v. Zelez, 901 F.2d 885 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Ohio v. Murphy, 91 Ohio St.3d 516 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

State v. Myers (2002), 97 Ohio St.3d 335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

State v. Nabozny, 54 Ohio St. 2d 195 (1978), vacated on other grounds, Nabozny v. Ohio, 439

U.S. 811 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

U.S. v. Nell. 526 F. 2d 1223 (5th Cir. 1976)

The Nereide, 13 U.S. (9 Cranch) 388, 422 (1815) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

United States v. Noon, 913 F.2d 20 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

xix

Commonwealth v. O'Neal II, 339 N.E.2d 676 (Mass. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

The Paquete Habana, 75 U.S. 677, 700 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

State v. Penix, 32 Ohio St. 3d 369 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Penry v. Lynaugh, 492 U.S. 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Utah v. Pierre, 572 P.2d 1338 (Utah 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

United States v. Pink, 315 U.S. 203 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

United States v. Pinkney, 551 F.2d 1241 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

State v. Poindexter, 36 Ohio St. 3d 1, 520 N.E.2d 568 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 73

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 63

Prejean v. Blackburn, 570 F. Supp. 985 (D. La. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Proffitt v. Florida, 428 U.S. 242 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Pulley v. Harris, 465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 54

State v.Reynolds (1998), 80 Ohio St.3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Rhodes v. Chapman, 452 U.S. 337, 361 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Rideau v. Louisiana (1963), 373 U.S. 723, 83 S. Ct. 1417 . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Robinson v. California, 370 U.S. 660 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

State v. Rogers (1986), 28 Ohio St. 3d 427, cert. denied (1987), 484 U.S. 958 . . . . . . . . . . . . 47

State v. Rojas, 64 Ohio St. 3d 131 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S. v. Salamone, 800 F.2d 1216, (3rd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Scurry v. United States, 347 F.2d 468 (D.C. Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

State v. Seneff, 70 Ohio App. 2d 171 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Shelton v. Tucker, 364 U.S. 479 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

xx

Skinner v. Oklahoma, 316 U.S. 535 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61 (1820) . . . . . . . . . . . . . . . . . . . . . . . 90

Spaziano v. Florida, 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

State v. Spisak, 36 Ohio St. 3d 80, 521 N.E.2d 800 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Spivey v. Zant, 661 F.2d 464 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

State v. Steffen, 31 Ohio St. 3d 111 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Strickland v. Washington (1984), 466 U.S. 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

Stringer v. Black, 503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 71

State v. Stumpf, 32 Ohio St. 3d 95, 512 N.E.2d 598 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

California v. Terry, 390 P.2d 381 (Cal. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Thomas v. Arn, 704 F.2d 865 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

State v. Tibbetts, 92 Ohio St.3d at 146, 2001 Ohio132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Treesh, (2001) 90 Ohio St.3d 460, 2001 Ohio 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Trop v. Dulles, 356 U.S. 86 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Tucker v. Zant, 724 F.2d 882 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Tuilaepa v. California, 512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Victor v. Nebraska, 114 S.Ct. 1239 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

Wainwright v. Witt (1985), 469 U.S. 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23, 24

Walton v. Arizona, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Westbrooke v. Zant, 704 F.2d 1487 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

State v. Williams, 74 Ohio St. 3d 569 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

In re Winship, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 48, 49

Witherspoon v. Illinois (1968), 391 U.S.510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

State v. Wogenstahl, 75 Ohio St. 3d 344 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998) . . . . . . . . . . . . . . . . . . . . . . . 61

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 65

Wyler Summit Partnership v. Turner Broadcasting System, Inc., 235 F.3d 1184 (9th Cir. 2000) 34

Zant v. Stephens, 462 U. S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 58, 65, 67, 69, 72

Zschernig v. Miller, 389 U.S. 429, 440 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

State v. Zuern, 32 Ohio St. 3d 56 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## PROVISIONS/STATUTES

R.C. 2901.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R.C. §2901.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 80

R.C. §2911.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R.C. 2903.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 67, 68, 92

R.C. 2913.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R.C. 2913.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

R.C. §2929.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57, 58, 71, 92

R.C. 2929.03 . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 48, 55, 57, 58, 66, 68, 70 ,71, 75, 86, 92

R.C. 2929.04 . . . . . . . . . . . . . . . . . 25, 26, 31, 43, 54, 57, 66, 67, 68, 69, 70 , 71, 75, 81, 85, 92

R.C. §2929.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55, 56, 58, 72, 74, 75 , 92

## OTHER AUTHORITIES

Ohio R. Crim. P. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Fifth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sixth Amendment, United States Constitution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Eighth Amendment, United States Constitution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fourteenth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

xxiii

## CASE OVERVIEW

The appellant Donna Roberts was convicted of complicity in the murder of her ex-husband/housemate Robert Fingerhut.  It was alleged that she maintained a relationship with the co-defendant Nathaniel Jackson while Mr. Jackson was imprisoned on an unrelated charge.  The two hatched the plot through letters and phone calls to kill Mr. Fingerhut for the purpose of obtaining the proceeds of his life insurance policies, of which Ms. Roberts was the beneficiary.  Mr. Jackson was convicted and sentenced to death in a trial prior to that of the appellant.

The issues presented in this Merit Brief are relatively small in number for a capital appeal.  This is because the appellant waived her right to present mitigation evidence in the penalty phase.  The validity of the waiver is at the core of the case.  Ms. Roberts maintained her innocence throughout the proceedings.   Angered at a verdict that she believed to be unjust, she waived her mitigation to receive a sentence proportional to her co-defendant, a black male.  To receive a lesser sentence as a Jewish white woman, would be another indication of inequality in the justice system based upon race.  The waiver was believed to have been entered to establish this point.

The problem is that the appellant only partially waived her penalty phase rights.  She insisted on presenting an unsworn statement.  In addition, the court never instructed her that the failure to present mitigation in a weighing state is automatic death.   This court is being asked to address whether the waiver under these circumstances comports with standards set in State v. Ashworth (1999) 85 Ohio St. 3d 56, 1999 Ohio 204.

In addition, the trial court, with the assistance of the prosecutor, prepared the R.C. §2929.04(F) sentencing opinion prior to the final sentencing hear (after the jury

1

recommendation) and prior to the appellant's allocution.  Defense counsel was unaware that the prosecutor was assisting in the drafting and/or editing of the opinion. This Court is presented with issues centered on whether there is need for an independent finding by the judge when preparing the required R.C. §2929.04(F) opinion and whether the appellant's right to allocution is anything more than a formality that has no real purpose in the sentencing procedure.  For if the court is permitted to prepare the sentencing opinion prior to allocution, the latter is a meaningless ritual whose only purpose it to establishing the appearance of fairness in the procedure.

2

## STATEMENT OF THE CASE

A Trumbull County grand jury indicted the defendant-appellant Donna Roberts (hereinafter appellant) on a four count indictment for various charges, including two alternative theory counts of capital murder surrounding the death of her husband, Robert Fingerhut. The indictment charged the appellant with one count of the purposeful killing of Mr. Fingerhut with prior calculation and design in violation of R.C. §2903.01(A) and one count of the so-called felony murder in violation of R.C. §2903.01(B). Each of these capital murder counts included two capital specifications addressing violations of R.C. §2929.04(A)(7). The first specification alleged that the murder occurred during the commission of an Aggravated Burglary, R.C. §2911.11. The second specification alleged that the murder occurred during the commission of an Aggravated Robbery, R.C. §2911.01.

The third and fourth counts charged the felonies underlying the aforementioned capital specifications, Aggravated Burglary, R.C. §2911.11 and Aggravated Robbery, R.C. §2911.01. Each count of the indictment included a firearm specification pursuant to R.C. §2929.141.

The charges indicated that the appellant was not the principal offender, but rather she acted in complicity with the principal, and co-defendant, Nathaniel Jackson. Mr. Jackson was tried separately as he also was capitally indicted. The appellant pleaded not guilty to all counts of the indictment at her arraignment on December 31, 2001.

On February 26, 2002, the trial court conducted a hearing on the appellant motion to suppress items taken from her home the night of the homicide. The trial court denied the motion.

A jury trial began on March 26, 2003, with the death qualification process. The jury found the appellant guilty of all counts including the capital and firearm specifications on May

3

2003.

On June 3, 2003, the appellant indicated to the court that she wanted to waive the presentation of mitigation at the penalty phase hearing, except she did desire to make an unsworn statement. The trial court conducted a hearing to determine her competency to do so. A psychologist, Thomas Eberle, who had previously examined her, believed the appellant to be competent. The court also directly questioned the appellant. The court determined her to be competent under State v. Ashworth (1999) 85 Ohio St. 3d 56, 1999 Ohio 204.

Prior to the commencement of the penalty phase hearing, the prosecutor elected to dismiss Count Two, R.C. §2903.01(B)(felony-murder) and proceeded with Count One, R.C. §2903.01.(A) (prior calculation and design). The hearing began on June 4, 2004. The defense waived opening and closing argument. The appellant did provide an unsworn statement. That same day, the jury recommended a sentence of death.

On June 20, 2003, the trial court accepted the recommendation and sentenced the appellant to death. The court also sentenced the appellant to serve ten years for both the convictions of Aggravated Robbery and Aggravated Burglary. These sentences are being served consecutively to each other and the sentence of death. The court also applied a three-year firearm specification, which is also being served consecutively to the principle sentences.

The appellant filed a Notice of Appeal for a delayed appeal on August 13, 2003. This Court granted the motion on September 24, 2003. The original counsel for the appellant, the Ohio Public Defender Office, withdrew representation as that office also represented the co-defendant Nathaniel Jackson. The trial court then assigned undersigned counsel. This Brief on the Merits follows.

4

## STATEMENT OF THE FACTS

The state charged the appellant Donna Roberts with planning the killing of her husband with a prison inmate, Nathaniel Johnson.  According to the state, the appellant and Mr. Jackson were pen-pals while he was serving time in a state penal institution.  It is alleged that at some point during the letter writing and phone conversations, the two planned the homicide of the appellant husband/roommate, Robert Fingerhut.  Shortly after Mr. Jackson was released from prison, the two allegedly orchestrated the homicide during a time which the appellant established an alibi for herself while shopping and eating away from her home, where the offense transpired.

The defense did not contest that Mr. Jackson was the killer.  The defense did argue that the appellant did not act in complicity with him.  While their correspondence was admittedly sexually graphic and did allude to actions suggestive of a plot, the defense argued that there was insufficient evidence that the appellant acted in complicity with Mr. Jackson.

### State's Case

On December 11, 2001, a screaming Donna Roberts made a call to 911 at 11:00 p.m. (T. 5138)  In response the call, Howland Township police officer Albert Ray was dispatched to the home of the appellant Donna Roberts to investigate a purported homicide.  He arrived to find the appellant yelling and screaming hysterically outside the home. (T. 5156)  Officer Ray found the decedent, Robert Fingerhut, laying in the entrance to the home from the garage.  The appellant told him to "Do whatever you have to do to catch the bastard." (T. 5161) A gun was located by the body on a step in the garage. (T. 5165)

The coroner reported that Mr. Fingerhut died from multiple gunshot wounds.  One of the shots entered his brain, causing the death. (T.5596) The time of death was estimated from as little

5

as two hours to a s great as six hours prior to the 1:00 a.m. autopsy which was performed on December 12, 2001. (T. 5603)

Sgt. Frank Dillon arrived on the scene to investigate the homicide. He found a partial footprint of blood near the body. He checked everyone's shoes but was unable to determine who stepped in the blood. (T. 5613, 5618) Upon checking the weapon, Sgt. Dillon discovered that all five chambers were filled with a bullet. (T. 5615)

A search of the body revealed that money remained in the wallet and pants pocket of the decedent. (T. 5629) He also noticed that Mr. Fingerhut's car was not at the home. (T. 5631) This was later discovered near the location of the residence where Nathaniel Jackson was living. (T. 5654)

Sgt. Dillon first became suspicious of the appellant when he noticed that she seemed to cry loudly only when the officers checked on her condition. She became silent when the officers talked amongst themselves as if trying to listen. (T. 5640)

Appellant' Alibi

The appellant informed the police that she was not at home at the time of Mr. Fingerhut's death. She described her day for the officers. (T. 5649-5650) She indicated that she was at the Greyhound station until 5:30 p.m. (T. 5868) She went to dinner at a Red Lobster and went shopping and bought some rotisserie chicken for her dogs. (T. 5868-5871) She did not arrive home until shortly before midnight to find the decedent. (T. 5872)

The connection to Nathaniel Jackson was made when the officer found letter correspondence in the bedroom and the trunk of her car. (T. 5886, 5897) The officers called the Lorain Correctional Institution and obtained CD's of 18 phone calls between the appellant and

6

Mr. Jackson. (T. 5147) Jose Sanchez worked for Mr. Fingerhut, who operated a Greyhound Bus station in Youngstown, Ohio. He knew the appellant as she worked at the location. He also knew Mr. Jackson, who visited the station. (T. 5235) Sanchez described a video from December 11, 2001, in which Mr. Fingerhut left the station at about 9:00 p.m. (T. 5240)

Jeff Diamantes worked at a Days Inn Hotel in Boardman, Ohio. On December 11, 2001, he rented a room to the appellant. He identified her because she offered a picture ID.(T. 5377, 5386) Blood stains were found throughout the room where he stayed, including on hand towels and a comforter. (T. 5533) Mr. Jackson's fingerprints were found in the hotel room. (T. 5843)

Detective Mike Yanucci found leather gloves in the residence where Mr. Jackson was living. The left index finger was torn. (T. 5403)

The appellant exercised her Fifth Amendment rights and did not testify. The facts will be further discussed in the following Propositions of Law.

7

## ARGUMENT

**Proposition of Law One:**

> **A waiver of the presentation of mitigation evidence in the penalty phase of trial is not valid unless the defendant is informed that the waiver will result in the death penalty. Such waiver is also invalid if the defendant intends to present any mitigation in any form.**

This Court has held that a capitally charged defendant has the right to waive the presentation of mitigation. However, before a trial court allows such a waiver, as in all situations where a criminal defendant waives his or her protections, assurances must be made that the defendant has knowingly, intelligently and voluntarily waived the particular right.

In this instance, the appellant waived her right to present mitigation. However, the trial court improperly accepted the waiver. The court failed to ensure that the appellant understood the ramifications of the waiver. Specifically, the court failed to inquire if the appellant understood that the waiver of the mitigation would most assuredly result in her receiving the death penalty.

Second, the waiver was not complete. The appellant wanted to waive the presentation of mitigation evidence, but only on the condition that she be able to give an unsworn statement. The appellant proceeded to provide the jury with an unsworn statement which included no confession of guilt and included mitigation considerations.

Thus, the issue here is whether the court may properly accept a mitigation waiver conditioned on the ability to present mitigation in an unsworn statement. Worded differently, may a court accept a partial waiver? Must a capital defendant completely waive or may the defendant waive only aspects of her penalty phase rights?

8

Ashworth Standards

The standards for waiving one's mitigation were set forth by this court in State v.

Ashworth (1999) 85 Ohio St. 3d 56, 1999 Ohio 204. In Ashworth this Court held at p. 62:

> . . .in a capital case, when a defendant wishes to waive the presentation of *all*
> mitigating evidence, a trial court must conduct an inquiry of the defendant on the
> record to determine whether the waiver is knowing and voluntary. The trial court
> must decide whether the defendant is competent and whether the defendant
> understands his or her rights both in the plea process and in the sentencing
> proceedings. The trial court must inform the defendant of the right to present
> mitigating evidence and explain what mitigating evidence is. The court must then
> inquire of the defendant, and make a determination on the record, whether the
> defendant understands the importance of mitigating evidence, the use of such
> evidence to offset the aggravating circumstances, and the effect of failing to
> present that evidence. After being assured that the defendant understands these
> concepts, the court must inquire whether the defendant desires to waive the right
> to present mitigating evidence, and, finally, the court must make findings of fact
> as to the defendant's understanding and waiver of rights.

Present Facts

Following the jury's finding of guilt on the charges of Aggravated Murder and the capital

specifications, the appellant sought to waive her right to mitigation, except her unsworn

statement. (T. 6222) In essence, she sought to partially waive her mitigation.

The trial court attempted to explain the purpose of mitigation, informing her that the

procedure would allow the jury to learn something about her that was not brought forth at trial.

The appellant responded:

> May I interrupt? If we let them know the real me, they will think they are in the
> wrong place, so let's not get them more mixed up than they are.

(T. 6222)

This statement is revealing for two reasons. First, it clearly implies that the killer that the

juror thought she was not the real Donna Roberts. Second, it expresses the anger of the appellant

9

over the verdict.

The verdict of guilt was received on May 28, 2003, at approximately 2:50 pm.  The appellant waived her mitigation on June 3, 2003, approximately five days later.  The court did not require her to waive the mitigation in writing.  The appellant had no forms to review or sign to ensure she was aware of her rights and the ramification of the waiver.

It is significant that the appellant did not admit guilt in this matter.  In fact, she made explicitly clear to the jury that she was not making an admission of guilt in her unsworn statement.  (T. 6297)

The court informed the appellant that she would miss an opportunity to present evidence that would make her into a "real person" (T.6223).  The court also informed her that by waiving the presentation of mitigating evidence, the jury had little to go upon in coming up with something other than death.  The appellant offered "that is what I hope for" (T.6232).  The court also informed the appellant that she could not revoke her decision (T.6233).  The appellant informed the court that she was absolutely sure of her decision (T.6234).

Dr. Thomas Eberle, a clinical psychologist, testified that he believed the appellant was competent (T.6231).  The court indicated that his decision to find that the waiver was properly entered was at least partially predicated on Dr. Eberle's testimony (T.6235).

The problem with the hearing in this matter is twofold.  First, at no time did anyone directly address the issue that the failure to present mitigation would result in a death sentence.  The court alluded to this problem by indicating to the appellant that the jury would have little other option.  However, the court failed to directly inform the appellant that because Ohio is a weighing state, by law the sentence would be death.  Certainly, a knowledgeable and intelligent

10

waiver requires, minimally, that a defendant acknowledge that death will result from the waiver.

Second, the appellant entered into only a partial waiver. The waiver was conditioned upon her ability to provide an unsworn statement. In no other area of the law are partial waivers accepted. One cannot partially waive Fifth Amendment protections. One cannot partially plea. One cannot partially waive confrontation. A true waiver of mitigation would encompass the presentation of any evidence.

In her unsworn statement, the appellant explained to the jury that she was not providing any mitigation (T.6253-4). She wanted to expose people that she believed were untruthful (T.6255). She also wanted to make a statement about racial inequality (T.6256, 6263).

In the process of making her statement, the appellant provided much of her life history to the jury. She explained that she was a business woman for about forty years. She had worked for a plastic surgeon. She had assisted in running an Avis franchise. She also ran a restaurant in Youngstown (T.6259).

She informed the jury that she had traveled around the world a couple of times. She had been exposed to other lifestyles, races, and beliefs. She believed that she was educated resulting in her better acceptance and understanding of different lifestyles (T.6260).

The appellant told the jury that she had spoiled her husband as much as she could. She walked with him at the mall. She admitted that she had been spoiled in her lifestyle. She wanted her husband to have every comfort available. She encouraged him to spend for his extensive sports collection (T.6267-8).  She told the jury that Mr. Fingerhut had a very bad relationship with his sons from a previous marriage. She encouraged him to resolve those relationships (T.6269).

11

She denied guilt in the case. She believed the verdict was going to be not guilty (T.6269-70). She went through each witness of the trial explaining how she believed the evidence should have been interpreted. This was all in effort to apparently convince them that they were incorrect in their verdict (T.6270-92).

The appellant told the jury that she was not going to beg for her life. However, she did want to beg for justice (T.6295). She believed that she should receive the death penalty because her co-defendant, Nathaniel Jackson, had received it. Because he was a black male, she should not receive a lesser sentence. Apparently the argument was that equality demanded that she receive the same sentence for the same offense, although she was not guilty of that offense (T.6295-6).

The appellant's anger about racial inequality was so strong that she literally wanted to sacrifice herself to make the point. She railed about the lack of competent counsel for Mr. Jackson. She feared that there would never be equality (T.6297). She hoped that her death would not be in vain as maybe someone would write about this case in its proper slant (T.6298).

She told the jury that she loved her husband. He had never touched her in a violent manner. He was a wonderful man (T.6299). She told the jury about her son and her last visit with him. She indicated that all her suffering began when her husband's life ended (T.6299).

This unsworn statement reveals the confusion felt by the appellant at the time of the waiver. She insisted that she was not guilty, but was torn by receiving a different sentence than Mr. Jackson had received. Mr. Jackson did not receive justice because of inequality based upon race and money. The appellant felt an obligation to sacrifice herself or become a hypocrite by benefitting from superior attorneys or the fact that she was white.

This is not the type of waiver that this Court envisioned in <u>Ashworth</u>.  This is not a defendant who admits guilt and wants to commit suicide.  This is not a defendant who is demanding acquittal or death.  This is a defendant who is sacrificing herself to establish a point about inequality within the justice system based upon race, religion or wealth.

The trial court's acceptance of a waiver in this instance was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

13

**Proposition of Law Two:**

> **The scope of a consent search of the home of a defendant must be limited strictly to the terms of the consent provided by the defendant.**

The police arrived at the appellant's home on the date of the homicide to investigate. The appellant appeared to be very distraught over the death of Mr. Fingerhut. During the initial processing, police officials testified that they informed the appellant that they needed to search the house. The appellant consented in the form of "Do what you have to do," or words to that effect. During the processing of the house, correspondence in the form of letters were discovered in the appellant's bedroom drawers and the trunk of her automobile. It is from these letters the appellant's connection to Nate Jackson were made by the police.

The defense sought to suppress the letters as the search was conducted without a warrant. Written consent of the appellant to search the house was not provided until the next day, after the evidence had been confiscated. The trial court found the above testimony to be credible. Thus, the court overruled the appellant's motion to suppress.

The argument here is that the search of the appellant's car went beyond the scope of the consent. The testimony of the officers involved, indicated that the appellant was informed only that her house would be processed. No mention was made of a search of the trunk of her car. Thus, the contraband correspondence taken from the vehicle should have been suppressed.

Scope of Authority to Search Given by Consent

The sole authority to search after a person has given consent derives from the consent itself. Therefore the scope of the search must be limited strictly to the terms of the consent. The implied limitation is that the only areas that may be searched are those where items that are the

14

subjects of the search might be hidden.  U.S. v. Dichiarinte, 445 F.2d 126 (7th Cir. 1971).  The deciding factor is whether the consent would reasonably be understood to extend to a particular container.  Florida v. Jimeno, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991).

In Jimeno, the Supreme Court held that consent to search the interior of an automobile did not preclude the opening of a paper bag found inside the car.  Id. 500 U.S. 248.  The Court reasoned that a reasonable person would know that drugs are usually carried in containers and, therefore, the police officer's interpretation of the defendant's consent was reasonable.  The standard enumerated in Jimeno for measuring the scope of the suspect's consent was "what the typical reasonable person would have understood by the exchange between the officer and the suspect".  Id. at 251.

Present Case

It is understood that this court will not undertake a credibility assessment in a challenge to a search.  Thus, the trial court's assessment of credibility of the witnesses may not be challenged on direct appeal.  As such, the items found in the car of the appellant, letters from Mr. Jackson to the appellant, should not have been included in the search.

In the present case, the police arrived at the home of the appellant after being notified about the homicide.  The chief investigator, Sergeant Paul Monroe, testified that the appellant was screaming "My Robert, my Robert" (T.227).  She appeared to be emotional upon his arrival (T.228).  Sergeant Monroe informed the appellant that Mr. Fingerhut had been shot to death and he needed to investigate what happened (T.230).  She continued to be emotional (T.230).

Monroe informed her that they needed to process " the entire house as a crime scene to determine where else a suspect may have gone in the house and what else he may have done."

15

(T.241).  The appellant replied by informing Monroe to do "whatever you have to do, search the whole place, just find the guy."  (T.241).

Sergeant Monroe admitted that he never informed the appellant that she had the right to refuse the search or to limit the search in any manner (T.279-80).  It is uncontested that the appellant did not sign a consent to search, until the following day (T.250).  This written consent occurred after the evidence had been confiscated (T.222, testimony of Sgt. Frank Dillon).

Limits on Consent

A search that rests on consent is limited to the extent of that consent.  When police rely on a consent to search, they are limited by any conditions, express or implied, attached to the consent.  A citizen who responds affirmatively to an officer's request to enter premises and look around has not seemingly set any limits, and presumably the search can extend to all rooms. However, a United States Court of Appeals found implicit limitations in a general consent, holding that the downloading and opening of computer files was not covered by a defendant's general consent which read: "to have conducted a complete search of the premises and property located at [address]."  The court held that "the scope of the consensual search was confined to the apartment itself." U.S. v. Carey, 172 F.3d 1268, 1270 (10th Cir. 1999).

A reasonable person, based upon the statements of the officers, would believe that the officers would be processing the house, not a vehicle parked in the driveway that was not at the location at the time of the offense.  The consent to process the house was limited to the house. Sgt. Monroe specifically told her that he needed to process "the entire house as a crime scene to determine where else a suspect may have gone in the house and what else he may have done." The appellant was in her vehicle at the time of the homicide.  It was not at the location of the

16

offense.  Thus, the vehicle would not have been part of what needed to be processed to determine what else Jackson "may have done."

During the suppression hearing, defense counsel specifically asked Sgt. Monroe,

Q. Are you saying that she verbally told you to go ahead and search the car?

A. She told me to do whatever I had to do, the car was there.

Q. Did she ever tell you it is okay to search my car?

A. Specifically her car?

Q. Specifically.

Q. No.

(T. 283)

The letters were seized from the trunk prior to the written consent of the next day.  Thus, the officers possessed the contraband before they sought her consent in written form. (T. 284)

It is clear that the officers, who admittedly did not inform the appellant of any ability to refuse of limit the search, expanded on the alleged consent to search a vehicle that a reasonably prudent person would not believe she had consented to a search.  Thus, the evidence confiscated from the appellant automobile must be suppressed.

17

**Proposition of Law Three:**

**A trial court's refusal to dismiss biased jurors from the panel deprives a capital defendant her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

A prospective juror should be excused for cause whenever the juror holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror. U.S. v. Salamone, 800 F.2d 1216, (3rd Cir. 1986). Once actual prejudice is shown, the court must grant a challenge for cause. U.S. v. Daly, 716 F.2d 1499 (9th Cir. 1983). Any claim of an erroneous ruling denying a challenge for cause in reality reduces the number of peremptory challenges that are available thereby constitutes reversible error. U.S. v. Nell. 526 F. 2d 1223 (5th Cir. 1976).

In Adams v. Texas (1980), 448 U.S. 38, the United States Supreme Court created the following standard for granting dismissal for cause in death penalty cases:

> A juror may not be challenged for cause based upon his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, the jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

Adams, supra, at 589. The application of this minimum constitutional standard was confirmed by the Court in Wainwright v. Witt (1985), 469 U.S. 412.

Jurors Inability to Fairly Consider Life Option

a. Prospective Juror Andrew Kotwis:

Upon examination by the state, Mr. Kotwis responded that he recognized that "the death penalty is an accepted way for law enforcement to provide comfort to the families of the

18

harmed." (T.4022). "I don't look at it as punishment" (T.4022).

Defense counsel informed the prospective juror that they had concern about him being a penalty phase juror because of his views on the death penalty (T.4111). Defense counsel believed that Mr. Kotwis was in favor of the death penalty and in the second phase would favor death and directly said so to the prospective juror (T.4111). Mr. Kotwis responded that he understood the concern, but did not deny the assessment (T.4112).

Defense counsel questioned Mr. Kotwis regarding his inclination to consider sympathy for the survivors of the victim in the deliberation process. "You have to decide between death and life. In making that decision are you going to consider sympathy or comfort for the victim's survivors?" (T.4120). Mr. Kotwis responded that "It will be a factor" (T.4120).

The following voir dire of the juror continued:

Q.      And the death penalty offers immediacy and life imprisonment does not?

Kotwis:      Correct (T.4122).

Q:      The immediacy works for the victim's survivors, at least that's what I'm sensing.

Kotwis:      Yeah , That's what I feel that's behind the debate between capital punishment and – life imprisonment and death penalty (T.4123).

The trial court attempted to clarify the situation and rehabilitate the juror. The trial court conducted the following voir dire:

> THE COURT:     Okay. From this standpoint, and you correct me if I'm wrong because maybe Jerry is right and I'm wrong on what he's picking up here, I think that you are talking on two levels. You have apparently given some thought to this whole idea of the capital punishment debate we have going on and you have rationalized it in your mind that the only – you don't believe that it's a deterrent.

19

KOTWIS:     No

THE COURT: A deterrent factor.  And that the only rationale you can put on as to why this debate continues is that it does give comfort to the families of the victims

KOTWIS: Uh-Huh.

THE COURT:  – or the victims of the crime.  But the point that the defense is trying to get you to state in a more definitive way, you've skirted around it and I think I know what your answer is but you're not really giving them a definite answer, and that is this question of sympathy.  Now, the way you answered it I understood to be this: Of course I'm going to have feelings of sympathy because they're human emotions.  You can't ask people to get in that jury box and not have feelings of anger or whatever.  We all suffer from our emotions.  But Mr. Ingram is concerned (T.4124) that because of your answer on that philosophical level that you are going to bring that in and apply it in this case as a determining factor in that second phase, that if you feel sorry for the family of the victim, that that may be a deciding part or a big part of any decision that you make.

KOTWIS: Un-huh.

THE COURT: And it may be, I don't know.

KOTWIS: I mentioned to him that it would be a factor.  (T.4125).

The court explained to Mr. Kotwis that an instruction  will be given that

the law does not permit sympathy to be a determining factor on the evidence.  Mr.

Kotwis responded as follows: "It wouldn't be a determining factor but it would

be, in all honesty, I think it would be a small factor in your consideration."

(T.4126).

Defense counsel again tried to clarify Mr. Kotwis' opinion as follows:

MR. INGRAM:     But we will agree that before you ever start a second phase that glass already has something in it and that the something in it favors the imposition of death, correct?

KOTWIS:     Uh-huh.        (T.4130).

20

The voir dire questioning of this juror continued for over one hundred pages of transcript The parties questioned Mr. Kotwis for well over one and one-half hours.

The defense objected for cause and requested that the court remove the juror based upon his answers. The defense believed that sympathy for the victim would improperly be a determining factor in Mr. Kotwis' decision in the second phase of the trial (T.4141). The court overruled the objection and placed Mr. Kotwis in the jury pool (T.4142).

B. Prospective Juror Michael Blake

Defense counsel also challenged prospective juror Michael Blake for cause (T.4408). Defense counsel believed that Mr. Blake had a fixed impression of the appellant's guilt. Mr. Blake stated that he recalled the incident. He described his recollection that a man was found shot and that the defendant and the other guy were found to be lovers and had murdered the guy for his insurance money (T.4361). Mr. Blake knew the defendant was Donna Roberts and the other co-defendant was Nate Jackson and Mr. Jackson was sentenced to death (T.4362).

Defense counsel questioned Mr. Blake regarding the information he had from the pre-trial publicity.

ATTY. JUHASZ:    . . .if you take all that publicity and put it together, what impressions did you have about Donna Roberts?"

BLAKE:    Well they must have had a good reason to arrest her, so.

ATTY JUHASZ:    Okay.

BLAKE:    There must be some truth. That's what I look at it. (T.4365).

ATTY JUHASZ:    ...you have some impression that she must have been involved in this, is that a fair characterization?

21

BLAKE:       Yes.    (T.4366).

ATTY JUHASZ:        . . . taking in all of this publicity did you ever read or see or hear anything that sort of changed that impression that sort of said.... maybe she wasn't involved....or does it all sort of lean to the conclusion or the impression that she was involved?

BLAKE:       Yes.

ATTY JUHASZ:       All pretty much one-sided?

BLAKE:       Yeah.

ATTY JUHASZ:       So nothing you've seen or read or heard has really done anything to change your impression that she might have been involved in this?
BLAKE:       Right.

ATTY JUHASZ:       Is that impression something that you would want to hear evidence in this trial ... to sort of dispel that impression?

BLAKE:       Of course.

ATTY JUHASZ:        . . . you would anticipate hearing that evidence from Donna Roberts or somebody acting on her behalf?

BLAKE:       Yes.    (T.4367).

This juror could not presume the appellant innocent. The court refused to dismiss the

juror for cause.

Defense counsel used only five of the six allowed peremptory challenges on the

prospective panel.  Mr. Kotwis was prospective juror number 29 and Mr. Blake was prospective

juror number 30.  The state used all six peremptory challenges (T.4603).  At the time of the sixth

peremptory for the defense, the next two jurors to be placed on the jury panel would have been

Mr. Kotwis and Mr. Blake.

Mr. Kotwis and Mr. Blake were the first two alternate jurors seated on the panel.  Defense

22

counsel used its only two peremptory challenges to remove both Mr. Kotwis and Mr. Blake as

alternate jurors (T.5032). Clearly, because the court failed to properly dismiss these two jurors

for cause, the defense was forced to reserve one of its peremptory challenges in order to keep Mr.

Kotwis and Mr. Blake off the jury panel. The defense was then forced to use both peremptory

challenges for Mr. Kotwis and Mr. Blake during alternate juror selection.

Substantially Impaired Prospective Jurors Must Be Excluded

In Wainwright v. Witt, supra, the United States Supreme Court adopted the standard test

as whether the juror's views would "prevent or substantially impair the performance of his duties

as a juror in accordance with his instructions and his oath." But however much Witt sought to

clarify its position in Witherspoon v. Illinois (1968) 391 U.S. 510, the Supreme Court

acknowledged that the Witt standard *"in addition to dispensing with Witherspoon's reference to*

*"automatic" decision making, this standard likewise does not require* that a juror's bias be proved

with "unmistakable clarity." at 424. And in addressing the dissents concerns, the majority noted

that "[w]e adhere to the essential balance struck by the Witherspoon decision rendered in 1968, if

not to the version of it presented by today's dissent; *we simply modify the test* stated in

Witherspoon 's footnote 21 to hold that the State may exclude from capital sentencing juries that

"class" of veniremen whose views would prevent or substantially impair the performance of their

duties in accordance with their instructions or their oaths. Witt, at 426, fn.5 In other words, the

Witt 'substantial impairment' test, as a practical matter, modifies the Witherspoon test.

Similarly, the Witt Court considered the difficulty that would possibly be encountered

when shifting from the Witherspoon test to the Adams test:

The state of this case law leaves trial courts with the difficult task of

23

distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial. Although this task may be difficult in any event, it is obviously made more difficult by the fact that the standard applied in Adams differs markedly from the language of footnote 21. The tests with respect to sentencing and guilt, originally in two prongs, have been merged; the requirement that a juror may be excluded only if he would never vote for the death penalty is now missing; gone too is the extremely high burden of proof. In general, the standard has been simplified.

Witt at 421.

The jurors addressed above clearing fit within the Witt exclusion standard. As noted the modified standard does not require that a juror's bias be proved with "unmistakable clarity." If the bias is apparent although not specified or admitted directly, the juror must be excluded under Witt-Adams. The failure to dismiss jurors for cause who could not follow the law as it related to this case was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

24

**Proposition of Law Four:**

**Evidence that does not establish the theft element of an Aggravated Robbery, R.C. §2911.01 and the corresponding capital specification, R.C. §2929.04(A)(7) is insufficient to sustain guilty verdicts on these charges.**

In the present case, the state charged and convicted the appellant of complicity in the Aggravated Robbery of her husband, the decedent Robert Fingerhut.  The evidence established that there was nothing taken from the household, except for the possibility of a firearm.  Both of the decedent's wallets were found on his body.  Large amounts of money were found in the wallet. (T. 5679)  The alleged theft was therefore based upon Mr. Fingerhut's car being driven from the house by the co-defendant, Nate Jackson.  The automobile was found a few blocks away from the residence where he was residing.

The fact the Mr. Jackson used the automobile to escape from the house does not constitute a theft offense.  Clearly, there was no attempt by Jackson to keep the car or sell it for his profit.  The car was utilized to drive from the scene and then abandoned, with the car keys left in the vehicle, at a very public location.  Without proof of a theft offense, the conviction of Aggravated Robbery and the corresponding capital specification must be dismissed.

Sufficiency Standard

Under the Due Process Clause of the Fourteenth Amendment, a defendant in a criminal case is protected against conviction except upon proof beyond a reasonable doubt of every element necessary to constitute the crime with which he is charged.  In re Winship, 397 U.S. 358, 364 (1970); Davis v. United States, 160 U.S. 469, 487-88 (1895).  The United States Supreme Court set forth the standard for sufficiency review in Jackson v. Virginia (1979), 443 U.S. 307.

25

The reviewing court is to view all the evidence in the light most favorable to the prosecution. In doing so, the court must then determine whether any reasonable trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. The state must prove each and every element of the offense charged by evidence beyond a reasonable doubt in order to sustain a conviction. State v. Jenks (1991), 61 Ohio St. 3d 259. When conducting this review, we do not weigh the evidence; rather, the inquiry is limited to whether reasonable minds could reach the conclusion reached by the trier of fact. See State v. Tibbetts, 92 Ohio St.3d at 146, 162, 2001 Ohio132; State v. Treesh, (2001) 90 Ohio St.3d 460, 484, 2001 Ohio 4.

Present Case

Here, the evidence was insufficient to establish the charge of Aggravated Robbery, R.C. §2911.01 or the corresponding capital specification, R.C. §2929.04(7), alleging the homicide occurred with prior calculation and design during an Aggravated Robbery. The basis of this challenge is two-fold. First, there was no concurrence of the elements. There is no evidence that Nathaniel Jackson formed the intent to take the victim's automobile until after the force had occurred in the form of the homicide. Second, there is insufficient evidence that a theft occurred. The usage of the automobile to escape from the scene of the offense did not constitute a theft offense.

It is hornbook law that there must be concurrence of the elements for an offense to have occurred. Here, the intent to commit a theft offense must be formed at the time of the force. If the intent is not formed until a time period long after the force has occurred, the offense may be an assault, or here a homicide, and a theft, but not a robbery. State v. Ballard, (1984) 14 Ohio App.3d 59. As the Ballard decision noted in its syllabus:

26

> Under R.C. 2911.02, the elements of robbery must occur simultaneously in order for the offense to occur.  Therefore, the state must prove that the accused's intent to deprive the owner of the property, as well as the actual taking (elements of the theft offense), coincided in point of time with the force or threat of force used in committing the theft offense, or in fleeing thereafter.

See also State v. Campbell, (Nov. 25, 1998) Cuyahoga App. No. 73643.

Here, there is no evidence that the co-defendant intended to take the automobile.  There is no evidence that taking the car was part of the alleged complicity.  Indeed, the fact that no money was taken clearly precludes the theory that Mr. Jackson intended to have the homicide appear to be for the purpose of committing a theft offense.  As the element did not occur contemporaneously, and the intent to use the automobile was not formed until after the homicide, the evidence may not sustain a conviction of Aggravated Robbery, R.C. §2911.01.

No Theft Offense Occurred

R.C. §2901.01 defines aggravated robbery in relevant part as follows:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

(3) Inflict, or attempt to inflict, serious physical harm on another.

Thus, in order to prove that an Aggravated Robbery had occurred, the state necessarily needed to prove beyond a reasonable doubt that a theft offense occurred during the offense.

A theft offense is defined in R.C. §2913.02 as follows in relevant part:

(A) No person, *with purpose to deprive the owner of property* or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

27

(1) Without the consent of the owner or person authorized to give consent

(Emphasis added)

Obviously, the key term here is *with purpose to deprive the owner of property.* If there is no purpose to deprive the owner of the property when the automobile was used, the offender is guilty at worst of an unauthorized use of a vehicle, R.C. §2913.03 which reads:

> (A) No person shall knowingly use or operate an aircraft, motor vehicle, motorcycle, motorboat, or other motor-propelled vehicle without the consent of the owner or person authorized to give consent.

In reviewing the evidence in a light most favorable to the state, the evidence establishes only that the appellant used the decedents automobile to leave the crime scene. It is not challenged that the decedent owned the car. (T. 5308) Mr. Fingerhut leased the vehicles. (T.5312, 5323) The automobile was found three blocks from where Nate Jackson resided at this time, with the keys in the vehicle. (T. 5654, 5655)

The decedent was found with $130 in his front pocket and $231 in his wallet. This is strongly suggestive that the homicide was not motivated by a robbery. As it was not established that Jackson took a weapon from the house, the only possible theft offense would have been the automobile. Based upon the evidence at trial, the state failed to establish this element beyond a reasonable doubt.

28

**Proposition of Law Five:**

**A capital defendant's right to allocution before being sentenced is mandatory. Where the sentencing court neglects this right, the subsequent sentence is void or voidable.**

In the present case, the trial court read his sentencing opinion written pursuant to R.C. §2929.03(F) prior to allowing the appellant her right to allocution.  The court sentenced her to death without inquiring whether she had anything to say about her sentence.   It was only after defense counsel pointed out the failure, that the court permitted the appellant to make a statement. (T. 6374) After the court permitted the appellant to make a statement, the court sentenced her on the remainder of the charges.  However, it is clear that the court had prepared the opinion and made up its mind as to the appropriate sentence without consideration of her statement.

In State v. Campbell (2000) 90 Ohio St.3d 320 1, this Court held that pursuant to Crim.R. 32(A)(1), before imposing sentence, a trial court must address the defendant personally and ask whether he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment. Crim.R. 32(A)(1), which holds "[b]efore imposing sentence the court shall afford counsel an opportunity to speak on behalf of the defendant and also shall address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment."

Campbell held that this rule applies to both capital cases and noncapital cases.  In a case in which the trial court has imposed sentence without first asking the defendant whether he or she wishes to exercise the right of allocution created by Crim.R. 32(A), re-sentencing is required unless the error is invited error or harmless error.

29

This Court has noted that the penalty phase in a capital case is not a substitute for defendant's right of allocution. State v.Reynolds (1998), 80 Ohio St.3d 670, 684. In Reynolds, this court found no prejudicial error in the trial court's failure to ask the defendant whether he wished to make a statement, because the defendant had already made an unsworn statement, and presented a personal letter to the court during the mitigation phase, and had defense counsel make a statement on his behalf. Id.  It is true that the appellant here also made an unsworn statement.  However, unlike Reynolds, she did not submit a letter to the court in which she was able to directly address the judge outside of the jury, which is, after all, the purpose of allocution.

Furthermore, the appellant did not testify under oath during the penalty stage as occurred in State v. Myers (2002), 97 Ohio St.3d 335.  However, Myers exercised the right to speak on his own behalf during the mitigation phase and subjected himself to cross-examination. This testimony encompassed over 200 pages of the mitigation phase transcript. This enabled him to directly appeal to the judge for his life.  The appellant's unsworn statement in the present case expressed anger and outrage at the jury and lead detective, and was not utilized by the appellant to address the court directly, as apparently occurred in Myers.

This court in Reynolds warned that:

> Failure to provide a defendant the right of allocution could constitute reversible error in a future case.

Reynolds, supra, at 684.

It is clear that the trial court here did not heed the warning.  Therefore, the denial of allocution here was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1483

**Proposition of Law Six:**

> **The trial court sentencing opinion under R.C. §2929.03(F) requires independent analysis of the trial court in the weighing the factors to determine the appropriateness of a death sentence. It in not proper for the court to allow the prosecutor of the case to draft the opinion as the sentence loses its independent nature mandated by the legislature.**

R.C. §2929.03(F) reads in pertinent part:

(F) The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

In the present case, the trial court prepared the sentencing entry prior to the actual sentencing date. Actually, it appears the prosecution rather than the judge prepared the opinion. The court clearly read its prepared R.C. §2929.04(F) opinion to the defendant in open court prior to any statement of the appellant or counsel (T. 6338-6334)

Following the reading of the opinion by the court, defense counsel noted that the prosecutor was reading along with the court. (T. 6335) The court indicated that the prosecutor was reading an opinion that he prepared, but that the prosecutor had a computer that made it easier to edit the document. (T. 6366) Defense stated that they were unaware of the joint effort and complained of the *ex parte* nature of the preparation of the document.

There were apparently six or seven drafts. The prosecutor made corrections which were kept on the hard drive of the computer. (T. 6370) The prosecutor noted that they "kept finding typos." (T. 6370) The prosecutor noted that he was "the court's secretary" as he typed the whole

31

document. (T. 6371) The court noted that this was done because it was the most practical system. The court noted that other counsel objected and acknowledged that it "may be a legitimate point." (T. 6371)

The court noted that he "gave notes saying this is what I want.  This, this and this, and they sent it back.  I read over, made some corrections, went back from there." (T. 6372) Thus, it is clear from the record that the prosecutor's participation was more than just proof-reading the draft of the court.  Defense counsel noted that it had not been consulted at any time during the writing of the opinion. (T. 6372)

Requirement for Independent Fact-Findings

The United States Supreme Court has long been critical of a court's verbatim adoption of findings of fact prepared by the prevailing party.  See Anderson v City of Bessemer City, 470 U.S. 564, 572 (1985); United States v El Paso Natural Gas Co., 376 U.S. 651, 656-57 (1964); United States v Marine Bancorporation, 418 U.S. 602, 615 (1974).  While adopted findings will stand on appeal if supported by the evidence, United States v. Crescent Amusement Co., 323 U.S. 173 (1944), "[t]hose drawn with the insight of a disinterested mind are, however, more helpful to the appellate court."  United States v. El Paso, 376 U.S. at 656.  A court should avoid simply signing findings and conclusions prepared by prevailing party because

> [t]hese lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can.  When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.  *Id. n. 4, quoting* Judge J. Skelly Wright, Seminars for Newly Appointed United States District Judges (1963), p. 166.

The trial court, as fact finder, "is the most important agency of the judicial branch of the

32

government precisely because on it rests the responsibility of ascertaining the facts." United States v. Forness, 125 F.2d 928, 942-43 (2nd Cir. 1942). When a trial court delegates its duty to the prevailing party to make findings of fact and conclusions of law, it abandons its institutional role:

> Who shall prepare the findings? Rule 52 says the court shall prepare the findings. The court shall find the facts specially and state separately its conclusions of law. We all know what has happened. Many courts simply decide the case in favor of the plaintiff or the defendant, have him prepare the findings of fact and conclusions of law and sign them. This has been denounced by every court of appeals save one. This is an abandonment of the duty and the trust that has been placed in the judge by these rules.

United States v. El Paso Natural Gas, 376 U.S. 651, 657 n. 4 (1964). (quoting J. Wright, The Nonjury Trial – Preparing Findings of Fact, Conclusions of Law, and Opinions, Seminars for Newly Appointed United States District Judges 159, 166 (1962)).

Appellate courts have almost universally condemned the practice of the prevailing party "ghost writing" for the trial courts its findings of facts and conclusions of law. Lawyers are adversarial and cannot be trusted to fairly draft an accurate version of the facts. See, e.g., Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454, 459 (4th Cir. 1983) ("[t]he adversarial zeal of counsel . . . too often infects what should be disinterested findings").

A trial judge impermissibly distances himself from the case and abandons the position for which he was chosen - to make judgments and findings in a fair and impartial manner - when he permits a party to make required findings for him. "[T]he practice tends to deflect the court's attention from, or actually to obscure, the more difficult factual issues and credibility problems presented by the evidence. The natural tendency of counsel, given an opportunity free of adversary constraints to shore up weak points, to gloss over evidence or credibility problems at odds

33

with necessary findings, and to argue inferences in the guise of 'findings' is obvious." Miller v.

Mercy Hosp., Inc., 720 F.2d 356, 369 (1983). See also Keystone Plastics, Inc. v. C & P Plastics,

Inc., 506 F.2d 960, 962 (5th Cir. 1975).

In a capital case a trial court's delegation of its judicial function to an adversary conflicts

with the need for both the reality and appearance that the process for imposing death is

exactingly fair, objective and reliable. Johnson v. Mississippi, 486 U.S. 578, 584-5 (1988);

Gardner v. Florida, 430 U.S. 349, 358 (1977).

The United States Supreme Court has twice told the federal courts that they should make

their own findings. Orders that simply adopt the fact-findings and legal arguments of one side are

"not worth the paper they are written on as far as assisting the court of appeals in determining

why the judge decided the case." United States v. El Paso Natural Gas Co., 376 U.S. 651, 656

n.4 (1964). Twenty-one years later the Court again "criticized courts for their verbatim adoption

of findings of fact prepared by prevailing parties, particularly when those findings have taken the

form of conclusory statements unsupported by citation to the record." Anderson v. Bessemer

City, 470 U.S. 564, 572-573 (1985). This is true, in part, because of the "potential for

overreaching and exaggeration on the part of attorneys preparing findings of fact." Id. at 572. In

Anderson, the Supreme Court did not reverse because [t]he court itself provided the framework

for the proposed findings when it issued its preliminary memorandum." Id.

The practice of verbatim adoption of proposed orders raises the possibility that there was

insufficient independent evaluation of the evidence and may cause the losing party to believe that

its position has not been given the consideration it deserves. Wyler Summit Partnership v.

Turner Broadcasting System, Inc., 235 F.3d 1184 (9th Cir. 2000). Other federal appellate

districts frown on the practice.  For example, the Fifth Circuit has demanded that "rubber-stamped" findings receive increased scrutiny.  McClennan v. American Eurocopter Corp., Inc., 245 F.3d 403, 409 (5th Cir. 2001), find that "the district court's decision to adopt one party's proposed findings and conclusions without change may cause us to approach such findings with greater caution, and as a consequence to apply the standard of review more rigorously."

In this state, the legislature requires the jury to recommend the sentence of death. The final sentence is for the judge.  The trial judge is permitted to consider and change the sentence.  Reynolds, supra at 683-684.  The final sentence is that of the judge, not the court.  The capital scheme is not designed to result in the judge merely rubber-stamping the recommendation without seriously considering the allocution of the defendant and any other evidence that may be presented.  Preparing the sentencing opinion, with the assistance of the prosecutor, prior to the hearing subterfuges the entire process and cannot be condoned.

It is understood that the record on direct appeal is that this is not an instance where the prosecutor prepared the opinion and the judge merely signed the entry.  However, the above case law is applicable as the prosecutor's assistance in drafting the order compromised the independence of the judiciary and in the process, the very essence of the requirement for the separation-of-powers doctrine.  As this is a capital case, extra scrutiny rather than less must be paid to procedures which are designed to protect the fundamental fairness of the procedure.

The failure of the trial court to follow Ohio's sentencing procedures which provided the appellant with a liberty interest is in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Proposition of Law Seven**

> **Where the pre-trial publicity is so pervasive that a jury cannot be expected to ignore the media attention to the case, a trial court must grant a defense request for a change of venue to protect the integrity of the fact-finding process.**

The appellant has a constitutional right to an impartial jury guaranteed by the due process clause of the Fourteenth Amendment of the United States Constitution in all state criminal cases. Additionally, the Ohio Constitution guarantees an impartial jury of the county in which the offense is alleged to have been committed. Article I, Section 10, Ohio Constitution.

In the appellant Roberts case, the pretrial publicity was so pervasive that the jury could not reasonably have been expected to place out other there mind and decide the case with an open mind, uninfluenced by the media stories. The co-defendant, Nate Jackson, had been tried in the same court house only months before the appellant's trial. He had been convicted and sentenced to death for the offense. The news media had saturated the relatively small county with reports of the offense, including the state's theory regarding the appellant complicity in the homicide. Proof of the prejudice is almost impossible. Jurors honestly believe that they can follow the law and ignore the influence of the media stories. To ask them to disregard a conviction and sentence of a co-defendant in the situation is simply to difficult of a task for jurors to undertake, try as they might.

Venue Law

Forty years ago, the United States Supreme Court spoke with regard to the necessity of change venue in order to assure that due process of law would be secured for the defendant in the case of Rideau v. Louisiana (1963), 373 U.S. 723, 83 S. Ct. 1417. In that case, the Court held,

36

without pausing to examine the particularized transcript of the voir dire examination, that due process of law required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised interview.  In that case, Rideau made a videotaped confession which was thereupon broadcast on television.

The Supreme Court, two years earlier, in the case of Irvin v. Dowd (1961), 366 U.S. 717, 81 S. Ct. 1639, stated:

> The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.  The failing to accord an accused a fair hearing violates even the minimal standards of due process... In the ultimate analysis, only the jury can strip a man of his liberty or life.  In the language of Lord Coke, a juror must be "indifferent as he stands unsworn."  Co Litt 155b.  His verdict must be based upon the evidence developed at the trial.  This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.  It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807).  The theory of the law is that a juror who has formed an opinion cannot be impartial.  Reynolds v. United States, 98 U.S. 145.

Mr. Justice Frankfurter concurring in the Irvin v. Dowd case said:

> More than one student of society has expressed the view that not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of the community.  One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure.  These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicable poisoned against him.  How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.  366 U.S. at 729.

37

Voir Dire Requirement

Defense counsel filed for a change of venue for the appellant.  The motion contained numerous exhibits, at least sixty-seven, depicting the level of pretrial publicity. (T.529)  The trial court held the decision in abeyance in an attempt to discover the level of the jurors knowledge of the facts of this case. (T. 146)

The use of the voir dire process to determine the influence of pre-trial publicity is essentially mandated in this state.  In State v. Mills (1992), 62 Ohio St. 3d 357, 363-364, this Court held that the trial court did not abuse its discretion by denying appellant's motion for a change of venue because the trial court had conducted an extensive voir dire of all prospective jurors in accordance with State v. Bayless (1976), 48 Ohio St. 2d 73, 98.  This process, in Mills, enabled the trial court to determine that a fair jury could be seated.

Pre-trial Publicity

The voir dire process here revealed that a jury should not have been seated in Trumbull County.  Defense counsel questioned all prospective jurors in regards to the amount of knowledge they had regarding this case prior to being called for jury service. The court permitted a jury questionnaire which had aided in the questioning.  At least 16 of the jurors had basic knowledge of the facts of the case from either television or newspaper accounts.  (T. 773, 2896, 2907, 2931, 2998, 3037, 3158, 3260, 3305, 3441, 3515, 3587, 3699, 3898, 3936, 4094, 4263, 4308).  In addition, jurors who had not heard of the case, overheard conversations from other jurors in the pool about the case and its facts (T.2894, 3086, 3158, 3305, 3438).

The following exemplify the process.  Prospective Juror William Hall stated that he had followed the case pretty closely on the television news (T.2907).  He also followed the case in

38

the newspaper (T.2907).  This juror was dismissed for cause as he admitted having a preconceived notion as to the defendant's guilt (T.2910).

Prospective Juror Robert Hamilton recalled seeing some of the case on television news reports or from the newspaper  He remembered reading that Mr. Jackson entered the home of the victim and shot and killed him (T.2931).  He was aware that the murder occurred in Howland and that Ms. Roberts was implicated in the murder (T.2958).

Prospective Juror Carol Selak read about the case in the newspaper and had discussed the case with her co-workers (T.2998-3005).  She recalled that Mr. Jackson was found guilty and Ms. Roberts was involved (T.3036-7).  She was told that there were some letters admitted in the first trial (T.3043).

Prospective Juror Margaret Fellows recalled reading about the case when it occurred (T.3698).  She recalled the name Nate Jackson and that he was arrested and convicted (T.3699).  She knew the incident occurred in Howland and that Ms. Roberts had been arrested (T.3700).

Prospective Juror Amy Bartlett stated that she had overheard a few women in the jury pool discussing what they had read in the newspaper about the case (T.3158).  She heard discussions regarding a death and who may have been involved (T.3158).

Prospective Juror Helene Messersmith stated that one juror discussed with her in general the things the juror recalled from television reports (T.3305).  Specifically, that juror told her that there were some letters admitted in the prior trial of the co-defendant (T.3306).  That juror was talking with Ms. Messersmith, but there were other jurors in the area (T.3308).

Prospective Juror Christine Hake stated that other jurors were talking about the case.  The jurors stated that they thought they were being called for the "Roberts" case (T.3438).  The jurors

39

asked each other if they had read about the case in the newspaper (T.3438). A juror specifically asked Ms. Hake if she had read about the case and she stated that she had (T.3441). She told that juror that she knew it was about a guy from Howland, and a boyfriend had already been convicted, "now they're coming after her" (T.3441).

40

**Proposition of Law Eight**

> **The failure to properly advise and ensure that a capital defendant understands the ramification of a the waiver of evidence in the penalty phase constitutes ineffective assistance of counsel.**

Both the Federal and State Constitutions guarantee a minimum standard of proficiency of a criminally accused's counsel. The Sixth Amendment of the United States Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right...to take the assistance of counsel for his defense." In Powell v. Alabama, 287 U.S. 45 (1932), the United States Supreme Court first recognized that a defendant has a right not only to the timely appointment of counsel but also to the quality of performance above a minimal level of effectiveness. Both State and Federal courts recognized that the failure of trial counsel to properly represent his or her client might affect the legitimacy of the fact finding progress just as errors by the court or prosecution might require the reversal of a conviction.

Here, the record does not reflect that the appellant understood the full ramifications of her waiver of her ability to present and argue mitigation evidence. It is understood that this argument is best made in the postconviction process R.C. §2953.21. State v. Smith (1985) 17 Ohio St.3d 98. However, as the attorney general and prosecutors are continually raising procedural default for not raising issue on direct appeal where any aspect of the argument is included in the record, it must be raised here.

Effectiveness Standard

The United States Supreme Court set forth the minimum standard for effective assistance in Strickland v. Washington (1984), 466 U.S. 68. A two-step test was announced. First, the

41

defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. This latter test requires that counsel's errors were so serious as to deprive the defendant of a fair trial.

While indulging a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, a court hearing an ineffective assistance claim must determine whether counsel's conduct caused a breakdown in the adversary process so as to destroy the fundamental fairness of the proceeding. Under the appropriate test for prejudice, the defendant must demonstrate a reasonable probability that, but for the counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 692. A "reasonable probability" of a different outcome means that defense counsels' error, or deficient performance, undermines the confidence in the adversarial nature of the trial. Id at 694.

Here, as addressed in Proposition of Law One, the appellant did not have a clear understanding of the process and the ramifications of the waiver. She sought to waive only part of her right, as she expressly wanted to provide an unsworn statement. The appellant was obviously angered by the outcome of her trial. Counsel failed to request a continuance of the penalty phase so that the appellant could calmly consider her fate. Also, counsel failed to address that the failure to provide mitigation, in which the appellant maintains the burden of going forward, results in automatic death in a weighing state. The record does not reflect that the appellant was aware that she was committing state assisted suicide. In fact, the mitigation offered in her unsworn statement, and her dismay at the verdict and the process, contradicts this and demonstrates her confusion.

42

**Proposition of Law Nine**

> **The inclusion of a R.C. §2929.04(A)(7) specification to a conviction of R.C. §2903.01(A) may not sustain a conviction of death when the element of prior calculation and design is found by the jury in both statutes.  The repeat finding of the same element fails to provide the narrowing procedure that is required for a sentencing scheme to be found constitutional.**

The grand jury charged the appellant with alternative theories of Aggravated Murder pursuant to R.C. §2903.01(A) and (B).  Each count included two capital specifications pursuant to R.C. §2929.04.(B)(7).  Following the jury's finding of guilt of all charges in the indictment, the prosecutor dismiss Count Two.  Thus, the jury deliberated on Count One.  Count One charged the appellant with complicity to commit a homicide with prior calculation and design, R.C. §2903.01(A).  The capital specifications, felony-murder allegations, conceded that the appellant was not the principal offender.  Therefore the jury necessarily had to find that the appellant committed the homicide during an Aggravated Burglary and/or Aggravated Robbery and committed the homicide with prior calculation and design.  As this element has already been found by the jury, the finding does not properly narrow the class of eligibility for death sentences.

Count One Instruction

The trial court instructed the jury in the following manner:

First, the state may not allow the jury to consider the element of prior calculation and design in the R.C. §2929.04(B)(7) specification where the defendant was charged with R.C. §2903.01(A).  This is because a finding of the appellant guilty of prior calculation and design in the principal offense and the same finding in the specification do not allow for constitutional narrowing.  State v. Penix, 32 Ohio St. 3d 369 (1987); State v. Landrum, 53 Ohio St.3d 107

43

(1990); State v. Burke, 73 Ohio St. 3d 399 (1995).

Under the Eighth Amendment, States must adopt procedural protections that "assure consistency, fairness, and rationality in the evenhanded operation of the state law ... to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed ..." Proffitt v. Florida, 428 U.S. 242, 260 (1976) (Joint Opinion of Stewart, Powell and Stevens, JJ.) (citation omitted), and "promote the evenhanded, rational, and consistent imposition of the death sentences under law." Jurek v. Texas, 428 U.S. 262, 276 (1976) (Joint Opinion of Steward, Powell and Stevens, JJ.) (citation omitted).

Central to this jurisprudence is the "constitutionally necessary narrowing function" of any death penalty scheme.  Pulley v. Harris, 465 U.S. 37, 50 (1984).  As the United States Supreme Court has stated:  "Our precedents make clear that a State's capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty.'"  Arave v. Creech, 113 S. Ct. 1534, 1542 (1993), quoting Zant v. Stephens, 462 U.S. 862, 877 (1983); Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (discussing narrowing requirement); Barclay v. Florida, 463 U.S. 939, 960 (1983) (Stevens, J., concurring) ("[W]e have stressed the necessity of 'genuinely narrowing the class of persons eligible for the death penalty.'"); Walton v. Arizona, 497 U.S. 639, 110 S. Ct. at 3060-3061 (1990) (Scalia, J., concurring).

In Lowenfield v. Phelps, 484 U.S. at 244,  the Court stressed the dual function of "genuine narrowing:"

> To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.

44

"When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so." Arave v. Creech, 113 S.Ct. at 1542, citing Lewis v. Jeffers, 497 U.S. 764, 776 (1990) and Godfrey v. Georgia, 446 U.S. 420, 433 (1980).

"Genuine narrowing" serves its Eighth Amendment purpose by reducing the opportunities for the "freakish" and "wanton" imposition of the death penalty in two ways. First, "narrowing" limits the class of murderers for whom the death sentence can be considered. By restricting eligibility, it assures that the death penalty cannot be imposed indiscriminately. See, e.g., Walton v. Arizona, 110 S. Ct. at 3090 (Stevens, J., dissenting) ("The risk of arbitrariness condemned in Furman is a function of the size of the class of convicted persons or eligible for the death penalty.") Second, "narrowing" limits the death penalty to those murderers whose culpability makes the death penalty particularly appropriate, insuring rationality by avoiding purely arbitrary sentencing. Not all murderers may be sentenced to death, and those who receive the death penalty must be rationally distinguishable from those who do not on grounds that reflect their respective degrees of culpability.

This Court has also acknowledged the constitutional requirement of narrowing in State v. Henderson (1988) 39 Ohio St.3d 24, 28-29. There the court found the 1981 statute constitutional, "the Ohio General Assembly has complied with Zant, supra, by narrowing the class of death-eligible aggravated murders." This compliance was based upon the additional factors in the B(7) specification of principal offender or prior calculation and design. Without a specific, unanimous finding as to one or the other, the specification may not stand. Where

45

neither is found in addition to the principal charge, the narrowing has not occurred as required.

The use of an aggravating circumstance which merely repeats an element of the underlying crime violates the Eighth and Fourteenth Amendments to the United States Constitution and Section 9, Article I of the Ohio Constitution because it fails to narrow the class of persons who are eligible for the death sentence.

**Proposition of Law Ten:**

> **Instructing the jury that its penalty phase determination was a recommendation is improper because it unfairly diminishes the jury's sense of responsibility**

The defense objected to the trial court's use of the term "recommendation" in the trial court's penalty phase instructions. (T.6241-42) The objection was overruled. The court instructed the jury that its verdict was a recommendation. (T. 6247)

The Supreme Court of the United States in <u>Caldwell v. Mississippi</u> (1985), 472 U.S. 320, held, "It is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."

In reversing the Mississippi Supreme Court's decision in <u>Caldwell</u>, and vacating the death sentence, the United States Supreme Court, at 2635, noted,

> Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an "awesome responsibility" has allowed this Court to view sentencer discretion as consistent with and indispensable to the

46

Eighth Amendment's "need for reliability in the determination that death is appropriate punishment in a specific case."

This Court has addressed the Caldwell issue many times. In State v. Rogers (1986), 28 Ohio St. 3d 427, cert. denied (1987), 484 U.S. 958, this Court distinguished between a mere restatement of the law and a situation where it appears an attempt is made to minimize the jury's role in the pronouncement of death. The court noted that, even though an instruction that the jury's death verdict might only be a recommendation, the effect of such an instruction would tend to diminish the jury's sense of responsibility. The Rogers decision court explicitly stated its preference that in death penalty cases no references be made to the jury regarding the finality of their decision.

Since this decision, trial courts have been inconsistent in the application of the Rogers guidance. It is conceded that this Court has not found the use of the term to constitute prejudicial error. Nevertheless, the appellant argues that the error is a violation of federal law, if not state constitutional prohibitions.

During its instructions to the jury throughout the trial, the trial court instructed the jury that its death verdict was a recommendation and not final. (T. 6247) The term was used by the court and the attorneys throughout the voir dire procedure.

The use of the term "recommendation" in relation to the sentencing duty of the jury was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

47

**Proposition of Law Eleven:**

**Ohio's definition of reasonable doubt is violative of the constitutional as it allows the Appellant to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Ohio's definition of reasonable doubt is violative of the constitutional as it allows the appellant to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The statutory definition of reasonable doubt as contained in O.R.C. §2901.05 establishes a clear and convincing standard rather than a standard of beyond a reasonable doubt. The appellant was thus convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments.

It is unquestioned that the Due Process Clause requires jurors to find that the State has proved each and every element of the offense beyond a reasonable doubt. In re Winship, 397 U.S. 358 (1970). In addition to an instruction requiring jurors to find guilt beyond a reasonable doubt, Ohio's capital sentencing scheme also requires the state to prove its entitlement to the death sentence beyond a reasonable doubt. O.R.C. § 2929.03 (D)(2) (Page's 1987). The instructions given to the jurors in appellant's case diluted that standard of proof, thus vitiating his conviction and death sentence.

At the trial phase, the judge instructed the jurors as follows:

Now reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say that they are firmly convinced of the truth of the charge. Reasonable doubt is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Now proof beyond a reasonable doubt is of such character that

48

an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs. (T.6148-49).

Likewise in the penalty phase, the court instructed:

Reasonable doubt is present when after you have carefully considered and compared all of the evidence, you cannot say you are firmly convinced that the aggravating circumstances outweigh the factors in mitigation.  Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt.  Proof of beyond a reasonable doubt is proof of such character, that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs. (T. 6314).

The definition of reasonable doubt given to the jury embodies a standard of proof below that required by the Due Process Clause and are constitutionally infirm. The United States Supreme Court has characterized proof beyond a reasonable doubt as proof of guilt "with utmost certainty". <u>Winship</u>, 397 U.S. at 364. The Court has remained vigilant in enforcing that standard which is the cornerstone of the criminal justice system.

In <u>Cage v. Louisiana</u>, 111 S.Ct. 328 (1990), the Court reversed a capital conviction and death sentence because the reasonable doubt instruction given in the case could have led jurors to find guilt "based upon a degree of proof below that required by the Due Process Clause." <u>Id</u>. at 330.  In <u>Victor v. Nebraska</u>, 114 S.Ct. 1239 (1994), the Court clarified that the constitutional question ". . . that the jury understood the instructions to allow conviction based on proof insufficient to meet the <u>Winship</u> standard."  <u>Id</u>. at 1243.

Under whichever standard applied, the reasonable doubt instruction given in the instant case failed to adequately convey to the jurors the stringent beyond a reasonable doubt standard.

49

In fact, the "firmly convinced" language in the first sentence of the instruction is not reasonable doubt at all, but rather represents only a clear and convincing evidence standard. Ohio's definition of clear and convincing evidence and the instruction given by the trial court on reasonable doubt are similar. This is apparent from a review of Cross v. Ledford, 161 Ohio St. 469 (1954), where the court defined clear and convincing evidence as that degree of proof "which will produce in the mind of the trier of facts a *firm belief* or conviction as to the facts sought to be established." Id. at paragraph three of the syllabus (emphasis added). The instruction as given suggests that reasonable doubt is present if jurors "cannot say they are *firmly convinced* of the truth of the charge." (Emphasis added).

In addition to the foregoing, the "willing to act" language given to the jury in the trial court's instruction fails to satisfy the stringent Due Process standard for a criminal conviction. The Supreme Court has expressly disapproved of the "willing to act" language when defining proof beyond a reasonable doubt. Holland v. United States, 348 U.S. 121 (1954). As the Court stated, "the charge should have been in terms of the kind of doubt that would make a person hesitate to act . . . rather than the kind on which he would be willing to act." Id. at 140. In Scurry v. United States, 347 F.2d 468 (D.C. Cir. 1965), the court explained the inherent danger in the "willing to act" charge:

Being convinced beyond a reasonable doubt cannot be equated with being "willing to act" in the more weighty and important matters in your own affairs. A prudent person called upon to act in an important business or family matter would certainly gravely weigh the often neatly balanced considerations and risks tending in both directions. But, in making and acting on a judgment after so doing, such a person would not necessarily be convinced beyond a reasonable

50

doubt that he had made the right judgement. Human experience, unfortunately, is to the contrary. Id. at 470.

In order to accurately convey the gravity of the beyond a reasonable doubt standard, it should be defined in terms of a prudent person who would hesitate to act when confronted with the evidence. United States v. Pinkney, 551 F.2d 1241 (D.C. Cir. 1976); United States v. Noon, 913 F.2d 20 (1st Cir. 1990); United States v. Colon, 835 F.2d 27 (2nd Cir. 1987); United States v. Conley, 523 F.2d 650 (8th Cir. 1975); Monk v. Zelez, 901 F.2d 885 (10th Cir. 1990). The Sixth Circuit has upheld Ohio's statutory definition of reasonable doubt, where the charge, as a whole, and taken in context, did not offend due process, but was critical of the "willing to act" language contained in the charge given. Thomas v. Arn, 704 F.2d 865 (6th Cir. 1983).

The reasonable doubt standard was further eroded by the reference to "moral evidence," because it unfairly required the jury to deliberate upon a lower burden of proof than constitutionally required. As in Victor v. Nebraska, supra, the Court upheld the constitutionality of a reasonable doubt instruction which referred to "moral certainty" and "moral evidence." The better-reasoned view is expressed by Justice Blackmun, concurring in part, dissenting in part, "the risk that jurors would understand "moral certainty" to authorize convictions based in part on value judgments regarding the defendant's behavior is particularly high in cases where the defendant is alleged to have committed a repugnant or brutal crime." Id. at 1258. The charge given in this case, when considered in context, unfairly reduced the State's burden of proof and violated due process.

51

**Proposition of Law Twelve:**

**The death penalty may not be sustained where the cumulative errors that occurring in in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.**

The combination of errors by the trial court, the prosecution and the ineffectiveness of the defense counsel deprived the appellant of a fair trial. The errors, if not individually, combined to cause the trial to be constitutionally infirm. State v. DeMarco (1987), 31 Ohio St.3d 191. These errors, as addressed in the Proposition of Laws in this brief, combined to violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

52

**Proposition of Law Thirteen:**

**The death penalty cannot be upheld where the reviewing court fails to follow the statutory provisions regarding the proportionality review of the defendant's sentence.**

The state of Ohio's purported proportionality review is best summarized by the dissent of Justice Paul Pfeifer, on of the authors of Ohio's death penalty statute, in Ohio v. Murphy, 91 Ohio St.3d 516 at 563-564 (2001). Justice Pfeiffer called Ohio's failure to properly address the proportionality statute as "ethically indefensible."

> We are required by statute to conduct a proportionality review in which we "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). This court has construed this language to limit review to similar cases in which the death penalty was imposed. State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. However, the "similar cases" language of R.C. 2929.05(A) is ambiguous. A narrow interpretation, such as this court's current one, is a possibility. Another is that "similar cases" refers more broadly to all factually similar cases, whether or not a capital specification was charged or proved.
>
> In my view, Murphy should be compared to the universe of all Ohio cases in which a person was killed during the course of a robbery, not just to cases in which a person was killed during the course of a robbery and in which a sentence of death was imposed. When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality. The lowest common denominator becomes the standard. *This result is ethically indefensible.* (Emphasis added)

Ohio's proportionality statute O.R.C. §2929.05, mandated the Ohio Supreme Court to conduct a proportionality review with, as Justice Pfeiffer, with the entire universe of similarly charged defendants, not just those who actually receive the death penalty. Because the latter standard is being implemented, there is no review being carried out as was intended by the state's

legislature.  Not surprisingly, the Ohio Supreme court has never reversed a sentence of death because it was disproportionate.  There is always a similarly convicted defendant who has received the death penalty.  If one other person has received the penalty of death, then the sentence is proportional.

It is understood that there is no federal constitutional right to a proportionality review of one's sentence of death.  Pulley v. Harris, 465 U.S. 37 (1984).  Thus, the question here is whether the Ohio statute has created a liberty interest for the defendant that the state may not ignore.  The answer here is unequivocally "yes." The failure of the Ohio courts to protect this interest is violative of federal due process.

In addition, O.R.C. §2929.05 plays an essential part in the narrowing requirement of Ohio's statutory scheme.  Ohio's narrowing is not simply limited to the designation of aggravators  pursuant to O.R.C. §2929.04(A).  The legislature include the proportionality statute to further narrow the death-eligible defendants.  The failure of the Ohio Supreme Court to carry-out the scheme renders the statutory framework unconstitutional.  Zant v. Stephens, 462 U. S. 862, 877 (1983).

When the Ohio Legislature reenacted the death penalty, it required the appellate courts of Ohio to conduct a proportionality review of any death sentence that it reviews. O.R.C. §2929.05. (attached hereto). O.R.C. Section 2929.05(A) provides that Ohio Appellate courts shall make a de novo review of all the evidence and facts in the case to determine if the sentence of death is appropriate: "In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in other cases." The statute mandates that Ohio appellate courts perform a

54

cross-case proportionality review to determine appropriateness and excessiveness in the sentence. Cross-case proportionality review is an additional safeguard against the arbitrary and capricious sentencing condemned in Furman v. Georgia, 408 U.S. 238 (1972).

To ensure that the courts had a sufficient body of data by which to conduct a proportionality review, the Legislature created an information-gathering system for capital cases. O.R.C. § 2929.021  R.C. §2929.03(G), and §2929.05(A). The trial courts in Ohio have consistently ignored the dictates of these Legislative mandates, thereby creating a proportionality system that is arbitrarily and capriciously implemented such that it is tilted toward death.

The Ohio Legislature has insisted that prior, to any individual being executed a proportionality review, *made in the context of a defined data base*, must be undertaken. O.R.C. § 2929.05(A). Such a proportionality review is the 'scheme' to 'provide adequate standards to guide the decision' of the appellate and Supreme courts' upholding and ultimately affirming the imposition of a death sentence. This proportionality scheme serves to limit the appellate and Supreme courts' discretion, to guide the court in upholding and giving effect to the ultimate sentence.  In this regard, if any state court acts with significant discretion in affording a Appellant his statutory rights, it must also act in accordance with the Due Process Clause of the United States Constitution. See Evitts v. Lucey, 469 U.S. 387 (1985); Goldberg v. Kelly, 397 U.S. 254 (1970).  Without honest comparative proportionality review, there is absolutely no guarantee that similarly situated defendants, charged and convicted for similar crimes, will not be treated differently. Without honest comparative proportionality review there is an abuse of discretion, because the courts' discretion must be guided by the Legislatively mandated data base against which that proportionality review is to be conducted.  Without honest comparative

55

proportionality review irrationality and arbitrariness, even discrimination, are likely to be the norm. Consequently, Appellant has a due process and a corresponding liberty interest in having a properly undertaken proportionality review.

In State v. Steffen, 31 Ohio St. 3d 111 (1987), the Ohio Supreme Court held that "the proportionality review required by O.R.C. §2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." Id., at 123-124. However, the appellant asserts that only reviewing cases in which the death penalty was imposed does not result in a fair proportionality review. Instead, it results in a system without meaningful analysis, void of unbiased comparisons and it also serves to "rubber stamp" all death verdicts.

The proportionality review prescribed in State v. Steffen, has been defined by legal scholars as the "precedent seeking" method of proportionality review. See e.g., Baldus, Pulaski and Woodworth, Comparative Review of Death Sentences:  An Empirical Study of the Georgia Experience, Journal of Criminal Law and Criminology, p. 661 (1984). Under the "precedent-seeking" method, the cases compared by the courts of appeals are limited to the few cases where a capitally indicted defendant is sentenced to death. The Courts are limited to comparing only those cases in which death sentences have been affirmed.

Ohio's proportionality statutes very specifically inform the appellate and Supreme Courts and that they "shall" create a very specific database, (O.R.C. §2929.02 and .03), and that they "shall" make a proportionality review in the context of that data base.

As will be further discussed infra, in Ohio v. Jenkins, 5 Ohio St.3d 164, 208-209, (1987), the Ohio Supreme Court acknowledged the Ohio Legislature's purpose behind mandating the

56

specific information sought to be collected in §2929.02 and .03:

> To aid the courts in conducting their proportionality review under O.R.C.
> 2929.05, O.R.C. 2929.021 *requires* that certain information be provided to the
> Ohio Supreme Court with respect to capital indictments issued or dismissed.
> Also, under O.R.C. 2929.03(F), trial judges rendering opinions in capital cases
> *are required* to file copies of those opinions with their court of appeals and with
> the Ohio Supreme Court. O.R.C. 2929.05(A) also *requires* courts of appeals to
> file copies of their sentencing opinions with the Ohio Supreme Court. *The
> purpose of these provisions is to provide the reviewing courts with some basis for
> reviewing the proportionality of the imposition of the death sentence in
> comparison with sentences entered in similar cases.* (emphasis added)

the Ohio Legislature required the court or panel to write a decision when a life sentence was

imposed:

> The court or the panel of three judges, when it imposes sentence of death, shall state in a
> separate opinion its specific findings as to the existence of any of the mitigating factors
> set forth in division (B) of section 2929.04 of the Revised Code, the existence of any
> other mitigating factors, the aggravating circumstances the offender was found guilty of
> committing, and the reasons why the aggravating circumstances the offender was found
> guilty of committing were sufficient to outweigh the mitigating factors. The court or
> panel, when it imposes life imprisonment under division (D) of this section, shall state in
> a separate opinion its specific findings of which of the mitigating factors set forth in
> division (B) of Section 2929.04 of the Revised Code it found to exist, what other
> mitigating factors it found to exist, what aggravating circumstances the offender was
> found guilty of committing, and why it could not find that these aggravating
> circumstances were sufficient to outweigh the mitigating factors. The Court or panel
> shall file the opinion required to be prepared by this division with the Clerk of the
> appropriate Court of Appeals and with the Clerk of the Supreme Court within fifteen days
> after the court or panel imposes sentence. The judgment in a case in which a sentencing
> hearing is held pursuant to this section is not final until the opinion is filed.

R.C. §2929.03(F)

The statute is clear and concise: when the court imposes a life sentence, it shall make

specific findings. There exists no rational reason to have a trial judge make findings of fact

when (s)he rejects a jury's death recommendation and not make such findings when (s)he accepts

57

a life recommendation.  In both cases, findings of fact are needed to have a complete data bank for the purposes of O.R.C. §§ 2929.021; 2929.03(G), and 2929.05(A).

There "is a qualitative difference between death and any other permissible form of punishment," and hence, " 'a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " Zant v. Stephens, 462 U.S. 862, 884-885, 103 S.Ct. 2733, 2746-2747, 77 L.Ed.2d 235 (1983), quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.).

By only considering cases in which the death penalty has been imposed, it is the equivalent of having an automatic rule of affirmance, which, in a weighing state like Ohio, is unconstitutionally invalid. Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982). Since 1981, not one Ohio court has found that a death sentence is disproportionate. This is the best evidence available that the proportionality review sanctioned in State v. Steffen is unfair.

The failure to properly conduct a meaningful proportionately review is violative of the Due Process Clause of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

58

**Proposition of Law Fourteen:**

**The death penalty is unconstitutional as presently administered in Ohio.**

The Eighth Amendment to the United States Constitution and Article I, § 9 of the Ohio Constitution prohibit the infliction of cruel and unusual punishment. The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660 (1962). Punishment that is "excessive" constitutes cruel and unusual punishment. Coker v. Georgia, 433 U.S. 584 (1977). The underlying principle of governmental respect for human dignity is the Court's guideline to determine whether this statute is constitutional. See Furman v. Georgia, 408 U.S. 238 (1972) (Brennan, J., concurring); Rhodes v. Chapman, 452 U.S. 337, 361 (1981); Trop v. Dulles, 356 U.S. 86 (1958). The Ohio scheme offends this bedrock principle in the following ways:

**A.      Arbitrary and unequal punishment**

The Fourteenth Amendment's guarantee of equal protection requires similar treatment of similarly situated persons. This right extends to the protection against cruel and unusual punishment. Furman, 408 U.S. at 249 (Douglas, J., concurring). A death penalty imposed in violation of the Equal Protection guarantee is a cruel and unusual punishment. See id. Any arbitrary use of the death penalty also offends the Eighth Amendment. Id.

Ohio's capital punishment scheme allows the death penalty to be imposed in an arbitrary and discriminatory manner in violation of Furman and its progeny. Prosecutors' virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because they lacked standards for imposition of a death sentence and were therefore removed from judicial review.

59

Woodson v. North Carolina, 428 U.S. 280 (1976).  Prosecutors' uncontrolled discretion violates this requirement.

Ohio's system imposes death in a racially discriminatory manner.  Blacks and those who kill white victims are much more likely to get the death penalty.  While African-Americans are less than twenty percent of Ohio's population, about half of Ohio's death row inmates are African-American.  (See Death Penalty Statistics, maintained by the Office of the Ohio Public Defender, as of Jan. 24, 2000).  While few Caucasians are sentenced to death for killing African-Americans, over thirty African-Americans sit on Ohio's death row for killing a Caucasian.

Ohio's statistical disparity is consistent with national findings.  The General Accounting Office found victim's race influential at all stages, with stronger evidence involving prosecutorial discretion in charging and trying cases.  "Death Penalty Sentencing:  Research Indicates Pattern of Racial Disparities," U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (February 1990).

Ohio courts have not evaluated the implications of these racial disparities.  While the General Assembly established a disparity appeals practice in post-conviction that may encourage the Ohio Supreme Court to adopt a rule requiring tracking the offender's race, Ohio Rev. Code §2953.21(A)(2), no rule has been adopted.  Further, this practice does not track the victim's race and does not apply to crimes committed before July 1, 1996.  In short, Ohio law fails to assure against race discrimination playing a role in capital sentencing.

Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest.  Commonwealth v. O'Neal II, 339 N.E.2d 676, 678 (Mass. 1975) (Tauro, C.J., concurring); Utah v. Pierre, 572 P.2d 1338 (Utah 1977) (Maughan, J., concurring

60

and dissenting).  Moreover, where fundamental rights are involved personal liberties cannot be broadly stifled "when the end can be more narrowly achieved."  Shelton v. Tucker, 364 U.S. 479 (1960).  The United States Supreme Court has recognized that the fundamental right to "life" deserves the highest protection possible under the Fourteenth Amendment's protection of "life, liberty and property."  Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998) (five Justices recognized a distinct "life" interest protected by the Due Process Clause in all stages of a capital case, above and beyond protected liberty and property interests).  Death is different; for that reason more process is due, not less.  See Lockett v. Ohio, 438 U.S. 586 (1978); Woodson v. North Carolina, 428 U.S. 280 (1976).  To imperil this protected, fundamental life interest, the State must show that it is the "least restrictive means" to a "compelling governmental end."  O'Neal, 339 N.E.2d at 678.

Despite the most exhaustive research by noted experts in the field, there is no convincing evidence that the death penalty is a deterrent superior to lesser punishment.  "In fact, the most convincing studies point in the opposite direction."  Id. at 682.  Studies in Ohio, more particularly, have similarly failed to show any deterrent effect by imposition of the death penalty.  Over twenty years ago, a study spanning fifty (50) years of executions in Ohio found no evidence that executions have any discernible negative effect on homicide rates.  Ohio Legisl. Serv. Comm'n., Capital Punishment (1961).  See also Bailey, The Deterrent Effect of the Death Penalty for Murder in Ohio. A Time-Series Analysis, 28 Cleve. St. L. Rev. 51, 68, 70 (1979).  The Supreme Court of Ohio has not addressed the issue of lack of evidence supporting deterrence in its previous decisions upholding the death penalty.

The death penalty is neither the least restrictive nor an effective means of deterrence.

61

Both isolation of the offender and retribution can be effectively served by less restrictive means. Society's interests do not justify the death penalty.

**B.      Unreliable sentencing procedures**

The Due Process and Equal Protection Clauses prohibit arbitrary and capricious procedures in the State's application of capital punishment. Gregg v. Georgia, 428 U.S. 153, 188, 193-95 (1976); Furman, 408 U.S. at 255, 274. Ohio's scheme does not meet those requirements. The statute does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty.

The statutory scheme is unconstitutionally vague which leads to the arbitrary imposition of the death penalty. The language "that the aggravating circumstances ... outweigh the mitigating factors" invites arbitrary and capricious jury decisions. "Outweigh" preserves reliance on the lesser standard of proof by a preponderance of the evidence. The statute requires only that the sentencing body be convinced beyond a reasonable doubt that the aggravating circumstances were marginally greater than the mitigating factors. This creates an unacceptable risk of arbitrary or capricious sentencing.

Additionally, the mitigating circumstances are vague. The jury must be given "specific and detailed guidance" and be provided with "clear and objective standards" for their sentencing discretion to be adequately channeled. Gregg; Godfrey v. Georgia, 446 U.S. 420 (1980).

Ohio courts continually hold that the weighing process and the weight to be assigned to a given factor is within the individual decision-maker's discretion. State v. Fox, 69 Ohio St. 3d 183, 193, 631 N.E.2d 124, 132 (1994). Giving so much discretion to juries inevitably leads to

62

arbitrary and capricious judgments.

Empirical evidence is developing in Ohio and around the country that, under commonly used penalty phase jury instructions, juries do not understand their responsibilities and apply inaccurate standards for decision. See Cho, Capital Confusion: The Effect of Jury Instructions on the Decision To Impose Death, 85 J. Crim. L. & Criminology 532, 549-557 (1994), and findings of Zeisel discussed in Free v. Peters, 12 F.3d 700 (7th Cir. 1993). This confusion violates the Federal and State Constitutions. Because of these deficiencies, Ohio's statutory scheme does not meet the requirements of Furman and its progeny.

**C.      Induced ineffective assistance of counsel and denial of an impartial jury**

Ohio's capital statutory scheme provides for a sentencing recommendation by the same jury which determines the facts at trial if Defendant is found guilty. This procedure violates Defendant's rights to effective assistance of counsel and to a fair trial before an impartial jury as guaranteed by the State and Federal Constitutions.

Ohio's bifurcated capital trial process with the same jury violates Defendant's right to effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution; McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970); Powell v. Alabama, 287 U.S. 45, 47 (1932); Ohio Const. art. I §§ 10 & 16; State v. Hester, 45 Ohio St. 2d 71, 341 N.E.2d 304 (1976).

First, under the operation of the current statute, if counsel argues to the jury a defense which loses at the guilt phase of the trial, in effect he is forced to simultaneously destroy Defendant's credibility prior to the start of the trial's sentencing phase. By invoking the defendant's right to strenuously argue for his innocence in the first phase, a loss for the defense

63

in the first phase means that counsel will have significantly reduced the credibility desperately needed to successfully argue for a life sentence.

The legislature should have eliminated this constitutional dilemma by providing for two separate juries, the first for determining guilt and the second for determining punishment. It is respectfully suggested that at the second trial the prosecuting attorney would be allowed to reiterate the specific evidence of aggravating circumstances. This proposed order of trial would eliminate the impairment of the right to have a defense presented with the effective assistance of counsel. The State essentially has "prevented (counsel) from assisting the accused during a critical stage of the proceeding." United States v. Cronic, 466 U.S. 648, 659, n.25 (1984). This creates constitutional error without any showing of prejudice necessary. Id.

The State's claim that it has an interest in having a single jury for both phases of the trial and that this should surmount the Defendant's right to a fair and impartial trial phase jury is also belied by the Attorney General's recent efforts in the Ohio legislature (through H.B. 585 and S.B. 258, introduced early 1996) to require that a second jury be selected for purposes of resentencing trials when a capital defendant's death sentence is overturned on appeal. The Attorney General's present claim that this two-jury practice would be workable and inexpensive flies in the face of the State's earlier urgings against just such a two-jury practice at the initial trial. The State cannot have it both ways, and the capital criminal justice system must not force defendants into trial before a less than impartial jury. No Ohio court has yet considered the impact that the State's contradictory positions have on the fairness of the present capital scheme.

Under Ohio's death penalty statutory scheme, an intolerable risk exists that a defendant's life may be put in the hands of a hostile venire, which in effect creates uncertainty in the

64

reliability of the determination reached.  Such a risk cannot be tolerated in a capital case.  Beck v. Alabama, 447 U.S. 625, 638 (1980).  Therefore, the statute must be struck down as an unconstitutional violation of Defendant's right to an impartial jury under the State and Federal constitutions.

**D.      Lack of individualized sentencing**

The Ohio statutes are unconstitutional because they require proof of aggravating circumstances in the trial phase of the bifurcated proceeding.  The Supreme Court of the United States has approved schemes that separate the consideration of aggravating circumstances from the determination of guilt.  Those schemes provide an individualized determination and narrow the category of defendants eligible for the death penalty.  See Zant v. Stephens, 462 U.S. 862 (1983); Barclay v. Florida, 463 U.S. 939 (1983).  Ohio's statutory scheme cannot provide for those constitutional safeguards.

The jury must be free to determine whether death is the appropriate punishment for a defendant.  Requiring proof of the aggravating circumstances simultaneously with proof of guilt effectively prohibits a sufficiently individualized determination in sentencing as required by post-Furman cases.  See Woodson, 428 U.S. at 961.  This is especially prejudicial because this is accomplished without consideration of any mitigating factors.

**E.      Defendant's right to a jury is burdened**

The Ohio scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial.  A defendant who pleads guilty or no contest benefits from a trial judge's discretion to dismiss the specifications "in the interest of justice."  Ohio R. Crim. P. 11(C)(3).  Accordingly, the capital indictment may be

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1518

dismissed regardless of mitigating circumstances.  There is no corresponding provision for a capital defendant who elects to proceed to trial before a jury.

Justice Blackmun found this discrepancy to be constitutional error.  <u>Lockett v. Ohio</u>, 438 U.S. 586, 617 (1978) (Blackmun, J., concurring).  This disparity violated <u>United States v. Jackson</u>, 390 U.S. 570 (1968), and needlessly burdened the defendant's exercise of his right to a trial by jury.  Since the Supreme Court's decision in <u>Lockett</u>, this infirmity has not been cured and Ohio's statute remains unconstitutional.

**F.      Mandatory submission of reports and evaluations**

Ohio's capital statutes are unconstitutional because they require submission of the pre-sentence investigation report and the mental evaluation to the jury or judge once requested by a capital defendant.  Ohio Rev. Code §2929.03(D)(1).  This mandatory submission prevents defense counsel from giving effective assistance and prevents the defendant from effectively presenting his case in mitigation.

**G.      The definition of mitigating factors in Ohio Rev. Code §2929.04(B)(7) violates the reliability component of the Eighth Amendment**

"Any other factors that are relevant to the issue of whether the offender should be sentenced to <u>death</u>" may be introduced as mitigation under Ohio Rev. Code §2929.04(B)(7) (emphasis added).  The court's charge and the definition in Ohio Rev. Code §2929.04(B)(7) are unconstitutional.  Both permit the sentencer to convert (B)(7) mitigation into reasons for imposing death.

The Eighth Amendment requires that the class of death eligible offenders be narrowly and rationally guided by state law.  <u>McCleskey v. Kemp</u>, 481 U.S. 279, 305 (1987).  In Ohio, the

66

factors that make a defendant death-eligible are detailed in Ohio Rev. Code §2929.04(A). The (B)(7) definition eviscerates the narrowing achieved by Ohio Rev. Code §2929.04(A) because it literally invites the sentencer to consider any factor relevant to imposing death. That language creates a "reasonable likelihood" that the sentencer will view proffered (B)(7) mitigation as a nonstatutory aggravator, rather than evidence that weighs against a death sentence. See Stringer v. Black, 503 U.S. 222, 231-235 (1992); Boyde v. California, 494 U.S. 370, 380-81 (1990).

The (B)(7) definition also precludes the jury from giving mitigating evidence its full consideration and effect. The intent was to allow the jury to consider all relevant evidence supporting a life sentence. See Lockett v. Ohio, 438 U.S. 586; see also O.R.C §2929.04(C). Poor wording frustrates the General Assembly's intent. The definition shifts the focus of the (B)(7) mitigating evidence to reasons to impose a death sentence. Because (B)(7) mitigating evidence can be construed as an aggravating factor, it is stripped of its full mitigating effect. To satisfy the Eighth Amendment, each actor in the capital sentencing scheme must be able to give consideration and full mitigating effect to all relevant mitigating evidence offered by the defendant. Penry v. Lynaugh, 492 U.S. 302; Eddings v. Oklahoma, 455 U.S. 104; Lockett, 438 U.S. 586. See Graham v. Collins, 506 U.S. 461, 510 (1993) (Souter, J. dissenting).

**H.    Ohio Rev. Code §2929.04(A)(7) is constitutionally invalid when used to aggravate Ohio Rev. Code §2903.01(B) aggravated murder**

"[T]o avoid [the] constitutional flaw of [vagueness and over breadth under the Eighth Amendment], an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence of a defendant as compared to others found guilty of (aggravated) murder." Zant v. Stephens, 462 U.S. 862, 877

67

(1983). Ohio's statutory scheme fails to meet this constitutional requirement because Ohio Rev. Code §2929.04(A)(7) fails to genuinely narrow the class of individuals eligible for the death penalty.

Ohio Rev. Code §2903.01(B) defines the category of felony-murderers. If any factor listed in Ohio Rev. Code §2929.04(A) is specified in the indictment and proved beyond a reasonable doubt the defendant becomes eligible for the death penalty. Ohio Rev. Code §§2929.02(A) and 2929.03.

The scheme is unconstitutional because the Ohio Rev. Code §2929.04(A)(7) aggravating circumstance merely repeats, as an aggravating circumstance, factors that distinguish aggravated felony-murder from murder. Ohio Rev. Code §2929.04(A)(7) repeats the definition of felony-murder as alleged, which automatically qualifies the defendant for the death penalty. Ohio Rev. Code §2929.04(A)(7) does not reasonably justify the imposition of a more severe sentence on felony-murderers. But, the prosecuting attorney and the sentencing body are given unbounded discretion that maximizes the risk of arbitrary and capricious action and deprivation of a defendant's life without substantial justification. The aggravating circumstance must therefore fail. Zant, 462 U.S. at 877.

As compared to other aggravated murderers, the felony-murderer is treated more severely. Each Ohio Rev. Code §2929.04(A) circumstance, when used in connection with Ohio Rev. Code §2903.01(A), adds an additional measure of culpability to an offender such that society arguably should be permitted to punish him more severely with death. But the aggravated murder defendant alleged to have killed during the course of a felony is automatically eligible for the death penalty - not a single additional proof of fact is necessary.

The killer who kills with prior calculation and design is treated less severely, which is also nonsensical because his blameworthiness or moral guilt is higher, and the argued ability to deter him

68

less.  From a retributive stance, this is the most culpable of mental states.  Comment, The Constitutionality of Imposing the Death Penalty for Felony Murder, 15 Hous. L. Rev. 356, 375 (1978).

Felony-murder also fails to reasonably justify the death sentence because the Supreme Court of Ohio has interpreted Ohio Rev. Code §2929.04(A)(7) as not requiring that intent to commit a felony precede the murder.  State v. Williams, 74 Ohio St. 3d 569, 660 N.E.2d 724, syl. 2 (1996). The asserted state interest in treating felony-murder as deserving of greater punishment is to deter the commission of felonies in which individuals may die.  Generally courts have required that the killing result from an act done in furtherance of the felonious purpose.  Id., referencing the Model Penal Code.  Without such a limitation, no state interest justifies a stiffer punishment.  The Ohio Supreme Court has discarded the only arguable reasonable justification for the death sentence to be imposed on such individuals, a position that engenders constitutional violations.  Zant v. Stephens, 462 U.S. 862 (1983).  Further, the Supreme Court of Ohio's current position is inconsistent with previous cases, thus creating the likelihood of arbitrary and inconsistent applications of the death penalty.  See, e.g., State v. Rojas, 64 Ohio St. 3d 131, 592 N.E.2d 1376 (1992).

Equal protection of the law requires that legislative classifications be supported by, at least, a reasonable relationship to legitimate State interests.  Skinner v. Oklahoma, 316 U.S. 535 (1941). The State has arbitrarily selected one class of murderers who may be subjected to the death penalty automatically.  This statutory scheme is inconsistent with the purported State interests.  The most brutal, cold-blooded and premeditated murderers do not fall within the types of murder that are automatically eligible for the death penalty.  There is no rational basis or any State interest for this distinction and its application is arbitrary and capricious.

69

I.    **Ohio Rev. Code §§2929.03(D)(1) and 2929.04 are unconstitutionally vague**

Ohio Rev. Code §2929.03(D)(1)'s reference to "the nature and circumstances of the aggravating circumstance" incorporates the nature and circumstances of the offense into the factors to be weighed in favor of death. The nature and circumstances of an offense are, however, statutory mitigating factors under Ohio Rev. Code §2929.04(B). Ohio Rev. Code §2929.03(D)(1) makes Ohio's death penalty weighing scheme unconstitutionally vague because it gives the sentencer unfettered discretion to weigh a statutory mitigating factor as an aggravator.

To avoid arbitrariness in capital sentencing, states must limit and channel the sentencer's discretion with clear and specific guidance. Lewis v. Jeffers, 497 U.S. 764, 774 (1990); Maynard v. Cartwright, 486 U.S. 356, 362 (1988). A vague aggravating circumstance fails to give that guidance. Walton v. Arizona, 497 U.S. 639, 653 (1990); Godfrey, 446 U.S. at 428. Moreover, a vague aggravating circumstance is unconstitutional whether it is an eligibility or a selection factor. Tuilaepa v. California, 512 U.S. 967 (1994). The aggravating circumstances in Ohio Rev. Code §2929.04(A)(1)-(8) are both.

Ohio Rev. Code §2929.04(B) tells the sentencer that the nature and circumstances of the offense are selection factors in mitigation. Moreover, because the nature and circumstances of the offense are listed only in Ohio Rev. Code §2929.04(B), they must be weighed only as selection factors in mitigation. See State v. Wogenstahl, 75 Ohio St. 3d 344, 356, 662 N.E.2d 311, 321-22 (1996). However, the clarity and specificity of Ohio Rev. Code §2929.04(B) is eviscerated by Ohio Rev. Code §2929.03(D)(1); selection factors that are strictly mitigating become part and parcel of the aggravating circumstance.

Despite wide latitude, Ohio has carefully circumscribed its selection factors into mutually

70

exclusive categories. See Ohio Rev. Code §2929.04(A) and (B); Wogenstahl, 75 Ohio St. 3d at 356, 662 N.E.2d at 321-22. Ohio Rev. Code §2929.03(D)(1) makes Ohio Rev. Code §2929.04(B) vague because it incorporates the nature and circumstances of an offense into the aggravating circumstances. The sentencer cannot reconcile this incorporation. As a result of Ohio Rev. Code §2929.03(D)(1), the "nature and circumstances" of any offense become "too vague" to guide the jury in its weighing or selection process. See Walton, 497 U.S. at 654. Ohio Rev. Code §2929.03(D)(1) therefore makes Ohio Rev. Code §2929.04(B) unconstitutionally arbitrary.

Ohio Rev. Code §2929.03(D)(1) is also unconstitutional on its face because it makes the selection factors in aggravation in Ohio Rev. Code §2929.04(A)(1)-(8) "too vague." See Walton, 497 U.S. at 654. Ohio Rev. Code §2929.04(A)(1)-(8) gives clear guidance as to the selection factors that may be weighed against the defendant's mitigation. However, Ohio Rev. Code §2929.03(D)(1) eviscerates the narrowing achieved. By referring to the "nature and circumstances of the aggravating circumstance," Ohio Rev. Code §2929.03(D)(1) gives the sentencer "open-ended discretion" to impose the death penalty. See Maynard, 486 U.S. at 362. That reference allows the sentencer to impose death based on (A)(1)-(8) plus any other fact in evidence arising from the nature and circumstances of the offense that the sentencer considers aggravating. This eliminates the guided discretion provided by Ohio Rev. Code §2929.04(A). See Stringer, 503 U.S. at 232.

**J.     Inadequate proportionality and appropriateness review**

Ohio Revised Code §§2929.021 and 2929.03 require data be reported to the courts of appeals and to the Supreme Court of Ohio. There are substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses or after charge reductions at trial. Ohio Rev. Code §2929.021 requires only minimal information on these cases. Additional data is necessary to

71

make an adequate comparison in these cases. This prohibits adequate appellate review.

Adequate appellate review is a precondition to the constitutionality of a state death penalty system. Zant, 462 U.S. at 879; Pulley v. Harris, 465 U.S. 37 (1984). The standard for review is one of careful scrutiny. Zant, 462 U.S. at 884-85. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. Id.

Ohio's statutes' failure to require the jury or three-judge panel recommending life imprisonment to identify the mitigating factors undercuts adequate appellate review. Without this information, no significant comparison of cases is possible. Without a significant comparison of cases, there can be no meaningful appellate review.

The comparison method is also constitutionally flawed. Review of cases where the death penalty was imposed satisfies the proportionality review required by Ohio Rev. Code §2929.05(A). State v. Steffen, 31 Ohio St. 3d 111, 509 N.E.2d 383, syl. 1 (1987). However, this prevents a fair proportionality review. There is no meaningful manner to distinguish capital defendants who deserve the death penalty from those who do not.

In Supreme Court of Ohio decisions, only other death sentences will be considered. State v. Zuern, 32 Ohio St. 3d 56, 64-65, 512 N.E.2d 585, 593-594 (1987); State v. Steffen, 31 Ohio St. 3d 111, 509 N.E.2d 383 (1987); State v. Stumpf, 32 Ohio St. 3d 95, 512 N.E.2d 598 (1987). The Court now disavows any ability to assure equal treatment of all capital defendants. Zuern, 32 Ohio St. 3d at 64, 512 N.E.2d at 593. While it acknowledges "[t]he purpose of a proportionality review is therefore to insure that the death penalty is not imposed in a random freakish, arbitrary or capricious manner," the Court's present review provides no means of achieving this. Id.

72

The Court claims "Ohio's system well documents why particular murderers receive the death sentence, which has removed the vestiges of arbitrariness." Id. at 64, 65, 512 N.E.2d at 594. However, that documentation, provided by collection of life sentence opinions and dispositions, is never consulted by the Ohio Supreme Court. The Ohio Supreme Court refuses to consider life sentence cases, even when they are presented to them by the capital defendant/appellant. See Stumpf, 32 Ohio St. 3d at 106-107, 512 N.E.2d at 609-610. The Court simply states it need not consider these, then does not. Id.

In fact, the Supreme Court of Ohio has proven itself unwilling to undertake meaningful review of any issues in capital cases. In State v. Poindexter, 36 Ohio St. 3d 1, 520 N.E.2d 568 (1988), the Court determined that it need not give any consideration to errors raised by a capital appellant. The Court held that when issues of law in capital cases have been considered and decided by the Court and are raised again in a subsequent capital case, the Court will summarily dispose of the issues in all following cases.

In State v. Spisak, 36 Ohio St. 3d 80, 521 N.E.2d 800 (1988), the Court demonstrated the extent to which it applies the Poindexter ban on review. Upon being presented with a brief containing sixty-four (64) propositions of law and exceeding four hundred ninety-four (494) pages, the court refused to review practically all of these errors and filed a four and one-half page opinion. Instead the court chastised appellant for vigorously exercising his rights to raise error on appeal. Id. at 82, 521 N.E.2d at 802.

In Ohio, the right to meaningful appellate review has been reduced to the right of having no review at all under Poindexter and Spisak. The constitutional requirement of meaningful appellate review recognized by Zant, Pulley and Barclay, is flagrantly violated by the Ohio courts. Under

73

present Ohio "review" standards, capital appellants may raise errors, but by doing so they open themselves to criticism for seeking review.  The only "guarantee" under present review standards is that Ohio courts can ignore the appellate errors raised.  This situation is constitutionally intolerable.

The Ohio Supreme Court's statement that the system "well documents" why a death sentence is imposed could not be more wrong.  So far as one can discern, all these collected documents reflecting why many persons received life sentences are laying in totally ignored files in the clerk's office.  The Supreme Court of Ohio has no notion of whether the death case before them represents a departure from a common practice of life sentencing on the same facts since they refuse to consider their "collected documents."

The defendant agrees that the appellate courts' responsibility to assure against arbitrary sentencing does not require absolute equal treatment among capital defendants and does not require that every possibility of arbitrariness be obliterated.  But, as the Supreme Court of the United States recently stated, the Eighth Amendment is offended if there is "a significant risk of arbitrary sentencing" that is unchecked.  McCleskey v. Kemp, 481 U.S. 279 (1987).  In McCleskey, the Court required "rationality in the system" and approved Georgia's practice of reviewing the proportionality of sentences as achieving "a reasonable level of proportionality" among the class of eligible defendants.  Id. 481 U.S. at 298.  Georgia reviews life sentences, and actively compares life and death sentences.  Zant, 462 U.S. at 879.

The Court's appropriateness analysis is also constitutionally infirm. Ohio Rev. Code §2929.05(A) requires appellate courts to determine the appropriateness of the death penalty in each case.  The statute directs affirmance only where the court is persuaded that the aggravating

74

circumstances outweigh the mitigating factors and that death is the appropriate sentence. Id. The Court has not followed these dictates. The appropriateness review conducted is very cursory. It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." Spaziano v. Florida, 468 U.S. 447, 460 (1984).

The cursory appropriateness review also violates the capital defendant's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. The General Assembly provided capital appellants with the statutory right of proportionality review. When a state acts with significant discretion, it must act in accordance with the Due Process Clause. Evitts v. Lucey, 469 U.S. 387, 401 (1985). The review currently used violates this constitutional mandate. An insufficient proportionality review violates due process, liberty interest in Ohio Rev. Code §2929.05.

**K.    Mandatory death penalty and failure to require appropriateness analysis**

The Ohio death penalty statutory scheme precludes a mercy option, either in the absence of mitigation or when the aggravating circumstances "outweigh" the mitigating factors. The statutes in those situations mandate that death shall be imposed. Ohio Rev. Code §§2929.03, 2929.04. The sentencing authority is impermissibly limited in its ability to return a life verdict by this provision.

In Gregg, the United States Supreme Court stated, "nothing" in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. 428 U.S. at 199. Gregg held only that, "in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Id. Gregg requires the State to establish, according to constitutionally sufficient criteria

75

of aggravation and constitutionally mandated procedures, that capital punishment is appropriate for the defendant. Nothing requires the State to execute defendants for whom such a finding is made. Indeed the Georgia statute, approved in Gregg as being consistent with Furman, permits the jury to make a binding recommendation of mercy even though the jury did not find any mitigating circumstances in the case. Fleming v. Georgia, 240 S.E.2d 37 (Ga. 1977); Hayes v. Georgia, 282 S.E.2d 208 (Ga. 1981). Subsequent to Lockett, the Fifth and Eleventh Circuits repeatedly reviewed and remanded cases for error in the jury instructions when the trial court failed to clearly instruct the jury that they had the option to return a life sentence even if the aggravating circumstances outweighed mitigation. Chenault v. Stynchcombe, 581 F.2d 444 (5th Cir. 1978); Spivey v. Zant, 661 F.2d 464 (5th Cir. 1981); Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1981); Westbrooke v. Zant, 704 F.2d 1487 (11th Cir. 1983); Tucker v. Zant, 724 F.2d 882 (11th Cir. 1984); Gray v. Lucas, 677 F.2d 1086 (5th Cir. 1982); Prejean v. Blackburn, 570 F. Supp. 985 (D. La. 1983).

Capital sentencing that is constitutionally individualized requires a mercy option. An individualized sentencing decision requires that the sentencer possess the power to choose mercy and to determine that death is not the appropriate penalty for this defendant for this crime. In Barclay v. Florida, 463 U.S. at 950, the Court stated that the jury is free to "determine whether death is the appropriate punishment."

Absent the mercy option, the Defendant faces a death verdict resulting from Lockett-type statute, i.e., a statute that mandated a death verdict in the absence of one of three specific mitigating factors. Under current Ohio law, the sentencer lacks the option of finding a life sentence appropriate in the face of a statute which requires that when aggravating circumstances outweigh mitigating factors "it shall impose a sentence of death on the offender." Ohio Rev. Code §2929.03(D)(3).

76

A non-mandatory statutory scheme that affords the jury the discretion to recommend mercy in any case "avoids the risk that the death penalty will be imposed in spite of factors 'too intangible to write into a statute' which may call for a less severe penalty, and avoidance of this risk is constitutionally necessary." Conner v. Georgia, 303 S.E.2d 266, 274 (Ga. 1983). Other state courts have also required a determination of "appropriateness" beyond mere weighing of aggravating circumstances and mitigating factors. California v. Brown, 726 P.2d 516 (Cal. 1985), rev'd on other grounds, 479 U.S. 538 (1987).

In California v. Brown, 479 U.S. 538, 543 (1987), the Supreme Court repeated "the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case." In Brown, the Court agreed that jurors may be cautioned against reliance on "extraneous emotional factors," and that it was proper to instruct the jurors to disregard "mere sympathy." Id. This instruction referred to the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase. The Court's analysis clearly approved and mandated that jurors be permitted to consider mercy, i.e., sympathy tethered or engendered by the penalty phase evidence.

The Ohio statute does not permit an appropriateness determination; a death sentence is mandated after a mere weighing. Finally, while the Supreme Court of Ohio has claimed that a "jury is not precluded from extending mercy to a defendant," State v. Zuern, 32 Ohio St. 3d 56, 64, 512 N.E.2d 585, 593 (1987), Ohio jurors are not in fact informed of this capability. In fact, the Supreme Court of Ohio has permitted penalty phase jury instructions in direct contradiction to this extension of mercy capability. The Ohio "no-sympathy" instructions to juries do not in any way distinguish between "mere" sympathy (untethered), and that sympathy tied to the evidence presented in penalty

77

phase, and therefore commit the very violation of the Eighth Amendment which the California instruction had narrowly avoided.

While the Supreme Court of Ohio claims extending mercy is permissible in Ohio, and acknowledges that "[s]entencing discretion is an absolute requirement of any constitutionally acceptable capital punishment statute," id. at 65, 512 N.E.2d at 594, there is in fact no such indication on the statute's face, and no state court assurance that jurors are so informed. Bald, unsupported assertions of compliance with the constitution are inadequate.

**L.    Ohio's "beyond a reasonable doubt" standard**

1.    The statutes fail to require proof beyond all doubt as to guilt that aggravating circumstances outweigh mitigating factors, and the appropriateness of death as a punishment before the death sentence may be imposed.

The burden of proof required for capital cases should be proof beyond all doubt. The jury should be instructed during both phases that the law requires proof beyond all doubt of all the required elements. Most importantly, death cannot be imposed as a penalty except upon proof beyond all doubt of both the crime itself and the fact that the aggravating circumstances outweigh the mitigating factors.

Insistence on reliability in guilt and sentencing determination is a vital issue in the United States Supreme Court's capital decisions. This emphasis on the need for reliability and certainty is a product of the unique decision that must be made in every capital case - the choice of life or death. The Supreme Court has consistently emphasized the "qualitative difference" of death as a punishment, stating that "death profoundly differs from all other penalties" and is "unique in its severity and irrevocability." Woodson, 428 U.S. at 305; Lockett, 438 U.S. at 605; Gardner v. Florida, 430 U.S. 349 (1977); Gregg, 428 U.S. at 187.

78

Parole Authority v. Woodard, 523 U.S. 272 (1998) (five Justices recognized a distinct "life"

interest protected by the Due Process Clause in capital cases above and beyond liberty and property

interests).  The most stringent standard of proof that is "humanly possible" is proof beyond all doubt.

The American Law Institute's Model Penal Code, cited by the United States Supreme Court

as a statute "capable of meeting constitutional concerns," adopts the beyond-all-doubt standard at

the sentencing phase.  See Gregg v. Georgia, 428 U.S. 153, 191-195 (1976).  The Model Penal Code

mandates a life sentence if the trial judge believes that "although the evidence suffices to sustain the

verdict, it does not foreclose all doubt respecting the defendant's guilt."  Model Penal Code

§210.6(1)(f).  If the trial judge has any doubt of the defendant's guilt, life imprisonment is

automatically imposed without a sentencing hearing.  The words used are "all doubt," not merely

"doubt" or "reasonable doubt."

2.      Ohio's definition of proof "beyond a reasonable doubt" results in a burden of proof
        insufficiently stringent to meet the higher reliability requirement in capital cases at the guilt
        phase, and this has not been cured by appellate courts in their review of convictions or death
        sentences.

Ohio law provides standard jury instructions of "reasonable doubt" and "proof beyond a

reasonable doubt" as the applicable burden of proof in capital cases. Ohio Rev. Code §2901.05(D).

However, Ohio's definition actually articulates the standard for the lower burden of proof by a

preponderance of the evidence; thus unconstitutionally diluting Defendant's rights to a fair trial.  See

Cross v. Ledford, 161 Ohio St. 469, 120 N.E.2d 118 (1954); Holland v. United States, 348 U.S. 121

(1954); Scurry v. United States, 347 F.2d 468, 470 (D.C. Cir. 1965) (... [I]mportant affairs is the

traditional test for clear and convincing evidence ... The jury ... is prohibited from convicting unless

it can say beyond a reasonable doubt that defendant is guilty as charged. ... To equate the two in the

80

juror's mind is to deny the defendant the benefit of a reasonable doubt.).  State v. Crenshaw, 51 Ohio App. 2d 63, 65, 366 N.E.2d 84, 84-85 (1977); cf. State v. Nabozny, 54 Ohio St. 2d 195, 375 N.E.2d 784 (1978), vacated on other grounds, Nabozny v. Ohio, 439 U.S. 811 (1978); State v. Seneff, 70 Ohio App. 2d 171, 435 N.E.2d 680 (1980).

The Ohio reasonable doubt instructions fail to satisfy the requirement of reliability in a capital case.  Even in Winship, when considering the reasonable doubt standard, the Court stated that the fact finder must be convinced of guilt "with utmost certainty," and that the court must impress on the trier of fact the necessity of reaching a subjective state of certitude.  Winship, 397 U.S. at 363, 364.  Ohio's definition of a reasonable doubt is inadequate to meet even these standards.

3.  <u>The Ohio death penalty statutes fail to require that the jury consider as a mitigating factor pursuant to Ohio Rev. Code §2929.04(B) that the evidence fails to preclude all doubt as to the defendant's guilt.</u>

The language of Ohio Rev. Code §§2929.04(D)(2) contemplates a balancing process focusing upon the mitigating factors present in the case as compared to the offender's "guilt" with respect to the aggravating specifications.

In determining the appropriateness of the death penalty, the fact that the evidence presented failed to foreclose all doubt as to guilt must be considered as a relevant mitigating factor.  "The jury should have before it not only the prosecution's unilateral account of the offense but the defense version as well.  The jury should be afforded the opportunity to see the whole picture ... ."  California v. Terry, 390 P.2d 381 (Cal. 1964).  The failure to require jury consideration of the fact that the evidence does not foreclose all doubt as to guilt violates the constitutional standards established for the imposition of the death penalty.

81

**M.    Lethal Injection**

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a death sentence. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); Fierro v. Gomez, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous. Death is not extremely rapid or within a matter of seconds. Rather . . . inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains . . . acute anxiety, and struggling to breath"), aff'd, 77 F.3d 301, 308 (9th Cir. 1996), vacated on other grounds, 519 U.S. 918 (1996). Further, "[p]unishments are cruel when they involve . . . a lingering death." In re Kemmler, 136 U.S. 436, 447 (1890). A punishment is particularly constitutionally offensive if it involves the *foreseeable* infliction of suffering. Furman v. Georgia, 408 U.S. 238, 273 (1973), citing Resweber, supra (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

Under Defendants execution procedures for lethal injection, it is not only foreseeable but also predictable that death by lethal injection as it is currently carried out will produce unnecessary pain, torture, and lingering death. Far from producing a rapid and sustained loss of consciousness and a humane death, Defendants' means and methods of lethal injection can and will cause defendants to consciously suffer an excruciatingly painful and protracted death.

82

**N.**    **Sentencing an individual to death in violation of treaties to which the United States of America is a signatory violates the Supremacy Clause of the United States Constitution**

International law binds each of the states that comprise the United States. Ohio is bound by international law whether found treaty or in custom. Because the Ohio death penalty scheme violates international law, Defendant cannot be subjected to the possibility of the death penalty.

**1.    International law binds the State of Ohio**

"International law is a part of our law[.]" The Paquete Habana, 75 U.S. 677, 700 (1900). A treaty made by the United States is the supreme law of the land. Article VI, United States Constitution. Where state law conflicts with international law, it is the state law that must yield. See Zschernig v. Miller, 389 U.S. 429, 440 (1968); Clark v. Allen, 331 U.S. 503, 508 (1947); United States v. Pink, 315 U.S. 203, 230 (1942); Kansas v. Colorado, 206 U.S. 46, 48 (1907). The Paquete Habana, 175 U.S. at 700; The Nereide, 13 U.S. (9 Cranch) 388, 422 (1815); Asakura v. City of Seattle, 265 U.S. 332, 341 (1924). In fact, international law creates remediable rights for United States citizens. Filartiga v. Pena-Irala, 630 F.2d 876 (2nd Cir. 1980); Forti v. Suarez-Mason, 672 F.Supp. 1531 (N.D. Cal. 1987).

**2.    Ohio's obligations under charters, treaties, and conventions**

The United States's membership and participation in the United Nations and the Organization of American States creates obligations in all fifty states. Through the U.N. Charter, the United States committed itself to promote and encourage respect for human rights and fundamental freedoms. Art. 1(3). The United States bound itself to promote human rights in cooperation with the United Nations. Art. 55-56. The United States again proclaimed the fundamental rights of the individual

when it became a member of the Organization of American States.  OAS Charter, Art. 3.

The United Nations has sought to achieve its goal of promoting human rights and fundamental freedoms through the creation of numerous treaties and conventions. The United States has ratified several of these including:  the International Covenant on Civil and Political Rights (ICCPR) ratified in 1992, the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) ratified in 1994, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) ratified in 1994.   Ratification of these treaties by the United States expressed its willingness to be bound by these treaties.  Pursuant to the Supremacy Clause, the ICCPR, the ICERD, and the CAT are the supreme laws of the land.  As such, the United States must fulfill the obligations incurred through ratification.  President Clinton recently reiterated the United States's need to fulfill its obligations under these conventions when he issued Executive Order 13107.  In pertinent part, the Executive Order states:

> By the authority vested in me as President by the Constitution and the laws of the United States of America, and bearing in mind the obligations of the United States pursuant to the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), the Convention on the Elimination on All Forms of Racial Discrimination (CERD), and other relevant treaties concerned with the protection and promotion of human rights to which the United States is now or may become a party in the future, it is hereby ordered as follows:
>
> Section 1.  Implementation of Human Rights Obligations.
>
> (a)  It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under the international human rights treaties to which it is a party, including the ICCPR, the CAT, and the CERD.

84

Ohio is not fulfilling the United States's obligations under these conventions. Rather, Ohio's death penalty scheme violates each convention's requirements and thus must yield to the requirements of international law. See discussion infra Subsection 1.

**a.** **Ohio's statutory scheme violates the ICCPR's and ICERD's guarantees of equal protection and due process**

Both the ICCPR and the ICERD guarantee equal protection of the law. ICCPR Art. 2(1), 3, 14, 26; ICERD Art. 5(a). The ICCPR further guarantees due process via Articles 9 and 14, which includes numerous considerations including: a fair hearing (Art. 14(1)), an independent and impartial tribunal (Art. 14(1), the presumption of innocence (Art. 14(2)), adequate time and facilities for the preparation of a defense (Art. 14(3)(a)), legal assistance (Art. 14(3)(d)), the opportunity to call and question witnesses (Art. 14(3)(e)), the protection against self-incrimination (Art. 14(3)(g)), and the protection against double jeopardy (Art. 14(7)). However, Ohio's statutory scheme fails to provide equal protection and due process to capital defendants as contemplated by the ICCPR and the ICERD.

Ohio's statutory scheme denies equal protection and due process in several ways. It allows for arbitrary and unequal treatment in punishment. See discussion infra Section A. Ohio's sentencing procedures are unreliable. See discussion infra Section B. Ohio's statutory scheme fails to provide individualized sentencing. See discussion infra Section C. Ohio's statutory scheme burdens a defendant's right to a jury. See discussion infra Section D. Ohio's requirement of mandatory submission of reports and evaluations precludes effective assistance of counsel. See discussion infra Section E. Ohio Rev. Code §2929.04(B)(7) arbitrarily selects certain defendants who may be automatically eligible for death upon conviction. See discussion infra Section F. Ohio's

85

proportionality and appropriateness review is wholly inadequate.  See discussion infra Section I.  As a result, Ohio's statutory scheme violates the ICCPR's and the ICERD's guarantees of equal protection and due process.  This is a direct violation of international law and of the Supremacy Clause of the United States Constitution.

    **b.**    **Ohio's statutory scheme violates the ICCPR's protection against arbitrary execution**

The ICCPR speaks explicitly to the use of the death penalty.  The ICCPR guarantees the right to life and provides that there shall be no arbitrary deprivation of life.  Art. 6(1).  It allows the imposition of the death penalty only for the most serious offenses.  Art. 6(2).  Juveniles and pregnant women are protected from the death penalty.  Art. 6(5).  Moreover, the ICCPR contemplates the abolition of the death penalty.  Art. 6(6).

However, several aspects of Ohio's statutory scheme allow for the arbitrary deprivation of life.  Punishment is arbitrary and unequal.  See discussion infra Section A.  Ohio's sentencing procedures are unreliable.  See discussion infra Section B.  Ohio's statutory scheme lacks individualized sentencing.  See discussion infra Section C.  Ohio's statutory definition of the (B)(7) mitigator renders sentencing unreliable.  See discussion infra Section F.  The (A)(7) aggravator maximizes the risk of arbitrary and capricious action by singling one class of murders who may be eligible automatically for the death penalty.  See discussion infra Section G.  The vagueness of Ohio Rev. Code §§2929.03(D)(1) and 2929.04 similarly render sentencing arbitrary and unreliable.  See discussion infra Section H.  Ohio's proportionality and appropriateness review fails to distinguish those who deserve death from those who do not.  See discussion infra Section I.  As a result, executions in Ohio result in the arbitrary deprivation of life and thus violate the ICCPR's death

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1538

penalty protections. This is a direct violation of international law and a violation of the Supremacy Clause of the United States Constitution.

        **c.**    **Ohio's statutory scheme violates the ICERD's protections against race discrimination.**

The ICERD, speaking to racial discrimination, requires that each state take affirmative steps to end race discrimination at all levels. Art. 2. It requires specific action and does not allow states to sit idly by when confronted with practices that are racially discriminatory. However, Ohio's statutory scheme imposes the death penalty in a racially discriminatory manner. See discussion infra Section A. A scheme that sentences blacks and those who kill white victims more frequently and which disproportionately places African-Americans on death row is in clear violation of the ICERD. Ohio's failure to rectify this discrimination is a direct violation of international law and of the Supremacy Clause of the United States Constitution.

        **d.**    **Ohio's statutory scheme violates the ICCPR's and the CAT's prohibitions against cruel, inhuman or degrading punishment**

The ICCPR prohibits subjecting any person to torture or to cruel, inhuman or degrading treatment or punishment. Art. 7. Similarly, the CAT requires that states take action to prevent torture, which includes any act by which severe mental or physical main is intentionally inflicted on a person for the purpose of punishing him for an act committed. See Art. 1-2. As administered, Ohio's death penalty inflicts unnecessary pain and suffering, see discussion infra Section J, in violation of both the ICCPR and the CAT. Thus, there is a violation of international law and the Supremacy Clause of the United States Constitution.

        **e.**    **Ohio's obligations under the ICCPR, the ICERD, and the CAT are not limited by the reservations and conditions placed on these conventions by the Senate.**

87

While conditions, reservations, and understandings accompanied the United States's ratifications of the ICCPR, the ICERD, and the CAT, those conditions, reservations, and understandings cannot stand for two reasons. Article 2 Section 2 of the United States Constitution provides for the advice and consent of two-thirds of the Senate when a treaty is adopted. However, the United States Constitution makes no provision for the Senate to modify, condition, or make reservations. The Senate is not given the power to determine what aspects of the treaty the United States will and will not follow. Their role is to simply advise and consent.

However, the Senate's inclusion of conditions and reservations in treaties goes beyond that role of advice and consent. The Senate picks and chooses which items of a treaty will bind the United States and which will not. This is the equivalent of the line-item veto, which is unconstitutional. Clinton v. City of New York, 524 U.S. 417, 438 (1998). The United States Supreme Court specifically spoke to the enumeration of the president's powers in the Constitution in finding that the president did not possess the power to issue line item vetoes. Id. If it is not listed, then the President lacks the power to do it. See id. Similarly, the Constitution does not give the power to the Senate to make conditions and reservations, picking and choosing what aspects of a treaty will become law. Thus the Senate lacks the power to do just that. Therefore, any conditions or reservations made by the Senate are unconstitutional. See id.

The Vienna Convention on the Law of Treaties further restricts the Senate's imposition of reservations. It allows reservations unless: they are prohibited by the treaty, the treaty provides that only specified reservations, not including the reservation in question, may be made, or the reservation is incompatible with the object and purpose of the treat. Art. 19(a)-(c). The ICCPR

88

specifically precludes derogation of Articles 6-8, 11, 15-16, and 18.   Pursuant to the Vienna Convention, the United States's reservations to these articles are invalid under the language of the treaty.  See id.  Further, it is the purpose of the ICCPR to protect the right to life and any reservation inconsistent with that purpose violates the Vienna Convention.  Thus, United States reservations cannot stand under the Vienna Convention as well.

> **f.    Ohio's obligations under the ICCPR are not limited by the Senate's declaration that it is not self-executing**

The Senate indicated that the ICCPR is not self-executing.  However, the question of whether a treaty is self-executing is left to the judiciary.  Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370 (7th Cir. 1985) (citing Restatement (Second) of Foreign Relations Law of the United States, Sec. 154(1) (1965)).  It is the function of the courts to say what the law is.  See Marbury v. Madison, 5 U.S. 137 (1803).

Further, requiring the passage of legislation to implement a treaty necessarily implicates the participation of the House of Representatives.  By requiring legislation to implement a treaty, the House can effectively veto the treaty by refusing to pass the necessary legislation.  However, Article 2, Section 2 excludes the House of Representatives from the treaty process.  Therefore, declaring a treaty to be not self-executing gives power to the House of Representatives not contemplated by the United States Constitution.   Thus, any declaration that a treaty is not self-executing is unconstitutional.  See Clinton, 417 U.S. at 438.

> **3.    Ohio's obligations under customary international law**

International law is not merely discerned in treaties, conventions and covenants. International law "may be ascertained by consulting the works of jurists, writing professedly on public law; or by

89

the general usage and practice of nations; or by judicial decision recognizing and enforcing that law." United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61 (1820).  Regardless of the source "international law is a part of our law[.]" The Paquete Habana, 75 U.S. at 700.

The Universal Declaration of Human Rights (DHR) has been recognized as binding international law by the judiciary and commentators.  The DHR "no longer fits into the dichotomy of 'binding treaty' against 'non-binding pronouncement,' but is rather an authoritative statement of the international community." Filartiga, 630 F.2d at 883 (internal citations omitted); see also William A. Schabas, The Death Penalty as Cruel Treatment and Torture (1996).

The DHR guarantees equal protection and due process (Art. 1, 2, 7, 11), recognizes the right to life (Art. 3), prohibits the use of torture or cruel, inhuman or degrading punishment (Art. 5) and is largely reminiscent of the ICCPR.  Each of the guarantees found in the DHR are violated by Ohio's statutory scheme.  See discussion infra Sections K(2)(a)-(c).  Thus, Ohio's statutory scheme violates customary international law as codified in the DHR and cannot stand.

However, the DHR is not alone in its codification of customary international law.  Smith directs courts to look to "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decision recognizing and enforcing that law" in ascertaining international law.  18 U.S. (5 Wheat.) at 160-61.  Ohio should be cognizant of the fact that its statutory scheme violates numerous declarations and conventions drafted and adopted by the United Nations and the Organization of American States, which may because of the sheer number of countries that subscribe to them, codify customary international law.  See id.  Included among these are:

    1.    The American Convention on Human Rights, drafted by the Organization of

90

American States and entered into force in 1978. It provides numerous human rights guarantees, including: equal protection (Art. 1, 24), the right to life and precludes the arbitrary deprivation of life (Art. 4(1)), allows for the imposition of the death penalty only for the most serious crimes (Art. 4(2)), prohibits re-establishing the death penalty once abolished (Art. 4(3)), prohibits torture, cruel, inhuman or degrading punishment (Art. 5(2)), and guarantees the right to a fair trial (Art. 8).

2. The United Nations Declaration on the Elimination of All Forms of Racial Discrimination proclaimed by U.N. General Assembly resolution 1904 (XVIII) in 1963. It prohibits racial discrimination and requires that states take affirmative action in ending racial discrimination.

3. The American Declaration of the Rights and Duties of Man adopted by the Ninth International Conference of American States in 1948. It includes numerous human rights guarantees, including: the right to life (Art. 1), equality before the law (Art. 2), the right to a fair trial (Art. 16), and due process (Art. 26).

4. Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment adopted by the U.N. General Assembly in Resolution 3452 (XXX) in 1975. It prohibits torture, defined to include severe mental or physical pain intentionally inflicted by or at the instigation of a public official for a purpose included punishing him for an act he has committed, and requires that the states take action to prevent such actions. Art. 1, 4.

5. Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty adopted by the U.N. Economic and Social Council in Resolution 1984/50 in 1984. it provides numerous protections to those facing the death penalty, including: permitting capital punishment for only the most serious crimes, with the scope not going beyond intentional crimes with lethal or other

91

extremely grave consequences (1), requiring that guilt be proved so as to leave no room for an alternative explanation of the facts (4), due process, and the carrying out of the death penalty so as to inflict the minimum possible suffering (9).

      6.     The Second Optional Protocol to the ICCPR, aiming at the abolition of the death penalty, adopted and proclaimed by the U.N. General Assembly in Resolution 44/128 in 1989. This prohibits execution (Art. 1(1)) and requires that states abolish the death penalty (Art. 1(2)).

These documents are drafted by the people <u>Smith</u> contemplates and are subscribed to by a substantial segment of the world. As such they are binding on the United States as customary international law. A comparison of the Sections A - J clearly demonstrates that Ohio's statutory scheme is in violation of customary international law.

## O.    Conclusion

Ohio's death penalty scheme fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur. The procedures actually promote the imposition of the death penalty and, thus, are constitutionally intolerable. Ohio Revised Code §§2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution. Furthermore, subjecting Defendant to the prospect of capital punishment violates international law and the Supremacy Clause of the United States Constitution.

## CONCLUSION

Pursuant to Propositions of Law Two, Three and Seven, the defendant-appellant, Donna Roberts,  respectfully requests that this Honorable Court reverse the convictions in this matter and remand for  a new trial. Additionally, pursuant to  Propositions of Law Four, it is respectfully requested that this Court dismiss Count Four, and the corresponding capital specification.  In the alternative, pursuant to Propositions of Law One, Five Six, Eight, Nine, Ten, Eleven, Twelve, Thirteen and Fourteen, the defendant-appellant respectfully requests that this Court reverse the sentence of death and remand her case for a new sentencing hearing.

Respectfully submitted,

DAVID L. DOUGHTEN

PATRICIA J. SMITH
Counsel for Appellant

93

**CERTIFICATE OF SERVICE**

A copy of the foregoing appellant's Brief was served upon Dennis Watkins, Trumbull

County Prosecutor and/or LuWayne Annos, Esq. Assistant Trumbull County Prosecutor,

Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this

17th day of July, 2004.

DAVID L. DOUGHTEN

PATRICIA J. SMITH
Counsel for Appellant

94

ORIGINAL

ON COMPUTER - X

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                    )
                                  )
        Plaintiff-Appellee        )        CASE No. 03-1441
                                  )
-vs-                              )
                                  )        Appeal from the Trumbull
                                  )        County Court of Common Pleas
DONNA ROBERTS                     )        Case No. 01-CR-793
                                  )
        Defendant-Appellant       )

---

STIPULATED EXTENSION OF TIME

---

DENNIS WATKINS
Atty. Reg. No. 0009949
LuWAYNE ANNOS (Counsel of Record)
Atty Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Fax No. (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE



DAVID L. DOUGHTEN
Atty Reg. No.0002847
PATRICIA J. SMITH
Atty. Reg. No. 0059621
4403 St. Clair Ave.
Cleveland, Ohio    44103
Telephone No. (216) 361-1112

COUNSEL FOR DEFENDANT-
APPELLANT

ORIGINAL

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          )
                                        )
        Plaintiff-Appellee              )   CASE No. 03-1441
                                        )
-vs-                                    )
                                        )   Appeal from the Trumbull
                                        )   County Court of Common Pleas
DONNA ROBERTS                           )   Case No. 01-CR-793
                                        )
        Defendant-Appellant             )

---

## STIPULATED EXTENSION OF TIME

---

Defendant-Appellant, Donna Roberts, and the Plaintiff-Appellee, the State of

Ohio ("State"), hereby stipulate to an extension of time of twenty days, pursuant to S.Ct.

Prac. R. XIV, Sec. 3, (B)(2)(a), for the filing of the State's merit brief in the above-

captioned matter.  Parties hereby agree that the State's brief originally due on October

18, 2004, is now due Nov. 8, 2004.

Respectfully submitted,

LuWAYNE ANNOS
Atty. Reg. No.0055651
COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Fax No. (330) 675-2431

_David J. Doughten_ per L.A.  _Patricia J. Smith_ per L.A.

DAVID L. DOUGHTEN    PATRICIA J. SMITH
Atty. Reg. No. 0002847    Atty. Reg. No. 0059621
4403 St. Clair Avenue     4403 St. Clair Avenue
Cleveland, Ohio 44103    Cleveland, Ohio 44103
Telephone No. (216) 361-1112  Telephone No. (216) 361-1112

COUNSEL FOR DEFENDANT-APPELLANT DONNA ROBERTS

PROOF OF SERVICE

  I do hereby certify that a copy of the foregoing stipulation was sent by ordinary U.S. Mail on this 12th Day of October, 2004, to Atty. David L. Doughten (Atty. Reg. 0002847), and Atty. Patricia J. Smith (Atty. Reg. 0059621) 4403 St. Clair Ave., Cleveland, Ohio, 44103.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Counsel for Plaintiff-Appellee, The State
Of Ohio

ORIGINAL

ON COMPUTER-**ALM**

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                              )
                                            )
    Plaintiff-Appellee                  )          CASE No. 03-1441
-vs-                                        )
                                            )          Appeal from the Trumbull
                                            )          County Court of Common Pleas
DONNA ROBERTS,                              )          Case No. 01-CR-793
                                            )
    Defendant-Appellant                 )

---

MERIT  BRIEF PLAINTIFF-APPELLEE  OF STATE OF OHIO

---

DENNIS WATKINS
Atty.  Reg. No. 0009949
LuWAYNE ANNOS (Counsel of Record)
Atty Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Fax No. (330) 675-2431
psannos@co.trumbull.oh.us



COUNSEL FOR PLAINTIFF-APPELLEE
STATE OF OHIO

DAVID . L. DOUGHTEN, ESQ
Atty. Reg.  No.  0002847
4403 St. Clair Avenue
Cleveland, Ohio    44103
Telephone No. (216) 361-1112

PATRICIA J. SMITH
Atty. Reg. No. 0059621
4403 St. Clair Avenue
Cleveland, Ohio    44103
Telephone No. (216) 361-1112

COUNSEL FOR DEFENDANT-
APPELLANT DONNA ROBERTS

ORIGINAL

<u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES..................................................................................................iv

STATEMENT OF FACTS...................................................................................................1

ARGUMENT.....................................................................................................................12

**APPELLEE'S PROPOSITION OF LAW ONE:**
Appellant's desire to present an unsworn, mitigation diatribe is in no way indicative of an incompetent or uninformed waiver of her right to introduce mitigation evidence and sworn testimony; nor does a trial court err in finding an intelligent waiver of the presentation of evidence and the desire to make an unsworn statement on her own behalf....................................................................................................................12

**APPELLEE'S PROPOSITION OF LAW TWO:**
A reasonable person would conclude that "consent to search" included an attached garage when said person was informed the "premises" constitute a crime scene which must be processed prior to consent..........................................20

**APPELLEE'S PROPOSITION OF LAW THREE:**
A trial court does not abuse its discretion in overruling challenges for cause of prospective jurors when the court finds that they are suitable jurors able to render an impartial verdict...............................................................................................26

**APPELLEE'S PROPOSITION OF LAW FOUR:**
After reviewing the facts in a light most favorable to the prosecution, a reasonable jury could find that when a victim is shot dead in his home and the shooter drives away from the murder scene in the victim's car, the State has proven all elements of aggravated robbery.......................................................24

**APPELLEE'S PROPOSITION OF LAW FIVE:**
A capital defendant suffers no prejudice when she is afforded the right of allocution after the sentence is announced from the bench, but before the sentencing hearing is adjourned, when the defendant has already requested a death sentence, thanks the judge for imposing a death sentence,  and has waived the right to present any mitigating evidence.........................................................40

**APPELLEE'S PROPOSITION OF LAW SIX:**
A capital defendant suffers no prejudice by the prosecuting attorney drafting a proposed sentencing opinion, compliant with R.C. 2929.03(F), which is ultimately adopted or edited by the trial court............................................................................44

-ii-

TABLE OF CONTENTS CONT'D

Page

**APPELLEE'S PROPOSITION OF LAW SEVEN:**
**A trial court properly overrules a motion for change of venue when a**
**defendant fails to demonstrate that the publicity in her case was so pervasive that it**
**impaired the ability of the empaneled jurors to deliberate fairly and impartially**..............48

**APPELLEE'S PROPOSITION OF LAW EIGHT:**
**Trial counsel's performance cannot be branded ineffective by a capital defendant's**
**voluntary and fully informed  waiver of her right to present mitigation evidence**..............52

**APPELLEE'S PROPOSITION OF LAW NINE:**
**Ohio's death penalty statutes constitutionally narrow the class of**
**murderers who will be death penalty  eligible**..........................................................55

**APPELLEE'S PROPOSITION OF LAW TEN:**
**A trial court properly overrules a capital defendant's motion to delete**
**all references that a jury's penalty phase verdict is only a recommendation**.......................59

**APPELLEE'S PROPOSITION OF LAW ELEVEN:**
**The trial court's instruction directed jurors to decide Appellant's guilt**
**and punishment by a standard of beyond a reasonable doubt, not a lesser standard**..........62

**APPELLEE'S PROPOSITION OF LAW TWELVE:**
**While no criminal defendant is guaranteed an error-free trial, reversal**
**of a conviction or sentence does not occur by the sheer  weight of numbers**
**of  harmless errors**.....................................................................................64

**APPELLEE'S PROPOSITION OF LAW THIRTEEN:**
**A death penalty scheme which requires reviewing courts to compare death**
**sentences with other death sentences is constitutionally sound**.............................65

**APPELLEE'S  PROPOSITION OF LAW FOURTEEN:**
**Ohio's death penalty scheme has been consistently held constitutional**...............................67

CONCLUSION.................................................................................83

PROOF OF SERVICE.......................................................................84

APPENDIX                                                                    Appx. Page
    *U.S. v. Caudill* (6th Cir. [Ky.], 2001, 25 Fed. Appx. 349, 2001 WL 1671075)..............A-1
    *State v. Cooper* (Sept. 26, 1997), 2nd Dist. No. 97-CA-15.............................................A-7

-iii-

TABLE OF AUTHORITIES

Page

CASES:

*Anderson v. City of Bessemer City N.C.* (1985), 470 U.S. 564 .................................................... 45

*Buell v. Mitchell* (2001), 274 F. 3d 337 ................................................................. 80, 81

*Cadet v. Bulger* ( 2004, C.A. 11), 377 F.3d 1173 ................................................. 82

*Caldwell v. Mississippi* (1985), 472 U.S. 320 ...................................................... 60, 61

*Coolidge v. New Hampshire* (1971), 403 U.S. 443 ................................................ 21

*Fauder v. Johnson* (1999, S.D. Texas), 99 F. Supp. 2d 744 .............................. 82

*Flippo v. West Virginia* (2002) 575 S.E. 2d 170 ................................................. 23

*Florida v. Jimeno* (1991), 500 U.S. 248 ................................................................ 21, 22

*Gregg v. Georgia* (1976) 428 U.S. 153 ................................................................ 67, 68

*Hill & Range Songs, Inc.  v. Fred Rose Music, Inc.*  (1976), 413 F. Supp. 967 ..................... 46, 47

*Holland v. United States* (1954), 348 U.S. 121 ................................................... 62, 63

*In re Kemmler* (1890), 136 U.S. 436 ...................................................................... 79

*Jurek v. Texas* (1976), 428 U.S. 262 ..................................................................... 56, 69

*Jackson v. Virginia* (1979), 443 U.S. 307 ............................................................ 35

*Louisiana v. Resweber* (1946), 329 U.S. 459 ...................................................... 79

*Lowenfield v. Phelps* (1988), 484 U.S. 231 .......................................................... 57

*McClesky v. Kemp* (1987), 481 U.S. 279 ............................................................ 68, 82

*O'Leary v. Liggett Drug Co.,* (6th Cir. 1945)150 F.2d 656, *cert. denied,* 326 U.S. 773 .............. 45

*Proffit v. Florida* (1976), 428 U.S. 242 ................................................................ 69

*Pulley v. Harris* (1984), 465 U.S. 37 .................................................................... 65

-iv-

TABLE OF AUTHORITIES CONT'D

Page

*Roberts v. Louisiana* (1976), 428 U.S. 325.................................................................69

*Schneckloth v. Bustamonte* (1973), 412 U.S. 218.....................................21 , 23, 24, 25

*State v. Ahmed* (2004), 103 Ohio St. 3d 27,.............................................................51

*State v. Apanovich* (1987), 33 Ohio St. 3d 19...........................................................78

*State v. Ashworth* (1999) 85 Ohio St. 3d 56...........................................12, 13, 16, 80

*State v. Ballard* (1984), 14 Ohio App. 3d 59............................................................38

*State v. Bedford* (1988), 39 Ohio State 122.............................................................65

*State v. Biros,* (1997), 78 Ohio St. 3d 426.........................................................37, 38

*State v. Branham* (1995), 104 Ohio App.3d 355.......................................................52

*State v. Broom* (1988), 40 Ohio St. 3d 277.............................................................32

*State v. Buell* (1986), 22 Ohio St. 124..........................................................72, 73, 77

*State v. Burnside* (2003), 100 Ohio St. 3d 152........................................................20

*State v. Campbell* (2000), 90 Ohio St. 3d 320....................................................41, 46

*State v. Carter* (2000), 89 Ohio St. 3d 593.............................................................79

*State v. Clemmons* (1998), 82 Ohio St. 3d 438........................................................77

*State v. Combs* (1994), 100 Ohio App. 3d 90, cert denied 71 Ohio St. 3d 1472.....................45, 46

*State v. Cooper* (Sept. 26, 1997), 2nd Dist. No. 97-CA-15.......................................23, 24

*State v. Davis* (1991) 62 Ohio St. 3d 326...............................................................64

*State v. Davie* (1997), 80 Ohio St. 3d 311,.............................................................59

*State v. Frazer* (1995), 73 Ohio St. 3d 323.............................................................63

*State v. Greer* (1988), 39 Ohio St. 3d 236..............................................................57

-v-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1554

TABLE OF AUTHORITIES CONT'D

Page

*State v. Gumm* (1995), 73 Ohio St. 413.................................................................76

*State v. Henderson* (1988), 39 Ohio St. 3d 24...................................................56, 57

*State v. Hill* (1996), 75 Ohio St. 3d 195..............................................................64

*State v. Jenkins* (1984), 15 Ohio St. 3d 164.....................26, 55, 56, 59, 63, 67, 69, 71, 72 , 77

*State v. Jordon* (2004), 101 Ohio St. 3d 216.........................................16, 18, 54

*State v. LaMar* (2002), 95 Ohio St. 3d 181..........................................................17

*State v. Landrum* (1990), 53 Ohio St. 3d 107.......................................................48

*State v. Loza* (1994), 71 Ohio St. 3d 61..........................................28, 59, 75, 77

*State v. Lynch* (2003), 98 Ohio St. 3d 514...................................................48, 50, 51

*State v.  Maurer* (1984), 15 Ohio St. 3d 239.......................................................63

*State v. McNeill* (1998), 83 Ohio St. 3d 438.......................................................76

*State v. Mills* (1992), 62 Ohio St. 357..............................................................72

*State v. Mink* (2004) 101 Ohio St. 3d 350..........................................................72

*State v. Myers* (2002), 97 Ohio St. 3d 335..........................................................42

*State v. Nabozny* (1978), 54 Ohio St. 2d 195 ......................................................63

*State v. Phillips* (1995), 74 Ohio St. 3d. 72.................................................52, 80

*State v. Posey* (1988), 40 Ohio St. 3d 420..........................................................21

*State v. Powell* (1993), 90 Ohio App. 3d 260.................................................45, 46

*State v. Reynolds* (1998), 80 Ohio St. 670.................................................40, 41, 42

*State v. Rojas* (1992), 64 Ohio St. 3d 131.................................................36, 37

-vi-

TABLE OF AUTHORITIES CONT'D

Page

*State v. Rogers* (1985), 17 Ohio St. 3d 174.................................................................26

*State v. Rogers* (1986), 28 Ohio St. 427.................................................................77

*State v. Smith* (1985), 17 Ohio St. 3d 98.................................................................52

*State v. Smith* (1991), 61 Ohio St. 3d 284.................................................................36

*State v. Sowell* (1991),73 Ohio App. 3d 672.................................................................46

*State v. Stallings* (2000), 89 Ohio St. 3d 280.................................................................75

*State v. Steffen* (1987), 31 Ohio St. 3d 111.................................................65, 66, 68, 82

*State v. Stojetz* (1999), 84 Ohio St. 3d 452.................................................................80

*State v. Stumpf* (1987), 32 Ohio St. 3d 95.................................................................70

*State v. Taylor* (1990), 50 Ohio St. 3d 24.................................................................12, 32

*State v. Thompkins* (1997), 78 Ohio St. 3d 380.................................................................35

*State v. Treesh* (2001), 90 Ohio St. 3d 460.................................................................49, 51

*State v. Underwood* (1983), 3 Ohio St. 3d 12.................................................62, 70, 74, 78

*State v. Vrabel* (2003), 99 Ohio St. 3d 184.................................................................18

*State v. Williams* (1983), 6 Ohio St. 3d 281,.................................................................26

*State v. Williams* (1986), 23 Ohio St. 3d 16.................................................................57

*State v. Williams* (1996) 74 Ohio St. 3d 569.................................................................37, 38

*State v. Wilson* (1972), 29 Ohio St. 2d 203.................................................................32

*State v. Zuern* (1987), 32 Ohio St. 3d 56.................................................................72

*Strickland v. Washington* (1984), 466 U.S. 668.................................................................52

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1556

TABLE OF AUTHORITIES

Page

*Troy v. Dulles* (1958), 356 U.S. 86.................................................................................................79

*Tuilapea v. California* (1994), 512 U.S. 967....................................................................................76

*U.S. v. Caudill* (6th Cir. [Ky.], 2001, 25 Fed. Appx. 349, 2001 WL 1671075)....................22, 23

*U.S. v. Jackson* (1968), 390 U.S. 570.............................................................................................73

*United States v. Bin Laden* (S.D. N.Y. 2001), 126 F. Supp. 2d 290............................................81

*United States v. Hastings* (1983), 461 U.S. 449............................................................................64

*Wainwright v. Witt* (1985) 469 U.S. 412.........................................................................................26

CONSTITUTIONAL PROVISIONS, RULES, STATUTES

Civ. R. 52..................................................................................................................................44, 70

Crim. R. 11(C)(3)....................................................................................................................72, 73

Crim. R. 18(B).........................................................................................................................48, 50

Crim. R. 24.............................................................................................................................26, 27

Crim. R. 30.....................................................................................................................................62

Crim. R. 32(A)(1)...........................................................................................................................40

Crim. R. 52(A)..............................................................................................19, 25, 32, 33, 52

R.C. 2901.05(D)......................................................................................................................62, 63

R.C. 2903.01(A)......................................................................................................................55, 58

R.C. 2923.03............................................................................................................................55, 75

R.C. 2929.03(D)(1).........................................................................................................17, 18, 73

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1557

TABLE OF AUTHORITIES CONT'D

Page

R.C. 2929.04(A)..................................................................................................74

R.C. 2929.04(A)(7).....................................................................................57, 58, 75

R.C. 2929.04(B)(1)............................................................................................70

R.C. 2929.04(B)(7)...............................................................................55, 74, 75, 77

R.C.2929.04(C)...............................................................................................77

-ix-

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1558

STATEMENT OF FACTS

The Plaintiff-Appellee, the State of Ohio ("State") takes no exception to Defendant-Appellant Donna Roberts' ("Appellant") rendition of the Statement of the Case as it appears in her brief at page 3 and 4 in her brief. With respect to the factual scenario adduced through testimony and physical exhibits, the State submits as follows:

Shortly after midnight on December 12, 2001, Appellant phoned a Trumbull County 911 operator. She was clearly hysterical and the 911 dispatcher had considerable difficulty understanding her. From the fragmented portions of the conversation which were intelligible, the dispatcher thought there may have been a suicide at Appellant's home at 254 Fonderlac Drive, Howland Township, Trumbull County, Ohio, a suburb east of Warren, Ohio. (T.p. Vol. XXIV, p. 5184). When the police arrived, they discovered Appellant's former husband, Robert Fingerhut, lying dead on the kitchen floor in a pool of his own blood. (T.p. Vol. XXIV, p. 5157). He had suffered a bullet wound to the top of skull, chest and back. A fully loaded .38 Taurus special was recovered nearby on the garage steps. (T.p. Vol. XXVII, p. 5614, 5615). As police converged upon the scene, the suicide theory began to quickly dissipate. Though there were no signs of forced entry, Mr. Fingerhut's car keys and silver Chrysler 300M were missing. (T.p. Vol. XXIV, p. 5159, XXVII, p. 5863).

Appellant spoke briefly with officers concerning her whereabouts that day, as well as those of her late ex husband. Though divorced, the couple shared the home on Fonderlac Drive. Mr. Fingerhut operated two Greyhound Bus terminals, one in Youngstown, Ohio, and one in Warren, Ohio. Both businesses were in Appellant's name. Appellant told officers that while Mr. Fingerhut prepared to go to work at the Youngstown terminal around 8 a.m., Dec. 11, 2001,

-1-

she lounged around in bed until 10 a.m.  Appellant worked that day at the Warren terminal until 5:30 p.m., dined alone at the Red Lobster restaurant in Niles, Ohio, arrived home around 6 p.m. Mr. Fingerhut was not home.  He phoned her and suggested she do some shopping because he was going to be late.  Appellant stated she stopped by a Giant Eagle supermarket near their home, and visited local Wal-mart and Super K-Mart stores.  Indeed, Appellant produced a Wal-Mart bag containing make-up and cigarette lighters which she had purchased at 9:37 p.m.  Dec. 11, 2001. ( T.p. Vol. XXVI, p. 5635-5649; T.p. Vol. XXVII, p. 5856).

As officers first arrived at Appellant's home, she initially remained at the scene.   At least three officers testified that Appellant was prone to intermittent fits of uncontrollable weeping and wailing, and then total silence.  (T.p. Vol. XXIV, p. 5162; XXVI, p. 5639-5640; T.p.Vol. XXVII, p. 5860).  According to Det. Sgt. Paul Monroe, the lead investigator, and Det. Sgt. Frank Dillon, Appellant would stifle the histrionics  every time the officers started conferring with each other. (T.p. Vol. XXVI, p. 5639-5640 , XXVII, p. 5833). Monroe advised Appellant that it would take hours to process the crime scene, and suggested that she stay with family or a neighbor.  (T.p. Vol. XXVI, p. 5642). Officers advised her that they  needed to search the entire property.  In no uncertain terms, Appellant told Monroe "to do whatever had to be done, search the entire house if we had to, just find whoever did this." (T.p. Vol. XXVII, p. 5885; see, also, T.p. Vol. XXIII, p. 5161, T.p. Vol. XXVI, p. 5642; Supp. T.p. 235-241). Appellant eventually left with her brother and sister-in law at approximately 3 a.m. and spent the remainder of the night at their Austintown Township home in Mahoning County.  (T.p. Vol. XXVI, p. 5642).

Monroe began to search the Fingerhut house and garage.  He located two life insurance policies in the headboard of the bed in the master bedroom. (T.p. Vol. XXVII, p. 5898-5899,

-2-

State's Ex. 322, 323). Robert Fingerhut was named as the insured and Appellant was the sole beneficiary of both policies.  The total value of the two policies was $550,000 (T.p. Vol. XXIV, p. 5275, 5279).  Monroe also located a brown paper shopping bag in the trunk of Appellant's car labeled "Nate Jackson."  The bag contained some clothing, and a treasure trove of 145 handwritten letters from Appellant to Jackson.  (State's Ex. 270, T.p. Vol. XXVII, p. 5888). Back in the house, Monroe discovered another set of 143 letters written by Jackson to Appellant and mailed to a Warren, Ohio, post office box from the Lorain Correctional Institution.  (T.p. Vol. XXVII, p. 5889). During the course of the search, a phone in the home rang.  When Monroe answered the phone, the caller hung up.  Using the "star 69" tracking system, the number "330-506-0373" appeared as the source of the call.  After daybreak,  Monroe visited Appellant at her brother's home where she signed a consent to search the house, Mr. Fingerhut's silver Chrysler 300M, and her own red Chrysler 300M.  (Supp. T.p. 249-250).

Appellant agreed to give a statement later that afternoon to the Howland Township Police Department. Appellant discussed some of her employment and personal history with Monroe. Appellant and Mr. Fingerhut had been together since 1983, and were married for three years before divorcing.  When they met, she was working for Dr. Mort Freeman, a  plastic surgeon in Miami, Florida. Her duties included general secretarial assignments, but she would also assist the doctor in basic medical procedures such a skin grafts.  She claimed to have accompanied the doctor to Israel and would assist him in dressing battle wounds.  According to Appellant, she and Mr. Fingerhut divorced, and his assets were placed in Appellant's name so that he would be uncollectable in the event of a lawsuit.  She told Monroe that she and Mr. Fingerhut "got along great."  He was never physically abusive, and their biggest running dispute concerned whose turn

-3-

it was to fill the dogs' water dish.  (T.p. Vol. XXVII, p. 5892-5895).

This idyllic scenario  sharply contrasted to the living hell described by Appellant in her 145 letters of  prison correspondence to Nate Jackson.[1]    Many of the letters recovered by Det. Monroe were sexually graphic.  Several detailed Appellant's contempt for Mr. Fingerhut, and spoke of both parties' desire to kill Fingerhut and to enjoy the benefits of his lucrative insurance proceeds.  For example, in a letter dated Oct. 20, 2001, at 11:20 p.m., Appellant wrote,  "And I get sick when he is about to come home at night.  I wonder what's going to happen in our house....If there was any way I could leave and just live half as well as I do - I would leave that house right now." (State Ex. 271-D-82).

In a six-page letter dated Nov. 26, 2001,  addressed to "My dearest sweetheart" Appellant told Jackson:

> "***And yes sneaking to see you for a couple hours doesn't do it.  It leaves us both with no real life together and when you go your way, and you have to fend for yourself and eat alone and sleep alone and be out with the wolves. And me - I (live) exist in hell on earth.  Like last night - I got so sick of just looking at him.  And hearing the same shit over and over.  And smelling his breath.  And every other little thing - it's all bad.  And seeing his skin.  And watching him walk - or breathe.  I can't hold in my disgust and contempt for him well at all and he sees it every time he looks at me now.  Which makes me make him feel worse about me in return and treat me like dirt."

(State's Ex.  271-D-8).  In that same letter, Appellant discussed looking for various items of apparel for which she had been shopping:

> "Oh - I have been looking all over for a ski mask.  I only see those knitted caps.  Any suggestions on who might have them?  And I'm still looking for gloves because I don't think the thick ones I'm seeing are good to work with as would be thinner leather ones." (Id).

---

[1]Both parties stipulated that Appellant wrote the set of letters found her trunk, and that Jackson wrote the letters recovered from Appellant's bedroom.  (T.p. Vol. XXVI, p. 5484).

-4-

Appellant complained in a letter dated Nov. 10, 2001, that she had insufficient funds marijuana and was accustomed to having $200 on her. "I have got to figure a way to get some money before you get home! That's for sure. He has me on a real short rope here. ...I HAVE TO ASK PERMISSION TO USE A CREDIT CARD OR WRITE A FUCKING CHECK!" (State's Ex. 271-D-35). Mr. Fingerhut's curtailment of Appellant's usual spending practices were apparently rooted in business downturns, because in a letter date Nov. 20, 2001, Appellant told Jackson that business was off $19,000 at the Youngstown terminal. (State's Ex 271-D-20). In a letter dated Oct. 20, 2001, "And I haven't been allowed to use any of my 52 charge cards - emergency only. I am not used to living like this. I am used to having plenty of cash for whatever I want and buying everything I want. Maybe those days will return again soon....Do whatever you want to him ASAP. Amen." (State's Ex. 271-D-81). Appellant's discontent with her spending restrictions was reinforced at trial by Greyhound employee Frank Reynolds. He claimed to have known Mr. Fingerhut and Appellant for nine years, and the only time he ever saw them argue is when she asked for money on Dec. 10, 2001, and he refused to give it to her. (T.p. Vol. XXIV, p. 5131-5138).

In another letter to Jackson, Appellant stated she had obtained a map to the Lorain Correctional Institution, a ski mask, boxers, and fleece-lined black gloves. (State's Ex.271-D-2). In turn, Jackson wrote Appellant on Oct. 2, 2001, "...let me do what I was gonna do to him...Its getting done when I come home." (State's Ex. 273-N-58). Six days later on Oct. 8, 2001, Jackson wrote, "Donna, I got it already planned out on how we're gonna take care of the Robert situation? An baby, it's the best plan ever!....I promise on my kids." (State's Ex.273-N-53). On Oct. 14, 2001, Jackson referenced putting "the gun to that dummy's head." (State Ex 273-N-49).

-5-

In letters dated Oct. 20 and 23, 2001, Jackson repeated that "Robert has to go." (State Ex 273-N-42 & 273-N-38).  He promised to carry out his plan Monday, December 10, 2001, in a letter dated Oct. 24, 2001. (State's Ex 273-N-37).  Jackson  reiterated the Dec. 10, 2001, target date in another letter dated Oct. 26, 2001, in which he drew a tombstone engraved with "Rest in piss." (State's Ex. 275 B).  Apparently dissatisfied with the selection of Chryslers at the Fingerhut/Roberts residence, Jackson  in a letter Oct. 29, 2001, requested that Appellant  get him a 2002 Cadillac Deville.  He further wrote, "An even if I gotta come to the house an shoot Robert in his f-ing head you're gonna be with me.  An do you know what mandatory means?....I want you to  marry me...Will you marry me after I take care of things."  (State's Ex 275-A).

Upon reviewing the collection of letters, Monroe asked Appellant whether she had any boyfriends.  Appellant stated she did, and gave the name "Carlos."  She also added that the late Mr. Fingerhut also had a boyfriend named "Bobby."  She stated each was aware of the other's affairs, but did not interfere.  (T.p. Vol. XXVII, p. 5906-5908).  Appellant made no mention of Nate Jackson.  When Monroe brought up  his name, Appellant admitted to having been romantically involved with him for two years, that he had recently been  incarcerated, and that they would exchange letters.  Appellant admitted picking him up from prison on Dec. 9, 2001, and to dropping him off on Wirt St., Youngstown, Ohio. Contrary to the very sexually graphic nature of the letters found in Appellant's bedroom and automobile, she insisted she and Jackson were just "friends."  She admitted that it was probably Jackson who telephoned her home in the early morning hours of Dec. 12, 2001, and  hung up on Monroe. (T.p. Vol. XXVII, p. 5909-5913).

To further explore the readily apparent clues provided in the series of letters exchanged

-6-

between Appellant and Jackson,  Howland Township Police contacted the Lorain Correctional

Institution("LCI") to see if Jackson had telephoned Appellant from the prison.  Indeed, Jackson

had made 18 collect calls to Appellant from LCI from Oct. 25, 2001 through December 8, 2001.

(T.p. Vol. XXIV, p. 5113).   Both disregarded periodic, pre-recorded warnings stating, "[t]his call

is originating from an Ohio Correctional Institution and may be recorded or monitored."  For

inmate Nathaniel Jackson, the calls were monitored AND recorded.    The Ohio State Patrol was

able to preserve those 18 calls and they were played for the jury.

For example, Jackson telephoned Appellant on October 25, 2001, and told her that he

would be released from prison December 9, 2001, just in time for the holiday shopping season.

When Jackson asked Appellant what she wanted for Christmas, she replied, "You."  Jackson

promised Appellant that:

> "I'm goin to go ahead and do that the next day, okay.  All right.***My mind
> is made up.  My mind made – I wrote it in my letters, you know what I'm saying,
> but you know, I don't like to talk too much like that but when I come home, you
> know what I mean, it's going be in full detail.  Okay. I'm goin to let you know
> how I'm goin to do it and everything.  I'm goin to do it for sure the next day."

(State 's Ex. 362, 362A).  In unbridled anticipation of his first free night's activities, Jackson

requested that Appellant book a room at the Wagon Wheel Motel, and that she wear thong

underwear.  (Id., State's Ex. 371, 371A).

In a call Nov. 8, 2001, the pair discussed Appellant performing oral sex on Jackson while

Fingerhut watches "before he goes away man."  (State's Ex. 366, 366A). Appellant cautions

Jackson in a call Nov. 22, 2001, that "the story with the trunk and handcuffs, that's too

involved.***It's much too involved.  Your [sic] gonna leave hair, your [sic] gonna leave prints,

your [sic]***" (State's Ex. 371, 371A).  Jackson, in a subsequent phone call Nov. 24, 2001,

-7-

attempts to reassure Appellant about possible DNA evidence. Appellant tells him that she has a

gun, a "big 38." Jackson also requests that she arrange a hotel room for him:

> "N. Jackson: After the 9th, you know what I'm saying, I get out, I'm going to be with you,
> you know what I'm saying. I next day, you know what I'm saying, I mean, that's when
> it's gonna to go down, you know what I mean. And then, you know what I mean, after
> that then I'm going to the hotel. You know what I'm saying."

> "D. Roberts: And you have to know a thousand percent, ***[t]hat you can trust
> me with your life and my life. Because it's my life too you know."

(State's Ex. 372, 373, 372A, 373A).   In one of the final calls Dec. 6, 2001, a gleeful Appellant

and Jackson discuss his imminent release, though the mood changes when Jackson tells

Appellant:

> "N. Jackson: I just need to be in that house when he come home.

> "D. Roberts: Oh no.

> "N. Jackson: Huh?

> "D. Roberts: No.

> "N. Jackson: Baby, it ain't gonna happen in the house. It ain't gonna happen in the
> house man, I promise you.

> "Recording: This call is originating from an Ohio Correctional Institution and may
> be recorded or monitored."

(State's Ex. 379, 379A).

Because the phone calls were both recorded and monitored, Monroe was able to recover

the DNA evidence which Appellant feared would link her jailbird boy toy to her ex-husband's

homicide. He discovered that Appellant had not only booked the Jacuzzi suite at the Wagon

Wheel Motel in neighboring Mahoning County for December 9, 2001, but she had left a pair of

red thong underwear behind. (T.p. Vol. XXIV, p. 5329-5338, State's Ex. 312). Appellant also

-8-

made good on Jackson's request to supply him with a post homicide, hotel hideout. She rented a

room for an entire week of December 11, 2001 at the Days Inn, Boardman. (T.p. Vol. XXV, p.

5376).

On Dec. 18, 2001, a special agent from the Bureau of Criminal Identification searched the

Days Inn room reserved by Appellant for finger prints, blood and hairs.  Though he found no

fingerprints in the room, he discovered a red and yellow stained washcloth and pubic hairs,

possible blood stains on a comforter and in a waste basket.  (T.p. XXV, p. 5528-5535). Monroe

went through a trash dumpster at the same motel and recovered additional physical

evidence.(T.p. Vol. XXVII, p. 5925).

BCI Serologist Brenda Gerardi linked Jackson's DNA to bloodied gauze recovered from

the Days Inn.  Mr. Fingerhut's silver Chrysler was found in Youngstown, Ohio, on Dec. 12,

2001,  approximately three blocks from where Appellant stated she dropped Jackson off the day

of his release from prison.  (T.p. Vol. XXV, p. 5357-5360).  From Mr. Fingerhut's car,  Gerardi

also detected a mixture of Mr. Fingerhut and Jackson's DNA on the visor and on the trunk

release.  (T.p. Vol. XXVII, p. 5767-5768., State's Ex. 286 A,C, D). Cynthia Mayle, a latent

fingerprint examiner matched Jackson's prints to the key card envelope from the Days Inn.  (T.p.

XXVII, p. 5834). Finally, Michael Roberts, a forensic firearms expert, opined that the bullets

recovered from the victim, his jacket, and the dry wall at the Fingerhut home were fired from a

.38 caliber gun. (T.p. Vol. XXVII, p. 5814).

During the course of his investigation, Monroe discovered that Jackson and Appellant

had been seen together by several people just hours before  the murder.  For instance, Greyhound

employee Frank Reynolds stated he saw Appellant and Jackson hugging and kissing at the

-9-

Youngstown terminal the morning of Dec. 11, 2001. (T.p. Vol. XXIV, p. 5133). Jose Flores, the general manager of the Wagon Wheel, saw both Appellant and Jackson pull into the hotel in Appellant's red Chrysler on Dec. 9, 2001. (T.p. Vol. XXIV, p. 5332). Jim McCoy, a Greyhound bus driver, saw Appellant at the Warren terminal at approximately 5 p.m. December 11, 2001, with a black male named "Nate," and they were in a hurry to leave. (T.p. Vol. XXVI, p. 5508-5509). Contrary to her statement that she dined alone at the Red Lobster restaurant, Jill Kenyon, Red Lobster server, selected both Appellant and Jackson from photo-line-ups and stated that she waited on the couple until approximately 6:43 p.m. Dec. 11, 2001. (T.p. Vol. XXIV p. 5171-5179).

Monroe testified that Jackson became his prime suspect in Fingerhut's murder on December 15, 2001. (T.p. Vol. XXVII, p. 5920). Appellant agreed to permit Monroe to monitor a phone conversation between herself and Jackson from her home. Monroe had prepared a set of questions which Appellant was to ask Jackson concerning an injury to his finger. Though she was able to reach him by phone Dec. 16, 2001, Monroe testified that Appellant strayed from the script and did not cooperate in asking the pre-discussed questions concerning the injury. (T.p. Vol. XXVII, p. 5923, 6048-6049). In further efforts to protect herself and Jackson prior to the homicide, Appellant attempted to set up Santiago Mason as a likely suspect. She had accused him of stealing a .38 caliber hand gun. She filed a complaint in Warren Municipal Court and had him arrested. (T.p. Vol. XXV, p. 5445-5448).

Despite Appellant's obfuscation and lack of cooperation, Jackson was arrested for Robert Fingerhut's murder on Dec. 21, 2001, at 791 Wirt St., Youngstown. After Jackson was extracted from the home, SWAT team members located a pair of men's black leather gloves in

-10-

the closet.  They were thin and the left index finger was torn and smeared with a red substance.

(T.p. Vol. XXV, p. 5401-5405). At the time of his arrest, Jackson was wearing a bandage on his

left index finger.(T.p. Vol. XXVII, p. 5926).

Jackson was convicted and sentenced to death for Mr. Fingerhut's murder.  That case has

been briefed by both parties and is pending in this Court in Case No. 03-137.  Appellant was also

convicted.  She presented no witnesses in the penalty phase.  For the mitigation phase, she

specifically waived her right to present mitigation, and chose instead to give a lengthy unsworn

statement denouncing the justice system and requesting the death penalty.  The jury and the trial

honored her request.

Other necessary facts will be brought to the Court's attention in the Argument portion of

this brief.

-11-

<u>ARGUMENT</u>

**APPELLEE'S PROPOSITION OF LAW ONE**:

  **Appellant's desire to present an unsworn, mitigation diatribe is in no way indicative of an incompetent or uninformed waiver of her right to introduce mitigation evidence and sworn testimony; nor does a trial court err in finding an intelligent waiver of the presentation of evidence and the desire to make an unsworn statement on her own behalf.**

  Appellant argues in her first Proposition of Law that the trial court did not fully inform her of the ramifications of waiving the presentation of mitigation evidence, and that because the trial court permitted her to make an unsworn statement in mitigation, the court accepted only a "partial waiver." This proposition is without merit.

  It is well-settled law that no capital defendant is obligated to present mitigating evidence to a jury during the sentencing phase of a capital trial:

   "The constitutional requirement that mitigation be considered is not, then, based on any societal interest, but is 'rooted solely in a desire to protect the defendant's interests * * *,' Bonnie[2], *supra,* at 1383-- specifically, his interest in not being treated as one of 'a faceless, undifferentiated mass.' That interest is protected by giving the defendant an opportunity to introduce the mitigating evidence available to him, and requiring the sentencer to consider it. See *People v. Silagy* (1984), 101 Ill.2d 147, 181, 77 Ill.Dec. 792, 809, 461 N.E.2d 415, 432. But where he chooses to forgo that opportunity, no societal interest counterbalances his right to control his own defense."

*State v. Taylor* (1990), 50 Ohio St. 3d 24, 28.

This Court noted "the Eighth Amendment does impose a high requirement of reliability on the determination that death is the appropriate penalty in a particular case.***However, the United States Supreme Court has never suggested that this requires or justifies forcing an unwilling

---

  [2]Bonnie, The Dignity of the Condemned (1988), 74 Va. L. Rev. 1363.

-12-

defendant to accept representation or to present an affirmative penalty defense in a capital case."
*State v. Ashworth* (1999) 85 Ohio St. 3d 56, 64.

Furthermore, Appellant cites in her brief at page 9 an extensive quote from the *Ashworth*
case wherein the trial court is instructed to determine whether the mitigation-waiving defendant
is competent, understands (1) her rights in the sentencing proceedings, (2) what mitigating
evidence is, and (3) the right to present said mitigating evidence. *Ashworth* further requires that
the court inquire whether the defendant understands the importance of mitigating evidence, the
use of said evidence to offset aggravating circumstances, and the effect of failing to present that
evidence. *Ashworth,* supra, at 62.

The record reflects that the trial court fully complied with *Ashworth* requirements. First,
even though the *Ashworth* case specifically states that "absent a request by counsel, or any indicia
of incompetence, a competency evaluation is not required, " Id. at 62, a competency evaluation
was nevertheless ordered and the evaluating psychologist gave sworn testimony during an in
camera hearing. (T.p. Vol. XXVIII, p. 6227-6232)

Appellant's waiver of her right to present mitigation evidence came after the trial court
extensively questioned Appellant herself, her two trial attorneys, and a clinical psychologist
during an in camera hearing occurring June 3, 2003. The trial court first explained her right to
present mitigation evidence and defined what "mitigation" evidence is:

> "THE COURT: Donna, you have been found guilty by the Jury of the
> charges that were filed against you and you are entitled, the law requires that this
> second phase be gone through, and I'm sure that you are aware by this time as to
> the function of the mitigation phase. ***And at that mitigation phase, your
> attorneys would have an opportunity to put before the Jury things in your favor,
> whereby this Jury would determine that there would be no purpose or reason in a
> larger sense to impose the death penalty upon you. I am informed by them that

-13-

you have instructed them that you do not wish to present any evidence.

"THE DEFENDANT: That is correct.

***

"THE COURT: Your attorneys will miss an opportunity to be able to present evidence that goes behind what they already know to make you into a real person, rather than the person that they know about. I have no idea what that evidence would be. Your attorneys would be quite capable, I'm sure, of presenting such evidence. The whole purpose of that is for the Jury to take the person that they know from what they have heard already, and be faced with comparing that person with the person your attorneys could present by the background and whatever. By ordering your attorneys not to do that, then this Jury knows you by what they have already heard.

"THE DEFENDANT: That is what I am hoping for.

"THE COURT: You understand that?

"THE DEFENDANT: I do.

"THE COURT: You have thought this through?

"THE DEFENDANT: Very much so.

"THE COURT: You have talked with your attorneys about what you are doing?

"THE DEFENDANT: I have talked to them, my parents, my son, my sister, people in five states that love me, a couple of countries, and yes, I know what I am doing. I explained to everyone that cares why I am doing it."

(T.p. Vol. XXVIII, p. 6221-6224).

The Court then sought input from both of Appellant's trial attorneys. Atty. Gerald Ingram placed in the record the nature of the mitigation evidence which they would present. Specifically, that evidence included Appellant's six-day stay in a psychiatric hospital, hospitalization due to a traffic accident, records from sessions at Valley Counseling, and testimony from various family members. He told the court:

-14-

"MR. INGRAM: Donna has instructed us not to present any mitigating evidence.  And while I professionally and personally may disagree with that decision, I'll state on the record that it is my personal and professional opinion that Donna's decision making process was rational and that she's competent to make that decision.***My own perspective is that this is a rational, competent decision on her part."

(T.p. Vol. XXVIII, p. 6225).

Likewise, Atty. Juhasz told the court, "I am comfortable that what Donna is doing is in [sic] indeed, knowing and voluntary and intelligent." Id. at p. 6227.  The court then took sworn testimony from Dr. Thomas Eberle, a court psychologist who evaluated Appellant in March of 2003 and just immediately prior to the in camera hearing in question.  In his expert opinion, he testified that "she's now mentally and rationally making this decision for reasons that are not unintelligent, ***it is really her right to make that decision, and I find no psychiatric or psychological abnormality that would prevent her from having the faculties need to make that decision in a rational way." Id. at 6231.

The court also ascertained that Appellant knew her decision was irrevocable. Id. at 6233 - 6234.  Finally, after this significant inquiry, the court found as follows:

"THE COURT: The court is satisfied from the conversation that has occurred this morning, from observing Miss Roberts in speaking with her, that this is her voluntary decision.  She appears to have no reluctance at all in making the decision.  The Court will note that she appears to me to be relieved in having made the decision.  I do not understand what that is, nor is it necessary that I do.  She's expressed several times that she has come to some resolution in her own mind that this is what she wants to do.  And I guess again as Mr. Juhasz says, it is not my function here to impose what I would do or what I would think is proper, that is strictly Miss Roberts say on the matter and she's had her say.  Do you wish to stick by that, is that correct?

"THE DEFENDANT: Yes, Sir.

"THE COURT: Fair enough."

-15-

Id. at 6234.  In further accordance with *Ashworth,* the court found that the decision was made "[f]reely, knowingly and voluntarily, intelligently.  It is done in a rational basis which is predicated on the testimony of the doctor that she's competent to make that decision."  Id. at 6235.

Furthermore, contrary to Appellant's claim at page 8 of her brief, this Court has *never* required that the court explain that a waiver of mitigation "would most assuredly result in her receiving the death penalty."  Indeed, this Court has stated just the opposite:

> "In addition, appellant is incorrect in asserting that the court erred in failing to inform him that if he presented no mitigation, the only lawful jury verdict would be death. Ohio law provides that the jury is required to consider as possible mitigating factors the nature and circumstances of the offense; the history, character, and background of the defendant; and any other factors that call for a penalty less than death or that lessen the appropriateness of the death penalty. The trial court here did instruct the jury that it must consider these statutory mitigating factors before it retired to deliberate as was required under R.C. 2929.04(B)."

> "Moreover, the jury is not restricted to considering mitigating evidence presented in the penalty phase. Rather, the jury is required to consider 'any evidence raised at trial that is relevant * * * to any factors in mitigation of the imposition of the sentence of death'."

*State v. Jordon* (2004), 101 Ohio St. 3d 216, ¶79, 80. Nevertheless, despite the fact the trial court was under no legal obligation to do so, the trial court told Appellant, "***I must be entirely convinced that this is your wish, and that you understand all aspects of it, that you understand that by waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty." Id. at 6232.  That being said, *Appellant* took the liberty of explaining to her jury that, "We haven't given you one piece of mitigating evidence. You are bound by law to give me one sentence, the death penalty.  You have no other choice. That is what I'm asking you to do." Id. at 6295.    Therefore, even though there is no legal support for Appellant's assertion that "the failure to present mitigation would result in a death

-16-

sentence," the trial court duly warned Appellant of the likely consequences of waving her right to present mitigating evidence.  To suggest for one moment that Appellant did not have a full understanding of those consequences is positively ludicrous and defied by her very own words to her jury.

Appellant further postulates  in this Proposition of Law that because the trial court permitted her to make an *unsworn statement* during the mitigation phase after she waived her right to present *mitigation evidence,* that Appellant's waiver is defective and that she in fact made only a "partial waiver."   Appellant's brief at p. 8.  This suggestion borders on the amusing. Appellant uses this Proposition of Law to complain that the trial court danced to every tune she played.

This Court should first dismiss this argument on the doctrine of invited error.  "Under the invited-error doctrine, a party cannot take advantage of an error that the party invited or induced the court to commit."  *State v. LaMar* (2002), 95 Ohio St. 3d 181, 206.  Appellant specifically requested that she be permitted to make her unsworn statement; the court did not suggest or require that she do so.  (T.p. XXVIII, p. 6222, 6235).  For this Court to find that Appellant's waiver to present mitigation evidence was defective because the court readily granted her wish to make an unsworn statement would be ignore the doctrine of invited error.

Secondly, Appellant presents absolutely no authority to this Court which states that when a capital defendant waives his or her right to present mitigation evidence, the defendant simultaneously relinquishes their right to make an unsworn statement to the jury. In fact, R.C. 2929.03(D)(1) reads that the capital defendant *shall* have the opportunity to address the jury in the mitigation phase:

-17-

"***The court, and the trial jury if the offender was tried by a jury, *shall* consider any report prepared pursuant to this division and furnished to it and any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, *shall* hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, *and shall hear the statement, if any, of the offender,* and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender. *The defendant shall be given great latitude in the presentation of evidence of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code and any other factors in mitigation of the imposition of the sentence of death.* If the offender chooses to make a statement, the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation." (Emphasis added).

While R.C. 2929.03(D)(1) does not require a capital defendant to make an unsworn statement, it clearly requires the judge and jury to consider whatever is said if that defendant chooses to so pontificate. Therefore, the State submits, the trial court would have been in error if it had conditioned the waiver of mitigating evidence upon a simultaneous waiver of Appellant's right to make an unsworn statement.

Furthermore, this Court has decided numerous capital cases wherein the defendants elected to waive the presentation of mitigation evidence and yet made unsworn statements to the jury. *Jordon*, supra at ¶54 ; *Taylor,* supra, at 27, *State v. Vrabel* (2003), 99 Ohio St. 3d 184, 191. This Court never qualified any of these capital defendant's waiver of mitigation evidence as a "partial waiver."

Finally, even if Appellant convinces this Court that the trial court's accommodation of her every mitigation whim and wish somehow de-constructs an otherwise *Ashworth*-compliant waiver into  a "partial waiver" of her right to present mitigation evidence, and the State in no way

-18-

concedes that point, any error is at worst harmless beyond a reasonable doubt as Appellant clearly suffered no prejudice. Crim R. 52 (A). Appellant was permitted to use her mitigation hearing as a bully pulpit to insult the Howland Police Department, the Trumbull County Prosecutor's Office, and the members of the jury panel. She degraded witness testimony and accused the press of not reporting the whole truth. She told the jury to recommend the same sentence imposed upon her co-defendant lover, Nathaniel Jackson. With no interruption from the State or from the court, Appellant was free to make the statement of her own composition, design and agenda. As Appellant so aptly writes in her brief, "[t]his is a defendant who is sacrificing herself to establish a point about inequality within the justice system based on race, religion or wealth." The State submits Appellant had every right to make such a noble sacrifice and that she should not come before this Court and complain that she was "confused" or the victim of an "unknowing" or "unintelligent" waiver.

For the above reasons, it is patently obvious that the trial court scrupulously advised Appellant of her right present mitigation evidence, the consequences of not doing so, and made certain that she made a competent decision to waive those rights. As such, Appellant's Proposition of Law One is without merit.

-19-

**APPELLEE'S PROPOSITION OF LAW TWO**

**A reasonable person would conclude that "consent to search" included an attached garage when said person was informed the "premises" constitute a crime scene which must be processed prior to consent.**

In Appellant's Proposition of Law Two, she takes issue with the trial court's denial of her Motion to Suppress Evidence, particularly the search of the trunk to her automobile which yielded a cache of letters written by Appellant and sent to her co-defendant lover, Nathaniel Jackson.

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. Burnside* (2003), 100 Ohio St. 3d 152, 155.

In the case sub judice, there are few factual disputes which must be resolved, though the State would note that Appellant was somewhat selective as to the facts which she wished to highlight for purposes of this Proposition of Law. The trial court did not parse out the validity of the search of the residence versus the search of Appellant's Chrysler in its judgment entry denying Appellant's Motion to Suppress. (T.d. #62). Perhaps an inconsequential detail, but the State would point out that Appellant incorrectly places Appellant's car in the *driveway* of the home, when in fact she parked her car in the attached *garage* of the home. (Appellant's brief at

-20-

16, T.p. Vol. I, p. 231).

Appellant in her brief all but concedes she consented to a search of her home, but "[t]he consent to process the house was limited to the house." (Appellant's brief at 16). Such was not the impression she gave to Det. Sgt. Paul Monroe, the chief investigator who discovered the letters. "[S]he wanted me to fully investigate this crime, to search the entire residence and basically gave me cart[e] blanche to look anywhere on their property while I was there, to find clues as to who had committed this act." (T.p. Vol I, p. 241). In fact, she told Det. Sgt. Monroe *three* times that it was his job to find Robert Fingerhut's murderer. Id. at 235. The implication was clear; if Det. Sgt. Monroe did not find the killer, he was not worthy of the badge he wore. In order to portray herself as the concerned and grieving widow, Appellant did not restrict her consent to any portion of the house or the property. Id. at p. 241-242, p. 246.

It is well settled that the Fourth Amendment to the United States Constitution protects citizens from unreasonable searches. When an officer conducts a warrantless search, the state bears the burden of establishing the validity of the search. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454-455. No Fourth Amendment violation occurs when proper consent, voluntarily obtained, precedes the search. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218. See, also, *State v. Posey* (1988), 40 Ohio St. 3d 420. When police officers rely upon consent to justify a warrantless search, they have no more authority than they have been given by the consent. "A suspect may * * * delimit as he chooses the scope of the search to which he consents." *Florida v. Jimeno* (1991), 500 U.S. 248, 252.

Based upon the above authority, it is significant to instant search that Appellant placed *no limits whatsoever* upon Det. Sgt. Monroe's search. Three Howland officers testified that

-21-

when Det. Sgt. Monroe told her it was necessary to process her residence as a crime scene, she said to do "whatever it takes" to find Robert Fingerhut's killer. (T.p. Vol. I, p. 182, 221, 241). Appellant has never disputed that she told Det. Sgt. Monroe to do "whatever" was necessary to find the perpetrator of this homicide.

The trial court found as follows: "She [Appellant] rationally, although emotionally, repeated the request for the police to find the killer, and there was every reason for the police to take her actions as a request from them to search for evidence. It was reasonable to imply Ms. Roberts consent to do so." (T.d. #62).The United Supreme Court has found that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, supra, at 251. The reasonable person, even a supposed grieving widow, would understand that when a policeman hears "do whatever it takes" he would be derelict in his duties by *not* searching every nook and cranny of the property to find every available clue to the killer's identity.

The United States Court of Appeals, Sixth Circuit, considered a similar query to the one at bar in *U.S. v. Caudill* (6th Cir. [Ky.], 2001, 25 Fed. Appx. 349, 2001 WL 1671075). In *Caudill,* the defendant's girlfriend, Michelle Coomer, consented to the search of his garage after Caudill deliberately shot himself in the leg, and then called the Kentucky State Police to investigate with hopes of pinning the shooting on his ex-wife. The KSP received a consent to search the house and outbuildings, and in the process found 132 marijuana plants and two pounds of processed marijuana. Given Caudill's invitation to find the "real" shooter, the Sixth Circuit found that the trial court properly denied his motion to suppress the marijuana:

-22-

> "It is not difficult to conclude that a reasonable person would understand that Coomer consented to have Detective Peters search the garage as part of his investigation. Coomer demanded a thorough inquiry. Peters told her that he intended to examine and videotape the house, the grounds and all the outbuildings. Peters considered the three shootings incidents to be related, and Coomer told him that a shooting two weeks earlier had originated near the corner of the garage. After Peters explained the expansive nature of his intended search to Coomer, Coomer left the premises and Peters went about his business. Neither Coomer nor the defendant attempted to limit Peters' access to the garage or any other part of the dwelling or curtilage, nor did anyone with authority over the premises attempt to withdraw the consent previously given.
>
> "The defendant's reasonable expectation of privacy in the contents of the garage was properly compromised by the consent to search, and his possessory interest in the marijuana was properly abridged under the plain view doctrine. The trial court correctly denied the motion to suppress the evidence."

*Caudill,* supra, at **5. Not only should Appellant's admonition to "do whatever it takes" cause this Court to conclude that scope of Appellant's consent included her automobile, but so should the fact that she left the officers at her Howland Township residence as she accompanied her brother and sister-in-law to Austintown knowing their search would continue with her blessing. (T.p. Vol. I, p. 275). The U.S. Supreme Court has determined that by employing a totality of the circumstances analysis, a court can determine the existence of an implied consent. "[T]the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth ,* supra, at 227. See, also, *Flippo v. West Virginia* (2002) 575 S.E. 2d 170, 180. In *State v. Cooper* (Sept. 26, 1997), 2nd Dist. No. 97-CA-15, the court applied the doctrine of "implied consent" when the defendant's wife motioned two officers through an open garage door and urged them to wait while she awoke her husband. While waiting for the defendant, police noticed various motorcycle parts, presumed stolen:

> "***In the instant case, Mrs. Cooper called to the officers from the opened

-23-

> garage and the officers responded by approaching her and entering the garage. The officers' entry appears to have been a reasonable and expectable response to Mrs. Cooper's actions. After the officers entered, Mrs. Cooper did not object or attempt to make them leave in any way. Indeed, she left alone in the garage when she reentered the house.***"

*Cooper,* supra, at *4. Like Mrs. Cooper, Appellant did not object to the police remaining behind, and in fact told them to "do whatever it takes" in processing the crime scene. At minimum, Appellant's consent to search for clues can be construed as an implied consent to search her entire property, without interference from her, and this consent to search included her car parked inside the attached garage.

Appellant further seeks to challenge the validity of the consent to search form (State's Suppression Ex. 1) as somehow inconsequential because she signed it after Det. Sgt. Monroe discovered the incriminating evidence in the trunk to her automobile. To the contrary, it is wholly dispositive of Appellant's wish that the police unearth every possible lead to find Robert Fingerhut's killer and she was knowingly and voluntarily waiving her Fourth Amendment rights to facilitate a thorough investigation. The signed consent form specifically includes two Chrysler 300M automobiles with the VIN numbers initialed by Appellant. (State's Suppression Ex. 1). Even post-search, the form makes it patently obvious that Appellant knew of the scope of the police search, and willingly acquiesced thereto. Based on a reasonableness standard, it would be unreasonable for any court to conclude that it was okay with Appellant if police searched her automobile the morning after the homicide, but not the night of the homicide.

Appellant also frequently references in her brief, as did her attorney at the suppression hearing, that she was not specifically advised of her right to refuse consent. However, the U.S. Supreme Court has determined that no such advisement is necessary. "While knowledge of the

-24-

right to refuse consent is one factor to be taken into account, the government need not establish

such knowledge as the sine qua non of an effective consent." *Schneckloth*, supra, at 227.

Finally, the State submits that even if this Court finds that the search of Appellant's trunk

was violative of the Fourth Amendment, and the State does not concede this point, the admission

of the letters is at worst harmless error. Crim 52(A)  The State had overwhelming evidence, even

absent that grouping of letters, to prove Appellant's role in her ex-husband's murder.

Specifically, the State had the letters which police removed from Appellant's bedroom, plus the

tapes of the recorded prison conversations between Appellant and co-defendant Jackson.

Therefore, any admission of the "Chrysler collection" is harmless at worst.

Based on the foregoing argument, Howland Police arrived at Appellant's residence

pursuant to *her* call upon finding Robert Fingerhut dead inside the home.  She told the police to

do "whatever it takes" to find his killer as they sought her verbal consent to search the property.

The very next morning,  she signed a consent form for not just the house, but for two Chrysler

automobiles, one of which was the one she parked in the garage the night of the homicide.  Ohio

courts recognize the doctrine of implied consent as an exception to the search warrant

requirement.  Not only was Appellant not a suspect when she gave verbal consent to officers to

"do whatever it takes" she was also not a suspect when she signed the consent form the next day.

(T.p. Vol. I, p. 182)  It is reasonable to conclude that if she signed a consent form to search her

car at 10 a.m. the next morning, she was equally consenting when she told Det. Sgt. Monroe to

"do what ever it takes" at midnight the same day.  As such, the trial court properly denied

Appellant's motion to suppress evidence and her second proposition of law is without merit.

-25-

## APPELLEE'S PROPOSITION OF LAW THREE:

**A trial court does not abuse its discretion in overruling challenges for cause of prospective jurors when the court finds that they are suitable jurors able to render an impartial verdict.**

In Proposition of Law Three, Appellant challenges the trial court's failure to dismiss certain jurors for cause. The State submits this argument is without merit.

It is well-settled that the scope of the examination during voir dire is within the sound discretion of the trial court and the judgment will not be reversed absent a showing that the trial court abused its discretion. *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 186 . In Ohio, "[t]he proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers* (1985), 17 Ohio St. 3d 174, paragraph three of the syllabus. This Court adopted this standard from the U.S. Supreme Court's decision in *Wainwright v. Witt* (1985)469 U.S. 412, 424: "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon*'s[3] reference to 'automatic' decision making, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity'." Trial courts have discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St. 3d 281, 288.

Moreover, Crim. R. 24 provides, in pertinent part:

Challenge for cause. A person called as a juror may be challenged for the

_____

[3] *Witherspoon v. Illinois* (1968), 391 U.S. 510.

-26-

following causes:
" * * *
"(9) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.
" * * *
"(14) That he is otherwise unsuitable for any other cause to serve as a juror."

With this background in mind, the State will address the two potential jurors who Appellant argues should have been dismissed for cause:

Andrew Kotwis:

Appellant argues that because at certain points during his voir dire, Mr. Kotwis suggested he might feel sympathy for the victim in this case, he should have been dismissed for cause. At no time does the defense argue, nor does the record demonstrate that the wholly reasonable emotional element of sympathy would "substantially impair" his ability to serve on a capital jury. Mr. Kotwis voiced no pre-conceived opinion which would cause the trial court to conclude he could not be fair and impartial. Indeed, Mr. Kotwis was anything but a death penalty enthusiast. "I'm not a flag waver, you know that runs down the street and promotes the death penalty, but I accept the death penalty as part of our legal system." (T.p. Vol. XIX, p. 4128). He further assured the court that he would not automatically impose the death penalty and would consider all four sentencing options. (T.p. Vol. XVIII, p. 4034, 4072). Mr. Kotwis stated several times that the did not feel the death penalty was a deterrent to crime. (T.p. Vol. XIX, p. 4116, 4119, 4122). He expressed strong beliefs in the presumption of innocence. (T.p. Vol. XVIII, p. 4051). Nevertheless, defense counsel's reservations about Mr. Kotwis' statements concerning

-27-

possible sympathetic undertows became a near obsession of Appellant's trial counsel.

As a result Mr. Kotwis sought to clarify his statements regarding feeling sympathy for the victims:

"ANDREW KOTWIS: I think the context that I made that statement on the questionnaire was that the argument for and against the death penalty by various states. And I never feel like, I never felt like it was something that really deters crimes so much as the death penalty provides a feeling of immediate comfort to the victims's families."

(T.p. Vol. XIX, p. 4116). However, the court explained to Mr. Kotwis that as a juror, he would have to put any feeling of sympathy aside:

"THE COURT: The standard instruction that is given, it's given in every case, is to the effect that the law recognizes that each of the jurors are human beings and that they may have sympathy for one side, sometimes for both sides, but that sympathy is not something that is to be used. You're to be more analytical and to apply the facts without applying anger, fear, sympathy, all the emotions we're subject to . Now, it may be that you feel that's an important part of a decision of this nature. If it is , that's fine, but the law does not permit sympathy to be a determining factor on the evidence."

"ANDREW KOTWIS: It won't be a deciding factor." (T.p. Vol. XIX, p. 4126).

Indeed, the trial court ultimately instructed the panel, on which Mr. Kotwis never sat, to "[c]onsider all the evidence. And make your findings with intelligence, and impartiality, without bias, sympathy or prejudice, so that both the State of Ohio and the Defendant, Donna Marie Roberts will feel that their case was fairly and impartially tried." (T.p. Vol. XXVIII, p. 6181). A jury is presumed to follow the trial court's instruction. *State v. Loza* (1994), 71 Ohio St. 3d 61, 79.

The Court continued its admonition concerning sympathy:

"THE COURT: ***You understand that sympathy cannot be a determining factor. I understand from your answers that you're going further than most people would

-28-

in saying I can't tell you I'm not going to have sympathy as we go through this trial, it's a human emotion.

"ANDREW KOTWIS: Uh-huh.

"THE COURT: Well, I suspect that's true. But the question is whether it is going to be a determining factor or not, and you're telling us that it isn't.

"ANDREW KOTWIS: I said no."

(T.p. Vol. XIX, p 4133).   The State submits that none of the answers given by Mr. Kotwis would justify a challenge for cause.  Even if comments made early on by Mr. Kotwis indicating possible sympathy for a murder victim and his family, there was no indication that those feeling would "substantially impair" his performance as a juror.  Mr. Kotwis gave every indication that he would follow the court's instructions and could render a fair and impartial verdict. Therefore, the trial court properly overruled the defense's challenge for cause.

Michael E. Blake :

The trial court also overruled defense motion to dismiss Mr. Blake for cause.  During the course of his lengthy examination, Mr. Blake acknowledged that he had read some newspaper accounts of co-defendant Jackson's case.  He felt as a result of what he read, that "they must have a good reason to arrest her (Appellant)."  (Vol. XX, p. 4365).  However, Mr. Blake also stated that he would be able to set aside anything he had heard or read about the case and to judge the case solely on the evidence presented and the court's instructions.  Id. at p. 4312.  Furthermore, he stated that an arrest is not necessarily indicative of Appellant's guilt:

"MICHAEL E. BLAKE: Well, I said I figured that she must have something to do with it because they arrested her, not saying she's guilty."

"ATTY. JUHASZ:  Okay.  Does the fact that she's arrested in some way lead you

-29-

to an inference that she's guilty or does it not.?

"MICHAEL E. BLAKE: No." (T.p. Vol. XX, p. 4395).

Drawing on a cake-baking analogy, Mr. Blake agreed that if the State failed to combine all the necessary "ingredients" (also known as elements) that Mr. Blake would have to find Appellant not guilty.  Id. at 4330-4331.  The prosecutor also explained "the cloak of innocence" which our justice system affords.  Mr. Blake agreed with the prosecutor "that the burden is totally only us (the prosecution), so the defendant doesn't have to do anything and it's only right, right?" Id. at p. 4335.  Mr. Blake stated he would return a not guilty verdict if prosecutors failed to prove their case.  Id. at 4398.

Even with his knowledge of the co-defendant's case, Mr. Blake further assured attorneys that he would not automatically impose the death penalty simply because Jackson was sentenced to death:

> "ATTY: JUHASZ: All right.  So the impressions that you have about the case are strictly what you got from the news media, am I correct?
>
> "MICHAEL E. BLAKE: Right, and I forgot half of that so."
> ***
>
> "MICHAEL E. BLAKE: I don't really understand how to answer that because, I mean, like I said, you only– what I read, you can't believe all of it, right?  I was taught that anyways."
>
> "ATTY. JUHASZ: All right.  Those things, did they do anything to sort of add to that impression?  'Well they must have had some good reason, and now look, the other guy, they convicted him and sentenced him to death'."
>
> "MICHAEL E. BLAKE: I would say no."

(T.p. Vol. XX, p. 4359- 4366).

In addition to Mr. Blake's skepticism concerning the reliability of local media reports,

-30-

Mr. Blake assured defense counsel he would listen to the evidence and not require Appellant to prove her innocence:

> "ATTY. JUHASZ: ***Having heard and having read what you read are you able to look at Donna Roberts and say look, okay, I've read and heard all this stuff but I presume you innocent, or in candor, would you have to look at hear and say look, I've read and heard all this stuff, I've got some inkling you were involved in this and you're going to have to do something to show me that I'm wrong about that?
>
> "MICHAEL E. BLAKE: No.***I wouldn't –I don't presume anybody guilty."

(T.p. Vol. XX, p. 4397).

Though Mr. Blake initially stated he would expect or anticipate that Appellant would attempt to dispel the version of the facts presented by the local news media, he also understood it was the State's job to prove the crime beyond a reasonable doubt, and that Appellant does not need to take the stand in her own defense.  Id. at 4391.

Through its own questioning the court attempted to assure itself that Mr. Blake understood that Appellant was not under any obligation to present evidence on her behalf:

> "THE COURT:*** And do you feel that from what you already know at this point about this trial that there's going to be any tendency on your part to somehow require something from the defense side or something even from the prosecution's side to disprove what you believe is true?
>
> "MICHAEL E. BLAKE: I'm going to set aside everything I've read or heard.  I'm just going to listen to the facts that are presented and I'll have to make up my mind that way.  I mean, I'm not– just because I read about it I don't feel like she's guilty."

(T.p. Vol. XX, p. 4405-4406).

Following this exchange, the defense challenged Mr. Blake for cause and the court overruled the challenge. Id. at 4408-4409.

-31-

The State submits Appellant has failed to demonstrate an abuse of discretion on the part of the trial court in overruling Appellant's motion to dismiss both Mr. Kotwis and Mr. Blake for cause. The questions revealed two prospective jurors who would vote to acquit Appellant if the State failed to prove its case, and would consider all four sentencing options if the case proceeded to a mitigation phase.

"A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Wilson* (1972), 29 Ohio St. 2d 203, 211. Appellant makes no claim that any of the jurors ultimately seated was less than impartial. He has therefore failed to state a constitutional violation. *State v. Broom* (1988), 40 Ohio St. 3d 277, 288. Furthermore, neither Mr. Kotwis nor Mr. Blake were seated on the panel. As Appellant tacitly acknowledges in brief, the full twelve-member panel which decided her guilt was in place before Mr. Kotwis and Mr. Blake re-appeared in the courtroom for the selection of the alternates. This Court in *State v. Taylor* (1990), 50 Ohio St. 3d 24, held that a capital defendant suffers no prejudice when he must use unexhausted peremptories to challenge alternate jurors:

> "After twelve jurors had been selected, venireman Mlakar was examined on voir dire as a possible alternate juror. Mlakar believed blacks in general to be more inclined than whites to commit crimes. The trial judge denied appellant's challenge for cause and appellant used a peremptory challenge to exclude Mlakar. Assuming *arguendo* that it was error to overrule appellant's challenge, no prejudice could have resulted. Appellant used a peremptory challenge to eliminate Mlakar, curing the error. Since no alternates participated in the verdict, appellant cannot claim that he wasted a peremptory challenge on Mlakar that he could have used to eliminate another venireman who sat as a juror. The jury's composition was in no way affected."

*Taylor,* supra, at 31, 32. Like *Taylor,* Appellant can claim no prejudice.

-32-

Finally, though the State concedes no error in the trial court's overruling Appellant's challenges for cause, any error would be at worst harmless beyond a reasonable doubt. Crim. R. 52(A). Regardless of the composition of the panel, Appellant herself waived her right to mitigation and told the jury to recommend the death penalty. The jury went along with her wishes. Therefore, the make-up of the jury is not prejudicial when Appellant herself argued for the imposition of the ultimate punishment.

For these above reasons, the trial court did not abuse its discretion in declining to dismiss Mr. Kotwis and Mr. Blake for cause. This Proposition of Law is without merit.

-33-

that property without the consent of the owner." (T.p. Vol. XXVIII, p. 6165).  She argues that no

theft offense occurred.

This Court's most oft-quoted definition of sufficiency of the evidence appears in *State v.*

*Thompkins* (1997), 78 Ohio St. 3d 380, 386-387:

> "With respect to sufficiency of the evidence, ' 'sufficiency' is a term of art
> meaning that legal standard which is applied to determine whether the case may
> go to the jury or whether the evidence is legally sufficient to support the jury
> verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. See, also
> Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court
> if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a
> test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a
> question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124
> N.E.2d 148. In addition, a conviction based on legally insufficient evidence
> constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45 citing
> *Jackson v. Virginia* (1979), 443 U.S. 307.

In reviewing the sufficiency of evidence, "the relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic.*)  *Jackson v.*

*Virginia* (1979), 443 U.S. 307, 319.

Appellant does not deny that her lover/co-defendant Jackson drove away in Robert

Fingerhut's Chrysler 300M the night Jackson shot Fingerhut.  Instead, she argues that Jackson

merely used the automobile as a means of escape from the homicide scene and was good enough

to leave the keys in the car when he abandoned it near his Youngstown, Ohio, home.  Therefore,

by definition, the taking of the car is not a theft offense, and she should not have been convicted

of aggravated robbery as a result.  (Appellant's brf. at p. 25).  She further argues that Jackson

never formed the intent to take the automobile until *after* he had used the force against Mr.

Fingerhut by killing him.  This Court has repeatedly rejected this theory in capital cases.

-35-

In *State v. Smith* (1991), 61 Ohio St. 3d 284, 290, this Court held:" * * * [T]he victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching her die, and then stealing her property after the death." Like *Smith,* Appellant seeks vindication for her role in an aggravated murder merely because the asportation of Mr. Fingerhut's Chrysler occurred after Jackson used the ultimate force, aggravated murder.

In *State v. Rojas* (1992), 64 Ohio St. 3d 131, the defendant sought relief from an aggravated robbery charge and aggravated murder specification because he did not try to take money from the victim's purse until after he had stabbed her and stayed behind in her apartment long enough to clean his blood-stained clothes and to rig the apartment for an explosion after he left. Rojas claimed in his appeal that he had no intent to rob his victim until after the stabbing, and should therefore be acquitted of the aggravated robbery charge. Rojas' argument rang hollow with this Court:

> "Although Rojas claims that no evidence shows that he stabbed Scott with
> the intent of robbing her, he did steal from her. His intent to rob can be inferred
> from the fact that he did so. See *State v. Lockett* (1976), 49 Ohio St. 2d 48,
> reversed on other grounds, *Lockett v. Ohio* (1978), 438 U.S. 56. Additionally,
> Rojas not only admitted he took the $25, he also thought about taking Scott's
> stereo, bloody clothing, and automobile, and he moved the stereo for that purpose.
> If Rojas intended to steal Scott's property while she was alive, the fact that he
> carried it away after she died is not crucial."

*Rojas,* supra, at 139. Likewise, Jackson's intent to steal the car is obvious by the fact that he did it.

This Court relied upon *Rojas* in deciding another Trumbull County capital murder case,

-36-

*State v. Williams* (1996) 74 Ohio St. 3d 569.  Williams tried unsuccessfully to argue to this Court

that because he  first murdered George Melnick and then raped Mr. Melnick's seriously wounded

wife, he should not have been convicted of the rape charge or specification because the State

could not prove that he *intended* to rape Mrs. Melnick prior to the murder of Mr. Melnick.  This

Court disagreed: "In this case, each of the crimes of which Williams was convicted during one

continuous incident.  Accordingly, Williams should not be able to escape the felony-murder rule

by claiming the rape was merely an afterthought." *Williams*, supra,  at 577. This Court went on

to hold that because the murder of Mr. Melnick was "associated" with the rape of Mrs. Melnick,

it occurred "as part of one continuous occurrence."

> "The facts are even stronger than those in *Rojas* and *Smith* in which death
> sentences were affirmed, because there is no evidence which suggests a
> substantial passage of time between the assault on Mr. Melnick and the attempted
> rape of Mrs. Melnick. Thus, *we find that neither the felony-murder statute nor
> Ohio case law requires the intent to commit a felony to precede the murder in
> order to find a defendant guilty of a felony-murder specification.*" (Emphasis
> added).

*Williams* at 577-578.   Clearly in the case at bar, the theft of Mr. Fingerhut's car was associated

with his murder. Based on the fact that Mr. Fingerhut was alive and well at 9 p.m. (T.p. Vol.

XXIV, p. 5240) and that Appellant placed her feigned hysteria 911 call at midnight, (T.p. Vol.

XXIV, p. 5184)  it can be argued that there was no substantial passage of time between the

murder and the auto theft.  Also, it can be reasonably inferred that if Mr. Fingerhut were alive in

his home rather than dead on the kitchen floor he would not have voluntarily handed over his car

keys to Jackson for a joy ride.  Pursuant to *Rojas* and *Williams,*  the State was not required to

prove Jackson formulated the intent to steal the vehicle prior to murdering Mr. Fingerhut.

Finally, in yet another Trumbull County capital murder case, *State v. Biros,* (1997), 78

-37-

Ohio St. 3d 426, the defendant argued there was insufficient evidence to sustain a conviction of

aggravated robbery because the State did not demonstrate that when Biros strangled his victim,

eviscerated her, and then "accidentally" removed a diamond ring from her finger as he was

dragging her lifeless corpse into the woods, he had no intention of stealing the ring. This Court

applied the *Williams* case and held as follows:

> "Viewing the evidence and the reasonable inferences to be derived therefrom in a light most favorable to the prosecution, it is clear that any rational finder of fact could conclude that appellant committed an aggravated robbery beyond a reasonable doubt. Even appellant's own testimony was sufficient to show the commission of an aggravated robbery offense. Specifically, appellant knowingly obtained or exerted control over Tami's ring without her consent and, at least inferentially, with the purpose to deprive her of that property. Thus, the evidence was sufficient to show that appellant committed a 'theft offense' as that term is defined in former R.C. 2913.01 (see former R.C. 2913.02[A][1] ) and that appellant had a deadly weapon on or about his person or under his control the entire time. Former R.C. 2911.01(A)."

*Biros,* supra, at 450-451.

Appellant relies upon *State v. Ballard* (1984), 14 Ohio App. 3d 59, to support his theory

that an intent to steal must coincide with force or threat of force. The State agrees, but

Appellant's reliance on *Ballard* is misplaced. The Eighth District Court of Appeals overturned

Ballard's robbery conviction because while he clearly intended to take his ex-girlfriend's purse,

the court did not agree that merely yanking the purse from the victim's shoulder constituted

sufficient force to support a robbery conviction. *Ballard,* supra, at 61.

Viewing the evidence and the reasonable inferences in a light most favorable to the

prosecution, it is patently obvious that a reasonable fact finder could find Appellant guilty of

complicity to aggravated robbery beyond a reasonable doubt. To wit, Appellant and Jackson

hatched a plot to murder Mr. Fingerhut for his insurance benefits. As a continuous occurrence

-38-

and incident, Jackson knowingly exerted control over Mr. Fingerhut's automobile to facilitate

his getaway from a murder which he planned with Appellant and which she clearly aided and

abetted.  See Statement of Facts, supra. Driving away in an automobile immediately after killing

its owner is indicative of aggravated robbery, not a mere unauthorized use which totally ignores

the elements of a deprivation of property and force. As such, the crime of complicity to

aggravated robbery is sustained by the sufficiency of the evidence and Appellant's Proposition

of Law Four is without merit.

-39-

**APPELLEE'S PROPOSITION OF LAW FIVE:**

**A capital defendant suffers no prejudice when she is afforded the right of allocution after the sentence is announced from the bench, but before the sentencing hearing is adjourned, when the defendant has already requested a death sentence, thanks the judge for imposing a death sentence, and has waived the right to present any mitigating evidence.**

In her Proposition of Law Five, Appellant argues prejudicial error by the trial court's announcement of her death sentence before it asked if she or her attorneys had anything to say on her behalf. The State concedes it was error to proceed with sentencing before affording Appellant her right of allocution, but said error is at worst harmless because of the unique circumstances of this case.

Crim. R. 32(A)(1) provides that at the time of imposing sentence the court shall "afford counsel an opportunity to speak on behalf of the defendant and also shall address the defendant personally and ask if he or she wishes to make a statement in his or her behalf or present any information in mitigation of punishment." This court explained in another capital case, *State v. Reynolds* (1998), 80 Ohio St. 670, 684, that "[t]he purpose of allocution is to permit the defendant to speak on his own behalf or present any information in mitigation of punishment."

In the case sub judice, Appellant made it abundantly clear that she wished to present *no* mitigating evidence. She specifically told her trial counsel to present no mitigation witnesses. When given the opportunity to present her unsworn statement at the close of the mitigation hearing, Appellant told the jury it had no choice but to recommend the death penalty because she presented no mitigating evidence.

When defense counsel brought to the court's attention that it had failed to afford Appellant her right of allocution immediately before sentencing, Appellant was afforded one last

-40-

opportunity to plead for leniency.  Instead, she told the court as follows:

"THE COURT: Gentlemen, would you have your client come forward, please?  Does the Defendant wish to address anything prior to sentencing?

"THE DEFENDANT: Yes, I think I would.  I would like to have one of those notes back.  Short and sweet this time.  You probably wonder why I did what I did about asking for the death penalty.  Because I think one small voice for justice is going to count.  Maybe if it is for only one person some day.  I didn't want to take the stand on race equality and the criminal justice system.  Criminal justice, an oxymoron, and two to expose and ask corrupt police officials who use a badge to destroy rather than protect lives for their own gain by committing perjury, planting and transferring evidence, tampering, and using race and religion to condemn.  Thank you.

"Thank you for your decision.  I was a little worried you might try to find something not to do that.  I appreciate what you did.  Thank you."

(T.p. Vol.XXVIII, p. 6373-6374).   The trial court then gave opportunity to Appellant's trial

counsel  to make any remarks.  One complained about a migraine headache, and then declined

further comment.  (T.p. Vol. XXVIII, p. 6374).

This Court in *State v. Campbell* (2000), 90 Ohio St. 3d 320, 326, held, "that in a case in

which the trial court has imposed sentence without first asking the defendant whether he or she

wishes to exercise the right of allocution created by Crim.R. 32(A), resentencing is required

unless the error is invited error or harmless error." The State submits that the case sub judice

personifies the poster child of harmless error when a trial court missteps on the right of

allocution. The Appellant can demonstrate no prejudice by the trial court's inadvertent omission.

Appellant asked for and received the death sentence.  Therefore, there is no prejudice.

This Court declined to remand Reynolds for sentencing because he had made an unsworn

statement to the jury, had sent a letter to the court, and his defense counsel had made a statement

on his behalf.  *Reynolds,* supra, at 684.  Interestingly, this Court also declined to overturn

-41-

Reynolds sentencing despite the fact that the trial court had filed its sentencing order prior to the sentencing hearing and prior to any opportunity for allocution.  Still, this Court found no prejudice:

> "***The trial court sat through the trial and penalty phases of the case and had listened to the evidence presented as to the aggravating circumstances and mitigating factors. The court had from May 31st until June 9th to consider the evidence presented by both sides. Counsel's arguments for Reynolds during the sentencing hearing were substantially the same as the arguments advanced during the penalty phase. Had new evidence or information been presented during the sentencing hearing, the trial court could have modified its sentencing order. We conclude that the premature filing was not prejudicial error."

*Reynolds,* at 683-684.  The trial court's attempt to correct its error by allowing Appellant to ask for leniency was more than just a hollow act equivalent to locking the barn door once the horse had fled.  Like in Reynolds, the trial court could have modified its sentencing order if Appellant had expressed a change of heart and requested a life sentence.  She did not.  In fact, she thanked the court for imposing the death penalty, and expressed apprehension that it might not follow the jury's recommendation.

In another death penalty case, this Court found no prejudicial error in the trial court's failure to inform a capital defendant of his right of allocution because he had previously given sworn testimony (as contrasted with an unsworn statement) and been permitted to request a recommendation of life in prison:

> "[T]the defendant here exercised the right to speak on his own behalf during the mitigation phase and subjected himself to cross-examination. This testimony encompassed over 200 pages of the mitigation phase transcript. Among other things, Myers testified that the jury was wrong because he did not commit the murder, and that anyone who implicated him in the murder was lying. Thus, since Myers did in fact personally appeal for his life before the trial judge through his sworn testimony, the court's failure to specifically advise him of his right of allocution prior to sentencing was harmless error under *Reynolds* and *Campbell*."

-42-

*State v. Myers* (2002), 97 Ohio St. 3d 335, 358.  This Court should also note that neither Reynolds, Campbell nor Meyers specifically requested an imposition of the death penalty.

For the reasons set forth above, any error on the part of the trial court to announce Appellant's death sentence prior to advising her of her right to allocution is at worst harmless error beyond a reasonable doubt. She suffered at worst, a technical violation of a right established in a Criminal Rule which she waived by her insistence that no mitigation evidence be presented on her behalf, and in her resolve to accept a death penalty even when given a final opportunity to exercise the proverbial woman's prerogative and to change her mind.  Therefore, Appellant's fifth Proposition of Law is without merit and there is no practical, logical or legal reason to remand this case for resentencing.

-43-

**APPELLEE'S PROPOSITION OF LAW SIX:**

> **A capital defendant suffers no prejudice by the prosecuting attorney drafting a proposed sentencing opinion, compliant with R.C. 2929.03(F), which is ultimately adopted or edited by the trial court.**

In her Proposition of Law Six, Appellant argues error of a constitution proportion because that the trial court apparently requested the assistance of the prosecutor's office in drafting and proofreading the trial court's sentencing opinion. For the reasons stated below, this argument is without merit.

The State would note that this issue appears to be one of first impression before this Court, as the Appellant could find no decision from this Court on point, nor could the Appellee.

As this Court is well aware, it is common practice for a trial court (and sometimes a reviewing court) to call upon the attorneys for the prevailing party to draft various entries for the court to review, edit, and ultimately sign and file. In fact, such a practice is memorialized by Civ. R. 52 to which reads, in pertinent part:

> "When a request for findings of fact and conclusions of law is made, the court, in its discretion, may require any or all of the parties to submit proposed findings of fact and conclusions of law; however, only those findings of fact and conclusions of law made by the court shall form part of the record."

Therefore, if the trial court prevailed upon the prosecutor's office to draft a proposed sentencing opinion, but did not invite the defense to submit one as well, such is not indicative of an "ex parte nature of preparation." (Appellant's Brf. at 31). Indeed, such an assignment would be permitted, if not even encouraged, by the Civil Rules.

Furthermore, the Sixth Circuit Court of Appeals has held, "[t]he fact that proposed findings of fact, prepared and submitted by the successful attorneys, have been adopted by the

-44-

trial court does not detract from their legal force or effect. When adopted, such findings become the findings of the court, and are entitled to the same respect as if the judge ... had drafted them."*O'Leary v. Liggett Drug Co.,* 150 F.2d 656, 667 (6th Cir.), *cert. denied,* 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945).  Though Appellant writes that lawyers cannot be trusted to draft an accurate version of the facts (Appellant's Brf. at p. 33), she fails to cite to one sentence within the court's sentencing opinion that is not factually accurate.

Moreover, Appellant repeatedly makes reference to the trial court's "verbatim adoption" of the State's recommendation.  (Appellant's Brf. at p. 34).  Yet such a criticism does not square with the very portions of the record relied upon by Appellant wherein it is noted that the version as read from the bench went through six or seven drafts.  (T.p. Vol. XXVIII, p. 6370). The State submits that six re-writes do not qualify as a "verbatim adoption."  However,  should this Court construe the court's final draft as a "verbatim adoption" of the prosecutor's submission,  the U.S. Supreme Court has held that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous."*Anderson v. City of Bessemer City N.C.* (1985)*,*  470 U.S. 564, 572.  Once again, Appellant fails to cite to one error in the ultimate product.  She merely now complains about the assembly process.

By way of analogy, the First District Court of Appeals has considered several times over whether a trial court's adoption (verbatim or otherwise) of the prosecutor's proposed  findings of fact and conclusions of law dismissing a petition for postconviction relief.

> "This argument has been raised many times before this court in postconviction proceedings and we have held, as we do now, that the trial court's adoption of the findings of fact and conclusions of law submitted by the state does not, by itself, deprive the petitioner of a meaningful review of his petition for postconviction relief and does not constitute error in the absence of demonstrated prejudice."

-45-

*State v. Powell* (1993), 90 Ohio App. 3d 260, 263, cert. denied (1994), 68 Ohio St. 3d 1436.  See, also, *State v. Combs* (1994), 100 Ohio App. 3d 90, cert denied 71 Ohio St. 3d 1472; *State v. Sowell* (1991),73 Ohio App. 3d 672, cert. denied 62 Ohio St. 3d 1456. This Court has found none of these cases worthy of review.

Applying the logic of *Powell, Sowell,* and *Combs,* Appellant can argue no prejudice even if the court had adopted word-for-word the sentencing opinion offered by the State.  As pointed out in the previous assignment of error, Appellant received the very sentence she asked the jury to recommend and the one she thanked the court for imposing.  For her to now complain about how the sentencing order was drafted when the order reflected the very sentence she personally requested is tantamount to invited error. It is well-settled law that a defendant may not take advantage of an error which he himself invited or induced, *i.e.,* a defendant cannot ask a court to do something and later claim that the action was erroneous.  *State v. Campbell* (2000), 90 Ohio St. 3d 320, 324.  For the same rationale, the State would submit that even if this Court finds that it was error for the trial court to read a sentencing opinion drafted, at least in part, by the State, such error is at worst harmless error beyond a reasonable doubt.

Finally, the U.S. District Court for Tennessee, Nashville Division, had some insight into this complaint when it became apparent that the prevailing party had authored an appellate opinion for a lower court.  Essentially, it labeled as "absurd" the notion that judges would not rely upon proposed entries to help lighten their  work load and manage their dockets:

> "Attorneys, who must likewise cope with the pressures of the 'workaday world,' are, with few exceptions, keenly aware of the burdens imposed upon district judges by their mounting case loads. It was with a good deal of surprise and indignation, therefore, that this court became aware of defendants' counsel's charge concerning the method by which the final memorandum in this case was

prepared. The very reason for seeking the assistance of attorneys in the final, ministerial task of articulting [sic] the concepts upon which the court has grounded its decision is to free the court to direct its energies and resources to the other cases awaiting its attention, wherein other attorneys demand consideration of their particular problems.

"The crucial role of the court in deciding any case is to bring its independent analysis and reflection to bear on the issues before it and to render a decision which is just, fair, and in accordance with the applicable law. But counsel for defendants would impose on the court the additional requirement that every word in the written opinion issue directly from the pen of the deciding judge. If this standard were indeed adopted, of what use would be per curiam [sic] opinions, concurrences in majority or dissenting opinions, or even quoting the language of prior decisions, since each involves the appropriation of another's words to express one's own conclusions?

"The absurdity of defendants' counsel's contention is patent. No district court with any appreciation of the demands upon its time would willingly neglect to avail itself of whatever resources might be available in order to more efficiently carry out its official duties."

*Hill & Range Songs, Inc. v. Fred Rose Music, Inc.* (1976), 413 F. Supp. 967, 973. It is axiomatic that the demands upon local judge's time have increased, not decreased, since 1976 when *Hill & Range Songs* was decided, but the logic still prevails. Using Appellant's logic, overworked defense lawyers (many of whom are Ohio Public Defenders and court-appointed lawyers), may be prevailed upon to write *four* potential life sentencing opinions in what may prove to be a vain or useless act. Such would be a shameful waste of resources.

The record in the case sub judice does not reflect a verbatim adoption of the State's proposal, but a work in progress which was altered and edited at the court's direction. Civ. R. 52 sanctions the preparation of a findings of fact at the court's request. Appellant cannot cite to one sentence in the order which is factually inaccurate or prejudicial. Appellant personally entreated the court to impose the sentence about which she now complains. As such, her Proposition of Law Six is without merit.

-47-

## APPELLEE'S PROPOSITION OF LAW SEVEN:

**A trial court properly overrules a motion for change of venue when a defendant fails to demonstrate that the publicity in her case was so pervasive that it impaired the ability of the empaneled jurors to deliberate fairly and impartially.**

The Appellant next argues that the trial court improperly denied her motion for change of venue. The State submits the law and the facts demonstrate otherwise.

A motion for change of venue is predicated upon Crim. R. 18(B) which provides, in pertinent part, "[u]pon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." This Court has held that "Crim. R. 18(B)does not require a change of venue merely because of extensive pretrial publicity." *State v. Lynch* (2003), 98 Ohio St. 3d 514, 519. Any decision on a change of venue rests in the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St. 3d 107, 116-117.

This Court has held that "a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." Id. at 117. Most important to the case sub judice, "[a] defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *Lynch,* supra, at 519.

To label the voir dire in case sub judice as "careful and searching" is to make the judicial understatement of the year. The voir dire in this case lasted from April 8, 2003 through May 12, 2003, and spans twenty two of twenty eight volumes of transcript. And while several of those prospective jurors told the court they had heard or read "something" about the case, in light of the

-48-

fact that co-defendant Jackson had been previously tried and sentenced, the potential jurors could recall very few salient details of the crime.  Parenthetically, it must have been very disheartening to any of the news reporters who covered the Jackson case to hear just how little their audience retained.

In his brief, Appellant cites to seven prospective jurors to support his contention of a media gone awry, and an impermissibly tainted jury pool.  Those jurors are William Hall, Robert Hamilton, Carol Selak, Margaret Fellows, Amy Bartlett, Helene Messersmith and Christine Hake.  It should first be noted that Mr. Hall, Mr. Hamilton, Ms. Messersmith, and Ms. Hake were not seated on the final panel, and therefore even if the record reflected that they read every article printed on the Fingerhut homicide, and retained everything they read, there was no prejudice to Appellant.  This Court has repeatedly held that reviewing courts should look to the purported bias of "empaneled jurors," not those dismissed. The defendant must show that " publicity in this case was so pervasive that it impaired the ability of the *empaneled jurors* to deliberate fairly and impartially." (Emphasis added). *State v. Treesh* (2001), 90 Ohio St. 3d 460, 464.  All four of these potential jurors were dismissed for cause. Only one of those four jurors, Mr. Hall, was dismissed because he had preconceived opinions of Appellant's guilt.  (T.p. Vol XIII, p. 2911-2912).  The other three dismissals for cause had nothing to do with pre-trial publicity.  Mr. Hamilton was excused because he was predisposed to vote for the death penalty if the jury convicted Appellant. (T.p. Vol. XIII, p. 2967-2670).  The Court excused Ms. Messersmith because of work obligations.  (T.p. Vol. XV, p. 3303-3305).  Ms. Hake told the court that for religious reasons, she could not sit in judgment of others, and was excused.  (T.p. Vol. XV, p. 3427- 3435).  A good example of how little pre-trial publicity tainted the jury pool is the voir

-49-

dire of Juror Margaret Fellows who Appellant references in her brief at page 39. While she remembered from newspaper accounts that Jackson was arrested and convicted, she could not recall his sentence. (T.p. Vol. XVII, p. 3699). Though she remembered the crime occurred in Howland Township, she could not recall how Mr. Fingerhut was killed. Id. at p. 3700. Ms. Fellows assured both State and defense attorneys that if live testimony conflicted with her recollections of the Jackson case, she would base her verdict on the live testimony. Id. at 3701, 3726. It should be noted that when *defense* counsel summarized the State's case for her, she said she did not remember the torrid letters or jailhouse recordings from Jackson's case. Id. at 3730-3731.

Ms. Selak acknowledge encountering some media coverage of the Jackson trial, but could not recall what sentence was imposed. She told the court she had not formed an opinion as to Appellant's guilt or innocence. (T.p. Vol. XIII, p. 2999-3001). Ms. Bartlett told the court she had not heard or read about the case prior to reporting for jury service. She stated she had not formed an opinion as to Appellant's guilt or innocence. (T.p. XIV, p. 3102-3104, p. 3157).

Significantly, trial counsel passed for cause on Ms. Fellows, Ms. Selak and Ms. Bartlett. (T.p. Vol XVII, p. 3751, XIII, p. 3071, XIV, p. 3197). This Court has found it significant when a capital defendant raises a Crim. R. 18(B) motion, but then fails to challenge a prospective juror for cause, or exercise a peremptory challenge to purge the panel of any purportedly tainted juror:

> "Following voir dire examination, the defense did not challenge any juror for cause due to pretrial publicity. Moreover, Lynch did not exhaust the full number of defense peremptory challenges to the prospective jurors. The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's exposure to pretrial publicity once voir dire was completed."

-50-

*Lynch,* supra, at ¶ 37. Appellant concedes in his brief at page 22 that he exercised only five of his allowed peremptory challenges. Based on the authority promulgated in *Lynch,* this Court should likewise find that Appellant's trial counsel was not "particularly troubled" by the effect of the pretrial publicity which Appellant now labels as "pervasive." (Appellant's brief at p. 36).

Moreover, even pervasive adverse pretrial publicity does not inevitably lead to an unfair trial. *State v. Ahmed* (2004), 103 Ohio St. 3d 27, at¶37. Also, "[a] defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *Treesh*, supra, at 464. This Appellant has failed to do. Of the seven potential jurors Appellant singled out to challenge in this appeal, only one said he could not be fair and impartial, and he was immediately dismissed from the panel. Of the three ultimately seated on the panel, Appellant cites to nothing in the record indicative of bias.

For the above stated reasons, Appellant fails to demonstrate that any of her empaneled jurors could not decide her case fairly and impartially. As a result, the trial court did not abuse its discretion in overruling Appellant's motion for change of venue. Her Proposition of Law Seven lacks merit.

-51-

**APPELLEE'S PROPOSITION OF LAW EIGHT:**

> **Trial counsel's performance cannot be branded ineffective by a capital defendant's voluntary and fully informed waiver of her right to present mitigation evidence.**

In Proposition of Law Eight, Appellant argues ineffective assistance of trial counsel based on her own election to convert her mitigation hearing into a soapbox to decry social and racial injustice everywhere by foregoing the presentation of mitigating evidence and by asking for a recommendation of death. It is to laugh.

As a general principle, it is well-settled law that a properly licensed attorney is presumed competent. *State v. Smith* (1985), 17 Ohio St. 3d 98, 100. The burden of proving ineffective assistance of counsel rests squarely with the defendant. Id. A reviewing court will reverse a conviction on the grounds of ineffective assistance of counsel only when the defendant demonstrates (1) "that counsel's performance was deficient," and that (2) "the deficient performance prejudiced the defense***so serious[ly] as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687. This standard of review requires a defendant to demonstrate that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.***A reasonable probability is a 'probability sufficient to undermine confidence in the outcome' of the proceeding." *State v. Branham* (1995), 104 Ohio App.3d 355, 362 quoting *Strickland* at 694. Furthermore, debatable strategic and tactical decisions will not form the basis of a claim of ineffective assistance of counsel even if there had been a better strategy available. *State v. Phillips* (1995), 74 Ohio St. 3d. 72, 85.

Here, Appellant re-couches her Proposition of Law One argument of an uninformed

-52-

waiver of her right to present mitigating evidence into an ineffective assistance of counsel argument. After essentially rearguing much of the first Proposition of Law, Appellant attempts to assign blame to her trial counsel by stating they "failed to request a continuance of the penalty phase so that appellant could calmly consider her own fate." (Appellant's Brf. 42). Obviously, Appellant had time to calmly consider her own fate from the point of her arrest in December of 2001 to her June 4, 2003, mitigation hearing. The likelihood of a mitigation phase after a guilty verdict on capital specifications was hardly a well guarded State secret. Plus, the jury rendered its verdict on May 28, 2003. The mitigation hearing did not begin until June 4, 2003, a day after the in camera hearing conducted with Dr. Thomas Eberle. Prior to that hearing, Appellant spent two hours with Dr. Eberle so that he could evaluate her competency to waive mitigation. (T.p. Vol. XXVIII, p. 6228). Trial counsel stated on the record that they had prepared for the mitigation hearing by reviewing Appellant's hospital and mental health records and by interviewing her family members. Id. at p. 6224-6225. Atty. Ingram stated that he and his co-counsel had been actively consulting about the mitigation strategy for five days:

> "MR. INGRAM: The conversations between Donna on the one hand and Mr. Juhasz and I on the other hand relating to the presentation of mitigation evidence during the sentencing phase of these proceedings occurred over *at least the last five day time span."* (Emphasis added.). Id.

Therefore, to suggest that Appellant was somehow thrown to the wolves because of unprepared defense counsel is simply not supported by the record. At the risk of repeating State's response to Proposition of Law One, it should be noted that both of Appellant's trial counsel went on the record stating they disagreed with their client's decision to forego mitigation. (T.p. Vol. XXVIII, p. 6225-6227). The trial court questioned both attorneys, a psychologist and Appellant herself to

-53-

determine that she was making a knowing, voluntary, and intelligent waiver of her right to present mitigation evidence.  (T.p. Vol.X XVIII, p. 6220-6235).

Appellant argues her counsel failed to explain to her that a failure to present mitigation evidence results in an automatic death penalty.  As stated in Proposition of Law One, that is not a proper statement of the law. *State v. Jordon* (2004), 101 Ohio St. 3d 216, ¶79, 80.  Nevertheless, the judge cautioned Appellant that without mitigating evidence "this Jury has little to go upon in coming up with something other than the death penalty." (T.p. Vol.XXVIII, p. 6232).  As for Appellant's argument that "[t]he record does not reflect that the appellant was aware that she was committing state assisted suicide," (Appellant's Brf. 42), this is again belied by Appellant's own unsworn statement to the jury: "We haven't given you one piece of mitigating evidence.  You are bound by law to give me one sentence, the death penalty.  You have no other choice.  That is what I'm asking you to do." Id.  (T.p. Vol. XXVIII, p. 6295).   This is not a capital defendant who is confused or dismayed, and was somehow duped into waiving her right to present mitigation.  The record reflects that Appellant is intelligent and articulate. She waived her right to mitigation with a full and complete understanding of the possible outcome.   For reasons that perhaps exceed those in the record, Appellant made a choice of death over life and argued for death in her unsworn statement.

The record reflects Appellant chose a path contrary to the wishes of her learned trial counsel.  There is nothing in the record to suggest they were ineffective in this or any other area of representation.  Their performance was not deficient.  Appellant suffered no prejudice.  Appellant's Proposition of Law Eight is without merit.

-54-

**APPELLEE'S PROPOSITION OF LAW NINE:**

  **Ohio's death penalty statutes constitutionally narrow the class of murderers who will be death penalty eligible.**

  Appellant here argues the unconstitutionality of Ohio's death penalty statutes by stating that the duplication of elements in R.C. 2929.04(B)(7) and R.C. 2903.01(A) does not permit a constitutional narrowing of those murderers who are eligible for the death penalty. This Court has steadfastly rejected this challenge for twenty years.

  In Count One of her indictment, Appellant was charge with complicity to aggravated murder, in violation of R.C. 2903.01(A) & R.C. 2923.03. The elements of that crime are as follows: Appellant did purposely solicit, procure, aid and/or abet another person to cause the death of another with prior calculation and design. (T.p. Vol. XXVIII, p. 6169). Also, appended to that charge were two specifications pursuant to R.C. 2929.04(B)(7) that the offense was committed while Appellant was a complicitor to (1)aggravated burglary or (2) aggravated robbery, and if she was not the principal offender, she committed the offense with prior calculation and design. (T.p. Vol. XXVIII, p. 6173-6174).

  Appellant submits that since the "prior calculation and design" language is listed in the aggravated murder charge, and then repeated in the specification, the statute is constitutionally infirm. This Court has repeatedly dismissed this notion since *State v. Jenkins* (1984), 15 Ohio St. 3d 164. Though the complaint in *Jenkins* was the alleged duplicate nature of R.C. 2903.01(B) and R.C. 2929.04(A)(7), the logic remains the same:

   "More importantly, while a conviction under R.C.2903.01(B) cannot be sustained unless the defendant is found to have intended to cause the death of another, the state, in order to prevail upon an aggravating circumstance under R.C. 2929.04(A)(7), must additionally prove that the offender was the principal

-55-

offender in the commission of the aggravated murder or, if the offender was not the principal offender, that the aggravated murder was committed with prior calculation and design."

*Jenkins,* supra, at 177, fn 17.   Applying the logic promulgated by the U.S. Supreme Court in

*Jurek v. Texas* (1976), 428 U.S. 262 the Jenkins Court found as follows:

> "[T]he present case demonstrates that even if we were to construe the aggravated conduct of felony murder set forth within R.C. 2903.01(B) as functionally equivalent to the aggravating circumstance under R.C. 2929.04(A)(7), no constitutional infirmities would arise. On the contrary, any duplication is the result of the General Assembly having set forth in detail when a murder in the course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the death penalty becomes available as a sentencing option."

*Jenkins,* supra, at 178.

This Court addressed Appellant's argument again in *State v. Henderson* (1988), 39 Ohio

St. 3d 24.  Henderson, like Appellant, argued that he should not face charges of felony murder

(R.C.2903.01[B]) and a separate specification for aggravated burglary because such an

arrangement runs afoul of the constitutional requirement to narrow the class of offenders who are

death penalty eligible.  Again, this Court disagreed:

> "Moreover, the purpose of an aggravating circumstance was stated in *Zant v. Stephens* (1983), 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, and serves to ' * * * genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder'.

> "R.C. 2929.04(A)(7), which sets forth the aggravating circumstances of aggravated burglary and rape, fulfills that purpose by allowing the death penalty to be imposed for felony murder only when the defendant was the principal offender or when the murder was premeditated. The finder of fact had to find that appellant committed murder while committing or attempting to commit burglary and/or rape and further, that appellant was the principal offender or that the murder was premeditated. By such a limitation, the Ohio General Assembly has complied with *Zant, supra,* by narrowing the class of death-eligible aggravated murders.

-56-

    "Even if we assume, for the sake of argument, that the aggravating circumstances for felony murder (set forth in R.C. 2929.04[A][7] ) are identical to the elements of aggravated murder (set forth in R.C. 2903.01[B] ),the Ohio death penalty scheme is constitutional.

    "In *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568, Chief Justice Rehnquist, writing for the majority, stated that the narrowing function that is required of all capital sentencing schemes may constitutionally be provided in either of two ways. First, the legislature may broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. Second, the legislature may itself narrow the definition of capital offenses so that the jury finding at the guilt phase responds to this concern. Id. at ----, 108 S.Ct. at 555, 98 L.Ed.2d at 582. The court found that Louisiana's capital sentencing scheme (at issue in the case) was of the second type. The court held that the duplicative nature of the statutory aggravating circumstances did not render petitioner's sentence infirm, since the constitutionally mandated narrowing function was performed at the guilt phase and the Constitution did not require an additional aggravating circumstance finding at the penalty phase. Id. at ----, 108 S.Ct. at 555, 98 L.Ed.2d at 582-583.

    "Ohio's capital sentencing scheme is also of the second type. It requires the jury to consider at the guilt phase whether the crime falls into a specific category justifying capital punishment.

    "Accordingly, we hold that Ohio's capital sentencing scheme does not violate the Ohio or United States Constitutions even if the aggravating circumstances for felony murder (set forth in R.C. 2929.04[A][7] ) are identical to the elements of aggravated murder (set forth in R.C. 2903.01[B] ). *State v. Jenkins, supra,* at 177-178, 15 OBR at 322-323, 473 N.E.2d at 279-80, followed.)

    "Ohio's capital sentencing scheme constitutionally narrows the class of persons eligible for the death penalty.(*Lowenfield v. Phelps, supra,* followed). "

*Henderson,* supra, at 28- 29.  Therefore, this Court, even citing *Lowenfield v. Phelps* (1988), 484

U.S. 231, as relied upon by Appellant in her brief, found no constitutional violation in the

sometimes duplicative language in elements of aggravated murder and R.C. 2929.04(A)(7).

    This issue has been repeatedly litigated in this Court. See, *State v. Greer* (1988), 39 Ohio

St. 3d 236, 247;  *State v. Williams* (1986), 23 Ohio St. 3d 16, 23. For these reasons, Ohio

-57-

capital's scheme constitutionally narrows the murderers who are death penalty eligible and Appellant suffers no constitutional violation. Even if it were, Appellant appropriately broadened her class by tossing herself into the mix and requesting the death penalty, and thanking the judge for imposing it.  Therefore Appellant suffers no prejudice by any duplicative wording in R.C. 2903.01(A) and R.C. 2929.04(A)(7).  As such, her Proposition of Law Nine is without merit.

-58-

**APPELLEE'S PROPOSITION OF LAW TEN:**

> **A trial court properly overrules a capital defendant's motion to delete all references that a jury's penalty phase verdict is only a recommendation.**

In this proposition of law, Appellant argues that her death sentence must be vacated because the trial court declined to delete all references to the term "recommendation" in the penalty phase instructions. This Court has considered this argument on numerous occasions and has consistently held it to be without merit.

This Court has repeatedly held that the term "recommendation" accurately reflects Ohio law, does not diminish the capital jury's sense of responsibility, and does not constitute plain error. *State v. Davie* (1997), 80 Ohio St. 3d 311, 326-327. This Court has even gone so far as to hold that "[t]he jury in the penalty phase of a capital prosecution may be instructed that its recommendation to the court that the death penalty be imposed is not binding and that the final decision as to whether the death penalty shall be imposed rests with the court." *State v. Jenkins* (1984), 15 Ohio St. 3d 164, paragraph six of the syllabus. In *State v. Loza* (1994), 71 Ohio St. 3d 61, 73, this Court specifically held that an instruction regarding the non-binding nature of the recommendation does not constitute reversible error. The court in the case sub judice never gave even this permissible instruction.

Indeed, at one point the trial court instructed the jury, "*[y]ou* shall sentence the Defendant to death only if you unanimously find by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors." (T.p. Vol. XXVIII, p. 6314). This is a misstatement of Ohio law. The jury does not sentence anyone to death. That responsibility lies solely with the judge. However, the misstatement was obviously favorable to Appellant in

that it arguably heightened, not diminished, the panel's sense of responsibility.  Though the word "recommend" or "recommendation" appears periodically in the penalty phase instruction, the court never sought to minimize the jury's role in the implementation of the death penalty.  Here is a sampling of the way the terms appear in the instructions:

> "If you are convinced that the aggravating circumstances which the Defendant was found guilty of committing as set forth in Count One outweigh, by proof beyond a reasonable doubt, the factors in mitigation, then the State has met its burden of proof and the jury shall recommend to the Court that the sentence of death should be imposed on the defendant."

(T.p. Vol. XXVIII, p. 6314).

> "All twelve (12) members of the Jury must agree on a recommendation of a death sentence.  If all twelve (12) jurors find that the aggravating circumstances which Defendant, Donna Marie Roberts, was found guilty of committing in the death of Robert S. Fingerhut, outweigh by proof beyond a reasonable doubt, the mitigating factors, then you shall return such a finding to the Court, and as a matter of law, make a recommendation that the sentence of death be ordered."

(T.p. Vol. XXVIII, p. 6321-6322).

Appellant in her brief relies upon the United States Supreme Court decision in *Caldwell v. Mississippi* (1985), 472 U.S. 320, to support her argument that the trial judge should not instruct the jury that its penalty phase verdict is a recommendation.  However, a trial court's instruction was not the reason the Supreme Court vacated the death sentence in *Caldwell.* Instead, the death sentence was reversed because the prosecutor, in closing arguments during the penalty phase, told the panel that it should not view itself as the final arbitrator over whether the defendant should die because the case would be reviewed by a higher court.  No such error is present in the case sub judice, and this Court has never applied *Caldwell* to penalty phase instructions to preclude the language that the jury "recommends" a life or death sentence.

-60-

It also cannot go without mention, again, that even if this Court should elect to revisit *Caldwell* and re-assess its long-held position in this matter, Appellant told the jury told the jury "[y]ou are bound by law to give me one sentence, death penalty."  (T.p. Vol. XXVIII, p. 6295). The state would submit whether the jury viewed its decision as a recommendation, or as the actual sentence, Appellant personally requested the death penalty, and jury and judge obliged. Therefore, she suffered no prejudice by the instruction.

Based on the unwavering authority of this Court promulgated pre and post *Caldwell*, the State submits Appellant's tenth Proposition of Law is without merit.

-61-

**APPELLEE'S PROPOSITION OF LAW ELEVEN:**

> **The trial court's instruction directed jurors to decide Appellant's guilt and punishment by a standard of beyond a reasonable doubt, not a lesser standard.**

In Proposition of Law Eleven, Appellant argues that Ohio's definition of reasonable doubt permitted the jury to impose the death penalty with evidence below the degree of proof required by the U.S. Constitution. This Court has rejected this claim on numerous occasions.

The State would first point out that Appellant's trial counsel did not object to the "beyond a reasonable doubt" definition read by the court in either the guilt or the mitigation phase. (T.p. Vol. XXVIII, p. 6100-6115, 6189-6198, 6240-6247). The failure to object to jury instructions at a time when an error could have been avoided or corrected by the trial court operates to waive consideration of the error on appeal, unless, but for the error, the outcome of the trial clearly would have been otherwise. Crim. R. 30; *State v. Underwood* (1983), 3 Ohio St. 3d 12, syllabus. Appellant does not argue, nor can she demonstrate, that if her counsel had objected, the court would have changed its definition, nor does she suggest what different definition the court would have used. Not only does she not suggest an alternative definition in her brief, she proposed the very "reasonable doubt" instruction in her "Defendant's Proposed Instruction to Trial Jury" that she assails in her brief at page 48-49. (T.d. 103, p. 1). Therefore, she cannot show that the outcome of the trial would have been different, and has therefore waived this issue on appeal.

In the alternative, the State submits that this Court has repeatedly held that the "beyond a reasonable doubt" definition as promulgated by R.C. 2901.05(D) and parroted by the trial court is not constitutionally infirm. R.C. 2901.05(D) reads, in pertinent part, "'[p]roof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and

-62-

act upon it in the most important of his own affairs." In *Holland v. United States* (1954), 348

U.S. 121, 140, the United States Supreme Court declared the following similar language as

constitutionally sound: "(T)he kind of doubt * * * which you folks in the more serious and

important affairs of your own lives might be willing to act upon." This Court has found that the

Ohio General Assembly managed to fashion a definition of "beyond a reasonable doubt" which is

*Holland* compliant:

> "The General Assembly has attempted, in R.C. 2901.05 and the definition of
> 'reasonable doubt' therein, to provide not only a degree of consistency as to the
> meaning of the term throughout the courts of this state, but also to have a
> definition comprehensible to all the members of the jury and not merely those
> trained in the subtle nuance of legalese. Considering the inherent difficulty in
> defining this abstract concept of reasonable doubt, the similarity of the definition
> under consideration with that in *Holland*, supra, and the beneficial aspects of the
> legislative mandated definition, we find that the General Assembly has
> pronounced a rational definition of 'reasonable doubt' which, when taken as a
> whole, correctly conveyed the concept of 'reasonable doubt' to the jury."

*State v. Nabozny* (1978), 54 Ohio St. 2d 195, 202-203., vacated on other grounds.  See, also,

*State v. Maurer* (1984), 15 Ohio St. 3d 239, paragraph six of the syllabus, *State v. Jenkins*

(1984), 15 Ohio St. 164, paragraph eight of the syllabus.

This Court tersely rejected Appellant's argument that the  R.C. 2901.05(D) phrase stating

that the jury must be "firmly convinced of the truth of the charges" causes the panel to decide the

issue of guilt by a standard less than beyond a reasonable doubt.  "Appellant's assertion that the

definition of reasonable doubt provided in R.C. 2901.05(D) enables a juror to determine guilt or

innocence based upon a clear and convincing standard is without merit."  *State v. Frazer* (1995),

73 Ohio St. 3d 323, 330.  The State submits that when the instruction is taken as a whole, and not

merely by selected phrases, R.C. 2901.05(D) provides an appropriate and constitutionally sound

-63-

definition of the abstract concept  of "beyond a reasonable doubt."

Appellant presents no compelling reason for this Court to abandon its long-standing definition.  Her Proposition of Law Eleven lacks merit.

## APPELLEE'S PROPOSITION OF LAW TWELVE:

**While no criminal defendant is guaranteed an error-free trial, reversal of a conviction or sentence does not occur by the sheer  weight of numbers of harmless errors.**

Without alleging any specifics, Appellant maintains that because of "errors" by the trial court, the prosecution and ineffectiveness of her own counsel, she was deprived of a fair trial. This argument is without merit.

This Court has characterized such an argument as "merely a restatement of previous propositions of law.  Inasmuch as the other propositions are not well taken, their cumulative effect cannot be error." *State v. Davis* (1991) 62 Ohio St. 3d 326, 348.  The U.S. Supreme Court has held that  "there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *United States v. Hastings* (1983), 461 U.S. 449, 508-509. Furthermore, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St. 3d 195, 212.

The State concedes to no errors in Appellant's trial. Should this Court disagree, Appellant received a fair trial, and any errors  were at worst harmless beyond a reasonable doubt, non prejudicial, and not outcome determinative.  This Proposition of Law is without merit.

-64-

**APPELLEE'S PROPOSITION OF LAW THIRTEEN:**

> **A death penalty scheme which requires reviewing courts to compare death**
> **sentences with other death sentences is constitutionally sound.**

Appellant next argues that Ohio law fails to provide a meaningful proportionality review for distinguishing between life and death sentences. Appellant boldly asserts that this Court's precedent to comparing death sentences with death sentences is constitutionally untenable. Appellant's averment is without merit.

This Court fully explained its position on the proportionality review in *State v. Steffen* (1987), 31 Ohio St. 3d 111  "The purpose of proportionality review is to determine whether the penalty of death is unacceptable in the cause under review because it is disproportionate to the punishment imposed on other convicted of *the same crime.*" Emphasis added. *Steffen,* supra at 123  quoting *Pulley v. Harris* (1984), 465 U.S. 37, 43. As Appellant concedes in her brief at page 54, the U.S. Supreme Court held that proportionality reviews are not constitutionally required. *Pulley,* supra, at 45. As a result, this Court has stated, "because a proportionality review is not mandated in a constitutionally valid sentencing scheme, Ohio is free to define the proportionality review." *State v. Bedford* (1988), 39 Ohio State 122, 131.  This Court's rationale for limiting the cases ripe for comparison to those in which the death penalty has been imposed is as follows:

> "Logic dictates that only those cases which result in conviction have any
> use in proportionality review, since only then will a penalty result with which the
> death sentence under review may be compared.  It is equally logical that only
> convictions of a capital crime are relevant for comparison purposes, since such
> cases are necessarily so qualitatively different from all others that comparison
> with non-capital offenses would be a profitless exercise.  In fact, R.C. 2929.05(A),
> in requiring proportionality review, limits the scope of review to 'similar' cases.
> We are further persuaded that a court cannot make a meaningful proportionality
> review unless the pool of cases is restricted to those which the reviewing court has
> decided itself.  Comparison with cases not passed upon by the reviewing court

-65-

would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness."

*Steffen,* supra, at 123.

Appellant takes issue with this Court's holding that, "[n]o reviewing court need consider any cases where the death penalty was sought but not obtained or where the death sentence could have been sought but was not." *State v. Steffen, supra* at 124. As has been previously stated in this argument, this Court decided this issue in *Steffen* and thus far has not changed its position. The State submits Appellant has presented no novel or compelling rationale to this Court to deviate from these holdings. The United States Supreme Court has yet to accept jurisdiction on this issued to force a change in Ohio's proportionality review. As such, this Proposition of Law is without merit.

-66-

**APPELLEE'S  PROPOSITION OF LAW FOURTEEN:**

   **Ohio's death penalty scheme has been consistently held constitutional.**

   In her Fourteenth  and final Proposition of Law, Appellant engages in a multi-faceted constitutional attack on Ohio's death penalty statutes.  As will be addressed infra, this Court has categorically rejected all of these challenges and this Proposition of Law is without merit.

   Before individually addressing all of Appellant's alleged constitutional short comings of Ohio's death penalty scheme, the State would first submit that Appellant has waived any constitutional error as applied to her because she specifically requested the application of the statutes she now decries as unconstitutional.  Furthermore, the doctrine of invited error should apply in this case to bar Appellant from raising these issues when she specifically requested the death penalty.

   Should this Court disagree, the State will now briefly address the sub arguments raised in this Proposition of Law using Appellant's sub headings only for clarity and continuity.

**A.     Arbitrary and unequal punishment**

   Appellant argues that Ohio's capital sentencing scheme is unconstitutional because of the prosecutor's virtual "uncontrolled indictment discretion."  (Appellant's Brief at p. 59).  This Court has consistently  rejected this claim since *State v. Jenkins* (1984), 15 Ohio St. 3d 164. This Court agreed with the concurring opinion in *Gregg v. Georgia* (1976) 428 U.S. 153, that there is no proof that prosecutors run amok when deciding who to try as a capital or non-capital defendant:

> "***Petitioner's argument that prosecutors behave in a standardless fashion in
> deciding which cases to try as capital felonies is unsupported by any facts.
> Petitioner simply asserts that since prosecutors have the power not to charge

-67-

capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly 'similar.' If the cases really were 'similar' in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary'."

*Jenkins,* supra, at 169-170 quoting *Gregg,* supra at 225.    This Court has continued to reject the

argument that prosecutors have unbridled charging discretion when deciding which defendant to

try as a capital case.

Appellant in this next sub argument posits that the death penalty is unconstitutional

because of the high number of blacks who await execution for killing whites.    Based on the

authority of the U.S. Supreme Court's decision in *McClesky v. Kemp* (1987), 481 U.S. 279, this

Court rejected the argument that race has any bearing on whether or not a person is sentenced to

death.  "Appellant herein has offered absolutely no evidence that improper racial considerations

prompted the jury's recommendation of death in this case. Without any evidence that racial bias

affected the sentencing process *in his case,* appellant's claim of violation of his right to equal

protection must fail."  *State v. Steffen* (1987), 31 Ohio St. 3d 111, 124.   Appellant has failed to

argue, much less demonstrate, that her race prompted the jury to recommend a death sentence, or

-68-

standard of proof. This issue has been thoroughly brief in Proposition of Law Eleven, and for

reasons of judicial economy, will be incorporated rather than reprinted here.

Appellant next argues the "vagueness" of the mitigating factors. Appellant failed to raise

this issue in the court below, thus the issue is waived except for plain error which cannot be

demonstrated here. Crim. R. 52(B); *State v. Underwood* (1983), 3 Ohio St. 3d 12, at syllabus.

Nevertheless, this Court has held there no constitutional infirmities in R.C. 2929.04(B)(1)

through (7):

> "These factors are broad enough to enable a defendant to present any favorable
> evidence relevant to the jury's, trial court's, or three-judge panel's decision whether
> to impose the death penalty, yet at the same time are sufficiently specific to guide
> the decision-maker's analysis in weighing the mitigating factors against the
> aggravating circumstances."

*State v. Stumpf* (1987), 32 Ohio St. 3d 95, 104. The State submits, contrary to Appellant, that

Ohio's sentencing procedures are indeed reliable, and constitutionally sound.

## C.   Induced ineffective assistance of counsel and denial of an impartial jury

Appellant next argues that Ohio's bifurcated capital trial system deprives the capital

defendant of effective assistance of counsel at trial because it is inconsistent to argue for the

defendant's innocence during the guilt phase, and then to switch gears by explaining their

behavior with mitigating factors, before the same jury. Again, this argument is wholly

inapplicable to Appellant because she opted to waive her right to present any mitigating factors

during the penalty phase of her trial. Appellant does not argue that if she had been permitted to

summon a second jury for the penalty phase, that she would have changed her trial strategy and

offered up mitigating factors for the new panel's consideration.

Nevertheless, this Court in *Jenkins* dismissed the two-jury averment:

-70-

"Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affect defendant's credibility, then his credibility is diminished at the sentencing stage. Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases***Cite omitted, the court has yet to even remotely suggest that the Constitution requires a new jury be selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention."

*Jenkins,* supra, at 238 FN 11.

Thus, it has been well-settled for over two decades that a death penalty defendant is not entitled to a second jury to decide the penalty recommendation. Appellant's complaint that Ohio's bifurcated capital trial process with the with the same jury violates her rights to effective assistance of counsel and an impartial jury is simply without merit.

**D.    Lack of individualized sentencing**

Appellant next argues that because Ohio's death penalty scheme requires proof of the aggravating circumstances during the guilt phase rather than the sentencing phase, Appellant is prejudiced because the jury makes these findings without simultaneously determining mitigating factors. Again, because Appellant specifically extracted any mitigating evidence from the mix, this argument does not apply to her.

Waiver notwithstanding, this Court, after analyzing capital sentencing procedures in Texas, Georgia and Florida came to the following conclusion on this issue:

"The system currently in place in Ohio does require the sentencing authority to focus on the particular nature of the crime as well as allow the accused to present a broad range of specified and nonspecified factors in mitigation of the imposition of a death sentence. Thus, we are unable to agree with appellant's contention that the consideration of aggravating circumstances at the guilt stage of his trial was

-71-

constitutionally prohibited."

*Jenkins,* supra, 174.  This Court reiterated this holding recently in *State v. Mink* (2004) 101 Ohio

St. 3d 350, ¶ 105.  Therefore, this Court has consistently rejected the "individualized sentencing"

argument.

**E.     Defendant's right to a jury is burdened**

Appellant next argues the unconstitutionality of Ohio's capital procedure because the

defendant who elects to try the case rather than to plead guilty is at a disadvantage.  Such is

arguable in *any* criminal trial.  A simple shop lifting case may end in an acquittal or conviction.

The jury-convicted shoplifter *may* end up with more severe sentence than one who opts to plead

guilty.  However, even the capital defendant who pleads guilty is not automatically spared the

death penalty.

Nonetheless, this Court has repeatedly rejected this argument as well.  In *State v. Buell*

(1986), 22 Ohio St. 124, this Court held:

> "[W]e reject appellant's contention that Crim. R. 11(C)(3) may encourage
> guilty pleas, and thereby a waiver of fundamental rights.  Crim. R. 11(C)(3) is
> applicable only in cases where there has been an accepted plea to the charge and
> specifications.  In this case, there was no plea offered or accepted.  Even in cases
> where a plea has been accepted, Crim. R. 11 (C)(3) may provide no advantage at
> all."

*Buell,* supra, at 138.  This Court has continued to hold that where there is no guilty plea offered,

the application of Crim. R. 11 (C)(3) is not an issue.  *State v. Zuern* (1987), 32 Ohio St. 3d 56,

64; *State v. Mills* (1992), 62 Ohio St. 357, 372.  In *Mills,* this Court wrote, "Crim. R. 11 (C)(3)

does not create an improper incentive to plead guilty."  Id.

Furthermore, this Court specifically held in *Buell* that Crim. R. 11 (C)(3) is not violative

-72-

of *U.S. v. Jackson* (1968), 390 U.S. 570, as Appellant argues in her brief:

> "In *Jackson,* the court held that a procedure which permitted a defendant to plead guilty, and thereby avoid a sentence of death, was constitutionally impermissible.  Since, in Ohio, a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial, Crim. R. 11 (C)(3) does not violate Jackson."

*Buell* at 138.  Therefore, this Court has indeed decided that Ohio's provision for a guilty plea in aggravated murder cases does not violate *Jackson.*   More to the point, the Appellant cannot assert this claim here because she did not *plead* guilty to aggravated murder, but went to trial and was *found* guilty.

### F.    Mandatory submission of reports and evaluations

In this sub-argument, Appellant briefly argues constitutional infirmities because R.C. 2929.03(D)(1) requires a "mandatory submission" of mental evaluations or a pre-sentencing investigation *if the capital defendant requests one.*  This Court has noted that since it is the defendant who must request such an evaluation or investigation, the defendant cannot argue prejudice:

> "[T]he defendant decides whether to expose himself to the  risk of potentially incriminating presentence investigations, including mental examinations. There is no constitutional infirmity in providing the defendant with such an option. Additionally, the jury should be privy to all information relevant to its task of deciding whether a defendant should be sentenced to life in prison or whether it should recommend that the defendant be put to death."

*Buell,* supra, 138.   Furthermore, Appellant specifically precluded the submission of *any* mitigating evidence to the jury, so she cannot argue any constitutional violation.  *Mink,* supra, at ¶ 107.

### G.    The definition of mitigating factors in R.C. 2929.04(B)(7) violates the reliability component of the Eighth Amendment.

-73-

Appellant here argues the purported unconstitutionality of R.C.2929.04(B)(7) claiming its language requiring consideration of any other relevant factor why a defendant should be sentenced to death permits the sentencer to convert a mitigating factor into a reason for imposing the death sentence. Appellant failed to raise this issue in the court below, thus the issue is waived except for plain error which cannot be demonstrated here. Crim, R. 52(A); *State v. Underwood* (1983), 3 Ohio St. 3d 12, at syllabus.

Nonetheless, a simple reading of R.C. 2929.04 shows this is not the case. R.C. 2929.04(A) lists the aggravating circumstances the panel may consider, and R.C. 2929.04(B) lists the mitigating factors with the so called "catch-all" mitigating factor, R.C. 2929.04(B)(7) which reads, "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." In other words, the capital defendant is permitted to interject any evidence he or she may view as relevant to the death sentence as a mitigating factor. By contrast, R.C. 2929.04(A) is so tightly written the State has no such option. There is no "catch-all" aggravating circumstance.

The trial court in its instruction included the above language solely and exclusively in its definition of mitigating factors:

> "Mitigating factors are factors that while they do not justify the crime of Aggravated Murder, nevertheless, if you find they exist, shall be considered by you as extenuating, lessening, weakening to some extent, or reducing the degree of the sentence. Mitigating factors are not related to Donna Marie Roberts' culpability, but rather those factors which are relevant to the issue of whether Donna Marie Roberts should be put to death."

> "You are to weigh as mitigating factors, such things including, but not limited to: (1) The unsworn statement of the Defendant. (2) Any other factors in mitigation that are relevant to the issue of whether Donna Marie Roberts should be sentenced to death. (3) The offender was a participant in the offense, but not the principal

-74-

offender, the degree of her participation in the offense, and the degree of the offender's participation in the acts that led to the death of the victim."

(T.p. Vol. XXVIII, p. 6319-6320). A jury is presumed to follow the instructions of the trial court. *State v. Loza* (1994), 71 Ohio St. 3d 61, 75.

This Court has concurred with the State's position that "catch-call" provision is favorable to the capital defendant. "The court's reference to the 'any other factors' language of R.C. 2929.04(B)(7) simply gave effect to the constitutional precept that the jury must be allowed to consider any relevant evidence the accused offers as mitigating." *State v. Stallings* (2000), 89 Ohio St. 3d 280, 298. Therefore, this Court should find no merit to this argument.

**H.    Ohio Rev. Code §2929.04(A)(7) is constitutionally invalid when used to aggravate Ohio Rev. Code §2903.01(B) aggravated murder**

Appellant makes the well-worn argument that R.C. 2929.04(A)(7) repeats the definition of felony murder and automatically qualifies a capital defendant for the death penalty by failing to genuinely narrow the class of individuals eligible for the death penalty. This Court has repeatedly disagreed with this contention:

> "[W]e hold that Ohio's capital sentencing scheme does not violate the Ohio or United States Constitutions even if the aggravating circumstances for felony murder (set forth inR.C. 2929.04[A][7] ) are identical to the elements of aggravated murder (set forth in R.C. 2903.01[B] ). State v. Jenkins, supra,at 177-178, 15 OBR at 322-323, 473 N.E.2d at 279-280, followed.) Ohio's capital sentencing scheme constitutionally narrows the class of persons eligible for the death penalty. (*Lowenfield v. Phelps,[4] supra,* followed.)."

*State v. Henderson* (1988), 39 Ohio St. 3d 24, 29. This Court has not changed its position on this issue. Furthermore, Appellant elected to forego the presentation of any mitigating evidence, specifically told the jury to recommend the death penalty, so even if this Court should change its

---

[4]*Lowenfield v. Phelps* (1988) 484 U.S. 231.

-75-

long-standing position on this issue, Appellant suffered no prejudice.

**I.      Ohio Revised Code §§2929.03(D)(1) and 2929.04 are unconstitutionally vague**

Appellant next argues regarding the purported vagueness of RC. 2929.03(D)(1) and

2929.04 stating that the wording gives the sentencer open-ended discretion to impose the death

penalty.  Applying *Tuilapea v. California* (1994), 512 U.S. 967, 973-980 and *State v. Gumm*

(1995), 73 Ohio St. 413, 416-423, this Court dismissed this argument:

> "We do not find the statutory language at issue, or the concepts it conveys, unconstitutionally vague. The reasoning employed in *Gumm* clarified that the 'nature and circumstances of the aggravating circumstances' referred to in R.C. 2929.03(D)(1) are separate and distinct from the 'nature and circumstances of the offense' referred to in 2929.04(B).Id. at 416-423, 653 N.E.2d at 259-264. See, also*State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 352-355, 662 N.E.2d 311, 318-321; *State v. Hill* (1996), 75 Ohio St.3d 195, 199-201, 661 N.E.2d 1068, 1075-1076."

*State v. McNeill* (1998), 83 Ohio St. 3d 438, 453.  Appellant's openly articulated wish for the

death penalty was certainly not vague, but crystal clear.   Therefore, even if this Court were to

decide to revisit *McNeill*, Appellant's complaints lack merit and credibility.

**J.      Inadequate proportionality and appropriateness review**

In the interest of judicial economy, the State adopts and incorporates its response to

Appellant's Proposition of Law Thirteen with respect to the proportionality argument raised here.

Appellant also alleges the appropriateness analysis is constitutionally infirm. Appellant

claims this Court conducts only a cursory review of death cases to determine the appropriateness

of a death sentence.  Appellant supplies no authority for this bold assertion.  Furthermore,

Appellant thought the death sentence was so appropriate for her she instructed the jury to

-76-

recommend it and thanked the judge when he imposed it. Therefore, Appellant fails to support her contention that the appropriateness analysis is constitutionally infirm.

### K.    Mandatory death penalty and failure to require appropriate analysis

In this sub-argument, Appellant opines that Ohio's death penalty scheme is unconstitutional because it does not provide a "mercy option" when the aggravating circumstances outweigh the mitigating factors. This Court rejected this notion in *Jenkins,* supra at 178-179, and in *Buell,* supra, at 141. This Court concluded R.C. 2929.04(B)(7) and (C) afford considerable latitude in the presentation of any relevant factors in mitigation and that judges and juries are mandated to weigh those factors against the aggravating circumstances. As such, Ohio's death penalty statutes comport with the U.S. and Ohio constitutions. *Jenkins,* supra, at 178-179. Furthermore, Appellant did not argue for mercy, as she is entitled to do. *State v. Rogers* (1986), 28 Ohio St. 427, 434. She instead argued for death. Therefore, even if this Court reconsiders the "mercy option" issue, Appellant was not prejudiced by the absence thereof.

### L.  Ohio's "beyond a reasonable doubt" standard.

In subsection 1, Appellant argues that the trial court should have instructed the jury that the standard for proof in both the guilt in penalty phase is "proof beyond all doubt." The State disagrees with such an instruction because "proof beyond all doubt" has never been, and is not now, the standard of proof in any Ohio criminal case. *Jenkins*, supra, at 210-212, *State v. Clemmons* (1998), 82 Ohio St. 3d 438, 448; *State v. Loza* (1994), 71 Ohio St. 3d 61, 81. Nor does Appellant cite to one single criminal case where a jury was instructed to consider the evidence "beyond all doubt," rather than "beyond a reasonable doubt."

Additionally, while Appellant now complains about the trial court's instruction, her trial

-77-

counsel made no objection to instruction that the burden of proof in both phases was "beyond a reasonable doubt" not "all doubt."     (T.p. Vol. XXVIII, p. 6100-6115, 6198-6189, 6240-6247). The failure to object to jury instructions at a time when an error could have been avoided or corrected by the trial court operates to waive consideration of the error on appeal, unless, but for the error, the outcome of the trial clearly would have been otherwise. Crim. R. 30; *State v. Underwood* (1983), 3 Ohio St. 3d 12, syllabus. Therefore, this issue is waived for purposes of this appeal in not only subsection 1, but 2 and 3 as well.

In subsection 2, Appellant reprises her argument made in Proposition of Law Eleven that the "beyond a reasonable doubt" instruction actually permits the jury to consider a capital defendant's guilt by a lower burden of proof.  The State again disagrees, and for the sake of judicial economy, refers this Court to its response in Proposition of Law Eleven.

In subsection 3, Appellant argues that the jury should have been instructed that the evidence does not foreclose all doubt as to guilt.  Again, this Court has rejected this proposition. *State v. Apanovich* (1987), 33 Ohio St. 3d 19, 26.  The Appellant references a California case and opines that "the jury should have before it not only the prosecution's unilateral account of the offense but the defense version of well." (Appellant's Brief at page 81).  Again, this  is somewhat of a comical argument from an Appellant who called no witnesses on her own behalf during the guilt phase, and who specifically waived her right to call mitigation witnesses.  If Appellant's jury had before it only the prosecutor's unilateral account (which it clearly did not in light of Appellant's unsworn statement), she can delegate  blame only upon her own choices, not upon the definition of beyond a reasonable doubt.

-78-

**M.     Lethal Injection**

Appellant here challenges the constitutionality of Ohio's sole method of execution, lethal injection.  This Court has held, in another Trumbull County capital case, that execution by lethal injection is not violative of the Eighth Amendment's proscription against cruel and unusual punishment.  *State v. Carter* (2000), 89 Ohio St. 3d 593, 608.  Furthermore, The Eighth Amendment does not prohibit the death penalty but requires it to be performed in a manner that avoids unnecessary or wanton infliction of pain.  *Louisiana v. Resweber* (1946), 329 U.S. 459, 463.  "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies something inhuman and barbarous, something more than mere extinguishment of life." *In re Kemmler* (1890), 136 U.S. 436, 447. The definition of cruel and unusual punishment also contains an element of comporting with current societal norms. *Troy v. Dulles* (1958), 356 U.S. 86, 100-01.

Appellant cites to no case law which finds death by lethal injection to be tortuous, inhuman or barbarous, or even unconstitutional.  As for whether lethal injection  comports with societal norms, the Ohio General Assembly established  a method for the extinguishment of a convicted killer's life  which is nearly identical to the method used for the extinguishment of the life of a beloved family pet.   Appellant does not suggest any viable alternatives or even a personal preference for her own method of execution.

Finally, because Appellant specifically requested that she be executed, the State submits that she has waived her right to complain about how the State of Ohio will comply with that request.

-79-

**N.**     **Sentencing an individual to death in violation of treaties to which the United States of America is a signatory violates the Supremacy Clause of the United States Constitution.**

For the remaining portion of her brief, Appellant argues that Ohio's sentencing scheme violates a number of tenets contained in international treaties and international law. Appellant does not cite to one Ohio capital case, a federal capital case, or even a capital case from another state which overturned a death sentence in deference to any international law or treaty.

Appellant nevertheless argues that the United States' membership in the Organization of American States, which promotes human rights, overrides the right of the citizens of Ohio to establish and impose capital punishment. This Court has soundly rejected this argument:

> "Appellant contends that capital punishment violates the American Declaration of the Rights and Duties of Man, which appellant claims binds the United States via the Charter of the Organization of American States. This claim is meritless. The declaration does not mention the death penalty; it forbids only 'cruel, infamous, or unusual punishment.' Moreover, the declaration is not legally binding, but rather was adopted 'as a resolution containing common standards of treatment which the states desired to protect.' Note (1990), 32 Wm. & Mary L.Rev. 161, 181. Nor does the OAS Charter incorporate the declaration. Even if it did, the United States Senate approved the charter with the reservation that 'none of its provisions shall be considered as * * * limiting the powers of the several states * * * with respect to any matters recognized under the Constitution as being within the reserved powers of the several states.' Charter of the Organization of American States (1951), 2 U.S.T. 2394, 2484."

*State v. Phillips* (1995), 74 Ohio St. 3d 72, 103, 104. See, also, *State v. Ashworth* (1999) 85 Ohio St. 3d 56, 71; *State v. Stojetz* (1999), 84 Ohio St. 3d 452, 468.    The U.S. Sixth Circuit Court of Appeals has held in *Buell v. Mitchell* (2001), 274 F. 3d 337, 372,[5] that the Charter of the Organization of the American States is not binding in the U.S. courts:

> "We must conclude that Ohio's imposition of the death penalty does not

_____

[5]Robert Buell was executed by lethal injection September 25, 2002.

-80-

violate any international agreements entered into by the United States. The agreements upon which Buell relies do not specifically outlaw the death penalty. To the extent that the agreements ban cruel and unusual punishment, the United States has included express reservations preserving the right to impose the death penalty within the limits of the United States Constitution. Moreover, neither agreement is binding on courts of the United States."

In fact, "[t]he United States is not a party to any treaty that prohibits capital punishment per se."

*United States v. Bin Laden* (S.D. N.Y. 2001), 126 F. Supp. 2d 290, 294.

Appellant goes on to challenge Ohio's death penalty scheme in light of the International Covenant on Civil and Political Rights (ICCPR). The U.S. Sixth Circuit Court of Appeals summarily dismissed this challenge. The court first pointed out that the ICCPR does not require the abolition of the death penalty, only cruel, inhumane or degrading punishment. *Mitchell*, supra at 371. The court went on to explain:

"Furthermore, when the United States ratified the treaty in 1992, it specifically reserved the right: subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age."

*Mitchell,* supra at 372. Given that Appellant was age 57 at the time of her conviction, it is safe to assume she will be neither a juvenile, nor a pregnant woman, when she exhausts her appeals and faces her executioner.

Appellant also attacks the constitutionality of Ohio's death penalty scheme pursuant to the International Convention on the Elimination of All Forms of Racial Discrimination ("ICERD") and the Convention Against Torture ("CAT"). Appellant is white. However, the United States Supreme Court and the Supreme Court of Ohio have refused to accept statistics

-81-

purporting to show a racial disparity in the imposition of the death penalty as grounds for finding the death penalty to be unconstitutional. These courts have held, instead, that a defendant "must show that racial considerations affected the sentencing process *in his case*" for equal protection to be implicated. (Emphasis sic.) *State v. Steffen* (1987), 31 Ohio St.3d 111, 124, certiorari denied (1988), 485 U.S. 916, 108 S.Ct. 1089. See, also, *McClesky v. Kemp* (1987), 481 U.S. 279, 297. Appellant does not argue, nor can she demonstrate, that racial considerations affected the sentencing process *in her case*. Appellant, a middle class, middle age, white woman was given the same sentence (as per her request) as her African American co-defendant. Therefore, the ICERD is inapplicable to this case.

Furthermore, "the United States signed reservations to both treaties stating that the United States understands this language to mean cruel and unusual punishment as defined by the Eighth Amendment, which does not include the death penalty. *Fauder v. Johnson* (1999, S.D. Texas), 99 F. Supp. 2d 744, 777. Additionally, for an act to constitute "torture" under CAT, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions. *Cadet v. Bulger* ( 2004, C.A. 11), 377 F. 3d 1173, 1181. The death penalty is a lawful sanction for aggravated murder. Therefore, Appellant cannot invoke CAT.

The State would further note that in Appellant's Motion to Dismiss Indictment (T.d. # 36), she failed to cite CAT or the ICERD. She has thus waived any claimed error emanating from these documents.

With respect to Appellant's reliance upon the Universal Declaration of Human Rights,

-82-

she cannot argue that the DHR states that all human beings enjoy a right not be executed.  If, as Appellant argues, the document guarantees equal protection, due process, and prohibits torture or cruel or degrading punishment, Ohio's current death penalty scheme has not been found violative thereof.

For these reasons, even under the international treaty challenges, Ohio's death penalty procedure is not racially discriminatory, violative of equal protection or due process, arbitrary, tortuous or cruel.

To conclude, as presented in all of the above arguments and subsections, Ohio's death penalty as presently administered in Ohio is constitutional and compliant with the Eighth Amendment to the U.S. Constitution.  Appellant's Proposition of Law Fourteen is without merit.

<u>CONCLUSION</u>

For the reasons stated in the foregoing fourteen propositions of law, the State submits Appellant's arguments are without merit, and her convictions and sentences, including her death sentence, should be affirmed by this Court.

-83-

Respectfully submitted by:

_(signature)_

DENNIS WATKINS (#0009949)
Prosecuting Attorney

_(signature)_

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio        44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

PROOF OF SERVICE

I do hereby certify that a copy of the foregoing brief was sent by ordinary U.S. Mail to Atty. David L. Doughten (Atty. Reg. #0002847) and Atty. Patricia Smith (Atty. Reg. #0059621), 4403 St. Clair Ave. Cleveland, Ohio   44103, Counsel for Defendant-Appellant Donna Roberts, on this 29th Day of October, 2004.

_(signature)_

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

-84-

# APPENDIX

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1641

Westlaw.

25 Fed.Appx. 349                                                                     Page 1
25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.))
**(Cite as: 25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.)))**

This case was not selected for publication in the Federal Reporter

NOT RECOMMENDED FOR FULL--TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.

Not selected for publication in the Federal Reporter.

This opinion was not selected for publication in the Federal Reporter. Please use FIND to look at the applicable circuit court rule before citing this opinion. FI CTA6 Rule 28(g).

United States Court of Appeals,
Sixth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas Leon CAUDILL, Defendant-Appellant.
**No. 00-5621.**

Dec. 28, 2001.

Defendant was convicted in the United States District Court for the Eastern District of Kentucky after he entered a conditional guilty plea to one count of a drug indictment, and he appealed. The Court of Appeals, David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation, held that the scope of defendant's girlfriend's **consent** to **search** of the premises where the girlfriend lived with defendant included the **garage**, and thus, police detective conducting **search** of the **garage** properly seized

marijuana and marijuana plants in plain view in the **garage**.

Affirmed.

West Headnotes

**[1] Searches and Seizures ☜186**
349k186 Most Cited Cases

When the government relies on consent as an exception to the warrant and probable cause requirements of the Fourth Amendment, the exception is circumscribed by the object of the search. U.S.C.A. Const.Amend. 4.

**[2] Searches and Seizures ☜186**
349k186 Most Cited Cases

The standard for measuring the scope of a suspect's consent to a search under the Fourth Amendment is that of objective reasonableness, and asks what the typical reasonable person would have understood by the exchange between the officer and the suspect; this test implies that the assessment of objective reasonableness is made as of the time of the conversation between the consenting party and the police, and consequently, information that comes to the police after the consent was given will not affect the validity or scope of the consent, unless the party withdraws his or her consent. U.S.C.A. Const.Amend. 4.

**[3] Searches and Seizures ☜186**
349k186 Most Cited Cases

Scope of defendant's girlfriend's **consent** to **search** of the premises where the girlfriend lived with defendant included **garage**, and thus, police detective conducting **search** of the **garage** properly seized marijuana and marijuana plants in plain view in the **garage**, where defendant, who later admitted he purposely shot himself twice in the leg, called police to the residence, claiming he had been shot, his girlfriend demanded that police investigate the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1642

25 Fed.Appx. 349
25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.))
(Cite as: 25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.)))

Page 2

shooting, and the detective told her he would go through everything and make video record inside the house, all the outbuildings, and all the grounds, the girlfriend then left for the hospital where defendant was taken, and the detective commenced his **search**. U.S.C.A. Const.Amend. 4.

**[4] Criminal Law** ☞517.2(3)
110k517.2(3) Most Cited Cases

Defendant's confession, made after he was given *Miranda* warning, that he owned marijuana and marijuana plants found in plain view in valid consensual search of his garage, was valid and admissible in drug prosecution, absent a claim of involuntariness or a violation of *Miranda*.
*350 On Appeal from the United States District Court for the Eastern District of Kentucky.

Before RYAN and BATCHELDER, Circuit Judges; and LAWSON, District Judge. [FN*]

> FN* The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

LAWSON, District Judge.

**\*\*1** On August 25, 1999, the defendant, Thomas Leon Caudill purposely shot himself two times in the leg. He intended to implicate his ex-wife in the shooting and called the Kentucky State Police to his home to investigate. In conducting a consent search of the house and outbuildings, the police discovered several marijuana plants and a quantity of processed marijuana, and the defendant was duly indicted for controlled substance violations. The defendant moved in the trial court to suppress the marijuana and a confession he made later, claiming there, as he does now on appeal, that the police exceeded the scope of their consent to search because their seizure of illegal drugs transformed the search from a shooting investigation into a controlled substance investigation. *351 The trial court rejected that argument, as do we, because the marijuana was discovered in plain view when the investigating detective was where he had a right to

be at the time.

I.

On the day in question, Thomas Caudill lived with his girlfriend, Michelle Coomer, at a residence in Lee County, Kentucky, consisting of a house and outbuildings including a large garage. Caudill told police that he was outdoors hanging laundry on his clothesline when he was struck by two gunshots which were fired from a tree line approximately 300 feet away. Caudill reportedly retrieved a handgun from the house and returned fire. Ms. Coomer also allegedly fired the handgun in the direction of the tree line.

Police were dispatched to the scene at approximately 9:35 a.m. A Lee County sheriff deputy was the first to arrive, followed by a medical unit which removed Caudill to the hospital. Detective Joie Peters, the only witness who testified at the suppression hearing, arrived at the scene at 11:45 a.m. to investigate the shooting. En route, Detective Peters learned that Caudill had been the object of two other shootings within a matter of months and that investigators suspected that at least one of the prior gunshots either had been self-inflicted or committed by Michelle Coomer so that Caudill could obtain drugs for himself at the hospital.

Several family members had gathered at the scene and complained to Peters when he arrived that the police had failed to properly investigate the prior shootings. After Peters interviewed Michelle Coomer and told her that her version of the shooting that day was implausible, Caudill's family became more upset. Coomer and Caudill's family demanded to know what happened and who had committed the shootings.

Detective Peters then told Coomer that he intended to conduct a thorough investigation.
> I explained to her that I would be going through everything. I explained to her that we were going to make a video record inside the house, all the outbuildings, all the grounds, and I would determine who shot him and why. I would give it all my attention until I found out.
J.A. at 92. Peters proceeded as if all three shootings were related because a small-caliber

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A-2

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1643

25 Fed.Appx. 349
25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.))
**(Cite as: 25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.)))**

Page 3

weapon was used in each instance to inflict flesh wounds resulting in no major injury. Two of the shootings had occurred on the premises; the previous one had allegedly originated from the corner of the garage.

**\*\*2** After Ms. Coomer asked Detective Peters to conduct the investigation, and Detective Peters told her that he intended to devote considerable time to examining the scene, Ms. Coomer left for the hospital. Several family members remained at the scene.

Detective Peters began his investigation outside around the grounds, where he found three 9-mm shell casings. He then moved inside the house and located a shirt that had blood on it; it also had bullet holes with powder residue around them. The shirt had been placed in a trash can with garbage piled on top of it. Peters also located the 9-mm pistol. While in the house, Detective Peters also found and seized drug paraphernalia and photographs depicting the defendant with marijuana.

Sometime during the search, Detective Peters learned via his dispatcher that the emergency room doctor believed that the defendant's gunshots were contact wounds with gunpowder imbedded in the skin. The defendant reportedly accused his wife of inflicting them, although this information was not considered reliable due to the defendant's medicated state.

**\*352** After several hours at the scene, Detective Peters turned his attention to the garage. He testified that he intended to investigate that area because one of the other shootings one or two weeks earlier was reported to have originated there, Peters wanted to search for a weapon in the garage, and he intended to thoroughly process the crime scene consistent with his own practice and the demands of Michelle Coomer and the defendant's family members. Peters had difficulty entering the garage, however, because while Peters had been in the house, the defendant's brother crashed his car into the garage doors and now claimed to have lost his car keys. A small gap in the door remained, and Detective Peters sent a Lee County sheriff deputy with the defendant's brother to take an initial look. They found 132 marijuana plants with root systems, together with approximately two pounds of

processed marijuana.

The next day, Detective Peters interviewed the defendant in the hospital. He informed the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) , and the defendant signed a waiver of his right to counsel and his right to silence. After Detective Peters confronted the defendant with the fruits of his search, the defendant admitted that all three prior gunshot wounds were self-inflicted, and that the marijuana belonged to him.

The defendant was indicted by a grand jury for one count of manufacturing marijuana and one count of possession with intent to distribute marijuana, both in violation of 21 U.S.C. § 841(a)(1). After the evidentiary hearing, his motion to suppress the evidence and statements was denied on the ground that the search of the defendant's premises was authorized by the valid consent of Michelle Coomer, the consent was not exceeded, and the statements were voluntary and not derivative of any illegal police conduct. Thereafter, the defendant entered a conditional guilty plea to one count of the indictment, specifically reserving the right to challenge on appeal the denial of his suppression motion.

II.

**\*\*3** When a ruling on a motion to suppress is challenged on appeal, we review the district court's legal conclusions *de novo,* and the factual findings under a clearly erroneous standard. *United States v. Fullerton,* 187 F.3d 587, 590 (6th Cir.1999). The district court's determination of whether the facts establish a violation of the Fourth Amendment is likewise reviewed *de novo. United States v. Harris,* 192 F.3d 580, 584 (6th Cir.1999). Our review is deferential, viewing the evidence "in the light most likely to support the district court's decision." *United States v. Navarro-Camacho,* 186 F.3d 701, 705 (6th Cir.1999)(quoting *United States v. Braggs,* 23 F.3d 1047, 1049 (6th Cir.), *cert. denied.* 513 U.S. 907, 115 S.Ct. 274, 130 L.Ed.2d 191 (1994)).

A.

The Fourth Amendment states:
  The right of the people to be secure in their

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*A - 3*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1644

25 Fed.Appx. 349
25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.))
**(Cite as: 25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.)))**

Page 4

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV.

The defendant has sensibly invoked the protection of this Amendment in objecting to the search and seizure of items from his residence since the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *353*Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It is beyond debate that only "reasonable" searches are allowed by the Fourth Amendment, and that searches and seizures without a warrant are *"per se* unreasonable" except in a few well-defined and carefully circumscribed instances. *Id.* at 586, 100 S.Ct. 1371; *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Likewise, to be reasonable, searches must be based "upon probable cause." *Carroll v. United States,* 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

It is equally well-established, however, that the search of property without a warrant or probable cause, but with proper consent voluntarily obtained, does not violate the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Furthermore, "[a] search does not violate the Fourth Amendment where police obtain consent to search from one who possesses common authority over the premises." *United States v. Clutter,* 914 F.2d 775, 777 (6th Cir.1990), *cert. denied,* 499 U.S. 947, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991). *See also United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.").

The defendant does not quarrel with these principles, nor does he contest the lower court's

finding that Michelle Coomer had common authority over the premises and consented to the **search**. Rather, Caudill argues that Detective Peters' **search** of the **garage** and the seizure of the marijuana was unreasonable because it exceeded the scope of Coomer's **consent**. Specifically, the defendant contends that Peters obtained Coomer's **consent** only to **search** the premises in order to investigate the reported shooting. According to the defendant, the seizure of the marijuana transformed the endeavor into a drug investigation for which no **consent** was given, and the warrantless drug seizure thus constituted a Fourth Amendment violation.

**4** [1] It is true that when the government relies on **consent** as an exception to the warrant and probable cause requirements of the Fourth Amendment, the "exception[ ][is] circumscribed ... by the object of the **search**." *United States v. Reed,* 141 F.3d 644, 649 (6th Cir.1998). In this case, Detective Peters' avowed purpose was to "determine who shot [Caudill] and why." J.A. at 92. The defendant argues that if Peters' true intention in searching the **garage** was to hunt for drugs, Coomer's **consent** was vitiated and the entry into the **garage** unlawful. Citing *United States v. Blair,* 214 F.3d 690 (6th Cir.2000), the defendant posits that the seizure of the marijuana itself, preceded by the collection of photographs and drug paraphernalia from the house, caused the transformation of the investigation into a drug **search**.

*Blair* does not support the defendant's position. The court there held that the execution of a search warrant for documents was not a subterfuge for a drug investigation, and that the government agents properly seized and field tested narcotics found in plain view during the course of the search. *Id.* at 697-98.

The defendant misapprehends the nature of the appropriate inquiry in this case because he fails to focus on the constitutional interests at stake. The Fourth Amendment protects individuals from both unlawful **searches** and unlawful seizures. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). "A **search** compromises the individual interest in privacy; a seizure deprives the *354* individual of dominion over his or her person or property." *Horton v.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A-4

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1645

25 Fed.Appx. 349
25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.))
**(Cite as: 25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.)))**

Page 5

*California,* 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). There is no dispute that the incriminating character of the marijuana seized in this case was immediately apparent. Thus, under the "plain view" doctrine, the contraband could lawfully be seized if Detective Peters did not violate the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed," and "he had a lawful right of access to the object itself." *Id.* at 136-37, 110 S.Ct. 2301. Since the Supreme Court in *Horton* dispensed with the "inadvertency" prong of the "plain view" test, Peters' subjective state of mind is not pertinent to the inquiry. If the **search** of the **garage** fell within the scope of the **consent** given by Ms. Coomer to Detective Peters, the seizure of the marijuana was proper.

[2] "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). This test implies that the assessment of objective reasonableness is made as of the time of the conversation between the consenting party and the police. Consequently, information that comes to the police after the consent has been given will not affect the validity or scope of the consent, unless, of course, the party withdraws his or her consent.

**\*\*5** [3] It is not difficult to conclude that a reasonable person would understand that Coomer consented to have Detective Peters **search** the **garage** as part of his investigation. Coomer demanded a thorough inquiry. Peters told her that he intended to examine and videotape the house, the grounds and all the outbuildings. Peters considered the three shootings incidents to be related, and Coomer told him that a shooting two weeks earlier had originated near the corner of the **garage**. After Peters explained the expansive nature of his intended **search** to Coomer, Coomer left the premises and Peters went about his business. Neither Coomer nor the defendant attempted to limit Peters' access to the **garage** or any other part of the dwelling or curtilage, nor did anyone with authority over the premises attempt to withdraw the **consent** previously given.

The defendant's reasonable expectation of privacy in the contents of the **garage** was properly compromised by the **consent** to **search**, and his possessory interest in the marijuana was properly abridged under the plain view doctrine. The trial court correctly denied the motion to suppress the evidence.

B.

The defendant's argument that his next-day confession should be suppressed is premised on the illegality of the search of the garage and seizure of the marijuana. He contends that giving *Miranda* warnings did not purge the taint of the supposed prior illegal police conduct and that his admission of ownership in the marijuana was the "fruit of the poisonous tree," or in this case, plant. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

[4] Having determined that the search and seizure were proper, it follows that, absent a claim of involuntariness or a violation of *Miranda,* the confession was also valid and admissible. The record demonstrates that the defendant was informed of his right to counsel and right to silence and that he knowingly and voluntarily waived those rights and freely chose to speak to the police. There was no error, therefore, in the denial of the motion to suppress the confession.

**\*355** III.

The defendant's co-tenant on the premises demanded and received a thorough investigation by the police, which included a comprehensive search of the premises themselves. That the search yielded evidence that may have been unexpected or unanticipated by the consenting party does not undermine the validity of the consent or the objective reasonableness of the police conduct. Because the search and seizure were constitutionally proper and the defendant's statements freely given, the order of the district court denying the defendant's motion to suppress is

AFFIRMED.

25 Fed.Appx. 349, 2001 WL 1671075 (6th Cir.(Ky.))

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*A -5*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1646

Westlaw.

Not Reported in N.E.2d
1997 WL 593754 (Ohio App. 2 Dist.)
**(Cite as: 1997 WL 593754 (Ohio App. 2 Dist.))**

Page 1

**C**
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio, Second District, Greene
County.

STATE of Ohio, Plaintiff-Appellee,
v.
Brackney Allen COOPER, Defendant-Appellant.

**No. 97-CA-15.**

Sept. 26, 1997.

WILLIAM F. SCHENCK, Greene County
Prosecutor, Atty. Reg. # 0015243, By: DAVID J.
CUSACK, Assistant Prosecuting Attorney, Atty.
Reg. #0063880, Greene County Courthouse, 45 N.
Detroit Street, Xenia, Ohio 45385, Attorneys for
Plaintiff-Appellee.

JACK HARRISON, 643 Warren Street, Dayton,
Ohio 45409, Atty. Reg. # 0005076, Attorney for
Defendant-Appellant.

OPINION

BROGAN, J.

**\*1** Brackney Cooper appeals from his conviction in
the Greene County Court of Common Pleas, upon
his no contest plea to a charge of receiving stolen
property. Making two assignments of error, he
argues that the trial court should have suppressed
evidence seized by the police pursuant to a
warrantless search. Because we find the police did
not violate the defendant's Fourth Amendment
rights, the judgment of the trial court is affirmed.

Testimony given at the hearing of
defendant-appellant's motion to suppress provides

the factual background of the case. According to
the testimony, on August 26, 1996, Vasilios Karras,
a resident of Sugarcreek Township, filed a report
with the local police department indicating that his
Kawasaki motorcycle had been stolen. The next
day, August 27, Karras flagged down a patrolman,
Vincent Chalecki, and reported that his motorcycle
had been found "dumped" on property owned by his
family at 3504 Pine Court. Officer Chalecki then
left to investigate the area where the motorcycle had
been dumped. Chalecki observed that wiring on
the motorcycle had been cut from an attempt to "hot
wire" it. He further observed that someone had
stripped it of a small windshield, several gages, and
some female couplers from the wiring harness.
From his conversation with Karras and his
observation of the motorcycle, Chalecki also
discovered that the vehicle was missing a black
vinyl tool kit, with a snap close, bearing the brand
name of the motorcycle.

Chalecki and another patrolman, Officer J. Deaton,
then went to the home of the appellant and his wife,
one of two houses located at the 3504 Pine Court
address. Chalecki was aware at that time of a path
leading from the area where the motor cycle was
abandoned to the appellant's house. The officers'
approach to the appellant's home led them first to an
attached garage with double overhead doors. The
right-hand door stood open, but the left-hand door
had a sign in a window indicating that visitors
should use the front door of the house with an arrow
pointing that direction. Chalecki headed toward
the front door while Deaton stayed by the open
garage.

At that time, Constance Cooper, the appellant's
wife, stepped from the house into the attached
garage through a connecting door. Mrs. Cooper
spoke to the officers from the garage, asking if she
could be of help. Deaton then waived Chalecki
back to the garage. The two patrolmen entered the
garage, stopping in the middle to converse with
Mrs. Cooper. The patrolmen asked Mrs. Cooper
about the stolen motorcycle. She said that she
didn't have any knowledge of it. She noted that her

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1647

Not Reported in N.E.2d
1997 WL 593754 (Ohio App. 2 Dist.)
(Cite as: 1997 WL 593754 (Ohio App. 2 Dist.))

Page 2

husband often worked on cars and motorcycles but said that she had not seen a Kawasaki like the one stolen. The officers then asked if Mr. Cooper was home. Mrs. Cooper replied that he was in bed and asked the officers if they wanted him to get him. When they assented, Mrs. Cooper reentered the house and left the officers standing in the garage. While awaiting the Coopers, Chalecki noticed, underneath a nearby work bench, some Kawasaki motorcycle tools, a black vinyl tool-pouch, and a pair of electrical couplers, all of which matched the items missing from the stolen motorcycle. At hearing, Chalecki indicated that these items stood out from the rest of the items in the garage because of their clean and shiny appearance.

*2 On September 12, 1996, a Greene County grand jury returned a secret indictment charging Mr. Cooper with receiving stolen property. On October 31, 1996, Cooper filed a motion to suppress the evidence found in his garage by Officer Chalecki. Following a hearing, the trial court ruled that Officers Chalecki and Deaton had not found the evidence in question pursuant to an illegal search. The court found that the evidence was in "plain view;" that the defendant had "abandoned any legitimate, actual and reasonable expectation of privacy in his garage" by leaving the door open; and that the officers' presence in the garage occurred with Mrs. Cooper's "acquiescence."

Subsequently, the defendant entered a plea of no contest to the charge against him. He was convicted and sentenced to a prison term of 17 months. He now appeals, assigning the following errors:
  1. The officer's warrantless search and seizure effected on premises in which Appellant had reasonable expectation of privacy was in contravention of Fourth Amendment of the Constitution and thus his vantage point was prohibited.
  2. Inadvertence of discovery of subject items and immediately recognizable nature as contraband were both lacking in this "plain view" seizure.

Both assignments of error allege violations of the Fourth Amendment protections against unreasonable searches and seizures. Although appellant does not specifically rely on Section 14, Article 1 of the Ohio Constitution, it has been held

to "protect the same interests and in a manner consistent with the Fourth Amendment." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87 n. 1, 565 N.E.2d 1271. Warrantless searches of residences are considered "per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions." *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585. If evidence is derived in violation of the Fourth Amendment, exclusion of the evidence is required. *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Thus, the appellant argues that the evidence produced pursuant to the warrantless search of his garage was illegal and, therefore, should have been suppressed.

I.

The warrant requirement of the Fourth Amendment does not apply unless the complaining party has a constitutionally protectable expectation of privacy. *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. Under the two-part test first announced in Justice Harlan's concurrence in *Katz,* constitutional protections against searches and seizures will only trigger if (1) a defendant held an actual, subjective expectation of privacy and (2) that expectation was objectively reasonable. *Katz v. United States* (1967), 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (Harlan, J., concurring); *California v. Ciraolo* (1986), 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215. Thus, a threshold issue in the instant case is whether the appellant maintained such an expectation of privacy in his garage. The trial court found that he did not because the door to the garage that the police entered was open. The appellant challenges this finding in his first assignment of error. We are not prepared to follow the trial court and hold that an open garage door waives all of a resident's expectations of privacy in the garage attached to his home. An attached garage falls within the curtilage of the home. *Los Angeles Police Protective League v. Gates* (C.A.9, 1990), 907 F.2d 879, 885. Thus, like the home itself, a garage is not subject to search without a warrant unless one of the few, specific exceptions to the warrant rule applies. See *id.* Generally, an open door alone is insufficient to prevent a party from asserting a reasonable expectation of privacy

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

H-8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1648

Not Reported in N.E.2d
1997 WL 593754 (Ohio App. 2 Dist.)
(Cite as: 1997 WL 593754 (Ohio App. 2 Dist.))

Page 3

in those areas not made plainly visible by the opening. See *City of Athens v. Wolf* (1974), 38 Ohio St.2d 237, 240, 313 N.E.2d 405. In this case, the officers had to enter the garage before they could discover the seized evidence. This was not a case where evidence was made plainly visible to passersby. See, *e.g., State v. Curto* (1991), 73 Ohio App.3d 16, 18, 595 N.E.2d 1038; see also *Katz v. United States* (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 ( "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.") Therefore, we believe that the appellant did entertain an actual and reasonable expectation of privacy and the officers' search of the garage requires Fourth Amendment analysis.

*3 The state asks us to find that the appellant relinquished any expectation of privacy in the garage because his wife met the police in the garage, conversed with them there without objection, and then left them waiting in the garage while she retrieved her husband. The state's concern appears to be best expressed as an assertion that the appellant's wife gave consent to the police officers to enter the garage. We recognize that the issues of consent and privacy are closely related. By giving consent to a search, a party can be said to relinquish his expectation of privacy. See *State v. Posey* (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61. Nevertheless, courts have treated consent as a specific exception to the warrant requirement. See *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854; *Posey, supra.* Therefore, the state's concerns should be properly and adequately addressed in the analysis below of whether proper consent was given.

Because we find the police intrusion in this case does trigger Fourth Amendment scrutiny, the next question raised by the appellant's first assignment of error is whether the officers' warrantless search fits within one of the recognized exceptions to the warrant requirement. In *State v. Akron Airport Post No. 8975* (1985), 19 Ohio St.3d 49, 482 N.E.2d 606, the Supreme Court of Ohio listed the judicially recognized exceptions to the search warrant requirement in Ohio as (1) a search incident to a lawful arrest, (2) consent signifying waiver of constitutional rights, (c) the stop-and-frisk doctrine,

(3) hot pursuit, (4) probable cause to search and the presence of exigent circumstances, and (5) the plain-view doctrine. *Id.* at 51, 482 N.E.2d 606. The trial court in the present case found that the evidence in question was discovered pursuant to the plain-view exception. It further found that the wife "acquiesced" to the officers' presence, indicating that she impliedly waived Fourth Amendment protections by consent.

Competent and credible evidence supports the trial court's factual finding that the relevant evidence lay in Officer Chalecki's plain view. Therefore, we have no cause to reassess that finding. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578; *State v. Hakeem,* (Ohio App.1990), 61 Ohio App.3d 187, 189, 572 N.E.2d 236. Nevertheless, that factual finding does not end the analysis. In *Horton v. California* (1990), 496 U.S. 128, 136-37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112, 123, the Supreme Court recognized a three-part test for determining whether an officer may seize evidence that lies in plain view. An officer may seize such evidence if (1) the initial intrusion leading to the item's discovery was lawful (2) if it was 'immediately apparent' that the item was incriminating, and (3) if the officer had lawful access to the evidence. *Id.*

*4 Under the first prong of the *Horton* test, we must determine whether the officers' initial intrusion into the appellant's garage violated his Fourth Amendment rights. We have already found that the appellant held a reasonable expectation of privacy in his garage. Therefore, the officers' entry must have occurred in conformity with one of the exceptions to the warrant requirement or else the plain-view doctrine will not apply. Consent has long been recognized as an exception to the warrant requirement. *Schneckloth, supra.* Thus, the question arises, did the acquiescence of the appellant's wife to the officers' presence, as noted by the trial court, constitute a waiver of the warrant requirement? We hold that it did.

Many courts have held that implied consent is sufficient to permit the entry of a police officer into a place without a warrant, and, after such an entry, the plain-view doctrine will apply. See, *e.g., Loyal Order of Moose Lodge No. 1473 v. Ohio Liquor Control Comm.* (1994), 95 Ohio App.3d 109, 112,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A - 9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1649

Not Reported in N.E.2d
1997 WL 593754 (Ohio App. 2 Dist.)
**(Cite as: 1997 WL 593754 (Ohio App. 2 Dist.))**

Page 4

641 N.E.2d 1182, citing *State v. Posey* (1988), 40 Ohio St.3d 420, 534 N.E.2d 61 (*Posey* established in Ohio a "judicially recognized exception of a search pursuant to implied consent."); *State v. Asworth* (April 11, 1991), Franklin App. No. 90AP-916, unreported, 1991 WL 54181; *United States v. Turbyfill* (C.A.8, 1975), 525 F.3d 57; *United States v. Wagner* (C.A.8, 1989), 884 F.2d 1090, certiorari denied, 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958; *People v. Harrington* (1970), 2 Cal.3d 991, 995, 88 Cal.Rptr. 161, 163, 471 P.2d 961, 96; *Terrell v. United States* (D.C.App.1976), 361 A.2d 207, 210; *State v. Knapp* (1991), 120 Idaho 343, 349, 815 P.2d 1083, 1089. In *Turbyfill, supra,* the Eighth Circuit held that "an invitation to enter a house may be implied as well as expressed." *Id.* at 59. In that case, Secret Service agents entered the defendant's house after a third party opened the front door and stood back a few feet. *Id.* at 58. The court held that the third party's actions constituted an implied consent to enter and, after entering, the officers were justified in seizing contraband in plain view. *Id.* at 59. In the instant case, Mrs. Cooper called to the officers from the opened garage and the officers responded by approaching her and entering the garage. The officers' entry appears to have been a reasonable and expectable response to Mrs. Cooper's actions. After the officers entered, Mrs. Cooper did not object or attempt to make them leave in any way. Indeed, she left alone in the garage when she reentered the house. We are persuaded by the logic of the *Turbyfill* decision that her actions were a form of consent to the entry.

*5 It is well settled that consent as a waiver of Fourth Amendment protections is only valid if given voluntarily and if the person consenting has some form of authority over the relevant location. See *State v. Sneed* (1992), 63 Ohio St.3d 3, 7, 584 N.E.2d 1160, certiorari denied, 507 U.S. 983, 113 S.Ct. 1577, 123 L.Ed.2d 145. To show the voluntariness of consent to search, the state need only show that consent was a product of free choice under a totality of the circumstances test. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875. Here, where Mrs. Cooper herself initiated the contact with the officers in the garage, the voluntariness of the consent is evident. It is also evident that Mrs. Cooper had common authority

over the garage with her husband sufficient to make consent a valid waiver of the warrant requirement. See *State v. McCarthy* (1971), 26 Ohio St.2d 87, 93, 269 N.E.2d 424. Therefore, because Mrs. Cooper validly consented to the officers' entry, that entry provided a lawful premise for the operation of the plain view doctrine under the first prong of the *Horton* test. Appellant's first assignment of error is overruled.

II.

Appellant's second assignment of error contends that the evidence seized did not otherwise fit within the plain-view exception. We will examine each of the remaining requirements of that exception in order. The second prong of the *Horton* test requires that the incriminating character of seized evidence be immediately apparent. We note that "[t]he 'immediately apparent' requirement of the 'plain view' doctrine is satisfied when police have probable cause to associate an object with criminal activity." *State v. Halczyszak* (1986), 25 Ohio St.3d 301, 496 N.E.2d 925, syllabus. The United States Supreme Court has explained that probable cause:

is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

*Texas v. Brown* (1983), 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed. 502, 514. Under this standard, there was more than enough indication of the nature of the evidence before Officer Chalecki to permit its seizure. Officer Chalecki testified that he noticed, among other things, that the two couplers he found were of a kind that he had observed missing from the abandoned motorcycle; that the nine-prong coupler had a color combination matching the severed wires on the motorcycle; that the black pouch fit the description of the one missing and described by Mr. Karras; and that the tools scattered about on the floor were stamped with

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 1650

Not Reported in N.E.2d
1997 WL 593754 (Ohio App. 2 Dist.)
**(Cite as: 1997 WL 593754 (Ohio App. 2 Dist.))**

the brand-name of the motorcycle, Kawasaki. Chalecki also testified that the motorcycle lay abandoned at the appellant's address at the end of a path leading to his house. We cannot find that the trial court erred in permitting the seizure of the evidence under these circumstances.

**\*6** The third-prong of the plain-view test from *Horton* requires that police officers have a lawful right of access to the evidence itself. The *Horton* Court explained that "this is simply a corollary of the familiar principal * * * that no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances." *Horton v. California,* 496 U.S. 128, 137 n. 7, 110 S.Ct. 2301, 2308 n. 7, 110 L.Ed.2d 112, 123 n. 7. This case clearly was not one in which the officer's attempted to use the plain view doctrine as a substitute for a warrant. In *State v. Halczyszak,* the Ohio Supreme Court stated: The initial lawful intrusion onto the premises penetrated appellees' zone of privacy completely as to those objects in plain sight. That zone of privacy encompassed is the premises described inclusive of the individual objects thereon. Therefore, the police could appropriately stand next to any object on the premises after the initial intrusion for purposes of a closer inspection. *State v. Halczyszak* (1986), 25 Ohio St.3d 301, 308, 496 N.E.2d 925. We make analogy to *Halczyszak* to point out that, in this case, the officers' lawful intrusion following Mrs. Cooper's consent extended to all objects in plain view. The officers did not require a warrant to seize the items that lay in plain view before them. See *BPOE Lodge 0170 Gallipolis v. Ohio Liquor Control Comm.* (1991), 72 Ohio App.3d 811, 815, 596 N.E.2d 529.

Finally, we touch on the assertion in the second assignment of error that the seizure of the evidence in this case was wrongful because its discovery was not "inadvertent." The inadvertency test, first articulated in the plurality opinion in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91, S.Ct. 2022, 29 L.Ed.2d 564, is no longer an appropriate element in the analysis of the plain-view doctrine. The Supreme Court rejected the inadvertency requirement in *Horton v. California, supra.* The Ohio Supreme Court signaled its intention to follow the federal court's lead in *State v. Waddy* (1992), 63 Ohio St. 424, 442 n. 5. The trial court, therefore, could not have erred in that regard.

Therefore, appellant's second assignment of error is not well taken and is overruled. Consistent with the foregoing analysis, we hold that the evidence that the appellant sought to suppress was evidence in plain view, lawfully discovered and seized after a consensual entry. The trial court did not err in finding such evidence admissible.

Judgement Affirmed.

WOLFF and GRADY, JJ., concur.

1997 WL 593754 (Ohio App. 2 Dist.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*A -11*

# The Supreme Court of Ohio

November 15, 2005

State of Ohio

        v.

Donna Marie Roberts

Case No. 03-1441

**NOTICE OF HEARING**

TO:   LuWayne Annos                     David L. Doughten

The Supreme Court of Ohio will hold a hearing on the merits in this case on Tuesday, the 24th day of January, 2006.  Time allowed for oral argument will be 30 minutes per side.

Attorneys who argue before the Court must comply with the provisions of Rule IX of the Rules of Practice of the Supreme Court of Ohio and the instructions that follow. Pursuant to Rule IX, Section 3, counsel for either or both parties may waive oral argument and submit the case upon briefs.  The Clerk must be notified in writing of the waiver at least ten days before the date scheduled for the oral argument.

Court convenes promptly at 9 a.m.  Counsel in all cases are expected to be present when court convenes.  Counsel must register with the deputy clerk **prior to 8:45 a.m.** at the information desk outside the Courtroom on the first floor of the Ohio Judicial Center.

For more information on protocol for presenting oral argument before the Supreme Court of Ohio, counsel may refer to the "Guide for Counsel Presenting Oral Argument" located at www.sconet.state.oh.us/Clerk_of_Court.

*Note: Assignments in the Supreme Court take precedence over other assignments.*

_____MARCIA J. MENGEL_____ CLERK

_Amy Weinstock_ DEPUTY CLERK

ORIGINAL
ON COMPUTER

IN THE SUPREME COURT OF OHIO

State of Ohio :
:
  Plaintiff - Appellee :  CASE NO.  03-1441
:
v. :
:
Donna Roberts :
:
  Defendant - Appellant :
:  CAPITAL CASE
:

---

### APPELLANT'S SUPPLEMENTAL AUTHORITIES

FILED

JAN 1 7 2006

MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

COUNSEL FOR APPELLEE:

DENNIS WATKINS, ESQ.
Trumbull County Prosecutor
LuWAYNE ANNOS
Assistant Trumbull County Prosecutor
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio 44481
(330) 675-2426

COUNSEL FOR APPELLANT:

DAVID L. DOUGHTEN, ESQ.
Regis. No. 0002847
4403 St. Clair Avenue
Cleveland, OH 44103-1125
(216) 361-1112

PATRICIA J. SMITH, ESQ.
Regis. No. 0059621
4403 St. Clair Avenue
Cleveland, OH 44103-1125
(216) 361-1112

RECEIVED

JAN 1 7 2006

MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE SUPREME COURT OF OHIO
No.03-1441

State of Ohio,                                          :
                                                       :
                    Appellee,                          :
                                                       :
        -v-                                            :
                                                       :
Donna Roberts,                                         :
                                                       :
                    Appellant.                         :

Now comes the appellant, Quisi Bryan, and pursuant to Supreme Court Rule of Practice

IX, Section 7, hereby provides this Court a list of Additional Authorities to be that may relied

upon during oral argument scheduled for January 24, 2006.  The tenth day prior to argument fell

on Saturday January 14, 2006.  As January 16, 2006, was a national holiday, Martin Luther King

Day, January 17, 2006, it the first date available for filing after the aforementioned January 14,

due date.  The additional authorities are:

**Proposition of Law One.**

1.    Boykin v. Alabama, 395 U.S. 238 (1969)

2.    Johnson v. Zerbst, 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938)

3.    Jones v. Barnes, 463 U.S. 745, 751, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (1983)

4.    North Carolina v. Alford, 400 U.S. 25 (1970)

5.    Schneckloth v. Bustamonte, 412 U.S. 218, 241, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)


**Proposition of Law Three**

1.    White v. Mitchell, No. 02-3073, dec. Dec. 7, 2005, ___ F.3d ___ (6th Cir.2005)

2.    Franklin v. Anderson, No.03-3636/3697, dec. Jan. 9, 2006, ___ F.3d. __ (6th Cir. 2005)

**Proposition of Law Four**

1.  <u>Ohio v. Barham</u>, Case No. 4-88-4, dec. 12-7-89, Third App. Dist.,1989 Ohio App. LEXIS 4561.

2.  <u>Ohio v. Spataro</u>, Case No. 469, dec. 4-6-1983, Twelfth App. Dist., 1983 Ohio App. LEXIS 11929.

Respectfully submitted,

_____

David L. Doughten
Patricia J. Smith
Counsel for Appellant

**<u>Proof of Service</u>**

A copy of the foregoing appellant's Brief was served upon Dennis Watkins, Trumbull County Prosecutor and/or LuWayne Annos, Esq. Assistant Trumbull County Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this <u>17th</u> day of January, 2006.

_____

David L. Doughten
Counsel for Appellant

 Caution
As of: December 31, 2021 5:01 PM Z

# *State v. Roberts*

Supreme Court of Ohio

January 24, 2006, Submitted ; August 2, 2006, Decided

No. 2003-1441

**Reporter**

110 Ohio St. 3d 71 *; 2006-Ohio-3665 **; 850 N.E.2d 1168 ***; 2006 Ohio LEXIS 2174 ****

The STATE of OHIO, APPELLEE, v. ROBERTS, APPELLANT.

**Subsequent History:** Reconsideration denied by *State v. Roberts, 111 Ohio St. 3d 1418, 2006-Ohio-5083, 854 N.E.2d 1095, 2006 Ohio LEXIS 2715 (Oct. 4, 2006)*

Related proceeding at *State v. Jackson (In re Stuard), 113 Ohio St. 3d 1236, 2006-Ohio-7233, 863 N.E.2d 636, 2006 Ohio LEXIS 3683 (Nov. 29, 2006)*

Post-conviction relief dismissed at *State v. Roberts, 2007-Ohio-5616, 2007 Ohio App. LEXIS 4956 (Ohio Ct. App., Trumbull County, Oct. 19, 2007)*

Motion granted by *State v. Roberts, 117 Ohio St. 3d 1428, 2008-Ohio-1066, 882 N.E.2d 447, 2008 Ohio LEXIS 582 (Mar. 13, 2008)*

Motion denied by, Application denied by *State v. Roberts, 119 Ohio St. 3d 1429, 2008-Ohio-4317, 892 N.E.2d 918, 2008 Ohio LEXIS 2294 (Aug. 26, 2008)*

Related proceeding at *Disciplinary Counsel v. Stuard, 121 Ohio St. 3d 29, 2009-Ohio-261, 901 N.E.2d 788, 2009 Ohio LEXIS 41 (Jan. 29, 2009)*

Related proceeding at *State v. Jackson, 190 Ohio App. 3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, 2010 Ohio App. LEXIS 4254 (Ohio Ct. App., Trumbull County, Oct. 15, 2010)*

Appeal after remand at, Remanded by *State v. Roberts, 137 Ohio St. 3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, 2013 Ohio LEXIS 2332 (Oct. 22, 2013)*

Post-conviction relief dismissed at *State v. Roberts, 2020-Ohio-4188, 2020 Ohio App. LEXIS 3088 (Ohio Ct. App., Trumbull County, Aug. 24, 2020)*

**Prior History:** **[****1]**  APPEAL from the Court of

Common Pleas for Trumbull County, No. 01-CR-793.

*State v. Roberts, 101 Ohio St. 3d 1451, 2004-Ohio-449, 802 N.E.2d 1126, 2004 Ohio LEXIS 220 (Feb. 6, 2004)*

**Disposition:** Judgment accordingly.

## Core Terms

sentencing, trial court, murder, mitigation, mitigating evidence, death penalty, trial judge, proposition of law, juror, death sentence, letters, preparing, unsworn statement, pretrial publicity, talk, aggravated robbery, prospective juror, aggravated, terminal, garage, seated, vacate, peremptory challenge, consent to search, defense counsel, crime scene, voir dire, challenges, phone, aggravating circumstances

## Case Summary

**Procedural Posture**

Defendant sought review of a judgment from the Court of Common Pleas of Trumbull County (Ohio), which convicted her of aggravated murder of her former husband, in violation of *Ohio Rev. Code Ann. §§ 2903.01(A)* and *(B)*, with death penalty specifications under *Ohio Rev. Code Ann. § 2929.04(A)(7)*. Defendant was also convicted of aggravated burglary and aggravated robbery with firearm specifications, and she was sentenced to death.

**Overview**

Defendant reported the death of her former husband at their home. Investigations by police revealed that defendant and her boyfriend had plotted to kill the husband. The boyfriend was convicted of aggravated murder and sentenced to death. In a separate trial, defendant was also convicted and sentenced to death. On appeal, the court found that denial of

State v. Roberts

suppression was proper based on defendant's consent to search her home, which was not exceeded by the search of a vehicle in the garage. There was no "good cause" shown to excuse two prospective jurors for cause under *Ohio Rev. Code Ann. §§ 2313.42(J)* and *2313.43*, and denial of defendant's motion to change venue due to pretrial publicity was not an abuse of discretion. The evidence supported the convictions, and there was no plain error in the jury instructions. Defendant clearly waived the giving of mitigation evidence aside from her unsworn statement, and there was no ineffectiveness of counsel shown. The trial court erred in allowing the prosecutor to assist her drafting the sentencing opinion in an ex parte manner, which was a violation of Ohio Code Jud. Conduct Canon 3(B)(7) and Ohio Code Prof. Resp. DR 7-110(B)(2).

**Outcome**

The court affirmed the judgment of the trial court with respect to defendant's conviction, and it vacated the sentence imposed and remanded the matter for resentencing. Upon remand, defendant was to be afforded her right to allocute, the evidence was to be reviewed and evaluated by the trial court, and the death penalty appropriateness was to be redetermined.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > ... > Warrantless Searches > Consent to Search > General Overview

*HN1*[⬇] **Search & Seizure, Scope of Protection**

The law with respect to consent to search and suppression is settled. When police conduct a warrantless search, the State bears the burden of establishing the validity of the search. Searches and seizures without a warrant are "per se unreasonable" except in a few well-defined and carefully circumscribed instances. It is equally well established, however, that a search of property without a warrant or probable cause but with proper consent having been voluntarily obtained does not violate the Fourth Amendment.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > ... > Warrantless

Searches > Consent to Search > Sufficiency & Voluntariness

*HN2*[⬇] **Search & Seizure, Scope of Protection**

The question of whether consent to a search is voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between an officer and a suspect.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Suppression of Evidence

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Motions to Suppress

*HN3*[⬇] **Standards of Review, Substantial Evidence**

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, a trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

Criminal Law & Procedure > ... > Warrantless Searches > Vehicle Searches > General Overview

Criminal Law & Procedure > ... > Warrantless Searches > Consent to Search > General Overview

*HN4*[⬇] **Warrantless Searches, Vehicle Searches**

Consent to search a residence and attached garage encompasses a search of a car found in the garage.

State v. Roberts

Criminal Law & Procedure > ... > Challenges for Cause > Bias & Impartiality > General Overview

**HN5[↓] Challenges for Cause, Bias & Impartiality**

*Ohio Rev. Code Ann. § 2313.42(J)* contemplates that "good cause" exists for the removal of a prospective juror when he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court. A prospective juror challenged for cause should be excused if a court has any doubt as to the juror's being entirely unbiased. *Ohio Rev. Code ANn. § 2313.43.*

Criminal Law & Procedure > ... > Challenges for Cause > Bias & Impartiality > General Overview

Criminal Law & Procedure > Juries & Jurors > Challenges for Cause > Judicial Discretion

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview

**HN6[↓] Challenges for Cause, Bias & Impartiality**

Trial courts have discretion in determining a juror's ability to be impartial, and such a ruling will not be disturbed on appeal unless it is manifestly arbitrary so as to constitute an abuse of discretion.

Criminal Law & Procedure > Juries & Jurors > Challenges for Cause > Judicial Discretion

Evidence > ... > Testimony > Credibility of Witnesses > General Overview

**HN7[↓] Challenges for Cause, Judicial Discretion**

A prospective juror's credibility in making certain statements is a matter for a trial judge.

Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > General Overview

Criminal Law & Procedure > Juries & Jurors > Challenges for Cause > General Overview

**HN8[↓] Juries & Jurors, Challenges to Jury Venire**

A defendant may claim prejudice when she unsuccessfully challenges a venireman for cause and that venireman would have been seated as an alternate juror if the defense had not exercised a peremptory challenge. But implicit in that rule is the requirement of a finding that a trial court should have excused the juror for cause.

Criminal Law & Procedure > ... > Challenges to Jury Venire > Pretrial Publicity > Change of Venue Requests

Criminal Law & Procedure > Jurisdiction & Venue > Venue

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Venue

**HN9[↓] Pretrial Publicity, Change of Venue Requests**

A trial court's ruling on a motion for a change of venue pursuant to *Ohio R. Crim. P. 18(B)* will not be disturbed on appeal unless the court abused its discretion. The Ohio Supreme Court has long held that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community.

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > ... > Challenges to Jury Venire > Pretrial Publicity > General Overview

Criminal Law & Procedure > Jurisdiction & Venue > Venue

**HN10[↓] Burdens of Proof, Defense**

A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually biased. Pretrial publicity - even pervasive, adverse publicity - does not inevitably lead to an unfair trial. Only in rare cases may prejudice be presumed. The Ohio Supreme Court has held that extensive voir dire helps to eliminate any negative effect arising from the pretrial publicity.

Criminal Law & Procedure > ... > Challenges to Jury Venire > Pretrial Publicity > General Overview

**HN11[↓] Challenges to Jury Venire, Pretrial Publicity**

State v. Roberts

The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense is not particularly troubled by the jury's exposure to pretrial publicity once voir dire is completed.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Evidence > ... > Testimony > Credibility of Witnesses > General Overview

Evidence > Weight & Sufficiency

*HN12*[⬇] **Standards of Review, Substantial Evidence**

When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. A verdict will not be disturbed on appeal on sufficiency grounds unless reasonable minds could not reach the conclusion reached by the trier-of-fact.

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Purpose

*HN13*[⬇] **Larceny & Theft, Elements**

The fact that a defendant did not keep or sell property for financial gain does not matter; the only purpose required for theft is a "purpose to deprive the owner of the property" in question. *Ohio Rev. Code Ann. § 2913.02(A)*.

Criminal Law & Procedure > ... > Robbery > Armed Robbery > Elements

Criminal Law & Procedure > ... > Murder > Felony Murder > Elements

*HN14*[⬇] **Armed Robbery, Elements**

The victim of a robbery, killed just prior to the robber's carrying off his property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time

of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching him die, and then stealing his property after the death.

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Jury Instructions

Criminal Law & Procedure > Trials > Jury Instructions > Objections

Criminal Law & Procedure > ... > Reviewability > Waiver > Triggers of Waivers

*HN15*[⬇] **Plain Error, Jury Instructions**

Where a defendant during trial fails to object to a jury instruction on the basis asserted on appeal, she thus waives all but plain error.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances

*HN16*[⬇] **Fundamental Rights, Cruel & Unusual Punishment**

The United States Supreme Court has never suggested that the Eighth Amendment requires forcing an unwilling defendant to present mitigating evidence in a capital case. No societal interest counterbalances the defendant's right to control his or her own defense. The Ohio Supreme Court has held that a defendant is entitled to decide what she wants to argue and present as mitigation in the penalty phase, including the decision to present no evidence. Ohio's death-penalty statute itself confers "great latitude" on a defendant in such decisions. *Ohio Rev. Code Ann. § 2929.04(C)*.

Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances

*HN17*[⬇] **Capital Punishment, Mitigating Circumstances**

The requirements of Ashworth do not apply when a defendant makes an unsworn statement and presents minimal evidence in mitigation. The Ohio Supreme Court's emphasis in Ashworth was to require an inquiry of a defendant only in

State v. Roberts

those situations where the defendant chooses to present no mitigating evidence whatsoever. An unsworn statement can constitute critical mitigating evidence. The Court has never held that a partial waiver of the right to present mitigating evidence is an invalid exercise of that right. To the contrary, the Court has upheld the death sentences in several cases in which a defendant chose to present only an unsworn statement to the jury in mitigation.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Assistance of Counsel

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > Counsel > Effective Assistance of Counsel > Tests for Ineffective Assistance of Counsel

*HN18*[  ]  **Criminal Process, Assistance of Counsel**

Reversal of a conviction for ineffective assistance requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Assistance of Counsel

Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances

Criminal Law & Procedure > Counsel > Effective Assistance of Counsel > Sentencing

*HN19*[  ]  **Criminal Process, Assistance of Counsel**

An attorney does not render ineffective assistance by declining, in deference to a client's desires, to present evidence in mitigation.

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > General Overview

*HN20*[  ]  **Jury Instructions, Particular Instructions**

The term "recommendation" in a jury instruction accurately reflects Ohio law and does not constitute prejudicial error.

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

Criminal Law & Procedure > ... > Murder > Aggravated Murder > Penalties

*HN21*[   ] **Sentencing, Capital Punishment**

*Ohio Rev. Code Ann. § 2929.03* governs the imposition of sentences for aggravated murder. *Section 2929.03(F)* clearly contemplates that a trial court itself will draft the death-sentence opinion.

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

Criminal Law & Procedure > ... > Murder > Aggravated Murder > Penalties

*HN22*[   ]  **Sentencing, Capital Punishment**

See *Ohio Rev. Code Ann. § 2929.03(F)*.

Criminal Law & Procedure > Sentencing > Appeals > Capital Punishment

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

*HN23*[   ]  **Appeals, Capital Punishment**

The Ohio Supreme Court's prior decisions have stressed the crucial role of a trial court's sentencing opinion in evaluating all of the evidence, including mitigation evidence, and in carefully weighing the specified aggravating circumstances against the mitigating evidence in determining the appropriateness of the death penalty.

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

*HN24*[   ]  **Sentencing, Capital Punishment**

The Ohio General Assembly has set specific standards in the statutory framework it created to guide a sentencing court's discretion in a death sentence matter by requiring examination of specific factors that argue in favor of or against imposition

State v. Roberts

of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

*HN25*[⬇] **Sentencing, Capital Punishment**

A trial judge is charged by statute under *Ohio Rev. Code Ann. § 2929.03(F)* with the sole responsibility of personally preparing the opinion setting forth the assessment and weight of the evidence, the aggravating circumstances of a murder, and any relevant mitigating factors prior to determining what penalty should be imposed.

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

*HN26*[⬇] **Sentencing, Capital Punishment**

The consideration and imposition of death are the most solemn of all the duties that are imposed on a judge, as Ohio courts have recognized. The judge alone serves as the final arbiter of justice in his courtroom, and he must discharge that austere duty in isolation. The scales of justice may not be weighted even slightly by one with an interest in the ultimate outcome.

Legal Ethics > Judicial Conduct

*HN27*[⬇] **Legal Ethics, Judicial Conduct**

See Ohio Code Jud. Conduct Canon 3(B)(7).

Legal Ethics > Judicial Conduct

Legal Ethics > Professional Conduct > Tribunals

*HN28*[⬇] **Legal Ethics, Judicial Conduct**

Any ex parte assistance in the preparation of a court's sentencing opinion is wholly inconsistent with the vital ethical constraints of ex parte communications under Ohio Code Jud. Conduct Canon 3(B)(7). Ohio Code Prof. Resp. DR 7-110(B)(2) and (3).

Criminal Law & Procedure > Sentencing > Imposition of Sentence > General Overview

Criminal Law & Procedure > Sentencing > Appeals > General Overview

*HN29*[⬇] **Sentencing, Imposition of Sentence**

A trial court's decision to use a prosecutor in preparing a sentencing opinion constitutes a grievous violation of the statutory deliberative process. It is so severe a violation that independent reweighing cannot serve as an adequate remedy.

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Allocution

*HN30*[⬇] **Imposition of Sentence, Allocution**

*Ohio R. Crim. P. 32(A)(1)* provides that before imposing sentence in a criminal trial, a trial court shall "address the defendant personally" and ask whether he or she wishes to make a statement on her own behalf or present any information in mitigation of punishment.

## Headnotes/Summary

**Headnotes**

*Criminal law -- Aggravated murder -- Convictions affirmed -- Court's ex parte communication with prosecutor invalidates sentencing opinion -- Death penalty vacated and resentencing ordered.*

**Counsel:** Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

David L. Doughten and Patricia J. Smith, for appellant.

**Judges:** O'CONNOR, J. MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

**Opinion by:** O'CONNOR

## Opinion

**[*71] [***1171] O'CONNOR, J.**

**[**P1]** At 12:01 a.m., December 12, 2001, the appellant,

Donna M. Roberts, phoned 911 to report the death of her former husband, Robert Fingerhut, at the home they shared in Howland Township, Trumbull County, Ohio. After investigating, the police learned that Roberts and Nathaniel Jackson had plotted to kill Fingerhut while Jackson was in prison in the months preceding the murder. Subsequently, the pair were arrested and indicted.

[**P2]  Jackson was convicted of the aggravated murder of Fingerhut and was sentenced to death, a conviction and sentence that we have affirmed. See *State v. Jackson, 107 Ohio St.3d 300, 2006 Ohio 1, 839 N.E.2d 362*. In a separate trial, Roberts was found guilty of the aggravated murder of Fingerhut and was also sentenced [****2] to death.

[**P3] [***1172] Roberts now appeals, raising an array of challenges to her conviction and sentence. Although we reject all of Roberts's attacks on her conviction, because of the trial judge's ex parte use of the prosecutor in directly preparing the court's sentencing opinion, we must vacate the sentence and remand the case to the trial court for resentencing.

[*72] RELEVANT BACKGROUND

[**P4]  The facts taken in the light favorable to the state establish the following facts.

[**P5]  *Donna Roberts* met Robert Fingerhut in Florida in 1983; they married, but were divorced soon thereafter. According to Roberts, the divorce was for financial and business reasons -- i.e., that Fingerhut wanted to shelter and protect assets in case his business was sued or collapsed.

[**P6]  The couple moved to Ohio and established a home on Fonderlac Drive in Howland Township, Warren, Ohio. Fingerhut bought two Greyhound bus terminals -- one in Warren and one in Youngstown -- and began operating them. Those assets and almost all others were listed in Roberts's name.

[**P7]  Despite the divorce, Fingerhut appears to have continued to treat Roberts as his wife, referring to her as such in many [****3] of his business dealings. Most people who dealt with Roberts and Fingerhut assumed that they were married. Roberts similarly maintains that, in her mind, she did not consider herself divorced because she and Fingerhut were a devout, loving couple.

[**P8]  Notwithstanding her feelings for Fingerhut, at some point during that relationship, Roberts met Nathaniel Jackson and began an affair with him. The liaison was interrupted in 2001, when Jackson was incarcerated in the Lorain Correctional Institution. Upon his release, however, they were reunited.

[**P9]  On December 6, 2001, Roberts reserved and paid for a Jacuzzi suite in Jackson's name at the Wagon Wheel Motel in Boardman. Three days later, Jackson and Roberts spent the night in that room.

[**P10]  Over the next several days, the pair were seen together at various places. A day or two before Fingerhut's death, Frank Reynolds, then an employee of the Greyhound bus terminal in Youngstown, saw Roberts and Jackson kissing and talking with one another near the terminal before Fingerhut arrived for work. Earlier, Reynolds had overheard Roberts asking Fingerhut for $ 3,000. Fingerhut had refused. According to Reynolds, Roberts [****4] was nervous and shaking and gave Fingerhut "the dirtiest look."

[**P11]  On December 11, 2001, Greyhound bus driver Jim McCoy saw Fingerhut working at the Youngstown terminal at approximately 4:30 p.m. Fingerhut was the only person working that afternoon.

[**P12]  Soon after seeing Fingerhut in the terminal, McCoy drove his bus to Warren. He saw Roberts and Jackson at the Warren terminal, and Jackson told McCoy, "[W]e're trying to get out of here." On December 11, a server at the Red Lobster restaurant in Niles waited on a couple she later identified as [*73] Roberts and Jackson. The two paid for their dinner at 6:43 p.m. and left the restaurant.

[**P13]  Fingerhut left the Youngstown bus terminal around 9:00 p.m. on December 11, telling the security guard on duty that he was leaving early for the evening. Around 9:30 p.m., a neighbor observed Roberts driving her car very slowly on Old State Route 82 near their homes, even though no one else was on the road at the time.

[**P14]  Later that night, Roberts went to the Days Inn in Boardman to reserve a room for the following week. She was [***1173] alone and paced around the lobby. The room receipt indicates that she paid for the room [****5] at 11:33 p.m.

[**P15]  At 12:01 a.m., December 12, 2001, Trumbull County authorities received a 911 call from Roberts, who was screaming hysterically that there was something wrong with her husband. Upon arriving at the home, police found Fingerhut's body on the kitchen floor near the door to the garage.

[**P16]  A Trumbull County forensic pathologist, Dr. Humphrey Germaniuk, observed Fingerhut's body at the crime scene and later performed an autopsy. Fingerhut had sustained lacerations and abrasions to his left hand and head, as well as multiple gunshot wounds to his head, chest, and back. Dr. Germaniuk concluded that the gunshot to

State v. Roberts

Fingerhut's head was the cause of death.

[**P17]  During the crime-scene search, police found a fully loaded .38-caliber revolver near Fingerhut's body. A firearms expert with the Bureau of Criminal Identification and Investigation ("BCI") later concluded that the bullets recovered from the home and Fingerhut's body were fired from the same weapon, either a .38-caliber special or a .357 Magnum, but that none of the bullets had been fired from the revolver found near Fingerhut's body.

[**P18]  During the hours immediately following Roberts's [****6] 911 call, police observed that her emotional state fluctuated. At times, she was calm and quiet, and at other times she was crying or screaming, "Oh, my Robert, my Robert." Two detectives noticed that when police investigators talked extensively, they no longer heard Roberts shouting. When a detective checked on Roberts in her bedroom because she had been quiet, she began shouting again upon seeing him. One officer at the scene remarked that he "didn't notice any tears coming from [Roberts's] eyes" when she appeared to be crying.

[**P19]  In this period of initial investigation, Roberts told police that she had left work at the Greyhound bus terminal in Warren at 5:30 that evening, had dined alone at a Red Lobster restaurant, and had then gone home. According to Roberts, Fingerhut called her and said he would be late coming home and suggested that she go shopping. Roberts said she had left her home at 9:00 p.m. and had gone to several stores. When she returned home shortly before [*74] midnight, she found Fingerhut lying on the floor, bleeding from the face. She also stated that her husband's car was not at the house.

[**P20]  Eventually, police arranged for Roberts's brother to [****7] pick her up while they continued to secure the scene and collect evidence. Before Roberts left the house, Detective Sergeant Paul Monroe told Roberts that the house was a crime scene and that police needed to search the house and everything in it, including the garage and cars. Roberts allegedly replied, "Do whatever you have to do to catch the bastard."

[**P21]  At 3:38 a.m. that morning, police were still at the house investigating. The phone rang, and Detective Sergeant Monroe answered it. There was a pause, and then the caller hung up. Detective Monroe traced the call to Roberts's cell phone.

[**P22]  Around 10:00 a.m. that morning, Detective Monroe visited Roberts at her brother's home. At that time, Roberts gave police written consent to continue searching the residence.

[**P23]  Later, on the afternoon of December 12, Roberts met with Sergeant Frank Dillon and Detective Sergeant Monroe at the police station. Roberts described her "loving relationship" with Fingerhut but also stated that she and Fingerhut were a "cool couple" and that he "did his thing, she did hers."

[**P24]  [***1174]  She described Fingerhut as "go[ing] both ways" and said that he had a friend named [****8] "Bobby." She recalled that about a week and a half before the murder, Fingerhut was acting kind of "nutty," and she had thought the behavior was because of his relationship with Bobby.

[**P25]  Roberts also stated that she had been having a sexual relationship with a man named Carlos for six months. She additionally indicated that she had a friend named Santiago whom she had tried to help, but that he had stolen money and a gun from her. When Detective Monroe asked Roberts whether she had relationships with anyone else, Roberts replied, "No, there's nobody else. I told you everybody."

[**P26]  Monroe then asked her about a man named Nate Jackson, and Roberts said, "Yes, I forgot about him." Roberts admitted that she had been dating Jackson for two years and that he had called her from prison and had exchanged letters with her. Roberts claimed that she had last seen Jackson on December 9, when she picked him up at Lorain Correctional Institution and had then left him in Youngstown at a house on Wirt Street. Roberts added that she had last spoken to Jackson over the telephone rather than in person on the morning of December 11.

[**P27]  Detective Monroe asked Roberts whether [****9] she had a cell phone and whether he could look at it. Roberts searched her purse and said that she had [*75] left it at home. Monroe then told Roberts that a call originating from her cell phone had been placed to the crime scene at 3:38 that morning. Roberts said, "Nate must have had the phone. He's always borrowing it"

[**P28]  In the ensuing week and a half, police continued to investigate and learned that Jackson and Roberts had spent a night together at the Wagon Wheel Motel and that Roberts had registered at the Days Inn and had paid for one week's rental.

[**P29]  Police and a BCI agent located and retrieved evidence, including Jackson's fingerprints, from the room at the Days Inn in which Jackson had stayed. Police also recovered a garbage bag in a dumpster at the motel that had come from Jackson's room. That bag contained a bottle of peroxide, used bandages, and gauze with blood that was

State v. Roberts

consistent with Jackson's DNA profile.

[**P30] Police learned that Fingerhut had taken out two life insurance policies on his life, naming Roberts as sole beneficiary. The aggregate benefit of the policies amounted to $ 550,000.

[**P31] On December 12, police found Fingerhut's [****10] abandoned vehicle in Youngstown, approximately three blocks from Wirt Street. A forensic specialist found blood on the driver's side visor and on other areas inside the automobile. Subsequent scientific analysis determined that blood on the visor contained a mixture consistent with both Jackson's and Fingerhut's DNA profiles. Blood recovered from the trunk release inside the car contained a DNA mixture with a major profile that was consistent with Jackson's DNA and a minor profile consistent with Fingerhut's DNA. The frequency for Jackson's DNA on the trunk release was one in 45 quintillion, 170 quadrillion in the Caucasian population, and one in 29 quadrillion, 860 trillion in the African-American population. Jackson is African-American.

[**P32] Cell-phone records indicated that a number of phone calls were made on December 11 between 9:45 p.m. and 11:44 p.m. from the cell phone that Roberts said Jackson had borrowed from her and a cell phone located in Roberts's vehicle.

[**P33] Additional evidence implicated Roberts and Jackson in the murder. As [***1175] noted previously, Roberts had admitted to police that she and Jackson had exchanged letters and telephone calls during his incarceration. [****11] During their initial search of the home, police discovered more than 140 letters and cards written by Jackson to Roberts, most of which were addressed to Roberts at a post office box in Warren.

[**P34] Police also found a brown paper bag with Jackson's name on it in the trunk of Roberts's car, which had been parked in the garage at their residence. The bag contained clothing and approximately 140 handwritten letters, dated between October and December 2001, sent by Roberts to Jackson.

[**P35] [*76] Passages from letters exchanged between Jackson and Roberts suggested strongly that there had been a plot to murder Fingerhut. Many of the letters described the couple's physical relationship and plans for Jackson's release, as well as references to how they would deal with Fingerhut once Jackson was out of prison.

[**P36] For example, in a letter from early October 2001,

Jackson wrote Roberts: [1] "[W]hy don't you leave Robert an lets carry on with a world of our own? Or let me do what I was gonna do to him, because you know that -- that was our little thing so you better not go an try to get know one else to do it, because I told you its getting done when I come home * * *." [****12] Less than a week later, Jackson wrote Roberts: "Donna I got it already planned out on how we are gonna take care of the Robert situation? An baby its the best plan ever! Because Donna its now time that we really be together so that we can really see the true side of our love because I'm tired of not being able to be with you * * *."

[**P37] Soon thereafter, Jackson again expressed his desire to be with Roberts and to be rid of Fingerhut: "Donna I don't care what you say but Robert has to go! An I'm not gonna let you stop me this time. An Donna you know that I've always wanted to live my life with you an only you but everytime that I wanted to take care of the situation by myself you wouldn't never let me. Because you wouldn't let me do what I wanted to do to make you happy an that was get rid of him! So Donna can I do this so that we can go on an live happy? An then maybe we can sell the house an move on to somewhere else in our own world. [****13] An I'm not gonna be happy until that happens!"

[**P38] Roberts responded to Jackson with her own letters. In one from mid-October 2001, she indicated her frustration over limits that Fingerhut apparently had imposed on her spending and her apparent agreement to Jackson's plan for Fingerhut's murder. She wrote, "You know you can always count on me -- you always could. It'll just be a little tougher now because he gives me $ 100 a week for everything and then makes me write checks to keep track of it all. And I haven't been ALLOWED to use any of my 52 charge cards -- emergency only. I am not used to living like this. I am used to having plenty of cash for whatever I want & buying everything I want. Maybe those days will return again soon. Do whatever you want to him ASAP. Amen." Jackson replied, "An then after that you don't ever have to worry about making know more excuses to him, because he will no longer be with us after 12-10-01 an then it'll be me an you totally an completely * * *." Within that same passage, Jackson drew a tombstone with the inscription, "Rest In Piss," before continuing, "Hey Donna just think come [*77] 12-11-01 you'll be waking up to me or maybe we'll give it [****14] a couple of days to let things look cool an then after the funeral [***1176] baby when I come home I'm never leaving an we're only doing it like that just to make it look good * * *. Alls I need is for my baby not to worry an leave everything else up to me."

---

[1] The words used in Jackson's letters are presented verbatim.

State v. Roberts

[**P39]  Jackson's subsequent letters further evinced the developing plan to deal with "the Robert problem." Jackson wrote, "Yes I'm taking care of that the next night, because I told you I'm tired of living like this when I don't have to. An after that will you get me a 2002 Cadillac Deville?" In that same letter, Jackson wrote: "An even if I gotta come to the house and shoot Robert in his fucking head you're gonna be with me."

[**P40]  The letters also indicate a role for Roberts in the scheme. An October letter from Jackson reads, "Well I see now you know that I'm about my business when I get out as far as our little situation? An get me a size large leather gloves an see if you can find me a ski mask hat okay? An I need them handcuffs you have an its mandatory, so get them for me, because the way that I'm gonna do it is gonna be right okay?" About two weeks before the murder, Roberts wrote to Jackson: "I also went to 4 stores [****15] and finally found your ski mask & boxers & a pair of beautiful fleeced lined black leather gloves."

[**P41]  Though the words written in those letters were significant evidence of the planning of the murder, the state also marshaled the actual words spoken between Roberts and Jackson.

[**P42]  Prison authorities at Lorain Correctional Institute routinely record telephone conversations of prisoners and maintain the recordings for at least six months. Eighteen phone calls between Roberts and Jackson were recorded electronically. Those recordings also reflect the plot to murder.

[**P43]  For example, in a recorded conversation between Jackson and Roberts on October 25, 2001, the following colloquy took place:

[**P44]  "[JACKSON]: I'll be home to you. December 9th all the worries will be over baby.

[**P45]  "* * *

[**P46]  "[JACKSON]: The next day out, I'm goin to -- I already got it in my mind, my mind made up. I'm goin to go ahead and do that the next day, okay. All right.

[**P47]  "[ROBERTS]: Oh, I just wrote to you that I didn't think that you really meant it.

[**P48]  "[JACKSON]: What. My mind is made up. My mind made -- I wrote it in my letters, [****16] you know what I'm saying, but you know, I don't like to talk too much like that but when I come home, you know what I mean, it's goin to be in [*78] full detail. Okay. I'm goin to let you know how I'm goin to do it and everything. I'm goin to do it for sure

the next day."

[**P49]  In recorded phone conversations between Jackson and Roberts during November 2001, they continued to discuss what Jackson planned to do to Fingerhut. In a conversation on November 8, 2001, Jackson told Roberts that he wanted Fingerhut to see Roberts performing oral sex on Jackson before Fingerhut "goes away."

[**P50]  Two weeks later, Roberts worried about Jackson's being apprehended for the murder of Fingerhut:

[**P51]  "[JACKSON]: You know what I'm saying, the next day after. You know what I told you I wanted to do right?

[**P52]  "[ROBERTS]: I'm afraid Nate.

[**P53]  "[JACKSON]: What you, man.

[**P54]  "[ROBERTS]: I can't afford to lose you. * * * I can not lose you. Like I will kill myself.

[**P55]  "* * *

[**P56]  [***1177]  "[JACKSON]: Just forget about it man, * * * when a person, man, know what he's doing, man, * * * that's like jinxing, man. * * *

[**P57]  "[ROBERTS]: [****17]  But what was the story with the trunk and handcuffs, that's too involved.

[**P58]  "[JACKSON]: Just, just, just leave it alone, alright.

[**P59]  "[ROBERTS]: It's too much involved. Your gonna leave hair, your gonna leave prints, your gonna,

[**P60]  "[JACKSON]: Leave it alone, man. Leave it alone, alright. * * * Come on man. This ain't Perry Mason man.

[**P61]  "[ROBERTS]: I don't want to know anything about it ever."

[**P62]  On November 24, Jackson tried to reassure Roberts about his plan.

[**P63]  "[JACKSON]: Man, we gonna * * * really talk when I come home, ok.

[**P64]  "[ROBERTS]: OK.

[**P65]  "[JACKSON]: Especially about our, that situation, man. You know.

[**P66]  "[ROBERTS]: Yeah.

[**P67]  "[JACKSON]: I mean, it just, you know, you get too nervous at times, that's all the deal is.

State v. Roberts

**[\*\*P68]** "[ROBERTS]: Yeah I know, it part of my nature.

**[\*\*P69]** "[JACKSON]: And then you said DNA, the only way they can do a DNA is if they got the other, the person's, you know what I'm saying. If they **[\*79]** got the person and the hair cause they can't just take no hair and say this is such and such hair. * * * [T]he laws that we **[\*\*\*\*18]** got in the State of Ohio and the laws from everywhere else, * * * I mean they way different. * * *

**[\*\*P70]** "[ROBERTS]: Really.

**[\*\*P71]** "[JACKSON]: Hell yeah. We'll, we'll talk about it when I come home Donna. Ok, I don't want to talk about it over the phone."

**[\*\*P72]** Around Thanksgiving 2001, Roberts and Jackson discussed DNA evidence, a "big 38" firearm, their reunification on the night after his release from prison and his stay in a hotel the week thereafter, and Roberts's complete reliance on Jackson.

**[\*\*P73]** On December 8, the day before Jackson was released from prison, Jackson and Roberts had one final recorded conversation. Roberts expressed misgivings about what Jackson was planning to do to Fingerhut, but Jackson told her, "I got to do this Donna. I got to." Roberts told Jackson that she did not want to know about it. The following colloquy then took place:

**[\*\*P74]** "[JACKSON]: Just consider it a done deal. Only thing I'm gonna need is one thing.

**[\*\*P75]** "[ROBERTS]: What?

**[\*\*P76]** "* * *

**[\*\*P77]** "[JACKSON]: I just need to be in that house when he come home.

**[\*\*P78]** "[ROBERTS]: Oh no.

**[\*\*P79]** "* * *

**[\*\*P80]** "[JACKSON]: **[\*\*\*\*19]** Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you.

**[\*\*P81]** "* * *

**[\*\*P82]** "[JACKSON]: I just need to be in there man. It ain't gonna happen in the house man. I mean I ain't gonna jeopardize that man.

**[\*\*P83]** "[ROBERTS]: Well, let's not talk about it now.

**[\*\*P84]** "[JACKSON]: Ok. We'll talk, we'll, I'll just wait until tomorrow."

**[\*\*P85]** In light of the accumulating inculpatory evidence and Roberts's unpersuasive explanations for it, Jackson and Roberts became the prime suspects in **[\*\*\*1178]** Fingerhut's murder. Detective Monroe then arranged for Roberts to call Jackson to ask him some prepared questions and for police to record the conversation. According to Detective Monroe, however, Roberts failed to ask Jackson the critical questions that police had instructed her to ask.

**[\*\*P86]** On December 21, 2001, Roberts was arrested at her home for the murder of Robert Fingerhut. That same day, police raided a home on Wirt **[\*80]** Street in Youngstown, and Jackson surrendered. At that time, Jackson had a bandage wrapped around his left index finger. A search of the Wirt Street home uncovered additional evidence. Included in that **[\*\*\*\*20]** evidence was a pair of black leather gloves; the index finger of the left glove appeared to have been torn off, and there was a red substance on the glove near the tear.

**[\*\*P87]** On December 28, 2001, a grand jury indicted Roberts on two counts of aggravated murder related to Fingerhut's death. *R.C. 2903.01(A)* and *(B)*. Both murder counts carried two death-penalty specifications: murder during an aggravated burglary and murder during an aggravated robbery. *R.C. 2929.04(A)(7)*. The grand jury also indicted Roberts on separate counts of aggravated burglary and aggravated robbery, each carrying a firearm specification.

**[\*\*P88]** At trial, the state presented numerous witnesses establishing the facts previously set forth. The defense presented no witnesses. The jury found Roberts guilty of aggravated murder and the other offenses as charged.

**[\*\*P89]** At the mitigation hearing, Roberts waived the presentation of evidence except for a lengthy unsworn statement. The jury recommended -- and the trial court imposed -- the death penalty on Roberts.

**[\*\*P90]** In this appeal of her conviction and sentence, Roberts now raises 14 propositions **[\*\*\*\*21]** of law. We have reviewed each and determined that Roberts demonstrates no error that would justify reversal of her conviction. Although most of her claims related to sentencing also fail, for the reasons set forth more fully below, we hold that the trial court's sentencing opinion supporting the death penalty is so grievously flawed that it cannot properly support the sentence imposed. We therefore affirm Roberts's convictions and other sentences, but we must vacate the death sentence and remand the cause to the trial court to reconsider the imposition of the death penalty and to prepare a proper sentencing opinion.

ANALYSIS

PRETRIAL ISSUES

*The Motion to Suppress*

[**P91] In proposition of law two, Roberts argues that police exceeded the scope of her consent to search the home during the investigation of Fingerhut's murder and that the trial court erred in failing to suppress her letters to Jackson, which the police seized from inside a bag in the trunk of her car in the attached garage. Roberts contends that a reasonable person would have believed that the police would be searching her house, but not a vehicle in the garage that was not at her home at the time of the offense.

[**P92] [****22] [*84] During the pretrial hearing on appellant's motion to suppress, the state presented several witnesses who testified that Roberts clearly and directly gave police open-ended consent to search the premises. The testimony received at the suppression hearing was consistent with Roberts told police to do whatever they needed to do in their efforts to find out who killed Fingerhut.

[**P93] Howland Township police officer Albert Ray, who investigated the murder [**179] scene shortly after Roberts called 911, testified that he overheard Detective Paul Monroe tell Roberts that the entire residence was a crime scene and that police needed to look everywhere for evidence or possible suspects. Roberts reportedly responded, "Do whatever you have to do to catch the bastard." Similarly, Detective Sergeant Frank Dillon was at the residence shortly after the body was discovered and heard Detective Monroe explain to Roberts that police would have to go through the entire house because it was a crime scene. According to Detective Sergeant Dillon, Detective Monroe told Roberts that police needed to search for evidence to determine who committed the murder, and Roberts was adamant in her reply: "I [****23] don't care, you do what you have to do. I want you to get the person who did this to my Robert."

[**P94] Detective Sergeant Monroe himself testified that after he told Roberts that police needed to process the entire house as a crime scene, Roberts said: "[D]o whatever you have to do, search the whole place, just find the guy" He further testified that Roberts gave him permission to look further anywhere on the property to find clues as to who had committed the murder.

[**P95] Roberts's brother also testified. He stated that his sister was very cooperative with the police and did not rebuff them in any way. According to Roberts's brother, when police told her they wanted to search through the house for clues to the homicide, she told the police, "[D]o what you got to do."

[**P96] Captain Karl Compton of the Howland police accompanied Detective Monroe to the home of Roberts's brother on the morning after the murder, at which time Roberts signed the consent form to search the residence and both of the vehicles. According to Detective Monroe, Roberts was very positive about the consent to search and again said, "[D]o whatever you have to do."

[**P97] In light of such [****24] testimony, the trial court denied Roberts's motion to suppress. The court found that Roberts "repeated the request for the police to find the killer, and there was every reason for the police to take her actions to imply Ms. Roberts [sic] consent to do so. It was reasonable by Ms. Roberts agreeing in writing later on * * * for the police to re-search the house."

[**P98] *HN7* The law in this area is settled. When police conduct a warrantless search, the state bears the burden of establishing the validity of the search. Searches and seizures without a warrant are "*per se* unreasonable" except in a [*82] few well-defined and carefully circumscribed instances. *Coolidge v. New Hampshire (1971), 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564.* Accord *Payton v. New York (1980), 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639.* It is equally well established, however, that a search of property without a warrant or probable cause but with proper consent having been voluntarily obtained does not violate the *Fourth Amendment. Schneckloth v. Bustamonte (1973), 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854;* [****25] *State v. Posey (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61.*

[**P99] *HN8* The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041, 36 L.Ed.2d 854.* The standard for measuring the scope of consent under the *Fourth Amendment* is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect. [***180] *Florida v. Jimeno (1991), 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297.*

[**P100] *HN9* "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.* Consequently, an appellate court must accept the

trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning (1982), 1 Ohio St.3d 19, [20], 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583;*

[***26] Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. Burnside, 100 Ohio St.3d 152, 2003 Ohio 5372, 797 N.E.2d 71, at P 8.*

[*P101] We hold that the evidence here adequately supports the trial court's finding that Roberts gave unlimited consent to search the premises of her home. Roberts told Detective Monroe, "[D]o whatever" must be done and to "[D]o what you have to do" in searching the premises. Although Roberts was described as being in a fluctuating emotional state when the consent to search was requested initially, nothing suggests that her state of mind precluded her ability and desire to confer unconditional permission to search.

[*P102] A reasonable person in Detective Monroe's position would have understood Roberts's statement, "Do whatever you have to do, search the whole place, just find the [killer]," as permitting voluntary consent to an unlimited search of the residence, including the attached garage where Roberts's car was parked. *Jimeno, 500 U.S. at 251, 111 S.Ct. 1801, 114 L.Ed.2d 292;* [****27] Indeed, when police contacted Roberts hours later at her brother's home, she repeated her permission [*83] for police to "do whatever [they] have to do" and signed a written consent to search the home and both automobiles. Other courts in similar circumstances have held that HN4 consent to search a residence and attached garage encompasses a search of a car found in the garage. See *United States v. Pennell (C.A.2, 1985), 756 F.2d 600, 612-613* (a warrant to search a residence and attached garage authorizes the search of a car found inside the garage); *United States v. Quiroz (D.Minn.1999), 57 F. Supp. 2d 805, 820-821* (voluntary consent to search a residence and attached garage includes the car parked in the garage). Accord *United States v. Caudill (C.A.6, 2001), 25 Fed. Appx. 349, 353, 2001 WL 1671075.* We find such decisions persuasive here.

*Voir Dire Issues*

[*P103] Based on the totality of the circumstances presented, we conclude that Roberts gave clear, open-ended permission to the police to search the premises and that her consent extended to the garage and the vehicle therein. The trial court properly denied the motion to suppress. Accordingly, we overrule [****28] this claim of error.

[*P104] In proposition of law three, Roberts contends that

in failing to excuse two prospective jurors because of their alleged bias and inability to fairly consider a life-sentence option, the trial court erred.

[*P105] HN5 *R.C. 2313.42(J)* contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." *R.C. 2313.43;* [**1181] see *State v. Cornwell (1999), 86 Ohio St.3d 560, 563, 1999 Ohio 125, 715 N.E.2d 1144; State v. Allard (1996), 75 Ohio St.3d 482, 495, 1996 Ohio 208, 663 N.E.2d 1277.*

[*P106] HN6 Trial courts have discretion in determining a juror's ability to be impartial, *State v. Williams (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323,* and such a ruling "will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576,* [***29] Accord *State v. Williams (1997), 79 Ohio St.3d 1, 8, 1997 Ohio 407, 679 N.E.2d 646.* With these standards in mind, we turn to the specific claims raised by Roberts.

[*P107] Alleging that one venireman, Andrew Kotwis, was unable to fairly consider a life sentence, Roberts asserts that the trial court abused its discretion in overruling her challenge to him for cause. Her claim is predicated largely on statements that the prospective juror made indicating that he would consider sympathy for the survivors in deciding whether to vote for a life sentence or the [*84] death penalty. A review of the transcript of the voir dire examination of Kotwis affords perspective and context.

[*P108] Kotwis stated that he would "[a]bsolutely" consider all sentencing options. He admitted that he believed that the death penalty provides comfort and solace to the survivors and that sympathy or comfort for the survivors would factor into his decision whether to vote for life or death. But after the trial court instructed Kotwis that sympathy could not be a determining factor in whether to vote for a death sentence, he agreed to obey the instruction. Moreover, Kotwis "[a]bsolutely" agreed with [****30] defense counsel that he would consider all sentencing options equally and that no option would "start with a leg up over the other."

[*P109] In failing to dismiss Kotwis for cause, the trial court observed that Kotwis "rehabilitated himself in his answers to the follow-up questions described. In these circumstances, we find no abuse of discretion on the part of

the trial court in denying Roberts's request to discharge him for cause. Although Kotwis gave some answers that could be construed as ambiguous, he ultimately stated that he would consider all sentencing options equally. HN25 His credibility in making such statements was a matter for the trial judge. *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 ("Deference must be paid to the trial judge, who sees and hears the juror"), Roberts fails to demonstrate that we should disturb that finding.

[**PP110] Roberts next asserts that the trial court abused its discretion in failing to excuse prospective juror Michael Blake, who expressed what Roberts characterizes as a fixed impression of her guilt. During the voir dire examination, Blake initially declared that from what he had read in [****31] the news, "they must have had a good reason to arrest [Roberts] * * *. [T]here must be some truth."

[**PP111] Blake's statements must also be considered in a larger context. Blake stated that he could set aside anything he had read or heard and that he would consider the case solely on the evidence presented and the court's instructions. Blake conceded that although he believes mass murderers such as Ted Bundy should automatically get the death penalty, every case is different and he did not presume anyone guilty. And at the conclusion of questioning, Blake reiterated that he would set aside everything he had read or heard about the case and make up his mind solely on the facts presented during trial. The trial court did [****1182] not abuse its discretion in refusing to excuse prospective juror Blake for cause.

[**PP112] Roberts claims that she suffered prejudice because she was "forced" to reserve her final peremptory challenge to prevent the impanelment of Kotwis and Blake, who were next in the venire to be seated in the jury box. She also asserts that she was prejudiced by using the two peremptory challenges allotted for alternate jurors to strike [****32] Kotwis and Blake. Given our conclusion that there is [*85] no showing that the trial court abused its discretion in rejecting her claims to remove Kotwis and Blake for cause, we reject these contentions.

[**PP113] Our conclusion is not affected by the fact that an alternate juror was seated on the jury during trial when one juror had to be removed because of an ailment. We have held that HN26 a defendant may claim prejudice when she unsuccessfully challenges a venireman for cause and that venireman would have been seated as an alternate juror if the defense had not exercised a peremptory challenge. *State v. Group*, 98 Ohio St.3d 248, 2002 Ohio 7247, 781 N.E.2d 980, P 61, fn. 1; see, also, *State v. Leonard*, 104 Ohio St.3d 54, 2004 Ohio 6235, 818 N.E.2d 229, P 61; *State v. Tyler*, 50 Ohio St.3d at 31-32, 553 N.E.2d 576. But implicit in that rule is the requirement of a finding that the trial court should have excused the juror for cause. *Group*, 98 Ohio St.3d 248, 2002 Ohio 7247, 781 N.E.2d 980, P 61, quoting *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 1999 Ohio 125, 715 N.E.2d 1144 ("Ohio law recognizes that where the [****33] defense exhausts its peremptory challenges before the full jury is seated, *the erroneous denial of a challenge for cause in a criminal may be prejudicial* "). (Emphasis added.) Here, we have already concluded that the trial court did not abuse its discretion in failing to sustain the challenges for cause raised against the venireman.

[**PP114] Moreover, Roberts fails to show that any of the jurors ultimately seated were other than impartial. Thus, she fails to demonstrate a violation of the *Due Process Clause of the United States Constitution.* See *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682. Accordingly, we reject Roberts's suggestion that there was error in the trial court's decisions in empaneling the jury.

*Change of Venue*

[**PP115] In proposition of law seven, Roberts attacks the trial judge's decision to deny her motion for a change of venue. In support of her contentions, Roberts points to pervasive pretrial publicity regarding the murder, Jackson's trial (which occurred only months prior to her own trial), and the state's theory of her complicity in the murder. Although there may have been a great deal of publicity about the [****34] murder and Jackson's trial in Trumbull County, we do not agree that Roberts shows that media coverage of the murder so saturated the county and influenced the potential venire that she was deprived of a fair trial.

[**PP116] HN27 A trial court relying on a motion for a change of venue pursuant to *Crim.R. 18(B)* will not be disturbed on appeal unless the court abused its discretion. See, e.g., *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 1995 Ohio 227, 653 N.E.2d 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710. We have long held that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair [*86] and impartial jury from the community. See *State v. Lynch*, 98 Ohio St.3d 514, 2003 Ohio 2284, 787 N.E.2d 1185, at P 35; *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710; *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 Ohio Op. 2d [****35] 270, 214 N.E.2d 417, paragraph one of the syllabus.

[**PP117] HN28 A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually [****35] biased. *State v. Treesh* (2001),

State v. Roberts

*90 Ohio St.3d 460, 464, 2001 Ohio 4, 739 N.E.2d 749*; *Mayola v. Alabama (C.A.5, 1980), 623 F.2d 992, 996*. Pretrial publicity -- even pervasive, adverse publicity -- does not inevitably lead to an unfair trial. *Nebraska Press Assn. v. Stuart (1976), 427 U.S. 539, 554, 96 S. Ct. 2791, 49 L. Ed. 2d 683*. Only in rare cases may prejudice be presumed. *Treesh, 90 Ohio St.3d at 464, 739 N.E.2d 749*.

[**P118]  We have held that extensive voir dire helps to eliminate any negative effect arising from the pretrial publicity, *Lundgren, 73 Ohio St.3d at 479-480, 653 N.E.2d 304*, and the trial court here engaged in such an effort. The trial court held Roberts's motion to change venue in abeyance in order to determine whether pretrial publicity tainted the jury pool. It then conducted a thorough voir dire, as evidenced by the facts that voir dire took a month to complete and encompasses more than 20 volumes and approximately 4,700 pages of transcript. Near the conclusion of voir dire, the trial court overruled the motion to change venue, stating: "[T]he Court feels very comfortable that this case [****36] can be fairly tried in this county * * *."

[**P119]  To support her claim that fairness was lacking and that pretrial publicity impaired the trial court's ability to seat an impartial jury, Roberts cites the voir dire of seven prospective jurors. However, four of these prospective jurors never sat on the final panel, so prejudice to Roberts is not shown. *Treesh, 90 Ohio St.3d at 464, 739 N.E.2d 749*.

[**P120]  Nor does the fact that three jurors had heard about some aspects of the case prior to trial necessarily reflect bias or lack of impartiality. See *State v. Ahmed, 103 Ohio St.3d 27, 2004 Ohio 4190, 813 N.E.2d 637, at P 37-41*; *State v. Bies (1996), 74 Ohio St.3d 320, 324, 1996 Ohio 276, 658 N.E.2d 754*. Moreover, defense counsel passed for cause on those three jurors and did not exercise a peremptory challenge on any of them, even though Roberts had remaining peremptory challenges at the time those jurors were seated. As we observed in a similar situation: *HN11*[⬆] "The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's [****37] exposure to pretrial publicity once voir dire was completed." *State v. Lynch, 98 Ohio St.3d 514, 2003 Ohio 2284, 787 N.E.2d 1185, at P 37*. So, too, here.

[**P121]  Accordingly, we hold that there is not a sufficient showing that the trial court abused its discretion in denying Roberts's motion for change of venue. See [*87] *State v. Gross, 97 Ohio St.3d 121, 2002 Ohio 5524, 776 N.E.2d 1061, P 30*. We reject Roberts's claim to the contrary.

TRIAL ISSUES

*Sufficiency of Evidence*

[**P122]  Roberts argues in proposition of law four that the evidence at trial did not sufficiently establish the theft element of aggravated robbery and the corresponding capital specification.

[**P123]  *HN12*[⬆] When we review a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492*, paragraph two of the syllabus, following *Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560*. [****38] "[T]he weight to be given the evidence and [***1184] the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass (1967), 10 Ohio St.2d 230, 39 Ohio Op. 2d 366, 227 N.E.2d 212*, paragraph one of the syllabus. A verdict will not be disturbed on appeal on sufficiency grounds unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis (1997), 79 Ohio St.3d 421, 430, 1997 Ohio 372, 683 N.E.2d 1096*.

[**P124]  In her effort to show that the evidence was insufficient to demonstrate theft, Roberts points out that Fingerhut's wallets, one of which contained large amounts of money, were found with his body after the murder. She challenges the state's theory that the theft element was established by Jackson's use of Fingerhut's car to escape.

[**P125]  In her latter analysis, Roberts does not deny that Jackson drove away from the crime scene in Fingerhut's car. Indeed, the evidence shows that Jackson shot Fingerhut and drove from the scene in Fingerhut's automobile. Rather than attacking the facts, Roberts argues the law.

[**P126]  Roberts claims that the taking of the car does not constitute a theft [****39] offense because Jackson did not keep the car or try to sell it, but rather, merely drove it to Youngstown and abandoned it with the keys inside. In other words, she claims that because Jackson merely used the vehicle as a means of escape, taking it cannot constitute a theft offense. We reject that assertion.

[**P127]  The evidence established that Jackson asserted control over the keys to Fingerhut's car and the car itself. He therefore deprived Fingerhut of that property. See *State v. Biros (1997), 78 Ohio St.3d 426, 450, 1997 Ohio 204, 678 N.E.2d 891*. *HN13*[⬆] The fact that Jackson did not keep or sell the car for financial gain does not matter; [*88] the only purpose required for theft is "purpose to deprive the owner of [the] property" in question. *R.C. 2913.02(A)*.

[\*\*P128] Roberts next challenges the conviction with a contention that there is no evidence that Jackson formed the intent to take Fingerhut's automobile until after he murdered Fingerhut. Assuming purely arguendo that the evidence supports such a conclusion (and we think it does not), the claim fails.

[\*\*P129] We repeatedly have rejected the argument that there is no aggravated robbery when [\*\*\*\*40] the victim's property is taken after he is murdered. *HN14* "[T]he victim of a robbery, killed just prior to the robber's carrying off [his] property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching [him] die, and then stealing [his] property after the death." *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510. Accord *State v. Rojas* (1992), 64 Ohio St.3d 131, 139, 1992 Ohio 110, 592 N.E.2d 1376.

[\*\*P130] The evidence was sufficient to support a finding that the killing was associated with the aggravated robbery of Fingerhut's keys and car as part of one continuous occurrence; see *State v. Williams* (1996), 74 Ohio St.3d 569, 577, 1996 Ohio 91, 660 N.E.2d 724, and we hold the evidence sufficient to support the jury's verdict beyond a reasonable doubt on the essential elements of aggravated robbery, R.C. 2911.01, and on the R.C. 2929.04(A)(7) capital specification, aggravated robbery in connection with aggravated murder.

## Jury Instructions

[\*\*P131] [\*\*\*\*41] In proposition of law 11, Roberts contends that the trial court erred in instructing the jury on reasonable doubt based on the statutory definition of R.C. 2901.05. *HN15* During trial, however, she failed [\*\*\*185] to object to the instruction on the basis asserted here. She thus waives all but plain error. See *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus, and we find no such error. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 2000 Ohio 187, 739 N.E.2d 300; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus.

## SENTENCING ISSUES

### Waiver of Mitigation

[\*\*P132] In proposition of law one, Roberts contends that a waiver of mitigation evidence is not valid unless the defendant is informed that the waiver will result in the death penalty. In addition, Roberts submits that such a waiver is invalid if the defendant intends to present any mitigation evidence in any form.

[\*\*P133] [\*89] At the outset of the mitigation phase, Roberts informed her counsel that she did not wish to present any mitigating evidence to the jury except an unsworn [\*\*\*\*42] statement. During the ensuing in camera hearing on this issue, the court explained to Roberts the purpose of the mitigation phase and her right to present mitigation evidence. The judge then inquired as to whether Roberts had instructed her attorneys not to present such evidence; she confirmed that the court's understanding was correct. Roberts explained to the trial judge that she had talked with her attorneys, family, and friends before declaring, "I know what I am doing, I explained to everyone that cares why I am doing it."

[\*\*P134] Trial counsel described for the judge the evidence that could be presented in mitigation. Counsel noted that professionally and personally, he disagreed with Roberts's decision not to present such evidence but that he believed her competent and that the decision was the product of rational thought.

[\*\*P135] The court then heard from Dr. Thomas Eberle, a psychologist who had evaluated Roberts earlier during the prosecution and who did so again just prior to the hearing. Dr. Eberle testified that Roberts's decision to forgo presentation of mitigating evidence was rational. He further found that she suffered no psychiatric or psychological abnormality [\*\*\*\*43] that would prohibit a rational decision regarding presentation of mitigating evidence.

[\*\*P136] Having heard the foregoing testimony, the trial court specifically inquired of Roberts whether she understood that "by waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty." Roberts replied: "That is what I hope for. \* \* \* I know what I am doing and I know why. Thank you for asking." The court then found that the decision to forgo mitigation evidence was a voluntary one made without any reluctance, that Roberts had reiterated that decision repeatedly, and that she appeared relieved to have made it. The court found that Roberts understood that her decision was irrevocable, and it accepted her decision to forgo the presentation of mitigation evidence.

[\*\*P137] Roberts later presented an unsworn statement to the jury. In that statement, she told the jury that she would not provide any mitigating evidence. She then said, "You are bound by law to give me one sentence, the death penalty. You have no other choice. That is what I'm asking you to do, because that is the right thing to do." She reiterated [\*\*\*\*44]

State v. Roberts

that objective after the trial court sentenced her to death.

[**P138]  With this factual background in mind, we turn to the law.

[**P139]  *HN16*[🔼]  The United States Supreme Court has never suggested that the *Eighth Amendment* requires forcing an unwilling [***1186] defendant to present mitigating evidence in a capital case. *State v. Ashworth (1999), 85 Ohio St.3d 56, 63, 1999 Ohio 204, 706 [*90] N.E.2d 1231*. No societal interest counterbalances the defendant's right to control his or her own destiny. *Tyler, 50 Ohio St.3d at 28, 553 N.E.2d 576*.

[**P140]  We have held that a defendant is entitled to decide what she wants to argue and present as mitigation in the penalty phase, see, e.g., *Jenkins, 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264*, citing *Lockett v. Ohio (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973*, including the decision to present no evidence. Ohio's death-penalty statute itself confers "great latitude" on a defendant in such decisions. *R.C. 2929.04(C)*. See, also, *State v. Barton, 108 Ohio St.3d 402, 2006 Ohio 1324, 844 N.E.2d 307, P 47*. Roberts was entitled to present no mitigation [****45] evidence.

[**P141]  Her contention that she did not fully understand the ramifications of her decision and that the trial judge did not sufficiently inquire of her in that regard is belied by the record. As set forth above, the record clearly establishes that the trial judge specifically addressed the likelihood of the jury's imposing a death sentence if Roberts failed to present mitigating evidence and that she understood that a death sentence was the probable outcome. In fact, Roberts asked the jury to impose that sentence. We reject her claim that she did not understand that the waiver would yield such a result.

[**P142]  We now turn to Roberts's suggestion that her waiver of the right to present mitigation evidence was not a complete waiver.

[**P143]  Roberts contends that she entered only a "partial waiver" because she gave an unsworn statement and that a partial waiver does not constitute a valid waiver. Roberts cites no decision to support her assertion, nor are we aware of any such authority. We do recognize, however, our prior holding in *State v. Monroe, 105 Ohio St.3d 384, 2005 Ohio 2282, 827 N.E.2d 285, P 72-76*, in which we concluded that *HN17*[🔼] the [****46] requirements of *Ashworth, 85 Ohio St.3d 56, 1999 Ohio 204, 706 N.E.2d 1231, paragraph one of the syllabus*, do not apply when a defendant makes an unsworn statement and presents minimal evidence in mitigation. Our emphasis in *Ashworth* was to require an inquiry of "a defendant only in those situations where the defendant chooses to present *no* mitigating evidence whatsoever."

(Emphasis added.) *Monroe, 105 Ohio St.3d 384, 2005 Ohio 2282, 827 N.E.2d 285, P 74*. Here, Roberts presented an unsworn statement. An unsworn statement can constitute critical mitigating evidence. See *State v. Scott, 101 Ohio St.3d 31, 2004 Ohio 10, 800 N.E.2d 1133, at P 64*; *State v. Lynch, 98 Ohio St.3d 514, 2003 Ohio 2284, 787 N.E.2d 1185, at P 110*. *Barton, 108 Ohio St.3d 402, 2006 Ohio 1324, 844 N.E.2d 307, P 50*. We decline to extend *Ashworth* to the context Roberts presents.

[**P144]  Moreover, we have never held that a partial waiver of the right to present mitigating evidence is an invalid exercise of that right. To the contrary, we have upheld the death sentences in several cases in which the defendant chose [*91] to present only [****47] an unsworn statement to the jury in mitigation. See *State v. Mink, 101 Ohio St.3d 350, 2004 Ohio 1580, 805 N.E.2d 1064, P 113-114*; *State v. Vrabel, 99 Ohio St.3d 184, 2003 Ohio 3193, 790 N.E.2d 303, P 22*; *Tyler, 50 Ohio St.3d at 28, 553 N.E.2d 576*; *Barton, 108 Ohio St.3d 402, 2006 Ohio 1324, 844 N.E.2d 307, P 47*.

[**P145]  In any event, the record reflects that the trial judge complied with the *Ashworth* requirements. We reject Roberts's claims of error in the trial court's decisions with respect to her decision to waive mitigating evidence.

[***1187] *Effective Assistance*

[**P146]  Similarly, in proposition of law eight, to the extent that Roberts argues that trial counsel were ineffective for failing to properly advise her and ensure that she understood the ramifications of her waiver of her right to present mitigating evidence, her claim fails.

[**P147]  *HN18*[🔼]  Reversal of a conviction for ineffective assistance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the *Sixth Amendment*. Second, the defendant must show that the deficient [****48] performance prejudiced the defendant." *Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674*. Accord *State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373*, paragraph two of the syllabus.

[**P148]  We again reject Roberts's contentions that she did not understand the full ramifications of waiving her right to present and argue mitigation evidence. The record shows that Roberts understood what she was doing when she decided to present only her unsworn statement during the mitigation hearing. The record also establishes that the trial court explained sufficiently the ramifications of that decision, that Roberts essentially told the trial court that she was not

presenting additional mitigating evidence because she wanted to be given a death sentence; and that she disregarded her attorney's advice and instead directed them not to present any mitigating evidence beyond her unsworn statement. *HN18* An attorney does not render ineffective assistance by declining, in deference to a client's desires, to present evidence in mitigation. See, e.g., *State v. Monroe*, 105 Ohio St.3d 384, 2005 Ohio 2282, 827 N.E.2d 285, P 100; [****49] *State v. Cowans* (1999), 87 Ohio St.3d 68, 81, 1999 Ohio 250, 717 N.E.2d 298; *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 1997 Ohio 367, 684 N.E.2d 47. Her claims that counsel was constitutionally ineffective fail.

*Cumulative Error*

[**P149] Although Roberts claims in proposition of law 12 that a combination of errors by the trial court and prosecution and ineffectiveness of counsel deprived her of a fair trial, she offers no analysis of substance to support those claims. [**92] She thus fails to demonstrate that she was denied a fair trial. *State v. Sapp*, 105 Ohio St.3d 104, 2004 Ohio 7008, 822 N.E.2d 1239, P 103.

*Jury Instructions*

[**P150] Roberts asserts in proposition of law ten that it was error for the trial court to use the term "recommendation" in its sentencing instructions to the jury. *HN20* The term "recommendation" in a jury instruction, however, accurately reflects Ohio law and does not constitute prejudicial error. *State v. Clemons* (1998), 82 Ohio St.3d 438, 444, 1998 Ohio 406, 696 N.E.2d 1009; *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 1995 Ohio 104, 651 N.E.2d 965.

*Proportionality Review*

[**P151] We summarily reject Roberts's [****50] challenges in proposition of law 13 to Ohio's system of proportionality review in light of our precedent. See *State v. Jordan*, 101 Ohio St.3d 216, 2004 Ohio 783, 804 N.E.2d 1, P 96; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383.

*Constitutionality*

[**P152] We summarily reject Roberts's various constitutional claims in proposition of law 14. See, e.g., *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 2001 Ohio 1290, 752 N.E.2d 904; *State v. Carter* (2000), 89 Ohio St.3d 593, 608, 2000 Ohio 172, 734 N.E.2d 345; *State v. Gumm* (1995), 73 Ohio St.3d 413, 417-418, 1995 Ohio 24, 653 [****188] N.E.2d 253; *State v. Henderson* (1988), 39 Ohio St.3d 24, 29, 528 N.E.2d 1237; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598; *State v. Buell* (1986), 22 Ohio St.3d 124, 135-142, 22 OBR 203, 489 N.E.2d 795; and *State v. Jenkins*, 15 Ohio St.3d 167-178, 15 OBR 311, 473 N.E.2d 264.

*Sentencing Opinion*

[**P153] Having disposed of the substantial majority of Roberts's claims, [****51] we now turn to a critical one. In proposition of law six, Roberts asserts that the trial court erred in allowing the prosecutor to assist in drafting the court's sentencing opinion. The claim arises from the facts that follow.

[**P154] At the sentencing hearing, the court read aloud its sentencing opinion and imposed the death penalty on Roberts. As the court was doing so, defense counsel noticed that the prosecutor was looking at a document and appeared to be reading along with the trial judge. At the end of the court's reading, defense counsel raised a "vehement" objection to the prosecutor's apparent ex parte involvement with the sentencing opinion.

[**P155] [*93] The [****51] prosecution had participated in the drafting of the opinion without the knowledge of defense counsel. The trial judge stated that he had given notes to the prosecutor and had instructed the prosecutor: "[T]his is what I want." The court added that the opinion had to be corrected six or seven times. The trial judge apologized to defense counsel for not providing them with a copy of the opinion before the sentencing hearing.

[**P156] *HN21* R.C. 2929.03 governs [****52] the imposition of sentences for aggravated murder. R.C. 2929.03(F) clearly contemplates that the trial court itself will draft the death-sentence opinion. *HN22* "*The court * * * when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors * * *, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors * * *.*" (Emphasis added.)

[**P157] *HN23* Our prior decisions have stressed the crucial role of the trial court's sentencing opinion in evaluating all of the evidence, including mitigation evidence,

and in carefully weighing the specified aggravating circumstances against the mitigating evidence in determining the appropriateness of the death penalty. For example, in *State v. Green* (2000), *90 Ohio St.3d 352, 360, 2000 Ohio 182, 738 N.E.2d 1208*, we vacated the death penalty because the trial court's sentencing opinion "was constitutionally deficient." There, the trial court's sentencing opinion "improperly considered [****53] nonstatutory aggravating circumstances, and failed to consider relevant mitigating evidence." Id. We concluded that "the collective deficiencies in the trial court's decision to impose the death penalty, as reflected in the sentencing opinion, undermine our confidence in that decision. * * * These cumulative errors reflect grievous violations of the statutory deliberative process." *Id. at 363-364, 738 N.E.2d 1208.*

[**P158] Similarly, in *State v. Davis* (1988), *38 Ohio St.3d 361, 528 N.E.2d 925*, we vacated the death sentence because of grievous errors in the trial court's sentencing opinion. In *Davis*, we noted, *HN24* "[T]he General Assembly has set specific standards in the statutory framework it created to guide a sentencing court's discretion 'by requiring examination *of specific factors* that argue in favor of or against imposition of the death penalty, thus eliminating [***189] total arbitrariness and capriciousness in its imposition.'" (Emphasis sic.) *Id. at 372-373, 528 N.E.2d 925, quoting Proffitt v. Florida (1976), 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913.*

[**P159] In this case, our confidence in the trial [****54] court's sentencing opinion is undermined by the fact that the trial judge directly involved the prosecutor in preparing the sentencing opinion and did so on an ex parte basis. *HN25* The trial judge is charged by statute with the sole responsibility of personally preparing the [**94] opinion setting forth the assessment and weight of the evidence, the aggravating circumstances of the murder, and any relevant mitigating factors prior to determining what penalty should be imposed. The fact that the trial judge provided his notes to the prosecutor to guide the prosecutor in drafting the sentencing opinion does not change the result. The various drafts of the opinion that ultimately imposed death on Roberts involved the assistance of the prosecutor.

[**P160] The trial court's delegation of any degree of responsibility in this sentencing opinion does not comply with *R.C. 2929.03(F)*. Nor does it comport with our firm belief that the consideration and imposition of death are the most solemn of all the duties that are imposed on a judge, as Ohio courts have also recognized. See *State v. Vrabel (Mar. 2, 2000), Mahoning App. No. 95 CA 221, 2000 Ohio App. LEXIS 903, 2000 WL 246482 *5 [****55]* ("The role of this Court in reviewing a death penalty case is codified by statute and

defined by the Ohio Supreme Court. It is a duty of immense proportions which we undertake with great solemnity"). The judge alone serves as the final arbiter of justice in his courtroom, and he must discharge that austere duty in isolation. The scales of justice may not be weighted even slightly by one with an interest in the ultimate outcome. Given the prosecutor's direct role in the preparation of the sentencing opinion, we cannot conclude that the proper process was followed here.

[**P161] That conclusion is compelled particularly in light of the trial court's ex parte communications about sentencing with the prosecutor in preparing the sentencing opinion. The Code of Judicial Conduct, Canon 3(B)(7) specifies, *HN27* "A judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding * * *." Both the trial judge and the prosecutor should have known that *HN28* any ex parte assistance in the preparation of the court's sentencing opinion was wholly inconsistent [****56] with these vital ethical constraints. See Disciplinary Rule 7-110(B)(2) and (3).

[**P162] The trial court's consultation with the prosecutor, particularly when undertaken without the knowledge or participation of defense counsel, can neither be excused nor found to be harmless error. Cf *Gardner v. Florida (1977), 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393* (defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information [from a presentence report] which he had no opportunity to deny or explain"). We cannot cure the deficiencies in the preparation of the sentencing opinion by our own independent assessment.

[**P163] *HN29* The trial court's decision to use the prosecutor in preparing the sentencing opinion constitutes a grievous violation of the statutory deliberative process. It is so severe a violation that independent reweighing cannot serve as [**95] an adequate remedy. See *State v. Green, 90 Ohio St.3d at 363-364, 738 N.E.2d 1208*. We find that we must vacate the sentence because of the critical constitutional interests and notions of justice that are implicated by the [**P190] prosecutor's [****57] participation in drafting the sentencing opinion.

[**P164] We accordingly sustain Roberts's claim of error in the trial judge's use of the prosecutor to assist directly in the preparation of the sentencing opinion. Accordingly, we vacate the sentence and remand to the trial court for resentencing as set forth expressly below.

*Allocution Rights*

State v. Roberts

[**P165] Finally, we turn to Roberts's claim in proposition of law five that the trial court committed reversible error by not affording Roberts the right of allocution before announcing the sentence.

[**P166] *HN30* *Crim.R. 32(A)(1)* provides that before imposing sentence in a criminal trial, the trial court shall "address the defendant personally" and ask whether he or she wishes to make a statement on her own behalf or present any information in mitigation of punishment. Because we have vacated the death sentence and remanded the case, this issue is now moot. The trial court shall provide Roberts with her right of allocution before imposing any new sentence.

CONCLUSION

[**P167] Having found no prejudicial error in regard to Roberts's conviction, we affirm the conviction and the judgment of the [****58] trial court pertaining to them. Because of the prejudicial error in sentencing Roberts to death, the sentence of death is vacated, and the cause is hereby remanded to the trial court. On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'DONNELL, and LANZINGER, JJ., concur.

End of Document

ON COMPUTER-KMR

# The Supreme Court of Ohio

## 104-147

FILED

AUG 0 2 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

| | |
|---|---|
| State of Ohio | Case No. 03-1441 |
| v. | JUDGMENT ENTRY |
| Donna Marie Roberts | APPEAL FROM THE COURT OF COMMON PLEAS |

This cause, here on appeal from the Court of Common Pleas for Trumbull County, was considered in the manner prescribed by law. On consideration thereof, the judgment of the court of appeals is affirmed in part, vacated in part, and this cause is remanded to the trial court, consistent with the opinion rendered herein.

It is further ordered that a mandate be sent to the Court of Common Pleas for Trumbull County to carry this judgment into execution; and that a copy of this entry be certified to the Clerk of the Court of Common Pleas for Trumbull County for entry.

(Trumbull County Court of Common Pleas; No. 01CR793)

THOMAS J. MOYER
Chief Justice

IN THE OHIO SUPREME COURT

No. 2003 S.Ct. 1441

STATE OF OHIO,                                :
                                             :
    Plaintiff-Appellee,                       :
                                             :
    -vs-                                       :
                                             :
DONNA ROBERTS,                              :        MOTION FOR REHEARING AND TO
                                             :        STAY THE ISSUANCE OF MANDATE
    Defendant-Appellant.                     :
                                             :
                                             :        DEATH PENALTY APPEAL

COUNSEL FOR APPELLEE:

DENNIS WATKIND,  ESQ.  0009949
Trumbull County Prosecutor
4th Floor Administration Building
160 High Street NW
Warren OH 44481
(330) 675-2426

LUWAYNE ANNOS - 0055651
Assistant Trumbull County Prosecutor

COUNSEL FOR APPELLANT:

DAVID L. DOUGHTEN, ESQ.
Regis. No. 0002847
4403 St. Clair Avenue
Cleveland, OH 44103-1125
(216) 361-1112

PATRICIA J. SMITH, ESQ.
Regis. No. 0059621
4403 St. Clair Avenue
Cleveland, OH 44103-1125
(216) 361-1112



FILED

AUG 1 1 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE OHIO SUPREME COURT

2003-1441

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | |
| -vs- | : | |
| | : | |
| DONNA ROBERTS, | : | **MOTION FOR REHEARING AND TO** |
| | : | **STAY THE ISSUANCE OF MANDATE** |
| Defendant-Appellant. | : | |
| | : | |
| | : | DEATH PENALTY APPEAL |

Now comes the appellant, Donna Roberts, by and through his attorney, David L. Doughten, and pursuant to Supreme Court Rule of Practice IX, §1 and 2, and moves this Honorable Court to rehear the above captioned case and to stay the issuance of the mandate. Specifically the appellant asks the Court to rehear Proposition of Law III.

Respectfully submitted,

DAVID L. DOUGHTEN
Counsel for Appellant

PATRICIA SMITH
Counsel for Appellant

## CERTIFICATE OF SERVICE

A copy of the foregoing appellant's Brief was served upon Dennis Watkins, Trumbull County Prosecutor and/or LuWayne Annos, Esq. Assistant Trumbull County Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this 10th day of July, 2006.

DAVID L. DOUGHTEN

PATRICIA J. SMITH
Counsel for Appellant

## ARGUMENT

**Proposition of Law III:**

> **A trial court's refusal to dismiss biased jurors from the panel deprives a capital defendant her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

During the jury selection of this trial, the trial court overruled a defense motion to dismiss for cause a juror who acknowledged that his sympathy for the decedent and the decedent's family would be consideration in sentencing. Because that juror never specifically and unequivocally stated that such sympathy would not be a consideration in his weighing of mitigation and the proven statutory aggravators in this matter, Donna Roberts must be afforded a new trial.

With respect to juror impartiality on the specific issue of capital punishment, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980). A juror who would automatically vote for the imposition of the death penalty without weighing the aggravating and mitigating evidence presented must be removed for cause, and a failure of trial court to do so rises to the level of constitutional error sufficient to grant habeas relief. Morgan v. Illinois, 504 U.S. 719, 728-29 (1992). A trial judge's finding of juror impartiality may only be overturned where manifest error is shown. Patton v.Yount, 467 U.S. 1025, 1031 (1984). Nevertheless, if the record reflects that a juror would allow improper considerations to influence his decision, the failure to dismiss the juror is constitutionally inviolate. White v. Mitchell, 431 F.3d 517 (2006)

Jurors Inability to Fairly Consider Life Option

    a. Prospective Juror Andrew Kotwis:

1

This Court rejected the appellant's contention that Juror Kotwis should have been excluded for cause.  The decision was based upon the records reflection that Juror Kotwis could consider both sides and that assure the parties that no option would "start with a leg up over the other."  Opinion p. 19.  This Court then found that the trial court properly determined that the juror had rehabilitated himself.

There are two problems with the above finding.  First, the mere fact that a juror says that he or she is not biased, after considerable subtle urging and leading by the court and the prosecutor, that he could follow the law, does not automatically pass federal standards.  Secondly, the opinion did not address the problem with juror's desire to consider a non-statutory aggravating factor in the weighing equation.  The jury's sympathy for the victim cannot be countenanced in the weighing process.  At no point did Juror Kotwis state that he *would be able to set aside his sympathy for the victim and his family* and weigh the sentence on the properly found aggravating factors alone.

In voir dire, Juror Kotwis stated that he recognized that "the death penalty is an accepted way for law enforcement to provide *comfort* to the families of the harmed."  (T.4022).  "I don't look at it as punishment" (T.4022).  (Emphasis added)

Defense counsel specifically questioned Mr. Kotwis regarding his inclination to consider sympathy for the survivors of the victim in the deliberation process.  "You have to decide between death and life.  In making that decision are you going to consider sympathy or comfort for the victim's survivors?" (T.4120).  Mr. Kotwis responded that *"It will be a factor"* (T.4120).  (Emphasis added)

The trial court attempted to clarify the situation and rehabilitate the juror.  The trial court

2

conducted the following voir dire:

> THE COURT:    Okay.  From this standpoint, and you correct me if I'm wrong because maybe Jerry is right and I'm wrong on what he's picking up here, I think that you are talking on two levels.  You have apparently given some thought to this whole idea of the capital punishment debate we have going on and you have rationalized it in your mind that the only – you don't believe that it's a deterrent.

> KOTWIS:    No

> THE COURT: A deterrent factor.  And that the only rationale you can put on as to why this debate continues is that it does give comfort to the families of the victims.

> KOTWIS: Uh-Huh.

> THE COURT:  – or the victims of the crime.  But the point that the defense is trying to get you to state in a more definitive way, you've skirted around it and I think I know what your answer is but you're not really giving them a definite answer, and that is this question of sympathy.  Now, the way you answered it I understood to be this: Of course I'm going to have feelings of sympathy because they're human emotions.  You can't ask people to get in that jury box and not have feelings of anger or whatever.  We all suffer from our emotions.  But Mr. Ingram is concerned (T.4124) that because of your answer on that philosophical level that you are going to bring that in and apply it in this case as a determining factor in that second phase, that if you feel sorry for the family of the victim, that that may be a deciding part or a big part of any decision that you make.

> KOTWIS: Un-huh.

> THE COURT: And it may be, I don't know.

> KOTWIS: I mentioned to him that it would be a factor.  (T.4125).

The court explained to Mr. Kotwis that an instruction  will be given that

the law does not permit sympathy to be a determining factor on the evidence.  Mr.

Kotwis responded as follows: "It wouldn't be a determining factor but it would

be, in all honesty, I think it would be a small factor in your consideration."

(T.4126).

3

Defense counsel again tried to clarify Mr. Kotwis' opinion as follows:

MR. INGRAM:       But we will agree that before you ever start a second phase that glass already has something in it and that the something in it favors the imposition of death, correct?

KOTWIS:     Uh-huh.      (T.4130).

The voir dire questioning of this juror continued for over one hundred pages of transcript The parties questioned Mr. Kotwis for well over one and one-half hours.

The defense objected for cause and requested that the court remove the juror based upon his answers.  The defense believed that sympathy for the victim would improperly be a determining factor in Mr. Kotwis' decision in the second phase of the trial (T.4141).  The court overruled the objection and placed Mr. Kotwis in the jury pool (T.4142).

Violation of Federal Standard

The above juror response is similar in nature, if not more unequivocal than the juror's responses in White v. Mitchell, 431 F.3d 517 (2006).  In White, the juror equivocated in his responses to voir dire questions, depending on who asked the questions, for quite sometime until finally stating the talismanic phrase that he could be fair and impartial.  This invocation of the "right" answer was insufficient to pass constitutional muster.  It is the totality of the responses, and particularly the responses of the juror when he was permitted to freely allocute that controls the review.

The standard of review is set forth by the Supreme Court's holding in Patton v. Yount, supra, at 1036. In that case, the Supreme Court stated that the appropriate question on review of a juror bias issue is "did a juror swear that [s]he could set aside any opinion [s]he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been

4

believed." *Id.*  The second portion of that inquiry-whether the statements of the impartiality *should have been believed.*  It was this second part of the test that the Sixth Circuit had problems with in White.

With a transcript reflecting statements as internally inconsistencies and vacillations, including numerous statements of strong doubt regarding impartiality and merely a few tentative or cursory statements that she would be fair, the juror was simply unbelievable as an impartial juror.  Despite the deference usually owed to trial judges, the Sixth Circuit concluded that nothing about the juror's demeanor could cure the weighty concerns raised by her voir dire testimony. Accordingly, White found that the trial judge's failure to excuse juror was contrary to or an unreasonable application of Supreme Court precedent.

Both Parts of Patton Test Failed Here

At no time did Juror Kotwis unequivocally state that he would not consider sympathy *at all* in his deliberations.  Wolfe v. Brigano, 232 F.3d 499, 503 (6th Cir. 2000) (granting habeas relief based on a finding that it was unreasonable for a trial judge to fail to excuse two jurors who were unable to state unequivocally that they would set aside their personal beliefs and decide the case fairly and noting that "each juror's tentative statements that they would *try* to decide this case on the evidence presented at trial . . . . [was] without more, . . . insufficient.") (emphasis added).  Thus, Juror Kowtis failed the first part of the test in Patton; being able to swear that he could set aside any opinion that could improperly influence his opinion.

The second part the Patton test, the believability of the juror's answers, was also lacking here.  Even if he Kotwis provided a perfunctory response to a direct question that he would not consider sympathy *at all*, the overall tenor of his bias required dismissal for cause. After over 100

5

pages of tennis volley questioning, any assurances provided by the juror could not be deemed reliable.

Consideration of Non-Statutory Aggravator

Sympathy for the victim or the victim's family is not an aggravator under Ohio's death penalty sentencing scheme. R. C. §2929.04(A) *et al.* Where a sentencing body is required to weigh an aggravating circumstance against mitigating factors, that sentencer may not consider an invalid aggravating circumstance. If it does so, any death sentence imposed by the court is tainted with constitutional error. See Richmond v. Lewis, 506 U.S. 40, 46-47 (1992) (recognizing that a trial court commits constitutional error if it considers an unconstitutionally vague aggravating circumstance when engaging in weighing process).

The consideration of a non-statutory aggravator is constitutional error. Zant v. Stephens, 462 U.S. 862 (1983). As such, a juror is not permitted to consider a non-statutory factor in his or her weighing of the aggravators against the mitigation. If that juror is unable to limit his consideration of aggravation to only those proven beyond a reasonable doubt by the prosecution, that jury must be excused for cause as he is unable to follow the law.

6

## CONCLUSION

Pursuant to the above argument, the defendant-appellant Donna Roberts respectfully requests that this Honorable Court rehear the above issue and reverse her convictions with an order for a new trial.

Respectfully submitted,

DAVID L. DOUGHTEN
Counsel for Appellant

7

ORIGINAL

ON COMPUTER-NLW

IN THE SUPREME COURT OF OHIO

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| STATE OF OHIO, | ) | CASE NO. 2003-1441 |
| Appellee | ) | |
| | ) | Death Penalty Case |
| -vs- | ) | |
| | ) | |
| | ) | On Appeal from the Trumbull |
| DONNA ROBERTS, | ) | County Court of Common Pleas |
| Appellant | | No. 01 CR 793 |

---

## MEMORANDUM OF LAW IN OPPOSITION TO APPELLANT'S APPLICATION FOR REOPENING PURSUANT TO S.CT. PRAC. R. XI, Section 3(A)

---

DENNIS WATKINS
Ohio Reg. No. 0009949
LuWAYNE ANNOS
Ohio Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street N.W.
4th Floor, Administration Bldg.
Warren, Ohio      444481
(330) 675-2426

COUNSEL FOR THE STATE OF OHIO

DAVID L. DOUGHTEN
Ohio Reg. No. 0002847
PATRICIA SMITH
Ohio Reg. No. 0059621
4403 St. Clair Ave.
Cleveland, Ohio 44103-1125
(216) 361-1112

COUNSEL FOR APPELLANT
DONNA ROBERTS



RECEIVED
AUG 17 2006
MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

FILED
AUG 17 2006
MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

## MEMORANDUM OPPOSING APPELLANT'S MOTION FOR RECONSIDERATION

**Procedural History**:

On December 28, 2001, The Trumbull County Grand Jury indicted Defendant-Appellant Donna Roberts on two counts of aggravated murder for the murder of her common-law husband, Robert Fingerhut.   R.C. 2903.01(A) and (B). Both murder counts carried two death-penalty specifications: murder during an aggravated burglary and murder during an aggravated robbery. R.C. 2929.04(A)(7). The grand jury also indicted Appellant  on separate counts of aggravated burglary and aggravated robbery, each carrying a firearm specification.

At trial, the state presented numerous witnesses establishing that Appellant and her co-defendant boyfriend, Nathaniel Jackson, plotted Fingerhut's murder while Jackson was incarcerated at the Lorain Correctional Institution with hopes of collecting $550,000 in life insurance proceeds upon Mr. Fingerhut's demise.   The defense presented no witnesses. The jury found Appellant  guilty of aggravated murder and the other offenses as charged.

At her mitigation hearing, Appellant  waived the presentation of evidence except for a lengthy unsworn statement in which she specifically requested that the jury recommend the death penalty because Jackson had been sentenced to death. The jury recommended-and the trial court imposed-the death penalty on Roberts.

This Court affirmed Appellant's conviction in the above-captioned case number, but vacated her sentence and remanded for re-sentencing. *State v. Roberts* 110 Ohio St. 3d 71, 2006-Ohio-3665, at ¶167. Appellant filed a Motion for Rehearing and To Stay the Issuance of Mandate on Aug. 11, 2006, which this Court construed as a Motion for Reconsideration as set forth in S. Ct. Prac. R. XI, §2. Pursuant to S. Ct. Prac. R. XI, § 3(A), the State files this Memorandum

-1-

Opposing Motion for Reconsideration.

## LAW AND ARGUMENT

**APPELLANT'S PROPOSITION OF LAW III:**
    **A trial court's refusal to dismiss biased jurors from the panel deprives a capital defendant her protections under the Fifth, Sixth, Eighth Fourteenth Amendments to the United States Constitution.**

**APPELLEE'S PROPOSITION OF LAW III:**
    **A trial court does not abuse its discretion in overruling challenges for cause of prospective jurors when the court finds that they are suitable jurors able to render an impartial verdict.**

Appellant requests this Court to reconsider its judgment with respect to her Proposition of Law No. III which originally challenged the trial court's refusal to dismiss two prospective jurors. In her Motion for Rehearing, Appellant asks this Court to revisit only one of those jurors, Andrew Kotwis.

In analyzing Appellant's original claim, this Court cited to R.C. 2313.42(J) which contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased."

Moreover, trial courts have discretion in determining a juror's ability to be impartial, *State v. Williams* (1983), 6 Ohio St.3d 281, 288, and such a ruling "will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, Accord *State v. Williams* (1997), 79 Ohio St.3d 1, 8.

-2-

This Court specifically addressed Appellant's concerns that Mr. Kotwis indicated upon a printed questionnaire that feelings of sympathy for a victim's family may justify the death penalty (T.p Vol. XIX, p. 4116). This Court found it significant that after Mr. Kotwis made his statement concerning the sympathy factor, the trial court instructed him that sympathy could not be a consideration in imposing the death penalty. "[H]e agreed to obey the instruction. Moreover, Kotwis '[a]bsolutely' agreed with defense counsel that he would consider all sentencing options equally and that no option would 'start with a leg up over the other'." *Roberts,* supra, at ¶108. This Court did not disagree with the trial court's conclusions that Mr. Kotwis "rehabilitated" himself with respect to this issue:

> "In these circumstances, we find no abuse of discretion on the part of the trial court in denying Roberts's request to discharge him for cause. Although Kotwis gave some answers that could be construed as ambiguous, he ultimately stated that he would consider all sentencing options equally. His credibility in making such statements was a matter for the trial judge. *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 ('Deference must be paid to the trial judge who sees and hears the juror'). Roberts fails to demonstrate that we should disturb that finding."

*Roberts,* supra, at ¶109.

This Court has held "[a] trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Wilson* (1972), 29 Ohio St. 2d 203, 211. Appellant makes no claim that any of the jurors ultimately seated was less than impartial, including Mr. Kotwis. She has therefore failed to state a constitutional violation. *State v. Broom* (1988), 40 Ohio St. 3d 277, 288. Furthermore, Mr. Kotwis was not seated on the panel. This Court concluded, "Roberts fails to show that any of the jurors ultimately seated were other than

-3-

impartial. Thus, she fails to demonstrate a violation of the Due Process Clause of the United States Constitution. See *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682. Accordingly, we reject Roberts's suggestion that there was error in the trial court's decisions in empaneling the jury." *Roberts,* supra, ¶114.

Like its companion appellate rule, App. R. 26(A), S.Ct.Prac. R. XI provides no guidelines in determining whether a decision should be reconsidered or changed. However, many appellate courts throughout the state refer to *Matthews v. Matthews* (1981), 5 Ohio App. 3d 140, for its guidance in this arena. "The test generally applied is whether the motion for reconsideration calls to the attention of the court an obvious error in its decision or raises an issue for our consideration that was either not considered at all or was not fully considered by us when it should have been." Id. Appellant cites to no "obvious error" in this Court's decision regarding the dismissal of Mr. Kotwis.

In her Motion for Rehearing Appellant cites to the U.S. Sixth Circuit Court of Appeals decision in *White v. Mitchell* (6th Cir. 2005), 431 F. 3d 517, which was decided after the briefing and before oral arguments in the case sub judice. In *White,* the U.S. Sixth Circuit granted a writ of habeas corpus alleging this Court unreasonably applied federal law in determining that the trial court's refusal to dismiss juror for cause did not violate White's right to a fair trial and impartial jury with respect to his penalty phase. First, the State would point out that it disagrees with this decision. Second, the Ohio Attorney General's Office has filed a petition for writ of certiorari in the U.S. Supreme Court in case number 06-128, on behalf of the new death row warden, Marc C. Houk. Therefore, the U.S. Supreme Court may overturn the Sixth Circuit and re-affirm this Court's original findings in *State v. White* (1998), 82 Ohio St. 3d 16.

-4-

Nonetheless, the factual scenario with the offending juror in the *White* case is distinguishable for the facts in the case at bar. Taking the recitation of the facts at face value as presented by Judge Gibbons' opinion, the lone juror in *White* causing the grant of habeas had expressed an "eagerness to impose the death penalty." *White v. Mitchell* (6th Cir. 2005), 431 F. 3d 517, 539. The Sixth Circuit found this worthy of grant of habeas on the death sentence even though the juror promised she would follow the law. Id. 540-541.

Mr. Kotwis express no comparable level of eagerness to impose the death penalty. Indeed, Mr. Kotwis was anything but a death penalty enthusiast. "I'm not a flag waver, you know that runs down the street and promotes the death penalty, but I accept the death penalty as part of our legal system." (T.p. Vol. XIX, p. 4128). He further assured the court that he would not automatically impose the death penalty and would consider all four sentencing options. (T.p. Vol. XVIII, p. 4034, 4072). Mr. Kotwis stated several times that the did not feel the death penalty was a deterrent to crime. (T.p. Vol. XIX, p. 4116, 4119, 4122). He expressed strong beliefs in the presumption of innocence. (T.p. Vol. XVIII, p. 4051). Nevertheless, defense counsel's reservations about Mr. Kotwis' statements concerning possible sympathetic undertows became a near obsession of Appellant's trial counsel.

As a result Mr. Kotwis sought to clarify his statements regarding feeling sympathy for the victims:

> "ANDREW KOTWIS: I think the context that I made that statement on the questionnaire was that the argument for and against the death penalty by various states. And I never feel like, I never felt like it was something that really deters crimes so much as the death penalty provides a feeling of immediate comfort to the victims's families."

(T.p. Vol. XIX, p. 4116). However, the court explained to Mr. Kotwis that as a juror, he would

-5-

have to put any feeling of sympathy aside:

> "THE COURT: The standard instruction that is given, it's given in every case, is to the effect that the law recognizes that each of the jurors are human beings and that they may have sympathy for one side, sometimes for both sides, but that sympathy is not something that is to be used.  You're to be more analytical and to apply the facts without applying anger, fear, sympathy, all the emotions we're subject to .  Now, it may be that you feel that's an important part of a decision of this nature.  If it is , that's fine, but the law does not permit sympathy to be a determining factor on the evidence."

> "ANDREW KOTWIS: It won't be a deciding factor." (T.p. Vol. XIX, p. 4126).

Indeed, the trial court ultimately instructed the panel, on which Mr. Kotwis never sat, to "[c]onsider all the evidence.  And make your findings with intelligence, and impartiality, without bias, sympathy or prejudice, so that both the State of Ohio and the Defendant, Donna Marie Roberts will feel that their case was fairly and impartially tried." (T.p. Vol. XXVIII, p. 6181).  A jury is presumed to follow the trial court's instruction. *State v. Loza* (1994), 71 Ohio St. 3d 61, 79.

The Court continued its admonition concerning sympathy:

> "THE COURT: ***You understand that sympathy cannot be a determining factor.  I understand from your answers that you're going further than most people would in saying I can't tell you I'm not going to have sympathy as we go through this trial, it's a human emotion.

> "ANDREW KOTWIS: Uh-huh.

> "THE COURT: Well, I suspect that's true.  But the question is whether it is going to be a determining factor or not, and you're telling us that it isn't.

> "ANDREW KOTWIS: I said no."

(T.p. Vol. XIX, p 4133). This exchange belies Appellant's allegation at page 5 of her motion that Mr. Kotwis never said he would not consider sympathy.     The State submits that none of the answers given by Mr. Kotwis would justify a challenge for cause.  Even if comments made early on

-6-

by Mr. Kotwis indicating possible sympathy for a murder victim and his family, there was no indication that those feeling would "substantially impair" his performance as a juror or that he could not be fair and impartial.  Mr. Kotwis gave every indication that he would follow the court's instructions and could render a fair and impartial verdict. The record does not indicate bias on Mr. Kotwis' part. Therefore, the trial court properly overruled the defense's challenge for cause.

The State submits this Court committed no "obvious error" nor did it fail to fully consider the issue of the Kotwis challenge in its opinion.  As such, this Court should *deny* Appellant's Motion for Rehearing.

Respectfully submitted by:

DENNIS WATKINS (#0009949)
Prosecuting Attorney


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

-7-

<u>PROOF OF SERVICE</u>

     I do hereby certify that a copy of the foregoing memorandum was sent by ordinary U.S. Mail to Atty. David L. Doughten (Atty. Reg. #0002847) and Atty. Patricia Smith (Atty. Reg. #0059621), 4403 St. Clair Ave. Cleveland, Ohio  44103, Counsel for Defendant-Appellant Donna Roberts, on this 16th Day of August, 2006.

                                     LuWAYNE ANNOS (#0055651)
                                     Assistant Prosecuting Attorney

-8-

**ON COMPUTER-VJC**

# The Supreme Court of Ohio

## 104-389

FILED

OCT 0 4 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio

v.

Donna Marie Roberts

Case No. 03-1441

RECONSIDERATION ENTRY

Trumbull County

It is ordered by the Court that the motion for reconsideration in this case is denied.

(Trumbull County Court of Appeals; No. 01CR793)

_____
THOMAS J. MOYER
Chief Justice

## SUPREME COURT OF OHIO
### MOTION, ENTRY, AND CERTIFICATION FOR APPOINTED COUNSEL FEES

**ORIGINAL**

State of Ohio,
Plaintiff

FILED

OCT 19 2006

V.

Donna Roberts
Defendant

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Supreme Court No. 2003 S. Ct. 1441

Appeals Court No. n/a

Trial Court No. 01 CR 793

**ON COMPUTER-RV**

### MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES

The undersigned, having been previously appointed counsel for the defendant for the appeal to this court, as evidenced by the attached entry of appointment, now moves for an order approving payment of fees earned and expenses incurred as reflected by the itemized statement of the reverse hereof, pursuant to R.C. 2941.51.

| Hours Worked: | IN COURT 2.0 | OUT OF COURT 194.5 | Expenses (if any): $410.32 |
|---|---|---|---|

O.R.C. charge section number, name and classification

A.
2903.01 - 2929.04(A)(7) Capital Murder

B.

C.

| SUPREME COURT DECISION | TERMINATION DATE |
|---|---|
| August 2, 2006 - affirmed in part | 10/4/06 |

| ATTORNEY'S NAME David L. Doughten | SOC. SEC. NO. 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 | ATTORNEY'S SIGNATURE |
|---|---|---|

| ATTORNEY'S ADDRESS NUMBER AND STREET 4403 St. Clair Avenue | CITY Cleveland | STATE OH | ZIP 44103 |
|---|---|---|---|

### INFORMATION BELOW TO BE COMPLETED BY SUPREME COURT AND COUNTY AUDITOR ONLY

### JUDGMENT ENTRY

This court finds that counsel performed the legal services set forth in the itemized statement on the reverse hereof, and that the fees and expenses hereinafter approved are reasonable. IT IS THEREFORE ORDERED that appointed counsel fees are approved in the sum of $_____ and expense in the sum of $_____ for a total allowance of $_____, which amount is ordered certified to the _____ County Auditor for payment.

**SEE ATTACHED ENTRY**

RECEIVED

OCT 19 2006

MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

CHIEF JUSTICE

### CERTIFICATION

The Court, by the Chief Justice making this certification, attests to the accuracy of the figures contained herein. A subsequent audit by the Ohio Public Defender Commission and/or Auditor of the State which reveals unallowable or excessive costs may result in future adjustments against reimbursement or repayment of audit exceptions to the Ohio Public Defender Commission.

| COUNTY NUMBER | WARRANT NUMBER | WARRANT DATE |
|---|---|---|

COUNTY AUDITOR

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio:

| DATE | ACTIVITY | TOTAL TIME |
|------|----------|------------|
| 3/17/04 | Review state P.D. file | 3.0 |
| 4/25/04 | Write client; review file | 3.0 |
| 5/31/04 | Write client; review trial file | 2.7 |
| 6/1/04 | Meet with co-counsel re: trial | 2.3 |
| 6/6/04 | Review exhibits and letters | 5.0 |
| 6/7/04 | Review tapes and letters | 7.0 |
| 6/8/04 | Write client | .5 |
| 6/9/04 | Digest transcripts pp. 1-167 | 3.0 |
| 6/11/04 | Digest transcripts pp. 168-420 | 3.2 |
| 6/14/04 | Digest transcripts pp. 421-733 | 6.0 |
| 6/17/04 | Digest transcripts pp 734-1250; write prosecutor | 9.5 |
| 6/20/04 | Call prosecutor; prepare ext; digest pp. 1251-1640 | 7.2 |
| 6/21/04 | Mail motion to ext; review letters and exhibits | 3.3 |
| 6/22/04 | Write prosecutor | .2 |
| 6/23/04 | Digest transcript 1641-2337 | 6.8 |
| 6/24/04 | Digest transcript 2338-3100 | 7.3 |

*Time is to be recorded in tenth of an hour (6 minute) increments.*

| EXPENSE | PAID TO | AMOUNT |
|---------|---------|--------|
| Mail extension | FedEx | 13.35 |
| Mail brief | FedEx | 62.28 |
| Copy brief | Kinkos | 181.90 |
| Mail Supp. Author. | FedEx | 12.44 |
| Mail rehearing | FedEx | 19.79 |
| Hotel-oral argument | Red Roof | 120.56 |
|  |  |  |

To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00.

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

_____
Applicant's Signature

OPD-1031 (4/96)

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio:

| DATE | ACTIVITY | TOTAL TIME |
|------|----------|------------|
| 6/27/04 | Digest transcript pp. 3101-3750 | 5.8 |
| 6/29/04 | Visit client and return | 5.0 |
| 7/2/04 | Digest transcript pp. 3750-4135 | 7.1 |
| 7/5/04 | Digest trans pp. 4136-5200; write client | 7.0 |
| 7/6/04 | Digest trans pp. 5200-5676; review drafts; write of proposition; client | 9.3 |
| 7/9/04 | Digest trans pp. 5600-6100 | 8.5 |
| 7/11/04 | Complete digest; organize digest and file | 6.3 |
| 7/12/04 | Meet with co-counsel re: division of assets; research competency | 5.8 |
| 7/13/04 | Write Ashworth prop; research | 5.9 |
| 7/14/04 | Research, draft, bias jury claim | 7.3 |
| 7/15/04 | Edit and research suff prop 4; reserach prop 5&6; consult with co-counsel | 9.2 |
| 7/16/04 | Talk to printer; Write draft of 4&5; write/research 8-9; final edit | 13.3 |
| 7/17/04 | Pick up briefs; review, service, write to client; service to prosecutor | 1.7 |
| 11/27/04 | Review state brief, letter to client | 2.5 |
| 1/15/06 | Review for oral argument; check website | 4.5 |
| 1/16/06 | Prepare motion to supp.; write client | 1.0 |

*Time is to be recorded in tenth of an hour (6 minute) increments.*

| EXPENSE | PAID TO | AMOUNT |
|---------|---------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00.

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

_____
Applicant's Signature

OPD-1031 (4/96)

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio:

| DATE | ACTIVITY | TOTAL TIME |
|------|----------|------------|
| 1/17/06 | Write prosecutor; service | .1 |
| 1/23/06 | Travel; prepare for argument | 10.0 |
| 1/24/06 | Prepare; travel | 5.0 |
| 1/24/06 | in court argument | 2.0 |
| 1/25/06 | Write client | .2 |
| 3/6/06 | Letter from client | .1 |
| 3/8/06 | Write client | .2 |
| 8/20/06 | Review decision; write client | 1.5 |
| 8/9/06 | Review decision; research review file; write rehear | 3.6 |
| 8/10/06 | Edit, copy, prepare for mailings, take to FedEx | 2.0 |
| 8/11/06 | Write client | .2 |
| 8/19/06 | Read state response; write client | 1.0 |
| 10/12/06 | Receive rehearing denial; write client | .4 |
|  |  |  |
|  |  |  |
|  |  |  |

*Time is to be recorded in tenth of an hour (6 minute) increments.*

| EXPENSE | PAID TO | AMOUNT |
|---------|---------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00.

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

_____
Applicant's Signature

OPD-1031 (4/96)



| Account Number | Closing Date | Page 3 of 9 |
| --- | --- | --- |
| XXXX-XXXXX9-62001 | 07/30/04 | |

Amount $

| Date | Description | | | Amount |
| --- | --- | --- | --- | --- |
| | CLEVELAND | OH | 29.88 | |
| | AVERAGE | | 6.00 | |
| | MICROSOFT ONLINE SER800 3865550 | | | |
| | 00000000000000000098052 | | | |
| | MARATHON BOLIVAR OH | | | |
| | 46052813 | | | |
| | GAS/OTHER 046055328013 | | | |
| 07/04/04 | EARTHLINK.NET 800-719-4660 GA | | | |
| | 149676590 30309 | | | |
| | INTERNET SVC | | | |
| 07/05/04 | HORNBLOWERS BARGE & BAY VILLAGE OH | | | |
| | EATING PLACE RESTAURANT | | | |
| | FOOD-BEV | | 35.08 | |
| 07/06/04 | RIVERWALK CAFE 2000 SYCAMORE OH | | | |
| | FOOD/BEVERAGE | | | |
| | FOOD/BEV | | 29.27 | |
| | TIP | | 6.00 | |
| 07/06/04 | MALLORCA RESTAURANT CLEVELAND OH | | | |
| | FOOD/BEVERAGE | | | |
| | FOOD/BEV | | 91.25 | |
| | TIP | | 18.00 | |
| 07/07/04 | SHEETZ INC 000026STREETSBORO OH | | | |
| | SERVICE STATION | | | |
| 07/10/04 | RESERVATIONREWARDS 888-688-5995 CT | | | |
| | CONTINUITY/SUBSCRIPTION | | | |
| 07/14/04 | EXXONMOBIL7504722989ALVON WV | | | |
| | PAY AT PUMP7504722989 | | | |
| 07/15/04 | 13 N. AURORA RD. AURORA OH | | | |
| | 574242343001985510005848 | | | |
| 07/17/04 | KINKO'S INC: 1205 Cleveland OH | | 181.90 | |
| | 44114- | | | |
| 07/17/04 | FEDEX #839338715771 CLEVELAND OH | | 62.28 | |
| | ROBERTS MERIT 43215 | | | |
| | TO: OHIO SUPREME COURT OH | | | |
| | FROM: DAVID L DOUGHTEN 44103 | | | |
| | 001 PRIORITY PKG 38 LB AWB839338715771 | | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $2.44 | | | |
| 07/22/04 | UNION 76 EDMONDS WA | | | |

Prepared For
**DAVID L DOUGHTEN**
D L DOUGHTEN CO LPA

Account Number
XXXX-XXXXX9-62001

Page 4 of 10

### New Activity Continued

| Date | Description | | | Amount |
|---|---|---|---|---|
| 01/05/06 | MAXXDOOGANS AURORA OH | | | |
| | FOOD/BEVERAGE | | | |
| | FOOD/BEV | | 36.61 | |
| | TIP | | 7.00 | |
| 01/09/06 | SHELL OIL AURORA OH | | | ✓ |
| | 5742423430001051800159B | | | |
| 01/15/06 | COSTCO WHSE #00 0993CLEVELAND OH | | | 138 |
| | WHOLESALE CLUBS | | | |
| 01/16/06 | FEDEX #849927078376 CLEVELAND OH | | | ✓ |
| | STOUER 45202 | | | |
| | TO: SIXTH CIRCUIT COURT OF APPEA OH | | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | | |
| | 001 STANDARD LTR 1LB AWB849927078376 | | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $0.59 | | | |
| 01/16/06 | FEDEX #849927078387 CLEVELAND OH | | | |
| | ELSESSER 28202 | | | |
| | TO: WESTERN DISTRICT OF NORTH CA NC | | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | | |
| | 001 STANDARD LTR 1LB AWB849927078387 | | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $0.82 | | | |
| 01/16/06 | FEDEX #849927078398 CLEVELAND OH | | | ✓ 12.44 |
| | ROBERT SUPPAUTH 43215 | | | |
| | TO: OHIO SUPREME COURT OH | | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | | |
| | 001 STANDARD LTR 1LB AWB849927078398 | | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $0.59 | | | |
| 01/17/06 | FEDEX #849927078402 CLEVELAND OH | | | ✓ |
| | WHITE 45202 | | | |
| | TO: U S COURT OF APPEALS OH | | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | | |
| | 001 PRIORITY PAK 3LB AWB849927078402 | | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $1.24 | | | |
| 01/18/06 | MARATHON CANTON OH | | | |
| | 00646328 | | | |
| | GAS/OTHER 000645373028 | | | |
| 01/19/06 | I-90 and RT 534, NWGENEVA OH | | | ✓ |
| | BP | | | |
| | PAY AT PUMP10619419 | | | |
| 01/21/06 | HAYLETT'S BP MANTUA OH | | | ✓ |
| | BP | | | |
| | PAY AT PUMP276350610095 | | | |
| 01/23/06 | SHELL OIL SUNBURY OH | | | ✓ |
| | 2744141060502434704056D | | | |
| 01/23/06 | DAMON'S GRILL #021 COLUMBUS OH | | | ✓ |
| | RESTAURANT CHARGES | | | |
| 01/24/06 | RED ROOF INN #7262 COLUMBUS OH | | Ro Berg PS | ✓ 120.56 |
| | Arrival Date Departure Date | | | |
| | 01/23/06 01/23/06 | | | |
| | LODGING | | | |
| 01/25/06 | E 49TH and HARVARD NEWBURGH HTS OH | | | ✓ |
| | BP | | | |
| | PAY AT PUMP10482412 | | | |
| 01/26/06 | FEDEX #849927078413 CLEVELAND OH | | | ✓ |
| | 14213 | | | |
| | TO: JEFFREY NUNEZ NY | | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | | |
| | 001 PRIORITY BOX 2LB AWB849927078413 | | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $1.17 | | | |

**Total of New Activity for DAVID L DOUGHTEN**

New Charges
Payments/Credits

Continued on next page



| Account Number | Closing Date | Page 3 of 10 |
|---|---|---|
| XXXX-XXXXX9-62001 | 06/29/04 | |

Amount $

| | | | Amount |
|---|---|---|---|
| | CLEVELAND OH | | 28.25 |
| | | | 6.00 |
| | WYNDHAM HOTELS TOLEDTOLEDO OH | | |
| | LODGING CHARGES | | |
| | 1000 BUICK RD @I-75 ROSSFORD OH | | |
| | 57425324506154528010304 | | |
| | GEORGIOS INTERNATIONTOLEDO OH | | |
| | GENERAL | | |
| | FOOD/BEV | | 43.43 |
| | TIP | | 8.00 |
| 06/02/04 | WYNDHAM HOTELS TOLEDTOLEDO OH | | |
| | LODGING CHARGES | | |
| 06/03/04 | MICROSOFT ONLINE SER800 3865550 | | |
| | ELECTRONIC COMMERCE | | |
| 06/04/04 | EARTHLINK.NET 800-719-4660 GA | | |
| | 146279313 30309 | | |
| | INTERNET SVC | | |
| 06/04/04 | SUNOCO 0553165200OREGON OH | | |
| | 0024793 015636525 | | |
| 06/05/04 | FEDEX #839338715793 CLEVELAND OH | | |
| | SCHUERMAN 44035 | | |
| | TO: BORAIN COUNTY COURTHOUSE OH | | |
| | FROM: DAVID L DOUGHTEN 44103 | | |
| | 001 STANDARD PAK 2 LB AWB839338715793 | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $.73 | | |
| 06/09/04 | HAYLETT'S BP MANTUA OH | | |
| | BP | | |
| | PAY AT PUMP276350668059 | | |
| 06/10/04 | RESERVATIONREWARDS 888-688-5995 CT | | |
| | CONTINUITY/SUBSCRIPTION | | |
| 06/13/04 | VERIZON WIRELESS 460SOLON OH | | |
| | 44139 | | |
| | TELECOMMUNICATION EQUIPMENT AND TELEPHON | | |
| 06/17/04 | BP 04824 NEWBURGH HTS OH | | |
| | BP | | |
| | PAY AT PUMP10482412 | | |
| 06/21/04 | FEDEX #839338715782 CLEVELAND OH | | 13.35 |
| | 43215 | | |
| | TO: OHIO SUPREME COURT OH | | |
| | FROM: DAVID L DAUGHTEN 44103 | | |
| | 001 STANDARD PAK 1 LB AWB839338715782 | | |

Prepared For
DAVID L DOUGHTEN
D L DOUGHTEN CO LPA

Account Number
XXXX-XXXXX9-62001

Closing Date
08/29/06

Page 3 of 12

## Activity Continued

| Date | Description | | Amount $ |
|---|---|---|---|
| 07/31/06 | MICHAELANGELOS    CLEVELAND    OH | | ✓ |
| | EATING PLACE RESTAURANT | | |
| | FOOD-BEV | 399.99 | |
| | TIP | 80.00 | |
| 08/03/06 | MSN DIAL UP SUBS   800 3865550 | | ✓ |
| | 180001HM79B0 98052 | | |
| 08/03/06 | HORNBLOWERS BARGE & CLEVELAND    OH | | ✓ |
| | EATING PLACE RESTAURANT | | |
| | FOOD-BEV | 22.92 | |
| | TIP | 4.50 | |
| 08/04/06 | EARTHLINK.NET    800-719-4660    GA | | ✓ |
| | 237474425 30309 | | |
| | INTERNET SVC | | |
| 08/08/06 | FEDEX #849927078685 CLEVELAND    OH | | ✓ |
| | SFHLEMENT 44505 | | |
| | TO: TERREACE MMCINNEY OH | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | |
| | 001 STANDARD PAK 2LB AWB849927078685 | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $0.76 | | |
| 08/10/06 | E. 26TH  and SUPERIOCLEVELAND    OH | | ✓ |
| | BP | | |
| | PAY AT PUMP30110415 | | |
| 08/10/06 | FEDEX #849927078696 CLEVELAND    OH | | 19.72 |
| | 43215 | | |
| | TO: OHIO SUPEREME CT OH | | |
| | FROM: DAVID L. DOUGHTEN 44103 | | |
| | 001 PRIORITY PAK 2LB AWB849927078696 | | |
| | YOUR FEDEX CUSTOM DISCOUNT IS $0.90 | | |
| 08/12/06 | SPEEDWAY        AURORA    OH | | ✓ |
| | SPEEDWAY | | |
| | GAS/OTHER S35100051139 | | |
| 08/14/06 | HORNBLOWERS BARGE & CLEVELAND    OH | | ✓ |
| | EATING PLACE RESTAURANT | | |
| | FOOD-BEV | 30.71 | |
| | TIP | 6.00 | |
| 08/17/06 | CHAGRIN  and RICHMONBEACHWOOD    OH | | ✓ |
| | BP | | |
| | PAY AT PUMP10400919 | | |
| 08/18/06 | ROCK BOTTOM #1060  CLEVELAND    OH | | ✓ |
| | FOOD/BEVERAGE | | |
| | FOOD/BEV | 191.41 | |
| 08/20/06 | MERCHANT DIRECT    800-842-4050    IL | | ✓ |
| | MERCHANT DIR | | |
| 08/21/06 | E 49TH  and HARVARD NEWBURGH HTS    OH | | ✓ |
| | BP | | |
| | PAY AT PUMP10482412 | | |
| 08/22/06 | AT&T YELLOW PAGES  877-647-6278    CA | | ✓ |
| | INTERNET YELLOW PGS | | |
| 08/24/06 | C...    ...    NE | | ✓ |
| | A71129380 ...MERCHANDISE | | |
| 08/24/06 | OMNI WILLIAM PENN HOPITTSBURGH    PA | | ✓ |
| | FOOD/BEV | | |
| 08/25/06 | LIDIA'S PITTSBURGH LPITTSBURGH    PA | | ✓ |
| | FOOD/BEVERAGE | | |
| | FOOD/BEV | 160.00 | |
| 08/27/06 | OMNI WILLIAM PENN HOPITTSBURGH    PA | | ✓ |
| | LODGING CHARGES | | |

*Continued on reverse*

ON COMPUTER-KMR

FILED

# The Supreme Court of Ohio

NOV 28 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

## 104-622

State of Ohio

v.

Donna Marie Roberts

Case No. 2003-1441

E N T R Y

The Court finds that counsel performed the legal services set forth in the application for attorney fees filed on October 19, 2006, and that the fees and expenses hereinafter approved are reasonable.  Accordingly,

It is ordered that David L. Doughten is granted appointed counsel fees in the sum of $7,880.00 and expense in the sum of $289.76 for a total allowance of $8,169.76, which amount is ordered certified to the Trumbull County Auditor for payment.

It is further ordered that travel expenses are approved and shall be paid by the county auditor in accordance with applicable county standards.

(Trumbull County Court of Common Pleas; No. 01CR793)

THOMAS J. MOYER
Chief Justice

ORIGINAL

# SUPREME COURT OF OHIO
## MOTION, ENTRY, AND CERTIFICATION FOR APPOINTED COUNSEL FEES

State of Ohio,
Plaintiff

NOV 13 2006

V.

Donna Roberts

Defendant

Supreme Court No. 2003 S. Ct. 1441

Appeals Court No. ___n/a___

Trial Court No. 01 CR 793

ON COMPUTER-RV

### MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES

The undersigned, having been previously appointed counsel for the defendant for the appeal to this court, as evidenced by the attached entry of appointment, now moves for an order approving payment of fees earned and expenses incurred as reflected by the itemized statement of the reverse hereof, pursuant to R.C. 2941.51.

| Hours Worked: | IN COURT 2.0 | OUT OF COURT 190.6 | Expenses (if any): $ |
|---|---|---|---|

O.R.C. charge section number, name and classification

A.
2903.01 - 2929.04(A)(7) Capital Murder

B.

C.

| SUPREME COURT DECISION August 2, 2006 - affirmed in part | TERMINATION DATE 10/4/06 |
|---|---|

| ATTORNEY'S NAME Patricia J. Smith | SOC. SEC. NO. 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 | ATTORNEY'S SIGNATURE |
|---|---|---|

| ATTORNEY'S ADDRESS  NUMBER AND STREET 4403 St. Clair Avenue | CITY Cleveland | STATE OH | ZIP 44103 |
|---|---|---|---|

### INFORMATION BELOW TO BE COMPLETED BY SUPREME COURT AND COUNTY AUDITOR ONLY

### JUDGMENT ENTRY

This court finds that counsel performed the legal services set forth in the itemized statement on the reverse hereof, and that the fees and expenses hereinafter approved are reasonable. IT IS THEREFORE ORDERED that appointed counsel fees are approved in the sum of $ _____ and expense in the sum of $_____ for a total allowance of $_____, which amount is ordered certified to the _____ County Auditor for payment.

SEE ATTACHED ENTRY

CHIEF JUSTICE

### CERTIFICATION

The County Auditor, in executing this certification, attests to the accuracy of the figures contained herein. A subsequent audit by the Ohio Public Defender Commission and/or Auditor of the State which reveals unallowable or excessive costs may result in future adjustments against reimbursement or repayment of audit exceptions to the Ohio Public Defender Commission.

| COUNTY NUMBER | WARRANT NUMBER | WARRANT DATE |
|---|---|---|

COUNTY AUDITOR

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio:

| DATE | ACTIVITY | TOTAL TIME |
|------|----------|------------|
| 3/17/04 | Review state P.D. file | 3.0 |
| 4/25/04 | Review file | 3.0 |
| 5/31/04 | Review trial file | 2.7 |
| 6/1/04 | Meet with co-counsel re: trial | 2.3 |
| 6/6/04 | Review exhibits and letters | 5.0 |
| 6/7/04 | Review tapes and letters | 7.0 |
| 6/8/04 | Digest transcripts pp. 1-167 | 3.0 |
| 6/9/04 | Digest transcripts pp. 168-420 | 3.2 |
| 6/10/04 | Digest transcripts pp. 421-733 | 6.0 |
| 6/11/04 | Digest transcripts pp. 734-1250 | 9.5 |
| 6/20/04 | Prepare extension; digest transcript pp. 1251-1640 | 7.2 |
| 6/21/04 | Review letters and exhibits | 3.3 |
| 6/22/04 | Digest transcript pp. 1641-2337 | 6.8 |
| 6/23/04 | Digest transcript pp. 2338-3100 | 7.3 |
| 6/24/04 | Digest transcript pp. 3101-3750 | 5.8 |
| 6/29/04 | Visit client and return | 5.0 |

*Time is to be recorded in tenth of an hour (6 minute) increments.*

| EXPENSE | PAID TO | AMOUNT |
|---------|---------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00.

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

_____
Applicant's Signature

OPD-1031 (4/96)

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio:

| DATE | ACTIVITY | TOTAL TIME |
|---|---|---|
| 6/30/04 | Digest transcript pp. 3750–4135 | 7.1 |
| 7/1/04 | Digest transcript pp. 4136–5200 | 7.0 |
| 7/2/04 | Digest transcript pp. 5200–5676; review drafts of proposition; write client | 9.3 |
| 7/6/04 | Digest transcript pp. 5600–6100 | 8.5 |
| 7/11/06 | Complete digest; organize digest and file | 6.3 |
| 7/12/04 | Meet with co-counsel re: division of assets; research competency | 5.8 |
| 7/13/04 | Write proposition; research | 5.9 |
| 7/14/04 | Research, draft, bias jury claim | 7.3 |
| 7/15/04 | Edit and research prop 2; research prop 3; consult with co-counsel | 9.2 |
| 7/16/04 | Write draft of 6&13; write/research 7&12; final edit | 13.3 |
| 11/27/04 | Review state brief | 2.5 |
| 1/15/06 | Review for oral argument; check website | 4.5 |
| 1/23/06 | Travel; prepare for argument | 10.0 |
| 1/24/06 | Prepare; travel | 5.0 |
| 1/24/06 | In-court argument | 2.0 |
| 3/6/06 | Letter from client | .1 |

Time is to be recorded in tenth of an hour (6 minute) increments.

| EXPENSE | PAID TO | AMOUNT |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00.

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

_____
Applicant's Signature

OPD-1031 (4/96)

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio:

| DATE | ACTIVITY | TOTAL TIME |
|------|----------|------------|
| 3/8/06 | Write client | .2 |
| 8/20/06 | Review decision; write client | 1.5 |
| 8/9/06 | Review decision; research review file; write rehear | 3.6 |
| 8/10/06 | Edit, copy, prepare for mailings, take to FedEx | 2.0 |
| 8/19/06 | Read state response; write client | 1.0 |
| 10/12/06 | Receive rehearing denial; write client | .4 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Time is to be recorded in tenth of an hour (6 minute) increments.*

| EXPENSE | PAID TO | AMOUNT |
|---------|---------|--------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00.

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

Applicant's Signature

OPD-1031 (4/96)

ON COMPUTER-KMR

# The Supreme Court of Ohio

## 104-622

FILED

NOV 28 2006

MARCIA J. MENGEL, **CLERK**
SUPREME COURT OF OHIO

State of Ohio

v.

Donna Marie Roberts

Case No. 2003-1441

E N T R Y

The Court finds that counsel performed the legal services set forth in the application for attorney fees filed on November 13, 2006, and that the fees hereinafter approved are reasonable.  Accordingly,

It is ordered that Patricia J. Smith is granted appointed counsel fees in the sum of $7,724.00, which amount is ordered certified to the Trumbull County Auditor for payment.

(Trumbull County Court of Common Pleas; No. 01CR793)

THOMAS J. MOYER
Chief Justice