

### SUPREME COURT
OF THE UNITED STATES

**Visiting the Court | Touring the Building | Exhibitions**

Search: ● All Documents ○ Docket          **Advanced Search**

Enter Search Text: [                    ]     [ Search ]  [ Help ]

**Home | Search Results**

No. 13-8411

| | |
|---|---|
| Title: | Donna Roberts, Petitioner |
| | v. |
| | Ohio |
| Docketed: | January 27, 2014 |
| Lower Ct: | Supreme Court of Ohio |
| Case Nos.: | (2007-2288) |
| Decision Date: | October 22, 2013 |

~~~Date~~~ ~~~~~~~Proceedings and Orders~~~~~~~~~~~~~~~~~~~~~

Jan 21 2014 Petition for a writ of certiorari and motion for leave to proceed in forma pauperis filed. (Response due February 26, 2014)

Feb 11 2014 Brief of respondent Ohio in opposition filed.

Feb 27 2014 DISTRIBUTED for Conference of March 21, 2014.

Mar 24 2014 Petition DENIED.

~~Name~~~~~~~~~~~~~~~~~~          ~~~~~~~Address~~~~~~~~~~~~~~~~          ~~Phone~~~

**Attorneys for Petitioner:**

| | | |
|---|---|---|
| David L. Doughten | 4403 St. Clair Avenue | (216) 361-1112 |
| Counsel of Record | Cleveland, OH  44103 | |
| | ddoughten@yahoo.com | |
| Party name: Donna Roberts | | |
| **Attorneys for Respondent:** | | |
| Dennis Watkins | Trumbull County Prosecutor's Ofc. | (330) 675-2426 |
| Counsel of Record | 160 High Street, N.W., 4th Fl. | |
| | Warren, OH  44481 | |
| Party name: Ohio | | |

January 28, 2016 | Version 2014.1

**Home | Help | Site Map | Contact Us | About Us | FAQ | Jobs | Links | Building Regulations
Website Policies and Notices | Privacy Policy | USA.GOV**

## Supreme Court of the United States

No

IN THE

SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 2014

DONNA ROBERTS,

*Petitioner,*

v.

THE STATE OF OHIO

*Respondent.*

On Petition for Writ of Certiorari to the Supreme Court of Ohio

*13 - 8411*

*Docketed*

*Jan. 27, 2014*

MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

Petitioner, Donna Roberts, asks leave to file the accompanying petition for writ of certiorari, without prepayment of costs, and to proceed *in forma pauperis*. Petitioner was found indigent and was represented by court-appointed counsel following her conviction in the trial court in all proceedings thereafter, including those in the Ohio Supreme Court.

Accordingly, petitioner asks leave to proceed *in forma pauperis* in this Court. Petitioner's affidavit in support of this motion is attached.

Respectfully submitted,

*David L. Doughten*
DAVID L. DOUGHTEN

Counsel of Record
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112

JEFFREY M. GAMSO
ERIKA CUNLIFFE
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113
216-443-7583

Counsel for Petitioner

2

**AFFIDAVIT OR DECLARATION**
**IN SUPPORT OF MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS***

I, _Donna Roberts_ , am the petitioner in the above-entitled case.   In support of my motion to proceed *in forma pauperis*, I state that because of my poverty I am unable to pay the costs of this case or to give security therefor; and I believe I am entitled to redress.

1. For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months.  Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.  Use gross amounts, that is, amounts before any deductions for taxes or otherwise.

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You *h, m.* | Spouse *deceased* |
| Employment | $ N/A | $ *deceased* | $ *none* | $ |
| Self-employment | $ N/A | $ | $ " | $ |
| Income from real property (such as rental income) | $ N/A | $ | $ " | $ |
| Interest and dividends | $ N/A | $ | $ " | $ |
| Gifts | $ N/A | $ | $ " | $ |
| Alimony | $ N/A | $ | $ " | $ |
| Child Support | $ N/A | $ | $ " | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ N/A | $ | $ " | $ |
| Disability (such as social security, insurance payments) | $ N/A | $ | $ " | $ |
| Unemployment payments | $ N/A | $ | $ " | $ |
| Public-assistance (such as welfare) | $ N/A | $ | $ " | $ |
| Other (specify): ___ | $ NONE | $ | $ " | $ |
| **Total monthly income:** | $ 0 | $ | $ " | $ 0 |

2. List your employment history for the past two years, most recent first.   (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of Employment | Gross monthly pay |
|----------|---------|---------------------|-------------------|
| N/A | | | $_____ |
| | | | $_____ |
| | | | $_____ |

3. List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of Employment | Gross monthly pay |
|----------|---------|---------------------|-------------------|
| deceased | | | $_____ |
| | | | $_____ |
| | | | $_____ |

4. How much cash do you and your spouse have? $ _0_____
   Below, state any money you or your spouse have in bank accounts or in any other financial institution.

| Financial institution | Type of account | Amount you have | Amount your spouse has |
|-----------------------|-----------------|-----------------|------------------------|
| N/A | | $_____ | $_____ |
| | | $_____ | $_____ |
| | | $_____ | $_____ |

5. List the assets, and their values, which you own or your spouse owns.  Do not list clothing and ordinary household furnishings.

☐ Home
Value __N/A_____

☐ Other real estate
Value __N/A_____

☐ Motor Vehicle #1
Year, make & model _N/A___
Value _0_____

☐ Motor Vehicle #2
Year, make & model _N/A___
Value _0_____

☐ Other assets
Description _NONE_____
Value _0_____

6. State every person, business, or organization owing you or your spouse money, and the amount owed.

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| _____⊖_____ | $ _____⊖_____ | $ _____⊖_____ |
| _____ | $ _____ | $ _____ |
| _____ | $ _____ | $ _____ |

7. State the persons who rely on you or your spouse for support.

| Name | Relationship | Age |
|---|---|---|
| _____⊖_____ | _____⊖_____ | _____⊖_____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

8. Estimate the average monthly expenses of you and your family.   Show separately the amounts paid by your spouse.   Adjust any payments that are made weekly, biweekly, quarterly, or annually to show the monthly rate.

|  | You | Your spouse *deceased* |
|---|---|---|
| Rent or home-mortgage payment (include lot rented for mobile home) | $ ___⊖___ | $ _____ |
| Are real estate taxes included?   ☐ Yes   ☐ No |  |  |
| Is property insurance included?   ☐ Yes   ☐ No |  |  |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ ___⊖___ | $ _____ |
| Home maintenance (repairs and upkeep) | $ ___⊖___ | $ _____ |
| Food | $ ___⊖___ | $ _____ |
| Clothing | $ ___⊖___ | $ _____ |
| Laundry and dry-cleaning | $ ___⊖___ | $ _____ |
| Medical and dental expenses | $ ___⊖___ | $ _____ |

| | You | Your spouse |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ _N/A_ | $ _deceased_ |
| Recreation, entertainment, newspapers, magazines, etc. | $ _N/A_ | $_____ |

Insurance (not deducted from wages or included in mortgage payments)

| | You | Your spouse |
|---|---|---|
| Homeowner's or renter's | $ _N/A_ | $_____ |
| Life | $ _N/A_ | $_____ |
| Health | $ _N/A_ | $_____ |
| Motor Vehicle | $ _N/A_ | $_____ |
| Other: _____ | $ _N/A_ | $_____ |

Taxes (not deducted from wages or included in mortgage payments)

| | You | Your spouse |
|---|---|---|
| (specify): _____ | $ _N/A_ | $_____ |

Installment payments

| | You | Your spouse |
|---|---|---|
| Motor Vehicle | $ _N/A_ | $_____ |
| Credit card(s) | $ _N/A_ | $_____ |
| Department store(s) | $ _N/A_ | $_____ |
| Other: _____ | $_____ | $_____ |
| Alimony, maintenance, and support paid to others | $ _N/A_ | $_____ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ _N/A_ | $_____ |
| Other (specify): _Since 12.21.01 I have been incarcerated_ | $_____ | $_____ |
| **Total monthly expenses:** _N/A_ | $_____ | $_____ |

9. Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?

   ☐ Yes   ☒ No      If yes, describe on an attached sheet.

10. Have you paid – or will you be paying – an attorney any money for services in connection with this case, including the completion of this form?   ☐ Yes   ☒ No

    If yes, how much? _____

    If yes, state the attorney's name, address, and telephone number:

11. Have you paid—or will you be paying—anyone other than an attorney (such as a paralegal or a typist) any money for services in connection with this case, including the completion of this form?

    ☐ Yes   ☒ No

    If yes, how much? _____

    If yes, state the person's name, address, and telephone number:

    N/A

12. Provide any other information that will help explain why you cannot pay the costs of this case.

    *I'm incarcerated since 12.21.01*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____January 13_____, 20_14_

_____
(Signature)

*Jenise Jacobs*
*My commission exp 1-7-15*

No.

IN THE

SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 2014

DONNA ROBERTS,

*Petitioner,*

v.

THE STATE OF OHIO

*Respondent.*

PETITON FOR WRIT OF CERTIORARI

Donna Roberts respectfully petitions this Court for a writ of certiorari to review the judgment of the Ohio Supreme Court, which vacates her death sentence and remands the matter for resentencing, but bars the trial court from considering any mitigating evidence at the new sentencing proceeding.

COUNSEL FOR APPELLEE

DENNIS WATKINS,
Trumbull County Prosecutor
4th Floor Administration Building
160 High Street, NW
Warren, OH 44481
(330) 675-2426

LUWAYNE ANNOS
Assistant Trumbull County Prosecutor

COUNSEL FOR APPELLANT

DAVID L. DOUGHTEN,
Counsel of Record
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112

JEFFREY M. GAMSO
ERIKA CUNLIFFE
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113
216-443-7583

## QUESTIONS PRESENTED

I.     Where a capital defendant has had her sentence of death reversed and remanded to the trial court for a new sentencing procedure, may the sentencing judge refuse to consider mitigation evidence adduced during her time of incarceration after her original sentencing?

II.    Where defense counsel failed to investigate and present mitigation evidence during a capital defendant's first sentencing hearing as is required by *Lockett v. Ohio*, may a state preclude that defendant from presenting that evidence to the sentencing judge at the second sentencing hearing?

ii

## LIST OF PARTIES TO THE PROCEEDINGS IN THE COURT BELOW
AND RULE 29.6 STATEMENT

All parties appear in the caption of the case on the cover page. None of the

parties thereon have a corporate interest in the outcome of this case.

iii

TABLE OF CONTENTS

QUESTION PRESENTED..................................................................................ii

TABLE OF CONTENTS ................................................................................iv

TABLE OF AUTHORITIES...........................................................................v

OPINIONS BELOW .....................................................................................1

JURISDICTION ..........................................................................................1

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED .......................1

INTRODUCTION.........................................................................................2

STATEMENT OF THE CASE ........................................................................3

REASONS FOR GRANTING THE WRIT....................................................................

    A state sentencing judge may not refuse to consider and give effect to a capital defendant's relevant mitigation evidence at a second sentencing hearing after the sentence has been reversed by an appellate court...................

    A.    Evidence in mitigation not investigated and developed at the original penalty phase hearing may be presented for a sentencing re-hearing.............................................................................................

    B.    Evidence in mitigation based upon a defendant's experience in prison which was developed after the original sentence is nonetheless relevant to the appropriate sentence for that defendant. .........................

CONCLUSION ..........................................................................................

INDEX TO APPENDICES

APPENDIX A

Opinion of the Supreme Court of Ohio, *State v. Roberts*, 137 Ohio St.3d 230; 998 N.E.2d 1100; 2013 Ohio 4580, October 22, 2013 ..............A-1

APPENDIX B

Opinion of the Supreme Court of Ohio, *State v. Roberts*, 111 Ohio St.3d 71, 850 N.E.2d 1168, 2006-Ohio-3665, August 2, 2006................A-39

iv

## TABLE OF AUTHORITIES

<u>CASES</u>

*California v. Brown*, 479 U. S. 538 (1987) ............................................ 11
*Davis v. Clark*, 475 F.3d 761 (6th Cir. 2007) ...................................... 11
*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ..................................... 5, 10
*Hitchcock v. Dugger*, 481 U.S. 393 (1987) ........................................ 10
*Lockett v. Ohio*, 438 U.S. 586 (1978) ....................................... 2-5, 9-14
*McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ............................ 5, 10
*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................ 5, 11
*Skipper v. South Carolina*, 476 U.S. 1 (1986) ......................... 5, 10, 11

## <u>CONSTITUTIONAL PROVISIONS</u>

Sixth Amendment .................................................................................. 1

Eighth Amendment ................................................................................ 1

Fourteenth Amendment ........................................................................ 2

v

## OPINIONS BELOW

The decisions of the Ohio Supreme Court: one entered on October 22, 2013 and published as *State v. Roberts*, 137 Ohio St.3d 230, 998 N.E.2d 1100, 2013 Ohio 4580 (Pet. App. A 1-38); the other entered on August 2, 2006, in *State v. Roberts*, 111 Ohio St.3d 71, 850 N.E.2d 1168, 2006-Ohio-3665 (Pet. App. at B. 39-74)

## JURISDICTION

Petitioner is appealing the most recent ruling of the Supreme Court of Ohio, which restricts her ability to present evidence at a re-sentencing proceeding following the vacation and reversal of her death sentence, *State v. Roberts*, 137 Ohio St.3d 230, 998 N.E.2d 1100, 2013 Ohio 4580. Jurisdiction of this Court is conferred pursuant to 28 U.S.C. §§ 1254(1).

## CONSTITUTIONAL PROVISIONS INVOLVED

The Sixth Amendment to the United States Constitution provides in pertinent part that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

The Eighth Amendment to the United States Constitution provides that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

1

The Fourteenth Amendment to the United States Constitution provides in relevant part that:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## INTRODUCTION

The trial court that sentenced Donna Roberts to death refused to hear, and therefore could not consider relevant mitigation evidence. The Supreme Court of Ohio said that the trial court was right in refusing to consider the mitigation evidence.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), this Court held that the Eighth and Fourteenth Amendments require that the sentencer in a capital case "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*, at 604 (emphasis in original).

Because Ohio law at the time placed severe limitations on the mitigation evidence that could be considered, this Court found Ohio's death penalty law unconstitutional. In this case, thirty-five years after *Lockett*, the trial court refused even to hear, let alone consider, mitigation evidence, and the Supreme Court of Ohio endorsed that refusal.

2

Donna Roberts was charged with and convicted of aggravated murder with death specifications. At the mitigation phase of her trial, she presented no evidence though she made, as Ohio law allows, an unsworn statement to the jury. No mitigating evidence having been presented, the jury determined that the death specifications of which she was convicted outweighed the non-existing mitigating evidence and voted unanimously for death. The Supreme Court of Ohio reversed the death sentence and remanded the case for a new sentencing hearing.

> Having found no prejudicial error in regard to Roberts's conviction, we affirm the conviction and the judgment of the trial court pertaining to them. Because of the prejudicial error in sentencing Roberts to death, the sentence of death is vacated, and the cause is hereby remanded to the trial court. *On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03.* The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

*State v. Roberts*, 111 Ohio St.3d 71, 95, 2006-Ohio-3665, ¶167, 850 N.E.2d 1168, 1190 (*Roberts I*) (emphasis added).

At the new hearing, Roberts sought to make a full mitigation presentation so that the trial court could obey the Ohio Supreme Court's remand instructions and the command of this Court in *Lockett*. The court, however, refused to hear any evidence in mitigation, again sentencing Roberts to die.

On direct appeal, the Supreme Court of Ohio affirmed the trial court's refusal. Even though in *Roberts I* it had ordered the judge to consider "any relevant mitigating evidence," the court now claimed that, in so ordering, it had actually

3

meant that the trial court consider only "relevant mitigating evidence" that had

been presented at trial – when there was none.  Further, and bizarrely confusing

the right to present mitigation with a non-existent right to continual resentencing,

the court explained that it would violate the equal protection rights of death-

sentenced people who were properly sentenced to have someone like Roberts, who

was improperly sentenced, get a full and fair sentencing.

> Establishing a right to update mitigation could result in arbitrary
> distinctions between similarly situated capital defendants. A defendant who
> had an error-free mitigation hearing could not update his mitigation—no
> matter how compelling the new mitigation that might be available to him—if
> the trial judge committed no error after the mitigation hearing that called for
> the case to be remanded. But another defendant, whose mitigation hearing
> was equally free of error, would have the right to update his mitigation in the
> event that a posthearing sentencing error took place that required a remand.

*State v. Roberts*, 137 Ohio St.3d 230, 237, 2013-Ohio-4580, ¶ 37, 998 N.E.2d 1100,

1108 (*Roberts II*).

Although the court went on to again reverse Ms. Roberts' death sentence and

remand the case for a new sentencing, it explicitly ordered the judge to consider no

mitigating evidence.  The trial court was, instead, to weigh the aggravating

circumstances against the non-existent mitigating evidence.  It was not even to

consider what Ohio law specifically mandates that it does, Ms. Roberts's "history,

character, and background."  See Ohio Rev.Code Ann. § 2929.04(B).  Rather,

the new sentencing determination was to be made "on the basis of the existing

record."  *Id.* at 250, 2006-Ohio-4580 at ¶96, 998 N.E.2d at 1119.

In effect, *Roberts II* mandates that the trial court violate *Lockett*.  And of

course, *Lockett* does not stand alone.  *Lockett's* holding – that a capital sentencer

4

must hear and consider all relevant mitigating evidence – has been applied

repeatedly. See, *e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 113-114 (1982);

*McCleskey v. Kemp*, 481 U.S. 279, 304 (1987); *Penry v. Lynaugh*, 492 U.S. 302, 327-

328 (1989). As Justice White explained for the Court in *Skipper v. South Carolina*,

476 U.S. 1, 4 (1986),

> There is no disputing that this Court's decision in *Eddings* requires that in
> capital cases " `the sentencer . . . not be precluded from considering, *as a
> mitigating factor,* any aspect of a defendant's character or record and any of
> the circumstances of the offense that the defendant proffers as a basis for a
> sentence less than death.' "*Eddings, supra,* at 110 (quoting *Lockett, supra,* at
> 604 (plurality opinion of BURGER, C. J.)) (emphasis in original). Equally
> clear is the corollary rule that the sentencer may not refuse to consider or be
> precluded from considering "any relevant mitigating evidence." 455 U. S., at
> 114.

"These rules," the justice added, "are now well established."

## STATEMENT OF THE CASE

A grand jury in Trumbull County, Ohio, indicted petitioner Donna Roberts on

two alternative theories of capital murder stemming from the death of her ex-

husband, Robert Fingerhut. The indictment charged Roberts with one count of

purposefully killing Mr. Fingerhut, with prior calculation and design, in violation of

Ohio Rev. Code §2903.01(A) and one count under Ohio's felony murder provision

under Ohio Rev. Code §2903.01(B)

The charges indicated that Roberts was not the principal offender but acted

in complicity with the principal, and co-defendant, Nathaniel Jackson. Mr. Jackson

was also capitally indicted, and he was tried separately.

5

According to the prosecution, Roberts become romantically involved with Nathaniel Jackson, and maintained a relationship with Jackson while he was imprisoned on an unrelated charge. During that time, the two hatched the plot to kill Fingerhut to obtain the proceeds of his life insurance policies, of which Roberts was the beneficiary. Finderhut was later killed in the home he and Roberts shared with Jackson. Roberts was in a restaurant at the time of the killing. Jackson was convicted and sentenced to death. Roberts, who went to trial afterwards, was convicted of complicity in the murder and also sentenced to death.

On direct appeal, the Supreme Court of Ohio remanded Roberts' case for new sentencing procedure in *Roberts I*. The court based its decision on the trial court's failure to allow Ms. Roberts to allocute, which is required under Ohio law. In addition, the court noted that the trial court failed to independently prepare its sentencing opinion as required by R.C. §2929.03(F).

<u>Re-Sentencing Procedure in Trumbull County Common Pleas Court</u>

On remand, Ms. Roberts moved to expand the sentencing hearing to include all relevant mitigation evidence. The trial court denied the motion. At the September 14, 2007 hearing, the court allowed Ms. Roberts to allocute, but it barred her from presenting any mitigating evidence. Counsel for Roberts proffered the precluded mitigation, which included a well-documented history of severe mental illness and no prior criminal history. Counsel argued that this mitigating evidence warranted the imposition of a life sentence. Nevertheless, on October 29, 2007, the court imposed a death sentence, refusing to consider the proffered mitigation.

6

The Supreme Court of Ohio found that Roberts had no right to introduce any additional evidence in mitigation at the resentencing it ordered in *Roberts I*, beyond what Roberts uttered in her allocution. The court reasoned that allowing the presentation of additional mitigation at such a hearing would be unfair to defendants who did not have their death sentences reversed. Nevertheless, the high court reversed the death sentence imposed. Again it remanded the case, this time because the record indicated that the trial court had not considered the evidence provided during Roberts' allocution. During this remanded proceeding, however, the court advised that Roberts would not be allowed to address judge, nor would the trial court be permitted to consider anything other than the transcripts of Roberts's original penalty phase hearing and of Roberts's allocution at her first remand hearing.

### REASONS FOR GRANTING THE PETITION

A state sentencing judge may not refuse to consider and give effect to a capital defendant's relevant mitigation evidence at a second sentencing hearing after the sentence has been reversed by an appellate court.

Petitioner Donna Roberts was convicted of capital murder for allegedly assisting her co-defendant in her ex-husband's murder. In *Roberts I*, the Ohio Supreme Court reversed her death sentence, remanding it for a new sentencing hearing. At the remand hearing, the trial court concluded that it was precluded from considering any evidence that was not presented at the first sentencing presentation. Accordingly, a wealth of mitigation evidence amassed since the initial

7

sentencing – evidence which demonstrated that death was not the appropriate penalty, could not be presented or considered.

This mitigating evidence could be classified into two categories. First, there was the evidence that had been available at the time of the first sentencing hearing but was not then presented. This includes evidence that Roberts suffered from severe mental illness which was exacerbated by traumatic head injury. The second class of evidence was developed post-sentencing, much of it from her stay on the state's death row. This evidence likewise featured evidence of chronic mental illness, and the medication used to treat it. The post-sentencing evidence also demonstrated Roberts' ability to successfully adapt to her prison environment, when not suffering the symptoms of her mental illness.

A trial court's refusal to consider this mitigation evidence creates two problems. First, the sentencer is constitutionally mandated to hear and consider all available mitigation evidence. Second, allowing the defendant to allocute means nothing if the sentencer refuses to hear the background evidence supporting and providing credibility to the allocution. And, not surprisingly, in this case, the record makes it clear that the trial court did not accord any weight to the allocution.

When the Ohio Supreme Court initially sent the matter back for resentencing in *Roberts I*, it held that:

> Having found no prejudicial error in regard to Roberts's conviction, we affirm the conviction and the judgment of the trial court pertaining to them. Because of the prejudicial error in sentencing Roberts to death, the sentence of death is vacated, and the cause is hereby remanded to the trial court. On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the

8

aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

*Roberts I*, at 95, 2006-Ohio-3665 at ¶167, 850 N.E.2d at 1190

Nothing in *Roberts I* prohibited Ms. Roberts from providing, and the trial court from considering, new evidence at a second or remand sentencing hearing. Had it prohibited that, it would have violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Applicable Mitigation Law

This Court has long held that a death sentence may not stand if the sentencing body has been precluded from considering relevant evidence suggesting that the death sentence would not be appropriate. The Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty. In *Lockett*, 438 U.S. 586, this Court held that the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.,* at 604. Thus, this Court found an Ohio death penalty statute unconstitutional because it mandated capital punishment upon a finding of one aggravating circumstance unless one of three statutory mitigating factors were present.

*Lockett* and Its Progeny Mandate Consideration of All Relevant Mitigation

9

This expansive approach to the presentation of mitigation evidence has remained an abiding theme in this Court's opinions scrutinizing *Lockett*. *Eddings v. Oklahoma*, 455 U.S. 104, *Skipper v. South Carolina*, 476 U.S. 1, *Hitchcock v. Dugger*, 481 U.S. 393 (1987). In *Eddings*, this Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death.

*Eddings* involved an Oklahoma death penalty statute, which permitted the defendant to introduce evidence of any mitigating circumstance, but the sentencing judge concluded, as a matter of law, that he was unable to consider mitigating evidence of the youthful defendant's troubled family history, beatings by a harsh father, and emotional disturbance. Applying *Lockett*, however, this Court held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." 455 U.S., at 113-114 (emphasis omitted). In that case, "it was as if the trial judge had instructed a jury to disregard the mitigating evidence [the defendant] proffered on his behalf." *Id.,* at 114.

The Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, 304 (emphasis in original). "Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect

10

to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh*, 492 U.S. 302, 327-328.

These cases make it clear that if the sentencing court is precluded from considering and giving effect to mitigation, the sentence of death must be reversed. In the absence of such consideration, the sentence imposed will fail to reflect a reasoned moral response to the defendant's background, character, and crime. *California v. Brown*, 479 U. S. 538, 545 (1987).

<u>Sentencing Remand</u>

These well-settled principles apply even where, as in the instant case, the original death sentence is reversed and remanded for a new sentencing hearing. The Sixth Circuit has clearly stated that the scope of the mitigation in a re-sentencing hearing could not be limited.  In *Davis v. Clark*, 475 F.3d 761 (6th Cir. 2007), the trial court at a second sentencing hearing refused to consider the defendant's conduct in prison following his death sentence. On review, the Sixth Circuit concluded that defendant's post-sentencing behaviour was proper mitigation evidence admissible under *Skipper v. South Carolina*, 476 U.S. 1.  Accordingly, in that case, the three-judge panel's refusal to consider it required the death sentence's reversal. Ohio courts ignored that precedent.

A. **Evidence in mitigation not investigated and developed at the original penalty phase hearing may be presented for a sentencing re-hearing.**

Much of the mitigation evidence proffered at Ms. Roberts' resentencing hearing derived from records compiled and produced by the Social Security Administration and the Ohio Department of Rehabilitation and Correction (DRC) –

11

where Roberts had been housed following her original death sentence. These materials demonstrate the following mitigating information:

- Roberts was sexually abused as a child.

- At least one doctor who examined Roberts believed there is a strong likelihood that she suffers from post-traumatic stress disorder linked to that childhood sexual abuse.

- Roberts is intellectually disabled. In 1999, following her application for SSI disability due to her mental condition, testing revealed a full scale IQ of 65.

- Roberts suffers from mental illness. Both pre-offense and post offense records consistently note that Ms. Roberts suffers from mental health difficulties. A treating doctor noted that dementia could not be ruled out in 1999.

- Roberts has a history of severe head injuries. Records reveal the Roberts had been in a severe car accident. Individuals close to Roberts reported to SSA that her personality changed dramatically after the accident and that she was emotionally unstable. She was diagnosed with post-concussion syndrome.

- Roberts was hospitalized for various mental illnesses - depression, major depression, recurrent bi-polar disorder, severe anxiety, agitation, auditory and visual hallucinations and suicidal ideations.

- Roberts is physically and emotionally dependent on medication to treat mental health symptoms - Paxil and Remeron.

B. Evidence in mitigation based upon a defendant's experience in prison developed after the original sentence is also relevant to the appropriate sentence for that defendant.

Additional mitigation evidence contained in records from the DRC, further supported Roberts claim that a death sentence was not appropriate in this case. Since Robert had no criminal record before the underlying incident, the DRC

12

materials reflected the time Roberts spent on death row. Those records bolster numerous mitigating circumstances, including the following:

- Roberts suffered from chronic depression with onset as early as age six;

- Roberts was suicidal and suffers from bi-polar disorder;

- Roberts grew up in an extremely abusive environment and was, herself a victim of physical and sexual abuse as a child, possibly causing PTSD;

- Roberts was delusional and suffered from hallucinations;

- Roberts had a history of multiple head injuries, with the most serious one occurring in 1999;

- Following the 1999 accident and injury, Roberts underwent personality and behavioural changes;

- Roberts was extremely dependent on medication used to treat her mental illness;

- MRI scans indicate that Roberts has brain abnormalities, possibly explaining bizarre behaviour observed by DRC personnel;

- Roberts demonstrated severe cognitive impairment at various times during her incarceration.

<u>Summary</u>

The Social Security and DRC records discussed above amply document a number of weighty mitigating circumstances. Additional evidence in the form of affidavits from an examining psychologist and Ms. Roberts' son were similarly mitigating. All of this information was critical at Ms. Roberts' resentencing for two reasons: 1) it demonstrates that death is not the appropriate punishment in this case; and 2) it provides evidentiary support for Roberts' statement in allocution. By

13

ignoring it all, the trial court was able to conclude that the aggravating circumstances of the case outweighed the mitigation; and that Ms. Roberts' allocution was not worthy of belief. This result is not only absurd, it turns the principle this Court established in *Lockett* on its head.

It has been 20 years since this Court addressed the important ideals highlighted in *Lockett* and its progeny. That line of cases made it clear that in the capital sentencing context the presentation and consideration of evidence thought to be mitigating should be largely unfettered. The Ohio Supreme Court's remand order directing the trial court not to consider any mitigation – even as it determines whether death is the appropriate punishment here – openly defies those ideals.

<div align="center">CONCLUSION</div>

For the foregoing reasons, the petition for a writ of certiorari should be granted.

<div align="right">Respectfully submitted,

*David L. Doughten*
DAVID L. DOUGHTEN
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112

JEFFREY M. GAMSO
ERIKA CUNLIFFE
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113
216-443-7583

*Counsel for Petitioner*</div>

<div align="center">14</div>

# APPENDIX

[Cite as *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665.]

The STATE of OHIO, APPELLEE, *v.* ROBERTS, APPELLANT.

[Cite as *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665.]

*Criminal law — Aggravated murder — Convictions affirmed — Court's ex parte communication with prosecutor invalidates sentencing opinion — Death penalty vacated and resentencing ordered.*

(No. 2003-1441 — Submitted January 24, 2006 — Decided August 2, 2006.)

APPEAL from the Court of Common Pleas for Trumbull County,

No. 01-CR-793.

_____

O'CONNOR, J.

{¶ 1} At 12:01 a.m., December 12, 2001, the appellant, Donna M. Roberts, phoned 911 to report the death of her former husband, Robert Fingerhut, at the home they shared in Howland Township, Trumbull County, Ohio. After investigating, the police learned that Roberts and Nathaniel Jackson had plotted to kill Fingerhut while Jackson was in prison in the months preceding the murder. Subsequently, the pair were arrested and indicted.

{¶ 2} Jackson was convicted of the aggravated murder of Fingerhut and was sentenced to death, a conviction and sentence that we have affirmed. See *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362. In a separate trial, Roberts was found guilty of the aggravated murder of Fingerhut and was also sentenced to death.

{¶ 3} Roberts now appeals, raising an array of challenges to her conviction and sentence. Although we reject all of Roberts's attacks on her conviction, because of the trial judge's ex parte use of the prosecutor in directly preparing the court's sentencing opinion, we must vacate the sentence and remand the case to the trial court for resentencing.

SUPREME COURT OF OHIO

RELEVANT BACKGROUND

{¶ 4}  The facts taken in the light favorable to the state establish the following facts.

{¶ 5}  Donna Roberts met Robert Fingerhut in Florida in 1983; they married, but were divorced soon thereafter.  According to Roberts, the divorce was for financial and business reasons — i.e., that Fingerhut wanted to shelter and protect assets in case his business was sued or collapsed.

{¶ 6}  The couple moved to Ohio and established a home on Fonderlac Drive in Howland Township, Warren, Ohio.  Fingerhut bought two Greyhound bus terminals – one in Warren and one in Youngstown – and began operating them.  Those assets and almost all others were listed in Roberts's name.

{¶ 7}  Despite the divorce, Fingerhut appears to have continued to treat Roberts as his wife, referring to her as such in many of his business dealings.  Most people who dealt with Roberts and Fingerhut assumed that they were married.  Roberts similarly maintains that, in her mind, she did not consider herself divorced because she and Fingerhut were a devout, loving couple.

{¶ 8}  Notwithstanding her feelings for Fingerhut, at some point during that relationship, Roberts met Nathaniel Jackson and began an affair with him.  The liaison was interrupted in 2001, when Jackson was incarcerated in the Lorain Correctional Institution.  Upon his release, however, they were reunited.

{¶ 9}  On December 6, 2001, Roberts reserved and paid for a Jacuzzi suite in Jackson's name at the Wagon Wheel Motel in Boardman.  Three days later, Jackson and Roberts spent the night in that room.

{¶ 10}  Over the next several days, the pair were seen together at various places.  A day or two before Fingerhut's death, Frank Reynolds, then an employee of the Greyhound bus terminal in Youngstown, saw Roberts and Jackson kissing and talking with one another near the terminal before Fingerhut arrived for work.  Earlier, Reynolds had overheard Roberts asking Fingerhut for $3,000.  Fingerhut

2

January Term, 2006

had refused. According to Reynolds, Roberts was nervous and shaking and gave Fingerhut "the dirtiest look."

{¶ 11} On December 11, 2001, Greyhound bus driver Jim McCoy saw Fingerhut working at the Youngstown terminal at approximately 4:30 p.m. Fingerhut was the only person working that afternoon.

{¶ 12} Soon after seeing Fingerhut in the terminal, McCoy drove his bus to Warren. He saw Roberts and Jackson at the Warren terminal, and Jackson told McCoy, "[W]e're trying to get out of here." On December 11, a server at the Red Lobster restaurant in Niles waited on a couple she later identified as Roberts and Jackson. The two paid for their dinner at 6:43 p.m. and left the restaurant.

{¶ 13} Fingerhut left the Youngstown bus terminal around 9:00 p.m. on December 11, telling the security guard on duty that he was leaving early for the evening. Around 9:30 p.m., a neighbor observed Roberts driving her car very slowly on Old State Route 82 near their homes, even though no one else was on the road at the time.

{¶ 14} Later that night, Roberts went to the Days Inn in Boardman to reserve a room for the following week. She was alone and paced around the lobby. The room receipt indicates that she paid for the room at 11:33 p.m.

{¶ 15} At 12:01 a.m., December 12, 2001, Trumbull County authorities received a 911 call from Roberts, who was screaming hysterically that there was something wrong with her husband. Upon arriving at the home, police found Fingerhut's body on the kitchen floor near the door to the garage.

{¶ 16} A Trumbull County forensic pathologist, Dr. Humphrey Germaniuk, observed Fingerhut's body at the crime scene and later performed an autopsy. Fingerhut had sustained lacerations and abrasions to his left hand and head, as well as multiple gunshot wounds to his head, chest, and back. Dr. Germaniuk concluded that the gunshot to Fingerhut's head was the cause of death.

3

SUPREME COURT OF OHIO

{¶ 17} During the crime-scene search, police found a fully loaded .38-caliber revolver near Fingerhut's body.  A firearms expert with the Bureau of Criminal Identification and Investigation ("BCI") later concluded that the bullets recovered from the home and Fingerhut's body were fired from the same weapon, either a .38-caliber special or a .357 Magnum, but that none of the bullets had been fired from the revolver found near Fingerhut's body.

{¶ 18} During the hours immediately following Roberts's 911 call, police observed that her emotional state fluctuated.  At times, she was calm and quiet, and at other times she was crying or screaming, "Oh, my Robert, my Robert." Two detectives noticed that when police investigators talked extensively, they no longer heard Roberts shouting.  When a detective checked on Roberts in her bedroom because she had been quiet, she began shouting again upon seeing him. One officer at the scene remarked that he "didn't notice any tears coming from [Roberts's] eyes" when she appeared to be crying.

{¶ 19} In this period of initial investigation, Roberts told police that she had left work at the Greyhound bus terminal in Warren at 5:30 that evening, had dined alone at a Red Lobster restaurant, and had then gone home.  According to Roberts, Fingerhut called her and said he would be late coming home and suggested that she go shopping.  Roberts said she had left her home at 9:00 p.m. and had gone to several stores.  When she returned home shortly before midnight, she found Fingerhut lying on the floor, bleeding from the face.  She also stated that her husband's car was not at the house.

{¶ 20} Eventually, police arranged for Roberts's brother to pick her up while they continued to secure the scene and collect evidence.  Before Roberts left the house, Detective Sergeant Paul Monroe told Roberts that the house was a crime scene and that police needed to search the house and everything in it, including the garage and cars. Roberts allegedly replied, "Do whatever you have to do to catch the bastard."

4

January Term, 2006

{¶ 21} At 3:38 a.m. that morning, police were still at the house investigating.  The phone rang, and Detective Sergeant Monroe answered it. There was a pause, and then the caller hung up.  Detective Monroe traced the call to Roberts's cell phone.

{¶ 22} Around 10:00 a.m. that morning, Detective Monroe visited Roberts at her brother's home.  At that time, Roberts gave police written consent to continue searching the residence.

{¶ 23} Later, on the afternoon of December 12, Roberts met with Sergeant Frank Dillon and Detective Sergeant Monroe at the police station.  Roberts described her "loving relationship" with Fingerhut but also stated that she and Fingerhut were a "cool couple" and that he "did his thing, she did hers."

{¶ 24} She described Fingerhut as "go[ing] both ways" and said that he had a friend named "Bobby."  She recalled that about a week and a half before the murder, Fingerhut was acting kind of "nutty," and she had thought the behavior was because of his relationship with Bobby.

{¶ 25} Roberts also stated that she had been having a sexual relationship with a man named Carlos for six months.  She additionally indicated that she had a friend named Santiago whom she had tried to help, but that he had stolen money and a gun from her.  When Detective Monroe asked Roberts whether she had relationships with anyone else, Roberts replied, "No, there's nobody else.  I told you everybody."

{¶ 26} Monroe then asked her about a man named Nate Jackson, and Roberts said, "Yes, I forgot about him."  Roberts admitted that she had been dating Jackson for two years and that he had called her from prison and had exchanged letters with her.  Roberts claimed that she had last seen Jackson on December 9, when she picked him up at Lorain Correctional Institution and had then left him in Youngstown at a house on Wirt Street.  Roberts added that she

5

SUPREME COURT OF OHIO

had last spoken to Jackson over the telephone rather than in person on the morning of December 11.

{¶ 27} Detective Monroe asked Roberts whether she had a cell phone and whether he could look at it. Roberts searched her purse and said that she had left it at home. Monroe then told Roberts that a call originating from her cell phone had been placed to the crime scene at 3:38 that morning. Roberts said, "Nate must have had the phone. He's always borrowing it."

{¶ 28} In the ensuing week and a half, police continued to investigate and learned that Jackson and Roberts had spent a night together at the Wagon Wheel Motel and that Roberts had registered at the Days Inn and had paid for one week's rental.

{¶ 29} Police and a BCI agent located and retrieved evidence, including Jackson's fingerprints, from the room at the Days Inn in which Jackson had stayed. Police also recovered a garbage bag in a dumpster at the motel that had come from Jackson's room. That bag contained a bottle of peroxide, used bandages, and gauze with blood that was consistent with Jackson's DNA profile.

{¶ 30} Police learned that Fingerhut had taken out two life insurance policies on his life, naming Roberts as sole beneficiary. The aggregate benefit of the policies amounted to $550,000.

{¶ 31} On December 12, police found Fingerhut's abandoned vehicle in Youngstown, approximately three blocks from Wirt Street. A forensic specialist found blood on the driver's side visor and on other areas inside the automobile. Subsequent scientific analysis determined that blood on the visor contained a mixture consistent with both Jackson's and Fingerhut's DNA profiles. Blood recovered from the trunk release inside the car contained a DNA mixture with a major profile that was consistent with Jackson's DNA and a minor profile consistent with Fingerhut's DNA. The frequency for Jackson's DNA on the trunk release was one in 45 quintillion, 170 quadrillion in the Caucasian population, and

6

January Term, 2006

one in 29 quadrillion, 860 trillion in the African-American population. Jackson is African-American.

{¶ 32} Cell-phone records indicated that a number of phone calls were made on December 11 between 9:45 p.m. and 11:44 p.m. from the cell phone that Roberts said Jackson had borrowed from her and a cell phone located in Roberts's vehicle.

{¶ 33} Additional evidence implicated Roberts and Jackson in the murder. As noted previously, Roberts had admitted to police that she and Jackson had exchanged letters and telephone calls during his incarceration. During their initial search of the home, police discovered more than 140 letters and cards written by Jackson to Roberts, most of which were addressed to Roberts at a post office box in Warren.

{¶ 34} Police also found a brown paper bag with Jackson's name on it in the trunk of Roberts's car, which had been parked in the garage at their residence. The bag contained clothing and approximately 140 handwritten letters, dated between October and December 2001, sent by Roberts to Jackson.

{¶ 35} Passages from letters exchanged between Jackson and Roberts suggested strongly that there had been a plot to murder Fingerhut. Many of the letters described the couple's physical relationship and plans for Jackson's release, as well as references to how they would deal with Fingerhut once Jackson was out of prison.

{¶ 36} For example, in a letter from early October 2001, Jackson wrote Roberts:[1] "[W]hy don't you leave Robert an lets carry on with a world of our own? Or let me do what I was gonna do to him, because you know that – that was our little thing so you better not go an try to get know one else to do it, because I told you its getting done when I come home * * *." Less than a week later, Jackson wrote Roberts: "Donna I got it already planned out on how we are gonna

_____

1. The words used in Jackson's letters are presented verbatim.

7

take care of the Robert situation?  An baby its the best plan ever!  Because Donna its now time that we really be together so that we can really see the true side of our love because I'm tired of not being able to be with you * * *."

{¶ 37} Soon thereafter, Jackson again expressed his desire to be with Roberts and to be rid of Fingerhut: "Donna I don't care what you say but Robert has to go!  An I'm not gonna let you stop me this time.  An Donna you know that I've always wanted to live my life with you an only you but everytime that I wanted to take care of the situation by myself you wouldn't never let me.  * * * Because you wouldn't let me do what I wanted to do to make you happy an that was get rid of him!  So Donna can I do this so that we can go an live happy?  An then maybe we can sell the house an move on to somewhere else in our own world.  An I'm not gonna be happy until that happens!"

{¶ 38} Roberts responded to Jackson with her own letters.  In one from mid-October 2001, she indicated her frustration over limits that Fingerhut apparently had imposed on her spending and her apparent agreement to Jackson's plan for Fingerhut's murder.  She wrote, "You know you can always count on me — you always could.  It'll just be a little tougher now because he gives me $100 a week for everything and then makes me write checks to keep track of it all.  And I haven't been ALLOWED to use any of my 52 charge cards – emergency only.  I am not used to living like this.  I am used to having plenty of cash for whatever I want & buying everything I want.  Maybe those days will return again soon.  Do whatever you want to him ASAP.  Amen."  Jackson replied, "An then after that you don't ever have to worry about making know more excuses to him, because he will no longer be with us after 12-10-01 an then it'll be me an you totally an completely * * *."  Within that same passage, Jackson drew a tombstone with the inscription, "Rest In Piss," before continuing, "Hey Donna just think come 12-11-01 you'll be waking up to me or maybe we'll give it a couple of days to let things look cool an then after the funeral baby when I come home I'm never leaving an

8

January Term, 2006

we're only doing it like that just to make it look good * * *. Alls I need is for my baby not to worry an leave everything else up to me."

{¶ 39} Jackson's subsequent letters further evinced the developing plan to deal with "the Robert problem." Jackson wrote, "Yes I'm taking care of that the next night, because I told you I'm tired of living like this when I don't have to. An after that will you get me a 2002 Cadillac Deville?" In that same letter, Jackson wrote: "An even if I gotta come to the house and shoot Robert in his fucking head you're gonna be with me."

{¶ 40} The letters also indicate a role for Roberts in the scheme. An October letter from Jackson reads, "Well I see now you know that I'm about my business when I get out as far as our little situation? An get me a size large leather gloves an see if you can find me a ski mask hat okay? An I need them handcuffs you have an its mandatory, so get them for me, because the way that I'm gonna do it is gonna be right okay?" About two weeks before the murder, Roberts wrote to Jackson: "I also went to 4 stores and finally found your ski mask & boxers & a pair of beautiful fleeced lined black leather gloves."

{¶ 41} Though the words written in those letters were significant evidence of the planning of the murder, the state also marshaled the actual words spoken between Roberts and Jackson.

{¶ 42} Prison authorities at Lorain Correctional Institute routinely record telephone conversations of prisoners and maintain the recordings for at least six months. Eighteen phone calls between Roberts and Jackson were recorded electronically. Those recordings also reflect the plot to murder.

{¶ 43} For example, in a recorded conversation between Jackson and Roberts on October 25, 2001, the following colloquy took place:

{¶ 44} "[JACKSON]: I'll be home to you. December 9th all the worries will be over baby.

{¶ 45} "* * *

9

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 2240

SUPREME COURT OF OHIO

{¶ 46} "[JACKSON]: The next day out, I'm goin to – I already got it in my mind, my mind made up. I'm goin to go ahead and do that the next day, okay. All right.

{¶ 47} "[ROBERTS]: Oh, I just wrote to you that I didn't think that you really meant it.

{¶ 48} "[JACKSON]: What. My mind is made up. My mind made – I wrote it in my letters, you know what I'm saying, but you know, I don't like to talk too much like that but when I come home, you know what I mean, it's goin to be in full detail. Okay. I'm goin to let you know how I'm goin to do it and everything. I'm goin to do it for sure the next day."

{¶ 49} In recorded phone conversations between Jackson and Roberts during November 2001, they continued to discuss what Jackson planned to do to Fingerhut. In a conversation on November 8, 2001, Jackson told Roberts that he wanted Fingerhut to see Roberts performing oral sex on Jackson before Fingerhut "goes away."

{¶ 50} Two weeks later, Roberts worried about Jackson's being apprehended for the murder of Fingerhut:

{¶ 51} "[JACKSON]: You know what I'm saying, the next day after. You know what I told you I wanted to do right?

{¶ 52} "[ROBERTS]: I'm afraid Nate.

{¶ 53} "[JACKSON]: What you, man.

{¶ 54} "[ROBERTS]: I can't afford to lose you. * * * I can not lose you. Like I will kill myself.

{¶ 55} "* * *

{¶ 56} "[JACKSON]: Just forget about it man, * * * when a person, man, know what he's doing, man, * * * that's like jinxing, man. * * *

{¶ 57} "[ROBERTS]: But what was the story with the trunk and handcuffs, that's too involved.

10

January Term, 2006

{¶ 58} "[JACKSON]:  Just, just, just leave it alone, alright.

{¶ 59} "[ROBERTS]:  It's too much involved.  Your gonna leave hair, your gonna leave prints, your gonna,

{¶ 60} "[JACKSON]:  Leave it alone, man.  Leave it alone, alright.  * * * Come on man.  This ain't Perry Mason man.

{¶ 61} "[ROBERTS]:  I don't want to know anything about it ever."

{¶ 62} On November 24, Jackson tried to reassure Roberts about his plan.

{¶ 63} "[JACKSON]:  Man, we gonna * * * really talk when I come home, ok.

{¶ 64} "[ROBERTS]: OK.

{¶ 65} "[JACKSON]:  Especially about our, that situation, man.  You know.

{¶ 66} "[ROBERTS]:  Yeah.

{¶ 67} "[JACKSON]:  I mean, it just, you know, you get too nervous at times, that's all the deal is.

{¶ 68} "[ROBERTS]:  Yeah I know, it part of my nature.

{¶ 69} "[JACKSON]:  And then you said DNA, the only way they can do a DNA is if they got the other, the person's, you know what I'm saying.  If they got the person and the hair cause they can't just take no hair and say this is such and such hair.  * * * [T]he laws that we got in the State of Ohio and the laws from everywhere else, * * * I mean they way different.  * * *

{¶ 70} "[ROBERTS]:  Really.

{¶ 71} "[JACKSON]:  Hell yeah.  We'll, we'll talk about it when I come home Donna.  Ok, I don't want to talk about it over the phone."

{¶ 72} Around Thanksgiving 2001, Roberts and Jackson discussed DNA evidence, a "big 38" firearm, their reunification on the night after his release from prison and his stay in a hotel the week thereafter, and Roberts's complete reliance on Jackson.

11

SUPREME COURT OF OHIO

{¶ 73} On December 8, the day before Jackson was released from prison, Jackson and Roberts had one final recorded conversation. Roberts expressed misgivings about what Jackson was planning to do to Fingerhut, but Jackson told her, "I got to do this Donna. I got to." Roberts told Jackson that she did not want to know about it. The following colloquy then took place:

{¶ 74} "[JACKSON]: Just consider it a done deal. Only thing I'm gonna need is one thing.

{¶ 75} "[ROBERTS]: What?

{¶ 76} "* * *

{¶ 77} "[JACKSON]: I just need to be in that house when he come home.

{¶ 78} "[ROBERTS]: Oh no.

{¶ 79} "* * *

{¶ 80} "[JACKSON]: Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you.

{¶ 81} "* * *

{¶ 82} "[JACKSON]: I just need to be in there man. It ain't gonna happen in the house man. I mean I ain't gonna jeopardize that man.

{¶ 83} "[ROBERTS]: Well, let's not talk about it now.

{¶ 84} "[JACKSON]: Ok. We'll talk, we'll, I'll just wait until tomorrow."

{¶ 85} In light of the accumulating inculpatory evidence and Roberts's unpersuasive explanations for it, Jackson and Roberts became the prime suspects in Fingerhut's murder. Detective Monroe then arranged for Roberts to call Jackson to ask him some prepared questions and for police to record the conversation. According to Detective Monroe, however, Roberts failed to ask Jackson the critical questions that police had instructed her to ask.

{¶ 86} On December 21, 2001, Roberts was arrested at her home for the murder of Robert Fingerhut. That same day, police raided a home on Wirt Street

12

January Term, 2006

in Youngstown, and Jackson surrendered. At that time, Jackson had a bandage wrapped around his left index finger. A search of the Wirt Street home uncovered additional evidence. Included in that evidence was a pair of black leather gloves; the index finger of the left glove appeared to have been torn off, and there was a red substance on the glove near the tear.

{¶ 87} On December 28, 2001, a grand jury indicted Roberts on two counts of aggravated murder related to Fingerhut's death. R.C. 2903.01(A) and (B). Both murder counts carried two death-penalty specifications: murder during an aggravated burglary and murder during an aggravated robbery. R.C. 2929.04(A)(7). The grand jury also indicted Roberts on separate counts of aggravated burglary and aggravated robbery, each carrying a firearm specification.

{¶ 88} At trial, the state presented numerous witnesses establishing the facts previously set forth. The defense presented no witnesses. The jury found Roberts guilty of aggravated murder and the other offenses as charged.

{¶ 89} At the mitigation hearing, Roberts waived the presentation of evidence except for a lengthy unsworn statement. The jury recommended – and the trial court imposed – the death penalty on Roberts.

{¶ 90} In this appeal of her conviction and sentence, Roberts now raises 14 propositions of law. We have reviewed each and determined that Roberts demonstrates no error that would justify reversal of her conviction. Although most of her claims related to sentencing also fail, for the reasons set forth more fully below, we hold that the trial court's sentencing opinion supporting the death penalty is so grievously flawed that it cannot properly support the sentence imposed. We therefore affirm Roberts's convictions and other sentences, but we must vacate the death sentence and remand the cause to the trial court to reconsider the imposition of the death penalty and to prepare a proper sentencing opinion.

13

SUPREME COURT OF OHIO

ANALYSIS

PRETRIAL ISSUES

*The Motion to Suppress*

{¶ 91} In proposition of law two, Roberts argues that police exceeded the scope of her consent to search the home during the investigation of Fingerhut's murder and that the trial court erred in failing to suppress her letters to Jackson, which the police seized from inside a bag in the trunk of her car in the attached garage. Roberts contends that a reasonable person would have believed that the police would be searching her house, but not a vehicle in the garage that was not at her home at the time of the offense.

{¶ 92} During the pretrial hearing on appellant's motion to suppress, the state presented several witnesses who testified that Roberts clearly and directly gave police open-ended consent to search the premises. The testimony received at the suppression hearing was consistent: Roberts told police to do whatever they needed to do in their efforts to find out who killed Fingerhut.

{¶ 93} Howland Township police officer Albert Ray, who investigated the murder scene shortly after Roberts called 911, testified that he overheard Detective Paul Monroe tell Roberts that the entire residence was a crime scene and that police needed to look everywhere for evidence or possible suspects. Roberts reportedly responded, "Do whatever you have to do to catch the bastard." Similarly, Detective Sergeant Frank Dillon was at the residence shortly after the body was discovered and heard Detective Monroe explain to Roberts that police would have to go through the entire house because it was a crime scene. According to Detective Sergeant Dillon, Detective Monroe told Roberts that police needed to search for evidence to determine who committed the murder, and Roberts was adamant in her reply: "I don't care, you do what you have to do. I want you to get the person who did this to my Robert."

14

January Term, 2006

{¶ 94} Detective Sergeant Monroe himself testified that after he told Roberts that police needed to process the entire house as a crime scene, Roberts said: "[D]o whatever you have to do, search the whole place, just find the guy." He further testified that Roberts gave him permission to look anywhere on the property to find clues as to who had committed the murder.

{¶ 95} Roberts's brother also testified. He stated that his sister was very cooperative with the police and did not rebuff them in any way. According to Roberts's brother, when police told her they wanted to search through the house for clues to the homicide, she told the police, "[D]o what you got to do."

{¶ 96} Captain Karl Compton of the Howland police accompanied Detective Monroe to the home of Roberts's brother on the morning after the murder, at which time Roberts signed the consent form to search the residence and both of the vehicles. According to Detective Monroe, Roberts was very positive about the consent to search and again said, "[D]o whatever you have to do."

{¶ 97} In light of such testimony, the trial court denied Roberts's motion to suppress. The court found that Roberts "repeated the request for the police to find the killer, and there was every reason for the police to take her actions as a request for them to search for evidence. It was reasonable to imply Ms. Roberts [sic] consent to do so. This is reinforced by Ms. Roberts agreeing in writing later on * * * for the police to re-search the house."

{¶ 98} The law in this area is settled. When police conduct a warrantless search, the state bears the burden of establishing the validity of the search. Searches and seizures without a warrant are "*per se* unreasonable" except in a few well-defined and carefully circumscribed instances. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564. Accord *Payton v. New York* (1980), 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639. It is equally well established, however, that a search of property without a warrant or

15

SUPREME COURT OF OHIO

probable cause but with proper consent having been voluntarily obtained does not violate the Fourth Amendment. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854; *State v. Posey* (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61.

{¶ 99} The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041, 36 L.Ed.2d 854. The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect. *Florida v. Jimeno* (1991), 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297.

{¶ 100} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, [20], 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8.

{¶ 101} We hold that the evidence here adequately supports the trial court's finding that Roberts gave unlimited consent to search the premises of her home. Roberts told Detective Monroe, "[D]o whatever" must be done and to "[D]o what you have to do" in searching the premises. Although Roberts was described as being in a fluctuating emotional state when the consent to search was

16

January Term, 2006

requested initially, nothing suggests that her state of mind precluded her ability and desire to confer unconditional permission to search.

{¶ 102} A reasonable person in Detective Monroe's position would have understood Roberts's statement, "Do whatever you have to do, search the whole place, just find the [killer]," as permitting voluntary consent to an unlimited search of the residence, including the attached garage where Roberts's car was parked. *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801, 114 L.Ed.2d 297. Indeed, when police contacted Roberts hours later at her brother's home, she repeated her permission for police to "do whatever [they] have to do" and signed a written consent to search the home and both automobiles. Other courts in similar circumstances have held that consent to search a residence and attached garage encompasses a search of a car found in the garage. See *United States v. Percival* (C.A.7, 1985), 756 F.2d 600, 612-613 (a warrant to search a residence and attached garage authorizes the search of a car found inside the garage); *United States v. Quiroz* (D.Minn.1999), 57 F.Supp.2d 805, 820-821 (voluntary consent to search a residence and attached garage includes the car parked in the garage). Accord *United States v. Caudill* (C.A.6, 2001), 25 Fed.Appx. 349, 353, 2001 WL 1671075. We find such decisions persuasive here.

{¶ 103} Based on the totality of the circumstances presented, we conclude that Roberts gave clear, open-ended permission to the police to search the premises and that her consent extended to the garage and the vehicle therein. The trial court properly denied the motion to suppress. Accordingly, we overrule this claim of error.

*Voir Dire Issues*

{¶ 104} In proposition of law three, Roberts contends that in failing to excuse two prospective jurors because of their alleged bias and inability to fairly consider a life-sentence option, the trial court erred.

17

SUPREME COURT OF OHIO

{¶ 105}  R.C. 2313.42(J) contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." R.C. 2313.43; see *State v. Cornwell* (1999), 86 Ohio St.3d 560, 563, 715 N.E.2d 1144; *State v. Allard* (1996), 75 Ohio St.3d 482, 495, 663 N.E.2d 1277.

{¶ 106}  Trial courts have discretion in determining a juror's ability to be impartial, *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323, and such a ruling "will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576. Accord *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646. With these standards in mind, we turn to the specific claims raised by Roberts.

{¶ 107}  Alleging that one venireman, Andrew Kotwis, was unable to fairly consider a life sentence, Roberts asserts that the trial court abused its discretion in overruling her challenge to him for cause. Her claim is predicated largely on statements that the prospective juror made indicating that he would consider sympathy for the survivors in deciding whether to vote for a life sentence or the death penalty. A review of the transcript of the voir dire examination of Kotwis affords perspective and context.

{¶ 108}  Kotwis stated that he would "[a]bsolutely" consider all sentencing options. He admitted that he believed that the death penalty provides comfort and solace to the survivors and that sympathy or comfort for the survivors would factor into his decision whether to vote for life or death. But after the trial court instructed Kotwis that sympathy could not be a determining factor in whether to vote for a death sentence, he agreed to obey the instruction. Moreover, Kotwis "[a]bsolutely" agreed with defense counsel that he would

18

January Term, 2006

consider all sentencing options equally and that no option would "start with a leg up over the other."

{¶ 109} In failing to dismiss Kotwis for cause, the trial court observed that Kotwis "rehabilitated himself" in his answers to the follow-up questions described. In these circumstances, we find no abuse of discretion on the part of the trial court in denying Roberts's request to discharge him for cause. Although Kotwis gave some answers that could be construed as ambiguous, he ultimately stated that he would consider all sentencing options equally. His credibility in making such statements was a matter for the trial judge. *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 ("Deference must be paid to the trial judge who sees and hears the juror"). Roberts fails to demonstrate that we should disturb that finding.

{¶ 110} Roberts next asserts that the trial court abused its discretion in failing to excuse prospective juror Michael Blake, who expressed what Roberts characterizes as a fixed impression of her guilt. During the voir dire examination, Blake initially declared that from what he had read in the news, "they must have had a good reason to arrest [Roberts] * * *. [T]here must be some truth."

{¶ 111} Blake's statements must also be considered in a larger context, however. In other statements, Blake stated that he could set aside anything he had read or heard and that he would consider the case solely on the evidence presented and the court's instructions. Blake conceded that although he believes mass murderers such as Ted Bundy should automatically get the death penalty, every case is different, and he did not presume anyone guilty. And at the conclusion of questioning, Blake reiterated that he would set aside everything he had read or heard about the case and make up his mind solely on the facts presented during trial. The trial court did not abuse its discretion in refusing to excuse prospective juror Blake for cause.

19

SUPREME COURT OF OHIO

{¶ 112} Roberts claims that she suffered prejudice because she was "forced" to reserve her final peremptory challenge to prevent the impanelment of Kotwis and Blake, who were next in the venire to be seated in the jury box. She also asserts that she was prejudiced by using the two peremptory challenges allotted for alternate jurors to strike Kotwis and Blake. Given our conclusion that there is no showing that the trial court abused its discretion in rejecting her claims to remove Kotwis and Blake for cause, we reject these contentions.

{¶ 113} Our conclusion is not affected by the fact that an alternate juror was seated on the jury during trial when one juror had to be removed because of an ailment. We have held that a defendant may claim prejudice when she unsuccessfully challenges a venireman for cause and that venireman would have been seated as an alternate juror if the defense had not exercised a peremptory challenge. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61, fn. 1; see, also, *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 61; *State v. Tyler*, 50 Ohio St.3d at 31-32, 553 N.E.2d 576. But implicit in that rule is the requirement of a finding that the trial court should have excused the juror for cause. *Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61, quoting *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144 ("Ohio law recognizes that 'where the defense exhausts its peremptory challenges before the full jury is seated, *the erroneous denial* of a challenge for cause in a criminal may be prejudicial' "). (Emphasis added.) Here, we have already concluded that the trial court did not abuse its discretion in failing to sustain the challenges for cause raised against the veniremen.

{¶ 114} Moreover, Roberts fails to show that any of the jurors ultimately seated were other than impartial. Thus, she fails to demonstrate a violation of the Due Process Clause of the United States Constitution. See *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682. Accordingly, we reject Roberts's

20

January Term, 2006

suggestion that there was error in the trial court's decisions in empaneling the jury.

*Change of Venue*

{¶ 115}  In proposition of law seven, Roberts attacks the trial judge's decision to deny her motion for a change of venue.  In support of her contentions, Roberts points to pervasive pretrial publicity regarding the murder, Jackson's trial (which occurred only months prior to her own trial), and the state's theory of her complicity in the murder.  Although there may have been a great deal of publicity about the murder and Jackson's trial in Trumbull County, we do not agree that Roberts shows that media coverage of the murder so saturated the county and influenced the potential venire that she was deprived of a fair trial.

{¶ 116}  A trial court's ruling on a motion for a change of venue pursuant to Crim.R. 18(B) will not be disturbed on appeal unless the court abused its discretion.  See, e.g., *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710. We have long held that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community.  See *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 35; *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710; *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

{¶ 117}  A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually biased.  *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996.  Pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial.  *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.  Only in rare cases may prejudice be presumed.  *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

21

SUPREME COURT OF OHIO

{¶ 118} We have held that extensive voir dire helps to eliminate any negative effect arising from the pretrial publicity, *Lundgren*, 73 Ohio St.3d at 479-480, 653 N.E.2d 304, and the trial court here engaged in such an effort. The trial court held Roberts's motion to change venue in abeyance in order to determine whether pretrial publicity tainted the jury pool. It then conducted a thorough voir dire, as evidenced by the facts that voir dire took a month to complete and encompasses more than 20 volumes and approximately 4,700 pages of transcript. Near the conclusion of voir dire, the trial court overruled the motion to change venue, stating: "[T]he Court feels very comfortable that this case can be fairly tried in this county * * *."

{¶ 119} To support her claim that fairness was lacking and that pretrial publicity impaired the trial court's ability to seat an impartial jury, Roberts cites the voir dire of seven prospective jurors. However, four of these prospective jurors never sat on the final panel, so prejudice to Roberts is not shown. *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 120} Nor does the fact that three jurors had heard about some aspects of the case prior to trial necessarily reflect bias or lack of impartiality. See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 37-41; *State v. Bies* (1996), 74 Ohio St.3d 320, 324, 658 N.E.2d 754. Moreover, defense counsel passed for cause on those three jurors and did not exercise a peremptory challenge on any of them, even though Roberts had remaining peremptory challenges at the time those jurors were seated. As we observed in a similar situation: "The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's exposure to pretrial publicity once voir dire was completed." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37. So, too, here.

22

January Term, 2006

{¶ 121}  Accordingly, we hold that there is not a sufficient showing that the trial court abused its discretion in denying Roberts's motion for change of venue. See *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 30.  We reject Roberts's claim to the contrary.

TRIAL ISSUES

*Sufficiency of Evidence*

{¶ 122}  Roberts argues in proposition of law four that the evidence at trial did not sufficiently establish the theft element of aggravated robbery and the corresponding capital specification.

{¶ 123}  When we review a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.  "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.  A verdict will not be disturbed on appeal on sufficiency grounds unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096.

{¶ 124}  In her effort to show that the evidence was insufficient to demonstrate theft, Roberts points out that Fingerhut's wallets, one of which contained large amounts of money, were found with his body after the murder. She then challenges the state's theory that the theft element was established by Jackson's use of Fingerhut's car to escape.

{¶ 125}  In her latter analysis, Roberts does not deny that Jackson drove away from the crime scene in Fingerhut's car.  Indeed, the evidence shows that

23

SUPREME COURT OF OHIO

Jackson shot Fingerhut and drove from the scene in Fingerhut's automobile. Rather than attacking the facts, Roberts argues the law.

{¶ 126} Roberts claims that the taking of the car does not constitute a theft offense because Jackson did not keep the car or try to sell it, but rather, merely drove it to Youngstown and abandoned it with the keys inside. In other words, she claims that because Jackson merely used the vehicle as a means of escape, taking it cannot constitute a theft offense. We reject that assertion.

{¶ 127} The evidence established that Jackson asserted control over the keys to Fingerhut's car and the car itself. He therefore deprived Fingerhut of that property. See *State v. Biros* (1997), 78 Ohio St.3d 426, 450, 678 N.E.2d 891. The fact that Jackson did not keep or sell the car for financial gain does not matter; the only purpose required for theft is "purpose to deprive the owner of [the] property" in question. R.C. 2913.02(A).

{¶ 128} Roberts next challenges the conviction with a contention that there is no evidence that Jackson formed the intent to take Fingerhut's automobile until after he murdered Fingerhut. Assuming purely arguendo that the evidence supports such a conclusion (and we think it does not), the claim fails.

{¶ 129} We repeatedly have rejected the argument that there is no aggravated robbery when the victim's property is taken after he is murdered. "[T]he victim of a robbery, killed just prior to the robber's carrying off [his] property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching [him] die, and then stealing [his] property after the death." *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510. Accord *State v. Rojas* (1992), 64 Ohio St.3d 131, 139, 592 N.E.2d 1376.

{¶ 130} The evidence was sufficient to support a finding that the killing was associated with the aggravated robbery of Fingerhut's keys and car as part of

24

January Term, 2006

one continuous occurrence, see *State v. Williams* (1996), 74 Ohio St.3d 569, 577, 660 N.E.2d 724, and we hold the evidence sufficient to support the jury's verdict beyond a reasonable doubt on the essential elements of aggravated robbery, R.C. 2911.01, and on the R.C. 2929.04(A)(7) capital specification, aggravated robbery in connection with aggravated murder.

### Jury Instructions

{¶ 131} In proposition of law 11, Roberts contends that the trial court erred in instructing the jury on reasonable doubt based on the statutory definition of R.C. 2901.05. During trial, however, she failed to object to the instruction on the basis asserted here. She thus waives all but plain error, *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus, and we find no such error. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus.

### SENTENCING ISSUES

### Waiver of Mitigation

{¶ 132} In proposition of law one, Roberts contends that a waiver of mitigation evidence is not valid unless the defendant is informed that the waiver will result in the death penalty. In addition, Roberts submits that such a waiver is invalid if the defendant intends to present any mitigation evidence in any form.

{¶ 133} At the outset of the mitigation phase, Roberts informed her counsel that she did not wish to present any mitigating evidence to the jury except an unsworn statement. During the ensuing in camera hearing on this issue, the court explained to Roberts the purpose of the mitigation phase and her right to present mitigation evidence. The judge then inquired as to whether Roberts had instructed her attorneys not to present such evidence; she confirmed that the court's understanding was correct. Roberts explained to the trial judge that she

25

SUPREME COURT OF OHIO

had talked with her attorneys, family, and friends before declaring, "I know what I am doing. I explained to everyone that cares why I am doing it."

{¶ 134}  Trial counsel described for the judge the evidence that could be presented in mitigation. Counsel noted that professionally and personally, he disagreed with Roberts's decision not to present such evidence but that he believed her competent and that the decision was the product of rational thought.

{¶ 135}  The court then heard from Dr. Thomas Eberle, a psychologist who had evaluated Roberts earlier during the prosecution and who did so again just prior to the hearing. Dr. Eberle testified that Roberts's decision to forgo presentation of mitigating evidence was rational. He further found that she suffered no psychiatric or psychological abnormality that would prohibit a rational decision regarding presentation of mitigating evidence.

{¶ 136}  Having heard the foregoing testimony, the trial court specifically inquired of Roberts whether she understood that "by waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty." Roberts replied: "That is what I hope for. * * * I know what I am doing and I know why. Thank you for asking." The court then found that the decision to forgo mitigation evidence was a voluntary one made without any reluctance, that Roberts had reiterated that decision repeatedly, and that she appeared relieved to have made it. The court found that Roberts understood that her decision was irrevocable, and it accepted her decision to forgo the presentation of mitigation evidence.

{¶ 137}  Roberts later presented an unsworn statement to the jury. In that statement, she told the jury that she would not provide any mitigating evidence. She then said, "You are bound by law to give me one sentence, the death penalty. You have no other choice. That is what I'm asking you to do, because that is the right thing to do." She reiterated that objective after the trial court sentenced her to death.

26

January Term, 2006

{¶ 138} With this factual background in mind, we turn to the law.

{¶ 139} The United States Supreme Court has never suggested that the Eighth Amendment requires forcing an unwilling defendant to present mitigating evidence in a capital case. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706 N.E.2d 1231. No societal interest counterbalances the defendant's right to control his or her own defense. *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576.

{¶ 140} We have held that a defendant is entitled to decide what she wants to argue and present as mitigation in the penalty phase, see, e.g., *Jenkins*, 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973, including the decision to present no evidence. Ohio's death-penalty statute itself confers "great latitude" on a defendant in such decisions. R.C. 2929.04(C). See, also, *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47. Roberts was entitled to present no mitigation evidence.

{¶ 141} Her contention that she did not fully understand the ramifications of her decision and that the trial judge did not sufficiently inquire of her in that regard is belied by the record. As set forth above, the record clearly establishes that the trial judge specifically addressed the likelihood of the jury's imposing a death sentence if Roberts failed to present mitigating evidence and that she understood that a death sentence was the probable outcome. In fact, Roberts asked the jury to impose that sentence. We reject her claim that she did not understand that the waiver would yield such a result.

{¶ 142} We now turn to Roberts's suggestion that her waiver of the right to present mitigation evidence was not a complete waiver.

{¶ 143} Roberts contends that she entered only a "partial waiver" because she gave an unsworn statement and that a partial waiver does not constitute a valid waiver. Roberts cites no decision to support her assertion, nor are we aware of any such authority. We do recognize, however, our prior holding in *State v.*

27

SUPREME COURT OF OHIO

*Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 72-76, in which we concluded that the requirements of *Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus, do not apply when a defendant makes an unsworn statement and presents minimal evidence in mitigation. Our emphasis in *Ashworth* was to require an inquiry of "a defendant only in those situations where the defendant chooses to present *no* mitigating evidence whatsoever." (Emphasis added.) *Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 74. Here, Roberts presented an unsworn statement. An unsworn statement can constitute critical mitigating evidence. See *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, at ¶ 64; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 110. *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 50. We decline to extend *Ashworth* to the context Roberts presents.

{¶ 144}  Moreover, we have never held that a partial waiver of the right to present mitigating evidence is an invalid exercise of that right.  To the contrary, we have upheld the death sentences in several cases in which the defendant chose to present only an unsworn statement to the jury in mitigation. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 113-114; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 22; *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576; *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47.

{¶ 145}  In any event, the record reflects that the trial judge complied with the *Ashworth* requirements.  We reject Roberts's claims of error in the trial court's decisions with respect to her decision to waive mitigating evidence.

*Effective Assistance*

{¶ 146}  Similarly, in proposition of law eight, to the extent that Roberts argues that trial counsel were ineffective for failing to properly advise her and

28

January Term, 2006

ensure that she understood the ramifications of her waiver of her right to present mitigating evidence, her claim fails.

{¶ 147} Reversal of a conviction for ineffective assistance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 148} We again reject Roberts's contentions that she did not understand the full ramifications of waiving her right to present and argue mitigation evidence. The record shows that Roberts understood what she was doing when she decided to present only her unsworn statement during the mitigation hearing. The record also establishes that the trial court explained sufficiently the ramifications of that decision, that Roberts essentially told the trial court that she was not presenting additional mitigating evidence because she wanted to be given a death sentence, and that she disregarded her attorneys' advice and instead directed them not to present any mitigating evidence beyond her unsworn statement. An attorney does not render ineffective assistance by declining, in deference to a client's desires, to present evidence in mitigation. See, e.g., *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *State v. Cowans* (1999), 87 Ohio St.3d 68, 81, 717 N.E.2d 298; *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47. Her claims that counsel was constitutionally ineffective fail.

*Cumulative Error*

{¶ 149} Although Roberts claims in proposition of law 12 that a combination of errors by the trial court and prosecution and ineffectiveness of counsel deprived her of a fair trial, she offers no analysis of substance to support

29

SUPREME COURT OF OHIO

those claims. She thus fails to demonstrate that she was denied a fair trial. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103.

### Jury Instructions

{¶ 150} Roberts asserts in proposition of law ten that it was error for the trial court to use the term "recommendation" in its sentencing instructions to the jury. The term "recommendation" in a jury instruction, however, accurately reflects Ohio law and does not constitute prejudicial error. *State v. Clemons* (1998), 82 Ohio St.3d 438, 444, 696 N.E.2d 1009; *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 651 N.E.2d 965.

### Proportionality Review

{¶ 151} We summarily reject Roberts's challenges in proposition of law 13 to Ohio's system of proportionality review in light of our precedent. See *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 86; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383.

### Constitutionality

{¶ 152} We summarily reject Roberts's various constitutional claims in proposition of law 14. See, e.g., *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *State v. Carter* (2000), 89 Ohio St.3d 593, 608, 734 N.E.2d 345; *State v. Gumm* (1995), 73 Ohio St.3d 413, 417-418, 653 N.E.2d 253; *State v. Henderson* (1988), 39 Ohio St.3d 24, 29, 528 N.E.2d 1237; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598; *State v. Buell* (1986), 22 Ohio St.3d 124, 135-142, 22 OBR 203, 489 N.E.2d 795; and *State v. Jenkins*, 15 Ohio St.3d at 167-178, 15 OBR 311, 473 N.E.2d 264.

### Sentencing Opinion

{¶ 153} Having disposed of the substantial majority of Roberts's claims, we now turn to a critical one. In proposition of law six, Roberts asserts that the

30

January Term, 2006

trial court erred in allowing the prosecutor to assist in drafting the court's sentencing opinion. The claim arises from the facts that follow.

{¶ 154} At the sentencing hearing, the court read aloud its sentencing opinion and imposed the death penalty on Roberts. As the court was doing so, defense counsel noticed that the prosecutor was looking at a document and appeared to be reading along with the trial judge. At the end of the court's reading, defense counsel raised a "vehement" objection to the prosecution's apparent ex parte involvement with the sentencing opinion.

{¶ 155} The trial judge conceded that the prosecution had participated in the drafting of the opinion without the knowledge of defense counsel. The trial judge stated that he had given notes to the prosecutor and had instructed the prosecutor, "[T]his is what I want." The court added that the opinion had to be corrected six or seven times. The trial judge apologized to defense counsel for not providing them with a copy of the opinion before the sentencing hearing.

{¶ 156} R.C. 2929.03 governs the imposition of sentences for aggravated murder. R.C. 2929.03(F) clearly contemplates that the trial court itself will draft the death-sentence opinion: "*The court* * * * when it imposes sentence of death, *shall state* in a separate opinion *its* specific findings as to the existence of any of the mitigating factors * * *, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors * * *." (Emphasis added.)

{¶ 157} Our prior decisions have stressed the crucial role of the trial court's sentencing opinion in evaluating all of the evidence, including mitigation evidence, and in carefully weighing the specified aggravating circumstances against the mitigating evidence in determining the appropriateness of the death penalty. For example, in *State v. Green* (2000), 90 Ohio St.3d 352, 360, 738 N.E.2d 1208, we vacated the death penalty because the trial court's sentencing

31

SUPREME COURT OF OHIO

opinion "was constitutionally deficient."   There, the trial court's sentencing opinion "improperly considered nonstatutory aggravating circumstances, and failed to consider relevant mitigating evidence."  Id.  We concluded that "the collective deficiencies in the trial court's decision to impose the death penalty, as reflected in the sentencing opinion, undermine our confidence in that decision. * * * These cumulative errors reflect grievous violations of the statutory deliberative process."  Id. at 363-364, 738 N.E.2d 1208.

{¶ 158}  Similarly, in *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925, we vacated the death sentence because of grievous errors in the trial court's sentencing opinion.  In *Davis*, we noted, "[T]he General Assembly has set specific standards in the statutory framework it created to guide a sentencing court's discretion 'by requiring examination of *specific factors* that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' "  (Emphasis sic.)  Id. at 372-373, 528 N.E.2d 925, quoting *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913.

{¶ 159}  In this case, our confidence in the trial court's sentencing opinion is undermined by the fact that the trial judge directly involved the prosecutor in preparing the sentencing opinion and did so on an ex parte basis.  The trial judge is charged by statute with the sole responsibility of personally preparing the opinion setting forth the assessment and weight of the evidence, the aggravating circumstances of the murder, and any relevant mitigating factors prior to determining what penalty should be imposed.  The fact that the trial judge provided his notes to the prosecutor to guide the prosecutor in drafting the sentencing opinion does not change the result.  The various drafts of the opinion that ultimately imposed death on Roberts involved the assistance of the prosecutor.

32

January Term, 2006

{¶ 160} The trial court's delegation of any degree of responsibility in this sentencing opinion does not comply with R.C. 2929.03(F). Nor does it comport with our firm belief that the consideration and imposition of death are the most solemn of all the duties that are imposed on a judge, as Ohio courts have also recognized. See *State v. Vrabel* (Mar. 2, 2000), Mahoning App. No. 95 CA 221, 2000 WL 246482, *15 ("The role of this Court in reviewing a death penalty case is codified by statute and defined by the Ohio Supreme Court. It is a duty of immense proportions which we undertake with great solemnity"). The judge alone serves as the final arbiter of justice in his courtroom, and he must discharge that austere duty in isolation. The scales of justice may not be weighted even slightly by one with an interest in the ultimate outcome. Given the prosecutor's direct role in the preparation of the sentencing opinion, we cannot conclude that the proper process was followed here.

{¶ 161} That conclusion is compelled particularly in light of the trial court's ex parte communications about sentencing with the prosecutor in preparing the sentencing opinion. The Code of Judicial Conduct, Canon 3(B)(7) specifies, "A judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding * * *" Both the trial judge and the prosecutor should have known that any ex parte assistance in the preparation of the court's sentencing opinion was wholly inconsistent with these vital ethical constraints. See Disciplinary Rule 7-110(B)(2) and (3).

{¶ 162} The trial court's consultation with the prosecutor, particularly when undertaken without the knowledge or participation of defense counsel, can neither be ignored nor found to be harmless error. Cf. *Gardner v. Florida* (1977), 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information [from a presentence report] which he had no opportunity to deny

33

or explain"). We cannot cure the deficiencies in the preparation of the sentencing opinion by our own independent assessment.

{¶ 163}  The trial court's decision to use the prosecutor in preparing the sentencing opinion constitutes a grievous violation of the statutory deliberative process. It is so severe a violation that independent reweighing cannot serve as an adequate remedy.  See *State v. Green*, 90 Ohio St.3d at 363-364, 738 N.E.2d 1208.  We find that we must vacate the sentence because of the critical constitutional interests and notions of justice that are implicated by the prosecutor's participation in drafting the sentencing opinion.

{¶ 164}  We accordingly sustain Roberts's claim of error in the trial judge's use of the prosecutor to assist directly in the preparation of the sentencing opinion.  Accordingly, we vacate the sentence and remand to the trial court for resentencing as set forth expressly below.

*Allocution Rights*

{¶ 165}  Finally, we turn to Roberts's claim in proposition of law five that the trial court committed reversible error by not affording Roberts the right of allocution before announcing the sentence.

{¶ 166}  Crim.R. 32(A)(1) provides that before imposing sentence in a criminal trial, the trial court shall "address the defendant personally" and ask whether he or she wishes to make a statement on her own behalf or present any information in mitigation of punishment.  Because we have vacated the death sentence and remanded the case, this issue is now moot.  The trial court shall provide Roberts with her right of allocution before imposing any new sentence.

## CONCLUSION

{¶ 167}  Having found no prejudicial error in regard to Roberts's conviction, we affirm the conviction and the judgment of the trial court pertaining to them.  Because of the prejudicial error in sentencing Roberts to death, the sentence of death is vacated, and the cause is hereby remanded to the trial court.

January Term, 2006

On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

<div align="right">Judgment accordingly.</div>

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

––––––––––

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

David L. Doughten and Patricia J. Smith, for appellant.

––––––––––

35

# APPENDIX

[Cite as *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580.]

THE STATE OF OHIO, APPELLEE, *v.* ROBERTS, APPELLANT.

[Cite as *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580.]

*Criminal law—Aggravated murder—Allocution—Death penalty vacated and resentencing ordered.*

[No. 2007-2288—Submitted May 7, 2013—Decided October 22, 2013.]

APPEAL from the Court of Common Pleas of Trumbull County,

No. 01-CR-793.

———————————

O'CONNOR, C.J.

{¶ 1} This is a death-penalty direct appeal as of right. A jury convicted appellant, Donna Roberts, of the aggravated murder of her former husband, Robert Fingerhut, with one death specification. The jury recommended that Roberts be sentenced to death. The trial court accepted that recommendation and sentenced her to death. However, on appeal we vacated the death sentence and remanded to the trial court for resentencing. On remand, the trial court again sentenced Roberts to death. For the following reasons, we are again compelled to vacate Roberts's sentence of death and to remand this case for resentencing.

Facts

{¶ 2} Our previous decision in this case sets forth the facts in detail. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 1-86 ("*Roberts I*"). For purposes of this opinion, we summarize the facts as follows.

{¶ 3} Roberts lived with Robert Fingerhut, her former husband, in Howland Township, Trumbull County. Fingerhut, who operated Greyhound bus terminals in Warren and Youngstown, owned two insurance policies on his life, both of which named Roberts as sole beneficiary. The total benefit of the two policies was $550,000.

SUPREME COURT OF OHIO

{¶ 4} At some point, Roberts began an affair with Nathaniel Jackson.[1] In 2001, the affair was interrupted by Jackson's confinement in the Lorain Correctional Institution.

{¶ 5} While Jackson was in prison, he and Roberts exchanged numerous letters and spoke on the telephone. Prison authorities recorded 18 of their telephone conversations.

{¶ 6} Passages from the Roberts-Jackson correspondence and the recorded phone conversations indicated a plot between the two to murder Fingerhut. Jackson repeatedly pledged to kill Fingerhut upon Jackson's release from prison. In one letter, Roberts complained about Fingerhut's maintaining control of her finances and urged Jackson to "[d]o whatever you want to him ASAP." At Jackson's request, Roberts purchased a ski mask and a pair of gloves for Jackson to use during the murder.

{¶ 7} Jackson was released from prison on December 9, 2001. Roberts drove to Lorain to pick him up, spent that night with him in a motel, and spent much of the next two days with him as well. On December 11, 2001, Fingerhut was shot to death at home.

Indictment, Trial, and Verdict

{¶ 8} Roberts was indicted on two counts of aggravated murder, in violation of R.C. 2903.01(A) (prior calculation and design) and (B) (felony murder). Both counts carried two death specifications under R.C. 2929.04(A)(7): one charging murder during an aggravated burglary and one charging murder during an aggravated robbery. The indictment also charged aggravated burglary, R.C. 2911.11, with a firearm specification, R.C. 2941.145, and aggravated robbery, R.C. 2911.01, also with a firearm specification. The jury found Roberts guilty of all counts and specifications. After trial, the

---

1. Jackson was also convicted of murdering Fingerhut and sentenced to death. *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362.

2

January Term, 2013

state elected to proceed on Count One (prior calculation and design) for sentencing purposes, and the trial court dismissed Count Two (felony murder) and its specifications.

### Sentencing

{¶ 9} Before the mitigation hearing, Roberts informed her counsel that she did not wish to present any mitigating evidence except an unsworn statement. After a hearing pursuant to *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231 (1999), paragraph one of the syllabus, the trial judge determined that Roberts was competent to make that decision.

{¶ 10} At the mitigation hearing, Roberts exercised her right under R.C. 2929.03(D)(1) to make an unsworn statement to the jury. She elected to present no other evidence. In compliance with Roberts's instructions, defense counsel waived opening statement and closing argument. The jury recommended a death sentence, and the trial court sentenced Roberts to death.

### Previous Appeal

{¶ 11} On direct appeal, we affirmed Roberts's convictions of aggravated murder and both death specifications. We also overruled a proposition of law in which Roberts attacked the validity of her waiver of mitigation. However, we vacated the death sentence and remanded the case to the trial court for resentencing because the trial judge had improperly allowed the prosecutor to participate in drafting the sentencing opinion and in doing so, had engaged in ex parte communications with the prosecutor. *Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 153-164. We directed the trial court "to afford Roberts her right to allocute," to "personally review and evaluate the evidence [and] weigh the aggravating circumstances against any relevant mitigating evidence," and to "determine anew the appropriateness of the death penalty." We further instructed the trial court to "personally prepare an entirely new

3

SUPREME COURT OF OHIO

penalty opinion * * * and conduct whatever other proceedings are required by law and consistent with this opinion." *Id.* at ¶ 167.

Sentencing Proceedings on Remand

{¶ 12} On remand, the defense filed a motion to allow Roberts to fully present mitigation at the sentencing rehearing. The trial court denied the motion. However, Roberts proffered her evidence into the record. This consisted of her prison records, a Social Security disability claim file documenting Roberts's head injury after a 1999 motor-vehicle accident, an affidavit by a psychologist giving his preliminary opinion that Roberts suffered from Bipolar Type II Disorder (manic-depressive illness), and a letter about Roberts from her son.

{¶ 13} At a hearing on October 22, 2007, the trial court heard Roberts's allocution. One week later, after asking Roberts if she had anything further to say, and after hearing argument from defense counsel, the trial court sentenced Roberts to death and filed its sentencing opinion pursuant to R.C. 2929.03(F).

{¶ 14} Roberts presents seven propositions of law for our consideration. Her second proposition of law, which claims that the trial court failed to consider her allocution in sentencing her to death, has merit. Accordingly, we sustain it, and we remand this case to the trial court for consideration of Roberts's allocution when weighing the aggravating circumstances and the mitigating factors.

I. Exclusion of Mitigating Evidence on Limited Remand

{¶ 15} In her first proposition of law, Roberts contends that the trial court erred by precluding her from presenting mitigating evidence on remand.

{¶ 16} Before the resentencing hearing, Roberts filed a motion to allow her to present mitigation at the resentencing hearing. In her motion, Roberts argued that she was entitled to "fully develop her mitigation for the evaluation of [the trial court] at her sentencing re-hearing." The trial court denied the motion.

4

January Term, 2013

{¶ 17} After the motion was denied, the defense proffered the following four items, which would have been adduced in mitigation had the trial court granted the motion:

{¶ 18} (1) Roberts's prison records, which document her bipolar disorder, depression, and an incident of hallucination during her time in prison.

{¶ 19} (2) A file documenting a Social Security disability claim that Roberts had filed after being injured in a 1999 motor-vehicle accident. This file also contains a diagnosis that Roberts suffered from a bipolar disorder.

{¶ 20} (3) An affidavit by James Eisenberg, Ph.D., a psychologist, who had reviewed Roberts's records and formed a preliminary opinion that Roberts suffered from Bipolar Type II Disorder, also known as manic-depressive illness, probably beginning in childhood. According to Dr. Eisenberg, this disorder "causes unusual shifts in a person's mood, energy, and ability to function." Its symptoms include poor judgment; aggressive behavior; extreme irritability; inappropriate, intense, or uncontrolled anger; and "frantic efforts to avoid abandonment, either real or imagined."

{¶ 21} (4) A letter from Michael Raymond, Roberts's son, extolling his mother's character, setting forth some of the history of her life before the murder, and pleading that her life be spared.

{¶ 22} Roberts contends that the trial court's refusal to consider this proffered evidence before resentencing her violated the Eighth Amendment.

A. Roberts's Eighth Amendment Claim

{¶ 23} It is a well-established tenet of Eighth Amendment jurisprudence that the sentencer in a capital case may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis sic.) *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Moreover, "[j]ust as the State

5

SUPREME COURT OF OHIO

may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." (Emphasis sic.) *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). *See also Hitchcock v. Dugger*, 481 U.S. 393, 398-399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

{¶ 24} In *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the court held that a capital defendant had an Eighth Amendment right to introduce, at his sentencing hearing, "testimony * * * regarding his good behavior during the over seven months he spent in jail awaiting trial." Such evidence was "relevant evidence in mitigation" because

> the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison. * * * [T]here is no question but that such inferences would be "mitigating" in the sense that they might serve "as a basis for a sentence less than death." * * * [E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings,* such evidence may not be excluded from the sentencer's consideration.

*Id.* at 4-5, quoting *Lockett* at 604.

{¶ 25} Roberts contends that the trial court committed constitutional error by denying her motion to allow full presentation of mitigation at the resentencing, because the Eighth Amendment—as interpreted in *Lockett*, *Eddings*, and *Skipper*—entitled her to introduce mitigating evidence before the trial judge on remand.

6

January Term, 2013

{¶ 26} We rejected a similar claim in *State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192 (1992) ("*Davis II*"). Davis had been tried to a three-judge panel and sentenced to death in 1984. *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925 (1988) ("*Davis I*"). On Davis's initial appeal, we "affirmed [his] conviction, but * * * reversed [his] death sentence based upon errors which occurred after all available mitigating evidence had been heard in the penalty phase of [his] trial." *Davis II* at 44. We then remanded the case to the original three-judge panel for a resentencing hearing. *Id.*

{¶ 27} At the hearing on remand, the trial court did not permit Davis to introduce evidence concerning his adjustment to prison life after his conviction and sentencing. Nor was Davis permitted to present expert testimony providing a " 'psychological update' " covering the period since his conviction and sentencing. *Id.* Instead, the panel "limit[ed] its consideration to the evidence presented in mitigation at appellant's 1984 trial" and reimposed the death sentence on Davis. *Id.* at 44-45.

{¶ 28} We affirmed, rejecting Davis's argument that *Lockett*, *Eddings*, *Skipper*, and *Hitchcock* entitled him to a new sentencing hearing. We distinguished *Skipper* by noting that it involved the erroneous exclusion of "evidence of Skipper's good prison record *between his arrest and trial*." (Emphasis sic.) *Id.* at 46. In contrast,

> no relevant mitigating evidence was excluded from consideration
> by the panel during the mitigation phase of appellant's 1984 trial.
> All mitigating evidence which was available at that time was duly
> received and considered by the panel including appellant's ability
> to adjust to prison life. That same relevant evidence was again
> received and considered by the panel in 1989 for purposes of
> resentencing appellant. The evidence excluded from consideration

7

SUPREME COURT OF OHIO

* * * at appellant's resentencing hearing concerned certain *post-trial* matters.

(Emphasis sic.) *Id.*

{¶ 29} We considered the same issue in *State v. Chinn*, 85 Ohio St.3d 548, 709 N.E.2d 1166 (1999). In *Chinn*, the defendant was sentenced to death after a jury trial. The court of appeals determined, however, that the trial judge had committed errors in performing his functions under R.C. 2929.03(D)(3) and (F)— i.e., in his independent evaluation of the sentence and in writing the sentencing opinion. The court of appeals affirmed the trial court's judgment as to all other issues.

{¶ 30} Like the appellant in *Davis*, Chinn argued that *Lockett, Skipper,* and *Hitchcock* entitled him to present new mitigating evidence on remand. We again rejected that argument:

> [E]ach of those cases involved a situation where the capital sentencer was prohibited, in some form or another, from considering relevant mitigating evidence at trial. * * * [N]o relevant mitigating evidence was ever excluded from consideration during the penalty phase of [Chinn's] 1989 trial. Therefore, the case at bar is clearly distinguishable from * * * *Lockett, Skipper,* and *Hitchcock.* Accordingly, as was the case in *State v. Davis* (1992), 63 Ohio St.3d 44, 46, 584 N.E.2d 1192, 1194-1195, we find *Lockett, Skipper,* and *Hitchcock* to be inapplicable here. It is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation

8

January Term, 2013

> phase of his 1989 trial. In this case, as in *Davis,* the errors
> requiring resentencing occurred after the close of the mitigation
> phase of the trial. Under these circumstances, the trial court is to
> proceed on remand from the point at which the error occurred.

*Chinn* at 564-565.

{¶ 31} Since our decision in *Chinn*, the United States Court of Appeals for the Sixth Circuit has addressed this issue in habeas corpus proceedings involving the *Davis* case. In *Davis v. Coyle*, 475 F.3d 761 (6th Cir.2007), the Sixth Circuit held that the three-judge panel's decision to exclude posttrial mitigation evidence from Davis's resentencing hearing violated his Eighth Amendment rights and that our affirmance of that ruling in *Davis II*, "based on the court's belief that the facts of Davis's case could be distinguished from *Skipper*'s solely on the basis of timing, was both an unreasonable application of the decision in *Skipper* and contrary to the holding in that opinion and its antecedent cases." *Id.* at 773.

{¶ 32} *Coyle* states that "the holding in *Skipper* that a defendant 'be permitted to present any and all relevant mitigating evidence that is available' * * * requires that, at resentencing, a trial court must consider any new evidence that the defendant has developed since the initial sentencing hearing." *Id.* at 774, quoting *Skipper*, 476 U.S. at 8, 106 S.Ct. 1669, 90 L.Ed.2d 1. *Accord Creech v. Arave*, 947 F.2d 873, 881-882 (9th Cir.1991) (en banc); *Sivak v. State*, 112 Idaho 197, 199-203, 731 P.2d 192 (1986). *See also Spaziano v. Singletary*, 36 F.3d 1028, 1032-1035 (11th Cir.1994) (assuming, without discussion, that *Lockett* requires a trial court to allow new evidence on remand); *State v. Tison*, 160 Ariz. 501, 502, 774 P.2d 805 (1989) (case remanded for resentencing; remand order specified, without discussion, that "[e]ither party may offer additional evidence of aggravation or mitigation applicable in each case as of the time of the hearing").

9

SUPREME COURT OF OHIO

{¶ 33} As the state points out, we are "not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court." *State v. Burnett*, 93 Ohio St.3d 419, 424, 755 N.E.2d 857 (2001). Hence, we are not obliged to follow *Coyle*. We are, however, free to consider whether *Coyle* is persuasive and whether it is on point in this case.

{¶ 34} We begin by noting, as we did in *Davis II* and *Chinn*, that *Lockett*, *Eddings*, *Skipper*, and *Hitchcock* are all distinguishable from this case. Each case in the *Lockett-Eddings-Skipper-Hitchcock* tetralogy involved the trial court's exclusion of, or refusal to consider, evidence in the original sentencing proceeding. None of these cases involved a proceeding on remand. This case, like *Davis II* and *Chinn*, involves a proceeding on remand for the limited purpose of correcting an error that occurred *after* the defendant had had a full, unlimited opportunity to present mitigating evidence to the sentencer.

{¶ 35} In other words, neither *Lockett* nor any of its progeny required the trial court to reopen the evidence after an error-free evidentiary hearing had already taken place. *See Chinn*, 85 Ohio St.3d at 564-565, 709 N.E.2d 1166. "[T]he issue in this case is whether the presentation of evidence of mitigating * * * factors must be reopened when a death sentence is reversed for a reason unrelated to the presentation of evidence. None of the Supreme Court cases cited by the majority supports that premise." *Coyle*, 475 F.3d at 782 (Gibbons, J., concurring).

{¶ 36} In a case in which the defendant was not deprived of any constitutional right—including her Eighth Amendment right to present mitigation—at the time of her mitigation hearing, there seems to be no basis for requiring the trial court to reopen or supplement that evidence in a later proceeding. To hold, as *Coyle* does, that a new mitigation hearing must be held, even though no constitutional error infected the original one, would transform the

10

January Term, 2013

right to present relevant mitigation into a right to *update* one's mitigation. Such a right has no clear basis in *Lockett* or its progeny.

{¶ 37} Establishing a right to update mitigation could result in arbitrary distinctions between similarly situated capital defendants. A defendant who had an error-free mitigation hearing could not update his mitigation—no matter how compelling the new mitigation that might be available to him—if the trial judge committed no error *after* the mitigation hearing that called for the case to be remanded. But another defendant, whose mitigation hearing was equally free of error, *would* have the right to update his mitigation in the event that a posthearing sentencing error took place that required a remand.

{¶ 38} Furthermore, as we noted in *Davis II*, the right to update mitigation would imply that a capital defendant appealing his death sentence would have a right to present new mitigation to the appellate court. *Davis II*, 63 Ohio St.3d at 46, 584 N.E.2d 1192, fn.2. Under R.C. 2929.05(A), this court (and, in pre-1995 cases, the court of appeals) has the obligation to independently review the death sentence.[2] Hence, a reviewing court could be considered a "sentencer" for *Lockett* purposes.

---

2. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review *and independently weigh* all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. * * * The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, or the supreme court shall affirm a sentence of death *only if the particular court is persuaded from the record* that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case.

(Emphasis added.) R.C. 2929.05(A).

11

SUPREME COURT OF OHIO

{¶ 39} For the foregoing reasons, we adhere to our precedent in *Davis II* and *Chinn*. Accordingly, we reject Roberts's claim that the Eighth Amendment required the trial court to admit Roberts's proffered mitigation.

B. The Trial Court's Compliance with the Remand Order in *Roberts I*

{¶ 40} Having rejected Roberts's Eighth Amendment claim, we will briefly consider certain points not argued by Roberts, but set forth in the concurring and dissenting opinion.

{¶ 41} The concurring and dissenting opinion asserts that by refusing to admit Roberts's proffered mitigation evidence, the trial court failed to comply with the instructions we issued in *Roberts I* when we remanded this case to the trial court for the first time.[3] *Id.* at ¶ 99. The concurring and dissenting opinion interprets *Roberts I* as *ordering* the trial court to hold a new mitigation hearing and to permit Roberts to introduce mitigating evidence.

{¶ 42} *Roberts I* did no such thing. In *Roberts I*, we instructed the trial court as follows:

> On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

---

3. Roberts asserts that our order in *Roberts I* did not *prohibit* the admission of new mitigating evidence on remand, but she does not contend that the order actually *required* the trial court to admit such evidence.

12

January Term, 2013

110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 167.

{¶ 43} The above order says nothing about holding a new evidentiary hearing. Nor is a requirement to hold a new evidentiary hearing implicit in our instructing the trial court to "weigh the aggravating circumstances against any relevant mitigating evidence" and "determine anew the appropriateness of the death penalty." Relevant mitigating evidence may be found in the guilt phase, as well as in the penalty phase. Indeed, R.C. 2929.03(D)(1) *requires* the trial court to consider "any evidence raised at trial" that is relevant "to any factors in mitigation of the imposition of the sentence of death."[4]

{¶ 44} Moreover, the remand order in *Roberts I* must be read against the backdrop of our precedents in *Davis II* and *Chinn*. In *Davis II*, a death sentence had been reversed, and the case remanded for resentencing, because of errors that occurred after mitigating evidence had been heard in the penalty phase. On appeal from remand, we rejected the claim that the trial court had erred by limiting its consideration to the evidence presented in the original mitigation hearing. *Davis II*, 63 Ohio St.3d at 45-46, 584 N.E.2d 1192.

{¶ 45} In *Chinn*, we adhered to *Davis II* and held that when "errors requiring resentencing occurred after the close of the mitigation phase," the correct procedure was for the trial court "to proceed on remand from the point at which the error occurred." *Chinn*, 85 Ohio St.3d at 565, 709 N.E.2d 1166. Indeed, we stated that "the trial court was *required* to proceed on remand from the

---

4. We have repeatedly recognized that the sentencer may glean relevant mitigating evidence from the guilt phase. *See, e.g., State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 80 (quoting R.C. 2929.03(D)(1)); *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 208 ("much of the trial-phase evidence was relevant to * * * the nature and circumstances of the offense, and the mitigating factors"); *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 49 (capital defendant elicited mitigating testimony on cross-examination of prosecution witnesses during the guilt phase of the trial).

13

SUPREME COURT OF OHIO

point at which the errors had occurred, i.e., after the jury had returned its recommendation of death." (Emphasis added.) *Id.* at 564.

{¶ 46} The trial court was bound by those precedents, as well as by our remand order in *Roberts I*. *Roberts I* neither overruled nor modified *Davis II* or *Chinn* and did not order the trial court to hold a new penalty-phase evidentiary hearing,   Thus, *Roberts I* cannot reasonably be understood as imposing a requirement that *Davis II* and *Chinn* had expressly declined to impose.

{¶ 47} The concurring and dissenting opinion also points out that Roberts "proffered four items in mitigation, only one of which dealt with her conduct in prison." *Id.* at ¶ 99.  While this is true, it lends no support to the claim that she should have been allowed a fresh opportunity to submit mitigating evidence on remand.

{¶ 48} As we stated in *Chinn*, "[i]t is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation phase of his 1989 trial." (Emphasis sic.)  *Chinn*, 85 Ohio St.3d at 564-565, 709 N.E.2d 1166.  In *neither* case is a capital defendant entitled to present such evidence on remand when "the errors requiring resentencing occurred after the close of the mitigation phase of the trial." *Id.* at 565.

{¶ 49} Additionally, mitigation evidence pertaining to events that took place before trial could have been presented to the trial court during Roberts's original mitigation hearing in 2003.  Instead of doing so at that time, Roberts expressly and validly waived her right to present mitigation.[5]  Thus, the case for

---

5. In *Roberts I*, we considered and rejected Roberts's claim that the waiver was invalid, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 132-145, and her claim that she did not receive effective assistance of counsel in connection with the waiver, *id.* at ¶ 146-148.

14

January Term, 2013

admitting proffered mitigation involving events that took place before trial is, if anything, weaker than the case for admitting posttrial prison records.

{¶ 50} For all of the foregoing reasons, we overrule Roberts's first proposition of law.

II. The Trial Court's Failure to Consider Roberts's Allocution

{¶ 51} In her second proposition of law, Roberts contends that the trial court failed to consider her allocution in determining the sentence.

{¶ 52} Pursuant to our mandate, the trial judge invited Roberts to make a statement in allocution at the hearing on October 22, 2007, and Roberts did. One week later, on October 29, the trial court imposed sentence and filed its sentencing opinion. Before imposing sentence, the trial court heard a brief statement from Roberts's counsel and asked Roberts if she had anything further to say. The trial court then stated that it had considered the record and the oral statements. The sentencing opinion notes that the trial court had been instructed to provide Roberts with the right of allocution before reimposing a sentence. Beyond this, however, the opinion does not discuss Roberts's allocution.

{¶ 53} Roberts contends that the trial court's failure to discuss the allocution in its opinion shows that the trial court failed to consider her allocution. This alleged failure, Roberts claims, violated the Eighth Amendment's requirement that the sentencer in a capital case consider all relevant mitigation. *See Eddings*, 455 U.S. at 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1.

{¶ 54} We have previously rejected claims that a trial court's failure to *mention* particular mitigating factors in a sentencing opinion obliges a reviewing court to infer that the trial court failed to *consider* those factors. "Appellant erroneously assumes that evidence that is not specifically mentioned in an opinion was not considered. While a sentencing court must consider all evidence of mitigation, it need not discuss each [allegedly mitigating] factor individually."

15

SUPREME COURT OF OHIO

*State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995), citing *Parker v. Dugger*, 498 U.S. 308, 314-315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

{¶ 55} Nevertheless, we conclude that the particular circumstances of this case warrant the inference that the trial judge did, in fact, fail to consider Roberts's allocution in sentencing her to death.

{¶ 56} To begin with, Roberts's allocution was the *only* relevant matter that was specifically placed before the trial court as mitigation. At her original mitigation hearing in 2003, Roberts had elected to present no evidence. Although she had given an unsworn statement before the jury, that statement contained no mitigation; indeed, Roberts had used it to insist that a sentence of death be imposed upon her. *See Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 137 and 148. And although Roberts tried to present mitigating evidence during the proceedings on remand, that attempt was (properly, as we hold today) overruled by the trial court. The trial court did find one mitigating factor in the guilt-phase record.[6] But this merely underscores the fact that *nothing* was placed before the trial court for the specific purpose of mitigating the sentence—except Roberts's statement in allocution.

{¶ 57} And this statement contained much information whose relevance as mitigation was clear. For instance, Roberts stated that she grew up in a "very very abusive" household, in which her father abused her mother physically and verbally and in which "guns came out" at times during household disputes. Roberts claimed that when she was very young, her cousin raped her. Roberts also said that she "always felt empty" because she never received any attention or affection.

---

6. The trial court found, in Roberts's letters to Jackson, indications that Fingerhut "may have been physically abusive to her," which the court considered relevant to the mitigating factors listed in R.C. 2929.04(B)(1) (victim-induced or facilitated offense) and (2) (duress, coercion, or strong provocation). The trial court gave this factor "very slight weight."

16

January Term, 2013

{¶ 58} Roberts recounted a long history of motor-vehicle accidents and resulting injuries, including injuries to her head, that she claimed affected her mental health. In 1963, 1983, and 1999, Roberts said, she was involved in accidents serious enough to put her in the hospital. After the 1963 accident, she said, she was "spacey for awhile." In the 1983 collision, she was thrown through a windshield. She went to a neurosurgeon for many months after that accident.

{¶ 59} In 1999, Roberts was involved in an accident that demolished her car. Roberts remembered being in the hospital, but after that she could not remember anything "for a long time." Roberts said that Fingerhut "was really worried" about her because she was acting "spacey" and "goofy." After this last accident, Roberts stated, she suffered from depression. She attempted suicide and was hospitalized in a psychiatric ward. She suffered from auditory hallucinations that were successfully treated with Risperdal.[7]

{¶ 60} After the suicide attempt, Roberts began falling down repeatedly, hitting her head, and losing track of what day it was. Eventually, Roberts said, Fingerhut made her "go to Social Security," and she was sent to a psychiatrist.

{¶ 61} In her allocution, Roberts also cited examples of her selflessness and contributions to society. Roberts worked "almost 23 years" in a plastic surgeon's office and "helped a lot of people" during that time. She also volunteered to go to Israel, along with her employer, to treat wounded soldiers. She recounted how, after her conversion to Judaism, she had raised funds to rescue a person from Ethiopia who was in danger of being murdered for his religious beliefs. She said that when she ran the restaurant in the bus terminal, she gave food and money to people who were short of money at the end of the month. She also gave several thousand dollars to help her sisters and her son.

---

7. According to Roberts, when she went to prison and stopped taking Risperdal, she hallucinated "giant anthills."

17

SUPREME COURT OF OHIO

{¶ 62} *Lockett* explains that the category of relevant mitigating factors includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. A court may "exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 605, fn. 12. *See also Brown v. Payton*, 544 U.S. 133, 149-150, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005) (Souter, J., dissenting) ("it was settled law that a capital defendant has a plenary right to present evidence going to any aspect of [the defendant's] character, background, or record * * * that might justify a sentence less than death"); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The information contained in Roberts's allocution was clearly relevant under this definition.

{¶ 63} We note, too, that our opinion in *Roberts I* specifically called the matter of allocution to the attention of the trial judge. When we remanded this case to the trial court, we did so with the following instruction: "The trial court shall provide Roberts with her right of allocution before imposing any new sentence."[8] *Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 166.

{¶ 64} When we consider the presence of relevant and potentially significant mitigation in Roberts's allocution, the utter lack of anything else offered for the specific purpose of mitigation, and our order specifically calling the matter of allocution to the trial judge's attention, we can hardly conclude that the trial court's failure to mention the allocution in its sentencing opinion was a mere oversight. Given these unusual circumstances, we are justified in drawing

---

8. In the original appeal, Roberts alleged that she had not been asked whether she wished to make a statement in allocution and that this omission violated Crim.R. 11. Because we had vacated Roberts's original death sentence on other grounds, we held her allocution claim moot. *Roberts I* at ¶ 165-166.

18

January Term, 2013

the inference that when the trial judge weighed the aggravating circumstances against the mitigating factors, he did not consider Roberts's allocution.[9]

{¶ 65} This failure violated the Eighth Amendment. Unquestionably, the allocution contained information relevant to mitigation. That information (unlike the evidence discussed in relation to Roberts's first proposition of law) was properly before the court. The court could not, therefore, refuse to consider it.[10] "The sentencer * * * may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." *Eddings*, 455 U.S. at 114-115, 102 S.Ct. 869, 71 L.Ed.2d 1.

{¶ 66} Our decisions have acknowledged the importance of allocution in capital cases. In *State v. Campbell*, 90 Ohio St.3d 320, 323-326, 738 N.E.2d 1178 (2000), and *State v. Green*, 90 Ohio St.3d 352, 358-360, 738 N.E.2d 1208 (2000), we remanded capital cases for resentencing because the trial courts had failed to comply with Crim.R. 32(A)(1). "Trial courts must painstakingly adhere to Crim.R. 32, guaranteeing the right of allocution. A Crim.R. 32 inquiry is much more than an empty ritual: it represents a defendant's last opportunity to plead his case or express remorse." *Green* at 359-360. In a capital case, the denial of allocution can undermine the "constitutional reliability" of a death sentence. *Id.* at 360.

{¶ 67} We recognize, as the dissent notes at ¶ 114, that the allocution under Crim.R. 32(A)(1) is unsworn and thus may not technically amount to evidence. *See* Evid.R. 603 (witness testimony must be preceded by oath or

---

9. The dissent suggests that drawing this inference is inconsistent with *Phillips*. Dissenting opinion at ¶ 112-113 and 115-116. As we discussed above, *Phillips* states a general rule. But this case presents exceptional circumstances, which the dissent does not take into account, that justify a narrow exception to the general rule.

10. The dissent's contention that there is no constitutional right to allocution, dissenting opinion at ¶ 104, is beside the point. Once a capital defendant has used her state-law right of allocution to place constitutionally relevant mitigating factors before the sentencer, the Eighth Amendment does not permit the sentencer to disregard that mitigation.

19

SUPREME COURT OF OHIO

affirmation).  However, the dissent concludes that the information contained therein is therefore not relevant to weighing the aggravating circumstances against the mitigating factors.  Dissenting opinion at ¶ 110 and 116.  This conclusion is incorrect.  In the context of capital sentencing, as *Lockett* makes plain, relevant information has to do with content, not form.  We do not believe that a sentencer is licensed to ignore constitutionally relevant mitigating factors brought before the sentencer in accordance with state law, simply because they come labeled "allocution" instead of "evidence."[11]

{¶ 68} *People v. Davis*, 794 P.2d 159 (Colo.1990), exemplifies this point.  In *Davis*, the trial court had instructed the jury that the defendant's penalty-phase unsworn statement[12] was not evidence.  The Colorado Supreme Court recognized that this was "technically correct" because the statement, which was unsworn, was not evidence under Colorado law.  However,

> in the sentencing phase of a capital case, the jury is not limited to consideration of matters technically defined as evidence.  In making the profoundly moral decision of whether to impose a sentence of death, it must consider all the facts and circumstances of the crime, the defendant's background and character and any mitigating factors raised by the defendant.

---

11.  The dissent states that we have "confuse[d] allocution—which is not evidence—with the opportunity to present an unsworn statement in the penalty phase of the trial and the right to present mitigating evidence to the jurors or fact-finders."  Dissenting opinion at ¶ 114.  We have not.  We simply disagree with the dissent's conclusion that because an allocution is unsworn, it is irrelevant to sentencing.  Indeed, if that were so, there would have been no reason to remand in *Campbell* and *Green*.

12.  *Davis* called the defendant's penalty-phase statement an "allocution," consistent with Colorado precedent deriving the right to make an unsworn statement to the jury in a capital case from the right to allocution provided in Colorado's version of Crim.R. 32.  *See* 794 P.2d at 191, citing *People v. Borrego*, 774 P.2d 854, 856 (Colo.1989).

20

January Term, 2013

*Id.* at 192. The court then proceeded to evaluate the likelihood that a reasonable juror would interpret the trial court's instructions to prevent consideration of the defendant's statement. *Id.* at 192-193. Even though the defendant's unsworn statement lacked the status of evidence under Colorado evidentiary law, *Davis* regarded that statement as "constitutionally relevant evidence" for Eighth Amendment purposes:

> [O]ur examination of the instructions as a whole, as well as the context of the sentencing hearing, leads us to conclude that there is not a "reasonable likelihood" that the jury applied instructions No. 1 and No. 4 in a manner preventing it from considering constitutionally relevant evidence. On the contrary, reasonable jurors would have properly understood that they should consider fully the statement offered by the defendant in allocution.

(Footnote omitted.)  794 P.2d at 193. We cannot, therefore, agree with the dissent's contention that "[b]ecause the allocution offered by Roberts prior to the imposition of sentence is not evidence, it has no significance in establishing any mitigating factor." Dissenting opinion at ¶ 116.

{¶ 69} For the foregoing reasons, we conclude that the trial court failed to consider Roberts's allocution and that this error violated the Eighth Amendment. That leaves us with the question of how to remedy the error. In *Phillips*, we stated: "[E]ven if 'the trial court in this case should have more explicitly analyzed the mitigating evidence,' this court's independent reweighing will rectify the error." 74 Ohio St.3d at 102, 656 N.E.2d 643, quoting *State v. Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990).

{¶ 70} In *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), we used independent review to rectify a trial court's failure to enunciate its reasoning.

SUPREME COURT OF OHIO

There, we observed that the very purpose of an independent appellate review of death sentences is, "at least in part, to correct such omissions." *Id.* at 247.

{¶ 71} However, we also cautioned:

> In so holding, we do not intend to trivialize the duty of the trial court under R.C. 2929.03(F) to articulate its reasoning or to suggest that such an omission is insignificant. It is not. The failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pursues his appeal and in which a reviewing court makes its determination.

*Id.*

{¶ 72} This case presents the closer call that we anticipated in *Maurer*.[13] We find that the sentencing opinion is so inadequate as to severely handicap our ability to exercise our power of independent review. Accordingly, we must vacate Roberts's sentence of death and remand this case for resentencing.

{¶ 73} On remand, the trial court is to review the entire record, including Roberts's allocution of October 22, 2007. The trial court shall consider the entire record—again, including the allocution—in determining whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The trial court shall then write and file a sentencing opinion pursuant to R.C. 2929.03(F) reflecting that it has complied with these instructions.

---

13. The dissent, in stressing the role of independent review in curing errors by the sentencing court, fails to take account of *Maurer*.

22

January Term, 2013

{¶ 74} In accordance with our holding as to Roberts's first proposition of law, Roberts is not entitled to present any further evidence on remand. Moreover, because Roberts has been given her opportunity to make allocution pursuant to Crim.R. 32, she is not entitled to make another one.

{¶ 75} Finally, while the trial court must consider Roberts's allocution, nothing in today's opinion should be interpreted as a determination that the matters discussed in her allocution are true or that the trial court must afford them any particular weight. It is for the trial court to determine in the first instance what mitigating factors, if any, are present in the case, and what weight, if any, they should be given.

{¶ 76} Roberts's second proposition of law is sustained.

III. Nonstatutory Aggravating Circumstances in Sentencing Opinion

{¶ 77} In her third proposition of law, Roberts contends that the trial court's sentencing opinion demonstrates that the trial court erroneously considered nonstatutory aggravating circumstances in sentencing her to death. Inasmuch as the trial court, on remand, will be required to write a new sentencing opinion, we find that Roberts's third proposition of law is moot.

IV. Denial of Recusal Motion

{¶ 78} In her fourth proposition of law, Roberts contends that the trial judge should have recused himself from her resentencing. However, during the pendency of this appeal, the trial judge died. Because we are remanding this case for resentencing, which necessarily will be conducted by a different judge, we find that Roberts's fourth proposition of law is moot.

V. Ineffective Assistance of Counsel

{¶ 79} In her fifth proposition of law, Roberts contends that her counsel rendered ineffective assistance at her 2003 mitigation hearing. She argues that her counsel "fail[ed] to fully investigate and present all possible evidence of mitigation." Specifically, Roberts complains that trial counsel failed to discover

23

SUPREME COURT OF OHIO

and present information contained in her Social Security file and in a letter to the trial court written by her son, both of which she proffered to the trial court on remand in 2007. The state argues that Roberts's current ineffective-assistance claim with regard to the mitigation hearing is barred by res judicata, inasmuch as Roberts did not raise it on her original appeal to this court.

{¶ 80} In light of our disposition remanding this case to the trial court for resentencing, we decline to address Roberts's fifth proposition of law at this time. If Roberts receives a death sentence on resentencing, the parties may present these arguments (including the state's res judicata argument) to us for review on the ensuing direct appeal.

VI. Competency to Stand Trial

{¶ 81} Roberts's sixth and seventh propositions of law address her competency to stand trial during the mitigation hearing in 2003 and during the resentencing proceedings on remand in 2007. *See generally* R.C. 2945.37 (establishing standards and procedures for adjudicating defendant's competency to stand trial).

A. Competency during the 2007 Resentencing

{¶ 82} A defendant is competent to stand trial if she has sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding and has a rational as well as a factual understanding of the proceedings against her. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). In her sixth proposition of law, Roberts contends that the state failed to prove that she met the standard of competency during her 2007 resentencing proceeding.

{¶ 83} Roberts contends that "[t]he trial court may not conduct a sentencing hearing for a death-eligible defendant where the record does not establish by a preponderance of the evidence that the defendant is legally competent," that "there was insufficient evidence of her ability to assist counsel in

24

January Term, 2013

preparation for the hearing," and that "[w]*ithout evidence* that Roberts *could* properly assist counsel, the [sentencing] hearing should not have been conducted." (Emphasis added.)

{¶ 84} Roberts's argument misallocates the burden of persuasion. R.C. 2945.37(G) provides:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

Thus, the question is not whether the state introduced sufficient evidence to prove Roberts competent, but whether a preponderance of the evidence proved that she was *not* competent. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 45; *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28; *State v. Hicks*, 43 Ohio St.3d 72, 79, 538 N.E.2d 1030 (1989). *See also Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (assigning defendant burden of proving incompetency does not violate due process).

{¶ 85} The trial court appointed Dr. Thomas Gazley, a psychologist with the Forensic Psychiatric Center of Northeast Ohio, to conduct a competency evaluation. Dr. Gazley interviewed Roberts, had conversations with her defense attorneys and with the director of mental-health services at the Ohio Reformatory for Women, where Roberts was incarcerated, and reviewed her mental-health

25

SUPREME COURT OF OHIO

chart from the reformatory. Dr. Gazley was the sole witness at the hearing on Roberts's competency. After he testified, his report was admitted without objection.

{¶ 86} Dr. Gazley testified that Roberts had the ability to "understand the sentencing process and * * * to understand what the alternatives available are to her as well as * * * to provide her counsel with any mitigating circumstances, should she desire to do so." He concluded that based on her ability to interact with him and to provide information and a coherent account of her perceptions about the situation, she would be able to do so with her defense counsel as well. Dr. Gazley further testified: "[W]hen I saw [Roberts] earlier this year, she was very coherent, her comments and responses to my questions were very relevant and * * * to the point." Dr. Gazley noted in his report that Roberts's "memory for both recent and remote events is intact" and that she "maintains the capacity for abstract thinking."

{¶ 87} Dr. Gazley knew that Roberts had been involved in a number of automobile accidents and had had several head injuries. He also knew that she had been diagnosed with depression and that she had engaged in suicidal thinking, which he attributed to her depression. However, Dr. Gazley testified that Roberts's depression had responded to treatment; by the time he saw her, her symptoms were in remission, and "[s]he was progressively getting better."

{¶ 88} Dr. Gazley's report states that his opinion, reached "with reasonable psychological certainty," is that Roberts "currently has the cognitive ability and functioning to understand, in a general way, the penalties that could or will be imposed as a result of her conviction" and that she "has the capacity to communicate relevant facts in mitigation to her attorney."

{¶ 89} Roberts argues that there was no testimony relevant to the issue of Roberts's ability to work with and assist counsel. Even if that were so, Roberts

26

January Term, 2013

could not prevail, because competency is presumed and the defense bears the burden of proving incompetency. R.C. 2945.37(G).

{¶ 90} However, Dr. Gazley's testimony was relevant to the criteria for competency, including Roberts's ability to assist counsel. Dr. Gazley testified that Roberts was able to understand the sentencing process and what alternatives were available and to provide mitigating circumstances. After interviewing Roberts, Dr. Gazley concluded that Roberts had the ability to interact with defense counsel and to provide information and a coherent account of her own perceptions about the situation to her counsel.

{¶ 91} Roberts contends that Dr. Gazley did not know her psychological history before her incarceration and that he had neither reviewed her Social Security records nor obtained a neuropsychological evaluation of the effects of her head injury. However, Dr. Gazley explained that none of this mattered to his evaluation of Roberts's competency at the time of resentencing, because that evaluation was based on his interview with Roberts:

> I base my opinion * * * on the information that I receive from the subject at the time I do the interview. * * * I make my decision about the opinion based on the responses the person provides me to the questions I asked that I believe are related to the questions the Court needs to address, rather than the [past] diagnosis.

{¶ 92} A criminal defendant's competency to stand trial, including competency to assist in a sentencing proceeding, is a question of fact. *See Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (upholding state-court finding of competency that was fairly supported by the

27

SUPREME COURT OF OHIO

record); *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33 (deferring to trial court's "factual findings" that defendant was competent).

{¶ 93} Dr. Gazley's testimony supports the trial court's finding that Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007. Because "there was some reliable, credible evidence supporting" the trial court's finding that Roberts was competent, we will not disturb that finding. *Vrabel* at ¶ 33. Roberts's sixth proposition of law is overruled.

B. Competency during the 2003 Mitigation Hearing

{¶ 94} In her seventh proposition of law, Roberts contends that there was insufficient evidence to prove that she was competent to stand trial during her original mitigation hearing in 2003. Roberts also claims that the trial court failed to conduct a full evidentiary hearing into her competency.

{¶ 95} These claims are res judicata. They are based entirely on the record of the 2003 hearing. Thus, Roberts could have, and should have, raised these issues in *Roberts I*. She is barred from raising them now. "Where an argument could have been raised on an initial appeal, *res judicata* dictates that it is inappropriate to consider that same argument on a second appeal following remand." *State v. D'Ambrosio*, 73 Ohio St.3d 141, 143, 652 N.E.2d 710 (1995). *See also State v. Gillard*, 78 Ohio St.3d 548, 549, 679 N.E.2d 276 (1997) (issues not raised on prior appeal are barred by res judicata and overruled without further consideration).

Conclusion

{¶ 96} Under the unique circumstances present here, we find that the trial court failed to consider relevant mitigating evidence contained in Roberts's allocution. Accordingly, we vacate the death sentence and remand this case for resentencing on the basis of the existing record. On remand, the trial court must consider all the mitigating evidence reflected in the record, including Roberts's

28

January Term, 2013

allocution, weigh the aggravating circumstances against the mitigating factors, and file a sentencing opinion that reflects that it has complied with these instructions.  In doing so, the trial court must make an independent determination of whether a death sentence is appropriate and may not give deference to the sentences previously entered.

<div align="right">Judgment reversed<br>and cause remanded.</div>

PFEIFER, LANZINGER, and FRENCH, JJ., concur.

O'NEILL, J., concurs in part and dissents in part.

O'DONNELL and KENNEDY, JJ., dissent.

_____

**O'NEILL, J., concurring in part and dissenting in part.**

{¶ 97} The questions addressed by the majority and the dissent are significant, but I do not believe it is necessary to decide them in this case.  Our previous remand order required the trial court to "afford Roberts her right to allocute, * * * personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03."  *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 167.  I believe that order was sufficient on its face, but unfortunately it was not followed by the trial court.

{¶ 98} As Justice O'Donnell points out, a capital defendant's statutory right to make an unsworn statement in mitigation under R.C. 2929.03(D)(1) is " 'not an allocution under the rule.' "  (Emphasis deleted.)  Dissenting opinion at ¶ 110, quoting *State v. Campbell*, 90 Ohio St.3d 320, 326, 738 N.E.2d 1178 (2000). And if we were addressing this issue in the first instance, the dissent might well be correct in concluding that the defendant's allocution "has no significance in establishing any mitigating factor." *Id.* at ¶ 116.  But our previous

<div align="center">29</div>

SUPREME COURT OF OHIO

remand order was not limited to permitting allocution—it required the court to evaluate "any relevant mitigating evidence" and make its sentencing decisions "anew." I would hold that the trial court failed to comply with this remand order in that it failed to accept and evaluate relevant mitigation evidence, including the unsworn statement offered by the defendant.

{¶ 99} Given the clear language in our prior mandate, the trial court clearly erred by refusing to accept the defendant's evidence in mitigation. Even if I were to accept that the defendant had attempted to "update mitigation" with evidence of her good prison conduct and that such evidence was improper, majority opinion at ¶ 37, the trial court expressed no opinion on the relevance of that evidence and did not render a sentencing decision "anew" as directed. But I must also note that the majority's characterization here is inaccurate. As the majority observes, the defendant proffered four items in mitigation, only one of which dealt with her conduct in prison. And it is apparent that even the defendant's prison records, like her other proffered evidence, were submitted to demonstrate her continued mental illness, not her conduct. Moreover, as the majority itself recognizes, its analysis on this point is likely to be set aside by the federal courts on collateral review. *See* majority opinion at ¶ 31-33, citing *Davis v. Coyle*, 475 F.3d 761 (6th Cir.2007).

{¶ 100} Therefore, I concur in the court's judgment vacating the death sentence and remanding this case for resentencing, but I dissent as to the limitations placed on that resentencing by the majority. The defendant should be permitted to offer a case in mitigation, in accordance with both our prior remand and the Sixth Circuit's judgment in similar cases. And given both my opinion that capital punishment violates the Eighth Amendment to the Constitution of the United States and Article I, Section 9 of the Ohio Constitution, *see State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 2 (O'Neill, J., dissenting), and the fact that the record as currently constituted provides strong

30

January Term, 2013

evidence of the defendant's severe mental illness, I would hold that on remand the trial court is precluded from imposing the death penalty upon the defendant.

---

**O'DONNELL, J., dissenting.**

{¶ 101} Respectfully, I dissent.

{¶ 102} The principal focus of this appeal concerns whether a trial court commits reversible error if it fails to include in its statutorily mandated capital-offense sentencing opinion a statement that it has considered the allocution of a convicted murderer. However, allocution is a statutory right, not a constitutional one, and it necessarily follows that the court's failure to affirmatively state that it considered the allocution does not rise to the level of constitutional error. Further, this court has never required the trial court to discuss in its sentencing opinion every consideration that factors into its sentence. Rather, our precedent establishes that any such error is cured by our independent sentence evaluation. Accordingly, this court should independently review the allocution and the sentence and determine whether the penalty imposed is in conformity with others in which the death penalty has been imposed.

### Allocution

{¶ 103} The purpose of allocution is "to permit a convicted defendant an opportunity to plead personally to the court for leniency in his sentence," *United States v. Tamayo*, 80 F.3d 1514, 1518 (11th Cir.1996), based on the consideration that "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself," *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961) (Frankfurter, J., plurality opinion). Thus, courts recognize that "[t]he right to allocute is no more than the defendant's 'right to stand before the [sentencer] and ask in his own voice that he be spared.' " *People v. Davis*, 794 P.2d 159, 192 (Colo.1990), quoting *State v. Zola*, 112 N.J. 384, 430, 548 A.2d 1022 (1988).

31

SUPREME COURT OF OHIO

{¶ 104} There is no recognized constitutional right to allocution.  In *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Supreme Court rejected a claim that the Constitution requires the trial court to invite an accused represented by counsel to make a statement before sentencing, explaining that the failure to do so "is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure."  And in *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *judgment vacated sub nom. Crampton v. Ohio*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972), the court noted that "Ohio has provided for retention of the ritual of allocution, albeit only in its common-law form, precisely to avoid the possibility that a person might be tried, convicted, and sentenced to death in complete silence. We have held that failure to ensure such personal participation in the criminal process is not necessarily a constitutional flaw in the conviction."

{¶ 105} The Sixth Circuit Court of Appeals has also held that "[t]here is no constitutional right to allocution under the United States Constitution," *Pasquarille v. United States*, 130 F.3d 1220, 1223 (6th Cir.1997), and that federal law does not require Ohio to afford the accused an opportunity to make an unsworn statement, *Bedford v. Collins*, 567 F.3d 225, 237 (6th Cir.2009). Notably, the Sixth Circuit is not alone; almost every federal circuit court has held that allocution is not a constitutional right.  *See United States v. Picard*, 464 F.2d 215, 220 (1st Cir.1972), fn. 9; *United States v. Li*, 115 F.3d 125, 132 (2d Cir.1997), fn. 3; *United States v. Saferstein*, 673 F.3d 237, 243 (3d Cir.2012); *United States v. Lighty*, 616 F.3d 321, 365 (4th Cir.2010); *United States v. Reyna*, 358 F.3d 344, 349 (5th Cir.2004); *United States v. Covington*, 681 F.3d 908, 910 (7th Cir.2012); *United States v. Hoffman*, 707 F.3d 929, 937 (8th Cir.2013); *United States v. Smith*, 705 F.3d 1268, 1274 (10th Cir.2013); *United States v.*

32

January Term, 2013

*Fleming*, 849 F.2d 568, 569 (11th Cir.1988). It is only the Ninth Circuit that concludes that "the denial of the right to allocute is a due process violation." *United States v. Dablan*, 205 Fed.Appx. 620, 622 (9th Cir.2006).

{¶ 106} This court has previously suggested that the Constitution does not require allocution at the sentencing hearing. In *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, we rejected a claim that the trial court violated the constitutional rights of the accused by denying his request to give his statement through questioning by counsel, explaining that "the majority view [regarding the right to allocution] does not support a holding that a defendant has a constitutional right even to make an unsworn statement, let alone an unsworn statement in a question-and-answer format." *Id.* at ¶ 103. And in *Lancaster v. Green*, 175 Ohio St. 203, 192 N.E.2d 776 (1963), we denied a writ of habeas corpus to an offender who claimed that the trial court's failure to include the allocution in the sentence invalidated it, stating that "the failure to include the allocution in the certificate of sentence did not void the sentence. In fact, the absolute failure to accord petitioner this right is not a ground for relief by habeas corpus." *Id.* at 206, citing *Hill*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417.

**Confusion regarding Allocution**

{¶ 107} The term "allocution" has been used to refer to different statements made by an offender. For example, a statement made by a defendant at the time of a plea has been described as an allocution. Such a statement can give a court a factual basis to adjudicate guilt. *United States v. Garcia*, 587 F.3d 509, 514 (2d Cir.2009) (explaining that the trial court may examine the accused's plea allocution in determining whether a sufficient factual basis supports the plea); *State v. Jones*, 6th Dist. Sandusky No. S-08-034, 2010-Ohio-1780, ¶ 17 ("A plea allocution is conducted only after the individual has been fully apprised of and waived a litany of constitutional rights, including Fifth Amendment rights").

33

SUPREME COURT OF OHIO

{¶ 108} In Ohio, R.C. 2929.03(D)(1) permits an accused to make a statement to the jury or fact-finder during the penalty phase of a capital-murder trial and further provides that such a statement is not subject to cross-examination unless the accused makes the statement under oath. This unsworn statement permits the accused to address the jury or fact-finder in an effort to influence the penalty recommendation and is sometimes referred to as allocution, but in fact, it is a part of the penalty phase of the trial. *State v. Campbell*, 90 Ohio St.3d 320, 326, 738 N.E.2d 1178 (2000); *State v. Roe*, 41 Ohio St.3d 18, 26, 535 N.E.2d 1351 (1989) (noting that the statute provides that all mitigating evidence must be presented before the jury makes a recommendation in the penalty phase of trial; "[a] defendant may not wait for an unfavorable jury recommendation before presenting all relevant evidence in mitigation of sentence").

{¶ 109} The foregoing examples of statements are not implicated in this case. Rather, the common-law right to allocution applicable in capital and noncapital cases is contained in Crim.R. 32(A)(1), which directs the trial court, prior to imposing sentence, to afford counsel an opportunity to speak on behalf of the defendant and to address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment. This statement is not made under oath, is not subject to cross-examination, and is not evidence—but it can be considered by the court in imposing its sentence.

{¶ 110} We distinguished the right to make an unsworn statement afforded by R.C. 2929.03(D)(1) from the allocution before sentence is pronounced in *Campbell*, where we said, "No authority requires a trial court to inform a capital defendant of his right to make an unsworn, penalty-phase statement. Crim.R. 32(A)(1) does not apply, because *an unsworn statement under R.C. 2929.03(D)(1) is not an allocution under the rule.*" (Emphasis added.) *Id.* at 326. Thus, a penalty-phase statement may be relevant to weighing whether the aggravating

34

January Term, 2013

circumstances were sufficient to outweigh the mitigating factors, but an allocution is not.

{¶ 111} In this case, pursuant to our order on remand, the trial court allowed Roberts to allocute prior to reimposing sentence.  And before it imposed the sentence, the court stated that it had considered the record and the oral statements, which included her allocution.  In my view, no reasonable inference may be drawn from the failure of the trial court to specifically incorporate the content of the allocution made by Roberts in its sentencing opinion.  Obviously, because we remanded for that right to be accorded before sentencing, the trial court listened to Roberts and was aware of what she presented.  In this case, then, " '[t]here is no showing of irregularity to contradict the presumption of regularity accorded all judicial proceedings.' "  *State v. Raber*, 134 Ohio St.3d 350, 2012-Ohio-5636, 982 N.E.2d 684, ¶ 19, quoting *State v. Sweet,* 72 Ohio St.3d 375, 376, 650 N.E.2d 450 (1995).

{¶ 112} We have previously held that in considering mitigating factors in a capital-offense sentencing opinion, the failure to incorporate and discuss all of them in its sentencing opinion does not mean that the trial court did not consider them and that such a failure is not reversible error.  *E.g.*, *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 363; *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995).  In *Phillips*, we considered the argument that "the trial court's sentencing opinion fail[ed] to give effect to all of the mitigation evidence offered by appellant."  *Id.*  We concluded:

> [Phillips] erroneously assumes that evidence that is not specifically mentioned in an opinion was not considered. While a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually. *Parker v. Dugger* (1991), 498 U.S. 308, 314–315, 111 S.Ct. 731, 736, 112 L.Ed.2d 812, 822. Further, even

35

SUPREME COURT OF OHIO

> if "the trial court in this case should have more explicitly analyzed
> the mitigating evidence," this court's independent reweighing will
> rectify the error. *State v. Lott* (1990), 51 Ohio St.3d 160, 171-172,
> 555 N.E.2d 293, 305.

*Id.* We therefore rejected that claim.

{¶ 113} This case is less egregious than *Phillips*, because the allocution statement made by Roberts before sentencing is not evidence; rather it is an opportunity for the defendant to make a personal statement in her own behalf or to present any information in mitigation of punishment, such as an apology, a request for mercy, or an appeal for leniency. A trial court may exercise its discretion in considering the allocution when imposing sentence.

{¶ 114} The majority confuses allocution—which is not evidence—with the opportunity to present an unsworn statement in the penalty phase of the trial and the right to present mitigating evidence to the jurors or fact-finders, and it concludes that the sentence of death violated the Eighth Amendment, specifically because the allocution contained relevant mitigating evidence. It is true that a sentencer cannot refuse to consider mitigating evidence before imposing the death penalty, *see, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), but in this case, Roberts had waived her right to present mitigating evidence during the penalty phase of the trial.

{¶ 115} More significantly, however, an unsworn statement in allocution is not evidence. *Biddinger v. State*, 868 N.E.2d 407, 413 (Ind.2007); *People v. Davis*, 794 P.2d at 192. Nor is allocution intended to prove or disprove facts relevant to sentencing. *State v. Lord*, 117 Wash.2d 829, 897, 822 P.2d 177 (1991); *Davis* at 192. Thus, an allocution statement made prior to sentencing pursuant to Crim.R. 32(A)(1) is not admissible evidence. *See* Evid.R. 603; *Allstate Ins. Co. v. Rule*, 64 Ohio St.2d 67, 69, 413 N.E.2d 796, 798 (1980)

36

January Term, 2013

("Section 7 of Article I of the Constitution of Ohio requires an oath or affirmation as a prerequisite to the testimony of a witness" [footnote omitted]); *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 42, 322 N.E.2d 629 (1975) ("it is error for unsworn testimony to be admitted in evidence"); *Clinton v. State*, 33 Ohio St. 27 (1877), paragraph two of the syllabus ("every one offered as a witness in a court must take an oath or affirmation before giving testimony").

{¶ 116} I therefore disagree with the conclusion of the majority that Roberts's statement "contained much information whose relevance as mitigation was clear." Majority opinion at ¶ 57. Because the allocution offered by Roberts prior to the imposition of sentence is not evidence, it has no significance in establishing any mitigating factor.

### Conclusion

{¶ 117} Neither the United States nor the Ohio Constitution requires a trial court to permit allocution by a person convicted of a crime. Rather, in Ohio, the legislature has allowed a capital defendant to make a penalty-phase statement on his own behalf and to provide any information relevant to the penalty that should be imposed. But an unsworn allocution statement made after the penalty phase is not mitigating evidence. The omission of any reference to what Roberts said during allocution in the trial court's sentencing opinion does not permit an inference that the court failed to consider those statements, nor does it constitute reversible error.

{¶ 118} Even if the failure to refer to the allocution in the sentencing opinion did constitute error, "[o]ur independent sentence evaluation and reweighing can cure the effect of errors in previous death-penalty sentencing decisions." *State v. Bey*, 85 Ohio St.3d 487, 505, 709 N.E.2d 484 (1999). Although the sentencer's consideration of mitigating evidence is mandated by the Constitution, *Eddings*, 455 U.S. at 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1, we have held that our independent review can cure a trial court's failure to explain

37

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 2304

SUPREME COURT OF OHIO

how it weighed that evidence, *State v. Hill*, 75 Ohio St.3d 195, 210, 661 N.E.2d 1068 (1996).  And we have recognized that " '[w]hile a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually.' " *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 363, quoting *Phillips*, 74 Ohio St.3d at 102, 656 N.E.2d 643. Tellingly, in *Clemons v. Mississippi*, 494 U.S. 738, 750, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the court explained that the sentencer need not make written findings concerning mitigating circumstances in order for an appellate court to perform an independent sentence evaluation.  Thus, contrary to the majority's conclusion here, the failure to discuss the allocution does not hinder our independent review of the sentence.

{¶ 119} And if it is not reversible error to fail to explain how a court weighed mitigating evidence, how can it be reversible error to fail to refer to the allocution in a sentencing opinion when that allocution is not evidence?

{¶ 120} Accordingly, there is no reason for this court to reverse the sentence based on the trial court's failure to expressly mention in its sentencing opinion that it had considered Robert's unsworn statement.  I would overrule proposition of law II and address the remaining propositions of law on the merits.

KENNEDY, J., concurs in the foregoing opinion.

———————————

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

David L. Doughten and Robert A. Dixon, for appellant.

———————————

38

**U.S. SUPREME COURT NO. 13-8411**

Supreme Court, U.S.
FILED

FEB 1 1 2014

OFFICE OF THE CLERK

IN THE

SUPREME COURT OF THE UNTIED STATES

OCTOBER TERM, 2014

———————————

DONNA ROBERTS,

*Petitioner,*

V.

THE STATE OF OHIO,

*Respondent.*

———————————

RESPONDENT'S BRIEF IN OPPOSITION TO
PETITION FOR WRIT OF CERTIORARI
**A Death Penalty Case**

———————————

COUNSEL FOR RESPONDENT

DENNIS WATKINS
Trumbull County Prosecuting Attorney
Counsel of Record
LuWAYNE ANNOS
Assistant Trumbull County
Prosecuting Attorney
160 High St. N.W.
Warren, Ohio   44481
(330) 675-2426

COUNSEL FOR PETITIONER

DAVID L. DOUGHTEN
Counsel of Record
4403 St. Clair Ave.
Cleveland, OH 44103
(216) 361-1112

JEFFREY M. GAMSO
ERIKA CUNLIFFE
Courthouse Square, Suite 200
310 Lakeside Ave.
Cleveland Ohio 44113
(216) 443-7583

COPY



RECEIVED
FEB 1 4 2014
OFFICE OF THE CLERK
SUPREME COURT, U.S.

COUNTER STATEMENT OF QUESTION PRESENTED

I.  Does a capital defendant suffer a constitutional violation of the right to present
mitigating evidence when that right is specifically waived prior to the penalty
phase and the case is remanded solely to correct errors occurring at the sentencing
hearing?

ii

### TABLE OF CONTENTS

PAGES(S)

COUNTER STATEMENT OF QUESTION PRESENTED.................................................ii

TABLE OF CONTENTS.....................................................................................................iii

TABLE OF AUTHORITIES...............................................................................................iv

CONSTITUTIONAL PROVISIONS....................................................................................1

INTRODUCTION.................................................................................................................3

STATEMENT OF THE CASE............................................................................................7

REASONS FOR DENYING THE PETITION.................................................................12

A.  Petitioner made an ironclad waiver of her right to present mitigation evidence...........12

B.  This case does not present an 8th Amendment violation or Lockett deviation...............14

C.  Trial court is to proceed on remand from the point where error occurred...................17

CONCLUSION...................................................................................................................21

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 2308

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### <u>CASES</u>

*Davis v .Coyle,* 475 F. 3d 761 (6th Cir. 2007).............................................................19

*Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954 (1978)....................................6, 14, 15, 19

*Oregon v. Guzek ,* 546 U.S. 517, 126 S.Ct. 1226 (2006).........................................17, 18

*Schriro v . Landrigan,* 550 U.S. 465, 127 S. Ct. 1933 (2007).................................16, 17

*State v. Chinn,* 85 Ohio St.3d 548,564-565 709 N.E.2d 1166 (1999)...........................17

*State v. Davis,* 63 Ohio St. 3d 44, 584 N.E. 2d 1192 (1992).......................................17

*State v. Roberts,*  137 Ohio St.3d 230,  998 N.E.2d 1100, 2013-Ohio-4580
....................................................................................1, 2, 5, 6, 10, 11, 12, 13, 17, 18, 19

*State v. Roberts,* 110 Ohio St. 3d 71, 850 N.E. 2d 1168, 2006-Ohio-3665
.................................................................................3, 4, 5, 6, 7, 8, 9, 15, 16, 17

### <u>OHIO STATUTES</u>
Ohio Rev.Code Ann. § 2929.04(B) (1975)....................................................................14

Ohio Rev.Code Ann. § 2929.04(B) (1981)..............................................................14, 15

O.R.C. 2903.01(A) & (B)...............................................................................................3

O.R.C. 2929.04(A)(7).....................................................................................................3

### <u>U.S. CONSTITUTIONAL PROVISIONS</u>
Eighth Amendment...................................................................................................14, 21

iv

## LIST OF PARTIES TO THE PROCEEDINGS IN THE COURT BELOW AND RULE 29.6 STATEMENT

The Respondent, State of Ohio ("State of Ohio"), takes no exception to the "List of Parties" presented by the Petitioner, Donna Roberts ("Petitioner") presented at page iii of her petition.

## OPINIONS BELOW

Petitioner correctly lists two decisions entered by the Ohio Supreme Court which both remanded her capital murder case to the Trumbull County, Ohio, Court of Common Pleas for purposes of re-sentencing.

## JURISDICTION

The State of Ohio does not take exception to the jurisdictional synopsis presented by the Petitioner at page 1 of her petition.

## CONSTITUTIONAL PROVISIONS

The State of Ohio disagrees that Petitioner's case presents any U.S. Constitutional questions worthy of review. As Justice O'Donnell noted in his well-reasoned dissent: "There is no recognized constitutional right to allocution. In *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Supreme Court rejected a claim that the Constitution requires the trial court to invite an accused represented by counsel to make a statement before sentencing, explaining that the failure to do so 'is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure.' And in *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *judgment vacated sub nom. Crampton v. Ohio,* 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972), the court

- 1 -

noted that 'Ohio has provided for retention of the ritual of allocution, albeit only in its common-law form, precisely to avoid the possibility that a person might be tried, convicted, and sentenced to death in complete silence. We have held that failure to ensure such personal participation in the criminal process is not necessarily a constitutional flaw in the conviction'." *State v. Roberts,* 137 Ohio St.3d 230, 998 N.E.2d 1100, 2013-Ohio-4580, ¶104 .

This case was returned to the trial court in 2007 for the purposes of an allocution, a reweighing of the mitigating factors and aggravating circumstances, and a re-writing of the sentencing entry.  It was not remanded for purposes of a new mitigation hearing or the presentation of evidence or testimony deliberately waived by the Petitioner. The trial court afforded Petitioner ample opportunity to make an unsworn statement and, upon remand, to allocute.  The record abounds with her extensive and articulate commentary.  If ever there was a death row inmate who was decidedly *not* "sentenced to death in complete silence," it is the Petitioner.

This case presents absolutely no constitutional implications.  The Ohio Supreme Court did not render a decision on a federal question of law.  See Supreme Ct. R. 10(b).

- 2 -

## INTRODUCTION

Petitioner is currently the only woman on Ohio's death row.  She was sentenced there by an Ohio common pleas judge who presided over her jury trial in 2003 wherein she was convicted on two counts of complicity to aggravated murder related to the shooting death of her ex-husband and housemate, Robert Fingerhut,  in violation of Ohio Revised Code ("O.R.C.") 2903.01(A) and (B). Both murder counts carried two death-penalty specifications: murder during an aggravated burglary and murder during an aggravated robbery. O. R.C. 2929.04(A)(7). The jury also convicted Petitioner on separate counts of complicity to commit aggravated burglary and complicity to commit aggravated robbery, each carrying a firearm specification. As discussed in the prior Ohio Supreme Court opinions, Petitioner knowingly and willingly embroiled herself in two-person plot to kill Mr. Fingerhut.  Her co-conspirator and triggerman in this escapade is a man named Nathaniel Jackson who, at the planning stage of this homicide, was Petitioner's prison pen pal paramour. Jackson was tried first, convicted, and also sentenced to death.

Between the point of her conviction and the commencement of her mitigation hearing afforded under Ohio law, Petitioner made it abundantly clear that she would present *absolutely no mitigation evidence,* and would instead rely upon an unsworn statement to the jury.  In an in camera discussion with her counsel, the trial court personally addressed Petitioner and explained the rather obvious pitfalls of such a strategy. *State v. Roberts,* 110 Ohio St. 3d 71, 850 N.E. 2d 1168, 2006-Ohio-3665, ¶133 ("*Roberts* I"). During this in camera hearing trial counsel summarized for the judge the type of evidence they had planned to introduce before Petitioner stopped them in their tracks.  They also placed in the record that they disagreed with her

- 3 -

decision. *Id.,* at ¶134. In an abundance of due caution, the trial court referred Petitioner to a second evaluation by a licensed psychologist to determine if Petitioner was mentally competent to waive the presentation of mitigation testimony and evidence. The doctor found her decision to abandon any mitigation presentation was " rational." *Id.* at ¶135. The doctor also opined that Petitioner "suffered no psychiatric or psychological abnormality that would prohibit a rational decision regarding presentation of mitigating evidence." *Id.*

The trial court proceeded with a mitigation hearing which essentially consisted of Petitioner delivering a lengthy, unsworn diatribe wherein she insisted that the jurors recommend the death penalty since her co-defendant had been sentenced to death in a separate trial. *Id.* at ¶137. Her jury obliged. At her sentencing hearing, the trial court inadvertently omitted Petitioner's opportunity to make a statement in allocution before announcing the death sentence. However, before the hearing adjourned and before advising Petitioner of her appellate rights and reading the sentence on the non-capital offenses, Petitioner made the following statement: "Thank you for your decision. I was little worried you might try to find something not to do that. I appreciate what you did. Thank you." (Roberts Trial T.p. Vol. XXVIII, p. 6374).

The Ohio Supreme Court was not so appreciative. Ohio's high court remanded Petitioner's case for resentencing because of the judge's misstep regarding the allocution and because the assistant prosecutors who tried the case for the State of Ohio had typed the findings of fact and conclusions of law which imposed the very sentence Petitioner demanded. The Ohio Supreme Court instructed the trial court as follows:

"Having found no prejudicial error in regard to Roberts's convictions, we affirm the convictions and the judgment of the trial court pertaining to them. Because of the prejudicial error in sentencing Roberts to death, the sentence of death is vacated, and the cause is hereby

- 4 -

remanded to the trial court. On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by[O.] R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by [O.] R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion." *Id.* at ¶167. The State of Ohio did not appeal this decision.

The sentencing judge, who is now deceased, conducted a second sentencing hearing on October 29, 2007. Prior to that hearing, Petitioner's counsel motioned the trial court to permit her to "fully develop her mitigation for the evaluation of [the trial court] at her sentencing re-hearing." *Roberts II,* at ¶16. The trial court denied the motion and Petitioner's counsel proffered exhibits which he purportedly would have introduced at the hearing had the court so permitted. At the re-sentencing, Petitioner again made a lengthy statement, much of which was repetitive of her 2003 unsworn statement. *Id.* at ¶¶57-61. At no point during this statement did Petitioner express remorse for Mr. Fingerhut's murder, nor did she ask the court to spare her life. (Re-sentencing T.p. 47-65). The court re-imposed the sentence of death.

Petitioner again appealed to the Ohio Supreme Court. In the second appeal, the Ohio Supreme Court agreed that the trial court was correct in prohibiting Petitioner from introducing mitigating evidence – which was not heard by her jury – at her 2007 re-sentencing hearing. "In a case in which the defendant was not deprived of any constitutional right—including her Eighth Amendment right to present mitigation—at the time of her mitigation hearing, there seems to be no basis for requiring the trial court to reopen or supplement that evidence in a later proceeding. To hold *** that a new mitigation hearing must be held, even though no constitutional error

- 5 -

infected the original one, would transform the right to present relevant mitigation into a right to *update* one's mitigation. Such a right has no clear basis in *Locket* [v. *Ohio,* 438 U.S. 586] or its progeny." (Italics original). *Roberts II,* at ¶36

Nevertheless, the Ohio Supreme Court regrettably remanded Petitioner's case for a *third* sentencing hearing on what the State respectfully considers a hyper -technicality. While the trial court stated from the bench that "I have taken into account the additional information which you have proffered on behalf of your client" and "the court has considered the record, *the oral statements* as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11" (Emphasis added. Resentencing T.p. 70), the trial court did not repeat these statements in its self-authored, written sentencing entry. *Roberts II,* at ¶52. "When we consider the presence of relevant and potentially significant mitigation in Roberts's allocution, the utter lack of anything else offered for the specific purpose of mitigation, and our order specifically calling the matter of allocution to the trial judge's attention, we can hardly conclude that the trial court's failure to mention the allocution in its sentencing opinion was a mere oversight. Given these unusual circumstances, we are justified in drawing the inference that when the trial judge weighed the aggravating circumstances against the mitigating factors, he did not consider Roberts's allocution." *Roberts II,* at ¶64.

Petitioner does not seek to challenge the ultimate holding of the court, nor does she suggest that a third sentencing hearing is not in order. For reasons that will be discussed *infra,* the State of Ohio disagrees with Petitioner's position that the trial court's disinclination to transmogrify a remanded *sentencing* hearing into a belated *mitigation* hearing- which Petitioner specifically and unequivocally waived -violates this Court holding in *Lockett, supra.* The State of Ohio opposes a grant of certiorari in this case.

- 6 -

## STATEMENT OF THE CASE

Generally, the State of Ohio takes few exceptions to the Statement of the Case presented by Petitioner at pages 5 through 7 of her petition, but would like to point to some perceived errors in that portion of the petition.  Though a minor point, the evidence did not show that Petitioner was in a restaurant at the time Nathaniel Jackson entered the Fingerhut home and shot the victim dead in his kitchen as is stated at page 6 of the petition.  A server from a local Red Lobster testified she waited on Petitioner *and* Jackson the night of the murder and they left at 6:43 p.m.  *Roberts I,* at ¶12.   Around 9:30 p.m. that night, a Fingerhut neighbor spotted Petitioner driving her car very slowly on Old State Route 82 near their homes, even though no one else was on the road at the time. *Id.* at ¶13.  Petitioner initially told police she had dined alone that night and later contacted Mr. Fingerhut, who suggested she go out shopping afterwards.  She claims she did around 9 p.m. *Id.* at¶19.  The State of Ohio would agree that no evidence was introduced to suggest Petitioner was in her home when Jackson fired the fatal shots.

Petitioner also states that "Finderhut [sic] was later killed in the home he and Roberts shared with Jackson." Petition at p. 6.  There was no evidence that Jackson lived at the Fingerhut home, hence both co-conspirators were charged with aggravated burglary.

Petitioner gives few details of her unqualified waiver of her right to present mitigating evidence during the penalty phase of her capital murder trial.  The State of Ohio will direct the Court to the following details:  Contrary to her second Question Presented at page ii of her petition, trial counsel did not "fail to investigate and present mitigation evidence" during her first sentencing hearing.  The record clearly states that trial counsel had diligently investigated

- 7 -

potential mitigating factors and was prepared to proceed with mitigating evidence. Petitioner was aware of these efforts and forbade them from calling a single witness on her behalf. Notably, her trial counsel told the court in 2003, "We have obtained hospital records relating to a six day psychiatric stay in the year 2000. There was a hospitalization in April of -- two hospitalizations of [sic] April of 1999 relating to a traffic accident. We have obtained counseling records from Valley Counseling. We made arrangements for basically family members to come and testify during the sentencing phase. Those witnesses were canceled. Donna has instructed us not to present mitigating evidence." (Trial T.p. Vol. XXVIII, p. 6225). The Ohio Supreme Court reiterated the unequivocal nature of Petitioner's wish to abandon the presentation of evidence during mitigation and the trial court's attempt to dissuade her from that strategy: "The court explained to Roberts the purpose of the mitigation phase and her right to present mitigation evidence. The judge then inquired as to whether Roberts had instructed her attorneys not to present such evidence; she confirmed that the court's understanding was correct. Roberts explained to the trial judge that she had talked with her attorneys, family, and friends before declaring, 'I know what I am doing. I explained to everyone that cares why I am doing it'." *Roberts I, supra,* at ¶134.

Of particular note is the Ohio Supreme Court's finding that: "*Trial counsel described for the judge the evidence that could be presented in mitigation.* Counsel noted that professionally and personally, he disagreed with Roberts's decision not to present such evidence but that he believed her competent and that the decision was the product of rational thought." (Emphasis added) *Id.* at ¶134. While Petitioner seeks to paint herself as "intellectually disabled," "mentally ill," "emotionally unstable" and "physically and emotionally dependent" on Paxil and Remeron (Petition at p. 12), a licensed psychologist who had evaluated her competency for trial purposes

- 8 -

was summoned for a second evaluation when  the prospects of a mitigation waiver became apparent to the trial court.  The court described the results of that evaluation as follows: "Dr. Eberle testified that Roberts's decision to forgo presentation of mitigating evidence was rational. He further found that she suffered no psychiatric or psychological abnormality that would prohibit a rational decision regarding presentation of mitigating evidence." *Roberts I, supra,* at ¶135.  Petitioner's counsel at re-sentencing stated just the opposite. (Resentencing T.p. 68-69).

The State of Ohio also takes issue with Petitioner's statement that the evidence she proffered for mitigation at re-sentencing "included a well-documented history of severe mental illness."  In fact, in a psychological evaluation conducted in 1999 by Dr. Donald Degli, Petitioner scored a 65 on the Wechsler Adult Intelligence Scale.  Dr. Degli found as follows: "The intellectual assessment yielded questionable functioning and an intelligence quotient in the mild mental retardation range.  Memory functioning, as measured by the Wechsler Memory Scales was also impaired, although her responses were suggestive of confabulation and malingering.  Reading skills proved to be functional at the high school level." His DSM-IV diagnosis included "malingering or exaggeration."  She was turned down for benefits in December of 1999 because "You are still able to drive and perform your normal daily activities. Your medical condition is not so severe as to prevent you from doing most of your usual activities, including working."  ( Proffered Ex. A, T.d. # 195, Dec. 10, 1999 Social Security Notice).  Any claim that Petitioner suffers from "severe mental illness" is belied by her own proffered exhibits.

Also, counsel never argued that any of the proffered mitigating evidence "warranted the imposition of a life sentence."  Petition at p. 6.  Initially, trial counsel said he "had nothing to add" to Petitioner's allocution.  (Re-sentencing T.p. 65).  But, he did add, "Our position is, we

- 9 -

have proffered what we think we need to make—I understand the Court is under order from the Supreme Court [of Ohio]. I urge you to listen to what she said, which I believe the Court has done." *Id.* After a week-long recess, her counsel first sought to blame her 2003 mitigation waiver on "Donna's mental instability," a condition specifically refuted by Dr. Eberle in 2003. He continued, "***Donna is not one of the worst of the worst, that she had no prior record, that if not for the aberration caused by all of these mental disabilities, this would have never happened and she wouldn't be here, and it is our request that the Court consider as much as it is allowed to by the dictates of the Supreme Court, why Donna said what she said, why she did what she did. Thank you very much." *Id.* at 68-69. At no point does Petitioner or her counsel argue for a life sentence, ask for mercy, or state that Petitioner had a change of heart regarding her sentence of death.

If Petitioner's learned counsel appeared to be walking on eggshells during the re-sentencing, it was with good reason. Just prior to the October 22, 2007, hearing, Dr. Thomas Gazley, a psychologist with the Forensic Psychiatric Center of Northeast Ohio, interviewed Petitioner at the Marysville Correctional Institution to determine her competency for re-sentencing. *Roberts II* discusses his testimony at some length in its opinion from ¶¶85-93. The opinion references Dr. Gazley's report but omits the portion therein where he explains Petitioner's stated reason for foregoing the presentation of mitigation evidence in 2003.

During her competency evaluation, she told Dr. Gazley that she preferred confinement on Ohio's death row to confinement in the general prison population. "She acknowledged that being imprisoned for life in the general population would be almost worse than being executed. She reported, 'When you're in prison your life is over anyway.' Though Ms. Roberts insisted it was 'not my view,' she did report that, 'As long as you're on death row, there's always the

- 10 -

possibility of an appeal." (Gazley report, p. 6).  Dr. Gazley quoted Petitioner as saying, "Give me death instead of having to live here among these animals and eating slop." (Gazley report, p. 9).  More so than any alleged "mental instability," Dr. Gazley's report - compiled four years into her confinement at Marysville - shows why she waived mitigation evidence and witnesses and why neither Petitioner nor her counsel argued for a life sentence when given ample opportunity to do so on remand.

Finally, the State of Ohio takes issue with Petitioner's statement that the "court imposed sentence, refusing to consider the proffered mitigation," (Petition at p. 6) or that the "record indicated that the trial court had not considered the evidence provided during Robert's allocution." (Petition at p. 7).  While it is true that the court did not directly reference Petitioner's allocution in the *written* sentencing entry, the "record" - which includes the transcripts of proceedings - quotes the judge as follows, "I have taken into account the additional information which you have proffered on behalf of your client" and "the court has considered the record, *the oral statements* as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11" (Emphasis added.) ( Re-sentencing T.p. 70). The opinion of the court below acknowledges these statements from the trial judge, albeit tersely: "The trial court then stated that it had considered the record and the oral statements. The sentencing opinion notes that the trial court had been instructed to provide Roberts with the right of allocution before reimposing a sentence." *Roberts II* at ¶52.

The State of Ohio submits Petitioner misquotes the opinion of the court below when she writes, "[d]uring this remanded proceeding***the court advised Roberts would not be allowed to address [the] judge, nor would the trial court be permitted to consider anything other than the *transcripts* of Roberts's original penalty phase hearing and of Roberts's allocution at her first

- 11 -

remand hearing." (Italics added). (Petition at p. 7).  In fact, the court held,  "we vacate the death sentence and remand this case for resentencing on the basis of the existing *record*. On remand, the trial court must consider all the mitigating evidence reflected in the record, including Roberts's allocution, weigh the aggravating circumstances against the mitigating factors, and file a sentencing opinion that reflects that it has complied with these instructions." (Emphasis added). *Roberts  II*, at ¶96.  The State submits the "record" would encompass anything in the court file which would include, *inter alia,* pleadings, motions, responses, mitigation transcripts, her lengthy unsworn statement, and Dr. Gazley's report which sheds considerable light on Petitioner's true motivation in stonewalling her trial counsel's efforts to present evidence and testimony which may have swayed her jury to recommend a more lenient sentence than death. Additional facts will be brought to the Court's attention as necessary in the Reasons for Denying the Petition section of this brief.

## REASONS FOR DENYING THE PETITION

### A.  Petitioner made an ironclad waiver of her right to present mitigation evidence

The chief reason for denying Petitioner certiorari is because she knowingly and unflinchingly waived her right to present mitigation evidence and testimony to her jury.  Now that the jury has been dismissed, she seeks to seize on the minor procedural infractions committed by the trial court during a *sentencing hearing* for the purpose of re-staging her *mitigation hearing.*

The State of Ohio absolutely disagrees with Petitioner's statement at page 7 of her Petition wherein she states "a wealth of mitigation evidence amassed since the initial sentencing***[that] could not be presented," during her mitigation hearing,  unless, of course, "amassed since the initial sentencing" translates to "photo-copied and stuffed into someone's

- 12 -

brief case."   The bulk of the information which Appellant proffered to the court in 2007 was readily available to Petitioner and her trial counsel in 2003.  She willfully and unconditionally blocked its admission.

The State of Ohio further disagrees with Petitioner's self-diagnosis of a "chronic mental illness." No mental health professional - pre-homicide or post-sentencing – has ever diagnosed Petitioner with a "chronic mental illness."  In the proffered 1999 Social Security records – which Petitioner declined to submit to her jury – Dr.  Delgi accused her of "confabulation and malingering" in her deliberate and apparently unconvincing attempts to skew her I.Q. downwards for purposes of obtaining Social Security Disability.  His DSM-IV diagnosis included "malingering and exaggeration."  And while the State acknowledges that at some point during her early years of incarceration Petitioner was deemed "moderately to severely depressed" and put on medication (Re-sentencing T.p. 40), the treatment proved efficacious. The Ohio Supreme Court noted: "Dr. Gazley knew that Roberts had been involved in a number of automobile accidents and had had several head injuries. He also knew that she had been diagnosed with depression and that she had engaged in suicidal thinking, which he attributed to her depression. However, Dr. Gazley testified that Roberts's depression had responded to treatment; by the time he saw her, her symptoms were in remission, and '[s]he was progressively getting better'." *Roberts II,* at ¶87. As previously stated, Dr. Gazley evaluated Petitioner in 2007. Thus, even with the acknowledgment that Petitioner suffered from some mental health issues post-incarceration, according to Dr. Gazley those problems were controlled by medication and Petitioner had improved by the time of her 2007 re-sentencing.

- 13 -

**B. This case does not present an 8ᵗʰ Amendment violation or Lockett deviation**

Petitioner argues repeatedly throughout her petition that the trial court's refusal to re-open her mitigation hearing is violative of the Eighth Amendment and runs contrary to this Court's holding in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, (1978). The State of Ohio disagrees. *Lockett* extends no relief to the Petitioner-created anomalies that saturate this case.

In *Lockett* this Court held, "we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. (Italics original). *Lockett, supra,* at 438 U.S. 586, 604-605, 98 S.Ct. 2954, 2964 - 2965 (U.S.Ohio,1978). In some respects, Petitioner's case qualifies as "the rarest kind of capital case" in that she specifically refused to present evidence concerning her character or why she was worthy of a life rather than death sentence until the case was remanded for an "error" occurring after the close of the penalty phase of her trial.

Moreover, *Lockett* held unconstitutional Ohio's *former* death penalty statute which was delineated only the following mitigating factors: "(1) The victim of the offense induced or facilitated it."(2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation. "(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity." Ohio Rev.Code Ann. § 2929.04(B) (1975).

As a result of *Lockett,* the Ohio General Assembly expanded those mitigating factors to include: (B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt,

- 14 -

and if the offender did not raise the matter of age pursuant to section 2929.023 of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors: (1) Whether the victim of the offense induced or facilitated it; (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation; (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law; (4) The youth of the offender; (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications; (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim; (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death. Ohio Rev.Code Ann. § 2929.04(B) (1981).

Despite this post-*Lockett* expansion, Petitioner waived her right to present *any* mitigating evidence. As the Ohio Supreme Court correctly noted: "The United States Supreme Court has never suggested that the Eighth Amendment requires forcing an unwilling defendant to present mitigating evidence in a capital case. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706 N.E.2d 1231. No societal interest counterbalances the defendant's right to control his or her own defense. *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576. We have held that a defendant is entitled to decide

- 15 -

what she wants to argue and present as mitigation in the penalty phase, see, e.g., *Jenkins,* 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973, including the decision to present no evidence. Ohio's death-penalty statute itself confers 'great latitude' on a defendant in such decisions. R.C. 2929.04(C). See, also, *State v. Barton,* 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47. Roberts was entitled to present no mitigation evidence." *Roberts I,* at ¶139-140.

In *Schriro v. Landrigan,* 550 U.S. 465, 127 S. Ct. 1933 (2007), this Court overturned a decision by the Ninth Circuit Court of Appeals when it awarded habeas relief to a capital defendant who, like Petitioner, opted to waive presentation of mitigating evidence.   He then tried to argue ineffective assistance of trial counsel in his federal habeas petition.  In a 5-4 decision, this Court refused to find trial counsel ineffective for "failing to investigate" possible mitigating evidence: "Landrigan interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating. He even refused to allow his attorney to proffer that he had worked a regular job at one point. *Id.,* at D–6, D–7. This behavior confirms what is plain from the transcript of the colloquy: that Landrigan would have undermined the presentation of any mitigating evidence that his attorney might have uncovered. On the record before us, the Arizona court's determination that Landrigan refused to allow the presentation of any mitigating evidence was a reasonable determination of the facts." *Id.* at 476-477, 127 S.Ct. 1933, 1941 (U.S.,2007).

The dissenting justices in *Landrigan* opined that his trial counsel's investigation as to possible mitigating evidence was not "constitutionally sufficient." Id. at 483.  The opinions of the Ohio Supreme Court make it clear that trial counsel had reviewed episodes of head trauma and hospitalization, and Petitioner barred any presentation of such to the jury. *Roberts I,* ¶134.

- 16 -

It is also interesting to note from *Landrigan* that this Court has "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Landrigan,* at 479, 127 S.Ct. 1933, 1943 (U.S.,2007). Not only did the trial judge conduct an extensive colloquy to determine whether Petitioner knew the likely consequences of her actions, he ordered a competency evaluation to determine whether she was competent to forego her presentation of mitigating evidence. *Roberts I,* at ¶133-135.

**C. Trial court is to proceed on remand from the point where error occurred.**

A recurring theme in *Roberts II,* and the Ohio authority relied upon to support the court's rationale, is that on remand, a trial court is to proceed from the point that the error occurred. *Roberts II,* at ¶30; *State v. Chinn,* 85 Ohio St.3d 548,564-565 709 N.E.2d 1166 (1999), *State v. Davis,* 63 Ohio St. 3d 44, 584 N.E. 2d 1192 (1992). The trial court is under no legal obligation to back track to a point in the trial which was error free; but that is exactly the relief sought by Petitioner.

These holdings are consistent with this Court's decision in *Oregon v. Guzek ,* 546 U.S. 517, 126 S.Ct. 1226 (2006), wherein a capital defendant, subject to his third resentencing, sought to introduce an alibi witness – his mother – at his resentencing hearing. The objective of the mother's testimony was to cast doubt on the jury's verdict of guilt. This Court overturned an Oregon appellate court's decision which found error in the trial court restricting the evidence at resentencing: "The Eighth Amendment also insists that a sentencing jury be able 'to consider and give effect to mitigating evidence' about the defendant's 'character or record or the circumstances of the offense.' *Penry, supra,* at 327–328, 109 S.Ct. 2934. But the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted. Rather, 'States are

- 17 -

free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' *Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (quoting *Franklin, supra*, at 181, 108 S.Ct. 2320 (plurality opinion)); see, *e.g., Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); *California v. Brown*, 479 U.S. 538, 543, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)." *Guzek, supra,* at 526, 126 S.Ct. 1232.

The Ohio Supreme Court has set reasonable limits with respect to the nature of the proceedings at this third sentencing.  The time for mitigation evidence is over.  The time for additional allocution is over.  "On remand, the trial court is to review the entire record, including Roberts's allocution of October 22, 2007. The trial court shall consider the entire record—again, including the allocution—in determining whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The trial court shall then write and file a sentencing opinion pursuant to R.C. 2929.03(F) reflecting that it has complied with these instructions." *Roberts II,* at ¶73.

*Guzek* also cites to the need for a "rationale and equitable administration of the death penalty."  That was precisely the concern of the Ohio Supreme Court in Petitioner's case.  The court cautioned against an unequal treatment of similarly situated death row inmates if certain defendants were permitted to "update" their mitigation with information compiled post-mitigation hearing:  "Establishing a right to update mitigation could result in arbitrary distinctions between similarly situated capital defendants. A defendant who had an error-free mitigation hearing could not update his mitigation—no matter how compelling the new mitigation that might be available to him—if the trial judge committed no error *after* the mitigation hearing that called for the case to be remanded. But another defendant, whose

- 18 -

mitigation hearing was equally free of error, *would* have the right to update his mitigation in the event that a posthearing sentencing error took place that required a remand." (Italics original) *Roberts II*, ¶37. Petitioner references this rationale at page 7 of her petition. This is sound reasoning. To hold otherwise is to promote the disparate treatment of similarly situated death row inmates.

The State does not disagree with Petitioner's proposition that *Lockett* and its progeny hold that the failure of a trial court to at least consider potential mitigating evidence may be grounds for reversal of a death sentence. But none of the cases cited by Petitioner mandate that a capital defendant present mitigating evidence, nor do they even suggest that the sentencing court is required to override a capital defendant's decision to forego the presentation of mitigating evidence as happened here.

Petitioner all but acknowledges her attempts to bootstrap her Social Security records, compiled in 1999, is a far-fetched application of her rights under *Lockett*. However, she cites to the Sixth Circuit Court of Appeals decision in *Davis v .Coyle,* 475 F. 3d 761 (6th Cir. 2007), to suggest the trial court erred in failing to consider her prison records compiled from 2003 to 2007. First, the State would respectfully disagree with the Sixth Circuit's position that the omission of a capital defendant's prison records at a re-sentencing is reversible error. Second, like the Ohio Supreme Court, this Court is not bound by the holding of an inferior court. Third, *Coyle,* in effect, grants more constitutional rights than required by *Lockett*. "In a case in which the defendant was not deprived of any constitutional right—including her Eighth Amendment right to present mitigation—at the time of her mitigation hearing, there seems to be no basis for requiring the trial court to reopen or supplement that evidence in a later proceeding. To hold, as *Coyle* does, that a new mitigation hearing must be held, even though no constitutional error

- 19 -

infected the original one, would transform the right to present relevant mitigation into a right to *update* one's mitigation. Such a right has no clear basis in *Lockett* or its progeny." *Roberts, II,* at ¶36.

A few other distinguishing facts are worthy of note here as well. For instance, Von Clark Davis never waived his right to present mitigating evidence, nor did he ask for the imposition of the death penalty as did Petitioner. Also, at re-sentencing, the prosecution argued Davis' "special danger" to society. *Coyle, supra,* at page 773. At Petitioner's re-sentencing, the State of Ohio stood silent. In fact, the judge did not even ask for input from the prosecution. The fact patterns in these two cases are not totally analogous. The State of Ohio submits *Coyle* is inapplicable to Petitioner's case.

At page 12 of the petition, Petitioner argues seven potential mitigating factors which are contained in her Social Security Records and Ohio Department Rehabilitation and Correction records. With the possible exceptions of her prescription Paxil and Remeron, all of the factors cited would have been known at the time she waived her mitigation. Petitioner refused to place this evidence before her jury.

Moreover, while Petitioner may have been precluded from entering as exhibits the paper documents in question during her re-sentencing, the trial court listened patiently as she gave a none-too-brief synopsis of their contents during her allocution. The State of Ohio would refer the Court to paragraphs 57-61 of *Roberts II,* for a summary of her supposed mitigating factors which Petitioner listed during her allocution. Suffice it say that Petitioner's goofiness, "spaceyness," boundless generosity to others, head injuries, turbulent upbringing and purported suicide attempt would all have been known to Petitioner in 2003 and could have been introduced during the mitigation hearing. Parenthetically, the prison records which she now wishes to

- 20 -

introduce show that she denied any prior suicide attempt and that she is not suffering from dementia. (Proffered Ex. A, Mental Health Segregation notes, Jan. 23, 2007; Ohio Reformatory Intake, Dept. of Mental Health Services, July 24, 2003; Mental Health Caseload Classification July 2, 2003 & June 13, 2006).

Petitioner is not entitled to further review in this case. She waived her mitigation. In her belated allocution, she listed potentially mitigating factors which were undoubtedly known to her and available to her trial counsel in 2003. Interestingly, neither Petitioner nor her counsel at re-sentencing asked for mercy or suggested an alternate sentence. Reasonable restrictions have been placed on her up-coming re-sentencing which in no way implicate the Eighth Amendment. Petitioner enjoyed error-free guilt and penalty phases during her 2003 capital murder trial. She has no constitutional right to rewind her proceedings to a point *before* a sentencing phase error occurred.

## CONCLUSION

For the reasons thus stated, the State of Ohio urges this Court to **deny** Petitioner's Petition for Writ of Certiorari and to permit the trial court to re-sentence Petitioner in a manner consistent with the opinion of the Ohio Supreme Court.

- 21 -

Respectfully submitted by:

*Dennis Watkins*

DENNIS WATKINS
Trumbull County Prosecuting Attorney By:
COUNSEL OF RECORD


*LuWayne Annos*

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR RESPONDENT,
THE STATE OF OHIO

- 22 -

U.S. SUPREME COURT NO. 13-8411

IN THE
SUPREME COURT OF THE UNTIED STATES
OCTOBER TERM, 2014

DONNA ROBERTS,

*Petitioner,*

V.

THE STATE OF OHIO,

*Respondent.*

## RESPONDENT'S BRIEF IN OPPOSITION TO
## PETITION FOR WRIT OF CERTIORARI

### CERTIFICATE OF SERVICE

I, LuWayne Annos, a member of the Bar of this Court, hereby certify that on this 11th

Day of February, 2014, a copy of the foregoing Respondent's Brief in Opposition, was deposited

in the U.S. Mail, first class postage prepaid, pursuant to Rule 29.3 to Counsel for Petitioner

Donna Roberts, Atty. David L. Doughten, 4403 St. Clair Ave., Cleveland, Ohio 44103, Atty.

Jeffrey M. Gamso and Atty. Erika Cunliffe, Courthouse Square, Suite 200, 310 Lakeside Ave.,

Cleveland, Ohio 44113.

LuWAYNE ANNOS
Assistant Prosecuting Attorney
Trumbull County Ohio

RECEIVED
FEB 1 4 2014
OFFICE OF THE CLERK
SUPREME COURT, U.S.

COPY

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

March 24, 2014

Mr. Dennis Watkins
Trumbull County Prosecutor's Ofc.
160 High Street, N.W., 4th Fl.
Warren, OH  44481

        Re:  Donna Roberts
             v. Ohio
             No. 13-8411

Dear Mr. Watkins:

    The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

                        Sincerely,

                        *[signature]*

                        **Scott S. Harris**, Clerk