Case Details - CourtView Justice Solutions

## 2001 CR 00793 STATE OF OHIO -VS- ROBERTS, DONNA MARIE JMS

Case Type:
CR - Criminal
Case Status:
CLOSED
File Date:
12/21/2001
DCM Track:

Action:
AGGRAVATED MURDER (prior calculation/design)
Status Date:
12/20/2001
Case Judge:
STUARD, JOHN M
Next Event:

| All Information | Party | Charge | Ticket/Citation # | Event | Docket | Financial | Checks | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 12/20/2001 | FILING FEE FOR EACH CAUSE OF ACTION AND EACH UNDERTAKING<br>Amount Owed: $27.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $27.00 | |
| 12/20/2001 | PRISONER FEES<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 12/20/2001 | GENERAL REVENUE FUND<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 12/20/2001 | VICTIMS OF CRIME<br>Amount Owed: $30.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $30.00 | |
| 12/20/2001 | SPECIAL PROJECTS JUDGES<br>Amount Owed: $50.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $50.00 | |
| 12/21/2001 | WARRANT ON COMPLAINT AND RETURN OF SERVICE FILED. | $0.00 | |
| 12/21/2001 | COMPLAINT AND AFFIDAVIT FILED UNDER SEAL BY ORDER OF THE COURT | $0.00 | |
| 12/21/2001 | DEFT APPEARED WITH COUNSEL. NO PLEA ENTERED. NO BOND SET. | $0.00 | |
| 12/26/2001 | MOTION TO INTERVENE WITH SERVICE FILED BY ATTY STEPHEN BOLTON. | $0.00 | |
| 12/28/2001 | PRELIMINARY HEARING 12/31/2001  11:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 12/28/2001 | DIRECT PRESENTMENT FOR<br>CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES<br>CT 2: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES<br>CT 3: AGG BURGLARY (F1) W/FIREARM SPEC<br>CT 4: AGG ROBBERY (F1) W/FIREARM SPEC | $0.00 | |

10/20/21, 11:18 AM                                Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 12/28/2001 | INDICTMENT AND SUMMONS FILED BY PROSECUTOR'S OFFICE AND COPIES OF SAME ISSUED TO SHERIFF.<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 12/28/2001 | MOTION OF THE VINDICATOR PRINTING CO IN OPPOSITION TO DEFT DONNA M ROBERTS MOTION TO SEAL COURT RECORDS WITH SERVICE FILED BY ATTY DAVID MARBURGER. | $0.00 | |
| 12/28/2001 | NOTICE OF APPEARANCE AS CO-COUNSEL WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 12/28/2001 | DEFTS MOTION AND MEMORANDUM TO HOLD AFFIDAVIT AND EXHIBITS UNDER SEAL WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 12/31/2001 | NOT GUILTY PLEA TO ARRAIGNMENT ON INDICTMENT & SUMMONS NO BOND SET | $0.00 | |
| 12/31/2001 | SUMMONS ON INDICTMENT RETURNED BY SHERIFF ON DONNA MARIE ROBERTS SHERIFF ALTIERE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 12/31/2001 | CAPIAS RETURNED AND ENDORSED BY SHERIFF ON DONNA MARIE ROBERTS SHERIFF ALTIERE | $0.00 | |
| 01/03/2002 | PRE TRIAL 01/30/2002  09:00 AM<br>JUDGE:HON. JOHN M. STUARD LOC:COURT 2<br>(N1-3-02) | $0.00 | |
| 01/04/2002 | CERTIFIED MAILER NUMBER 0891 801 SENT TO: THE SUPREME COURT OF OHIO<br>Amount Owed: $5.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 01/07/2002 | VICTIM'S RIGHTS NOTIFICATION FILED. | $0.00 | |
| 01/07/2002 | DEFENDANT'S NOTICE OF REQUEST FOR DISCOVERY FILED BY DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 01/07/2002 | DEFENDANT'S MOTION FOR NOTICE OF INTENTION TO USE EVIDENCE FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 01/14/2002 | CERTIFIED MAIL NUMBER 891801 RETURNED ENDORSED FROM THE SUPREME COURT OF OHIO ON 1/9/02 BY ? | $0.00 | |
| 02/01/2002 | HEARING ON PENDING MOTIONS 05/23/2002  01:00 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/01/2002 | JURY TRIAL 11/18/2002  09:00 AM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/01/2002 | 963/427 WAIVER OF SPEEDY TRIAL FOR 300 DAYS UNTIL 11/18/02<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/11/2002 | DEFENDANT'S MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS FILED FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 02/11/2002 | DEFENDANT'S MOTION FPR DISCOVERY FILED  BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 02/20/2002 | MOTION TO DETERMINE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ. | $0.00 | |
| 02/26/2002 | DEFENDANT'S MOTION FOR COMPREHENSIVE VOIR DIRE EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 03/13/2002 | NOTICE TO SUPREME COURT (COPY) CC02008 | $0.00 | |
| 03/15/2002 | STATE'S REQUEST FOR RECIPROCAL DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/15/2002 | STATE'S RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/15/2002 | STATE'S RESPONSE TO DEFENDANT'S REQUEST BILL OF PARTICULARS FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/20/2002 | MOTION OF INTEREST PARTY FILED BY ATTORNEY ROSEMARY MILBY ATTORNEY FORD MOTOR CREDIT COMPANY FILED | $0.00 | |
| 04/16/2002 | STATES SECOND SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/18/2002 | STATES THIRD SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 05/20/2002 | HEARING ON PENDING MOTIONS 07/18/2002  01:00 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 06/18/2002 | DEFENDANT'S MOTION FOR COMPEHENSIVE VOIR DIRE EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN B JUHASZ | $0.00 | |
| 06/18/2002 | DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE EVIDENTIARY HEARING REQUESTED FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN J JUHASZ | $0.00 | |
| 07/09/2002 | DEFENDANT'S MOTION TO SUPPRESS EVIDENCE REQUEST FOR EVIDENTIARY HEARING FILED BY THE DEFENDANT'S ATTORNEY J. GERALD INGRAM AND JOHN B JUHASZ | $0.00 | |
| 07/15/2002 | DEFENDANT'S MOTION FOR ALTERNATING VOIR EXAMINATION FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 07/15/2002 | DEFENDANT'S MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM | $0.00 | |
| 07/18/2002 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATIONS UNTIL PROSECUTION HAS SHOWN PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | STATE'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO DETERMINE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPREHENSIVE VOIR DIRE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 07/18/2002 | DEFENDANT'S MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL REQUEST FOR ORAL HEARING FILED BY THE DEFENDANT'S ATTORNEY'S JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 07/19/2002 | 976/309 ENTRY OF STIPULATION REGARDING DEFTS JULY 9, 2002 MOTION TO SUPPRESS. SEE J/E. 7/19/02  COPIES SENT TO: J INGRAM, J JUHASZ, S BOLTON, D MARBURGER, A MILLETTE & PROSECUTOR Amount Owed: $4.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 07/19/2002 | POSTAGE Amount Owed: $2.22 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.22 | |
| 07/23/2002 | HEARING ON PENDING MOTIONS 09/20/2002  09:00 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 08/26/2002 | DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 09/11/2002 | 981/507 DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT THE DEATH PENALTY IS BEING SOUGHT IS DENIED. SEE J/E. 9/11/02 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ Amount Owed: $6.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.00 | |
| 09/11/2002 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 09/12/2002 | DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW REQUEST FOR HEARING WITH SERVICE FILED BY ATTY JOHN JUHASZ | $0.00 | |
| 09/13/2002 | DEFTS MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/16/2002 | DEFTS MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULLING OBJECTIONS PLACED ON THE RECORD WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/16/2002 | DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 09/20/2002 | HEARING ON PENDING MOTIONS 10/10/2002  01:00 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 10/04/2002 | MOTION TO SUPPRESS WITH SERVICE FILED BY ATTY GERALD INGRAM | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM CONTRA TO DEFTS MOTION TO DISMISS INDICTMENT: OR IN ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO HAVE REASONS FOR DEFENSE OBJECTIONS AND REASONS FOR OVERRULING DEFTS OBJECTIONS PLACED ON RECORD WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO PROHIBIT THE USE OF PEREMPTORY CHALLENGES TO EXCLUDE VERIREMEN WHO EXPRESS CONCERNS ABOUT IMPOSING CAPITAL PUNISHMENT WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MEMORANDUM IN OPPOSITION TO DEFTS MOTION FOR ALTERNATING VOIR DIRE WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | MOTION FOR DEFT TO SUBMIT TO HANDWRITING EXEMPLARS WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | STATES FOURTH SUPPLEMENTAL RESPONSE TO DEFTS REQUEST FOR DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 10/10/2002 | 983/808 MOTIONS HEARING SCHEDULED FOR 9/20/02 AT 9:00 AM IS RESCHEDULED TO 10/10/02 AT 1:00 PM. 10/10/02 COPIES SENT TO: C BECKER, K BAILEY, TR CO PROSECUTOR, J INGRAM AND J JUHASZ Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 10/15/2002 | HRG ON MOTION TO SUPPRESS 11/08/2002  09:00 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 10/21/2002 | STATUS CONFERENCE 10/24/2002  11:30 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 10/25/2002 | 985/232 WAIVER OF SPEEDY TRIAL FOR 210 DAYS UNTIL 4/7/03 Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 10/29/2002 | JURY TRIAL 04/07/2003  09:00 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 11/01/2002 | PRE TRIAL 12/19/2002  08:45 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 12/03/2002 | DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONST ART IV, 2 AND 3 AND ORC ANN 2929.05 AND 2953.02 AND REQUEST FOR HEARING WITH SERVICE FILED BY ATTY J GERALD INGRAM | $0.00 | |
| 12/20/2002 | PRE TRIAL 01/02/2003  08:45 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 01/03/2003 | SUPPRESSION HEARING 02/26/2003  09:00 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | FINAL PRE TRIAL 03/26/2003  01:00 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | JURY TRIAL 04/08/2003  09:00 AM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/28/2003 | 995/415 WAIVER OF SPEEDY TRIAL FOR ADDITIONAL 45 DAYS; TRIAL DATE APRIL 8, 2003. Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 03/03/2003 | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/17/2003 | NOTICE OF OPEN FILE DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 03/18/2003 | DEFENDANT'S MOTION FOR ORDER GRANTING EXPERT ACCESS TO DEFENDANT IN COUNTY JAIL FILED BY THE DEFENDANT'S ATTORNEY JOHN JUHASZ | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 03/18/2003 | 996/977 JUDGMENT ENTRY GRANTING EXPERT ACESS. 3/18/03 CC SENT TO: C BECKER, K BAILEY, J G INGRAM, J JUHASZ, DR T EBERLE & T ALTIERE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $2.00 | |
| 03/18/2003 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.22 | |
| 03/21/2003 | DEFENDANT'S POST SUPPRESSION HEARING MEMORANDUM FILED BY THE DEFENDANT'S ATTORNEY GERALD INGRAM AND JOHN JUHASZ | $0.00 | |
| 04/04/2003 | 998/433 DEFTS MOTION TO SUPPRESS IS DENIED. 4/4/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $6.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.00 | |
| 04/04/2003 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 04/07/2003 | PROPOSED ORIENTATION INSTRUCTIONS AS TO PROCEDURE IN A CAPITAL CASE FILED BY THE DEFENDANT'S ATTORNEY J GERALD INGRAM | $0.00 | |
| 04/07/2003 | HEARING ON MOTION TO SUPPRESS EVIDENCE FILED BY THE DEFENDANT'S ATTONREY J GERALD INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 04/07/2003 | NOTICE OF APPEAL TO THE 11TH APPELLATE COURT FILED BY ATTY J JUHASZ | $0.00 | |
| 04/07/2003 | DEFENDANTS MOTION TO CHANGE VENUE REQUEST FOR CLOSED ORAL HEARING FILED BY ATTY INGRAM AND JUHASZ | $0.00 | |
| 04/08/2003 | 998/713 MANDATE FROM COURT OF APPEALS. THE INSTANT APPEAL IS DISMISSED FOR LACK OF JURISDICTION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 04/08/2003 | SUBPOENA RETURNED AND ENDORSED ON ANDREW HARVEY BY SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/09/2003 | SUBPOENA RETURNED AND ENDORSED ON JOSE SANCHEZ MAHONING COUNTY SHERIFF'S DEPARTMENT<br>Amount Owed: $1.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.00 | |
| 04/10/2003 | PRELIMINARY INSTRUCTIONS (DEFENDANT'S SUBMISSION) FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 04/10/2003 | DEFENDANT'S MOTION FOR SPECIFIC DISCLOSURE OF DUE PROCESS MATERIAL FILED BY THE DEFENDANT'S ATTONREY JERRY INGRAM AND JOHN JUHASZ | $0.00 | |
| 04/14/2003 | STATE'S FIFTH SUPPLEMENTAL RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON MELVIN WILLIAMS MAHONING COUNTY SHERIFF<br>Amount Owed: $6.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.60 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON SHELIA FIELDS MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JEFFREY DIAMANTES MAHONING COUNTY SHERIFF<br>Amount Owed: $27.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $27.40 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JOSE FLORES RICHLAND COUNTY SHERIFF<br>Amount Owed: $2.50<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.50 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JIM MCCOY CUYAHOGA COUNTY SHERIFF<br>Amount Owed: $16.27<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $16.27 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON CHRIS GEAR MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON RALPH ROBERTS MAHONING COUNTY SHERIFF<br>Amount Owed: $14.50<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $14.50 | |
| 04/24/2003 | SUBPOENA RETURNED AND ENDORSED ON JAMES CULWELL FRANKLIN COUNTY SHERIFF<br>Amount Owed: $2.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JILL KENYON SHERIFF ALTIERE<br>Amount Owed: $4.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JENNIFER ROBINSON MAHONING COUNTY SHERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JEFFREY PASCARELLA MAHONING COUNTY SHERIFF<br>Amount Owed: $8.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.60 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON RITA MORRISON MAHNING COUNTY SJERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON RITA MOSSISON SHERIFF ALTIERE | $0.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JOHN GUZIK MAHONING COUNTY SHERIFF<br>Amount Owed: $5.40<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $5.40 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON MIGUEL DIAZ MAHONING SHERIFF ALTIERE<br>Amount Owed: $6.60<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $6.60 | |
| 04/25/2003 | TRIAL STIPULATION FILED BY THE DEDENDANT'S ATTORNEY ALONG WITH THE PROSECUTOR'S OFFICE | $0.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON FRANK REYNOLDS NOT SERVED MAHONING COUNTY SHERIFF<br>Amount Owed: $11.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $11.00 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON JAMES DANIELS MAHONING COUNTY SHERIFF<br>Amount Owed: $3.80<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.80 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON BRIDGET PAUL SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/25/2003 | SUBPOENA RETURNED AND ENDORSED ON PAULA CARSON SHERIFF ALTIERE<br>Amount Owed: $3.30<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $3.30 | |
| 04/25/2003 | SUBPOENA RETURNED UNABLE TO SERVE IN TIME FOR HEARING (KRIS ELLINGTON) | $0.00 | |
| 04/29/2003 | SUBPOENA RETURNED - UNABLE TO SERVE IN TIME FOR HEARING - NEW ADDRESS 2747 RANDOLPH NW, WARREN, OH 44485 (SANTIAGO MASON) | $0.00 | |

DONNA ROBERTS v WARDEN<br>CASE NO. 4:21-cv-00368-DAP<br>APPENDIX – PAGE 3180

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 05/12/2003 | 1001/295 1 - DEFTS MOTION TO PROHIBIT THE GOVERNMENT FROM USING PEREMPTORY CHALLENGES TO EXCLUDE VENIREMEN WHO EXPRESS CONCERN ABOUT IMPOSING CAPITAL PUNISHMENT IS OVERRULED.<br>2 - DEFTS MOTION TO HAVE REASONS FOR OBJECTIONS AND REASONS FOR OVERRULING OBJECTIONS PLACED ON THE RECORD IS GRANTED IN PART. THE COURT WILL PROVIDE ITS REASONS FOR OVERRULING ANY OBJECTIONS ON THE RECORD IF REQUESTED BY EITHER PARTY.<br>3 - DEFTS MOTION TO DISMISS DEATH PENALTY SPECIFICATIONS BECAUSE METHOD OF EXECUTION IS UNCONSTITUTIONAL IS OVERRULED.<br>4 - DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS DUE TO INADEQUATE APPELLATE REVIEW IS OVERRULED.<br>5 - DEFTS MOTION TO SUPPRESS REFERENCES TO THE JURY THAT A VERDICT OF DEATH IS ONLY A RECOMMENDATION IS OVERRULED.<br>6 - DEFTS MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO DISMISS DEATH SPECIFICATIONS BECAUSE DEATH PENALTY IN OHIO IS UNCONSTITUTIONAL IS OVERRULED.<br>7 - DEFTS MOTION FOR ALTERNATING VOIR DIRE EXAMINATION IS WITHDRAWN.<br>8 - DEFTS MOTION FOR AN ORDER ENLARGING THE TIME FOR FILING PRETRIAL MOTIONS FILED 2/11/02 IS GRANTED.<br>9 - DEFTS MOTION TO DETERMINE THE PROPER STANDARD TO EXCUSE JURORS FOR CAUSE IS OVERRULED TO THE EXTENT THAT THE COURT WILL DETERMINE BASED UPON THE APPLICABLE LAW THE STANDARD FOR EXCUSING JURORS.<br>10 - DEFTS MOTION FOR COMPREHENSIVE VOIR DIRE EXAMINATION IS GRANTED AND THE COURT WILL PERMIT THE PARTIES 45 MINUTES PER SIDE TO INDIVIDUALLY VOIR DIRE THE PROSPECTIVE JURORS.<br>11 - DEFTS MOTION TO PROHIBIT DEATH QUALIFICATION OF JURORS UNLESS AND UNTIL THE GOVERNMENT HAS ESTABLISHED PROBABLE CAUSE THAT THE CASE WILL PROCEED TO A SECOND PHASE IS OVERRULED.<br>12 - STATES MOTION TO HAVE THE DEFT SUBMIT TO HANDWRITING EXEMPLARS IS MOOT DUE TO THE STIPULATED ENTRY FILED ON 4/25/02.<br>13 - DEFTS MOTION TO DISMISS DEATH SPECIFICATIONS AND TO DECLARE INVALID OHIO CONSTITUTION ART IV, 2 AND 3 AND ORC 2929.05 AND 2953.02 IS OVERRULED.<br>14 - DEFTS MOTION TO CHANGE VENUE IS OVERRULED.<br>5/12/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 05/12/2003 | DEFENDANT'S MOTION IN LIMINE HEARING REQUEST OR HEARING FILED BY THE DEFENDANT'S ATTORNEY JERRY INDRAM AND JOHN JUHASZ | $0.00 | |
| 05/12/2003 | DEFENDANT'S MOTION IN LIMINE CONCERING EXTRANEOUS STATEMENTS IN LETTERS AND TAPES FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM & JOHN JUHASZ | $0.00 | |
| 05/12/2003 | STENOGRAPHER FEE FILED BY KELLY J WILSON OFFICIAL COURT REPORTER<br>Amount Owed: $125.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $125.00 | |
| 05/13/2003 | WITNESS FEES FOR CHRIS MONYAK<br>Amount Owed: $24.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $24.00 | |
| 05/14/2003 | WITNESS FEES<br>JAMES DANIELS<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 05/14/2003 | WITNESS FEES<br>$283.90<br>Amount Owed: $283.90<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 132123  Date: 08/25/2008 | $283.90 | |
| 05/15/2003 | WITNESS FEES  SANTIAGO MASON<br>Amount Owed: $24.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $24.00 | |
| 05/15/2003 | STIPULATION FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |
| 05/16/2003 | DEFENDANT'S MTION IN LIMNE REQUEST FOR HEARING FILED BY THE DEFENDANT'S ATTORNEY JERRY AND ATTORNEY JOHN JUHASZ | $0.00 | |

10/20/21, 11:18 AM                                     Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/22/2003 | 1002/478 JURORS MARGARET KAY AND TERRY GRAY ARE ORDERED BY THIS COURT NOT TO REPORT TO THEIR PLACES OF EMPLOYMENT DURING THE DURATION OF THEIR JURY SERVICE IN THE ABOVE STYLED CASE. THIS ORDER SHALL REMAIN IN EFFECT UNTIL A FINAL VERDICT IS REACHED IN THIS CASE IN THE GUILT PHASE AS WELL AS THE PENALTY PHASE IF SUCH PHASE IS NECESSARY. 5/22/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/22/2003 | POSTAGE<br>Amount Owed: $1.11<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 123746  Date: 04/29/2008 | $1.11 | |
| 05/22/2003 | 1004/867 ORDERED THAT JURORS MARGARET KAY & TERRY GRAY ARE NOT TO REPORT TO PLACES OF EMPLOYMENT DURING DURATION OF JURY SERVICE IN THIS CASE 06-30-03 COPIES TO J GERALD INGRAM, JOHN JUHASZ & PROS<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/27/2003 | DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL FILED BY THE DEFENDANT'S ATTOENRY J. INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/27/2003 | DEFENDANT'S PROPSED INSTRUCTION TO TRIAL JURY FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/27/2003 | CHARGE IF THE COURT FILED BY THE DEFENDANT'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 05/29/2003 | 1002/761 VERDICT FOR PLAINTIFF - COUNT ONE - COMPLICITY TO AGGRAVATED MURDER (PRIOR CALCULATION AND DESIGN)<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/762 VERDICT FOR PLAINTIFF COUNT ONE - VERDICT ON SPECIFICATION ONE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/763 VERDICT FOR PLAINTIFF  COUNT ONE - VERDICT ON SPECIFICATION TWO<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/764 VERDICT FOR PLAINTIFF COUNT TWO - COMPLICITY TO AGGRAVATED MURDER (FELONY MURDER)<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/765 VERDICT FOR PLAINTIFF COUNT TWO VERDICT ON SPECIFICATION ONE<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/766 VERDICT FOR PLAINTIFF COUNT TWO - VERDICT ON SPECIFICATION TWO<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/767 VERDICT FOR PLAINTIFF COUNT THREE COMPLICITY TO AGGRAVATED BURGLARY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/768 VERDICT FOR PLAINTIFF COUNT THREE - VERDICT ON FIREARM SPECIFICATION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 05/29/2003 | 1002/769 VERDICT FOR PLAINTIFF COUNT 4 COMPLICITY TO AGGRAVATED ROBBERY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 05/29/2003 | 1002/770 VERDICT FOR PLAINTIFF COUNT FOUR - VERDICT ON FIREARM SPECIFICATION<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 06/03/2003 | MOTION TO MERGE DEATH SPECIFICATIONS FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT READMISSION OF CERTAIN EXHIBITS FROM THE FIRST TRIAL PHASE FILED BY THE DEFENDANT'S ATTORNEY'S ATTORNEY JERRY INGRAM AND ATTORNEY JOHN JUHASZ | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT REFERENCE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AT CERTAIN TIMES FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT REFERENCE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSES AT CERTIN TIMES FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | MOTION TO PROHIBIT IMPROPER COMMENT BY PROSECUTOR ON DEFENDANT'S UNSWORN STATEMENT FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/03/2003 | PROPOSED INSTRUCTION TO JURY FILED BY THE DEFENDANT'S ATTORNEY | $0.00 | |
| 06/05/2003 | 1003/391 JURY FINDING AND RECOMMENDATION OF DEATH SENTENCE. COUNT ONE SPECIFICATION ONE: AGGRAVATED BURGLARY<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 06/05/2003 | 1003/393 JURY FINDING AND RECOMMENDATION OF DEATH SENTENCE. COUNT ONE SPECIFICATION TWO: AGGRAVATED ROBBERY<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 06/13/2003 | SENTENCING HEARING 06/20/2003  01:30 PM<br>BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 06/16/2003 | 1003/911 THE COURT FINDS THAT THERE IS NO AUTHORITY TO ORDER A PRE-SENTENCE INVESTIGATION AND REPORTS, AS WAS ORDERED BY THE COURT ON 6/4/03. AS SUCH A REPORT MAY BE PREPARED ONLY AT THE REQUEST OF THE DEFT AND AS THE DEFT HAS NOT MADE SUCH A REQUEST,THE DIRECTIVE THAT SUCH A REPORT BE PREPARED IS RESCINDED<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 06/20/2003 | 1004/263 JURORS EXCUSED WITHOUT OBJECTION BY COUNSEL. SEE J/E<br>Amount Owed: $16.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $16.00 | |
| 06/20/2003 | 1004/271 JURORS EXCUSED FOR CAUSE DURING THE TRIAL. SEE J/E<br>Amount Owed: $8.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $8.00 | |
| 06/20/2003 | 1004/275 OPINION OF THE COURT IMPOSING DEATH SENTENCE AND FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH SENTENCE. SEE J/E<br>Amount Owed: $34.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $34.00 | |
| 06/23/2003 | POST SENTENCING RIGHTS FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 06/24/2003 | COMPLETE RECORD<br>Amount Owed: $20.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $20.00 | |
| 06/24/2003 | STENOGRAPHER FEE<br>Amount Owed: $25.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $25.00 | |
| 06/24/2003 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON 6-24-03 | $0.00 | |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3183

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 06/24/2003 | 1004/449 SENTENCING: 6/4/03 DEFT IS SENTENCED TO DEATH ON 1/11/04 ON COUNT ONE. DEFT SENTENCED TO THE OHIO REFORMATORY FOR WOMEN AT MARYSVILLE OHIO FOR 10 YEARS ON COUNT 3 PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 3; 10 YEARS ON COUNT 4 PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT THREE. FIREARM SPECIFICATIONS IN COUNT THREE AND COUNT FOUR SHALL MERGE AS ONE SENTENCE IN COUNT THREE AS A MATTER OF LAW. DEFT TO PAY COSTS. 6/24/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J JUHASZ Amount Owed: $8.00 Paid Before Conversion: $0.00 Receipt Number: Receipt: 128021 Date: 06/30/2008 | $8.00 | |
| 06/24/2003 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number: Receipt: 123746 Date: 04/29/2008 | $1.11 | |
| 06/25/2003 | 1004/453 WRIT TO CONVEY PRISONER FOR EXECUTION OF PENALTY Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 06/25/2003 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF Amount Owed: $5.00 Paid Before Conversion: $0.00 Receipt Number: Receipt: 128021 Date: 06/30/2008 | $5.00 | |
| 06/30/2003 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT DONNA ROBERTS SHERIFF ALTIERE Amount Owed: $82.30 Paid Before Conversion: $0.00 Receipt Number: Receipt: 128021 Date: 06/30/2008 | $82.30 | |
| 07/23/2003 | NOTICE OF COMMITTMENT AND CALCULATION OF SENTENCE FILED BY OHIO DEPT. OF REHABILITATION/CORRECTION | $0.00 | |
| 08/05/2003 | 1008/468 THE STATE OF OHIO PUBLIC DEFENDER'S OFFICE IS APPOINTED AS COUNSEL FOR THE DEFT IN HER APPEAL OF THIS MATTER. 8/6/03 COPIES SENT TO: PROSECUTOR, J INGRAM & J YUHASZ Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 08/06/2003 | POSTAGE Amount Owed: $1.11 Paid Before Conversion: $0.00 Receipt Number: Receipt: 123746 Date: 04/29/2008 | $1.11 | |
| 08/18/2003 | ORDER TO FILE RECORD WITH SUPREME COURT BY 10/14/03 Amount Owed: $2.00 Paid Before Conversion: $0.00 Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 12/05/2003 | PETITIONER DONNA ROBERT'S MOTION FOR APPOINTMENT OF COUNSEL FILED BY THE DEFENDANT ALSO MEMORANDUM IN SUPPORT OF PETITIONER DONNA ROBERT'S MOTION FOR APPOINTMENT OF COUNSEL FILED BY THE DEFENDANT DONNA MARIE ROBERTS. | $0.00 | |
| 01/20/2004 | APPELLANTS NOTICE OF APPEAL FOR DELAYED APPEAL IN THE SUPREME COURT OF OHIO FILED. | $0.00 | |
| 01/29/2004 | RECORD TRANSMITTED TO THE SUPREME COURT INCLUDING ORIGINAL PAPERS,TRANSCRIPTS (28 VOLUMES), AND EXHIBITS WITH INDEX BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY SHERIFFS DEPARTMENT.COPIES OF INDEX SENT TO COUNSEL OF RECORD. Amount Owed: $1.00 Paid Before Conversion: $0.00 Receipt Number: Receipt: 123746 Date: 04/29/2008 | $1.00 | |
| 02/02/2004 | COPY OF EXHIBIT OF RECORD OF DEATH PENALTY CASE FROM THE SUPREME COURT OF OHIO | $0.00 | |
| 02/13/2004 | HEARING 03/12/2004 01:00 PM BEFORE:HON. JOHN M. STUARD LOC:COURT 2 | $0.00 | |
| 02/27/2004 | MOTION FOR WARRANT FOR REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |

10/20/21, 11:18 AM                          Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 02/27/2004 | ONE CERTIFIED COPY OF WARRANT FOR REMOVAL AND COPY OF MOTION FOR WARRANT OF REMOVAL AND WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL ISSUED TO THE SHERIFF ON 2-27-04 | $0.00 | |
| 02/27/2004 | 1024/551 ORDER ON WARRANT TO CONVEY<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 03/15/2004 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT SHERIFF ALTIERE<br>Amount Owed: $240.50<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 03/23/2004 | 1026/435 THE COURT FINDS THAT THERE IS A CONFLICT OF INTEREST WITH THE PUBLIC DEFENDERS OFFICE. ATTYS DAVID DOUGHTEN AND PATTY SMITH APPOINTED AS COUNSEL FOR DEFT IN HER APPEAL. THE ADDRESS FOR ATTYS IS 4403 ST CLAIR AVE, CLEVELAND OH 44103 (216)361-1112<br>3/23/04 COPIES SENT TO: K CULSHAW, R TROUTMAN, J WILHELM, D WATKINS, C BECKER, K BAILEY & L ANNOS. CC TO THE OHIO SUPREME COURT<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.00 | |
| 03/23/2004 | POSTAGE<br>Amount Owed: $2.96<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.96 | |
| 04/14/2004 | 1028/385 ORDER APPOINTING COUNSEL FOR POST CONVICTION PETITION AND SETTING FEES.<br>4/14/04 COPIES SENT TO: J INGRAM, J JUHASZ, D BODIKER, J WILHELM, S BOLTON, D MARGURGER, A MILLETTE, D WATKINS, C BECKER, K BAILEY & L ANNOS<br>Amount Owed: $4.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 04/14/2004 | POSTAGE<br>Amount Owed: $4.07<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $4.07 | |
| 07/22/2004 | MOTION FOR SUBSTITUTION OF COUNSEL FILED BY THE THE DEFENDANT'S ATTORNEY DAVID L DOUGHTEN AND ATTORNEY PATRICIA J SMITH | $0.00 | |
| 08/20/2004 | 1039/213 MOTION FOR SUBSTITUTION OF COUNSEL IS GRANTED<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 09/09/2004 | JOINT MOTION TO TOLL FILING DATE OF POST CONVICTION PETITION FILED BY ATTY LUWAYNE ANNOS | $0.00 | |
| 09/09/2004 | 1040/696 PURSUANT TO A JOINT MOTION FILED BY COUNSEL FOR DEFT DONNA ROBERTS AND COUNSEL FOR THE STATE OF OHIO, THIS COURT IN THE INTEREST OF JUSTICE WILL CONSTRUE DEFTS POSTCONVICTION PETITION TIMELY FILED IF IT IS TIME-STAMPED BY THE CLERK OF COURTS ON OR BEFORE 9/25/04.<br>9/9/04 COPIES SENT TO: PROSECUTOR, J INGRAM, J YUHASZ, D BODIKER, J WILHELM & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 09/09/2004 | POSTAGE<br>Amount Owed: $2.22<br>Paid Before Conversion: $0.00<br>Receipt Number:  Receipt: 128021  Date: 06/30/2008 | $2.22 | |
| 09/24/2004 | PETITION TO VACATE OR SET ASIDE SENTENCE FILED BY ATTORNEY DAVID DOUGHTEN COUNSEL FOR PETITIONER ALSO EXHIBIT B FILED  NATHANIEL JACKSON'S VIDEO STATEMENT FILED.SERVED A COPY OF PETITION TO THE TRUMBULL COUNTY PROSECUTORS OFFICE ON THIS DATE. | $0.00 | |
| 10/01/2004 | MOTION TO EXTEND TIME  TO RESPONSE FILED BY THE PROSECUTOR'S OFFICE | $0.00 | |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3185

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/07/2004 | 1042/898 PURSUANT TO A JOINT MOTION FILED BY COUNSEL FOR DEFT DONNA ROBERTS AND COUNSEL FOR THE STATE OF OHIO, THIS COURT, IN THE INTEREST OF JUSTICE, WILL CONSTRUE DEFTS POSTCONVICTION PETITION TIMELY FILED IF IT IS TIME-STAMPED BY THE CLERK OF COURTS ON OR BEFORE 9/25/04.<br>10/7/04 COPIES SENT TO: PROSECUTOR, J INGRAM, J YUHASZ, D BODIKER, J WILHELM & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 10/07/2004 | 1042/899 PURSUANT TO A MOTION BY THE PLAINTIFF-RESPONDENT, THE STATE OF OHIO, AND R.C. 2953.21 (D), THIS COURT FIXES THE DUE DATE FOR THE STATE'S RESPONSE BY ANSWER OR MOTION AT 11/3/04. THE STATE, PER MOTION, HAS SHOWN GOOD CAUSE TO EXTEND THE DUE DATE FROM 10/4/04 TO 11/3/04.<br>10/7/04 COPIES SENT TO: PROSECUTOR & D DOUGHTEN<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 10/25/2004 | FIRST AMENDED PETITION TO VACATE OR SET ASIDE SENTENCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 11/02/2004 | MOTION FOR SUMMARY JUDGMENT WITH SERVICE FILED BY ATTY LUWAYNE ANNOS | $0.00 | |
| 11/03/2004 | COPY OF MERIT BRIEF OF PLTF/APPLEE OF STATE OF OHIO FILED BY PROSECUTOR | $0.00 | |
| 12/01/2004 | PETITIONER'S MOTION TO TRANSFER THE RECORD OF NATHANIEL JACKSON TO THE CAUSE OF ACTION FILED BY THE DEFENDANT'S ATTORNEY DAVID L DOUGHTEN | $0.00 | |
| 12/01/2004 | PETITIONER'S MOTION IN OPPOSITION TO STATE'S MOTION FOR SUMMARY JUDGMENT FILED BY THE DEFENDANT'S ATTORNEY DAVID DOUGHTEN | $0.00 | |
| 12/01/2004 | MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY FILED BY THE DEFENDANT'S ATTORNEY DAVID DOUGHTEN | $0.00 | |
| 01/24/2005 | FILE SIGNED OUT TO JUDGE STUARD ON 1-25-05 | $0.00 | |
| 02/11/2005 | 1052/303 FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING PETITIONERS ORIGINAL AND FIRST AMENDED PETITION FOR POST CONVICTION RELIEF<br>Amount Owed: $28.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $28.00 | |
| 02/11/2005 | 1052/709 DEFENDANT-PETITIONER DONNA ROBERTS' MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY FILED DECEMBER 1, 2004 IS OVERRULED AS MOOT. MOTION TO TRANSFER THE RECORD OF NATHANIEL JACKSON TO THIS CAUSE OF ACTION IS ALSO DENIED AS MOOT.<br>2/14/05 COPIES SENT TO: J INGRAM, J JUHASZ, D BOKER, J WILHELM, D DOUGHTEN, S BOLTEN, D MARBURGER, A MILLETTE, A WATKINS, C BECKER, D BODIKER, K BAILEY, L ANNOS<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 02/14/2005 | POSTAGE<br>Amount Owed: $4.81<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $4.81 | |
| 02/23/2005 | 1053/026 ORDER FOR CLERK OF COURTS TO IMMEDIATELY SERVE A COPY OF THIS COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW FILED FEBRUARY 11, 2005 UPON ATTY DAVID DOUGHTEN COUNSEL FOR DEFENDANT-PETITIONER DONNA ROBERTS AND UPON TRUMBULL COUNTY PROSECUTOR'S OFFICE COUNSEL FOR PLAINTIFF RESPONDENT. 2/24/05 COPIES SENT: ATTY D DOUGHTEN, PROSECUTOR<br>Amount Owed: $2.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $2.00 | |
| 03/01/2005 | MOTION FOR APPOINTMENT OF APPELLATE COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 03/17/2005 | MOTION FOR LEAVE TO FILE DELAYED APPEAL AND NOTICE OF APPEAL TO THE 11TH APPELLATE COURT FILED BY ATTY D DOUGHTEN | $0.00 | |
| 03/30/2005 | 1056/564 APPROVAL OF PAYMENT OF COUNSEL FEES CC: AUDITOR<br>Amount Owed: $12.00<br>Paid Before Conversion: $0.00<br>Receipt Number: Receipt: 128021 Date: 06/30/2008 | $12.00 | |
| 09/13/2006 | NOTICE FILE REQUESTED BY JUDGE STUARD FROM CLERK'S OFFICE | $0.00 | |

10/20/21, 11:18 AM                                    Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/10/2006 | ORDER FROM SUPREME COURT OF OHIO.  JUDGMENT OF THE COURT OF COMMON PLEAS IS AFFIRMED IN PART, VACATED IN PART AND THIS CAUSE IS REMANDED TO THE TRIAL COURT CONSISTENT WITH THE OPINION RENDERED HEREON.   SEE JE | $0.00 | |
| 10/10/2006 | ORDERED BY THE SUPREME COURT OF OHIO THAT THE MOTION FOR RECONSIDERATION IN THIS CASE IS DENIED | $0.00 | |
| 11/01/2006 | HEARING SET: <br> Event: STATUS HEARING <br> Date: 12/06/2006   Time: 9:00 am <br> Judge: STUARD, JOHN M  Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 11/01/2006 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  11/01/2006  10:10:21 | | |
| 12/04/2006 | MOTION FOR APPOINTMENT OF CO-COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/04/2006 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/04/2006 | MOTION FOR RELEASE OF RECORDS WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 12/06/2006 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 12/06/2006 at 9:00 am has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 01/17/2007   Time: 3:00 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 12/06/2006 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  12/06/2006  12:31:39 | | |
| 12/08/2006 | MOTION FOR APPOINTMENT OF CO-COUNSEL IS GRANTED | $0.00 | |
| 01/17/2007 | ORDERED THAT ROBERT A DIXON BE APPOINTED AS CO COUNSEL  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/17/2007 | ORDER DIRECTIVING EVALUATION OF DEFENDANT'S COMPETENCE TO STAND TRIAL 1-23-97 COPIES TO  J. INGRAM, J. WILHELM, D DOUGHTON, R. DIXON, D. BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/17/2007 | ORDER FOR FORENSIC EXAM 1-23-07 COPIES TO J. INGRAM, J. WILHELM, D. DOUGTEN, R. DIXON, D BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 01/23/2007 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 01/17/2007 at 3:00 pm has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 02/14/2007   Time: 3:30 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 01/23/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on:  01/23/2007  14:22:06 | | |
| 01/25/2007 | MOTION FOR APPROPRIATION OF FUNDS FOR LEAD COUNSEL WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 01/29/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 01/29/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 02/01/2007 | REGULAR MAIL SENT TO:ROBERTA A DIXON <br> RETURNED BY POST OFFICE  FOR: ATTEMPTED NOT KNOWN <br> Receipt: 123746  Date: 04/29/2008 | $0.20 | |

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3187

10/20/21, 11:18 AM                                    Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 02/05/2007 | ORDER FOR DAVID DOUGHTEN TO BE APPOINTED LEAD COUNSEL.  2-8-07  COPIES SENT TO D DOUGHTEN, J INGRAM, J WILHELM, R DIXON, D BODIKER, J JUHASZ AND PROS  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 02/08/2007 | POSTAGE  Receipt: 128021  Date: 06/30/2008 | $2.73 | |
| 02/26/2007 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 02/14/2007 at 3:30 pm has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 03/09/2007   Time: 2:00 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: SET STATUS CONFERENCE | | |
| 02/26/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on: 02/26/2007 11:04:16 | | |
| 03/09/2007 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 03/09/2007 at 2:00 pm has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 05/11/2007   Time: 2:00 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 03/09/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on: 03/09/2007 15:21:27 | | |
| 04/24/2007 | RECEIPT FROM THE SUPREME COURT OF OHIO.  ALL ORIGINAL PAPERS (3 BOXES) WERE RETURNED TO THE TRUMBULL COUNTY CLERK OF COURTS | $0.00 | |
| 05/01/2007 | MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING REHEARING WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 05/01/2007 | MOTION TO CONTINUE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 05/25/2007 | HEARING SET: <br><br> The following event: STATUS HEARING scheduled for 05/11/2007 at 2:00 pm has been rescheduled as follows: <br><br> Event: STATUS HEARING <br> Date: 06/29/2007   Time: 10:30 am <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: SET SENTENCING | | |
| 05/25/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on: 05/25/2007 14:49:56 | | |
| 06/28/2007 | STATES MEMORANDUM IN OPPOSITION TO DEFTS MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING  HEARING AND MEMORANDUM IN OPPOSITION WITH SERVICE FILED BY PROSECUTOR | $0.00 | |
| 06/29/2007 | HEARING SET: <br> Event: RE-SENTENCING HEARING <br> Date: 08/15/2007   Time: 3:00 pm <br> Judge: STUARD, JOHN M   Location: COURTROOM 2 <br><br> Result: TO BE RESET | | |
| 06/29/2007 | NOTICE SENT: <br><br> SPEEDY MAILER <br> Sent on: 06/29/2007 11:14:40 | | |
| 07/13/2007 | WARRANT FOR REMOVAL.  Receipt: 128021  Date: 06/30/2008 | $2.00 | |
| 07/13/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 07/13/2007 | WARRANT ISSUED TO SHERIFF ON 7-13-07 | $0.00 | |
| 08/02/2007 | MOTION TO CONTINUE SENTENCING HEARING WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 08/02/2007 | MOTION FOR VOLUNTARY RECUSAL OF TRIAL JUDGE, TO ASSIGN CASE TO VISITING JUDGE AND TO HOLD CASE IN ABEYANCE WITH SERVICE FILED BY ATTY DAVID DOUGHTEN | $0.00 | |
| 08/07/2007 | XXX COSTS SENT TO CORRECTIONAL FACILITY FOR INMATE PAYMENT OF COSTS | $0.00 | |
| 08/15/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 08/17/2007 | HEARING SET:  The following event: RE-SENTENCING HEARING scheduled for 08/15/2007 at 3:00 pm has been rescheduled as follows:  Event: RE-SENTENCING HEARING  Date: 09/21/2007   Time: 2:30 pm  Judge: STUARD, JOHN M   Location: COURTROOM 2  Result: TO BE RESET | | |
| 08/17/2007 | NOTICE SENT:  SPEEDY MAILER  Sent on:  08/17/2007  14:44:40 | | |
| 08/17/2007 | HEARING SET:  Event: HEARING  Date: 09/20/2007   Time: 2:30 pm  Judge: STUARD, JOHN M   Location: COURTROOM 2  Result: TO BE RESET | | |
| 08/17/2007 | NOTICE SENT:  SPEEDY MAILER  Sent on:  08/17/2007  14:49:21 | | |
| 08/27/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 08/27/2007 | WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL  ISSUED TO SHERIFF ON 8-28-07 | $0.00 | |
| 08/27/2007 | WARRANT FOR REMOVAL.  8-28-07 ISSUED TO SHERIFF  Receipt: 123746  Date: 04/29/2008 | $2.00 | Image |
| 09/05/2007 | ORDER FOR CONTINUANCE OF TRIAL IS GRANTED TO ALLOW THE COMPETENCY EXAM TO BE CONDUCTED. SENTENCING DATE WILL BE SET AT COMPLETION OF COMPETENCY PROCEEDINGS.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 09/11/2007 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/14/2007 | DEFENDANTS MOTION TO ALLOW FULL PRESENTATION OF MITIGATION AT SENTENCING HEARING IS DENIED.  9-14-07 COPIES TO: PROS, J. INGRAM, D. DOUGHTEN  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 09/14/2007 | POSTAGE  Receipt: 123746  Date: 04/29/2008 | $0.82 | |
| 09/18/2007 | MOTION TO PROFFER EVIDENCE FILED BY THE  DEFENDANT WITH PROOF OF SERVICE ALSO MEMORANDUM IN SUPPORT FILED BY THE DEFENDANT'S ATTORNEY WITH PROOF OF SERVICE DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/18/2007 | MOTION TO PROFFER EVIDENCE APPENDIX PRISON RECORDS ALONG WITH EXHIBITS FILED BY THE DEFENDANT'S ATTORNEY  FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/19/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 128021  Date: 06/30/2008  Receipt: 132122  Date: 08/25/2008 | $230.50 | |
| 09/20/2007 | MOTION TO PROFFER EVIDENCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 09/20/2007 | MOTION FOR APPOINTMENT OF INDEPENDENT EXPERT AND FOR CONTINUANCE WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |

10/20/21, 11:18 AM                                    Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 09/21/2007 | HEARING SET:<br><br>The following event: HEARING scheduled for 09/20/2007 at 2:30 pm has been rescheduled as follows:<br><br>Event: HEARING<br>Date: 10/22/2007   Time: 1:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 09/21/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  09/21/2007  13:24:22 | | |
| 09/21/2007 | HEARING SET:<br><br>The following event: RE-SENTENCING HEARING scheduled for 09/21/2007 at 2:30 pm has been rescheduled as follows:<br><br>Event: RE-SENTENCING HEARING<br>Date: 10/29/2007   Time: 1:00 pm<br>Judge: STUARD, JOHN M   Location: COURTROOM 2<br><br>Result: SENTENCED | | |
| 09/21/2007 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  09/21/2007  13:59:03 | | |
| 10/02/2007 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | |
| 10/02/2007 | JOURNAL ENTRY/ WARRANT FOR REMOVAL.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 10/03/2007 | WARRANT TO CONVEY TO TRUMBULL COUNTY JAIL  ISSUED TO SHERIFF ON 10-3-07 | $0.00 | |
| 10/18/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008 | $240.50 | |
| 10/22/2007 | MANDATE FROM COURT OF APPEALS. INSTANT APPEAL IS DISMISSED FOR LACK OF JURISDICTION.  Receipt: 128021  Date: 06/30/2008 | $2.00 | Image |
| 10/29/2007 | DEFT ROBERT'S SENTENCING MEMORANDUM WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |
| 10/29/2007 | ORDERED THAT THE JURYS RECOMMENDATION IS ACCEPTED AND COURT DOES  FIND THAT THE SENTENCE OF DEATH IS THE APPROPRIATE PENALTY IN THIS CASE.<br>10-29-07 COPIES TO: PROS, D. DOUGTHEN  Receipt: 128021  Date: 06/30/2008 | $48.00 | Image |
| 10/29/2007 | POSTAGE  Receipt: 123746  Date: 04/29/2008 | $0.41 | |
| 11/06/2007 | EXECUTION FOR COSTS IN FELONY  ISSUED TO SHERIFF ON 11-6-07 | $0.00 | |
| 11/06/2007 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN  ISSUED TO SHERIFF ON 11-6-07 | $0.00 | |
| 11/06/2007 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF  Receipt: 128021  Date: 06/30/2008 | $5.00 | |
| 11/06/2007 | WRIT TO CONVEY PRISONER FOR EXECUTION OF PENALTY ON OCT. 28, 2008.<br>11-6-07 ISSUED TO SHERIFF  Receipt: 123746  Date: 04/29/2008 | $2.00 | Image |
| 11/06/2007 | SENTENCING: ON OCT. 29, 2007 DEFENDANT RE-SENTENCED TO DEATH ON OCT. 28, 2008 ON COUNT 1; AND IMPRISONED FOR 10 YEARS ON COUNT 3; PLUS MANDATORY TERM OF 3 YEARS OF FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO COUNT 3; 10 YEARS ON COUNT 4, PLUS MANDATORY 3 YEARS ON FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO SENTENCE IMPOSED ON COUNT 3. FIREARM SPECIFICATION IN COUNT 3 & 4 SHALL MERGE AS ONE SENTENCE IN COUNT 3.<br>11-6-07 COPIES TO: PROS, D. DOUGHTEN, BUREAU OF SENTENCE COMPUTATION  Receipt: 128021  Date: 06/30/2008 | $6.00 | Image |
| 11/06/2007 | POSTAGE  Receipt: 123746  Date: 04/29/2008 | $0.82 | |
| 11/07/2007 | WARRANT RETURNED SHOWING SERVICE ON DEFENDANT  Receipt: 132122  Date: 08/25/2008  Receipt: 132123  Date: 08/25/2008 | $240.50 | |
| 11/15/2007 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED  Receipt: 128021  Date: 06/30/2008 | $6.00 | Image |
| 12/03/2007 | MOTION TO APPOINT APPELLATE COUNSEL WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | |

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 12/14/2007 | ORDER TO CERTIFY RECORD IN DEATH PENALTY CASE BY 2-11-08 FILED BY THE SUPREME COURT OF OHIO | $0.00 | |
| 12/18/2007 | TRANSCRIPT OF PROCEEDINGS FILED BY MARY ANN MILLS COURT REPORTER | $0.00 | |
| 12/18/2007 | DEFTS EXHIBIT A, DEFTS EXHIBIT B AND STATES EXHIBIT 1 FILED BY MARY ANN MILLS COURT REPORTER | $0.00 | |
| 01/11/2008 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED Receipt: 128021 Date: 06/30/2008 | $8.00 | Image |
| 01/11/2008 | ORDERED THAT ATTY JEFFREY J HELMICK TO REPRESENT DEFENDANT FOR PURPOSES OF APPEAL. 1-11-08 COPIES TO: PROS, J. HELMICK Receipt: 128021 Date: 06/30/2008 | $2.00 | Image |
| 01/11/2008 | POSTAGE Receipt: 123746 Date: 04/29/2008 | $0.41 | |
| 02/07/2008 | INDEX PREPARED AND SENT TO ATTY'S. | $0.00 | |
| 02/12/2008 | RECEIPT FROM THE SUPREME COURT OF OHIO FOR FOUR BOXES WHICH INCLUDE THE CASE FILE, EXHIBITS AND TRANSCRIPTS OF THIS CASE | $0.00 | |
| 02/21/2008 | RECEIPT FROM SUPREME COURT OF OHIO FOR 6 BOXES OF EXHIBITS AND ONE POSTER | $0.00 | |
| 06/24/2008 | MOTION FOR APPOINTMENT OF COUNSEL FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 07/01/2008 | COUNTY FEES WITNESS FEES FOR CHRIS MONYAK, JAMES DANIEL AND SANTIAGO MASON Receipt: 128057 Date: 07/01/2008 | $56.00 | |
| 07/09/2008 | MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED. Receipt: 132122 Date: 08/25/2008 | $4.00 | Image |
| 07/09/2008 | ATTY DAVID L DOUGHTEN IS REAPPOINTED AS COUNSEL FOR DEFENDANT. 7-10-08 COPIES TO: PROS, D. DOUGHTHEN Receipt: 132122 Date: 08/25/2008 | $2.00 | Image |
| 07/09/2008 | POSTAGE Receipt: 132122 Date: 08/25/2008 | $0.42 | |
| 08/20/2008 | APPENDIX TO DONNA ROBERTS FILED ALONG WITH EXHIBIT A FILED BY DAVID L DOUGHTEN | $0.00 | |
| 08/20/2008 | PETITION TO VACATE OR SET ASIDE SENTENCE FILED BY DAVID L DOUGHTEN | $0.00 | Image |
| 08/20/2008 | APPENDIX TO DONNA ROBERTS ALONG WITH EXCHIBIT K FILED BY DAVID L DOUGHTEN | $0.00 | Image |
| 08/22/2008 | MOTION TO EXTEND TIME TO RESPOND FILED WITH PROOF OF SERVICE LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 08/26/2008 | COUNTY FEES *WITNESS FEES Receipt: 134296 Date: 09/25/2008 Receipt: 136816 Date: 11/03/2008 | $283.90 | |
| 09/02/2008 | ORDERED THAT DEFENDANTS PETITION TO A FIXED DATE OF SEPT 30, 2008 IS GRANTED. 9-2-08 COPIES TO: PROS, D. DOUGHTEN Receipt: 134296 Date: 09/25/2008 | $2.00 | Image |
| 09/02/2008 | POSTAGE Receipt: 134296 Date: 09/25/2008 | $0.42 | |
| 09/17/2008 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE (INDEPENDENT PSYCHOLOGIST) WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | MOTION FOR APPROPRIATION OF FUNDS FOR EXPERT ASSISTANCE (NEUROPSYCHOLOGIST) WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | MOTION TO STAY WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/17/2008 | DONNA ROBERT'S MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY WITH SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 09/22/2008 | STATES RESPONSE TO PETITIONERS MOTION TO STAY POSTCONVICTION PROCEEDINGS WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE (INDEPENDENT PSYCHOLOGIST) WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES RESPONSE TO PETITIONERS MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/22/2008 | STATES OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE (NEUROPSYCHOLOGIST) WITH SERVICE FILED BY PROSECUTOR | $0.00 | Image |
| 09/25/2008 | ORDERED THAT DEFENDANTS MOTION IS GRANTED. 9-26-08 COPIES TO: PROS, J. INGRAM Receipt: 136816 Date: 11/03/2008 | $2.00 | Image |
| 09/25/2008 | POSTAGE Receipt: 136816 Date: 11/03/2008 | $0.42 | |

10/20/21, 11:18 AM                                    Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 10/02/2008 | LETTER FILED BY DEFT REGARDING COURT COSTS | $0.00 | |
| 10/29/2008 | COUNTY FEES WITNESS FEES Receipt: 136592 Date: 10/29/2008 Receipt: 136816 Date: 11/03/2008 | $339.90 | |
| 11/03/2008 | DEPOSIT FROM: OVERPAYMENT OF COURT COSTS Receipt: 136816 Date: 11/03/2008 | $281.41 | |
| 11/04/2008 | REFUND OF OVERPAYMETN OF LEBANON CORRECTIONAL  Voided on 11/19/2008. | $0.00 | |
| 11/19/2008 | REFUND OF DEPOSIT TO: OAKWOOD CORRECTIONAL INSTITUTION | $281.41 | |
| 03/11/2013 | MOTION TO APPOINT COUNSEL WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/08/2013 | APPOINTMENT OF COUNSEL:  ORDERED THAT ROBERT DIXON, OHIO REGISTRATION #0022466, 4403 ST. CLAIR AVENUE, CLEVELAND, OHIO 44103 BE APPOINTED AS SUBSTITUTE COUNSEL. 4/8/13--COPIES TO:  PROS, ATTY J. INGRAM, ATTY A. MILLETTE, ATTY J. WILHELM, ATTY J. HELMICK, ATTY S. BOLTON, ATTY D. DOUGHTEN, ATTY R. DIXON, ATTY J. JUHASZ  Receipt: 280467 Date: 08/18/2014 | $2.00 | Image |
| 04/08/2013 | POSTAGE Receipt: 280467 Date: 08/18/2014 | $3.68 | |
| 04/24/2013 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM RETURNED BY POST OFFICE FOR: RETURN TO SENDER, NOT DELIVERABLE AS ADDRESSED, UNABLE TO FORWARD | $0.00 | |
| 11/18/2013 | APPEAL FROM THE COURT OF COMMON PLEAS:  THE DEATH SENTENCE IS VACATED AND THIS CAUSE IS REMANDED TO THE TRIAL COURT FOR RESENTENCING ON THE BASIS OF THE EXISTING RECORD, CONSISTENT WITH THE OPINION RENDERED HEREIN.  IT IS FURTHER ORDERED THAT MANDATES BE SENT TO AND FILED WITH THE CLERK OF THE COURT OF APPEALS FOR TRUMBULL COUNTY AND THE COURT OF COMMON PLEAS FOR TRUMBULL COUNTY.  Receipt: 280467 Date: 08/18/2014 | $9.00 | Image |
| 01/02/2014 | RETURN OF RECORD OF DEATH PENALTY CASE FROM THE SUPREME COURT OF OHIO. CONTENTS ARE 4 LARGE BOXES AND 4 REGULAR BOXES.   EXHIBITS SHARED WITH 01 CR 794 (STATE VS JACKSON) RETAINED BY THE SUPREME COURT FOR CONSIDERATION OF SUPREME COURT CASE NO.  2012-1644.  ATTACHED LIST OF PHYSICAL EXHIBITS ARE ALSO RETURNED. | $0.00 | Image |
| 03/25/2014 | HEARING SET: Event: RE-SENTENCING HEARING Date: 04/30/2014   Time: 2:00 pm Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/25/2014 | NOTICE SENT:<br><br>SPEEDY MAILER Sent on: 03/25/2014 15:47:33.48 | | |
| 03/27/2014 | NOTICE SENT:<br><br>SPEEDY MAILER Sent on: 03/27/2014 10:52:01.91 | | |
| 03/27/2014 | HEARING SET: Event: CONFERENCE CALL Date: 03/28/2014   Time: 10:00 am Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/28/2014 | HEARING SET: Event: HEARING ON PENDING MOTIONS Date: 04/30/2014   Time: 11:00 am Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/28/2014 | NOTICE SENT:<br><br>SPEEDY MAILER Sent on: 03/28/2014 11:45:42.97 | | |
| 04/02/2014 | MOTION FOR WARRANT REMOVAL FILED BY PROSECUTOR'S OFFICE | $0.00 | Image |
| 04/02/2014 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON: APRIL 2, 2014 | $0.00 | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 04/02/2014 | WARRANT FOR REMOVAL FOR A MOTIONS HEARING ON APRIL 30, 2014 @ 11:00 A.M. AND A RE-SENTENCING HEARING @ 2:00 P.M. 4/3/14--COPIES TO: PROS, J. INGRAM, A. MILLETTE, J. WHILHELM, L. ANNOS, S. BOLTON, D. DOUGHTEN, R. DIXON, D. BODIKER, J. JUHASZ Receipt: 280467 Date: 08/18/2014 | $3.00 | Image |
| 04/03/2014 | MOTION TO APPOINT COUNSEL (DEATH PENALTY CASE) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/03/2014 | POSTAGE Receipt: 280467 Date: 08/18/2014 | $4.32 | |
| 04/10/2014 | JE: ATTORNEY DAVID L. DAUGHTEN AND ATTORNEY ROBERT A. DIXON ARE HEREBY APPOINTED TO REPRESENT THE DEFENDANT, DONNA ROBERTS, IN THE ABOVE CAPTIONED CASE FOR THE SENTENCING HEARING SCHEDULED FOR APRIL 30, 2014. Receipt: 280467 Date: 08/18/2014 | $3.00 | Image |
| 04/17/2014 | MOTION TO PRECLUDE A SENTENCE OF DEATH; OR IN THE ALTERNATIAVE, ORDER A FULL PENALTY PHASE HEARING WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/23/2014 | MOTION FOR CONTINUANCE OF SENTENCING HEARING WITH SERVICE FILED BY: DAVID L Doughten (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 04/24/2014 | REGULAR MAIL ISSUED TO: DAVID H BODIKER RETURNED BY POST OFFICE FOR: ATTEMPTED NOT KNOWN Receipt: 280467 Date: 08/18/2014 | $0.48 | |
| 04/24/2014 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM RETURNED BY POST OFFICE FOR: ATTEMPTED NOT KNOWN Receipt: 280467 Date: 08/18/2014 | $0.48 | |
| 04/28/2014 | WARRANT TO CONVEY RETURNED SHOWING SERVICE ON DEFENDANT Receipt: 282654 Date: 09/19/2014 | $471.00 | Image |
| 04/30/2014 | NOTICE OF POST RELEASE CONTROL FILED AND SIGNED BY DONNA M ROBERTS (DEFENDANT) AND DAVID L DOUDGHTEN (ATTORNEY FOR DEFENDANT) | $0.00 | Image |
| 04/30/2014 | OPINION OF THE COURT: FINDS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH PENALTY. THE COURT HEREBY FINDS THE SENTENCE OF DEATH IS AN APPROPRIATE PENALTY FOR THE DEFENDANT DONNA MARIE ROBERTS IN THIS MATTER. Receipt: 280467 Date: 08/18/2014 | $69.00 | Image |
| 04/30/2014 | INDIGENT APPLICATION FEE ($25.00) NOTICE FILED Receipt: 280467 Date: 08/18/2014 | $25.00 | Image |
| 04/30/2014 | JE: THIS WRIT OF EXECUTION TO CONVEY DONNA MARIE ROBERTS TO THE OHIO REFORMATORY FOR WOMEN OR OTHER FACILITY AS INSTRUCTED BY THE DIRECTOR FOR THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTION WHERE SHE SHALL BE HELD UNTIL THE EXECUTION OF THE DEATH SENTENCE AGAINST DONNA MARIE ROBERTS. Receipt: 280467 Date: 08/18/2014 | $3.00 | Image |
| 04/30/2014 | JE: THE COURT FINDS ROBERT'S MOTION TO PRECLUDE A SENTENCE OF DEATH; OR IN THE ALTERNATIVE, ORDER A FULL PENALTY PHASE HEARING IS DENIED. Receipt: 280467 Date: 08/18/2014 | $9.00 | Image |
| 04/30/2014 | DEATH PENALTY SENTENCING: DEFENDANT SENTENCE ON APRIL 30, 2014 TO THE OHIO REFORMATORY FOR WOMEN. DEFENDANT SENTENCED TO DEATH ON COUNT ONE, SHALL SERVE AN IMPRISONMENT TERM OF 10 YEARS ON COUNT 3; PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION ON COUNT 3; SHALL SERVE PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED ON COUNT 3; SHALL SERVE AN IMPRISONMENT TERM OF 10 YEARS ON COUNT 4, PLUS A MANDATORY TERM OF 3 YEARS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT 4, SENTENCE IN COUNT 4 TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED ON COUNT 3 PLUS COSTS. 4/30/14--COPIES TO: PROS, J. INGRAM, A. MILLETTE, J. WILHELM, D. MARBURGER, S. BOLTON, D. DOUGHTEN, J. JUHASZ Receipt: 280467 Date: 08/18/2014 | $15.00 | Image |
| 04/30/2014 | POSTAGE Receipt: 280467 Date: 08/18/2014 | $3.36 | |
| 05/01/2014 | WARRANT TO CONVEY TO OHIO REFORMATORY FOR WOMEN ISSUED TO SHERIFF ON: MAY 1, 2014 | $0.00 | |
| 05/01/2014 | EXECUTION FOR COSTS IN FELONY ISSUED TO SHERIFF ON: MAY 1, 2014 | $0.00 | |
| 05/01/2014 | EXECUTION OF COSTS RETURNED ENDORSED BY SHERIFF Receipt: 280467 Date: 08/18/2014 | $5.00 | Image |
| 05/05/2014 | STATES MOTION FOR NUNC PRO TUNC ENTRIES WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 05/05/2014 | MOTION TO APPOINT APPELLATE COUNSEL DEATH PENALTY CASE WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 05/05/2014 | WARRANT TO CONVEY RETURNED SHOWING SERVICE ON DEFENDANT | $471.00 | Image |

10/20/21, 11:18 AM                              Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 05/12/2014 | ORDER:  ATTORNEY DAVID L. DOUGHTEN IS APPOINTED LEAD COUNSEL AND ROBERT L. DIXON IS APPOINTED AS CO-COUNSEL.  Receipt: 280467  Date: 08/18/2014 | $3.00 | Image |
| 05/14/2014 | REGULAR MAIL ISSUED TO: JOSEPH E WILHELM<br>RETURNED BY POST OFFICE FOR: NO SUCH NUMBER  Receipt: 280467  Date: 08/18/2014 | $0.48 | |
| 06/02/2014 | MOTION TO CLARIFY COURTS SENTENCING OPINION FILED PURSUANT TO R.C. 2929.03(F) WITH CERTIFICATE OF SERVICE FILED BY<br>DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 06/03/2014 | $636.32 COSTS SENT TO CORRECTIONAL FACILITY FOR INMATE PAYMENT OF COSTS | $0.00 | Image |
| 06/10/2014 | OPINION OF THE COURT:  NUNC PRO TUNC FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING IMPOSITION OF DEATH PENALTY.  SEE JE  Receipt: 280467  Date: 08/18/2014<br>Receipt: 282654  Date: 09/19/2014 | $72.00 | Image |
| 06/16/2014 | ORDER TO CERTIFY RECORD WITH NOTICE OF APPEAL OF APPELLANT DONNA ROBERTS DEATH PENALTY APPEAL | $0.00 | Image |
| 07/07/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED<br>7/8/2014: CC TO AUDITOR.  Receipt: 280467  Date: 08/18/2014 | $12.00 | Image |
| 07/17/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES<br>CC AUDITOR 7/18/14  Receipt: 280467  Date: 08/18/2014 | $6.00 | Image |
| 07/22/2014 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED<br>CC AUDITOR 7/24/14  Receipt: 280467  Date: 08/18/2014 | $18.00 | Image |
| 09/15/2014 | RECORD TRANSPORTED TO THE SUPREME COURT INCLUDING ORIGINAL PAPERS (1 BOX), TRANSCRIPTS (28 VOLUMES IN 3 BOXES), NUMBERED INDEX AND LIST OF EXHIBITS BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY CLERK OF COURTS ON SEPTEMBER 15, 2014. COPIES OF INDEX ALSO SENT TO COUNSEL OF RECORD (L ANNOS, D DOUGHTEN, R DIXON)  Receipt: 282654  Date: 09/19/2014 | $1.00 | Image |
| 09/15/2014 | TRANSCRIPT OF PROCEEDINGS FILED BY: OFFICIAL COURT REPORTER:  RICHELLE J. GUERRIERI | $0.00 | |
| 09/18/2014 | RECEIPT OF RECORD DEATH PENALTY CASE (4 BOXES) TRANSMITTED TO THE CLERK OF COURT OF THE SUPREME COURT OF OHIO BY THE TRUMBULL COUNTY CLERK OF COURTS ON 09/15/14  Receipt: 282654  Date: 09/19/2014 | $1.00 | Image |
| 09/23/2014 | EXHIBITS (ONE EXPANDABLE FOLDER)  AND LIST OF EXHIBITS (SEE IMAGE) TRANSPORTED TO THE SUPREME OF COURT OF OHIO BY PERSONAL DELIVERY FROM THE TRUMBULL COUNTY CLERK OF COURTS ON SEPTEMBER 26, 2014 | $0.00 | Image |
| 12/15/2014 | MEMO ENTRY:  4 BOXS OF EVIDENCE, 1 BOX COPIES OF THE RECORD AND 3 BOXES OF TRANSCRIPTS TRANSPORTED TO THE EVIDENCE ROOM ON | $0.00 | |
| 02/17/2015 | MOTION TO AMEND POST-CONVICTION PETITION PURSUANT TO R.C.2929.03(F) FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 02/26/2015 | MOTION TO EXTEND TIME TO RESPOND WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Prosecuting Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 03/05/2015 | HEARING SET:<br>Event: MOTION<br>Date: 03/31/2015    Time: 1:30 pm<br>Judge: RICE, RONALD J    Location: COURTROOM 2<br><br>Result: COMPLETED | | |
| 03/05/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  03/05/2015  14:40:00.79 | | |
| 03/05/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  03/05/2015  14:42:09.60 | | |
| 07/20/2015 | AGREED JUDGMENT ENTRY SUBMITTED BY  ATTORNEY DAVID L. DOUGHTEN AND ATTORNEY LUWAYNE ANNOS | $0.00 | Image |
| 08/19/2015 | AGREED JUDGMENT ENTRY.  SEE JE. | $6.00 | Image |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| 08/19/2015 | Issue Date:  08/19/2015<br>Service:  FINAL APPEALABLE ORDER<br>Method:  REGULAR MAIL - ENVELOPE<br>Cost Per:  $<br><br>ROBERTS, DONNA MARIE<br>055 276<br>OAKWOOD CORRECTIONAL FACILITY<br>3200 N WEST STREET<br>LIMA, OH  45801<br>Tracking No: R000005205<br><br>STATE OF OHIO<br>c/o ATTY: ANNOS, LUWAYNE<br>TRUMBULL COUNTY ASSISTANT PROSECUTOR<br>160 HIGH STREET NW-4TH FLOOR<br>WARREN, OH  44481<br>Tracking No: R000005206 | | |
| 08/28/2015 | MOTION FOR SUMMARY JUDGMENT WITH PROOF OF SERVICE FILED BY LUWAYNE ANNOS (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 09/04/2015 | HEARING SET:<br>Event: MOTION FOR SUMMARY JUDGMENT (MEMO)<br>Date: 10/30/2015   Time: 8:00 am<br>Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: TAKEN UNDER ADVISEMENT | | |
| 09/04/2015 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  09/04/2015  08:37:29.79 | | |
| 11/16/2015 | LETTER FILED BY: DONNA MARIE ROBERTS (DEFENDANT); PRO SE (REQUEST FOR COPIES OF TRANSCRIPTS) | $0.00 | Image |
| 07/28/2017 | ENTRY:  RECONSIDERATION IS DENIED FILED BY SUPREME COURT | $6.00 | Image |
| 04/12/2018 | NOTICE FROM THE SUPREME COURT OF OHIO. THE FOLLOWING RECORD IN THE ABOVE-NAMED CASE WAS RECEIVED BY THE UNDERSIGNED.<br>LIST OF CONTENTS:  4 BOXES | $0.00 | Image |
| 04/02/2019 | HEARING SET:<br>Event: MEMO ONLY<br>Date: 06/07/2019   Time: 8:00 am<br>Judge: RICE, RONALD J   Location: COURTROOM 2<br><br>Result: UNDER ADVISEMENT | | |
| 04/02/2019 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  04/02/2019  15:53:47.34 | | |
| 04/02/2019 | NOTICE SENT:<br><br>SPEEDY MAILER<br>Sent on:  04/02/2019  15:54:50.16 | | |
| 06/05/2019 | NOTICE OF MEMORANDUM IN SUPPORT WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 06/07/2019 | RENEWED MOTION FOR SUMMARY JUDGMENT WITH PROOF OF SERVICE FILED BY CHRISTOPHER D. BECKER (Attorney) on behalf of STATE OF OHIO (PLAINTIFF) | $0.00 | Image |
| 06/13/2019 | OBJECTION TO SUMMARY JUDGMENT WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 11/20/2019 | Issue Date: 11/20/2019<br>Service: FINAL APPEALABLE ORDER<br>Method: REGULAR MAIL - ENVELOPE<br>Cost Per: $<br><br>ROBERTS, DONNA MARIE<br>c/o ATTY: DIXON, ROBERT A<br>4403 ST CLAIR AVENUE<br>CLEVELAND, OH  44103<br>Tracking No: R000101953<br><br>STATE OF OHIO<br>c/o ATTY: MUSICK, ASHLEIGH<br>ASSISTANT PROSECUTING ATTORNEY<br>160 HIGH ST, N.W. 4TH FLOOR<br>WARREN, OH  44481<br>Tracking No: R000101954 | | |
| 11/20/2019 | POSTAGE | $0.50 | |
| 11/20/2019 | JE: THE PETITION FOR POST-CONVICTION RELIEF FILED BY DEFENDANT IS DENIED WITHOUT HEARING. SEE JE. FAP. | $18.00 | Image |
| 12/02/2019 | MOTION TO APPOINT APPELLATE COUNSEL (DEATH PENALTY CASE) WITH CERTIFICATE OF SERVICE FILED BY DAVID L DOUGHTEN (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT); ROBERT A DIXON (Attorney) on behalf of DONNA MARIE ROBERTS (DEFENDANT) | $0.00 | Image |
| 12/10/2019 | JE: ATTORNEY ROBERT A. DIXON AND ATTORNEY DAVID L. DOUGHTEN ARE APPOINTED AS APPELLATE COUNSEL. | $3.00 | Image |
| 12/18/2019 | NOTICE OF APPEAL TO 11TH DISTRICT COURT OF APPEALS WITH DOCKETING STATEMENT, AFFIDAVIT OF INDIGENCY AND COPY OF JE FILED BY: DAVID L DOUGHTEN (Attorney) on behalf of DONNA ROBERTS (DEFENDANT); ROBERT A DIXON (Attorney) on behalf of DONNA ROBERTS (DEFENDANT) | $0.00 | Image |
| 12/18/2019 | APPROVAL OF PAYMENT OF COUNSEL FEES FILED; CC: TRUMBULL COUNTY AUDITOR'S OFFICE | $12.00 | Image |
| 08/25/2020 | MANDATE FROM COURT OF APPEALS; JUDGMENT OF THE TRUMBULL COUNTY COURT OF COMMON PLEAS IS AFFIRMED. COSTS TO APPELLANT. | $3.00 | |
| 10/06/2020 | IT IS SO ORDERED THAT THE MOTION FOR STAY OF EXECUTION IS GRANTED AND IT IS FURTHER ORDERED THAT THIS STAY SHALL REMAIN IN EFFECT UNTIL EXHAUSTION OF ALL STATE POSTCONVICTION PROCEEDINGS, INCLUDING ANY APPEALS, FILED BY THE SUPREME COURT OF OHIO | $0.00 | Image |

2000 JUN 24 A 10: 34

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. 2001 CR 0793 |
| | : | |
| Respondent, | : | JUDGE JOHN M. STUARD |
| | : | |
| -vs- | : | |
| | : | |
| DONNA ROBERTS, | : | **MOTION FOR APPOINTMENT** |
| | : | **OF COUNSEL** |
| Petitioner. | : | |

Now comes the defendant, Donna Roberts, by and through her attorney, David L.

Doughten, and respectfully moves this Court to appoint her counsel for preparation of her

postconviction petition pursuant to R.C. 2953.21. This Court previously assigned undersigned

counsel for preparation of this document. This Court denied the petition and counsel filed an

appeal for Ms. Roberts in the Eleventh District Court of Appeals. Upon the reversal of her case

for resentencing, the Eleventh District dismissed the appeal as being premature as there was no

longer a sentence of death.

As this Court resentenced Ms. Roberts for death, Ms. Roberts must file a second a

postconviction petition. Counsel believes that his original appointment is still valid, but requests

re-appointment to ensure that the record is clear on this point

Respectfully Submitted,

David L. Doughten #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
216.361.1112
ddoughten@yahoo.com

## CERTIFICATE OF SERVICE

A copy of the foregoing Petitioner's Motion was served upon Dennis Watkins, Trumbull

County Prosecutor and/or Christopher Becker, Esq. Assistant Trumbull County Prosecutor,

Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this

20th day of June, 2008.

DAVID L. DOUGHTEN
Counsel for Petitioner

JUDGE JOHN M. STUARD

- 2 -

# IN THE COURT OF COMMON PLEAS
## -GENERAL DIVISION-
## TRUMBULL COUNTY, OHIO

### CASE NUMBER:  2001 CR 00793

**STATE OF OHIO**
**PLAINTIFF**

**vs.**                                      **JUDGE JOHN M STUARD**

**DONNA MARIE ROBERTS**
**DEFENDANT**                                **JUDGMENT ENTRY**


Attorney David L. Doughten is re-appointed as counsel for

Defendant, Donna Roberts.


Date: _7/8/08_                              JUDGE JOHN M STUARD


7-10-08
copies to:
Pros.
D. Doughten

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JU... ...OF RECORD
OR UPON THE PAR... ...ED FORTH
WITH BY ORDINARY...

JUDGE



IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

FILED
COURT OF COMMON PLEAS
AUG 20 2008
TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

STATE OF OHIO,                   :        Case No. 01 CR 793

    Plaintiff-Respondent,        :        JUDGE JOHN M. STUARD

-vs-                             :

DONNA ROBERTS,                   :

    Defendant-Petitioner.        :

FILED
COURT OF COMMON PLEAS
AUG 20 2008
TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

Petition to Vacate or Set Aside
Sentence Pursuant to
Ohio Revised Code §2953.21

Now comes the Petitioner, Donna Roberts, and petitions this court for

postconviction relief pursuant to Ohio Revised Code §2953.21 as follows:

<u>Jurisdictional Facts</u>

1)      A Trumbull County grand jury indicted the defendant-petitioner Donna Roberts

(hereinafter petitioner) on a four count indictment for various charges, including two alternative

theory counts of capital murder surrounding the death of her ex-husband/housemate, Robert

Fingerhut.

2)      The indictment charged the petitioner with one count of the purposeful killing of

Mr. Fingerhut with prior calculation and design in violation of R.C. §2903.01(A) and one count

of the so-called felony murder in violation of R.C. §2903.01(B). Each of these capital murder

counts included two capital specifications addressing violations of R.C. §2929.04(A)(7). The

1



2001 CR
00793
00098593413
CRM

219

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3200

first specification alleged that the murder occurred during the commission of an Aggravated

Burglary, R.C. §2911.11. The second specification alleged that the murder occurred during the

commission of an Aggravated Robbery, R.C. §2911.01.

3)    The third and fourth counts charged the felonies underlying the aforementioned

capital specifications, Aggravated Burglary, R.C. §2911.11 and Aggravated Robbery, R.C.

§2911.01. Each count of the indictment included a firearm specification pursuant to R.C.

§2929.141.

4)    The charges indicated that the petitioner was not the principal offender, but rather

she acted in complicity with the principal, and co-defendant, Nathaniel Jackson. Mr. Jackson

was tried separately as he also was capitally indicted. The petitioner pleaded not guilty to all

counts of the indictment at her arraignment on December 31, 2001.

5)    On February 26, 2002, this court conducted a hearing on the petitioner's motion to

suppress items taken from her home the night of the homicide. This court denied the motion.

6)    A jury trial began on March 26, 2003, with the death qualification process. The

jury found the petitioner guilty of all counts including the capital and firearm specifications on

May 2003.

7)    On June 3, 2003, the petitioner indicated to the court that she wanted to waive the

presentation of mitigation at the penalty phase hearing, except she did desire to make an unsworn

statement. This court determined the petitioner to be competent under State v. Ashworth (1999)

85 Ohio St. 3d 56, 1999 Ohio 204.

8)    Prior to the commencement of the penalty phase hearing, the prosecution elected

to dismiss Count Two, R.C. §2903.01(B)(felony-murder) and proceeded with Count One, R.C.

2

§2903.01.(A) (prior calculation and design).

9)     The penalty phase hearing began on June 4, 2004.  The defense waived opening and closing argument.  The petitioner did provide an unsworn statement.  That same day, the jury recommended a sentence of death.

10)     On June 20, 2003, the trial court accepted the recommendation and sentenced the petitioner to death.  The court also sentenced the petitioner to serve ten years for both the convictions of Aggravated Robbery and Aggravated Burglary.  These sentences are being served consecutively to each other and the sentence of death.  The court also applied a three-year firearm specification, which is also being served consecutively to the principle sentences.

11)     The petitioner filed a Notice of Appeal for a delayed appeal on August 13, 2003. The Ohio Supreme Court granted the motion on September 24, 2003.  The original counsel for the petitioner, the Ohio Public Defender Office, withdrew representation as that office also represented the co-defendant Nathaniel Jackson.

12)     This court conducted a hearing and determined a conflict did exist by the representation of the petitioner by the Ohio Public Defender Office.

13)     The petitioner filed her brief on direct appeal in the Ohio Supreme Court on July 19, 2004.

14)     The petitioner was represented at trial by:

> J. Gerald Ingram
> John Juhasz
> 7330 Market Street
> Youngstown, OH 44512

15)     The petitioner was represented on her first direct appeal to the Ohio Supreme

3

Court by Appeals by:

> David L. Doughten
> 4403 St. Clair Avenue
> Cleveland Ohio 44103
>
> Patricia M. Smith
> 4403 St. Clair Avenue
> Cleveland, Ohio 44103

16)     The petitioner raised the following issues on appeal to the Ohio Supreme Court:

Proposition of Law One:

A waiver of the presentation of mitigation evidence in the penalty phase of trial is not valid unless the defendant is informed that the waiver will result in the death penalty.  Such waiver is also invalid if the defendant intends to present any mitigation in any form.

Proposition of Law Two:

The scope of a consent search of the home of a defendant must be limited strictly to the terms of the consent provided by the defendant.

Proposition of Law Three:

A trial court's refusal to dismiss biased jurors from the panel deprives a capital defendant her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Proposition of Law Four:

Evidence that does not establish the theft element of an Aggravated Robbery, R.C. §2911.01 and the corresponding capital specification, R.C. §2929.04(A)(7) is insufficient to sustain guilty verdicts on these charges.

Proposition of Law Five:

A capital defendant's right to allocution before being sentenced is mandatory. Where the sentencing court neglects this right, the subsequent sentence is void or voidable.

4

Proposition of Law Six:

The trial court sentencing opinion under R.C. §2929.03(F) requires independent analysis in the weighing of the factors to determine the appropriateness of a death sentence. It in not proper for the court to allow the prosecutor of the case to draft the opinion as the sentence loses its independent nature mandated by the legislature.

Proposition of Law Seven:

Where the pre-trial publicity is so pervasive that a jury cannot be expected to ignore the media attention to the case, a trial court must grant a defense request for a change of venue to protect the integrity of the fact-finding process.

Proposition of Law Eight

The failure to properly advise and ensure that a capital defendant understands the ramification of a the waiver of evidence in the penalty phase constitutes ineffective assistance of counsel.

Proposition of Law Nine:

The inclusion of a R.C. §2929.04(A)(7) specification to a conviction of R.C. §2903.01(A) may not sustain a conviction of death when the element of prior calculation and design is found by the jury in both statutes.  The repeat finding of the same element fails to provide the narrowing procedure that is required for a sentencing scheme to be found constitutional.

Proposition of Law Ten:

Instructing the jury that its penalty phase determination was a recommendation is improper because it unfairly diminishes the jury's sense of responsibility.

Proposition of Law Eleven:

Ohio's definition of reasonable doubt is violative of the constitutional as it allows the Appellant to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

5

Constitution.

Proposition of Law Twelve:

The death penalty may not be sustained where the cumulative errors that occurred in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.

Proposition of Law Thirteen:

The death penalty cannot be upheld where the reviewing court fails to follow the statutory provisions regarding the proportionality review of the defendant's sentence.

Proposition of Law Fourteen:

The death penalty is unconstitutional as presently administered in Ohio.

**Postconviction Proceedings**

17)     On September 24, 2004, the appellant filed a postconviction petition pursuant to R. C. §2953.21.  An amended petition was filed on October 25, 2004.

18)     This common pleas court denied the postconviction request and the request to hold an evidentiary hearing.

19)     The petitioner filed an appeal to the Eleventh District Court of Appeals. Following the oral argument, the court issued a stay of the proceedings until the Ohio Supreme Court addressed the relevant issues.  Upon the remand of that court, the Eleventh District found the postconviction proceedings to be moot as a final appealable order had not yet been rendered due to the sentencing reversal in the Ohio Supreme Court.  The appeal was therefore dismissed.

**Reversal of Sentence on Direct Appeal**

6

20)     The Ohio Supreme Court reversed the sentencing based up the failure of this court to permit allocution prior to the writing of the independent sentencing decision required by R.C. 2929.03(F) and the failure to independently prepare the aforementioned entry (Propositions of Law Five and Six) State v. Roberts (2006), 110 Ohio St. 3d 71, 2006 Ohio 3665.

21)     The matter was remanded for a new sentencing hearing. This Court interpreted the mandate of the above decision as limiting consideration for sentencing. This court believed that it could only consider the information contained in Ms. Roberts' allocution. This Court would not considered any additional information proffered by the defense.

22)     Pursuant to a defense motion, this Court granted a defense motion for a competency examination to be conducted on Ms. Roberts to determine whether she was competent for the remand sentencing hearing.

23)     On October 22 , 2007, this Court held a competency hearing. Dr. Thomas Gazley of the Trumbull County Forensic Diagnostic Center testified that in his opinion Ms. Roberts was competent. This Court agreed with the opinion and found her to be competent.

24)     That same day, this court conducted a hearing for the purpose of hearing the allocution of Ms. Roberts as required by the Ohio Supreme Court decision.

25)     On October 29, 2007, this court announced its decision, again finding death to be the appropriate penalty.

26)     The petitioner alleges a denial or infringement of her rights as to render his judgment or convictions void or voidable under the Ohio Constitution and the United States Constitution.

27)     Some of the constitutional errors which entitle the petitioner to relief were not

7

included in the record and therefore could not have been fully and completely asserted on appeal.

28)     As noted above, this Court refused to consider any newly presented evidence. Relevant mitigation evidence was produced and proffered for the record. If this Court is correct in its finding that it could not consider additional mitigation outside of the allocution of Ms. Roberts, the proffered evidence is evidence of what should have been introduced at the original penalty phase hearing and is *de hors* the record and is proper postconviction documentation. Such evidence will be reproduced and presented here where possible.

29)     In addition, it is believed that the affidavits attached to the moot petition are already part of the record. In caution, they will be reattached here where possible. The exception is the videotape of the co-defendant Nathaniel Jackson's statement. Counsel does not possess a second copy and will move to ensure that the video tape is part of this record.

30)     The issues below are essentially the same as filed in the moot petition. However, there are a few discernible differences. Ms. Roberts previously attacked the constitutionality of lethal injection. The Supreme Court of the United States has decided that issue so the claim has been dropped for the petition. On the other hand, in Claim Four below, Ms. Roberts raises the claim of ineffective assistance of penalty phase counsel. This claim was not in the original petition. The supporting documentation was either undiscovered or unavailable at that time. As noted, the proffered material at the re-sentencing hearing are included below in addition to other documentation. Finally, claims related to Roberts competency at the original trial and the remand are included in this petition.

**Overview**

31)     The petitioner Donna Roberts was convicted of complicity in the murder of her

8

ex-husband/housemate Robert Fingerhut.  It was alleged that she maintained a relationship with the co-defendant Nathaniel Jackson while Mr. Jackson was imprisoned on an unrelated charge. The two purportedly hatched a plot through letters and phone calls to kill Mr. Fingerhut for the purpose of obtaining the proceeds of his life insurance policies, of which Ms. Roberts was the beneficiary.  Mr. Jackson was convicted and sentenced to death in a trial prior to that of the petitioner.

32)     The issues in this petition closely mirrors those raised in co-defendant Nathaniel Jackson's petition filed pursuant to R.C. § 2953.21.  This should not be surprising as the two were similarly situated.  Ms.  Roberts thus attacks the procedures which act to cause the jury pool to be under represented by minority jurors.

33)     The Petitioner Roberts also addresses the level of representation at the culpability phase of trial and the penalty phase of trial.  (There had been a question of whether Ms. Roberts had waived the presentation of mitigation at the penalty phase.  The Ohio Supreme Court specifically found that no waiver existed.)

34)     The culpability phase issues remain essentially the same as originally raised in the voided petition.  The penalty phase issues addressed below were not included in the previously filed petition.  The major challenge is bases upon the Social Security Administration Records. These records reflect a history of mental illness and an abrupt change in Roberts after a severe automobile accident in 1999.  Many of the changes were reported to the agency by the decedent, Robert Fingerhut

35)     Finally, in view of the Security Records, the competency findings fall under grave doubt as Roberts' delusions, hallucinations and adaptive inabilities raise issues as to her

9

intelligence level in addition to her competency.

10

## FIRST CLAIM FOR RELIEF

36)     Petitioner Roberts  fully incorporates each and every allegation contained

elsewhere in the Petition as if fully rewritten herein.

37)     Petitioner Roberts' convictions and sentences are void and/or voidable because

Petitioner was denied her right to a fair and impartial jury and equal protection because there was

an under-representation of African Americans in the venire from which her jury was drawn.

Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of

an impartial jury as guaranteed by the Sixth Amendment and the Equal Protection Clause of the

Fourteenth Amendment.

38)     The record does not reveal which jurors were of African-American heritage.  The

jury questionnaires are also silent as to the racial heritage of the prospective jurors.

39)     African Americans comprised 7.9 percent of the population in Trumbull County.

Consequently, there should have been approximately eleven African-Americans in the one

hundred forty persons who appeared for jury duty.  Even if the prosecutors' second statement was

accurate, there was still a substantial under-representation of African-Americans.

40)     In State v. Davie, Trumbull C.P. No. 91 CR 288, this Court presided over another

capital case.  The clerk drew two hundred names and approximately one-hundred thirty of the

one-hundred fifty individuals appeared for jury duty.   Not one African-American appeared for

jury duty.

41)     Subsequent to Mr. Davie's jury trial, Diane Wiley of the National Jury Project

reviewed the venire that was drawn in that case.  Ms. Wiley has conducted jury evaluations in

more than fifty cases throughout the United States.  She is co-author of one of the leading

11

treatises on juries, Jurywork: Systematic Techniques.   Ms. Wiley made the following findings concerning the racial discrimination in the Davie case:

> The number of African American citizens called to serve as jury venire persons for *State of Ohio v. Roderick Davie*, on February 3, 1992 in Trumbull County Common Pleas Court under represented the percentage of African Americans in Trumbull County by 100%.

> This under representation represents a statistically significant deviation from the number of African American persons who would be expected utilizing a truly random sampling method from a truly random pool representative of the county . . . .

> It is disturbing to find a venire of this size without even one African American juror being included in a jurisdiction with 6% African Americans.  This simply should not occur unless there was some kind of systematic discrimination. [Emphasis added.]

42)     The under-representation of African-Americans on juries in cases over which this Court presides continued in co-defendant Donna Roberts' case and that of the co-defendant. (The petitioner refers the court to Nate Jackson's Seventh Cause of Action. There were no African-Americans on the jury which convicted her of capital murder and returned a death recommendation.

43)     The under-representation of a cognizable group in a petit jury venire constitutes a denial of the Due Process Clause of the Fourteenth Amendment, Peters v. Kiff, 470 U.S. 493, 501 (1972); the Fair Cross Section requirement of the Sixth Amendment, Taylor v. Louisiana, 419 U.S. 522, 531 (1975); and the Equal Protection Clause of the Fourteenth Amendment, Taylor v. Louisiana, 419 U.S. at 531.

44)     Donna Roberts requires discovery and an evidentiary hearing to demonstrate the third prong for both the Equal Protection and Fair Cross Section tests.

12

45)     The wrongful exclusion of African-Americans from the venire is a structural error and Petitioner Roberts is entitled to relief without the demonstration of prejudice.

## SECOND CLAIM FOR RELIEF

46)     Petitioner Donna Roberts fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

47)     Petitioner Roberts' convictions and sentence are void or voidable because the grand jury that indicted him was drawn from a venire in which African-Americans were disproportionately excluded in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

48)     In the First Claim for Relief, Petitioner alleged that African-Americans were under-represented in the venire from which the jury was drawn that convicted her of capital murder and recommended that she be sentenced to death.

49)     This racial discrimination is most likely not limited to the petit jury venire.  The venire from which the Grand Jury was selected that capitally indicted Petitioner was drawn using the same procedures as the petit jury venire. O.R.C. §§ 2939.02, 2313.07, 2313.08, 2313.35. Thus, there is a reasonable likelihood that the grand jury venire suffers from the same constitutional flaw that the petit jury suffered.

50)     The grand jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. <u>Powers v. Ohio</u>, 499 U.S. 400, 411 (1991).  It controls not only the initial decision to indict, but contradicts other significant decisions including the number of counts to charge and whether to charge a lesser offense. <u>Vasquez v. Hillery</u>, 474 U.S. 254, 263. (1986). The

13

integrity of these decisions depends on the integrity of the process used to select the grand jurors. If that selection process is infected with racial discrimination, doubt is cast over the fairness of all subsequent decision. Rose, 433 U.S. at 555-556 (Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process).

51) The grand jury process must be free of racial discrimination. Rose v. Mitchell, 443 U.S. 545, 557 (1979); Vasquez v. Hillery, 474 U.S. at 261-262 .The Supreme Court in an unbroken line of cases has held that a criminal conviction cannot stand under the Equal Protection Clause if it is based on an indictment returned by a grand jury from which individuals were excluded on the basis of race. Alexander v. Louisiana, 405 U.S. 625, 628 (1972); Castaneda v. Partida, 430 U.S. 482, 492-495 (1977).

52) To achieve an impartial grand jury, the panels from which grand jurors are chosen must also be drawn from a fair cross section of the community. Taylor v. Louisiana, 419 U.S. 522, 527 (1975); Atwell v. Blackburn, 800 F.2d 502, 505 (5th Cir. 1986) (fair cross section requirement applies to grand jury panels); Machetti v. Linahan, 479 F.2d 236, 239 (11th Cir. 1982) (same).

53) Petitioner Roberts requires discovery, an evidentiary hearing and the appointment of experts to fully develop the factual predicate for this Claim for Relief.

54) This Court must presume prejudice as to this constitutional violation because it is a structural error. If racial discrimination occurs in the selection process of the grand jury, the conviction must be reversed notwithstanding overwhelming evidence of guilt. Vasquez, 474 U.S. at 263. In the alternative the prosecutor must be required to demonstrate by proof beyond a reasonable doubt that this racial discrimination did not infect the trial and mitigation phases.

14

55)     Donna Roberts requires discovery and an evidentiary hearing to demonstrate the third

prong for both the Equal Protection and Fair Cross Section tests.

### THIRD CLAIM FOR RELIEF

56)     Petitioner Roberts fully incorporates each and every allegation contained elsewhere

in the Petition as if fully rewritten herein.

57)     Petitioner Roberts' convictions and sentences are void and/or voidable because

Petitioner was denied the effective assistance of counsel during the trial stage of her capital case. The

acts and omissions of trial counsel deprived her of the Sixth Amendment right to effective assistance

of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution. Strickland v. Washington, 486 U.S. 668 (1984).

58)     Counsel did not provide an articulated defense for the Petitioner at trial.  Counsel

failed to object to at least two jurors of African-American heritage during the jury selection.

Although counsel did cross-examine and challenge evidence throughout the culpability stage of trial,

counsel failed to give an opening statement, present a video tape of the co-defendant Nate Jackson

in which Jackson precluded Roberts' participation in the homicide, failed to present the co-

defendant's claim of self-defense, obstructed the Petitioner's right to testify and failed to provide a

closing argument to the jury.  This confusing strategy would only suggest to the jury that the

Petitioner was not professing her innocence.  There is no articulable reasonable strategy for counsels'

above actions or inactions at trial.

59)     Counsel failed to object to the use of peremptory challenges on at least two black

jurors by the prosecution.  These jurors were dismissed in violation of in Batson v. Kentucky

15

(1986), 476 U.S. 79.  In Batson, the United States Supreme Court recognized that the Equal

Protection Clause of the Fourteenth Amendment precludes purposeful discrimination by the state

in the exercise of its peremptory challenges so as to exclude members of minority groups from

service on petit juries. See id. at 89.  Defense Exhibit D.

60)     The United States Supreme Court, in Batson, explicitly "rejected the evidentiary

formulation * * * which required a defendant * * * to demonstrate the systematic exclusion of a

group of jurors * * *." State v. Pratt, 1987 Ohio App. LEXIS 8622 (Sept. 9, 1987), Hamilton

App. No C-860436, unreported.  The existence of a pattern of discriminatory strikes is not a

prerequisite to a prima facie case or to a finding of actual discrimination by the trial court.  State

v. White (1999) 85 Ohio St. 3d 433, 436.  The fact that other African-American jurors remained

on the jury does not exonerate the state for the discriminatory exercise of a peremptory challenge,

although in the Petitioner's case, no other blacks were selected for the final jury.

61)     In State v. Walker (1st Dist.-2000) 139 Ohio App.3d 52, the First Appellate

District held that where a defendant identified facts and circumstances in a prospective juror's

voir dire responses sufficient to establish the inference that the prosecutor used a peremptory

challenge to exclude a juror because he was an African-American, the prosecutor's explanation

that the defendant had not established a pattern of discriminatory exclusion based on race, and

that three African-Americans remained on the panel, was not a facially valid, race-neutral

justification for a peremptory strike. The trial court was clearly erroneous in accepting the state's

impermissible explanation, and the defendant's convictions for murder and felonious assault are

reversed and remanded.

62)     Here, the record does not reflect the race of the jurors dismissed by use of a

16

peremptory challenge. The jury questionnaires do not reflect the race of the jurors. The Petitioner remembers the use of the peremptory challenges on these jurors. Therefore, discovery and the assistance of an investigator are necessary to further develop this claim.

63)     Counsel for Petitioner Roberts did not present an opening statement. Counsel had the Petitioner read a statement to the jury. Counsel did discuss having the Petitioner read the statement to the jury prior to the opening statement, but did not indicate to her or make clear to her that counsel themselves would not be addressing the jury. The statement provided by the Petitioner was ambiguous at best and did not state a defense. Exhibit A, D.

64)     The defense failed to present the defense of the co-defendant, Nate Jackson, to the jury. At his trial, Mr. Jackson argued self-defense as the basis for his actions resulting in the death of Robert Fingerhut. The consideration of Mr. Jackson's self-defense claim was relevant to Petitioner Roberts' claim that she did not conspire to have her husband killed.

65)     Defense counsel failed to introduce a video tape of Nathaniel Jackson in which he exculpates Petitioner Roberts and explains how the homicide occurred. Defense Exhibit B.

66)     On the tape, Nathaniel Jackson was interviewed by police detectives. Jackson, who described himself as a street hustler, explained the on the day of the incident the decedent Fingerhut had purchased a small amount of marijuana from Jackson for about $100.00. Jackson had known Fingerhut for a couple of years. Jackson had been to Fingerhut's house previously. Defense Exhibit B. (Already part of the record as it was filed with the moot 2953.21 petition)

67)     Fingerhut took Jackson to his, Fingerhut's, home to watch a sporting event. Fingerhut pulled the car into the garage. The two exited the car and went into the house. They sat at the kitchen table. Fingerhut was looking over his mail. Jackson was hoping Fingerhut

17

could give him some work at the restaurant. Fingerhut then said words to the effect of "you black guys are the same, you don't want to do anything for yourself." Fingerhut continued to lecture Jackson. Defense Exhibit B.

68)   Jackson did not want to be subjected to the lecture and be "disrespected." He asked to be taken home. Fingerhut told him to walk. Jackson refused to walk. When Jackson looked up, Fingerhut was pointing a gun at him. Jackson felt that Fingerhut had "flipped." Jackson described the change in Fingerhut's demeanor as being like, "Dr. Jeckyl and Mr. Hyde." Defense Exhibit B.

69)   Jackson then said that, "He squeezed on me, man," referring to Fingerhut pulling the trigger. Jackson had grabbed the gun which had been pointed at him. The shot injured Jackson's finger. Jackson thought that he "was a done deal," meaning himself. He then shot Fingerhut. After the first shot, Fingerhut kept coming at him. Jackson shot again and killed him. Defense Exhibit B.

70)   Jackson said that he did not intend to kill Fingerhut. He has not thought about shooting Fingerhut ahead of time. Defense Exhibit B.

71)   The videotape of Jackson's rendition of the events is evidence of the Petitioner's actual innocence. An attorney performing within the professional norm would have presented it for the jury's consideration.

72)   Defense counsel waived closing argument in the culpability phase of the trial. This was not discussed with the Petitioner prior to the closing. No strategic reason for not providing an argument is apparent from the record.

73)   Defense counsel would not allow Petitioner Roberts to testify. According to

18

Robert's affidavit, the Petitioner begged counsel to allow her to testify. The attorneys wavered

on the matter, but instructed her not do. There was no valid waiver by the Petitioner of her right

to testify. Defense Exhibit D.

74)    A defendant's right to testify was fundamental. See Rock v. Arkansas, 483 U.S.

44, 52-53, 97 L. Ed. 2d 37, 107 S. Ct. 2704 & n.10, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct.

2704 (1987) ("An accused's right to present his own version of events in his own words" is "even

more fundamental to a personal defense than the right of self-representation"); see also Rogers-

Bey v. Lane, 896 F.2d 279, 283 (7th Cir. 1990). And it noted that the right is personal to the

accused, and not capable of being waived by counsel on the defendant's behalf. See Jones v.

Barnes, 463 U.S. 745, 751, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (1983). Roberts' personal waiver

of this fundamental right, which protects the fairness of the criminal proceeding, must be made in

a knowing and intelligent manner to be valid. See Schneckloth v. Bustamonte, 412 U.S. 218,

241, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973) ("A strict standard of waiver has been applied to

those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest

possible opportunity to utilize every facet of the constitutional model of a fair criminal trial.");

see also Johnson v. Zerbst, 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938) ("Courts

indulge in every reasonable presumption against waiver of fundamental rights, and . . . we do not

presume acquiescence in the loss of fundamental rights.") (quotation omitted).

75)    Counsel failed to talk to family members, including her son, Michael Raymond,

who could have testified as to Robert s' relationship with Fingerhut in the time prior to the

offense, including Roberts' recent gift orders for Fingerhut. Raymond also made relevant phone

calls to the residence on the date in question. Petitioners Exhibit F.

19

76)     The failure of defense counsel to adequately represent her at the trial stage resulted in a sentence of death that does not comply with the minimum constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sec. 9 of the Ohio Constitution .

77)     Petitioner Roberts requires discovery as provided by the Ohio Rules of Civil Procedure in order to fully develop and pursue this claim.  Denial of the request for discovery as it relates to this claim would amount to a denial of substantive and procedural due process as guaranteed by the aforementioned state and federal constitutional provisions.

### FOURTH CLAIM FOR RELIEF

78)     Petitioner Donna Roberts fully incorporates each and every fact contained elsewhere in the Petition as if fully rewritten herein.

79)     Trial counsel violated Roberts' Sixth Amendment right to effective assistance of counsel at the penalty phase when they failed to make a timely and reasonable investigation of her character, history, and background.  Counsel's mitigation presentation was deficient and deprived the jurors of evidence that was worthy of weight and effect.  Defense counsel's deficient performance undermines confidence in the outcome of Roberts' sentencing hearing.  As a result of trial counsel's ineffectiveness, Roberts' rights guaranteed by the United States Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments were violated.

80)     Defense counsel failed to provide Roberts' jurors with any insight into her background.  The United States Supreme Court has addressed the issue without equivocation: trial counsel have an "obligation to conduct a thorough investigation of the defendant's

20

background." <u>Williams v. Taylor</u>, 529 U.S. 362, 396 (2000).  The Court buttressed this requirement when it declared that "<u>Strickland</u> does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." <u>Wiggins v. Smith</u>, 539 U.S. 510, 527 (2003). <u>See also</u> <u>Haliym v. Frazier</u>, 492 F.3d 680, 712–18 (6th Cir. 2007).

81)     Counsel was unable to provide this essential personal background of Roberts because they did not fully investigate the possible mitigation evidence.  To begin, counsel failed to hire a mitigation investigator or specialist.  This is required by ABA Guideline standards.

82)     According to the revised ABA Guidelines, mitigation specialists are mandated as part of the defense function. The Guidelines detail the "current consensus" of capital defense and require each "team" consist, at a minimum, of two attorneys, an investigator, and a mitigation specialist. *See* Guideline 1.1, 4.1 and the commentary.

83)     The United States Supreme Court reiterated and emphasized the requirement of counsel to engage in a complete investigation and presentation of all available evidence in mitigation. In <u>Rompilla v. Beard</u>, 545 U.S. 374 , 125 S. Ct. 2456 (2005), the Supreme Court established stringent duties that must be followed by capital litigators in their duty to their client.

84)     In <u>Rompilla</u>, during the penalty phase, the prosecutor sought to prove that the murder was committed in the course of another felony, by torture, and that petitioner had a significant violent felony conviction history.  The Court held that counsel had a duty to make all reasonable efforts to learn what they could about the offense, including obtaining the prior conviction file to discover any mitigating evidence and to anticipate the aggravating details. Given that defense counsel had notice of the death penalty, the conviction file showed prior rape and assault convictions, and the file was a readily accessible public document, the lawyers were

21

deficient in failing to examine that file.

85)    The Supreme Court found that without this information, a convincing residual

doubt argument – the defense theory in mitigation – was impossible.  The Court concluded that

the Commonwealth courts were objectively unreasonable in concluding that counsel could

reasonably decline to make any effort to review the file.  Moreover, the file also included

mitigation leads that no other source suggested and would have prompted further investigation.

The undiscovered mitigating evidence might well have influenced the jury's appraisal of the

petitioner's culpability.

86)    The Court, citing ABA standards as to how reasonable capital counsel should

perform, found that it is the "duty of the lawyer to conduct a prompt investigation of the

circumstances of the case and to explore all avenues leading to facts relevant to the merits of the

case and the penalty in the event of conviction. The investigation should always include efforts to

secure information in the possession of the prosecution and law enforcement authorities. The

duty to investigate exists regardless of the accused's admissions or statements to the lawyer of

facts constituting guilt or the accused's stated desire to plead guilty." 1 ABA Standards for

Criminal Justice 4-4.1 (2d ed. 1982 Supp.).  Rompilla at 2466.

87)    The underlying question remains, does Wiggins mandate that a mitigation

investigator be added to the defense team? Stated differently, must courts comply with the ABA

Guidelines?  The answer is yes, at least according to a relatively recent Note. *Sixth Amendment

– Ineffective Assistance of Counsel: Wiggins v. Smith*. 117 Harv. L. Rev. 278 (Nov. 2003).  The

Note, facilely dealing with Strickland v. Washington, 466 U.S. 668 (1984), Ake v. Oklahoma,

470 U.S. 68 (1985), Wiggins, and the revised ABA Guidelines, concludes:

22

In <u>Wiggins</u>, the Court promoted a longstanding guideline of the ABA – that capital counsel thoroughly explore the social background of the defendant – to the level of constitutional mandate…Although the Court did not expressly state that a mitigation specialist is required to lead this investigation, its logic may strongly support such a conclusion." 117 Harv. L. Rev. at 281.

88)    The Sixth and Fourteenth Amendments to the United States Constitution guarantee the Accused the right to the assistance of counsel as do Sections 10 and 16, Article I of the Ohio Constitution.  The United States Supreme Court has recognized that this right to counsel is a right to effective aid of counsel.  <u>Powell v. Alabama</u> (1932), 287 U.S. 45; <u>Gideon v. Wainwright</u> (1963), 373 U.S. 335.  Further, the Sixth Amendment assures the defendant the right to compulsory process, which includes the "right to present the defendant's version of the facts." <u>Washington v. Texas</u> (1967), 388 U.S. 14, 19.

89)    Defense counsel failed to present personal firsthand accounts of the environment in which Roberts' lived.  The Sixth Circuit has found that "first-hand accounts from those who knew Petitioner best" provide a "significant benefit during the penalty phase." <u>Powell v. Collins</u>, 332 F.3d 376, 400 (6th Cir. 2003).

90)    Counsel failed to take the necessary time to speak to family members, including her son Mike Raymond, her sister and Roberts herself.  See Petitioners Exhibits E, F.  Had they done so they would have learned that:

A.    Ms. Roberts' mother suffered from severe depression.  Her sister Janice also suffers from depression.  She is currently receiving treatment and medication for her depression.  She has been taking medication for approximately seven years.  She has suffered from depression for most of her life until finally getting help.  ( Petitioner's Exhibit E)

B.    Donna was about 15 when Janice was born.  Because of their mother's condition, Donna essentially raised Janice.  She taught her everything.  When she left the house to move to Florida, Janice was crushed.  My mother sent me to live with Donna every time that she

23

was not in school; every vacation, Christmas, Thanksgiving, spring and summer, etc. She paid for medical care, taught Janice right from wrong, and even helped pay college tuition for at least three different institutions; including the University of Pittsburgh and a correspondence course with Louisiana State University. Janice ultimately graduated from Florida Atlantic University. ( Petitioner's Exhibit E)

C.   Growing up was difficult because of all the fights between Roberts' mother and father. Their father never struck the kids, but he was always threatening and chasing my mother. Donna had it worse. The father was always breaking chairs and tables and glasses when he would lose his temper. Donna told Janice that on one occasion she saw their dad chase their mother with a gun, although he did not shoot it. Donna was so scared that she hid under the bed for days. Another time she told Janice about their mother falling down the steps during a fight. Janice was always afraid that my dad would kill her mother. (Petitioner's Exhibit E )

D.   Their father may have been an alcoholic. He drank beer usually, but he was so on and off with his temper. One minute he would be threatening their mother. The next moment the two would get along wonderfully. ( Petitioner's Exhibit E)

E.   Donna always felt alone. She did not feel she belonged anywhere. She desperately wanted affection and love from others. She was always trying to keep the family together. She was always afraid of being abandoned. ( Petitioner's Exhibit E, F)

F.   When Janice was 17, she moved to Florida to live with Donna and her first husband. Donna was working as a nurse for Dr. Feiman, who was a plastic surgeon. Donna was not certified as a nurse but worked under him. She did convert do Judaism at that time, probably as the result of her relationship with the doctor. Donna was raised Catholic. Dr. Fieman pressured Donna into numerous unnatural acts and to watch pornographic movies with him. Janice believed she converted to fit in with Dr. Feiman, who was Jewish. Donna thought the family did not approve, but Janice believed that the conversion did not bother the rest of the family as much as Donna thought it did. According to Janice, it was a typical Donna decision made to be accepted by others who she was with at that particular time. Donna's father did not approve. ( Petitioner's Exhibit E, F)

G.   One of the really terrible incidents for Donna was in her middle thirties with her second husband, Bert. She became pregnant. Bert did not want the child. He talked her into an abortion. She never forgave herself for this. She became inconsolable. She divorced him because of this. She was extremely depressed and isolated herself from people after this incident. She agreed to have it because she was afraid that the drinking a drug usage would cause medical problems for the child. She feared ex-communication if anyone found out about it. ( Petitioner's Exhibit E, F )

H.   Donna met Robert Fingerhut after she left Bert. Her isolation continued with him. She

24

did not keep up with family gatherings.  Robert perpetuated her isolation.  Janice only brought her son to see Donna when he was not home.  Robert did not encourage her to keep up with the family.  Fingerhut and Donna moved back to the Youngstown area after a man tried to hi-jack her car with her as a captive.  They both gave up good jobs to move from the Miami area. ( Petitioner's Exhibit E, F)

I.    The car accidents seem to make things worse.  She suffered from at least three automobile accidents throughout her life.  One was in the 1960's, one was in the 1980's.  The final accident in 1999 was particularly bad.  Everything got worse after it.  She completely isolated herself from friends and family.  She quit calling me, which was very unusual because we always talked.  She quit going to family functions.  Janice had to track her down sometimes just to talk to her. Fingerhut informed Michael Raymond that Donna was not a normal person and feared that she was either on drugs or had a major chemical imbalance.  She even began smoking where she had previously been very anti-smoking. (Petitioner's Exhibits E, F)

J.    Donna's mental health became even worse.  I know she was institutionalized for a mental health evaluation for a couple of weeks around this time.  She did not let her family know where she was.  She finally called Janice from the institution. ( Petitioner's Exhibit E)

K.    Her sister Janice recommended counsel Ingram to represented Donna.  He had represented Janice previously.  He seemed disinterested in talking to the family.  Janice told him about the family history and that people would talk to him but he never set up a meeting to discuss this.  She asked him about the video tape of Nathaniel Jackson's statement which cleared Donna, and he said maybe they would use it in mitigation.  He never did.  The family was very frustrated because the lawyers would not communicate with them. ( Petitioner's Exhibit E, F)

L.    Donna's son, Mike Raymond was raised by the decedent.  Mike considered Robert Fingerhut to be his father.  The execution of his mother would mean that he would lose both parents.  (Petitioner's Exhibit F)

91)    Counsel failed to uncover Social Security records which reveal the extent of her head injuries which resulted in Roberts receiving disability payments.  See Social Security Records, Petitioner's Exhibit .   These records reveal, in addition to the severe car accident, that:

A.    Ms. Roberts was receiving SSI benefits for mental disability;

B.    The decedent, Robert Fingerhut, himself had called the Social Security Administration to urge that she receive the benefits.  He informed that agency that

25

Donna had not been herself since the accident. Fingerhut was afraid someone would grab her after one of her memory problems. She was a changed person. She did not have the emotional stability to work anymore. She had lost some of her memory. Petitioners Exhibit A, p. 1, 3 Robert Fingerhut gave examples. Donna had previously know all members of the Cleveland Indians but could no longer recall them. (Petitioners Exhibit A, p. 5)

C. The examiners noted the change in mental condition since the accident. Petitioners Exhibit A, p. 4, 6. This all occurred two to three weeks after the accident. She became more moody with more irrational thinking. She takes medication for her depression. Fingerhut had not seen anyone come from such a high point to such a low point. She was not the same person that she had been. She had lapses of time. A half of an hour may pass and Donna would think that half the day had passed. She could not remember dates after repeated prompting. She went into rages, forcing him to leave. ( Petitioners Exhibit A, p. 6, 9)

D. Fingerhut noted that she was getting worse. She was not thinking clearly. She forgot where she was in familiar places and forgets where she placed items in the home. She could not even remember the dogs names.  She was seeing a psychiatrist. (Petitioners Exhibit A, p. 7)  The psychiatric records have not been obtained currently as the name of the doctors remains unknown to Roberts.

E. Fingerhut reported that she had violent mood swings, including one in the doctors office. This necessitated her being admitted to the "mental ward" at St. Joseph's Hospital. (Petitioners Exhibit A, p. 8, 9)

F. There appears to be a diagnosis of psychotic disorder, personality disorder in the records. Petitioners Exhibit A, p. 11. The admitting diagnosis was depression, suicidal, major depression, recurrent bi-polar disorder. Medications were numerous. (Petitioners Exhibit A, p. 16)

G. The records included the discharge summary for St. Joseph's Health Center in Warren, Ohio. This report noted that:

The immediate reason for this hospitalization was because of severe anxiety, agitation, depression, ***auditory and visual hallucinations and suicidal ideations*** and intention by CO2 poisoning. Roberts stated that she has been getting quite tense, restless and depressed lately, having frequent mood swings, losing interest in doing things, having difficulties concentrating and started hearing voices talking to her. She has been seeing shadows around the room when no one is home and has the feeling that someone is after her. Medications: Remeron (15 mg), Zyprexa (5

26

mg), Vistaril (50 mg), Premarin, Provera, Paxil (20 mg), Depakote
(500 mg), Risperdal (1 mg)

(Emphasis added) Petitioners Exhibit A, p. 17.

       The final diagnosis was Bi-polar disorder, circular type.  (Petitioners Exhibit A, p.
18).

H.     The emergency room documentation of February 10, 2000 indicates the doctors
found herself depressed and suicidal.  Petitioners Exhibit A, p. 19, 20.  She was
admitted to the general psychiatric unit in stable condition.  Feelings of paranoia
were noted, in addition to psychiatric problems with her father.  That she had past
bouts with diabetes was also noted. (Id. 21, 50).

I.     Donna revealed to doctors that she has had some psychiatric problems and has
taken some medicines from a psychiatrist in the past.  She admitted to having
frequent mood swings, going from elation to depression all throughout her life.
Id., p. 22.  She believed that she would be better off dead than alive and thought of
killing herself with CO2.  She admitted hearing voices and seeing shadows in her
rooms and believed that someone was after her and trying to hurt her. Id. 23.  She
was again diagnosed with major depression with possible bi-polar disorder.  She
thought of killing herself "everyday." (Id. 37).

J.     The records revealed that she had been an "abuse victim." Id. 38.  She has
"probable post-concussion syndrome with memory loss and confusion." Id. p. 43,
48, 50.  An MRI of the brain was recommended.  Depression again was noted.
She was taking Paxil and Remeron.  (Id. 48).

K.     An EEG was taken on June 25, 1999.  As the result.  It was suggestive of
psychological dysfunction and thought less likely to be structural damage.  (Id. 96)

L.     Roberts displayed bizarre behavior in a January 14, 2000 interview where she
pulled gum from her bosom, repeatedly licked the filters of her cigarettes.  She
heard noises that others could not hear, felt rage and saw a light to the side of her
head that others could not see, but denied that they were hallucinations. Id. 118
She was obsessed with sex and death.  She had obsessive thoughts of bad things
happening to her if she did not complete her rituals.  She was experiencing
auditory and visual hallucinations. (Id.)

M.    The records and evaluations of Dr. Degli are address below.  These records alone
would have presented a varied and significant array of mitigation. (Petitioners
Exhibit G).

27

92)     The accidents were verified by Dr. Gazley of the Forensic Diagnostic Center.  Dr. Gazley, who is not a neuropsychologist (Exh. Hearing T. 24-25)  noted that he did not know if there was "such a thing as competency to be resentenced criteria." (T. 25) It was difficult for him to determine what effect a head injury in 2000 might have seven years later.   There is no evidence that Dr.Gazley reviewed any of the Social Security records. Certainly, these records were not available for the competency evaluation prior to the actual trial.  See Claims Six and Seven.

93)     Counsel failed to hire a neuropsychologist to determine the extent of her head injuries and the effect that these injuries had on her thinking and actions.  As noted, even the decedent Fingerhut noted to the Social Security Administration that she had been acting peculiarly since the accident.  Petitioner will be requesting the appointment of a neuropsychologist to develop this claim further.  Dr. Gazley defined a neuropsychologist as a psychologist who is specialized in evaluating, assessing and sometimes treating disorders of the brain that have to do with often times neurological impairment, whether the result of disease, whether the result of some sort of injury or illness of the brain. (T. 25)

94)     A brain injury could be a diagnostic question, that is if the injury changes the person's ability to process thought as it has to do with the cognitive process, the use of language and memory. (T. 26-27)  It may also cause a personality of a person to change.  This could effect a defendant's ability to interact with counsel, but Dr. Gazley did not observe this process in his evaluation. (T. 27)

95)     Counsel failed to hire an independent psychologist and spend the necessary time with their client.  Had they done so, they would have discovered that she had suffered from

28

depression for a great many years and was probably bi-polar.  Petitioner's exhibits C, D, G.

96)     Counsel failed to introduce the psychological testing results from Dr. Donald Degli, the psychologist who evaluated Ms. Roberts for her application for SSI benefits in 1999. This report included an assessment of a verbal IQ of 79 and a performance IQ of 55.  The full-scale IQ was 65, below the level of State v. Lott, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002). See Petitioners Exhibit C and G.  See Fifth Claim for Relief.

97)     Even a subsequent hearing would result in Ms. Roberts not meeting Atkins criteria, the report should have been admitted as evidence in mitigation.  Low intelligence is a recognized mitigator, regardless of whether it meets Lott standards.  State v. Evans, 63 Ohio St. 3d 231 (1992); State v. Hill, 64 Ohio St. 3d 313 (1992); State v. Green, 66 Ohio St. 3d 141 (1993);  State v. Murphy, 65 Ohio St. 3d 554 (1992);  State v. Webb, 638 N.E.2d 1023 (1994).

98)     In addition, the report contained important psychological testing results and opinion that was instrumental to the jury's determination of the appropriate sentence.  The report concluded as follows:

> This is the evaluation of a fifty-five year old woman who presents a rather odd diagnostic picture.  Unfortunately, no formal history accompanied the referral to this office for this claimant who suffered multiple injuries including head trauma in a reported automobile accident which occurred in April of 1999.  Thus, today's evaluation leads to rule out differential diagnostics.  At times, she seemed to be genuinely confused as she well complained of memory problems.  At other times, her responses seemed to be an exaggeration, dramatization, confabulation or malingering.  She reports medications for dizziness.  She also takes antidepressant medication.  Yet, she reports no formal mental health care.  The intellectual assessment yielded questionable functioning and an intelligence quotient in the mild mental retardation range.  Memory functioning, as measured by the Wechsler Memory Scales was also impaired, although her responses were suggestive of confabulation and malingering.  Reading skills proved to be functional at the high school level.  Personality and emotional assessment reveals an individual who is rather blunted, expressionless, preoccupied, worrisome and evidencing some

29

rather strange ideation if she is being genuine in her presentation.  Diagnostically, there is a need for rule out consideration of dementia.  There is certainly a need for thorough review of whatever medical/neurological records are available.

Psychologically, Donna does present herself as genuinely impaired to some degree, probably not able to follow directions or do routine tasks in a competitive work environment at the present time.  She has the ability and judgment to manage basic money matters appropriately.  Interpersonal functioning was particularly impaired, if today is an example.  She will have difficulty in simple social interactions and at best, presents marginal capacity to interact appropriately in a competitive workplace.  Provisionally, Donna is moderately impaired in her ability to meet the demands of competitive adult employment.  These observations are made without regard to whatever physical limitations she may have.

(Petitioner's Exhibit G)

99)     It is important to note that the report was prepared approximately two years prior to the homicide.  It notes, consistently, the "Interpersonal functioning was particularly impaired," which may explain her difficulty with her attorneys.  She had a "marginal capacity to interact appropriately in a competitive workplace."  (Petitioner's Exhibit G).

100)    The report also noted that, "There is certainly a need for thorough review of whatever medical/neurological records are available."  This is consistent with Dr. Eisenberg's affidavit.  Petitioner's Exhibit C and D.  This is required by the ABA Guidelines for the representation of a capital defendant.

101)    Counsel failed to prepare Roberts for her unsworn statement.  Because of her memory loss and mental condition, counsel could have directed her statement.  Had counsel conducted the proper investigation, Roberts could have been provided materials that she could have to refresh her recollection for the remand unsworn statement of October 22, 2007.  This information included references to sexual abuse which caused to have an imaginary friend(T.

30

46), that she was a good student in school, (T. 48), her automobile accidents, (T. 49, 50), her change after the accident, her depression, that she had been in a psychiatric ward, that Fingerhut made her go to the Social Security Administration to get help and that she was placed on SSI and medicaid. (T. 53) She also could have clarified the extent of her work in Israel with the plastic surgery for the injured soldiers. (T. 56-57) She was successful in business and often helped her family financially. (T. 60, 62)

102) The jury heard none of the above information and could not include it in their deliberations. Discovery under the Ohio Civil Rules of Evidence is necessary to further develop this claim.

31

## FIFTH CLAIM FOR RELIEF

### (Mental Retardation)

103) Petitioner Donna Roberts fully incorporates each and every fact contained elsewhere in the Petition as if fully rewritten herein.

104) Ms. Roberts is not eligible for the death penalty as her full-scale IQ is less than 70.

105) In 1999, Roberts applied for SSI disability due to her mental condition. The psychological evaluation was prepared by Dr. Donald Delgli. The reports were filed with the administration on November 3, 1999 for the purpose of a Disability Determination. The report disclosed that Ms. Roberts tested to a full scale IQ of 65. The verbal I.Q. was 79. The performance level tested to a 55. See Petitioner's Exhibit G.

106) In Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), the Court held that the death penalty cannot be imposed on those with mental retardation. In State v. Lott, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002), the Ohio Supreme Court delineated the substantive and procedural standards to be employed when assessing whether a trial-level or post-trial capital defendant is mentally retarded for purposes of triggering the Atkins exclusion. Under Lott, both pre-trial capital defendants bear the burden of producing evidence on the factual issue of mental retardation; and Lott places the burden on Petitioner to prove "by a preponderance of the evidence" that he is mentally retarded. Id. at 307, 779 N.E.2d at 1015.

107) The Ohio Supreme Court in State v. Lott, provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in Atkins, "so impaired as to fall within the range of mentally retarded offenders [against] who[se]

32

[execution] there [has emerged] a national consensus."  The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) that these manifestations of mental retardation appeared before the age of 18.  Lott at p.12.

108)    The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."  Id.  Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."  Contrarily, a level of 65 clearly establishes a level within the Atkins range.  State v. Darryl Gumm, 2006 Ohio App. LEXIS 6409 (Ohio 1st App 12/8/2006)

109)    The problem here is that the issue is not fully developed.  Defense counsel did not obtain a mitigation investigator.  The records were not gathered.  The school records and testing were not part of the records.

110)    It is possible that the low intelligence score is the result of other factors, such as the automobile accidents causing brain trauma.  See Petitioners Exhibit C for possible malingering.  See  Petitioners Exhibit G.  In retrospect, after reviewing the records of Roberts' mental health problems in prison, malingering seems unlikely.  However, professional mental health testing and further discovery of the records is necessary to determine this claim.

111)    Petitioner Roberts will be requesting the appointment of a psychologist and a neuropsychologist to perform the necessary testing.  Full discovery will be necessary to ensure that the necessary documentation is available to fairly determine this claim.

33

## SIXTH CLAIM FOR RELIEF

**(Competency at Sentencing Hearing -Original Penalty Phase Hearing)**

112)    Petitioner hereby incorporates by reference all of the allegations contained elsewhere in this Petition as if rewritten fully herein.

113)    Ms. Roberts was not competent to make decisions at her penalty phase hearing. As the result, the decisions made by her and statements made by her were illogical, disjointed and self-defeating.  She was unable to assist counsel to represent her in a meaningful fashion. She was unable to address the jury or understand the procedures which resulted in her receiving the death penalty.  The conducting of the penalty phase while she was not competent was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

114)    The record reflects a history of depression with suicidal tendencies.  This is consistent with Robert's refusal to cooperate with counsel at the penalty phase presentation to the jury.

115)    R.C. 2945.37(G) states:

"A defendant is presumed to be competent to stand trial.  If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present *mental condition*, the defendant is *incapable* of understanding the nature and objective of the proceedings against the defendant *or* of assisting in the defendant's defense, the court *shall* find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code." (Emphasis added).

116)    The United States Supreme Court has characterized the test for competence to stand trial in the following manner: "...the test must be whether he has sufficient present ability

34

to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, (1960), 362 U.S. 402. See also, State v. Williams, (1997), 116 Ohio App.3d 237. The Dusky standard has been adopted in Ohio by the Ohio Supreme Court. State v. Berry, (1995), 72 Ohio St.3d 354. Consequently, the essential feature of a determination of a defendant's competency to stand trial from the perspective of the statute and case law is the defendant's ability to be rationally engaged in the trial process.

117) Fundamental principles of fairness and due process demand that a criminal defendant who is not legally competent may not be tried or convicted of a crime. Pate v. Robinson, (1966), 383 U.S. 375; State v. Berry, supra. It is established law that, "...a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial...." Drope v. Missouri, (1975), 420 U.S. 162. The conviction of an accused while he is not legally competent to stand trial violates due process of law. Bishop v. United States, (1956), 350 U.S. 961.

118) In the case at bar, the appellant, through counsel, submits that there was *not* reliable, credible evidence that she was capable of rationally assisting in her own defense, and, therefore, she should not have been tried or convicted of a crime. The appellant, further, submits that the issue is not whether she was mentally ill, or even to what extent she was mentally ill, but, rather, the issue was whether she could rationally participate in the trial process. All of the experts who examined the appellant agreed that the appellant was obsessively and persistently fixated upon a factual analysis that was, ineluctably, not based in reality and that the appellant

35

would essentially entertain no other considerations in assisting in her own defense. All of the experts agreed that the appellant suffered from some mental condition. The evidence in the trial court supported only one finding—incompetence.

119) In United States v. Blohm, (1984), 579 F. Supp. 495, the issue of competence to stand trial was addressed in a case that is factually similar to the case at bar. In Blohm, the defendant believed that his criminal prosecution was merely an opportunity to publicize and expose a conspiracy related to an unrelated and meritless lawsuit in which he had been the plaintiff. Blohm was charged in his criminal case with mailing a threatening letter to a federal judge.

120) Blohm was examined by professionals on the issue of competence. During the subsequent competency hearing, Blohm sought the removal of his attorney, in that the attorney wanted to defend with a particular strategy that excluded trial, while Blohm insisted upon proceeding to trial. The court complied with Blohm's request. There remained an issue of whether Blohm had the capacity to make decisions in his own best interest. The federal test for competence under 18 U.S.C. 4244 is remarkably similar to R.C. 2945.37(G) and is based upon the decision in Dusky v. United States, supra.

121) It was determined that Blohm did, in fact, have a factual understanding of the proceedings in the criminal case, including statutory law and court procedures. The essential issue before the court was Blohm's rationality which the court determined to be an objective assessment based upon the average person's perspective of rationality. Blohm believed that he would be acquitted when the jury heard evidence of the conspiracy that he felt was arrayed against him. The court stated: "The issue is not his ability to understand, in the sense of being

36

able to recite the legal consequences of certain acts, but rather to evaluate the realities of his situation in order to assist his counsel in his defense." United States v. Blohm, supra., at 500, 501. In the final analysis, the court's determination of incompetence, contrary to the professionals' findings, was based upon Blohm's own behavior. That behavior included an unshakable, obsessive fixation upon factual claims of a conspiracy that were irrational and false in nature and not based in objective reality. The potential dangers of a loss at trial were simply not important to Blohm, who viewed a trial as a forum in which he would be able to expose the conspiracy against him. Blohm's delusional thinking was beyond his control. He was incompetent to stand trial.

122)    Here, Ms. Roberts used the trial as her stand to show to the world that racial inequality exists. Because her co-defendant Nathaniel Jackson received the death penalty, then she too should receive it. See Petitioner's Exhibit D. She so instructed the jury this fact. (T.6256, 6263).

123)    In her unsworn statement, Roberts explained to the jury that she was not providing any mitigation (T.6253-4). She wanted to expose people that she believed were untruthful (T.6255).

124)    Roberts was unable to work with counsel. The sentencing hearing is replete with defense counsel's frustration with his inability to communicate with his client.

125)    At that time, June 3, 2008, the record did not indicate Roberts' head trauma, low intelligence level, history of depression, history of suicide attempts, possible post-traumatic stress syndrome from childhood abuse, bi-polar diagnosis and other mental health issues found in the social security records. Petitioner's Exhibit A. Roberts asked for death, another attempt at

37

suicide, "that is what I hope for" (T.6232)

126)    At the time of her competency examination the testing results from Dr. Donald Delgi, including her IQ testing, was unknown.

127)    At the time of the competency examination, the fact that Roberts was receiving SSI benefits for mental disability was not known or discussed by counsel for either party or addressed by the psychologist.

128)    At the time of the competency hearing, the 24-point disparity between verbal and performance IQ, which strongly suggests head trauma suffered from severe automobile accidents was unknown to the parties. See Petitioner's Exhibit C.

129)    The trial court failed to conduct a full evidentiary hearing, where some of this material may have been located and presented.   It is admittedly speculative that the social security records might have been found as Ms. Roberts was not cooperative and defense counsel was not discussing much with the family of Ms. Roberts.  See Petitioner's Exhibit E.

130)    This claim is not fully developed.  The appointment of a psychologist and a neuropsychologist is necessary to properly establish this claim.  Testing needs to be conducted to determine the cause of the mental disabilities found in the record. Discovery is also necessary to develop this claim.

38

## SEVENTH CLAIM FOR RELIEF

### (Competency at Sentencing Hearing -Remand Procedure)

131)   Petitioner hereby incorporates by reference all of the allegations contained elsewhere in this Petition as if rewritten fully herein.

132)   The trial court refused to grant an independent evaluation as requested by defense counsel. Defense counsel requested the independent psychologist on December 6, 2006.

133)   At the competency hearing of October 22, 2007, Dr. Gazley noted that he had interviewed Ms. Roberts for two and one-half hours. He reviewed the mental health file at the prison. He also reviewed the director of the psychology department at the prison. Finally, he had a conversation with defense counsel. It was the doctor's opinion that she could understand the alternatives available for sentencing and to provide counsel with any mitigating circumstances, should she desire to do so. (Petitioner's Exhibit J, T. 21, 22)

134)   Dr. Gazley stated that "I don't know if there is such a thing as a competency to be sentenced criteria." He could not comment on whether the auto accident suffered in approximately 2000 would influence her competency. (Petitioner's Exhibit J, T. 25) The doctor also admitted that he had no direct observation of her ability to interact with defense counsel. However, because she could provide him with a coherent account of her own perceptions, he came to the conclusion that she would be able to do so with defense counsel. (Petitioner's Exhibit J, T. 27)

135)   Dr. Gazley did not interview family members about Donna's history. He remembered a discussion about childhood sex abuse but could not remember if it came from the records or Donna. He did not recall seeing any reference to Donna's suffering from post-

39

traumatic syndrome but acknowledged that the syndrome sometimes was caused by childhood sex abuse. (Petitioner's Exhibit J, T. 28) He did not see in the records any reference to Donna going through hallucinations such as the referral in the prison for her on March 26, 2006. The report indicates that she was hallucinating about seeing ants. She put down coffee grounds to get rid of the ants. She appeared disheveled without makeup, mumbling imperceptibly. (Exhibit K, p. 396)

136)     The doctor did diagnose Donna with a bi-polar disorder, but not with schizophrenic features, which would suggest possible hallucinations. (Petitioner's Exhibit J, T. 31) He did not see any references to schizophrenia in the records. He did acknowledge that she consistently possessed suicide ideation. (Petitioner's Exhibit J, T. 31)

137)     Dr. Gazley did not know Donna's psychiatric history. He did not review mental health evaluations prior to her conviction. (Petitioner's Exhibit J, T. 33) He did not review the records from the Social Security Administration (Petitioner's Exhibit J, T. 34) He did not think that Donna receiving mental disability benefits would have an affect on his opinion. (Petitioner's Exhibit J, T. 34) The doctor did not believe that if neurological impairment existed that it would not have changed his opinion because Ms. Roberts was able to provide a coherent, relevant reasonable, intelligent response to what the court needed to know. (Petitioner's Exhibit J, T. 37)

138)     The United States Supreme Court has characterized the test for competence to stand trial in the following manner: "...the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, (1960), 362 U.S. 402. The conducting of the penalty phase while she was not competent

40

was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## EIGHTH CLAIM FOR RELIEF

139)     Petitioner hereby incorporates by reference all of the allegations contained elsewhere in this Petition as if rewritten fully herein.

140)     Petitioner Roberts' judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States. The Petitioner understands that the Eleventh District Court of Appeals has previously found that postconviction is an improper venue for challenging the constitutionality of the procedure. However, the Petitioner alleges that even though the state courts have decided the issue, the federal aspect has not been definitively decided in the federal Sixth Circuit Court of Appeals.

141)     Ohio provides for collateral proceedings to attack void or voidable judgments in criminal cases. The law was originally passed in 1965 as an emergency measure to provide "a new procedure" to protect constitutional rights and provide an "orderly method of hearing such matters." See, Sec. 2 of Amended S.B. 383, 106th Gen. Assembly; Kott v. Maxwell, 3 Ohio App. 2d 337, 338, 210 N.E. 746, 747 (1965).

142)     Ohio's post-conviction procedure is set forth in Ohio Rev. Code Ann. § 2953.21, et seq. Subsection (A) provides:

> (A) Any person convicted of a criminal offense or adjudged delinquent claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the

41

>Ohio Constitution or the Constitution of the United States, may file
a petition at any time in the court which imposed sentence, stating
the grounds for relief relied upon, and asking the court to vacate or
set aside the judgment or sentence or to grant other appropriate
relief. The petitioner may file such supporting affidavit and other
documentary evidence as will support his claim for relief.

143)  Under Ohio law, the state appellate courts on direct appeal will consider only errors apparent from the record of the proceedings, if they consider the error at all. As such, all state or federal constitutional violations which depend upon off-the-record evidence must be raised in state post-conviction proceedings. Examples would include claims of ineffective assistance of counsel which depend on development of the facts and evidence not in the record, as well as claims of newly discovered evidence.

144)  The Due Process Clause of the Fourteenth Amendment requires that the states must provide their prisoners with some "clearly defined method by which they may raise claims of denial of federal rights." See, e.g., Young v. Ragen, 337 U.S. 235, 239 (1949).

145)  The Eighth Amendment also establishes a need for heightened reliability of death sentences, as well as the need to eliminate the arbitrary imposition of the death penalty.

146)  Although the Ohio post-conviction statutes as enacted by the Ohio General Assembly were designed to meet federal constitutional requirements, the entire state post-conviction process has been effectively rendered meaningless by subsequent decisions of the Ohio state courts. For example, in State v. Perry, 10 Ohio St. 2d 175, 226 N.E. 104 (1967), the Ohio Supreme Court held that it would use the doctrine of res judicata to bar post-conviction relief as to any issue that was raised or could have been raised by the defendant at the trial or on appeal. Id., at Syllabus 8 and 9. This doctrine has been applied with fervor by the state courts to

42

preclude Ohio prisoners from receiving adequate post-conviction review of their convictions.

147)    In addition to the doctrine of <u>res judicata</u>, the courts have adopted and applied numerous other procedural bars to preclude Ohio prisoners from obtaining adequate review of their state and federal constitutional claims or from even obtaining an evidentiary hearing on their claims.  The state appellate courts are not conducting any meaningful review of the trial courts' dismissals of state post-conviction actions on appeal. The Ohio Supreme Court, since the reintroduction of the death penalty in Ohio in 1981, has refused to exercise its discretion to review a single case.   Only one capital case, <u>State v. Sterling Barnes</u> CR. 83-5911 (Lucas County 5/17/91), has been reversed by a state trial court.

148)    The policies adopted and procedures employed by the state trial and appellate courts in summarily disposing of state post-conviction claims have deprived Petitioner of her rights to due process, equal protection, adequate trial and appellate review, and to be free from cruel and unusual punishment in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the Petitioner, Donna Roberts, requests the following relief:

1) That Petitioner be granted an evidentiary hearing pursuant to Ohio Revised Code §2953.21.

2) That her convictions and sentence be determined void or voidable and that she be granted a new trial.

3) Or in the alternative, and only if the court determines that her conviction is not void or voidable, that her sentence be determined void or voidable and that Petitioner be granted a new sentencing hearing.

For such other and further relief as the court may deem just and proper.

Respectfully submitted,

DAVID L. DOUGHTEN
Reg. #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
216-361-1112

Counsel for Petitioner

44

## CERTIFICATE OF SERVICE

Although service by the Petitioner is not required by R.C. §2953.21, a courtesy copy of

the foregoing appellant's Brief was served upon Dennis Watkins, Trumbull County Prosecutor

and/or LuWayne Annos, Esq. Assistant Trumbull County Prosecutor, Administration Building,

160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this _20th_ day of August, 2008.

DAVID L. DOUGHTEN
Counsel for Petitioner

45

# APPENDIX

PETITIONER ROBERTS' EXHIBIT LIST

A.    SOCIAL SECURITY RECORDS

B.    TAPE OF NATHANIEL JACKSON'S STATEMENT

C.    AFFIDAVIT OF DR. JAMES EISENBERG

D.    AFFIDAVIT OF DONNA ROBERTS

E.    AFFIDAVIT OF JANICE ROBERTS

F.    AFFIDAVIT OF MICHAEL RAYMOND

G.    PSYCHOLOGICAL EVALUATION OF DR. DONALD DEGLI

H.    PHOTOGRAPHS OF DONNA ROBERTS, ROBERT FINGERHUT AND MICHAEL
      RAYMOND

I.    DONNA ROBERTS ALLOCUTION OF OCTOBER 22, 2007

J.    DONNA ROBERTS COMPETENCY HEARING OF OCTOBER 22, 2007

K.    PRISON RECORDS FROM THE OHIO REFORMATORY FOR WOMEN

**James R. Eisenberg, Ph.D.**
161 North State Street
Painesville, Ohio 44077

Phone:  440-354-6030

Jreisen@lec.edu

Forensic and Clinical Psychology

Diplomate, American Board
of Forensic Psychology

## AFFIDAVIT OF JAMES R. EISENBERG, PH.D.

IN THE STATE OF OHIO

COUNTY OF LAKE, SS:

I, James R. Eisenberg, being first duly sworn according to law, state the following:

1) I am a psychologist, licensed to practice in Ohio since 1978.

2) I am a Diplomate of the American Board of Professional Psychology with Board Certification in Forensic Psychology.  I am Professor of Psychology at Lake Erie College and Director of their Criminal Justice Program.  I have a private practice in forensic and clinical psychology.

3) For nineteen years I served as the Court Psychologist and Associate Director for the Lake County Forensic Psychiatric Clinic evaluating adult criminal defendants for the Lake County Court of Common Pleas.

4) In the course of my employment with the Forensic Psychiatric Clinic and my practice as a Forensic Psychologist, I have evaluated more than five thousand criminal defendants including approximately 200 capitally charged defendants.

5) I have testified for the prosecution, defense and for the court.  I am very familiar with the type of preparation required for capital cases, especially mitigation of the death penalty.

6) My book:  Law, *Psychology, and Death Penalty Litigation* was published in 2004 by Professional Resource Press.

7) I am recognized nationally and internationally on my expertise in the role of the psychologist in death penalty litigation and have presented workshops to the American Academy of Forensic Psychology on this topic every year for the past twelve years.  I have presented numerous talks on the same subject to attorneys training to be qualified to represent capital defendants.  The following are examples of recent presentations:



EXHIBIT

C

"The Role of the Forensic Psychologist in Death Penalty Litigation."
Contemporary issues in Forensic Psychology - Workshop Series.
Baltimore (1994), Atlanta (1995), Seattle (1996) , San Francisco (1997),
Santa Fe (1998), Las Vegas, (1999) Chicago (1999), San Antonio (2001),
Kansas City (2002), Indianapolis (2006), Albuquerque (2007) and San
Antonio (scheduled for 2008).

Invited address and consultant.  National Congress of Honduras and the
Universidad Jose Cecilio del Valle.  *Crime and the Antisocial Personality.*
May 9 to May 16th, 2005.  Tegucigalpa, Honduras.

U.S. Speaker and Specialist grant, Human Rights Project, Tegucigalpa,
Honduras, August 1-7, 1999.  United States Information Agency's Bureau
of Information.  Presentation to the Honduran Congress, University Law
Professors, members of the Honduran Bar Association, Journalists and
students.  Topic:  "The Death Penalty in the United States."

"Dismantling the Anti-social Personality Disorder."  Indiana Public
Defender Defense Council:  Defending Death Penalty Cases.  Indianapolis,
Indiana, September 11 and 12, 1996.

8) I was a participant and member of the American Bar Association's Individual
Rights Task Fore on Mental Illness and the Death Penalty.  Our
recommendations were adopted by the ABA in August of 2006.

9) I have also received the following honors:

Elected to the Board of Directors of the American Board of Forensic
Psychology for a six year term beginning in January of 2006.

The 2004 NOCHE Award for Teaching Excellence.  Northeast Ohio
Council of Higher Education.

Excellence in Teaching Award.  Lake Erie College, 2003-2004 academic
year.

10) For a proper affidavit I would normally interview and evaluate the defendant
and review any available records.  The cost would normally be $250 per hour.
For a defendant in Marysville, Ohio, the cost for the evaluation, not including
a report and testimony, would be approximately $2500 given the distance and
time involved.

11) It is my understanding that the Court was not willing to provide funding for a
psychological evaluation in support of this affidavit.

2

12) Therefore I was only able to review records and offer the following preliminary opinion based on those records:

A review of the available records clearly indicates that Ms. Roberts suffers from Bipolar Type II Disorder, as well as a number of other physical conditions including borderline diabetes, sustained head injuries, pelvic and spine pain, and hypertension. The bipolar condition most likely began in childhood and is particularly relevant given her current legal status.

The Bipolar Disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in a person's mood, energy, and ability to function. Different from the normal ups and downs that everyone goes through, the symptoms of bipolar disorder are severe and affect approximately one percent of the population. Some of the symptoms include: increased energy, activity, and restlessness; excessively "high," overly good, euphoric mood; extreme irritability; racing thoughts and talking very fast, jumping from one idea to another; and distractibility and difficulty concentrating. The essential feature of a Bipolar II Disorder is a clinical course that is characterized by the occurrence of one or more Major Depressive Episodes accompanied by at least one Hypomanic Episode.

Additional symptoms include: unrealistic beliefs in one's abilities and powers; poor judgment; abuse of drugs; provocative, intrusive, or aggressive behavior; and denial that anything is wrong. These symptoms would be accompanied by marked mood swings with periods of intense depression, irritability, and/or anxiety lasting a few hours to a few days; inappropriate, intense, or uncontrolled anger; impulsiveness in spending, sex, substance use; recurring suicidal threats or self-injurious behavior; unstable, intense personal relationships with extreme, black and white views of people and experiences; and marked, persistent uncertainty about self-image, long term goals, friendships, values; frantic efforts to avoid abandonment, either real or imagined.

13) A review of the Wechsler Adult Intelligence Scales – III, administered by Donald Degil, MA, on October 20, 1999, indicates that Donna Roberts yielded a Verbal IQ of 79, a performance IQ of 55, resulting in a full scale IQ of 65. As Mr. Dengil notes, "The Full Scale IQ of 65 is at the top of the mild mental retardation range." The discrepancy between the verbal and performance scores (24 points) is significant and indicative of serious neurological and/or cognitive impairment. Though malingering is always a possibility in such cases, in my forensic experience, malingering is most often apparent in verbal scores, not performance scores. Therefore a complete neuropsychological evaluation is clearly indicated by these scores to determine both the extent of the impairment as well as to rule out malingering.

3

The above factors would be the foundation for a mitigation sentencing evaluation consistent with sentencing guidelines.

FURTHER AFFIANT SAYETH NAUGHT.

_____
James R. Eisenberg, Ph.D.

Sworn to and subscribed before me this 7th day of August 2008.

_____
Notary Public

DAVID L. DOUGHTEN, Attorney
Notary Public, State of Ohio
My Comm. Has No Expiration Date
Section 147.03 R.C.

4

page one of two

STATE OF OHIO          :
                       : SS.      A F F I D A V I T
COUNTY OF UNION        :



**EXHIBIT**
Defense

D

NOW COMES DONNA ROBERTS, being first duly sworn according to law, and states the following:

1.   I was the defendant in State of Ohio v. Donna Roberts, Case No. 01-CR-793. I was capitally tried and convicted. I am currently on death row in the Ohio Reformatory for Women in Marysville, Ohio.

2.   I remember that there were no black jurors seated on my jury. I think that there were at least two or three blacks in the jury pool, but no one of an African-American background were on the final jury or alternates.

3.   At least two black prospective jurors were in the jury pool. The prosecutor used peremptory challenges to excuse both jurors. My attorneys did not object to the jurors being dismissed. We had both of them very highly as potential jurors, the highest as a matter of fact.

4.   I did instruct my attorneys that I did not want them to participate in the penalty phase of the trial. I did want them to fight for my innocence in this matter. I did not think that it would be fair for me to not get death if I was convicted of the same crime as my co-defendant. I did not think we should receive a different sentence just because I was white and he was black. The same crime should receive the same sentence. I know that I did not do this crime and I believe that Nate Jackson acted in self-defense because we did not plan his together.

5.   I did not know that my attorneys were not going to give an opening statement. They did give me a piece of paper with what they wanted me to say in opening statement. I practiced and did what they told me. They did not tell me that I was the only one who was going to speak.

6.   I wanted them to argue self-defense in this case. Not for me, but for Nate Jackson, my co-defendant. It was my understanding the Nate had argued self-defense at his trial. I thought that my jury should know that. To that end, I wanted Nate Jackson's video statement to be introduced into evidence because it is my understanding the he admitted that I had nothing to do with the offense. My attorneys did not discuss this strategy with them. I had paid them a lot of money I thought that they would do the right thing for me. They did not in this regard.

page two of two

7.     I wanted to testify on my behalf.  I begged my attorneys to let me testify.  They wavered, agreeing I should testify one day and changing their mind the next.  When it came time for me to testify, they said no.

8.     I did not ask my attorneys not to say anything in closing argument on my behalf.  This strategy was not discussed with me.  I was shocked when they did not say anything on my behalf.  They just took charge of the case and I did not know what to say or what I should do.

*call defense witnesses*

FURTHER AFFIANT SAYETH NAUGHT.

*Donna Roberts*
DONNA ROBERTS

SWORN TO AND SUBSCRIBED in my presence this *15* day of October , 2004.

*Jensi Jacobs*
NOTARY PUBLIC
Commission Expires: *1-7-10*

*They said they would not present any defense.*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3252

STATE OF OHIO      :
                  : SS.           **A F F I D A V I T**

COUNTY OF CUYAHOGA :

        NOW COMES JANICE PERRY, being first duly sworn according to law, and

states the following:

1.     I am the sister of Donna Roberts, who has been convicted of Aggravated Murder in Trumbull County, Ohio. Donna was my closest friend growing up and throughout my adulthood. My mother suffered from severe depression most of her life. I know it is genetic, as both Donna and I also suffer from it. I am currently receiving treatment and medication for my depression. I have been taking medication for approximately seven years. I suffered from it most of my life until finally getting help.

2.     Donna was 15 when I was born. Because of my mother's condition, Donna essentially raised me. She taught me everything. She got married and left the house when I was 7. She moved to Florida when I was 8. I was devastated. My mother knowing our close relationship, sent me to live with Donna every time I was not in school, every vacation; Christmas, Thanksgiving, spring and summer, etc. Throughout my entire life, Donna paid for medical care, taught me right from wrong, and even helped pay college tuition for courses at least three different institutions, including the University of Pittsburgh and a correspondence course with Louisiana State University. After all credits transferred, I graduated from Florida Atlantic University with dual BS degrees in Accounting and Finance.

3.     Growing up was difficult because of all the fights between my mother and father. My father never struck me, but he was always threatening and chasing my mother in violent fits of rage. Donna always told me she had it worse. We were best friends and talked about most everything. She told me that dad was better when I grew up than when she was younger. Dad was always breaking chairs and tables and glasses when he would lose his temper. Donna told me that on one occasion she saw my dad chase my mother with a gun, although he did not shoot it. Donna was so scared that she hid under the bed for days. I remember my mother falling down a short flight of the steps while trying to escape from my father during a fight. Personally, I was always afraid that my father would, at one time or another, kill my mother during one of these rages. Thankfully, he did not.

4.     I believe, in retrospect, that my dad may have been an alcoholic; although I did not see him drink heavily, usually only beer or wine. None of us [children] ever drank other than socially. I never understood his anger, temper or rage. After these violent breakouts when he would verbally threaten and belittle my mother they made up and acted like nothing ever happened, being all lovey-dovey.



EXHIBIT

F

Page two of three

5.    Donna always felt alone. She did not feel she belonged anywhere. She desperately wanted affection and love from others. She was always afraid of being abandoned.

6.    When I was 17, I moved to Florida to live with Donna and her second husband, Burt Gelfand. She took care of me in every way. She was working as a nurse for Dr. Freiman, who was a plastic surgeon. She was not certified as a nurse but worked under him. She converted to Judaism at that time. She was raised Catholic. I think she converted to fit in with Dr. Freiman, who was Jewish. She thought the family did not approve, but I think it did not bother the rest of us as much as she thought it did. It was a typical Donna decision made to be accepted by others who she was with at that particular time. I helped her study for the conversion because it seemed that it was what she really wanted to do.

7.    One of the really terrible incidents for Donna occurred when she was in her middle thirties with her second husband, Burt Gelfand. She became pregnant. Burt did not want the child. My knowledge is that he talked her into an abortion. She never forgave herself for agreeing to this. She became inconsolable. She divorced him because of this. She was extremely depressed and isolated herself from people after that. I believe that she really wanted the child. She told me the child was a girl.

8.    She met Robert after she left Burt. He preyed on her vulnerability and her isolation worsened with him. She did not keep up with family gatherings. Robert was not the friendliest; he was a child in a man's body. I got along with him alright, but I only visited Donna and brought my son to see her when he was not home. Robert did not encourage her to keep up with the family, although my family welcomed him.

9.    The car accidents seem to make things worse. I remember a bad one when I was 6 or 7 years old, I will always remember her picking glass out her hair after she was released from the hospital. I also remember it because she hit the side of a house after ricocheting from a tree and the accident revealed a log cabin underneath the siding of the house. It was discovered that the house was one of the oldest in the area because of the accident. There was a second very serious accident with Robert Fingerhut in North Miami Beach. Donna sustained severe neck and back injuries which still plague her today. The final horrific car accident was in Ohio. She was driving home alone, hit a divider and was found facing backwards on the floor of the passenger side. Donna was never the same person after that accident; I say that as an understatement. Everything got worse for Donna after that accident. She completely isolated herself from friends and family. She quit calling me, which was very unusual because we talked nearly every day. She quit going to family functions altogether. I had to track her down just to talk to her. I was very worried. I think the isolation just made her more depressed and more vulnerable.

10.    I believe Donna's mental health became extensively worse after the accident. I know she was institutionalized for a mental health evaluation for about a couple of weeks around this time. I believe because of suicidal tendencies. I did not know where she was.

Page three of three

   She eventually called me from the institution to let me know where she was.

11. I was the one who recommended which attorney should be hired for the trial.  Jerry Ingram had represented me for a case in the mid 1980's.  When my 2 brothers and I consulted with him, we told him the above information.  He recommended an insanity plea.  He seemed disinterested about anything after my sister would not go along with the plea of insanity, insisting on her innocence.  I told him about the family history and that people would talk to him but he never set up a meeting to discuss this.  I asked him about the video tape of Nathaniel Jackson's statement which cleared Donna, and he said maybe they would use it in mitigation or appeal.  He never did.  He contended Donna was uncooperative, "crazy" and would be found guilty, although he never protected her from herself.  He would not talk to me in detail saying he was said he was communicating with her son.  He did not discuss with us the problems that they were having with her until after the fact.  I could have helped.  I was very frustrated because I was never aware of his intent in the proceedings until after the fact; after the damage to her case was done.  I was living in Connecticut at the time and unable to travel for the trial because of health issues.  During the trial, my family could not believe what was going on with her defense because of our ignorance of the law and little to no communication with her attorneys.  We found it extremely unusual and were very distraught in the fact that her attorneys called no witnesses on her behalf and allowed Donna to speak to the jury in her condition.

12. I also told the attorneys about the car accidents.  To my knowledge, they did not follow-up on this information even though she began receiving disability benefits after the last accident.

FURTHER AFFIANT SAYETH NAUGHT.

*Janice Perry*

         JANICE PERRY

SWORN TO AND SUBSCRIBED in my presence this ⸺ day of August, 2008.

        NOTARY PUBLIC
        Commission Expires: MAY 30, 2012

*SEE ATTACHED CERTIFICATE FOR NOTARY.*

JUSTIN DREYFUS
Commission # 1799740
Notary Public - California
Ventura County
My Comm. Expires May 30, 2012

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**

State of California

County of ___Ventura___ } ss.

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____  _____
Signature of Document Signer No. 1   Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this

__11__ day of __August__, __2008__, by
 Date          Month              Year

(1) __Janice Perry__
 Name of Signer

☐ Personally known to me
☑ Proved to me on the basis of satisfactory evidence
   to be the person who appeared before me (.) (,)
                                        (and

(2) _____
 Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
   to be the person who appeared before me.)

_____
Signature of Notary Public

JUSTIN DREYFUSS
Commission # 1799740
Notary Public - California
Ventura County
My Comm. Expires May 30, 2012

Place Notary Seal Above

**OPTIONAL**

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

STATE OF OHIO         :
                        : SS           A F F I D A V I T

COUNTY OF MAHONING  :


       NOW COMES MICHAEL RAYMOND, being first duly sworn according to law,

and states the following:

1.      I am the son of Donna Roberts and Robert Fingerhut. On the night of Tuesday, December 11, 2001, my parental family was devastated beyond nightmarish proportions. On that tragic night, I lost my close friend and step-father, Robert S. Fingerhut whom had been a very big part of my life since 1980 and lost my mother who had become jailed pre-trial in late December 2001 until present day.

2.      Robert was far more than a typical step-father in my upbringing. He was also my friend and mentor in many ways. I spent most weekends, weeks in the summer and holidays with Robert and my mother. From as far back as 1980 I went to baseball games with Robert, traveled with them throughout Europe in 1989, while I was stationed in the US Army in Germany. We went on several cruises, many family vacations, countless road trips and Cleveland Indians & Cleveland Browns games over the years. The most memorable moment I shared with my mother and Robert was when they flew out from Miami, FL to Tucson, AZ to greet me at the airport as I returned back home from the Persian Gulf War/Desert Storm. Robert was terrified of flying, but regardless, he flew out to welcome me home anyway after being in the war for 8 months. He was so scared of flying that he had his Will updated the week prior to flying thinking his plane would crash. My grandfather, Robert and myself were all Mason's from St. Albans Lodge in Youngstown, Ohio.

3.      I spent many weekends down in the Warren area visiting my mother and Robert, even helping out when they ran the Avis Car Rental at the Youngstown Airport and the Greyhound Bus offices located in both Warren and Youngstown from 1994-1998, when I lived about an hour north of them in Ashtabula, Ohio. I moved out to New Hampshire in 1998 after accepting a position working in the criminal law division for the U.S. Attorneys Office. I later worked for an educational testing company that required me to travel at least 3 weeks out of the month, however I would book my own travel and had frequent weekend stopovers when traveling through Cleveland or Pittsburgh and spent the weekend with my mother and Robert.



EXHIBIT
F

Page two of nine

4.  My mother was born on May 22, 1944 to Michael & Pauline Roberts of Youngstown, Ohio. My grandfather Michael Roberts is currently alive; however, my grandmother passed away last October 2007.  My grandfather appears to be doing alright physically, however, psychologically he felt as if he lost his daughter and son-in-law back in December 2001.  There are times when he just starts yelling aloud that he just cannot understand what was wrong with her; how could something like this happen to her? He has felt for years that she had some major mental problems and may have even been using drugs.

5.  My birth father, William Raymond and my mother, Donna Roberts met one another in the 1960s at Fitch High School and dated. They went to college at Youngstown University and moved down to Miami, FL in 1966.

6.  I was born on June 17, 1969. My mother was mentally overwhelmed by the responsibilities of having to care for a child and felt that she was missing out on living life, which resulted in her leaving my father and me around the spring of 1971 and began dating her future husband Burt Gelfand who also lived in Miami, FL.  I would visit my mother on the weekends. Usually she would pick me up Friday evening and would bring me back to my father Sunday afternoon.  My mother and Burt were married for five years and divorced in 1978-79.  She would get into frequent arguments and fights with Burt over the littlest things.  One moment she would be happy and cheery, the next moment she would be screaming in his face or give him the silent treatment for days on end. My mother and Burt lived a more adventurous lifestyle of worldly travels, partying, drinking and some drugs. I later found out that my mother had an abortion back in the late 1970s in fear that hers and Burts child would have medical problems due to their drinking and drug use.  She was devastated and went into a major depression for months following this and it was one of the main reasons her and Burt divorced. My mother was terrified of ever telling her parents about this because they would potentially excommunicate her from the family.  My mother remained single for the next two years and dated a few different individuals from a swingers-single club she belonged to in North Miami Beach.

7.  My mother and Robert happened to live in the same apartment complex in North Miami Beach in 1980 and were introduced to one another by a woman who also lived in the complex who was a mutual friend of theirs. At one point in 1981, I believe my mother and Robert ended up sharing her apartment. They broke up several times and Robert would keep calling

Page three of nine

and surprising my mother at her apartment until she would go out with him again.

8.  My mother who was born and raised Catholic converted to Judaism under strict Orthodox conditions after several years of studying the Torah. I believe my mother converted for several reasons; first being that her second husband Burt was Jewish, plus Dr. Morton Frieman she worked for was Jewish and had many connections within the Jewish Community in Miami. Then when she started dating Robert who was Jewish, she wanted to feel more accepted and part of social group. Our Italian Catholic family was not thrilled with my mothers decision to do this and she became somewhat shunned and distanced by her siblings, with the exception of her younger sister Janice whom she has had a very close relationship with her entire life. In fact, Janice ended up moving down to Florida and living with my mother because she was living in a very stressful situation at home herself and I heard that Janice too had an abortion behind the families back since it was basically considered murder by her parents, as well as her one brother who was a Deacon.

9.  Within a year, my mother and Robert later moved to a condo high-rise located on Miami Beach in 1983 and were married in a traditional Jewish marriage after my mother had studied and converted from being Catholic to Jewish under strict Orthodox conditions. I recall my grandfather making comments that something must be wrong with her, she was never right in the head; how could she do this to her family.

10.  My mother worked as a plastic surgeon's assistant and office manager for Dr. Morten Frieman of North Miami Beach from the early 1970s until 1993. My mother later told me of some strange things Dr. Frieman would have her do to him in their office whenever they didn't have patients around, like him getting down on the floor on all fours and having her ride him and spank him. He also took her along with him a few times to an adult video store a few blocks away from the office to watch adult movies with him in private booths. She used to sneak him food and treats into the office that his wife Tina wouldn't let him have at home. My mother became very close friends of Dr. Frieman's mother, Sylvia, whom she used to take out to eat and would do shopping for her on occasion, as well as buy her gifts for her birthday and holidays and would say they were from her son Morten.

11.  My mother and Robert moved to Richmond, VA for one year, then ended up moving to Ohio in 1994. During her time with Dr. Frieman's office, she was his right-hand man. She did everything for that office including writing all of the prescriptions on behalf of Dr. Frieman; signing his name

Page four of nine

and DEA number on prescription scripts. As a small child, the pill bottles in her bathroom cupboard never meant much to me, however in the later years I noticed that both she and Robert were taking many different medications that she had prescribed under Dr. Frieman's name while in Miami as well as once they moved to Ohio. I recall seeing drugs names such as: valium, xanax, klonopin, diazepam, lithium, prozac, zoloft, percocet, vicoden, codeine and more. There were always at least a dozen different brown prescription drug bottles on both their dressers and bathroom counters. I asked them one time why do you have all these drugs "they told me that's how you try and deal with life and this f@#ked up world."

12. My mother was involved in many community service and awareness groups when she lived and worked in North Miami Beach and donated many hours of community service to lower income Jewish families and would bring them food quite frequently. She helped care for a friend of hers named Judy Azulay who was violently attacked and raped at knife point. After becoming close friends, my mother also helped them out with food since they were experiencing some tough times. My mother spent many nights at Judy's home to comfort her and since Judy was terrified the attacker would strike again. She also made two trips over to Israel in the early 1980s with Dr. Frieman volunteering to assist plastic surgery operations on Israeli soldiers wounded in conflict with the Palestinians. They were in hostile areas and worked in field medical conditions that were considered war zones. She helped many injured soldiers in an attempt to give them a second chance in life by performing skin-graphs from recently deceased soldiers to those who were badly burned or severally injured.

13. My mother was in a bad car accident back in the 1960s where she lost control of her car and crashed into a historical log cabin somewhere in Youngstown. In the mid 1980s my mother was in a severe car accident in her Toyota Corolla after another car ran through a light and struck her directly on. She was taken to Parkway General Hospital in North Miami Beach and suffered significant concussions, internal injuries, and back injury. Even though she recovered from the physical injuries, she continues to suffer to this day with major headaches, neck and back problems.

14. My mother had an incident in the mid 1980s where an individual ran up to her car while trying to leave work, he grabbed her door handle and started to open the door at which time she hit the gas and sped away.

Page five of nine

15.  There was an incident late one night where my mother got a flat tire on her way home from Parkway General Hospital; a man stopped to help her, however she was scared of the man and said that she had already called AAA for assistance. She was standing next to her car when a police officer pulled up and started treating her like a criminal and accused her of being a prostitute. She tried to explain to the officer, however he threw her to the ground and handcuffed her in front of the man who offered to help her, he tried to explain to the officer as well and he completely ignored her. She was later released and the arrest and charges were dropped against her and the officer later apologized for his conduct. She however was afraid of police at this point and became very paranoid whenever driving.

16.  The straw that broke the camels back for my mother and Robert living in Miami was when she was attacked in broad daylight on the corner of a busy intersection at a gas station. She had just finished pumping gas and paid, as she was opening her car door to get in, a man ran up shoved her into the car and started hitting her and trying to push her over so that he could drive the car off with her inside. However, she was hitting and kicking the attacker and grabbed her mini mace on her key chain and tried to spray the attacker, which ended up spraying all over both of them. A mechanic at the gas station ran over and tried to stop the attack when a car with three other men drove up and grabbed their friend and sped away. This incident impacted her and Robert so severely that they both gave up long successful and good paying jobs and a very nice home in Miami and moved away.

17.  They initially moved to Richmond, VA in 1993 where Robert worked as a counselor at a local correctional facility and my mother worked at home. After being disappointed in the Richmond area for a year, they decided to move to Ohio in 1994 since my mothers entire family lived there, not too mention Robert was a very big fan of the Cleveland Indians & Browns and wanted to be able to go to games frequently. They initially lived upstairs at her parent's home in Youngstown until they found their own home in Warren.

18.  Upon first moving to Ohio, my mother and Robert operated the Avis Car Rental franchise at the Youngstown/Warren Regional Airport for over a year. They left Avis and Robert worked in sales for a year or so before they took over the Greyhound bus service located in downtown Youngstown. While at the WRTA bus terminal, they also ran a small fast food restaurant called Just the Ticket, but later closed the restaurant after a year or so after putting in too many hours at both businesses.  After significant success and improving sales and customer service with the

Page six of nine

Youngstown Greyhound station, they were offered the opportunity to take over the Warren Greyhound office where it turned out to be a success as well. They were taking in over a million in sales each year between the two greyhound stations, however they were working over sixty hours a week.

19. In April of 2000, my mother blacked-out while driving home from Youngstown to Warren along Route 11 and collided with a pillar under an overpass. Her car was totally destroyed and she suffered 3 traumatic concussions to her skull, broken ribs and a few other injuries. There was suspicion that someone may have spiked my mothers drink at the bus station.

20. Prior to this accident, my mother would call me a minimum of once a week, sometimes more depending on what was going on in their lives or mine. Even when I was deployed to the Gulf War she would call me in Saudi Arabia at least once a week and their phone bills ran in the hundreds during my eight-month deployment. However, after this severe car accident in April, 2000, my mother became a different person. The weekly phone calls ceased and I was lucky to hear from her once a month, and half the time I had to initiate the call. Even our phone discussions themselves seemed different. Not only were they shorter in nature, her voice or tone of voice sounded different, it was as if I was talking to a different person at times who seemed distant, lacking emotion or not interest in speaking with me. Sometimes she would be all excited and perky in tone, the next time down and depressed.

21. Robert told me a few months after her accident that she had become indifferent towards him more than ever. That she was messed up in the head and not a normal person. He thought she was wacked out of her mind and that she could be on some sort of drugs or had a major chemical imbalance.

22. I do not know the exact dates or specific hospital, but I believe it to be the Warren Hospital that my mother checked herself into in late 2000 after she initially attempted suicide with her one dog Blossom when she got into her car in the garage, started the car and sat in it for a few minutes. She told me that Blossom looked at her and licked her; that was when she realized she was in a trance, shut off the car and quickly got out of the garage and went outside for fresh air. She spent a week getting mental health treatment at a medical facility and was later discharged. Like I previously stated, they both took a lot of different medication, to deal with the stress of everything. I also discovered that my other started smoking both regular and marijuana cigarettes after her car accident and up until

Page seven of nine

the tragedy. My mother never liked cigarettes and couldn't stand to be around others who smoked, I didn't understand how she could all of a sudden start to smoke these.

23.  My mother and Robert had a unique relationship for over twenty years. Even though they married and divorced after five years, they were only divorced by the courts, not by Jewish law which they practiced and followed. At times they were happier than any couple I had ever come across having the times of their lives, traveling the world and having everything they ever wanted, including their two Lhaso Apsoâs, Fluffy and Blossom whom they loved and spoiled more than anything. Their dogs didn't eat dog food, ever. They would prepare baked chicken, meatloaf, rice, pasta and would give them each a tablespoon of peanut butter each night before going to bed.

24.  Then there were the not so good times when they would argue and fight with one another, much like that in the movie "War of the Roses." They would verbally fight and accost one another to the extreme and then the complete opposite type fights where they would give each other the silent treatment for days and even weeks where they wouldn't say one word to one another. I only know of one fight that turned physical when Robert took my mothers jewelry box and tossed it out into the front yard containing all of her jewelry, she confronted him and as they argued he grabbed her and shoved her out of his way and she fell to the ground. After I heard of this incident, I told Robert it is none of my business about their disagreements or arguments, but when it turns physical and either of you are harming one another "I will intervene. This incident was in the early 1990s when they still lived down in North Miami Beach, FL.

25.  At no time during my upbringing as a child did either Robert or my mother ever strike or hit me. They were not the physical type people when it came to parenting, unlike my birth father, who had spanked me at times. Instead, they would use words and punishment instead.

26.  My mother and Robert had possessed handguns as far back as I could remember dating back to 1980. They both practiced at target ranges and my mother had all their weapons registered. After her first attack, my mother obtained a concealed firearms license from the State of Florida. At no time, even during the worst of times between my mother and Robert, they never made any deadly threats or pulled a gun out during their fights. Robert kept a handgun in the nightstand next to him and my mother kept one in her purse. I recall my mother telling me her handgun was stolen out of her purse at the Warren Greyhound station sometime I believe in the summer of 2001. I recall her telling me that she reported it

Page eight of nine

to the Warren Police. Robert would carry his handgun with him if he was working late and especially on Tuesdays since that was traditionally the day he carried the bank deposit home with him that he would drop off at the bank the next morning.

27.     I called my parents home around 9:30 p.m. on Tuesday, December 11, 2001 because I knew Robert closed the bus station at 9:00 p.m. and was usually home by 9:25 p.m. It was also the third night of Chanukah and I wanted to wish them happy holidays since my mother would wait each night to light the Menorah until Robert returned home. I also was calling to let them know I had sent them the care package of goodies from NJ (Roberts birthplace) a few days prior that they asked me to get while I was there the on a business trip. The call was never answered and I got their voicemail and left them an animated holiday type message.  Days later when I was taken into the home with the Howland P.D., I noticed the flashing light on the answering machine in the kitchen just a few feet away from where Robert laid.

28.     Several packages arrived at their home between December 11th – 20th of Chanukah gifts that my mother ordered for Robert and he ordered for her as well.  Several of the orders were dated in the first week of December.  I accessed my parent's email that my mother and Robert shared (drobe31356@aol.com) and there were several emails from my mother to people whom she bought sports gifts for Robert on Ebay days prior to the tragedy.

29.     I find it very hard to comprehend the entire ordeal.  If my mother no longer wanted to be with Robert, all she had to do was literally change the locks.  Everything was in my mothers name, the house, the cars, the businesses, bank accounts, and since Ohio did not have common law marriages during the time, he had no rights to anything, she simply could have just cut him off.  I did not know about an alleged affair my mother had with Nathaniel Jackson, their telephone conversations or letters to one another.

30.     My mother never spoke of seeing anyone, nor did Robert ever say anything to me about being suspicious of her doing anything.  I do not know of Robert having any affairs or involvement with anyone.  He basically worked so much that it would have been nearly impossible for him to do so.

I have post-traumatic stress disorder from the Gulf War, anxiety, depression, a sleeping disorder.  This event compounded my health issues four fold and continue to affect me whenever my mother

Page nine of nine

informs me of her mistreatment in jail and my feeling of being helpless while she suffers in prison.

31.     As a family member of both the victim and accused, I feel as though I am placed on the fence and suffer in multiple ways by the loss of my parents, Donna Roberts & Robert Fingerhut.  They were more than just parents to me, they were also my friends whom I could talk to about anything and everything in my life.

32.      My mother's lawyers did not ask me about these things before or during the trial.  They did not ask me to intervene when she became uncooperative and said she wanted the death penalty.  They did not ask me about the family history I addressed above.  I would have so testified if I had been asked as I did not want to lose my mother and father.

33.     I supplied photographs of the myself and my mother and father (Mr. Fingerhut) to defense counsel. I am in uniform for service in Desert Storm.

FURTHER AFFIANT SAYETH NAUGHT.

_____
MICHAEL RAYMOND

SWORN TO AND SUBSCRIBED in the presence this __12__ day of August, 2008.

_____
NOTARY PUBLIC

DAVID L. DOUGHTEN, Attorney
Notary Public, State of Ohio
My Comm. Has No Expiration Date
Section 147.03 R.C.

**Donald Degli,** M.A.
Psychologist

4 D411

*Listed Since 1975, National Register of Health Service Providers in Psychology*

5500 Market Street
Suite 201
Youngstown, Ohio 44512
(330) 782-3112
727-9887

Branch Office At
8052 East Market Street
Warren, Ohio 44484
(330) 856-5486

## PSYCHOLOGICAL EVALUATION

Claimant: Donna M. Roberts
DOB: 05/22/44
Date of Evaluation: 10/20/99
SSN: 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

Prepared For Bureau of Disability Determination
P.O. Box 359001
Columbus, Ohio 43235-9001
Exam Serial #: 991006 000474



NOV 0 3 1999

REHAB SERVICES COMM.
BUR. OF DISABILITY DETERM.

DDS RELEASE COPY TO

C/E DR DEC 0 7 1999

TESTS ADMINISTERED
Wechsler Adult Intelligence Scale - III
Wechsler Memory Scale
Wide Range Reading Test
Nelson Reading Test
Clinical Interview

### BACKGROUND INFORMATION AND MENTAL STATUS

Donna, age fifty-five years, came to the evaluation alone. She was quite difficult to engage. She was odd, distant and detached. She complained of confusion, and reported she had difficulty getting to the office alone. She said she made several stops along the way. She was complaining of confusion which she eventually related to earlier head trauma. Also, at the end of the assessment, she went outside and waited approximately twenty minutes, sitting on a bench before she got into her car to leave. She complained that she was somewhat dazed and confused.

Today's evaluation creates difficulty for this psychologist, and diagnostic uncertainty. Donna presented a mixed picture. At times she seemed genuinely confused. At other times, some of her responses during formal testing were suggestive of malingering or exaggeration. At other times, she reported some symptoms which seemed to suggest exaggeration or dramatization of whatever difficulties she may truly be experiencing. My task was complicated because she alluded to a significant medical history which included neurological insult. Yet, there was no formal medical history accompanying the referral to this office. At the end of it all, I was left with diagnostic options to include possible dementia, possible malingering or exaggeration and symptoms of mood disturbance. The brief history accompanying the referral was informal, a "report of contact." That report alluded to an April, 1999 auto accident indicating "She became unconscious ... woke up in the hospital and found that she had fractured ribs, back and sternum." For the most part, no other significant medical reference was indicated. The report indicated she was taking Paxil for menopause.

Slowly and haltingly, Donna reports that she was divorced from her three marriages. She has one child, a son, age thirty years. While divorced, she still lives with her third ex-husband at a house that she has owned for the past three or four years. Donna had earlier graduated from high school in nearby Austintown, Ohio. She completed two years at Youngstown State University. She attended lab technician classes while living in Miami.

Donna was last employed "helping my husband in his restaurant businesses." She had been doing that for a few years until April of 1999 when she was in an auto accident. Prior to that she was living in Miami, Florida where she worked as a medical assistant in a physician's office for nearly twenty years. She said she cannot work now because of her medical difficulties.

Medical problems are described as injury to her ribs and sternum. She complains of "flashing light in my right eye." She said she was knocked unconscious in the April, 1999 auto accident. She said that she has "memory lapses for hours." She described other symptoms of withdrawal and fear. "I'm afraid to go out. It's like they're waiting for me." (More on this ideation later in this report.) She added, "They said that my head is OK, according to the last test." Her medications include Meclazine for dizziness. She takes Paxil and Norpramin. With her very blunted expression and poor eye contact, she stated, "My head goes whoosh." She reports virtually no history of mental health care. She denies any history of alcoholism or drug abuse. She denies any history of legal difficulties.

Orientation was at least mildly impaired. She can name the president, but not the previous president. She knew the month and year, but said the day was Tuesday instead of Wednesday.

EXHIBIT

G

000055

2 - Donna M. Roberts  10/20/99

RELEASE COPY

C/E DR DEC 07 '99

<u>Speech and conversation</u> were impoverished.  Eye contact remained poor.  She did respond to simple structured questions.  She occasionally digressed, oddly at times, suggesting some strained ideation.  Formal vocabulary was slightly below average, as measured by intelligence testing.

<u>Memory</u> is presented as impaired.  That is, she complains of confusion and memory lapses that go on for hours.  Today during formal memory testing, her responsiveness seemed to lack a genuine effort.  She recalled a history of family, schooling and employment.  She recalled recent activities in a slow and halting manner.  She processed information with difficulty, suggestive of a deteriorated intellectual functioning, but possible preoccupation with the outcome of this evaluation.

<u>Concentration and thought</u> are impaired, according to this claimant.  She complains of confusion and periods of disorientation.  She digressed regarding some strange ideation suggesting delusional thinking.  As mentioned earlier, she said, "I'm afraid of people out there waiting."  I asked her to explain.  "The people who come to get you when you die.  The dead people."  She digressed suggesting that she considers herself very ill and about to die.  "I think ... I almost died in the accident.  I saw those people.  I was turning into cement and the light ... it flashes in my right eye every time."

<u>Judgment and insight</u> seem impaired at present.  If this presentation is genuine, she is evidencing symptoms of dementia.  She presents herself as confused and complains of significant memory lapses.  She has become quite dependent.  Yet, she drove to the office but said she had to make several stops.  She reported confusion.  Today's formal testing reveals functioning which is in the mild mental retardation range, although I had questions about the genuineness of her effort.

<u>Mood and Symptoms</u>:  When asked directly if she is a happy person, she paused, "Well ... I used to be.  Now -- there's no reason to be happy.  I'm waiting to die now ... any second.  Don't you think so?!" she asked.  If sincerely presented, she presents herself as somewhat depersonalized and detached.  She doesn't complain of sleep disorder.  She said her appetite is poor, "I haven't eaten since Monday.  I lost about thirty pounds lately.  I was fat, though ... I weigh about 130 now."  I asked about her social life.  "Nothing," she stated bluntly.  I asked about the relationship with her ex-husband.  "He's tired of me."  When asked if she has questioned the value of life, she responded directly, "All the time.  I was going to do it.  I have guns.  I just can't pull the trigger.  They say gas is painless."  Again, I was wondering whether she was wishing to dramatize whatever difficulties are confronting her.  Otherwise, there is some suicidal risk.  She added, "I just can't function anymore."  She presents herself as rather depressed.

<u>Activities</u> are very diminished.  She said she spends all of her time at home.  She does not do any cooking or cleaning anymore, she insisted.  I asked if she uses tobacco, "Now I do," she added, indicating that she recently took up smoking cigarettes.  She has a license.  She still drives short distances in the community.  "I had to make a lot of stops, though.  I practiced before I came here."

PSYCHOLOGICAL TEST RESULTS

The <u>Wechsler Adult Intelligence Scale - III</u> was administered yielding a response pattern which was variable, some of her responses were strongly suggestive of confabulation and malingering, while other responses seemed more genuine.  I consider her intelligence test quotients of questionable validity for any direct interpretation.  Her response pattern yielded a <u>Full Scale</u> IQ of 65 with a <u>Verbal</u> IQ of 79 and <u>Performance</u> IQ of 55.  Subtests are summarized below.

| FULL SCALE IQ | 65 | VERBAL | | PERFORMANCE | |
|---|---|---|---|---|---|
| Verbal IQ | 79 | | | | |
| Performance IQ | 55 | Vocabulary | 7 | Picture Completion | 1 |
| | | Similarities | 6 | Digit Symbol | 2 |
| | | Arithmetic | 6 | Block Design | 4 |
| | | Digit Span | 6 | Matrix Reasoning | 3 |
| | | Information | 9 | Picture Arrangement | 3 |
| | | Comprehension | 6 | | |

The Full Scale IQ of 65 is at the top of the mild mental retardation range.  The Verbal/Performance differential of 79/55 is very large, revealing mild impairment in verbal and language-related skills and severe impairment in perceptual and spatial relations skills, tasks involving novel directions.  Vocabulary, arithmetic skills and comprehension skills are mildly impaired.  General fund of information is in tact, near average for her age.  It was on the Performance subtests where her functioning seemed confabulated.  It was on the Digit Symbol subtest where she yielded responses which were not simple errors, but confabulations; original responses, twenty items completed, ten of them erroneous and confabulated.  She presented herself as confused with her attention to visual detail and with assembly skills.  I consider a need to rule out possible malingering or exaggeration of her difficulties.

000056

3 - Donna M. Roberts  10/20/99

The Wechsler Memory Scales were administered, again yielding a response pattern which was questionable, warranting direct interpretation. She yielded a Memory Quotient of 64. When asked to recall digits such as 7-2-8-6, she responded oddly, "Well ... I like the number 9. Number 9 or 13. Those are what I like." She digressed, "I have to do things sometimes. Like nine times or thirteen times." Her conversation was now starting to confuse me. When asked to count backwards from twenty, she left out most of the numbers. She could not recite the alphabet. She could not count forward by threes. I considered her responses less than optimum. She was also extremely confused in recalling facts from two brief stories which were read. As mentioned, she was oriented to simple worldly matters and to time. On the visual memory task, she confabulated responses.

The Wide Range Reading Test (WRAT-3) and Nelson Reading Test were administered revealing word recognition skills which are functional at the high school level, Standard Score 94. She could recognize, pronounce and read in context common and uncommon multisyllable words.

SUMMARY AND CONCLUSIONS:

This is the evaluation of a fifty-five-year-old woman who presents a rather odd diagnostic picture. Unfortunately, no formal history accompanied the referral to this office for this claimant who suffered multiple injuries including head trauma in a reported automobile accident which occurred in April of 1999. Thus, today's evaluation leads to rule out differential diagnostics. At times, she seemed to be genuinely confused as she well complained of memory problems. At other times, er responses seemed to be an exaggeration, dramatization, confabulation or malingering. She reports medications for dizziness. She also takes antidepressant medication. Yet, she reports no formal mental health care. The intellectual assessment yielded questionable functioning and an intelligence quotient in the mild mental retardation range. Memory functioning, as measured by the Wechsler Memory Scales was also impaired, although her responses were suggestive of confabulation and malingering. Reading skills proved to be functional at the high school level. Personality and emotional assessment reveals an individual who is rather blunted, expressionless, preoccupied, worrisome and evidencing some rather strange ideation if she is being genuine in her presentation. Diagnostically, there is a need for rule out consideration of dementia. There is certainly a need for thorough review of whatever medical/neurological records are available.

Psychologically, Donna does present herself as genuinely impaired to some degree, probably not able to follow directions or do routine tasks in a competitive work environment at the present time. She has the ability and judgment to manage basic money matters appropriately. Interpersonal functioning was particularly impaired, if today is an example. She will have difficulty in simple social interactions and at best, presents marginal capacity to interact appropriately in a competitive workplace. Provisionally, Donna is moderately impaired in her ability to meet the demands of competitive adult employment. These observations are made without regard to whatever physical limitations she may have.

DIAGNOSIS (DSM IV)

| | |
|---|---|
| Axis I: | R/O  Dementia |
| | R/O  Malingering or exaggeration of Axis I difficulties. |
| Axis II: | Deferred -- Rule Out Premorbid Intellectual Deficiency |
| | R/O  Malingering of Axis II difficulties. |
| Axis III: | Multiple injuries including head trauma, by claimant report and informal history -- deferring to medical/ neurological review. |
| Axis IV: | Psychosocial Stressor: Unspecified. |
| Axis V: | Current GAF: 55 - Provisionally |

Donald Degli, M.A., Psychologist

DM:10/20/99

000057



EXHIBIT

H

# PETITIONER'S EXHIBIT I

# ALLOCUTION

# 10/22/07

# STATE OF OHIO v. DONNA ROBERTS

# CASE NO. 01 CR 793

# JUDGE JOHN M. STUART

1    on appeal for whether she had a proper trial to
2    begin with because there were problems that
3    weren't gone into.  Her attorneys quite clearly
4    tried to get her to allow them to pursue such
5    things and my understanding at the time was that
6    she gave orders not to get into anything of that
7    nature.  So those are Appellate questions, they
8    are not before this Court, nor relevant to the
9    issue at hand in my mind.
10              Please submit anything of that nature
11   that you wish to put into the record.  That will
12   go up with the case.
13   (SIDE BAR DISCUSSION.  OFF THE RECORD AND OUT OF
14   HEARING.)
15              THE COURT:  Would you please
16   bring your client forward?  Good afternoon.  This
17   is an opportunity for you to address the Court.
18   I'm sure your attorneys have told you.
19              A jury has returned a finding of guilty,
20   and they have recommended to this Court the death
21   penalty.  You may address the Court as to anything
22   that you feel is relevant to your situation.
23              DEFENDANT:  First of all, I

46

```
 1    think there's been a big misrepresentation about
 2    me, my character, my personality, and my life, and
 3    I just want you to know me a little better.
 4                    I was born in 1944 on the east side of
 5    Youngstown Ohio.
 6                    ATTY. DOUGHTEN:  Speak like you
 7    are angry.  The Judge needs to hear you.
 8                    DEFENDANT:  And when I was
 9    about five years old, my Dad moved us out to the
10    country because he thought it would be a lot
11    healthier for us and I lived on a farm in
12    Austintown when there was no Austintown.  We were
13    Roman Catholic and my Dad helped build the first
14    church there, Immaculate Heart of Mary, and I
15    attended school there for many years.  When I was
16    real young, I was sexually abused, I was raped by
17    an older cousin and he hurt me and he ruined a lot
18    of me inside.  And to get away from that pain and
19    everything, and I was able to, I looked sideways
20    and I'd picture a little girl in a green and white
21    ruffled little dress with a little straw hat and
22    straw basket with flowers in it and that is how I
23    got through that.
```

47

1        And a lot of times after that, I did the
2    same thing.  I just went somewhere else to endure.
3    I lived in a very very abusive household.  That is
4    why we had my father leave.  He beat my mother.
5    He verbally abused her every which way you can.
6    It was horrible, and I spent a lot of time under
7    my bed, especially when guns came out.
8        Somehow one of my aunts, not the aunt who
9    was the mother of this person, told my Mom
10   something was happening because she noticed how I
11   was and wasn't acting, and my Mom took me to an
12   older male doctor and he took me in a room, all
13   alone and my Mom didn't come with me, and when we
14   came out, he said to my Mom, she's a bad girl.
15   And that is what I thought my whole life really.
16       I tried to be happy and positive and
17   everybody around me just loved to be with me, but
18   then when I was alone, my face was long and I was
19   very sad and I always felt empty because nobody
20   had ever paid attention to me or hugged me or
21   anything, just wasn't time.  There were five of us
22   kids.
23       I'm sorry to be hesitating and taking up

48

1    your time.  My Dad made us know that we had to get

2    good grades and throughout my entire schooling, I

3    always got certificates that I was on the honor

4    roll, and I went to Youngstown University, it

5    wasn't state then, I was on the dean's list.

6        I married my high school sweetheart, I

7    guess you could say, and after one year, we moved

8    to Miami, Florida, and I had a lot of trouble

9    getting pregnant because of what had happened to

10    me, but I finally did, and in 1969 I had the most

11    wonderful son any mother could want, mannerly,

12    respectful of everyone, intelligent and in 1987,

13    when he graduated from high school, he told me he

14    wasn't going to go to college, he wanted to go in

15    the Army and I had a breakdown.  And I was like 87

16    pounds shortly thereafter, and he went out of the

17    country to Germany, and he was in JAG for ten

18    years.  After that, he went to New Hampshire to

19    work for the attorney general.

20        And here his mother is in prison.  I know

21    I am forgetting a lot of things, but David wants

22    me to tell you about my injuries.

23        In 1963 I was going to college and I was

49

1    working in South and North Side hospitals in the
2    lab getting training.  And I used to always work
3    like day and night call for the technologist and
4    once I worked day night day and when I was going
5    home, I fell asleep and the car went through big
6    giant trees, hitting something, I don't know what
7    at the end, but I was there on the passenger side
8    on the front floor, filled with glass and I could
9    feel my head going up.  It felt like it was going
10   up that much, and I don't remember the ambulance
11   or anything, but I know I went to the hospital,
12   and I know they spent a long time picking glass
13   out of me, and I was like spacey for awhile.
14           And then in 1983, Robert was driving the
15   car and somebody was speeding right through the
16   red light and he caught her in the corner of his
17   eye, turned just enough to get hit like right here
18   and I flew through the windshield and then again,
19   went my head and this time my legs and hands were
20   numb and I was real afraid.  I was in the hospital
21   and they put me in traction and then after that
22   for a long time, many many many months, I had to
23   go to the neurosurgeon that was taking care of me,

50

```
1    and he put these big needles in my neck for some
2    kind of shots.
3            The next one was 1999, April, and that
4    was the one.  Again I fell asleep.  I worked too
5    hard and I worked too long at home and at the
6    businesses, and I fell asleep and again, every
7    case, everybody looked at the cars and they
8    couldn't believe anybody could survive.  The same
9    with that car, it was a brand new car, and State
10   Farm rendered it totally demolished, and I think I
11   was kind of demolished.  My head, I don't remember
12   anything, I don't remember falling asleep.  I
13   remember about, I remember when I was in the
14   hospital, I heard the doctor saying to Robert, she
15   has to stay.  I just came out and heard that and
16   went back, and I don't remember anything for a
17   long time, a long time.  If I had to say what I
18   did in March, April, May, June, July, August, I
19   don't even remember.
20           And Robert was calling me spacey and
21   goofy, and he was really worried about me, and he
22   told me I should get some kind of help, but I
23   didn't want any help.  I had so much pain in my
```

```
 1    life and I think I must have ignored depression, I
 2    was always so low and so empty and I got my little
 3    dog Blossom, she was my little girl and nobody
 4    could ever love her like me or take care of her,
 5    know everything she wanted and went out to the
 6    garage and I put her on the passenger seat, I sat
 7    down, and then I turned the key on, and I looked
 8    at Blossom and I gave her a little kiss, and all
 9    of a sudden, my body was always so tense, it just
10    was relaxed, and I felt like I was in a cloud and
11    then Blossom was going like this on me with her
12    little paw, and she licked me and she started
13    whimpering, and I looked at her and I thought, Oh
14    my God, what am I doing to my little girl.  I
15    didn't even care about me.  So somehow, I dialed
16    some number on the car phone, it was like that and
17    I dialed something and I think it was a lady, she
18    said, turn your car off and open the garage door,
19    and I thought, Oh know, here I am back to earth
20    again.  Pain, depression, and some man came.  I
21    know some man came in a car, and he put Blossom in
22    the house, and he took me in the house and told me
23    to get some personal things I needed, and then I
```

52

1    remember getting in his car and that was it.
2              A week later, I realized I was in a
3    psychiatric ward, and I walked up and down the
4    hall and after I'd been there some days, Robert
5    came to see me.  We always took care of each
6    other.  We really loved each other.  I don't know
7    how all of this happened, but they gave me a lot
8    of medications, and they gave me, I remember the
9    name of only one, I think I had three or four and
10   they gave me Risperdal and that was for voices, to
11   stop the voices.  And it worked, but when I got to
12   Marysville, I asked Dr. Naluri that I wanted to
13   stop taking it, because everybody knows
14   everybody's business and I didn't want them making
15   fun of me, but I had some terrible experiences.
16             One day I was seeing these giant anthills
17   like that, all over the floor in my room and I
18   remember telling the warden who came, we were good
19   friends.  She came to visit me every week.  We had
20   nice talks and she came and I said, my Mom told me
21   if you put coffee around these aunts, they will go
22   away and the major came and everybody came and
23   they were looking at me like I was out of my mind.

53

```
1    I guess I was, but then I started falling all over
2    the place and hitting my head again and again, and
3    I fell and hit the corner of the desk once and got
4    two cuts on the bottom of my eyes, and I ended up
5    in the hospital.
6           I don't know how I got there or how long
7    I was there or anything.  And it is just like ever
8    since that accident, even right afterwards, I
9    would get up and think its Tuesday but it would be
10   Wednesday, and I just tried so hard to remember
11   Tuesday, but I couldn't, and it was kind of scary.
12   It was really Wednesday, and I couldn't believe
13   it.  And I looked at the paper for the date and I
14   asked everybody, and then, there were periods
15   where I just wasn't there.  I didn't know what was
16   going on or anything.
17          And after I think seven months after
18   that, after I got out of the hospital, Robert made
19   me go to Social Security and they made me go to a
20   psychiatrist, that was in 2000.  And they said, I
21   was, whatever how you say it, and they put me on
22   Social Security and Medicare and Medicaid.  And I
23   still was not all there.  I can't even remember
```

54

1    what I did in the year 2000.

2         I do remember one thing after the

3    accident and before the hospital, I went in my

4    restaurant, locked it up, and walked out and never

5    went back.  I left refrigerators full, freezers

6    full, I just couldn't do it anymore.  I couldn't

7    take it anymore.  It was just too much.

8         And I was working in the Warren office

9    too and juggling.  I had a part time man here,

10    part-time girl here, and I would like you to know,

11    sir, that while I had that restaurant, I loved it

12    more than almost 23 years in that plastic

13    surgeon's office.  That was a high class thing.  I

14    had beautiful clothes.  When we went to surgery,

15    people respected us.  We helped a lot of people.

16    I had people that were completely scarred and made

17    them want to live again.  If it took a year or two

18    years to do reconstructive surgery, I was with

19    them the whole time.  And think I saved maybe two

20    lives for sure, one woman was so bad that I

21    helped, that her husband actually shot himself to

22    death.  He couldn't stand it anymore looking at

23    her because she had been so beautiful.  She showed

55

1    us pictures.  She was a Cuban girl.  She was

2    gorgeous.

3            When I was in the restaurant, at the end

4    of the month, people didn't have anymore money,

5    and I learned they got checks like at the

6    beginning of the month, and they would come and we

7    would have a wonderful time.  All but three people

8    of all of the customers, there were a lot of them,

9    they were all black, but those three older white

10   people who came, everybody came almost everyday,

11   every afternoon.  But at the end of the month,

12   when there was no more money to give the children

13   milk or food, they all came to Donna, Miss Donna,

14   they called me, they got food, they got milk.  I

15   had bowls of candy for the children.

16           I gave them the best.  We only had the

17   best of everything, and I gave them everything.

18   And some of them needed money to keep their

19   electricity on for their kids, to keep the phone

20   on, in case there was an accident.  A phone isn't

21   a luxury anymore, and I helped them, and I never

22   wanted anything back.

23           There came a time in 1980 that I felt

56

```
 1    very strongly about God, and one God, and I
 2    converted to Judaism.  The first thing I was able
 3    to do was join the Chevre Kadisha, and that is the
 4    burial society.  You have to be in a state of
 5    grace to work for them and we get called out in
 6    the middle of the night, very strict about burial,
 7    you can't wait, and we would wash them, wash the
 8    bodies, and we would talk to them in case they
 9    were still around, and we would tell them not to
10    be embarrassed and that God loved them and they
11    were about to go meet God, and then we dressed
12    them in a shroud and it had to be all cotton, no
13    clips, no buttons, and we would actually have to
14    put them in a wooded casket and it had to be
15    wooden, no metal, only wooden, so it would
16    disintegrate into the earth.  Then we call Shomar,
17    that means to watch.  Usually a little old man,
18    because we never leave a body alone, because you
19    never know what horrendous things people will do.
20          Then the next thing I did, was campaign
21    to save one Falasha Jew, that would be a black Jew
22    in Ethiopia.  They were just murdering them,
23    slaughtering them and we had people there that
```

57

1  could get them, but it cost thousands and
2  thousands of dollars to get them out of there, and
3  so, I got from the Jewish Society, I got slides
4  and all of that information, materials, and I went
5  from Temple to Temple, and I showed them.  And I
6  collected enough money to save one life.  They got
7  him, they got him out of the back country and out
8  where he could take a plane and they flew him to
9  Israel to freedom.  I am very proud of that.  I
10  saved a life.
11       A while later, there was a war, there's
12  always a war in Israel, and I volunteered to work
13  for a month with the plastic surgeons.  We had to
14  go into the morgue in the morning and we got, we
15  used a Dermatone, it's a special machine plastic
16  surgeons use.  It cuts the right amount of skin
17  off the body.  My job was to hold up the leg while
18  the doctor did that and as I did that, I was
19  looking at all of those dead that their mother's
20  raised.
21       So in the afternoon, we would do skin
22  grafts and reconstruction.  We even worked on one
23  of our enemies, and we gave him the best care.  He

58

 1    was really afraid because those people when they
 2    get a Jewish soldier, they slaughter them, they
 3    take their penis off, they put it down their
 4    throat.  That is a regular thing with them.  Then
 5    they tie them to a car and drag them through the
 6    streets.  So he was really scared, but we took
 7    good care of him, and everybody stayed far away
 8    from him.  When I went over to him one day and he
 9    didn't speak English, but I patted him and I
10    rubbed his arm, and I told him, don't worry its
11    okay, and somehow he understood me and he smiled.
12          No one knows what that can mean unless it
13    is you and you are there.
14          I wanted to get to something that the
15    Ohio Supreme Court typed up.  Now I don't know
16    where they got this information, but it hurts me
17    so bad, that I have laid in my bed for I don't
18    know how long, and just talked to you.  I talk to
19    you, Your Honor.  I said everything I wanted to
20    say to you, and I prayed some day I'd get the
21    chance to say it.  This first page, I don't know
22    who did it, it had to be the Prosecution and Paul
23    Monroe, the Detective, who tainted evidence, moved

1    it, put it in, lied under oath.  He sat in that
2    chair and raised his hand to God, he swore to tell
3    the truth, and then, I learned what it all means.
4    I swear to tell the truth.  People's ears shut off
5    at that, but then I realized.  The whole truth and
6    nothing but the truth, because that man took
7    truths that I told him, and he put all of these
8    lies in like that.  He didn't tell the truth.  He
9    didn't tell the whole truth and he didn't tell
10   nothing but the truth.  He lied and lied and lied.
11   So I imagine it was him and the Prosecution, that
12   created this.  How would the Supreme Court know?
13       It says Donna Roberts and Robert
14   Fingerhut, next line, Fingerhut bought two
15   Greyhound bus terminals.  You don't buy Greyhound
16   bus terminals.  They are not for sale.
17       I had 23 years of running an office.  I
18   did everything for the doctor.  It was me and him,
19   except sometimes I'd bring in my sister to give
20   her a job to do or whatever.  You have to be an
21   entrepreneur, and then they give it to you, if you
22   have the money to pay all of the workmen's comp
23   and insurances and everything they say.  So it was

60

```
 1    mine.  That was mine.  I wasn't a hanger on.  I
 2    wasn't a money grubber.  It was exactly the
 3    opposite.  I handed the money out to whoever
 4    needed it.  Then they say that we were divorced to
 5    protect his assets and against being sued.  We
 6    were married in 1983.  I was scheduled to close on
 7    my dream house I had built on June 14.  We got
 8    divorced on May 29 to protect my assets.  Robert
 9    had no assets.  He just been through the second
10    horrible divorce of his life.  I took $75,000 out
11    of my tax free Franklin mutual fund as a down
12    payment on that house, and I was making enough
13    money that I paid it, and Robert was working
14    occasional sales jobs here and here and here.
15              I invested in stocks, bonds, mutual
16    funds.  I bought real estate and sold it, in fact,
17    I bought Robert's house so he could finally settle
18    his divorce thing.  And I sold it like 60 days
19    later and I did make a great profit.
20              So, the way they portray me, Your Honor,
21    its sinful.  It is sinful, and you sat here and
22    you heard this and you read these things.
23              Now there is another thing, I have to say
```

61

```
 1    and it doesn't have anything to do with
 2    mitigation, but I have to get this out, please
 3    give me a minute.  It says, there was a Frank
 4    Reynolds who worked for us.  He testified here.
 5    He was on mental disability.  The man said he was
 6    at our Youngstown terminal at 3:30 that afternoon
 7    and heard me beg Robert for $3,000, and when he
 8    wouldn't give it to me, I made a mean face.  That
 9    was his testimony.  The man was never there that
10    day sir.  Our manager sat there and said, no, he
11    wasn't there.  The police officer, Jose Sanchez,
12    sat there and said, no, he wasn't there.  He
13    himself said he got a ticket and went off to
14    another city to visit his sister.  This is what I
15    had to live with these fake things here.  I didn't
16    have to ask Robert for $3,000.
17              The accounts were mine.  The house was
18    mine.  The only way we had three cars is on my
19    credit.  Three because I bought my parents one.
20    They never had a new car, the same as the year
21    because of us little brats having to be raised and
22    educated, so in 1998, I went and right off the
23    showroom, a silver Ford and brought it to their
```

1    house with one of those big red bows.

2          My son needed extra money for his

3    townhouse in New Hampshire, I wired $10,000 to

4    him, the same minute I hung up the phone from

5    talking to him.  My sister needed money for

6    college, first the IRS, college, $5,000, here's a

7    check.  I wrote them right in front of Robert.  I

8    didn't have to ask him.  Then my sister needed

9    money for college, another $5,000.  I helped that

10   girl.  You might say I helped save her life.  My

11   parents were in their late 50's when she was

12   fifteen.  She's fifteen years younger than me and

13   she was getting in all kinds of trouble, and I

14   won't be specific, and they sent her to live with

15   me.  So I had the burden of raising a fifteen year

16   old girl that was in big trouble and I did raise

17   her.  I loved her.  I made my husbands love her.

18   If they didn't, we helped her, everywhere we went,

19   we took her, and then my little sister became a

20   CPA.  After going through hell, drugs and other

21   things, and I am proud of that too.

22          Now I have to say more about Paul Monroe.

23   He said I was uncooperative, but in the first

63

1   things before the trial, I don't know what you
2   call that, he said I was very cooperative.  In
3   fact, he came to my house almost everyday.  My
4   attorneys were not present.  He asked me
5   questions, he asked me to go to the police
6   station.  He put a little tape recorder in front
7   of me, and he said, the time, date, my name, his
8   name and Frank Dillon's name, and I spoke to them
9   for an hour and a half, I told them everything.  I
10  told them about Nate.  I told them all about the
11  whole day, what I did, where I did it, everything
12  before they wanted to know, after, and when he
13  came to court, he said he did not make a tape
14  recording, but he admitted that he and Frank
15  Dillon took copious notes, and you know what --
16              THE COURT:  Let me interrupt
17  you, if I may, we can go over all of the facts of
18  the case that were presented to the jury, that is
19  really not the purpose of this hearing.  The
20  hearing is to state whether you have anything that
21  you feel you wish to tell the Court that may alter
22  my decision one way or the other that I have to do
23  in regard to either accepting the recommendation

64

1    or denying the recommendation of the jury as to

2    the death penalty.  You have been going over, I

3    listened to the part, which is very correct of

4    your history and that, but you are going through

5    the case now piece meal and that is not part of

6    this hearing.  It is what, if anything, you wish

7    to say to the Court as to why the recommendation

8    of the jury should not be upheld.

9                ATTY. DOUGHTEN:  Could we have

10    one second?

11    (Off the record)

12                DEFENDANT:   I wanted to say

13    that I was a very good writer in high school and

14    in college and I wrote stories because I had a

15    great imagination.  I won prizes, medals,

16    certificates, trophies, and I was always as maybe

17    you can surmise that I had a creative mind, and in

18    those letters and conversations with Nate, that is

19    all they were, stories.  I never initiated any

20    talk of hurting anyone in the tapes or the

21    letters.  But it was my imagination, and I

22    answered and I wrote what he told me to write, and

23    I'm not a bad person, Your Honor.

# PETITIONER'S EXHIBIT J

# COMPETENCY HEARING

# 10/22/07

# STATE OF OHIO v. DONNA ROBERTS

# CASE NO. 01 CR 793

# JUDGE JOHN M. STUART

14

1    MONDAY, OCTOBER 22, 2007

2      HEARING ON MOTIONS

3      IN OPEN COURT AT 1:25 p.m.

4                    THE COURT:  Good afternoon.

5    This matter is before the Court on remand from the

6    Supreme Court in State vs. Roberts.  2006, 110

7    Ohio State 3d, 71.

8                    ATTY. BECKER:  Our case number

9    is 01-CR-793.

10                    THE COURT:  The Court found no

11   prejudicial error in regard to Defendant Roberts

12   conviction, and the conviction and judgment of the

13   Court was affirmed.

14        The Court then remanded the case for the

15   second phase on the basis that they felt there was

16   input from the Prosecutor's office.  The Court

17   has -- well, that is not important at this point.

18        The purpose of today is to handle the

19   remand and the narrow focus in which the Supreme

20   Court sent the matter back here.  We have some

21   motions, which must be put on the record in the

22   meantime.  I have had conversations with both

23   sides in regard to these motions over the last

1    couple of weeks, but we have not formally

2    journalized them.

3           I have first a motion for Appropriation

4    of Funds for Expert Assistance.  That has been

5    briefed by the defense.  I don't know that the

6    State has presented anything other than the

7    discussion that we had.  What is the State's

8    position?

9                ATTY. BECKER:  We would oppose

10   that motion at this point.  We believe in the

11   dictates of the opinion, the Forensic Center

12   has -- and we have testimony here today and a

13   report of Dr. Gazley detailing the Defendant's

14   competency for these proceedings.  The opinion of

15   Dr. Gazley is that she is competent.  I understand

16   the Court has to accept that and we'll present

17   some testimony on that, but we'll oppose the

18   second violation.

19                THE COURT:  Do you have

20   anything else to add?

21                ATTY. DOUGHTEN:  Nothing.

22                THE COURT:  I have advised

23   counsel for both sides, the Court is taking a

1    narrow approach here as to what is appropriate.

2    The primary thing that, and the only thing that I

3    felt was relevant, was the present competency of

4    the Defendant, Miss Roberts.  I had appointed a

5    forensic expert in that regard.  I have that

6    report back, which I have accepted.  It finds that

7    she's presently competent.

8                    ATTY. BECKER:  Your Honor, I

9    don't think they are stipulating to that report.

10   I know you have the report, but I think we need to

11   put some testimony on from Dr. Gazley.  That's why

12   we have subpoenaed him here.  They are not going

13   to stipulate to the report.

14                   ATTY. DOUGHTEN:  No, we are

15   not.

16                   ATTY. BECKER:  We are going to

17   ask, or we are going to call Dr. Gazley to the

18   witness stand, he's here.  Dr. Thomas Gazley

19   prepared the report.

20

21                   DR. THOMAS GAZLEY

22   being first duly sworn, according to law,

23   testified as follows:

17

1  DIRECT EXAMINATION BY ATTY. BECKER:

2  Q       Would you state your name for the record?

3  A       Thomas Gazley.

4  Q       Dr. Gazley, where are you employed?

5  A       Forensic Psychiatric Center of Northeast

6  Ohio.

7  Q       What is your occupation there?

8  A       Psychologist.

9               ATTY. BECKER:  It is my

10  understanding that the defense will stipulate to

11  his credentials.

12               THE COURT:  I misunderstood.  I

13  apologize for that.

14               ATTY. DOUGHTEN:  That's

15  correct, Your Honor.

16  Q       You have a Ph.D., you're a psychologist

17  and you work for the Forensic Diagnostic Center,

18  is that correct?

19  A       That is correct.

20  Q       Do you make routine, as part of your

21  work, evaluations to determine competency of

22  criminal Defendants?

23  A       That is true.

18

```
1   Q       You also make a part of your work,
2   determining not guilty by reason of insanity pleas
3   and making opinions with respect to those pleas,
4   is that correct?
5   A       That is correct.
6   Q       How long have you been employed with the
7   Forensic Center?
8   A       One year.
9   Q       I want to direct your attention and
10  specifically to a report that was prepared
11  involving a woman by the name of Donna Roberts.
12  Are you familiar with that report?
13  A       Yes, I am.
14  Q       I have it to be ten pages in length, and
15  we have marked a copy of it as State's Exhibit
16  No. 1 and I have put today's date of October 22,
17  2007, on it.  Do you have a copy of that report in
18  front of you?
19  A       Yes, I do.
20  Q       You probably have the original?
21  A       Correct.
22                  ATTY. BECKER:  I believe
23  counsel for the defense has a copy of this ten
```

1    page document.

2                        ATTY. DOUGHTEN:  We do.

3    Q       I am going to provide that to Dr. Gazley

4    and ask if that is a fair and accurate copy of the

5    original which you have prepared.

6    A       It seems to be, yes.

7    Q       Does your signature appear on the last

8    page?

9    A       Yes, it does.

10   Q       The original would be either in your

11   files at the Forensic Diagnostic Center or in your

12   files that you brought here today?

13   A       Correct.

14   Q       Which is it?

15   A       It is at the Diagnostic Center.  This is

16   a copy.

17   Q       Dr. Gazley, you were asked to evaluate

18   Miss Roberts to determine whether she was

19   competent to be sentenced in these matters and to

20   proceed, is that correct?

21   A       I believe the actual wording in the Court

22   order was competence to be resentenced.

23   Q       And in efforts to find out whether she

1    was, what steps did you undertake to make that

2    determination?

3    A        I interviewed Miss Roberts at Marysville.

4    I was able to review her mental health records in

5    the mental health department at Marysville, and I

6    reviewed the available information in the court

7    file regarding some of the background information

8    in the case.

9    Q        And how long did you actually interview

10   Mrs. Roberts?

11   A        It was close to two and a half hours, one

12   way or the other.

13   Q        And you physically went to Marysville

14   Correctional Institution and did that?

15   A        Yes, I did.

16   Q        How much time did you spend going over

17   the records that you received and inspected?

18   A        There were the records from the police

19   reports.  There were records available in the

20   mental health file at Marysville.  So I would say

21   in the neighborhood of an hour, hour and a half.

22   Q        And you reviewed those and reviewed your

23   interview with her and you said there were some

1    other documents you had?

2    A        There were, there was the order for the

3    evaluation.  There was some police reports.  I had

4    a conversation, in person conversation with the

5    director of the psychology department at

6    Marysville.  I also had, I believe, a phone

7    conversation with defense counsel.

8    Q        Mr. Doughten or Mr. Dixon?

9    A        Correct.

10   Q        Or both of them?

11   A        To the best of my recollection, it was a

12   speaker phone call.  I'm not certain exactly.

13   Q        After you gathered all of that

14   information and reviewed it, I assume you took

15   notes at the interview with Miss Roberts.

16   A        That is correct.

17   Q        Did you then come to an opinion as to

18   whether or not she was competent to be

19   resentenced?

20   A        I phrased the opinion, not so much in

21   terms of competency, given that that's a question

22   for the Court to decide, but I do have an opinion

23   in terms of her ability to understand the

```
 1    sentencing process and the ability to understand
 2    what the alternatives available are to her as well
 3    as her ability to provide her counsel with any
 4    mitigating circumstances, should she desire to do
 5    so.
 6    Q        And what was your determination?
 7    A        That she would be able to do those things
 8    I just listed.
 9    Q        And you have put that opinion in your
10    report, is that correct?
11    A        Yes, I did.
12    Q        And the person that you met with in
13    Marysville, she's the Defendant in this case, Miss
14    Donna Roberts?
15    A        That is correct.
16    Q        So it's your opinion with a reasonable
17    degree of psychological certainty that Miss
18    Roberts is aware of what she could do, not whether
19    she's going to do it, but what she could do to
20    present to this Court to spare her from being
21    given the death penalty?
22    A        That is correct.
23    Q        She's aware that she can give evidence to
```

1    the Court and to her attorneys to mitigate the

2    sentence?

3    A       Yes, and she has the ability to do that.

4    Q       And it is your opinion, based upon your

5    evaluation of her, that these proceedings could

6    continue with her being sentenced and being able

7    to present I guess allocution or make a statement

8    to the Court?

9    A       Yes.

10    Q       The item you have in front of you,

11    State's Exhibit No. 1 with a date of today,

12    10/22/07, that is a fair and accurate copy of the

13    original?

14    A       It appears to be, yes.

15                 ATTY. BECKER I have no further

16    questions for Dr. Gazley, but I would move that

17    his report, the ten page report be made a part of

18    the record and I know Mr. Doughten may want to

19    wait.

20                 THE COURT:  You can proffer it

21    at this time.

22

23

24

1    CROSS EXAMINATION BY ATTY. DOUGHTEN:

2    Q        I want to ask you this afternoon a little

3    bit about references that you made in your report

4    and were in the prison records as to the auto

5    accident, the head injuries, the sex abuse, those

6    sort of things.  I'll go through them one by one.

7    Did you become aware that Miss Roberts had been

8    involved in a number of auto accidents?

9    A        Yes.

10   Q        In a serious one in the year 2000?

11   A        The degree to which it was serious, I

12   don't know.  It did result in some injury I am

13   aware of.

14   Q        That is what I wanted to ask you about.

15   Is it important to know the effect that a head

16   injury might have on one's ability to be

17   competent?

18   A        I think the, certainly in a typical

19   competency proceeding, it is my understanding that

20   the criteria that the Court uses to make a

21   determination about competency are pretty spelled

22   out in terms of what the Court has to weigh.

23   Under these circumstances, I don't know if there

1    is such a thing as a competency to be resentenced

2    criteria.  It is difficult for me to say, yes, a

3    head injury in 2000 would in fact influence

4    competency to be resentenced in the year 2007

5    without knowing specifically what the injury might

6    have been.

7    Q        That is my question.  What is a

8    neuropsychologist?

9    A        A neuropsychologist is a psychologist who

10   is specialized in evaluating, assessing and

11   sometimes treating disorders of the brain that

12   have to do with often times neurological

13   impairment, whether the result of disease, whether

14   the result of some sort of injury or illness of

15   the brain.

16   Q        And do you sometimes refer cases out to a

17   neuropsychologist?

18   A        I personally have not as of this date,

19   but I am aware of neuropsychologists.  I have

20   colleagues who are neuropsychologists.  I know

21   what they do, where they are employed, what type

22   work they do.

23   Q        With your educational background, explain

26

1    -- what is organic brain damage?

2    A        Organic brain damage?

3    Q        Is there such a thing?

4    A        Well there used to be.

5    Q        If you could explain that for us.

6    A        Organic simply means it refers to

7    something that has to do with damage to that

8    particular organ of the brain.  Years ago in some

9    of the old nomenclature, organic brain damage was

10   in fact a diagnosis.  It is no longer a diagnosis.

11   Q        What is the proper diagnosis if you would

12   determine, and this is hypothetical, if you would

13   determine that perhaps a brain injury caused

14   significant change in a person's ability to

15   process thought?

16   A        I think it is a diagnostic question.  If

17   the question is specifically that it changes a

18   person's ability to process thought, that is a

19   different diagnostic question, than if it changes

20   a person's personality and their ability to

21   function.

22   Q        Explain the differences.

23   A        Processing thought is a cognitive,

27

1    intellectual, it is a processing type of thing.

2    It has to deal with the use of language.  It has

3    to deal with the use of memory.  It has to deal

4    with the ability to take in information, do

5    something with it, feed it back, if that is the

6    task.  The personality part of it, is the person's

7    ways of relating to others, relating to

8    situations, acting in a characteristic manner,

9    personality meaning it has some sort of stability

10   across different situations.

11   Q       Might a sudden mood change or personality

12   change, might that effect one's ability to

13   interact with defense counsel say?

14   A       It could.

15   Q       Did you find that to be so in this case?

16   A       I had no direct observation of her

17   ability to interact with defense counsel, but

18   based on her ability to interact with me and

19   provide me information, provide a coherent account

20   of her own perceptions about the situation, I came

21   to the conclusion that she would be able to do so

22   with her defense counsel as well.

23   Q       Did you talk to any of her family

28

1    members, son, sisters, in regard to her situation

2    before and after the auto accident?

3    A        No, did I not.

4    Q        In reviewing the Marysville records, did

5    you come across some allegations of sexual abuse

6    that she had suffered as a child?

7    A        I don't remember if it was actually in

8    the record at Marysville or something that Miss

9    Roberts told me directly.

10   Q        Let me ask you this, did you see

11   anything, I saw, I see the post-traumatic stress

12   syndrome is not a diagnosis of yours today, is

13   that correct?

14   A        That is correct.

15   Q        Did you see anything in the mental health

16   records at Marysville referring to post-traumatic

17   stress syndrome?

18   A        Not that I recall.

19   Q        Is that sometimes an effect of childhood

20   sex abuse?

21   A        Yes.

22   Q        Were you aware, from discussing with the

23   mental health experts at Marysville, whether Miss

```
 1    Roberts had gone through periods of
 2    hallucinations?
 3    A       I don't recall them saying she had gone
 4    through periods of hallucinations specifically.
 5    She was going through periods of significant
 6    depression while at Marysville.
 7    Q       You don't remember any specific incidents
 8    of imagining things in herself, that wasn't made
 9    available to you?
10    A       Not that I recall right offhand.
11    Q       Do you remember what drugs she was taking
12    at Marysville?
13    A       Yes, I do.
14    Q       Do you remember if they were giving her
15    any psychotropic drugs at Marysville?
16    A       Yes, she was getting psychotropic
17    medication.
18    Q       What is a psychotropic drug, and then
19    what is it usually prescribed for?
20    A       Qualifying my answer with that I'm not a
21    medical doctor.  I'm talking about this based on
22    my experience in behavioral medicine, not being a
23    physician, but being a psychologist and being
```

30

1    familiar with types of medications, not being able
2    to prescribe.
3    Q        You know a whole lot more than we do I'm
4    sure.  Anything you can help us with.
5    A        She was prescribed medication called
6    Trazodone, a medication called Lithium and a
7    medication called Wellbutrin.  The Lithium is a
8    mood stabilizing medication often used to treat
9    the symptoms of bipolar disorder.  The Wellbutrin
10   is a anti-depressant medication often used to
11   treat the symptoms of depression and the Trazodone
12   is a medication that is often used to treat
13   depression or often used as a sleeping aid as
14   well.  And I believe those are the three
15   medications she had been prescribed.
16   Q        This may be out of the your field, if it
17   is an unfair question, let me know.  Aren't
18   psychotropic drugs often used for people suffering
19   from hallucinations?  Isn't that one of the
20   reasons they are sometimes prescribed?
21   A        Hallucinations are a symptom of a
22   psychiatric disorder, known as schizophrenia.
23   Sometimes a bipolar disorder with psychotic

```
 1    features, a person may experience symptoms of
 2    hallucinations as well.  Psychotropic medication
 3    is a general name for any kind of medication that
 4    is used to treat psychiatric illness.
 5    Q        What I was going to ask you, you have
 6    diagnosed her with bipolar disorder, but not with
 7    schizophrenic features, is that correct?
 8    A        That is correct.
 9    Q        Did you see in the Marysville records or
10    speak to a health official in Marysville about any
11    type of schizophrenia being present in Miss
12    Roberts?
13    A        No.
14    Q        You didn't see that?
15    A        Not that I recall.
16    Q        You mentioned in your report, and that
17    Miss Roberts had a pretty consistent suicide
18    ideation, is that the right term?
19    A        Yes.
20    Q        And what did you base that on?
21    A        Her report.  She told me she had thought
22    about suicide in the past.
23    Q        Did you speak to any mental health
```

1    officials at Marysville or in reviewing the mental

2    health records, did you see any specific instances

3    of suicide attempts or suicidal thoughts while she

4    was in Marysville?

5    A        I believe early on in her stay there, she

6    was diagnosed with a level of depression that was

7    significantly more severe than the depression that

8    she experienced at the time that I saw her.

9    Q        And if you can early on, if you can time

10   frame, are you talking, well if you can, can you

11   give us a year approximately?

12   A        I believe in reviewing the mental health

13   record at Marysville, in July of 2003, they had

14   indicated that she was experiencing moderate to

15   severe depressive mood.

16   Q        Is that consistent with your bipolar

17   diagnosis?  If it is, can you explain to us how

18   that works?

19   A        Are you asking me, is depressed mood

20   consistent with the bipolar diagnosis?

21   Q        It is a convoluted question.  Let me back

22   up and straighten it out for you.  Did you come to

23   an opinion, an opinion as to what was the basis

1    for her conscience thinking of suicide?

2    A        My assumption was, it was due to symptoms

3    of depression.  Depression causing the suicide

4    thoughts.

5    Q        Do you know from your reviewing of her

6    mental health records, did this pre-exist the

7    charges here?

8    A        That I don't know.  The mental health

9    records that I reviewed were mental health records

10   from Marysville institution.

11   Q        You are unaware if this was chronic, and

12   what I mean by that, say for 20 years preceding

13   the homicides or if this was just post, when she

14   got to Marysville?

15   A        I know there was a previous psychiatric

16   history, I do not know what the diagnosis was.

17   There was no record available to me in terms of

18   what her previous psychiatric illness might have

19   been or how it was treated or what it was treated

20   with.

21   Q        Speaking of records, for the Court's --

22   in all fairness to the doctor, we just received

23   this last Friday, which was the 19th.  I think I

1    showed it to you for five minutes.

2    A        You did.

3    Q        Identifying Defense Exhibit A, these are

4    the Social Security records SSI, and the reason I

5    wanted to ask you, were you aware at the time you

6    did the diagnosis, if Miss Roberts was receiving

7    any type of benefits for mental disorder, mental

8    handicap from Social Security administration?

9    A        I was not aware of that.

10   Q        You just saw this for the first time

11   today, is that correct?

12   A        I saw about two pages of that, yes.

13   Q        If you were aware, if you became aware

14   that someone had been diagnosing, was receiving

15   benefits from the Government for a mental

16   disability, could that have any affect on your

17   opinion, do you think?

18   A        I don't think it would have an affect on

19   my opinion that addressed the legal question

20   before the Court at this time.

21   Q        And could you explain why that is?

22   A        There are often situations where people

23   are been diagnosed with psychiatric illnesses

```
 1    either of acute or of a chronic nature.  And they
 2    have been accused of an offense, and that they,
 3    the Court remains concerned either about their
 4    competency to participate in proceedings or about
 5    their sanity at the time of the offense.  The
 6    diagnosis, simply because a person has a
 7    psychiatric or mental health diagnosis does not
 8    influence one way or the other whether a person is
 9    ultimately found to be competent to stand trial.
10    The diagnosis is part of how, what you would have
11    to investigate to make that determination, but it
12    doesn't impact, simply because a person has a
13    diagnosis doesn't necessarily mean they are
14    automatically competent or not competent.  A
15    person who is psychotic, a person who has paranoid
16    schizophrenia, a person who has a bipolar
17    disorder, a person who has a major depressive
18    disorder, can be and often is found competent to
19    stand trial.
20    Q       I just have one more area.  I just want
21    to clean up one thing.  I want to get back to the
22    head injury aspect of your diagnosis.  Is this
23    something that a person, a psychologist who is not
```

```
 1    a neuropsychologist, can you make a determination
 2    of how severe the injury is?
 3    A        No.
 4    Q        So that is something that in order to
 5    understand the affect that the injury may have
 6    had, you would have to have a neuropsychologist
 7    give an evaluation, which in turn you would have
 8    to review in incorporating your opinion, is that
 9    correct?
10    A        The way you phrase the question, I don't
11    believe it is correct.
12    Q        Go ahead and phrase it properly.
13    A        I think, I base my opinion that I provide
14    the Court on the information that I receive from
15    the subject at the time I do the interview.
16    Whether or not that person has a severe or
17    disabling mental illness or whether or not that
18    person may have a neurological impairment, or a
19    brain injury, I think is maybe related, but is not
20    the crux of how I make the decision about my
21    opinion.  I make my decision about the opinion
22    based on the responses the person provides me to
23    the questions I asked that I believe are related
```

```
 1   to the questions the Court needs to address,

 2   rather than the diagnosis.  The diagnosis may

 3   provide some helpful information in terms of what

 4   might be expected, but in terms of the person's

 5   ability to actually provide a coherent, relevant

 6   reasonable, intelligent response to what the Court

 7   needs to know, it is not necessary.

 8                    ATTY. DOUGHTEN:  Thank you very

 9   much.

10                    THE COURT:  Any other

11   questions?

12                    ATTY. BAILEY:  Just for

13   purposes of the record, I'm replacing Mr. Becker

14   because he got called down to trial in Judge

15   McKay's Court.

16

17   REDIRECT EXAMINATION BY ATTY. BAILEY:

18   Q       Dr. Gazley, with the additional

19   information that defense counsel just presented to

20   you, and the questions that he asked, did that

21   change your opinion in any way as to the

22   Defendant's ability to be competent to be

23   resentenced?
```

```
1    A        No, it did not.
2                     ATTY. BAILEY:  Thank you.
3                     THE COURT:  I have a couple of
4    questions.  If I understand what you are saying,
5    and I think the main thrust of counsel's question
6    was, if a person has had some psychiatric problem,
7    whatever it maybe, bipolar, schizophrenia,
8    whatever, unless the person is to the point where
9    they don't understand what is going on at the
10   time, you are looking at a slot of time to
11   determine, is this person competent to understand
12   what is going on now, is that correct?
13                    WITNESS:  That is correct.
14                    THE COURT:  That is the purpose
15   of the competency hearing?
16                    WITNESS:  Correct.
17                    THE COURT:  You may have
18   somebody that hears voices or whatever, but they
19   still have the ability to understand and
20   communicate and understand what their attorney is
21   saying, whatever, that may qualify as being
22   competent, even though they may be pretty much not
23   normal, is my understanding correct?
```

1              WITNESS:  Yes.
2              THE COURT:  Is it possible for
3    somebody to have these other problems and still be
4    determined competent at any certain time?
5              WITNESS:  Are you asking is it
6    possible for a person to have a psychiatric
7    diagnosis such as --
8              THE COURT:  The thing that
9    concerns me here is, they brought up this fact
10   that she has been, while in prison, been given
11   Lithium, which I think most of us realize is for
12   bipolar disorder, and other drugs that may be for
13   some other reason.  My question is, are you
14   comfortable with your determination of competency,
15   taking that all into account, as to whether or not
16   she's competent at the present time to understand
17   the proceedings against her?
18             WITNESS:  I think, especially
19   in reviewing the information available to me at
20   Marysville, there is a definite improvement in her
21   overall psychiatric and psychological well-being
22   from the time she was admitted, up until the time
23   I saw her, and you can see in the rating scales

40

1    that they used, the way they described the
2    improvement and the progression of her illness, to
3    the point where, back in 2003, I believe I
4    mentioned to defense counsel, that she was
5    moderately to severely depressed, and then the
6    descriptors lessened as time went on and she was
7    treated both psychiatrically and psychologically
8    there, to the point where the final diagnostic
9    considerations by the mental health people at
10   Marysville were that her symptoms were in fact in
11   remission at the time that I saw her.  She was
12   progressively getting better, and when I saw her
13   earlier this year, she was very coherent, her
14   comments and responses to my questions were very
15   relevant and I thought to the point.
16                   THE COURT:  The State have any
17   further questions of the witness?
18                   ATTY. BAILEY:  No, Your Honor.
19                   THE COURT:  Defense?
20                   ATTY. DOUGHTEN:  No, Your
21   Honor.  Thank you.
22                   THE COURT:  You may step down.
23   Thank you.





IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

STATE OF OHIO,                    :        CASE NO. 2001 CR 0793
                                  :
            Respondent,           :        JUDGE JOHN M. STUARD
                                  :
      -vs-                        :
                                  :
DONNA ROBERTS,                    :        <u>APPENDIX TO DONNA</u>
                                  :        <u>ROBERTS R.C. 2953.21 PETITION</u>
            Petitioner.           :


Now comes the Petitioner-defendant, Donna Roberts, by and through her attorney, David

L. Doughten, and respectfully presents the appendix to Ms. Roberts' Petition to Vacate filed

contemporaneously with this appendix. The attached appendix consists of records obtained from

the Social Security Administration and is designated Petitioner's Exhibit A.


Respectfully Submitted,

David L. Doughten #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
216.361.1112
ddoughten@yahoo.com

Counsel for Petitioner



2001 CR
00793
00083869561
CRM

218

**CERTIFICATE OF SERVICE**

A copy of the foregoing Petitioner's Appendix was served upon Dennis Watkins,

Trumbull County Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by

Regular U. S. mail on this _____ day of August, 2008.

DAVID L. DOUGHTEN
Counsel for Petitioner

FILED
COURT OF COMMON PLEAS

AUG 0 8 2008

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

STATE OF OHIO,             :       CASE NO. 2001 CR 0793
                            :
       Respondent,     :       JUDGE JOHN M. STUARD
                            :
    -vs-               :
                            :
DONNA ROBERTS,     :       <u>APPENDIX TO DONNA</u>
                            :       <u>ROBERTS R.C. 2953.21 PETITION</u>
       Petitioner.       :

Now comes the Petitioner-defendant, Donna Roberts, by and through her attorney, David

L. Doughten, and respectfully presents the appendix to Ms. Roberts' Petition to Vacate filed

contemporaneously with this appendix. The attached appendix consists of records obtained from

the Social Security Administration and is designated Petitioner's Exhibit A.

                                 Respectfully Submitted,

                                  David L. Doughten #0002847
                                  4403 St. Clair Avenue
                                  Cleveland, OH 44103
                                  216.361.1112
                                  ddoughten@yahoo.com

                                  Counsel for Petitioner

## CERTIFICATE OF SERVICE

A copy of the foregoing Petitioner's Appendix was served upon Dennis Watkins,

Trumbull County Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by

Regular U. S. mail on this _____ day of August, 2008.

DAVID L. DOUGHTEN
Counsel for Petitioner

# PETITIONER'S EXHIBIT A

# SOCIAL SECURITY RECORDS

# STATE OF OHIO v. DONNA ROBERTS

# CASE NO. 01 CR 793

# JUDGE JOHN M. STUART

DAVID L. DOUGHTEN
Reg. #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
216-361-1112

Counsel for Petitioner

CAASE DEVELOPMENT SHEET

Clmt:  DONNA M ROBERTS                    SSN:   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  Case #: 070507
       254 FONDERLAC SE                   Exmnr: 344  Unit: 3E
       WARREN, OH  44484                  Rcpt:  02/22/00   Assign: 02/22/00
                                          DOB:   05/22/1944  Level:  RECON
Phone: 330-609-7812                       Case Codes:RA   DIB   Conc:N

Date  ID  Type Topic          Contact                    Rpt F/U  Comp Date

02/22 SLF ATTY Attorney        New rcd Robert L Heller Atty
02/22 SLF RCPT Summary
02/22 SLF RCPT 293381661  01
02/22 MJB ASGN ASSIGNED TO 344
02/24 344 LTR  CLAIMANT PSYCH  DONNA M ROBERTS              R
02/24 344 LTR  CLAIMANT PSYCH  DONNA M ROBERTS              R    EP   03/06/2000
03/07 344 LTR  Response Rcvd   DONNA M        ROBERTS       R
03/10 344 MEDA 12 med advice   12 med advice                    EP   03/20/2000
          sent to Dr Kadle for review, may be malingering or may actually h
          ave significant mental problems. Not clear upon initial review.
          03/10/2000  10:56  344
02/24 344 MER  Hospital Cover  ST JOSEPH HLTH CTR
02/24 344 MER  Hospital Cover  ST JOSEPH HLTH CTR               BO   03/16/2000
          Talked to Sandy at St Joseph's. She has no idea when the request
          will go out.
          03/15/2000  14:59  344
03/16 344 MER  Report Received ST JOSEPH HLTH CTR
02/24 344 MER  Hospital Cover  VALLEY COUNSELING SVCS INC    R
03/10 344 MER  Report Received VALLEY COUNSELING SVCS INC    R
02/24 344 NOTE ATTY CALL
          CALLED ATTY HELLERS OFFICE AND LEFT NAME AND NUMBER. TALKED TO ST
          ACEY.
          02/24/2000  16:27  344
03/16 344 NOTE claimant call   Robert Fingerhut - 3d pty
          Fingerhut reported that he lives with Donna Roberts and he is a
          business partner of hers. She had been in business managing a
          Greyhound franchise for Warren and Youngstown for several years
          prior to her car accident. He stated that nobody was more
          effervescent and bubbly than Donna was premorbidly. She was a
          fantastic cook, and she worked as an assistant in a plastic
          surgery office in Florida for many years. She played tennis and
          was an avid baseball fan, frequently attending the Indians games
          in Cleveland. She knew all the members of the team and their
          stats. She does not know anything about it now. She would get up
          early and go to work, selling tickets, taking care of luggage,
          and driving between Youngstown and Warren taking care of
          problems that occurred in the business. She was one of the top
          students at Youngstown State U in the nineteen sixties. Her
          change mentally happened two to three weeks after her accident.
          She became more moody, and her thinking more irrational. She

EXHIBIT

A

_Jllew_ 3/21/00

000001

CAASE DEVELOPMENT SHEET

Clmt:  DONNA M ROBERTS                    SSN:   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  Case #: 070507
       254 FONDERLAC SE                   Exmnr: 344  Unit: 3E
       WARREN, OH  44484                  Rcpt:  02/22/00   Assign: 02/22/00
                                          DOB:   05/22/1944  Level:  RECON
Phone: 330-609-7812                       Case Codes:RA   DIB   Conc:N

Date  ID  Type Topic          Contact                    Rpt F/U  Comp Date


02/22 SLF ATTY Attorney       New rcd Robert L Heller Atty
02/22 SLF RCPT Summary
02/22 SLF RCPT 293381661  01
02/22 MJB ASGN ASSIGNED TO 344
02/24 344 LTR  CLAIMANT PSYCH DONNA M ROBERTS               R
02/24 344 LTR  CLAIMANT PSYCH DONNA M ROBERTS               R   EP  03/06/2000
03/07 344 LTR  Response Rcvd  DONNA M      ROBERTS          R
03/10 344 MEDA 12 med advice  12 med advice                    EP  03/20/2000
          sent to Dr Kadle for review, may be malingering or may actually h
          ave significant mental problems. Not clear upon initial review.
          03/10/2000  10:56  344
02/24 344 MER  Hospital Cover ST JOSEPH HLTH CTR
02/24 344 MER  Hospital Cover ST JOSEPH HLTH CTR                BO  03/16/2000
          Talked to Sandy at St Joseph's. She has no idea when the request
          will go out.
          03/15/2000  14:59  344
03/16 344 MER  Report Received ST JOSEPH HLTH CTR
02/24 344 MER  Hospital Cover VALLEY COUNSELING SVCS INC     R
03/10 344 MER  Report Received VALLEY COUNSELING SVCS INC    R
02/24 344 NOTE ATTY CALL
          CALLED ATTY HELLERS OFFICE AND LEFT NAME AND NUMBER. TALKED TO ST
          ACEY.
          02/24/2000  16:27  344
03/16 344 NOTE claimant call  Robert Fingerhut - 3d pty
          Fingerhut reported that he lives with Donna Roberts and he is a
          business partner of hers. She had been in business managing a
          Greyhound franchise for Warren and Youngstown for several years
          prior to her car accident. He stated that nobody was more
          effervescent and bubbly than Donna was premorbidly. She was a
          fantastic cook, and she worked as an assistant in a plastic
          surgery office in Florida for many years. She played tennis and
          was an avid baseball fan, frequently attending the Indians games
          in Cleveland. She knew all the members of the team and their
          stats. She does not know anything about it now. She would get up
          early and go to work, selling tickets, taking care of luggage,
          and driving between Youngstown and Warren taking care of
          problems that occurred in the business. She was one of the top
          students at Youngstown State U in the nineteen sixties. Her
          change mentally happened two to three weeks after her accident.
          She became more moody, and her thinking more irrational. She

                              *[signature]* 3/21/00              000002

CAASE DEVELOPMENT SHEET

Clmt:   DONNA M ROBERTS                SSN:    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   Case #: 070507
        254 FONDERLAC SE               Exmnr:  344   Unit: 3E
        WARREN, OH  44484              Rcpt:   02/22/00    Assign: 02/22/00
                                       DOB:    05/22/1944  Level:  RECON
Phone: 330-609-7812                    Case Codes:RA   DIB   Conc:N

Date  ID  Type Topic          Contact                    Rpt F/U  Comp Date
        account she has written the checks from so that he can keep
        account of the finances. He is afraid that with such rampant
        crime in the Youngstown/Warren areas that someone will grab her
        after she gets one of these memory problems. He stated that she
        is a changed person. They have worked together for twenty eight
        years. She does not want to lie in bed, he reported, but she
        does not have the emotional stability to work anymore, he
        indicated. He seemed disturbed at the Social Security
        Administration for not getting benefits to her.
        03/16/2000  10:34   344
03/17 JCK NOTE psych ma
03/20 344 831  Case Closure                                      EP
03/20 344 831  831 Form A1  02

000003

*w Kadle on consideration*

# MEDICAL ADVICE REQUEST

Name _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_    01  RA   02 _____    Body System(s) _12?_

SS _ROBERTS, DONNA M_        Specialists: ☐ Yes  ☐ No _12?_
_05/22/1944_    _330-609-7812_
A/R _WARREN_        _403 3E344 1894_    Adjudicator Code _3E 344_  Date _3/16/__

(Name)        (Phone #)

☐ No treating source  ☐ No treating source functional statement.  Request sent _____

Treating Source/Consultant opinion(s) regarding function:

Limitations claimant alleges:  AOD of _4/19/98_ : 

*mental problems s/p auto accident*

Summary of claim issues:

*Clt 55 y R E mental problems s/p traumatic accident - I have F'kd c
St Joseph's for 2/99 ip, no response. I do however, have a detailed
3° pty ADL from Fmr. business partner/Housemate. Please review
claim and assess.*

Medical Analysis:  (Respond on reverse side if necessary)

*James —
She meets 12.04 c AOD = EOD —
Thx for all your efforts!*

☐ Findings needed to establish severity as noted above.

☐ These findings complete the medical portion of the determination.
☐ Impairment not severe based on findings noted above.
☑ Listing _____ is met as of _AOD_ .
☐ Severity equals listings as of _____
☐ Functional or  ☐ Medical

☐ Findings are adequate to establish severity.

☐ RFC  ☐ SSA-538  ☐ PRTF  attached

☐ Continued on back.

Signature ____Anne Kadle PhD)____    Date _17 March 2000_
RSC-6033 Rev. 11/99

ANNE KADLE, Ph.D. -38
PSYCHOLOGIST

000004

WORKSTATION SAC6003:307380

10:42:40 am    Thursday        March 16, 2000


Notes Entry/Maintenance              Ohio DDS Adjudicator Worksheet Syst
EW320.01                                              MODE:  C
(ENTER)update (2)1st (3)last (4)prev (5)next (9)search (10)keyword (16)exit
(7)insert line (8)delete line (11)word wrap (17)date stamp (19)print notes

Claimant Name DONNA M ROBERTS          SSN 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    01  Number 0705
Case Codes RA   DIB    Level RECON    Conc N   Xref 000 00 0000
Examiner 344    Unit 3E   Rcpt 02/22  Assign 02/22  Age 55  DOB 05/22/1944
    Date   ID   Type  Topic       Contact                    Rpt F/U Dat
    03/16                                                      R
Keyword         Notes                                        Print Notes
                Fingerhut reported that he lives with Donna Roberts and he is a
                business partner of hers. She had been in business managing a
                Greyhound franchise for Warren and Youngstown for several years
                prior to her car accident. He stated that nobody was more
                effervescent and bubbly than Donna was premorbidly. She was a
                fantastic cook, and she worked as an assistant in a plastic
                surgery office in Florida for many years. She played tennis and
                was an avid baseball fan, frequently attending the Indians game
                in Cleveland. She knew all the members of the team and their
                stats. She does not know anything about it now. She would get u
                early and go to work, selling tickets, taking care of luggage,
                and driving between Youngstown and Warren taking care of
                problems that occurred in the business. She was one of the top

C00005

```
WORKSTATION SAC6003:307380

10:42:45 am    Thursday       March 16, 2000


  Notes Entry/Maintenance          Ohio DDS Adjudicator Worksheet Syst
  EW320.01                                            MODE: C
  (ENTER)update (2)1st (3)last (4)prev (5)next (9)search (10)keyword (16)exit
  (7)insert line (8)delete line (11)word wrap (17)date stamp (19)print notes

  Claimant Name DONNA M ROBERTS        SSN 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    01  Number 0705
  Case Codes RA   DIB   Level RECON    Conc N  Xref 000 00 0000
  Examiner 344   Unit 3E   Rcpt 02/22  Assign 02/22   Age 55   DOB 05/22/1944
    Date   ID  Type  Topic          Contact                 Rpt F/U Dat
    03/16                                                    R
  Keyword        Notes                                     Print Notes
               students at Youngstown State U in the nineteen sixties. Her
               change mentally happened two to three weeks after her accident.
               She became more moody, and her thinking more irrational. She
               takes psych medications for her depression, and he has not seen
               anybody come from such a high point to such a low point. She is
               not the same person she was. He has known her for years. She
               used to travel around the world. She now has lapses of time, a
               half hour may pass and she will think half the day has passed,
               or she will not remember the correct date, after repeated
               prompting. She never had many friends premorbidly, but she had
               couple. She was mainly busy, out and about and seeing sporting
               events. Now she goes into rages screaming, and he has to leave
               so he wont get into a confrontation with her. She is getting
```

000006

WORKSTATION SAC6003:307380

10:42:52 am    Thursday        March 16, 2000

Notes Entry/Maintenance          Ohio DDS Adjudicator Worksheet Syst
EW320.01                                                    MODE:  C
(ENTER)update (2)1st (3)last (4)prev (5)next (9)search (10)keyword (16)exit
(7)insert line (8)delete line (11)word wrap (17)date stamp (19)print notes

Claimant Name DONNA M ROBERTS          SSN 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    01  Number 0705
Case Codes RA    DIB    Level RECON    Conc N  Xref 000 00 0000
Examiner 344    Unit 3E   Rcpt 02/22   Assign 02/22   Age 55   DOB 05/22/1944
    Date   ID   Type  Topic          Contact              Rpt F/U Dat
    03/16                                                   R
Keyword          Notes                               Print Notes
                 worse, she goes to therapy, and to a psychiatrist. She does not
                 think clearly. She has forgotten where she was at before, in
                 familiar places like the mall. She does the minimum housework
                 possible. He takes care of most of the housework, and he brings
                 in a lot of food so she does not have to cook. She forgets that
                 she has put things in the stove and he finds them once the smok
                 detector goes off. They have a pair of Lhasa Apsos, and she
                 cannot even remember the dogs names sometimes. She goes to
                 therapy now, and she has to reread parts of the books to
                 understand what is going on. She used to read books all of the
                 time, one a day, premorbidly. She went to computer school, and
                 now cannot remember what she learned. She has forgotten her
                 pills at the pharmacy, and has forgotten items at the store. He

000007

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3330

WORKSTATION SAC6003:307380

10:42:57 am    Thursday          March 16, 2000

Notes Entry/Maintenance              Ohio DDS Adjudicator Worksheet Syst
EW320.01                                          MODE:
(ENTER)update (2)1st (3)last (4)prev (5)next (9)search (10)keyword (16)exit
(7)insert line (8)delete line (11)word wrap (17)date stamp (19)print notes

Claimant Name DONNA M ROBERTS          SSN 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    01  Number 0705
Case Codes RA    DIB    Level RECON      Conc N   Xref 000 00 0000
Examiner 344    Unit 3E    Rcpt 02/22    Assign 02/22    Age 55    DOB 05/22/1944
  Date    ID    Type  Topic              Contact                Rpt F/U Dat
  03/16                                                       R
Keyword          Notes                                          Print Notes
          partner goes with her to the store now and makes sure that she
          gets what she needs. She hardly wants to drive anymore, and whe
          she does he frequently calls her on her car telephone so that h
          can keep tabs on her. She gets up for an hour or two, calls Mr
          Fingerhut, then she is in bed and takes her medications. She
          does nothave set activities. She has had mood swings that were
          violent enough that she had one in the doctors office and the
          doctor had someone follow her home, get her things, and take he
          to the mental ward at St Josephs. She was screaming at some
          credit card solicitors the other day. She cannot handle or take
          stress anymore. She has bounced several checks before because
          she did not know which account to write them from. He takes ove
          much of her accounting. Previously to the accident she did the

000008

```
WORKSTATION SAC6003:307380

10:43:02 am    Thursday        March 16, 2000


Notes Entry/Maintenance         Ohio DDS Adjudicator Worksheet Syst
EW320.01                                            . MODE:  (
(ENTER)update (2)1st (3)last (4)prev (5)next (9)search (10)keyword (16)exit
(7)insert line (8)delete line (11)word wrap (17)date stamp (19)print notes

Claimant Name DONNA M ROBERTS          SSN 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      01  Number 0705
Case Codes RA    DIB    Level RECON     Conc N   Xref 000 00 0000
Examiner 344   Unit 3E   Rcpt 02/22    Assign 02/22  Age 55   DOB 05/22/1944
  Date    ID   Type  Topic             Contact                 Rpt F/U Dat
  03/16                                                       R
Keyword         Notes                                         Print Notes
               financial recordkeeping for the Greyhound franchise. He does no
               tell her about problems and the day to day activities of the
               business because he does not want to stress her out. He gives
               her a few dollars now and again. He told the people at the
               Mahoning Bank to let him know when she writes checks and which
               account she has written the checks from so that he can keep
               account of the finances. He is afraid that with such rampant
               crime in the Youngstown/Warren areas that someone will grab her
               after she gets one of these memory problems. He stated that she
               is a changed person. They have worked together for twenty eight
               years. She does not want to lie in bed, he reported, but she
               does not have the emotional stability to work anymore, he
               indicated. He seemed disturbed at the Social Security
```

C0G0009

```
WORKSTATION SAC6003:307380

10:43:07 am    Thursday       March 16, 2000


   Notes Entry/Maintenance          Ohio DDS Adjudicator Worksheet Syst
   EW320.01                                              MODE: C
   (ENTER)update (2)1st (3)last (4)prev (5)next (9)search (10)keyword (16)exit
   (7)insert line (8)delete line (11)word wrap (17)date stamp (19)print notes

   Claimant Name DONNA M ROBERTS          SSN 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    01  Number 0705
   Case Codes RA   DIB   Level RECON     Conc N   Xref 000 00 0000
   Examiner 344   Unit 3E   Rcpt 02/22   Assign 02/22   Age 55   DOB 05/22/1944
      Date   ID   Type  Topic          Contact                 Rpt F/U Dat
      03/16                                                       R
   Keyword        Notes                                        Print Notes
                  Administration for not getting benefits to her.
                  03/16/2000  10:34  344
```

```
03/06/00    *------------ ------- Client Info ------ -------------*    1:37
          Name:  ROBERTS,DONNA  (293381661)          Sex/Race:  FEMALE/WHI
   Loc/Program:  AO-OFFICE / OUTPATIENT (200)        Birthdate:  05/22/44
508 Cert/Date:                  -                    Last Adm:   01/14/00
 Client Phone:  330-609-7812                         Last Term:  01/14/00
       Address:  254 FONDERLAC, WARREN, OHIO, 44484 - **NO MAIL**
Notify Person:
1st Dx Axs I&II:  298.90 PSYCHOTIC DISORDER NOT OT - 301.90 PERSONALITY DISORI
1st Dx Axs III:
2nd Dx Axs I&II:  V71.09 NO DIAGNOSIS V71.09 NO DIAGNOSIS
*------------------------------ Billing Info -----------------------------
  % Of Fee: 0  T-XIX #:           T-XVIII#:             Last Update: 01/14/0
    Collection:  -
    MACSIS Sig:  Y
      Comments
               :
       PAYORS:  1-SELF-PAY 3-INSURANCE 9-MACSIS

------------------------- Program Activity History -----------------------

      Program                  Adm      Trm       Provider
   OUTPATIENT                 01/14/00  -         SMITH,SUE
   MED/SOMATIC                02/10/00  -         ARIZA,GUAROA D. MD
   CRISIS MANAGEMENT          02/10/00  02/10/00  BRYANT,DALE
   ADULT CASE MANAGEMENT      02/10/00  -         ROBINSON,WENDY

*------------------------ Client Movement History ------------------------

         Event     From     To        Date
         ADM       -        120P      01/06/00
         DIS       120P     -         01/14/00
         ADM       -        200       01/14/00


*------------------------------------------------------------------------
```

CONFIDENTIAL
FOR PROFESSIONAL USE ONLY
Do not share with client or family unless authorized
by VCS. Confidentiality laws prohibit further
use of this information without specific written
consent of the client. A general authorization for
release of medical or other information is NOT
sufficient.

000011

REHABILITATION SERVICES COMMISSION
BUREAU OF DISABILITY DETERMINATION
P.O. BOX 359001
COLUMBUS, OHIO 43235-6001

February 24, 2000

RECD MAR 16 2000

ST JOSEPH HLTH CTR
MEDICAL RECORDS
667 EASTLAND AVE SE
WARREN, OH 44484

RE: DONNA M ROBERTS —
DOB: 05-22-1944 SEX: F
REF:
AN: 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-3E344-02S
DATES: 2/00
IP/OP/ER

Dear Medical Records Staff:

We are processing a disability claim filed with the Social Security
Administration for DONNA M ROBERTS. The claimant reports being treated in your
facility on the dates listed above and your records are needed to adjudicate the
disability claim. If there are no records for the dates requested, please send
records of any treatment closest to those dates.

We would also like to have a statement based on the medical findings, about the
claimant's ability, despite the functional limitations imposed by the
impairment(s), to do work-related activities as specified on the attached page.
For children, we would like a statement about functional limitations in
learning, motor functioning, performing self-care activities, communicating,
socializing, and completing tasks. For children age 1 or less, if not
statutorily blind, we also need to know responsiveness to stimuli. Additional
information needed is listed on the attached page.

Please use the enclosed pre-addressed envelope when submitting this information.
This will help expedite the mail handling process. **If you wish to submit this
report using a facsimile machine (FAX), please use the telephone number
1-888-672-5267.** If an invoice accompanies this request, please complete it and
return with the information you are providing.

The Privacy Act of 1974 gives individuals the right to inspect records about
themselves that are maintained by Federal Agencies. A medical release signed by
the claimant or the legally designated representative is enclosed giving you the
authority to release the requested information to this agency for the purpose of
processing the claimant's disability claim. If the claimant is deceased, the
information is still needed since the estate may be paid past due benefits.

If you need additional information regarding this specific claim, you may call:
1. If calling **long distance**, use the **Toll Free** number 1-800-282-2696.

2. If you are **within Franklin County**, you may call 438-1894.

Please ask for Mr. J. Dew, who is the Adjudicator handling this claim.

ENC: Medical Release/Medical Correspondence

**REHABILITATION SERVICES COMMISSION**
BUREAU OF DISABILITY DETERMINATION
P.O. BOX 359001
COLUMBUS, OHIO 43235-9001

February 24, 2000

ST JOSEPH HLTH CTR

                    RE: DONNA M ROBERTS
                    AN:  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-3E344-02S
                    AUTH #:  000224864941


*    Admission and Discharge Summaries, if available, on each of the
     admissions listed above.


*    Out-Patient Notes from dates listed above


*    Emergency Room Report/Summary


*    Specialist's Consultation Reports


*    Dates and results of all Scanning procedures


*    Operative report


*    All x-ray findings


000013

DONNA M ROBERTS
293381661C1
page: 2

* Medical reports should include medical history, clinical findings,
treatment prescribed with response, diagnosis, prognosis and a statement
based on medical findings describing the patient's capacity to perform
work related activities.  Work related physical activities include
sitting, standing, walking, lifting, carrying, handling objects, hearing
speaking and traveling.  Work related mental activities include
understanding, remembering and carrying out instructions, and responding
appropriately to supervision, co-workers and work pressures in a work
setting.  For children, the statement should describe the child's ability
to perform age-appropriate activities of daily living.

344

000014

## OHIO BUREAU OF DISABILITY DETERMINATION
## AUTHORIZATION FOR RELEASE OF INFORMATION

**DONNA M. ROBERTS**          **05/22/44**          **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**

(CLAIMANT'S NAME)          (DOB)          (SSN)

I hereby authorize _____ S T. Joseph Hlth Ctr _____

(DOCTOR, HOSPITAL, CLINIC, AGENCY, OR SCHOOL)

Its director, designee, or records department, to release information contained in your records including records now in your possession from other physicians, hospitals, clinics, agencies, and schools, to the **Social Security Administration, Bureau of Disability Determination.**

Specific type of information to be disclosed: **Medical records of treatment for physical and/or emotional illness, to include psychological testing, workshop reports, educational records, and treatment records of alcohol or drug abuse, all records of HIV testing, as well as other records documenting the diagnosis and/or treatment of AIDS, ARC, and other related diseases.**

The purpose and need for such disclosure: **Adjudication of Social Security and/or Supplemental Security Income disability claim.**

This consent may be revoked at any time.  It shall be valid no longer than is reasonably necessary to come to the final disposition of my disability claim(s), not to exceed one (1) year.

Applicant's Signature: ✔ _Donna Roberts_          Date: _2/24/00_

Applicant's Relationship to claimant  (If other than claimant): **SELF**

Witnessed by: ⇨ _S Judis          Ca_          Relationship to Claimant ✓ _none_

THIS AGENCY IS GOVERNED BY THE FEDERAL PRIVACY ACT OF 1974  (PL 93-579) AND THE FREEDOM OF INFORMATION ACT OF 1974  (PL 93-502).

THIS FORM GIVES GENERAL AUTHORIZATION AND SPECIAL AUTHORIZATION TO RELEASE MEDICAL INFORMATION UNDER THE DRUG ABUSE OFFICE AND TREATMENT ACT OF 1972 (PL 92-255), THE COMPREHENSICE ALCOHOL ABUSE AND ALCOHOLISM PREVENTION, TREATMENT AND REHABILITATION ACT AMENDMENTS OF 1974  (PL 93-282) AND THE VETERANS OMNIBUS HEALTH CARE ACT OF 1976  (PL 94-581).

IT IS ALSO IN COMPLIANCE WITH 42 CFR, PART 2 (PL 93-282), WHICH PROHIBITS FURTHER DISCLOSURE WITHOUT THE EXPRESS WRITTEN CONSENT OF THE PERSON TO WHOM IT PERTAINS, OR AS OTHERWISE PERMITTED BY SUCH REGULATIONS.

RSC-6105*

000015

ST. JOSEPH HEALTH CENTER

Acct NO    Adm Date   Time  NS  RM   BD AC Srv PT Src AT FC   Unit No      Int
00041-00282 02/10/00  1348  6WJ 0631-01 S  MED IBJ 7  1  P  00174589      AAB
     Class:
  R MS  DOB    Age       Denom        Church              Test Date
  7 D  05/22/44 55Y      NON          NONE                          6-PSYCH

--------------------------------------------------------------------------------
Patient Information       SS# 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      Employer              ABST
ROBERTS,DONNA M
254 FONDERLAC SE          (330)609-7812

WARREN      OH 44484-0000
--------------------------------------------------------------------------------
Guarantor Information     SS# 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      Employer
ROBERTS,DONNA M
254 FONDERLAC SE          (330)609-7812
                          SELF
WARREN      OH 44484-0000
--------------------------------------------------------------------------------
Contact Person            SS# 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      Employer
FINGERHUT,ROBERT
254 FONDERLAC SE          OTHER
                          (330)609-7812
WARREN      OH 44484-0000
--------------------------------------------------------------------------------
Insurance 1 Address                    Insurance 2 Address
SUPERMED PLUS              1
P.O. BOX 6018
CLEVELAND    OH 44101
PRIVATE POLI  ROBERTS,DONNA;M
 15438002    293381661
--------------------------------------------------------------------------------
Insurance 3 Address        Ins Rel            Will      Donor



                                              Case Manager
--------------------------------------------------------------------------------
Accident Y/N?   Date & Time           Description
  NO
--------------------------------------------------------------------------------
Admitting Diagnosis         Admitting Physician
DEPRESSION SUICIDAL         ARIZA,CESAR A        **WALK IN
                            Attending Physician
                            ARIZA,CESAR A

COMMENTS:                                    PREVIOUS ADMIT I
                                                05/05/99
                                             DISCHG DATE & TI
                                             2-16-00 695
Diagnosis/Procedures-------------------------------------------
  296.30

  9425

Major depression, Recurrent      Rx: Risperdal - 2 mg. + i.d. #75
XO. Bipolar disorder, in acute Ig re   Depakote - 250 mg. q A.M. x500mg.
#0. Serio appec tuil disorder.    Paxil 20 mg. q A.M.   #15+15
                                  Ucs in 2 weeks.
Phys Sig   C.A. Bisa m.D.

 08262                 000016      adm. his tes dictates 2/4/00 - C.A
                                   Discharge dictated 2/16/00 - C.A

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

DISCHARGE SUMMARY

| | |
|---|---|
| Patient Name: ROBERTS, DANA | Patient # 174589 |

Attending Physician:  C. ARIZA, M.D.

| | |
|---|---|
| Admission Date: 02/10/2000 | Discharge Date: 02/16/2000 |

The patient is a 55-year-old white female who was admitted to
this hospital psychiatric unit from the emergency room after
screened by Valley Counseling on 02/10/2000.  The immediate
reason for this hospitalization was because of severe
anxiety, agitation, depression, auditory and visual
hallucinations and suicidal ideations and intention by
$CO_2$ poisoning.  The patient stated that she has been getting
quite tense, restless and depressed lately, having frequent
mood swings, losing interest in doing things, having
difficulties concentrating and started hearing voices talking
to her.  The patient stated that she was not able to make out
what the voices were saying.  She also has been seeing
shadows around her room, and when she is alone, and she had
the feeling that somebody is after her, and that somebody is
going to harm her.  The patient stated that she feels that
everybody picks on her and that she has come to the
conclusion that she might as well be dead, and for these
reasons, she thought of getting into her garage and starting
her car with the garage door closed, and stated to die from
$CO_2$ poisoning.

On this hospitalization, the patient was treated with Remeron
15 mg h.s., Zyprexa 5 mg b.i.d., Vistaril 50 mg intramuscular
or p.o. q. four hours p.r.n., and her Premarin, Provera
medication prescribed by her doctor was continued, as
prescribed.  On 02/11/2000, the Paxil 20 mg q. a.m. was
started and on 02/12/2000, the Remeron was discontinued and
Depakote 500 mg one at h.s. was started.  On 02/13/2000, the
Zyprexa was discontinued, and she was placed on Risperdal 1
mg t.i.d.  The Depakote was increased to 250 mg q. a.m. and
500 mg at h.s.  The patient started to calm down, but still
was experiencing hallucinations.  On 02/14/2000, the
Risperdal was increased to 2 mg three times a day with good
result.  She calmed down, became more sociable in the unit.
Her hallucinatory experiences ceased and her mood improved
greatly.  On 02/16/2000, the patient was discharged in an

Page 1

000017

| Acct NO | Adm Date | Time | NS | RM | BD AC | Srv | PT | Src | AT | FC | Unit No | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00041-00282 | 02/10/00 | 1348 | 6WJ | 0631-01 | S | MED | IBJ | 7 | 1 | P | 00174589 | AAB |

Pat Class:

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3340

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

<u>DISCHARGE SUMMARY</u>

| Patient | Patient |
|---|---|
| **Name:** ROBERTS, DANA | **#** 174589 |

improved condition.

Upon discharge, she was given a prescription for Risperdal 2 mg t.i.d. #45, Depakote 250 mg q. a.m. and 50 mg at h.s. #45, Paxil 20 mg q. a.m. #15 and recommendations to followup at Valley Counseling Services in two weeks after discharge.

FINAL DIAGNOSIS:
Bipolar disorder, circular type.  Prognosis guarded.

_____
C. ARIZA, M.D.

CA/MRC50
WDS
D:  02/16/2000 @ 17:33
T:  02/22/2000 @ 02:12
28202

Page 2

ORIGINAL

<u>DISCHARGE SUMMARY</u>

000018

Dr Arizz. C

Patient ID: 0004100282                    MRN: 00174589
Patient Name: ROBERTS,DONNA,M            Admit Date: 20000210  Admit Time: 1219
Sex: Female                               DOB: 19440522
Age: 55 Y

**CHIEF COMPLAINT:** I am depressed and have thought of hurting myself

**HISTORY OF THE PRESENT ILLNESS:** Patient complains of Depression with thoughts of suicidal ideation for days prior to arrival. Symptom onset was gradual. There has not been a fever. There has been no nausea. There has been no vomiting. Patient without any known history of trauma. Patient is suicidal and has not had previous attempts. No SOB, No handChest Pain noi other complaints The condition has worsened since onset. The patient has received no treatment prior to arrival.

**REVIEW OF SYSTEMS:** All other systems negative except as per the preceding.
**PMH:** ALLERGIES AND MEDICATIONS: discussed with patient or representative or obtained from accompanying documents.
ILLNESS/SURGERIES/HOSPITALIZATIONS: Depression
**SOCIAL HISTORY:** no smoking, alcohol abuse, or illicit drug use.
**FAMILY HISTORY:** discussed.

The History of Present Illness, Review of Systems, and Past and Social History are complete to the best the patient or the patient's representative was capable of reporting or could not be obtained because of the patient's clinical or mental status as evidenced by the medical record.

**PHYSICAL EXAM:** Vital Signs: Reviewed Nurse's notes.
GENERAL APPEARANCE: cooperative, alert and nontoxic.
ORIENTATION: Age-appropriately oriented to time, place, and person.
AFFECT: Depressed.
EYES: PERRL, EOMI, no discharge or conjunctival injection.
EARS: External ears without lesions.
NOSE: Normal mucosa and septum.
THROAT: Pharynx without injection, exudate, or tonsillar hypertrophy. Airway patent.
NECK: Supple.
LUNGS: Clear to auscultation and breath sounds equal.
HEART: Regular rate and rhythm, normal heart sounds, without pathological murmurs, ectopy, gallops, or rubs.
ABDOMEN: Soft, nontender. No firm or pulsatile mass.
BACK: No costovertebral angle tenderness.
LOWER EXTREMITIES: No tenderness. No edema.
SKIN: Normal turgor. Warm, dry, without visible rash.
NEUROLOGICAL: Cranial and cerebellar functions normal. Motor functions intact.
MENTAL STATUS:

000019

Patient ID:        0004100282
Patient Name:    ROBERTS,DONNA,M

THOUGHT:  With suicidal ideation, without a plan, has not made a gesture.  Without homicidal ideation.  Without delusions.  Without paranoid ideation.  Without phobias.  Congruent thought process, without flight of ideas, without rambling conversation.
MOOD: Quiet.
AFFECT: Depressed.
BEHAVIOR:  Speech, gestures, and actions appropriate.
PERCEPTION: No auditory or visual hallucinations.
INSIGHT: Normal.
JUDGMENT: Normal.

Unless otherwise stated in this report or unable to obtain because of the patient's clinical or mental status as evidenced by this report, examination of the constitutional, mental status/psychiatric, eyes, ENT, neck, cardiovascular, respiratory, gastrointestinal, and integument systems are negative for physical findings related to the presenting medical problem.

**LABORATORY/X-RAY/STUDY RESULTS - ED Physician's Interpretation**

ALCOHOL:  within normal limits
DRUG SCREEN:  results pending.

**TREATMENT & COURSE**

TREATMENT:
Patient was observed for several hours.
REEXAMINATION:
Condition is stable.

CONSULT:  Dr. Ariza was consulted by phone and will admit the patient.

**DIAGNOSIS:** 1.  Depression with suicidal ideation
**DISPOSITION:** Patient was admitted to General Psychiatric Unit in stable condition.

Unless indicated above as not seen or done by me, I directly participated in all medical services and treatment rendered to this patient.

                                                        Gary F. Joseph, D.O.

DATE OF DICTATION: Thu Feb 10, 2000 at 01:17 pm

000020

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

ADMISSION NOTE

| Patient Name: ROBERTS, DONNA M | Patient # 174589 |
|---|---|

Attending Physician:  C. ARIZA, M.D.

Admission
Date:  02/10/2000                          Room

The patient is a 55-year-old white female, who was admitted
to this hospital psychiatric unit from the emergency room
after screening by Valley Counseling Services on 2/10/2000.

REASON FOR HOSPITALIZATION:  The immediate reason for
admission was because of anxiety, agitation, depression,
auditory and visual hallucinations, and suicidal ideations
and intention by $CO_2$ poisoning.

PRESENT ILLNESS:  The patient has been quite tense, restless
and depressed, having frequent mood swings, losing interest
in doing things, having difficulty concentrating.  She has
been hearing voices talking to her, but stated that she is
not able to make out what they are saying.  The patient was
also seeing shadows around her room when she is alone, and
she had the feeling that somebody is after her, and that
somebody is going to harm her.  The patient has been feeling
that everybody picks on her and she has come to the
conclusion that she might as well be dead, and for this
reason she thought of getting into her garage and starting
her car with the doors closed and stay there to die from $CO_2$
poisoning.  On this interview the patient was anxious, tense,
suspicious and has grandiose and paranoid delusional type of
thinking.

PAST MEDICAL HISTORY:  The patient had the usual childhood
diseases.  She had a tonsillectomy and appendectomy, and also
abdominal surgery because of an ovarian cyst removal.

FAMILY HISTORY:  Father is alive at age 78 in good health.
There is a history of diabetes mellitus and also psychiatric
problems on father.  Mother, age 78, alive and in good
health.  She has a history of heart surgery for a bypass.
Also history of carcinoma in her family and heart disease.
The patient stated that she also had some psychiatric

Page 1

ORIGINAL

ADMISSION NOTE

000021

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

ADMISSION NOTE

| Patient | Patient |
|---|---|
| Name:  ROBERTS, DONNA M | #  174589 |

problems and has taken medicines from a psychiatrist in the past.  She has three brothers ages 57, 58 and 50.  All of them are alive and in good health.  She has one sister age 40, alive and in good health.  She has one son age 30, alive and in good health.  She has no daughters.

ALLERGIES:  None.

DEVELOPMENTAL HISTORY:  The patient was born in Youngstown, Ohio on 4/22/44.  The patient's father was a steel mill worker and mother was a housewife.  The patient stated that she had a very good early childhood.  Her parents were both very good to her.  She reported no problems with toilet training and never wet the bed after the age of 3.  She started school at age 5.  The patient stated that she did not mix much in grade school, and did not have many friends, but she made straight A's in school.  She stated that when she went to high school she socialized much more and she participated in different extra curricular activities.  The patient stated that she was on the Dean's list and she graduated at age 18.  After her graduation from high school she went to Youngstown State University where she started studying journalism, but then she quit after three years and started working at Southside Hospital as a lab technician and worked there for about six years.  Then the patient moved to Miami and she was a secretary to a skin specialist doctor and worked with him for about thirty years, and then she moved back to Ohio.  The patient has been married three times.  The patient is living with her last ex-husband.  The patient at presents admits to having frequent  mood swings, going from elation to depression all throughout her life.

ALLERGIES:  None.

MENTAL STATUS EXAMINATION:  The patient was clean and neat in appearance and tidy in her personal habits.  On this interview she was cooperative and willing to talk freely about herself.  She answered routine questions slowly and her production was relevant and coherent most of the time, showing good association and logical progression of ideas.

Page 2

ADMISSION NOTE

ORIGINAL

000022

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3345

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

ADMISSION NOTE

| Patient | Patient |
|---|---|
| Name:  ROBERTS, DONNA M | #  174589 |

Emotionally she was anxious, tense and depressed.  She admits
to feeling she has no hopes and that she would be better off
dead than alive, and also admitted to thinking suicide in the
recent past by $CO_2$ poisoning.

She stated that she has been feeling quite tense and
depressed, losing interest in doing things and having
difficulty concentrating for the last two months, but is not
able to identify any precipitating factors.  She has been
having some problems adjusting with the ex-husband who she
feels is too controlling of her.  The patient admits to
hearing voices and also admits to seeing shadows in her room,
mainly at night and feels that somebody is after her and
trying to hurt her.

Sensorium was clear and well oriented in all three spheres.
Attention, concentration and thinking capacity was normal.
Memory was good for recent, past and remote events.
Intellect was normal corresponding with her schooling.
Insight and judgment were impaired.

DIAGNOSIS:
AXIS I:      Major depression, recurrent episodes.
             Rule out bipolar disorder, circular type.
AXIS II:     None.
AXIS III:    None.
AXIS IV:     History of depressive episodes in the past.
AXIS V:      Present GAF around 20.

TREATMENT PLAN:
Pharmacotherapy with neuroleptics, anxiolytics and
antidepressants to address present symptomatology.
Supportive type of psychotherapy to help the patient develop
insight into her problems and also develop better coping
mechanisms.
Milieu therapy to help the patient develop better
interpersonal relationships.

Length of hospitalization within one week.

Page 3

ADMISSION NOTE

ORIGINAL

000023

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

### ADMISSION NOTE

| Patient | Patient |
|---|---|
| Name:  ROBERTS, DONNA M | #  174589 |

ASSETS:  The patient is physically healthy and seems to have
a good support system with her ex-husband.

LIABILITY:  The patient has history of depressive episodes in
the past and does not handle relations well.

C. ARIZA, M.D.

CA/MRC50
WAN
D:  02/11/2000 @ 18:15
T:  02/12/2000 @ 09:22
27555

Page 4

ORIGINAL

### ADMISSION NOTE

000024

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3347

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                    MRN#: J00174589
Location: SJHC-PSYCH(6W)          Room: 0631  01      Billing#: J0004100282
DOB: 05/22/1944      Age: 55      Sex: F          Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00          DISCH.: 02/16/00

## P R E G N A N C Y   T E S T I N G

```
--------------------+------14101749------+--------------
COLLECTED, PRIORITY  |02/10/00 15:05 TIMED 1|REFERENCE RANGE
PHYSICIAN            |ARIZA, CESAR        |
--------------------+--------------------+--------------

HCG MIU          |    NEGATIVE        |NEGATIVE
```

KEY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
KEY FOR ALTERNATE SITE:
L=St. Elizabeth Lab   R=LabCorp of America
   Youngstown, OH      Dublin, OH

000025

95 of 149                      PRINTED 02/17/00 04:56       Page: 7 of 8

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                    MRN#: J00174589
Location: SJHC-PSYCH(6W)          Room: 0631  01      Billing#: J0004100282
DOB: 05/22/1944     Age: 55     Sex: F       Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00          DISCH.: 02/16/00

## H E M A T O L O G Y

```
-----------------------+------14110548------+---------------
COLLECTED, PRIORITY    |02/11/00 06:20 TIMED 0|REFERENCE RANGE
PHYSICIAN              |ARIZA, CESAR         |
-----------------------+--------------------+---------------
WBC                    |        7.5         |4.5-11.5 E9/L
                       |        4.22        |3.50-5.50 E12/L
HGB                    |        14.4        |11.5-15.5 g/dL
HCT                    |        40.1        |34.0-48.0 %
MCV                    |        95.0        |80.0-99.9 fL
MCH                    |        34.0        |26.0-35.0 pg
MCHC                   |        35.8 H      |32.0-34.5 %
RDW                    |        12.0        |11.5-15.0 fL
PLATELET COUNT         |        284         |130-450 E9/L
MPV                    |        8.3         |7.0-12.0 fL
Absolute Neut #        |        3.10        |1.80-7.30 E9/L
 Absolute Lymph #      |        3.80        |1.50-4.00 E9/L
 Absolute Mono #       |        0.40        |0.10-0.95 E9/L
Absolute Eos #         |        0.20        |0.05-0.50 E9/L
Absolute Baso #        |        0.00        |0.00-0.20 E9/L
Seg neutrophils        |        42 L        |43-80 %
Lymphocytes            |        50 H        |20-42 %
Monocytes              |        5           |2-12 %
Eosinophils            |        3           |0-6 %
Basophils              |        0           |0-2 %
```

KEY FOR ABNORMAL COLUMN:   L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
KEY FOR ALTERNATE SITE:

 E=St. Elizabeth Lab    R=LabCorp of America
 Youngstown, OH         Dublin, OH

000026

## HM HEALTH SERVICES LABORATORIES
St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

### DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                              MRN#: J00174589
Location: SJHC-PSYCH(6W)          Room: 0631 01      Billing#: J0004100282
DOB: 05/22/1944      Age: 55      Sex: F        Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00        DISCH.: 02/16/00

### T R I A G E   D R U G   T E S T I N G

```
------------------------+------14301645-------+--------------
COLLECTED, PRIORITY     |02/10/00 13:05 STAT  |REFERENCE RANGE
PHYSICIAN               |JOSEPH, GARY         |
------------------------+---------------------+--------------
TRIAGE PHENCYCLIDINE    |   NOT DETECTED      |Cutoff: 25 ng/ml
TRIAGE BENZODIAZEPINES  |   NOT DETECTED      |Cutoff:300 ng/ml
TRIAGE COCAINE          |   NOT DETECTED      |Cutoff:300 ng/ml
TRIAGE AMPHETAMINES     |   NOT DETECTED   M1 | ng/ml
TRIAGE THC              |     POSITIVE        |Cutoff: 50 ng/ml
TRIAGE OPIATES          |   NOT DETECTED      |Cutoff:300 ng/ml
TRIAGE BARBITUATES      |   NOT DETECTED      |Cutoff:300 ng/ml
TRIAGE TRICYCLIC ANTIDE |   NOT DETECTED   M1 | ng/ml
M1:  R A N G E S :
    Cutoff:
    1000
```

KEY FOR ABNORMAL COLUMN:   L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
KEY FOR ALTERNATE SITE:
.St. Elizabeth Lab   R=LabCorp of America
Youngstown, OH        Dublin, OH

000027

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3350

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                      MRN#: J00174589
Location: SJHC-PSYCH(6W)        Room: 0631  01   Billing#: J0004100282
DOB: 05/22/1944   Age: 55   Sex: F     Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00     DISCH.: 02/16/00

## T O X I C O L O G Y

```
----------------------+------14101643------+----------------
COLLECTED, PRIORITY    |02/10/00 13:00 STAT |REFERENCE RANGE
PHYSICIAN              |JOSEPH, GARY        |
----------------------+--------------------+----------------
ETHANOL                | NOT DETECTED   M1 | mg/dL
M1  R A N G E S :
     Not Detected
```

---

KEY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
FOR ALTERNATE SITE:
   Elizabeth Lab   R=LabCorp of America
Youngstown, OH     Dublin, OH

000028

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3351

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                          MRN#: J00174589
Location: SJHC-PSYCH(6W)          Room: 0631  01      Billing#: J0004100282
DOB: 05/22/1944      Age: 55      Sex: F      Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00          DISCH.: **02/16/00**

## THERAPEUTIC   DRUG   MONITORING

```
-------------------+------14150724------+---------------
COLLECTED, PRIORITY |02/15/00 06:50 TIMED 0|REFERENCE RANGE
PHYSICIAN           |ARIZA, CESAR        |
-------------------+--------------------+---------------

PROIC ACID          |       58           |50-100 mcg/mL
```

KEY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
EY FOR ALTERNATE SITE:
E=St. Elizabeth Lab   R=LabCorp of America
 Youngstown, OH      Dublin, OH                                000029

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3352

# HM HEALTH SERVICES LABORATORIES
### St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M          MRN#: J00174589
Location: SJHC-PSYCH(6W)     Room: 0631  01    Billing#: J0004100282
DOB: 05/22/1944    Age: 55    Sex: F    Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00      DISCH.: 02/16/00

## E N D O C R I N E   S T U D I E S

| | ----14110548---- | |
|---|---|---|
| COLLECTED, PRIORITY | 02/11/00 06:20 TIMED 0 | REFERENCE RANGE |
| PHYSICIAN | ARIZA, CESAR | |

| | | | |
|---|---|---|---|
| T3 UPTAKE | | 31.4 | H\|27.8-40.7 % |
| T₄ | | 6.3 | H\|5.5-11.5 mcg/dL |
| TSH | | 1.87 | H\|0.40-4.60 uIU/mL |

000030

KEY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
   ?Y FOR ALTERNATE SITE:
   St. Elizabeth Lab   R=LabCorp of America
   Youngstown, OH      Dublin, OH

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3353

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                                  MRN#: J00174589
Location: SJHC-PSYCH(6W)              Room: 0631  01    Billing#: J0004100282
DOB: 05/22/1944    Age: 55    Sex: F       Att.physician: ARIZA, CESAR
Adm. Date: 02/10/00      DISCH.: 02/16/00

## G E N E R A L   C H E M I S T R I E S

```
-------------------+-----1411054B-----+---------------
COLLECTED, PRIORITY |02/11/00 06:20 TIMED 0|REFERENCE RANGE
PHYSICIAN           |ARIZA, CESAR       |
-------------------+------------------+---------------
SODIUM              |      146          |135-148 mmol/L
POTASSIUM           |      3.9          |3.6-5.0 mmol/L
CHLORIDE            |      104          |98-112 mmol/L
CO2                 |      25           |22-30 mmol/L
GLUCOSE             |      102          |70-120 mg/dL
BUN                 |      15           |5-22 mg/dL
CREATININE          |      0.8          |0.6-1.3 mg/dL
CALCIUM             |      9.0          |8.6-10.4 mg/dL
TOTAL PROTEIN       |      8.1 H        |6.0-8.0 g/dL
ALBUMIN             |      3.5          |3.5-5.0 g/dL
ALK PHOS            |      54           |25-136 U/L
AST (SGOT)          |      13 L         |15-45 U/L
TL BILI             |      0.5          |0.1-1.0 mg/dL
```

KEY FOR ABNORMAL COLUMN:   L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
    Y FOR ALTERNATE SITE:
    c. Elizabeth Lab   R=LabCorp of America
Youngstown, OH        Dublin, OH

000031

89 of 149                    PRINTED 02/17/00 04:56     Page: 1 of 8

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3354

*RECON*

# MEDICAL ADVICE REQUEST

Name _Donna M Roberts_ Body System(s) _12ᵂ_

SSN _293 38 1661_ Age _55_ Specialists: ❑ Yes ❑ No _12ᵂ_

A/P _____ Adjudicator Code _3E 344_ Date _____
   (Name)      (Phone #)

❑ No treating source ❑ No treating source functional statement. Request sent_____
Treating Source/Consultant opinion(s) regarding function:

Limitations claimant alleges: AOD of _4/19/99_ :

    mental problems

Summary of claim issues:

Clt presents bizarrely at A/P and C/E. C/E dr. suspects malingering — P/P Dx Psychiatric D/o n.o.s. — are there additional limitations we need to consider in this claim, or is it ready for affirmation?

Medical Analysis: (Respond on reverse side if necessary)

James — It seems unlikely that clt has role-played or made all this up this consistently across a # of medical sources over the last 8-10 months. Clt was hosp 2/10/2000 - 2/16/2000 per Valley Counseling (clipped) Can you request those records — also, there

❑ Findings needed to establish severity as noted above.

❑ These findings complete the medical portion of the _about_ determination. _3rd party ADS indica_

❑ Impairment not severe based on findings noted above.

❑ Listing _____ is met as of _____

❑ Severity equals listings as of _____

    ❑ Functional or ❑ Medical _pre & post morbid fxing — it sounds like she used._

❑ Findings are adequate to establish severity.

    ❑ RFC ❑ SSA-538 ❑ PRTF attached _be rather high-fx_

    ❑ Continued on back.

Signature _Joanne Wadle Ph.D_ Date _____
RSC-6033 Rev. 11/99

_onset of deterioration etc._

JOANNE WADLE, Ph.D. -38
PSYCHOLOGIST

000032

## VALLEY COUNSELING SERVICES, INC.
### Medication Record

| ALLERGIES |
|---|
| NKA |

| DATE | MEDICATION | PHYSICIAN SIGNATURE |
|---|---|---|
| 2-16-00 | Dsch: St Joe's hospital | Noted |
| | Meds: Risperdal 2mg tid #45 | B Crawford |
| | Depakote 250mg q AM + 500mg q HS #75 + #75 | |
| | Pofil 20mg ĩ q Am #75 | |
| | Giant 856-1432 | |
| 2-28-00 | Risperdal 2mg tid #30 | |
| | Depakote 250mg q AM + 500mg q HS #10 #30 each | |
| | Pofil 20 mg ĩ q Am #10 | Q.A |
| T.O.C. Dr | Vistaril 50mg ĩ BID PRN #20 | C. Aziz m.d. |
| | | B.C. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

CLIENT'S NAME   Roberts, Donna        NUMBER   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

REV. 08/90

000033

(NOTE: THESE PAGES WILL BE COMPLETED AND ATTACHED TO PRINTED REPORT)

**RISK ASSESSMENT**
**RISK ASSESSMENT**
**SELF-INJURIOUS BEHAVIOR:**
Suicidal Ideation & Actions
Describe all gestures/attempts - when, what, with what results
Describe recent ideation - frequency, duration, intensity, content, sense of control, motivation to die, patients expectation
Describe other related behavior/emotions - degree of hopelessness, feelings of worthlessness, guilt, giving away possessions, making
    arrangements for personal affairs, etc

No past attempts.

Hx of intermittent suicidal ideations. Denies intent
"I think there's hope" Denies current ideations

Other Risk Factors Present Which Relate to Suicide Risk (Y-yes, N-No, NA-Not assessed)

| | | | | | | |
|---|---|---|---|---|---|---|
| WHITE OR NATIVE AMERICAN | Y N NA | SUBSTANCE ABUSE | Y N NA | UNEMPLOYED | Y N NA |
| MALE | Y N NA | ACTIVE PSYCHOSIS | Y N NA | LOW RELIGIOUS INVOLVEMENT | Y N NA |
| 35 YRS OR > 65 | Y N NA | RECENT LOSS | Y N NA | ISOLATED | Y N NA |
| SEPARATED/DIVORCED | Y N NA | RELATIVE/FRIEND SUICIDED | Y N NA | MIDDLE OR HIGHER SES | Y N NA |
| SERIOUS DEPRESSION | Y N NA | ACCESS TO GUNS | Y N NA | | |

**RISK TO SELF - SELF-CARE & PROTECTION**
Health & Safety (Describe any significant risk due to the client's inability to manage the health problems listed elsewhere, ability to protect from
outside risk including adequate shelter, etc

See health hx

**RISK TO OTHERS:**
Aggressive/Hostile Ideation & Actions
Describe past violence - When, what, with what results to victim and patient
Describe ideation - What, toward whom, why, programs/plans, expectations, attitude toward consequences/punishment

Denies hx of violence. Denies current violent
ideations/intents. Some agitated mood observed.
Client reports excessive anger at t.

Other Risk Factors Present Which Relate to Violence Risk (Y-yes, N-No, NA-Not assessed)

| | | | | | | |
|---|---|---|---|---|---|---|
| MINORITY | Y N NA | EARLY FAMILY VIOLENCE | Y N NA | < 12 YRS EDUCATION | Y N NA |
| MALE | Y N NA | UNEMPLOYED | Y N NA | PROJECTION/EXTERNALIZATION | Y N NA |
| 15-25 YRS | Y N NA | ISOLATED | Y N NA | VIOLENT SOCIAL GROUP | Y N NA |
| INTOXICATION OR OBS | Y N NA | LOWER SES | Y N NA | | |
| ACTIVE PSYCHOSIS | Y N NA | ACCESS TO GUNS | Y N NA | | |

**MEDIATING FACTORS**

Describe adequacy of available formal and informal support systems to monitor, control, protect client from available sources of harm or to

control client's aggression

Denies current risk.
Disorganized.

Client's awareness of functioning, need for treatment, current and near-term ability to cooperate and respond to direction and control

poor.                                        fair

000034

VCS GENERIC SERVICE NOTE

DATE OF SERVICE _____ 3/6/2000 _____ START TIME _____ AM  PM

Y  N  CLIENT IS CURRENTLY IN: JAIL, JJC, A STATE HOSPITAL, OR AGE 21-65 & IN A FREE-STANDING PSYCH HOSPITAL

Y  N  DISCHARGED IN PAST 30 DAYS FROM: JAIL, JJC, A STATE HOSPITAL, OR AGE 21-65 & IN A FREE-STANDING PSYCH HOSPITAL

CONTACT WITH CLIENT (CIRCLE ONE)  (1) FACE-FACE  (T) PHONE  (0) NONE, CLIENT NOT PRESENT

CONTACT WITH OTHER (DONT USE FOR GROUPS) (CIRCLE ONE)  (1) FACE-FACE  (T) PHONE  (0) NONE, CONTACT WITH CLIENT ONLY

| PROG CODE | SERVICE CODE | |
|---|---|---|
| B | 00 NON-BILLABLE | 40 MED-SOM - PHYSICIAN |
| C | 01 DIAG ASSESSMENT | 41 MED-SOM INJECTION |
| D | 02 COUNS - IND | 42 MED-SOM NURSING |
| G | 03 COUNS - GRP COTHERAPY | 46 MED-SOM EVAL - PHYS |
| H | 04 COUNS - GROUP | 51 DNA APPT |
| I | 05 CSP - GROUP | 52 CANCELED APPT |
| J | 13 PSYCHOLOGICAL ASSESS | 53 CANCE/DNA DX ASSESS |
| M | 30 CRISIS (FACE) | 54 DNA GROUP |
| P | 31 PRE-SCREENING | 55 CANCELED GROUP |
| R | 32 CRISIS (PHONE) | 64 CSP -IND |
| S | | 80 ICS ADDENDUM |
| Z | | |

MIN
N/C

| LOCATION CODE | | | | | |
|---|---|---|---|---|---|
| | SEO | NO | PSU | AO | CO |
| Office | 50 | 70 | 100 | 400 | 500 |
| School | 51 | 71 | 101 | 401 | 501 |
| Hospital | 52 | 72 | 102 | 402 | 502 |
| Nursing Home | 53 | 73 | 103 | 403 | 503 |
| Residence | 55 | 75 | 105 | 405 | 505 |
| Jail, JJC | 56 | 76 | 106 | 406 | 506 |
| Other Agency | 57 | 77 | 107 | 407 | 507 |
| Car | 58 | 78 | 108 | 408 | 508 |
| Phone | 59 | 79 | 109 | 409 | 509 |
| Other | 60 | 80 | 110 | 410 | 510 |

PROGRESS ON ISP GOALS: (CIRCLE GOALS FROM ISP AND RATE PROGRESS SINCE LAST SESSION)

| | | | | | |
|---|---|---|---|---|---|
| A. Live in the least restrictive, most independent environment | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| B. Be able to get along with other people and have a satisfying social life | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| C. Be emotionally healthy and stable, have effective thinking and problem solving skills | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| D. Have healthy family relationships and functioning; for children, remain with family | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| E. Be successful in school or vocational activities | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| F. Other: | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |

Goals/objectives targeted during session

| Goal Letter | Objective # | Goal Letter | Objective # |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Other Presenting Problems Addressed

BRIEF DESCRIPTION OF INTERVENTIONS/ACTIVITIES, AND WHEN INDICATED RISK ASSESSMENT OR DOCUMENTATION OF SIGNIFICANT CHANGE IN FUNCTIONING AND SYMPTOMS(Include start time and minutes for each contact when multiple contacts occur on the same day)

_TC to cl's machine to request contact._

_Reviewed note fr. 2/2000 hosp stay at SJC – note cl tested positive for THC on a 2/10/20 drug screen. 1:55p Recd return TC fr. cl requesting counseling services – referred to clerk to sched. appt._

PROVIDER & DATE _____ Dawn Smith PCSW/2482 _____   **000035**

SUPERVISOR & DATE _____

CLIENT _____ Donna Roberts _____  CL# _____ 293381661 _____
Revised 10/6/99

VCS GENERIC SERVICE NOTE

ENTERED
FEB. 1 5 2000

DATE OF SERVICE _____ 2/11/2000 _____ START TIME _____ AM  PM

Y  N  CLIENT IS CURRENTLY IN: JAIL, JJC,  A STATE HOSPITAL, OR AGE 21-65 & IN A FREE-STANDING PSYCH HOSPITAL

Y  N  DISCHARGED IN PAST 30 DAYS FROM: JAIL, JJC,  A STATE HOSPITAL, OR AGE 21-65 & IN A FREE-STANDING PSYCH HOSPITAL

CONTACT WITH CLIENT (CIRCLE ONE)   (1) FACE-FACE   (T) PHONE   (0) NONE, CLIENT NOT PRESENT

CONTACT WITH OTHER (DONT USE FOR GROUPS) (CIRCLE ONE)   (1) FACE-FACE   (T) PHONE   (0) NONE, CONTACT WITH CLIENT ONLY

| PROG CODE | SERVICE CODE | | |
|---|---|---|---|
| B | 00 NON-BILLABLE | 40 MED-SOM - PHYSICIAN | |
| C | 01 DIAG ASSESSMENT | 41 MED-SOM INJECTION | |
| D | 02 COUNS - IND | 42 MED-SOM NURSING | |
| G | 03 COUNS - GRP COTHERAPY | 46 MED-SOM EVAL - PHYS | |
| H | 04 COUNS - GROUP | 51 DNA APPT | |
| I | 05 CSP - GROUP | 52 CANCELED APPT | |
| J | 13 PSYCHOLOGICAL ASSESS | 53 CANCEL/DNA DX ASSESS | |
| M | 30 CRISIS (FACE) | 54 DNA GROUP | |
| P | 31 PRE-SCREENING | 55 CANCELED GROUP | |
| R | 32 CRISIS (PHONE) | 64 CSP -IND | |
| S | | 80 ICS ADDENDUM | |
| Z | | | |

MIN
0

| LOCATION CODE | SEO | NO | PSU | AO | CO |
|---|---|---|---|---|---|
| Office | 50 | 70 | 100 | 400 | 500 |
| School | 51 | 71 | 101 | 401 | 501 |
| Hospital | 52 | 72 | 102 | 402 | 502 |
| Nursing Home | 53 | 73 | 103 | 403 | 503 |
| Residence | 55 | 75 | 105 | 405 | 505 |
| Jail, JJC | 56 | 76 | 106 | 406 | 506 |
| Other Agency | 57 | 77 | 107 | 407 | 507 |
| Car | 58 | 78 | 108 | 408 | 508 |
| Phone | 59 | 79 | 109 | 409 | 509 |
| Other | 60 | 80 | 110 | 410 | 510 |

**PROGRESS ON ISP GOALS: (CIRCLE GOALS FROM ISP AND RATE PROGRESS SINCE LAST SESSION)**

| | | | | | |
|---|---|---|---|---|---|
| A. Live in the least restrictive, most independent environment | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| B. Be able to get along with other people and have a satisfying social life | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| C. Be emotionally healthy and stable, have effective thinking and problem solving skills | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| D. Have healthy family relationships and functioning; for children, remain with family | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| E. Be successful in school or vocational activities | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |
| F. Other: | NA | NONE | MINIMAL | MODERATE | SUBSTANTIAL |

| Goals/objectives targeted during session | | | | Other Presenting Problems Addressed |
|---|---|---|---|---|
| Goal Letter | Objective # | Goal Letter | Objective # | |
| | | | | |
| | | | | |
| | | | | |

FEB 2000
RECEIVED

**BRIEF DESCRIPTION OF INTERVENTIONS/ACTIVITIES, AND WHEN INDICATED RISK ASSESSMENT OR DOCUMENTATION OF SIGNIFICANT CHANGE IN FUNCTIONING AND SYMPTOMS(Include start time and minutes for each contact when multiple contacts occur on the same day)**

C — hosp. yesterday aft. appt w/ our dr.

(this case has been assigned to June Moller who's on sick leave - I'll ask that it be reassigned to me)

PROVIDER & DATE _____ Susan Smith ACSW/LISW _____ 000036

SUPERVISOR & DATE _____

CLIENT _____ Donna Roberts _____ CL# _____ 293381661

Revised 10/6/99

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3359

VALLEY COUNSELING SERVICES
PROGRESS NOTES

| DATE / TYPE LENGTH OF SERVICE | CONTENT SUMMARY |
|---|---|
| 2-10-00 | (cont) that "there are people out there trying to harm her." also feels that "he is out there, somebody watching her." Pt was evaluated by Dr Cavanaugh at his private office and sent here for treatment before any other facility of psychiatric intervention. On interview, she appeared quite labile; attention felt inappropriate, childish. her responses at times. She told me she thinks about killing herself every day, and has a plan of doing it c connecting to her car in her garage. She further stated she doesn't want to be alive, and seemed manipulative a times. (over) |

NAME: Roberts, Donna

CASE # 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

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3360

## VALLEY COUNSELING SERVICES, INC
## SERVICE TERMINATION FORM

THIS FORM IS TO BE COMPLETED WHENEVER A CLIENT IS TERMINATING FROM A SERVICE BUT NOT FROM THE AGENCY. IF THIS TERMINATION IS FOR THE ONLY SERVICE THAT THE CLIENT IS RECEIVING THEN THE AGENCY TERMINATION FORM SHOULD BE COMPLETED INSTEAD. THIS INFO MUST BE ENTERED INTO THE PAF.

DATE OF TERMINATION _01/14/00_ DATE OF ADMISSION TO SERVICE _01/14/00_

SERVICE _PSU / INTAKE_ PROVIDER _Joe Humphries, MSEd, NCC, LSW, LPCC_

REASON FOR TERMINATION _Client to receive outpatient services at the Adult Office._

IF THIS PERSON DISCONTINUED SERVICES UNEXPECTEDLY (IE. DROPPED OUT), DESCRIBE ANY EFFORTS MADE TO CONTACT THIS INDIVIDUAL/FAMILY FOR FOLLOW-UP X_ NA _____

IF THIS PERSON/FAMILY HAS NOT DISCONTINUED SERVICES UNEXPECTEDLY, DESCRIBE HOW THEY HAVE PARTICIPATED IN THE TERMINATION DECISION AND THEIR RESPONSE TO TERMINATION __ NA _____
_Client agreeable with receiving continued services at the Adult Office._

SUMMARY OF SERVICES PROVIDED AND THE PROGRESS IN RELATION TO THE GOALS ON THE ISP WHICH WERE ADDRESSED BY THIS SERVICE _Diagnostic Assessment completed at PSU_

UNRESOLVED ISSUES & PROBLEMS _Abuse victim_

SERVICES THAT THE CLIENT WILL CONTINUE TO RECEIVE _OP psych_

SIGNATURE OF PROVIDER _Joe Humphries, LCGSW, LPC_ DATE _01/14/00_
SIGNATURE OF SUPERVISOR (IF REQUIRED) _____
CLIENT NAME: _Ingram, Jeffrey_ CASE # _293 - 38 -1661_
Revised: February 8, 1993

000038

| TO BE COMPLETED BY SSA |
| --- |
| NUMBER HOLDER |
| **DONNA M. ROBERTS** |
| SOCIAL SECURITY NUMBER |
| **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** |
| EMPLOYEE/CLAIMANT/BENEFICIARY (If other than Number Holder) |

## AUTHORIZATION FOR SOURCE TO RELEASE
## INFORMATION TO THE SOCIAL SECURITY ADMINISTRATION (SSA)

### INFORMATION ABOUT MEDICAL OR OTHER SOURCE-PLEASE PRINT, TYPE, OR WRITE CLEARLY

| NAME AND ADDRESS OF SOURCE (Include Zip Code) | RELATIONSHIP TO DISABLED PERSON |
| --- | --- |
| Valley  Counseling  Svcs  Inc. | |

### INFORMATION ABOUT DISABLED PERSON-PLEASE PRINT, TYPE, OR WRITE CLEARLY

| NAME AND ADDRESS (if known) AT TIME DISABLED PERSON HAD CONTACT WITH SOURCE (Include Zip Code) | DATE OF BIRTH | DISABLED PERSON'S ID NUMBER (If known and different than SSN) (Clinic/Patient No.) |
| --- | --- | --- |
| | **05/22/44** | |

APPROXIMATE DATES OF DISABLED PERSON'S CONTACT WITH SOURCE (e.g. dates of hospital admission, treatment, discharge, etc.)

### TO BE COMPLETED BY DISABLED PERSON OR PERSON AUTHORIZED TO ACT IN HIS/HER BEHALF

**GENERAL AND SPECIAL AUTHORIZATION TO RELEASE MEDICAL AND OTHER INFORMATION IN ACCORDANCE WITH THE PROVISIONS OF THE SOCIAL SECURITY ACT; THE PUBLIC HEALTH SERVICE ACT, SECTIONS 523 AND 527; AND TITLE 38 U.S.C. VETERANS BENEFITS SECTION 4132.**

I hereby authorize the above-named source to release or disclose to the Social Security Administration or State agency the following information for the period(s) identified above:

1) All medical records or other information regarding my treatment, hospitalization, and/or outpatient care for my impairment(s), including psychological or psychiatric impairment(s), drug abuse, alcoholism, sickle cell anemia, or human immunodeficiency virus (HIV) infection, including acquired immunodeficiency syndrome (AIDS), or tests for HIV;

2) Information about how my impairment(s) affects my ability to complete tasks and activities of daily living;

3) Information about how my impairment(s) affected my ability to work.

I authorize the use of a telefax or photocopy of this form for the release or disclosure of the information described above.

I understand that this authorization, except for action already taken, may be voided by me at anytime. If I do not void this authorization, I will automatically end when a final decision is made on my claim. If I am already receiving benefits, the authorization will end when a final decision is made as to whether I can continue to receive benefits.

**READ IMPORTANT INFORMATION ON REVERSE BEFORE SIGNING FORM BELOW**

| SIGNATURE OF DISABLED PERSON OR PERSON AUTHORIZED TO ACT IN HIS/HER BEHALF | RELATIONSHIP TO DISABLED PERSON (if other than self) | DATE |
| --- | --- | --- |
| ☑ Donna Roberts | **SELF** | 2/24/00 |
| STREET ADDRESS | | TELEPHONE NUMBER (Area Code) |
| 254 FONDERLAC SE | | 330-609-7812 |
| CITY | STATE | ZIP CODE |
| WARREN | OH | 44484 |

The signature and address of a person who either knows the person signing this form or is satisfied as to that person's identity is requested below. This is not required by the Social Security Administration, but without it the source may not honor this authorization.

| SIGNATURE OF WITNESS | STREET ADDRESS |
| --- | --- |
| ☑ S. Jhudi | CR, SOCIAL SECURITY, 1353 E MARKET ST, |
| CITY | STATE | ZIP CODE |
| WARREN | OH | 44484 |

Form SSA-827 (8-94) Use Prior Editions

000039

CAASE DEVELOPMENT SHEET

Clmt:  DONNA M ROBERTS                SSN:    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   Case #: 983389
       254 FONDERLAC SE               Exmnr:  477  Unit: 4D
       WARREN, OH  44484              Rcpt:   07/23/99   Assign: 07/28/99
                                      DOB:    05/22/1944  Level:  INITIAL
Phone: 330-609-7812                   Case Codes:IA   DIB  Conc:N

Date   ID   Type Topic              Contact                  Rpt F/U  Comp Date


07/23 TMJ RCPT Summary
07/23 TMJ RCPT 293381661   00
07/28 MJB ASGN ASSIGNED TO 477
08/02 477 MER  FACILITY LETTER BANYAN TREE REHAB CTR         R
08/02 477 MER  Hospital Cover  ST JOSEPH HLTH CTR            R
08/02 477 MER  Hospital Cover  TRUMBULL MEM HOSP             R
08/02 477 MER  HOSPITAL F/U LT TRUMBULL MEM HOSP             R   BO  08/25/1999
08/25 477 MER  HOSPITAL F/U LT TRUMBULL MEM HOSP             R   EP  09/03/1999
08/02 477 MER  Initial Dr. Cov BENJAMIN J KULPER MD          R
08/02 477 MER  Initial Dr. Cov DAVID BAROFF MD               R
09/21 477 CE   order C/E       consults                          EP  10/06/1999
10/06 RAG CE   CE Scheduled    Donald Degli, M.A.            R
10/06 RAG CE   Appt Reminder   Donald Degli, M.A.            R   BO  10/10/1999
10/06 RAG CE   Appt Reminder   Donald Degli, M.A.            R   EP  10/15/1999
         Signed 8090 associated.
         10/15/1999  10:26  234
10/21 RAG CE   Appt Kept       Donald Degli, M.A.            R
11/02 EEE CE   Report Received Donald Degli, M.A.            R
10/08 RAG CE   CE Scheduled    Charles Ogunro, M.D.
10/08 RAG CE   Appt Reminder   Charles Ogunro, M.D.              BO  10/25/1999
10/08 RAG CE   Appt Reminder   Charles Ogunro, M.D.              EP  11/01/1999
11/01 RAG CE   Appt Reminder   Charles Ogunro, M.D.              EP  11/02/1999
         left message on machine
         11/01/1999  14:44  477
11/02 RAG CE   Appt Reminder   Charles Ogunro, M.D.              EP  11/03/1999
         left another message on machine
         11/02/1999  13:56  477
         she can go and she has a ride
         11/03/1999  08:49  477
11/09 EEE CE   Report Received Charles Ogunro, M.D.
11/09 EEE CE   Appt Kept       Charles Ogunro, M.D.
11/12 477 MEDA phys and psych                                    EP  12/07/1999
08/12 477 MER  Report Received BANYAN TREE REHAB CTR         R
08/23 477 MER  Report Received ST JOSEPH HLTH CTR            R
09/03 477 MER  HOSPITAL F/U LT TRUMBULL MEM HOSP             R   EP
         they have the request it has not been done yet
         09/03/1999  14:21  477
09/21 477 MER  Report Received TRUMBULL MEM HOSP             R
08/20 477 MER  Report Received BENJAMIN J KULPER MD          R
08/12 477 MER  Report Received DAVID BAROFF MD               R


000040

CAASE DEVELOPMENT SHEET

Clmt:  DONNA M ROBERTS                    SSN:   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  Case #: 983389
       254 FONDERLAC SE                   Exmnr: 477  Unit: 4D
       WARREN, OH  44484                  Rcpt:  07/23/99   Assign: 07/28/99
                                          DOB:   05/22/1944  Level:  INITIAL
Phone: 330-609-7812                       Case Codes:IA   DIB   Conc:N

Date  ID  Type Topic          Contact                    Rpt F/U  Comp Date

11/04 477 MER  Initial Dr. Cov BENJAMIN J KULPER MD
11/04 477 MER  Initial Dr. Cov BENJAMIN J KULPER MD              EP  11/10/1999
          Dr. Kulper's nurse said that Donna had an evaluation by a
          neurologist, Dr. Holly Maggiano in 7/99 for post-concussion
          syndrome.
          11/10/1999  10:37  477
11/10 477 MER  Initial Dr. Cov HOLLY MAGGIANO MD           R
11/12 477 MER  Report Received HOLLY MAGGIANO MD           R
08/26 477 NOTE Attempted T/c   get update                       EP  08/31/1999
08/31 477 NOTE Attempted T/c   get update                       EP  09/07/1999
          no answer, call tommorow
          08/31/1999  15:55  477
          left message on machine after she left a message on my voicemail
          09/09/1999  12:29  477
09/16 477 NOTE Attempted T/C   answering machine               EP  09/21/1999
11/24 EAB NOTE MA
          MA sent to Cinc 11/23
          11/24/1999  12:01  EAB
12/07 477 831  831 Form F1  02
12/07 477 831  Case Closure                                    EP
12/07 477 PDN  PDN Letter
07/30 477 NOTE voc. hist.      Claimant                              07/30/1999
          received voc hist form
          07/30/1999  10:54  477
07/30 477 NOTE Attempted T/C   answering machine                    07/30/1999
07/30 477 RC   Clarifying      Claimant                              07/30/1999
          spoke with claimant -- see RC
          07/30/1999  15:21  477

*12/7 Copy of CE report sent to Dr Kulper*

000041

## MEDICAL ADVICE REQUEST

**Date: 11/12/99 1:23 PM**                      Adjudicator Code 4D477

Name  Donna Roberts                                              Body System(s) 1.00

SSN  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          Age 55          Specialists: ☐ NO    ☐ YES _____

A/P  Dr. Kulper  (330) 372-8800
    (Name)                                  (Phone #)

☐ No treating source ☐ No treating source functional statement. Request sent _____.
Treating Source/Consultant opinion(s) regarding function:
C/E -- lift/carry 15 lbs.  stand 6 hrs.  walk 4 hrs. sit 8 hrs.

Limitations claimant alleges:          **AOD of 4/99**
can't sit, stand, walk too long,  pain

Summary of claim issues:
55 yr. old female S/P MVA in 4/99 with resulting back pain.  Please review RC, MER, and C/E
report and provide RFC as necessary while mental allegations are pending.

**Medical Analysis**: (Respond on reverse side if necessary)

*Will not limit → not severe*

☐ **Findings needed to establish**         ☑ These findings complete the medical portion of the Determination
   **severity as noted above.**         ☑ Impairment not severe based on findings noted above.
                                  ☐ Listing_____is met as of_____
                                    ☐ Severity equals listings as of_____
                                    ☐ Functional  or ☐ Medical
**Findings are adequate to establish severity.**
          ☐ RFC      ☑ SSA-538          ☐ PRTF attached      ☐ **Continued on back**

**Signature** _____ ~~Gerald W. Klyop, M.D. - 34~~              **Date** 1/6/99
RSC-6033 Rev. 2/98

"These findings complete the medical portion
of the disability determination."

000042

# MEDICAL ADVICE REQUEST

**Date: 11/12/99 1:21 PM**                          **Adjudicator Code 4**

Name  Donna Roberts                                          **Body Sys**

SSN  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          Age  55          Specialists: ☐ NO    ☐ YE

A/P  Dr. Maggiano  (330) 856-5003
            (Name)                              (Phone #)

☐ No treating source ☐ No treating source functional statement. Request sent _____.
Treating Source/Consultant opinion(s) regarding function:
C/E -- not able to follow directions, interpersonal impaired

Limitations claimant alleges:          **AOD of  4/99**
confusion, memory loss

Summary of claim issues:
55 yr. old female with hx of MVA in 4/99. She presents with probable post-concussion syndrome
with memory loss and confusion. She had neuro eval in 7/99 and follow up in 10/99, records in
file. Please review RC, MER, and C/E and provide PRTF/MRFC as necessary while physical
allegations are pending.

**Medical Analysis: (**Respond on reverse side if necessary)

NMDI

| **Findings needed to establish** | ☐ These findings complete the medical portion of the Determination |
| **severity as noted above.** | ☐ Impairment not severe based on findings noted above. |
| | ☐ Listing_____is met as of_____ |
| | ☐ Severity equals listings as of_____ |
| | ☐ Functional  or ☐ Medical |

**Findings are adequate to establish severity.**
      ☐ RFC      ☐ SSA-538      ☐ PRTF attached      ☐ **Continued on back**

**Signature**  C. Lewin, PH.D                          **Date**  11-16-
RSC-6033 Rev. 2/98

CAROLINE T. LEWIN, PH.D. - 38
PSYCHOLOGIST.

000043

SENT BY:BUR. DIS. DETERM.  ;11-12-99 ; 7:28AM ;  REHAB. SERS. COMM. →  330 856 9224;# 1/ 6



### REHABILITATION SERVICES COMMISSION

Bureau of Disability Determination
P.O. Box 359001 Columbus, Ohio 43235-9001

## * * * FACSIMILE COVER MEMORANDUM* * *

### PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

Date: ~~From:~~ 11/10/99
DR. MAGGIANO

Department/Unit: _____

Telephone: _____

FAX Number: (330) 856 9224

Total Number of Page(s) Including the Cover Sheet: 6

**TO:** (JAMIE DYER)  Adj Code: 4D477

Department/Unit: RSC - BUREAU OF DISABILITY DETERMINAT

Telephone: 1-800-282-2697 Ext. 1645

FAX Number: 614-438-1390 or
614-785-5067

TOLL Free: 1-888-672-5260

RE: Donna Roberts

AN: 293 38 1661

*Please copy
records and
return ASAP.

Thanks!

Jamie Dyer

## SOCIAL SECURITY DISABILITY — SUPPLEMENTAL SECURITY INCOME

000044

REHABILITATION SERVICES COMMISSION
BUREAU OF DISABILITY DETERMINATION
P.O. BOX 359001
COLUMBUS, OHIO 43235-9001

November 10, 1999

HOLLY MAGGIANO MD

                    RE: DONNA M ROBERTS
                    AN:  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-4D477-02S
                    AUTH #:  991110834369

\* Please fax us copies of any records you have for Donna Roberts from her
evaluation with Dr. Maggiano.  Thanks.

We would like to have a statement (you may respond at the bottom of this page
or on the back), based on your opinion about the patient's ability, despite
the functional limitations imposed by the impairment(s), to do work-related
activities or if a child, age appropriate daily activities and to behave in
age appropriate manner such as:

Physical activities:             Mental activities:
sitting                          understanding and memory
standing                         sustained concentration
walking                            and persistence
bending                          social interaction and adaptation
lifting
carrying
handling objects
hearing
speaking
traveling

Please provide any other relevant information that you may have.

\* Should we need to contact you for additional information, what hours would be
most convenient to call?

Date first examined  _7-30-99_     Date last examined  _10-12-99_

Signature _____     Date _11-12-99_

\* If we decide that a consultative examination is needed and if you have an
ongoing doctor/patient relationship with this individual, would you be willing
to perform a new exam or special testing?  _no_

If you do not respond to this question we will assume you do not wish to
perform an exam and it will be scheduled with another doctor.

000045

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3368

## OHIO BUREAU OF DISABILITY DETERMINATION
## AUTHORIZATION FOR RELEASE OF INFORMATION

| **DONNA M. ROBERTS** | 05/22/44 | 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 |
|---|---|---|
| (CLAIMANT'S NAME) | (DOB) | (SSN) |

I hereby authorize   Dr. Maggiano

(DOCTOR, HOSPITAL, CLINIC, AGENCY, OR SCHOOL)

Its director, designee, or records department, to release information contained in your records including records now in your possession from other physicians, hospitals, clinics, agencies, and schools, to the **Social Security Administration, Bureau of Disability Determination.**

Specific type of information to be disclosed:  **Medical records of treatment for physical and/or emotional illness, to include psychological testing, workshop reports, educational records, and treatment records of alcohol or drug abuse, all records of HIV testing, as well as other records ocumenting the diagnosis and/or treatment of AIDS, ARC, and other related diseases.**

The purpose and need for such disclosure:  **Adjudication of Social Security and/or Supplemental Security Income disability claim.**

This consent may be revoked at any time.  It shall be valid no longer than is reasonably necessary to come to the final disposition of my disability claim(s), not to exceed one (1) year.

Applicant's Signature: ☑ _Donna Roberts_                                  Date: _10/30/99_

Applicant's Relationship to claimant  (If other than claimant): **SELF**

Witnessed by: ⇨ _____  CA_        Relationship to Claimant ✓ none

**THIS AGENCY IS GOVERNED BY THE FEDERAL PRIVACY ACT OF 1974  (PL 93-579) AND THE FREEDOM OF INFORMATION ACT OF 1974  (PL 93-502).**

**THIS FORM GIVES GENERAL AUTHORIZATION AND SPECIAL AUTHORIZATION TO RELEASE MEDICAL INFORMATION UNDER THE DRUG ABUSE OFFICE AND TREATMENT ACT OF 1972 (PL 92-255), THE COMPREHENSICE ALCOHOL ABUSE AND ALCOHOLISM PREVENTION, TREATMENT AND REHABILITATION ACT AMENDMENTS OF 1974 (PL 93-282) AND THE VETERANS OMNIBUS HEALTH CARE ACT OF 1876  (PL 94-581).**

**IT IS ALSO IN COMPLIANCE WITH 42 CFR, PART 2  (PL 93-282), WHICH PROHIBITS FURTHER DISCLOSURE WITHOUT THE EXPRESS WRITTEN CONSENT OF THE PERSON TO WHOM IT PERTAINS, OR AS OTHERWISE PERMITTED BY SUCH REGULATIONS.**

RSC-6105*

000046

Your medical specialty: _Neurology_ _____

477

000047

Donna Roberts

10/12/1999

Donna has been complaining of dizziness and also a lapse of time and forgetting. She has felt very depressed. She is very disorganized. She has an impending sense of doom. She has thought about shooting herself.

She has decreased appetite. She states that off the Paxil she was having more dizziness. She is currently back on it and is off the Remeron.

EXAMINATION: WT 150. Extraocular movements are full. Gait is stable.

In general, she is somewhat anxious and seems worried.

IMPRESSION:
1. Post concussion syndrome

RECOMMENDATION/PLAN:
1. I have discussed the case with Dr. Kavanaugh who will see her on Monday, October 18th.
2. MRI of the brain

Holly J. Maggiano, M.D.

HJM:clh
Transcribed: 10/20/1999

000048



**Holly J. Maggiano, M.D.**
Neurology
983 Niles Cortland Rd., S.E. • Warren, Ohio 44484
(330) 856-5003 • (330) 856-9224 Fax

July 30, 1999

Benjamin Kulper, M.D.
2600 Elm Road
Cortland, Ohio 44410

RE: DONNA ROBERTS

Dear Ben:

Donna Roberts is a 55-year-old woman who is seen today for evaluation of post concussion syndrome.

Ms. Roberts states that on 4/19/1999, she was involved in an auto accident. She states that the last thing that she remembers she stood up to leave work. She saw a white light and does not remember anything from there on. Apparently, she got all of her things, got in her car and was involved in a one car accident where she hit a brick wall and totaled the car. She was found on the passenger side on the floor and was unconscious for approximately three hours. She was hospitalized at St. Joe's Hospital for approximately one day. She had a fracture of the left ribs and sternum and apparently some vertebral bodies. She was evaluated by Dr. Baroff. She has had pain in multiple places since that time. She did begin physical therapy, but only had three sessions because it increased vertigo and also increased pain.

She complains of having dizziness since the accident which is sudden and resolves transiently. She occasionally has nausea with these episodes. They are provoked by change of position.

She has also had short-term memory problems. She forgets conversations. She finds that she needs to make lists of things. She states that she needs to write things down to remember them.

She has also had trouble sleeping which was a problem in the past, but worse since the accident. She states that she can not fall asleep. She may be up for 24 hours. She may sleep two to three hours per night for several days and then will sleep for an extended period. She states this has been unchanged since the accident.

She has had occasional visual scintillations in the right visual field described as a flashing light. She has not any history of migraine headaches.

000049

page 2        (Donna Roberts)

She has also had episodes of a discomfort or pressure in the left axilla.  It feels like she has a tourniquet on.  The left upper extremity will become cyanotic and feel uncomfortable.  She states that it resolves if she lies flat on her back.  Apparently, she did have an ultrasound to rule out a thrombosis in the axilla which was negative.

She has also had right leg numbness and her foot has a buzzing sensation which occurs transiently.  She seems to notice this when she has transient vertigo.

She states that she is currently going through menopause.  She has been having hot flashes.  She was initially treated with Zoloft and now with Paxil.

MEDICATIONS:  Premarin, Provera, Paxil, aspirin, Antivert

She states that she also has a history of diet controlled diabetes mellitus.

EXAMINATION:  HT 4'10", WT 150.

CARDIOVASCULAR EXAMINATION:  There were no carotid or ocular bruits.  Heart was normal rate and rhythm.

NEUROLOGIC EXAMINATION:    A complete neurologic examination was performed including higher mental functions, cranial nerves and motor, sensory and autonomic functions.  Pertinent findings include:  In general, Mrs. Roberts was very flamboyant.  When I walked into the exam room, she had made notes on the exam table regarding my décor in my exam room and waiting room.  She was very pleasant.  She was also sweating.  Speech was normal.

Fundi revealed the discs to be flat.  Pupils were equal, round and reactive.  Extraocular movements were full.  Visual fields were full.  Face was symmetric.  Tongue was midline.  Palate elevated symmetrically.  Strength was 5/5 throughout.  Tone was normal.  Sensory examination was intact to all modalities.  Reflexes were 2/4 throughout.  RAM were symmetric.  Toes were downgoing.  Gait was normal including tandem.

MUSCULOSKELETAL EXAMINATION:  There was tenderness on palpation of the cervical paraspinal and trapezius muscles and on palpation along the sternum.

IMPRESSION:
1.  Post concussion syndrome consisting of vertigo, short-term memory impairment, myalgias, trapezius muscular spasm and insomnia.  I discussed with Ms. Roberts that if we can treat the sleeping problems, some of the other symptoms may improve.  She should have gradual improvement in the current symptoms and then I would like to restart the physical therapy.

RECOMMENDATION/PLAN:
1.  D/c Paxil
2.  Begin Remeron 15mg qhs

000050

page 3        Donna Roberts)

3.  She should notify me in the next week of her status

Thank you very much for allowing me to participate in the care of this patient.

Holly J. Maggiano, M.D.

HJM:clh
Transcribed: 08/04/1999

000051

SENT BY:BUR.DIS.DETERM. ; 11-12-99 ; 7:50AM ; REHAB. SERV. COMM.→ 000-000-0229;#1/1

REHABILITATION SERVICES COMMISSION
BUREAU OF DISABILITY DETERMINATION
P.O. BOX 359001
COLUMBUS, OHIO 43235-9001

November 10, 1999

1-800-282-2697 EXT. 1645

HOLLY MAGGIANO MD
983 NILES-CORTLAND RD SE
WARREN, OH  44484

RE:  DONNA M ROBERTS
      254 FONDERLAC SE
      WARREN, OH  44484

DOB: 05-22-1944    SEX:  F
REF:
AN:  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-4D477-02S
ADJ: Ms J. Dyer

Dear Doctor Maggiano:

This agency is processing an initial disability claim filed with the Social
Security Administration for DONNA M ROBERTS.  Disability is alleged due to S/P
MVA, post-concussion syndrome? with an onset of 4/99.  We are requesting
information from your existing records.

If you recently sent us a report on this patient, we are recontacting you
because additional information is needed.  If the claimant is deceased, the
information is still needed since the estate may be paid past due benefits.

The Privacy Act of 1974 gives individuals the right to inspect records about
themselves that are maintained by Federal Agencies.  The information provided
will be considered in reaching a determination as to eligibility to benefits and
may be referred to when your patient is notified of this decision.

Medical reports should include medical history, clinical findings, treatment
prescribed with response, diagnosis, prognosis, and a statement based on medical
findings describing the patient's capacity to perform-work related activities as
specified in the section near the end of the enclosed questionnaire.  For
children, the statement should describe the child's functional limitations in
learning, motor functioning, performing self-care activities, communicating,
socializing, and completing tasks (and, if the child is age 1 or less and not
statutorily blind, responsiveness to stimuli).

**Toll Free teledictation service is available by dialing 1-800-282-6926.**
To dictate, please enter general access code 1234.  System is voice-activated;
tone will stop when you begin speaking.  If you wish to submit this report
using a facsimile (FAX) machine, please dial 1-888-672-5260.

If an invoice accompanies this request, complete the payee portion of the
invoice and return it along with your response.

ENC:  Medical Release/Medical Questionnaire
477/991110834369

000052

*Charles O. Ogunro, M.D. P.C.*

DIPLOMATE OF THE AMERICAN BOARD
OF PSYCHIATRY AND NEUROLOGY

MAILING ADDRESS
P.O. BOX 588
GREENVILLE, PA 16125

701 NORTH HERMITAGE ROAD
P.O. BOX 1048
HERMITAGE, PA 16148-1048
TELEPHONE (724) 981-3046

CERTIFIED IN NEUROLOGY
CERTIFIED IN CLINICAL NEUROPHYSIOLOGY
CERTIFIED IN NEUROSONOLOGY

NEUROLOGY
ELECTROMYOGRAPHY
EVOKED POTENTIALS
TRANSCRANIAL DOPPLER
CAROTID DUPLEX SCANNING
POLYSOMNOGRAPHY

NAME: Donna Roberts
SS#: 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
DATE OF EXAM: 11-4-99

REFERRED BY:

Ohio Disability Office

### MUSCULOSKELETAL EVALUATION

HISTORY

    This is a thirty-five-year-old female who was examined at this office on 11-4-99. At the time of examination she was complaining of right low back pains which occur daily and radiate to the right buttock and right posterior thigh. This commenced seven months ago following an automobile accident. She complains of recurrent numbness and "blueness" of the left upper limb. This is of minutes in duration. It is relieved by lying in the recumbent position. She complains of a "flashing bright light" at the right visual field of the right eye. This occurs daily. This is associated with numbness of the right foot. She also complains of forgetfulness and dizziness. She complains of nightmares.

    Her past medical history includes diabetes mellitus. She takes meclizine, renieron, paxil, skelaxin, vicoprofen, premarin and provera.

    Her surgical history includes removal of ovarian cyst.

    Her mother has cardiac disease.

    She does not smoke tobacco or consume alcohol.

EXAMINATION

    She is 57 inches tall, weighs 140 pounds and is right handed. Visual acuity at the right eye is 20/200 and at the left eye is 20/40, corrected. She was able to hear a ticking watch at both ears. She was able to independently stand from a sitting position, mount and dismount the examination table and dress and undress herself. There was mild obesity. Her appearance was that of a middle aged, mildly obese, well developed female. Her behavior was appropriate to examination. She was oriented to month, year, person and place. She was able to recall one of three items in three minutes. Remote memory, speech and writing were normal. There was no evidence of joint swelling, redness, tenderness, instability or deformity. There was no evidence of fracture. There was tenderness of the whole back. There was no deformity. Straight leg raising in the supine position was 60° on the right and 70° on the left. There was no muscular atrophy and there were no spasms. Pinprick, position and vibration perception were normal. Deep tendon reflexes were 2+ and symmetric at the biceps, triceps, brachioradialis, patella and tendoachilles. There was no Babinski's. She walked with a limp sparing the right lower limb. She did not use any assistive device. She was unable to heel walk on the left. She was able to toe walk, bilaterally and tandem walk. Station was normal with the eyes open and closed.

000053

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3376

Continuation of report on Donna Roberts

DIAGNOSIS

Low back syndrome. Diabetes mellitus. She does not require the use of any ambulatory assistive device. She is able to manage benefits. She can lift 15 pounds, carry 15 pounds, stand 6 hours, walk 4 hours and sit 8 hours. There are no restriction to handing objects, hearing, speaking or traveling.

ldh

Charles Ogunro, MD

000054

**Donald Degli, M.A.**
Psychologist

*Listed Since 1975, National Register of Health Service Providers in Psychology*

5500 Market Street
Suite 201
Youngstown, Ohio 44512
(330) 782-3112
727-9887

Branch Office At
8052 East Market Street
Warren, Ohio 44484
(330) 856-5488

PSYCHOLOGICAL EVALUATION

Claimant: Donna M. Roberts
DOB: 05/22/44
Date of Evaluation: 10/20/99
SSN: 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

Prepared For Bureau of Disability Determination
P.O. Box 35900l
Columbus, Ohio 43235-900l
Exam Serial #: 991006 000474

TESTS ADMINISTERED
Wechsler Adult Intelligence Scale - III
Wechsler Memory Scale
Wide Range Reading Test
Nelson Reading Test
Clinical Interview



NOV 0 3 1999
REHAB SERVICES COMM.
BUR. OF DISABILITY DETERM.

DDS RELEASE COPY TO

C/E DR DEC 0 7 1999

BACKGROUND INFORMATION AND MENTAL STATUS

Donna, age fifty-five years, came to the evaluation alone.  She was quite difficult to engage.  She was odd, distant and detached.  She complained of confusion, and reported she had difficulty getting to the office alone.  She said she made several stops along the way.  She was complaining of confusion which she eventually related to earlier head trauma.  Also, at the end of the assessment, she went outside and waited approximately twenty minutes, sitting on a bench before she got into her car to leave.  She complained that she was somewhat dazed and confused.

Today's evaluation creates difficulty for this psychologist, and diagnostic uncertainty.  Donna presented a mixed picture.  At times she seemed genuinely confused.  At other times, some of her responses during formal testing were suggestive of malingering or exaggeration.  At other times, she reported some symptoms which seemed to suggest exaggeration or dramatization of whatever difficulties she may truly be experiencing.  My task was complicated because she alluded to a significant medical history which included neurological insult.  Yet, there was no formal medical history accompanying the referral to this office.  At the end of it all, I was left with diagnostic options to include possible dementia, possible malingering or exaggeration and symptoms of mood disturbance.  The brief history accompanying the referral was informal, a "report of contact."  That report alluded to an April, 1999 auto accident indicating "She became unconscious ... woke up in the hospital and found that she had fractured ribs, back and sternum."  For the most part, no other significant medical reference was indicated.  The report indicated she was taking Paxil for menopause.

Slowly and haltingly, Donna reports that she was divorced from her three marriages.  She has one child, a son, age thirty years.  While divorced, she still lives with her third ex-husband at a house that she has owned for the past three or four years.  Donna had earlier graduated from high school in nearby Austintown, Ohio.  She completed two years at Youngstown State University.  She attended lab technician classes while living in Miami.

Donna was last employed "helping my husband in his restaurant businesses."  She had been doing that for a few years until April of 1999 when she was in an auto accident.  Prior to that she was living in Miami, Florida where she worked as a medical assistant in a physician's office for nearly twenty years.  She said she cannot work now because of her medical difficulties.

Medical problems are described as injury to her ribs and sternum.  She complains of "flashing light in my right eye."  She said she was knocked unconscious in the April, 1999 auto accident.  She said that she has "memory lapses for hours."  She described other symptoms of withdrawal and fear.  "I'm afraid to go out.  It's like they're waiting for me."  (More on this ideation later in this report.)  She added, "They said that my head is OK, according to the last test."  Her medications include Meclazine for dizziness.  She takes Paxil and Norpramin.  With her very blunted expression and poor eye contact, she stated, "My head goes whoosh."  She reports virtually no history of mental health care.  She denies any history of alcoholism or drug abuse.  She denies any history of legal difficulties.

Orientation was at least mildly impaired.  She can name the president, but not the previous president.  She knew the month and year, but said the day was Tuesday instead of Wednesday.

000055

RELEASE COPY

2 - Donna M. Roberts  10/20/99

CVE DR DEC 0 7 199

<u>Speech and conversation</u> were impoverished. Eye contact remained poor. She did respond to simple structured questions. She occasionally digressed, oddly at times, suggesting some strained ideation. Formal vocabulary was slightly below average, as measured by intelligence testing.

<u>Memory</u> is presented as impaired. That is, she complains of confusion and memory lapses that go on for hours. Today during formal memory testing, her responsiveness seemed to lack a genuine effort. She recalled a history of family, schooling and employment. She recalled recent activities in a slow and halting manner. She processed information with difficulty, suggestive of a deteriorated intellectual functioning, but possible preoccupation with the outcome of this evaluation.

<u>Concentration and thought</u> are impaired, according to this claimant. She complains of confusion and periods of disorientation. She digressed regarding some strange ideation suggesting delusional thinking. As mentioned earlier, she said, "I'm afraid of people out there waiting." I asked her to explain. "The people who come to get you when you die. The dead people." She digressed suggesting that she considers herself very ill and about to die. "I think ... I almost died in the accident. I saw those people. I was turning into cement and the light ... it flashes in my right eye every time."

<u>Judgment and insight</u> seem impaired at present. If this presentation is genuine, she is evidencing symptoms of dementia. She presents herself as confused and complains of significant memory lapses. She has become quite dependent. Yet, she drove to the office but said she had to make several stops. She reported confusion. Today's formal testing reveals functioning which is in the mild mental retardation range, although I had questions about the genuineness of her effort.

<u>Mood and Symptoms</u>:  When asked directly if she is a happy person, she paused, "Well ... I used to be. Now -- there's no reason to be happy. I'm waiting to die now ... any second. Don't you think so?!" she asked. If sincerely presented, she presents herself as somewhat depersonalized and detached. She doesn't complain of sleep disorder. She said her appetite is poor, "I haven't eaten since Monday. I lost about thirty pounds lately. I was fat, though ... I weigh about 130 now." I asked about her social life. "Nothing," she stated bluntly. I asked about the relationship with her ex-husband. "He's tired of me." When asked if she has questioned the value of life, she responded directly, "All the time. I was going to do it. I have guns. I just can't pull the trigger. They say gas is painless." Again, I was wondering whether she was wishing to dramatize whatever difficulties are confronting her. Otherwise, there is some suicidal risk. She added, "I just can't function anymore." She presents herself as rather depressed.

<u>Activities</u> are very diminished. She said she spends all of her time at home. She does not do any cooking or cleaning anymore, she insisted. I asked if she uses tobacco, "Now I do," she added, indicating that she recently took up smoking cigarettes. She has a license. She still drives short distances in the community. "I had to make a lot of stops, though. I practiced before I came here."

## PSYCHOLOGICAL TEST RESULTS

The <u>Wechsler Adult Intelligence Scale - III</u> was administered yielding a response pattern which was variable, some of her responses were strongly suggestive of confabulation and malingering, while other responses seemed more genuine. I consider her intelligence test quotients of questionable validity for any direct interpretation. Her response pattern yielded a <u>Full Scale</u> IQ of 65 with a <u>Verbal</u> IQ of 79 and <u>Performance</u> IQ of 55. Subtests are summarized below.

| FULL SCALE IQ | 65 | VERBAL | | PERFORMANCE | |
|---|---|---|---|---|---|
| Verbal IQ | 79 | | | | |
| Performance IQ | 55 | Vocabulary | 7 | Picture Completion | 1 |
| | | Similarities | 6 | Digit Symbol | 2 |
| | | Arithmetic | 6 | Block Design | 4 |
| | | Digit Span | 6 | Matrix Reasoning | 3 |
| | | Information | 9 | Picture Arrangement | 3 |
| | | Comprehension | 6 | | |

The Full Scale IQ of 65 is at the top of the mild mental retardation range. The Verbal/Performance differential of 79/55 is very large, revealing mild impairment in verbal and language-related skills and severe impairment in perceptual and spatial relations skills, tasks involving novel directions. Vocabulary, arithmetic skills and comprehension skills are mildly impaired. General fund of information is in tact, near average for her age. It was on the Performance subtests where her functioning seemed confabulated. It was on the Digit Symbol subtest where she yielded responses which were not simple errors, but confabulations; original responses, twenty items completed, ten of them erroneous and confabulated. She presented herself as confused with her attention to visual detail and with assembly skills. I consider a need to rule out possible malingering or exaggeration of her difficulties.

000056

3 - Donna M. Roberts 10/20/99

The Wechsler Memory Scales were administered, again yielding a response pattern which was questionable, not warranting direct interpretation. She yielded a Memory Quotient of 64. When asked to recall digits such as 7-2-8-6, she responded oddly, "Well ... I like the number 9. Number 9 or 13. Those are what I like." She digressed, "I have to do things sometimes. Like nine times or thirteen times." Her conversation was now starting to confuse me. When asked to count backwards from twenty, she left out most of the numbers. She could not recite the alphabet. She could not count forward by threes. I considered her responses less than optimum. She was also extremely confused in recalling facts from two brief stories which were read. As mentioned, she was oriented to simple worldly matters and to time. On the visual memory task, she confabulated responses.

The Wide Range Reading Test (WRAT-3) and Nelson Reading Test were administered revealing word recognition skills which are functional at the high school level, Standard Score 94. She could recognize, pronounce and read in context common and uncommon multisyllable words.

SUMMARY AND CONCLUSIONS:

This is the evaluation of a fifty-five-year-old woman who presents a rather odd diagnostic picture. Unfortunately, no formal history accompanied the referral to this office for this claimant who suffered multiple injuries including head trauma in a reported automobile accident which occurred in April of 1999. Thus, today's evaluation leads to rule out differential diagnostics. At times, she seemed to be genuinely confused as she well complained of memory problems. At other times, er responses seemed to be an exaggeration, dramatization, confabulation or malingering. She reports medications for dizziness. She also takes antidepressant medication. Yet, she reports no formal mental health care. The intellectual assessment yielded questionable functioning and an intelligence quotient in the mild mental retardation range. Memory functioning, as measured by the Wechsler Memory Scales was also impaired, although her responses were suggestive of confabulation and malingering. Reading skills proved to be functional at the high school level. Personality and emotional assessment reveals an individual who is rather blunted, expressionless, preoccupied, worrisome and evidencing some rather strange ideation if she is being genuine in her presentation. Diagnostically, there is a need for rule out consideration of dementia. There is certainly a need for thorough review of whatever medical/neurological records are available.

Psychologically, Donna does present herself as genuinely impaired to some degree, probably not able to follow directions or do routine tasks in a competitive work environment at the present time. She has the ability and judgment to manage basic money matters appropriately. Interpersonal functioning was particularly impaired, if today is an example. She will have difficulty in simple social interactions and at best, presents marginal capacity to interact appropriately in a competitive workplace. Provisionally, Donna is moderately impaired in her ability to meet the demands of competitive adult employment. These observations are made without regard to whatever physical limitations she may have.

DIAGNOSIS (DSM IV)

| | |
|---|---|
| Axis I: | R/O Dementia |
| | R/O Malingering or exaggeration of Axis I difficulties. |
| Axis II: | Deferred -- Rule Out Premorbid Intellectual Deficiency |
| | R/O Malingering of Axis II difficulties. |
| Axis III: | Multiple injuries including head trauma, by claimant report and informal history -- deferring to medical/ neurological review. |
| Axis IV: | Psychosocial Stressor: Unspecified. |
| Axis V: | Current GAF: 55 - Provisionally |

Donald Degli, M.A., Psychologist

DM:10/20/99

000057

REHABILITATION SERVICES COMMISSION
BUREAU OF DISABILITY DETERMINATION
P.O. BOX 359001
COLUMBUS, OHIO 43235-9001

August 02, 1999

TRUMBULL MEM HOSP
MEDICAL RECORDS
1350 E MARKET ST
WARREN, OH  44482

RE:    DONNA M ROBERTS
DOB:   05-22-1944   SEX:  F
REF:
AN:    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-4D477-02S
DATES: all records 4/99 to present

Dear Medical Records Staff:

We are processing a disability claim filed with the Social Security
Administration for DONNA M ROBERTS.  The claimant reports being treated in your
facility on the dates listed above and your records are needed to adjudicate the
disability claim.  If there are no records for the dates requested, please send
records of any treatment closest to those dates.

We would also like to have a statement based on the medical findings, about the
claimant's ability, despite the functional limitations imposed by the
impairment(s), to do work-related activities as specified on the attached page.
For children, we would like a statement about functional limitations in
learning, motor functioning, performing self-care activities, communicating,
socializing, and completing tasks.  For children age 1 or less, if not
statutorily blind, we also need to know responsiveness to stimuli.  Additional
information needed is listed on the attached page.

Please use the enclosed pre-addressed envelope when submitting this information.
This will help expedite the mail handling process.  **If you wish to submit this
report using a facsimile machine (FAX), please use the telephone number**
1-888-672-5260.  If an invoice accompanies this request, please complete it and
return with the information you are providing.

The Privacy Act of 1974 gives individuals the right to inspect records about
themselves that are maintained by Federal Agencies.  A medical release signed by
the claimant or the legally designated representative is enclosed giving you the
authority to release the requested information to this agency for the purpose of
processing the claimant's disability claim.  If the claimant is deceased, the
information is still needed since the estate may be paid past due benefits.

If you need additional information regarding this specific claim, you may call:
1.  If calling **long distance**, use the Toll **Free** number 1-800-282-2697.

2.  If you are **within Franklin County**, you may call 438-1645.

Please ask for Ms J. Dyer, who is the Adjudicator handling this claim.

ENC:  Medical Release/Medical Questionnaire
477/990802820680

PT. ACC. NO: 8791855 (3)         MR NO: **024-49-13**
ATIENT: **ROBERTS, DONNA M**    AGE: 55Y   DOB: 05/22/1944
ADDRESS: 254 FONDERLAC SE     SEX: F
     WARREN, OH 44484     PHONE: (330)609-7812

PT. ROOM/BED AT ORDER:        PT. TYPE: F CLASS: O
PT. ROOM/BED WHEN PRINTED:     PT. TYPE: F CLASS: O
ADMITTING DX:
SECONDARY DX:
**FAX:** ORD. PHYS.:000101 **B KULPER**     PRIORITY: ROUTINE
  **FAX:** ATT. PHYS.:101 **B KULPER**    PRELIMINARY: N
  **FAX:** ALT. PHYS.:101 **B KULPER**
        PRIMARY INS.: 684 SECONDARY INS.:
ORD. REASON: DIZZINESS, HA'S
ORD. COMMENTS:

           DEPARTMENT: CAT
      COMPLETED PROCEDURES FOR ORDER NO. 3
READING DATE: (06/25/99 )

AT7058-**HEAD WO/W CONTRAST** 70470 CNCLD:
3 EXAM DTIME: **06/25/1999 09:10**  TECHNOLOGIST/S: CJB  FLUORO:

CLINICAL STATEMENT: dizziness

Axial images were obtained from the skull base to the top of the head.
Intravenous contrast was given without reaction. There is no evidence of
hydrocephalus or midline shift of ventricles. No extra axial fluid
collections or focal mass effect is seen. No abnormal contrast enhancement
is seen.

IMPRESSION: Negative for intracranial mass effect or hemorrhage.

Result electronically signed by: H. AMES M.D.
From Trumbull Memorial Hospital Medical Imaging Department

PRACTICE OF RADIOLOGY CERTIFIED BY THE AMERICAN COLLEGE OF RADIOLOGY
                   Pg. 1

000059

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3382

REHABILITATION SERVICES COMMISSION
BUREAU OF DISABILITY DETERMINATION
P.O. BOX 359001
COLUMBUS, OHIO 43235-9001

August 02, 1999

ST JOSEPH HLTH CTR
MEDICAL RECORDS
667 EASTLAND AVE SE          RE:    DONNA M ROBERTS
WARREN, OH  44484            DOB:   05-22-1944  SEX:  F
                            REF:
                            AN:    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-4D477-02S
                            DATES: all records 4/99 to present

Dear Medical Records Staff:

We are processing a disability claim filed with the Social Security
Administration for DONNA M ROBERTS.  The claimant reports being treated in your
facility on the dates listed above and your records are needed to adjudicate the
disability claim.  If there are no records for the dates requested, please send
records of any treatment closest to those dates.

We would also like to have a statement based on the medical findings, about the
claimant's ability, despite the functional limitations imposed by the
impairment(s), to do work-related activities as specified on the attached page.
For children, we would like a statement about functional limitations in
learning, motor functioning, performing self-care activities, communicating,
socializing, and completing tasks.  For children age 1 or less, if not
statutorily blind, we also need to know responsiveness to stimuli.  Additional
information needed is listed on the attached page.

Please use the enclosed pre-addressed envelope when submitting this information.
This will help expedite the mail handling process.  **If you wish to submit this
report using a facsimile machine (FAX), please use the telephone number
1-888-672-5260.**  If an invoice accompanies this request, please complete it and
return with the information you are providing.

The Privacy Act of 1974 gives individuals the right to inspect records about
themselves that are maintained by Federal Agencies.  A medical release signed by
the claimant or the legally designated representative is enclosed giving you the
authority to release the requested information to this agency for the purpose of
processing the claimant's disability claim.  If the claimant is deceased, the
information is still needed since the estate may be paid past due benefits.

If you need additional information regarding this specific claim, you may call:
1.  If calling **long distance**, use the **Toll Free** number 1-800-282-2697.

2.  If you are **within Franklin County**, you may call 438-1645.

Please ask for Ms J. Dyer, who is the Adjudicator handling this claim.

ENC:  Medical Release and Medical Questionaire
477/99080282067

000060

ST. JOSEPH HEALTH CENTER **OBSERVATI**

**ABST**

| Acct No | Adm Date | Time | NS RM | BD AC | Srv PT Src AT FC |
|---|---|---|---|---|---|
| 99109-00452 | 04/20/99 | 0148 | OVJ | MED | OVJ 7 1 C 00174589 |

S R MS DOB      Age        Denom         rch                    Test Date
? 7 M 05/22/44 54Y        NON          NONE

---

Patient Information       SS# 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       Employer
ROBERTS,DONNA M
254 FONDERLAC SE          (330)609-7812

WARREN        OH 44484-0000

---

Guarantor Information     SS# 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       Employer
ROBERTS,DONNA M
254 FONDERLAC SE          (330)609-7812
                          SELF
WARREN        OH 44484-0000

---

Contact Person            SS# 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       Employer
FINGERHUT,ROBERT          (330)609-7812
254 FONDERLAC SE          OTHER

    RREN        OH 44484-0000

---

Insurance 1 Address              1            Insurance 2 Address
STATE FARM
MAHONING AVE                 THOMAS INS A
YOUNGSTOWN        OH
AUTO INS     ROBERTS,DONNA,M
DOI-04/19/99  G21-2964-F07-35

---

Insurance 3 Address        Ins Rel          Will        Donor

                                            Case Manager

---

Accident Y/N?     Date & Time              Description
    YES           04/19/99 2000            AUTO ACCIDENT

---

Admitting Diagnosis              Admitting Physician
MULTIPLE LT UPPER RIB FX,        ROSTOM,MOURAD L          HOWLAND FD
                                 Attending Physician
                                 ROSTOM,MOURAD L

COMMENTS:PT TOLD TO CALL CAR INS I            PREVIOUS ADMIT
                                                 01/29/99
                                807.03        DISCHG DATE & TI
                                850.90        4-20-99   13:15p
Diagnosis/Procedures
                                803.90

                                E 816.0

Phys Sig                                    000061

                    Hosp dist 4/21/99

                                            99284



ACCOUNT #: 9910900452
MEDICAL RECORD #: 00174589
NAME: Roberts, Donna
54 year old female
DATE OF VISIT: Tue Apr 20, 1999

DDS RELEASE COPY TO:

C/E DR SEP 2 1 1999

**CHIEF COMPLAINT:** MVA/loss of consciousness/chest pain/alcohol intoxication

**HISTORY OF THE PRESENT ILLNESS:** Patient was involved in a(n) auto accident a short time prior to arrival. Claims to have hit head. The extent of damage is moderate. Patient complains of loss of consciousness, loss of memory, chestr discomfort.. There was a blunt trauma with injury to the head which happened at the same time with a loss of consciousness for an unknown period. There has been no dizziness. There has been no nausea and vomiting. There has been no blurred vision. The patient has had some confusion since the injury. There has been no seizure activity since the trauma. There is no history of coagulopathy. There is no neck pain. Pt states that she thinks that she may have lost consciousness before the accident. States that she had not been drinking or taking any drugs. Denies LOC but states that it does hurt top take a deep inhalation. There has been no back pain. There has been no numbness. There has been no weakness. There has been no melena, hematemesis or hematochezia. There has been no abdominal pain. The condition has remained unchanged since onset.

**REVIEW OF SYSTEMS:** All systems negative except as per the preceding.
**PMH:** ALLERGIES AND MEDICATIONS: discussed with patient or representative or obtained from accompanying documents.
ILLNESS/SURGERIES/HOSPITALIZATIONS: depression
**SOCIAL HISTORY:** alcohol

**PHYSICAL EXAM:** Vital Signs: Reviewed Nurse's notes.
**GENERAL APPEARANCE:** awake, drowsy, confused, cooperative.
**ORIENTATION:** disoriented to time, disoriented to place, oriented to person.
**AFFECT:** Blunted.
**MEMORY:** There is evidence of recent short-term memory loss.
**EYES:** PERRL, EOMI, no discharge or conjunctival injection.
**EARS:** External ears without lesions.
**NOSE:** Normal mucosa and septum.
**THROAT:** Pharynx without injection, exudate, or tonsillar hypertrophy. Airway patent.
**NECK:** Supple.
**LUNGS:** Breath sounds equal both sides. No wheezes, rales, or ronchi.
**HEART:** Rate: normal. Rhythm: normal. Heart Sounds: normal. No systolic or diastolic murmurs. No pericardial rub. No gallops.
**ABDOMEN:** Soft, nontender. No firm or pulsatile mass.
**BACK:** No costovertebral angle tenderness.
**LOWER EXTREMITIES:** No tenderness. No edema.
**SKIN:** Normal turgor. Warm, dry, without visible rash.
**CERVICAL SPINE:** no tenderness.
**NEUROLOGICAL:** Drowsy; disoriented to time, disoriented to place, oriented to person. Cranial nerves: normal. Motor function: normal. Sensory function: normal. Cerebellar function: normal.
**CHEST:** There are no retractions. Extreme pain on palpation to anterior chest wall. No subcutaneous emphysema

000062

Page 1 of 2      ST. JOSEPH EMERGENCY DEPARTMENT

Patient ID:        9910900452
Medical Record #:  00174589
Patient Name:      Roberts, Donna

DDS RELEASE COPY

C/E DR SEP 2 1 199

palpated.  No ecchymosis to chest wall.  No flail chest.
HEAD:  No sinus tenderness.  No face tenderness.  No scalp tenderness.  No deformity.
PELVIS:  Nontender.  Stable to palpation.  No battle or raccoon signs are noted on examination.  Mid face stable.
Airway patent.

Unless otherwise stated in this report or unable to obtain because of the patient's clinical or mental status as evidenced by this report, examination of the constitutional, mental status/psychiatric, eyes, ENT, neck, cardiovascular, respiratory, gastrointestinal, and integument systems are negative for physical findings related to the presenting medical problem.

**LABORATORY/X-RAY/STUDY RESULTS - ED Physician's Interpretation**

X-RAY (as read by radiologist): CT head:  normal.
X-RAY (as read by ED physician): chest:  lung fields clear.  Left-sided rib fractures.  Rib x-rays fractures ribs 1, 2, 3.
Normal
CBC:  within normal limits.
SMA-7:  within normal limits.
ALCOHOL:  208
DRUG SCREEN:  results pending.

**TREATMENT & COURSE**

TREATMENT:
Patient was observed for several hours.
REEXAMINATION:
Condition is stable.
CONSULT:  Dr. Kanterman was consulted by phone and will admit the patient.

**CRITICAL CARE**

After presentation to the emergency department and my examination and evaluation, I determined the patient's medical condition to require my constant attention.  See Emergency Department Course/Medical Record for details.  Total time: 30 minutes

DIAGNOSIS: 1. MVA:  blunt head trauma/concussion.  2. Multiple upper left rib fractures.  3. Alcohol intoxication.
**DISPOSITION:**  Patient was admitted to Telemetry in stable condition.

Unless indicated above as not seen or done by me, I directly participated in all medical services and treatment rendered to this patient.

Gary F. Joseph, D.O.

DATE OF DICTATION: Tue Apr 20, 1999 at 05:03 am

000063

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3386

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

**HISTORY & PHYSICAL**

| | |
|---|---|
| Patient<br>Name: ROBERTS, DONNA | Patient<br># 174589 |

Attending Physician: L. KANTERMAN, M.D.

Admission                                                Room
Date: 04/20/99

## HISTORY

CHIEF COMPLAINT: Motor vehicle accident.

HISTORY OF PRESENT ILLNESS: The patient is a 54-year-old white female generally in good health. She had been ill with an upper respiratory tract infection and had been taking a lot of NyQuil and had not slept well. She denies any other alcohol intake. The patient was driving her vehicle and apparently fell asleep at the wheel, lost control of the vehicle, drove off of the road and went into a ditch, she had transient loss of consciousness and struck her chest. The patient was brought to the emergency room where a CT scan of the head was done and no neurological impairment was seen, and the CT scan was normal. However, it was determined that the patient had multiple rib fractures in the right upper chest and she was held for observation.

ALLERGIES: No known allergies.

PAST SURGICAL HISTORY: Carpal tunnel in 1999.

### PHYSICAL EXAMINATION

The physical examination shows the patient to be a well developed and well nourished white female in no acute distress. She is alert, oriented and appropriate.

HEENT: Head, eyes, ears, nose and throat were unremarkable.

LUNGS: Clear.

CHEST: Moderate anterior chest wall tenderness was noted on the right. No ecchymoses were noted.

HEART: The heart examination showed regular rate and rhythm with no murmurs, gallops, rubs or bruits.

**000064**

Page 1

**HISTORY & PHYSICAL**

ORIGINAL

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3387

ST. JOSEPH HEALTH CENTER - EASTLAND
667 Eastland Ave, S.E.
Warren, Ohio

## HISTORY & PHYSICAL

| Patient Name:  ROBERTS, DONNA | Patient #  174589 |
| --- | --- |

ABDOMEN:  Soft. Benign.  Not tender with no organomegaly or masses.

EXTREMITIES:  The extremities showed no edema.

NEUROLOGICAL EXAMINATION:  Completely within normal limits.

LABORATORY DATA:  Blood alcohol was elevated at 208. Electrolytes were normal.  White count 10,800.  Hemoglobin 14.2.

ASSESSMENT:
Motor vehicle accident with multiple rib fractures.

I do not feel that the patient had any significant neurologic injury; but, indeed, appears to have just fallen asleep at the wheel and driven off the road with some transient disorientation and mild intoxication.  There are no signs of alcohol withdrawal at this time.

PLAN:  Discharge to home.  Give pain medication.  Follow-up with her regular physician, Dr. Rostom.

L. KANTERMAN, M.D.

LK/MRC50
MRC50/WHP
D:  04/20/99 @ 07:49
T:  04/20/99 @ 06:29
2752

000065

Page 2

## HISTORY & PHYSICAL

ORIGINAL

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3388

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M               MRN#: J00174589
Location: SJHC-EMERGENCY          Room: 0423  01    Billing#: J9910900452
DOB: 05/22/1944      Age: 54     Sex: F       Att.physician: ROSTOM, MOURAD
Adm. Date: 04/20/99         DISCHARGED: 04/20/99

## G E N E R A L   C H E M I S T R I E S

| COLLECTED, PRIORITY | 04/19/99 22:00 STAT | REFERENCE RANGE |
|---|---|---|
| PHYSICIAN | JOSEPH, GARY | |
| SODIUM | 148 | 135-148 mmol/L |
| POTASSIUM | 3.8 | 3.6-5.0 mmol/L |
| CHLORIDE | 110 | 98-112 mmol/L |
| CO2 | 25 | 22-30 mmol/L |
| G... SE | 103 | 70-120 mg/dL |
| BUN | 11 | 5-22 mg/dL |
| CREATININE | 0.6 | 0.6-1.3 mg/dL |

---

'EY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
 3Y FOR ALTERNATE SITE:

E=St. Elizabeth Lab   R=LabCorp of America
 Youngstown, OH       Dublin, OH

000066

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3389

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                                    MRN#: J00174589
Location: SJHC-EMERGENCY          Room: 0423  01      Billing#: J9910900452
DOB: 05/22/1944    Age: 54      Sex: F        Att.physician: ROSTOM, MOURAD
Adm. Date: 04/20/99          DISCHARGED: 04/20/99

## T O X I C O L O G Y

```
--------------------+-------04191980-------+--------------
COLLECTED, PRIORITY |04/19/99 22:00 STAT  |REFERENCE RANGE
PHYSICIAN           |JOSEPH, GARY         |
--------------------+---------------------+--------------
ETHANOL             |      208   M1 | mg/dL
M1:   R A N G E S :
      Not Detected
```

specimen very lipemic

KEY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
 IY FOR ALTERNATE SITE:
E=St. Elizabeth Lab    R=LabCorp of America
Youngstown, OH      Dublin, OH

000067

49 of 79                       PRINTED 04/21/99 07:45     Page: 2 of 3

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3390

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## DISCHARGE REPORT

Patient Name: ROBERTS, DONNA M                    MRN#: J00174589
Location: SJHC-EMERGENCY            Room: 0423  01      Billing#: J9910900452
DOB: 05/22/1944      Age: 54      Sex: F      Att.physician: ROSTOM, MOURAD
Adm. Date: 04/20/99          DISCHARGED: 04/20/99

# H E M A T O L O G Y

```
-----------------+-------04191980-------+----------------
COLLECTED, PRIORITY   |04/19/99 22:00 STAT  |REFERENCE RANGE
PHYSICIAN             |JOSEPH, GARY         |
-----------------+---------------------+----------------
WBC                  |     10.8            |4.5-11.5 E9/L
RBC                  |     4.18            |3.50-5.50 E12/L
HGB                  |     14.2            |11.5-15.5 g/dL
HCT                  |     39.1            |34.0-48.0 %
MCV                  |     93.5            |80.0-99.9 fL
MCH                  |     33.9            |26.0-35.0 pg
MCHC                 |     36.2 H          |32.0-34.5 %
RDW                  |     11.8            |11.5-15.0 fL
PLATELET COUNT       |     313             |130-450 E9/L
MPV                  |     7.4             |7.0-12.0 fL
Absolute Neut #      |     7.70 H          |1.80-7.30 E9/L
  solute Lymph #     |     2.40            |1.50-4.00 E9/L
  solute Mono #      |     0.50            |0.10-0.95 E9/L
Absolute Eos #       |     0.10            |0.05-0.50 E9/L
Absolute Baso #      |     0.10            |0.00-0.20 E9/L
Seg neutrophils      |     72              |43-80 %
Lymphocytes          |     22              |20-42 %
Monocytes            |     4               |2-12 %
Eosinophils          |     1               |0-6 %
Basophils            |     1               |0-2 %
```

KEY FOR ABNORMAL COLUMN:   L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
 ?Y FOR ALTERNATE SITE:
 ?=St. Elizabeth Lab   R=LabCorp of America
 Youngstown, OH      Dublin, OH

000068

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3391



**MOUNTING FORM**

ROBERTS, DONNA M
04/19/99 2047        54Y    F
00174589

TRACING # 6

TRACING # 5

TRACING # 4

TRACING # 3

TRACING # 2

000071

BED 1 02:13 20APR1999 I MON HR =91 A=0

PEED=25 MM/SEC        SP02=96%



ROBERTS, DONNA H
04/26/99 0148          54Y
00174589      99109-00452

**MOUNTING FORM**

TRACING # 6

TRACING # 5

TRACING # 4

TRACING # 3

ROBERTS ROSTOM 423-A 04:55  20APR1999 II MON HR =86 A=0

4.0 MV

PR.16          SR85          QRS.08

0 MV

SPEED=25 MM/SEC          V1

ROBERTS ROSTOM 423-1 03:15

PR.20  QRS.08  SR94

25 MM/SEC

000072

Form 4052

HUMILITY OF MARY HEALTH PARTNERS
St. Joseph Health Center
MEDICAL IMAGING REPORT
H.S. SHIN,MD - E.C. WALKER,MD - R.P. BRENNAN,MD - W.L. CRAWFORD,MD

Account # 9912500207                     Unit Number J00174589
PATIENT ROBERTS,DONNA M                    LOC DIS        Sex: F      DOB 05/22/44
Work Diag: COMPRESSION FX LUMBAR
Ord Diag: BACK PAIN
PCP: ROSTOM,MOURAD L
ADM: BAROFF,DAVID M
REF:
ORD: BAROFF,DAVID M

PERF DATE/TIME: 05/05/99 1145          PT TYPE: OPJ

      Chk-in #    Order    Exam
        99445     0001     38010   NM BONE IMAGING LIMITED STUDY
                                   Ord Diag: BACK PAIN

      CI#99445
      BONE SCAN:

Static spot images of the bones were obtained including the anterior
RPO, LPO and anterior thorax and the dorsal lumbar spine.

There were discrete areas of abnormal radionuclide uptake extending from
the 1st through the 4th left ribs anteriorly and from approximately the
2nd through the 7th right ribs anteriorly.  Additional abnormalities
were noted at the proximal level of the 8th and 9th right costovertebral
junctions.  There was also abnormal uptake in the mid portion of the
sternum.

IMPRESSION:              Abnormalities noted above highly suggestive
                         of fractures.


                      /Read By/ CHARLES H CURTISS, D.O.
                      /Released By/ CHARLES H CURTISS, D.O.
                      Released 05/06/99 0721
                      LXK



      FINAL


000073

AB89

ST. JOSEPH HEALTH CENTER

| Acct No | Adm Date | Time | NS | RM | BD AC Srv PT Src AT FC | Unit No |
|---------|----------|------|-----|-----|------------------------|---------|
| 99114-00116 | 04/24/99 | 1445 | EDJ | | MED EDJ 7 1 C | 00174589 | AA |

| S R MS | DOB | Age | Denom | Church | Test Date |
|--------|-----|-----|-------|--------|-----------|
| 7 M | 05/22/44 | 54Y | NON | NONE | |

Patient Information          SS# 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          Employer
ROBERTS,DONNA M
254 FONDERLAC SE             (330)609-7812

WARREN          OH 44484-0000

Guarantor Information        SS# 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          Employer
ROBERTS,DONNA M
254 FONDERLAC SE             (330)609-7812
                             SELF
WARREN          OH 44484-0000

Contact Person               SS# 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          Employer
FINGERHUT,ROBERT             (330)609-7812
254 FONDERLAC SE             OTHER

WARREN          OH 44484-0000

Relative 2 Name                        Home Phone    Relationship Work Phone

Insurance 1 Address                    Insurance 2 Address
STATE FARM                  1
4962 MAHONING
YOUNGSTWON       OH 44515
AUTO INS     ROBERTS,DONNA;M
DOI 041999   G21-2964-F07-35

Insurance 3 Address          Ins Rel          Will          Donor

                                              Case Manager

ident Y/N?    Date & Time              Description
YES           04/19/99 1300            AUTO ACCIDENT

Admitting Diagnosis          Admitting Physician
LEFT HAND PAIN               ROSTOM,MOURAD L          **WALK IN
                             Emergency Physician
                             JOSEPH,GARY F     EMG (330)841-4019

COMMENTS:                    PREVIOUS ADMIT DATE
                             04/20/99
                             DISCHG DATE & TIME

Phys Sig _____
            ROBERTS,DONNA M              ROBERTS,DONNA M
            99114-00116                  99114-00116

000074

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3395

# HM HEALTH SERVICES LABORATORIES

St. Joseph Health Center
667 Eastland Avenue
Warren, Ohio 44484

## autoreporting lab

Patient Name: ROBERTS, DONNA M                    MRN#: J00174589
Location: SJHC-EMERGENCY          Room:          Billing#: J9911400116
DOB: 05/22/1944     Age: 54      Sex: F    Att.physician: JOSEPH, GARY
Adm. Date: 04/24/99

Order Id         : 04241050
Req.physician    : JOSEPH, GARY
Report to        : JOSEPH, GARY


# A U T O M A T E D   C O A G U L A T I O N   S T U D I E S

| TEST-NAME | RESULT | AB | NRML-RANGE | UNITS | SITE |
|---|---|---|---|---|---|
| COLLECTED 04/24/99 15:35 | | | | | |
| PROTIME | 11.2 | | 11.2-14.2 | secs. | |
| INR | 0.8 | | | | |
| COUMADIN YES/NO? | UNKNOWN | | | | |
| DATE GIVEN? | - | | | | |
| PARTIAL THROMBOPLASTIN | 24.7 | | 20.0-34.0 | secs. | |
| HEPARIN Y/N | UNKNOWN | | | | |
| DATE GIVEN? | - | | | | |

KEY FOR ABNORMAL COLUMN:  L=LOW, H=HIGH, AB=ABNORMAL, C=CRITICAL
KEY FOR ALTERNATE SITE:
ᴱ=St. Elizabeth Lab   ᴿ=LabCorp of America
  Youngstown, OH       Dublin, OH

Printed: 04/24/99 16:12                                   PAGE: 1 of

000075

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

STATE OF OHIO,
    Plaintiff-Respondent
                            :        CASE NO. 01-CR-793

                            :        JUDGE JOHN M. STUARD
-vs-

DONNA ROBERTS,
    Defendant-Petitioner.          :        MOTION TO EXTEND TIME
                                    TO RESPOND

Now comes the State of Ohio, by and through the undersigned counsel, and moves this

Court pursuant to R.C. 2953.21(D) to fix the due date for the Plaintiff-Respondent's, (the State of

Ohio), answer or motion at September 30, 2008.

For cause, Defendant-Petitioner Donna Roberts filed her Post-Conviction Petition with

this Court August 20, 2008, and a copy was served upon the State the same day. The State's

current deadline to respond by answer or by motion is September 2, 2008 (accounting for the

Labor Day holiday weekend). The State submits that ten days is insufficient time to respond to

said petition.

As the Court is aware, this is a death penalty case. The record in this matter is most

voluminous, spanning 29 volumes of transcripts and over three-hundred exhibits. The petition

itself contains eight claims for relief and covers 43 pages, plus over two volumes of exhibits.

Undersigned counsel is the sole assistant prosecutor assigned to answer post-conviction petitions.





2001 CR
00793
00022405266
CRM

221

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3397

PROOF OF SERVICE

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to

Atty. David L. Doughten (#0002847),  Counsel for Defendant-Petitioner Donna Roberts, 4403

St. Clair Ave., Cleveland, Ohio 44103-1125, on this 22nd Day of August, 2008.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

         :

STATE OF OHIO,          :
    Plaintiff-Respondent             CASE NO. 01-CR-793

         :        JUDGE JOHN M. STUARD
-vs-

DONNA ROBERTS,         MOTION TO EXTEND TIME
    Defendant-Petitioner.       :    TO RESPOND

*2008 AUG 22  AM 10:25*
*TRUMBULL COUNTY*
*CLERK OF COURTS*
*KAREN INFANTE ALLEN*
*CLERK OF COURTS*
*TRUMBULL COUNTY*

Now comes the State of Ohio, by and through the undersigned counsel, and moves this

Court pursuant to R.C. 2953.21(D) to fix the due date for the Plaintiff-Respondent's, (the State of

Ohio), answer or motion at September 30, 2008.

For cause, Defendant-Petitioner Donna Roberts filed her Post-Conviction Petition with

this Court August 20, 2008,  and a copy was served upon the State the same day.  The State's

current deadline to respond by answer or by motion is September 2, 2008 (accounting for the

Labor Day holiday weekend).  The State submits that ten days is insufficient time to respond to

said petition.

As the Court is aware, this is a death penalty case. The record in this matter is most

voluminous, spanning 29  volumes of transcripts and over three-hundred exhibits. The petition

itself contains eight claims for relief and covers 43 pages, plus over two volumes of exhibits.

Undersigned counsel is the sole assistant prosecutor assigned to answer post-conviction petitions.



DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3399

Among her other duties, she is also the only assistant prosecutor assigned to prepare briefs for both the Eleventh District Court of Appeals and the Ohio Supreme Court. Additionally, counsel also is occasionally assigned to cover matters in the Common Pleas Court. Prior to our current September 2nd due date, undersigned counsel will be attending an out-of-town seminar with the Association of Government Attorneys in Capital Litigation 29th Annual Conference from August 27 through August 30, 2008, and will be unavailable to prepare State's answer to this petition.

Undersigned counsel submits this request is not made for purposes of delay but to facilitate a full and adequate response to Petitioner's rather lengthy filing.

For these reasons, the State respectfully moves this Court to fix the due date for the State's answer or motion to Defendant-Petitioner's Post-Conviction Petition at September 30, 2008.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to

Atty. David L. Doughten (#0002847),  Counsel for Defendant-Petitioner Donna Roberts, 4403

St. Clair Ave., Cleveland, Ohio 44103-1125, on this 22nd Day of August, 2008.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

**IN THE COURT OF COMMON PLEAS**
**-GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

CASE NUMBER:  2001 CR 00793

**STATE OF OHIO**
      **PLAINTIFF**

**vs.**

**JUDGE JOHN M STUARD**

**DONNA MARIE ROBERTS**
      **DEFENDANT**

**JUDGMENT ENTRY**

The State of Ohio is granted Motion to Extend Time to Respond to

Defendant-Petitioner, Donna Roberts, Post-Conviction Petition to a fixed date of

September 30, 2008.

JUDGE JOHN M STUARD

Date: 8/20/08



TO THE CLERK OF COURTS:  YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.

JUDGE

2008 SEP -2  AM 8:50
TRUMBULL COUNTY
CLERK OF COURTS

2001 CR
00793
00017109601
0

222

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

STATE OF OHIO,                          :        CASE NO. CR 2001 CR 0793

    Plaintiff,                       :

   -vs-                               :        JUDGE JOHN M. STUARD

DONNA ROBERTS,                          :        <u>MOTION FOR APPROPRIATION</u>
                                                 <u>OF FUNDS FOR EXPERT</u>
    Defendant.                        :        <u>ASSISTANCE</u>

                                                 (Independent Psychologist)

    Now comes the defendant, Donna Roberts, by and through undersigned counsel, and re-

spectfully moves this Court for an order authorizing defense expenditures to enable the defendant

to hire James Eisenberg, Ph. D. 161 North State St., Painesville, Ohio, 44077, Phone:

440.639.4763, a forensic psychologist. These funds are necessary to protect the defendant's

rights to due process, equal protection, effective assistance of counsel and to be free of cruel and

unusual punishment as guaranteed by both the State and Federal constitutions. Counsel requests

the independent psychologist to assist in the determination of Ms. Roberts mental health status

and mental health history, including her intelligence level. The appointment is necessary to

develop the Fourth, Fifth, Sixth and Seventh Claims for Relief in her R.C. 2953.21 petition.

    Dr. Eisenberg requests a billing rate of $200.00 (Two Hundred Dollars) per hour with a

cap of $5000.00 (Five Thousand Dollars). He agrees not to bill over this amount unless or until

additional fees are approved by this court.



2001 CR
00793
00034052615
CRM

*223*

In addition, Dr. Eisenberg is a certified as a forensic psychologist.  The importance of this classification has been noted by the Ohio Supreme Court.  In <u>State v. Filiaggi</u> (1999), 86 Ohio St.3d 230, which emanated from this county, the Ohio Supreme Court found that the state's mental health experts were to be given greater credibility in the mental health field because they were classified as a "forensic expert," as opposed to the defendant's mental health experts, who were not.

**Wherefore**, it is respectfully requested that this court appoint Dr. Eisenberg at the requested rate of funding.  The denial of the request will result in a violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Respectfully Submitted,

DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland OH 44103
(216) 361-1112

Counsel for Defendant Donna Roberts

- 2 -

**CERTIFICATE OF SERVICE**

A copy of the foregoing Defendant's Motion was served upon LuWayne Annos,

Trumbull County Prosecutor and/or Christopher Becker, Esq. Assistant Trumbull County

Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S.

mail on this 15th day of September, 2008.

DAVID L. DOUGHTEN

Attorney for Defendant

- 3 -

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

STATE OF OHIO,                      :        CASE NO. CR 2001 CR 0793

    Plaintiff,                      :

  -vs-                                :        JUDGE JOHN M. STUARD

DONNA ROBERTS,                      :        <u>MOTION FOR APPROPRIATION</u>
                                             <u>OF FUNDS FOR EXPERT</u>
    Defendant.                      :        <u>ASSISTANCE</u>

(Neuropsychologist)

    Now comes the defendant, Donna Roberts, by and through undersigned counsel, and respectfully moves this Court for an order authorizing defense expenditures to enable the defendant to hire Jeffrey L. Smalldon, 5151 Reed Road, Suite 211, Columbus, Ohio, 43220, as a neuropsychologist for the development of her postconviction claims. These funds are necessary to protect the defendant's rights to due process, equal protection, effective assistance of counsel and to be free of cruel and unusual punishment as guaranteed by both the State and Federal constitutions. Counsel requests Dr. Smalldon to determine the extend of brain damage suffered by Ms. Roberts from her numerous head injuries. Ms. Roberts was awarded SSI relief because of these injuries. The appointment is necessary to develop the Fourth, Fifth, Sixth and Seventh Claims for Relief in her R.C. 2953.21 petition.

    Dr. Smalldon requests a billing rate of $250.00 (Two Hundred FiftyDollars) per hour with a cap of $7500.00 (Seven Thousand Five Thousand Dollars). He agrees not to bill over this amount unless or until additional fees are approved by this court.

2001 CR
00793
00046807366
CRM

224

**Wherefore**, it is respectfully requested that this court appoint Dr. Smalldon at the requested rate of funding. The denial of the request will result in a violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Respectfully Submitted,

DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland OH 44103
(216) 361-1112

Counsel for Defendant Donna Roberts

## CERTIFICATE OF SERVICE

A copy of the foregoing Petitioner's Motion was served upon LuWayne Annos, Trumbull County Prosecutor and/or Christopher Becker, Esq. Assistant Trumbull County Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this 15th day of September, 2008.

DAVID L. DOUGHTEN

Attorney for Defendant

- 2 -

## MEMORANDUM IN SUPPORT

As addressed in Claim Five of Roberts petition, trial counsel failed to hire a neuropsychologist to determine the extent of her head injuries and the effect that these injuries had on her thinking and actions.

In the petition, the exhibits from prison and the social Security Administration , in addition to family members all recount the number of serious automobile accidents causing injury to Roberts. She mentioned the accidents in her allocution to this court. (T. 49, 50) The Social Security records proffered into the record reveals that even the decedent Fingerhut noted to the Social Security Administration that Roberts had been acting peculiarly since the accident. Dr. Thomas Gazley, at the competency hearing of October 22, 2007, defined a neuropsychologist as a psychologist who is specialized in evaluating, assessing and sometimes treating disorders of the brain that have to do with often times neurological impairment, whether the result of disease, whether the result of some sort of injury or illness of the brain. (T. 25)

A brain injury could be a diagnostic question, that is if the injury changes the person's ability to process thought as it has to do with the cognitive process, the use of language and memory. (T. 26-27) It may also cause a personality of a person to change. This could effect a defendant's ability to interact with counsel, but Dr. Gazley did not observe this process in his evaluation. (T. 27) See also proffered affidavit of Dr. James Eisenberg.(Proffer of September 20, 2007)

Defense counsel failed to introduce the psychological testing results from Dr. Donald Degli, the psychologist who evaluated Ms. Roberts for her application for SSI benefits in 1999. This report included an assessment of a verbal IQ of 79 and a performance IQ of 55. The 24

- 3 -

point differential may be indicative of brain damage.  The appointment of a neuropsychologist was allow the proper tests to be administered to determine if in fact the number of accidents resulted in damage to her brain.

Dr. Smalldon's curriculum vitae is attached.

Respectfully submitted,

DAVID L. DOUGHTEN

- 4 -

# JEFFREY L. SMALLDON, PH.D.
**Diplomate in Forensic Psychology**
**American Board of Professional Psychology**

**David J. Tennenbaum, Ph.D., and Associates**
**5151 Reed Road, Suite A-211 ~ Columbus, Ohio 43220-2553**
**Telephone 614 451-6517 ~ Telecopier 614 451-5387**

# CURRICULUM VITA

### Education

| | |
|---|---|
| Ph.D. | The Ohio State University (Psychology, 1989) |
| | <u>Clinical Training</u>: |
| | . Netcare Forensic Psychiatry Center |
| | (<u>Supervisor</u>: Kristen Haskins, Psy.D.) |
| | . Timothy B. Moritz Forensic Psychiatry Center |
| | (<u>Supervisor</u>: Daniel L. Davis, Ph.D.) |
| | . David J. Tennenbaum, Ph.D., and Associates |
| | (<u>Supervisor</u>: David J. Tennenbaum, Ph.D., Forensic |
| | Diplomate, American Board of Professional Psychology) |
| | . Pre-Doctoral Internship: Forensic Psychiatric Unit, Connecticut |
| | Valley Hospital; Middletown, CT (9/88 - 8/89) |
| M.H.A. | The George Washington University (Health Services Administration, 1982) |
| Post-Grad. | Trinity College, The University of Dublin (Modern Anglo-Irish Literature, |
| Diploma | 1979) |
| M.A. | Purdue University (English, 1976) |
| B.A. | Valparaiso University (English, 1975) |

### Licensure/Board Certification

License No. 4376; Ohio State Board of Psychology (1990)
Board Certified in Forensic Psychology, American Board of Professional Psychology (ABPP)

### Recent Employment History

| | |
|---|---|
| 1990-Present | Psychologist, Private Practice; David J. Tennenbaum, Ph.D., and Associates |
| 1990-1991 | Psychologist; Riverside Methodist Hospitals' Neurological Rehabilitation Center |
| 1989-1990 | Post-Doctoral Fellow, Riverside Methodist Hospitals' Neurological |
| | Rehabilitation Center (half-time) |
| 1989-1990 | Post-Doctoral Fellow, David J. Tennenbaum, Ph.D., and Associates (half-time) |
| 1986-1988 | Teaching Associate (Psychology); The Ohio State University |
| 1983-1985 | Vice President, Mental Health and Alcoholism Services; Riverside Methodist |
| | Hospitals; Columbus, Ohio |

### Professional Memberships/Affiliations

American Psychological Association (APA)
Division 40 (Clinical Neuropsychology) of APA
Division 41 (American Psychology - Law Society) of APA
American Academy of Forensic Psychology
American College of Forensic Psychology
National Academy of Neuropsychology
Ohio Psychological Association
Central Ohio Psychological Association
Department of Psychiatry, Section of Psychology, Riverside Methodist Hospitals
Adjunct Assistant Professor, Department of Psychology, The Ohio State University
(graduate seminar in forensic psychological assessment; 1993 - 2000)

( (

## Selected Presentations

* Demonstration of Direct and Cross Examination of an Expert.  Participant at the Chester Professionalism Institute, Trial Practice Seminar for Public Service Lawyers, November   2007.

* Pathways Toward an Understanding of Serial Murder.  Presentation at the Ohio Forensic Centers annual continuing education conference, June 2004.

* A Psychological Perspective on the Investigation of Alleged Child Sexual Abuse.  Invited workshop at the FBI's September 2003 Violent Crime/Crimes Against Children Conference (Columbus, Ohio).

* Framing the Serial Killer: The Uses, Limits and Potential of Psychological Inquiry.  Presentation at  the 2003 annual conference of the Office of Forensic Services, the Ohio Department of Mental Health.

* Juvenile Sexual Predator Evaluations: An Overview of Conceptual and Applied Issues. Presentation to the Central Ohio Association of Juvenile Attorneys (August 2003).

* Issues in the Treatment and Management of Symptoms/Behavior Associated with the Cluster B Personality Disorders: Clinical and Forensic Considerations.  Presentation to Ohio Health's interdisciplinary Behavioral Health staff,  April 2003.

* Forensic Psychology in the Courtroom.  Invited lecture for the annual Law-Psychology Colloquium at the Valparaiso University School of Law.  February 2003.

* Child Custody Cases Involving Abuse Allegations.  Presentation to members of the Columbus Bar Association.  March 2002.

* Framing the Serial Killer: Conceptual, Psychological, and Investigatory Issues.  Invited half-day workshop for graduates of the FBI National Academy training program for law enforcement officers (Huron, OH, September 2000; Lawrence, Kansas, April 2001).

* Violence in the Workplace: The Role of Mental Health Consultation.  Presentation to the faculty/staff at North Central Technical College, Mansfield, Ohio, April 2000.

* Understanding the Psychological Report in Child Custody Cases.  Presentation to the Advanced Family Law Seminar sponsored by the Ohio CLE Institute, June 1997.

* The Role of the Consulting Psychologist in Child Custody Cases.  Presentation at the annual conference of the Ohio Association of Court Referees and Magistrates, September 1996.

* Criminal Defendants and the Lies They Tell; or, Crisis and the Urge to Rewrite History. Presentation at the annual conference sponsored by the National Association of Sentencing Advocates, May 1996.

* Psychologists, Mitigation Specialists, and the Search for Meaning in Cases of Serial Murder. Presentation at the annual conference sponsored by the National Association of Sentencing Advocates, May 1995.

* Child Custody Evaluations: A Psychologist's Perspective.  Presentation at the Family Law Seminars sponsored by the Ohio Academy of Trial Lawyers, (Columbus and Cleveland), March 1995.

* Issues in the Assessment of Child Sexual Abuse Allegations.  Half-day continuing education workshop (with two co-presenters) for members of the Columbus Bar Association, September 1994.

* The Psychologist's Role in Child Custody Determinations.  Presentation to members of the Columbus Bar Association, June 1993.

* A Stress Management Primer for Domestic Court Referees.  Presentation at the annual conference of the Ohio Association of Court Referees and Magistrates, September 1994.

* The Role of the Interpretive Psychologist in the Sentencing Phase of a Capital Murder Trial. Panelparticipant at conference of the National Association of Sentencing Advocates, Indianapolis, Indiana, June 1993.

* Developmental Roots of Adult Personality Disorders.  Workshop at conference of the National Association of Sentencing Advocates, Indianapolis, Indiana, June 1993.

* Antisocial Personality Disorder and Death Penalty Mitigation.  Presentation at the Death Penalty Conference, Cleveland, Ohio, June 1993.

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

STATE OF OHIO,                  :        CASE NO. 2001 CR 0793

      Respondent,           :        JUDGE JOHN M. STUARD

-vs-                            :

                               :

DONNA ROBERTS,                  :        <u>MOTION TO STAY</u>

      Petitioner.           :

Now comes the defendant, Donna Roberts, by and through his attorney, David L. Doughten, and respectfully moves this Court to stay her postconviction proceedings. The reasons are two-fold; first, this court and a member of the prosecuter's office are currently litigants in a disciplinary action in a matter related to Ms. Roberts. Second, the complete record is not believed to be located in the Trumbull County Clerk's Office. In particular, the video-tape of the co-defendant is located at the Ohio Supreme Court Clerk's Office. It is not believed that a copy exists at the local court house. This Court is required to review the complete record of the proceedings before rendering a decision. This cannot be complied with unless a proper copy of the statement is present with the record at the Trumbull County Clerk's Office.

Respectfully submitted,



DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112

ATTORNEY FOR DEFENDANT

2001 CR
00793
00009494003
CRM

225

CERTIFICATE OF SERVICE

A copy of the foregoing Petitioner's Motion was served upon Dennis Watkins, Trumbull

County Prosecutor and/Chris Becker, Esq. Assistant Trumbull County Prosecutor, Administra-

tion Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this 15th day of

September, 2008.

DAVID L. DOUGHTEN<br>
Counsel for Petitioner

- 2 -

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    :

      Plaintiff,                  :

     -v-                          :          Case No. 01-CR-793

DONNA ROBERTS,                    :

      Defendant.                 :

---

## DONNA ROBERT'S MOTION FOR
## LEAVE OF COURT TO CONDUCT DISCOVERY

---

    Petitioner Donna Roberts moves this Court for leave to conduct discovery. A Memorandum of Law is attached and incorporated herein.

                        Respectfully Submitted,

                        David L. Doughten #0002847
                        4403 St. Clair Avenue
                        Cleveland, OH 44103
                        216.361.1112
                        ddoughten@yahoo.com



2001 CR
00793
00094804333
CRM

*226*

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3414

## CERTIFICATE OF SERVICE

Although a copy of the foregoing Motion was served upon Dennis Watkins, Trumbull County

Prosecutor and/or LuWayne Annos, Esq. Assistant Trumbull County Prosecutor, Administration

Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this <u>15th</u> day of

September, 2008.

DAVID L. DOUGHTEN

Counsel for Petitioner

<u>**MEMORANDUM IN SUPPORT**</u>

I.    **INTRODUCTION**

On August 11, 2008, the Petitioner Donna Roberts filed her amended Post-Conviction Petition. As is noted in the petition, further factual development is needed.  The Petitioner now requests that this court issue an order allowing counsel to depose trial counsel and the necessary funds to conduct such depositions.

A petition for post-conviction relief is a civil proceeding and is governed by the rules of civil procedure. <u>State v. Pless</u> (1993), 91 Ohio App.3d 197, jurisdictional motion overruled 69 Ohio St.3d 1408.

II    **THE CLAIMS**

A.    **FIRST AND SECOND CLAIMS FOR RELIEF: JURY-RACE ISSUES**

The following discovery requests are being made for the first two claims for relief.

1.    ***Requests for Production of Documents***

<u>Request for Production No. 1</u>:  All documents concerning the present case, maintained by the Trumbull County Prosecutor's Office relating to the selection of petit jurors, including, but not limited to, background information on all prospective jurors included in the venire, regardless of whether the prospective juror was questioned or seated on the jury, and any documentation relating to prospective jurors who were excused prior to being called or reporting for jury duty.

<u>Request for Production No. 2</u>:  All documents maintained by the Trumbull County Jury Commissioners relating to the selection procedures for grand jury venires in Trumbull County between the years of 1990—2002, including, but not limited to, the method by which names of potential grand jurors were drawn from voter registration lists, the method by which the grand jury venire was selected from any preliminary list, and any methods employed by the Trumbull County

1

Jury Commissioners to excuse individuals prior to the individuals being called to report for grand jury duty.

Request for Production No. 3: All documents maintained by the Trumbull County Jury Commissioners relating to the selection procedures in petit venires for criminal cases in Trumbull County between the years of 1995-2002, including, but not limited to, the method by which names of potential jurors were drawn from voter registration lists, the method by which the jury venire was selected from any preliminary list, and any methods employed by the Trumbull County Jury Commissioner to excuse individuals prior to the individuals reporting for jury duty.

Request for Production No. 4: All documents maintained by the Trumbull County Jury Commissioner identifying individuals drawn from voter registration lists for prospective petit jury or grand jury service between the years of 1990-2002.

Request for Deposition No. 1: TRUMBULL COUNTY JURY COMMISSIONER CONNIE PIERCE – concerning the method by which names of potential jurors were drawn from voter registration lists between the years of 1990-2002, the method by which the grand and petit jury venires were selected from that preliminarily list, and any methods employed by the Trumbull County Jury Commissioner to excuse individuals prior to the individuals' being called to report for jury duty or actually reporting for jury duty.

Request for Deposition No. 2: FORMER TRUMBULL COUNTY JURY COMMISSIONER(S) – concerning the methods by which names of potential jurors were drawn from voter registration lists between the years of 1990-2002, the methods by which jury venires were selected from any preliminarily lists, and any methods employed by former Trumbull County Jury Commissioners to excuse individuals prior to the individuals' being called to report for jury duty or appearing for jury duty.

2

**B.**              **THIRD CLAIM FOR RELIEF**

**Ineffective assistance in the culpability phase.**

In the Third Claim for Relief, the Petitioner has alleged that trial counsel was ineffective. The petitioner bears the burden of proving that trial counsel's assistance was ineffective and of overcoming the presumption that the attorney's decisions were products of "sound trial strategy." Strickland v. Washington(1984), 466 U.S. 668.

Petitioner Roberts is seeking to meet her burden of proving that trial counsel's decisions were not a product of sound strategy by probing trial counsel's decision making process on the issues raised in the petition and amended petition.  Both parties will be present and inquiring into trial counsel's decision making process. The state would have the chance to inquire about the Petitioner's allegation included in her affidavit.  Inquiry into the decision making process is critical to a proper assessment of counsel's investigative and litigation decisions.  As trial counsel is the only person who can address the questions of trial strategy, the desired evidence is unavailable through other sources.

The petitioner will seek to minimize the burden that the deposition would impose on the State and on the witnesses by providing the witness in advance copies of the postconviction documents that may be used as exhibits during the deposition. In order to eliminate surprise, petitioner will inform counsel in advance of specific areas of inquiry.

The denial of the right to take the deposition of trial counsel will violate petitioner's right of due process of law to make a record for federal habeas corpus review.  The interference with the right to make an adequate record for federal habeas corpus review will have the effect of denying the petitioner his right of access to the federal courts.

The U.S. Supreme Court in various recent cases made it clear that a postconviction

3

petitioner is obligated to discover, obtain and present all his evidence against the conviction and

sentence at the earliest possible time in state court.  The failure to do so may bar relief in a

federal habeas corpus review.  McClesky v. Zant(1991), 111 S.Ct. 1454 and Keeney v. Tamayo-

Reyes(1992), 112 S. Ct. 1715.

> In McClesky, the court in rejecting a successor federal habeas held that the:

> Petitioner must conduct a reasonable and diligent investigation aimed at including
> all relevant claims and grounds for relief in the first federal habeas petition. If
> what petitioner knows or could have discovered upon reasonable investigation
> supports a claim for relief in a federal habeas petition what he doesn't know is
> irrelevant.  Omissions of the claim will not be excused merely because evidence
> discovered later might also have supported or strengthened the claim.

McClesky at 1472.

> In Keeney, the court went further and held that petitioner must also develop all material

facts before the state court proceeding or he may be denied the opportunity of presenting these

facts in a federal habeas corpus petition. The purpose of the holding is to properly fulfill the

exhaustion requirement of federal habeas review.  The court stated:

> The purpose of exhaustion is not to create a procedural hurdle on the path to
> federal habeas corpus court, but to channel claims into an appropriate forum,
> where meritorious claims may be vindicated and unfounded litigation obviated
> before resort to federal court. Comity concerns dictate that the requirement of
> exhaustion is not satisfied by the mere statement of a federal claim in state court.
> Just as the state must afford the petitioner a full and fair hearing on his federal
> claim, so must the petitioner afford the state a full and fair opportunity to address
> and resolve the claim on the merits.

Keeney, 60 U.S.L.W. 4342-43.

> The granting of the depositions would allow the petitioner to fulfill his obligation to

investigate, discover and litigate his ineffective assistance claim in state court before presenting,

if necessary, a claim in federal court. First, Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments of the U.S. Constitution.

Wherefore, petitioner requests that this court grant an order and appropriate funds for an order granting him leave to take discovery depositions of petitioner's trial counsel, Jerry Ingram and John Uhaz.

### C.  FOURTH, FIFTH, SIXTH AND SEVENTH CLAIMS FOR RELIEF

**Ineffective assistance of penalty phase counsel.**

The above claims of relief relate to the failure of trial counsel to obtain records, in particular records related to Roberts mental health history, which relate to her competency, intelligence level, her ability to assist counsel in preparing for trial, and presentation of mitigation at the penalty phase.  It is important to determine why the records were not collected and if any strategy was involved.  Also, counsels relationship with Roberts is extremely important to all above issues.  A deposition of trial counsel, in conjunction with the previous claim is the best means of procuring this information outside of an evidentiary hearing.

### III.  THE COURT SHOULD AUTHORIZE THE CONDUCTING OF THE LIMITED DISCOVERY IDENTIFIED HEREIN.

Once a post-conviction petitioner attaches sufficient documents to his petition, he is entitled to conduct discovery pursuant to the Ohio Civil Rules.  <u>State v. Smith</u>, 30 Ohio App. 3d 138, 140 (1986).  Donna Roberts attached sufficient documentation to his postconviction petition to be afforded the opportunity to conduct discovery.  The facts alleged, if proven, would entitle the Petitioner to relief.

### A.  Donna Roberts is entitled to conduct the discovery necessary to oppose the state's motion to dismiss.

The Ohio Supreme Court has determined that a post-conviction action is a civil

5

proceeding. <u>State v. Nichols</u>, 11 Ohio St. 3d 40, 41 (1984); <u>State v. Milanovich</u>, 42 Ohio St. 2d

46,  49 (1975). Thus, the civil rules govern an action for post-conviction relief. <u>Milanovich</u>, 42

Ohio St. 2d at 51-52.

Because the state will request the Court to rule on the merits of the petition, it is

incumbent upon Donna Roberts to contest the State's factual allegations.  She cannot rest upon

the mere allegations or denials of his pleadings.  Instead her response, by affidavit or as

otherwise, has to set forth specific facts showing that there is a genuine issue of judgment.

Ohio R. Civ. P. 56(F) provides as follows:

> <u>When affidavits unavailable</u>. Should it appear from the affidavits of a party
> opposing the motion for summary judgment that he cannot for sufficient reasons
> stated present by affidavits facts essential to justify his opposition, the court may
> refuse the application for judgment or <u>may order a continuance to permit
> affidavits to be obtained or discovery to be had</u> or make any other order as may be
> just. (Emphasis added.)

In <u>Tucker v. Webb</u>, 4 Ohio St. 3d 121, 122 (1983), the Ohio Supreme Court held that

summary judgment should not be granted in favor of the moving party before the non-moving

party has had the chance to conduct discovery.

**B.      The Fourteenth Amendment requires that Donna Roberts be permitted to
conduct discovery.**

Even if Petitioner Roberts did not attach sufficient documentation to his petition, he is

still entitled to conduct discovery.  When a state establishes a program or procedure, that

program or procedure must be operated within the confines of the Due Process Clause of the

Fourteenth Amendment of the United States Constitution.  <u>Goldberg v. Kelly</u>, 397 U.S. 254, 262

(1970). When a state creates a right to appellate review (even though the State is not so required),

that system of appellate review also must meet the requirements of due process. <u>Evitts v. Lucey</u>,

469 US. 387, 401 (1985); <u>See also Ohio Adult Parole Authority v. Woodard</u>, 523 U.S. 272

(1998).  The State of Ohio's post-conviction system, pursuant to <u>Evitts</u> and <u>Goldberg</u>, must meet the requirements of due process.

In the State of Ohio, the petitioner in a post-conviction proceeding has the initial burden of submitting documentation to demonstrate to the trial court that a hearing is warranted as to the constitutional violations alleged in the petition.  <u>State v. Kapper</u>, 5 Ohio St. 3d 36, 38 (1983); <u>State v. Cole</u>, 2 Ohio St. 3d 112, 114 (1982); <u>State v. Pankey</u>, 68 Ohio St. 2d 58, 59 (1981); <u>State v. Jackson</u>, 64 Ohio St. 2d 107, 111 (1980).

That documentation must consist of evidence dehors the record.  <u>State v. Milanovich</u>, 42 Ohio St. 2d 46, 51 (1975); <u>State v. Mishelek</u>, 42 Ohio St. 2d 140 (1975).  If the petitioner fails to submit exhibits in support of the allegations contained in the post-conviction petition, then the petition is subject to summary dismissal.  <u>State v. Milanovich</u>, 42 Ohio St. 2d at 51.

The State, consistent with the Due Process Clause of the Fourteenth Amendment, cannot place this initial evidentiary burden upon a petitioner and subsequently deny him a meaningful opportunity to meet that burden.  To deny petitioner the opportunity to meet this burden is to emasculate his right to pursue his post-conviction remedies.

**C.      The Eighth Amendment requires that the court permit the Petitioner to conduct discovery.**

The need for discovery in capital cases is especially acute.  Capital cases require that the procedures employed therein ensure heightened reliability in the determination of both the defendant's guilt and/or his sentence.  <u>Beck v. Alabama</u>, 447 U.S. 625, 637 (1980).  Where an individual's life is at stake, the Supreme Court repeatedly has insisted upon higher standards of reliability and fairness.  <u>See, e.g.</u>, <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978) (plurality opinion) ("'the penalty of death is qualitatively different' from any other sentence . . . .  We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of

7

reliability when the death sentence is imposed.") (quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976)).  "Because habeas corpus discovery is designed to aid courts in determining the validity of the petitioners' claims, it often can add – and may in fact be indispensable – to the reliability of habeas corpus proceedings in capital cases.

Petitioner Roberts raised colorable constitutional violations that he should be permitted to develop through the discovery of additional facts.  <u>See</u> <u>Wilson v. Butler</u>, 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be permitted every opportunity possible . . . to present the facts relevant to his constitutional claims.")  The claims on which the Petitioner seeks discovery are not so "'palpably incredible'[or] 'patently frivolous or false' as to warrant summary dismissal."  <u>Blackledge v. Allison</u>, 431 U.S. 63, 76 (1977).

## IV.    CONCLUSION

In accordance with Ohio R. Civ. P. 56(F), <u>Tucker v. Webb</u>, <u>State v. Milanovich</u>, and the Eighth and Fourteenth Amendments this Court should grant Donna Roberts the opportunity to conduct the discovery necessary to further develop the issues contained in her petition.

Respectfully submitted,

DAVID L. DOUGHTEN
Counsel for Petitioner

8

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,
    Plaintiff-Respondent

-vs-

DONNA ROBERTS
    Defendant-Petitioner.

)
)
)
)
)
)
)
)

CASE No. 2001-CR-0793

JUDGE JOHN M. STUARD

2008 SEP 22 PM 3: 24

CLERK OF COURTS

---

### STATE'S RESPONSE TO PETITIONER'S MOTION TO STAY POSTCONVICTION PROCEEDINGS

    Now comes the Plaintiff-Respondent, the State of Ohio ("State"), and states that it has no objection to this Court's granting a stay in the postconviction proceedings presently pending before this Court. Defendant-Petitioner Donna Roberts filed a "Motion for Stay" with this Court Sept. 17, 2008, and for the following reasons, the State does not object.

    For cause, Crim. R. 35(C) requires this Court to rule on a petition for post-conviction relief within 180 days of its filing. However, that requirement is directory, rather than mandatory, and this Court will not lose jurisdiction if it delays any action thereon. *State v. ex rel. Madsen v. Jones* 106 Ohio St. 3d 178, 2005-Ohio-4381, ¶8. Indeed, Petitioner's specific request for a stay would presumably waive that directory.

    As a point of clarification, the State does not see pending disciplinary action involving this Court or an assistant prosecutor as a reason to stay the post-conviction process. The Ohio Supreme Court did not remove this Court for purposes of re-sentencing Petitioner even though the disciplinary proceedings were pending at that time. Nor did it stay the re-sentencing until the disciplinary issues were resolved. However, the State does acknowledge that if portions of the


2001 CR
00793
00032541773
CRM



227

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3424

entire court record are not readily available for review as Petitioner submits, both parties could

be prejudiced, and this Court will be unable to fulfill its statutory duty to "consider all the files

and records pertaining to the proceedings against the petitioner." R.C. 2953.21(C).

Wherefore, the State does not object to the Court staying the postconviction proceedings

until such time as the entire record is available for the State's response (due in this Court

September 30, 2008), and for the Court's review.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

PROOF OF SERVICE

I do hereby certify that a copy of the response and proposed judgment entry were sent by

ordinary U.S. Mail to Atty. David L. Doughten (#0002847), Counsel for Defendant-Petitioner

Donna Roberts, 4403 St. Clair Ave., Cleveland, Ohio 44103-1125, on this 22nd Day of

September, 2008.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,
    Plaintiff-Respondent

-vs-

DONNA ROBERTS
    Defendant-Petitioner.

)
)
)
)
)
)
)
)
)

CASE No. 2001-CR-0793

JUDGE JOHN M. STUARD

2008 SEP 22  PM 3: 33

CLERK OF COURTS

---

### STATE'S OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE
(Independent Psychologist)

---

Now comes the State of Ohio ("State"), by and through the undersigned counsel, and objects to Defendant-Petitioner Donna Roberts' ("Petitioner") Motion for Appropriation of Funds for Expert Assistance (Independent Psychologist) filed with this Court September 17, 2008.

For cause, Petitioner seeks the appointment of Dr. James Eisenberg to more fully develop her Fourth, Fifth, Sixth and Seventh Claims for relief in her post conviction petition filed with this Court Aug. 20, 2008. The Eleventh District Court of Appeals clearly and repeatedly has held that no post-conviction petitioner is automatically entitled to expert assistance: "The right to expert assistance is linked to the constitutional right to counsel. See *State v. Richey* (1992), 64 Ohio St.3d 353, 595 N.E.2d 915, 359, 64 Ohio St.3d 353, 595 N.E.2d 915. Because postconviction proceedings are civil in nature, a petitioner has no constitutional right to court-appointed counsel. *State v. Mapson* (1987), 41 Ohio App.3d 390, 535 N.E.2d 729, 391, 41 Ohio App.3d 390, 535 N.E.2d 729. Consequently, a petitioner would have no corresponding right to expert assistance. If the trial court grants a hearing, a petitioner may have a statutory right to legal representation by the public defender's office if his petition is found to have arguable merit. *State v. Crowder* (1991), 60 Ohio St.3d 151, 60 Ohio St.3d 151, 573 N.E.2d 652, paragraphs one



2001 CR
00793
00053524728
CRM

228

and two of the syllabus; R.C. 120.16." *State v. Lorraine* (Sept. 1, 2000), Trumbull App. No. 99-T-0060, unreported at *4 quoting *State v. Williams* (Oct. 16, 1998), Trumbull App. 97-0153, unreported, at 9.

Pursuant to *Lorraine* and *Williams,* two other Trumbull County capital cases, Petitioner must, at minimum, demonstrate that she is entitled to a hearing before this Court may even consider whether she is eligible for expert assistance. At best, Petitioner's motion is pre-mature. The State has not had opportunity to respond to her petition at this juncture, and this Court has not decided whether a hearing will be held.

Therefore, the State submits this Court should either deny this motion outright, or delay ruling thereon until this Court decides whether to grant a postconviction hearing.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the response was sent by ordinary U.S. Mail to Atty.

David L. Doughten (#0002847),  Counsel for Defendant-Petitioner Donna Roberts, 4403 St.

Clair Ave., Cleveland, Ohio 44103-1125, on this 22nd Day of September, 2008.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

2001 SEP 22 PM 3: 34

STATE OF OHIO,
    Plaintiff-Respondent

-vs-

DONNA ROBERTS
    Defendant-Petitioner.

)
)
)
)
)
)
)
)
)

CASE No. 2001-CR-0793

JUDGE JOHN M. STUARD

---

## STATE'S RESONSE TO PETITIONER'S MOTION FOR LEAVE OF COURT TO CONDUCT DISCOVERY

---

    Now comes the State of Ohio ("State"), by and through the undersigned counsel, and objects to Defendant-Petitioner Donna Roberts' ("Petitioner") Motion For Leave of Court to Conduct Discovery filed with this Court September 17, 2008.

    It is well settled that R.C. 2953.21 places the burden upon the *petitioner* to make initial evidentiary presentation containing sufficient operative facts to demonstrate a claim for post conviction relief to merit a hearing. *State v. Lorraine* (Sept. 1, 2000), Trumbull App. No. 99-T-0060, at *5. Furthermore, the power to conduct and compel discovery is not included within the court's statutorily-defined conduct. Id. Pursuant to *Lorraine,* Petitioner must submit sufficient evidence with her petition, and not shift the burden to this Court to ferret out evidence to support her claims. Even if this Court elected to take on the role of evidence facilitator, it would stretch its statutorily-defined authority beyond legislative intent. The time to amass evidence in support of the petition is *before* the petition is filed, not afterwards.

    For these reasons, the State urges this Court to DENY leave to conduct discovery.



Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the foregoing response was sent by ordinary U.S. Mail

to Atty. David L. Doughten (#0002847),  Counsel for Defendant-Petitioner Donna Roberts, 4403

St. Clair Ave., Cleveland, Ohio 44103-1125, on this 22nd Day of September, 2008.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                              )
    Plaintiff-Respondent            )          CASE No. 2001-CR-0793
                       )
-vs-                                        )          JUDGE JOHN M. STUARD
                       )
DONNA ROBERTS                               )
    Defendant-Petitioner.           )

2000 SEP 22  PM 3:34
CLERK OF COURTS

---

### STATE'S OPPOSITION FOR APPOINTMENT OF FUNDS FOR EXPERT ASSISTANCE
(Neuropsychologist)

---

Now comes the State of Ohio ("State"), by and through the undersigned counsel, and

objects to Defendant-Petitioner Donna Roberts' ("Petitioner") Motion for Appropriation of

Funds for Expert Assistance (Neuropsychologist) filed with this Court September 17, 2008.

For cause, Petitioner seeks the appointment of Dr. Jeffery Smalldon to more fully

develop her Fourth, Fifth, Sixth and Seventh Claims for relief in her post conviction petition

filed with this Court Aug. 20, 2008.  The Eleventh District Court of Appeals clearly and

repeatedly has held that no post-conviction petitioner is automatically entitled to expert

assistance: "The right to expert assistance is linked to the constitutional right to counsel. See

*State v. Richey* (1992), 64 Ohio St.3d 353, 595 N.E.2d 915, 359, 64 Ohio St.3d 353, 595 N.E.2d

915. Because postconviction proceedings are civil in nature, a petitioner has no constitutional

right to court-appointed counsel. *State v. Mapson* (1987), 41 Ohio App.3d 390, 535 N.E.2d 729,

391, 41 Ohio App.3d 390, 535 N.E.2d 729. Consequently, a petitioner would have no

corresponding right to expert assistance. If the trial court grants a hearing, a petitioner may have

a statutory right to legal representation by the public defender's office if his petition is found to

have arguable merit. *State v. Crowder* (1991), 60 Ohio St.3d 151, 60 Ohio St.3d 151, 573 N.E.2d

652, paragraphs one and two of the syllabus; R.C. 120.16." *State v. Lorraine*  (Sept. 1, 2000),



2001 CR
00793
00026043018
CPM

230

Trumbull App. No. 99-T-0060, unreported at *4 quoting *State v. Williams* (Oct. 16, 1998), Trumbull App. 97-0153, unreported, at 9.

Pursuant to *Lorraine* and *Williams,* two other Trumbull County capital cases, Petitioner must, at minimum, demonstrate that she is entitled to a hearing before this Court may even consider whether she is eligible for expert assistance.  At best, Petitioner's motion is pre-mature.  The State has not had opportunity to respond to her petition at this juncture, and this Court has not decided whether a hearing will be held.

Therefore, the State submits this Court should either deny this motion outright, or delay ruling thereon until this Court decides whether to grant a postconviction hearing.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

PROOF OF SERVICE

I do hereby certify that a copy of the response was sent by ordinary U.S. Mail to Atty.

David L. Doughten (#0002847),  Counsel for Defendant-Petitioner Donna Roberts, 4403 St.

Clair Ave., Cleveland, Ohio 44103-1125, on this 22nd Day of September, 2008.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

# IN THE COURT OF COMMON PLEAS
## -GENERAL DIVISION-
### TRUMBULL COUNTY, OHIO

CASE NUMBER: 2001 CR 00793

STATE OF OHIO
**PLAINTIFF**

vs.                                                    **JUDGE JOHN M STUARD**

DONNA MARIE ROBERTS
**DEFENDANT**                                 **JUDGMENT ENTRY**

This cause came to be heard on the motion of the Defendant, Donna Marie Roberts, to stay the post-conviction proceedings until such time as a complete review of the file can be conducted. The Court finds the motion to be well taken. There is no objection to the stay request. Therefore, the Crim.R.35(C) directive that this Court must decide post-conviction petition within 180 days is deemed waived by both parties and the matter is stayed.

IT IS SO ORDERED.

_____
JUDGE JOHN M STUARD

Date: 9/24/08

Copies to:
Christopher D Becker
J. GERALD INGRAM

9-26-08
copies to:
Pros.
J. Ingram

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGEMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL

JUDGE

2008 SEP 25 P 2:18

231

SCAN

2001 CR 00793

September 26, 2008

Dear Ms. Infante,

My first attorney, Jerry Ingraham had me fill out an indigency form in 2002. Is that no longer in effect? The sheriffs came to get me in August and September, 2007, brought me to the court but there was no hearing and I was returned to Marysville. My attorneys were not even notified. Why was I charged?

What payments am I credited with?

How did you come to that balance?

Has the $100.72 been credited to my account? Ms. Sassi, cashier here sent it in a week ago.

Your reply will be appreciated. Thank You.

Respectfully Yours,

Donna M Roberts 55276

2008 OCT -2 P 1:12
TRUMBULL COUNTY
CLERK OF COURTS
DIANE V. ALLEN
CLERK OF COURTS
TRUMBULL COUNTY

P.S. You send a bill, my son pays it ($1,384±) and then you send him another and he pays it ($1,362±) now he has another bill for $286±. When is this going to stop? Shall I send Judge Stuard the information about 8/07 when there was no court session but I got charged anyway so he can send you verification?

232

KAREN INFANTE ALLEN
CLERK OF COURTS
TRUMBULL COUNTY

2015 FEB 17 PM 2: 17

TRUMBULL COUNTY
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. 2001 CR 0793 |
| | : | |
| Respondent, | : | JUDGE RAYMOND RICE |
| | : | |
| -vs- | : | |
| | : | |
| DONNA ROBERTS, | : | **MOTION TO AMEND POST-** |
| | : | **CONVICTION PETITION** |
| Petitioner. | : | **PURSUANT TO R.C. 2929.03(F)** |
| | : | |

    Now comes the defendant, Donna Roberts, by and through her attorney, David L. Doughten , and respectfully moves this Court to allow her to amend her previously filed post-conviction petition filed pursuant to R.C. §2929.03(F). This request is being made because Roberts acknowledges changes in the law since the filing of her previously filed petitions.

    In her amended petition here, Roberts is dropping two of her claims. Electrocution is no longer the instrument of death in this state. Therefore, Claim Four of the previous petition has been dropped. Robert's cannot amend with a challenge to the current method of lethal injection. The Supreme Court of Ohio has specifically addressed the ability of a capital defendant to challenge the fairness of the method of death in Ohio. In <u>Scott v. Houk</u>, 127 Ohio St.3d 317, 2010 Ohio 5805, the Supreme Court of Ohio held that the Ohio Assembly had not yet provided the courts with an Ohio law for the cause of action to challenge the lethal injection protocol. Until such a forum is provided by the assembly, the court saw no need to craft one.



2001 CR
00793
00060545008
CRM

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3436

Therefore, at present, there is no procedure permitted in the Ohio courts for a capitally convicted defendant to challenge the current lethal injection protocol under <u>Baze v. Rees</u>, 553 U.S. 35 (2008).  The current challenges are being filed under 18 U.S.C. 1983 in federal court. The bottom-line is that Roberts may not challenge the procedure here.

The Fifth Claim of the petition has also been dropped as Supreme Court of the United States decisions since the filing of the previous petition dictate the this Court is not the forum to address the overall fairness of the postconviction procedure.

For these reasons, Robert's respectfully requests that this Court permit the amending of the previously filed petition of August 20, 2008.

Respectfully submitted,

_____

DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112
ddoughten@yahoo.com

ATTORNEY FOR PETITION

## CERTIFICATE OF SERVICE

A copy of the foregoing Petitioner's Motion was served upon Dennis Watkins, Trumbull County Prosecutor and/Chris Becker, Esq. Assistant Trumbull County Prosecutor, Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this ___ day of February, 2015.

_____
DAVID L. DOUGHTEN
Counsel for Petitioner

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Respondent | | CASE NO. 01-CR-793 |
| | : | JUDGE: RONALD J. RICE |
| -vs- | | |
| DONNA ROBERTS, | | MOTION TO EXTEND TIME |
| Defendant-Petitioner. | : | TO RESPOND |

2015 FEB 26 PM 3: 16
TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN
CLERK OF COURTS
TRUMBULL COUNTY

Now comes the State of Ohio, by and through the undersigned counsel, and moves this Court pursuant to R.C. 2953.21(D) to fix the due date for the Plaintiff-Respondent's, the State of Ohio, answer or motion at March 27, 2015.

For cause, Defendant-Petitioner Donna Roberts filed her Amended Post-Conviction Petition with this Court February 17, 2015   The State's current deadline to respond by answer or by motion is February 27, 2015.  The State submits that ten days is insufficient time to respond to said petition.

As the Court is aware, this is a death penalty case. The record in this matter is most voluminous, spanning 29 volumes of transcripts and over three-hundred exhibits.  Undersigned counsel is the sole assistant prosecutor assigned to answer post-conviction petitions.  Among her other duties, she is also the only assistant prosecutor assigned to prepare briefs for both the Eleventh District Court of Appeals and the Ohio Supreme Court. Additionally, counsel also is



2001 CR
00793
00031851862
CRM

occasionally assigned to cover matters in the Common Pleas Court. Presently, undersigned counsel is responding to two separate Memorandums in Support of Jurisdiction filed in the Ohio Supreme Court by Petitioner's codefendant, Nathaniel Jackson, which have been filed under OSC case numbers 15-0264 and 15-0265. Undersigned counsel submits this request is not made for purposes of delay but to facilitate a full and adequate response to Petitioner's amended petition.

For these reasons, the State respectfully moves this Court to fix the due date for the State's answer or motion to Defendant-Petitioner's Amended Petition at March 27, 2015.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio        44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

PROOF OF SERVICE

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to

Atty. David L. Doughten (#0002847), Counsel for Defendant-Petitioner Donna Roberts, 4403 St.

Clair Ave., Cleveland, Ohio 44103-1125, on this 26th day of February, 2015.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,
    Plaintiff-Respondent

-vs-

DONNA ROBERTS,
    Defendant-Petitioner.

:
:
:

:

CASE NO. 01-CR-793
JUDGE: RONALD J. RICE

**AGREED JUDGMENT ENTRY**

Counsel for both the Defendant-Petitioner Donna Roberts and the Plaintiff-Respondent

The State of Ohio have reviewed the attached, proposed entry and agree with the contents

thereof.

David L. Doughten (#0002847)
4403 St. Clair Avenue
Cleveland, Ohio  44103

LuWayne Annos (#0055651)
Trumbull Co. Prosecutor's Office
160 High St. N.W. 4ᵗʰ Floor
Warren, Ohio  44481

Counsel for Donna Roberts,
Defendant-Petitioner

Counsel for the State of Ohio
Plaintiff-Respondent

2001 CR
00793
00057961929
N

**ORIGINAL**

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

STATE OF OHIO,                          :
      Plaintiff-Respondent                   CASE NO. 01-CR-793
                                      :       JUDGE: RONALD J. RICE
-vs-

DONNA ROBERTS,                          **PROPOSED**
      Defendant-Petitioner.          :       **JUDGMENT ENTRY**

On February 17, 2015, Defendant-Petitioner Donna Roberts filed with this Court a motion to amend her postconviction petition filed in this Court August 20, 2008. The proceedings in the original petition were stayed by the trial judge, the Honorable John Stuard, pending various proceedings in the Ohio Supreme Court. Subsequent to the motion to amend, the Plaintiff-Respondent State of Ohio motioned this Court for additional time to respond to the amended petition.

This Court conducted a status conference on the postconviction proceedings March 31, 2015. Counsel for the Petitioner and the State attended. Petitioner's presence was waived by her counsel.

Per agreement of the parties, Petitioner's 2008 petition is amended per the Petitioner's motion. Claims 4 and 5 will be eliminated. Pursuant to R.C. 2953.21 (D), the Court finds that the State has demonstrated good cause to continue its due date to respond by answer or motion to Petitioner's amended petition. The Court hereby sets the State's new due date at August 31, 2015. By agreement of the parties, the Court will withhold its ruling on the Petition and State's

response until the Ohio Supreme Court issues its opinion in *State v. Roberts,* Ohio Supreme

Court No. 2014- 0989. Counsel for Petitioner was directed to prepare this order.

**IT IS SO ORDERED**

_____
**RONALD J. RICE, JUDGE**
**OF THE TRUMBULL COUNTY COMMON**
**PLEAS COURT**

**The Clerk of Courts is Hereby Ordered**
**To serve Counsel for the State and Petitioner**
**With a time stamped copy of this order.**

_____
**Judge Ronald J. Rice**

**IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO**

State of Ohio,                                )        Case No. 2001 CR 793
                                             )
     Plaintiff-Respondent,        )        Judge Ronald J. Rice
                                             )
-vs-                                         )        **JUDGMENT ENTRY**
                                             )
Donna Roberts,                               )
                                             )
     Defendant-Petitioner.       )

On February 17, 2015, Defendant-Petitioner Donna Roberts filed with this Court a motion to amend her post-conviction petition filed in this Court August 20, 2008. The proceedings in the original petition were stayed by the trial judge, the Honorable John Stuard, pending various proceedings in the Ohio Supreme Court. Subsequent to the motion to amend, the Plaintiff-Respondent State of Ohio motioned this Court for additional time to respond to the amended petition.

This Court conducted a status conference on the post-conviction proceedings March 31, 2015. Counsel for the Petitioner and the State attended. Petitioner's presence was waived by her counsel.

Per agreement of the parties, Petitioner's 2008 petition is amended per the Petitioner's motion. Claims 4 and 5 will be eliminated. Pursuant to R.C. 2953.21 (D), the Court finds that the State has demonstrated good cause to continue its due date to respond by answer or motion to Petitioner's amended petition. The Court hereby sets the State's new due date at August 31, 2015. By agreement of the parties, the Court will withhold its ruling on the Petition and the State's response until the Ohio



2001 CR
00793
00082300906
0

Supreme Court issues its opinion in *State v. Roberts*, Ohio Supreme Court No. 2014-0989. Counsel for Petitioner was directed to prepare this order.

_____

Judge Ronald J. Rice

Date: 08-19-2015

**The Clerk of Courts is Hereby Ordered To serve Counsel for the State and Petitioner with a time stamped copy of this order.**

_____

**Judge Ronald J Rice**

THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
                                        )       CASE NO. 2001 CR 793
    Plaintiff-Respondent,           )
                                        )       JUDGE: RONALD J. RICE
-vs-                                    )
                                        )       MOTION FOR SUMMARY JUDGMENT
DONNA ROBERTS,                          )
                                        )
    Defendant-Petitioner.           )

    Now comes Plaintiff-Respondent, the State of Ohio, by and through the Trumbull County

Prosecutor's Office, pursuant to R.C. 2953.21(D), and respectfully requests that Defendant-

Petitioner's Petition to Vacate or Set Aside Sentence Pursuant to Ohio Revised Code 2953.21

filed in this Court August 20, 2008 be dismissed without a hearing for failure to establish

substantive grounds for relief. The State moves this Court for Summary Judgment pursuant to

Civ. R. 56. The reasons in support of this motion are set forth in the accompanying

memorandum.

                                       Respectfully submitted,
                                       DENNIS WATKINS (#0009949)
                                       Prosecuting Attorney By:

                                       LuWAYNE ANNOS (#0055651)
                                       Assistant Prosecuting Attorney
                                       Trumbull County Prosecutor's Office
                                       160 High Street, N.W.
                                       Fourth Floor, Administration Building
                                       Warren, Ohio 44481
                                       Telephone No.: (330) 675-2426

                                       COUNSEL FOR PLAINTIFF-RESPONDENT,
                                       THE STATE OF OHIO



2001 CR
00793
00029503236
CRM


ORIGINAL

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3447

## MEMORANDUM
FACTS

Respondent does not dispute the Jurisdictional Facts as articulated by Petitioner in ¶1 through¶ 25 of her 2008 Petition. By way of update, the Ohio Supreme Court reversed and remanded Petitioner's case for a *third* sentencing hearing in *State v. Roberts,* 137 Ohio St. 3d 230, 998 N.E. 2d 1100, 2013-Ohio-4580 (*Roberts II*), on December 22, 2013. The Ohio Supreme Court opined that because Petitioner's 2007's allocution was not directly referenced in the court's sentencing opinion, Petitioner was entitled to yet another sentencing hearing.[1] Petitioner's third sentencing hearing was conducted June 10, 2014, by a successor Trumbull County Common Pleas Judge, the Honorable Ronald J. Rice, and an appeal of that proceeding is presently pending before the Ohio Supreme Court under Case Number 2014-0989. Both sides have submitted their briefs and are awaiting an oral argument date.   Respondent denies that Petitioner has suffered any denial of her constitutional rights which would render her convictions void or voidable, or that she is entitled to relief for constitutional errors as Petitioner argues at ¶¶26, 27.

Additionally, Petitioner on February 17, 2015, filed a motion to amend her 2008 petition eliminating Claims Four and Five. The court conducted a status conference on the post-conviction proceedings and granted Petitioner's motion to amend and reset the Respondent's due date to respond to the 2008 petition to August 31, 2015.

For the following reason, the Respondent is entitled to a grant of summary judgment.

---

[1] Sentencing Judge John Stuard referenced "oral statements" in his entry, but did not use the word "allocution."

2

## ARGUMENT

Before reviewing Petitioner's remaining six Claims for Relief, it is useful to review some general concepts with respect to the post-conviction proceeding. The purpose of post-conviction relief proceedings under Ohio R.C. 2953.21 is set forth in subsection (A), which provides in pertinent part: (A) Any person convicted of a criminal offense or adjudicated delinquent claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file for relief relied upon, and asking the court to vacate or set aside judgment or sentence or to grant other appropriate relief.

Subsection (C) of 2953.21 provides that before a hearing is granted on such a petition, the trial court "shall determine whether there are substantive grounds for relief." In making this determination, the trial court is to consider the allegations of the petition for post-conviction relief and the particular facts upon which a petitioner bases his claim. The court is also required to consider "in addition to the petition and supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court and the court reporter's transcript." R.C.2953.21(C). If, upon such consideration, the trial court finds that there are no substantive grounds for relief which would warrant a hearing, the court may dismiss the petition without a hearing. *State v. Jackson,* 64 Ohio St.2d 107, 110. (1980).

In addition, the Ohio Supreme Court has determined that it is incumbent upon a petitioner to do more than simply assert a claim to be entitled to a hearing on his petition. Where the record indicates that the petitioner is not entitled to relief, the petitioner must also support the

3

allegations in a petition for postconviction relief with evidentiary documents containing sufficient operative facts to support the allegations or claims for relief.  Otherwise, the petition is subject to dismissal without a hearing.  *State v. Kapper,* 5 Ohio St. 3d 36, 38. (1983).

Moreover, such supporting evidence must meet a minimum level of cogency, and evidence in the form of the petitioner's own self-serving affidavit alleging a constitutional deprivation will not compel a hearing.  *State v. Combs*, 100 App.3d 90, 98, (1st Dist. 1994) citing *State v. Kapper,* supra.  A trial court may discount self-serving affidavits from the petitioner or his family members. *State v. Moore* (1994), 99 Ohio App.3d 748, 755-756, 651 N.E.2d 1319.  Although a trial court should give deference to affidavits filed in support of a post-conviction relief petition, it may exercise its discretion when assessing the credibility of the affidavits. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 714 N.E.2d 905, paragraph one of the syllabus.

Furthermore, the doctrine of res judicata is applicable to post-conviction relief proceedings.  In *State v. Perry,* 10 Ohio St. 175 (1967), the Ohio Supreme Court held that: "Under the doctrine of *res judicata,* a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except on appeal from that judgement, any defense or claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in the judgment of conviction or on appeal from that judgment." *Id.* at 180.

In *State v. Cole,* 2 Ohio St. 3d 112 (1982), the court clarified that res judicata is a proper basis upon which to dismiss a petition for post-conviction relief where the issue sought to be presented could have been raised at trial or on direct appeal, and where "such issue could fairly have been determined without resort to evidence de hors the record." *Cole,* at paragraph one of the syllabus. Furthermore, evidence de hors the record submitted with the petition must demonstrate that these claims could not have been raised on appeal based on the information in

4

the original record. *State v. Lawson* 103 Ohio App. 3d 307, 315(12th Dist.1995).

Finally, "the violation upon which the petitioner relies to establish his right to relief must be of constitutional dimension, and it must have occurred at the time the petitioner was tried and convicted of a criminal offense." *State v. Powell* 90 Ohio App. 3d 260, 264(1st Dist.1993).

Additionally, summary judgment in the respondent's favor in post-conviction proceedings is appropriate when: (1) the state is entitled to judgment as a matter of law, (2) the state identifies affirmative evidence showing no genuine issue as to any material fact and (3) reasonable minds could come to but one conclusion, which is against the defendant, who is entitled to have the evidence construed most strongly in his favor. Civ.R. 56; *State v. DePew*, 97 Ohio App.3d 111, 113(12th Dist.1994), *Harless v. Willis Day Warehousing Co.* 54 Ohio St.2d 64, 66 (1978). The Eleventh District further explained the summary-judgment process in post-conviction in another Trumbull County capital case. "In a summary-judgment exercise, the court must construe conflicting evidence in petitioner's favor. Civ.R. 56(C). The respondent is entitled to summary judgment if "there is no genuine issue as to any material fact" and "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Id." *State v. Williams*, 165 Ohio App.3d 594, 601, 2006-Ohio-617, 847 N.E.2d 495, 500, ¶ 23.

With this background established, Respondent will address Petitioner's remaining six Claims for Relief individually.

5

## RESPONSE TO PETITIONER'S FIRST CLAIM FOR RELIEF

In her First Claim for Relief, Petitioner argues that her convictions are void and voidable because of an underrepresentation of African Americans in the venire from which the petit jury was drawn.

Petitioner supplies no credible evidence to support her broad brush statement at ¶37 of her Petitioner that "there was an underrepresentation of African Americans in the venire from which her jury was drawn."  In her own affidavit, Defense Ex. D, she writes "I *think* that there were at least two or three blacks in the jury pool."  She claims the prosecutor excused them through peremptory challenges and her counsel did not object.  Apparently aware of the fact that she has no other evidence whatsoever to support her allegation, she asks this Court to order the discovery in hopes of generating the evidence which, thus far, Petitioner does not have.  However, the Eleventh District Court of Appeals held in *State v. Lorraine* 11th Dist. No.  95-T-5196, 1996-WL-207676 (Feb. 23, 1996), that the burden is on the *petitioner* to submit evidentiary documents to support his claim, and the trial court has no statutory authority to compel discovery.  Therefore, unless a hearing is granted, the petitioner is not entitled to conduct discovery.  *Lorraine,* supra, at *5.

The court echoed these sentiments in another Trumbull County capital case a few years later. "This court has previously held that R.C. 2953.21 places the burden on the petitioner to make the initial evidentiary presentation containing sufficient operative facts to demonstrate a claim for postconviction relief to merit a hearing. *State v. Lorraine* (Feb. 23, 1996), Trumbull App. No. 95-T-5196, unreported at 10. Furthermore, the power to conduct and compel discovery is not included within the trial court's statutorily defined authority. *Id.*" *State v. Getsy*, 11th Dist. Trumbull No. 98-T-0140, 1999 WL 1073682, *8 (Oct. 22, 1999). The Respondent submits that

6

Petitioner is not entitled to a hearing on this or any other claim, and therefore she is not entitled to discovery.

Nevertheless, Petitioner pegs the African American population in Trumbull County at 7.9 percent and claims 140 persons reported for jury duty for her case. Petition at ¶39.  Not only does she not supply this court with any figures as to the actual racial and ethnic mix of her jury pool, she even acknowledges that both the record and the juror questionnaires are silent on this issue. ¶38.  Because Petitioner has failed to submit sufficient evidentiary documents to support her claim, it is therefore subject to dismissal without hearing.  See *Kapper,* supra, at 38.

Furthermore, Trumbull County selects its potential jurors from the voter registration rolls, a practice which has been upheld repeatedly by various courts, including the Ohio Supreme Court. *State v. Spirko*, 59 Ohio St. 3d 1, 36, (1991) citing *State v. Johnson*, 31 Ohio St. 3d 106 (1972).  The Eleventh District has recently weighed in on this issue as well: "Assuming, arguendo, that the racial composition of [appellant's] jury pool did not fairly represent the community, this fact does not constitute a violation of the Sixth Amendment. *State v. McNeill,* 83 Ohio St.3d 438, 444, 700 N.E.2d 596 (1998) ('underrepresentation on a single venire is not *systematic* exclusion); [*State v.*]*Jones,* 91 Ohio St.3d 335, 340, 744 N.E.2d 1163 ('[a]ppellant must do more than show that his particular panel was unrepresentative'). As noted above, potential jurors in Ashtabula County are chosen at random from the list of electors. The Ohio Supreme Court has repeatedly held that such a method is not inherently unconstitutional. *Jones* at 340, 744 N.E.2d 1163; *State v. Yarbrough,* 95 Ohio St.3d 227, 2002–Ohio–2126, 767 N.E.2d 216, ¶ 106 ('the calling of venires from voter registration lists * * * does not systematically exclude blacks from the jury-selection process."). *State v. Johnson*, 11th Dist. No. 2012-A-0016, 2013-Ohio-1286,  ¶ 42.

7

To demonstrate an alleged constitutional violation in the jury selection process, Petitioner must show that the jury selection process systematically excluded members of a distinctive group. *State v. Fulton*, 57 Ohio St. 3d 120, 125, (1991) citing *Duren v. Missouri* (1979), 439 U.S. 357, 364. *Duren* sets forth the following standards in determining whether a petit jury was selected from a fair cross section of the community:

> "To establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a defendant must show: '(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process'."

*Duren* at 364. Even if this Court takes at face value that Petitioner's venire is underrepresented by African Americans, she does not demonstrate that the purported underrepresentation is due to any systematic exclusion with the jury-selection process. Underrepresentation on a single venire is insufficient to show systematic exclusion. *State v. McNeill*, 83 Ohio St. 3d 438, 444(1998). Therefore, Petitioner fails to set forth sufficient operative facts establishing substantive grounds for relief.

Furthermore, Respondent submits this claim is barred by the doctrine of res judicata. The racial make-up of the final jury panel or the jury pool would have been evident from the jurors who appeared for jury service. If, in fact, there was an underrepresentation of minorities, such a fact could have been noted in the record, and the claim could have been raised as a proposition of law in Petitioner's direct appeal. It was not, therefore, the doctrine of res judicata applies. *Perry,* supra, at 180; *Cole,* supra, at paragraph one of the syllabus.

Petitioner at ¶41 references a study conducted by Diane Wiley of the National Jury Project who criticized the make-up of an earlier Trumbull County capital case, *State v. Roderick Davie.* Trumbull County Common Pleas No. 1991 CR 288. Ms. Wiley did not supply an

8

affidavit for Petitioner's case, but she did provide one for Petitioner's co-defendant's postconviction petition. See, *State v. Jackson,* Trumbull County Common Pleas No. 2001-CR-794. The trial court and reviewing court were completely unimpressed with her findings: "Upon reviewing the prior precedent in this state regarding the 'fair cross-section' requirement of the Sixth Amendment, this court concludes that appellant's exhibits were insufficient to make a prima facie showing of systematic exclusion of African-Americans. In *State v. McNeill* (1998), 83 Ohio St.3d 438, 700 N.E.2d 596, the Ohio Supreme Court's analysis of the third prong of the *Fulton* test consisted of the following: 'Moreover, [the defendant's] systematic-exclusion claim is based solely on alleged underrepresentation on *his* venire. But underrepresentation on a single venire is not *systematic* exclusion. See *Ford v. Seabold* (C.A.6, 1988), 841 F.2d 677, 685. Cf. [*Duren v. Missouri* (1979), 439 U.S. 357,] at 366, 99 S.Ct. 664, 58 L.Ed.2d 579, * * * (discrepancy 'not just occasionally, but in every weekly venire for a period of nearly a year' showed systematic exclusion).' (Emphasis sic.) Id. at 444. In light of the reference in *McNeill* to the *Duren* precedent, it follows that a prima facie showing of systematic exclusion must be predicated upon a continuing pattern of underrepresentation. Thus, *the conclusory statement in the Wiley affidavit, based solely on her analysis of the jury venire in the Davie case, would not be sufficient to establish a continuing pattern.* Similarly, in light of the fact that the trial in the instant case was held approximately ten years after the trial in *Davie,* it cannot be said that the underrepresentation in both cases shows a continuing pattern." (Emphasis added). *State v. Jackson*, 2004-T-0089, 2006-Ohio-2651, ¶¶ 111-113, *cause dismissed,* 110 Ohio St.3d 1407, 2006-Ohio-3306, 850 N.E.2d 69, ¶¶ 111-114 (2006).

Respondent would point out that Ms. Wiley's study has failed to persuade any court that the racial make-up of Roderick Davie's jury pool warranted a reversal. Davie was executed

9

August 10, 2010.[2]

As stated previously, Petitioner claims there were no "blacks" on her jury, and that she "thinks" there were two or three blacks in the jury pool. She further claims the prosecutor used peremptory challenges to excuse "both jurors." Defense Ex. D. This claim is not supported by another other piece of evidence, such as an affidavit from any of the trial attorneys who also recall two blacks subject to removal by peremptory challenge. Such supporting evidence must meet a minimum level of cogency, and evidence in the form of the petitioner's own self-serving affidavit alleging a constitutional deprivation will not compel a hearing. *State v. Combs* (1994), 100 App.3d 90, citing *State v. Kapper,* supra. Respondent submits Petitioner's self-serving recollections should be given no weight, and should not compel a hearing.

Furthermore, Respondent attaches the affidavits of Assistant Prosecutors Christopher Becker and Kenneth Bailey who prosecuted Petitioner on behalf of the State of Ohio and were present during the peremptory challenges. By their recollection, there *were* in fact two African American women dismissed with the use of a peremptory challenge, Karen Tilton, and Maxine Howard. However, they point out, it was the *defense* who excused Tilton, while the State excused only one African-American, Howard. (T.p. Vol. XXI, p. 4600-4601, p.4603). In their affidavits[3], Atty. Becker and Atty. Bailey state that Howard was excused for numerous race neutral reasons, including the fact that she would require the State to prove its case "beyond a shadow of a doubt," would be inclined to believe anyone who proclaimed their innocence, had apprehensions about convicting the wrong person of a crime and was uncertain as to whether she would impose the death penalty. (T.p. Vol. IV, p. 966-1015, T.p. Vol. V, p. 1023-1070). As a

---

[2] Ohio Department of Rehabilitation and Corrections website.
[3] The affidavits attached to this document are copies. The originals are in Petitioner's court file affixed to the State's November 2, 2004, Motion for Summary Judgment.

10

result, even if her counsel had raised a so-called *Batson* challenge pursuant to *Batson v. Kentucky* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), or objected to Ms. Howard's dismissal, it is likely such objection would have been overruled.

Respondent maintains that pursuant to *Jackson, supra* at 110, Petitioner has failed to establish substantive grounds for relief on this or any other Claim for Relief, and therefore, her Petition must be dismissed without hearing. Since she is not entitled to a hearing, she is not entitled to discovery. For these reasons, Petitioner's First Claim for Relief is without merit, is subject to summary judgment and should be dismissed without hearing.

11

**RESPONSE TO PETITIONER'S SECOND CLAIM FOR RELIEF**

As a logical spin-off from her First Claim for Relief, Petitioner next argues that because there was an underrepresentation of African Americans in her *petit* jury pool, there was an underrepresentation of African Americans in her *grand* jury pool. However, this argument is equally flawed her as it was in the first claim.

Petitioner fails to attach any documentary evidence to support her charge of minority underrepresentation at the grand jury level. Furthermore, she fails to supply this Court with *any* data with respect to the racial composition of her grand jury. If she cannot prove the racial *composition* of the grand jury, it is axiomatic that she cannot prove racial *discrimination*. Therefore, this claim is equally subject to dismissal without hearing. *Kapper,* supra, 38.

Just as in the First Claim of Relief, Petitioner at ¶53 seeks court-ordered discovery to generate the evidentiary material which her petitions lack. For the reasons articulated supra, this Court again must just say no to court ordered discovery in a post-conviction exercise. See *Lorraine*, supra, at * 5. Additionally, Petitioner appends a request for the appointment of experts to support her claim. Petition at ¶53. The Eleventh District Court of Appeals, in Petitioner's co-defendant's post-conviction appeal, declined to require the trial courts to appoint experts in postconviction proceedings: "Like the discovery issue, this court has already addressed the question of the appointment of an expert in a postconviction proceeding. In *State v. Williams* (Oct. 16, 1998), 11th Dist. No. 97-T-0153, 1998 Ohio App. LEXIS 4884, we began our discussion by stating that the right to an expert was tied to the constitutional right to counsel. The *Williams* court further noted that, under the relevant Ohio Supreme Court precedent, a criminal defendant's constitutional right to counsel did not extend to a proceeding under R.C. 2953.21 because a postconviction proceeding was civil in nature. Based upon this precedent, the *Williams*

12

court ultimately held that the same logic would apply to experts; i.e., since a proceeding under R.C. 2953.21 is considered civil, there is no constitutional right to expert assistance. In applying the *Williams* logic in subsequent cases, this court has also held that if a postconviction petitioner does not initially demonstrate substantial grounds to support an evidentiary hearing on a petition, he is not entitled to the appointment of any experts. *State v. Getsy* (Oct. 22, 1999), 11th Dist. No. 98-T-0140, 1999 Ohio App. LEXIS 4975, 1999 WL 1073682." *State v. Jackson*, 11th Dist. No. 2004-T-0089,  2006-Ohio-2651, ¶¶ 24-25,  *cause dismissed,* 110 Ohio St.3d 1407, 2006-Ohio-3306, 850 N.E.2d 69.

Other Ohio appellate districts have followed this logic. "However, 'R.C. 2953.21 does not provide a right to funding or appointment of expert witnesses or assistance in a postconviction petition.' *State v. Madison,* Franklin App. No. 08AP-246, 2008-Ohio-5223, at ¶ 16, citing *State v. Tolliver,* Franklin App. No. 04AP-591, 2005-Ohio-989, at ¶ 25. See, also, *State v. Smith* (Mar. 15, 2000), Lorain App. No. 98CA007169; *State v. Hooks* (Oct. 30, 1998), Montgomery App. Nos. CA 16978 & CA 17007. Therefore, '[w]ith exceptions not applicable here, it is not error for a court to deny a defendant's request for [expert assistance] in support of his or her petition for postconviction relief.' *State v. Starks,* Lucas App. No. L-08-1221, 2009-Ohio-1125, at ¶ 38. See, also, *State v. Davis,* Licking App. No.2008-CA-16, 2008-Ohio-6841, at ¶ 29 ('A petitioner in a post conviction proceeding is not entitled to the appointment of an expert witness to assist in discovery.'); *Tolliver* at ¶ 25; *Hook." State v. Hicks*, 4th Dist. No. 09CA15, 2010-Ohio-89, ¶ 22. Petitioner is not entitled to experts on this issue, because she again fails to demonstrate substantial grounds for relief to warrant a hearing.  Pursuant to *Lorraine* and *Jackson,* Petitioner is entitled to neither court-ordered discovery, nor court-appointed experts.

Moreover, the Ohio Supreme Court has held that "not every grand jury has to represent a

'fair cross-section,' so long as the selection process is nondiscriminatory." *State v. Williams*, 79 Ohio St. 3d 1, 17(1997). Likewise, the court specifically held that since the use of voter registration in petit jury selection was constitutionally sound and neither systematically nor intentionally excludes any racial group, the same method of selection should be equally permissible for the selection of the grand jury. "We see no reason to apply a different principle to the selection of the grand jurors." *State v. Issa,* 93 Ohio St. 3d 49, 62 (2001). As stated supra, Trumbull County relies upon the voter registration rosters for its grand jurors. Because the Ohio Supreme Court has consistently ruled that this method does not exclude any minority, Petitioner cannot prove discrimination or constitutional violation.

For the above stated reasons, Petitioner cannot demonstrate substantive grounds for relief, the claim is subject to summary judgment and therefore this claim must be dismissed without hearing.

14

## RESPONSE TO PETITIONER'S THIRD CLAIM FOR RELIEF

Petitioner in this claim alleges ineffective assistance of trial counsel, the same counsel she personally praised in open court during her unsworn statement. (T.p. Vol. XXVIII, p. 6287, p. 6296-6297). Any claims of ineffective assistance of counsel are completely belied by the record in this case and wholly unsupported by her petitions and the exhibits.

As a general principle, it is well-settled law where a petitioner asserts a claim of ineffective assistance of counsel, he or she bears the initial burden to submit evidence to demonstrate that his defense was prejudiced by counsel's ineffectiveness. If he or she fails to do so, no evidentiary hearing is required. *State v. Pankey* 68 Ohio St. 2d 58, 59 (1981).

The Eleventh District Court of Appeals explained in *State v. Pierce*, 128 Ohio App. 3d 578, 586 (11th Dist. 1998), that in asserting an ineffective assistance claim, the petitioner must submit materials containing sufficient operative facts to demonstrate both prongs of the two-part test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 687: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. Prejudice will not be found unless the defendant demonstrates there is a reasonable possibility that, if not for counsel's errors, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St. 3d 136, 143(1989). "In the absence of positive proof to the contrary, certainly there is a reasonable inference that one licensed by the state to practice law and appointed by a court to represent an accused did competently and properly represent such accused during his trial." *Vaughn v. Maxwell*, 2 Ohio St. 2d 299, 301(1965). In order to overcome this presumption of effectiveness, the petitioner must submit sufficient operative facts or evidentiary documents that, if proven would show that the petitioner was prejudiced by ineffective assistance of counsel. *State v. Smith,* 36 Ohio App. 3d 152, 163 (1987).

15

With this background in mind, Respondent turns to the Petition. In ¶¶58-62, Petitioner asserts that her counsel failed to object to the peremptory challenge of two black jurors by the prosecution. She openly acknowledges that the record makes no reference to any juror's race excused with a peremptory challenge, or by any other method. Petition ¶62.

On this topic, the Ohio Supreme Court has reasoned:

> "***Recognizing that voir dire is largely a matter of strategy and tactics, we find that counsel in the present case was in a much better position to determine whether the prospective jurors qualified to be on the panel. The reason for excusing these prospective jurors may have been readily apparent to those viewing the jurors as they answered the question."

*State v. Keith,* 79 Ohio St.3d 514, 521(1997). Furthermore, the Respondent refers the Court to its response to Petitioner's Second Claim for Relief, supra, and notes that by the State attorneys' recollection, the State used only *one* peremptory challenge to remove an African-American juror, and the State would have been able to articulate race neutral reasons for doing so. Respondent's Ex. 1 & 2. Thus, even had the objection been raised, the juror would have been dismissed anyway. Therefore, counsel's performance was not deficient, nor was the lack of the objection outcome determinative.

Petitioner next complains that her trial counsel failed to make an opening statement, presumably at the mitigation phase because counsel did make a brief opening statement during the guilt phase. (T.p. Vol. XXIII, p. 5095-5096). Ohio courts have held that the decision to waive opening statements is a tactical decision that does not rise to the level of ineffective assistance of counsel. *State v. Williams*, 74 Ohio App.3d 686, 700 (1991), *Bradley*, supra, at 143. Furthermore, just what does Petitioner *now* contend her counsel should have told her jury? Counsel is on record opposing her decision to ask for the death penalty during in camera proceedings before the mitigation phase. (T.p. Vol. XXVIII, p. 6225-6227). Does Petitioner

16

now suggest her counsel should have chimed in with a companion argument that she should be executed? Or should they have argued that the jury should spare her life in direct contravention to their client's well documented wishes? Both scenarios place trial counsel in an untenable position.

Because Petitioner clearly and unequivocally sought only one outcome in her mitigation phase, the imposition of the death penalty, she can now argue no deficient performance on behalf of her trial counsel for not offering additional arguments to compliment her own. She was obviously persuasive because she received the penalty she sought, so she cannot brand counsel ineffective for not asking for the death penalty too. Nor can she argue that if counsel had argued contrary to wishes for a life sentence that the outcome would have been different. She cannot and does not argue prejudice because she received the sentence she requested. As such, she fails to demonstrate ineffective assistance of trial counsel and fails to merit a hearing. *Kapper,* supra, at 38.

Furthermore, the lack of an opening statement would have been apparent on the face of the record, and could have been raised on direct appeal. It is therefore barred by the doctrine of res judicata. *Perry,* supra, at 180; *Cole* supra, at paragraph one of the syllabus. In fact, it must be mentioned that Petitioner raised an ineffective assistance of counsel claim in her merit brief to the Ohio Supreme Court in her first direct appeal. She attacked her trial counsel for purportedly not explaining the full effects of Petitioner's decision to waive the presentment of mitigating evidence. The Ohio Supreme Court soundly rejected that argument. *State v. Roberts,* 110 Ohio St. 3d 71, 2006-Ohio-3665, 850 N.E. 2d 1168, ¶¶146-148.

Next, at ¶¶64 through 71, Petitioner contends that her counsel was ineffective in failing to introduce her co-defendant Nathaniel Jackson's videotaped statement to police at her trial.

17

(Petitioner's Ex. B). Petitioner fails to detail to this Court just how her trial counsel was supposed to circumvent the Ohio and Federal Rules barring hearsay to facilitate the inclusion of Jackson's tape in her trial.

> Evid. R. 804(B)(3) reads as follows:
>
> "(3) *Statement against interest.* A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. *A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.* (Emphasis added)."

Petitioner does not explain how her co-defendant's self-serving and implausible excuse of self-defense has any indicia of trustworthiness as required by Evid. R. 804(B)(3). Indeed, "circumstantial indicia of corroboration may include proof that the declarant repeated his story often and consistently, or evidence that the statement was made to someone who would respond officially, e.g., a law enforcement officer." *State v. Akers* No. 95-P-0073, 1997 WL 184760 (April 4, 1997), at \*9, quoting *State v. Long,* Clark App. No. 1893, 1984 WL 5375 (July 12, 1984), at \*8. Petitioner introduces no evidences to suggest Jackson repeated his story of self-defense and there is certainly nothing in the record from Petitioner's case to suggest that it might be true. Therefore, Petitioner cannot demonstrate that the video tape would have been admissible, and therefore, she cannot argue her trial counsel ineffective for not introducing same.

Issues of admissibility aside, it can easily be argued that trial counsel concluded the Jackson video would not have been beneficial to Petitioner's defense, and therefore, as a matter of trial strategy, made a conscious decision not to use it. A review of Petitioner's Ex. B will only demonstrate that Jackson admitted shooting Mr. Fingerhut, albeit in self-defense. The claim is

18

completely fallacious given that the rest of the record in Petitioner's case shows more pre-event planning and preparation for Mr. Fingerhut's homicide than is commonly associated with the average royal wedding. It is reasonable trial strategy to consciously choose to withhold the Jackson video from Petitioner's jury.

Finally, she cannot argue that the video-taped statement would have been outcome determinative. It obviously did not sway Jackson's jury. Not only did his jury convict him as the principle offender, it recommended the death penalty. *State v. Jackson,* 107 Ohio St. 3d 300, 2006-Ohio-1, 839 N.E. 2d 362. Jackson's own attorneys viewed the video so detrimental to his case that they unsuccessfully sought to suppress it. *Id.* at ¶¶69-72. This Court must ask itself why Petitioner's counsel was ineffective in opting not to use the Jackson video when Jackson himself tried to keep it from his own jury. Therefore, because Petitioner cannot demonstrate that Jackson's video tape would have been outcome determinative, she cannot argue that her counsel was ineffective.

Petitioner next argues counsel's ineffectiveness by their decision to forego closing arguments during the guilt phase of this trial. (T.p. Vol. XXVIII, p.6146). A waiver of closing argument is not per se ineffective. Indeed, "[d]efendant may have waived arguments as a tactical device to prevent the state from 'staging a strong rebuttal'." *State v. Robb*, 88 Ohio St. 3d 59, 74 (2000) quoting *State v. Burke*, 73 Ohio St. 3d 399, 404(1995). As with the waived mitigation opening arguments, Petitioner's trial counsel's decision to waive closing arguments may very well have been a tactical move. Since Petitioner cannot argue that the jury would not have convicted her had counsel delivered a closing argument, she cannot meet the final prong of *Strickland* or *Bradley* test for ineffectiveness. Thus, her argument is subject to dismissal without hearing.

19

Furthermore, this argument is barred by the doctrine of res judicata. As with the waiver of mitigation opening statements, the waiver of guilt phase closing statements is apparent from the record and could have been raised on direct appeal.  Therefore, it is barred by the doctrine of res judicata. *Perry,* supra, at 180; *Cole* supra, at paragraph one of the syllabus.

Petitioner also now claims in her affidavit that she "begged" her counsel to allow her to testify.  Defense Ex. D. As a reminder, Petitioner did not testify during the guilt or penalty phase of her trial, but offered a 47-page unsworn statement during her mitigation hearing.  (T.p. Vol. XXVIII, p. 6253-6300).  It is well-settled Ohio law that a decision regarding whether to call a defendant to testify on his or her own behalf during the course of trial is a matter of trial strategy. *State v. Adkins,* 144 Ohio App.3d 633, 646, 761 N.E.2d 94 (12th Dist. 2001) (noting that "the decision whether to call a defendant as a witness falls within the purview of trial tactics").

Moreover, "[a]lthough the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. This is so because the defendant's attorney is presumed to follow the rules of professional conduct and is 'strongly presumed to have rendered adequate assistance' in carrying out the general duty 'to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.' A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. At base, a defendant must 'alert the trial court' that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred by the defendant's conduct. Waiver is presumed from the defendant's

20

failure to testify or notify the trial court of the desire to do so." (Internal citations omitted). *State v. Huber*, 8th Dist. No. 98128, 2013-Ohio-97, ¶ 9 citing *Gonzales v. Elo,* 233 F.3d 348, 356–357, 2000 U.S.App. LEXIS 29507, 2000 WL 1725146 (6th Cir.2000).

Contrary to Petitioner's self-serving affidavit, this Court must presume Petitioner waived her right to testify on her own behalf in favor of her 47-page soliloquy which did nothing to mitigate her guilt in the Fingerhut homicide. While she had every opportunity to apologize for her conduct or try to even minimize her role in the killing of her common law husband, she chose instead to trash the Howland Police, the local media, and the jurors. The clear advantage to this tactic is that she was not subject to cross-examination; she could control the message and not face questions about her behavior from the State. Moreover, Petitioner's affidavit does not offer even a summation of testimony which would have changed the course of her trial and caused the jurors to acquit, rather than convict her. Therefore, even if her attorneys ignored her wishes to offer sworn testimony, her Petition fails to explain how that would have changed the outcome of her case.

The Respondent does not dispute that both Petitioner's sister and son expressed dissatisfaction with her trial counsel's performance. Defense Ex. E & F. However, it is obvious from the record that Petitioner tied their hands and forbade them from offering any defense in mitigation. The Ohio Supreme Court clearly articulated that Petitioner's dearth of mitigation was self-inflected and not the result of any professional shortcomings by her counsel. "The record shows that Roberts understood what she was doing when she decided to present only her unsworn statement during the mitigation hearing. The record also establishes that the trial court explained sufficiently the ramifications of that decision, that Roberts essentially told the trial court that she was not presenting additional mitigating evidence because she wanted to be given

21

a death sentence, and that she disregarded her attorneys' advice and instead directed them not to present any mitigating evidence beyond her unsworn statement. An attorney does not render ineffective assistance by declining, in deference to a client's desires, to present evidence in mitigation. See, e.g., *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *State v. Cowans* (1999), 87 Ohio St.3d 68, 81, 717 N.E.2d 298; *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47. Her claims that counsel was constitutionally ineffective fail." *Roberts I at* ¶ 148. While Petitioner's son and sister may have offered testimony sufficient to sway Petitioner's jury to recommend a life, rather than death sentence, Petitioner personally and deliberately pulled that evidence from consideration.

Finally, Petitioner again requests discovery to bolster her claim of ineffective assistance of counsel. The State reiterates that it is not this Court's duty to order discovery, but the petitioner's burden to produce the evidence necessary to support the claim. *Lorraine,* supra at *5.

Petitioner has not submitted "evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *Pankey,* supra, at 59. Her conclusory statement at ¶ 76 that the failure of her counsel to adequately represent her at the trial stage resulted in a sentence of death which does not comply with minimum constitutional standards of reliability is not supported by her exhibits, is belied by the record and by the State's exhibits. For these reasons, her claim of ineffective assistance of counsel is subject to summary judgment and dismissal without hearing.

22

**RESPONSE TO PETITIONER'S FOURTH CLAIM FOR RELIEF**
**Withdrawn by Petitioner**

**RESPONSE TO PETITIONER'S FIFTH CLAIM FOR RELIEF**
**Withdrawn by Petitioner**

**RESPONSE TO PETITIONER'S SIXTH CLAIM FOR RELIEF**

In her Sixth Claim for Relief, Petitioner alleges she was not competent to waive her presentation of mitigating evidence during her penalty phase.  The record states otherwise and the exhibits cited by Petitioner provide no evidence that on June 3, 2003, she was incompetent to waive the presentation of evidence in favor of her lengthy unsworn statement.

By way of review, Judge Stuard fully scrutinized Petitioner's stated wishes to present no mitigation evidence as well as representations by her trial counsel that she was making a "knowing and voluntary and intelligent" decision  regarding the waiver. (Trial T.p. Vol. XXVIII, p. 6227).  The judge ordered that Petitioner submit to an evaluation by Dr. Thomas Eberle, a board certified forensic psychologist.  (Trial T.p. Vol. XXVIII, p. 6629).  Dr. Eberle testified during an in-chambers hearing that she was competent to make that decision. "[I]t is my opinion***that she's now mentally and rationally making this decision [to forego mitigation evidence] for reasons that are not unintelligent.***I find no psychiatric or psychological abnormality that would prevent her from having the faculties needed to make that decision in a rational way." (Trial T.p. Vol. XXVIII, p. 6231).  Her "rational" and "not unintelligent" reasons became apparent during competency evaluations for her first re-sentencing in 2006 when she told Dr. Thomas Gazley that she preferred a sheltered existence on death row to life in general population among "these animals."  (T.d. #211, #212, State's Ex. 1, p.2).

With this brief review, the State first submits that this issue is barred by res judicata for

23

further review at this time. *Perry,* supra, at 180; *Cole* supra, at paragraph one of the syllabus. The specific topic of Petitioner's competency was addressed by Judge Stuard prior to her mitigation hearing. Dr. Eberle conducted a post-guilt phase, pre-mitigation phase evaluation and found her competent. As such, the status of petitioner's competency could have been raised in her direct appeal, and is therefore barred by res judicata.

Though Petitioner did not couch the argument in terms of "competency" in her first direct appeal, the Ohio Supreme Court had much to say about her state of mind at the time she waived mitigation: "The court then heard from Dr. Thomas Eberle, a psychologist who had evaluated Roberts earlier during the prosecution and who did so again just prior to the hearing. Dr. Eberle testified that Roberts's decision to forgo presentation of mitigating evidence was rational. He further found that she suffered no psychiatric or psychological abnormality that would prohibit a rational decision regarding presentation of mitigating evidence." *Roberts I*, supra, ¶ 135. Respondent submits that "psychiatric or psychological abnormality" would include mental incompetency which Dr. Eberle specifically ruled out. (T.p. Vol. XXVIII, p. 6230-6231).

The court continued: "[T]he record clearly establishes that the trial judge specifically addressed the likelihood of the jury's imposing a death sentence if Roberts failed to present mitigating evidence and that she understood that a death sentence was the probable outcome. In fact, Roberts asked the jury to impose that sentence. We reject her claim that she did not understand that the waiver would yield such a result." *Roberts I*, at ¶ 141. Thus, the issue of Petitioner's mental status at the time she waived presentation of mitigating evidence could have been, and in fact was, raised in her direct appeal. Moreover, Petitioner did raise this claim of mental incompetence at the mitigation hearing in her second direct appeal to the Ohio Supreme Court. The Ohio Supreme Court held, "[t] hese claims are res judicata. They are based entirely

24

on the record of the 2003 hearing. Thus, Roberts could have, and should have, raised these issues in *Roberts I*. She is barred from raising them now." *Roberts II,* at ¶95. If the Ohio Supreme Court viewed this claim as non-reviewable in 2013, this Court is without jurisdiction to consider it now.  This claim is unquestionably res judicata barred.

Further, based on the doctrine of the law of the case, this Court has no discretion to deviate from a decision already considered by the Ohio Supreme Court.  It is well-settled Ohio law that "[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." *Nolan v. Nolan,* 11 Ohio St.3d 1, 462 N.E.2d 410, syllabus (1984). Further explaining *Nolan,* the Eleventh District Court of Appeals has held the law of the case doctrine is typically understood as a rule of judicial hierarchy whereby " 'the decision of a reviewing court in a case remains the law of the case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.' *Keytack v. Warren,* 11th Dist. No.2005-T-0152, 2006-Ohio-5179, at ¶ 56, quoting *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 462 N.E.2d 410." *State v. King,* 11th Dist. No. 2009-P-0040, 2010-Ohio-3254, ¶ 56. Therefore, this issue is not only res-judicata barred, but law-of-the-case barred.

Petitioner intimates at ¶114 that her self-reported suicide attempt constitutes indicia of mental incompetency.  The Eleventh District, as well as other Ohio appellate courts, has rejected the theory that suicidal tendencies are dispositive of mental incompetence: "Several districts have found that a suicide attempt, when it is not coupled with any other evidence of a defendant's incompetence, does not warrant a conclusion that a defendant is incompetent to either stand trial or enter a plea of guilty. *See State v. Thayer,* 6th Dist. No. E–08–059, 2009–Ohio–5198, ¶ 60 (a plea was knowingly and intelligently made, although the defendant attempted suicide prior to

25

entering the plea, when no other evidence was present to show the defendant was incompetent); *State v. Robinson,* 8th Dist. No. 89136, 2007–Ohio–6831, ¶ 28 (where the only evidence related to a defendant's incompetence was a suicide attempt, and the record showed that he was properly advised of his rights and understood them, the trial court did not err by failing to hold a competency hearing)." *State v. Wise,* 11th Dist. No. 2012-T-0028, 2012-Ohio-4896, ¶ 19.

Respondent does not dispute that Petitioner used her unsworn statement to champion the cause of racial equality, instructing her jurors that because her co-defendant, who is black, received the death penalty, the panel was obligated to make the same recommendation for her. Petitioner re-enforces this position in her Ex. D. She does not suggest that her perception of racial inequality was the product of any confusion, coercion or incompetence. Therefore, Ex. D does not provide sufficient operative facts to support Petitioner's allegations or claims for relief. Therefore, this claim is subject to dismissal without a hearing. *Kapper, supra,* at 38.

At ¶124, Petitioner argues that "Roberts was unable to work with counsel. The sentencing hearing is replete with defense counsel's frustration with his inability to communicate with his client." Petitioner does not cite to one episode of "frustration" - in the record or de hors the record - wherein either of Petitioner's trial counsel was unable to communicate with her. She may have elected to ignore their advice about presenting mitigating evidence, but such an election does not equate to an "inability to communicate." Indeed, the record overflows with examples of Petitioner's well-honed communication skills through her letters to Jackson, her phone calls to Jackson, her 47-page unsworn statement (T.p. Vol. XXVIII, p. 6253-6300), and her 20-page allocution (2007 Sentencing T.p. 45-65). Politely put: Petitioner has never been at a loss for words and any suggestion that Petitioner suffers from an inability to communicate is imploded by the record.

26

Nevertheless, Respondent recognizes that Petitioner's Ex. A discusses *some* mental health issues which jurors may, or may not, have considered mitigating to the point where they would have recommended a life sentence. However, Petitioner forbade her trial counsel from submitting similar records for the panel's consideration. (T.p. Vol. XXVIII, p. 6224-6225). The Ohio Supreme Court briefly referenced her instructions to her trial attorneys prior to mitigation. "Trial counsel described for the judge the evidence that could be presented in mitigation. Counsel noted that professionally and personally, he disagreed with Roberts's decision not to present such evidence but that he believed her competent and that the decision was the product of rational thought." *Roberts, I,* at ¶ 134.

Petitioner references her Ex. C, a 3-page affidavit from Dr. James R. Eisenberg who evaluated Petitioner *after* her October 29, 2007, resentencing, presumably for post-conviction purposes as it is dated August 7, 2008. The bulk of the affidavit is nothing more than a reprint of Dr. Eisenberg's curriculum vitae. It does not appear Dr. Eisenberg ever met with or interviewed Petitioner. Instead, he based his opinion on records dating back several years. He concludes Petitioner suffers from a bipolar disorder. Notably, he also states he could not discern whether Petitioner malingered on an I.Q. test administered in 1999. Like suicidal tendencies, a bipolar disorder is not dispositive of mental incompetence. *State v. Baughman,* 6th Dist. No. L-11-1045, 2012-Ohio-5327, ¶36. Most significantly, Dr. Eisenberg did not diagnose Petitioner as mentally incompetent, even in 2008, five years after the mitigation hearing in question. As for the supposed drop in I.Q. to a reported 65 in 1999, Dr. Donald Degli writes, "her responses seemed to be an exaggeration, dramatization, confabulation or malingering." Petitioner's Ex. G. In the common parlance, a mental health professional diagnosed Petitioner as a drama queen. Moreover, a 65 I.Q. is simply incongruous with a woman who zealously touted her business

27

acumen in her unsworn statement to the jury and in her 2007 allocution. Again, Ex. C does not provide sufficient operative facts to support Petitioner's allegations or claims for relief. Therefore, this claim is subject to dismissal without a hearing. *Kapper, supra,* at 38.

The final exhibit cited in this claim, Petitioner's Ex. E, is an affidavit from Petitioner's younger sister. She gives her layperson's diagnosis that Petitioner was depressed, isolated and vulnerable. This exhibit does not provide sufficient operative facts to support her claim of mental incompetence and should cause this claim to be dismissed without hearing. *Kapper, supra,* at 38.

Finally, Petitioner requests appointment of a psychologist and neuropsychologist to support her claim. Respondent again cites to *State v. Getsy* (Oct. 22, 1999), 11th Dist. No. 98-T-0140, 1999 Ohio App. LEXIS 4975, 1999 WL 1073682 and *State v. Jackson*, 11th Dist. No. 2004-T-0089, 2006-Ohio-2651, ¶¶ 24-25, *cause dismissed,* 110 Ohio St.3d 1407, 2006-Ohio-3306, 850 N.E.2d 69 to support its position that a post-conviction petitioner is not entitled to the appointment of experts to bolster theories merely floated, and not supported, in the post-conviction petition itself.

This claim is barred by res judicata and the law of the case and is unsupported by the documentation submitted by Petitioner. Therefore, this claim is subject to dismissal without hearing. Respondent is entitled to a grant of summary judgment.

28

## RESPONSE TO PETITIONER'S SEVENTH CLAIM FOR RELIEF

In her Seventh Claim for Relief, Petitioner argues she was incompetent to stand for re-sentencing in 2007. Absolutely no evidence appears in the record to suggest Petitioner was *ever* incompetent, and she presents no evidence de hors the record with her petition to support her claim of mental incompetence during her resentencing.

Indeed, her sole exhibit to support this claim, Petitioner's Ex. J, specifically contradicts any claim of mental incompetence in 2007. Prior to resentencing, Petitioner motioned the court to appoint Dr. James Eisenberg to assistant her counsel in ferreting out "any psychological issues" which might be germane to resentencing. (T.d. #168). Though Judge Stuard did not appoint Dr. Eisenberg, he nevertheless ordered the Forensic Psychiatric Center of Northeast Ohio to examine Petitioner to determine her "competence to be sentenced." (T.d. #172). The forensic center assigned Dr. Thomas Gazley to complete this task.

Petitioner's Ex. J is the testimony offered by Dr. Gazley in 2007. In his written report and testimony, Dr. Gazley opined that Petitioner was able to understand the alternatives available to her and to provide her counsel with mitigating evidence should she desire to do so. (Petitioner's Ex. J, p. 22-23, 37-38). Neither Dr. Gazley's report nor his testimony points to any indicia of mental incompetence as defined in R.C. 2945.37(G). As Petitioner's Ex. J does not provide sufficient operative facts to support Petitioner's allegations or claims for relief, this claim is subject to dismissal without a hearing. *Kapper, supra,* at 38.

More importantly, this issue was raised by Petitioner in her direct appeal of her 2007 resentencing, and thoroughly addressed by the Ohio Supreme Court. *Roberts II,* at ¶¶82-93. The court found: "A criminal defendant's competency to stand trial, including competency to assist in a sentencing proceeding, is a question of fact. *See Maggio v. Fulford,* 462 U.S. 111, 103

29

S.Ct. 2261, 76 L.Ed.2d 794 (1983) (upholding state-court finding of competency that was fairly supported by the record); *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, (deferring to trial court's 'factual findings' that defendant was competent). Dr. Gazley's testimony supports the trial court's finding that Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007. Because 'there was some reliable, credible evidence supporting' the trial court's finding that Roberts was competent, we will not disturb that finding. *Vrabel* at ¶ 33." *Roberts II,* at ¶¶ 92-93.

Further, just as in the preceding claim, the law of the case doctrine bars further review by this Court. The Ohio Supreme Court has decided this specific issue as it relates to the 2007 resentencing, including a thorough analysis of Dr. Gazley's report, testimony, and expert opinion. *Roberts II,* at ¶¶85-93. As quoted above, "Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007." *Roberts II,* at ¶93. For reasons discussed in the previous claim, this Court may not disturb those findings. See, *Noble, King, supra.*

To conclude, this claim must be dismissed without hearing pursuant to the doctrines of res judicata and the law of the case. Additionally, the sole exhibit submitted to support this claim deflates it instead. Because Petitioner fails to provide sufficient operative facts, this Court must dismiss this claim without hearing. Respondent is entitled to a grant of summary judgment.

**RESPONSE TO PETITIONER'S EIGHTH CLAIM FOR RELIEF**

In her Eighth, and final, Claim for Relief, Petitioner argues her convictions and sentences are void or voidable because Ohio's post-conviction statutes, as written, are constitutionally infirm and provide an inadequate corrective process. Petitioner acknowledges this well-worn argument has been repeatedly rejected by Ohio courts. Respondent respectfully submits that Petitioner presents no compelling argument to convince this Court she or any other Ohio post-conviction petitioner suffers a constitutional violation by their voluntary participation in this process.

In *Freeman v. Maxwell*, 4 Ohio St.2d 4, 5-6, 210 N.E.2d 885(1965), the Ohio Supreme Court held the statutory procedure for post-conviction relief constitutes an adequate remedy in the ordinary course of law for a prisoner to establish that a judgment of conviction has denied the prisoner their constitutional rights. Also, the U.S. Supreme Court has held that states have no constitutional obligation to provide post-conviction remedies. *Pennsylvania v. Finley*, 481 U.S. 551,556, 107 S.Ct. 1990, 95 L.Ed.2d 539(1987). The Ohio Supreme Court has also held that state collateral review is not a constitutional right, *State v. Steffen* 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994), and the petitioner receives no more rights than those granted by the post-conviction statute. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999).

The Eleventh District Court of Appeals has steadfastly declined to declare Ohio's post-conviction scheme unconstitutional. The court's rationale is sound. R.C. 2953.21 requires the petitioner to demonstrate constitutional error occurring *at trial,* and post-conviction proceedings, as the name suggests, do not occur at trial, but *after trial*. "[A]ny alleged argument regarding the unconstitutionality of R.C. 2953.21 did not stem from the proceedings that resulted in [petitioner's] conviction." *State v. Trimble*, 11th Dist. No. 2007-P-0098 2008-Ohio-6409, ¶ 109.

31

"[T]he violation upon which the petitioner relies to establish his right to relief must be of constitutional dimension, and it *must have occurred at the time the petitioner was tried and convicted of a criminal offense.*" (Emphasis added). *State v. Powell,* 90 Ohio App. 3d 260, 264 (1st Dist.1993). Petitioner was not found guilty or sentenced to death because Ohio's post-conviction statutes are –in her view – unconstitutional. The statutes have no impact whatsoever on her conviction or sentence. Therefore, her claim crumbles from the outset.

Other appellate courts have similarly ruled that Ohio's post-conviction statutes are not constitutionally infirm. *State v. Davis*, 12th Dist. Butler No. CA2012–12–258, 2013–Ohio–3878, ¶ 34; *State v. Frazier,* 6th Dist. Lucas No. L–07–1388, 2008–Ohio–5027, ¶ 70; *State v. Elmore,* 5th Dist. Licking No.2005–CA–32, 2005–Ohio–5940,¶¶ 143–149; *State v. Hessler,* 10th Dist. No. 01AP–1011, 2002–Ohio–3321, ¶ 73; *State v. Fitzpatrick*, 1st Dist. No. C-030804, 2004-Ohio-5615, ¶ 60; *State v. Smith*, 9th Dist. No. 04CA008546, 2005-Ohio-2571, ¶ 10; *State v. McKnight,* 4th Dist. No. 07CA665, 2008-Ohio-2435; *State v. Drummond,* 7th Dist. No. 05MA197, 2006-Ohio-7078, ¶¶114-122; *State v. Taylor*, 2nd Dist. Nos.2000 CA 77, 2000 CA 103, (June 29, 2001) unreported, *2.

As Petitioner correctly notes at ¶140 of her Petition, the Eleventh District Court of Appeals has held the proper venue to challenge the constitutionality of Ohio's post-conviction scheme is in the federal habeas proceedings, not in the state trial court. It restated its position in Petitioner's co-defendant's case: "[A]ppellant maintains that Ohio's postconviction relief procedure should be declared unconstitutional because the statutes create so many procedural hurdles for a criminal defendant to overcome that it is simply too difficult to obtain relief. As to this point, this court would first note that we have expressly held that the constitutionality of the postconviction procedure can only be properly challenged in a habeas corpus proceeding. *State v.*

32

*Wiles* (1998), 126 Ohio App.3d 71, 709 N.E.2d 898." *State v. Jackson*, 11th Dist. No. 2004-T-0089, 2006-Ohio-2651, ¶ 151, *cause dismissed,* 110 Ohio St.3d 1407, 2006-Ohio-3306, 850 N.E.2d 69, ¶ 151 (2006).

Petitioner states at ¶140 of her Petition that the federal implications of Ohio's post-conviction procedure have not been addressed by the U.S. Sixth Circuit Court of Appeals.  This may be true, but Ohio's district federal courts have addressed this issue head on:

"The Court is sympathetic to a petitioner's situation on postconviction, as the standards are strict. Nonetheless, the standards for granting an evidentiary hearing and discovery in postconviction are supported by reasonable policy reasons, such as the finality of judgments, judicial economy, and the intention that postconviction review not be a second appeal, and Petitioner has not cited any case finding an entire postconviction system inadequate for reasons similar to his arguments." *Jamison v. Collins*, 100 F.Supp.2d 521, 568 (S.D.Ohio 1998), *aff'd,* 291 F.3d 380 (6th Cir. 2007).

Ohio's Northern District court has weighed in as well. "While strict, *Ohio's postconviction system does not violate the Constitution.* The United States Supreme Court has stated that a postconviction system is unconstitutional when state rules act as 'snarls or obstacles [and] preclude an effective state remedy against unconstitutional convictions.' *Bartone v. United States,* 375 U.S. 52, 54, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963). Ohio's system does not preclude a remedy; it merely forces a petitioner to prove he or she is entitled to a remedy." (Emphasis added) *Dennis v. Mitchell*, 68 F.Supp.2d 863, 885 (N.D.Ohio 1999) *aff'd,* 354 F.3d 511 (6th Cir.2003). Respondent would point out that while the Sixth Circuit did not directly address the

33

constitutionality of the post-conviction procedure in *Dennis, supra,* it nevertheless affirmed the district court's decision. Adremy Dennis was executed in October 2004.[4]

Petitioner at ¶146 argues the post-convictions statutes are unconstitutional because of the frequent application of the doctrine of res judicata to dismiss portions or all of a post-conviction petition. This argument also has been rejected by Ohio courts: "We have reviewed R.C. 2953.21 and do not believe it to be unconstitutional. The implementation of the doctrine of *res judicata* does not act to deprive litigants of constitutional rights, but rather conserves judicial resources while still permitting a defendant to have his day in court." *State v. Sklenar*, 71 Ohio App.3d 444, 449, 594 N.E.2d 88, 91 (9th Dist.1991). Such a holding is sound. The application of res judicata precludes the undesirable practice of deliberately omitting an argument subject to review on direct appeal and saving it for later consideration during post-conviction proceedings.

Petitioner did not attach any evidence de hors the record to support this claim. Therefore, Respondent will dispense with a sufficiency analysis at this juncture.

Petitioner fails to support her claim as to the unconstitutionality of Ohio post-conviction process. R.C. 2953.21(A) addresses a denial and infringement of constitutional rights during the trial and sentencing proceedings which would render a conviction void or voidable. The constitutionality of the post-conviction process has no bearing on Petitioner's conviction or her death sentence. Moreover, no Ohio court has ever held R.C. 2953.21 et. seq. unconstitutional, and she provides no compelling argument why this Court should be the first. Ohio's Eleventh District has held that a habeas petition, not a post-conviction petition, is the proper vehicle wherein to challenge Ohio's post-conviction process. Therefore, Petitioner's Eighth Claim for Relief must be dismissed without hearing. Respondent is entitled to summary judgment.

---

[4] Ohio Department of Rehabilitation and Corrections website.

34

**PRAYER FOR RELIEF**

WHEREFORE, Respondent, the State of Ohio, requests the following relief:

1) That this Court grants summary judgment in this matter and that Petitioner is denied a hearing. Respondent is entitled to summary judgment as a matter of law as there are no genuine issues as to any material fact, and reasonable minds can come to but one conclusion and that conclusion is adverse to the Petitioner.

2) That this Court issue a findings of fact and conclusions of law pursuant to R.C. 2953.21(G) stating that it does not find grounds for granting relief and that it denies relief on Petitioner's petition.

       Respectfully submitted,
       DENNIS WATKINS (#0009949)
       Prosecuting Attorney By:

       LuWAYNE ANNOS (#0055651)
       Assistant Prosecuting Attorney
       Trumbull County Prosecutor's Office
       160 High St. 4th Floor
       Warren, Ohio  44481

       Telephone: (330) 675-2426
       Facsimile: (330) 675-2431

       COUNSEL FOR PLAINTIFF-RESPONDENT,
       THE STATE OF OHIO

PROOF OF SERVICE

   I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to Atty. David L. Doughten (#0002847), Counsel for Defendant-Petitioner Donna Roberts, 4403 St. Clair Ave., Cleveland, Ohio 44103-1125, on this 28th Day of August, 2015.

       LuWAYNE ANNOS (#0055651)
       Assistant Prosecuting Attorney

35



## AFFIDAVIT

TRUMBULL COUNTY, OHIO

I, CHRISTOPHER D. BECKER, of the Trumbull County Prosecutor's Office, 160 High Street, Warren, Ohio, being duly sworn say:

1. I was one of the two (2) Assistant Prosecuting Attorney's that tried the Capital Murder case of State of Ohio v. Donna Roberts, 01-CR-793.

2. To the best of my knowledge and recollection the State exercised six (6) peremptory challenges. To the best of my knowledge and recollection the Defense exercised five (5) peremptory challenges and passed on their final challenge.

3. To the best of my knowledge and recollection the State only used one (1) of those peremptory challenges to excuse an African-American Juror. That Juror was Maxine E. Howard. To the best of my knowledge and recollection the Defense used one (1) peremptory challenge to excuse an African-American Juror. That Juror was Karen S. Tipton.

4. The Juror that was excused by the State had indicated that she would require the State to prove its case beyond a shadow of a doubt. Further the juror stated in her juror questionnaire, "I firmly believe in people and if a person says they're innocent-I believe them." The juror also expressed concern that if she found someone guilty they may not really be guilty and she would not want to be on a case where the wrong person was convicted of a crime.

5. The Juror was a Licensed Practical Nurse, had previously served as a Missionary, was deeply religious and was uncertain if she could give the death penalty to a defendant who had killed multiple victims such as Saddam Hussein.

6. The Prosecution believed that this Juror would have trouble convicting and would definitely not fairly consider the death penalty as an option on equal footing with the other potential penalties if the case went to the penalty phase.

Further Affiant sayeth not.



CHRISTOPHER D. BECKER

NOTARY ATTEST

Sworn before me and subscribed in my presence this _2nd_ day of November 2004.

Frances A. Hively
Notary Public

FRANCES A. HIVELY, Notary Public
State of Ohio
My Commission Expires 6-30-08

**AFFIDAVIT**

TRUMBULL COUNTY, OHIO

I, KENNETH N. BAILEY, of the Trumbull County Prosecutor's Office, 160 High Street, Warren, Ohio, being duly sworn say:

1. I was one of the two (2) Assistant Prosecuting Attorney's that tried the Capital Murder case of State of Ohio v. Donna Roberts, 01-CR-793.

2. To the best of my knowledge and recollection the State exercised six (6) peremptory challenges. To the best of my knowledge and recollection the Defense exercised five (5) peremptory challenges and passed on their final challenge.

3. To the best of my knowledge and recollection the State only used one (1) of those peremptory challenges to excuse an African-American Juror. That Juror was Maxine E. Howard. To the best of my knowledge and recollection the Defense used one (1) peremptory challenge to excuse an African-American Juror. That Juror was Karen S. Tipton.

4. The Juror that was excused by the State had indicated that she would require the State to prove its case beyond a shadow of a doubt. Further the juror stated in her juror questionnaire, "I firmly believe in people and if a person says they're innocent-I believe them." The juror also expressed concern that if she found someone guilty they may not really be guilty and she would not want to be on a case where the wrong person was convicted of a crime.

5. The Juror was a Licensed Practical Nurse, had previously served as a Missionary, was deeply religious and was uncertain if she could give the death penalty to a defendant who had killed multiple victims such as Saddam Hussein.

6. The Prosecution believed that this Juror would have trouble convicting and would definitely not fairly consider the death penalty as an option on equal footing with the other potential penalties if the case went to the penalty phase.

Further Affiant sayeth not.



_Kenneth N. Bailey_
KENNETH N. BAILEY

NOTARY ATTEST

Sworn before me and subscribed in my presence this 2nd _____ day of November 2004.

_____
Notary Public

> NOTARY PUBLIC
> STATE OF OHIO
> CHRISTOPHER D
> BECKER
> My commission does not expire ORC 147.03

November 11, 2015
(Rich)

Trumbull County Clerk of Courts
111 High Street, N.E.
Warren, Ohio 44481

RE: Case No. 2001 CR 00793
State of Ohio - vs - Roberts, DonnaMarie

Dear Sir or Madam,

I have been reviewing my case transcripts and realized that I never received many pages.
I have pages 300 to 4900 and 5700-6200.
Therefore, I need pages 1-300 and also 5000 to 5700.
Please bill me when you send them and I will remit an institutional check.
Thank you very much for your prompt response.

Sincerely,

DonnaM Roberts

FILED
COURT OF COMMON PLEAS

NOV 16 2015

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK



2001 CR
00793
000882297568
LETTER

# The Supreme Court of Ohio



FILED

JUL 26 2017

CLERK OF COURT
SUPREME COURT OF OHIO

State of Ohio

v.

Donna Marie Roberts

Case No. 2014-0989

RECONSIDERATION ENTRY

Trumbull County

It is ordered by the court that the motion for reconsideration in this case is denied.

(Trumbull County Court of Common Pleas; No. 2001CR00793)

Maureen O'Connor
Chief Justice



**The Official Case Announcement can be found at http://www.supremecourt.ohio.gov/ROD/docs/**



2001 CR
00793
00086587356
O

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3485

# The Supreme Court of Ohio

FILED

MAY 30 2017

CLERK OF COURT
SUPREME COURT OF OHIO

State of Ohio

v.

Donna Marie Roberts

Case No. 2014-0989

JUDGMENT ENTRY

APPEAL FROM THE
COURT OF COMMON PLEAS

This cause, here on appeal from the Court of Common Pleas for Trumbull County, was considered in the manner prescribed by law. On consideration thereof, the judgment of the Trumbull County Court of Common Pleas is affirmed, consistent with the opinion rendered herein.

Furthermore, it appearing to the court that the date fixed for the execution of judgment and sentence of the Trumbull County Court of Common Pleas has passed, it is ordered by the court that the sentence be carried into execution by the Warden of the Southern Ohio Correctional Facility or, in his absence, by the Deputy Warden on Wednesday, the 12th day of August, 2020, in accordance with the statutes so provided.

It is further ordered that a certified copy of this entry and a warrant under the seal of this court be certified to the Warden of the Southern Ohio Correctional Facility, and that the Warden shall make due return to the Clerk of the Court of Common Pleas for Trumbull County.

It is further ordered by the Court that a mandate be sent to the Court of Common Pleas for Trumbull County to carry this judgment into execution, and that a copy of this entry be certified to the Clerk of the Court of Common Pleas for Trumbull County for entry.

(Trumbull County Court of Common Pleas; No. 2001CR00793)

I, CERTIFY that this document is a true and accurate copy of the judgement entry of the Supreme Court of Ohio filed on 5-30-2017 in Case No. 2014-0989 and constitutes the mandate of the Court pursuant to S.Ct.Prac.R. 18.04.

In witness, I have subscribed my name and affixed the seal of the Supreme Court of Ohio on this 26th day of July , 2017.
Clerk of Court
By _____ , Deputy Clerk

Maureen O'Connor
Chief Justice

The Official Case Announcement can be found at http://www.supremecourt.ohio.gov/ROD/docs/

# THE SUPREME COURT OF OHIO

State of Ohio

v.

Donna Marie Roberts

CASE NO. 2014-0989
TRUMBULL COUNTY
COMMON PLEAS COURT
CASE NO. 2001CR00793
RETURN OF RECORD
DEATH PENALTY CASE

THE FOLLOWING RECORD IN THE ABOVE-NAMED CASE WAS RECEIVED BY THE UNDERSIGNED.

LIST CONTENTS:
  - 4 BOXES

MARY VASSIS   For
TRUMBULL COUNTY CLERK OF COURTS

4-11-18
4/11/2018

KARA N. SCHULKERS
DEPUTY CLERK, SUPREME COURT OF OHIO

4-11-18
4/11/2018

2001 CR
00793
00011421145
CRN

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | Case No. 01 CR 793 |
| Plaintiff-Respondent, | : | |
| -vs- | : | JUDGE Ronald J. Rice |
| DONNA ROBERTS | : | **Death Penalty Case** |
| Defendant-Petitioner. | : | |

Now comes the Petitioner Donna Roberts, by and through undersigned counsel, David L.

Doughten, and presents this Court with a Memorandum in Support of the issues she raised in her

amended petition to vacate filed in 2015 pursuant to R.C. §2953.21. The arguments are contained

in the attached Memorandum.

Respectfully submitted,

DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112
ddoughten@yahoo.com

ATTORNEY FOR PETITIONER

KAREN INFANTE ALLEN
CLERK OF COURTS
2019 JUN -5 AM 10: 23
TRUMBULL COUNTY
CLERK OF COURTS

2001 CR
00793
00080274900
CRN

## CERTIFICATE OF SERVICE

The foregoing appellant's Brief was served upon Dennis Watkins, Trumbull County

Prosecutor and/or Christopher Becker, Esq. Assistant Trumbull County Prosecutor,

Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail and/or

email on this  4<u>th</u>   day of June, 2018.

DAVID L. DOUGHTEN

Counsel for Petitioner

# MEMORANDUM IN SUPPORT

## I.    Overview

The petitioner Donna Roberts has been capitally convicted and sentenced to death. Her procedural history is long and complicated. An attempt to simplify it as much as possible will be made here as background for the Memorandum.

Roberts originally filed her petition to vacate pursuant to R.C. §2953.21 on September 24, 2004. Due to the fact that her sentence was twice vacated and remand to this Court, Roberts filed a second petition in 2008, and an amended petition, the subject of this memorandum, in 2015 by agreement of the parties. As her direct appeal proceedings have been completed, the attention now turns to her pending petition.

**Trial Proceedings**

This case started on December 28, 2001, when a Trumbull County grand jury indicted the defendant-petitioner Donna Roberts on a four count indictment for various charges, including two alternative theory counts of capital murder surrounding the death of her ex-husband, Robert Fingerhut, with whom she was living at the time of the offense.

The indictment charged Roberts with one count of the purposeful killing of Mr. Fingerhut with prior calculation and design in violation of R.C. §2903.01(A) and one count of the so-called felony-murder in violation of R.C. §2903.01(B). Each of these capital murder counts included two capital specifications addressing violations of R.C. §2929.04(A)(7). The first specification alleged that the murder occurred during the commission of an Aggravated Burglary, R.C. §2911.11. The second specification alleged that the murder occurred during the commission of an Aggravated Robbery, R.C. §2911.01.

1

The third and fourth counts charged the felonies underlying the aforementioned capital specifications, Aggravated Burglary, R.C. §2911.11 and Aggravated Robbery, R.C. §2911.01. Each count of the indictment included a firearm specification pursuant to R.C. §2929.141.

The charges did not implicate Roberts as the actual shooter, but rather that she acted in complicity with the principal, and co-defendant, Nathaniel Jackson. Jackson was tried separately as he also was capitally indicted. Jackson was sentenced to death also in a trial that proceeded Roberts' trial. Essentially, the prosecution argued that Roberts persuaded Jackson to shoot Fingerhut to obtain life insurance proceeds. There was no allegation or evidence that Roberts was present at the time of the actual shooting, which occurred in the Roberts/Fingerhut residence.

A jury trial began with the death qualification process in May of 2003. The jury found Roberts guilty of all counts including the capital and firearm specifications on May 29, 2003.

On June 3, 2003, the petitioner indicated to the court that she wanted to waive the presentation of mitigation at the penalty phase hearing, except she did desire to make an unsworn statement.

Prior to the commencement of the penalty phase hearing, the prosecution elected to dismiss Count Two, R.C. §2903.01(B) (felony-murder) and proceeded with Count One, R.C. §2903.01.(A) (prior calculation and design).

The penalty phase hearing began on June 5, 2004. The defense waived opening and closing argument per instruction from Roberts. The petitioner did provide an unsworn statement. That same day, the jury recommended a sentence of death.

On June 20, 2003, the trial court, Judge Stuard, accepted the recommendation and sentenced Roberts to death. The court also sentenced the petitioner to serve ten years for both the

convictions of Aggravated Robbery and Aggravated Burglary. These sentences are being served consecutively to each other and the sentence of death. The court also applied a three-year firearm specification, which is also being served consecutively to the principle sentences.

**Postconviction History**

As noted above, Roberts originally filed her petition to vacate pursuant to R.C. §2953.21 on September 24, 2004. On February 11, 2005, the trial court, Judge Stuard, denied the petition and affirmed the convictions and sentence. The notice of appeal was filed to the Eleventh District Court of Appeals, but stayed by agreement of the parties pending the disposition by the Supreme Court of Ohio.[1]

On October 10, 2006, the Supreme Court affirmed the convictions but reversed the sentence of death and remanded this matter for a new sentencing. State v. Roberts, 110 Ohio St.3d 71, 2006-Ohio-3665. On the remand, pursuant to a defense motion, Roberts was referred for a competency evaluation. On October 28, 2007, Judge Stuard found Roberts competent for the hearing. Roberts had filed a motion to the court to allow her to present a full mitigation hearing, but this request was denied by the court. Roberts was permitted only to allocute for the judge.

That same day, the remand hearing was conducted. Judge Stuard again sentenced Roberts to death. Roberts again appealed her case to the Supreme Court of Ohio.

In the meantime, on August 20, 2008, Roberts again filed a motion to vacate as her original petition was essentially moot, and had been filed before, as it turns out, she had been

---

[1] The Eleventh District Court of Appeals dismissed the first postconviction appeal on October 22, 2007 for lack of jurisdiction, because of the reversal of the Supreme Court of Ohio. There was no final judgment as Roberts had not yet been sentenced.

3

actually sentenced. The parties agreed this to be the appropriate action. The proceedings were kept in abeyance pending her second appeal.

On May 7, 2013, the Supreme Court again reversed her sentence of death and remanded the matter for the limited purpose of having the sentencing judge prepare a sentencing opinion which complied with the mandates of R.C. §2929.03. State v. Roberts, 137 Ohio St.3d 230, 2013-Ohio-4580.

On April 30, 2014, this Court again, albeit a different judge, sentenced Roberts to death and filed its independent opinion in compliance with the Supreme Court mandate. Roberts appealed the decision a third time. She argued that allowing a judge to sentence her to death who had not presided over her trial or any of the sentencing proceedings violated the Fifth, Eighth and Fourteenth Amendments. However, she was unsuccessful as the Supreme Court of Ohio this time affirmed her sentence of death. State v. Roberts, 150 Ohio St.3d 47, 2017-Ohio-2998. Her motion for reconsideration was denied by that court on July 28, 2017. Roberts appealed her case to the United States Supreme Court on December 18, 2017. Her petition for an issuance of a writ of certiorari was denied on February 20, 2018. Roberts v. Ohio, 138 S.Ct 998 (2018) .

While the direct appeal was pending, the parties agreed that a filing of an amended postconviction petition, in which claims that were deemed moot were actually dropped, would be appropriate. It was also agreed that the proceeding would stay in abeyance until her direct appeal process was completed. The agreed judgment was filed on July 20, 2015 in this Court.

4

With the completion of all direct appeal procedures, this post-conviction petition is ripe for adjudication.

**Current Petition**

In her amended 2015 petition, Roberts argued three claims. The first two claims argued that her jury pool and the grand jury pool was under-represented by African-Americans. In both claims Roberts requested discovery and an evidentiary hearing so that she could develop her claims further. It is conceded that without such tools, Roberts cannot meet her burden of establishing either of these claims. She therefore again requests for discovery and an evidentiary hearing. Those claims will not be further argued here.

The third claim addressed the alleged ineffective nature of her counsel in the trial stage. This is argued below. As Roberts controlled her counsel in the penalty phase, those issues are not available to her for this procedure.

**Mental Health Claims**

The overriding issue in Roberts' case is and was her mental health. However those issues are not the subject of the postconviction petition as they have been repeatedly litigated in her previously filed direct appeals. A background of that issue may prove helpful here, if only as an explanation on further review as to why they were not included in the petition.

In the actual penalty phase of her trial, Roberts limited her counsel in the presentation of the evidence presented on her behalf. As noted, the only presentation was her unsworn statement. On her first direct appeal, counsel for Roberts argued that she was not competent to make decisions about the presentation of evidence. Roberts claimed in her First Assignment of Error that she should have been re-examined by a psychologist prior to her penalty phase

5

decisions which were clearly against her interest pursuant to State v. Ashworth (1999) 85 Ohio

St. 3d 56, 1999 Ohio 204.

In Ashworth this Court held at p. 62:

. . .in a capital case, when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary. The trial court must decide whether the defendant is competent and whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings. The trial court must inform the defendant of the right to present mitigating evidence and explain what mitigating evidence is. The court must then inquire of the defendant, and make a determination on the record, whether the defendant understands the importance of mitigating evidence, the use of such evidence to offset the aggravating circumstances, and the effect of failing to present that evidence. After being assured that the defendant understands these concepts, the court must inquire whether the defendant desires to waive the right to present mitigating evidence, and, finally, the court must make findings of fact as to the defendant's understanding and waiver of rights.

However, the Supreme Court of Ohio held Ashworth was not applicable. The Court

found that because Roberts made an unsworn statement, thus she had not waived her mitigation

phase defense.  That Court nevertheless reversed the case for the failure of the trial court to

allow her allocution and because the court had not written an independent opinion pursuant to

R.C. §R.C. 2929.03(F) opinion. State v. Roberts (2006), 110 Ohio St. 3d 71, 2006 Ohio 3665.

On remand, Roberts did allocute and did address mental health issues. She also proffered

additional material in support of those issues. Judge John M. Stuard, the original trial judge,

conducted the proceedings on the re-sentencing mandate. On May 1, 2007, Ms. Roberts moved to

expand the sentencing hearing to include all relevant mitigation evidence, mental health

especially, including documentation of her being granted SSI payments due to mental disabilities

that may have resulted from a serious automobile accident.  The trial court denied the motion and

6

restricted the hearing to only the allocution of Roberts on September 14, 2007.  A defense request for an independent psychologist was also denied by the court.

Roberts had moved for a competency evaluation for the purposes of the re-sentencing hearing.  The court granted the motion.

On October 22 , 2007, Judge Stuard conducted a competency hearing.  Dr. Thomas Gazley of the Trumbull County Forensic Diagnostic Center testified that in his opinion Ms. Roberts was competent.  The trial court agreed with the opinion and found her to be competent.

That same day,  the court conducted a hearing for the purpose of hearing the allocution of Ms. Roberts as required by the Ohio Supreme Court decision.

On October 29, 2007, Judge Stuard announced his decision, again finding death to be the appropriate penalty.  She was again sentenced to death.  She appealed that sentence to the Supreme Court of Ohio.  Her sentence was again reversed, ostensibly because of the trial court's failure to address the mitigation presented in her allocution. However, the Supreme Court did not find error in the trial court's failure to consider the additional documentation in support of her allocution and mental health claims.  State v. Roberts,137 Ohio St.3d 230; 998 N.E.2d 1100; 2013 Ohio 4580, October 22, 2013.

In the second remand hearing, this Court was severely restricted in its consideration of relevant evidence and ordered by the Supreme Court to write an opinion based solely on the record before it.  Roberts was not permitted to speak or present additional evidence which might call for a sentence less than death.  She was again sentenced to death on April 30, 2014.

Roberts appeals her sentence to the Supreme Court of Ohio a third time.  One of the issues raised was whether a judge who did not hear any of the previous proceedings or spoken to

7

the defendant could make a determination of the appropriateness of the death penalty under state or federal due process protections. The Supreme Court of Ohio indicated that this procedure was not violative of due process and affirmed the sentence of death.

Roberts appealed her sentence of death to the Supreme Court of the United States. Her petition for a writ of Certiorari was denied.

The bottom-line is that Roberts' mental health issues were raised repeatedly in the direct appeals of her trial and sentencing hearings. Therefore, although those issues are preserved and ripe for federal review, they could not and were not claimed in her petition here because of res judicata bars. Therefore, although she includes these issues in her requests for discovery and an evidentiary hearing which was requested in both her original and amended petitions, Roberts did not raise independent mental health claims here.

The issue that remains is ineffective assistance of counsel for the trial phase of trial. Roberts raised that issue independent of the mental health claims that establish that she was denied her Sixth Amendment right to the effective assistance of counsel.

**Underlying Factual Summary of Homicide**

The state charged Roberts with planning the killing of her husband with a prison inmate, Nathaniel Johnson. According to the state's position of the case, Roberts and Jackson were pen-pals while he was serving time in a state penal institution. It was alleged that at some point during the letter writing and phone conversations, the two planned the homicide of Roberts' ex-husband/roommate, Robert Fingerhut. Shortly after Jackson was released from prison, the two allegedly orchestrated the homicide during a time which Roberts attempted to establish an alibi for herself while shopping and eating away from her home, where the offense transpired.

8

The defense did not contest that Mr. Jackson was the killer. The defense did argue that the appellant did not act in complicity with him. While their correspondence was admittedly sexually graphic and did allude to actions suggestive of a plot, the defense argued that there was insufficient evidence that the appellant acted in complicity with Jackson.

### State's Case

On December 11, 2001, a screaming Donna Roberts made a call to 911 at 11:00 p.m. (T. 5138) In response the call, Howland Township police officer Albert Ray was dispatched to the home of the petitioner Roberts to investigate a purported homicide. He arrived to find the Roberts yelling and screaming hysterically outside the home. (T. 5156) Officer Ray found the decedent, Robert Fingerhut, laying in the entrance to the home from garage. Roberts told him to "Do whatever you have to do to catch the bastard." (T. 5161) A gun was located by the body on a step in the garage. (T. 5165)

The coroner reported that Mr. Fingerhut died from multiple gunshot wounds. One of the shots entered his brain, causing the death. (T.5596) The time of death was estimated from as little as two hours to as much as six hours prior to the 1:00 a.m. autopsy which was performed on December 12, 2001. (T. 5603)

Sgt. Frank Dillon arrived on the scene to investigate the homicide. He found a partial footprint of blood near the body. He checked everyone's shoes but was unable to determine who stepped in the blood. (T. 5613, 5618) Upon checking the weapon, Sgt. Dillon discovered that all five chambers were filled with a bullet. (T. 5615)

A search of the body revealed that money remained in the wallet and pants pocket of the decedent. (T. 5629) He also noticed that Mr. Fingerhut's car was not at the home. (T. 5631) This

9

was later discovered near the location of the residence where Nathaniel Jackson was living. (T. 5654)

Sgt. Dillon first became suspicious of Roberts when he noticed that she seemed to cry loudly only when the officers checked on her condition.  According to Dillon, she became silent when the officers talked amongst themselves as if trying to listen.  (T. 5640)

Roberts' Alibi

Roberts informed the police that she was not at home at the time of Fingerhut's death. She described her day for the officers.  (T. 5649-5650) She indicated that she was at the Greyhound station until 5:30 p.m. (T. 5868)  She went to dinner at a Red Lobster and went shopping and bought some rotisserie chicken for her dogs. (T. 5868-5871) She did not arrive home until shortly before midnight to find the decedent. (T. 5872)

The connection to Nathaniel Jackson was made when the officer found letter correspondence between the two in the bedroom and the trunk of her car. (T. 5886, 5897)  The officers called the Lorain Correctional Institution and obtained CD's of 18 phone calls between Roberts and Jackson. (T. 5147)

Jose Sanchez had worked for Fingerhut, who operated a Greyhound Bus station in Youngstown, Ohio.  He knew Roberts because she worked at the location. He also knew Jackson, who visited the station. (T. 5235)  Sanchez described a video from December 11, 2001, in which Mr. Fingerhut left the station at about 9:00 p.m. (T. 5240)

Jeff Diamantes worked at a Days Inn Hotel in Boardman, Ohio.  On December 11, 2001, he rented a room to Roberts.  He identified her because she offered a picture ID.(T. 5377, 5386) Blood stains were found throughout the room where they stayed, including on hand towels and a

10

comforter. (T. 5533) Mr. Jackson's fingerprints were found in the hotel room. (T. 5843)

Detective Mike Yanucci found leather gloves in the residence where Jackson lived. The left index finger was torn. (T. 5403)

Roberts exercised her Fifth Amendment rights and did not testify.

### Third Claim for Relief

**Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial or first stage of her capital trial.**

Both the Federal and State Constitutions guarantee a minimum standard of proficiency of a criminally accused's counsel. The Sixth Amendment of the United States Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right...to take the assistance of counsel for his defense." In Powell v. Alabama, 287 U.S. 45 (1932), the United States Supreme Court first recognized that a defendant has a right not only to the timely appointment of counsel but also to the quality of performance above a minimal level of effective-ness. Both State and Federal courts recognized that the failure of trial counsel to properly represent his or her client might affect the legitimacy of the fact finding progress just as errors by the court or prosecution might require the reversal of a conviction. The Court has specifically stated that "It is our responsibility under the Constitution to ensure that no criminal defendant--whether a citizen or not--is left to the '"mercies of incompetent counsel.'" McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441.

In the present case, defense counsel did not provide an articulated defense for the

11

Petitioner at trial. Although counsel did cross-examine and challenge evidence throughout the culpability stage of trial, counsel failed to give an opening statement, present a tape of the co-defendant in which he precluded her participation in the homicide, failed to present the co-defendant Nate Jackson's claim of self-defense, and failed to provide a closing argument to the jury. This confusing strategy would only suggest to the jury that the Petitioner was not professing her innocence. There is no articuable reasonable strategy for counsel's actions or inactions at trial in this regard.

**Standard for Review of Effective Assistance of Counsel Challenge**

The United States Supreme Court set forth the minimum standard for effective assistance in Strickland v. Washington (1984), 466 U.S. 68. A two-step test was announced. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. This latter test requires that counsel's errors were so serious as to deprive the defendant of a fair trial.

While indulging a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, a court hearing in ineffective assistance claim must determine whether counsel's conduct caused a breakdown in the adversary process so as to destroy the fundamental fairness of the proceeding. Under the appropriate test for prejudice, the defendant must demonstrate a reasonable probability that, but for the counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 692.

Under Strickland, a reviewing court must first determine whether counsel's representation "fell below an objective standard of reasonableness." 466 U.S., at 688, 104 S. Ct. 2052. Then it must be determined whether "there is a reasonable probability that, but for counsel's

12

unprofessional errors, the result of the proceeding would have been different." Id., at 694, 104 S. Ct. 2052. The first prong--constitutional deficiency--is necessarily linked to the practice and expectations of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id., at 688, 104 S. Ct. 2052.

The Supreme Court has long recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . ." Ibid.; Bobby v. Van Hook, 558 U.S. 4, 7, 130 S. Ct. 13 (2009) (per curiam); Florida v. Nixon, 543 U.S. 175, 191, and n. 6, 125 S. Ct. 551 (2004); Wiggins v. Smith, 539 U.S. 510, 524, 123 S. Ct. 2527 (2003); Williams v. Taylor, 529 U.S. 362, 396, 120 S. Ct. 1495, (2000). Although they are "only guides," Strickland, 466 U.S., at 688, 104 S. Ct. 2052, and not "inexorable commands," Bobby, 558 U.S., at 8, 130 S. Ct. 13, these standards may be valuable measures of the prevailing professional norms of effective representation. Padilla v. Kentucky, 559 U.S. 356, at 367, 130 S.Ct. 1473, (2010)

The ABA Guidelines on capital defense was released in 1984. Thus they are relevant in establishing the professional norms. As they had been in place for almost 20 years at the start of trial, the guidelines are more than mere aspirational.

**Omissions in Roberts Case**

Counsel for Petitioner Roberts did not present an opening statement. Counsel had Roberts read a statement to the jury. Counsel did discuss having the Petitioner read the statement to the jury prior to the opening statement, but did not indicate to her or make clear to her that counsel themselves would not be addressing the jury. The statement provided by Roberts was ambiguous at best and did not state a defense. Exhibit A.

13

The defense failed to present the defense of the co-defendant, Nate Jackson, to the jury. At his trial, Jackson argued self-defense as the basis for his actions resulting in the death of Robert Fingerhut.  The consideration of Jackson's self-defense claim was relevant to Petitioner Roberts' claim that she did not conspire to have her husband killed. A claim of self-defense is contrary to the element of prior-calculation and design and the complicity theory of the state.  If the two defendants planned a murder, self-defense would not apply.  Minimally, the evidence might have had a strong "carry-over" effect into the penalty phase.  State v. Thompson, (1987), 33 Ohio St. 3d 1.  There is a strong likelihood that the jury would have weighed this evidence as a factor mitigating against death.

Defense counsel failed to introduce a video tape of Nathaniel Jackson in which he exculpates Roberts and explains how the homicide occurred.  Defense Exhibit B.  Counsel could have moved to have the video/exhibit played as Jackson, having been already convicted and was clearly unavailable.  Even if the trial court have found that Evid. R. 804 would not allow its admission, counsel would have preserved the issue for appeal as the preclusion of the admission of such strong evidence of actual innocence and/or mitigation would have violated her right to present a defense. The Supreme Court of the United States has often held that a state evidentiary rule may not preclude a defendant's right present a defense. Holmes v. South Carolina, 547 U.S. 319, 324 (2006) .

**Right to Present a Defense**

The phrase "right to present a defense" is a talisman for the Sixth Amendment right to compulsory process (even though the original cases were necessarily 14th Am. "due process" cases)

14

The right to present a defense and the right to have equal access to evidenced was first

clearly announced by the Supreme Court in Dennis v. United States, 384 U.S. 855, 873 (1966).

Although Dennis specifically addressed grand jury proceedings, the principle of equal access for

to evidence nonetheless was established. In Dennis, the defendant was denied the ability to

review grand jury testimony because he had failed to establish a particularized need to do so.

The government had argued that perhaps an in camera inspection of the minutes would have been

the proper remedy.

The Court soundly rejected this position. The Court concluded that:

> "it will be extremely difficult for even the most able and experienced trial judge
> under the pressures of conducting a trial to pick out all of the grand jury testimony
> that would be useful in impeaching a witness." *Pittsburgh Plate Glass*, 360 U.S.
> 395, at 410 (1959) (dissenting opinion). Nor is it realistic to assume that the trial
> court's judgment as to the utility of material for impeachment or other legitimate
> purposes, however conscientiously made, would exhaust the possibilities. In our
> adversary system, it is enough for judges to judge. The determination of what may
> be useful to the defense can properly and effectively be made only by an advocate.

Id 874.

The Court further explained the position in the following from Dennis.

> In our adversary system for determining guilt or innocence, *it is rarely justifiable
> for the prosecution to have exclusive access to a storehouse of relevant fact.*
> Exceptions to this are justifiable only by the clearest and most compelling
> considerations. For this reason, we cannot accept the view of the Court of Appeals
> that it is "safe to assume" no inconsistencies would have come to light if the grand
> jury testimony had been examined. There is no justification for relying upon
> "assumption."

Id., 384 U.S. at 873-74. (Emphasis added)

The concept was further established by the Court in California v. Green, 399 U.S. 149,

176, (1970). In his concurring opinion, Justice Harlan indicated that the compulsory process and

15

confrontation clauses of the Sixth Amendment "constitutionalize the right to a defense as we

know it."  Additionally, in <u>Washington v. Texas</u>, 388 U.S. 14 (1967) the Court said, "The right to

offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the

right to present the defense."

The United States Supreme Court has long held that an accused's right to "establish a

defense" is a "fundamental element of due process." <u>Washington v. Texas</u>, *supra*.  In

<u>Washington</u>, the Court was called upon for the first time "to decide whether the right of an

accused to have compulsory process for obtaining witnesses in his favor, guaranteed in federal

trials by the Sixth Amendment, is so fundamental and essential to a fair trial that it is

incorporated in the Due Process Clause of the Fourteenth Amendment." <u>Id</u>. at 17-18.

Relying on <u>In re Oliver</u>, the Court observed that, among other things, an accused's right

'to offer testimony' is a basic component of his right to offer a defense.  <u>Id</u>. at 18 (quoting <u>In re</u>

<u>Oliver</u>, 333 U.S. 257, 273 (1948)). The Court therefore concluded that "[t]he right to offer

testimony of witnesses and to compel their attendance [] is in plain terms the right to present a

defense" because "[j]ust as an accused has the right to confront the prosecution's witnesses for

the purpose of challenging their testimony, he has the right to present his own witnesses to

establish a defense." <u>Id</u>. at 19.  It is then up to the jury to "decide where the truth lies." <u>Id</u>.

The Court spoke again on the constitutional significance of allowing a defendant to

present testimony in connection with his defense in <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986).

Specifically, in <u>Crane</u>, the Court held that the exclusion of testimony surrounding the

circumstances of a defendant's confession deprived the defendant of his fundamental right,

whether under the Due Process Clause of the Fourteenth Amendment or under the Compulsory

16

Process or Confrontation Clauses of the Sixth Amendment, to present a defense. Id. at 690-91. The Court reasoned that the opportunity to be heard "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Id. As a result, the Court concluded that the "exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" Id. at 690-91 (quoting United States v. Cronic, 466 U.S. 648, 656 (1984)).

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." United States v. Scheffer, 523 U.S. 303, 308. This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, supra at 690. This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Scheffer, supra, at 308.

In sum, where a defendant's federal right is limited by a state evidentiary rule, the evidentiary rule must fall. Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). Holmes v. South Carolina 547 U.S. 319 (2006). Here, the failure to allow the defense to place into evidence a statement made by Wesson in November of 2008 violated his right to present a defense.

17

In establishing procedural rules, a state may not arbitrarily limit a defendant's ability to secure the testimony of favorable witnesses or arbitrarily limit the evidence a defendant may present. Holmes v. South Carolina, supra, "affirming a criminal defendant's right to a meaningful opportunity to present a complete defense." *(quoting* Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

Additionally, a state cannot rigidly apply otherwise valid procedural rules if their application to a specific case would violate the defendant's compulsory process rights. Chambers v. Mississippi, 410 U.S. 284, 294 (1973). In other words, had the exhibit of Jackson's statement been offered, it should have and probably would have been presented to the Roberts' jury.

**Content of Jackson's Statement**

On the tape, Nathaniel Jackson was interviewed by police detectives. Jackson, who described himself as a street hustler, explained that on the day of the incident the decedent Fingerhut had purchased a small amount of marijuana from Jackson for about $100.00. Jackson had known Fingerhut for a couple of years. Jackson had been to Fingerhut's house previously. Defense Exhibit B

According to Jackson, Fingerhut took Jackson to his home, Fingerhut's, to watch a sporting event. Fingerhut pulled the car into the garage. The two exited the car and went into the house. They sat at the kitchen table. Fingerhut was looking over his mail. Jackson was hoping Fingerhut could give him some work at the restaurant. Fingerhut then said words to the effect of "you black guys are the same, you don't want to do anything for yourself." Fingerhut continued to lecture Jackson. Defense Exhibit B

18

Jackson did not want to be subjected to the lecture and be "disrespected." He asked to be taken home. Fingerhut told him to walk. Jackson refused to walk. When Jackson looked up, Fingerhut was pointed a gun at him. Jackson felt that Fingerhut had "flipped." Jackson described the change in Fingerhut's demeanor as being like, "Dr. Jeckyl and Mr. Hyde." Defense Exhibit B

Jackson then said that, "He squeezed on me, man," referring to Fingerut pulling the trigger. Jackson had grabbed the gun which had been pointed at him. The shot injured Jackson's finger. Jackson thought that he "was a done deal," meaning himself. He then shot Fingerhut. After the first shot, Fingerhut kept coming at him. Jackson shot again and killed him. Defense Exhibit B.

Jackson said that he did not intend to kill Fingerhut. He had not thought about shooting Fingerhut ahead of time. Defense Exhibit B

The videotape of Jackson's rendition of the events is evidence of Roberts' actual innocence. An attorney performing within the professional norm would have presented it for the jury's consideration. As addressed above, the tape would have been relevant and favorable to Roberts' defense in both phases of trial.

Defense counsel waived closing argument in the culpability phase of the trial. This was not discussed with Roberts's prior to the closing. No strategic reason for not providing an argument is apparent from the record. Roberts has the right to make those decisions, not counsel. McCoy v. Louisiana, 138 S.Ct. 1500, No. 16-8255, dec. May 14, 2018.

The failure of defense counsel to adequately represent her at the trial stage resulted in a conviction and sentence of death that does not comply with the minimum constitutional

19

standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sec. 9 of the Ohio Constitution.

In her petition, Roberts challenged that counsel failed to object to the use of peremptory challenges by the state for at least two jurors of African-American heritage during the jury selection. However, Roberts concedes that she has been unable to establish this sub-claim as nowhere does the record establish the race of prospective jurors dismissed via peremptory challenges. Without an evidentiary hearing or discovery, Roberts does not have the means to establish this sub-claim.

## II. If the affidavits provided in a Petitioner's Motion to Vacate filed pursuant to R.C. §2953.21 establish a meritorious issue, the trial court may not dismiss the petition without an evidentiary hearing.

This Court may not summarily dismiss Robert's postconviction action without granting him relief or an evidentiary hearing. A dismissal without an evidentiary hearing would deny Roberts her constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, United States Constitution and Section 16, Article I, Ohio Constitution.

Roberts has had included evidence outside the record to support her claim that she had not been afforded effective assistance of counsel during the first phase of trial of her capital trial.

Roberts has included as exhibits her affidavit as well as the video of her co-defendant's video of his explanation of the events leading up to the homicide. The video is not only evidence

20

that this offense did not occur with prior calculation and design, but that it was an act of self-defense, exculpating Roberts.  This evidence was not part of the record on direct appeal.  It was included in the appellant's petition filed pursuant to R.C. §2953.21.  As this evidence was *dehors* the record, the trial court should have granted an evidentiary hearing to determine the underlying facts of the issues presented.

**Petition to Vacate Statute Provides Statutory Protections and Rights**

The right to postconviction relief is set forth in Section (A) of R.C. §2953.21, which provides:

> (A)  Any person convicted of a criminal offense or adjudicated delinquent claiming that there was such a denial or infringement of his rights as to render that the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition at any time in that court which imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief.  The petitioner may file such supporting affidavit and other documentary evidence as will support his claim for relief.

As such, any person convicted of a criminal offense in Ohio whose rights have been infringed under either the Ohio or Federal Constitutions may seek relief under the Ohio postconviction statutes.

Postconviction actions are civil proceedings.  State v. Milanovich (1975), 42 Ohio St. 46. As such, the Ohio Rules of Civil Procedure were thought to apply.  Milanovich, supra, at 52. This conclusion is somewhat clouded by the decision of State v. Calhoun (1999), 86 Ohio St.3d 279.  In Calhoun, the Ohio Supreme Court reiterated that a postconviction petition was a "collateral civil attack on the judgment."  Id. 281.  However, the rights of a appellant were seemingly greatly curtailed by this decision.

21

The Supreme Court of Ohio has held that generally only three issues can be the basis for a dismissal without a hearing.  The first issue centers upon whether the individual cause of action or claim alleges a state or federal constitutional violation which affects appellant's conviction. The second issue is whether the appellant has met his burden to submit evidentiary documents containing sufficient operative facts to support her claims.  State v. Jackson (1980), 64 Ohio St. 2d 107.  Finally, the third issue is whether the evidence or documentation attached to the petition is so specious as to not warrant a hearing.  State v. Cole (1982), 2 Ohio St. 3d 112, 115.  This issue turns on an assessment of the evidence or documentation *dehors* the record that is attached to the petition.  If such evidence or documentation is merely specious, then no hearing on the petition is warranted.  Id.  However, the evidence submitted by appellant can only be deemed specious when, in comparison to evidence in the record, such *dehors* evidence fails to establish or support a claim.

Present Case

As noted, the claim here is whether the failure to present the video of co-defendant Jackson's claim of self-defense was a strategy within the professional norm for a capital litigator in 2003.  A review of the case does not reveal any reasonable basis for not introducing a statement of the actual shooter that Roberts was not involved and grew out of a dispute between Jackson and the victim.  Because the video was not made part of the record, this sub-claim was not and could not be included in the direct appeal briefing.

In Calhoun, the Supreme Court of Ohio clarified that a petitioner filing pursuant to that statute receives no more rights than those granted by the statute.  The court also held that the summary judgment opinions in civil cases do not apply because the trial court "has presumably

22

been presented with evidence sufficient to support the original entry of conviction." <u>Calhoun</u>, <u>Id</u>. 284. The court, thus, under certain conditions, found that the reviewing court may rule on the credibility of the affidavits attached.

The <u>Calhoun</u> decision would seem to provide greater discretion to the trial judge in determining whether petitioner met his proof burden in filing the petition. But in that case, unlike here, the presiding judge personally heard the trial evidence and therefore that judge would have some insight into the credibility of the various witnesses and the evidence in general. This cannot be done here as the judge hearing the trial and remand allocution has unfortunately died. And this Court was restricted by the limitation of the remand.

In reviewing the attached documents, the Supreme Court noted that an affidavit, being by definition a statement that the affiant has sworn to be truthful, should not lightly be deemed false. The Court followed the guidelines of the First Appellate District in <u>State v. Moore</u> (1994) 99 Ohio App.3d 748. Among these factors:

(1)     Whether the judge reviewing the postconviction relief petition also presided at trial;

(2)     Whether multiple affidavits contained merely identical language or otherwise appear to have been drafted by the same person;

(3)     Whether the affidavits contained or rely on hearsay;

(4)     Whether the affiants are relatives of the petitioner or otherwise interested in the success of the petitioner's efforts, and;

(5)     Whether the affidavits contradict evidence proffered by the defense at trial.

Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening

23

the credibility of that testimony.  The decision court concluded that depending on the entire

record, one or more of these factors may be sufficient to justify the conclusion that an affidavit

asserting information outside of the record lacks credibility.  Id. 285.

In applying the above factors, this  court would abuse its discretion by summarily

dismissing the petition.  Multiple affidavits are not contained in the petition.  The affidavits rely

on the personal experience of the affiant. The exhibits are material.  The sole item in favor of

questioning the credibility of the affiant is that the appellant clearly has his interest to consider.

R.C. §2953.21(c) requires that the reviewing judge consider the entire record.  This

section holds that "the court *shall* consider, in addition to the petition, the supporting affidavits,

the documentary evidence," in addition to the other items in the court file.  Subsection (E) of this

statute mandates in relevant part that: *unless the petition and the files and records of the case*

*show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the*

*issues . . .*

There is no clear showing Roberts is not entitled to relief.  A hearing is thus mandated in

this instance.  She was denied her rights to effective assistance of counsel at trial and to due pro-

cess of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

24

**Conclusion**

WHEREFORE, the Petitioner, Donna Roberts, requests the following relief:

76) That Petitioner be granted an evidentiary hearing pursuant to Ohio Revised Code §2953.21.

77) That her convictions and sentence be determined void or voidable and that she be granted a new trial.

78) Or in the alternative, and only if the court determines that her conviction is not void or voidable, that her sentence be determined void or voidable and that Petitioner be granted a new sentencing hearing.

For such other and further relief as the court may deem just and proper.

Respectfully submitted,

DAVID L. DOUGHTEN

Counsel for Petitioner Roberts

25

**ORIGINAL**

THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
                                        )    CASE  NO. 2001 CR 793
        Plaintiff-Respondent,           )
                                        )    JUDGE: RONALD J. RICE
-vs-                                    )
                                        )    RENEWED MOTION FOR
DONNA ROBERTS,                          )    SUMMARY JUDGMENT
                                        )
        Defendant-Petitioner.           )

Now comes Plaintiff-Respondent, the State of Ohio, by and through the Trumbull County

Prosecutor's Office, pursuant to R.C. 2953.21(D), and respectfully requests that Defendant-

Petitioner's Petition to Vacate or Set Aside Sentence Pursuant to Ohio Revised Code 2953.21 filed

in this Court August 20, 2008 and accompanying memorandum in support filed June 5, 2019, be

dismissed without a hearing for failure to establish substantive grounds for relief.[1]

The State renews its motion and moves this Court for Summary Judgment pursuant to Civ.

R. 56. As Petitioner does not raise anything additional in her most recent post-conviction filing,

the State submits the reasons in support of this motion are fully set forth in State's memorandum

filed in this Court on August 28, 2015. As mentioned by Petitioner in her brief, since the filing of

her 2008 and 2015 petitions, the Ohio Supreme Court affirmed her sentence and conviction in

*State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998. The Ohio Supreme Court further denied her

motion for reconsideration of that decision on December 18, 2017. On February 20, 2019, the

Supreme Court of the United States denied her petition for writ of certiorari. *Roberts v. Ohio*, 138

S.Ct 998 (2018).

---

[1] The State submits that this memorandum was filed two days prior to the memo only hearing
scheduled by this Court for June 7, 2019.

1



2001 CR
00793
00051555688
CRM

As such, the State of Ohio, respectfully requests that this Court grants summary judgment in this matter and that Petitioner is denied a hearing. Respondent is entitled to summary judgment as a matter of law as there are no genuine issues as to any material fact, and reasonable minds can come to but one conclusion and that conclusion is adverse to the Petitioner. As such, the State further requests that this Court issue findings of fact and conclusions of law pursuant to R.C. 2953.21(G) stating that it does not find grounds for granting relief and that it denies relief on Petitioner's petition.

Respectfully submitted,

DENNIS WATKINS (#0009949)
Prosecuting Attorney By:

CHRISTOPHER BECKER (#0047252)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High Street, N.W.
Fourth Floor, Administration Building
Warren, Ohio  44481
Telephone No.:  (330) 675-2426

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

2

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the foregoing motion was sent to Counsel for

Defendant-Petitioner Donna Roberts, Atty. David L. Doughten (#0002847) by electronic mail to

ddoughten@yahoo.com and by ordinary U.S. Mail to 4403 St. Clair Ave., Cleveland, Ohio

44103-1125, on this _____ Day of June 2019.

CHRISTOPHER BECKER (#0047252)
Assistant Prosecuting Attorney

3

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | Case No. 01 CR 793 |
|     Plaintiff-Respondent, | : | |
| -vs- | : | JUDGE Ronald J. Rice |
| DONNA ROBERTS | : | **Death Penalty Case** |
|     Defendant-Petitioner. | : | **Objection to Summary Judgment** |

Now comes the Petitioner Donna Roberts, by and through undersigned counsel, *David L.*

Doughten, and files her objection to the states Motion for Summary Judgment. Roberts

specifically argued in her second issue in her previously filed Memorandum in Support of her

Petition to Vacate pursuant to R.C. §2953.21, the reasons why summary judgment was not

appropriate in this matter. Roberts adopts and refers to her previously submitted argument as the

basis for her objection to the state's argument.

Respectfully submitted,

DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland, OH 44103
(216) 361-1112
ddoughten@yahoo.com

ATTORNEY FOR PETITIONER

2001 CR
00793
00056248832
CRM

**CERTIFICATE OF SERVICE**

The foregoing appellant's Brief was served upon Dennis Watkins, Trumbull County

Prosecutor and/or Christopher Becker, Esq. Assistant Trumbull County Prosecutor,

Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail and/or

email on this   11th   day of June, 2019.

DAVID L. DOUGHTEN

Counsel for Petitioner

**IN THE COURT OF COMMON PLEAS**
**-GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

**CASE NUMBER:  2001 CR 00793**

**STATE OF OHIO**
**PLAINTIFF**

**vs.**                                    **JUDGE RONALD J. RICE**

**DONNA MARIE ROBERTS**
**DEFENDANT**                    <u>**JUDGMENT ENTRY**</u>

This matter is before the Court on the Amended Post-Conviction Petition filed by the Defendant/Petitioner Donna Marie Roberts and the Motion for Summary Judgment filed by the State. The Court has reviewed the petition, the supporting affidavits, exhibits, memoranda and accompanying exhibits, the documentary evidence, the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the relevant applicable law. The Court notes certain aspects of the post-conviction petition have been withdrawn by the Defendant per the February 17, 2015 Motion to Amend. The Court shall refrain from discussing the merits of the withdrawn claims herein.

Post-conviction relief is a collateral civil attack on a criminal judgment; not an appeal of that judgment. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 281. As such, the Defendant is afforded only those rights set forth in the accompanying statutory scheme. Id. According to R.C. 2953.21(C), the Court shall determine whether there are substantive grounds for relief by reviewing the "*** petition, the supporting affidavits,



2001 CR
00793
00058658161
0

and the documentary evidence, all the files and records pertaining to the proceedings against the petition, including, but not limited to, the indictment, the court's journal entries, the journalized record of the clerk of the court, and the court reporter's transcript."

The Court has conducted this review and finds the Defendant is not entitled to a hearing on this post-conviction petition. The Court finds there are no substantive grounds for relief which would warrant a hearing on the petition. Accordingly, the Court hereby makes the following findings of fact and conclusions of law dismissing the Defendant's Amended Petition for Post-Conviction Relief without a hearing as the Defendant failed to establish substantive grounds for relief.

The Court finds the arguments raised by the Defendant are each barred by res judicata. "It is established that, pursuant to res judicata, a defendant cannot raise any issue in a motion for post conviction relief if he could have raised the issue in a direct appeal." *State v. Reynolds* (1997), 79 Ohio St.3d 158, 160.

The Court finds the Defendant has failed to show she was "unavoidably prevented from discovery of the facts" or entitled to a newly recognized federal or state right. Furthermore, the Defendant has failed to show, by even a preponderance of the evidence, that "*** but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense ***."

Claims re Jury Pool and Grand Jury Pool:

Roberts asserts, without any evidence whatsoever in support, that the jury pool and the grand jury pool was underrepresented by race. However, Roberts concedes

that she has no evidentiary support to establish such claims. Roberts requested additional discovery in an effort to establish such as well as an evidentiary hearing. However, the Court finds Roberts is not entitled to discovery or an evidentiary hearing. In fact, the duty to come forth with evidence in this statutorily-defined process is on the Defendant. "Instead, the burden is on the petitioner to submit evidentiary documents containing sufficient operative facts to demonstrate his claim and to merit a hearing. It is well established that the power to conduct and compel discovery is not included within the trial court's statutorily-defined authority." *State v. Lorraine*, 1996 WL 207676, *5, 11th Dist. No. 95-T-5196.

In addition, the Court finds a claim challenging the racial venire of either the jury or the grand jury could have and should have been raised in the initial direct appeal of this matter. Therefore, the claim is now barred by res judicata.

Accordingly, the claims regarding an inappropriate jury or Grand jury pool are found to be not well taken and the same are hereby denied without a hearing. These claims are also barred by res judicata.

Claim re Ineffective Assistance of Counsel in Trial Phase:

Roberts asserts ineffective counsel during the initial trial phase. "In a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *State v. Jackson* (1980), 64 Ohio St.2d 107, paragraph one of syllabus.

The burden is on Roberts to produce sufficient evidentiary material to support such an argument of ineffective assistance of counsel. "Before a hearing is granted, the petitioner bears the initial burden in a post-conviction proceeding to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and also that the defense was prejudiced by counsel's ineffectiveness." Id at 822.

This burden is not sustained with vague and bare assertions of ineffective assistance. "Broad assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction petitions. General conclusory allegations to the effect that a defendant has been denied effective assistance of counsel are inadequate as a matter of law to impose an evidentiary hearing." Id.

Roberts asserts trial counsel "did not provide an articulated defense ***." Although Roberts now challenges this strategy as "confusing," it is a trial strategy nonetheless. Each of the alleged deficiencies cited now by Roberts were trial tactics of strategy. There is no evidence to suggest such a strategy was deficient or prejudicial.

The decision not to present the Nathaniel Jackson interview was a trial tactic likely employed due to the credibility of the testimony contained therein. Likewise, the decision to limit opening statements and jury selection were also trial strategies not appropriate for such a collateral attack.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or setting aside of a death sentence requires that the defendant show, first, that counsel's performance was deficient and, second, that the

deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, paragraph two of syllabus. None of the issues raised by Roberts come close to meeting this standard.

In any event, an ineffective assistance of counsel argument should have been raised in the initial direct appeal. Indeed, an argument regarding ineffective assistance in the mitigation phase of the trial was presented and rejected. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665. Therefore, the Court finds the claim regarding ineffective assistance of counsel during the initial trial phase is barred by res judicata. *State v. Cole*, (1982) 2 Ohio St.3d 112.

Accordingly, the Court finds the petition, supporting documents, files and the record do not demonstrate sufficient operative facts to establish substantive grounds for relief. Therefore, the Court finds the Petitioner is not entitled to a hearing.

Furthermore, the Court finds that after construing the evidence in favor of Roberts as the non-moving party, reasonable minds can reach only once conclusion and that conclusion is adverse to Roberts. There are no genuine issues of material fact. The Court finds the Motion for Summary Judgment filed by the State is well taken and the same is hereby granted. The Petition for Post-Conviction Relief filed by Roberts is hereby denied without a hearing in accordance with Ohio law.

IT IS SO ORDERED.

This is a final and appealable order and there is no just cause for delay.

Date: *11-20-2019*

_____
JUDGE RONALD J. RICE

**TO THE CLERK OF COURTS:** You Are Ordered to Serve
Copies of this Judgment on all Counsel of Record
or Upon the Parties who are Unrepresented Forthwith
by Ordinary Mail.

JUDGE RONALD J RICE

2019 NOV 20  PM 2: 20

TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CRIMINAL DIVISION

STATE OF OHIO,                    :        CASE NO. 2001 CR 0793
                                  :
            Respondent,           :        JUDGE RONALD J. RICE
                                  :
    -vs-                          :
                                  :
DONNA ROBERTS,                    :        MOTION TO APPOINT
                                  :        APPELLATE COUNSEL
            Petitioner.           :
                                  :        (DEATH PENALTY CASE)

        Petitioner Donna Roberts moves this Honorable Court to appoint appellate counsel to the

Eleventh District Court of Appeals for the purposes of appealing the denial of the petition to

vacate her conviction and sentence of death filed pursuant to R.C. §2953.21.  This court entered

the journal entry dismissing her petition on November 20, 2019.

        Ms. Roberts is on death row and is indigent.  She has previously been adjudged so by this

court.  As this is a death penalty appeal, this is an appeal of right.

                                           Respectfully Submitted,

_____                  _____
ROBERT A. DIXON #0022466                   DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue                      4403 St. Clair Avenue
Cleveland, OH 44103                        Cleveland OH 44103
(216) 432-1992                             (216) 361-1112
dixonlaws@aol.com                          ddoughten@yahoo.com


        Counsel for Defendant-Petitioner Donna Roberts

2019 DEC -2  PM 1: 53
TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN

2001 CR
00793
00096273495
CRM

**CERTIFICATE OF SERVICE**

A copy of the foregoing Petitioner's Motion was served upon Dennis Watkins, Trumbull

County Prosecutor and/ Christopher Becker, Esq. Assistant Trumbull County Prosecutor,

Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail on this 2

day of November, 2019.

DAVID L. DOUGHTEN
Counsel for Petitioner

- 2 -

# IN THE COURT OF COMMON PLEAS
## -  GENERAL DIVISION  -
### TRUMBULL COUNTY, OHIO

|  |  |  |
|---|---|---|
| | ) | **CASE NUMBER:  2001 CR 793** |
| | ) | |
| **STATE OF OHIO** | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **VS.** | ) | **JUDGE RONALD J. RICE** |
| | ) | |
| **DONNA MARIE ROBERTS** | ) | |
| **DEFENDANT** | ) | **JUDGMENT ENTRY** |

This matter is before the Court on the Motion for Appointment of Appellate Counsel filed by the Defendant, Donna Marie Roberts. Upon review, the Court finds the Defendant's motion is well taken.

Accordingly, Attorney Robert A. Dixon and Attorney David L. Doughten are hereby appointed Appellate Counsel in this matter.

IT IS SO ORDERED.

Date: _12-10-2019_

cc: Robert A. Dixon #0022466
    David L. Doughten #0002847

JUDGE RONALD J. RICE

2019 DEC 10  PM 3: 45

TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN

# ELEVENTH DISTRICT COURT OF APPEALS
## DOCKETING STATEMENT
(To be attached to and filed with Notice of Appeal)

state of Ohio

Plaintiff-Appellee

- vs -

Donna Roberts

Defendant-Appellant

Name of Trial Court  Trumbull County

Trial Court No.  CR 01-793

Court of Appeals No.  2019 TR 89

**FILED**
**COURT OF APPEALS**

DEC 18 2019

**TRUMBULL COUNTY, OH**
**KAREN INFANTE ALLEN, CLERK**

**FILED**
COURT OF COMMON PLEAS

DEC 18 2019

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

## REGULAR CALENDAR

☒ Case should be assigned to the Regular Calendar with full briefing.

## ACCELERATED CALENDAR - (Check if this applies)

☐ I have read Loc.R.11.1. This appeal meets those requirements, and I request that it be briefed and decided on the Accelerated Calendar.

## EXPEDITED APPEAL

☐ This case should be heard as an expedited appeal as defined under App.R. 11.2 because: (State provision of App.R. 11.2 or applicable statute):

## ORAL ARGUMENT

☒ To expedite oral argument, I am willing to travel to whichever adjoining county in which the Eleventh District has the first available date.

☐ I want oral argument in this appeal set in the county in which the appeal originates.

## CASE TYPE

☐ **A. Criminal**
Specify nature of offense(s) (e.g., assault, burglary, rape:)  Death Penalty

(1) Is the defendant presently in jail?  ☒ Yes   ☐ No   If the answer is "Yes," give date of incarceration _____

When is he/she due to be released (if you know)? _____

(2) Has a stay been filed in the trial court?  ☐ Yes   ☒ No   If granted, what are the terms? _____

(3) Does the judgment entry comply with Crim.R. 32(C) by including the plea, verdict or findings, and a sentence?

☐ Yes   ☐ No   If the answer is "No," this is not a final appealable order.

☒ **B. Post-Conviction Relief**   Date of Conviction:  June 20, 2003

☐ **C. Civil**
Specify cause(s) of action: _____

☐ **App.R. 11.2 (Abortion, Adoption, or Termination of Parental Rights Appeal).**

PROBABLE ISSUE FOR REVIEW _Failure of trial court to grant an evidentiary hearing, ineffective assistance of trial counsel_

## THE FOLLOWING QUESTIONS APPLY TO ALL CIVIL AND ADMINISTRATIVE APPEALS

### 1. FINAL APPEALABLE ORDER

(a) Has the trial court disposed of all claims by and against all parties?

☐ Yes **(Attach copies of all judgments and orders indicating that all claims against all parties have been concluded.)**

☐ No

(b) If the answer to (a) is "No," has the trial court made an express determination that there is "no just reason for delay," pursuant to Civ.R. 54(B), with respect to the judgment or order from which the appeal is taken?

☐ Yes (Attach a copy of that order.)

☐ No

(c) Is the judgment order subject to immediate appeal under R.C. 2505.02?  If so, set forth the specific provision(s) that authorize this appeal:

(d) Does the right to an immediate appeal arise from a provision of a statute other than R.C. 2505.02?  If so, identify that statute:

### 2. MEDIATION

(a) Would a pre-hearing conference or mediation assist in the resolution of this matter?

☐ Yes     ☐ No     ☐ Maybe

Please explain (optional)

CERTIFICATE OF SERVICE: I certify that I have mailed or otherwise delivered a copy of this Docketing Statement to all counsel of record, or to the parties if unrepresented. The following is a listing of the name, address and telephone number of all counsel and the parties they represent and any parties not represented by counsel: (attach extra sheet if necessary)

_Dennis Watkins_
_Trumbull County Prosecutor_
_Administration Bldg_
_160 High Street._
_Warren, OH 44481_

_Chris Becker_
_Asst cty prosecutor_
_same address_

DATE _12-17-19_     SIGNATURE _[signature]_

Admin/Forms/New Dkt Stmt. 4
Revised 04/26/2011

IN THE COURT OF COMMON PLEAS
-GENERAL DIVISION-
TRUMBULL COUNTY, OHIO

CASE NUMBER:  2001 CR 00793

STATE OF OHIO
        PLAINTIFF

vs.                                  JUDGE RONALD J. RICE

DONNA MARIE ROBERTS
        DEFENDANT                 **JUDGMENT ENTRY**

      This matter is before the Court on the Amended Post-Conviction Petition filed by the Defendant/Petitioner Donna Marie Roberts and the Motion for Summary Judgment filed by the State. The Court has reviewed the petition, the supporting affidavits, exhibits, memoranda and accompanying exhibits, the documentary evidence, the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the relevant applicable law. The Court notes certain aspects of the post-conviction petition have been withdrawn by the Defendant per the February 17, 2015 Motion to Amend. The Court shall refrain from discussing the merits of the withdrawn claims herein.

      Post-conviction relief is a collateral civil attack on a criminal judgment; not an appeal of that judgment. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 281. As such, the Defendant is afforded only those rights set forth in the accompanying statutory scheme. Id. According to R.C. 2953.21(C), the Court shall determine whether there are substantive grounds for relief by reviewing the "*** petition, the supporting affidavits,

and the documentary evidence, all the files and records pertaining to the proceedings against the petition, including, but not limited to, the indictment, the court's journal entries, the journalized record of the clerk of the court, and the court reporter's transcript."

The Court has conducted this review and finds the Defendant is not entitled to a hearing on this post-conviction petition. The Court finds there are no substantive grounds for relief which would warrant a hearing on the petition. Accordingly, the Court hereby makes the following findings of fact and conclusions of law dismissing the Defendant's Amended Petition for Post-Conviction Relief without a hearing as the Defendant failed to establish substantive grounds for relief.

The Court finds the arguments raised by the Defendant are each barred by res judicata. "It is established that, pursuant to res judicata, a defendant cannot raise any issue in a motion for post conviction relief if he could have raised the issue in a direct appeal." *State v. Reynolds* (1997), 79 Ohio St.3d 158, 160.

The Court finds the Defendant has failed to show she was "unavoidably prevented from discovery of the facts" or entitled to a newly recognized federal or state right. Furthermore, the Defendant has failed to show, by even a preponderance of the evidence, that "*** but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense ***."

Claims re Jury Pool and Grand Jury Pool:

Roberts asserts, without any evidence whatsoever in support, that the jury pool and the grand jury pool was underrepresented by race. However, Roberts concedes

that she has no evidentiary support to establish such claims. Roberts requested additional discovery in an effort to establish such as well as an evidentiary hearing. However, the Court finds Roberts is not entitled to discovery or an evidentiary hearing. In fact, the duty to come forth with evidence in this statutorily-defined process is on the Defendant. "Instead, the burden is on the petitioner to submit evidentiary documents containing sufficient operative facts to demonstrate his claim and to merit a hearing. It is well established that the power to conduct and compel discovery is not included within the trial court's statutorily-defined authority." *State v. Lorraine*, 1996 WL 207676, *5, 11th Dist. No. 95-T-5196.

In addition, the Court finds a claim challenging the racial venire of either the jury or the grand jury could have and should have been raised in the initial direct appeal of this matter. Therefore, the claim is now barred by res judicata.

Accordingly, the claims regarding an inappropriate jury or Grand jury pool are found to be not well taken and the same are hereby denied without a hearing. These claims are also barred by res judicata.

Claim re Ineffective Assistance of Counsel in Trial Phase:

Roberts asserts ineffective counsel during the initial trial phase. "In a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *State v. Jackson* (1980), 64 Ohio St.2d 107, paragraph one of syllabus.

The burden is on Roberts to produce sufficient evidentiary material to support such an argument of ineffective assistance of counsel. "Before a hearing is granted, the petitioner bears the initial burden in a post-conviction proceeding to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and also that the defense was prejudiced by counsel's ineffectiveness." Id at 822.

This burden is not sustained with vague and bare assertions of ineffective assistance. "Broad assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction petitions. General conclusory allegations to the effect that a defendant has been denied effective assistance of counsel are inadequate as a matter of law to impose an evidentiary hearing." Id.

Roberts asserts trial counsel "did not provide an articulated defense ***." Although Roberts now challenges this strategy as "confusing," it is a trial strategy nonetheless. Each of the alleged deficiencies cited now by Roberts were trial tactics of strategy. There is no evidence to suggest such a strategy was deficient or prejudicial.

The decision not to present the Nathaniel Jackson interview was a trial tactic likely employed due to the credibility of the testimony contained therein. Likewise, the decision to limit opening statements and jury selection were also trial strategies not appropriate for such a collateral attack.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or setting aside of a death sentence requires that the defendant show, first, that counsel's performance was deficient and, second, that the

4

deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, paragraph two of syllabus. None of the issues raised by Roberts come close to meeting this standard.

In any event, an ineffective assistance of counsel argument should have been raised in the initial direct appeal. Indeed, an argument regarding ineffective assistance in the mitigation phase of the trial was presented and rejected. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665. Therefore, the Court finds the claim regarding ineffective assistance of counsel during the initial trial phase is barred by res judicata. *State v. Cole*, (1982) 2 Ohio St.3d 112.

Accordingly, the Court finds the petition, supporting documents, files and the record do not demonstrate sufficient operative facts to establish substantive grounds for relief. Therefore, the Court finds the Petitioner is not entitled to a hearing.

Furthermore, the Court finds that after construing the evidence in favor of Roberts as the non-moving party, reasonable minds can reach only once conclusion and that conclusion is adverse to Roberts. There are no genuine issues of material fact. The Court finds the Motion for Summary Judgment filed by the State is well taken and the same is hereby granted. The Petition for Post-Conviction Relief filed by Roberts is hereby denied without a hearing in accordance with Ohio law.

IT IS SO ORDERED.

This is a final and appealable order and there is no just cause for delay.

Date: _11-20-2019_

_____
JUDGE RONALD J. RICE

TO THE CLERK OF COURTS:  You Are Ordered to Serve
Copies of this Judgment on all Counsel of Record
or Upon the Parties who are Unrepresented Forthwith
by Ordinary Mail.

_____
JUDGE RONALD J RICE

2019 NOV 20  PM 2: 20

TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN

6

**IN THE COURT OF COMMON PLEAS**
**- GENERAL DIVISION -**
**TRUMBULL COUNTY, OHIO**

|  |  |  |
|---|---|---|
| | ) | **CASE NUMBER:  2001 CR 793** |
| | ) | |
| **STATE OF OHIO** | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **VS.** | ) | **JUDGE RONALD J. RICE** |
| | ) | |
| **DONNA MARIE ROBERTS** | ) | |
| **DEFENDANT** | ) | **JUDGMENT ENTRY** |

This matter is before the Court on the Motion for Appointment of Appellate
Counsel filed by the Defendant, Donna Marie Roberts. Upon review, the Court finds the
Defendant's motion is well taken.

Accordingly, Attorney Robert A. Dixon and Attorney David L. Doughten are
hereby appointed Appellate Counsel in this matter.

IT IS SO ORDERED.

Date: 12-10-2019

cc: Robert A. Dixon #0022466
   David L. Doughten #0002847



JUDGE RONALD J. RICE

2019 DEC 10 PM 3: 45
TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN

2001 CR
00793
00007581716
0

IN THE COURT OF COMMON PLEAS
COUNTY OF TRUMBULL
CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO.    2001 CR 793 |
| | | *2019 TR 89* |
| Plaintiff-Respondent, | : | JUDGE RONALD J. RICE |
| -vs- | : | |
| DONNA ROBERTS, | : | **NOTICE OF APPEAL** |
| Defendant-Petitioner. | : | Death Penalty Appeal |

Now comes the defendant, Donna Roberts, by and through undersigned counsel, and hereby gives notice that she will appeal, on questions of law, the denial of his petition for postconviction relief pursuant to R.C. §2953.21.  This appeal is taken pursuant to Ohio Rule of Appellate Procedure 4(A) and is filed as a matter of right.  The final judgment was filed on November 20, 2019.  Undersigned counsel have been court appointed.

**TRANSCRIPT OF PROCEEDINGS INFORMATION -App. R. 9(B)**

No transcript or statement pursuant to App. R. (9)( C) or (D) is required. There was no evidentiary hearing in this matter.  The judge granted the prosecutor's motion for summary judgment.

*12-17-19*
Date



DAVID L. DOUGHTEN #0002847
4403 St. Clair Avenue
Cleveland, Ohio  44103
(216) 361-1112
FAX: (216) 881-3928
ddoughten@yahoo.com

**FILED**
COURT OF COMMON PLEAS

DEC 1 8 2019

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

**FILED**
**COURT OF APPEALS**

DEC 1 8 2019

**TRUMBULL COUNTY, OH**
**KAREN INFANTE ALLEN, CLERK**

2001 CR
00793
00017224358
CANALC

ROBERT A. DIXON, OH #0022466
4403 St. Clair Avenue
Cleveland Oh, 44103
(216) 432-1992

Counsel for Petitioner-Appellant

## CERTIFICATE OF SERVICE

The foregoing appellant's Brief was served upon Dennis Watkins, Trumbull County

Prosecutor and/or Christopher Becker, Esq. Assistant Trumbull County Prosecutor,

Administration Building, 160 High Street, Warren, Ohio 44481, by Regular U. S. mail and/or

email on this   17th   day of December, 2019.

DAVID L. DOUGHTEN

Counsel for Petitioner-Appellant

## MOTION, ENTRY, AND CERTIFICATION FOR APPOINTED COUNSEL FEES

| | | | |
|---|---|---|---|
| **In the** | Common Pleas | **Court of** | Common Pleas **, Ohio** |
| Plaintiff: | State of Ohio | Current Case No. | 2001 CR 00793 |
| **V.** | | Reference Case No. (if app.) | |
| | Donna Roberts | ☒ Capital Offense Case *(check if this is a Capital Offense case)* | |
| Defendant / Party Represented | | ☐ Guardian Ad Litem *(check if appointed as GAL)* | |
| In re: | | Judge | Ronald J. Rice |

## MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES

The undersigned having been appointed counsel for the party represented moves this Court for an order approving payment of fees and expenses as indicated in the itemized statement herein. I certify that I have received no compensation in connection with providing representation in this case other than that described in this motion or which has been approved by the Court in a previous motion, nor have any fees and expenses in this motion been duplicated on any other motion. I, or an attorney under my supervision, have performed all legal services itemized in this motion.

☐ Periodic Billing *(check if this is a periodic bill)*

As attorney/guardian ad litem of record, I was appointed on _____May 12, 2014_____ . This case terminated and/or was

disposed of on ___November 25, 2019___ I am submitting this application on ___December 11, 2019___ .

Name ___David L. Doughten___          Signature _____

Address ___4403 St. Clair Avenue, Cleveland, OH, 44103___

*Address* *City / State / Zip* OSC Reg. No. ___0002847___

## SUMMARY OF CHARGES, HOURS, EXPENSES, AND BILLING

| OFFENSE/CHARGE/MATTER | ORC/CITY CODE | DEGREE | DISPOSITION |
|---|---|---|---|
| 1.) Agg. Murder With Specs | 2903.01WS | NA | Other |
| | | | |
| | | | |

*List only the three most serious charges beginning with the one of the greatest severity and continuing in descending order.*

| **Grand Total Hours From Other Side:** | OUT-OF-COURT | IN-COURT | | IN-COURT TOTAL | GRAND TOTAL |
|---|---|---|---|---|---|
| | | PRE-TRIAL HEARINGS | ALL OTHER IN-COURT | | |
| | 37.50 | 0.00 | 0.00 | 0.00 | 37.50 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ Flat Fee | Hrs:In | 0.00 | X Rate $125.00 = | $0.00 | Total Fees | $4,687.50 | |
| ☐ Min. Fee | Hrs:Out | 37.50 | X Rate $125.00 = | $4,687.50 | Expenses | $0.00 | Total $4,687.50 |

## JUDGMENT ENTRY

The Court finds that counsel performed the legal services set forth on the itemized statement on the reverse hereof, and that the fees and expenses set forth on this statement are reasonable, and are in accordance with the resolution of the Board of County Commissioners of _____Trumbull_____ County, Ohio relating to payment of appointed counsel, that all rules and standards of the Ohio Public Defender Commission and State Public Defender have been met.

IT IS THEREFORE ORDERED that counsel fees and expenses be, and are hereby approved, in the amount of _4687.50_ . It is further ordered that the said amount be, and hereby is, certified by the Court to the County Auditor for payment.

☐ *Extraordinary fees granted (copy of journal entry attached)*     Judge _____     _12-18-2019_

 *Signature* *Date*

## CERTIFICATION

The County Auditor, in executing this certification, attests to the accuracy of the figures contained herein. A subsequent audit by the Ohio Public Defender Commission and/or Auditor of the State which reveals unallowable or excessive costs may result in future adjustments against reimbursement or repayment of audit exceptions to the Ohio Public Defender Commission.

County Number ___78___     Warrant Number _____     Warrant Date _____

2001 CR
00793
00072397648
OAF

CASE NUMBER_____2001 CR 00793_____  ATTORNEY/GAL _____David  L. Doughten_____

IF CAPITAL OFFENSE CASE, LIST CO-COUNSEL'S NAME HERE: _____Robert A. Dixon_____

### ITEMIZED FEE STATEMENT

I hereby certify that the following time was expended in representation of the defendant/party represented:

| DATE OF SERVICE | OUT-OF-COURT TOTAL | PRE-TRIAL HEARINGS | ALL OTHER IN-COURT | IN-COURT TOTAL | DAILY TOTAL | DATE OF SERVICE (continued) | OUT-OF-COURT TOTAL | PRE-TRIAL HEARINGS | ALL OTHER IN-COURT | IN-COURT TOTAL | DAILY TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/16/18 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 | | | | | | |
| 11/1/18 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | | | | | | |
| 12/1/18 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | | | | | | |
| 12/5/18 | 0.3 | 0.0 | 0.0 | 0.0 | 0.3 | | | | | | |
| 12/7/18 | 0.4 | 0.0 | 0.0 | 0.0 | 0.4 | | | | | | |
| 12/18/18 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 | | | | | | |
| 12/27/18 | 0.8 | 0.0 | 0.0 | 0.0 | 0.8 | | | | | | |
| 12/28/18 | 7.0 | 0.0 | 0.0 | 0.0 | 7.0 | | | | | | |
| 12/29/18 | 0.4 | 0.0 | 0.0 | 0.0 | 0.4 | | | | | | |
| 2/6/19 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 | | | | | | |
| 2/10/19 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | | | | | | |
| 2/13/19 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 | | | | | | |
| 4/8/19 | 0.4 | 0.0 | 0.0 | 0.0 | 0.4 | | | | | | |
| 4/18/19 | 8.5 | 0.0 | 0.0 | 0.0 | 8.5 | | | | | | |
| 6/1/19 | 4.5 | 0.0 | 0.0 | 0.0 | 4.5 | | | | | | |
| 6/2/19 | 7.2 | 0.0 | 0.0 | 0.0 | 7.2 | | | | | | |
| 6/3/19 | 3.3 | 0.0 | 0.0 | 0.0 | 3.3 | | | | | | |
| 6/10/19 | 2.0 | 0.0 | 0.0 | 0.0 | 2.0 | | | | | | |
| 11/1/19 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | | | | | | |
| 11/20/19 | 0.5 | 0.0 | 0.0 | 0.0 | 0.5 | | | | | | |
| 11/25/19 | 1.0 | 0.0 | 0.0 | 0.0 | 1.0 | GRAND TOTAL | 37.5 | 0.0 | 0.0 | 0.0 | 37.5 |

*Continue at top of next column.*      *Time is to be reported in tenth of an hour (6 minute) increments.*

**I hereby certify that the following expenses were incurred:**

Use the following categories for Type:     (1) Experts     (2) Postage/Phone     (3) Records/Reports     (4) Transcripts     (5) Travel     (6) Other

| TYPE | PAYEE | AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | TOTAL | |

*Clearly identify each expense and include a receipt for any expense over $1.00.  See Section (P)(1)(c) for privileged information.*

### FINANCIAL DISCLOSURE FORM
($25.00 application fee may be assessed—see notice on reverse side)

#### I. PERSONAL INFORMATION

| Applicant's Name | D.O.B. | Name of Person Being Represented *(if juvenile)* | D.O.B. |
|---|---|---|---|
| *Donna Roberts* | | | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| *marysville, OSRW* | *marysville* | *OH* | |

| Case No. | Phone | Cell Phone |
|---|---|---|
| *2001 CR 793* | (   )   - | (   )   - |

| SSN Last 4 | Gender | Race (double-click to de-select) |
|---|---|---|
| *1661* | *F* | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American  ☐ Native Hawaiian or Pacific Islander  ☐ Spanish or Latino  ☑ White  ☐ Other |

#### II. OTHER PERSONS LIVING IN HOUSEHOLD

| Name 1) | D.O.B. | Relationship | Name 3) | D.O.B. | Relationship |
|---|---|---|---|---|---|
| *N/A* | | | | | |
| 2) *N/A* | | | 4) | | |

#### III. PRESUMPTIVE ELIGIBILITY

The appointment of counsel is presumed if the person represented meets any of the qualifications below.  Please place an 'X'

Ohio Works First / TANF: _____   SSI: _____   SSD: _____   Medicaid: _____   Poverty Related Veterans' Benefits: _____   Food Stamps: _____

Refugee Settlement Benefits: _____   Incarcerated in state penitentiary: _____   Committed to a Public Mental Health Facility: _____

Other (please describe): *on death row* _____   Juvenile: _____ *(if juvenile, please continue at Section VIII)*

#### IV. INCOME AND EMPLOYER

| | Applicant | Spouse (Do not include spouse's income if spouse is alleged victim) | Total Income |
|---|---|---|---|
| Gross Monthly Employment Income | $ | $ | $ |
| Unemployment, Worker's Compensation, Child Support, Other Types of Income | $ | $ | $ |
| | | TOTAL INCOME | $ *0* |

Employer's Name: _____   Phone Number: (   ) _____

Employer's Address: _____

#### V. LIQUID ASSETS

| Type of Asset | Estimated Value |
|---|---|
| Checking, Savings, Money Market Accounts | $ |
| Stocks, Bonds, CDs | $ |
| Other Liquid Assets or Cash on Hand | $ |
| Total Liquid Assets | $ |

#### VI. MONTHLY EXPENSES

| Type of Expense | Amount | Type of Expense | Amount |
|---|---|---|---|
| Child Support Paid Out | $ | Telephone | $ |
| Child Care (if working only) | $ | Transportation / Fuel | $ |
| Insurance (medical, dental, auto, etc.) | $ | Taxes Withheld or Owed | $ |
| Medical / Dental Expenses or Associated Costs of Caring for Infirm Family Member | $ | Credit Card, Other Loans | $ |
| Rent / Mortgage | $ | Utilities (Gas, Electric, Water / Sewer, Trash) | $ |
| Food | $ | Other (Specify) | $ |
| EXPENSES | $ *0* | EXPENSES | $ *0* |

#### VII. DETERMINATION OF INDIGENCY

If applicant's Total Income in Section IV is at or below 187.5% of the Federal Poverty Guidelines, counsel will be appointed.
For applicants whose Total Income in Section IV is above 125% of the Federal Poverty Guidelines, see recoupment notice in Section XI.
If applicant's Liquid Assets in Section V exceed figures provided in OAC 120-1-03, appointment of counsel may be denied if applicant can employ counsel using those liquid assets.
If applicant's Total Income falls above 187.5% of Federal Poverty Guidelines, but applicant is financially unable to employ counsel after paying monthly expenses in Section VI, counsel must be appointed.

DONNA ROBERTS v WARDEN
CASE NO. 4:21-cv-00368-DAP
APPENDIX – PAGE 3543

**VIII. $25.00 APPLICATION FEE NOTICE**

By submitting this Financial Disclosure Form, you will be assessed a non-refundable $25.00 application fee unless waived or reduced by the court. If assessed, the fee is to be paid to the clerk of courts within 7 days of submitting this form to the entity that will make a determination regarding your indigency. No applicant may be denied counsel based upon failure or inability to pay this fee.

**IX. APPLICANT CERTIFICATION**

I, _Donna M Roberts_ _____ (applicant or alleged delinquent child) state:

1. I am financially unable to retain private counsel without substantial hardship to me or my family.

2. I understand that I must inform the public defender or appointed attorney if my financial situation should change before the disposition of the case(s) for which representation is being provided.

3. I understand that if it is determined by the county or the court that legal representation should not have been provided, I may be required to reimburse the county for the costs of representation provided. Any action filed by the county to collect legal fees hereunder must be brought within two years from the last date legal representation was provided.

4. I understand that I am subject to criminal charges for providing false financial information in connection with this application for legal representation, pursuant to Ohio Revised Code sections 120.05 and 2921.13.

5. I hereby certify that the information I have provided on this financial disclosure form is true to the best of my knowledge.

x _Donna M Roberts_  12.03.19
Signature                          Date

**X. JUDGE CERTIFICATION**

I hereby certify that the above-noted applicant is unable to fill out and/or sign this financial disclosure for the following reason: _____. I have determined that the party represented meets the criteria for receiving court-appointed counsel.

_____     _____
Judge's Signature                          Date

**XI. NOTICE OF RECOUPMENT**

ORC. §120.03 allows for county recoupment programs. Any such program may not jeopardize the quality of defense provided or act to deny representation to qualified applicants. No payments, compensation, or in-kind services shall be required from an applicant or client whose income falls below 125% of the federal poverty guidelines. See OAC 120-1-05.

Through recoupment, an applicant or client may be required to pay for **part** of the cost of services rendered, if he or she can reasonably be expected to pay. See ORC §2941.51(D)

| XII. JUVENILE'S PARENTS' INCOME* – FOR RECOUPMENT PURPOSES ONLY – NOT FOR APPOINTMENT OF COUNSEL | | |
|---|---|---|
| | Custodial Parents' Income (Do not include parents' income if parent or relative is alleged victim) | Total |
| Employment Income (Gross) | $ | $ |
| Unemployment, Workers Compensation, Child Support, Other Types of Income | $ | $ |
| TOTAL INCOME | | $ |

*Please complete Section VI on page 1 of this form if you would like the court to consider your monthly expenses when determining the amount of recoupment which you can reasonably be expected to pay.

OPD-206R rev. 12/2017

| | |
|---|---|
| **STATE OF OHIO** ) )SS. **COUNTY OF TRUMBULL** ) | **IN THE COURT OF APPEALS** **ELEVENTH DISTRICT** |

STATE OF OHIO,

      Plaintiff-Appellee,

    - vs -

DONNA ROBERTS,

      Defendant-Appellant.

**JUDGMENT ENTRY**

**CASE NO.  2019-T-0089**

For the reasons stated in the Opinion of this court, the assignments of error are without merit.  The order of this court is that the judgment of the Trumbull County Court of Common Pleas is affirmed.  Costs to be taxed against appellant.

_____
JUDGE MATT LYNCH

TIMOTHY P. CANNON, P.J.,

MARY JANE TRAPP, J.,

concur.

**FILED**
**COURT OF APPEALS**

AUG 2 4 2020

**TRUMBULL COUNTY, OH**
**KAREN INFANTE ALLEN, CLERK**