**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **DONNA ROBERTS,** | ) | **Case No. 4:21 CV 368** |
| | ) | |
| **Petitioner,** | ) | **Judge:  DAN AARON POLSTER** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TERI BALDUAF, WARDEN,** | ) | **CAPITAL HABEAS CASE** |
| | ) | |
| **Respondent.** | ) | |

---

**PETITIONER DONNA ROBERTS'S TRAVERSE**

---

## I.     INTRODUCTION

Donna Roberts could not have been depicted in a worse light during her trial, not only by the State, but by the media as well. The depiction was followed right along the lines of *Double Indemnity*. According to that narrative, she was a middle-aged femme fatale, carrying on assignations in cheap motels with her a paramour, a younger Black man who had just been released from prison. Together, so the narrative went, they schemed to kill her ex-husband/roommate for his insurance money. The love letters and recorded phone calls were trotted out, as cringeworthy as one would expect. Volumes of them were submitted as evidence at trial.

Yet none of this tells the real story of Donna Roberts. Ms. Roberts grew up witnessing physical abuse between her mother and father and was herself raped by a family member at a young age. She has suffered from severe mental illness for most of her life. Ms. Roberts has been diagnosed with Bipolar Disorder, Depression, and experienced hallucinations. As a result of three automobile accidents, she has an array of cognitive disabilities.

In spite of these hardships, prior to this homicide, the hallmark of Ms. Roberts's life was acts of great generosity. She converted to Judaism and took the concept of *chesed* to heart, providing financial support to her adult son and younger sister, assisting with reconstructive surgery for Israeli soldiers, and providing financial support to an Ethiopian Jew to relocate to Israel to escape from persecution.

So, the portrait of the heartless femme fatale painted by the prosecution was not at all accurate. Yet the jury was never presented with another picture. Ohio courts consistently failed to consider evidence that would have dispelled the myth of Donna Roberts's "dirty old lady" persona and given the trier of fact a more complete and accurate picture. Tried by an all-white jury, she also was never able to get her case before a fair cross-section of the community.

This Court should grant the writ and order a new, fair trial. In the alternative, this Court should grant the writ and order a new, fair penalty phase. Again, in the alternative, this Court should grant discovery and an evidentiary hearing on the following claims for relief.

## II.    RELEVANT PRINCIPLES OF PROCEDURAL DEFAULT AND EXHAUSTION

### A.    Doctrine of Procedural Default

Whether a federal constitutional claim is procedurally defaulted is a question of federal law. *Henry v. Mississippi*, 379 U.S. 443, 447 (1965). Federal courts review state procedural judgments with the aim to respect "concerns of comity and federalism." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). State procedural rules must, however, be "adequate and independent" to justify imposing a bar to federal review of constitutional claims. *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977). Even if a petitioner has defaulted a constitutional claim under state law, a federal court may excuse the default in certain circumstances and rule on the merits of the claim. *See Coleman*, 501 U.S. at 750 (procedural default bars review of a claim "unless the prisoner can

demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice"); *Reed v. Ross*, 468 U.S. 1, 9 (1984) ("Our decisions have uniformly acknowledged that federal courts are empowered . . . to look beyond a state procedural forfeiture and entertain a state prisoner's contention that his constitutional rights have been violated.").

This Court must consider the circumstances in deciding whether to address the merits of each allegedly defaulted claim. *Francis v. Henderson*, 425 U.S. 536, 539 (1976). Capital cases should be subject to heightened scrutiny because death "is different in both its severity and its finality." *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

Federal courts "must go through a complicated analysis" when the Warden makes a claim of default. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). The Warden must prove all the elements of procedural default to establish the defense for each constitutional claim and sub-claim. The elements of default are:

> There exists a state procedural rule that applies to the petitioner's claim and that the petitioner failed to comply with the rule;
>
> The state court actually enforced the state procedural sanction;
>
> The state procedural forfeiture is an "adequate and independent" state ground on which the Warden can rely to foreclose review of a federal constitutional claim.

*See id*. If the Court determines these conditions have been met, then to have the claim resolved on the merits, the petitioner must "demonstrate . . . that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.*

1.      **The Warden Must Prove A State Procedural Rule That Applies To The Petitioner's Claim Exists And Prove That The Petitioner Failed To Comply With That Rule**

For each claim of default, the Warden must first demonstrate there is a clearly applicable state procedural rule. This element is not met where state law does not clearly support the existence or application of a state procedural rule. *See Ulster Cty. Ct. v. Allen*, 442 U.S. 140, 154 (1979) (explaining that "if neither the state legislature nor the state courts indicated that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim"). The federal habeas court need not honor a state "procedural bar" that has no foundation in state law. *Bransford v. Brown*, 806 F.2d 83, 84-85 (6th Cir. 1986) (reaching merits of claim where state appeal was considered on the merits); *Walker v. Engle*, 703 F.2d 959, 966 (6th Cir. 1983). The rule must also have been in effect during the alleged default. *See, e.g.*, *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

This element is also not proven where the facts surrounding a specific constitutional claim support the application of a recognized exception to the rule. *See, e.g.*, *Wills v. Texas*, 511 U.S. 1097 (1994) (O'Connor, J., concurring in denial of certiorari) (state law allowing certain claims to be raised for the first time in post-conviction; failure to raise claim on direct appeal does not bar federal habeas review). If the State misapplied a procedural bar that should not have precluded consideration of a claim, the federal court need not impose default. *Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007); *Dugger v. Adams*, 489 U.S. 401, 410-11, n.6 (1989).

The Warden must demonstrate that Ms. Roberts actually violated the state procedural rule in presenting the specific constitutional claim. *Maupin*, 785 F.2d at 138. If Ms. Roberts effectively and substantially complied with the state rule or made a reasonable and good faith effort to comply

with the rule, there is no default. *See Lee v. Kemna*, 534 U.S. 362, 366-67 (2002) (federal habeas review not barred because petitioner "substantially, if imperfectly" complied with the state rule).

### 2. The Warden Must Prove The State Court Actually Enforced The State Procedural Sanction

The Warden also must demonstrate that the state courts actually enforced the procedural bar. *Maupin*, 785 F.2d at 138. If the last state court rendering a judgment reached the merits of the claim, the federal court too may address the merits. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Franklin v. Anderson*, 434 F.3d 412, 420-21 (6th Cir. 2005).

### 3. The Warden Must Prove The State Procedural Forfeiture Is An "Adequate And Independent" State Ground On Which The State Can Rely To Foreclose Review Of A Federal Constitutional Claim

Finally, the Warden must demonstrate that the state procedural rule is both an adequate and an independent ground upon which to base a federal default. *Maupin*, 785 F.2d at 138. To be adequate, a procedural rule must be a "firmly established and regularly followed state practice." *Ford*, 498 U.S. at 423 (internal quotation marks omitted). States must consistently apply and evenhandedly enforce the rule. A state rule is not adequate when the rule was not regularly enforced at the time of conviction. *See Rogers v. Howes*, 144 F.3d 990, 994-95 (6th Cir. 1998); *see also Mapes v. Coyle*, 171 F.3d 408, 429 (6th Cir. 1999) (holding that a state procedural ground for failing to review claim was based upon "erroneous circular reasoning" and was therefore inadequate).

A rule is not independent if the state ground for the decision is so "interwoven with federal law" that the ground is not independent of federal law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)). To be independent, state procedural rules and decisions must not rely on federal law. *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008).

### 4. Cause And Prejudice Will Excuse The Default

Despite the application and enforcement of an adequate and independent state procedural bar, the federal court can still review the claim if Ms. Roberts demonstrates "that there was 'cause' for her not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138.

The "cause" requirement can be met if "the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). There is no set definition of "cause;" it is "something external to the petitioner, something that cannot fairly be attributed to him." *Gravely v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (internal quotation marks omitted). "Cause" can run the gamut from state concealment of evidence, (*see Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988); *Strickler v. Greene*, 527 U.S. 263, 283 (1999)), to "a showing that the factual or legal basis for a claim was not reasonably available to counsel" when the default occurred, (*see Coleman*, 501 U.S. at 753 (internal citations omitted)), to ineffective assistance of trial counsel, (*see Gravely*, 87 F.3d at 785), to ineffective assistance of appellate counsel, (*see Buell v. Mitchell*, 274 F.3d 337, 351-52 (6th Cir. 2001)).

"Cause" may be demonstrated through showing the denial of the effective assistance of counsel in failing to properly preserve a claim for review in state court. *Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000); *see also Ege v. Yukins*, 485 F.3d 364, 378 (6th Cir. 2007) (discussing claim defaulted by trial counsel's failing to object and acknowledging ineffective assistance of counsel as being available to establish cause and prejudice).

*Maupin* further instructs federal courts how to assess the "prejudice" prong: "in analyzing a petitioner's contention of prejudice, the court should assume that the petitioner has stated a

meritorious constitutional claim." *Maupin,* 785 F.2d at 139. The federal court must assume that a claim has merit and decide whether the federal constitutional claim meets the test for prejudice articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.*

Determining whether cause and prejudice exists frequently involves factual questions that may only be resolved at an evidentiary hearing. "[C]ause and prejudice are 'federal questions' on which the federal courts have a duty to make 'an independent determination.'" Randy Hertz and James S. Leibman, Federal Habeas Corpus Practice & Procedure § 26.3d, Vol. II, at 1356-57 (5th ed. 2005). Such factual questions "include the competence of counsel, whether some state official impeded petitioner's ability or effort to comply with a procedural rule . . . whether petitioner or his attorney was aware of the relevant facts with which the alleged default occurred . . . and the degree of prejudice." "[A]pplication of the 'cause' and 'prejudice' standard may turn on factual findings that should be made by a district court." *Jenkins v. Anderson*, 447 U.S. 231, 234-35, n. 1 (1980).

In *Mapes*, the Sixth Circuit ordered the district court to conduct an evidentiary hearing on whether *Mapes* was denied the effective assistance of appellate counsel, whether such ineffectiveness constituted "cause," and whether counsel's defective performance prejudiced Mapes such that several procedural defaults could be excused, and the federal court could reach the merits of those federal constitutional claims. 171 F.3d at 429; *see also Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993) ("[T]he absence of a hearing on the issue of cause and prejudice makes it more difficult for this reviewing court to determine whether a sufficient showing has been made.").

### a. Ineffective Assistance Of Appellate Counsel Claims Raised Under Ohio R. App. P. 26(B) or Ohio S. Ct. Prac. R. 11(6)

Under Ohio law, ineffective-assistance-of-appellate-counsel claims must be raised under Ohio R. App. P. 26(B) or Ohio S. Ct. Prac. R. 11(6). *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992). A so-called "*Murnahan* application" seeks delayed reconsideration in the appellate court in which the alleged error took place. *Id.* The rule requires these applications to be filed within ninety days of the journalization of the court's opinion. *Franklin v. Anderson*, 434 F.3d 412, 419 (6th Cir. 2006).

The Supreme Court of Ohio's treatment of the timeliness of Applications to Reopen in capital cases has been "erratic" and has "fluctuated" noticeably since 2000. *Id.* at 420-21 (listing cases and inconsistent dispositions). The Sixth Circuit has concluded that the ninety-day time limit is not an "actually enforced" "state procedural sanction." *Id.* at 420 (citing *Maupin*, 785 F.2d at 138). Therefore, the Ohio rule was found "not an adequate and independent state rule" that is regularly established and followed so it would preclude consideration of an IAAC claim on habeas review. *Franklin*, 434 F.3d at 421.

The Sixth Circuit has also recognized that it is "unreasonable to expect counsel to raise an ineffective assistance claim against himself." *Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008). An inmate will have complied with the state procedural rule if he has filed his *Murnahan* application within ninety days after his direct-appeal counsel is replaced by new counsel. *Id.*

### b. *Res Judicata* And Ohio's Post-Conviction Statute

Any constitutional claim that cannot be fully resolved except by reliance on matters outside the record cannot be resolved on direct appeal and must be raised under Ohio's statutory post-conviction procedure. Ohio Rev. Code § 2953.21 *et seq.*; *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982). Ohio's post-conviction procedure, however, is strictly limited to addressing constitutional

claims that could not have been fully resolved on direct appeal. Any issue that *was or could have been* resolved on direct appeal will be subject to the defense of *res judicata* and will not be cognizable in post-conviction. *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967).

The Sixth Circuit has concluded that "Ohio's application of its *res judicata* rule generally constitutes an independent and adequate state ground that forecloses federal habeas review." *Hartman v. Bagley*, 492 F.3d 347, 357-58 (6th Cir. 2007). If the state court's reliance on its own rule was misplaced or erroneous, however, the federal court is not foreclosed from reviewing the claim. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005). An Ohio court erroneously applies *res judicata* when it dismisses a claim based on evidence outside the record that could not have been brought on direct appeal. *See, e.g.*, *Hartman*, 492 F.3d at 358 (ineffective-assistance claim was based on psychologist's report not part of the trial record and could not have been litigated on direct appeal); *White*, 431 F.3d at 527 (ineffective-assistance claim supported by affidavits from the trial mitigation expert, and two other experts); *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005) (post-conviction claim introduced evidence outside the record, including a post-trial affidavit from the mitigation expert, and an affidavit from another expert).

## B.     Doctrine of Exhaustion

Under 28 U.S.C. § 2254(b)(1), a state prisoner seeking a writ of habeas corpus must first give the State the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curium) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)) (citation omitted). A prisoner provides such an "opportunity" by "'fairly present[ing]' his claim in each appropriate state court, thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Duncan*, 513 U.S. at 365-66. To preserve claims for federal review, the petitioner

must present the claims to the State's highest court, even if the only review available is discretionary under ordinary appellate procedure. *O'Sullivan*, 526 U.S. at 847-48.

The claims presented in state and federal court do not need to be identical. A prisoner exhausts his claim by presenting "the substance of a federal habeas corpus claim" to the state courts. *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005) (citing *Connor*, 404 U.S. at 277-78). Variations in legal theory or factual allegations render no claim unexhausted, as long as the ultimate question for disposition remains the same. *Id.* at 613.

A petitioner can take four actions that are "significant to the determination of whether a claim has been 'fairly presented.'" *Whiting*, 395 F.3d at 612-13. To analyze whether the factual and legal bases of the claim have been exhausted, courts look to the state court briefing for a petitioner's:

reliance upon federal cases employing constitutional analysis;

reliance upon state cases employing federal constitutional analysis;

phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or,

alleging facts well within the mainstream of constitutional law.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

Exhaustion is satisfied if the petitioner has fairly presented the claim and is not dependent on how the state court adjudicates the claim. *Clinkscale v. Carter*, 375 F.3d 430, 438 (6th Cir. 2004) ("[I]t is beyond peradventure that exhaustion does not require a state court adjudication on the merits of the claim at issue.").

## IV.     STANDARD OF REVIEW PURUSUANT TO 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the standard for the federal courts' review of Ms. Roberts's claims for relief under 28 U.S.C. § 2254(a) because he is in custody in violation of the Constitution or law or treaties of the United States.  Under the AEDPA, 28 U.S.C. § 2254(d) provides, in relevant part:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or,
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Clearly established Federal law" has been defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The Sixth Circuit has recognized that "[t]hat body of precedent includes 'not only bright-line rules but also the legal principles and standards flowing from precedent.'" *Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008).  The jurisprudence of appellate courts is not entirely irrelevant, however, as a federal court "may look to lower courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal precedent had been clearly established." *Hereford*, 536 F.3d at 528.

The Supreme Court has explained that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams*, 529 U.S. at 405. It also explained that a decision will be

11

considered "contrary to" clearly established federal law "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406.

Under the "unreasonable application" prong, a federal court can grant habeas relief if a state court decision on the merits "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The "unreasonableness" of a decision is analyzed objectively, and the standard is not met if the decision is merely erroneous or incorrect. *See id.* at 409-11. To find a decision unreasonable, a federal court does not have to find that "all reasonable jurists" would have reached a different conclusion than the state court. *Id.* at 410.

Even constitutional principles "stated in general terms" can be applied unreasonably by state courts. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment). A federal court can find that a state court unreasonably applied a principle to a set of facts, even if the facts differ from the precedent announcing the principle. *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

Besides the provisions in § 2254(d)(1), a federal court can also grant relief if the state proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determination of the facts upon which its decision is based will be procedurally unreasonable if, for example, the state court misconstrued or misstated the record or overlooked or misconstrued evidence. *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Ayers v. Hudson*, 623 F.3d 301, 317, n.5 (6th Cir. 2010) (explaining

12

that when the state court bases its determination to deny relief on, at least in part, a "demonstrably false" factual statement, that "error alone undermines confidence in the result reached by the" state court).

A petitioner also may have relief under § 2254(d)(2) if the state court makes a factual determination using an adequate procedure to make that determination but where the resulting determination is substantively unreasonable because it is not supported by the evidence presented in the state court proceeding. *See Miller-El v. Dretke*, 545 U.S. 231, 257-58, 266 (2005); *Wiggins*, 539 U.S. at 528; *Cockrell*, 537 U.S. at 340.

These limitations on the federal court's power to grant habeas relief are not always applicable, however, and there are circumstances under which a federal court should grant relief after its *de novo* review of a habeas claim. If a state court "did not assess the merits of a claim properly raised in a habeas petition," then § 2254(d)'s limitations do not apply. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). For instance, the Supreme Court applied *de novo* review to the prejudice element of ineffective-assistance-of-counsel claims in both *Wiggins* and *Rompilla*, and the performance prong in *Porter*, because the state courts had never assessed those issues. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins*, 539 U.S. at 534.

Determining a particular factual issue made by a state court is presumed correct, but a habeas petitioner can overcome this presumption with clear and convincing evidence that the state court's factual determination was erroneous. *Sawyer v. Hofbauer*, 299 F.3d 605, 609 (6th Cir. 2002). To make a "determination of a factual issue" to which § 2254(e)(1) applies, a state court may not simply provide conclusory recitations of the case, but instead must actually provide a "definitive statement of 'the facts'" and resolve any testimonial or evidentiary inconsistencies.

13

*Vasquez v. Bradshaw*, 345 F. App'x 104, 113 (6th Cir. 2009). In other words, the state court must actually "determine" the facts before § 2254(e)(1) might apply. *See Wiggins*, 539 U.S. at 530-31 (evaluating a state court's conclusory factual finding, given its explanation and denying it deference under § 2254(e)(1)); *Vasquez*, 345 F. App'x at 113 ("The dispute over whether the district court accorded the proper deference [under § 2254(e)(1)] is limited to only [the] statements where the [state court's] 'determination of a factual issue' [is] actually discernable.").

A state court fails to make factual determinations entitled to review under § 2254(e)(1)'s limitations when it simply provides the "background to its decision" that includes "a statement of the applicable legal rules, a summary of the factual testimony given by each witness . . . and portions of trial transcript relevant to certain . . . issues." *Vasquez*, 345 F. App'x at 113. Moreover, a state court's decision that one interpretation of evidence is better than another, or the state court's determination that a jury would reach certain conclusions or would believe certain witnesses, are determinations reserved for the jury, not a judge, and thus such state court determinations are not "factual determinations" entitled to § 2254(e)(1)'s limitations on review. *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007); *see also Barker v. Yukins*, 199 F.3d 867, 874-75 (6th Cir. 1999); *Vasquez*, 345 F. App'x at 114-15.

14

## V.    GROUNDS FOR RELIEF

### FIRST GROUND FOR RELIEF

**WHEN CONSIDERING THE APPROPRIATE SENTENCE IN A CAPITAL TRIAL, THE SENTENCING JUDGE MUST CONSIDER AND GIVE EFFECT TO ALL MITIGATING EVIDENCE. A TRIAL COURT'S REFUSAL TO CONSIDER MITIGATING EVIDENCE IS A VIOLATION OF A CAPITAL DEFENDANT'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE CONSTITUTION AND IN VIOLATION OF *SKIPPER V. SOUTH CAROLINA*, 476 U.S. 1 (1986), *EDDINGS V. OKLAHOMA*, 455 U.S. 104 (1982), AND *LOCKETT V. OHIO*, 438 U.S. 586 (1978).**

### A.    Introduction

The United States Supreme Court has held consistently that the death penalty is different from all others. *Woodson v. North Carolina*, 428 U.S. 280 (1976). Based on this acknowledgement, Eighth Amendment jurisprudence has safeguarded a capital defendant's right to present mitigating evidence at the penalty phase of a capital trial. Beginning with *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court has expanded the rights of capital defendants to present to capital sentencers any evidence that could mitigate their sentences to something less than death. Although this principle was first enunciated in 1978 with the *Lockett* holding, the Supreme Court has steadfastly adhered to it in subsequent cases, even those on federal habeas review. *See, e.g., Abdul-Kabir v. Quarterman,* 550 U.S. 233, 264 (2007) ("Our cases following *Lockett* have made clear that when the [capital sentencer] is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed.").

The Ohio Supreme Court ignored this mandate when it unreasonably applied *Lockett* and its progeny to Ms. Roberts's case. As another judge on this Court has found, the Ohio Supreme Court opinion "guts" the *Lockett* line of cases. *Jackson v. Houk*, 4:07-cv-0880, PageID 23853 (N.D. Ohio Feb. 23, 2021). Furthermore, it disregarded the Sixth Circuit Court of Appeals'

15

reasoning on a factually indistinguishable case. *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007). This reasoning was flawed and an unreasonable application of *Lockett*, *Eddings*, and *Skipper*. This Court should follow the reasoning of the *Jackson* court and find it is bound by the Sixth Circuit's well-supported *Davis* opinion and conclude that the Ohio Supreme Court's opinion was an unreasonable application of United States Supreme Court precedent under 28 U.S.C. § 2254(d)(1). It should grant habeas relief on this claim.

### B.    State Court Proceedings

Ms. Roberts raised this ground for relief on her second direct appeal in propositions of law one and two and on her third direct appeal in proposition of law two. (ECF 12-6, App'x to ROW, PageID 8822-8846; ECF 12-9, App'x to ROW, PageID 9433-37). The state does not allege, nor could it, that this ground for relief is procedurally defaulted. The Court therefore should address it on the merits.

### C.    Clearly Established Federal Law

The United States Supreme Court held in *Lockett v. Ohio*, 438 U.S. 586 (1978), that a capital defendant has an Eighth Amendment right to present any evidence in mitigation during the penalty phase of trial. In *Lockett*, Ohio had enacted a death penalty scheme that permitted a sentencer to consider only a limited range of mitigating circumstances. In finding Ohio's statutes unconstitutional, the *Lockett* Court held, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 587 (emphasis in original).

A short time later, the Supreme Court again struck down a statutory scheme in which the sentencer was precluded from considering mitigating evidence. In *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court enunciated that a state may not prohibit capital sentencers "from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 114 (emphasis in original). There, it was the trial judge who had instructed the jury to disregard mitigating evidence the defendant had introduced. The Court rejected this action outright, determining, "The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114-15.

Completing the trilogy, the Court in *Skipper v. South Carolina*, 476 U.S. 1 (1986), applied the *Lockett-Eddings* holdings to a capital defendant's prison behavior. In that case, South Carolina convicted Skipper of capital murder and rape. At Skipper's sentencing hearing, the trial court rejected as irrelevant Skipper's offer of evidence "regarding [Skipper's] good behavior during the other seven months he spent in jail awaiting trial" and testimony that Skipper "made a good adjustment" while awaiting trial. *Id.* at 4.  The jury sentenced Skipper to death.

On appeal, the Supreme Court reversed the lower courts' decisions, vacating Skipper's sentence. It determined Skipper had a right to place before the sentencing jury all relevant evidence in mitigation of punishment, including his good prison behavior. *Id.* at 4. Finding that Skipper's prison conduct was relevant mitigating evidence Skipper had the right to present, the Court determined, "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating" and, under *Eddings*, may not be excluded from the sentencer's consideration. *Id.* at 5.

Following this established precedent, the Sixth Circuit Court of Appeals adjudicated this precise issue in *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007). In that case, the Sixth Circuit reviewed a federal habeas claim in which the petitioner who had been allowed to present all of his mitigating evidence at his initial sentencing hearing, was denied the chance to present new mitigating evidence at his resentencing. *Id.* 768-70. The Sixth Circuit vacated Davis's second death sentence and held that:

> [T]he decision of the three-judge panel to exclude testimony concerning [the petitioner's] exemplary behavior on death row in the time between the two sentencing hearings violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and the state courts' decisions affirming the panel's ruling were contrary to the those of the Supreme Court of the United States in *Lockett*, *Eddings*, and *Skipper*.

*Id.* at 770. Like *Lockett* and its progeny, the *Davis* court concluded that "the holding in *Skipper* . . . requires that, at resentencing, a trial court must consider any new evidence that the defendant has developed since the initial sentencing hearing." *Id.* at 774 (citing *Skipper*, 476 U.S. at 8).

The *Lockett-Eddings-Skipper* trilogy is clear: a capital defendant must be permitted to present any evidence to mitigate his or her sentence. The Ohio Supreme Court's upholding Ms. Roberts's sentence, when the trial court refused to do precisely what the *Lockett* cases proscribe, renders the Ohio Supreme Court's opinion an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2244(d)(1).

### D.    Argument

There is no question that the Ohio Supreme Court unreasonably applied Ms. Roberts's *Lockett* claim. The Ohio Supreme Court found factually significant the procedural posture of the case: that Ms. Roberts's case was on remand for resentencing after vacating her death sentence on direct appeal, rather than a first sentencing hearing. It noted that it had held similarly in the case *State v. Davis*, 584 N.E.2d 925 (Ohio 1988) and the defendant there raised the identical claim Ms.

18

Roberts raised in her second direct appeal. As it did in *Davis*, the Ohio Supreme Court "distinguished *Skipper* by noting that it involved the erroneous exclusion of 'evidence of Skipper's good prison record *between his arrest and trial*.'" *State v. Roberts*, 998 N.E.2d 1100, 1106 (Ohio 2013) (emphasis in original). "In other words," it explained, "neither *Lockett* nor any of its progeny required the trial court to reopen the evidence after an error-free evidentiary hearing had already taken place." *Id.* at 1108.

Finding that allowing Ms. Roberts to present mitigating evidence on remand after vacating her initial death sentence would provide her with the right to "update" her mitigation, the Ohio Supreme Court rejected Ms. Roberts's *Lockett* claim. While it observed that the United States Court of Appeals for the Sixth Circuit had overturned Davis's death sentence in federal habeas proceedings, it rejected that holding, decrying, "As the state points out, we are 'not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court.'" *Id.*

As noted above, another judge on this Court found the Ohio Supreme Court's reasoning on the nearly identical issue to be an unreasonable application of *Skipper*. The Court found:

In the instant case, the Ohio Supreme Court somehow rejected the *Davis* Court's reading of *Lockett*, *Eddings*, *Skipper*:

> To hold, as [*Davis v. Coyle*] does, that a new mitigation hearing must be held, even though no constitutional error infected the original one, would transform the right to present relevant mitigation into a right to update one's mitigation. Such a right has no clear basis in *Lockett* or its progeny.

*Jackson v. Houk*, 4:07-cv-00880-JG, ECF 80, PageID 23852 (citing *State v. Jackson III*, 73 N.E.3d 414, 429 (Ohio 2016) (quoting *Roberts*, 998 N.E.2d at 1108).

19

The Ohio Supreme Court said that it was not bound by *Davis* or any "rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court." [citing *Jackson III*, 73 N.E.3d at 428 (quoting *Roberts*, 998 N.E.2d at 1108)].

But the *Davis* Court correctly interpreted the U.S. Supreme Court's *Lockett*, *Eddings*, *Skipper* holdings. The Ohio Supreme Court's finding guts the Supreme Court's requirement that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating" and "[u]nder *Eddings*, such evidence may not be excluded from the sentencer's consideration." [*Skipper*, 476 U.S. at 5

Rejecting the core holdings of *Lockett*, *Eddings*, *Skipper*, the Ohio Supreme Court rejected Jackson's claims that he had a right to present new and updated mitigation evidence at his resentencing:

> Jackson was given a full opportunity to present mitigating evidence during his initial sentencing hearing. Accordingly, Jackson was not entitled to improve or expand his mitigating evidence simply because the court of appeals required the judge to resentence him and prepare a new sentencing opinion.

*State v. Jackson III*, 73 N.E.3d at 430.

*Davis v. Coyle* interpreted Supreme Court requirements. This Court is bound by *Davis* and the Sixth Circuit's understanding of the dictates of the Supreme Court's *Lockett*, *Eddings*, and *Skipper* precedent. In addition, the Ohio Supreme Court's interpretation destroys the Supreme Court's holding that defendants be given a chance to offer mitigating evidence.

> Therefore, the Court finds that the Ohio Supreme Court's decision to prevent Jackson from presenting mitigating evidence at his resenting [sic] hearing "was both an unreasonable application of the *Skipper* decision and contrary to the holding in that opinion and its antecedent cases." [*Davis*, 475 F.3d at 773.] Consequently, the Court grants Jackson's habeas corpus petition on Ground 30.

*Jackson v. Houk*, 4:07-cv-0880, PageID 23852-54 (N.D. Ohio Feb. 23, 2021).

Although *Jackson* is not binding authority for this Court, the Court should find its reasoning to be thorough and persuasive. First, as a district court residing within the Sixth Circuit Court of Appeals, the Court should find that it is bound by the *Davis* holding. Even if it were not, the Court should find that the Ohio Supreme Court's arbitrary and unreasoned decision to delineate a distinction between a defendant who is sentenced in the first instance and one whose initial sentence has been vacated and faces resentencing for the death penalty is clearly contrary to and an unreasonable application of *Lockett* and its progeny.[1] 28 U.S.C. § 2244(d)(1).

The *Lockett-Eddings-Skipper* line of cases all support a capital defendant's right to present *any* evidence to mitigate their sentence. The Supreme Court has consistently struck down any state impediment to this hallowed principle. The Eighth Amendment cannot be thwarted merely because a capital defendant's sentence was vacated on appeal rather than be sentenced initially. The Ohio Supreme Court finds a distinction without any true difference. This Court should find, as did another judge on the Court, the Ohio Supreme Court's reasoning unreasonably applies longstanding Supreme Court precedent. It should grant Ms. Roberts federal habeas relief on this ground.

### E.     The Warden's Arguments Are Irrelevant To This Court's Analysis. The Court Should Disregard Them.

The Warden makes several superfluous arguments regarding Ms. Roberts's claim. The Warden observes that she waived the presentation of mitigating evidence at her initial penalty phase hearing. The Warden further notes the Ohio Supreme Court's finding of Ms. Roberts's valid waiver is a finding of fact to which this Court owes deference under 28 U.S.C. § 2244(d)(2). The

---

[1] Ms. Roberts notes that the United States Supreme Court has held under the federal criminal sentencing system that, "when a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider evidence of a defendant's rehabilitation since his prior sentencing and that such evidence may, in appropriate cases, support [a lower sentence]." *See Pepper v. United States*, 562 U.S. 472, 490 (2011).

Warden also argues that Ms. Roberts's initial waiver was still in place once the Ohio Supreme Court vacated her sentence and remanded her case for resentencing. (ECF 15, ROW, PageID 12848).

In Ms. Roberts's first ground for relief, she does not attack or question the validity of her waiver, nor does she question the Ohio Supreme Court's finding that her waiver was valid under Ohio law. Simply put, whether or not Ms. Roberts waived her right to present mitigating evidence at her penalty phase hearing is beside the point. The waiver of her rights at the initial sentencing hearing cannot override her subsequent wish to present evidence at her second and third sentencing hearings. The Eighth and Fourteenth Amendments dictate that an individual faced with a capital sentence is entitled to present *any* evidence that could mitigate the sentence to something less than death. *Eddings*, 455 U.S. at 114. Here, the trial court did precisely that when it determined, "*as a matter of law*," that Ms. Roberts was precluded from presenting extensive and profound evidence that could mitigate her sentence. The Court should find irrelevant the Warden's waiver arguments.

For the foregoing reasons, the Court should find the Ohio Supreme Court unreasonably applied clearly established federal law when it upheld the trial court's denial of Ms. Roberts's motion to present additional, significant mitigating evidence on remand after it vacated her initial death sentence. The Court should follow the binding precedent in *Davis v. Coyle* and the persuasive ruling of another judge on this Court and find habeas relief is warranted for Ms. Roberts's First Ground for Relief. 28 U.S.C. § 2244(d)(1).

## SECOND GROUND FOR RELIEF

**MS. ROBERTS'S RIGHT TO DUE PROCESS, A FAIR TRIAL, AND THE EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY COUNSEL'S DEFICIENT PERFORMANCE DURING THE PENALTY PHASE OF HER TRIAL, IN VIOLATION OF HER SIXTH, EIGHTH AND FOURTEENTH RIGHTS OF THE UNITED STATES CONSTITUTION.**

### A.    Introduction

Defense counsel failed to conduct a constitutionally sufficient mitigation investigation. Counsel failed to take the necessary time to speak to family members, including Ms. Roberts's son, Mike Raymond, her sister, Janice and even Ms. Roberts herself about her upbringing and background, as outlined in the Petition. Had counsel developed something more than a superficial relationship with Ms. Roberts and her family, they would have uncovered powerful mitigation evidence. Counsel neither took the time to become acquainted with Ms. Roberts personally nor, more importantly, procured important medical records. Had counsel done so, they could have developed a trusting relationship where she would have trusted their advice to proceed with the presentation of a wide array of mitigating evidence.

### B.    State Court Proceedings

Ms. Roberts raised trial counsel's ineffectiveness for failure to investigate and procure mitigating evidence in the Fourth Ground for Relief in her post-conviction petition. (ECF 12-13, PageID 10221-10232). As noted in the Petition, after the Supreme Court of Ohio affirmed the convictions but vacated the death sentence, the first post-conviction appeal was dismissed for lack of jurisdiction. On August 20, 2008, Ms. Roberts again filed a petition for post-conviction relief with the trial court. It is in this post-conviction petition that Ms. Roberts filed her claim regarding ineffective assistance during the penalty phase proceedings. (Id. at PageID 10202.) The post-conviction proceedings were held in abeyance pending Ms. Roberts's second direct appeal.

23

While the direct appeal was pending, and a second resentencing hearing occurred, Ms. Roberts filed an amended petition for post-conviction relief on July 20, 2015. This petition was held in abeyance while the third direct appeal was pending. (ECF 12-13, Judgment Entry, PageID 10436). Once those proceedings concluded, the trial court directed post-conviction counsel to withdraw the ineffective assistance of counsel for failure to investigate before the penalty phase claim because Ms. Roberts "controlled" her counsel during penalty phase of trial. (*Id.* at PageID 10490; 10496).

This claim is therefore not procedurally defaulted because Ms. Roberts fairly presented it to the state courts. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (holding "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"). Because it was the state court that caused Ms. Roberts to forego this opportunity, she should not be precluded from raising, and the Court should not be precluded from addressing, her ineffective assistance of counsel during the penalty phase claim here. *Shinn v. Ramirez*, __ U.S. __, 142 S.Ct. 1718 (2022).

The Warden addresses only the procedural aspects of this claim in the Return of Writ. (ECF 15, Return of Writ, PageID 12852-56). He argues Ms. Roberts failed to raise this claim on the first direct appeal, raised it on the second direct appeal, but failed to raise it on the third direct appeal. The Warden's analysis is not relevant to this Court's procedural default analysis. One of the Supreme Court of Ohio's longstanding principals is that a criminal defendant cannot raise on direct appeal any claim that is based on evidence outside of the record. *State v. Perry*, 226 N.E.2d 104 (Ohio 1967). By its very nature, Ms. Roberts's ineffective assistance for failure to investigate mitigating evidence claim must be based on evidence outside the record, as the claim must be supported by evidence counsel failed to introduce. The Warden's argument that it is unexhausted

or procedurally defaulted based on an analysis of the direct appeal appellate briefs is therefore improper. Any analysis of Ms. Robert's ineffective assistance for failure to investigate claim must begin with the post-conviction litigation.

Here, the post-conviction court directed counsel to withdraw certain claims, and counsel complied. (ECF 12-13, PageID 10490). Because Ms. Roberts presented, but the post-conviction court refused to hear, her ineffective assistance for failure to investigate mitigating evidence claim, there is no state court opinion to which this Court must defer. The Court should find this claim is properly before it and review this claim on the merits under a *de novo* standard.

### C.    Clearly Established Federal Law

The seminal United States Supreme Court opinion on counsel's mitigation phase ineffectiveness is the now-familiar *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, the Court held that counsel's failure to investigate and present to the jury mitigating evidence regarding the petitioner's difficult childhood was unreasonable and violated the Sixth Amendment. The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*. The *Wiggins* Court cautioned that, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id*. at 527. While *Strickland* established that strategic decisions can be virtually unchallengeable, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation. *Id.* Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's

background further, the Court held that trial counsel's actions were objectively unreasonable under *Strickland*.

Similarly, in *Porter v. McCollum*, 558 U.S. 30 (2009), the Supreme Court reversed the Eleventh Circuit's decision to deny a writ of habeas corpus where counsel failed to investigate and present evidence of Porter's military service in two Korean war battles as well as evidence of a troubled childhood and brain dysfunction. Because counsel made no attempts to uncover this information despite it being obtainable, the *Porter* Court held that the state court had unreasonably concluded that Porter failed to meet his burden of proving ineffective assistance. These cases demonstrate that counsel's decisions regarding the introduction of mitigating evidence must be based on a thorough investigation.

Finally, the recent decision in *Andrus v. Texas*, __ U.S. __, 140 S.Ct 1875 (2020), attests to *Wiggins*'s longevity. In that case, the Court considered whether capital defense counsel's performance fell below professional norms when counsel failed to procure significant mitigating evidence of Andrus's childhood trauma and abuse. Although counsel had conducted a mitigation investigation, the Court nonetheless found it deficient because "it overlook[ed] vast trenches of mitigating evidence." *Id.* at 1881. Echoing *Wiggins*, the *Andrus* Court reiterated that counsel cannot overcome a deficient mitigation investigation merely by cloaking themselves in "strategy." As the *Andrus* Court observed, "Here . . . [a]lthough counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand after the prosecution rested, the record leaves no doubt that counsel's investigation to support that case was an empty exercise." *Id.* at 1882.

Importantly, a court's finding that counsel conducted a thorough mitigation investigation does not end the *Strickland* analysis. Counsel's actions (or inactions) also must be subject to a reasonableness review regarding other decisions and actions counsel take. In *Roe v. Flores-Ortega*,

528 U.S. 470 (2000), the Supreme Court found appellate counsel to be constitutionally inadequate when counsel failed to file a timely appeal. Because it was not entirely clear whether the client had requested one, the *Roe* Court remanded the case and instructed the lower court to analyze the case pursuant to its specific facts.  It eschewed "mechanical rules" regarding counsel's behavior, ruling instead that a reviewing court should focus on whether the defendant received a fair trial and appeal. *Id.* at 481. The *Roe* Court held that, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were *reasonable*." *Id.* (emphasis supplied). *Roe* thus stands for the proposition that counsel's "strategic" choices cannot withstand constitutional scrutiny—and are therefore unreasonable pursuant to *Strickland*—if their effect is to deny a defendant the right to a fair trial or appeal.

The Sixth Circuit followed *Roe* in *Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004). There the Court found counsel to be constitutionally ineffective even when counsel had alleged that their failure to file a timely notice of alibi was a strategic decision. The Court opined that, "even if Clinkscale's attorneys subjectively believed that failing to file an alibi notice on time was in some way strategic - which is doubtful - such a 'strategy' cannot, under the circumstances presented in this case, be considered objectively 'sound' or 'reasonable.'" *Id*. at 443 (citing *Roe*, 528 U.S. at 481) (footnote and further citations omitted). Read together, *Andrus*, *Roe*, and *Clinkscale* instruct a habeas court that *Strickland* requires counsel to behave in an objectively reasonable manner. Counsel's subjective beliefs about the reasonableness of their decisions or their trial strategy are irrelevant when a court conducts a *Strickland* review.

In addition to the reasonableness prong, a petitioner also must demonstrate that counsel's actions prejudiced the outcome of the proceeding. A court finds prejudice when it determines that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (internal quotation marks and citations omitted).

### D.    Argument

As noted in the Petition, counsel failed to even proffer any evidence that they would have introduced had they conducted a mitigation presentation. Counsel could have presented evidence of Mr. Roberts's troubled upbringing, including her father's violent outbursts which, in one instance, led to him chasing her mother with a gun. They could have described the increased isolation and estrangement she felt from her family after she converted to Judaism.

Had counsel fully investigated Ms. Roberts's background, they would have known that she had a significant history of head injuries and mental health issues. Ms. Roberts was involved in at least three automobile accidents throughout her life. One was in the l960's and another was in the 1980's. The final accident in 1999 altered Ms. Roberts's behavior. She completely isolated herself from friends and family. She stopped calling Janice, to whom she has spoken most every day. After this accident, Fingerhut called the Social Security Administration to urge the agency to provide Ms. Roberts with benefits. He informed that agency that Ms. Roberts had not been herself since the accident.

These accidents were verified by Dr. Thomas Gazley of the Forensic Diagnostic Center. (ECF 11-4, PageID 6685-6686). Dr. Gazley, who is not a neuropsychologist, noted that he did not know if there was "such a thing as competency to be resentenced criteria." (*Id.* at PageID 6686). It was difficult for him to determine what effect a head injury in 1999 might have several years later. There is no evidence that Dr. Gazley reviewed any of the Social Security records. Further underscoring trial counsel's ineffectiveness, these records were not available for the competency evaluation prior to the actual trial.

The Social Security records revealed the extent of Ms. Roberts's head injuries, resulting in her receiving disability payments. Trial counsel also failed to hire a neuropsychologist to determine the extent of Ms. Roberts's head injuries and the effect that these injuries had on her thinking and actions at the time of the trial and penalty phase hearing. Trial counsel's failure to investigate this obvious avenue of mitigating evidence is contra *Wiggins*.

Had counsel conducted a thorough mitigation investigation, they would have presented evidence of Ms. Roberts's mental health diagnoses. From the records at St. Joseph's Hospital to which she was admitted after a suicide attempt, it appears Ms. Roberts was diagnosed with Psychotic Disorder and a personality disorder. (ECF 12-13, PageID 10342). The admitting diagnosis was Depression, suicidal, Major Depression, recurrent Bipolar Disorder. Because they failed to conduct a thorough investigation, trial counsel were unaware that Ms. Roberts was prescribed: Remeron (15 mg), Zyprexa (526mg), Vistaril (50 mg), Premarin, Provera, Paxil (20 mg), Depakote (500 mg), Risperdal (1 mg), (*id.*), or that her final diagnosis was Bipolar Disorder, circular type. (Id. at 10348) Trial counsel failed to hire an independent psychologist and spend the necessary time with their client. Had they done so, they would have discovered that she had suffered from Depression for a great many years and was probably Bipolar. (ECF 12-13, PageID 10249; 10253; 10268).

Trial counsel's failure to investigate led to Ms. Roberts's waiver and tainted the outcome of the penalty phase proceedings. Finally, because of the superficial relationship with Ms. Roberts, trial counsel were unaware that, following her 1999 auto accident, tests revealed an IQ of 65. (Id. at PageID 10251). Even if a subsequent hearing would not have resulted in Ms. Roberts meeting the criteria for intellectual disability under *Atkins v. Virginia*, 536 U.S. 304 (2002), the report of her post-accident IQ should have been admitted as evidence in mitigation. Low intelligence is a

29

recognized mitigator, regardless of whether it meets Ohio's intellectual disability standards. This evidence could have humanized Ms. Roberts to the jury by explaining her conduct.

Counsel's mitigation investigation was deficient. As the *Andrus* Court observed, a constitutionally adequate investigation under *Wiggins* requires that, "in any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances. . .." *Andrus*, 140 S.Ct. at 1881 (citing *Wiggins*, 539 U.S. at 521-22).

Although trial counsel conducted some mitigation investigation, it was constitutionally inadequate. In capital trials, investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Rompilla v. Beard,* 545 U.S. 374, 387, n.7 (2005) (emphasis in original, citation and quotation marks omitted). In conducting such investigations, "counsel should consider presenting [the defendant's] medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (citation omitted, emphasis in original). Counsel's failure to conduct a constitutionally mandated mitigation investigation resulted in her waiver of the penalty phase of trial and death sentence. The Court should find that Ms. Roberts's ineffective assistance of counsel for failure to investigate mitigation claim has merit.

The Warden fails to address the merits of Ms. Roberts's ineffective assistance for failure to investigate mitigating evidence claim and the impact it would have had on the penalty phase proceedings, including Ms. Roberts's decision to waive the presentation of mitigating evidence in the first instance. As the *Wiggins* Court cautioned, "'strategic choices made after less than complete investigation are reasonable' only to the extent that reasonable professional judgments

support the limitations on investigation." *Wiggins*, 539 U.S. at 512 (quoting *Strickland*, 466 U.S. at 690-91). The Court should consider how trial counsel's inadequate investigation led to Ms. Robert's waiver, which in turn clearly prejudiced the outcome of the penalty phase of Ms. Roberts's capital trial. It should grant habeas relief on Ms. Roberts's Second Ground.

### E.     Conclusion

The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. §2254 (d)(1)(2). Ms. Roberts is entitled to the writ of habeas corpus on this claim.

### THIRD AND NINTH GROUNDS FOR RELIEF

**THE TRIAL COURT ACCEPTED MS. ROBERTS'S WAIVER OF THE PRESENTATION OF MITIGATING EVIDENCE DURING THE PENALTY PHASE OF TRIAL WHEN IT WAS NOT KNOWING, VOLUNTARY, AND INTELLIGENT. TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY ALLOWED MS. ROBERTS TO WAIVE HER RIGHT TO PRESENT MITIGATION EVIDENCE BECAUSE TRIAL COUNSEL FAILED TO FULLY INFORM HER OF THE CONSEQUENCES OF THE WAIVER. MS. ROBERTS'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED.**

### A.     Introduction

Ms. Roberts is entitled to habeas relief where her trial counsel failed to explain the consequences of waiving the penalty phase of her capital trail. The superficial nature of the attorney-client relationship was evident during the course of trial and culminated in counsel's deficient performance during the penalty phase, when counsel failed to fully explain how likely it was that the jury would sentence her to death. Still reeling from being disavowed of her belief that the jury would find her not guilty; Ms. Roberts could not render an intelligent decision about her mitigation phase waiver. In the wake of her shock over the guilty verdict, she decided to forego

the presentation of mitigating evidence. Her desire to present mitigating evidence was clear in her adamance in making an unsworn statement. Her waiver was therefore only a partial one. The culmination of counsel's failures to provide legal assistance to their capital client led directly to Ms. Roberts waiving any presentation of mitigating evidence, prejudicing the outcome of her penalty phase. The trial court was the last stopgap to protect Ms. Roberts's federal constitutional rights. Its failure to see the defects in her mitigation waiver was a violation of these rights.

### B.     State Court Proceedings

Ms. Roberts raised this claim in her first direct appeal to the Supreme Court of Ohio as Proposition of Law 1 and 8. (ECF 12-4, PageID 8263; PageID 9296). The court addressed both claims on the merits, thus they are ripe for federal habeas review. *State v. Roberts*, 850 N.E.2d 1168, 1185-89 (Ohio 2006).

### C.     Clearly Established Federal Law

Although the United States Supreme Court has recognized the right of criminal defendants to waive trial rights that are guaranteed by the U.S. Constitution, this waiver must be done knowingly, voluntarily, and intelligently. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969) (holding that a waiver of the right to trial and entry of a guilty plea be intelligent and voluntary); *Faretta v. California* 422 U.S. 806 (1975) (holding that the record must establish that the right to counsel was waived knowingly and voluntarily); *Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). In this case, the record is clear that Ms. Roberts did not have sufficient awareness of the consequences of her waiver. Trial counsel failed to provide Ms. Roberts with a thorough explanation of either aspect of the criminal process, resulting in an invalid waiver of mitigation.

The Sixth and Fourteenth Amendments guarantee to the accused the right to counsel at trial. *Gideon v. Wainwright*, 372 U.S. 335, 342-45 (1963). The test for judging trial counsel's effectiveness is found in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, this Court must first determine if counsel's performance was deficient and whether the defendant suffered prejudice from counsel's errors or omissions. *Id.* at 686-87.

For *Strickland*'s deficient performance prong, the proper measure of counsel's performance is reasonableness under prevailing professional norms. *Id.* at 688. And in a capital case, trial counsel's responsibilities are magnified by the extreme finality of the death penalty. *Wiggins*, 539 U.S. at 528.

For *Strickland's* prejudice prong, the habeas court must weigh any mitigating evidence presented to the state courts in the aggregate to determine its collective weight relevant to the aggravating circumstances proved at trial. Prejudice based on counsel's inadequate representation at the sentencing phase of a capital trial is established when there is a reasonable probability that at least one juror would have acquitted the defendant of the death penalty based on the collective weight of the mitigation evidence. *Wiggins*, 539 U.S. at 537. Here, Ms. Roberts can demonstrate a reasonable probability of a different outcome in the mitigation phase based on the "totality of the [mitigating] evidence... adduced at trial... and... adduced in the habeas proceeding." *Id*. at 536 (internal citation omitted).

### D.    Argument

The Warden discounts Ms. Roberts's waiver and ineffective assistance of counsel based on the waiver claims, recasting them as new "characterization[s]" of the waiver circumstances that

33

occurred during trial. (ECF 15, PageID 12861). Once again, the Warden misses the mark, misapprehending the basis for Ms. Roberts's constitutional claims.

After determining that the United States Supreme Court has never required a capital defendant to present mitigating evidence, the Supreme Court of Ohio then turned to state law precedent to find that Ms. Roberts's waiver was proper. It found that the record established that she waived the presentation of mitigating evidence, which it held was her right because the Ohio death penalty statutes imbue "'great latitude' on a defendant in such decisions.  R.C. 2929.04(C)." *State v. Roberts*, 850 N.E.2d 1168, 1186 (Ohio 2006). It next turned to her argument regarding "partial waiver." Acknowledging that Ms. Roberts's presentation of an unsworn statement during the penalty phase hearing rendered her waiver a "partial waiver," it found this too had precedent under state law. *See Roberts*, 850 N.E.2d at 1186 ("We have never held that a partial waiver of the right to present mitigating evidence is an invalid exercise of that right."). Although appellate counsel raised Ms. Roberts's ineffective assistance of counsel for waiver under both state and federal law, the Ohio Supreme Court failed altogether to address Ms. Roberts's claim regarding her federal constitutional rights to a knowing, voluntary, and intelligent waiver, and for trial counsel to ensure that this constitutional right was protected.

The Court therefore should find that the Ohio courts' reasoning is not entitled to AEDPA deference. The Ohio courts, like the Warden, failed to address the precise claim Ms. Roberts raised. The Ohio courts simply failed to address the superficial nature of the attorney-client relationship during these proceedings and counsel's failure to investigate to an objectively reasonable standard. This investigative failure *caused* Ms. Roberts to waive her mitigation presentation. Because no Ohio court has squarely addressed counsel's deficient performance as a basis for rendering the waiver to be unknowing and unintelligent under the federal Constitution, the Court should review

it here *de novo*. It should find that counsel's inadequate performance led Ms. Roberts to make a choice that ultimately prejudiced her sentencing phase proceedings.

Had counsel worked to unearth significant mitigating evidence and fully understood Ms. Roberts's mental health diagnoses and the concomitant limitations, Ms. Roberts would not have waived the presentation of mitigation evidence. Given the wealth of evidence to present, (*see* Second Ground Claim for Relief), there is a reasonable probability that at least one juror would have voted to spare her life. *Strickland v. Washington*, 466 U.S. 668 (1984).

The Court should find that ineffective assistance of counsel caused Ms. Roberts's (partial) mitigation presentation waiver. It should further find that her waiver was not knowing, voluntary, and intelligent and that her federal constitutional rights were violated. It should grant habeas relief on Grounds for Relief Three and Nine.

## FOURTH GROUND FOR RELIEF

**MS. ROBERTS WAS DENIED HER RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE CULPABILITY PHASE OF HER TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

### A.    Introduction

Ms. Roberts's representation was marred by numerous incidents of ineffective assistance of counsel across the course of trial counsel's representation. Namely, defense counsel failed to make a *Batson* challenge; neglected to make an opening statement; failed to introduce the defense of her co-defendant; waived closing argument; and failed to fully advise Ms. Roberts of her right to testify on her own behalf. All these actions and inactions severely prejudiced Ms. Roberts by leading to her ultimate death verdict.

### B.      Procedural Posture

These claims were raised in post-conviction and were adjudicated by the state court of appeals. The Warden again raises, as a procedural defense, the idea of "defective pleading" for the entire ineffective assistance of counsel claim, including each sub-claim. Once again, there is nothing in this made-up procedural defense that applies to Ms. Roberts's claims. The Warden cites to Ms. Roberts's co-defendant's case, *Jackson v. Houk,* Case No. 4:07-CV-880, 2021 WL 698590 (Feb. 23, 2021). This opinion, however, was issued after the petitioner filed both the petition and the traverse, when the case was fully briefed before the court. No holding or dicta in the cases intimates, as the Warden insists, that the identified violation of clearly established federal law must be included in the initial pleading. Because the *Jackson* case was differently postured than Ms. Roberts's case is currently, it is inapplicable and does not support immediate dismissal of the petition as the Warden urges. The Court should disregard this argument.

### C.      Clearly Established Federal Law

Ms. Roberts's constitutional right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution is unquestionable. In proving an ineffective assistance of counsel claim, a petitioner must show: (1) deficient performance; and (2) prejudice. Both must be proven to prevail. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner will meet the deficient performance prong of the test by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id*. (emphasis added).  The prejudice prong will be met when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

If counsel fails to meaningfully challenge the State's case, the petitioner does not need to show prejudice. *See United States v. Cronic*, 466 U.S. 648, 659 (1984) ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.").

### D. Argument

#### 1. Failure To Make A Batson Challenge

Trial counsel failed to object when at least two Black jurors were excused by the State during the course of jury selection. This left no Black jurors on the panel. These challenges were discriminatory and violated Ms. Roberts's right to Equal Protection. As argued below in Claim Thirteen, the fact that 300 people were called for the venire, and only two or three of them were Black, made it vitally important for counsel to object to the exclusion so that Ms. Roberts could be tried before a jury of her peers. Counsel's failure to do so jeopardized her right to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

#### 2. Failure To Make An Opening Statement

Trial counsel did not present an opening statement, but instead let Ms. Roberts read her own written statement to the jury. Ms. Roberts did not know that her attorneys would not be making an opening statement on her behalf. They gave her a piece of paper with what they thought she should say written on it. (ECF 12-11, PageID 9798). She had no idea that the fact she wanted to speak for herself would preclude her attorneys from also speaking on her behalf. Ms. Roberts was mentally ill and inexperienced with the legal system. She should have been better informed by her attorneys about the advantages of permitting them to speak for her. Their failure to do so was unreasonable and prejudicial.

### 3.　　Failure To Use The Co-Defendant's Statement

Nathaniel Jackson had made a video statement in which he exculpated Ms. Roberts and stated that he had killed Fingerhut in self-defense. The content of the video is discussed in Ms. Roberts's Petition and incorporated here. (ECF 10, PageID 131). This video would have supported the self-defense claim Ms. Roberts wanted her attorneys to make on behalf of Jackson.

The state court found that Ms. Roberts's argument did not create a genuine issue of fact. The court agreed with the State that the video was inadmissible hearsay under Evid.R. 804 and Ms. Roberts had not produced any corroboration for it. Yet even if the video was not admitted under state rules of evidence, the issue of the video still could have been preserved if trial counsel had made the effort to place it into evidence. Ms. Roberts made this argument in state post-conviction.

The state court's ruling on this sub-claim was an unreasonable determination of clearly established federal law. Ms. Roberts had the right to present a complete defense. In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court held that while legislatures have broad discretion to establish rules for excluding evidence at trials, that discretion is limited when it infringes on the accused's right to present a complete defense. *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986) ("'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984))). The right to present a defense "is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they

are designed to serve.'" *Holmes* 547 U.S, at 324-25 (quoting *U.S. v. Scheffer,* 523 U.S. 303, 308 (1998)). Counsel's failure to move the video into evidence was both unreasonable and prejudicial. The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. §2254(d)(1).

### 4.     Failure to Make Closing Arguments

Similar to the failure to make an opening statement, trial counsel's failure to make closing arguments was unreasonable and prejudicial. Once again, they did not discuss this decision with Ms. Roberts. Ms. Roberts did not ask them to refrain from making the closing statement. And there was no strategic reason for doing so. The state court dismissed this sub-claim as well. The court's denial of this claim is an unreasonable application of clearly established federal law.

### 5.     Refusal To Allow Ms. Roberts to Testify

A defendant's right to testify is fundamental. The Supreme Court in *McCoy v. Louisiana* noted that while the choice of the accused to be represented by counsel was not an "all or nothing" proposition, and while trial management is the lawyer's province, she is the client's "assistant" and the accused is the "master of his own defense." 138 S.Ct. 1500, 1508 (2018). The Court reasoned, "[s]ome decisions . . . are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.*

Ms. Roberts begged her attorneys to allow her to testify. (ECF 12-13, PageID 10254). She averred that they waffled as to whether they would permit her to do so, and then decided that she would not.

The state courts gave short shrift to all of Ms. Roberts's claims of ineffective assistance in the culpability phase. To the extent this sub-claim was not fully presented to the state courts, the Court should either remand to state court for exhaustion or conduct a *de novo* review.

39

E.        **Conclusion**

The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. §2254 (d)(1)(2). Ms. Roberts is entitled to the writ of habeas corpus on this claim.

## FIFTH GROUND FOR RELIEF

**PERVASIVE PRETRIAL PUBLICITY DEPRIVED MS. ROBERTS OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

A.        **Introduction**

Media publicity surrounding a murder for hire in a small Ohio town was overwhelming, particularly one involving a middle-aged white woman and her Black paramour. The failure to change venue deprived Ms. Roberts of her right to a fair trial and a trial by a fair and impartial jury under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.

B.        **Procedural Posture**

1.        **Warden's Claim Of Default**

Ms. Roberts presented this claim on her first direct appeal. (ECF 12-4, PageID 8291-95). The Ohio Supreme Court adjudicated this claim on the merits. (ECF 12-4, PageID 8471-72). The Warden submits that this claim is barred by defective pleading, and accordingly should be dismissed. The Warden is incorrect. The Warden first argues that Ms. Roberts did not cite or attack the state court decisions, as she must, to prevail under 28 U.S.C. § 2254(d)(1). The Warden decries Ms. Roberts's failure to identify which clearly established United States Supreme Court precedent the Ohio courts unreasonably applied, rendering her pleading inadequate. The Warden cites to Ms.

40

Roberts's co-defendant's case, *Jackson v. Houk,* Case No. 4:07-CV-880, 2021 WL 698590 (Feb. 23, 2021). But Ms. Roberts already explained why this case is inapplicable and does not support immediate dismissal of the claim or petition as the Warden urges. The Court should disregard this argument.

### 2.    Presentation Of Claim To State Courts

In her Seventh Proposition of Law in her merit brief on direct appeal, Ms. Roberts alleged she was denied a fair trial because many jurors had either read, heard, discussed or seen an account of the crime. Ms. Roberts discussed several specific jurors who had been tainted by pretrial publicity. (ECF 12-4, PageID 8293-95).

### C.    Clearly Established Federal Law

The right to a jury trial guarantees the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Failing to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver*, 333 U.S. 257, 278 (1948) ("It is the law of the land that no man's life, liberty, or property should be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal."). In "extraordinary" cases where the trial atmosphere has been corrupted by media coverage, a court must presume that pre-trial publicity has engendered prejudice in the members of the venire. *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966); *see also Patton v. Yount*, 467 U.S. 1025 1031 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed.")

### D.    Argument

Numerous media reports, television broadcasts, radio shows, and newspaper articles, both in print and online, provided extensive coverage of Ms. Roberts's case. Prior to voir dire, trial counsel moved the trial court for a change of venue. (Motion for Change of Venue, ECF 12-2,

PageID 7620-49).  They included lengthy attachments of exhibits regarding news stories that had been run in the area. (ECF 12-2, PageID 7650-7769). The trial court overruled the motion, stating that trial counsel could renew said motion should the attempt to empanel impartial jurists prove futile. (ECF 10-13, PageID 970).

The Ohio Supreme Court, however, only gave lip service to clearly established federal law. In denying Ms. Roberts's claim, the Ohio Supreme Court reasoned:

> A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996. Pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial. *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683. Only in rare cases may prejudice be presumed. *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

*State v. Roberts*, 850 N.E.2d 1168, 1183 (Ohio 2006).

This is the rare case contemplated by *Sheppard* and *Patton*. The pre-trial publicity splashing the salacious story of a middle-aged white woman hiring her Black paramour to murder her ex-husband was consumed by a large number of the venire. At least sixteen of the jurors had basic knowledge of the facts of the case from either television or newspaper accounts. (ECF 11-1, PageID 1032-33; ECF 11-2, PageID 3153, 3164, 3188, 3255, 3295, 3416, 3519, 3566, 3700, 3775, 3847, 3960, 4159, 4198, 4357, 4529, 4572). In addition, jurors who had not heard of the case overheard conversations from other jurors in the pool about the case and its facts. (ECF 11-1, PageID 3151, 3344, 3416, 3566, 3697). The totality of circumstances warrants a conclusion that the jury pool was sufficiently tainted to require a new trial. Ms. Roberts's guilt was presumed, and there was a public outcry for a death sentence. The jurors empaneled were not sequestered during the trial and were free to go their separate ways outside of the courtroom. Ms.

Roberts was entitled to a change of venue to a county that was not saturated with extensive negative publicity, and where a jury could be fair and impartial.

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence…." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). This has long been the undeviating rule of our justice system. While the constitution does not limit jury membership to persons completely ignorant of the facts and issues, *Mu'Min, v. Virginia*, 500 U.S. 415, 428 (1991), a defendant's right to an impartial jury may be secured if a juror attests that he or she can set aside any information he has obtained and render a verdict based on the evidence presented in court. *Irvin*, 366 U.S. at 722-23. While the seated jurors stated in voir dire that they could set aside all information learned outside of the courtroom, and made assurances of impartiality, "the frailties of human nature" render these statements of impartiality of little weight in a community saturated with prejudicial publicity. *Irvin*, 366 U.S. at 727-28.

The trial judge in this case "did not fulfill his duty to protect [the defendant] from the inherently prejudicial publicity which saturated the community[.]" *Sheppard*, 384 U.S. at 363. Where there is a "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Id*. at 362-63. Further, the "ultimate responsibility" for protecting Ms. Roberts's due process rights and ensuring her a fair trial rested with the trial court. *See Powell v. Alabama*, 287 U.S. 45, 52 (1932). To the extent the Ohio courts ruled on the merits of the trial court's failure to change venue, their rulings were an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a

decision based on an unreasonable determination of the facts, given the evidence presented in state courts.  28 U.S.C. § 2254(d).

Applying the four-factor test the Supreme Court set forth in *Skilling v. United States*, 561 U.S. 358 (2010) shows that Ms. Roberts is entitled to relief on this claim. In *Skilling*, the Court considered (1) the size and characteristics of the community in which the crime occurred; (2) whether media coverage about the defendant contained "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" (3) whether the passage of time lessened media attention; and (4) whether the jury's conduct was inconsistent with a presumption of prejudice. *See Skilling*, 561 U.S. at 382-83.

Under *Skilling*'s four-factor test, Ms. Roberts satisfies a presumption of prejudice. Her trial took place in a relatively small community of far less people than the "4.5 million individuals eligible for jury duty" in *Skilling*. Further, the media that saturated Trumbull County contained blatantly prejudicial information, including an affidavit for an arrest warrant with references to sexually explicit love letters and tapes between Ms. Roberts and her co-defendant Nate Jackson. This affidavit was released during Jackson's trial, which occurred a mere six months prior to jury selection in Ms. Roberts's trial. The publicity in Ms. Roberts's case was ongoing, particularly because her co-defendant's trial concluded just four months before Ms. Roberts's began. The passage of time between the publicity in Ms. Roberts's case and her trial was far less than that in *Skilling*, consisting of roughly four months between her co-defendant's sentencing and the accompanying news flurry, and the start of her trial, as opposed to the four years that passed in *Skilling*. Reports remained ongoing throughout Ms. Roberts's trial. Finally, the jury's conduct of finding Ms. Roberts guilty and sentencing her to death was entirely consistent with a presumption of prejudice.

This was not only an unreasonable application of clearly established federal law, it was also an unreasonable determination of the facts, given the evidence presented.

The Warden's only response to the merits of Ms. Roberts's claim is that the voir dire was extensive and trial counsel did not challenge the jurors for cause or use peremptories on them.

The Warden relies on the fact that trial counsel did not challenge for cause the specific prejudiced jurors who sat on Ms. Roberts's jury. (ECF 15, PageID 12874). However, regardless of defense counsel's decision not to challenge these jurors for cause, it is ultimately the trial court's duty to protect a defendant's constitutional right to a fair trial. *Sheppard*, 384 U.S. at 363. The Supreme Court has cautioned that statements of impartiality "can be given little weight" due to "the frailties of human nature." *Irvin*, 366 U.S. at 727-28.

Applying clearly established federal law to the extensive pre-trial publicity surrounding Ms. Roberts's trial would have resulted in a finding of presumed prejudice. *See Skilling*, 561 U.S. at 382-383; *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554-55 (1976); *Sheppard*, 384 U.S. at 363; *Irvin*, 366 U.S. at 722-23. The Supreme Court of Ohio's analysis of this claim was an unreasonable application of clearly established federal law.

### E.    Conclusion

Perhaps the most fundamental of rights the criminal justice system recognizes is the defendant's right to a fair trial by a fair and impartial jury. *Patterson*, 205 U.S. at 462. The pervasiveness of the media coverage in this case was such that a change of venue was constitutionally mandated. *See Sheppard*, 384 U.S. at 362-63. In cases such as Ms. Roberts's, adverse publicity was so pervasive and so prejudicial that jury prejudice is presumed. *See Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963).

In a capital case, heightened due process demands that all possible steps necessary to ensure Ms. Roberts received a fair trial under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments

were taken. *See Lockett v. Ohio*, 438 U.S. 586, 606-09 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 301-05 (1976). Whether or not Ms. Roberts may likely have been convicted in another venue is irrelevant. The right to a fair and impartial jury is fundamental. The denial of that right is a structural error that is never harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991). The trial court erred in failing to grant Ms. Roberts a change of venue and deprived her of her right to due process, a fair trial, and a trial by a fair and impartial jury. The state court's decision was an unreasonable determination of both the facts and the law. 28 U.S.C. § 2254 (d)(1)(2). Habeas relief should be granted.

### SIXTH GROUND FOR RELIEF

**A TRIAL COURT'S REFUSAL TO DISMISS BIASED JURORS FROM THE PANEL DEPRIVED MS. ROBERTS OF A FAIR TRIAL AND HER PROTECTIONS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### A.    Introduction

During voir dire it was established that two potential jurors, Andrew Kotwis and Michael Blake, could not be fair and impartial. Trial counsel moved the trial court to excuse each of them for cause, yet the court refused. Both of these jurors admitted that influences outside of the evidence presented would be a factor in making their decision as potential jurors. At a point where the State had used all six of its peremptory challenges, and the defense had used five, Kotwis and Blake were next in the venire to be seated in the jury box, and Ms. Roberts was forced to reserve her final peremptory challenge to prevent their empanelment. She then had to use two peremptory challenges allotted for alternate jurors to strike the two jurors as alternates. The trial court's refusal to excuse the two veniremen for cause, even though they had demonstrated their bias in voir dire, violated Ms. Roberts's rights to a fair trial and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### B.    Procedural Posture

Ms. Roberts presented this claim on her first direct appeal before the Ohio Supreme Court. (ECF 12-4, PageID 8273-79). The Ohio Supreme Court adjudicated this claim on the merits. (ECF 12-4, PageID 8470-71). The Warden acknowledges that the claim was raised in state court, yet submits that this claim is barred by defective pleading, and accordingly should be dismissed. The Warden is incorrect. The Warden first argues Ms. Roberts did not cite or attack the state court decisions, as she must, to prevail under 28 U.S.C. § 2254(d)(1). The Warden decries Ms. Roberts's failure to identify which clearly established United States Supreme Court precedent the Ohio courts unreasonably applied, rendering her pleading inadequate. The Warden cites to Ms. Roberts's co-defendant's case, *Jackson v. Houk,* Case No. 4:07-CV-880, 2021 WL 698590 (Feb. 23, 2021). Mr. Roberts already explained why this case is inapplicable and does not support immediate dismissal of the petition as the Warden urges. The Court should disregard this argument.

### C.    State Court Proceedings

Ms. Roberts raised this claim of bias on the part of jurors Andrew Kotwis and Michael Blake as her Third Proposition of Law in her first direct appeal before the Ohio Supreme Court. (ECF 12-4, PageID 8273-79). In denying this claim, the state court cited to state statutory and case law to find that the trial court had not abused its discretion. The court first discussed the provisions of Ohio Revised Cod e§ 2313.42(J), finding that "'good cause' exists for the removal of a prospective juror when 'he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court.' A prospective juror challenged for cause should be excused 'if the court has any doubt as to the juror's being entirely unbiased.'" *State v. Roberts*, 850 N.E.2d 1168, 1180 (Ohio 2006).

The court found that even though Kotwis's answers were "ambiguous," the trial court found Kotwis ultimately stated that he would keep an open mind as to all sentencing options, and the trial court's finding that he was credible was entitled to deference. *Roberts*, 850 N.E.2d at 1180.

Similarly, the Ohio Supreme Court found that, although Michael Blake stated he believed that the death penalty should be automatic under certain circumstance and he could not extend the presumption of innocence to Ms. Roberts, the trial court did not abuse its discretion in denying Ms. Roberts's challenge to the juror for cause. *Id.* The state court further found that, based on its findings that the trial court did not abuse its discretion in denying exclusion of the two jurors for cause, there was no prejudice to Ms. Roberts. *Id.* at 1182.

### D.    Clearly Established Federal Law

The test created by the United States Supreme Court regarding juror impartiality on the specific issue of capital punishment provides that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas,* 448 U.S. 38, 45 (1980). In reaffirming the *Adams* test in *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court noted, "in addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Witt*, 469 U.S. at 424. A juror who would automatically vote for the imposition of the death penalty without weighing the aggravating and mitigating evidence presented must be removed for cause, and a failure of a trial court to do so rises to the level of constitutional error sufficient to grant habeas relief. *Morgan v. Illinois,* 504 U.S. 719, 728-29 (1992).

E. **Argument**

As support for the merits of this claim, Ms. Roberts relies on the facts as pled in her Petition. (ECF 10, PageID 136-43). With the facts in the record, the state courts made an unreasonable determination that Ms. Roberts's claim did not warrant relief. As pled in her Petition and as also explained above, the only reasonable determination of the facts before this Court is that the trial court failed to dismiss for cause two biased potential jurors, forcing Ms. Roberts to use her peremptory challenges, all to her prejudice.

The record contradicts the trial court's finding that Kotwis was open to a life sentence. Kotwis expressed a clear preference for the death penalty, and even the state court allowed that his responses were "ambiguous." While the state court found that Kotwis had "rehabilitated himself," this was not clear from the record and the state court's finding should not be entitled to deference.

Similarly, Blake made clear that all he had heard from the pre-trial publicity in the case negated the presumption of innocence required from a juror in a criminal case. In answering trial counsel's questions, Blake stated that he would want to hear evidence from Ms. Roberts to negate his impression that she was involved in the crime. (ECF 11-2, Trial Tr., PageID 4631).

The state court made short shrift of Ms. Roberts's arguments, determining that the trial court did not abuse its discretion in refusing to excuse the jurors for cause and further failing to see how Ms. Roberts had been prejudiced. However, the state court only paid lip service to clearly established federal law by mentioning *Wainwright v. Witt*, 469 U.S. 412 (1985) but mainly referring to state law in making its determination that the trial court had not abused its discretion.

These two jurors fit within the *Witt* standard for exclusion. In this case, while the bias may not have been demonstrated with "unmistakable clarity," *Witt*, 469 U.S. at 424, the bias was certainly apparent from the record. The biases that both potential jurors expressed were not

consistent with the mindset that jurors are required to possess to make a fair and impartial decision on a defendant's guilt, and certainly not to determine whether the defendant is eligible for the death penalty. This Court should consider this claim in full and grant habeas relief on the merits.

### F.    Conclusion

As both the bias of the two potential jurors, as well as the prejudice to Ms. Roberts for the trial court failing to excuse them was clear, the Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254 (d)(1)(2). Ms. Roberts is entitled to the writ of habeas corpus granting her release from custody unless the State of Ohio grants her a timely new trial.

<u>**SEVENTH GROUND FOR RELIEF**</u>

**MS. ROBERTS'S RIGHT TO DUE PROCESS AND FAIR TRIAL WERE VIOLATED WHEN SHE WAS TRIED AND RESENTENCED WHILE SHE MAY HAVE BEEN INCOMPETENT.**

### A.    Introduction

The Constitution forbids the trial and sentencing of an incompetent defendant. By extension, the Supreme Court has made clear that a defendant must be provided a meaningful opportunity to present evidence demonstrating her incompetence.  Thus, where a reasonable judge would experience doubt about a defendant's incompetence, a full and fair hearing must be held on the issue.

Here, prior to Ms. Roberts' resentencing, the trial court entertained doubts about Ms. Roberts's incompetence but then permitted only a limited evaluation by Dr. Thomas Gazley, a psychologist at the Trumbull County Forensic Diagnostic Center. Dr. Gazley spoke with Ms. Roberts only briefly and was unaware of Ms. Roberts's full mental health history. Dr. Gazley also never observed Ms. Roberts interact with her counsel, even though a key inquiry for incompetence

50

asks whether the defendant has sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding. Both before and after Dr. Gazley's testimony, Ms. Roberts asked for a full evaluation by an independent neuropsychologist. The trial court denied that request, and so defense counsel called no witnesses at the hearing. This denial deprived Ms. Roberts of her procedural due process rights to an adequate competency hearing, and the Ohio Supreme Court's contrary holding was an unreasonable application of clearly established precedent.

### B.    Procedural Posture

Ms. Roberts raised this ground for relief in propositions of law six and seven on her second direct appeal in state court.  (ECF 12-6, PageID 8858-66). The Ohio Supreme Court adjudicated this claim on the merits. *State v. Roberts*, 998 N.E.2d 1100, 1116-18 (Ohio 2013). The Warden acknowledges that the claim was raised in state court yet submits that this claim is barred by defective pleading. The Warden again cites to *Jackson v. Houk*, 2021 WL 698590, but Ms. Roberts has already explained why that case is inapplicable and does not support immediate dismissal of the petition as the Warden urges.

The Warden also contends that Ms. Roberts made an "express waiver" of this claim during state post-conviction proceedings. (ECF 15, PageID 12884-85). But the Warden's citation to Ms. Roberts's post-conviction brief is misleading at best. There, Ms. Roberts explained that claims relating to her "mental health issues" were "raised repeatedly in the direct appeals" and therefore "although those issues are preserved and ripe for federal review, they could not and were not claimed in her petition here because of res judicata bars." (ECF 12-14, PageID 10585). This, of course, evinces no express waiver of her claim.  And the case the Warden cites simply stands for the proposition that "a state prisoner must present his claims to a state supreme court in a petition

for discretionary review in order to satisfy the exhaustion requirement." *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-40 (1999).  The Warden does not contest that Ms. Roberts raised this claim on direct appeal before the Ohio Supreme Court.  This Court should therefore consider this claim on the merits.

### C.      State Court Proceedings

The Ohio Supreme Court denied Ms. Roberts's claim because "Dr. Gazley's testimony supports the trial court's finding that Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007." *State v. Roberts*, 998 N.E.2d at 1118. The court rejected Ms. Roberts's criticism of Dr. Gazley's opinion—specifically, his failure to evaluate her psychological history and the effects of a prior head injury—because Dr. Gazley's "evaluation was based on his interview with Roberts." *Id.* The court did not address Ms. Roberts's claim regarding the trial court's failure to permit examination by an independent neuropsychologist.

### D.      Clearly Established Federal Law

It is well-settled that the "criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). This "prohibition is fundamental to an adversary system of justice." *Drope v. Missouri*, 420 U.S. 162, 172 (1975). A corollary to this principle is that "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives h[er] of h[er] due process right to a fair trial." *Id.* In other words, a defendant's procedural due process rights are violated when she is deprived of a "reasonable opportunity to demonstrate that [s]he is not competent to stand trial." *Medina*, 505 U.S. at 451.

This type of "procedural competency claim"—one that alleges a "failure to hold a competency hearing, or an adequate competency hearing"—is "held to a lower burden of proof than one raising a substantive competency claim"—one that alleges that the defendant "was tried and convicted while, in fact, incompetent." *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001); *see also Walton v. Angelone*, 321 F.3d 442, 459-60 (4th Cir. 2003) (discussing procedural and substantive competency claims); *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005) (same). To prevail on a procedural competency claim, the defendant need only show that "a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Mackey v. Dutton*, 217 F.3d 399, 413-14 (6th Cir. 2000); *see also Drope*, 420 U.S. at 173 (hearing required "where the evidence raised a 'bona fide doubt' as to a defendant's competence"). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 180. Additionally, the right to an adequate competency determination persists throughout trial; thus, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id.* at 181.

Also well settled are the standards for evaluating competency. The trial court must consider "whether [defendant] has sufficient present ability to consult with h[er] lawyer with a reasonable degree of rational understanding—and whether [s]he has a rational as well as factual understanding of the proceedings against h[er]." *Dusky v. United States*, 362 U.S. 402, 402 (1960). "That

defendant can recite the charges against her, list witnesses, and use legal terminology are insufficient" to demonstrate that she had a rational, as well as factual, understanding of the proceedings. *United States v. Williams*, 113 F.3d 1155, 1160 (10th Cir. 1997).

### E.  Argument

Here, the record reveals that any reasonable judge would have "experienced doubt" with respect to Ms. Roberts's incompetency, and thus she was entitled to a full and fair competency hearing. As explained, her medical records reflect a history of Depression and Bipolar Disorder with suicidal tendencies and hallucinations.  (*E.g.*, ECF 10, PageID 102-07). These issues manifested in a repeated refusal to work with counsel and her irrational waiver of mitigation in an attempt to receive a death sentence. Indeed, after defense counsel raised the issue at her 2006 resentencing, the prosecution itself agreed that Ms. Roberts's competency had to be examined. (ECF 11-4, PageID 6672).

But rather than conduct a full and fair competency hearing, the trial court directed a limited examination by Dr. Thomas Gazley, a psychologist at the Trumbull County Forensic Diagnostic Center. Dr. Gazley simply reviewed Ms. Roberts's prison records for one hour and then spoke with her for two and a half hours. (*Id.* at PageID 6681).  Based on this limited review, he found that Ms. Roberts was competent to be re-sentenced. Yet Dr. Gazley reviewed none of her mental health records from before prison. He was unaware, for example, of her SSI disability diagnosis, even though he admitted that prior diagnoses are "what you would have to investigate to make [the competency] determination."  (ECF 11-4, PageID 6696).  He was unfamiliar with the details of her prior head injuries, (*id.* at PageID 6685-86, 6689), and admitted that he, as a "psychologist who is not a neuropsychologist," could not make a determination regarding the severity and impact of her head injuries. (*Id.* at PageID 6696-97). Nor did he interview family members about Ms.

Roberts's history. (*Id.* at PageID 6688-89). And even as to her prison records, Dr. Gazley did not evaluate all the relevant information. For example, he did not review the records showing that Ms. Roberts experienced severe hallucinations while on death row. *Id.* at PageID 6689-31. Nor did he have any "direct observation of [Ms. Roberts's] ability to interact with defense counsel"—he simply assumed she was competent based on her ability to communicate with *him* during the short time he spoke with her. (*Id.* at PageID 6688).[2]

Both before and after Dr. Gazley testified, defense counsel requested that Ms. Roberts be evaluated by an independent neuropsychologist. (*Id.* at PageID 6669, 6703-05). The trial court denied the request, simply stating it was "for another court and another day." (*Id.* at PageID 6703-06). Accordingly, defense counsel called no witnesses at the hearing.

On direct appeal from her subsequent death sentence, Ms. Roberts raised a claim based on her incompetency and the failure of the trial court to permit evaluation by an independent neuropsychologist. (ECF 12-6, PageID 8858-66). The Ohio Supreme Court rejected the claim. It dismissed Ms. Roberts's criticism of Dr. Gazley's opinion, citing Dr. Gazley's explanation that "none of" the evidence regarding Ms. Roberts's prior history and diagnoses "mattered to his evaluation of Roberts's competency at the time of resentencing, because that evaluation was based on his interview with Roberts." *State v. Roberts*, 998 N.E.2d at 1118. Dr. Gazley had explained that "I make my decision about the opinion based on the responses the person provides me to the questions I asked that I believe are related to the questions the Court needs to address, rather than the [past] diagnosis." *Id.* The court found that "Dr. Gazley's testimony supports the trial court's

---

[2] Additionally, at the time of Dr. Gazley's competency examination, the testing results from Dr. Donald Degli, including the IQ testing, was unknown. (ECF 12-13, PageID 10381). Thus, Dr. Gazley was unaware that there was a 24-point disparity between Ms. Roberts's verbal and performance IQ, which strongly suggests serious neurological and/or cognitive impairment. (ECF 12-13, PageID 10251).

finding that Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007." *Id.*

In rejecting this claim, the Ohio Supreme Court unreasonably applied clearly established federal law. As explained, "where the evidence raise[s] a 'bona fide doubt' as to a defendant's competence," the trial court must hold an adequate competency hearing. *Drope*, 420 U.S. at 173. That did not occur here. The trial court failed to conduct a full evidentiary hearing during which both sides could present evidence. Specifically, defense counsel was precluded from presenting testimony from an independent mental health expert who could review all relevant information. This type of one-sided hearing did not provide Ms. Roberts a "reasonable opportunity to demonstrate" incompetence. *Medina*, 505 U.S. at 451; *see also Williams*, 113 F.3d at 1161 (defendant must be given the opportunity to demonstrate incompetence "in the crucible of a full-blown evidentiary hearing"); *Cf. Barry v. Barchi*, 443 U.S. 55, 66 (1979) ("[T]he opportunity to be heard must be 'at a meaningful time and in a meaningful manner.'"). Indeed, "a hearing that precludes full participation by the defendant is no hearing at all." *Lewis v. Zon*, 573 F. Supp. 2d 804, 818 (S.D.N.Y. 2008).

And Dr. Gazley's evaluation was far from adequate. In determining competence, one must consider "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial" and must give "[]sufficient attention to the aggregate of those indicia." *Drope*, 420 U.S. at 180. Here, Dr. Gazley and, by extension, the trial court, "failed to consider and give proper weight to the record evidence"—including Ms. Roberts's medical history and irrational behavior at trial. *Id.* at 179; *see also id.* (a court cannot ignore the defendant's "history of pronounced irrational behavior" and "any prior medical opinion" (quoting *Pate v. Robinson*, 383 U.S. 375, 386 (1966))). And the Ohio Supreme Court unreasonably applied

this precedent when it simply repeated Dr. Gazley's assertions that none of this other evidence "mattered" because his opinion was based on his (limited) interview with Ms. Roberts. In short, the court-imposed limitations on the hearing deprived Ms. Roberts of a full and fair opportunity to demonstrate incompetence, and the Ohio Supreme Court's contrary holding was an unreasonable application of clearly established federal law.

The Warden's only argument in response—other than the faulty procedural arguments discussed above—is to say that this Court must defer to the trial court's determination that Ms. Roberts was competent. (ECF 15, PageID 12881-82). But Ms. Roberts principally attacks the *procedure* used to determine her competence, and that procedure was inadequate under clearly established precedent. On that issue, the state courts made no factual finding to which this Court must defer.

### F.    Conclusion

The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254 (d)(1)(2). Ms. Roberts is entitled to the writ of habeas corpus on this claim.

## EIGHTH GROUND FOR RELIEF

**THE SENTENCING COURT'S USE OF THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AS NON-STATUTORY AGGRAVATING FACTORS IN ITS SENTENCING DECISION IS IN VIOLATION OF MS. ROBERTS'S RIGHTS OF DUE PROCESS AND IS IN VIOLATION OF HER RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

### A.    Introduction

A state that authorizes capital punishment must tailor and apply its laws in a manner that avoids the arbitrary and capricious infliction of the death penalty. And a defendant's due process rights may be infringed by a state's failure to adhere to its own laws in imposing that sentence.

Under Ohio law, a person can be sentenced to death only if one or more statutory aggravating circumstances are proven beyond a reasonable doubt. Those aggravating circumstances are then weighed against the nature and circumstances of the offense, the history, character, and background of the offender, and all the statutory mitigating factors to determine whether the aggravating circumstances outweigh the mitigating factors.  Only then can the defendant be sentenced to death.

Because the nature and circumstances of the offense is not a statutory aggravator in Ohio, those circumstances cannot be weighed *against* the mitigating evidence—in other words, they can be considered only on the side *for* mitigation.  In imposing the death sentence here, however, the trial court found that several non-statutory circumstances of the offense weighed against Ms. Roberts's mitigating evidence. That violated Ohio law and thus Ms. Roberts's due process rights. And though the Ohio Supreme Court attempted to independently reweigh the evidence, that court committed the same error as the trial court. Thus, Ms. Roberts is entitled to a new sentencing decision.

### B.      Procedural Posture

Ms. Roberts raised this ground for relief in proposition three on her third direct appeal in state court. (ECF 12-9, PageID 9438-40). The Ohio Supreme Court adjudicated this claim on the merits. *State v. Roberts*, 78 N.E.3d 851, 866 (Ohio 2017). This Court should therefore consider this claim on the merits.

### C.      State Court Proceedings

The Ohio Supreme Court denied Ms. Roberts's claim, holding that the nature-and-circumstances evidence "was properly considered as part of the statutory aggravating circumstances in this case" and was properly "used to explain *why* the aggravating circumstances outweigh the mitigating factors." *State v. Roberts*, 78 N.E.3d at 865.  The court also held that, "[a]fter our independent review and weighing, we find that the aggravating circumstances present in this case outweigh the mitigating factors beyond a reasonable doubt." *Id.* at 870.

### D.      Clearly Established Federal Law

A state that authorizes capital punishment "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (quoting *Gregg v. Georgia*, 428 U.S. 153, 196 n.47 (1976)). One way a state can violate this command is by relying upon a constitutionally invalid aggravating factor to define who can be sentenced to death. *See, e.g., id.* at 428 (reversing death sentence where sole aggravating circumstance was the finding that the offense was "wantonly vile, horrible and inhuman" because such a factor was insufficient to serve as a restraint on the "arbitrary and capricious infliction of the death sentence"). And a "defendant's due process rights may also be

infringed upon by a state's failure to adhere to its own sentencing statute." *Fox v. Coyle*, 271 F.3d 658, 665 (6th Cir. 2001) (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)).

Under Ohio's death penalty statute, "[i]mposition of the death penalty for aggravated murder is precluded unless" one or more statutory aggravating factors are proven "beyond a reasonable doubt." Ohio Rev. Code § 2929.04(A). The trial court must then "consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender," and all of the statutory mitigating factors. Ohio Rev. Code §2929.04(B). Because the "nature and circumstances of the offense" is not a statutory aggravating factor, those circumstances "*may not be weighed against the mitigating circumstances*, nor may they be included among the aggravating circumstances." *Fox*, 271 F.3d at 669 (emphasis added) (citing *State v. Gumm*, 653 N.E.2d 253, 262-63 (Ohio 1995)). In other words, "the nature and circumstances of the offense may only enter into the statutory weighing process on the side of *mitigation*." *State v. Wogenstahl*, 662 N.E.2d 311, 322 (Ohio 1996) (emphasis in original).

### E. Argument

The trial court here improperly weighed the nature and circumstances of the offense against the mitigating factors. The court initially gave some weight to several mitigating factors: Ms. Roberts's history of abuse; her charitability; and her mental instability and physical traumas. (ECF 12-8, PageID 9215-17). The court then discussed the nature and circumstances of the offense— including that she "conspired with Jackson, her imprisoned lover, to murder Fingerhut for his life insurance proceeds" and later "attempted to thwart the investigation" and "feigned emotional outbursts over Fingerhut's death." (*Id.* at PageID 9219). Based on these circumstances, the court "therefore" decided to give "little to no weight to any of the mitigating factors," and thus concluded

that "the aggravating circumstances outweigh the mitigating factors." (*Id.* at PageID 9219-20). By using the nature and circumstances of the offense to zero-out the mitigating factors, the court violated Ohio law and Ms. Roberts's federal due process rights. *Fox*, 271 F.3d at 669; *Wogenstahl*, 662 N.E.2d at 322.

On appeal, the Ohio Supreme Court found no error because, in its view, the trial court's discussion went to "prior calculation and design" and thus was a proper evaluation of "the statutory aggravating circumstances in this case." *State v. Roberts*, 78 N.E.3d at 865. But that is an unreasonable reading of the trial court's opinion. The trial court's discussion was not confined to prior calculation and design—the trial court also discussed things like Ms. Roberts's conduct during police interviews after the murders, her attempt to implicate other individuals in the murder, and her failure to mention Jackson "as one of her named lovers." (ECF 12-8, PageID 9219). Moreover, the at-issue discussion is located in the section on "Mitigating Factors"—the trial court had *already found* the presence of the statutory aggravators several pages earlier in the section titled "Aggravating Circumstances." (*Id.* at PageID 9209-20). Thus, this was not simply a discussion regarding the statutory aggravators; it was a balancing of the nature-and-circumstances evidence against the mitigating factors that the court had just discussed.

In its decision on appeal, the Ohio Supreme Court also noted that "the nature and circumstances of the offense may also be used to explain *why* the aggravating circumstances outweigh the mitigating factors." *State v. Roberts*, 78 N.E.3d at 865. It cited *State v. Frazier*, which held that it was proper for a prosecutor to mention the nature and circumstances of the offense to "refute[] trial counsel's argument suggesting that the nature and circumstances of the offense had mitigating aspects." 873 N.E.2d 1263, 1294 (Ohio 2007). But the trial court's decision here was not simply a finding "that the nature and circumstances of the offense were not mitigating." *Id.*

61

Instead, the trial court: first gave weight to mitigating factors (like Ms. Roberts's history and health); then discussed the nature and circumstances of the offense (some of which had nothing to do with the statutory aggravators or the mitigating factors); and then decided to zero-out the mitigating factors based on the nature and circumstances of the offense. (ECF 12-8, PageID 9215-20). In so doing, the trial court impermissibly weighed the nature and circumstances of the offense against the mitigating circumstances. *Fox*, 271 F.3d at 669; *Wogenstahl*, 662 N.E.2d at 322. Accordingly, the Ohio Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.

The Warden's only argument in response is to invoke the Ohio Supreme Court's reweighing of the evidence under Ohio Revised Code § 2929.05(A). (ECF 15, PageID 12885-88). It is correct that this type of error may be cured through an "independent reweighing of the aggravating and mitigating circumstances" by the state supreme court. *Clemons v. Mississippi*, 494 U.S. 738, 750 (1990).[3] But that is true only if the state supreme court "independently reweighs the aggravating and mitigating circumstances *without reference to the extra-statutory factor improperly relied upon by the lower state courts*." *Fox*, 271 F.3d at 667 (emphasis added); *see also Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006) ("[R]eweighing by the Ohio Supreme Court under Ohio Rev.Code § 2929.05(A) satisfies the requirements of *Clemons* when the court

---

[3] *Clemons* may no longer be good law.  Its holding relied on *Spaziano v. Florida*, 468 U.S. 447 (1984), and *Hildwin v. Florida*, 490 U.S. 638 (1989), both of which have now been overruled by the Supreme Court.  In *Hurst v. Florida*, the Court held that "[t]ime and subsequent cases have washed away the logic of *Spaziano* and *Hildwin*" and thus those "decisions are overruled to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." *Hurst v. Fla.*, 577 U.S. 92, 102 (2016). Because those decisions are the underpinnings of *Clemons*'s appellate reweighing doctrine, and they have now been overruled, they can no longer support the constitutionality of appellate reweighing in capital cases when the appellate court is the forum in which the constitutionally mandated weighing of aggravators against mitigating factors is performed in the first instance.

either *eliminates impermissible aggravating factors* or adds overlooked mitigating factors." (emphasis added)).

Here, the Ohio Supreme Court made the same error as the trial court, and so its reweighing did not cure the constitutional defect. For example, the court found that the "evidence at trial establishes that Roberts was not the principal offender in the aggravated murder" and that this mitigating factor had at least some weight. *State v. Roberts*, 78 N.E.3d at 869. But the court later stated that the "nature and circumstances of the offense offer *nothing* in mitigation." *Id.* at 870 (emphasis added). That Ms. Roberts "was not a principal offender," however, goes to the nature and circumstances of the offense. Therefore, it is clear that the Ohio Supreme Court used some nature-and-circumstances evidence to weigh against (indeed, entirely negate) the principal-offender mitigation evidence. That was impermissible under Ohio law. The Ohio Supreme Court's decision thus did not cure the constitutional error.

### F.    Conclusion

The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. §2254 (d)(1)(2). Ms. Roberts is entitled to the writ of habeas corpus on this claim.

## TENTH GROUND FOR RELIEF

**DONNA ROBERTS WAS DENIED HER RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN A DIFFERENT JUDGE, WHO HAD NEVER HEARD THE TESTIMONY NOR MS. ROBERTS'S ALLOCUTION, SENTENCED MS. ROBERTS TO DEATH WITHOUT PERMITTING HER TO SPEAK ON HER OWN BEHALF OR OTHERWISE SUBMIT NEW TESTIMONY IN MITIGATION. U. S. CONST. AMENDS. 6, 8 & 14.**

### A.    Introduction

Ms. Roberts went through three sentencing hearings before the Ohio Supreme Court upheld her death sentence. Although Ms. Roberts's right to an allocution was the subject of reversal in her prior two appeals, this third and final sentencing hearing was conducted on a cold record by a judge who had never before heard Ms. Roberts's allocution. Permitting the new trial judge to pass sentence without conducting a new sentencing hearing, or minimally hearing and seeing Ms. Roberts's allocution, deprived Ms. Roberts of her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### B.    Procedural Posture

This claim was presented as the first proposition of law in Ms. Roberts's third appeal to the Ohio Supreme Court. *State v. Roberts*, 2017-Ohio-2998, 78 N.E.3d 851, 150 Ohio St.3d 47 (*Roberts III*). The Warden acknowledges that this claim was raised in the state court and does not argue that it is defaulted or otherwise unripe for habeas review.

### C.    State Court Proceedings

In the First Proposition of Law in her third appeal, Ms. Roberts argued that the trial court's decision to sentence her on a cold record violated the Eighth Amendment's mandate for individualized sentencing, including the consideration of all available mitigation evidence. In its opinion, the Ohio Supreme Court held that there is no precise rule derived from clearly established

federal law that precludes a sentencing judge in a capital case from "consider[ing] mitigation presented by the defendant without having *personally* observed its presentation in court." *Roberts III*, 78 N.E.3d at 861. This is a narrow and highly constrained reading of the United States Supreme Court's Eighth Amendment jurisprudence, and is contrary to or an unreasonable interpretation of clearly established federal law. 28 U.S.C. § 2254(d)(1).

### D.      Clearly Established Federal Law

The Supreme Court has long held that the base of any constitutional death penalty scheme is the requirement of individualized sentencing in which all mitigating evidence is considered by the sentencing court. The United States Supreme Court makes the requirement that a factfinder consider mitigation evidence clear. *Payne v. Tennessee*, 510 U.S. 808, 822 (mitigation evidence is "evidence that must be received"); *Woodson v. North Carolina*, 428 U.S. 280, 304 (opinion of Stewart, Powell, Stevens, JJ.) (holding that the Constitution "require[s] consideration of the character and record of the individual offender . . . as a constitutionally indispensable part of the process of inflicting the penalty of death."); *see also Eddings v. Oklahoma*, 455 U.S. 104 (1982). An individualized mitigation phase is a right guaranteed by the Eighth and Fourteenth Amendments and, as a result, preventing mitigation is unconstitutional. *See Lockett v. Ohio* 438 U.S. 586 (1978); *Hitchcock v. Dugger*, 481 U.S. 393 (1987). The sentencer must actually consider and give effect to all relevant mitigation evidence when determining whether a death sentence is appropriate. *Penry v. Lvnaugh*, 492 U.S. 302 (1989); *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982).

### E.      Argument

The Warden argues that this claim, as presented to the Ohio Supreme Court, was solely presented on state law grounds. That is not true. Ms. Roberts began the claim with the argument

that limiting the presentation of mitigating evidence was an Eighth Amendment violation and was unreconcilable with the *Lockett-Eddings-Skipper-Hitchcock* line of cases. (ECF 12-9 PageID 9429-30). The constitutional claim was fully presented to the Ohio Supreme Court.

The Warden next narrows the argument to take it outside the realm of the constitutional protections of clearly established federal law, alleging that there is no federal right "to prevent the orderly transition of a new trial judge to replace the former trial judge who died." (Return of Writ, ECF 15, PageID 12888). The Warden proceeds to argue that the protections offered in the *Lockett-Eddings* line of cases are based on too high a level of generality and cannot be applied to the very narrow fact pattern of the new trial judge taking over the seat. But trying to fit this constitutional claim in the tiniest box imaginable still does not detract from the fact that clearly established federal law requires the consideration of all the mitigating evidence. Every death sentence must be reliable and proportionate, and that cannot occur unless the court hears a properly presented mitigation case. It is impossible to impose a death sentence with out considering all the evidence.

While there may be no case law that exactly mirrors the facts here, that is not necessary under 28 U.S.C. § 2254 (d)(1). AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment). A federal court can find that a state court unreasonably applied a principle to a set of facts, even if the facts differ from the precedent announcing the principle. *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (holding that "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied,'" nor does it "prohibit a federal court from finding an application of a principle unreasonable when it

involves a set of facts 'different from those of the case in which the principle was announced.'"). This Court should consider this claim in full and grant habeas relief on the merits.

### F.      Conclusion

Because the sentencing judge was different than the original judge who conducted the trial and subsequent allocution at the first remand, the trial court, at a minimum, should have permitted Ms. Roberts to make a second allocution or, ideally, should have conducted a completely new penalty phase hearing. Permitting the new sentencing trial judge to pass sentence on a cold record deprived Ms. Roberts of her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law in light of the evidence presented in state court. 28 U.S.C. § 2254 (d)(1). Ms. Roberts is entitled to the writ of habeas corpus on this claim.

### ELEVENTH GROUND FOR RELIEF

**MS. ROBERTS WAS DENIED HER RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO GRANT HER AN EVIDENTIARY HEARING TO ALLOW HER TO ESTABLISH THE PREJUDICE OF THE ERRORS WHICH OCCURRED DURING HER CAPITAL TRIAL.**

### A.      Introduction

Post conviction in Ohio is frequently a sham avenue for relief, since money is seldom provided by the court for expert or investigative assistance in order to develop claims, discovery is never granted, and petitioners virtually never are given a hearing on the claims they do make. Ms. Roberts's case was no different. Ms. Roberts submitted her claims of ineffective assistance of counsel to the trial court with supporting affidavits and other

supporting evidence outside the record. Yet the trial court summarily dismissed Ms. Roberts's petition without an evidentiary hearing, refused discovery, and further refused to let her supplement her record with the trial record of her co-defendant, Mr. Jackson. This was a denial of Ms. Roberts's right to Due Process under the federal constitution.

**B.    Procedural Posture**

Ms. Roberts raised this claim in her appeal on postconviction and the claim was denied by the state court of appeals. The substance of her post-conviction claims concerned the ineffective assistance of trial counsel and resulting denial of her constitutional rights. Ms. Roberts followed the statutory requirements of Ohio Revised Code § 2953 and supported her claims with affidavits and evidence outside the record. The trial court summarily dismissed her entire petition. Ms. Roberts appealed the decision to the 11th District Court of Appeals. The court of appeals ruled that the supporting materials did not raise a genuine issue of fact as to Ms. Roberts's ineffective assistance of counsel claims.

**C.    Clearly Established Federal Law**

The right to due process is a bedrock principal of the criminal legal system, requiring that no one should be punished by the state without receiving the necessary process. The guarantees of due process call for a "hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). In the case of criminal law, and the death penalty in particular, the requirement of due process is inarguable in that, "there are certain immutable principles of justice, which inhere in the very idea of free government, which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice, and an opportunity of being heard in his defense."

68

*Holden v. Hardy*, 169 U.S. 366, 389-90 (1898)

Indeed, the right to a hearing is mandated by the Due Process Clause. In *Powell v. Alabama*, the Court stated, "[t]he fact that the right involved is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' is obviously one of those compelling considerations which must prevail in determining whether it is embraced within the due process clause of the Fourteenth Amendment." 287 U.S. 45, 67 (1932) (quoting *Hebert v. State of Louisiana*, 272 U.S. 312, 316 (1926)).

### D.  Argument

The Warden argues that the state court's decision to summarily dismiss Ms. Roberts's post-conviction petition is principally a state court determination regarding admissibility of the evidence, and thus is not cognizable in habeas. The Warden states that, "the opportunity for post-conviction relief is not required by the federal constitution." (ECF 15, PageID 12893). "When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication—and federal courts will review the application of those constitutionally required procedures." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011).  In this case, the summary dismissal of Ms. Roberts's valid claims was a denial of due process and it is within this Court's purview to vindicate her rights.

### E.  Conclusion

The Ohio state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254 (d)(1)(2). Ms. Roberts is entitled to the writ of habeas corpus on this claim.

## TWELFTH GROUND FOR RELIEF

**THE EVIDENCE THE PROSECUTION PRESENTED AT TRIAL DID NOT ESTABLISH THE THEFT ELEMENT OF OHIO'S AGGRAVATED ROBBERY STATUTE, OHIO REVISED CODE § 2911.01, AND THE ATTENDANT CAPITAL SPECIFICATION UNDER OHIO REVISED CODE § 2929.04(A)(7). THE EVIDENCE WAS THEREFORE INSUFFICIENT TO SUPPORT GUILTY VERDICTS ON THESE CHARGES.**

Ms. Roberts withdraws this claim.

## THIRTEENTH GROUND FOR RELIEF

**THE TRIAL COURT FAILED TO ENSURE THE INCLUSION OF BLACK JURORS ON THE JURY PANEL IN MS. ROBERTS'S CAPITAL TRIAL TO HER EXTREME PREJUDICE, AND THEREBY DEPRIVED MS. ROBERTS OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, EQUAL PROTECTION, AND A JURY THAT REPRESENTS A FAIR CROSS SECTION OF THE COMMUNITY.**

### A.    Introduction

Ms. Roberts was tried by an all-white jury. Trumbull County is not an all-white county, and at the time of trial, the county had a 7.9% Black population. https://en.wikipedia.org/wiki/Trumbull_County,_Ohio. From her 300-person jury pool, she should have had 24 potential jurors in the pool, yet there were only two or three Black jurors in the venire, and these were excused by the State. This denied Ms. Roberts her constitutional right to be tried by a fair cross-section of her community.

### B.    Procedural Posture

This claim was included in Ms. Roberts's first Petition for Post Conviction Relief in 2004. (ECF 12-11 PageID 9759-60). That petition was summarily dismissed by the trial court without the benefit of discovery or an evidentiary hearing. A timely appeal was filed, but the court of appeals dismissed the appeal *sua sponte* for lack of jurisdiction after the Ohio Supreme Court reversed the trial court's decision on Ms. Roberts's direct appeal. (ECF 12-12 PageID 10173). The

claim was again raised on post conviction, (ECF 12-13 PageID 10212), but again, the petition was summarily dismissed by the trial court without any factual development. (ECF 12-13 PageID 10527). The claim was not raised in the state court of appeals. Because the nature of a fair cross-section claim requires investigation and factual development, including evidence regarding the county's jury selection process, it was impossible for Ms. Roberts to make a credible claim without discovery or a hearing, so admittedly the claim was abandoned on appeal. Ms. Roberts asks the Court to either find cause and prejudice for any default, or upon Ms. Roberts's motion, to stay the case and permit her to return to state court for exhaustion and a full hearing on the claim.

### C.      Clearly Established Federal Law

During a capital trial, the exclusion of African Americans from the venire and subsequent jury panel violates: the Due Process Clause of the Fourteenth Amendment, *Peters v. Kiff*, 407 U.S. 493, 501 (1972); the Fair Cross Section requirement of the Sixth Amendment, *Taylor v. Louisana*, 419 U.S. 522, 531 (1975); and the Equal Protection Clause of the Fourteenth Amendment, *Taylor v. Louisana*, 419 U.S. at 531; *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228 (2019).

### D.      Argument

The failure to grant any discovery or an evidentiary hearing was devastating to Ms. Roberts's fair-cross-section claim in post-conviction. According to Ms. Roberts's Affidavit in support of her petition, there were no Black jurors seated on her jury, and although there were two or three Black persons in the venire, they were excused by the prosecutor. (Appx. To PCR Petition (2008), ECF 12-13 PageID 10253). The trial judge stated that 300 people had reported for jury duty on the first day of trial. (Tr., ECF 11-1 PageID 549). If this was the case, there should have been twenty-four Black jurors on the panel. Yet there were only two or three.

The Warden argues that the trial court correctly denied the claim for lack of evidence. This is illustrative of the catch-22 of Ohio state post conviction: the court refuses to grant discovery to a petitioner, and then summarily dismisses a claim for lack of evidence. The Warden also noted the trial court's holding that the claim was res judicata and should have been asserted on direct appeal. This is patently incorrect. Ms. Roberts moved for discovery in post-conviction for production of records and documents maintained by the Trumbull County Jury Commission and Prosecutors Office regarding jury selection, such as policy memos, statistics, memos, and other documents, many spanning ten years, and also requested depositions of some of the jury commission officials. (Motion for Discovery, ECF 12-11 PageID 9973-74). This evidence, clearly outside the record, would have provided support for the fair-cross-section claim; indeed, the evidence was the only way Ms. Roberts could present a credible claim. The claim could only have been supported by evidence dehors the record, and the court refused to permit discovery.  Ms. Roberts could not have brought her claim on direct appeal.

In any event, the simple math in the evidence that was before the court strongly supports Ms. Roberts's claim. A jury pool of three hundred people, with only two or three Black jurors and a 7.9% Black population in the county constitutes anything but a fair cross-section. And those two or three jurors were excused by the prosecution. There was a significant underrepresentation of Black persons on Ms. Roberts's jury—indeed, there were zero. This violated Ms. Roberts's constitutional right to a fair and impartial jury of her peers.

### E.    Conclusion

Ms. Roberts asked for discovery with each post-conviction petition to be able to fully develop this claim. She was denied each time. This claim is therefore not procedurally defaulted because Ms. Roberts fairly presented it to the state courts.  *See O'Sullivan v. Boerckel*, 526 U.S.

838, 844 (1999) (holding that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"). Because it was the state court that caused Ms. Roberts to forego this opportunity, she should not be precluded from raising it here. In the alternative, the Court should either remand to state court for exhaustion, or review this claim *de novo*.

**FOURTEENTH CLAIM FOR RELIEF**

**THE DEATH PENALTY ON ITS FACE AND AS APPLIED TO MS. ROBERTS IS ARBITRARY, CRUEL AND UNUSUAL, AND VIOLATES DUE PROCESS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### A.    Introduction

The evolving standards of decency render Ohio's death penalty law unconstitutional. Ohio's death penalty was also applied to Ms. Roberts in an arbitrary, cruel and unusual way, violating due process.

### B.    Procedural Posture

Ms. Roberts challenged the constitutionality of Ohio's death penalty scheme on direct appeal. Although not acknowledged by the Warden, the Ohio Supreme Court addressed the issue, although summarily. *State v. Roberts*, 850 N.E.2d 1168, 1187 (Ohio 2006).

### C.    Clearly Established Federal Law

The Eighth Amendment to the U.S. Constitution prohibits the infliction of cruel and unusual punishment. The underlying principle of governmental respect for human dignity guides the Court in determining whether a statute is constitutional. These protections apply to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962). Punishment that is "excessive" constitutes cruel and unusual punishment. *Coker v. Georgia*, 433 U.S. 584

73

(1977); *see also Furman v. Georgia*, 408 U.S. 238 (1972) (Brennan, J., concurring); *Rhodes v.*

*Chapman*, 452 U.S. 337, 361 (1981); *Trop v. Dulles*, 356 U.S. 86 (1958).

> The Fifth Amendment provides that "no person shall . . . be deprived of life,
> liberty, or property, without due process of law." Our cases establish that
> the Government violates this guarantee by taking away someone's life,
> liberty, or property under a criminal law so vague that it fails to give
> ordinary people fair notice of the conduct it punishes, or so standardless that
> it invites arbitrary enforcement. . . . These principles apply not only to
> statutes defining elements of a crime, but also to statutes fixing sentences.

*Johnson v. United States*, 576 U.S. 591, 595 (2015) (internal citations omitted).

The Ohio death penalty scheme offends these bedrock principles because it lacks

reliability, is an arbitrary application of a serious and irreversible punishment, allows for individual

suffering by long delays, and lacks any penological purpose. Although there have been no recent

Supreme Court decisions finding the death penalty unconstitutional, the Connecticut and

Washington Supreme Courts have recently found the death penalty "no longer comports with

contemporary standards of decency and no longer serves any legitimate penological purpose,"

*State v. Santiago*, 122 A.3d 1, 10 (Conn. 2015), and "is invalid because it is imposed in an arbitrary

and racially biased manner." *State v. Gregory*, 427 P.3d 621, 626 (Wash. 2018).

Under the evolving standards of decency analysis, the Supreme Court has continually

narrowed the death penalty and its application. *See generally Atkins v. Virginia*, 536 U.S. 304

(2002) (holding that execution of intellectually disabled persons violated the Eighth Amendment);

*see also Roper v. Simmons*, 543 U.S. 551 (2005) (holding that execution of juveniles violated the

Eighth Amendment). Additionally, in 2015, four justices on the Supreme Court expressed doubt

and concern regarding the constitutionality of the death penalty. *See Glossip v. Gross*, 576 U.S.

863 (2015) (Breyer, J. dissenting). In Justice Breyer's dissent, the justices focused on concerns

stemming from fundamental constitutional defects of the death penalty: 1) serious unreliability, 2)

arbitrariness in application, and 3) unconscionably long delays that undermine the death penalty's penological purpose. *Id.* 2755-56. In Ms. Roberts's case, these concerns are very real.

### C.    Argument

#### 1.    Ohio Imposes The Death Penalty In An Unconstitutional Manner

The Fourteenth Amendment's guarantee of equal protection requires similar treatment of similarly situated persons. This right extends to the protection against cruel and unusual punishment. *Furman*, 408 U.S. at 249 (Douglas, J., concurring). The Supreme Court has attempted to interpret the death penalty to make it applicable to only the "worst of the worst," *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (dissenting opinion), but clearly that is not what modern day cases reveal.

> [S]tudies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not. Other studies show that circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often do.

*Glossip*, 576 U.S. at 918 (Breyer, J. dissenting).

The Due Process and Equal Protection Clauses prohibit arbitrary and capricious procedures in the state's application of capital punishment. *Gregg v. Georgia*, 428 U.S. 153, 188, 193–95 (1976); *Furman*, 408 U.S. at 255, 274. Ohio's capital punishment system does not meet those requirements. The Ohio statute does not require the state to prove the absence of any mitigating factors or that death is the only appropriate penalty.

Ohio's capital punishment system imposes the death penalty in an arbitrary and discriminatory manner in violation of *Furman* and its progeny. Application of the death penalty is arbitrary because prosecutors have virtually uncontrolled indictment discretion. Mandatory death penalty statutes were deemed fatally flawed because they lacked standards for imposing death

sentence and were therefore removed from judicial review. *Woodson v. North Carolina*, 428 U.S. 280 (1976). The prosecutors' uncontrolled discretion lacks the same standards.

Ohio's capital punishment system also imposes death in a racially discriminatory manner. African Americans and those who kill white victims are much more likely to be sentenced to death. While African Americans account for less than twenty percent of Ohio's population, about half of Ohio's death row inmates are African American. While few Caucasians are sentenced to death for killing African Americans, over thirty African Americans sit on Ohio's death row for killing a Caucasian. Ohio's statistical disparity is consistent with national findings. The General Accounting Office found victim's race influential at all stages, with stronger evidence involving prosecutorial discretion in charging and trying cases. *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities*, U.S. Gen. Accounting Office, Rpt. to Senate and House Comm. on the Judiciary (Feb. 1990).

The Ohio death penalty is also vague and is thus unreliable in its sentencing procedures. The statutory scheme is unconstitutionally vague in both Ohio Rev. Code § 2929.03(D)(1) and Ohio Rev. Code § 2929.04. The statute eliminates the guidance of aggravating circumstances and provides only that the jury may consider the "nature and circumstances of the aggravating circumstance." Ohio Rev. Code § 2929.03(D)(1). The Supreme Court has already held "that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988). By providing the jury with the discretion to consider any circumstance, the jury may impose the death penalty on any other fact in evidence arising from the nature and circumstances of the offense that the jury deems aggravating, which was the concern in *Maynard*. Ohio courts continually hold that the weighing

process and the weight to be assigned to a given factor is within the individual decision-maker's discretion. *State v. Fox*, 631 N.E.2d 124, 132 (Ohio 1994). Allowing so much discretion inevitably leads to arbitrary and capricious judgments.

### 2. Mandatory Death Penalty And Failure To Require Appropriateness Analysis

The Ohio death penalty scheme precludes a mercy option, either in the absence of mitigation or when the aggravating circumstances "outweigh" the mitigating factors. The statutes in those situations mandate that death shall be imposed. Ohio Rev. Code §§ 2929.03, 2929.04. The limit on the sentencing authority's ability to return a life verdict is impermissible.

In *Gregg*, the Supreme Court stated, "nothing" in any of its case law suggests the decision to afford an individual defendant mercy violates the Constitution. 428 U.S. at 199. *Gregg* held only that, "in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose death had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id. Gregg* requires the State to establish, according to constitutionally sufficient criteria of aggravation and constitutionally mandated procedures, that capital punishment is appropriate for the specific defendant.

Even when the State establishes that death is appropriate, nothing requires the State to execute any defendant for whom such a finding is made. The Georgia statute, approved in *Gregg* as following *Furman*, permits the jury to make a binding recommendation of mercy even though the jury found no mitigating circumstances in the case. *Fleming v. Georgia*, 240 S.E.2d 37 (Ga. 1977); *Hayes v. Georgia*, 282 S.E.2d 208 (Ga. 1981). Even if the aggravating circumstances outweigh mitigation, trial courts in the Fifth and Eleventh Circuits have required the judge to instruct the jury that it still has the option to return a life sentence. *Chenault v. Stynchcombe*, 581

F.2d 444 (5th Cir. 1978); *Spivey v. Zant*, 661 F.2d 464 (5th Cir. 1981); *Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982); *Westbrook v. Zant*, 704 F.2d 1487 (11th Cir. 1983); *Tucker v. Zant*, 724 F.2d 882 (11th Cir. 1984); *Gray v. Lucas*, 677 F.2d 1086 (5th Cir. 1982); *Prejean v. Blackburn*, 570 F. Supp. 985 (W.D. La. 1983).

Under Ohio law, the jury lacks the option of finding a life sentence appropriate in the face of a statute that requires that when aggravating circumstances outweigh mitigating factors "it shall impose [a] sentence of death on the offender." Ohio Rev. Code § 2929.03(D)(3). A non-mandatory statutory scheme that affords the jury the discretion to recommend mercy "avoids the risk that the death penalty will be imposed in spite of factors 'too intangible to write into a statute' which may call for a less severe penalty, and avoidance of this risk is constitutionally necessary." *Conner v. Georgia*, 303 S.E.2d 266, 274 (Ga. 1983) (citation omitted). Other state courts have also required a determination of "appropriateness" beyond mere weighing of aggravating circumstances and mitigating factors. *California v. Brown*, 726 P.2d 516, 540 (Cal. 1985), *rev'd on other grounds*, 479 U.S. 538 (1987).

The Ohio statute permits no appropriateness determination; a death sentence is mandated after a mere weighing. Finally, while the Supreme Court of Ohio has claimed that a jury "is not precluded from extending mercy to a defendant," *State v. Zuern*, 512 N.E.2d 585, 593 (Ohio 1987), Ohio juries are not informed of this capability. The Supreme Court of Ohio has permitted penalty phase jury instructions in direct contradiction to this extension-of-mercy capability. The Ohio "no-sympathy" instructions do not distinguish between "mere" sympathy (untethered) and that sympathy tied to the evidence presented in penalty phase. Therefore, these instructions commit the very violation of the Eighth Amendment which the California instruction had narrowly avoided.

The Supreme Court of Ohio claims extending mercy is permissible in Ohio and acknowledges that "[s]entencing discretion[] is an absolute requirement in any constitutionally acceptable capital punishment statute." *Id.* at 594. However, there is no such indication on the statute's face, and no state court assurance that juries are so informed. Bald, unsupported assertions of compliance with the constitution are inadequate.

### F.    Conclusion

This Court should vacate Ms. Roberts's death sentence because Ohio's capital punishment statutes offend the Constitution. Ms. Roberts is entitled to conditional release unless the State timely resentences him without the death penalty.

## FIFTEENTH GROUND FOR RELIEF

**THE CUMULATIVE IMPACT OF THE ERRORS AND OMISSIONS OF TRIAL COUNSEL PREJUDICED MS. ROBERTS AND DEPRIVED HER OF HER RIGHT TO A FAIR TRIAL AND SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.**

### A.    State Court Proceedings

Ms. Roberts raised the issue of cumulative error on direct appeal. *State v. Roberts*, 850 N.E.2d 1168, 1187 (Ohio 2006). The Ohio Supreme Court relied on state law to determine that there was no prejudice. However, this decision ran afoul of clearly established federal law.

### B.    Clearly Established Federal Law

The U.S. Constitution provides numerous protections to ensure that a criminal defendant is afforded a fair trial and sentencing determination. The Fifth Amendment requires a grand jury indictment for capital crimes, prohibits double jeopardy, protects individuals from having to be a witness against oneself in a criminal trial, and guarantees due process of law. U.S. Const. amend. V. The Fourteenth Amendment guarantees due process and equal protection. U.S. Const. amend.

XIV §1. The Eight Amendment prohibits excessive fines, excessive bail, or infliction of cruel and unusual punishments. U.S. Const. amend. VIII. Lastly, the Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense. U.S. Const. amend. VI.

Together, these amendments guarantee that individuals receive a fair trial when confronting criminal prosecution.

### C.     The Cumulative Error Doctrine

One of the most important factors in ensuring that a criminal defendant is given a fair trial and sentence, is the right to effective assistance of counsel. Although the Sixth Amendment states that a criminal defendant is entitled to representation, the Supreme Court has held that "the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759 (1970). Therefore, errors made by trial or appellate counsel may entitle an individual to relief. However, not every error made by counsel presents grounds for relief. The Supreme Court has held that a claim of ineffective assistance of counsel must contain two core components: (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An error has prejudiced a criminal defendant if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

If there is no individual trial error that could meet the *Strickland* prejudice requirement, federal courts have still found that a criminal defendant may have been prejudiced by a cumulation of errors. In cases where "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (reversing denial of writ of habeas corpus

after finding cumulative errors infected the proceedings and violated the appellant's due process rights). Further, the United States Court of Appeals for the Ninth Circuit ruled that a determination of whether counsel's deficiencies meet the prejudice standard may be unnecessary, where other significant errors have occurred, that considered cumulatively, require relief. *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *United States v. Tucker*, 716 F.2d 576, 595 (9th Cir. 1983) (stating that "a court may find unfairness - and thus prejudice - from the totality of counsel's errors and omissions"). The cumulative error doctrine protects a criminal defendant's constitutional right to a fair trial and ensures that the aggregate of numerous errors be examined for potential prejudice. If the court determines that the cumulation of multiple trial errors resulted in prejudice against the defendant, relief must be granted. *Tucker*, 716 F.2d at 595 (determining that multiple errors resulted in an unfair trial necessitating reversal).

### D.      Argument

Ms. Roberts was prejudiced by numerous errors that offend the U.S. Constitution. These errors are all set out in detail in the Petition and this Traverse. The mitigation errors in particular, largely committed by the trial court as well as counsel, rendered her death sentence entirely inappropriate under the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution. The cumulative effect of all of them was powerful.

In this case, the specific mitigation errors resulting in prejudice are as follows:

(1)      The sentencing judge failed to consider mitigation and failed to permit her to provide additional evidence.

(2)      Trial counsel performed deficiently during the penalty phase of her trial.

(3)      Trial counsel allowed Ms. Roberts to waive her right to present mitigation at trial, and failed to fully inform her of the consequences of her waiver.

(4)      Pervasive pretrial publicity denied her the right to a fair and unbiased jury of her peers.

(5)  Ms. Roberts was incompetent at the time of her sentencing.

(6)  The trial court used the nature and circumstances of the crime as a non-statutory aggravating factor.

(7)  The trial court accepted Ms. Roberts's waiver of the presentation of mitigating evidence when it was knowing, voluntary, and intelligent.

Although the Supreme Court has recognized the right of criminal defendants to waive trial rights that are guaranteed by the U.S. Constitution, this waiver must be done knowingly, voluntarily, and intelligently. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969) (holding that a waiver of the right to trial and entry of a guilty plea be intelligent and voluntary); *Faretta v. Cal*. 422 U.S. 806 (1975) (holding that the record must establish that the right to counsel was waived knowingly and voluntarily). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). In this case, the record makes clear that Ms. Roberts did not have sufficient awareness of the appellate process and the consequences of waiving mitigation. Both trial counsel and the court failed to provide Ms. Roberts with a thorough explanation of either aspect of the criminal process, resulting in an invalid waiver of mitigation.

Even if the court determines that none of these errors alone are sufficient for relief, the court must consider these errors in the cumulative. Considering these errors in the cumulative demonstrates that Ms. Roberts was not afforded effective trial counsel, did not validly waive his constitutional rights, and was thus prejudiced during sentencing. Therefore, Ms. Roberts's death sentence violates the United States Constitution.

### E.    Conclusion

Federal courts have ruled that a multiplicity of errors may in the aggregate violate a criminal defendant's constitutional right to a fair trial. In this case, Ms. Roberts's trial counsel made numerous errors resulting in an invalid waiver of mitigation, and a failure to present mitigating evidence. These errors resulted in an unfair criminal trial, in violation of the U.S. Constitution. Therefore, Ms. Roberts's death sentence should be vacated.

## VI.    CONCLUSION

For these reasons, Ms. Roberts is entitled to habeas relief and granting of the writ. At a minimum, the Court should grant discovery and an evidentiary hearing to further support the claims presented.

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
FEDERAL PUBLIC DEFENDER

*/s/ Jillian S. Davis*
JILLIAN S. DAVIS (0067272)
Research and Writing Attorney

*/s/ Lori B. Riga*
LORI B. RIGA (0066994)
Research and Writing Attorney
Office of the Federal Public Defender
1660 W. Second Street, Suite 750
Cleveland, OH 44113
(216) 522-4656
(216) 522-1951 (fax)
Jillian_davis@fd.org;
Lori_Riga@fd.org

## CERTIFICATE OF SERVICE

I certify that on January 13, 2023, a copy of the foregoing <u>PETITIONER DONNA ROBERTS'S TRAVERSE</u> was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

*/s/ Jillian S. Davis*
Research and Writing Attorney
Capital Habeas Unit
