UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Donna Roberts, | : | Case No. 4:21 CV 368 |
| | : | |
| Petitioner, | : | |
| | : | JUDGE DAN AARON POLSTER |
| vs. | : | |
| | : | |
| Teri Baldauf, Warden, | : | **MEMORANDUM OF OPINION** |
| | : | **AND ORDER** |
| Respondent. | : | |

### INTRODUCTION

Petitioner Donna Roberts was convicted and sentenced to death in an Ohio state court for the aggravated murder of her former husband, Robert Fingerhut.  Roberts has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of her convictions and sentence.  (Doc. 10.)  Respondent Warden Teri Baldauf has filed a return of writ to the petition.  (Doc. 15.)  And Roberts has filed a traverse (Doc. 24), to which Respondent has replied (Doc. 26).  For the reasons stated below, Roberts' petition is denied.

### FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Roberts' convictions:

{¶ 5} Donna Roberts met Robert Fingerhut in Florida in 1983; they married, but were divorced soon thereafter. According to Roberts, the divorce was for financial and business reasons—i.e., that Fingerhut wanted to shelter and protect assets in case his business was sued or collapsed.

{¶ 6} The couple moved to Ohio and established a home on Fonderlac Drive in Howland Township, Warren, Ohio. Fingerhut bought two Greyhound bus terminals—one in Warren and one in Youngstown—and began operating them. Those assets and almost all others were listed in Roberts's name.

{¶ 7} Despite the divorce, Fingerhut appears to have continued to treat Roberts as his wife, referring to her as such in many of his business dealings. Most people who dealt with Roberts and Fingerhut assumed that they were married. Roberts similarly maintains that, in her mind, she did not consider herself divorced because she and Fingerhut were a devout, loving couple.

{¶ 8} Notwithstanding her feelings for Fingerhut, at some point during that relationship, Roberts met Nathaniel Jackson and began an affair with him. The liaison was interrupted in 2001, when Jackson was incarcerated in the Lorain Correctional Institution. Upon his release, however, they were reunited.

{¶ 9} On December 6, 2001, Roberts reserved and paid for a Jacuzzi suite in Jackson's name at the Wagon Wheel Motel in Boardman. Three days later, Jackson and Roberts spent the night in that room.

{¶ 10} Over the next several days, the pair were seen together at various places. A day or two before Fingerhut's death, Frank Reynolds, then an employee of the Greyhound bus terminal in Youngstown, saw Roberts and Jackson kissing and talking with one another near the terminal before Fingerhut arrived for work. Earlier, Reynolds had overheard Roberts asking Fingerhut for $3,000. Fingerhut had refused. According to Reynolds, Roberts was nervous and shaking and gave Fingerhut "the dirtiest look."

{¶ 11} On December 11, 2001, Greyhound bus driver Jim McCoy saw Fingerhut working at the Youngstown terminal at approximately 4:30 p.m. Fingerhut was the only person working that afternoon.

{¶ 12} Soon after seeing Fingerhut in the terminal, McCoy drove his bus to Warren. He saw Roberts and Jackson at the Warren terminal, and Jackson told McCoy, "[W]e're trying to get out of here." On December 11, a server at the Red Lobster restaurant in Niles waited on a couple she later identified as Roberts and Jackson. The two paid for their dinner at 6:43 p.m. and left the restaurant.

{¶ 13} Fingerhut left the Youngstown bus terminal around 9:00 p.m. on December 11, telling the security guard on duty that he was leaving early for the evening. Around 9:30 p.m., a neighbor observed Roberts driving her car very slowly on Old State Route 82 near their homes, even though no one else was on the road at the time.

{¶ 14} Later that night, Roberts went to the Days Inn in Boardman to reserve a room for the following week. She was alone and paced around the lobby. The room receipt indicates that she paid for the room at 11:33 p.m.

{¶ 15} At 12:01 a.m., December 12, 2001, Trumbull County authorities received a 911 call from Roberts, who was screaming hysterically that there was something wrong with her husband. Upon arriving at the home, police found Fingerhut's body on the kitchen floor near the door to the garage.

{¶ 16} A Trumbull County forensic pathologist, Dr. Humphrey Germaniuk, observed Fingerhut's body at the crime scene and later performed an autopsy. Fingerhut had sustained lacerations and abrasions to his left hand and head, as well as multiple gunshot wounds to his head, chest, and back. Dr. Germaniuk concluded that the gunshot to Fingerhut's head was the cause of death.

{¶ 17} During the crime-scene search, police found a fully loaded .38–caliber revolver near Fingerhut's body. A firearms expert with the Bureau of Criminal Identification and Investigation ("BCI") later concluded that the bullets recovered from the home and Fingerhut's body were fired from the same weapon, either a .38–caliber special or a .357 Magnum, but that none of the bullets had been fired from the revolver found near Fingerhut's body.

{¶ 18} During the hours immediately following Roberts's 911 call, police observed that her emotional state fluctuated. At times, she was calm and quiet, and at other times she was crying or screaming, "Oh, my Robert, my Robert." Two detectives noticed that when police investigators talked extensively, they no longer heard Roberts shouting. When a detective checked on Roberts in her bedroom because she had been quiet, she began shouting again upon seeing him. One officer at the scene remarked that he "didn't notice any tears coming from [Roberts's] eyes" when she appeared to be crying.

{¶ 19} In this period of initial investigation, Roberts told police that she had left work at the Greyhound bus terminal in Warren at 5:30 that evening, had dined alone at a Red Lobster restaurant, and had then gone home. According to Roberts, Fingerhut called her and said he would be late coming home and suggested that she go shopping. Roberts said she had left her home at 9:00 p.m. and had gone to several stores. When she returned home shortly before midnight, she found Fingerhut lying on the floor, bleeding from the face. She also stated that her husband's car was not at the house.

{¶ 20} Eventually, police arranged for Roberts's brother to pick her up while they continued to secure the scene and collect evidence. Before Roberts left the house, Detective Sergeant Paul Monroe told Roberts that the house was a crime scene and that police needed to search the house and everything in it, including the garage and cars. Roberts allegedly replied, "Do whatever you have to do to catch the bastard."

3

{¶ 21} At 3:38 a.m. that morning, police were still at the house investigating. The phone rang, and Detective Sergeant Monroe answered it. There was a pause, and then the caller hung up. Detective Monroe traced the call to Roberts's cell phone.

{¶ 22} Around 10:00 a.m. that morning, Detective Monroe visited Roberts at her brother's home. At that time, Roberts gave police written consent to continue searching the residence.

{¶ 23} Later, on the afternoon of December 12, Roberts met with Sergeant Frank Dillon and Detective Sergeant Monroe at the police station. Roberts described her "loving relationship" with Fingerhut but also stated that she and Fingerhut were a "cool couple" and that he "did his thing, she did hers."

{¶ 24} She described Fingerhut as "go[ing] both ways" and said that he had a friend named "Bobby." She recalled that about a week and a half before the murder, Fingerhut was acting kind of "nutty," and she had thought the behavior was because of his relationship with Bobby.

{¶ 25} Roberts also stated that she had been having a sexual relationship with a man named Carlos for six months. She additionally indicated that she had a friend named Santiago whom she had tried to help, but that he had stolen money and a gun from her. When Detective Monroe asked Roberts whether she had relationships with anyone else, Roberts replied, "No, there's nobody else. I told you everybody."

{¶ 26} Monroe then asked her about a man named Nate Jackson, and Roberts said, "Yes, I forgot about him." Roberts admitted that she had been dating Jackson for two years and that he had called her from prison and had exchanged letters with her. Roberts claimed that she had last seen Jackson on December 9, when she picked him up at Lorain Correctional Institution and had then left him in Youngstown at a house on Wirt Street. Roberts added that she had last spoken to Jackson over the telephone rather than in person on the morning of December 11.

{¶ 27} Detective Monroe asked Roberts whether she had a cell phone and whether he could look at it. Roberts searched her purse and said that she had left it at home. Monroe then told Roberts that a call originating from her cell phone had been placed to the crime scene at 3:38 that morning. Roberts said, "Nate must have had the phone. He's always borrowing it."

{¶ 28} In the ensuing week and a half, police continued to investigate and learned that Jackson and Roberts had spent a night together at the Wagon Wheel Motel and that Roberts had registered at the Days Inn and had paid for one week's rental.

4

{¶ 29} Police and a BCI agent located and retrieved evidence, including Jackson's fingerprints, from the room at the Days Inn in which Jackson had stayed. Police also recovered a garbage bag in a dumpster at the motel that had come from Jackson's room. That bag contained a bottle of peroxide, used bandages, and gauze with blood that was consistent with Jackson's DNA profile.

{¶ 30} Police learned that Fingerhut had taken out two life insurance policies on his life, naming Roberts as sole beneficiary. The aggregate benefit of the policies amounted to $550,000.

{¶ 31} On December 12, police found Fingerhut's abandoned vehicle in Youngstown, approximately three blocks from Wirt Street. A forensic specialist found blood on the driver's side visor and on other areas inside the automobile. Subsequent scientific analysis determined that blood on the visor contained a mixture consistent with both Jackson's and Fingerhut's DNA profiles. Blood recovered from the trunk release inside the car contained a DNA mixture with a major profile that was consistent with Jackson's DNA and a minor profile consistent with Fingerhut's DNA. The frequency for Jackson's DNA on the trunk release was one in 45 quintillion, 170 quadrillion in the Caucasian population, and one in 29 quadrillion, 860 trillion in the African–American population. Jackson is African–American.

{¶ 32} Cell-phone records indicated that a number of phone calls were made on December 11 between 9:45 p.m. and 11:44 p.m. from the cell phone that Roberts said Jackson had borrowed from her and a cell phone located in Roberts's vehicle.

{¶ 33} Additional evidence implicated Roberts and Jackson in the murder. As noted previously, Roberts had admitted to police that she and Jackson had exchanged letters and telephone calls during his incarceration. During their initial search of the home, police discovered more than 140 letters and cards written by Jackson to Roberts, most of which were addressed to Roberts at a post office box in Warren.

{¶ 34} Police also found a brown paper bag with Jackson's name on it in the trunk of Roberts's car, which had been parked in the garage at their residence. The bag contained clothing and approximately 140 handwritten letters, dated between October and December 2001, sent by Roberts to Jackson.

{¶ 35} Passages from letters exchanged between Jackson and Roberts suggested strongly that there had been a plot to murder Fingerhut. Many of the letters described the couple's physical relationship and plans for Jackson's release, as well as references to how they would deal with Fingerhut once Jackson was out of prison.

{¶ 36} For example, in a letter from early October 2001, Jackson wrote Roberts:1 "[W]hy don't you leave Robert an lets carry on with a world of our own? Or let me do what I was gonna do to him, because you know that—that was our little thing so you better not go an try to get know one else to do it, because I told you its getting done when I come home * * *." Less than a week later, Jackson wrote Roberts: "Donna I got it already planned out on how we are gonna take care of the Robert situation? An baby its the best plan ever! Because Donna its now time that we really be together so that we can really see the true side of our love because I'm tired of not being able to be with you * * *."

{¶ 37} Soon thereafter, Jackson again expressed his desire to be with Roberts and to be rid of Fingerhut: "Donna I don't care what you say but Robert has to go! An I'm not gonna let you stop me this time. An Donna you know that I've always wanted to live my life with you an only you but everytime that I wanted to take care of the situation by myself you wouldn't never let me. * * * Because you wouldn't let me do what I wanted to do to make you happy an that was get rid of him! So Donna can I do this so that we can go on an live happy? An then maybe we can sell the house an move on to somewhere else in our own world. An I'm not gonna be happy until that happens!"

{¶ 38} Roberts responded to Jackson with her own letters. In one from mid-October 2001, she indicated her frustration over limits that Fingerhut apparently had imposed on her spending and her apparent agreement to Jackson's plan for Fingerhut's murder. She wrote, "You know you can always count on me—you always could. It'll just be a little tougher now because he gives me $100 a week for everything and then makes me write checks to keep track of it all. And I haven't been ALLOWED to use any of my 52 charge cards—emergency only. I am not used to living like this. I am used to having plenty of cash for whatever I want & buying everything I want. Maybe those days will return again soon. Do whatever you want to him ASAP. Amen." Jackson replied, "An then after that you don't ever have to worry about making know more excuses to him, because he will no longer be with us after 12–10–01 an then it'll be me an you totally an completely * * *." Within that same passage, Jackson drew a tombstone with the inscription, "Rest In Piss," before continuing, "Hey Donna just think come 12–11–01 you'll be waking up to me or maybe we'll give it a couple of days to let things look cool an then after the funeral baby when I come home I'm never leaving an we're only doing it like that just to make it look good * * *. Alls I need is for my baby not to worry an leave everything else up to me."

{¶ 39} Jackson's subsequent letters further evinced the developing plan to deal with "the Robert problem." Jackson wrote, "Yes I'm taking care of that the next night, because I told you I'm tired of living like this when I don't have to. An after that will you get me a 2002 Cadillac Deville?" In that same letter, Jackson

6

wrote:  "An even if I gotta come to the house and shoot Robert in his fucking head you're gonna be with me."

{¶ 40} The letters also indicate a role for Roberts in the scheme. An October letter from Jackson reads, "Well I see now you know that I'm about my business when I get out as far as our little situation? An get me a size large leather gloves an see if you can find me a ski mask hat okay? An I need them handcuffs you have an its mandatory, so get them for me, because the way that I'm gonna do it is gonna be right okay?" About two weeks before the murder, Roberts wrote to Jackson: "I also went to 4 stores and finally found your ski mask & boxers & a pair of beautiful fleeced lined black leather gloves."

{¶ 41} Though the words written in those letters were significant evidence of the planning of the murder, the state also marshaled the actual words spoken between Roberts and Jackson.

{¶ 42} Prison authorities at Lorain Correctional Institute routinely record telephone conversations of prisoners and maintain the recordings for at least six months. Eighteen phone calls between Roberts and Jackson were recorded electronically. Those recordings also reflect the plot to murder.

{¶ 43} For example, in a recorded conversation between Jackson and Roberts on October 25, 2001, the following colloquy took place:

{¶ 44} "[JACKSON]: I'll be home to you. December 9th all the worries will be over baby.

{¶ 45} " * * *

{¶ 46} "[JACKSON]: The next day out, I'm goin to—I already got it in my mind, my mind made up. I'm goin to go ahead and do that the next day, okay. All right.

{¶ 47} "[ROBERTS]: Oh, I just wrote to you that I didn't think that you really meant it.

{¶ 48} "[JACKSON]: What. My mind is made up. My mind made—I wrote it in my letters, you know what I'm saying, but you know, I don't like to talk too much like that but when I come home, you know what I mean, it's goin to be in full detail. Okay. I'm goin to let you know how I'm goin to do it and everything. I'm goin to do it for sure the next day."

{¶ 49} In recorded phone conversations between Jackson and Roberts during November 2001, they continued to discuss what Jackson planned to do to Fingerhut. In a conversation on November 8, 2001, Jackson told Roberts that

he wanted Fingerhut to see Roberts performing oral sex on Jackson before Fingerhut "goes away."

{¶ 50} Two weeks later, Roberts worried about Jackson's being apprehended for the murder of Fingerhut:

{¶ 51} "[JACKSON]: You know what I'm saying, the next day after. You know what I told you I wanted to do right?

{¶ 52} "[ROBERTS]: I'm afraid Nate.

{¶ 53} "[JACKSON]: What you, man.

{¶ 54} "[ROBERTS]: I can't afford to lose you. * * * I cannot lose you. Like I will kill myself.

{¶ 55} " * * *

{¶ 56} "[JACKSON]: Just forget about it man, * * * when a person, man, know what he's doing, man, * * * that's like jinxing, man. * * *

{¶ 57} "[ROBERTS]: But what was the story with the trunk and handcuffs, that's too involved.

{¶ 58} "[JACKSON]: Just, just, just leave it alone, alright.

{¶ 59} "[ROBERTS]: It's too much involved. Your gonna leave hair, your gonna leave prints, your gonna,

{¶ 60} "[JACKSON]: Leave it alone, man. Leave it alone, alright. * * * Come on man. This ain't Perry Mason man.

{¶ 61} "[ROBERTS]: I don't want to know anything about it ever."

{¶ 62} On November 24, Jackson tried to reassure Roberts about his plan.

{¶ 63} "[JACKSON]: Man, we gonna * * * really talk when I come home, ok.

{¶ 64} "[ROBERTS]: OK.

{¶ 65} "[JACKSON]: Especially about our, that situation, man. You know.

{¶ 66} "[ROBERTS]: Yeah.

{¶ 67} "[JACKSON]: I mean, it just, you know, you get too nervous at times, that's all the deal is.

{¶ 68} "[ROBERTS]: Yeah I know, it part of my nature.

{¶ 69} "[JACKSON]: And then you said DNA, the only way they can do a DNA is if they got the other, the person's, you know what I'm saying. If they got the person and the hair cause they can't just take no hair and say this is such and such hair. * * * [T]he laws that we got in the State of Ohio and the laws from everywhere else, * * * I mean they way different. * * *

{¶ 70} "[ROBERTS]: Really.

{¶ 71} "[JACKSON]: Hell yeah. We'll, we'll talk about it when I come home Donna. Ok, I don't want to talk about it over the phone."

{¶ 72} Around Thanksgiving 2001, Roberts and Jackson discussed DNA evidence, a "big 38" firearm, their reunification on the night after his release from prison and his stay in a hotel the week thereafter, and Roberts's complete reliance on Jackson.

{¶ 73} On December 8, the day before Jackson was released from prison, Jackson and Roberts had one final recorded conversation. Roberts expressed misgivings about what Jackson was planning to do to Fingerhut, but Jackson told her, "I got to do this Donna. I got to." Roberts told Jackson that she did not want to know about it. The following colloquy then took place:

{¶ 74} "[JACKSON]: Just consider it a done deal. Only thing I'm gonna need is one thing.

{¶ 75} "[ROBERTS]: What?

{¶ 76} " * * *

{¶ 77} "[JACKSON]: I just need to be in that house when he come home.

{¶ 78} "[ROBERTS]: Oh no.

{¶ 79} " * * *

{¶ 80} "[JACKSON]: Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you.

{¶ 81} " * * *

{¶ 82} "[JACKSON]: I just need to be in there man. It ain't gonna happen in the house man. I mean I ain't gonna jeopardize that man.

{¶ 83} "[ROBERTS]: Well, let's not talk about it now.

{¶ 84} "[JACKSON]: Ok. We'll talk, we'll, I'll just wait until tomorrow."

{¶ 85} In light of the accumulating inculpatory evidence and Roberts's unpersuasive explanations for it, Jackson and Roberts became the prime suspects in Fingerhut's murder. Detective Monroe then arranged for Roberts to call Jackson to ask him some prepared questions and for police to record the conversation. According to Detective Monroe, however, Roberts failed to ask Jackson the critical questions that police had instructed her to ask.

{¶ 86} On December 21, 2001, Roberts was arrested at her home for the murder of Robert Fingerhut. That same day, police raided a home on Wirt Street in Youngstown, and Jackson surrendered. At that time, Jackson had a bandage wrapped around his left index finger. A search of the Wirt Street home uncovered additional evidence. Included in that evidence was a pair of black leather gloves; the index finger of the left glove appeared to have been torn off, and there was a red substance on the glove near the tear.

*State v. Roberts*, 110 Ohio St. 3d 71, 72-80 (Ohio 2006).

These factual findings "shall be presumed to be correct," and Roberts has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## A.  State-Court Proceedings

### 1.  Trial

On December 28, 2001, a grand jury in Trumbell County, Ohio, indicted Roberts on two counts of aggravated murder for causing Fingerhut's death, pursuant to Ohio Rev. Code §§ 2903.01(A) and (B).  (Doc. 12-1 at 40-43.)[1]  Each murder count carried two death-penalty specifications – murder during an aggravated burglary and an aggravated robbery, both with prior calculation and design, pursuant to Ohio Rev. Code § 2929.04(A)(7).  (*Id.*)  The grand

---

[1] For ease of reference, all citations to page numbers of documents filed in the Court's electronic court filing system ("ECF") are to the ECF-assigned page numbers of the individual documents, not to the documents' original page numbers or the ECF "PageID" numbers.

jury also indicted Roberts on separate counts of aggravated burglary and aggravated robbery, each carrying a firearm specification.  (*Id*. at 44-45.)

Roberts was represented by retained counsel, J. Gerald Ingram and John B. Juhasz. (*Id*. at 57-58.)  She entered a plea of not guilty to all charges.  (*Id*. at 36.)

The trial began on April 8, 2003.  (*See* Doc. 12-2 at 631.)[2]  On May 28, 2003, the jury found Roberts guilty of all charges.  (*See id*. at 632.)  Because the aggravated-murder counts of the indictment, counts one and two, merged for purposes of sentencing, the State elected to dismiss count two and the attached specifications before the mitigation phase of the trial.  (*See id*.)

The penalty phase of the trial began on June 4, 2003.  (*Id*.)  The day before, Roberts had indicated to the trial court that, while she wanted to make an unsworn statement to the jury, she wished to waive the presentation of mitigation evidence. (Doc. 11-3 (Trial Tr.) at 1749.)  The court conducted a hearing to determine her competency to effectuate such a waiver.  (*Id*. at 1747-61.)  It ultimately determined that Roberts was competent to waive her right to present mitigation evidence and her waiver was "freely, knowingly[,] voluntarily, [and] intelligently" made.  (*Id*. at 1760-61.)

The jury recommended a sentence of death on count one and both of its attached specifications.  (Doc. 12-2 at 611-12.)  The trial court agreed with the jury's recommendation and imposed the death sentence in a written opinion issued on June 20, 2003.  (*Id*. at 611-27.) The court further imposed a sentence of ten years' imprisonment for each of the counts of aggravated burglary and aggravated robbery, to be served consecutively, and three years'

---

[2]  Opening statements and the presentation of evidence did not begin until May 13, 2003.  (Doc. 11-1 at 23.)

imprisonment for the firearm specifications, which were merged, also served consecutively. (*Id*. at 633-34.)

### 2. Direct Appeal

#### a. First direct appeal and remand

Roberts filed a notice of appeal and motion for delayed appeal with the Ohio Supreme Court on August 13, 2003. (Doc. 12-4 at 3-5.) The court granted the motion for delayed appeal. (*Id*. at 1.) She was represented by appointed counsel David Doughten and Patricia Smith. (*See id*. at 96.)

In her merit brief, Roberts presented the following propositions of law, stated as:

1. A waiver of the presentation of mitigation evidence in the penalty phase of trial is not valid unless the defendant is informed that the waiver will result in the death penalty. Such waiver is also invalid if the defendant intends to present any mitigation in any form.

2. The scope of a consent search of the home of a defendant must be limited strictly to the terms of the consent provided by the defendant.

3. A trial court's refusal to dismiss biased jurors from the panel deprives a capital defendant her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4. Evidence that does not establish the theft element of aggravated robbery, R.C. § 2911.01 and the corresponding capital specification, R.C. § 2929.04(A)(7)[,] is insufficient to sustain guilty verdicts on these charges.

5. A capital defendant's right to allocution before being sentenced is mandatory. Where the sentencing court neglects this right, the subsequent sentence is void or voidable.

6. The trial court sentencing opinion under R.C. § 2929.03(F) requires independent analysis of the trial court in [] weighing the factors to determine the appropriateness of a death sentence. It [is] not proper for the court to allow the prosecutor of the case to draft the opinion as the sentence loses its independent nature mandated by the legislature.

12

7. Where the pre-trial publicity is so pervasive that a jury cannot be expected to ignore the media attention to the case, a trial court must grant a defense request for a change of venue to protect the integrity of the fact-finding process.

8. The failure to properly advise and ensure that a capital defendant understands the ramification of a [] waiver of evidence in the penalty phase constitutes ineffective assistance of counsel.

9. The inclusion of a R.C. §2929.04(A)(7) specification to a conviction of R.C. §2903.0l(A) may not sustain a conviction of death when the element of prior calculation and design is found by the jury in both statutes. The repeat finding of the same element fails to provide the narrowing procedure that is required for a sentencing scheme to be found constitutional.

10. Instructing the jury that its penalty phase determination was a recommendation is improper because it unfairly diminishes the jury's sense of responsibility.

11. Ohio's definition of reasonable doubt is violative of the constitutional as it allows the Appellant to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

12. The death penalty may not be sustained where the cumulative errors that occurring [*sic*] in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.

13. The death penalty cannot be upheld where the reviewing court fails to follow the statutory provisions regarding the proportionality review of the defendant's sentence.

14. The death penalty is unconstitutional as presently administered in Ohio.

(*See* Doc. 12-4 at 101-09, 131.)  The State filed a responsive brief.  (*Id*. at 220-321.)

On August 2, 2006, the Ohio Supreme Court affirmed Roberts' convictions for aggravated murder, aggravated burglary, and aggravated robbery, but vacated the death sentence and remanded to the trial court for resentencing on the ground that the trial judge improperly used the prosecutor to assist directly in drafting the sentencing opinion.  *State v. Roberts*, 110 Ohio St. 3d 71, 92-95 (Ohio 2006) ("*Roberts I*").  Roberts moved for

13

reconsideration, which was denied. *State v. Roberts*, 111 Ohio St. 3d 1418 (Ohio 2006) (Table).

### b. First resentencing and second direct appeal

On remand, Roberts, now represented by David Doughten and Robert Dixon (*see* Doc. 12-5 at 25-27, 39), moved for funds for expert assistance for forensic psychologist James Eisenberg (*id*. at 25-29) and the release of records relating to her medical, psychological, hospital, institutional, school and employment history (*id*. at 31-36). At a status hearing on January 17, 2007, the issue of Roberts' competence came to the court's attention, and the court issued an order directing a competency evaluation. (*Id*. at 40-41.) In September 2007, defense counsel renewed its motion for funds for Dr. Eisenberg (*id*. at 70-72), and an independent expert in neuropsychology (*id*. at 189-90). The State opposed both motions (Doc. 11-4 (Trial Tr.) at 15), and the court denied them (*id*. at 42).

At a hearing on October 22, 2007, defense counsel informed the court that they would not stipulate to the court-ordered report of the forensic psychologist, Thomas Gazley, who concluded that Roberts was competent to be resentenced. (*Id*. at 16.) The State, therefore, presented Dr. Gazley to testify before the court and both parties questioned him. (*Id*. at 16-40.) The court accepted his determination and found Roberts competent for purposes of resentencing. (*Id*. at 43-44.)

Roberts filed a motion on May 1, 2007, requesting that she be permitted to present additional mitigation evidence at the resentencing hearing. (Doc. 12-5 at 46-51.) The State opposed the motion (*id*. at 54-57), and the court denied it (*id*. at 73). Defense counsel then moved to proffer for the record the mitigation evidence they would have presented had they

been permitted to do so (*id*. at 75), which the court granted (Doc. 11-4 (Trial Tr.) at 41, 44-45).

The resentencing hearing took place on October 29, 2007, at which the trial court reimposed the death penalty.  (Doc. 12-5 at 225-27.)

Roberts, now represented by David Doughten and Jeffrey Helmick, timely appealed the trial court's resentencing judgment to the Ohio Supreme Court.  (Doc. 12-6 at 3-4, 129.) In her merit brief, she asserted the following propositions of law, stated as:

1. Where a capital sentence is remanded for a new sentencing, the trial court must consider and give effect to all relevant evidence in mitigation available for consideration. A remand to allow allocution does not prevent the sentencing court from considering evidence which would support and provide weight to the allocution.

2. When considering the appropriate sentence in a capital trial, R.C. [§] 2929.03(F) and the federal constitution require that the sentencing judge must consider and give effect to all presented evidence in mitigation.

3. In a capital case, the sentencing court may not consider non-statutory aggravating factors in the determination of the appropriate sentence.

4. In a capital trial, where the death sentence is reversed for improper conduct by the sentencing judge, that judge must recuse himself from the resentencing hearing where an ethical investigation by the reviewing court is pending at the time of the hearing.

5. The failure to fully investigate and present all possible evidence of mitigation in a capital trial constitutes ineffective assistance of penalty phase counsel where the investigation would have revealed substantial evidence calling for a sentence of less than death.

6. The trial court may not conduct a penalty phase hearing for a death-eligible defendant where the record does not establish by a preponderance of the evidence that the defendant is legally competent.

7. A sentence of death may not stand where the review of the evidence establishes that the aggravating factors do not outweigh the mitigation presented beyond a reasonable doubt.

(*Id*. at 32-35.)  The State filed a responsive brief.  (*Id*. at 131-86.)

15

On May 7, 2013, the Ohio Supreme Court vacated Roberts' death sentence again and remanded for resentencing, this time because the trial court failed to consider Roberts' allocution, as it was not referenced in the sentencing opinion.  *State v. Roberts*, 137 Ohio St. 3d 230, 240-46 (Ohio 2013) ("*Roberts II*").

Roberts then filed a petition for writ of *certiorari* with the United States Supreme Court.  (Doc. 12-7 at 3-103.)  The State opposed the petition.  (*Id*. at 104-31.)  The Court denied Roberts' petition on March 24, 2014.  *Roberts v. Ohio*, 572 U.S. 1022 (2014) (Mem).

### c.  Second resentencing and third direct appeal

Roberts was represented on remand by David Doughten and Robert Dixon.  (Doc. 12-8 at 36-37.)  On April 17, 2014, she moved the court, with a different judge presiding, to preclude a death sentence or, alternatively, to permit her presentation of additional mitigation evidence.  (*Id*. at 39-56.)  On April 30, 2014, the court denied the motion, as the Ohio Supreme Court had already ruled against the defense on that matter.  (*Id*. at 89-91.)  That same day, the trial court again affirmed Roberts' death sentence.  (*Id.* at 63-88.)

Roberts, still represented by David Doughten and Robert Dixon, filed a timely appeal to the Supreme Court of Ohio.  (Doc. 12-9 at 3-8.)  In her merit brief, she raised the following propositions of law, stated as:

1. Where a capital sentence is remanded for a new sentencing hearing because of the trial court failure to consider and give effect to the defendant's allocution, a sentence of death is precluded if a different judge conducts the hearing without allowing the defendant to speak because proper weighing is impossible without ever having heard the defendant speak.

2. When considering the appropriate sentence in a capital trial, the sentencing judge must consider and give effect to all presented evidence in mitigation. This process requires the independent weighing of the available evidence in mitigation separately from the weight assessed to the proven capital

16

specifications.  It is not required that the mitigation "draw attention" from the proven aggravating factors before weight is assessed.

3. In a capital case, the sentencing court may not use its findings of the nature and circumstances of a the [*sic*] case to negate the presence of available factors in mitigation.

4. On remand for a new sentencing procedure requiring a judge who has not had the benefit of hearing the trial, penalty phase or allocution phases of trial to write a R.C. § 2929.03(F) opinion, the trial court must conduct a *de novo* penalty phase hearing.

(*Id*. at 66-67.)

The Ohio Supreme Court affirmed the trial court's judgment on appeal.  *State v. Roberts*, 150 Ohio St. 3d 47, 47 (Ohio 2017) (*"Roberts III"*).  Roberts then moved for reconsideration, which Respondent opposed.  (Doc. 12-9 at 236-60.)  The court denied the motion.  *State v. Roberts*, 150 Ohio St. 3d 1411 (Ohio 2017) (Table).

Roberts then filed a timely petition for writ of *certiorari* in the Supreme Court.  (Doc. 12-10 at 38-52.)  The State opposed the petition.  (*Id*. at 56-75.)  The Court denied the petition on February 20, 2018.  *Roberts v. Ohio*, 138 S. Ct. 998 (2018) (Mem).

### 3.  Post-Conviction Proceedings

#### a.  First post-conviction petition

Meanwhile, on September 24, 2004, Roberts, represented by David Doughten, filed a petition for post-conviction relief in the state trial court.  (Doc. 12-11 at 32-53.)  On October 25, she filed a first amended petition, in which she asserted the following five claims for relief, written as:

1. Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied his [*sic*] right to a fair and impartial jury and equal protection because there was an under-representation of African Americans in the venire from which his [*sic*] jury was drawn. Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of an impartial jury as guaranteed by the Sixth

17

Amendment and the Equal Protection Clause of the Fourteenth Amendment.

2. Petitioner Roberts' convictions and sentence are void or voidable because the grand jury that indicted him [*sic*] was drawn from a venire in which African-Americans [*sic*] were disproportionately excluded in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3. Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of his [*sic*] capital case. The acts and omissions of trial counsel deprived him [*sic*] of the Sixth Amendment right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 486 U.S. 668 (1984).

4. The death sentence against Petitioner Roberts is void and/or voidable because the death penalty as administered by lethal injection violates his [*sic*] constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law. Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) (five justices holding that the Due Process Clause protects the life interest at issue in capital cases).

5. Petitioner Roberts' judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States. The Petitioner understands that the Eleventh District Court of Appeals has previously found that post[-]conviction is an improper venue for challenging the constitutionality of the procedure. However, the Petitioner alleges that even though the state court's [*sic*] have decided the issue, the federal aspect has not been definitively decided in the federal Sixth Circuit Court of Appeals.

(*Id*. at 65, 67, 69, 74, 76.)

The State moved for summary judgment on November 2, 2004 (*id*. at 79-236), which Roberts opposed (*id*. at 239-50).  Roberts also moved for leave to conduct discovery.  (*Id*. at 251-61.)  The court denied Roberts' amended petition without an evidentiary hearing on February 11, 2005, and overruled her motion for discovery as moot.  (*Id*. at 262-76.)

Roberts, still represented by David Doughten, filed a motion for leave to file a delayed appeal of the trial court's judgment with the state appellate court.  (*Id.* at 280-84.)   That motion was denied as moot because the notice of appeal was in fact timely filed.  (Doc. 12-12 at 15-16.)  In her appellant's brief, Roberts presented the following claims, stated as:

1.  The trial court erred by failing to grant Appellant Roberts an evidentiary hearing which would allow her to establish the prejudice of the errors which occurred during her capital trial.

2.  The appellant was denied her right to a fair and impartial jury and equal protection because there was an under-representation of African Americans in the venire from which his [*sic*] jury was drawn.

3.  The appellant's convictions and sentence are void or voidable because the grand jury that indicted her was drawn from a venire in which African-Americans [*sic*] were disproportionately excluded in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4.  The appellant's [*sic*] was denied the effective assistance of counsel during the culpability stage of her capital case.

5.  The death sentence against Appellant Roberts is void and/or voidable because the death penalty as administered by lethal injection violates her constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and federal due process of law.

6.  Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States [Constitution].

(*Id.* at 22-25.)  The State filed a responsive brief.  (*Id.* at 56-147.)

On October 19, 2007, the court of appeals dismissed the appeal for lack of jurisdiction, because, on direct appeal, the Ohio Supreme Court had vacated the final judgment underlying Roberts' convictions and sentence and remanded to the trial court for resentencing.  *State v. Roberts*, No. 2005-T-0034, 2007 WL 3052212, at *1-2 (Ohio Ct. App. Oct. 19, 2007).

### b. Second post-conviction petition

Roberts, still represented by Attorney Doughten, filed a second post-conviction petition on August 20, 2008. (Doc. 12-13 at 26-222.) In it, she asserted the following claims, stated as:

1. Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied her right to a fair and impartial jury and equal protection because there was an under-representation of African Americans in the venire from which her jury was drawn. Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of an impartial jury as guaranteed by the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

2. Petitioner Roberts' convictions and sentence are void or voidable because the grand jury that indicted him [*sic*] was drawn from a venire in which African-Americans [*sic*] were disproportionately excluded in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3. Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of her capital case. The acts and omissions of trial counsel deprived her of the Sixth Amendment right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 486 U.S. 668 (1984).

4. Trial counsel violated Roberts' Sixth Amendment right to effective assistance of counsel at the penalty phase when they failed to make a timely and reasonable investigation of her character, history, and background. Counsel's mitigation presentation was deficient and deprived the jurors of evidence that was worthy of weight and effect. Defense counsel's deficient performance undermines confidence in the outcome of Roberts' sentencing hearing. As a result of trial counsel's ineffectiveness, Roberts' rights guaranteed by the United States Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments were violated.

5. Ms. Roberts is not eligible for the death penalty as her full-scale IQ is less than 70.

6. Ms. Roberts was not competent to make decisions at her penalty phase hearing.  As the result, the decisions made by her and statements made by her were illogical, disjointed and self-defeating.  She was unable to assist counsel to represent her in a meaningful fashion.  She was unable to address the jury or understand the procedures which resulted in her receiving the death penalty.  The conducting of the penalty phase while she was not competent was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

7. The trial court refused to grant an independent evaluation as requested by defense counsel.  Defense counsel requested the independent psychologist on December 6, 2006.

8. Petitioner Roberts' judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States [Constitution].

(*Id*. at 36, 38, 40, 45, 57, 59, 64, 66.)  Roberts also moved for funds for expert assistance of an independent psychologist and neuropsychologist and for leave to conduct discovery.  (*Id*. at 229-31; 232-37; 240-49.)  The State opposed the motions.  (*Id*. at 252-59.)

On September 17, 2008, Roberts moved to stay the proceedings on the grounds that there was a disciplinary action pending involving the parties and court and the court did not have a complete record.  (*Id*. at 238-39.)  The State did not object.  (*Id*. at 250-51.)  The court granted the stay request.  (*Id*. at 260.)

Roberts moved to amend her post-conviction petition on February 17, 2015, seeking to withdraw two claims, one challenging Ohio's method-of-execution claim and one challenging Ohio's post-conviction review procedures.  (*Id*. at 262-64.)  On August 19, 2015, pursuant to the parties' agreement, the court granted Roberts' motion to amend her petition by eliminating two claims "per [her] motion" and agreed to withhold its ruling on the petition until Roberts'

21

direct appeal was concluded.  (*Id*. at 271-72.)  The State filed a motion for summary judgment on August 28, 2015.  (*Id*. at 273-309.)

Once the direct appeal was complete, Roberts filed a memorandum in support of her amended petition (*id*. at 314-40), which also withdrew her claim of ineffective assistance of counsel based on deficient investigation and presentation of mitigation evidence "[a]s Roberts controlled her counsel in the penalty phase" (*id*. at 320).  The State then renewed its summary judgment motion.  (*Id*. at 341-44.)  Roberts objected to the motion.  (*Id*. at 345-46.)  On November 20, 2019, the trial court denied Roberts' petition.  (*Id*. at 347-52.)

Roberts, represented by Attorneys Doughten and Dixon, filed a timely appeal of the trial court's judgment.  (*Id*. at 365-66.)  In her appellant brief, she asserted two assignments of error, stated as:

> 1. Petitioner Roberts' convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial or first stage of her capital trial.
>
> 2. If the affidavits provided in a [p]etitioner's [m]otion to [v]acate filed pursuant to R.C. § 2953.21 establish a meritorious issue, may trial court dismiss the petition without an evidentiary hearing.

(Doc. 12-14 at 28, 29.)  The State filed a responsive brief.  (*Id*. at 64-90.)

On August 24, 2020, the court of appeals affirmed the trial court's decision.  *State v. Roberts*, No. 2019-T-0089, 2020 WL 4933461 (Ohio Ct. App. Aug. 24, 2020).

Roberts, still represented by Attorneys Doughten and Dixon, timely appealed the appellate court's affirmance to the Ohio Supreme Court.  (Doc. 12-15 at 2-3.)  In her memorandum in support of jurisdiction, she presented two propositions of law, written as:

> 1. In the first phase of a capital trial, trial counsel renders ineffective assistance of counsel if they fail to introduce the tape recording of the co-defendant in which that co-defendant claims he shot the victim in self-defense and precludes the involvement of the petitioner altogether.

2.  In a capital case, if the affidavits provided in a [p]etitioner's [m]otion to
[v]acate filed pursuant to R.C. § 2953.21 established a meritorious issue,
[the] trial court may not dismiss the petition without an evidentiary hearing.

(*Id*. at 13, 16.)  The State filed an opposing memorandum.  (*Id*. at 45-62.)  Ohio's high court

denied jurisdiction over the appeal on December 29, 2020.  (*Id*. at 63.)

## B.  Federal Habeas Proceedings

Roberts filed a petition for writ of habeas corpus in this Court on December 20, 2021,

asserting fifteen grounds for relief.  (Doc. 10.)  Respondent filed a return of writ on February

18, 2022.  (Doc. 15.)  Roberts filed her traverse on January 13, 2023.  (Doc. 24.)  In it, she

withdrew her twelfth ground for relief.  (*Id*. at 70.)  Respondent filed a sur-reply on January

23, 2023.  (Doc. 26.)

### PETITIONER'S GROUNDS FOR RELIEF

1.  When considering the appropriate sentence in a capital trial, the sentencing judge must
consider and give effect to all mitigating evidence.  A trial court's refusal to consider
mitigating evidence is a violation of a capital defendant's Eighth and Fourteenth
Amendment rights under the Constitution and in violation of *Skipper v. South Carolina*,
476 U.S. 1 (1986), *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and *Lockett v. Ohio*, 438
U.S. 586 (1978).

2.  Ms. Roberts's right[s] to due process, a fair trial and the effective assistance of counsel
[were] denied by counsel's deficient performance during the penalty phase of her trial in
violation of the Sixth, Eighth and Fourteenth Amendments [to] the United States
Constitution.

3.  Trial counsel were ineffective when they allowed Ms. Roberts to waive her right to
present mitigation evidence because trial counsel failed to fully inform her of the
consequences of the waiver and the waiver was therefore not knowing, voluntary and
intelligent.

4.  Ms. Roberts was denied her right to the effective assistance of counsel during the
culpability phase of her trial in violation of the Sixth, Eighth and Fourteenth Amendments
to the United States Constitution.

5. Pervasive pre-trial publicity deprived Ms. Roberts of her right[s] to a fair trial and due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

6. A trial court's refusal to dismiss biased jurors from the panel deprived Ms. Roberts of a fair trial and her protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

7. Ms. Roberts' right[s] to due process and [a] fair trial were violated when she was tried and resentenced while she may have been incompetent.

8. The sentencing court's use of the nature and circumstances of the offense as non-statutory aggravating factors in its sentencing decision [is] in violation of Ms. Roberts's right[] [to] due process and is in violation of her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments [to] the United States Constitution.

9. The trial court accepted Ms. Robert's [sic] waiver of the presentation of mitigating evidence during the penalty phase of trial when it was not knowing, voluntary and intelligent in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10. Donna Roberts was denied her right[s] to due process and a fair trial when a different judge, who had never heard the testimony nor Ms. Roberts's allocution, sentenced Ms. Roberts to death without permitting her to speak on her own behalf or otherwise submit new testimony in mitigation.  U.S. Const. Amends. 6, 8 & 14.

11. Ms. Roberts was denied her right[s] to due process and a fair trial when the trial court failed to grant her an evidentiary hearing to allow her to establish the prejudice of the errors which occurred during her capital trial.

12. The evidence the prosecution presented at trial did not establish the theft element of Ohio's aggravated robbery statute, Ohio Revised Code § 2911.01, and the attendant capital specification under Ohio Revised Code § 2929.04(A)(7).   The evidence was therefore insufficient to support guilty verdicts on these charges.

13. The trial court failed to ensure the inclusion of African[-]American jurors on the jury panel in Ms. Roberts's capital trial to her extreme prejudice, and thereby deprived Ms. Roberts of her right[s] to due process, a fair trial, [] equal protection and [] a jury that represents a fair cross[-]section of the community.

14. The death penalty on its face and as applied to Ms. Roberts is arbitrary, cruel and unusual, and violates due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

15. The cumulative effects of the errors and omissions set forth in the preceding claims for relief prejudiced Ms. Roberts and deprived her of her right to a fair trial and sentencing

determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments [to] the United States Constitution.

(Doc. 10 at 62, 77, 89, 93, 98, 104, 111, 116, 119, 123, 126, 128, 131, 134, 146 (capitalization altered).)

STANDARD OF REVIEW

**A.     AEDPA Review**

Habeas corpus is essentially "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  Roberts' petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date).  The Act, which amended 28 U.S.C. § 2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id.* at 19.

Most significantly, § 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts will presume a state court has adjudicated a federal claim "on the merits," and AEDPA deference therefore applies, regardless of whether the last state court to decide the claim provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (applying presumption to state-court summary dispositions); *see also Johnson v. Williams*, 568 U.S. 289, 292-93 (2013) (applying *Richter* presumption to state-court decisions that rule against a defendant and address some issues, but not expressly the federal claim in question).

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). When identifying what a Supreme Court decision actually holds, courts should not frame the decision "at too high a

level of generality." *Woods v. Donald*, 575 U.S. 312, 318 (2015).  Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

A state-court decision is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under § 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75 (citations omitted).  "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Id*. (citations omitted).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003).  The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing

evidence.  28 U.S.C. § 2254(e)(1).[3]  The Supreme Court has cautioned, however, that "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

In deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact under § 2254(d), a habeas court must "'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims . . . .'"  *Wilson v. Sellers,* – U.S. –, 138 S. Ct. 1188, 1191-92 (2018) (quoting *Hittson v. Chatman*, 576 U.S. –, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari).  In cases in which the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion, a habeas court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."  *Id*. at 1192.[4]  But when the last state court to adjudicate a federal claim on the merits issues an *unexplained* order upholding a lower court's *explained*

---

[3] Section 2254(e)(1) provides:  "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

[4] The Sixth Circuit has adhered to *Wilson*'s directive.  *See, e.g., Cassano v. Shoop*, 1 F.4th 458, 472 (6th Cir. 2021) ("this Court reviews only the Ohio Supreme Court's reasons for denying Cassano's claim") (citing *Wilson*, 138 S. Ct. at 1192); *Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("AEDPA requires this court to review the actual grounds on which the state court relied") (citing *Wilson*, 138 S. Ct. at 1192); *Thompson v. Skipper*, 981 F.3d 476, 480 (6th Cir. 2020) (following and quoting *Coleman*);.  But the circuit court also has acknowledged that "[i]n the wake of *Wilson*, courts have grappled with whether AEDPA deference extends only to the reasons given by a state court (when they exist), or instead applies to other reasons that support a state court's decision."  *Thompson*, 981 F.3d at 480 n.1 (listing cases); *see also id*. at 483-85 (Nalbandian, J., concurring in result but emphasizing that "[f]ederal courts have never been required to confine their habeas analysis to the exact reasoning that the state court wrote, and neither [*Wilson* nor *Coleman*] compels us to change our analysis").

judgment on a federal claim, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Id.* (adopting the "look through" presumption in determining procedural default of federal habeas claims established in *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).  The state may then rebut this presumption "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued for the state supreme court or obvious in the record it reviewed." *Id*.

The Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims.  The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Richter,* 562 U.S. at 102-03 (internal quotation marks and citation omitted).  A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id.* at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.    Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The

exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is an "important corollary" to the exhaustion requirement. *Davila v. Davis,* 582 U.S. 521, 527 (2017) (internal quotation marks and citation omitted). The doctrine generally prevents federal courts from hearing federal constitutional claims that were not presented to the state courts "consistent with [the state's] own procedural rules." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). It occurs when a habeas petitioner failed to either: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28.

Where a state court declines a prisoner's federal claim because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[5]

---

[5] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition.").  Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review.  *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the petitioner's] claims are now procedurally barred under [state] law'" (internal citations omitted)).

---

First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'"  *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts again employ a "look through" presumption and review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst,* 501 U.S. at 805 (emphasis in original).  If the last state court "explicitly imposes a procedural default," then the claim is presumed defaulted.  *Id.* at 803; *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) (state court must "clearly and expressly state[] that its judgment rests on a state procedural bar" to result in procedural default).  Conversely, if the last state court presented with the claim reaches its merits in a decision that "'fairly appear[s] to rest primarily upon federal law,'" then any procedural bar is presumed removed, and the federal habeas court may consider the merits of the claim in its review.  *Ylst*, 501 U.S. at 803 (citation omitted).[6]

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750.  "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him."  *Id*.  To establish prejudice, a

---

[6] Also, where a later state-court decision rests upon a prohibition against further state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ."  *Ylst*, 501 U.S. at 804 n.3.

petitioner must demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

## C.    Cognizability

Federal habeas courts also must consider whether the petitioner's claims are cognizable. To the extent a claim alleges state-law violations, it is not reviewable by a federal habeas court and must be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982)

("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## ANALYSIS

### I.    First Ground for Relief: *Presentation of Additional Mitigation Evidence at Resentencing*

Roberts claims in her first ground for relief that the trial court erred in precluding her from presenting additional mitigating evidence at her resentencing hearing on remand. (Doc. 10 at 62-77.) Roberts presented this claim on her second direct appeal to the Ohio Supreme Court, which adjudicated it on the merits. It is therefore ripe for federal habeas review.

The Ohio Supreme Court set forth the following procedural history of Roberts' sentencing:

### Indictment, Trial, and Verdict

{¶ 8} Roberts was indicted on two counts of aggravated murder, in violation of R.C. 2903.01(A) (prior calculation and design) and (B) (felony murder). Both counts carried two death specifications under R.C. 2929.04(A)(7): one charging murder during an aggravated burglary and one charging murder during an aggravated robbery. The indictment also charged aggravated burglary, R.C. 2911.11, with a firearm specification, R.C. 2941.145, and aggravated robbery, R.C. 2911.01, also with a firearm specification. The jury found Roberts guilty of all counts and specifications. After trial, the state elected to proceed on Count One *232 prior calculation and design) for sentencing purposes, and the trial court dismissed Count Two (felony murder) and its specifications.

### Sentencing

{¶ 9} Before the mitigation hearing, Roberts informed her counsel that she did not wish to present any mitigating evidence except an unsworn statement. After a hearing pursuant to *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231 (1999), paragraph one of the syllabus, the trial judge determined that Roberts was competent to make that decision.

{¶ 10} At the mitigation hearing, Roberts exercised her right under R.C. 2929.03(D)(1) to make an unsworn statement to the jury. She elected to present no other evidence. In compliance with Roberts's instructions, defense counsel waived opening statement and closing argument. The jury recommended a death sentence, and the trial court sentenced Roberts to death.

### Previous Appeal

{¶ 11} On direct appeal, we affirmed Roberts's convictions of aggravated murder and both death specifications. We also overruled a proposition of law in which Roberts attacked the validity of her waiver of mitigation. However, we vacated the death sentence and remanded the case to the trial court for resentencing because the trial judge had improperly allowed the prosecutor to participate in drafting the sentencing opinion and in doing so, had engaged in ex parte communications with the prosecutor. *Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 153–164. We directed the trial court "to afford Roberts her right to allocute," to "personally review and evaluate the evidence [and] weigh the aggravating circumstances against any relevant mitigating evidence," and to "determine anew the appropriateness of the death penalty." We further instructed the trial court to "personally prepare an entirely new penalty opinion * * * and conduct whatever other proceedings are required by law and consistent with this opinion." *Id.* at ¶ 167.

### Sentencing Proceedings on Remand

36

{¶ 12} On remand, the defense filed a motion to allow Roberts to fully present mitigation at the sentencing rehearing. The trial court denied the motion. However, Roberts proffered her evidence into the record. This consisted of her prison records, a Social Security disability claim file documenting Roberts's head injury after a 1999 motor-vehicle accident, an affidavit by a psychologist giving his preliminary opinion that Roberts suffered from Bipolar Type II Disorder (manic-depressive illness), and a letter about Roberts from her son.

{¶ 13} At a hearing on October 22, 2007, the trial court heard Roberts's allocution. One week later, after asking Roberts if she had anything further to say, and after hearing argument from defense counsel, the trial court sentenced Roberts to death and filed its sentencing opinion pursuant to R.C. 2929.03(F).

{¶ 14} Roberts presents seven propositions of law for our consideration. Her second proposition of law, which claims that the trial court failed to consider her allocution in sentencing her to death, has merit. Accordingly, we sustain it, and we remand this case to the trial court for consideration of Roberts's allocution when weighing the aggravating circumstances and the mitigating factors.

### I. Exclusion of Mitigating Evidence on Limited Remand

{¶ 15} In her first proposition of law, Roberts contends that the trial court erred by precluding her from presenting mitigating evidence on remand.

{¶ 16} Before the resentencing hearing, Roberts filed a motion to allow her to present mitigation at the resentencing hearing. In her motion, Roberts argued that she was entitled to "fully develop her mitigation for the evaluation of [the trial court] at her sentencing re-hearing." The trial court denied the motion.

{¶ 17} After the motion was denied, the defense proffered the following four items, which would have been adduced in mitigation had the trial court granted the motion:

{¶ 18} (1) Roberts's prison records, which document her bipolar disorder, depression, and an incident of hallucination during her time in prison.

{¶ 19} (2) A file documenting a Social Security disability claim that Roberts had filed after being injured in a 1999 motor-vehicle accident. This file also contains a diagnosis that Roberts suffered from a bipolar disorder.

{¶ 20} (3) An affidavit by James Eisenberg, Ph.D., a psychologist, who had reviewed Roberts's records and formed a preliminary opinion that Roberts suffered from Bipolar Type II Disorder, also known as manic-depressive illness, probably beginning in childhood. According to Dr. Eisenberg, this disorder "causes unusual shifts in a person's mood, energy, and ability to function." Its symptoms include poor judgment; aggressive behavior; extreme irritability;

inappropriate, intense, or uncontrolled anger; and "frantic efforts to avoid abandonment, either real or imagined."

{¶ 21} (4) A letter from Michael Raymond, Roberts's son, extolling his mother's character, setting forth some of the history of her life before the murder, and pleading that her life be spared.

{¶ 22} Roberts contends that the trial court's refusal to consider this proffered evidence before resentencing her violated the Eighth Amendment.

*Roberts II*, 137 Ohio St. 3d at 231-33.

The Ohio Supreme Court then addressed Roberts' federal constitutional claim,

deciding:

### A.  Roberts's Eighth Amendment Claim

{¶ 23} It is a well-established tenet of Eighth Amendment jurisprudence that the sentencer in a capital case may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis sic.) *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Moreover, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." (Emphasis sic.) *Eddings v. Oklahoma*, 455 U.S. 104, 113–114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). *See also Hitchcock v. Dugger*, 481 U.S. 393, 398–399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

{¶ 24} In *Skipper v. South Carolina*, 476 U.S. 1, 4–5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the court held that a capital defendant had an Eighth Amendment right to introduce, at his sentencing hearing, "testimony * * * regarding his good behavior during the over seven months he spent in jail awaiting trial." Such evidence was "relevant evidence in mitigation" because

> the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison. * * * [T]here is no question but that such inferences would be "mitigating" in the sense that they might serve "as a basis for a sentence less than death." * * * [E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings*, such evidence may not be excluded from the sentencer's consideration.

*Id*. at 4–5, 106 S.Ct. 1669, 90 L.Ed.2d 1, quoting *Lockett* at 604, 98 S.Ct. 2954, 57 L.Ed.2d 973.

{¶ 25} Roberts contends that the trial court committed constitutional error by denying her motion to allow full presentation of mitigation at the resentencing, because the Eighth Amendment—as interpreted in *Lockett, Eddings*, and *Skipper*—entitled her to introduce mitigating evidence before the trial judge on remand.

{¶ 26} We rejected a similar claim in *State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192 (1992) ("*Davis II*"). Davis had been tried to a three-judge panel and sentenced to death in 1984. *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925 (1988) ("*Davis I*"). On Davis's initial appeal, we "affirmed [his] conviction, but * * * reversed [his] death sentence based upon errors which occurred after all available mitigating evidence had been heard in the penalty phase of [his] trial." *Davis II* at 44, 584 N.E.2d 1192. We then remanded the case to the original three-judge panel for a resentencing hearing. *Id*.

{¶ 27} At the hearing on remand, the trial court did not permit Davis to introduce evidence concerning his adjustment to prison life after his conviction and sentencing. Nor was Davis permitted to present expert testimony providing a "'psychological update'" covering the period since his conviction and sentencing. *Id*. Instead, the panel "limit[ed] its consideration to the evidence presented in mitigation at appellant's 1984 trial" and reimposed the death sentence on Davis. *Id*. at 44–45, 584 N.E.2d 1192.

{¶ 28} We affirmed, rejecting Davis's argument that *Lockett, Eddings, Skipper*, and *Hitchcock* entitled him to a new sentencing hearing. We distinguished *Skipper* by noting that it involved the erroneous exclusion of "evidence of Skipper's good prison record *between his arrest and trial*." (Emphasis sic.) *Id*. at 46, 584 N.E.2d 1192. In contrast,

> no relevant mitigating evidence was excluded from consideration by the panel during the mitigation phase of appellant's 1984 trial. All mitigating evidence which was available at that time was duly received and considered by the panel including appellant's ability to adjust to prison life. That same relevant evidence was again received and considered by the panel in 1989 for purposes of resentencing appellant. The evidence excluded from consideration * * * at appellant's resentencing hearing concerned certain *post-trial* matters.

(Emphasis sic.) *Id*.

{¶ 29} We considered the same issue in *State v. Chinn*, 85 Ohio St.3d 548, 709 N.E.2d 1166 (1999). In Chinn, the defendant was sentenced to death after a jury trial. The court of appeals determined, however, that the trial judge had committed

errors in performing his functions under R.C. 2929.03(D)(3) and (F)—i.e., in his independent evaluation of the sentence and in writing the sentencing opinion. The court of appeals affirmed the trial court's judgment as to all other issues.

{¶ 30} Like the appellant in *Davis*, Chinn argued that *Lockett, Skipper*, and *Hitchcock* entitled him to present new mitigating evidence on remand. We again rejected that argument:

> [E]ach of those cases involved a situation where the capital sentencer was prohibited, in some form or another, from considering relevant mitigating evidence at trial. * * * [N]o relevant mitigating evidence was ever excluded from consideration during the penalty phase of [Chinn's] 1989 trial. Therefore, the case at bar is clearly distinguishable from * * * *Lockett, Skipper*, and *Hitchcock*. Accordingly, as was the case in *State v. Davis* (1992), 63 Ohio St.3d 44, 46, 584 N.E.2d 1192, 1194–1195, we find *Lockett, Skipper*, and *Hitchcock* to be inapplicable here. It is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation phase of his 1989 trial. In this case, as in *Davis*, the errors requiring resentencing occurred after the close of the mitigation phase of the trial. Under these circumstances, the trial court is to proceed on remand from the point at which the error occurred.

*Chinn* at 564–565, 709 N.E.2d 1166.

{¶ 31} Since our decision in *Chinn*, the United States Court of Appeals for the Sixth Circuit has addressed this issue in habeas corpus proceedings involving the *Davis* case. In *Davis v. Coyle*, 475 F.3d 761 (6th Cir.2007), the Sixth Circuit held that the three-judge panel's decision to exclude posttrial mitigation evidence from Davis's resentencing hearing violated his Eighth Amendment rights and that our affirmance of that ruling in *Davis II*, "based on the court's belief that the facts of Davis's case could be distinguished from *Skipper*'s solely on the basis of timing, was both an unreasonable application of the decision in *Skipper* and contrary to the holding in that opinion and its antecedent cases." *Id*. at 773.

{¶ 32} *Coyle* states that "the holding in *Skipper* that a defendant 'be permitted to present any and all relevant mitigating evidence that is available' * * * requires that, at resentencing, a trial court must consider any new evidence that the defendant has developed since the initial sentencing hearing." *Id*. at 774, quoting *Skipper*, 476 U.S. at 8, 106 S.Ct. 1669, 90 L.Ed.2d 1. *Accord Creech v. Arave*, 947 F.2d 873, 881–882 (9th Cir.1991) (en banc); *Sivak v. State*, 112 Idaho 197, 199–203, 731 P.2d 192 (1986). *See also Spaziano v. Singletary*, 36 F.3d 1028, 1032–1035 (11th Cir.1994) (assuming, without discussion, that Lockett requires a trial court to allow new evidence on remand); *State v. Tison*, 160 Ariz. 501, 502, 774

P.2d 805 (1989) (case remanded for resentencing; remand order specified, without discussion, that "[e]ither party may offer additional evidence of aggravation or mitigation applicable in each case as of the time of the hearing").

{¶ 33} As the state points out, we are "not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court." *State v. Burnett*, 93 Ohio St.3d 419, 424, 755 N.E.2d 857 (2001). Hence, we are not obliged to follow *Coyle*. We are, however, free to consider whether *Coyle* is persuasive and whether it is on point in this case.

{¶ 34} We begin by noting, as we did in *Davis II* and *Chinn*, that *Lockett, Eddings, Skipper,* and *Hitchcock* are all distinguishable from this case. Each case in the *Lockett–Eddings–Skipper–Hitchcock* tetralogy involved the trial court's exclusion of, or refusal to consider, evidence in the original sentencing proceeding. None of these cases involved a proceeding on remand. This case, like *Davis II* and *Chinn*, involves a proceeding on remand for the limited purpose of correcting an error that occurred after the defendant had had a full, unlimited opportunity to present mitigating evidence to the sentencer.

{¶ 35} In other words, neither *Lockett* nor any of its progeny required the trial court to reopen the evidence after an error-free evidentiary hearing had already taken place. *See Chinn*, 85 Ohio St.3d at 564–565, 709 N.E.2d 1166. "[T]he issue in this case is whether the presentation of evidence of mitigating * * * factors must be reopened when a death sentence is reversed for a reason unrelated to the presentation of evidence. None of the Supreme Court cases cited by the majority supports that premise." *Coyle*, 475 F.3d at 782 (Gibbons, J., concurring).

{¶ 36} In a case in which the defendant was not deprived of any constitutional right—including her Eighth Amendment right to present mitigation—at the time of her mitigation hearing, there seems to be no basis for requiring the trial court to reopen or supplement that evidence in a later proceeding. To hold, as *Coyle* does, that a new mitigation hearing must be held, even though no constitutional error infected the original one, would transform the right to present relevant mitigation into a right to *update* one's mitigation. Such a right has no clear basis in *Lockett* or its progeny.

{¶ 37} Establishing a right to update mitigation could result in arbitrary distinctions between similarly situated capital defendants. A defendant who had an error-free mitigation hearing could not update his mitigation—no matter how compelling the new mitigation that might be available to him—if the trial judge committed no error *after* the mitigation hearing that called for the case to be remanded. But another defendant, whose mitigation hearing was equally free of error, *would* have the right to update his mitigation in the event that a posthearing sentencing error took place that required a remand.

41

{¶ 38} Furthermore, as we noted in *Davis II*, the right to update mitigation would imply that a capital defendant appealing his death sentence would have a right to present new mitigation to the appellate court. *Davis II*, 63 Ohio St.3d at 46, 584 N.E.2d 1192, fn. 2. Under R.C. 2929.05(A), this court (and, in pre–1995 cases, the court of appeals) has the obligation to independently review the death sentence. Hence, a reviewing court could be considered a "sentencer" for *Lockett* purposes.

{¶ 39} For the foregoing reasons, we adhere to our precedent in *Davis II* and *Chinn*. Accordingly, we reject Roberts's claim that the Eighth Amendment required the trial court to admit Roberts's proffered mitigation.

*Roberts II*, 137 Ohio St. 3d at 233-37 (footnote omitted).

Roberts contends that the Ohio Supreme Court's decision unreasonably applied the clearly established law set forth in the line of Supreme Court cases *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Skipper v. South Carolina*, 476 U.S. 1 (1986). (Doc. 10 at 62-77.)

In *Lockett*, the Supreme Court considered the constitutionality of a former provision in Ohio's death penalty statute that did not permit a sentencing judge to consider, as mitigating evidence, factors such as the defendant's character, prior record, and age. *See Lockett*, 438 U.S. at 597. A plurality of the Court ruled in that case that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604 (emphasis in original) (footnote omitted). The sentencer's broad consideration of a defendant's individual characteristics was viewed as protection against the arbitrary and capricious use of the death penalty and ensured that "the death penalty would be imposed in a more consistent and rational manner . . . ." *Id*. at 601 (citation omitted). It achieved this consistency by providing a "meaningful basis for distinguishing the . . . cases in which [the death penalty] is imposed from . . . the many cases

42

in which it is not." *Id.* (citation and emphasis omitted).  *See also Hitchock,* 481 U.S. at 398-99 (finding a *Lockett* violation where the trial judge instructed the advisory jury not to consider, and he himself refused to consider, evidence of mitigating circumstances – testimony concerning the petitioner's family background and his capacity for rehabilitation – not specifically enumerated in Florida's death penalty statute).

In *Eddings*, a majority of the Court adopted *Lockett*'s plurality opinion and extended it, holding that a capital sentence imposed after the trial judge excluded evidence of the defendant's family history was unconstitutional.  *Eddings*, 455 U.S. at 112-15.  "Just as the State may not by statute preclude the sentencer from considering any mitigating factor," it declared, "neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id*. at 113-14 (emphasis in original).

In S*kipper*, the Court applied the *Lockett*/*Eddings* rule to overturn a trial court's exclusion of mitigation evidence the defendant offered at his sentencing hearing of his good behavior during the period of his incarceration between arrest and trial.  *Skipper*, 476 U.S. at 2-4.  The trial court had ruled that the evidence was irrelevant based on state case law that a defendant's ability to adjust to prison could not be relevant to capital sentencing.  *Id*. at 3.  The Supreme Court reversed Skipper's death sentence, holding that such evidence was relevant and "may have affected the jury's decision to impose the death sentence" because it would have mitigated the state's assertion that if given a life sentence, the defendant posed a threat to the safety of other inmates.  *Id.* at 8.  The Court noted that "'any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.'"  *Id*. at 5 (quoting *Jurek v. Texas*, 428 U.S. 262, 275 (1976)).

In *Lockett* and its progeny, therefore, the Supreme Court clearly established that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances . . . ." *Payne v. Tennessee*, 501 U.S. 808, 822 (1991).  But each of these cases arose when a capital sentencer refused to consider, or was precluded from considering, relevant mitigation evidence in the original sentencing hearing *at trial*.  They did not establish an absolute constitutional right for a capital defendant, like Roberts, to introduce mitigation evidence at a resentencing hearing on remand that the defendant had every opportunity to present at an error-free sentencing hearing at trial.

Nevertheless, as the Ohio Supreme Court recognized, the Sixth Circuit applied *Lockett*, *Eddings*, and *Skipper* to require a full resentencing hearing on remand, including the consideration of new mitigation evidence, in *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007).  And if *Davis* were directly on point, this Court, unlike the Ohio Supreme Court, would be bound to follow its interpretation of the *Lockett* line of cases.  But it is not; *Davis* is easily distinguished from this case.

In *Davis*, the defendant had been tried before a three-judge panel and sentenced to death.  *Id*. at 763.  On his initial appeal, the Ohio Supreme Court affirmed his conviction, but reversed his death sentence based upon errors that occurred after all available mitigating evidence had been heard in the penalty phase of his trial and remanded the case to the original three-judge panel for a resentencing hearing.  *Id*.  At the hearing on remand, the trial court did not permit the defendant to introduce evidence concerning his prison behavior and psychological profile after his conviction and sentencing.  *Id*. at 763-64.  This new evidence would have rebutted the state's argument at the original sentencing hearing that Davis was too dangerous an offender to serve a life sentence.  *Id*. at 772.  Instead, the panel relied solely on

44

the record from the first sentencing hearing. *Id.* at 765. It found that the only remaining, applicable aggravating factor – that Davis had been previously convicted of second-degree murder – outweighed the mitigating factors present beyond a reasonable doubt. and reimposed the death sentence. *Id.*

As in Roberts' case, the Ohio Supreme Court upheld the trial court's exclusion of the mitigation evidence in *Davis*, rejecting the defendant's argument that under *Lockett*, *Eddings*, *Skipper*, and *Hitchcock*, he was entitled to present new mitigation evidence at a resentencing hearing. *See Roberts II*, 137 Ohio St. 3d at 235 (explaining its decision in *Davis*). The court distinguished *Skipper* by holding that it applied only to the erroneous exclusion of evidence of a defendant's good prison record between his arrest and trial*,* and not to *post-trial* prison behavior. *Id.* And it noted that in *Davis*, by contrast, no relevant mitigating evidence was excluded from consideration by the panel during the mitigation phase of the trial; all mitigating evidence that was available at that time was considered, including the defendant's ability to adjust to prison life. *Id.* And that same relevant evidence was again received and considered by the panel at his resentencing. *Id.* The evidence excluded from consideration at the defendant's resentencing hearing concerned only certain *post-trial* matters. *Id.*

The Sixth Circuit, on habeas review, held that the Ohio Supreme Court's decision in *Davis* was contrary to, and an unreasonable application of, the Supreme Court's holdings in *Lockett, Eddings,* and *Skipper*. *Davis,* 475 F.3d at 773. The state court, it concluded, erroneously affirmed the trial court's exclusion of the proffered testimony based on its "belief that the facts of Davis's case could be distinguished from *Skipper*'s solely on the basis of timing" when "the record in [the] case establishe[d] without a doubt that [the new mitigation

evidence] was highly relevant to the single aggravating factor relied upon by the state – that future dangerousness should keep Davis on death row." *Id*.

The circuit court noted the Supreme Court's observation in *Eddings* that a sentencer "'may determine the weight to be given [the] relevant mitigating evidence,' but 'may not give it no weight by excluding such evidence from their consideration.'" *Id*. (quoting *Eddings*, 455 U.S. at 114-15). But the court solidly grounded its ruling on *Skipper*, explaining:

> [T]he core of the analysis in *Skipper* reflects the Court's understanding that the right of a defendant to present evidence of good behavior in prison is particularly relevant when a prediction of future dangerousness figures centrally in a prosecutor's plea for imposition of the death penalty. In *Skipper*, the right to produce such evidence was triggered specifically "by the prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison." *Id*. at 5 n. 1, 106 S.Ct. 1669. Thus, "it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence [of good behavior in prison]; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" *Id*. (quoting *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)).

*Id*. at 771. The court further cited the Supreme Court's decision in *Ayers v. Belmontes*, 549 U.S. 7 (2006), in which the Court "unmistakably recognized yet again the importance of permitting capital defendants to put forth evidence of the likelihood of future good conduct at sentencing." *Id*. at 773-74.

Finally, the circuit court noted that the Ninth and Eleventh Circuits also have recognized that *Skipper*'s holding that "a defendant be 'permitted to present any and all relevant mitigating evidence that is available,' *Skipper*, 476 U.S. at 8, . . . requires that, at resentencing, a trial court must consider any new evidence that the defendant has developed since the initial sentencing hearing." *Id*. at 774 (listing cases). It deemed the Ninth Circuit case *Creech v. Arave*, 947 F.2d 873, 881-82 (9th Cir. 1991), "[m]ost significant[]," as its facts

46

were "virtually indistinguishable" from those in Davis' case.  *Id*.  The Ninth Circuit held, it explained, "that *Lockett*, *Eddings*, and *Skipper* dictate that evidence of a defendant's good behavior and peaceful adjustment while in prison following imposition of the death sentence is indeed mitigating evidence that should be considered at a resentencing hearing."  *Id*.  The court in *Davis* ordered a second re-sentencing by the trial court.  *Id*.

In *Davis*, therefore, the Sixth Circuit, despite its broad characterizations of *Lockett* and *Skipper*'s holdings, repeatedly emphasized that *Skipper* required a full resentencing because in that case*, like *Skipper,* there was a single aggravating circumstance, future dangerousness, leaving *Skipper* distinguishable from *Davis*' situation "solely on the basis of timing."  *Davis*, 475 F.3d at 773.  This case is different.

Here, Roberts was neither charged with, nor convicted of, future dangerousness as an aggravating circumstance, and the State did not raise any arguments about Roberts' future dangerousness at the original sentencing phase of her trial that would have made her post-trial behavior relevant in mitigation at resentencing.  (*See* Doc. 11-3 (Trial Tr.) at 1827-1907.)  At both resentencing proceedings, the trial court, pursuant to the Ohio Supreme Court's remand orders, considered only evidence presented in the original sentencing hearing.  *See Roberts II*, 137 Ohio St. 3d at 238-40; *Roberts III*, 150 Ohio St. 3d at 51.  Moreover, Roberts expressly waived her right to present any mitigation evidence other than her unsworn statement – a waiver that, as this Court will explain below, the Ohio Supreme Court reasonably upheld as valid.  *See infra* Section II.  Unlike *Davis* and *Skipper*, the evidence Roberts proffered at her resentencing would have been available at the time of her trial and she could have introduced then had she not waived her right to present mitigation evidence.

Furthermore, this Court finds compelling the Ohio Supreme Court's arguments against adopting a broader reading of *Davis* and its interpretation of *Lockett*, *Eddings*, and *Skipper*. As the Ohio Supreme Court aptly concluded, to follow *Davis* in Roberts' case and hold "that a new mitigation hearing must be held, even though no constitutional error infected the original one, would transform the right to present relevant mitigation into a right to *update* one's mitigation.  Such a right has no clear basis in *Lockett* or its progeny."  *Roberts II*, 137 Ohio St. 3d at 237 (emphasis in original).  Indeed, as Ohio's high court explained, such a ruling may result in arbitrary discrepancies between similarly situated capital defendants simply because of a post-sentence error in deliberation and would undermine the judicial economy of a tiered judicial system by permitting defendants to present appellate courts with new post-trial evidence. *Id*.

Accordingly, *Lockett* and its progeny, including *Skipper,* do not apply to Roberts' case.  And as there is no controlling clearly established Supreme Court precedent, the Ohio Supreme Court's decision upholding the trial court's exclusion of the proffered mitigation evidence at Roberts' resentencings was neither contrary to, nor an unreasonable application of, clearly established federal law.  *Accord Chinn v. Warden, Chillicothe Corr. Inst.,* No. 3:02 cv 512, 2020 WL 2781522, at*49-54 (S.D. Ohio May 29, 2020) (Morrison, J.) (distinguishing *Skipper* and *Davis* and finding no clearly established Supreme Court precedent in case analogous to Roberts'), *aff'd*, *Chinn v. Warden, Chillicothe Corr. Inst.*, 24 F.4th 1096, 1101 (6th Cir. 2022) (petitioner did not address on appeal his claim regarding the exclusion of mitigation evidence at resentencing, and the Sixth Circuit therefore considered it waived); *State v. Berget*, 853 N.W.2d 45, 51-64 (S.D. 2014) (examining analysis of *Davis* and *Roberts II* in case analogous to Roberts' and finding *Roberts II* more persuasive).  *But see Jackson v.*

48

*Houk*, No. 4:07 cv 880, 2021 WL 698590, at *10 (N.D. Ohio Feb. 23, 2023) (Gwin, J.) (applying *Davis* and granting habeas petition in the case of Roberts' co-conspirator, Nathaniel Jackson, whose sentencing judgment was reversed on the same grounds as Roberts' and remanded for resentencing hearing in which Jackson sought to introduce new mitigation evidence not relevant to future dangerousness).

## II.  Ninth Ground for Relief: *Waiver of Mitigation Evidence*

In a related claim, Roberts argues for her ninth ground for relief that the trial court erred when it accepted her waiver of the presentation of mitigation evidence at the sentencing phase of her trial, which she claims was invalid.  (Doc. 10 at 119-22.)  Roberts raised the claim on her initial direct appeal to the Ohio Supreme Court, which denied it on the merits, and it is therefore preserved for federal habeas review.

In addressing this claim, the Ohio Supreme Court stated:

{¶ 132} In proposition of law one, Roberts contends that a waiver of mitigation evidence is not valid unless the defendant is informed that the waiver will result in the death penalty. In addition, Roberts submits that such a waiver is invalid if the defendant intends to present any mitigation evidence in any form.

{¶ 133} At the outset of the mitigation phase, Roberts informed her counsel that she did not wish to present any mitigating evidence to the jury except an unsworn statement. During the ensuing in camera hearing on this issue, the court explained to Roberts the purpose of the mitigation phase and her right to present mitigation evidence. The judge then inquired as to whether Roberts had instructed her attorneys not to present such evidence; she confirmed that the court's understanding was correct. Roberts explained to the trial judge that she had talked with her attorneys, family, and friends before declaring, "I know what I am doing. I explained to everyone that cares why I am doing it."

{¶ 134} Trial counsel described for the judge the evidence that could be presented in mitigation. Counsel noted that professionally and personally, he disagreed with Roberts's decision not to present such evidence but that he believed her competent and that the decision was the product of rational thought.

{¶ 135} The court then heard from Dr. Thomas Eberle, a psychologist who had evaluated Roberts earlier during the prosecution and who did so again just prior

to the hearing. Dr. Eberle testified that Roberts's decision to forgo presentation of mitigating evidence was rational. He further found that she suffered no psychiatric or psychological abnormality that would prohibit a rational decision regarding presentation of mitigating evidence.

{¶ 136} Having heard the foregoing testimony, the trial court specifically inquired of Roberts whether she understood that "by waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty." Roberts replied: "That is what I hope for. * * * I know what I am doing and I know why. Thank you for asking." The court then found that the decision to forgo mitigation evidence was a voluntary one made without any reluctance, that Roberts had reiterated that decision repeatedly, and that she appeared relieved to have made it. The court found that Roberts understood that her decision was irrevocable, and it accepted her decision to forgo the presentation of mitigation evidence.

{¶ 137} Roberts later presented an unsworn statement to the jury. In that statement, she told the jury that she would not provide any mitigating evidence. She then said, "You are bound by law to give me one sentence, the death penalty. You have no other choice. That is what I'm asking you to do, because that is the right thing to do." She reiterated that objective after the trial court sentenced her to death.

{¶ 138} With this factual background in mind, we turn to the law.

{¶ 139} The United States Supreme Court has never suggested that the Eighth Amendment requires forcing an unwilling defendant to present mitigating evidence in a capital case. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706 N.E.2d 1231. No societal interest counterbalances the defendant's right to control his or her own defense. *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576.

{¶ 140} We have held that a defendant is entitled to decide what she wants to argue and present as mitigation in the penalty phase, see, e.g., *Jenkins*, 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973, including the decision to present no evidence. Ohio's death-penalty statute itself confers "great latitude" on a defendant in such decisions. R.C. 2929.04(C). See, also, *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47. Roberts was entitled to present no mitigation evidence.

{¶ 141} Her contention that she did not fully understand the ramifications of her decision and that the trial judge did not sufficiently inquire of her in that regard is belied by the record. As set forth above, the record clearly establishes that the trial judge specifically addressed the likelihood of the jury's imposing a death sentence if Roberts failed to present mitigating evidence and that she understood that a death sentence was the probable outcome. In fact, Roberts asked the jury

to impose that sentence. We reject her claim that she did not understand that the waiver would yield such a result.

{¶ 142} We now turn to Roberts's suggestion that her waiver of the right to present mitigation evidence was not a complete waiver.

{¶ 143} Roberts contends that she entered only a "partial waiver" because she gave an unsworn statement and that a partial waiver does not constitute a valid waiver. Roberts cites no decision to support her assertion, nor are we aware of any such authority. We do recognize, however, our prior holding in *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 72–76, in which we concluded that the requirements of *Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus, do not apply when a defendant makes an unsworn statement and presents minimal evidence in mitigation. Our emphasis in *Ashworth* was to require an inquiry of "a defendant only in those situations where the defendant chooses to present *no* mitigating evidence whatsoever." (Emphasis added.) *Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 74. Here, Roberts presented an unsworn statement. An unsworn statement can constitute critical mitigating evidence. See *State v. Scott,* 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, at ¶ 64; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 110. *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 50. We decline to extend *Ashworth* to the context Roberts presents.

{¶ 144} Moreover, we have never held that a partial waiver of the right to present mitigating evidence is an invalid exercise of that right. To the contrary, we have upheld the death sentences in several cases in which the defendant chose to present only an unsworn statement to the jury in mitigation. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 113–114; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 22; *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576; *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47.

{¶ 145} In any event, the record reflects that the trial judge complied with the *Ashworth* requirements. We reject Roberts's claims of error in the trial court's decisions with respect to her decision to waive mitigating evidence.

*Roberts I*, 110 Ohio St. 3d at 88-91.

Although Roberts acknowledges that the Ohio Supreme Court "addressed [her mitigation-waiver claim] on the merits" (Doc. 24 at 32), she argues that the state court's decision rejecting the claim is not due AEDPA deference, and this Court should review the claim *de novo*, because the state court "failed altogether to address" it (*id*. at 32).  As shown

above, the state court addressed the claim and referenced federal law.  Moreover, as noted above, the Supreme Court has held that when a state court rules against a defendant and addresses some issues, but not expressly the federal claim in question, federal habeas courts must presume that the state court adjudicated the claim on the merits for purposes of AEDPA's § 2254(d).  *Johnson v. Williams*, 568 U.S. 289, 292-93 (2013).  Roberts does not rebut that presumption, and the Court finds no apparent grounds for rebuttal, so AEDPA deference applies to the Ohio Supreme Court's decision on this claim.

Roberts first argues that her waiver was constitutionally invalid because it was not complete, as she insisted on making an unsworn statement to the jury before sentencing. (Doc. 10 at 119-20.)  The Supreme Court has never held, however, that the Constitution prohibits a capital defendant from waiving the right to present some, but not all, mitigation evidence.  And where there is no Supreme Court precedent on point, there can be no contravention or misapplication of "clearly established Federal law" in violation of § 2254(d)(1).

Roberts next maintains her waiver was invalid because she did not fully understand the consequences of her decision.  She argues the trial court erred by not informing her "directly" that her failure to present mitigating evidence other than her statement to the jury "would result in a death sentence."  (Doc. 10 at 120.)  On this point, the court told her, "I must be entirely convinced that . . . you understand that by waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty."  (Doc. 11-3 (Trial Tr.) at 1749.)  Roberts further contends the trial court should have secured her waiver in writing or "put in writing" the consequences of the waiver.  (Doc. 10 at 121.)  Finally, she argues that her contradictory statement to the jury, in which she insisted

that she was not guilty yet implored the jury to recommend a death sentence, "reveals the confusion she felt at the time of the waiver." (*Id*. at 121-22.)

In *Johnson v. Zerbst*, the Supreme Court held that courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (internal quotation marks and citations omitted). Such a waiver, it established, must be "intentional" and "intelligent." *Id*. Since then, the Court has recognized many constitutionally protected trial rights as fundamental and subject to *Zerbst*'s knowing and intelligent waiver requirement. *See Schriro v. Landrigan*, 550 U.S. 465, 485 n.2 (2007) (listing cases). But the Court has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce [mitigating] evidence" or "required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id*. at 479. The Ohio Supreme Court's decision, therefore, did not contravene or misapply Supreme Court precedent under § 2254(d)(1) in rejecting Roberts' argument that she did not understand the ramifications of her decision to forgo the presentation of mitigation evidence.

Moreover, as explained above, this Court must defer under § 2254(d)(2) and apply the presumption of correctness found in § 2254(e)(1) to the state court's factual determinations regarding the validity of Roberts' mitigation waiver. 28 U.S.C. § 2254(d)(2), (e)(1); *Miller-El v. Cockrell*, 537 U.S. 332, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2) . . . ."). The state court found "the record

clearly establishes that the trial judge specifically addressed the likelihood of the jury's imposing a death sentence if Roberts failed to present mitigating evidence and that she understood that a death sentence was the probable outcome." *Roberts I*, 110 Ohio St.3d at 90 (¶ 141).  In fact, it noted, "Roberts asked the jury to impose that sentence." *Id*.  Roberts has not identified any clearly erroneous factual determinations upon which the court based its conclusion, and the court's factual findings were reasonable and well supported by the record, as demonstrated in the decision.

Roberts' ninth ground for relief, therefore, lacks merit.

**III.    Second, Third, and Fourth Grounds for Relief:** *Ineffective Assistance of Trial Counsel*

In Roberts' second, third, and fourth grounds for relief, she claims her trial counsel provided constitutionally ineffective assistance.   Specifically, she argues that her trial attorneys:   (1) failed to conduct a sufficient mitigation investigation (Ground Two); (2) allowed her to waive her right to present mitigation evidence by failing to fully inform her of the consequences of such a waiver (Ground Three); (3) failed to make a *Batson* objection (Ground Four); (4) failed to present an opening statement in the guilt phase of trial (Ground Four); (5) failed to introduce the defense of her co-defendant, Jackson (Ground Four); (6) waived closing argument in the guilt phase of the trial (Ground Four); and (7) refused to allow her to testify (Ground Four).  (Doc. 10 at 78-98.)  Respondent counters that the claims are either procedurally defaulted or without merit.  (Doc. 15 at 12-30.)

**A.  Procedural Posture**

*Sub-Claim (1)*.   Respondent maintains that sub-claim (1), as listed above, is both procedurally defaulted and waived, because Roberts did not raise it in her third direct appeal despite being invited to do so by the Ohio Supreme Court in its opinion in the second direct

54

appeal and she withdrew it from her second post-conviction petition.  (Doc. 15 at 12-16; Doc. 26 at 10-12.)  Roberts responds that her default of this claim should be excused because the trial court on post-conviction review "directed" her counsel to withdraw the claim.  (Doc. 24 at 23-24.)

As the parties' arguments make clear, this claim has a complicated procedural history. In August 2008, Roberts presented her deficient-mitigation ineffective-assistance claim as her fourth claim for relief in her second-in-time post-conviction petition, with numerous extra-record supporting exhibits.  (Doc. 12-13 at 45-56.)  The following month, she raised a similar claim, based on the record, in her second direct appeal to the Ohio Supreme Court.  (*See* Doc. 12-6 at 34.)

In May 2013, the Ohio Supreme Court vacated Roberts' death sentence on Roberts' second direct appeal and again remanded the case for resentencing.  *Roberts II,* 137 Ohio St. 3d at 245-46.  Because of its ruling, the court explained that it would "decline to address" Roberts' deficient-mitigation ineffective-assistance claim but advised the parties that they could "present [those] arguments (including the state's [opposing] res judicata argument) . . . for review on the ensuing direct appeal."  *Id*. at 247 (¶ 80).  Roberts did not reassert the claim in her third direct appeal, filed in March 2015.  (*See* Doc. 12-9 at 66-67.)

Meanwhile, in February 2015, Roberts moved to amend her second post-conviction petition without altering the claim at issue.  (Doc. 12-13 at 262-64.)  But, according to Roberts, at a status conference in the case held a month later, for which there is no transcript in the record, the trial judge "directed" her counsel to withdraw her deficient-mitigation ineffective-assistance claim because, he said, Roberts "'controlled'" her counsel during the sentencing phase of trial (Doc. 24 at 24), and Roberts did in fact withdraw the claim for that

reason in a "Memorandum in Support" of her amended petition filed after her direct appeal was completed, in June 2019 (Doc. 12-13 at 320).[7]

Roberts did not waive this claim by failing to raise it in her third direct appeal because she had already raised the claim in her second post-conviction petition – the proper vehicle for the claim, as Ohio law permits the submission of supporting exhibits *dehors* the record in post-conviction proceedings. *State v. Cole*, 2 Ohio St. 3d 112, 114 (Ohio 1982) ("Generally, the introduction in a [post-conviction] petition of evidence dehors the record of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of res judicata."). She did, however, procedurally default the claim by failing to pursue it through "one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), with no remaining state-court remedy for the claim, *see State v. Nichols*, 11 Ohio St. 3d 40, 43 (Ohio 1984) ("[W]e hold a delayed appeal pursuant to App. R. 5(A) is not available in the appeal of a post-conviction relief determination . . . ."). *See, e.g., Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review.").

---

[7] There is some confusion in the record regarding Roberts' withdrawal of this claim from her second post-conviction petition. Respondent argues that Roberts "expressly withdrew by agreed entry" her deficient-mitigation ineffective-assistance claim, and the entry does specify that she did in fact agree to eliminate her fourth claim, which would be that claim. (Doc. 26 at 10.) But the agreed entry also states that she would withdraw two claims "per [her] motion" to amend. (Doc. 12-13 at 271.) And her motion to amend seeks to withdraw two claims, but neither is an ineffective- assistance claim – one claim challenged the method of execution, which was not even asserted in the second petition, and the other challenged Ohio's post-conviction procedures, which was asserted in the second petition. (*Id.* at 262-63.) Regardless, Roberts ultimately dropped the deficient-mitigation ineffective-assistance claim from her amended post-conviction petition.

Roberts argues in turn that any default of the deficient-mitigation ineffective-assistance claim should be excused because the trial court "caused" it by directing her counsel at a status conference to withdraw the claim.  (Doc. 24 at 24.)   Although she does not cite anything in the record to confirm this happened, and this Court cannot find anything (for instance, there is no transcript of the conference), Respondent, notably, does not dispute that what Roberts describes took place.

But even if the trial court's alleged action were to constitute cause, Roberts also must show "actual prejudice" to excuse the default.  *Francis v. Henderson*, 425 U.S. 536, 542 (1976). "Because of comity and federalism, the petitioner must show that 'the outcome would have been different' 'regardless of the nature of the underlying constitutional claim.' . . . . And that 'outcome' refers to the *actual* and *eventual* outcome of the *trial*."  *Jones v. Bell*, 801 F.3d 556, 563 (6th Cir. 2015) (emphasis in original) (quoting *Ambrose v. Booker*, 684 F.3d 638, 650–51 (6th Cir. 2012)); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (To establish actual prejudice for purposes of procedural default, a petitioner must demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.") (emphasis in original).  Proving actual prejudice may be challenging given counsel's testimony on the record regarding their efforts to collect evidence and prepare for the mitigation phase of trial and Roberts' insistent waiver of her right to present mitigation evidence.  But, regardless, Roberts has made no attempt to demonstrate actual prejudice.  She therefore forfeits the issue.  *See, e.g., Theriot v. Vashaw*, 982 F.3d 999, 1004 (6th Cir. 2020) ("[P]etitioner offers no argument about cause or actual prejudice; therefore, he forfeits this issue."); *Wogenstahl v. Mitchell,* 668 F.3d 307, 342 (6th Cir. 2012) ("Wogenstahl does not

argue cause to excuse his default.  Thus, we conclude that this claim was procedurally defaulted."); *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.").  Nor does Roberts contend that she is actually innocent such that the default should be excused.  Accordingly, Roberts' deficient-mitigation ineffective-assistance sub-claim is procedurally defaulted.

*Sub-Claims (2), (4), (5), (6)*:  Respondent concedes that Roberts' ineffective-assistance sub-claims (2), (4), (5), and (6), as listed above, were adjudicated on the merits in state courts and are therefore preserved for federal habeas review.  (Doc. 15 at 16-17, 25-28.)[8]

*Sub-Claims (3) and (7)*:  Respondent argues that sub-claims (3) and (7) are procedurally defaulted because, as with sub-claim (1), Roberts did not appeal the trial court's denial of the claims on post-conviction review to the state appellate court.  (*Id*. at 24-25, 28-29.)  In her traverse, Roberts contends the claims "were raised in postconviction and were adjudicated by the state court of appeals."  (Doc. 24 at 36.)  She also suggests, however, that "[t]o the extent . . . sub-claim [(7)] was not fully presented to the state courts, the Court should . . . remand to state court for exhaustion . . . ."  (*Id*. at 39.)

---

[8] In addressing sub-claims (4) and (6), as listed above, the state appellate court on post-conviction review, found in the alternative that the claims were barred by *res judicata* because they could have been raised on direct appeal but were not.  *Roberts*, 2020 WL 4933461, at *3 (¶18).  Respondent did not raise this defense, however, and it is therefore waived.  *See, e.g., Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)) ("procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter'"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("The state may waive a defense," including procedural default, "by not asserting it."); *McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) ("Procedural default is generally an affirmative defense that the state must either assert or waive.").

As with her deficient-mitigation ineffective-assistance sub-claim, these sub-claims are procedurally defaulted because Roberts did not fully litigate them through the state appellate process and no longer can do so. And, again, Roberts does not offer any argument regarding the cause for, or prejudice resulting from, her procedural default of these claims or contend that she is actually innocent. The Court, therefore, will not excuse Roberts' default of the claims. Nor will it address Roberts' request to remand sub-claim (7), as this claim is not unexhausted; it is procedurally defaulted.

**B. Merits Analysis**

The Supreme Court has long recognized the Sixth Amendment right to effective assistance of counsel at trial as a "bedrock principle in our justice system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963). The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984).

First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. An attorney's performance is "deficient" if his or her representation falls "below an objective standard of reasonableness." *Id*. at 688. The court must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689. Second, the petitioner must show that he was prejudiced by counsel's errors, demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the

outcome." *Id.* Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.* Whether a petitioner has been deprived of the effective assistance of counsel, however, is a mixed question of law and fact to which the unreasonable-application prong of § 2254(d)(1) applies. *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). An ineffective-assistance claim, it has explained, "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," and an "intrusive post-trial [*Strickland*] inquiry [may] threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.* (internal quotation marks and citations omitted). Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland,* 466 U.S. at 689).

The Court further has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Richter,* 562 U.S. at 105 (internal quotation marks and citations omitted). It has cautioned:

Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id*.

### 1. Failure to conduct sufficient mitigation investigation (Ground Two)

Roberts first contends her counsel were ineffective in failing to investigate and present mitigation evidence. (Doc. 10 at 77-88.) Respondent does not address the merits of this claim. And as no state court has adjudicated its merits, the Court reviews it *de novo*. 28 U.S.C. § 2254(d); *see also Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011).

The Supreme Court has made clear that trial counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Even if a defendant is "fatalistic or uncooperative" regarding mitigation, defense counsel still must "conduct *some* sort of mitigation investigation." *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (per curiam) (emphasis in original). Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *see also Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (further investigation excusable where counsel has evidence suggesting it would be fruitless). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Here, defense counsel described for the trial court at the hearing regarding Roberts' mitigation waiver the mitigation evidence they had amassed and were ready to present. They obtained, Attorney Ingram testified, "hospital records relating to a six[-]day psychiatric stay in the year 2000. There . . . [were] two hospitalizations [in] April of 1999 relating to a traffic accident. We have obtained counseling records from Valley Counseling. We made arrangements for basically family members to come and testify . . . ." (Doc. 11-3 (Trial Tr.) at 1750-51.) He explained that he and his co-counsel "explained to Donna the exact nature of the mitigating evidence we propose[d] to introduce." (*Id*. at 1750.)

Roberts argues, however, that her counsel should have done more. She claims, for instance, that they did not spend enough time with her or her family members to refresh their recollection of and properly understand the mitigation value of her troubled childhood, with a mother who suffered from depression and a father with an erratic temper. (Doc. 10 at 82-84 (citing Doc. 12-13 at 149-222 (Exs. E and F, 2nd Post-Convict. Pet.)).) They also failed to obtain records from the Social Security Administration, she contends, regarding her head injuries from the car accidents and resulting psychological problems and possible traumatic brain injury. (*Id*. at 84-87 (citing Doc. 12-13 at 79-94 (Ex. A, 2nd Post-Convict. Pet.)).) And she posits they could have presented evidence about her: good grades in school; car accidents; history of depression and bipolar disorder and a visit to a psychiatric ward; work in Israel with injured soldiers; financial success and no need to murder her husband for money; and financial generosity with her family. (*Id*. at 87.)

Armed with this evidence, Roberts claims, her counsel could have prepared her better for her unsworn statement or convinced her to permit them to present the evidence. (*Id*.) Instead, their inadequate investigation and preparation for the mitigation phase of trial, she

claims, "led to Ms. Roberts's waiver [of mitigation evidence], which in turn clearly prejudiced the outcome of the penalty phase of Ms. Roberts's capital trial."  (Doc. 24 at 31.)  And she faults counsel for not proffering any of the evidence they did have to the trial court to preserve the record.  (*Id*. at 28.)

First, Roberts' allegations are speculative and conclusory.  Some of this evidence clearly is mitigating – most notably, Roberts' struggles with head injuries and mental health issues and her family history of domestic violence.  But from the general description in the record of the evidence counsel did gather – hospital and counseling records and testimony of Roberts' family members – it appears likely that defense counsel possessed some or even much of the allegedly overlooked evidence.  And one can only speculate as to whether Roberts' allocution would have differed or if she would have decided not to waive the presentation of mitigation evidence had her counsel gathered and shared with her the information she describes.

Even if defense counsel had proffered their mitigation evidence and did fail to uncover some or all of the information Roberts identifies, counsel's performance was not deficient under *Strickland* for limiting their investigation.  As explained above, the Ohio Supreme Court reasonably determined that Roberts' waiver of mitigation evidence was knowing and intelligent.  And she presumably would have refused to testify on her own behalf at the mitigation hearing or cooperate with counsel in any further investigation and identification of mitigation evidence.  Under these circumstances, "[c]ounsel could have reasoned that additional investigation would be of little use because [her] own actions shut off the avenues for mitigation."  *Owens v. Guida*, 549 F.3d 399, 412 (6th Cir. 2008).  Roberts cannot now fault her trial counsel for failing to do what she expressly and knowingly forbade them from

doing.  "An attorney's conduct is not deficient simply for following his client's instructions." *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001) (finding no deficient performance of trial counsel where the failure to present mitigation evidence was the result of the petitioner's directions to proceed with a residual-doubt theory instead, and petitioner was competent to make that strategic decision).

Moreover, given Roberts' intransigent behavior at trial and explicit instructions to her counsel to forgo the presentation of mitigation evidence, it is reasonable to assume she would not have permitted the evidence's introduction even if counsel had obtained it.  Counsel's failure to investigate further, therefore, could not have prejudiced her under *Strickland.  See, e.g., Schriro v. Landrigan*, 550 U.S. 465, 476-77 (2007) (finding that "regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such [mitigating] evidence. Accordingly, . . . Landrigan could not demonstrate prejudice under *Strickland* even if granted an evidentiary hearing."); *Henness v. Bagley*, 644 F.3d 308, 323 (6th Cir. 2011) ("[A] habeas petitioner cannot establish prejudice resulting from counsel's failure to conduct a thorough investigation when the petitioner refuses to allow the presentation of any mitigating evidence at the sentencing hearing.").

This claim, therefore, fails.

### 2.  Waiver of right to present mitigation evidence (Ground Three)

Roberts claims her trial counsel also were ineffective for failing to "explain the consequences of waiving" the presentation of mitigation evidence at the sentencing hearing. (Doc. 24 at 31.)  She elaborates: "The superficial nature of the attorney-client relationship was evident during the course of trial and culminated in counsel's deficient performance

during the penalty phase, when counsel failed to fully explain how likely it was that the jury

would sentence her to death." (*Id*.)  Roberts raised this claim to the Ohio Supreme Court on

her first direct appeal, which the Ohio Supreme Court adjudicated and ruled:

> {¶ 146} Similarly, in proposition of law eight, to the extent that Roberts argues
> that trial counsel were ineffective for failing to properly advise her and ensure that
> she understood the ramifications of her waiver of her right to present mitigating
> evidence, her claim fails.
> . . .
>
> {¶ 148} We again reject Roberts's contentions that she did not understand the full
> ramifications of waiving her right to present and argue mitigation evidence. The
> record shows that Roberts understood what she was doing when she decided to
> present only her unsworn statement during the mitigation hearing. The record also
> establishes that the trial court explained sufficiently the ramifications of that
> decision, that Roberts essentially told the trial court that she was not presenting
> additional mitigating evidence because she wanted to be given a death sentence,
> and that she disregarded her attorneys' advice and instead directed them not to
> present any mitigating evidence beyond her unsworn statement. An attorney does
> not render ineffective assistance by declining, in deference to a client's desires, to
> present evidence in mitigation. *See, e.g., State v. Monroe*, 105 Ohio St.3d 384,
> 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *State v. Cowans* (1999), 87 Ohio St.3d
> 68, 81, 717 N.E.2d 298; *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d
> 47. Her claims that counsel was constitutionally ineffective fail.

*Roberts I*, 110 Ohio St. 3d at 91.

Roberts confusingly argues that this decision is not entitled to AEDPA deference

because the state court "failed to address the superficial nature of the attorney-client

relationship during these proceedings and counsel's failure to investigate to an objectively

reasonable standard." (Doc. 24 at 34.)  But nowhere in her merit brief to the Ohio

Supreme Court did she mention the nature of her relationship with her attorneys or

counsel's mitigation investigation (a separate sub-claim, addressed above).  Rather, she

claimed that her counsel were ineffective for failing "to properly advise [her] and ensure"

that she understood the consequences of her waiver of the right to present mitigation

evidence (Doc. 12-4 at 164-65 (Appellant Merit Brf.)), which she concedes the state court

adjudicated on the merits (Doc. 24 at 32).  The state court therefore reviewed the precise claim raised before it, and AEDPA deference applies.

Roberts does not provide any analysis of the Ohio Supreme Court's decision, and it is not this Court's duty to do so.  Nevertheless, there is nothing unreasonable about the state court's decision.  As explained above, this Court agrees with the state court that Roberts' waiver was knowingly, voluntarily, and intelligently made.  Roberts' trial attorney testified at the hearing on the mitigation waiver that he and his co-counsel had spent five days discussing with Roberts her decision to waive the presentation of mitigation evidence.  (Doc. 11-3 (Trial Tr.) at 1750.)  They explained "the exact nature" of the evidence they sought to introduce.  (*Id*. at 1750-51.)  But despite their disagreement, she adhered to her decision.  (*Id*. at 1751.)

Moreover, the trial judge clearly advised: "[B]y waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty."  (*Id*. a 1758.)  Thus, regardless of what Roberts' trial attorneys did or did not do, the trial court conducted a hearing to ensure that Roberts understood the nature of her right to present mitigation evidence and the consequences of forgoing that right, obviating any prejudice to Roberts resulting from her counsel's performance.

This claim, too, lacks merit.

### 3.  Failure to make a *Batson* objection (Ground Four)

For this sub-claim, Roberts argues that her counsel should have objected when the State excused "at least" two Black jurors, leaving no Black jurors on the panel.  (Doc. 10 at 37.)

As a preliminary matter, Respondent urges this Court to deny this claim (as well as sub-claims (4) through (7), as listed above (together, the remaining claims asserted in Ground Four)) based on Roberts' defective pleading.  (Doc. 15 at 22-23.)[9]  He argues that she fails to adequately address the claim within the framework of AEDPA – namely, whether, pursuant to § 2254(d) of the Act, the decision of the last state court to adjudicate the claim on the merits contravened or misapplied Supreme Court precedent or was based on an unreasonable determination of fact.  (*Id*.)  Respondent points out in his return of writ that Roberts' analysis of the claim in her petition is nearly identical to the one she presented in her merits brief in the Ohio Supreme Court; she does not identify the relevant state-court decision; and she presents no analysis of why that decision violates § 2254(d).  (*Id*.)  And, he notes in his sur-reply, her traverse does little to remedy these defects.  (Doc. 26 at 14-15.)  In fact, in her traverse, Roberts provides only the most bare-boned facts and virtually no legal analysis.  In addition, Roberts states that this claim was "raised in post-conviction and . . . adjudicated by the state court of appeals[,]" (Doc. 24 at 36), when, as explained above, she raised it in her second post-conviction petition in the trial court but did not appeal its denial to the state appellate court.

Roberts counters that there is no caselaw establishing that "the identified violation of clearly established federal law must be included in the initial [habeas] pleading."  (Doc. 24 at 36.)  But the obligation of parties to provide developed arguments through briefing is well established and fundamental to the American litigation process, and federal courts routinely find claims waived if insufficiently developed.  *See, e.g., United States v. Burke*, 504 U.S.

---

[9] Respondent also argues that Grounds Five, Six, and Seven are defectively pleaded. For those claims, however, Roberts identifies in her traverse the relevant state-court decision and the controlling, clearly established law, and the Court will address the merits of those claims.

229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one."); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.  As we recently said in a closely analogous context: 'Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.'") (internal quotation marks and citation omitted); *United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

Furthermore, this Court's case management order explicitly (and in bold print) directs parties to fully explain the factual and legal grounds for their respective positions.  (Doc. 9 at 5.)[10]  In addition, Rule 2(c) of the Rules Governing 2254 Cases in the United States District

---

[10] The case management order provides:

In all submissions to the Court, the parties shall, if applicable, include a summary of the facts upon which they rely, and statements of applicable law.  **ALL REFERENCES TO THE RECORD SHALL IDENTIFY THE PRECISE LOCATION OF THE MATERIALS UPON WHICH THE PARTY RELIES. REFERENCES TO THE STATE-COURT RECORD MUST INCLUDE SPECIFIC DOCUMENTS, SPECIFIC EXHIBITS AND SPECIFIC PAGES OF THE TRANSCRIPT.  THE ARGUMENTS MUST CONTAIN THE PARTIES' CONTENTIONS ON EACH OF THE ISSUES PRESENTED, AND**

Courts specifies that "*[t]he petition* must: (1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; [and] (3) state the relief requested . . . ." Habeas Rule 2(c) (emphasis added).  Indeed, another judge in this Court has denied habeas relief for similar pleading defects, stating:

> By repeating his state-court arguments and ignoring the last reasoned state-court opinion, Petitioner has defectively pleaded [multiple] Grounds.... The Court declines to review Petitioner's state-court challenges de novo. The Court also declines to identify the relevant state-court adjudications of Petitioner's challenges and conjure arguments on Petitioner's behalf for why these adjudications violate clearly established federal law or are based on unreasonable determinations of facts.
>
> Accordingly, [those] Grounds . . . fail.

*Jackson v. Houk*, No. 4:07 cv 880, 2021 WL 69850, at *14 (Gwin, J.).  Roberts counters in her traverse that *Jackson* is "inapplicable" because it was "differently postured" than this case, but she does not explain how it is distinguishable regarding defective pleading and this Court finds no reason that it is.  (Doc. 24 at 36.)

This claim, therefore, is procedurally defaulted and deficiently pleaded, and is denied.

### 4, 6.    Failure to present an opening and closing statement (Ground Four)

Roberts next complains that her trial counsel's performance was deficient because they did not make an opening or closing statement in the guilt phase of trial in her second

---

**THE REASONS THEREFOR, WITH CITATIONS TO THE AUTHORITIES, STATUTES, AND PARTS OF THE STATE-COURT RECORD UPON WHICH THE PARTIES RELIED.**

PETITIONER SHALL EXPLAIN IN HIS PETITION WHY THE CLAIMS ASSERTED ARE PROPERLY BEFORE THIS COURT AND ARE NOT PROCEDURALLY DEFAULTED.

… THE PARTIES ALSO SHOULD SPECIFY THE APPROPRIATE BURDEN OF PROOF, THE PARTY WHO BEARS IT, AND ANY DEFENSES ASSERTED.

(Doc. 9 at 5 (emphasis in original).)

post-conviction petition.  (Doc. 24 at 37, 39.)  The last state court to review the merits of this claim, the state appellate court on post-conviction review, opined:

> {¶14} The opening statement at trial was given by Roberts herself. She addressed the jury as follows:
>
>> Good morning. Will the real Donna Roberts please stand up? Ladies and gentlemen, the real Donna Roberts stands before you. The testimony and evidence will establish that I played no part in [Fingerhut's] death. The Donna Roberts you'll hear portrayed in the letters and on those tapes is not the real Donna Roberts.
>>
>> My attorneys will test the State's evidence and ask important questions in cross-examination. Please, please listen carefully for those questions.
>>
>> Perhaps I'll have more to say later. Regardless, I am not guilty. I am not guilty. And you'll know that when this case is over.
>
> {¶15} In support of her Petition, Roberts submitted an affidavit in which she stated in relevant part:
>
>> 5. I did not know that my attorneys were not going to give an opening statement. They did give me a piece of paper with what they wanted me to say in opening statement. I practiced and did what they told me. They did not tell me that I was the only one who was going to speak.
>>
>> 6. I wanted them to argue self-defense in this case. Not for me, but Nate Jackson, my co-defendant. It was my understanding that Nate had argued self-defense at his trial. I thought that my jury should know that. To that end, I wanted Nate Jackson's video statement to be introduced into evidence because it is my understanding that he admitted that I had nothing to do with the offense. My attorneys did not discuss this strategy with them [sic]. I had paid them a lot of money I thought that they would do the right thing for me. They did not in this regard.
>>
>> 7. I wanted to testify on my behalf. I begged my attorneys to let me testify. They wavered, agreeing I should testify one day and changing their mind the next. When it came time for me to testify, they said no.
>>
>> 8. I did not ask my attorneys not to say anything in closing argument on my behalf. This strategy was not discussed with me. I was shocked when they did not say anything on my behalf. They just took charge of the case and I did not know what to say or what I should do.

{¶16} With respect to opening and closing arguments, the face of the record in the present case does not raise issues of material fact with respect to counsel's performance or prejudice arising therefrom. It has often been observed that, "[w]hen performing a *Strickland* analysis, courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (Citation omitted.) *State v. Goff*, 154 Ohio St.3d 218, 2018-Ohio-3763, 113 N.E.3d 490, ¶ 42. Given this presumption, "counsel's decision to waive opening or closing statements is generally viewed as a tactical one, even in a capital case." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 139; *Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373 (counsel's omission of an opening statement and the substance of closing arguments "must be viewed as tactical decisions and do not rise to the level of ineffective assistance"); *State v. Fouts*, 4th Dist. Washington No. 15CA25, 2016-Ohio-1104, ¶ 69 ("[c]ounsel's decision on whether to give an opening statement or closing argument and how to formulate and deliver them are tactical decisions").

{¶17} In the present case, the opening statement given by Roberts apprised the jury that she was asserting her innocence and that the defense would focus on challenging the State's evidence. The decision to omit any closing argument must be viewed as a tactical decision made by trial counsel. The affidavit submitted by Roberts provides no support either for counsel's deficiency or prejudice resulting from counsel's performance. At most, the affidavit evidences Roberts' personal dissatisfaction with counsel's trial strategy, rather than "specific errors by counsel that undermine confidence in the reliability of the verdict." *State v. Sanders*, 92 Ohio St.3d 245, 273, 750 N.E.2d 90 (2001).

. . .

{¶19} We further note that, in the penalty phase of her trial, Roberts forbade trial counsel from making arguments or presenting evidence in mitigation. In lieu of arguing for mitigation, Roberts chose to personally make an unsworn statement directly to the jury. The statement was made against the advice of counsel. Her expressed purpose in making the statement was "to expose people who have taken an oath to God to tell the truth, the whole truth, and then sat in that witness box and lied and cheated [and] abused authority, used their power to destroy lives," and "to demand racial equality in a courtroom." In the course of this statement she expressed her appreciation for her attorneys described as "wonderful, brilliant men." She instructed her attorneys to quit filing motions on her behalf. Roberts also made mention of "the real Donna Roberts" as she had in her opening statement. In considering the performance of trial counsel with respect to opening and closing arguments, it is not unreasonable to infer that the character or personality of their client influenced the manner in which they chose to proceed at trial.

*Roberts*, 2020 WL 4933461, at *2-4.

Respondent argues that Roberts also failed to properly plead this sub-claim.  (Doc. 15 at 23.)  And by and large this is true.  Roberts provides no legal argument as to why the state court's opinion was contrary to, or an unreasonable application of, Supreme Court precedent; nor does she claim that the state court made an unreasonable determination of fact.  (*See* Doc. 10 at 95, 97; Doc. 24 at 37, 39.)  But because the factual allegations are somewhat developed, the Court will address these sub-claims.

"An attorney's decision not to make an opening statement is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel." *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) (internal quotation marks and citation omitted); *see also Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir. 2002) ("A trial counsel's failure to make an opening statement, however, does not automatically establish the ineffective assistance of counsel.").  Similarly, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

To support her habeas claim, Roberts repeats her allegations from an affidavit she submitted to the state court.  (Doc. 24 at 37, 39.)  In it, as the court noted, she attests that she did not instruct, and did not expect, her lawyers to forgo making an opening statement or closing argument at the guilt phase of trial.  Courts, however, routinely afford little weight to assertions made in a petitioner's affidavit that are unsupported by other credible evidence. *See, e.g., Thomas v. Perry*, 553 Fed. Appx. 485, 487 (6th Cir. 2014) ("Nothing in the record, other than Thomas's self-serving affidavit, suggests that trial counsel promised an acquittal if Thomas waived his right to a jury trial or abandoned her loyalty to him."); *Highers v.*

*Kapture*, 93 Fed. Appx. 48, 50 (6th Cir. 2004) ("However, there is nothing in the record, aside from Highers's self-serving affidavit, to suggest that Campbell guaranteed a particular result to his client."); *Hawkins v. Woods*, 2015 WL 348530, at *2 (E.D. Mich. 2015) ("Self-serving affidavits are regarded with extreme suspicion."); *Jackson v. United States*, 248 F. Supp. 2d 652, 655 (E.D. Mich. 2003) ("Petitioner has presented *no credible evidence* that counsel failed to inform him of a plea offer and instead merely relies on his own self-serving statements.") (emphasis in original) (internal quotation marks and citation omitted).  Roberts offers no evidence to support the allegations in her affidavit.

To the contrary, based on the circumstances of this case, including Roberts' judgment and behavior during trial and her admitted instructions to counsel that they not participate in any manner in the mitigation phase of trial, as detailed by the state court, the court reasonably presumed that counsel's decision to forgo opening statement and closing argument was a reasonable trial strategy.  *See Millender*, 376 F.3d at 525 ("We find no error in the district court's determination that the attorney's decision [to forgo an opening statement] was not objectively unreasonable, and therefore did not amount to ineffective assistance of counsel."); *Tinsley v. Million*, 399 F.3d 796, 811 (6th Cir. 2005) (remanding ineffective-assistance claim based on failure to make opening and closing statement to district court to determine whether claim was exhausted and remarking that defense counsel was a "seasoned criminal defense lawyer" who never made opening statements in the penalty phase of a criminal trial and it was possible that counsel made no closing argument as a matter of strategy because the prosecutor had produced no evidence or arguments worthy of attempted rebuttal).

Moreover, Roberts has failed to establish that an opening statement or closing argument by counsel would have created a reasonable probability of a different outcome in his

trial.  She merely alleges in a conclusory fashion that the omission "was patently unreasonable and prejudicial."  (Doc. 10 at 95.)  *See Moss*, 286 F.3d at 864 (finding petitioner's "conclusory allegations" insufficient to establish prejudice under *Strickland* by counsel's decision not to make an opening statement).

These claims, therefore, lack merit.

### 5.  Failure to introduce the defense of Jackson (Ground Four)

Roberts further argues that her counsel were ineffective for failing to introduce at trial a videotape of Jackson being interviewed by police that she contends would have supported a defense that she did not conspire with Jackson to commit her ex-husband's murder.  (Doc. 10 at 96-97.)  Roberts raised this claim on post-conviction review.  The last state court to review it, the state appellate court, ruled:

{¶20} Roberts also claims trial counsel was deficient for not introducing into evidence a video tape of Jackson being interviewed by the police in which Jackson asserts that he shot Fingerhut in self-defense and that Roberts "ain't had nothing to do with it at all, man." *See State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 69-72.

{¶21} The State counters that the video tape was inadmissible hearsay: "A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement." Evid.R. 804(B)(3). "The primary undertaking of a trial court's analysis [with respect to truthworthiness] is to apply the corroboration requirement in a manner to attempt to determine whether there are sufficient circumstances to overcome the motive to fabricate, whether because of fear, love, monetary inducement, etc." *State v. Cohen*, 11th Dist. Lake No. 12-011, 1988 WL 41545, *6.

{¶22} Nothing is proffered in Roberts' Petition that would serve as corroborating circumstances indicating the truthworthiness of Jackson's statement. On the contrary, other statements in the interview tend to undermine Jackson's claim that Roberts had nothing to do with Fingerhut's murder. According to Jackson's statements in the interview, he contacted Roberts, with whom he was having an affair, after leaving the residence in Fingerhut's car. Roberts met Jackson and rented a room for him at a hotel. She purchased medical supplies and treated his finger which had been injured during the struggle with Fingerhut. Yet Jackson

maintained Roberts knew nothing about the events that evening. Rather than being a disinterested statement, Jackson had to exculpate Roberts from any involvement or knowledge if his own claims of self-defense were to appear credible.

{¶23} Roberts claims that trial counsel was nevertheless ineffective for not attempting to introduce the video into evidence. "Even if the trial court had found that Evid.R. 804 would not allow its admission, counsel would have preserved the issue for appeal as the preclusion of the admission of such strong evidence of actual innocence and/or mitigation would have violated her right to present a defense." Appellant's brief at 15. Roberts relies on a line of United States Supreme Court cases recognizing an implicit constitutional right to present a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment * * * or in the Compulsory Process or Confrontation clauses of the Sixth Amendment * * *, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are '"arbitrary" or "disproportionate to the purposes they are designed to serve."'" *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), quoting *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), quoting *Rock v. Arkansas*, 483 U.S. 44, 58 and 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

{¶24} Roberts' argument falls short of demonstrating a genuine issue of material fact as to whether counsel was ineffective for not at least proffering the evidence. In the first instance, the Ohio Supreme Court has confirmed that Evidence Rule 403(B)(3) does not violate the right to present a complete defense:

> [W]e hold that the corroboration requirement of Evid.R. 804(B)(3) rationally serves a legitimate interest in the admission of trustworthy evidence, and therefore exclusion of a defendant's proffered evidence for lack of corroboration does not deprive a defendant of the right to present a complete defense. As we stated in [*State v.] Sumlin*, 69 Ohio St.3d [105,] at 111, 630 N.E.2d 681, "Through Evid.R. 804(B)(3), Ohio has addressed one of the principal concerns of cases such as *Chambers* [*v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)] which is that a criminal defendant's reliable evidence should not be excluded through application of hearsay rules that do not adequately protect due process rights. Evid.R. 804(B)(3) strikes a balance between hearsay statements against penal interest which are sufficiently trustworthy to be admissible and those which are not."

*State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 30.

{¶25} In the second instance, "[i]t is not ineffective assistance for a trial lawyer to maneuver within the existing law, declining to present untested or rejected legal theories." *State v. McNeill*, 83 Ohio St.3d 438, 449, 700 N.E.2d 596 (1998).

*Roberts*, 2020 WL 4933461, at *4-5.

Roberts argues the state court misapplied *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), in which the Supreme Court established that a state evidentiary rule may not infringe upon an accused's right to present a complete defense, in finding her counsel were not ineffective for failing to attempt to introduce the Jackson videotape in her defense.  (Doc. 24 at 38-39.)  She contends in a conclusory manner that the state court was unreasonable to recognize the Ohio Supreme Court's determination that the Ohio hearsay rule that rendered the videotape inadmissible did not infringe on her right to present a complete defense.  (*Id.*) But Roberts does not provide any argument as to why the court's interpretation of *Holmes* or the cases following it was unreasonable, and this Court finds nothing unreasonable about it.

Roberts further argues that even if the video were inadmissible hearsay, trial counsel should have attempted to place it into the record to preserve the issue for appeal.  But, as the state court observed, it is not ineffective assistance for an attorney to decide to follow established law rather than press untested or rejected legal theories.  And Roberts has not shown how she was prejudice where any appeal of this issue would most likely have been fruitless under Ohio law.

This claim, therefore, also fails.

### 7.   Refusal to allow her to testify (Ground Four)

Lastly, Roberts argues that her trial counsel should not have refused to allow her to testify.  (Doc. 10 at 97-98.)  As explained above, Roberts raised this claim in her second post-conviction petition.  The trial court rejected this claim along with all of her other ineffective-

assistance claims as barred by *res judicata* and also because "[e]ach of the alleged deficiencies cited now by Roberts were trial tactics of strategy" and she presented "no evidence to suggest such a strategy was deficient or prejudicial."  (Doc. 12-13 at 348, 350 (Opinion).)  Roberts did not appeal the trial court's rejection of the claim to the state appellate court.

As Respondent asserts, Roberts' pleading of this claim is undeveloped.  She does not identify the last state-court ruling on the issue and advances only conclusory allegations and a bare-boned legal argument for the claim.  (Doc. 10 at 97-98; Doc. 24 at 39.)  She also offers no factual support for the claim other than her self-serving affidavit, in which she attests that she "begged [her] attorneys to let [her] testify[,]" but "[w]hen it came time for [her] to testify, they said no."  (Doc. 12-13 at 78.)  Therefore, as this sub-claim is procedurally defaulted and insufficiently pleaded, the Court will not address it.

## IV.     Fifth Ground for Relief:  *Pretrial Publicity*

For her fifth ground for relief, Roberts argues that pervasive pretrial publicity deprived her of a fair trial.  (Doc. 10 at 98-104.)  She raised this claim in her first direct appeal, and the Ohio Supreme Court adjudicated it on the merits.  It is therefore ripe for review.

In addressing this claim, the Ohio Supreme Court stated:

{¶ 115} In proposition of law seven, Roberts attacks the trial judge's decision to deny her motion for a change of venue. In support of her contentions, Roberts points to pervasive pretrial publicity regarding the murder, Jackson's trial (which occurred only months prior to her own trial), and the state's theory of her complicity in the murder. Although there may have been a great deal of publicity about the murder and Jackson's trial in Trumbull County, we do not agree that Roberts shows that media coverage of the murder so saturated the county and influenced the potential venire that she was deprived of a fair trial.

{¶ 116} A trial court's ruling on a motion for a change of venue pursuant to Crim.R. 18(B) will not be disturbed on appeal unless the court abused its discretion. See, e.g., *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710. We have long held that a careful and searching voir dire examination provides

the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community. See *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 35; *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710; *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

{¶ 117} A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996. Pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial. *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683. Only in rare cases may prejudice be presumed. *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 118} We have held that extensive voir dire helps to eliminate any negative effect arising from the pretrial publicity, *Lundgren*, 73 Ohio St.3d at 479–480, 653 N.E.2d 304, and the trial court here engaged in such an effort. The trial court held Roberts's motion to change venue in abeyance in order to determine whether pretrial publicity tainted the jury pool. It then conducted a thorough voir dire, as evidenced by the facts that voir dire took a month to complete and encompasses more than 20 volumes and approximately 4,700 pages of transcript. Near the conclusion of voir dire, the trial court overruled the motion to change venue, stating: "[T]he Court feels very comfortable that this case can be fairly tried in this county * * *."

{¶ 119} To support her claim that fairness was lacking and that pretrial publicity impaired the trial court's ability to seat an impartial jury, Roberts cites the voir dire of seven prospective jurors. However, four of these prospective jurors never sat on the final panel, so prejudice to Roberts is not shown. *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 120} Nor does the fact that three jurors had heard about some aspects of the case prior to trial necessarily reflect bias or lack of impartiality. See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 37–41; *State v. Bies* (1996), 74 Ohio St.3d 320, 324, 658 N.E.2d 754. Moreover, defense counsel passed for cause on those three jurors and did not exercise a peremptory challenge on any of them, even though Roberts had remaining peremptory challenges at the time those jurors were seated. As we observed in a similar situation: "The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's exposure to pretrial publicity once voir dire was completed." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37. So, too, here.

{¶ 121} Accordingly, we hold that there is not a sufficient showing that the trial court abused its discretion in denying Roberts's motion for change of venue. See

> *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 30. We
> reject Roberts's claim to the contrary.

*Roberts I*, 110 Ohio St. 3d at 85-87.

The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961).  And it is well established that if prejudicial pretrial publicity jeopardizes this right, the court should grant the defendant a change in venue.  *See, e.g., id.* at 722-24; *Campbell v. Bradshaw*, 674 F.3d 578, 593–94 (6th Cir. 2012).  The trial court has a "duty to protect" criminal defendants from "inherently prejudicial publicity" that renders a jury's deliberations unfair.  *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

Even so, "juror *impartiality . . .* does not require *ignorance.*" *Skilling v. United States*, 561 U.S. 358, 381 (2010) (emphasis in original); *see also Irvin,* 366 U.S. at 722 (noting jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.").  The Supreme Court has made clear that "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976).

To demonstrate that pretrial publicity deprived one of a fair trial, a defendant must show either presumed or actual juror prejudice.  "'Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community and is rarely presumed.'" *Campbell,* 674 F.3d at 593 (quoting *Foley v. Parker,* 488 F.3d 377, 387 (6th Cir. 2007)).  "To demonstrate actual prejudice, the publicity and the *voir dire* testimony must show that a fair trial was impossible." *Hand v. Houk*, 871 F.3d 390, 410 (6th Cir. 2017).

### 1.  Presumed juror prejudice

Roberts argues that the Ohio Supreme Court unreasonably applied this clearly established law and based its decision on unreasonable determinations of fact when it failed to presume juror prejudice.  (Doc. 24 at 42-45.)  She offers evidence, as she did in state court, of what she characterized as the extensive and "salacious" media coverage about the murder during and after Jackson's trial.  (*Id*. at 41-42; *see also* Doc. 12-2 at 215-334 (Exs. to Def. Mot. to Change Venue).)  She further relies on the factors the Supreme Court considered in *Skilling v. United States*, 561 U.S. 358 (2010), in analyzing whether presumed prejudice resulted in that case from adverse pretrial publicity: (1) the size and characteristics of the community in which the crime occurred, (2) whether media coverage about the defendant contained "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," (3) whether the passage of time lessened media attention, and (4) whether the jury's conduct was inconsistent with a presumption of prejudice.  (*Id*. at 44 (citing *Skilling,* 561 U.S. at 382-83).)

Roberts distinguishes her case from *Skilling*, in which the Court did not presume prejudice, by citing:  (1) the "relatively" small size of Trumbell Country, Ohio, where her trial took place (versus Houston, the country's fourth most populous city, in *Skilling*); (2) the publicity at issue contained "blatantly prejudicial information," including an affidavit for an arrest warrant that referenced sexually explicit love letters and tapes between her and Jackson (versus the media coverage in *Skilling*, which the Court found was negative but not particularly memorable or damaging); (3) this affidavit was released to the media during Jackson's trial, six months before her trial began, and media coverage of it continued for another two months (versus four years before the trial in *Skilling*); and (4) the jury found her

guilty of aggravated murder and sentenced her to death (versus Skilling's jury acquitting him on nine of more than 25 substantive counts).  (*Id.* (citing *Skilling,* 561 U.S. at 382-83).)

But in Roberts' case, the Ohio Supreme Court considered and acknowledged many of these circumstances, noting that there was "pervasive pretrial publicity regarding the murder, Jackson's trial (which occurred only months prior to her own trial), and the state's theory of her complicity in the murder."  *Roberts I*, 110 Ohio St. 3d at 85.  And Roberts does not identify any specific evidence demonstrating that a "carnival atmosphere" pervaded the courthouse and surrounding community during her trial, *Sheppard*, 384 U.S. at 358, such that it amounted to a "hollow formality," *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963**).**  Nor does she identify any specific factual finding of the state court that is clearly erroneous.

The Ohio Supreme Court, therefore, reasonably concluded that the publicity surrounding Roberts' trial was not the type of "extreme case" in which juror prejudice should be presumed.  *Skilling* 561 U.S. at 381.  *Cf. Sheppard*, 384 U.S. at 355 (presuming juror prejudice where "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom"); *Estes v. Texas*, 381 U.S. 532 (1965) (presuming juror prejudice where extensive publicity before trial swelled into excessive exposure during preliminary court proceedings, as the media overran the courtroom and caused significant disruption); *Rideau,* 373 U.S. at 726 (presuming juror prejudice where "tens of thousands of people . . . saw and heard" a televised interview of the defendant in which he "personally confess[ed] in detail to the crimes").

### 2.  Actual juror prejudice

Roberts states that actual "[p]roof of the [jurors'] prejudice is almost impossible[,]" and focuses her argument instead on presumed juror prejudice.  (Doc. 10 at 99.)  But she

nonetheless appears to argue that the Ohio Supreme Court also unreasonably applied Supreme Court precedent in finding no actual prejudice.  She presents the same evidence here as she did in state court concerning the awareness among prospective jurors of the news coverage about the murder and her and Jackson's criminal prosecutions, including seven who had some knowledge of the facts of the cases.  (*Id*. at 99-101.)  And she claims the trial court's voir dire was not "thorough" enough.  (*Id*. at 104.)

The Supreme Court, however, has long recognized that individual voir dire is a particularly useful tool "to ferret out the damaging effect of pre-trial publicity."  *Davis v. Florida*, 473 U.S. 913, 915 (1985) (citing *Nebraska Press Assn*., 427 U.S. at 602).  Even if a prospective juror has some "preconceived notion as to the guilt or innocence of an accused, . . . [i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court."  *Irvin,* 366 U.S. at 722-23.  In this context, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror."  *Skilling*, 561 U.S. at 386 (2010) (quoting *Mu'Min v. Virginia,* 500 U.S. 415, 427 (1991)).

In this case, the Ohio Supreme Court reasonably found that the month-long voir dire in Roberts' trial was "extensive" and "thorough" enough to help "eliminate any negative effect arising from the pretrial publicity[.]"  *Roberts I*, 110 Ohio St. 3d at 86.  And it found the presence of the seven prospective jurors who were familiar with facts of her and Jackson's cases, only three of whom served on the jury, insufficient evidence of actual prejudice.  *Id*.

Roberts presents no evidence that the court's decision unreasonably applied Supreme Court precedent or was based on unreasonable factual determinations.

Accordingly, Roberts' fifth ground for relief is without merit.

## V.        Sixth Ground for Relief:  *Jury Selection*

Roberts argues in her sixth ground for relief that the trial court erred by failing to excuse for cause two prospective jurors whom she claims were biased in favor of the death penalty, forcing her to use peremptory challenges to excuse them, which resulted in a "jury unconstitutionally constituted."  (Doc. 10 at 104, 111.)  Roberts raised this claim in her first direct appeal, and the Ohio Supreme Court reviewed the claim on the merits.  It is therefore preserved for federal habeas review.

The Ohio Supreme Court opined:

{¶ 104} In proposition of law three, Roberts contends that in failing to excuse two prospective jurors because of their alleged bias and inability to fairly consider a life-sentence option, the trial court erred.

{¶ 105} R.C. 2313.42(J) contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased."  R.C. 2313.43; see *State v. Cornwell* (1999), 86 Ohio St.3d 560, 563, 715 N.E.2d 1144; *State v. Allard* (1996), 75 Ohio St.3d 482, 495, 663 N.E.2d 1277.

{¶ 106} Trial courts have discretion in determining a juror's ability to be impartial, *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323, and such a ruling "will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576. Accord *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646. With these standards in mind, we turn to the specific claims raised by Roberts.

{¶ 107} Alleging that one venireman, Andrew Kotwis, was unable to fairly consider a life sentence, Roberts asserts that the trial court abused its discretion in overruling her challenge to him for cause. Her claim is predicated largely on statements that the prospective juror made indicating that he would consider

sympathy for the survivors in deciding whether to vote for a life sentence or the death penalty. A review of the transcript of the voir dire examination of Kotwis affords perspective and context.

{¶ 108} Kotwis stated that he would "[a]bsolutely" consider all sentencing options. He admitted that he believed that the death penalty provides comfort and solace to the survivors and that sympathy or comfort for the survivors would factor into his decision whether to vote for life or death. But after the trial court instructed Kotwis that sympathy could not be a determining factor in whether to vote for a death sentence, he agreed to obey the instruction. Moreover, Kotwis "[a]bsolutely" agreed with defense counsel that he would consider all sentencing options equally and that no option would "start with a leg up over the other."

{¶ 109} In failing to dismiss Kotwis for cause, the trial court observed that Kotwis "rehabilitated himself" in his answers to the follow-up questions described. In these circumstances, we find no abuse of discretion on the part of the trial court in denying Roberts's request to discharge him for cause. Although Kotwis gave some answers that could be construed as ambiguous, he ultimately stated that he would consider all sentencing options equally. His credibility in making such statements was a matter for the trial judge. *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 ("Deference must be paid to the trial judge who sees and hears the juror"). Roberts fails to demonstrate that we should disturb that finding.

{¶ 110} Roberts next asserts that the trial court abused its discretion in failing to excuse prospective juror Michael Blake, who expressed what Roberts characterizes as a fixed impression of her guilt. During the voir dire examination, Blake initially declared that from what he had read in the news, "they must have had a good reason to arrest [Roberts] * * *. [T]here must be some truth."

{¶ 111} Blake's statements must also be considered in a larger context, however. In other statements, Blake stated that he could set aside anything he had read or heard and that he would consider the case solely on the evidence presented and the court's instructions. Blake conceded that although he believes mass murderers such as Ted Bundy should automatically get the death penalty, every case is different, and he did not presume anyone guilty. And at the conclusion of questioning, Blake reiterated that he would set aside everything he had read or heard about the case and make up his mind solely on the facts presented during trial. The trial court did not abuse its discretion in refusing to excuse prospective juror Blake for cause.

{¶ 112} Roberts claims that she suffered prejudice because she was "forced" to reserve her final peremptory challenge to prevent the impanelment of Kotwis and Blake, who were next in the venire to be seated in the jury box. She also

84

asserts that she was prejudiced by using the two peremptory challenges allotted for alternate jurors to strike Kotwis and Blake. Given our conclusion that there is no showing that the trial court abused its discretion in rejecting her claims to remove Kotwis and Blake for cause, we reject these contentions.

{¶ 113} Our conclusion is not affected by the fact that an alternate juror was seated on the jury during trial when one juror had to be removed because of an ailment. We have held that a defendant may claim prejudice when she unsuccessfully challenges a venireman for cause and that venireman would have been seated as an alternate juror if the defense had not exercised a peremptory challenge. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61, fn. 1; see, also, *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 61; *State v. Tyler*, 50 Ohio St.3d at 31–32, 553 N.E.2d 576. But implicit in that rule is the requirement of a finding that the trial court should have excused the juror for cause. *Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61, quoting *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144 ("Ohio law recognizes that 'where the defense exhausts its peremptory challenges before the full jury is seated, *the erroneous denial* of a challenge for cause in a criminal may be prejudicial'"). (Emphasis added.) Here, we have already concluded that the trial court did not abuse its discretion in failing to sustain the challenges for cause raised against the veniremen.

{¶ 114} Moreover, Roberts fails to show that any of the jurors ultimately seated were other than impartial. Thus, she fails to demonstrate a violation of the Due Process Clause of the United States Constitution. See *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682. Accordingly, we reject Roberts's suggestion that there was error in the trial court's decisions in empaneling the jury.

*Roberts I*, 110 Ohio St. 3d at 83-85.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court held that "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  The Ohio Supreme Court held that the trial court did not err in finding no cause under *Witt* to excuse prospective jurors Kotwis and Blake.  *Roberts I*, 110 Ohio St. 3d at 83-84.

Roberts argues that the state court unreasonably applied *Witt*, because the bias of the two potential jurors and the prejudice to her from being forced to use her peremptory challenges to later excuse them "was clear." (Doc. 24 at 50.)  She contends: "The judge's refusal to remove [the two prospective jurors] rendered Ms. Roberts' jury panel unconstitutionally constituted." (Doc. 10 at 111.)  As Respondent correctly argues, however, even if the trial court did err in failing to excuse the two prospective jurors for cause, which Roberts has not established, Roberts would have no federal constitutional claim.

In *Ross v. Oklahoma*, 487 U.S. 81 (1988), the Supreme Court observed that in its earlier decision in *Gray v. Mississippi*, 481 U.S. 648, 663 (1987), it expressly "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross*, 487 U.S. at 88.[11]  It explained that it has "long recognized that peremptory challenges are not of constitutional dimension[,]" as "[t]hey are a means to achieve the end of an impartial jury." *Id.* (citing *Gray*, 481 U.S. at 663; *Swain v. Alabama*, 380 U.S. 202, 219 (1965); *Stilson v. United States*, 250 U.S. 583, 586 (1919)).  The Court held that "so long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id*.  Roberts makes no claim that the jury actually seated in his trial was impartial. Her sixth ground for relief, therefore, fails.

---

[11] Roberts cites a Fifth Circuit case predating *Ross* for the proposition that "[a]ny claim of an erroneous ruling denying a challenge for cause in reality reduces the number of peremptory challenges that are available and thereby constitutes reversible error." (Doc. 10 at 109 (citing *United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976)).)  She further does not respond in her traverse to Respondent's reliance on *Ross*.  (*See* Doc. 24 at 48-50.)

## VI.    Seventh Ground for Relief:  *Competency to Stand Trial*

Roberts claims in her seventh ground for relief that the trial court violated her due process rights by failing to conduct full hearings on her competence to stand trial before the penalty phase of her trial and the first resentencing hearing in 2007.  (Doc. 10 at 111-16.) Respondent argues that the claim is procedurally defaulted, defectively pleaded, and without merit.  (Doc. 15 at 40-45; Doc. 26 at 23-25.)

### A.  Procedural Posture

Roberts raised two claims relating to her competency to stand trial in her second direct appeal to the Ohio Supreme Court – one regarding her competency at the penalty phase of her trial and the other regarding her competency at the 2007 resentencing.  (Doc. 12-6 at 81-89 (Appellant Merit Brf.).)  The court reviewed her claim as it related to the 2007 resentencing on the merits, but it found the other claim, related to her original sentencing hearing, barred by *res judicata* because it could have been raised on her first direct appeal but was not.  *Roberts II*, 137 Ohio St. 3d at 249-50 (¶¶ 94, 95); *see State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising claims that could have been raised on direct appeal from the judgment of conviction).  Roberts also raised these claims in her initial petition for post-conviction relief in the state trial court.  (Doc. 12-13 at 59-66.) She withdrew them, however, in a later memorandum submitted to the court.  (*See id*. at 322-23.)

Respondent argues in his return of writ that Roberts' withdrawal of the claims on post-conviction review resulted in their "express waiver" and procedural default for failure of fair presentation.  (Doc. 15 at 44-45.)  Roberts contends both sub-claims were adjudicated on the merits.  (*See* Doc. 24 at 51-52.)  The Court disagrees with both parties.  The last state court to

review the claims was the Ohio Supreme Court on direct appeal, which found the original-sentencing competency claim barred by *res judicata* and adjudicated the resentencing competency claim on the merits.  The resentencing competency sub-claim is therefore preserved for federal habeas review, and was not waived.  The original-sentencing competency sub-claim, however, is procedurally defaulted based on *res judicata*.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original) (in determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts review the "last *explained* state-court judgment" on the federal claim at issue); *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) (Ohio's *res judicata* rule is an adequate and independent state ground to procedurally bar claims asserted in federal habeas actions).  Roberts offers no cause for, or prejudice resulting from, the default, and the original-sentencing competency sub-claim is therefore defaulted.

Respondent changes his argument in his sur-reply, but to no avail.  He argues that this claim is procedurally defaulted because Roberts did not fairly present a *procedural* due process competency claim to state courts, only a *substantive* due process competency claim. (Doc. 26 at 24-25.)  It is true that in both of the competency claims she raised on direct appeal, Roberts focused primarily on her substantive due process claim that she was in fact incompetent.  But, as Respondent also acknowledges (*id*. at 24), Roberts challenged the original sentencing and later resentencing on procedural grounds in those claims, maintaining that the trial court failed to conduct "full evidentiary hearing[s]" with sufficient evidence and an independent psychologist.  (*See, e.g.,* Doc. 12-16 at 81, 83-84, 87, 89.)  This argument, therefore, fails, and Roberts' resentencing competency sub-claim is preserved for federal habeas review.

### B.  Merits Analysis

Regardless of their procedural status, both sub-claims lack merit.

The Supreme Court has long held that the Fourteenth Amendment forbids the criminal prosecution of a defendant who is not competent to stand trial.  *E.g.*, *Medina v. California*, 505 U.S. 437, 439 (1992).  The test for evaluating a defendant's competency is whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him.'"  *Drope v. Missouri*, 420 U.S. 162, 171 (1975) (quoting *Dusky v. United States,* 362 U.S. 402, 402 (1960))*.*

Furthermore, a trial court must "observe procedures adequate to protect a defendant's [due process] right not to be tried or convicted while incompetent to stand trial . . . ."  *Id.* at 172 (citing *Pate v. Robinson*, 383 U.S. 375, 385-86 (1966)).  Where there is sufficient evidence of a defendant's incompetence at the time of trial, therefore, a trial judge has the duty to order a hearing *sua sponte.  Robinson*, 383 U.S. at 385-86.  And even when a defendant is competent at the beginning of trial, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."  *Drope.* 420 U.S. at 181.

The Supreme Court has never "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure" for determining competency.  *Id.* at 172.  Nevertheless, the Court has explained that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required,

but that even one of these factors standing alone may, in some circumstances, be sufficient." *Id*. at 180; *see also Robinson*, 383 U.S. at 385-86.

Nor has the Court established what specific procedures a trial court must employ once sufficient doubt about a criminal defendant's competency is raised and a hearing is required. Rather, "'[t]raditionally, due process has required that only the *most basic* procedural safeguards be observed; more subtle balancing of society's interests against those of the accused ha[s] been left to the legislative branch." *Medina*, 505 U.S. at 453 (quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)) (emphasis added).  In *Medina v. California*, therefore, the Court held that a California state statute allocating the burden of proof to a criminal defendant to prove incompetence and establishing a presumption of competence did not violate procedural due process.  *Id*. at 452-53.  In so ruling, the Court emphasized that, consistent with its precedents, "it is enough that the State affords the criminal defendant on whose behalf a plea of incompetence is asserted a *reasonable opportunity* to demonstrate that he is not competent to stand trial," *id*. at 451 (emphasis added), and provide the "*minimum assistance necessary*" to assure a "fair opportunity to present his defense" and "to participate meaningfully in [the] judicial proceedings[,]" *id*. at 451 (citation and internal quotation marks omitted) (emphasis added).  Similarly, in *Pate v. Robinson*, the Court ordered only that the trial court had a duty to order *sua sponte* an "*adequate* hearing" where "uncontradicted testimony" of the defendant's history of "pronounced irrational behavior" met the state statutory standard of "bona fide doubt" about the defendant's competence to stand trial. *Robinson*, 383 U.S. at 385-86 (emphasis added).

Due process claims relating to a trial court's procedures for evaluating a defendant's competency to stand trial are governed by § 2254(d)(1).  *See, e.g., Hill v. Shoop*, 11 F.4th 373,

434 (6th Cir. 2021) (assessing petitioner's failure-to-hold-a-competency-hearing claim under
28 U.S.C. § 2254(d)(1)); *Carter v. Bogan*, 900 F.3d 754, 770 (6th Cir. 2018) (noting issue of
whether evidence that arose after the petitioner's competency hearings should have led the
trial court to reevaluate its competency finding is an issue of law assessed under 28 U.S.C. §
2254(d)(1)); *see also Franklin v. Bradshaw*, 695 F.3d 439, 450 (6th Cir. 2012) ("[T]he trial
court's failure to hold a midtrial competency hearing *sua sponte* was not a 'decision that was
contrary to, or involved an unreasonable application of, clearly established Federal law.'"
(citing 28 U.S.C. § 2254(d)(1))); *but see id*. at 451 (indicating later that failure-to-hold-a-*sua-
sponte*-competency-hearing claim is subject to review pursuant to 28 U.S.C. § 2254(d)(2)).

Additionally, "'the range of reasonable judgment [under § 2254(d)] can depend in part
on the nature of the relevant rule'" that the state court must apply. *Renico v. Lett*, 559 U.S.
766, 776 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Because
AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably*, it
follows that "'[t]he more general the rule'" at issue — and thus the greater the potential for
reasoned disagreement among fair-minded judges — "'the more leeway [state] courts have in
reaching outcomes in case-by-case determinations.'" *Id*. (quoting *Alvarado*, 541 U.S. at 664)
(emphasis in original).

### 1. Original sentencing

Roberts set forth her claim that the trial court did not provide her an adequate hearing
on her competency before the penalty phase of her trial in these few sentences:

> At her first trial, Ms. Roberts may not have been competent to make knowing
> and intelligent decisions concerning the penalty phase because of her severe
> mental illness untreated at the time. The decision to waive mitigation and her
> unsworn statement to the jury were illogical, disjointed, and self-defeating. It is
> more likely than not she could not assist counsel in her representation in a

> meaningful fashion. . . .  Ms. Roberts's constitutional rights to due process and a
> fair trial were therefore violated.

(Doc. 10 at 112-13.)  She adds that in her unsworn statement, she asked the jury for a death

sentence, citing racial inequity between her and Jackson's sentences, explained her decision to

waive mitigation evidence.  (*Id.* at 115.)  And her counsel expressed to the judge their

frustration with their inability to communicate with her.  (*Id.*)

Before the penalty phase began, the trial judge conducted an in-camera hearing on the

record to address whether Roberts' waiver of the presentation of mitigation evidence was

knowing, intelligent, and voluntary.  (*See* Doc. 11-3 (Trial Tr.) at 1746-61.)  The judge first

questioned Roberts himself about her decision.  (*Id.* at 1747-50.)  Then Roberts' trial counsel

addressed the court.  Attorney Ingram explained that for more than five days he and attorney

Juhasz had fully discussed with Roberts the importance of mitigation evidence and the

evidence they had prepared for trial, and although they did not agree with Roberts' decision to

waive her right to present that evidence, they believed she was competent to make it.  (*Id.* at

1750-53.)  He stated that it was his "personal and professional opinion that Donna's decision[-

]making process was rational and that she's competent to make the decision."  (*Id.* at 1751.)

Attorney Juhasz testified that, "having met with Donna, and Mr. Ingram and conferred with

Dr. Eberle, I am comfortable that what Donna is doing is . . . indeed, knowing and voluntary

and intelligent."  (*Id.* at 1753.)

Roberts' counsel then presented a psychologist engaged by the defense, Dr. Thomas

Eberle, who had examined Roberts a couple months before.  (*Id.* at 1754.)  Questioned by

both the judge and prosecutor, the expert testified that after his previous evaluation and having

met with Roberts for "a couple hours" that morning, he found "no psychiatric or

psychological abnormality that would prevent her from having the faculties needed to make

that decision in a rational way." (*Id*. at 1753-58.)  After again directly questioning Roberts about her decision, the judge ultimately found her waiver "freely, knowingly[,] voluntarily, [and] intelligently" made and "done in a rational basis, which is predicated on the testimony of the doctor that she's competent to make that decision." (*Id*. at 1758-61.)

Roberts does not explain how the trial court's hearing was insufficient in any regard such that it violated her due process rights.  The judge conducted a hearing at which he questioned Roberts and her attorneys, and he and the prosecutor questioned the defense's own expert.  Roberts merely offers equivocal and conclusory allegations, citing only to her decision to waive the presentation of mitigation evidence and her allocution as evidence that it was "more likely than not she could not assist counsel in her representation in a meaningful fashion. . . ."  (Doc. 10 at 113.)  Roberts has not demonstrated that the trial court failed to provide "basic" procedures to protect her due process right to "a reasonable opportunity" to show that she is able to provide the "minimum assistance necessary" to assure a "fair opportunity to present [her] defense" and "to participate meaningfully in [the] judicial proceedings." *Medina*, 505 U.S. at 453.  This claim, therefore, is without merit.

### 2. 2007 resentencing

Roberts further argues that the trial court violated her due process right to a full and fair competency hearing at the 2007 resentencing.  The Ohio Supreme Court, the last state court to address this claim, wrote:

> {¶ 82} A defendant is competent to stand trial if she has sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding and has a rational as well as a factual understanding of the proceedings against her. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). In her sixth proposition of law, Roberts contends that the state failed to prove that she met the standard of competency during her 2007 resentencing proceeding.

{¶ 83} Roberts contends that "[t]he trial court may not conduct a sentencing hearing for a death-eligible defendant where the record does not establish by a preponderance of the evidence that the defendant is legally competent," that "there was insufficient evidence of her ability to assist counsel in preparation for the hearing," and that "[w]i*thout evidence* that Roberts *could* properly assist counsel, the [sentencing] hearing should not have been conducted." (Emphasis added.)

{¶ 84} Roberts's argument misallocates the burden of persuasion. R.C. 2945.37(G) provides:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

Thus, the question is not whether the state introduced sufficient evidence to prove Roberts competent, but whether a preponderance of the evidence proved *248 that she was not competent. S*ee State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 45; *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28; *State v. Hicks*, 43 Ohio St.3d 72, 79, 538 N.E.2d 1030 (1989). *See also Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (assigning defendant burden of proving incompetency does not violate due process).

{¶ 85} The trial court appointed Dr. Thomas Gazley, a psychologist with the Forensic Psychiatric Center of Northeast Ohio, to conduct a competency evaluation. Dr. Gazley interviewed Roberts, had conversations with her defense attorneys and with the director of mental-health services at the Ohio Reformatory for Women, where Roberts was incarcerated, and reviewed her mental-health chart from the reformatory. Dr. Gazley was the sole witness at the hearing on Roberts's competency. After he testified, his report was admitted without objection.

{¶ 86} Dr. Gazley testified that Roberts had the ability to "understand the sentencing process and * * * to understand what the alternatives available are to her as well as * * * to provide her counsel with any mitigating circumstances, should she desire to do so." He concluded that based on her ability to interact with him and to provide information and a coherent account of her perceptions about the situation, she would be able to do so with her defense counsel as well. Dr. Gazley further testified: "[W]hen I saw [Roberts] earlier this year, she was very coherent, her comments and responses to my questions were very relevant and * * * to the point." Dr. Gazley noted in his report that Roberts's "memory for both

recent and remote events is intact" and that she "maintains the capacity for abstract thinking."

{¶ 87} Dr. Gazley knew that Roberts had been involved in a number of automobile accidents and had had several head injuries. He also knew that she had been diagnosed with depression and that she had engaged in suicidal thinking, which he attributed to her depression. However, Dr. Gazley testified that Roberts's depression had responded to treatment; by the time he saw her, her symptoms were in remission, and "[s]he was progressively getting better."

{¶ 88} Dr. Gazley's report states that his opinion, reached "with reasonable psychological certainty," is that Roberts "currently has the cognitive ability and functioning to understand, in a general way, the penalties that could or will be imposed as a result of her conviction" and that she "has the capacity to communicate relevant facts in mitigation to her attorney."

{¶ 89} Roberts argues that there was no testimony relevant to the issue of Roberts's ability to work with and assist counsel. Even if that were so, Roberts could not prevail, because competency is presumed and the defense bears the burden of proving incompetency. R.C. 2945.37(G).

{¶ 90} However, Dr. Gazley's testimony was relevant to the criteria for competency, including Roberts's ability to assist counsel. Dr. Gazley testified that Roberts was able to understand the sentencing process and what alternatives were available and to provide mitigating circumstances. After interviewing Roberts, Dr. Gazley concluded that Roberts had the ability to interact with defense counsel and to provide information and a coherent account of her own perceptions about the situation to her counsel.

{¶ 91} Roberts contends that Dr. Gazley did not know her psychological history before her incarceration and that he had neither reviewed her Social Security records nor obtained a neuropsychological evaluation of the effects of her head injury. However, Dr. Gazley explained that none of this mattered to his evaluation of Roberts's competency at the time of resentencing, because that evaluation was based on his interview with Roberts:

> I base my opinion * * * on the information that I receive from the subject at the time I do the interview. * * * I make my decision about the opinion based on the responses the person provides me to the questions I asked that I believe are related to the questions the Court needs to address, rather than the [past] diagnosis.

{¶ 92} A criminal defendant's competency to stand trial, including competency to assist in a sentencing proceeding, is a question of fact. *See Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (upholding state-court finding of competency that was fairly supported by the record); *State v. Vrabel*, 99 Ohio

St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33 (deferring to trial court's "factual findings" that defendant was competent).

{¶ 93} Dr. Gazley's testimony supports the trial court's finding that Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007. Because "there was some reliable, credible evidence supporting" the trial court's finding that Roberts was competent, we will not disturb that finding. *Vrabel* at ¶ 33. Roberts's sixth proposition of law is overruled.

*Roberts II,* 137 Ohio St. 3d at 248-49.

Roberts argues that the state court's decision unreasonably applied clearly established Supreme Court precedent, as the trial court did not afford her a "reasonable opportunity to demonstrate" her incompetence. (Doc. 24 at 54-57.) First, she claims the trial court erred by permitting the court-appointed psychologist, Dr. Gazley, to conduct only a "limited" competency evaluation. (*Id*. at 54.) The expert's evaluation included just a one- to one-and-a-half-hour review of her prison records and a two-and-a-half-hour examination of her. (*Id*. (citing Doc. 11-4 (Hrg. Tr.) at 20).) But it should have included, according to Roberts, a review of records of her medical history before prison, including her head injuries and mental health problems; interviews of family members regarding her medical history; interviews of defense counsel about her irrational and uncooperative behavior at trial; and direct observation of her interaction with counsel. (*Id*. at 54-55.) Roberts further contends the trial court erred by failing to grant the defense's requests for a full psychological evaluation by an independent neuropsychologist. (*Id*. at 55.)

As explained above, however, the Supreme Court has made clear that due process requires "only the most basic procedural safeguards" for competency hearings, *Medina*, 505 U.S. at 453, such as an "adequate hearing," *Robinson*, 383 U.S. at 386, and the court's consideration of evidence of "irrational behavior, [her] demeanor at trial, and any prior

medical opinion on competence to stand trial," *Drope*, 420 U.S. at 173.  There is no clearly established Supreme Court precedent setting forth particular standards for psychological evaluations or requiring the provision of independent experts, as Roberts suggests.  Indeed, the Ohio Supreme Court reasonably concluded that Roberts' 2007 competency hearing afforded her the "basic procedural safeguards" that the Court has established are required for defendants to demonstrate incompetency.  *Medina*, 505 U.S. at 451-53.

The trial court appointed a competent psychologist with strong credentials, whose evaluation included examining Roberts, speaking with defense counsel, and reviewing numerous records – including police reports, court filings, and prison records.  (Doc. 11-4 (Hrg. Tr.) at 17-18; 20-21.)  The court conducted a hearing at which defense counsel and the judge questioned Dr. Gazley about his evaluation and findings.  (*Id*. at 24-37; 38-40.)  The expert's ten-page report was admitted without objection.  (*Id*. at 18-19.)  Furthermore, the trial judge himself had ample opportunity to witness Roberts' demeanor at her trial, including the competency hearing held before the sentencing phase.  He also permitted defense counsel to supplement the record with additional mental-health records.  (*Id*. at 42, 44.)

The Ohio Supreme Court's decision, therefore, did not misapply clearly established Supreme Court precedent in rejecting this claim, and it is denied.

**VII.    Eighth Ground for Relief: *Sentencing Error***

For her eighth ground for relief, Roberts claims that the sentencing court's use of the nature and circumstances of her offense as non-statutory aggravating factors in the sentencing decision violated her due process rights.  (Doc. 10 at 116-19.)  Roberts presented this claim on her third direct appeal to the Ohio Supreme Court, and it is preserved for habeas review.

In rejecting this claim, the state court decided:

{¶ 77} The third proposition of law contends that the trial court improperly used the nature and circumstances of the offense as an aggravating circumstance based on the following language from the sentencing opinion:

> Roberts planned and plotted for the murder of Fingerhut over a period of at least three months. She conspired with Jackson, her imprisoned lover, to murder Fingerhut for his life insurance proceeds. The murder plan was well documented through telephone calls recorded from Jackson's residence[:] the Lorain Correctional Institut[ion]. In addition, detailed letters were exchanged between the loving couple outlining their plans. These plans included the acquisition of supplies, the procurement of a hotel room, and the promise of a new vehicle for Jackson—all provided by Roberts. Ultimately, Roberts provided access to the residence in order for Jackson to carry out the murder as planned.

> Despite these intricate details, Roberts "forgot" to include Jackson as one of her named lovers to the police during interviews. In addition, Roberts attempted to thwart the investigation into the Fingerhut murder by implicating other individuals[,] not Jackson. In addition, Roberts's feigned emotional outbursts over Fingerhut's death do not correlate to the insidious behavior relative to the same.

> Therefore, the court has granted little to no weight to any of the mitigating factors outlined by Roberts in her unsworn statement or her allocution.

{¶ 78} Roberts argues that her planning and preparation, her pecuniary motive, and her attempts to deceive the police and impede their investigation are part of the nature and circumstances of the offense. Pursuant to R.C. 2929.04(B), the nature and circumstances of the offense are mitigating factors and may not be weighed on the side of aggravation in determining whether aggravation outweighs mitigation. *See generally State v. Stumpf*, 32 Ohio St.3d 95, 99, 512 N.E.2d 598 (1987); *State v. Wogenstahl*, 75 Ohio St.3d 344, 354–355, 662 N.E.2d 311 (1996); *State v. Davis*, 76 Ohio St.3d 107, 120, 666 N.E.2d 1099 (1996). Since the trial court used these facts to determine that Roberts's proffered mitigating factors were to be "granted little or no weight," she contends that the trial court in effect weighed them against mitigation.

{¶ 79} This contention lacks merit. "When a court correctly identifies the aggravating circumstances in its sentencing opinion, we will presume that the court relied only on those circumstances and not on nonstatutory aggravating circumstances." *State v. Clemons,* 82 Ohio St.3d 438, 447, 696 N.E.2d 1009 (1998). That presumption applies here because the sentencing opinion correctly identifies the aggravating circumstances in this case, and Roberts failed to overcome the presumption.

{¶ 80} R.C. 2929.03(D)(1) requires the court to consider "the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." Aggravating circumstances here consist of felony-murder specifications pursuant to R.C. 2929.04(A)(7), which include findings that "the offender * * * if not the principal offender, committed the offense with prior calculation and design." Thus, the detailed planning of this killing, which was referenced in the sentencing opinion, is evidence that supports the finding of prior calculation and design and therefore was properly considered as part of the statutory aggravating circumstances in this case.

{¶ 81} Moreover, it is settled law that the nature and circumstances of the offense may also be used to explain why the aggravating circumstances outweigh the mitigating factors. *See, e.g., State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 183, citing *State v. Sheppard*, 84 Ohio St.3d 230, 238, 703 N.E.2d 286 (1998). In this case, the facts cited in the sentencing opinion are relevant to the mitigation offered because they refute the defendant's factual assertions.

{¶ 82} In her unsworn statement and in her allocution, Roberts asserted that she and Fingerhut had a good relationship and loved each other deeply. The trial court reasonably viewed these statements to be inconsistent with the relationship she had maintained with Jackson, her conspiracy with him to murder Fingerhut, her pecuniary motive for that murder, and her feigned emotional outbursts during police interviews. The sentencing opinion properly referred to these facts to refute her claims.

{¶ 83} The sentencing opinion does not treat the nature and circumstances of the offense as nonstatutory aggravating circumstances. Instead, the opinion correctly identifies the aggravating circumstances found by the jury's verdict and then discusses the facts of the case as they relate to those aggravating circumstances and to the claimed mitigating factors. Roberts's third proposition of law is therefore overruled.

*Roberts III*, 150 Ohio St. 3d at 61-63.

Roberts argues that the Ohio Supreme Court unreasonably applied Supreme Court precedent in concluding that the trial court properly considered the nature and circumstances of her offense in weighing the aggravating and mitigating circumstances present in her case for sentencing.  (Doc. 24 at 60-62.)  The Court disagrees.

In imposing capital punishment, states "ha[ve] a constitutional responsibility to tailor and apply [the] law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  Part of that responsibility is "to define the crimes for which death may be sentenced in a way that obviates 'standardless [sentencing] discretion.'"  *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 196 n.47 (1976)).  Some states have failed in that regard by relying on constitutionally invalid aggravating circumstances to define those who may be sentenced to death.  *See, e.g., id.* (rejecting the Georgia Supreme Court's affirmance of a sentence of death in a case in which the sole aggravating circumstance was the finding that the offense was "wantonly vile, horrible and inhuman," as such words were insufficient to serve as a restraint on the "arbitrary and capricious infliction of the death sentence").  States also infringe upon defendants' due process rights when they fail to adhere to their own capital sentencing statutes.  *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("Where . . . a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law.  The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion . . . .").

The Supreme Court has held, however, that "no constitutional claim is stated where a state's highest court either concludes that no extra-statutory factors were considered at the trial level . . . or independently reweighs the aggravating and mitigating circumstances without reference to the extra-statutory factor improperly relied upon by the lower state courts . . . ." *Fox v. Coyle*, 271 F.3d 658, 666-67 (6th Cir. 2001) (citing *Barclay v. Florida*, 463 U.S.

100

939, 951, 956-58 (1983); *Wainwright v. Goode*, 464 U.S. 78, 80-82, 86-87 (1983); *Clemons v. Mississippi*, 494 U.S. 738, 746-47 (1990)).

Roberts alleges that the trial court considered the nature and circumstances of her offense as a non-statutory aggravating circumstance, which, while not constitutionally impermissible, was improper under Ohio's capital sentencing statutes.  But she has not demonstrated that the Ohio Supreme Court's decision affirming the trial court's sentencing judgment or its own independent sentencing evaluation in her case violated Ohio law.

First, the Ohio Supreme Court determined that the trial court did not treat the nature and circumstances of Roberts' crime as non-statutory aggravating circumstances.  Roberts asserts that the court was incorrect and the trial court improperly "us[ed] the nature and circumstances of the offense to zero-out the mitigating factors."  (Doc. 24 at 61.)  But she seemingly bases her conclusion only on the order in which the trial court presented its findings.  According to Roberts, the court first discussed the mitigating factors; next, it described the nature and circumstances of the offense; and then it "decided to zero-out the mitigating factors based on the nature and circumstances of the offense."  (*Id.* at 62.)  But the court stated no such thing.  It concluded that it had "granted little to no weight to any of the mitigating factors outlined by Roberts in her unsworn statement or her allocution."  *Roberts III*, 150 Ohio St. 3d at 62.  The Ohio Supreme Court reasonably determined that the trial court included facts related to the offense in its opinion to (1) serve as "evidence that supports the finding of prior calculation and design," which was part of the statutory aggravating circumstances in the case, and (2) refute factual assertions that Roberts had offered in mitigation – both permissible sentencing considerations under Ohio law.  *Id*. at 26-63.

Roberts offers no legal basis to question the Ohio Supreme Court's interpretation of the sentencing opinion or Ohio law governing it.

Second, the Ohio Supreme Court cured any defect in the trial court's resentencing by reweighing the aggravating and mitigating circumstances.  Roberts argues that Ohio's high court repeated the trial court's error and "used some nature-and-circumstances evidence to weigh against (indeed, entirely negate) the principal-offender mitigation evidence."  (Doc. 24 at 62-63.)  She cites this finding of the court:

> {¶ 111} The statutory mitigating factor set forth in R.C. 2929.04(B)(6) exists in this case, since the evidence at trial establishes that Roberts was not the principal offender in the aggravated murder. Nonetheless, she had a central role in the murder, which diminishes the weight of this factor. *See State v. Herring*, 94 Ohio St.3d 246, 267, 762 N.E.2d 940 (2002). There is no other evidence of the statutory mitigating factors in this record. *See Stumpf*, 32 Ohio St.3d at 101–102, 512 N.E.2d 598 (defendant bears burden of proving existence of mitigating factors).

*Roberts III*, 150 Ohio St. 3d at 68.  And she claims the court's subsequent discussion of the nature and circumstances of the offense demonstrates that it then improperly weighed facts relating to her role in the murder against the mitigating weight of the fact that she was not a principal offender, as follows:

> {¶ 114} Finally, the nature and circumstances of the offense offer nothing in mitigation. Motivated at least in part by greed, she assisted Jackson in murdering Fingerhut in his home, which they planned prior to Jackson's release from prison.

*Id.*

But, again, Roberts presents no compelling argument based on Ohio law on which to challenge the Ohio Supreme Court's reweighing of the mitigating and aggravating circumstances presented in Roberts' case.  Roberts, therefore, has not demonstrated that the Ohio Supreme Court's decision rejecting this claim was contrary to, or unreasonably applied, Supreme Court precedent or was based on an unreasonable determination of fact.

## VIII.  Tenth Ground for Relief: *Substitute Judge at Resentencing*

For her tenth ground for relief, Roberts claims her due process rights were violated when a new trial judge was assigned to preside over her second resentencing, and the judge did not permit her to speak on her own behalf or to submit new testimony in mitigation.  (Doc. 10 at 123-26.)   Roberts presented this claim based on both Ohio statutory and federal constitutional law to the Ohio Supreme Court on her third direct appeal, and it is preserved for habeas review.[12]

In considering her federal claim, the state court decided:

{¶ 50} Stressing the importance of the trial judge's ability to see and hear the defendant's allocution and the evidence adduced in the penalty phase, Roberts contends that it is impossible for a judge to properly consider or weigh the mitigating factors present in the case by reviewing a cold record, and she urges that such a procedure infringes on a capital defendant's ability to have mitigation properly presented and accurately assessed. She further contends that the Eighth Amendment requires that the sentencer in a capital case "must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh*, 492 U.S. 302, 327–328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), overruled on other grounds, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

{¶ 51} Roberts cites *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), which states that the sentencer in a capital case may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that defendant proffers as a basis for a sentence less than death." (Emphasis sic.) *See also Eddings v. Oklahoma*, 455 U.S. 104, 113–114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence" [emphasis sic] ); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (testimony about defendant's good behavior in jail pending trial was relevant and therefore could not be excluded); *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (death sentence invalid when instructions precluded jury's consideration of mitigating

---

[12] Respondent argues that Roberts did not present the federal constitutional basis for this claim on direct appeal to the Ohio Supreme Court, and this claim is therefore not cognizable on federal habeas review.  (Doc. 15 at 48-49.)   But, as the state court opinion makes clear, Roberts raised, and the court fully addressed, the federal constitutional ground for this claim.  *See Roberts III*, 150 Ohio St. 3d at 52 (¶ 28), 56-58 (¶¶ 50-59).

circumstances not enumerated in statute); *Penry* at 319–328, 109 S.Ct. 2934 (instructions preventing jury from giving effect to evidence of intellectual disability were inconsistent with *Lockett* and *Eddings*).

{¶ 52} However, none of these cases address the question presented in this case. In *Saffle v. Parks*, 494 U.S. 484, 490, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the Supreme Court explained, "There is no dispute as to the precise holding in [*Lockett* and *Eddings*]: that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial." *See also Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence"). We recognized as much in *Roberts II*: "Each case in the *Lockett–Eddings–Skipper–Hitchcock* tetralogy involved the trial court's exclusion of, or refusal to consider, evidence in the original sentencing proceeding." 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 34.

{¶ 53} In this case, the issue is not what information is constitutionally relevant, but rather, it is whether a sentencing judge in a capital case may consider mitigation presented by the defendant without having *personally* observed its presentation in court.

{¶ 54} Here, the assignment of Judge Rice to conduct the third sentencing hearing based on review of the record and without hearing additional mitigating evidence did not "bar relevant mitigating evidence from being presented and considered during the penalty phase." *Saffle* at 490, 110 S.Ct. 1257. Roberts had an opportunity to present mitigating evidence during the penalty phase of her trial, but she elected not to do so. Previously, she had made an unsworn statement and had an opportunity for allocution. Judge Rice reviewed and considered her unsworn statement, her allocution, and the evidence in the trial record before imposing sentence for the third time.

{¶ 55} *Saffle* rejected a capital defendant's attempt to derive from *Lockett* and *Eddings* "a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider the mitigating evidence." (Emphasis sic.) *Saffle*, 494 U.S. at 490, 110 S.Ct. 1257, 108 L.Ed.2d 415. Likewise, Roberts seeks to derive from *Lockett* and *Penry* a rule "relating, not to what mitigating evidence the [judge] must be permitted to consider," but to how the judge must obtain it (i.e., by live presentation as opposed to reviewing a record). Neither *Lockett* nor its progeny state or imply any such rule.

{¶ 56} Indeed, the California Supreme Court has rejected similar constitutional claims in two capital cases: *People v. Espinoza*, 3 Cal.4th 806, 12 Cal.Rptr.2d 682, 838 P.2d 204 (1992), and *People v. Lewis*, 33 Cal.4th 214, 14 Cal.Rptr.3d 566, 91 P.3d 928 (2004).

{¶ 57} In *Espinoza*, the trial judge became ill during the guilt phase of the trial and another judge reviewed the transcript and completed the trial. *Espinoza* at 827–828, 12 Cal.Rptr.2d 682, 838 P.2d 204. *Lewis*, like this case, involved a capital case that had been remanded for resentencing due to postverdict error. *Lewis* at 218, 14 Cal.Rptr.3d 566, 91 P.3d 928. The original trial judge withdrew, and the resentencing was assigned to a different judge, who denied a defense request to present the guilt- and penalty-phase evidence by live testimony and proceeded to sentence the defendant on the basis of the record. *Id.* at 224, 14 Cal.Rptr.3d 566, 91 P.3d 928.

{¶ 58} In both cases, the defendants argued that because the substitute judge had not personally heard all the evidence, he could not properly impose a death sentence. And in both cases, the court rejected that argument. *Espinoza* at 830, 12 Cal.Rptr.2d 682, 838 P.2d 204; *Lewis* at 226, 14 Cal.Rptr.3d 566, 91 P.3d 928. The court in *Lewis* explained: "[W]hen the original trial judge is unavailable, necessity requires the replacement judge to evaluate the credibility of the witnesses as best he or she can from the written record. We find no constitutional obligation to provide more." *Id*.

{¶ 59} In the instant case, the retirement and death of the original trial judge and the substitution of Judge Rice did not deny Roberts the ability to present mitigating evidence or to have it considered by the sentencer. Her claim to the contrary is not supported by the *Lockett* line of cases she cites, and both *Lewis* and *Espinoza*, the only cases we have found that address this issue in the capital-sentencing context, reject the notion that a capital defendant may be sentenced to death only by a judge who has personally presided over one or both phases of the trial. We therefore reject this Eighth Amendment argument.

{¶ 60} Accordingly, we overrule the first and fourth propositions of law.

*Roberts III*, 150 Ohio St. 3d at 56-58.

Roberts claims the Ohio Supreme Court misapplied *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), by failing to apply them to her case. (Doc. 24 at 65-66.)  The Court disagrees.

As the state court noted, the Supreme Court has explained, "There is no dispute as to the precise holding in [*Lockett* and *Eddings*]: that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial.'" *Saffle v. Parks*, 494 U.S. 484, 490 (1990).  And, as the Ohio Supreme Court further observed,

in *Saffle v. Parks*, the Supreme Court "rejected a capital defendant's attempt to derive from *Lockett* and *Eddings* 'a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider the mitigating evidence.'" *Roberts III*, 150 Ohio St. 3d at 58 (quoting *Saffle*, 494 U.S. at 490 (emphasis in original)).  The court then reasonably concluded that *Saffle* foreclosed Roberts' claim that her final sentencing before a substitute judge violated the Eighth Amendment, as she "similarly [sought] to derive from *Lockett* and *Penry* a rule "relating, not to what mitigating evidence the [judge] must be permitted to consider," but to *how* the judge must obtain it (i.e., by live presentation as opposed to reviewing a record)."  *Id*. (emphasis in original).

The Ohio Supreme Court's reasoning applies with even more force here.  *Lockett* and its progeny did not "clearly establish" for purposes of § 2254(d)(1) that "a capital defendant may be sentenced to death only by a judge who has personally presided over one or both phases of the trial."  *Id*.  The Supreme Court emphasized in *Carey v. Musladin*, 549 U.S. 70 (2006), that "clearly established Federal law" under § 2254(d)(1) consists of "Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context." *House v. Hatch*, 527 F.3d 1010, 1017 (10th Cir. 2008).  "In conducting the 'clearly established' inquiry," therefore, "lower courts must narrowly construe Supreme Court precedents and, as a consequence, 'clearly established' law 'consist[s] only of something akin to on-point holdings.'" *Pouncy v. Palmer,* 846 F.3d 144, 161 (6th Cir. 2017) (quoting *House*, 527 F.3d at 1015).  In *Wright v. Van Patten*, 552 U.S. 120 (2008), for example, the Court

reversed a grant of habeas relief because no Supreme Court decision had "squarely address[ed]" the issue or "clearly establish[ed]" that law developed in a different context applied to the facts of that case.  *Id.* at 125.   As there was no clearly established Supreme Court precedent controlling this claim, the Ohio Supreme Court's decision was not an unreasonable application of clearly established federal law, and this claim lacks merit.

### IX.     Eleventh Ground for Relief: *State Post-Conviction Procedure*

Roberts contends in her eleventh ground for relief that the trial court on post-conviction review violated her due process rights when it failed to grant her an evidentiary hearing to allow her to establish the prejudice of the errors that occurred during her trial. (Doc. 10 at 126-28.)

This claim is not cognizable on federal habeas review.  *See, e.g., Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("[E]rrors in post-conviction proceedings are outside the scope of federal habeas corpus review."); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854-55 (6th Cir. 2017) (declining to revisit issue).   "'[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody.'"  *Id.* (quoting *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)).   Challenges to post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Kirby*, 794 F.2d at 247.  A due process claim related to collateral post-conviction proceedings, therefore, even if resolved in a petitioner's favor, would not "result [in] ... release or a reduction in ... time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention."  *Id.*  Accordingly, such claims cannot be brought in federal habeas proceedings.  *Id.* at 246.

This claim, therefore, is denied.

**X.      Twelfth Ground for Relief:** *Insufficient Evidence*

Roberts has withdrawn this claim.  (Doc. 24 at 70.)

**XI.     Thirteenth Ground for Relief:** *Jury Composition*

For her thirteenth ground for relief, Roberts claims that the trial court violated her Sixth Amendment right to a jury that represents a fair cross-section of her community (Trumbell County, Ohio) and her Fourteenth Amendment rights to due process and equal protection when it failed to ensure the inclusion of African Americans on the venire panel and jury.  (Doc. 10 at 131-34.)  Respondent asserts that this claim is procedurally defaulted and waived.  (Doc. 26 at 21-22.)

**A.  Procedural Posture**

Roberts raised this claim in her first post-conviction petition and sought discovery related to the claim.  (Doc. 12-11 at 39-40; 251-61.)  The court denied Roberts' amended petition without an evidentiary hearing and overruled her motion for discovery as moot.  (*Id.* at 262-76.)  Roberts appealed that judgment.  (Doc. 12-12 at 22-25.)  The court of appeals dismissed the appeal for lack of jurisdiction because, on direct appeal, the Ohio Supreme Court had vacated the final judgment underlying Roberts' convictions and sentence and remanded to the trial court for resentencing.  *Roberts*, 2007 WL 3052212, at *1-2.

Roberts then raised the claim in a second post-conviction petition.  (Doc. 12-13 at 38-40.)  The trial court denied the petition without discovery or an evidentiary hearing.  (*Id.* at 347-52.)  Roberts did not appeal the trial court's dismissal of this claim.

As Respondent argues, this claim is procedurally defaulted.  (Doc. 15 at 56-57.)  The trial court on successive post-conviction review, the last state court to consider the claim,

stated that "[i]n addition [to its ruling on the claim's merits], the Court finds a claim challenging the racial venire of either the jury or the grand jury could have and should have been raised in the initial direct appeal of this matter.  Therefore, the claim is now barred by res judicata." (Doc. 12-13 at 349.)  In addition, Roberts failed to raise the claim in every level of state court, resulting in the claim's default for a lack of fair presentation.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (habeas petitioners fully exhaust claims by giving state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process").  Moreover, Roberts can no longer present this claim due to Ohio's filing deadlines, post-conviction procedures, and *res judicata* rules.  *See, e.g., State v. Nichols*, 11 Ohio St. 3d 40, 43 (Ohio 1984) ("[W]e hold a delayed appeal pursuant to App. R. 5(A) is not available in the appeal of a post-conviction relief determination . . . .").

In response, Roberts argues that the court improperly asserted *res judicata* because this claim cannot be proven without resort to evidence outside the trial-court record.  (Doc. 24 at 72.)  *See, e.g., Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007) (federal habeas courts can "decline[] to observe Ohio's procedural bar and instead . . . proceed[] to the merits of an ineffective-assistance claim when [they] conclude[] that Ohio improperly invoked its res judicata rule").  But, as explained above, the claim also is defaulted because Roberts failed to raise it in the state appellate court.

Roberts further argues that even if the claim is defaulted, the default was caused by Ohio's post-conviction system, which does not facilitate the court-ordered factual development necessary for petitioners to support a fact-intensive claim like this one.  (Doc. 24 at 72.)

Regardless, the Court declines to resolve this procedural matter as this claim can easily be resolved on the merits.  *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner"); *see also* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits).[13]

## B.  Merits Analysis

Even if Roberts had properly presented this claim to state courts, it would fail.  The trial court on post-conviction review was the last state court to review this claim on the merits. It stated:

> Roberts asserts, without any evidence whatsoever in support, that the jury pool and the grand jury pool was underrepresented by race. However, Roberts concedes that she has no evidentiary support to establish such claims. Roberts requested additional discovery in an effort to establish such as well as an evidentiary hearing. However, the Court finds Roberts is not entitled to discovery or an evidentiary hearing. In fact, the duty to come forth with evidence in this statutorily-defined process is on the Defendant. "Instead, the burden is on the petitioner to submit evidentiary documents containing sufficient operative facts to demonstrate his claim and to merit a hearing. It is well established that the power to conduct and compel discovery is not included within the trial court's statutorily-defined authority." *State v. Lorraine*, 1996 WL 207676 *5, 11th Dist. No. 95-T-5196.
>
> . . .
>
> Accordingly, the claims regarding an inappropriate jury or Grand jury pool are found to be not well taken and the same are hereby denied without a hearing.

(Doc. 12-13 at 348-49.)

The Sixth Amendment guarantees criminal defendants a jury selected from a fair cross-section of the community.  *Duren v. Missouri,* 439 U.S. 357 (1979).

---

[13] Roberts also requests that the Court, "upon Ms. Roberts's motion, [] stay the case and permit her to return to state court for exhaustion and a full hearing on the claim."  (Doc. 24 at 71.)  The Court also declines to address this issue, as Roberts has not filed a motion for stay and abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005).

The *Duren* Court set forth three criteria necessary to establish a *prima facie* violation of the fair-cross-section requirement: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364.  Even if a defendant has established a *prima facie* fair-cross-section violation, the government may overcome the right to a proper jury by proffering a significant state interest that manifestly and primarily advances "those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68.

The selection of juries also must comply with the Equal Protection Clause of the Fourteenth Amendment. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994).  The Supreme Court has long recognized that racial exclusions and substantial underrepresentation in juries deny defendants equal protection under the law. *Castaneda v. Partida*, 430 U.S. 482, 492-93 (1977).  Traditionally, to show that an equal protection violation has occurred in this context, the defendant must satisfy the three-part test established in the Supreme Court decision *Castaneda v. Partida*. *United States v. Ovalle,* 136 F.3d 1092, 1104 (6th Cir. 1998).  The defendant must demonstrate: (1) "'the group excluded from the grand jury is one that is a recognizable, distinct class capable of being singled out for different treatment under the laws'"; (2) the selection procedure was "'susceptible to abuse or is not racially neutral'"; and (3) "'the degree of underrepresentation occurring over a significant period of time by comparing the proportion of the excluded group in the total population to the proportion serving as grand jurors.'" *Id.* (quoting *Jefferson v. Morgan,* 962 F.2d 1185, 1188-89 (6th Cir.

1992)).  Once a defendant has established a *prima facie* case, the burden shifts to the state to rebut the inference of intentional discrimination.  *Id*. (quoting *Jefferson*, 962 F.2d at 1189).

Roberts' claim that the trial court's ruling violated the Constitution fails, whether asserted under the Sixth or Fourteenth Amendment.  She claims that the "simple math" in the evidence that was before the trial court "strongly supports" her claim.  (Doc. 24 at 72.)  She cites to the record to show that there were 300 people initially in the jury pool.  (Doc. 11-1 (Trial Tr.) at 348.)  Her remaining factual allegations rely on her own recollection of the jury-selection process, attested to in her affidavit filed in support of her second post-conviction petition, because, she states, race was not disclosed in the voir dire process.  (Doc. 12-13 (2nd Post-Conv. Pet) at 77 (Roberts Aff., Ex. D).)  Roberts recalls that there were "at least two or three" Black members of the venire and no Black jurors on the seated jury, and the State used peremptory challenges to excuse two potential Black jurors with no objection from the defense.  (*Id*.)  Roberts further states, with no support, that African Americans comprised 7.9 percent of Trumbull County's population at the time of trial, resulting in an estimate of 24 African Americans who she claims should have appeared in the jury pool.  (Doc. 10 at 133.)

As the state court observed, however, a great deal more evidence is required to prevail on these constitutional claims of due process, equal protection and fair cross-section, than Roberts has set forth.  Roberts does not allege any constitutional defect in her jury's selection process.  She does not argue that there was a systematic exclusion of African Americans from the procedures; or a feature of the scheme that made it susceptible to abuse or not racially neutral; or that African Americans were underrepresented on juries for a significant period of time in comparison to the group's percentage of the total county population.  She cites only

the "simple math" of "at least two or three" Black potential jurors in the jury pool and no Black jurors in a community with a 7.9 percent African-American population.

Roberts also cites no clearly established Supreme Court precedent imposing an obligation on a trial court to effectuate the representation of any particular group on a jury. And for good reason: the Supreme Court has held the exact opposite. In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Court stated, "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id*. at 538. Criminal defendants, it declared, "are not entitled to a jury of any particular composition" as long as "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id*.; *see also Ballard v. United States*, 329 U.S. 187, 192 (1946) (noting that the fair-cross-section requirement "does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible").

Accordingly, Roberts' jury-composition claim is without merit.

## XII.    Fourteenth Ground for Relief:  *Constitutionality of Death Penalty*

Roberts' fourteenth ground for relief challenges Ohio's death penalty scheme as violating the Fifth, Sixth, Eighth, and Fourteenth Amendments.   (Doc. 10 at 134-46.) Specifically, she argues that Ohio's statute: (1) imposes arbitrary and unequal sentences; (2) provides unreliable sentencing procedures; (3) contains a provision improperly used to provide the aggravating circumstance for an aggravated-murder charge; (4) precludes a mercy

113

option in some circumstances, resulting in a mandatory death sentence; and (5) fails to meet the recommendations of a task force convened by the Ohio Supreme Court to review Ohio's death penalty.  (*Id.*)  Roberts raised these claims to the Ohio Supreme Court on her first direct appeal, which summarily denied them.  *See Roberts I*, 110 Ohio St. 3d at 92.  The claims, therefore, are preserved for habeas review.

The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Glossip v. Gross*, 576 U.S. 863, 881 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976).  Moreover, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death penalty scheme in particular, rejecting many of the claims Roberts asserts here.  *See Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008) ("Beuke next challenges the constitutionality of Ohio's death penalty scheme.  His arguments are entirely meritless and have been rejected by this court on numerous occasions.  We therefore will afford them minimal attention."); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010); *Cooey v. Coyle,* 289 F.3d 882, 928 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 367-76 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Jamison v. Collins*, 100 F. Supp. 2d 647, 759-67 (S.D. Ohio 2000).

The Court nonetheless will address each of Roberts' claims individually.

### A.  Arbitrary and Unequal Punishment

Roberts first claims that Ohio's death penalty scheme violates the Fourteenth Amendment's guarantee of equal protection, because it allows the death penalty to be imposed in an arbitrary and discriminatory manner.  (Doc. 10 at 135-38.)  The Sixth Circuit

repeatedly has rejected this argument.  *See, e.g., Buell*, 274 F.3d at 367; *Byrd*, 209 F.3d at 539.

It has explained:

> We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. In *Gregg*, the Court stated that the concerns expressed in *Furman* could be met by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195, 96 S.Ct. 2909. By complying with this requirement, the Ohio death penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the death penalty and does not run afoul of the Constitution.

*Buell*, 274 F.3d at 367.  This claim fails.

### B.  Unreliable Sentencing Procedures

Roberts next argues that Ohio's death penalty statute violates the Equal Protection and Due Process Clauses by not requiring the state to prove the absence of any mitigating factors or that death is the only appropriate penalty.  (Doc. 10 at 138-39.)  She also asserts that it is unconstitutionally vague in defining the process of weighing aggravating and mitigating circumstances and in defining mitigating circumstances.  (*Id*.)  The Sixth Circuit has squarely rejected these arguments as well.  *See, e.g., Buell*, 274 F.3d at 368.  These claims, therefore, also are unfounded.

### C.  Improper Aggravating Circumstance

Roberts further attacks the so-called felony-murder provision of Ohio's death penalty scheme, Ohio Rev. Code § 2929.04(A)(7), under which a murderer is death-eligible if the murder was committed while committing or attempting to commit certain felonies.  (Doc. 10

at 139-41.)  She contends that the provision fails to "'genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of (aggravated) murder[,]'" because it means that if a defendant commits murder during the commission of a felony, the felony can elevate a murder to aggravated murder *and* serve as an aggravating circumstance, making the defendant eligible for the death penalty without proof of an additional new factor. (*Id*. (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).)

The Sixth Circuit has found no such problematic overlap.  It has explained that § 2929.04(A)(7) also requires that the defendant "'either was the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation or design.'"  *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000) (quoting Ohio Rev. Code § 2929.04(A)(7)).  And the Ohio Supreme Court has held that "this language is distinct from the definition of felony murder, because in addition to causing a death during a felony, the defendant must also be proved to have caused the death personally and directly or in a premeditated manner."  *Id*. (citations omitted).  This claim, therefore, also lacks merit.

### D.  Lack of Mercy Option or Appropriateness Analysis

Roberts also argues that Ohio's capital punishment scheme is unconstitutional because it precludes "a mercy option" in the absence of mitigation or when aggravating circumstances outweigh the mitigating factors, resulting in a mandatory death penalty in those situations. (Doc.  10 at 141-43.)  But the Supreme Court has never clearly established that any type of "mercy option" in capital sentencing is constitutionally required.  In fact, it has twice declined to find unconstitutional instructions directing jurors not to be influenced by sympathy, mercy,

116

or passion in deciding on the appropriate sentence for the capital defendant.  *See Saffle v. Parks*, 494 U.S. 484, 490 (1990); *California v. Brown*, 479 U.S. 538, 539 (1987); *see also Austin v. Bell*, 927 F. Supp. 1058, 1064–65 (M.D. Tenn. 1996).  This claim, too, lacks merit.

### E.  Ohio Joint Task Force Recommendations

Finally, Roberts cites to several recommendations contained in a report of the Joint Task Force to Review the Administration of Ohio's Death Penalty – published in April 2014 and submitted to Maureen O'Connor, Chief Justice of the Ohio Supreme Court, and the Ohio State Bar Association – to demonstrate that Ohio's capital punishment statutory scheme is flawed.  (Doc. 10 at 144-46.)  This Court, however, has no authority to grant habeas relief based on these extrajudicial factual findings, and this claim fails as well.  *Accord Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2015 WL 2341094, at *45 (S.D. Ohio May 14, 2015), *aff'd*, 846 F.3d 832 (6th Cir. 2017).

Roberts' fourteenth ground for relief, therefore, lacks merit.

## XIII.  Fifteenth Ground for Relief:  *Cumulative Error*

Roberts asserts in her fifteenth ground for relief that cumulative error at her trial violated her constitutional rights.  (Doc. 10 at 146-48.)  Respondent argues this claim is "boilerplate" and meritless.  (Doc. 15 at 59.)  This Court agrees.  The Sixth Circuit repeatedly has held that a claim of cumulative trial error is not cognizable on federal habeas review.  *See, e.g., Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue.").  This ground for relief, therefore, is denied.

**CERTIFICATE OF APPEALABILITY ANALYSIS**

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Roberts' grounds for relief.  The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (3) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right.  *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: Two (ineffective assistance/mitigation); Three (ineffective assistance/mitigation waiver); Four (ineffective assistance/Jackson defense and opening and closing arguments in guilt phase); Five (pretrial publicity); Six (juror bias); Seven (competency/2007 resentencing); Eight (sentencing error); Nine (mitigation waiver); Ten (substitute judge); Thirteen (jury selection); and Fourteen (death penalty).  No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief Four (ineffective assistance/*Batson* objection and right to testify) and Seven (competency/trial), because they are unequivocally procedurally defaulted.

In addition, no COA will issue for grounds for relief Eleven (state post-conviction procedure) and Fifteen (cumulative error), because they are not cognizable on federal habeas review.

The Court will issue a COA for Roberts' ground for relief One (exclusion of mitigation evidence at resentencing).  A reasonable jurist could debate the Court's conclusions regarding this claim.

## CONCLUSION

For the foregoing reasons, this Court denies Roberts' Petition for Writ of Habeas Corpus (Doc. 10).  The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to the first ground for relief, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to that claim only.  As to all remaining claims, the Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.

Dated: August 15, 2023

DAN AARON POLSTER
UNITED STATES DISTRICT JUDGE